# EXHIBIT 4

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

| | |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, Jr.,** | **COMPLAINT AND APPLICATION FOR SPECIAL LEAVE TO FILE QUO WARRANTO COMPLAINT** |
| **Plaintiff,** | |
| **-vs-** | **EXPEDITED CONSIDERATION REQUESTED** |
| **CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,** | **FILE NO: 20-_____-AW** |
| | **JUDGE** |
| **Defendants.** | |

_____/

**David A. Kallman          (P34200)**
**Erin E. Mersino          (P70886)**
**Jack C. Jordan          (P46551)**
**Stephen P. Kallman          (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

**There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.**

EXHIBIT 3

## APPLICATION FOR SPECIAL LEAVE TO FILE
## QUO WARRANTO COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their application for leave to file a complaint for quo warranto relief, and for their complaint, hereby states as follows:

1.      Pursuant to MCL 600.4545(2), Plaintiffs respectfully request that this Honorable Court grant them special leave to file Counts II and III of this complaint for quo warranto for all the reasons as stated in their complaint, motion for temporary restraining order, supporting affidavits, exhibits, and accompanying brief, which are all incorporated herein by reference.

2.      Plaintiffs request this relief as recognized in *Shoemaker v City of Southgate*, 24 Mich App 676, 680 (1970).

**WHEREFORE,** Plaintiffs request that his application for special leave to file Counts II and III of this complaint for quo warranto relief be granted and that this Honorable Court grant such other and further relief as appropriate.

Dated: November 8, 2020.

           */s/ David A. Kallman*
           David A. Kallman        (P34200)
           Attorney for Plaintiffs

## COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.** (hereinafter "Plaintiff")**,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their Complaint hereby states as follows:

## INTRODUCTION

1.      The election was held on November 3, 2020 and approximately 850,000 votes were

EXHIBIT 3

reported as cast in Wayne County, Michigan.

2.     Plaintiff brings this action to raise numerous issues of fraud and misconduct that occurred in order to protect the rights of all voters in Michigan, especially Wayne County.

3.     In summary, this Complaint raises numerous instances of fraud, including, but not limited to:

    a.   Defendants systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets. When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted.

    b.   Defendants instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.

    c.   After election officials announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in trays at the TCF Center. There were tens of thousands of these absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates.

    d.   Defendants instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline.

    e.   Defendants systematically used false information to process ballots, such as using incorrect or false birthdays. Many times, the election workers inserted new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900.

    f.   On a daily basis leading up to the election, City of Detroit election workers and

EXHIBIT 3

employees coached voters to vote for Joe Biden and the Democrat party. These workers and employees encouraged voters to do a straight Democrat ballot. These election workers and employees went over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

g.  Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes.

h.  Defendant election officials and workers refused to record challenges to their processes and removed challengers from the site if they politely voiced a challenge.

i.  After poll challengers started discovering the fraud taking place at the TCF Center, Defendant election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

j.  Defendant election officials and workers allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate.  In fact, election officials and workers repeatedly obstructed poll challengers from observing. Defendants permitted thousands of ballots to be filled out by hand and duplicated on site without oversight from poll challengers.

**PARTIES, JURISDICTION, AND VENUE**

4.  Plaintiff Cheryl A. Costantino is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

5.  Plaintiff Edward P. McCall, Jr. is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

6.  Defendant City of Detroit is a municipality located in Wayne County tasked with

EXHIBIT 3

the obligation to hold all elections in a fair and legal manner.

7.     Defendant Election Commission is a department of the City of Detroit.

8.     Janice M. Winfrey, in her official capacity, is Clerk of the Defendant City of Detroit and the Chairman of the Defendant Detroit City Election Commission and is the city official who oversees and supervises all elections in the City of Detroit.

9.     Cathy M. Garrett, in her official capacity, is the Clerk of Defendant Wayne County, and is the county official who oversees and supervises all elections in Wayne County.

10.     Defendant Wayne County Board of Canvassers is the appointed body that is responsible for canvassing the votes cast within the county they serve. The Board members certify elections for all local, countywide and district offices which are contained entirely within the county they serve.

11.     This action is properly filed in Wayne County Circuit Court pursuant to MCR 3.306(A)(2), Mich. Const. art. 2, sec. 4, par. 1(h), MCL 600.4545, and MCL 600.605. Venue is proper pursuant to MCR 3.306(D).

## GENERAL ALLEGATIONS

12.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County.

13.     The TCF Center was the only facility within Wayne County authorized to count the ballots.

### Forging Ballots on the Qualified Voter List

14.     An attorney and former Michigan Assistant Attorney General was a certified poll challenger at the TCF Center (Exhibit A – Affidavit of Zachary Larsen).

15.     As Mr. Larsen watched the process, he was concerned that ballots were being

EXHIBIT 3

processed without confirmation that the voter was an eligible voter in the poll book because of information he had received from other poll challengers (Exhibit A).

16.     Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted. An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen (Exhibit A).

17.     Mr. Larsen was concerned that this practice of assigning names and numbers indicated that a ballot was being counted for a non-eligible voter who was not in either the poll book or the supplemental poll book. From his observation of the computer screen, the voters were not in the official poll book. Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned (Exhibit A).

18.     Because of Mr. Larsen's concern, he stepped behind the table and walked over to a spot behind where the first official was conducting her work. Understanding health concerns due to COVID-19, he attempted to stand as far away from this official as he reasonably could while also being able to visually observe the names on the supplemental poll book and on the envelopes (Exhibit A).

19.     As soon as Mr. Larsen moved to a location where he could observe the process by which the first official at this table was confirming the eligibility of the voters to vote, the first official immediately stopped working and glared at him. He stood still until she began to loudly and aggressively tell him that he could not stand where he was standing. She indicated that he needed to remain in front of the computer screen where he could not see what the worker was doing (Exhibit A).

EXHIBIT 3

20.    Both officials then began to tell Mr. Larsen that because of COVID, he needed to be six feet away from the table. He responded that he could not see and read the supplemental poll book from six feet away, and that he was attempting to keep his distance to the extent possible (Exhibit A).

21.    Just minutes before at another table, a supervisor had explained that the rules allowed Mr. Larsen to visually observe what he needed to see and then step back away. Likewise, on Election Day, he had been allowed to stand at equivalent distance from poll books in Lansing and East Lansing precincts without any problem. With this understanding, he remained in a position to observe the supplemental poll book (Exhibit A).

22.    Both officials indicated that Mr. Larsen could not remain in a position that would allow him to observe their activities; the officials indicated they were going to get their supervisor (Exhibit A).

23.    When the supervisor arrived, she reiterated that Mr. Larsen was not allowed to stand behind the official with the supplemental poll book, and he needed to stand in front of the computer screen. Mr. Larsen told her that was not true, and that he was statutorily allowed to observe the process, including the poll book (Exhibit A).

24.    The supervisor then pivoted to arguing that Mr. Larsen was not six feet away from the first official. Mr. Larsen told her that he was attempting to remain as far away as he could while still being able to read the names on the poll book (Exhibit A).

25.    The supervisor then stood next to the chair immediately to the left of the first official and indicated that Mr. Larsen was "not six feet away from" the supervisor and that she intended to sit in the chair next to the official with the poll book, so he would need to leave (Exhibit A).

EXHIBIT 3

26.     This supervisor had not been at the table at any time during the process, and she had responsibility for numerous ACVBs. Further, the supervisor's choice of chairs was approximately three feet to the left of the first official and therefore in violation of the six-foot distance rule (Exhibit A).

27.     Accordingly, Mr. Larsen understood that this was a ruse to keep him away from a place where he could observe the confirmation of names in the supplemental poll book. The supervisor began to repeatedly tell him that he "needed to leave" so he responded that he would go speak with someone else and fill out a challenge form (Exhibit A).

28.     After Mr. Larsen observed and uncovered the fraud that was taking place and had the confrontation with the supervisor, he left the counting room to consult with another attorney about the matter around 1:30 p.m. to 2:00 p.m. (Exhibit A).

29.     It was at this point that election officials stopped permitting any further poll challengers to enter the counting room, including Mr. Larsen (Exhibit A).

30.     Election officials never allowed Mr. Larsen to re-enter the counting room to fulfill his duties as a poll challenger after he had discovered the fraud which was taking place.

### Illegal Voter Coaching and Identification Issues

31.     An election employee with the City of Detroit was working at a polling location for approximately three weeks prior to the election. This City of Detroit employee directly observed, on a daily basis, other City of Detroit election workers and employees coaching voters to vote for Joe Biden and the Democrat party. This employee witnessed these workers and employees encouraging voters to do a straight Democrat ballot and witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote (Exhibit B – Affidavit of Jessy Jacob).

EXHIBIT 3

32.     During the last two weeks while this same employee was working at the polling location, she was specifically instructed by her supervisor never to ask for a driver's license or any photo I.D. when a person was trying to vote (Exhibit B).

**Changing Dates on Ballots**

33.     All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020 (Exhibit B).

34.     On November 4, 2020, a City of Detroit election worker was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. She was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. She estimates that this was done to thousands of ballots (Exhibit B).

**Illegal Double Voting**

35.     The election employee observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot (Exhibit B).

36.     This would permit a person to vote in person and also send in his/her absentee ballot.

37.     Prior to the election, the Michigan Secretary of State sent ballot applications to deceased residents and to non-residents of the State of Michigan.

EXHIBIT 3

**First Round of New Ballots**

38. At approximately 4:00 a.m. on November 4, 2020, tens of thousands of ballots were suddenly brought into the counting room through the back door (Exhibit C – Affidavit of Andrew Sitto).

39. These new ballots were brought to the TCF Center by vehicles with out-of-state license plates (Exhibit C).

40. It was observed that all of these new ballots were cast for Joe Biden (Exhibit C).

**Second Round of New Ballots**

41. The ballot counters were required to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list; this was the list of all persons who had registered to vote on or before November 1, 2020 and is often referred to as the QVF (Exhibit D - Affidavit of Bob Cushman)

42. The ballot counters were also provided with Supplemental Sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020 (Exhibit C).

43. The validation process for a ballot requires the name on the ballot to be matched with a registered voter on either the QVF or the Supplemental Sheets.

44. At approximately 9:00 p.m. on Wednesday, November 4, 2020, numerous boxes of ballots were brought to TCF Center (Exhibit D).

45. Upon information and belief, the Wayne County Clerk's office instructed the ballot counters to use the date of birth of January 1, 1900 on all of these newly appearing ballots.

46. None of the names of these new ballots corresponded with any registered voter on

EXHIBIT 3

the QVF or the Supplemental Sheets (Exhibit D).

47.     Despite election rules that required that all absentee ballots be inputted into the QVF system before 9:00 p.m. on November 3, 2020 (Exhibit B), the election workers inputted all of these new ballots into the QVF and manually added each voter to the list after 9:00 p.m. (Exhibit D).

48.     Upon information and belief, the vast majority of these new ballots indicated the voter's date of birth as January 1, 1900 entered into the QVF (Exhibit D).

49.     These newly received ballots were either fraudulent or apparently cast by persons who were not registered to vote prior to the polls closing at 8:00 p.m. on November 3, 2020.

### No Transparency - Denied Access

50.     Numerous election challengers were denied access to observe the counting process by the Defendants.

51.     After denying access to the counting rooms, election officials used large pieces of cardboard to block the windows to the counting room thereby preventing anyone from watching the ballot counting process (Exhibit C).

### Qualified Voter File Access

52.     Whenever an absentee vote application or in-person absentee voter registration was finished, election workers were instructed to input the voter's name, address, and date of birth into the QVF system (Exhibit B).

53.     The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with internet access (Exhibit B).

54.     This access permits anyone with the proper credentials to edit when ballots were

EXHIBIT 3

sent, received, and processed from any location with internet access (Exhibit B).

56. Many of the counting computers within the counting room had icons that indicated that they were connected to the internet (Exhibit F – Affidavit of Patrick J. Colbeck).

**Absentee Ballot Signatures**

56. Whenever a person requested an absentee ballot either by mail or in-person, that person was required to sign the absentee voter application.

57. When the voter returned his/her absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

58. Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.

59. Election officials at the TCF Center instructed workers to never validate or compare the signatures on absentee applications and the absentee envelopes to ensure their authenticity and validity (Exhibit B).

**Unsecured Ballots**

60. A poll challenger witnessed tens of thousands of ballots being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container (Exhibit E – Affidavit of Daniel Gustafson).

61. Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops (Exhibit E).

62. Contrary to law, these ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal (Exhibit E).

<u>COUNT I – CONSTITUTIONAL RIGHT TO ACCURACY AND INTEGRITY OF ELECTIONS
MICHIGAN CONSTITUTION – ARTICLE 2, SECTION 4, PARAGRAPH 1(H)</u>

63. Paragraphs 1 through 62 are hereby incorporated by reference as if fully restated

EXHIBIT 3

herein.

64.     Plaintiff brings this action to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

65.     The Mich. Const., art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

66.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

### COUNT II – STATUTORY QUO WARRANTO CLAIM – ELECTION FRAUD
### MCL 600.4545(2); MCL 168.861

67.     Paragraphs 1 through 66 are hereby incorporated by reference as if fully restated herein.

68.     MCL 600.4545(2) permits an action to request the issuance of a writ of quo warranto if the action is brought within 30 days after the election upon the request of "any citizen of the county by special leave of the court or a judge thereof."

69.     The statute also requires this action to "be brought against the municipality wherein such fraud or error is alleged to have been committed."

70.     Quo Warranto may be brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes before a recount pursuant to MCL 168.861, which states,

EXHIBIT 3

For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.

71.     Based upon the allegations contained herein, material fraud or error occurred in this election so that the outcome of the election was affected.

72.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

<u>**COUNT III – COMMON LAW QUO WARRANTO CLAIM – ELECTION FRAUD**</u>

73.     Paragraphs 1 through 72 are hereby incorporated by reference as if fully restated herein.

74.     MCR 3.306(B)(2) permits an action to request the issuance of a writ of quo warranto.

75.     An application to proceed by quo warranto must disclose sufficient facts and grounds and sufficient apparent merit to justify further inquiry.

76.     Quo warranto is warranted whenever it appears that material fraud or error has been committed at any election. This type of action is brought to challenge the validity of the election itself. *Barrow v Detroit Mayor*, 290 Mich App 530, 543 (2010). For all the reasons stated herein and in the attached affidavits, material fraud or error was committed during the election.

77.     This Quo Warranto claim is brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes.

78.     Based upon the allegations contained herein, material fraud or error occurred in this

EXHIBIT 3

election so that the outcome of the election was affected.

79.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

### COUNT IV – EQUAL PROTECTION VIOLATION
### Mich Const, art I, § 2.

80.     Paragraphs 1 through 79 are hereby incorporated by reference as if fully restated herein.

81.     The Equal Protection Clause of the Michigan Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights."  Mich Const, art I, § 2.

82.     The right to vote is a fundamental civil right and a political right.

83.     The Equal Protection Clause forbids election officials granting the right to vote on equal terms but later devaluing a person's vote through failing to use specific standards and uniform rules.

84.     Only specific standards and uniform rules provide sufficient guarantees of equal treatment.

85.     Every person has the right to vote, with their vote counted as one vote, and not have his or her vote diluted and voided out by the counting of an illegal vote.

86.     Defendants handling of the election, as described above and as described in the attached affidavits, establish how rampant and systemic fraud devalued and diluted Plaintiff's civil and political rights.

EXHIBIT 3

87.     The illegal procedures, illegal standards, and illegal treatment of the ballots and the counting of ballots in Wayne County and in Detroit employed by Defendants unconstitutionally burden the fundamental right to vote.

88.     Defendants have no legitimate interest in counting illegal and improper ballots, counting ballots more than once, illegally correcting and improperly duplicating ballots, adding false birthdates and voter information to ballots, and improperly handling the collection and counting of ballots in a way that dilutes and cancels out rightfully and properly cast votes.

89.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

## COUNT V – STATUTORY ELECTION LAW VIOLATIONS

90.     Paragraphs 1 through 89 are hereby incorporated by reference as if fully restated herein.

### Violation of MCL 168.765a.

91.     Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

92.     Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were

EXHIBIT 3

cast.

93.     Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots.  Defendants even physically blocked and obstructed election inspectors from the Republican party, including Plaintiff, by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

### Violation of MCL 168.733

94.     MCL 168.733 requires:

(1) The board of election inspectors shall provide space for the challengers within the polling place that enables the challengers to observe the election procedure and each person applying to vote. A challenger may do 1 or more of the following:
        (a) Under the scrutiny of an election inspector, inspect without handling the poll books as ballots are issued to electors and the electors' names being entered in the poll book.
        (b) Observe the manner in which the duties of the election inspectors are being performed.
        (c) Challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector.
        (d) Challenge an election procedure that is not being properly performed.
        (e) Bring to an election inspector's attention any of the following:
        (i) Improper handling of a ballot by an elector or election inspector.
        (ii) A violation of a regulation made by the board of election inspectors pursuant to section 742.
        (iii) Campaigning being performed by an election inspector or other person in violation of section 744.
        (iv) A violation of election law or other prescribed election procedure.
        (f) Remain during the canvass of votes and until the statement of returns is duly signed and made.
        (g) Examine without handling each ballot as it is being counted.
        (h) Keep records of votes cast and other election procedures as the challenger desires.

EXHIBIT 3

(i) Observe the recording of absent voter ballots on voting machines.

95.     Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to  observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud.

96.     Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

97.     Michigan law requires that in order to register as an absentee voter, the application must be made in writing and received by the clerk by 5pm on the Friday before the election.

**Violation of MCL 168.765(5)**

98.     Michigan election law, MCL 168.765(5), requires Defendants to post the following absentee voting information anytime an election is conducted which involves a state or federal office:

a.     The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.

EXHIBIT 3

      b.     The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.

      c.     The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

99.     Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

100.     Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

101.     Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

102.     Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol.

103.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

EXHIBIT 3

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court:

A.     issue an order requiring Defendants to conduct an independent and non-partisan audit to determine the accuracy and integrity of the November 3, 2020 election;

B.     issue an *ex-parte* TRO prohibiting Defendants' from certifying the election results or continuing to count ballots until this matter can be heard by the Court.

C.     issue an preliminary injunction prohibiting Defendants' from certifying the election results until this matter can be heard by the Court.

D.     issue an order voiding the November 3, 2020 election results and order a new election to be held.

E.     Issue a protective order as requested in the attached Motion for TRO.

F.     grant such other and further relief as is equitable and just, and grant him costs, expenses and attorney fees incurred in having to bring this action.

EXHIBIT 3

Great Lakes Justice Center

**I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.**

Dated: November 8, 2020.

_____
Cheryl A. Constantino, Plaintiff

Dated: November 8, 2020.

*Edward P. McCall*
_____
Edward P. McCall, Plaintiff

Prepared By:

*/s/ David A. Kallman*
_____
David A. Kallman      (P34200)
Stephen P. Kallman      (P75622)
Jack C. Jordan      (P46551)
Erin E. Mersino      (P70886)
Attorneys for Plaintiff

EXHIBIT 3

I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

Dated: November 8, 2020.

Cheryl A. Costantino, Plaintiff

Dated: November 8, 2020.

Edward P. McCall, Plaintiff

Prepared By:

*/s/ David A. Kallman*
David A. Kallman          (P34200)
Stephen P. Kallman        (P75622)
Jack C. Jordan            (P46551)
Erin E. Mersino           (P70886)
Attorneys for Plaintiff

Great Lakes Justice Center

21

EXHIBIT 3

# EXHIBIT A

EXHIBIT 3

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,**

**Plaintiff,**

-vs-

**CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,**

**Defendants.**

/

**AFFIDAVIT OF ZACHARY LARSEN**

**FILE NO: 20-_____-AW**

**JUDGE**

| | |
|---|---|
| David A. Kallman | (P34200) |
| Erin E. Mersino | (P70886) |
| Jack C. Jordan | (P46551) |
| Stephen P. Kallman | (P75622) |

**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

## AFFIDAVIT

The Affiant, Zachary Larsen, being first duly sworn, hereby deposes and states as follows:

1.      My name is Zachary Larsen, I am over the age of eighteen, have personal knowledge of the facts stated in this Affidavit and, if sworn as a witness, I am competent to testify to these facts.

EXHIBIT 3

2.      I am an attorney in private practice and licensed in the State of Michigan. Prior to my entry into private practice, I served as an Assistant Attorney General for eight years from January 2012 through January 2020, where I was recognized with an award for the quality of my work and served the state on several high-priority litigation matters.

3.      In September 2020, I volunteered to serve as a poll challenger for the Michigan Republic Party's election day operations to ensure the integrity of the vote and conformity of the election process to the election laws of Michigan.

4.      In preparation for my service, I attended an elections training, reviewed materials relating to the conduct of elections, and read pertinent sections of Michigan's election law.

5.      On Election Day, Tuesday, November 3, 2020, I served as a roving attorney and credentialed poll challenger with a group of attorneys and visited approximately 20-30 voting precincts in Lansing, East Lansing, and Williamston, Michigan to confirm that the election was conducted in accordance with law, and on a few occasions, to address complaints raised by specific voters.

6.      During my visits to precincts on Election Day, I was allowed to visually inspect the poll book without touching it at every precinct where we asked to review it. In each instance, I was allowed to stand a respectful distance behind the election officials while remaining close enough to read relevant names and numbers.

7.      The following day, on Wednesday, November 4, 2020, I arrived at the former Cobo Center, now known as the TCF Center, in Detroit, Michigan to serve as a poll challenger for the absent voter count occurring in Detroit and arrived between 9:30 and 9:45 a.m.

EXHIBIT 3

8. Prior to my admission to the floor where the absent voter count was occurring, I received credentials from the Michigan Republican Party and further instruction regarding the process for handling ballots at absent voter counting boards ("AVCBs").

9. Thereafter, I received a temperature scan from election officials that confirmed I did not have an elevated temperature. I arrived inside, and I was "checked in" by an election official who reviewed my driver's license and confirmed my credentials and eligibility to serve as a challenger. I was admitted at approximately 10:30 a.m.

10. When I arrived at a counting table and began to observe the process, I noticed immediately that part of the process that was being implemented did not conform to what I had been told in my training and the materials that I had received.

11. Specifically, the information I had received described the process that was supposed to be occurring at the tables as follows.

12. A first election official would scan a ballot. If the scan did not confirm a voter in the poll book, that official would then check the voter against a paper copy "supplemental poll book."

13. The official would then read the ballot number to a second election official and hand the ballot to that official, who would remove the ballot (while still in the secrecy sleeve) and confirm the ballot number. That second official would then hand the ballot (in the secrecy sleeve) to a third official who would tear the stub off of the ballot, and place the stub in a ballot stub envelope, then pass the remaining ballot to a fourth official.

14. The fourth official would then remove the ballot from the secrecy sleeve, flatten the ballot to ensure it was capable of processing, and visually inspect for rips, tears, or stains before placing the ballot in the "ballots to be tabulated box." However, if that fourth official identified a

EXHIBIT 3

concern, she would place the ballot back in its envelope and into a "problem ballots" box that required additional attention to determine whether they would be processed and counted. A copy of a diagram that I had received on this process is attached as Exhibit A to this affidavit.

15. What I observed immediately was that the secrecy of the ballot was not being respected.

16. Instead, the second official at the table where I was observing was repeatedly placing her fingers into the secrecy sleeve to separate the envelope and visually peek into the envelopes in a way that would allow her to visually observe the ballot and identify some of the votes cast by the voter.

17. Sometimes, the third official whose job was merely to remove the stub from the ballot would likewise remove the ballot from the secrecy sleeve or otherwise peek to observe the ballot. Sometimes a ballot would be removed completely from the secrecy sleeve and then placed back inside and passed along this process.

18. I conferred regarding this issue with another challenger at a nearby table, and he indicated he had observed similar irregularities regarding the use of the secrecy sleeves.

19. When that challenger raised the issue with a supervisor, and he was immediately asked "why does it matter?" and "what difference does it make?"

20. Beyond the legal requirements for maintaining ballot secrecy, both of us were concerned that the violations of the secrecy of the ballot that we witnessed could be or were being used to manipulate which ballots were placed in the "problem ballots" box.

21. Later that morning, at another table, a challenger identified concerns that ballots were being placed into "problem ballots" boxes purportedly based on the reason that the voter had failed to place the ballot in the secrecy sleeve, while other ballots at the same table were being

EXHIBIT 3

passed along and placed into the "ballots to be tabulated" box that also did not have secrecy sleeves.

22.  I personally observed that several ballots were placed into the "problem ballots" boxed and marked with a sticky note indicating that they were "problem ballots" merely because of the lack of a secrecy sleeve.

23.  When I spoke with a supervisor regarding this issue, he explained that these ballots were being placed in the "problem ballots" box for efficiency.

24.  From my experience at the first table I had visited (addressed in Paragraphs 15 through 17 above), I had also witnessed ballots that were placed into the "ballots to be tabulated" box that had arrived without a secrecy sleeve. So the differentiation among these ballots despite both ballots arriving in secrecy sleeves was perplexing and again raised concerns that some ballots were being marked as "problem ballots" based on who the person had voted for rather than on any legitimate concern about the ability to count and process the ballot appropriately.

25.  Just before noon, I arrived at another table (which I later contemporaneously noted as AVCB # 23), and I conferred with the Republican challenger who had been observing the process from a viewing screen and watching the response of the computer system as ballots were scanned by the first official.

26.  I asked the challenger if she had observed anything of concern, and she immediately noted that she had seen many ballots scanned that did not register in the poll book but that were nonetheless processed. Because she needed to leave for lunch, I agreed to watch her table.

27.  As I watched the process, I was sensitive to her concern that ballots were being processed without confirmation that the voter was an eligible voter in the poll book, so I stood at the monitor and watched.

EXHIBIT 3

28.    The first ballot scanned came in as a match to an eligible voter. But the next several ballots that were scanned did not match any eligible voter in the poll book.

29.    When the scan came up empty, the first official would type in the name "Pope" that brought up a voter by that last name.

30.    I reviewed the running list of scanned in ballots in the computer system, and it appeared that the voter had already been counted as having voted. Then the first official appeared to assign a number to a different voter as I observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen.

31.    That same official would then make a handwritten notation on her "supplemental poll book," which was a hard copy list that she had in front of her at the table.

32.    The supplemental poll book appeared to be a relatively small list.

33.    I was concerned that this practice of assigning names and numbers indicated that a ballot was being counted for a non-eligible voter who was not in either the poll book or the supplemental poll book. From my observation of the computer screen, the voters were certainly not in the official poll book. Moreover, this appeared to be the case for the majority of the voters whose ballots I had personally observed being scanned.

34.    Because of this concern, I stepped behind the table and walked over to a spot behind where the first official was conducting her work.

35.    Understanding health concerns due to COVID-19, I attempted to stand as far away from this official as I reasonably could while also being able to visually observe the names on the supplemental poll book and on the envelopes.

EXHIBIT 3

36.     Partly inhibiting my ability to keep a distance, the tables were situated so that two counting tables were likely a maximum of eight feet apart. In other words, you could not stand more than four feet behind one without being less than four feet from another.

37.     As soon as I moved to a location where I could observe the process by which the first official at this table was confirming the eligibility of the voters to vote, the first official immediately stopped working and glared at me. I stood still until she began to loudly and aggressively tell me that I could not stand where I was standing. She indicated that I needed to remain in front of the computer screen.

38.     I responded, "Ma'am, I am allowed by statute to observe the process." As I did, a Democratic challenger ran towards me and approached within two feet of me, saying "You cannot speak to her! You are not allowed to talk to her." I responded, "Sir, she spoke to me. I was just answering her."

39.     The first official again told me that the only place I was allowed to observe from was at the computer screen. A second official at the table reiterated this. I said that was not true.

40.     Both officials then began to tell me that because of COVID, I needed to be six feet away from the table. I responded that I could not see and read the supplemental poll book from six feet away, but I was attempting to keep my distance to the extent possible.

41.     Just minutes before at another table, a supervisor had explained that the rules allowed me to visually observe what I needed to see and then step back away. Likewise, on Election Day, I had been allowed to stand at equivalent distance from poll books in Lansing and East Lansing precincts without any problem. With this understanding, I remained in a position where I would be able to observe the supplemental poll book until I could do so for the voter whose ballots had just been scanned and did not register in the poll book.

EXHIBIT 3

42.     Both officials indicated that I could not remain in a position that would allow me to observe their activities and they were going to get their supervisor.

43.     This seemed particularly concerning because the Democratic challenger who raised concerns over my verbal response to the official had been positioned behind the second official (the one who confirms ballots as described in Paragraph 13) no further away than I was from the first official at that time and had not been stationed at the computer screen as the officials repeatedly told me was the only place that I could stay.

44.     When the supervisor arrived, she reiterated that I was not allowed to stand behind the official with the supplemental poll book, and I needed to stand in front of the computer screen. I told her that was not true, and that I was statutorily allowed to observe the process, including the poll book.

45.     The supervisor then pivoted to arguing that I was not six feet away from the first official. I told her I was attempting to remain as far away as I could while still being able to read the names on the poll book.

46.     In an attempt to address her concerns, I took a further step away from the table and indicated I would try to keep my distance, and that I thought I was about six feet away from the first official. The supervisor then stood next to the chair immediately to the left of the first official and indicated that I was "not six feet away from" the supervisor and that she intended to sit in the chair next to the official with the poll book, so I would need to leave.

47.     This supervisor had not been at the table at any time during the process, and she had responsibility for numerous ACVBs. Further, the supervisor's choice of chairs was approximately three feet to the left of the first official and therefore in violation of the six-foot distance rule.

EXHIBIT 3

48.     Accordingly, I understood that this was a ruse to keep me away from a place where I could observe the confirmation of names in the supplemental poll book. The supervisor began to repeatedly tell me that I "needed to leave" so I responded that I would go speak with someone else or fill out a challenge form.

49.     I went to find another attorney serving as a challenger and returned to discuss the matter further with the supervisor. When I returned, she reiterated her assertions and insisted that there was nowhere where I could stand in conformity with the six-foot rule that would allow me to observe the supplemental poll book. Ultimately, to avoid further conflict with the supervisor, I agreed that I would leave that counting table and move to another table.

50.     Between 1:30 p.m. and 2 p.m., my colleague and I decided to return to the suite that housed the Republican challengers to get lunch. We left the counting floor and went up to the Republicans second-floor suite.

51.     About 30 to 45 minutes later, an announcement was made that challengers needed to return to the floor. As we attempted to return, we were made aware that the officials admitting people had limited the number of election challengers to another 52 people who would be allowed inside. I displayed my credentials and walked up to near the door where a small crowd was gathering to be let in.

52.     Shortly thereafter, a man came out to announce that no one would be let in (despite the prior announcement) because the room had reached the maximum number of challengers. As he was asked why we would not be let in, he explained that the maximum number of challengers were determined from the number of names on the sign-in sheet, regardless of how many people had left the room.

EXHIBIT 3

53.     Many Republican challengers had left the room for lunch without signing out, including myself and my colleague. Accordingly, we were being arbitrarily "counted" towards this capacity limitation without actually being allowed into the room to observe.

54.     When challengers raised this issue with the man at the door, he refused to discuss any solutions such as confirming the identify of challengers who had been previously admitted.

55.     To the best of my recollection, I was never informed that if I left the room and failed to sign out that I would be refused admission or that there would be no means of confirming that I had been previously admitted.

56.     The above information is true to the best of my information, knowledge, and belief.

57.     Further affiant says not.

_____
Zachary Larsen

On this 8th day of November, 2020, before me personally appeared Zachary Larsen, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by his subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_____
Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

GREAT LAKES JUSTICE CENTER

10

EXHIBIT 3

# EXHIBIT B

EXHIBIT 3

# STATE OF MICHIGAN

# IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

| | |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,** | <u>**AFFIDAVIT OF JESSY JACOB**</u> |
| **Plaintiff,** | **FILE NO: 20-_____-AW** |
| **-vs-** | **JUDGE** |
| **CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,** | |
| **Defendants.** / | |

**David A. Kallman (P34200)**
**Erin E. Mersino (P70886)**
**Jack C. Jordan (P46551)**
**Stephen P. Kallman (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

## <u>AFFIDAVIT</u>

The Affiant, Jessy Jacob, being first duly sworn, hereby deposes and states as follows:

1.   My name is Jessy Jacob.  I am an adult citizen and resident of the State of Michigan.

2.   I have been an employee for the City of Detroit for decades.

3.   I was assigned to work in the Elections Department for the 2020 election.

4.   I received training from the City of Detroit and the State of Michigan regarding the election process.

EXHIBIT 3

5.   I worked at the election headquarters for most of September and I started working at a satellite location for most of October, 2020.

6.   I processed absentee ballot packages to be sent to voters while I worked at the election headquarters in September 2020 along with 70-80 other poll workers. I was instructed by my supervisor to adjust the mailing date of these absentee ballot packages to be dated earlier than they were actually sent. The supervisor was making announcements for all workers to engage in this practice.

7.   At the satellite location, I processed voter registrations and issued absentee ballots for people to vote in person at the location.

8.   I directly observed, on a daily basis, City of Detroit election workers and employees coaching and trying to coach voters to vote for Joe Biden and the Democrat party. I witnessed these workers and employees encouraging voters to do a straight Democrat ballot. I witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

9.   During the last two weeks while working at this satellite location, I was specifically instructed by my supervisor not to ask for a driver's license or any photo I.D. when a person was trying to vote.

10.  I observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot.

11.  Whenever I processed an absentee voter application or in-person registration, I was instructed to input the person's name, address, and date of birth into the Qualified Voter File (QVF) system.

12.  The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with internet access.

13.  I worked at the satellite location until the polls closed on November 3, 2020 at 8:00 p.m. and properly completed the entry of all absentee ballots into the QVF by 8:30 p.m.

EXHIBIT 3

14. I then reported to work at the TCF Center on November 4, 2020, at 8:30 a.m. to process ballots. I was instructed not to validate any ballots and not to look for any deficiencies in the ballots.

15. Absentee ballots that were received in the mail would have the voter's signature on the envelope. While I was at the TCF Center, I was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file.

16. All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to have enough time to process the absentee ballots, all satellites were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020.

17. On November 4, 2020, I was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. I was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. I estimate that this was done to thousands of ballots.

18. The above information is true to the best of my information, knowledge, and belief.

19. Further affiant says not.

_____

Jessy Jacob

On this 7th day of November, 2020, before me personally appeared Jessy Jacob, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters she states to be on information and belief, and as to those matters she believes them to be true.

_____

Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

EXHIBIT 3

# EXHIBIT C

EXHIBIT 3

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

---

**CHERYL A. COSTANTINO and EDWARD P. McCALL, Jr.,**

                    **Plaintiff,**

-vs-

**CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,**

                    **Defendants.**

                                      /

**AFFIDAVIT OF ANDREW SITTO**

**FILE NO: 20-_____-AW**

**JUDGE**

---

**David A. Kallman**         **(P34200)**
**Erin E. Mersino**           **(P70886)**
**Jack C. Jordan**            **(P46551)**
**Stephen P. Kallman**     **(P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

---

## AFFIDAVIT

The Affiant, Andrew Sitto, being first duly sworn, hereby deposes and states as follows:

1.    My name is Andrew Sitto and I was a poll challenger for the November 3, 2020 election.

2.    I arrived at the TCF Center at 9:30 p.m. on November 3, 2020.

3.    I reported to the counting room, which is a large room on the main floor of the TCF Center. The room is about 100 yards long and about 50 yards wide with windows.

EXHIBIT 3

4.  The poll challengers watch the counters who were sitting at tables comparing paper ballots to Michigan electronic poll book or registered voter list (sometimes called the QVF) on computer screens. Each counter compares the ballot to an electronic database on his/her computer to determine if the ballot correlates to a person who is registered to vote.

5.  I was standing in the center of the room where there were replacement or duplicate ballots for damaged ballots. I remained in this location from about 10:00 p.m. until about 4:30 a.m. If a counter needed a duplicate ballot, they would come to this central location to take a duplicate ballot.

6.  At approximately 4:30 a.m., I thought everyone was going to go home as our shift had ended.

7.  There were two men in charge of the counting, one in his 30s and one in his 50s.

8.  At approximately 4:30 a.m., on November 4, 2020, the man in his 50s got on the microphone and stated that another shipment of absentee ballots would be arriving and would have to be counted.

9.  I heard other challengers say that several vehicles with out-of-state license plates pulled up to the TCF Center a little before 4:30 a.m. and unloaded boxes of ballots.

10. At approximately 4:30 a.m., tens of thousands of ballots were brought in and placed on eight long tables. Unlike the other ballots, these boxes were brought in from the rear of the room.

11. The same procedure was performed on the ballots that arrived at approximately 4:30 a.m., but I specifically noticed that every ballot I observed was cast for Joe Biden.

12. While counting these new ballots, I heard counters say at least five or six times that all five or six ballots were for Joe Biden. All ballots sampled that I heard and observed were for Joe Biden.

13. There was a shift change at 5:00 a.m. for the poll challengers. Many challengers decided to leave at the 5:00 a.m. shift change. I decided not to leave and continued to monitor the ballot counting.

14. Upon information and belief, the TCF Center was the only place where absentee ballots were being counted.

EXHIBIT 3

14. Upon information and belief, the TCF Center was the only place where absentee ballots were being counted.

15. I filled out about six or seven incident reports about what occurred at the TCF Center.

16. At approximately 2:00 p.m. on November 4, 2020, election officials covered windows to the counting room with cardboard to block the view.

17. A little after 2:00 p.m., I exited the glass enclosed room to take a break in the lobby area of the TCF Center. When I tried to go back into the counting room, security guards refused to allow me back in to monitor the counting

18. Previously, people could come and go freely into the counting room.

19. The above information is true to the best of my information, knowledge, and belief.

20. Further affiant says not.

_____
Andrew Sitto

On this ⁀1th day of November, 2020, before me personally appeared Andrew Sitto, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_____
Notary    Public,   Macomb    County,

Michigan

My Commission Expires: 7/1/2027



EXHIBIT 3

Great Lakes Justice Center

# EXHIBIT D

EXHIBIT 3

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

| | |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,**<br><br>                              **Plaintiff,**<br><br>**-vs-**<br><br>**CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,**<br><br>                              **Defendants.** | **AFFIDAVIT OF ROBERT CUSHMAN**<br><br><br><br><br>**FILE NO:  20-_____-AW**<br><br>**JUDGE** |

_____/

**David A. Kallman            (P34200)**
**Erin E. Mersino            (P70886)**
**Jack C. Jordan            (P46551)**
**Stephen P. Kallman            (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

_____

## AFFIDAVIT

The Affiant, Robert Cushman, being first duly sworn, hereby deposes and states as follows:

1.      My name is Robert Cushman. I am an adult citizen and resident of the State of Michigan.

2.      I served and was trained to be a poll challenger for the November 2020 election in Detroit, Michigan.

EXHIBIT 3

3. During my observations of the normal processing of ballots on November 4th between about 7:45 a.m. and 8:30 a.m. I was substantially obstructed from performing my challenger duties of observing and making notes at Board Number 31. The persons involved either directly or indirectly involved: 1. A worker named Joe, 2. A supervisor named Miss Browner, 3. an unknown person with no credentials, 4. a Democratic Challenger with credentials and one of the AVCB leaders named David Nathan.

4. On Wednesday, November 4, 2020, Detroit election officials told us that they were going to process military ballots last. I did my best to try to observe the processing/duplication of the military ballots.

5. On November 4, 2020, I was surprised to see numerous new boxes of ballots arrive at the TCF Center in the evening. I first noticed these boxes in the distribution area after many of the military ballots had been distributed and processed. I estimate these boxes contained several thousand new ballots when they appeared.

6. The main list of persons who had registered to vote on or before November 1, 2020, was listed on an electronic poll book, often referred to as the QVF. As I understand it, the Supplemental Sheets were the lists of persons who had registered to vote on November 2, 2020 or November 3, 2020.

7. I observed that none of the names on these new ballots were on the QVF or the Supplemental Sheets.

8. I saw the computer operators at several counting boards manually adding the names and addresses of these thousands of ballots to the QVF system.

9. When I asked what the possible justification was to counting ballots from unknown, unverified "persons," I was told by election supervisors that the Wayne County Clerk's Office had "checked them out."

10. I challenged not one ballet, but the entire process as the names were not in the QVF or Supplemental Sheets and because the DOB's were all wrong, all being marked as 01-01-1900.

11. An Election Supervisor near board number #86 advised me to go to the podium of election officials and ask one of them to help me. I did, and I enlisted the help of one of the leaders, a young man named Anthony Miller.

EXHIBIT 3

12.     Mr. Miller walked me back to board number #86 and asked what I wanted the challenge to say. I said that I did not want to challenge just one ballot, but the entire process, as I was witnessing several thousand ballots inputted illegally.

13.     Mr. Miller advised the computer operator what to type in as a challenge so that it was part of the Official Record in the Poll Book for Board Number #86.

14.     I challenged the authority and the authenticity of all of these ballots that were being processed late with absolutely no accompanying documentation, no corresponding name in the QVF, and no corresponding name in the Supplemental List.

15.     Every ballot was being fraudulently and manually entered into the Electronic Poll Book (QVF), as having been born on January 1, 1900.  This "last" batch of ballots was processed in the 8:00 p.m. to 10:00 p.m. time frame.

16.     When I asked about this impossibility of each ballot having the same birthday occurring in 1900, I was told that was the instruction that came down from the Wayne County Clerk's office.

17.     Mr. Miller was very clear about these late ballots and that the instructions were coming from the Wayne County Clerk's office.

18.     I was surprised and disappointed at the preponderance of dishonesty, irregularities, and fraudulent tactics at the November 3, 2020 election at the TCF Center.

19.     The above information is true to the best of my information, knowledge, and belief.

20.     Further affiant says not.

_Robert F. Cushman_
Robert Cushman

On this 7th day of November, 2020, before me personally appeared Robert Cushman, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

_Stephen P. Kallman_
Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

3

EXHIBIT 3

# EXHIBIT E

EXHIBIT 3

# STATE OF MICHIGAN

# IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

| | |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,** | **AFFIDAVIT OF DANIEL GUSTAFSON** |
| **Plaintiff,** | |
| **-vs-** | |
| **CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,** | **FILE NO: 20-_____-AW**<br><br>**JUDGE** |
| **Defendants.** | |
| _____/ | |

**David A. Kallman (P34200)**
**Erin E. Mersino (P70886)**
**Jack C. Jordan (P46551)**
**Stephen P. Kallman (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

## AFFIDAVIT

The Affiant, Daniel Gustafson, being first duly sworn, hereby deposes and states as follows:

1.  My name is Daniel Gustafson.  I am an adult citizen and resident of the State of Michigan.

2.  I served and was trained to be a poll challenger for the November 3, 2020 election.

EXHIBIT 3

4. Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops.

5. These ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal.

6. The ballot bins were not marked or identified in any way to indicate their source of origin.

7. The above information is true to the best of my information, knowledge, and belief.

8. Further affiant says not.

Daniel Gustafson

On this 8th day of November, 2020, before me personally appeared Daniel Gustafson, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Stephen P. Kallman
Notary Public, Eaton County, Michigan
My Commission Expires: 11/26/2025

GREAT LAKES JUSTICE CENTER

2

EXHIBIT 3

# EXHIBIT F

EXHIBIT 3

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

|   |   |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,** | **AFFIDAVIT OF PATRICK J. COLBECK** |
| **Plaintiff,** | |
| | |
| **-vs-** | |
| | |
| **CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,** | **FILE NO: 20-_____-AW** |
| | **JUDGE** |
| **Defendants.** | |

/

**David A. Kallman (P34200)**
**Erin E. Mersino (P70886)**
**Jack C. Jordan (P46551)**
**Stephen P. Kallman (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**

## AFFIDAVIT

The Affiant, Robert Cushman, being first duly sworn, hereby deposes and states as follows:

1. My name is Patrick J. Colbeck, I was a poll challenger for the November 3, 2020 election, and I am a resident of Wayne County.

2. At approximately 5:30pm on November 3, 2020, I asked Daniel Baxter if Tabulation Computers were connected to internet. Mr. Baxter said simply "No."

EXHIBIT 3

3. At approximately 5:45pm on November 3, 2020, I first asked Chris Thomas how the tabulated results were to be transferred to the County and other parties. He said he didn't know, but he would find out. I repeated this inquiry throughout the evening until Mr. Thomas responded that he would not be able to release that information until the end of the next day. Early during the morning, I was able to look at a copy of the Detroit Election manual which specified that the tabulated votes would be copied from the adjudicator computers to a series of flash drives.

4. At approximately 7:30pm on November 3, 2020, about 50% of Poll Workers left the AV Counting Board before 8pm in violation of MCL 168.792a(11). An announcement was made by Detroit Election Officials at 7:45pm calling them back but most had already left the AV Counting Board area.

5. At approximately 11pm on November 3, 2020, I asked David Nathan if any of the computers were connected to the internet. He said "No." When I asked for confirmation, he said "Trust me." I stated that he may have been misled. When I pressed for a demonstration, he repeated "Trust me." All it takes to confirm the connectivity status of a Windows computer is to roll the cursor over the LAN connection icon in the bottom right corner of the display. When there is no internet connection, a unique icon showing a cross-hatched globe appears. I proceeded to review the terminal screens for the Tabulator and Adjudicator computers and I observed the icon that indicates internet connection on each terminal. Other poll challengers can attest to this observation as required (e.g. Kristina Karamos and Randy Bishop).

6. Sometime during the evening I proceeded to examine the physical cabling connections between all of the computers in the facility. The results of this observation are captured in the attached network topology diagram. The IT technician stationed on the stage actively discouraged any close-up observation of the network. Phone usage ban discouraged taking photographs of equipment. There were no observed ethernet connections for Electronic Poll Books at AV Counting Boards, but Wi-Fi Routers were present with attached active Wi-Fi networks in area including one called "AV_Connect" and a separate one for "CPSStaff" which were both of sufficient signal strength to be accessed outside of the Counting Board as well as inside. I did not confirm presence of internet connection for Electronic Poll Books but the "security incident" at 10am on 11/3 would seem to indicate that they were connected to internet via Wi-Fi.

7. Further affiant says not.

Patrick J. Colbeck

EXHIBIT 3

On this 8th day of November, 2020, before me personally appeared Patrick J. Colbeck, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that he has read the foregoing affidavit by him subscribed and knows the contents thereof, and that the same is true of his own knowledge and belief, except as to those matters he states to be on information and belief, and as to those matters he believes them to be true.

Notary Public, _Oakland_ County, Michigan
My Commission Expires: _Aug 4, 2025_

BARBARA A. HARRELL
NOTARY PUBLIC, STATE OF MI
COUNTY OF OAKLAND
MY COMMISSION EXPIRES Aug 4, 2025
ACTING IN COUNTY OF _wayne_

GREAT LAKES JUSTICE CENTER

3

EXHIBIT 3

# EXHIBIT G

EXHIBIT 3

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

PROMOTE THE VOTE,

        Plaintiff-Appellant,

V

SECRETARY OF STATE,

        Defendant-Appellee,

and

HOUSE OF REPRESENTATIVES and SENATE,

        Intervening Appellees.

FOR PUBLICATION
July 20, 2020
9:00 a.m.

No. 353977
Court of Claims
LC No. 20-000002-MZ

---

PRIORITIES USA and RISE, INC.,

        Plaintiffs-Appellants,

V

SECRETARY OF STATE

        Defendant-Appellee,

and

SENATE and HOUSE OF REPRESENTATIVES,

        Intervening Defendants-Appellees.

No. 354096
Court of Claims
LC No. 19-000191-MZ

---

Before: METER, P.J., and RONAYNE KRAUSE and GADOLA, JJ.

METER, P.J.

EXHIBIT 3

In Docket No. 353977, plaintiff, Promote the Vote (PTV), appeals by right a June 24, 2020 order entered by the Court of Claims. In Docket No. 354096, plaintiffs, Priorities USA and Rise, Inc. (collectively, the Priorities USA plaintiffs), also appeal by right the June 24, 2020 order. The Court of Claims order denied PTV's motion for summary disposition, as well as the Priorities USA plaintiffs' motion for a preliminary injunction, and granted the motions for summary disposition of the Secretary of State (Secretary) and the Senate and House of Representatives (collectively, the Legislature). This Court consolidated the two cases and ordered that the appeals would be decided without oral arguments. *Promote the Vote v Secretary of State*, unpublished order of the Court of Appeals, entered July 8, 2020 (Docket Nos. 353977, 354096).

Priorities USA is a "voter-centric progressive advocacy and service organization," which spends resources, including in the state of Michigan, to register young individuals to vote. Rise, Inc., is a "nonprofit organization that runs statewide advocacy and voter mobilization programs" in Michigan and California, as well as on a number of campuses throughout the country. Part of its mission is to increase voting access for college students. PTV is "a ballot question committee" that drafted the language of Proposal 3, a 2018 ballot proposal to amend Michigan's Constitution, collected more than 400,000 signatures in order to get the proposal placed on the ballot, and led the campaign for the proposal's passage.

On appeal, PTV and the Priorities USA plaintiffs argue that the proof of residency requirements in MCL 168.497(2)-(4), the challenged ballot procedure in MCL 168.497(5), and the Secretary's automatic voter registration policy unduly burden the rights in 1963 Const, art 2, § (4)(1), and are therefore unconstitutional. PTV and the Priorities USA plaintiffs also argue that MCL 168.497 violates the Equal Protection Clause of the Michigan Constitution. For the reasons discussed below, we affirm.

## I. LEGAL BACKGROUND

In the 2018 general election, Michigan voters approved Proposal 3, which made changes to Michigan's election law. Specifically, Proposal 3 amended 1963 Const, art 2, § 4. The article now provides:

(1) Every citizen of the United States who is an elector qualified to vote in Michigan shall have the following rights:

(a) The right, once registered, to vote a secret ballot in all elections.

* * *

(d) The right to be automatically registered to vote as a result of conducting business with the secretary of state regarding a driver's license or personal identification card, unless the person declines such registration.

(e) The right to register to vote for an election by mailing a completed voter registration application on or before the fifteenth (15th) day before that election to an election official authorized to receive voter registration applications.

EXHIBIT 3

(f) The right to register to vote for an election by (1) appearing in person and submitting a completed voter registration application on or before the fifteenth (15th) day before that election to an election official authorized to receive voter registration applications, or (2) beginning on the fourteenth (14th) day before that election and continuing through the day of that election, appearing in person, submitting a completed voter registration application and providing proof of residency to an election official responsible for maintaining custody of the registration file where the person resides, or their deputies.[1]  Persons registered in accordance with subsection (1)(f) shall be immediately eligible to receive a regular or absent voter ballot.

\* \* \*

All rights set forth in this subsection shall be self-executing.  This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes.  Nothing contained in this subsection shall prevent the legislature from expanding voters' rights beyond what is provided herein.  This subsection and any portion hereof shall be severable.  If any portion of this subsection is held invalid or unenforceable as to any person or circumstances, that invalidity or unenforceability shall not affect the validity, enforceability, or application of any other portion of this subsection.

(2) Except as otherwise provided in this constitution or in the constitution or laws of the United States[,] the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.  No law shall be enacted which permits a candidate in any partisan primary or partisan election to have a ballot designation except when required for identification of candidates for the same office who have the same or similar surnames.[2]

---

[1] We will refer to the period "beginning on the fourteenth (14th) day before that election and continuing through the day of that election" as the "14-day period."

[2] Before the passage of Proposal 3, 1963 Const, art 2, § 4 consisted of one paragraph, which was very similar to the current paragraph in § 4(2).  It provided:

The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States.  The legislation shall enact laws to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting.  No law shall be enacted which permits a candidate in any partisan primary or partisan election to have a ballot designation except when

EXHIBIT 3

Following the 2018 general election, the Legislature enacted 2018 PA 603, which amended MCL 168.497. The first five provisions of MCL 168.497 now provide:

(1) An individual who is not registered to vote but possesses the qualifications of an elector as provided in [MCL 168.492] may apply for registration to the clerk of the county, township, or city in which he or she resides in person, during the clerk's regular business hours, or by mail or online until the fifteenth day before an election.

(2) An individual who is not registered to vote but possesses the qualifications of an elector as provided in [MCL 168.492] or an individual who is not registered to vote in the city or township in which he or she is registering to vote may apply for registration in person at the city or township clerk's office of the city or township in which he or she resides from the fourteenth day before an election and continuing through the day of the election. An individual who applies to register to vote under this subsection must provide to the city or township clerk proof of residency in that city or township. For purposes of this subsection, proof of residency includes, subject to subsection (3), any of the following:

(a) An operator's or chauffeur's license issued under the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, or an enhanced driver license issued under the enhanced driver license and enhanced official state personal identification act, 2008 PA 23, MCL 28.301 to 28.308.

(b) An official state personal identification card issued under 1972 PA 222, MCL 28.291 to 28.300, or an enhanced official state personal identification card issued under the enhanced driver license and enhanced official state personal identification card act, 2008 PA 23, MCL 28.301 to 28.308.[3]

(3) If an application for voter registration under subsection (2) does not have proof of residency as that term is defined in subsection (2), the applicant may provide as his or her proof of residency any other form of identification for election

required for identification of candidates for the same offense which have the same or similar surnames.

---

[3] A person registering to vote in the 14-day period does not provide proof of residency simply by presenting a Michigan driver's license or personal identification card. Because the individual "must provide to the city or township clerk proof of residency in that city or township," the Michigan driver's license or personal identification card must include an address located in either the city or township. Both the Priorities USA plaintiffs and the Secretary read MCL 168.497(2) in the same manner. We will refer to a Michigan's driver's license or personal identification card that can establish proof of residency under MCL 168.497(2) as a "current Michigan driver's license or personal identification card."

EXHIBIT 3

purposes as that term is defined in [MCL 168.2] and 1 of the following documents that contains the applicant's name and current residence address:

    (a) A current utility bill.

    (b) A current bank statement.

    (c) A current paycheck, government check, or other government document.

    (4) If an application for voter registration under subsection (2) does not have identification for election purposes, the applicant may register to vote if he or she signs an affidavit indicating that the applicant does not have identification for election purposes and the applicant provides 1 of the following documents that contains the applicant's name and current residence address:

    (a) A current utility bill.

    (b) A current bank statement.

    (c) A current paycheck, government check, or other government document.

    (5) Immediately after approving a voter registration application, the city or township clerk shall provide to the individual registering to vote a voter registration receipt that is in a form as approved by the secretary of state. If an individual registers to vote in person 14 days or less before an election or registers to vote on election day, and that applicant registers to vote under subsection (3) or (4), the ballot of that elector must be prepared as a challenged ballot as provided in [MCL 168.727] and must be counted as any other ballot is counted unless determined by a court of law under [MCL 168.747 or MCL 168.748] or any other applicable law.

    MCL 168.2(k) defines "identification for election purposes" as the following: "[a]n operator's or chauffeur's license issued under the Michigan vehicle code . . . or an enhanced driver license issued under the enhanced driver license and enhanced official state personal identification card act"; "[a]n official state personal identification card . . . or an enhanced official state personal identification card issued under the enhanced driver license and enhanced official state personal identification card act"; a current operator's or chauffeur's license issued by another state; a current state personal identification card issued by another state; a current state government issued photo identification card; a current United States passport or federal government issued photo identification card; a current military photo identification card; a current tribal photo identification card; or "[a] current student photo identification card issued by a high school in this state, an institution of higher education in this state described in section 4, 5, or 6 of article VIII of the state constitution of 1963, a junior college or community college established under section 7 of article VIII of the state constitution of 1963, or another accredited degree[-] or certificate[-]granting college or university, junior college, or community college located in this state."

EXHIBIT 3

An election inspector must identify, as provided in MCL 168.745 and MCL 168.746, a challenged ballot. MCL 168.727(2)(a).[4] Under MCL 168.745, the election inspectors "shall cause to be plainly endorsed on said ballot, with pencil, before depositing the same in the ballot box, the number corresponding to the number placed after such voter's name on the poll lists without opening the same[.]" To prevent the identification of challenged ballots, the election inspectors "shall cause to be securely attached to said ballot, with mucilage or other adhesive substance, a slip or piece of blank paper of the same color and appearance, as nearly as may be, as the paper of the ballot, in such manner as to cover and wholly conceal said endorsement but not to injure or deface the same[.]" MCL 168.746.

MCL 168.747 provides:

> In case of a contested election, on the trial thereof before any court of competent jurisdiction, it shall be competent for either party to the cause to have produced in court the ballot boxes, ballots and poll books used at the election out of which the cause has arisen, and to introduce evidence proving or tending to prove that any person named on such poll lists was an unqualified voter at the election aforesaid, and that the ballot of such person was received. On such trial, the correspondence of the number endorsed on a ballot as herein provided with the number of the ballot placed opposite the name of any person on the poll lists shall be received as prima facie proof that such ballot was cast by such person: Provided, That the ballot of no person shall be inspected or identified under the provisions of this chapter unless such person shall consent thereto in writing, or unless such person has been convicted of falsely swearing in such ballot, or unless the fact that

---

[4] Any voter may be challenged under MCL 168.727. *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 14 n 24; 740 NW2d 444 (2007). Under MCL 168.727(1), an election inspector shall challenge an applicant applying for a ballot if the inspector knows or has good reason to know that the applicant is not a qualified and registered elector of the precinct. A registered elector of the precinct present in the polling place may challenge the right of anyone attempting to vote if the elector knows or has good reason to suspect that the individual is not a registered elector in that precinct. *Id.* Additionally, an election inspector or other qualified challenger may challenge the right of an individual attempting to vote who has previously applied for an absent voter ballot and who on election day is claiming to have never received the absent voter ballot or to have lost or destroyed the absent voter ballot. *Id.* These challenges shall not be made indiscriminately or without good cause. MCL 168.727(3). If a person attempting to vote is challenged, the person shall be sworn by one of the election inspectors to truthfully answer the questions asked of the person concerning the person's qualifications as an elector. MCL 168.729. If the person's answers to the questions show that the person is a qualified elector in the precinct, the person "shall be entitled to receive a ballot and vote." *Id.* The person's ballot shall be marked as required by MCL 168.745 and MCL 168.746, but it is counted as a regular ballot. MCL 168.727(2)(a); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 14 n 24.

EXHIBIT 3

such person was an unqualified elector at the time of casting such ballot has been determined.[5]

See also *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 14 n 24; 740 NW2d 444 (2007) ("The ballot cast by a challenged voter is marked (and the mark subsequently concealed) with a number corresponding to the voter's poll list number, and is counted as a regular ballot. MCL 168.745; MCL 168.746. The marked ballot becomes relevant only in the event of litigation surrounding a contested election, where the challenged voter's qualifications to vote are disputed.").

According to the Priorities USA plaintiffs, following the passage of Proposal 3, the Secretary began to automatically register to vote those who conducted business with her regarding a driver's license or personal identification card if they were at least 17½ years of age (the AVR Policy). To support this claim, the Priorities USA plaintiffs provide a press release from the Secretary that announced that she had instituted automatic voter registration.[6] But the press release says nothing about automatic voter registration only applying to those who are at least 17½ years of age. However, the Secretary does not dispute the Priorities USA plaintiffs' claim.

## II. PROCEDURAL HISTORY

On November 22, 2019, Priorities USA filed suit against the Secretary in the Court of Claims. An amended complaint was filed on January 21, 2020, by the Priorities USA plaintiffs.

---

[5] MCL 168.748 provides:

After issue joined in any case of contested election, either party to the cause may present a petition to the court before which the said cause is to be tried, setting forth among other things that the petitioner has good reason to believe and does believe that 1 or more voters at the election out of which the cause has arisen, naming him or them, and stating his or their place of residence, were unqualified to vote at such election; that he believes the same can be established by competent testimony; that the ballot or ballots of such voter or voters were received after being challenged, as provided by law; and praying that the court may try and determine the question of the qualification of such voter or voters at said election, which petition shall be verified by the oath of the petitioner or some other person acquainted with the facts, and thereupon the court shall direct an issue to be framed, within a time to be fixed therefor, for the purpose of determining the question of the qualifications of the voter or voters named in said petition to vote at said election; and such issue shall stand for trial as in other cases, and the verdict of the jury or judgment of the court upon such issue so made shall be received, upon the trial of the principal issue in said cause, as conclusive evidence to establish or to disprove the said qualifications of said voter or voters.

[6] Secretary of State, *Secretary Benson Announces Modernized Voter Registration on National Voter Registration Day* <https://www.michigan.gov/sos/0,4670,7-127-1640_9150-508246--,00.html> (accessed July 14, 2020).

EXHIBIT 3

On January 6, 2020, PTV filed suit against the Secretary in the Court of Claims. PTV's complaint and the Priorities USA plaintiffs' amended complaint both advanced similar allegations. PTV and the Priorities USA plaintiffs asserted that the Legislature's proof of residency definition in MCL 169.497 and the requirement that some voters be issued a challenge ballot unduly burdened the self-executing provisions in 1963 Const, art 2, § 4. Additionally, the proof of residency definition violated the Equal Protection Clause of the Michigan Constitution by burdening the right to vote, and by treating similarly situated voters differently: those who registered to vote within the 14-day period, but who could not show proof of residency with a current Michigan driver's license or personal identification card were issued a challenged ballot. The Priorities USA plaintiffs finally asserted that the Secretary's AVR Policy burdened and curtailed the right in 1963 Const, art 2, § 4(1)(d).

Following the consolidation of the two cases, and the Legislature's intervention, the Legislature filed a motion for summary disposition under MCR 2.116(C)(10).[7] The Legislature argued that the proof of residency amendment in MCL 168.497 was a constitutional exercise of its power to preserve the purity of elections, guard against abuses of the elective franchise, and provide for a system of voter registration and absentee balloting. The Legislature further argued that the Michigan Constitution, following the passage of Proposal 3, did not define proof of residency, which essentially required the Legislature to exercise its constitutional powers to define the phrase. The definition of proof of residency did not violate the Equal Protection Clause because the statute provided reasonable, nondiscriminatory restrictions; thus, it was subject to only rational basis review. The state's interest in preventing voter fraud justified the restrictions. Finally, the Legislature argued that the AVR Policy was consistent with 1963 Const, art 2, § 4 because the right to be automatically registered to vote only applies to those who are entitled to register to vote, namely individuals who are 17½ years of age or older.

The Secretary also moved for summary disposition under MCR 2.116(C)(10). Regarding the AVR Policy, the Secretary was automatically registering individuals to vote pursuant to the Michigan Constitution and statute, not a policy. The Secretary also argued that the definition of proof of residency did not impose an unconstitutional burden on the right to vote because the Legislature properly supplemented 1963 Const, art 2, § 4. Furthermore, an individual can register to vote in the 14-day period by signing an affidavit that the individual does not have a form of identification for election purposes and by presenting a document from a broad array of documents listed in the statute. Relatedly, an individual whose ballot must be marked as a challenged ballot casts either a regular ballot or an absent voter ballot. The ballot is merely marked so that it can later be identified if an election is contested. A challenged ballot does not require the individual to reveal the content of the ballot. Individuals who cannot produce a current Michigan driver's license or personal identification card and are required to vote a challenged ballot are not denied equal protection. Individuals who must vote a challenged ballot are not similarly situated to individuals who have a current Michigan's driver's license or personal identification card. The

---

[7] The Court of Claims granted the Legislature's motion to intervene in lower court no. 19-000191-MZ, and the Priorities USA plaintiffs do not challenge that order on appeal.

EXHIBIT 3

use of alternative, and sometimes less objective, forms of proof of residency reasonably warrants additional procedural requirements.

In PTV's motion for summary disposition under MCR 2.116(C)(10), PTV argued that MCL 168.497 imposed additional obligations on the self-executing rights of 1963 Const, art 2, § 4. The term "residence" is generally understood as the place where a person lives. In MCL 168.497, the Legislature defined proof of residency to mean more than simply proof of where one lives. It defined proof of residency to include proof of identity, i.e., a driver's license or personal identification card. Although MCL 168.497 did not require a person registering to vote in the 14-day period to provide a current Michigan driver's license or personal identification card, the Legislature narrowly limited the documents that it would accept as proof of residency, which curtailed and burdened the rights guaranteed by 1963 Const, art 2, § 4. Additionally, under MCL 168.497, only those who provide a current Michigan driver's license or personal identification card receive a regular or absent voter ballot. All others receive a challenged ballot, which is not a regular or absent voter ballot and which is also not a secret ballot.

PTV also argued that MCL 168.497 failed to provide equal protection of the law. The statute creates three classes of voters: (1) those who present a current Michigan driver's license or personal identification card, and who are allowed to vote a regular or absent voter ballot; (2) those who either submit other proof of identity, or who execute an affidavit attesting that they do not possess any of the acceptable forms of proof of identity, with one of a limited number of documents establishing residency, and who are required to vote a challenged ballot, and (3) those who do not have one of the limited number of documents establishing residency, and who are not allowed to vote. MCL 168.497 imposed a severe burden on the rights of the voters in the second class. Those voters had to vote a challenged ballot, which required extra time by the clerk's office, which required the voters to wait longer. MCL 168.497 also imposed a severe burden on the rights of the voters in the third class. These voters were deprived of their right to vote, and there was no compelling state interest justifying the deprivation, according to PTV.

The Priorities USA plaintiffs moved for a preliminary injunction, attaching three affidavits from two students at the University of Michigan and one student at Michigan State University that detailed their difficulties in registering to vote in the 14-day period. The Priorities USA plaintiffs also attached a report from Michael E. Herron, Ph.D., which detailed the results from two surveys he commissioned. In the first survey, 2,000 Michigan residents, who were eligible to vote and planned to vote in 2020, were asked about whether they had the documents listed in MCL 168.497. According to Dr. Herron, 1.6% of the participants answered that they did not have documentation that would satisfy the requirements of MCL 168.497. 1.6% of citizens of voting age in Michigan is 159,320 individuals. According to Dr. Herron, the survey also showed that approximately 6% of the participants who were younger than 25 years of age lacked documentation that would satisfy the requirements of MCL 168.497. The participants in the second survey were students at Michigan colleges or universities. According to Dr. Herron, of the students who were United States citizens and not registered to vote in Michigan, 16.9% of them did not have documentation that would satisfy the requirements of MCL 168.497. Dr. Herron believed that approximately 15,514 of the college and university students in Michigan would not be able to provide proof of residency under MCL 168.497. Dr. Herron also reviewed records provided by the Secretary, which indicated that, in the five elections following the passage of Proposal 3, 264 individuals (94

EXHIBIT 3

of whom were 21 years of age or younger) were not able to register in the 14-day period for the upcoming election because they lacked proof of residency.

On June 24, 2020, the Court of Claims issued an opinion and order granting the Legislature's and the Secretary's motions for summary disposition, denying PTV's motion for summary disposition, and denying the Priorities USA plaintiffs' motion for a preliminary injunction. The Court of Claims first addressed the claim that the amendments of 1963 Const, art 2, § 4, following the passage of Proposal 3, were "self-executing" and that the requirements of MCL 168.497(2)-(5) were unconstitutional because they unduly restricted the new rights recognized in the Michigan Constitution. The Court of Claims held that while the Legislature may not enact laws that impose additional burdens on self-executing constitutional provisions, it may enact laws that supplement those provisions, such as laws that provide clarity and safeguard against abuses. Because the phrase proof of residency was undefined in Const 1963, art 2, § 4, and the residence of a voter is essential for voting purposes, the Legislature properly supplemented the constitutional provision when it defined proof of residency.

Next, the Court of Claims rejected the argument that the AVR Policy unduly burdened and curtailed the rights in 1963 Const, art 2, § 4. The AVR Policy was not a policy, but "rather a restatement of state law, specifically MCL 168.493a and MCL 168.492, and is consistent with the right of 'electors qualified to vote' being entitled to automatically register to vote when doing business with the secretary of state offices." Further, the Michigan Constitution defines an elector qualified to vote as any resident who has reached the age of 18, and a qualified voter may be automatically registered to vote as a result of conducting business with the secretary of state. Under MCL 168.492, an elector qualified to vote is someone 17½ years of age or older, "and nowhere does the Constitution grant individuals under the age of [17½] the right to be automatically registered when conducting business with the secretary of state."

The Court of Claims then addressed whether MCL 168.497 placed an unconstitutional burden on voters. The court noted that, although the right to vote was not enumerated in either the federal or state constitutions, the United States Supreme Court has held that citizens have a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. Furthermore, the court held, the right to vote is not absolute. A state has the power to impose voter qualifications and to regulate access to the franchise in many different ways. The court rejected the argument that the Legislature's definition of proof of residency in MCL 168.497 placed a severe burden on the constitutional right to register to vote in the 14-day period. The statute imposed some burden on voters—the statute requires an individual to bring to the election office or polling place some form of proof of residency. But, this was a reasonable, nondiscriminatory restriction, given the wide variety of documents that constituted acceptable ways to establish proof of residency. Additionally, if a voter did not have an acceptable proof of residency in the form of a driver's license or a personal identification card, "that person may vote with a challenged ballot that is counted that day, the same as all other ballots," so long as they produce one of the acceptable forms of proof of residency.

The Court of Claims also rejected the Priorities USA plaintiffs' suggestion that younger voters will be most harmed by MCL 168.497. First, because it was a facial challenge to MCL 168.497, there could not be a focus on any possible effects on a discrete population; the focus must be on the voting population as whole. Second, the argument "overlook[ed] the broad range of

EXHIBIT 3

documents that suffice under the statute, the majority of which are readily available to college students, and the fact that registration can be accomplished over the internet, something 'younger voters' are surely able to utilize." Third, the argument gave no credence to the young voters' ability to understand and follow clear voter registration procedures.

Finally, the Court of Claims rejected the argument that the requirement in MCL 168.497(5) that challenged ballots be issued to those who register to vote in the 14-day period without providing a current Michigan driver's license or personal identification card violates equal protection because it denied those voters the right to a secret ballot. The court reasoned that challenged ballots were treated the same as any other ballot on election day. "[D]espite [the challenged ballot] being marked on the outside as challenged, upon presentment of identification, the voter was eligible to receive, and did receive, a regular ballot," which complied with 1963 Const, art 2, § 4(1)(f). To the extent that any burden was placed on a voter's right, it was minimal. A challenged ballot was a secret ballot because it was counted in the same way as a normal ballot, and the contents were not revealed to the public. The Court of Claims explained:

> It is only in the event of a contested election, where the challenged ballot is at issue, that the ballot may be inspected or identified; however, this inspection may only occur with either: the voter's written consent; or only *after* the individual has been convicted of falsely swearing the ballot; or the voter was deemed to be unqualified. MCL 168.474. Therefore, the only way for the vote to be revealed—absent express written consent—is under court order and even then, only in two limited circumstances that require a prior determination of falsehood. This is not a severe burden, and it places no burden on the voter at the time of voting, nor does it impact the tabulation of those particular votes cast on election day.

> In contrast, the state has an interest in ensuring the integrity of ballots should it be needed. This specific interest is properly served by this regulation, as in the event of suspected voter fraud, the court may reveal the identity of the voter and a determination can be made. Overall, the burden imposed on voters' rights is minimal, and the legislation is within the scope of the state's interest in preserving the purity of elections.

Thus, the Court of Claims granted summary disposition in favor of the Legislature and the Secretary, and dismissed the complaints with prejudice. This appeal follows.

### III. DISCUSSION

On appeal in Docket No. 353977, PTV argues that the Court of Claims erred in concluding that there is no constitutional right to vote; MCL 168.497 impermissibly imposed additional obligations on the self-executing provisions of 1963 Const, art 2, § 4(1)(a) and § 4(1)(f)(2); the requirement of issuing a challenged ballot was burdensome, unconstitutional, and served no legitimate state interest. In Docket No. 354096, the Priorities USA plaintiffs similarly argue that the Court of Claims erred in concluding that MCL 168.497 did not violate the self-executing provisions of 1963 Const, arts 1, § 2 and 2, § 4; the AVR Policy did not violate the self-executing provision of 1963 Const, art 2, § 4; and they were entitled to a preliminary injunction. We disagree.

EXHIBIT 3

## A.  STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Ellison v Dep't of State*, 320 Mich App 169, 175; 906 NW2d 221 (2017).  Summary disposition is proper under MCR 2.116(C)(10) if, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law."

This Court also reviews de novo questions of constitutional law.  *Bonner v Brighton*, 495 Mich 209, 221; 848 NW2d 390 (2014).  "A statute challenged on a constitutional basis is 'clothed in a presumption of constitutionality,' and the burden of proving that a statute is unconstitutional rests with the party challenging it."  *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 11; 740 NW2d 444 (2007) (citation omitted).

A challenge to the constitutionality of a statute is either a facial challenge or an as-applied challenge.  *Bonner*, 495 Mich at 223 nn 26-27; *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 11 & n 20.  "A facial challenge is a claim that the law is invalid *in toto*—and therefore incapable of any valid application," whereas an as-applied challenge "considers the specific application of a facially valid law to individual facts."  *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 11 & n 20 (quotation marks and citation omitted).  The challenges to MCL 168.497 are facial challenges.  PTV and the Priorities USA plaintiffs are asking that MCL 168.497(2)-(5) be declared unconstitutional in all circumstances.  They do not claim the statute is unconstitutional only when applied in a specific circumstance.

"A party challenging the facial constitutionality of a [statute] 'faces an extremely rigorous standard.' "  *Bonner*, 495 Mich at 223 (citation omitted).  A plaintiff "must establish that no set of circumstances exists under which the act would be valid" and "[t]he fact that the . . . act might operate unconstitutionally under some conceivable set of circumstances is insufficient' " to render the act invalid.  *Council of Orgs & Others for Ed About Parochiaid, Inc v Governor*, 455 Mich 557, 568; 566 NW2d 208 (1997) (quotation marks, alteration marks, and citation omitted).  Indeed, "if any state of facts reasonably can be conceived that would sustain [a legislative act], the existence of the state of facts at the time the law was enacted must be assumed."  *Id.* (quotation marks, alteration marks, and citation omitted).  "[B]ecause facial attacks, by their nature, are not dependent on the facts surrounding any particular decision, the specific facts surrounding plaintiffs' claim are inapposite."  *Bonner*, 495 Mich at 223.

## B.  CONSTITUTIONAL RIGHT TO VOTE

PTV and the Priorities USA plaintiffs argue that the Court of Claims erred by stating that the right to vote was not expressly enumerated in the Michigan Constitution.  Before addressing this argument, we find it necessary to detail the history of the right to vote.

In the Court of Claims opinion and order, the court stated that "the right to vote is not enumerated in either the federal or state constitution . . . ."  Although there are numerous provisions in the United States Constitution that prevent states from discriminating against specific groups by taking away their right to vote, there is no specific enumeration of the right to vote.  See

EXHIBIT 3

*San Antonio Indep Sch Dist v Rodriguez*, 411 US 1, 35 n 78; 193 S Ct 1278; 36 L Ed 2d 16 (1973) ("[T]he right to vote, per se, is not a constitutionally protected right . . . ."). For example, the Fifteenth Amendment states: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." US Const, Am XV. Nearly identical language is used in the Nineteenth and Twenty-Sixth Amendments, which prohibit denying or abridging the right to vote on the basis of gender or age, respectively. See US Const, Ams XIX and XXVI.

Despite the lack of a positive right to vote, the United States Supreme Court, "[i]n decision after decision, . . . has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v Blumstein*, 405 US 330, 336; 92 S Ct 995; 31 L Ed 2d 274 (1972). Indeed, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v Sanders*, 376 US 1, 17; 84 S Ct 526, 534-535; 11 L Ed 2d 481 (1964). However, "[t]his equal right to vote is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." *Dunn*, 405 US at 336 (quotation marks and citation omitted).

Following the passage of Proposal 3 in Michigan, this state's constitution now reads: "Every citizen of the Unites States who is an elector qualified to vote in Michigan shall have the following rights: The right, once registered, to vote a secret ballot in all elections." 1963 Const, art 2, § 4(1)(a). Although decided before the passage of Proposal 3, and the relevant amendment of our state's constitution, our Supreme Court stated in *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 16, that "the right to vote is an implicit fundamental political right that is preservative of all rights." (Quotation marks and citation omitted). Our Supreme Court continued: "However, '[t]his equal right to vote is not absolute . . . .' " *Id.*, quoting *Dunn*, 405 US at 336 (alteration in original; internal quotation marks omitted).

PTV and the Priorities USA plaintiffs assert that 1963 Const, art 2, § 4(1)(a) provides a constitutional right to vote. This section unambiguously provides that a qualified citizen has the "right, once registered, to vote a secret ballot in all elections." 1963 Const, art 2, § 4(1)(a). However, this section does not provide that an individual has an absolute constitutional right to vote; the individual must first be a qualified elector who has registered to vote. *Id*. Although the Michigan Constitution now expressly provides for the right to vote, certain requirements must be met before an individual can exercise his or her fundamental political right to vote. Despite the Court of Claims' quotation of caselaw predating the passage of Proposal 3, the court's opinion recognized the constitutionally protected status of the right to vote. Thus, there is no error requiring reversal.

## C. SELF-EXECUTING CONSTITUTIONAL PROVISIONS

PTV and the Priorities USA plaintiffs argue that the Legislature's definition of proof of residency in MCL 168.497 and the requirement in MCL 168.497(5) that a challenged ballot be issued to anyone who registers to vote in the 14-day period without providing a current Michigan driver's license or personal identification card unduly burden the rights in 1963 Const, art 2, § (4)(1)(f). They claim that, because the rights in 1963 Const, art 2, § 4(1) are self-executing

EXHIBIT 3

rights, the statutory provisions are unconstitutional. The Priorities USA plaintiffs also argue that the Secretary's AVR Policy unduly burdens the right in 1963 Const, art 2, § (4)(1)(d). We disagree.

There is no dispute among the parties that the rights in Const 1963, art 2, § 4(1) are self-executing. "A constitutional provision is deemed self-executing, if it supplies a sufficient rule, by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced[.]" *League of Women Voters of Mich v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 350938, 351073); slip op at 11 (quotation marks and citation omitted). While the Legislature may not impose additional obligations on a self-executing constitutional provision, *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466; 185 NW2d 392 (1971); *Durant v Dep't of Ed (On Second Remand)*, 186 Mich App 83, 98; 463 NW2d 461 (1990), it may enact laws that supplement a self-executing constitutional provision, see *Wolverine Golf Club*, 384 Mich at 466. Statutes that supplement a self-executing constitutional provision may not curtail the constitutional rights or place any undue burdens on them. See *id.*; *Durant*, 186 Mich App at 98. Additionally, the statutes must be in harmony with the spirit of the Michigan Constitution and their object must be to further the exercise of the constitutional rights and make them more available. *League of Women Voters of Mich*, ___ Mich App at ___; slip op at 11. Statutes that supplement a self-executing provision may be desirable, "by way of providing a more specific and convenient remedy and facilitating the carrying into effect or executing of the rights secured, making every step definite, and safeguarding the same so as to prevent abuses." *Wolverine Golf Club v Secretary of State*, 24 Mich App 711, 730; 180 NW2d 820 (1970) (opinion by LESINSKI, C.J.), aff'd 384 Mich 461 (1971) (quotation marks and citation omitted).

## 1. PROOF OF RESIDENCY

Under 1963 Const, art 2, § 4(1)(f)(2), a person who seeks to register to vote "beginning on the fourteenth (14th) day before that election and continuing through the day of that election" must submit "a completed voter registration application" and provide "proof of residency." A person's residence, for purposes of Michigan election law, is the "place at which a person habitually sleeps, keeps his or her personal effects, and has a regular place of lodging. If a person has more than 1 residence . . . that place at which the person resides the greater part of the time shall be his or her official residence[.]" MCL 168.11(1). An individual may only vote in the township or city in which the individual resides. See MCL 168.491; MCL 168.492. Because an individual may only vote in the township where he or she resides, the individual's residence dictates which candidates and proposals the individual can vote for.

MCL 168.497(2) requires an individual who applies to register to vote in the 14-day period to provide proof of residency. This is not an additional requirement; 1963 Const, art 2, § 4(1)(f)(2) specifically provides that a person who registers to vote in the 14-day period must provide proof of residency. In MCL 168.497(2)-(5), the Legislature defined proof of residency. Because there is no definition of proof of residency in 1963 Const, art 2, § 4(1), the Legislature's definition of proof of residency is a law that supplements the constitutional provision.

A definition from the Legislature of proof of residency was desirable. *Wolverine Golf Club*, 24 Mich App at 730. Absent a statutory definition of proof of residency, confusion and disorder could arise during the 14-day period and on election day itself. Any person who wanted

EXHIBIT 3

to register to vote in the 14-day period would be left to wonder what documents would be accepted as proof of residency. Each city or township clerk would have to make his or her own determination regarding what is acceptable proof of residency. Under these individualized determinations, the documents that would be accepted as proof of residency could be different in each of Michigan's cities and townships. Consequently, a definition of proof of residency makes definite what documents an individual must bring to register to vote in the 14-day period and creates a uniform standard in each of Michigan's voting jurisdictions. *Id.* Furthermore, the Legislature has the constitutional authority under 1963 Const, art 2, § 4(2) to enact laws to preserve the purity of elections,[8] to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting. Accordingly, a legislative definition of proof of residency, which makes definite what documents can be used as proof of residency, is in harmony with the Legislature's obligations under the Michigan Constitution concerning the administration of elections and furthers the exercise of voter registration in the 14-day period. *League of Women Voters of Mich*, ___ Mich App at ___; slip op at 11.

Additionally, even though the Priorities USA plaintiffs have presented evidence that the Legislature's definition of proof of residency in MCL 168.497 has prevented, and may prevent, individuals who are qualified to vote from registering in the 14-day period, the Legislature's definition of proof of residency does not unduly burden the right to register to vote in the 14-day period. Under MCL 168.497, a person provides proof of residency if the person presents either of the following: (1) a current Michigan driver's license or personal identification card, MCL 168.497(2); (2) "any other form of identification for election purposes," which includes driver's licenses and personal identification cards issued by other states and student photo identification cards, see MCL 168.2(k), along with a current utility bill, a current bank statement, or a current paycheck, government check, or other government document, MCL 168.497(3); or (3) an affidavit indicating that the individual does not have "identification for election purposes" and a current utility bill, a current bank statement, or a current paycheck, government check, or other government document, MCL 168.497(4).

The Legislature's definition of proof of residency allows a person to register to vote in the 14-day period with a broad array of common, ordinary types of documents that are available to persons of all voting ages. The Legislature did not provide a narrow list of documents that individuals who register to vote in the 14-day period must present as proof of residency. Moreover, 1963 Const, art 2, § 4(1)(f) requires an individual to provide proof of residency when registering to vote in the 14-day period, and MCL 168.497(2)-(4) defines what documents are acceptable to fulfill that constitutional requirement. Because the Legislature's definition does not unduly burden the right to register to vote in the 14-day period, the definition is a proper supplement to 1963 Const, art 2, § 4(1)(f).

---

[8] "The phrase 'purity of elections' does not have a single precise meaning. However, it unmistakably requires fairness and evenhandedness in the election laws of this state." *Barrow v Detroit Election Comm*, 305 Mich App 649, 676; 854 NW2d 489 (2014) (quotation marks and citation omitted).

EXHIBIT 3

## 2. CHALLENGED BALLOTS

We reject the claims of PVT and the Priorities USA plaintiffs that MCL 168.497(5), which requires that a challenged ballot be issued to anyone who registers to vote in the 14-day period without providing a current Michigan driver's license or personal identification card, unduly burdens the rights in 1963 Const, art 2, § 4(1)(a) and (f). Under 1963 Const, art 2, § 4(1)(f), a person who registers to vote in accordance with that subsection "shall be immediately eligible to receive a regular or absent voter ballot." Under 1963 Const, art 2, § 4(1)(a), a voter is entitled to "a secret ballot."

Michigan election law defines a "regular ballot" as "a ballot that is issued to a voter on election day at a polling place location." MCL 168.3(h). An "absent voter ballot" is "a ballot that is issued to a voter through the absentee voter process." MCL 168.2(b). A challenged ballot is not a third type of ballot. Rather, a challenged ballot is either a regular ballot or an absent voter ballot that is marked (and the mark subsequently concealed) with the number corresponding to the voter's poll list number. See MCL 168.745; MCL 168.746; MCL 168.761(6); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 14 n 24. Notably, a challenged ballot is entered and tabulated with all the other ballots that are cast. See MCL 168.497(5); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 14 n 24.

Furthermore, a challenged ballot is a secret ballot. Generally, a secret ballot is one that prevents anyone else from knowing how the individual voted. See *Helme v Bd of Election Comm'rs of Lenawee Co*, 149 Mich 390, 391-393; 113 NW 6 (1907); *People v Cicott*, 16 Mich 283, 297 (1868), overruled on other grounds by *Petrie v Curtis*, 387 Mich 436 (1972). The mark on a challenged ballot, either before or after it is concealed, does not indicate to anyone how the individual voted. Long before Proposal 3 was passed, the Supreme Court recognized that 1963 Const, art 2, § 4 provided a right to a secret ballot. *Belcher v Mayor of Ann Arbor*, 402 Mich 132, 134; 262 NW2d 1 (1978). This right is not absolute; upon a showing that the voter acted fraudulently, the right can be abrogated. *Id.* ("We hold that a citizen's right to a secret ballot in all elections as guaranteed by Const 1963, art 2, § 4, cannot be so abrogated in the absence of a showing that the voter acted fraudulently."). In a contested election, a challenged ballot may be inspected. See MCL 168.747. But, it may only be inspected if the person consents, the person has been convicted of falsely swearing in such ballot, or if it has been determined that such person was an unqualified elector at the time of casting the ballot. *Id.* Because the right to a secret ballot is not absolute, the fact that a challenged ballot may be inspected in a contested election, MCL 168.474, does not mean that it is not a secret ballot.

## 3. AVR POLICY

The Secretary's AVR Policy does not unduly burden the right in 1963 Const, art 2, § 4(1)(d). Under 1963 Const, art 2, § 4(1), "[e]very citizen of the United States who is an elector qualified to vote in Michigan shall have [certain] rights[.]" In other words, the rights listed in 1963 Const, art 2, § 4(1), including "[t]he right to be automatically registered to vote as a result of conducting business with the secretary of state regarding a driver's license or personal identification card," are rights of "any citizen of the United States who is an elector qualified to vote in Michigan." An individual is not an elector qualified to vote in Michigan—and entitled to

EXHIBIT 3

the rights listed in 1963 Const, art 2, § 4(1)—until the individual reaches 18 years of age.  See US Const, Am XXVI; 1963 Const, art 2, § 1; *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 at 47 n 1 (CAVANAGH, J., dissenting).

The AVR Policy, which allows those who are 17½ years of age or older to be automatically registered to vote as a result of conducting business with the Secretary regarding a driver's license or personal identification card, is consistent with MCL 168.492.  The statute provides:

> Each individual who has the following qualifications of an elector is entitled to register as an elector in the township or city in which he or she resides.  The individual must be a citizen of the United States; not less than 17-½ years of age; a resident of this state; and a resident of the township or city.  [MCL 168.492.]

Because a person under the age of 18 is not an elector qualified to vote in Michigan, and because the AVR Policy is consistent with MCL 168.492, which allows an individual who is not less than 17½ years of age to register to vote, the argument that the AVR Policy unduly burdens the right in 1963 Const, art 2, § 4(1)(d) is without merit.

## D.  EQUAL PROTECTION

PTV and the Priorities USA plaintiffs argue that MCL 168.497 violates the Equal Protection Clause of the Michigan Constitution.  1963 Const, art 1, § 2 provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."  The Equal Protection Clause in the Michigan Constitution is coextensive with the Equal Protection Clause of the United States Constitution.  *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). Equal protection applies when a state either classifies voters in disparate ways or places undue restrictions on the right to vote.  *Obama for America v Husted*, 697 F3d 423, 428 (CA 6, 2012).

The Priorities USA plaintiffs argue that MCL 168.497(5) violates equal protection because it treats similarly situated voters differently.  According to them, although Const 1963, art 2, § 4(1)(f) guarantees that all individuals who register to vote in the 14-day period shall receive a regular or absent voter ballot, under MCL 168.497(5), only those who submit a current Michigan driver's license or personal identification card as their proof of residency receive a regular or absent voter ballot.  PTV similarly argues that many people who register to vote in the 14-day period are denied the right to receive a regular or absent voter ballot.  The basis for these arguments is that a challenged ballot does not constitute a regular or absent voter ballot.  But, as previously discussed, a challenged ballot is a regular or absent voter ballot. As also laid out previously, a challenged ballot does not lose its character as a secret ballot unless the election is contested. Regardless how an individual provides proof of residency, as defined in MCL 168.497, the individual receives a regular or absent voter ballot that is also a secret ballot.  Similarly situated voters are not treated differently under MCL 168.497(5).

The Priorities USA plaintiffs argue that the Legislature's definition of proof of residency in MCL 168.497 severely burdens the right to vote because it has, and will, disenfranchise

EXHIBIT 3

hundreds, if not thousands, of individuals in Michigan who are qualified to vote. According to the Priorities USA plaintiffs, strict scrutiny should be applied to the definition.

Every election law, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v Celebrezze*, 460 US 780, 788; 103 S Ct 1564; 75 L Ed 2d 547 (1983).[9] Consequently, subjecting every voting regulation to strict scrutiny, thereby requiring that the regulation be narrowly tailored to advance a compelling state interest, would tie the hands of states seeking to assure that elections are operated equitably and efficiently. *Burdick v Takushi*, 504 US 428, 433; 112 S Ct 2059; 119 L Ed 2d 245 (1992). In *Burdick*, the United States Supreme Court held that "a more flexible standard" applies:

> A court considering a challenge to a state election law must weigh the "character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."
>
> Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. [*Id.* at 434 (citations omitted).]

See also *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 21-22, where the Supreme Court, after quoting these two paragraphs, stated:

> Thus, the first step in determining whether an election law contravenes the constitution is to determine the nature and magnitude of the claimed restriction inflicted by the election law on the right to vote, weighed against the precise interest identified by the state. If the burden on the right to vote is severe, then the

---

[9] Regardless whether the right to vote, following the passage of Proposal 3, is now an expressly enumerated right in the Michigan Constitution, the United States Supreme Court has recognized that the right to vote is a " 'a fundamental political right' " that "is preservative of other basic and civil political rights." *Reynolds v Sims*, 377 US 533, 562; 84 S Ct 1362; 12 L Ed 2d 506 (1964) (citation omitted). A citizen has "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 US at 336. The right to vote, however, is not absolute; a state has the power to impose voter qualifications, and to regulate access to the franchise in other ways. *Id.*; see also 1963 Const, art 2, § 4(2).

EXHIBIT 3

regulation must be "narrowly drawn" to further a compelling state interest. However, if the restriction imposed is reasonable and nondiscriminatory, then the law is upheld as warranted by the important regulatory interest identified by the state. The United States Supreme Court has stressed that each inquiry is fact and circumstance specific, because "[n]o bright line separates permissible election-related regulation from unconstitutional infringements[.]" [Citation omitted.]

In resolving an equal protection challenge to an election law under the Michigan Constitution, this Court applies the *Burdick* test. *Id.* at 35.

The Legislature's definition of proof of residency does not impose a severe burden on the right to vote. Because Const 1963, art 2, § 4(1) does not define proof of residency, the Legislature provided a definition in MCL 168.497, and the Legislature's definition allows individuals to provide proof of residency with a broad array of ordinary, common documents that are available to persons of all voting ages. The Priorities USA plaintiffs have presented evidence that there are individuals who are qualified to vote and who could not provide proof of residency, as defined in MCL 168.497, in the 14-day period leading up to the March 2020 presidential primary.

However, in arguing that the Legislature's definition of proof of residency has, and will, disenfranchise these individuals, the Priorities USA plaintiffs fail to recognize that an individual can register to vote in several ways. An individual can register to vote by mailing a completed voter registration application on or before the 15th day before the election. 1963 Const, art 2, § 4(1)(e). An individual can register to vote by appearing in person and submitting a completed voter registration application on or before the 15th day before the election. 1963 Const, art 2, § 4(1)(f)(1). See also MCL 168.497(1), which allows an individual to register to vote in person, by mail, or online until the 15th day before the election. Additionally, an individual can register to vote in the 14-day period by appearing in person, submitting a completed voter registration application, and providing proof of residency. 1963 Const, art 2, § 4(1)(f)(2).

The Priorities USA plaintiffs make no claim that any person who is unable to provide proof of residency, as defined in MCL 168.497, in the 14-day period would not be able to register to vote on or before the 15th day before the election. Notably, election days are set by the Michigan Constitution and by statute. See 1963 Const, art 2, § 5; MCL 168.641. Consequently, one should not be uninformed regarding when an election is to be held. Furthermore, it is not unreasonable to expect an individual who wishes to vote in an election, but who is not registered to vote or who has moved since registering to vote, to make inquiries or conduct research—in advance of the election—regarding how to register to vote. In doing so, an individual can learn the different options for registering to vote and the documents that are needed for each method. These inquiries are not a severe or substantial burden. Cf. *Crawford v Marion Co Election Bd*, 553 US 181, 198; 128 S Ct 1610; 170 L Ed 2d 574 (2008) (opinion by STEVENS, J.) (indicating that the inconvenience for those who need a photo identification to vote by gathering the required documents, making a trip to the bureau of motor vehicles, and posing for a photograph does not qualify as a substantial burden); *id.* at 205 (SCALIA, J., concurring) (stating that burdens are severe if they go beyond the merely inconvenient and that "[o]rdinary and widespread burdens, such as those requiring 'nominal effort' of everyone, are not severe") (citation omitted). Furthermore, while the Priorities USA plaintiffs claim that the Legislature's definition of proof of residency is narrow, they make no claim that a more expansive list of specific documents, such as those which the Secretary allows

EXHIBIT 3

to constitute proof of residency when one applies for a driver's license or personal identification card,[10] would allow a significant number of individuals who cannot provide proof of residency, as defined by MCL 168.497, to provide it.

The Legislature's definition of proof of residency in MCL 168.497 is a reasonable, nondiscriminatory restriction that applies to all individuals who seek to register to vote in the 14-day period. See *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 497 Mich at 25. It does not, therefore, violate equal protection of the laws.

Furthermore, the Legislature's definition of proof of residency is warranted by the state's regulatory interests. *Id.* at 22. The Legislature has constitutional authority to enact laws to preserve the purity of elections, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting. 1963 Const, art 2, § 4(2). These obligations include ensuring that fraudulent voting does not dilute the votes of lawful voters. *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 497 Mich at 19-20. Because a person's residence dictates which candidates and proposals the person can vote for, see MCL 168.492, the Legislature has an interest in ensuring that only residents of a city or township vote in that city or township. By defining proof of residency, a phrase undefined by 1963 Const, art 2, § 4(1), the Legislature has enacted a statute that helps to preserve the purity of elections and aids in providing for a system of voter registration. The clerks of Michigan's cities and townships, as well as those qualified to vote in Michigan, now know what documents are needed to establish proof of residency in the 14-day period.

Furthermore, the Legislature's definition of proof of residency is a reasonable means to prevent voter fraud. By defining proof of residency as requiring either a current Michigan driver's license or personal identification or a utility bill, bank statement, paycheck, government check, or other government document with the person's name and current address, the Legislature has required the person to provide a document—created by a neutral, detached third party—that connects the person with their place of residence.

We reject the Priorities USA plaintiffs' claim that voter fraud does not justify the Legislature's definition of proof of residency because voter fraud is not a problem in Michigan and there is no reason to believe that voter fraud would be more prevalent during the 14-day period than in any preceding period. Recall that it is the Michigan Constitution that requires different treatment of persons who register to vote in person on or before the 15th day before the election and those who register in the 14-day period. See 1963 Const, art 2, § 4(1)(f).[11] Additionally, the

---

[10] These documents include a credit card bill, bank statement, Michigan school transcript, mortgage, lease, or rental agreement, insurance policy, and vehicle title and registration. See Michigan Secretary of State, *Driver's License or ID Requirements*, SOS-428 (June 2020).

[11] "[T]he primary objective of constitutional interpretation, not dissimilar to any other exercise in judicial interpretation, is to faithfully give meaning to the intent of those who enacted the law." *Nat'l Pride at Work, Inc v Governor*, 481 Mich 56, 67; 748 NW2d 524 (2008). Under 1963 Const, art 2, § 4(1)(f), when a person registers to vote in person, the documents that the person must present to the election official depends on when the person registers to vote. If the person registers

EXHIBIT 3

Legislature was not required to wait until there was proven voter fraud during the 14-day period before it could enact a definition of proof of residency. See *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 26-27, where the Supreme Court rejected the argument that the state's interest in preventing in-person voter fraud was illusory because there was no significant evidence of such fraud:

> [T]here is no requirement that the Legislature "prove" that significant in-person voter fraud exists before it may permissibly act to prevent it. The United States Supreme Court has explicitly stated that "elaborate, empirical verification of the weightiness of the State's asserted justifications" is *not required.* Rather, a state is permitted to take prophylactic action to respond to potential electoral problems:
>
> > To require States to prove actual [harm] as a predicate to the imposition of reasonable . . . restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.
>
> Therefore, the state is not required to provide *any* proof, much less "significant proof," of in-person voter fraud before it may permissibly take steps to prevent it. [Citations omitted.]

We also reject the Priorities USA plaintiffs' claim that the Legislature's definition of proof of residency was not justified because other statutes adequately prevent voter fraud. They point to MCL 168.933, which provides that "[a] person who makes a false affidavit or swears falsely while under oath . . . for the purpose of securing registration, for the purpose of voting at an election . . . is guilty of perjury." In *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 28 n 69, the Supreme Court rejected a similar argument that the picture identification requirement of MCL 168.523(1) was not justified because there were statutes that imposed criminal penalties for those who impersonated another for voting purposes. It explained:

to vote on or before the 15th day before the election the person must submit "a completed voter registration application." 1963 Const, art 2, § 4(1)(f)(1). But, if the person registers to vote during the 14-day period, the person must submit "a completed voter registration application" and provide "proof of residency." 1963 Const, art 2, § 4(1)(f)(2). Consequently, it is apparent that the voters who enacted Proposal 3 intended that those who register to vote in the 14-day period must provide additional documentation than those who register to vote on or before the 15th day before the election—in addition to submitting a completed voter registration application, they must also provide proof of residency.

EXHIBIT 3

> [T]hat Michigan criminalizes in-person voter fraud does not address Michigan's undisputed interest in *preventing* fraud in the first instance, nor do criminal sanctions provide a means of *detecting* fraud. Moreover, it is unclear how the imposition of criminal penalties could remedy the harm inflicted on our electoral system by a fraudulently cast ballot. [*Id.*]

Accordingly, MCL 168.933 does not dispel the Legislature's interest in preventing voter fraud during the 14-day period.

Finally, PTV, in arguing that MCL 168.497 violates equal protection, focuses on the burden that is caused by the actual issuance of challenged ballots. According to PTV, because it takes longer for a challenged ballot to be issued, which results in longer lines, the requirement that challenged ballots be issued to those who register in the 14-day period without a current Michigan driver's license or personal identification card burdens the right to vote.

The burden of long lines, which results in people having to wait longer to register to vote, is not a severe burden. Long lines are certainly an inconvenience, but a burden must go beyond mere inconvenience to be severe. *Crawford*, 553 US at 205 (SCALIA, J., concurring). Additionally, the burden is justified by the state's interest in preventing voter fraud. See *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich at 19-20. The challenged ballot provides a procedure, in a contested election, to identify a ballot that was cast by someone who engaged in voter fraud. See MCL 168.747; *Belcher*, 402 Mich at 132. It was reasonable for the Legislature to conclude that it was less likely that those persons who register to vote in the 14-day period with a current Michigan driver's license or identification card would be committing fraud than those who register without one. Those who register to vote with a current Michigan driver's license or personal identification card have a government issued identification that contains their picture and their current address. But someone who registers to vote by providing "any other form of identification for election purposes," may have picture identification with a noncurrent address, such as a driver's license or personal identification card issued by another state, or no address for the person, such as a student photo identification card, and someone who registers to vote by submitting an affidavit that he or she does not have "identification for election purposes" simply provides no photo identification at all.

## IV. RESPONSE TO THE DISSENT

Our dissenting colleague concedes that the Legislature was within its rights to establish what constitutes "proof of residency" within the 14-day period. Indeed, the dissent states that the Legislature "can and should" provide guidance as to what is acceptable proof of residency. By making this concession, our colleague must also acknowledge that the legislative choice reflected in MCL 168.497 represents a considered policy judgment of the political branches of our government. That policy judgment is one with which our dissenting colleague clearly disagrees. Indeed, our colleague states that she might have upheld the statute had the Legislature enacted a definition of proof of residency more in line with what she considers to be its "well-understood

EXHIBIT 3

meaning."[12]  But in our view it is not part of the judicial role to second guess the Legislature's policy judgment in this regard, so long as what has been enacted does not run afoul of the constitution.  See *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 149; 644 NW2d 715 (2002) ("It is not the role of the judiciary to second-guess the wisdom of a legislative policy choice; our constitutional obligation is to interpret—not to rewrite—the law.").  We have laid out in painstaking detail why the statutory enactments at issue in this case are well within constitutional bounds.

Finally, the dissent posits that there is a well-accepted meaning of the term "proof of residency."  If so, why should the Legislature have need of defining the term, as the dissent concedes that it "can and should" have done?  More fundamentally, we disagree that the Legislature has substituted "proof of identity" for "proof of residency."  In the context of this statute, a State of Michigan driver's license or personal identification card is being used not as proof of identity, but as proof of residency.  Indeed, the Legislature considers it to be the highest and best proof of residency, as a prospective voter need not supply any other documentation within the 14-day period so long as the voter presents either of those documents reflecting an address within the voting jurisdiction.

## V.  CONCLUSION

We affirm the June 24, 2020 opinion and order of the Court of Claims.  The Secretary and the Legislature were entitled to summary disposition.  The Legislature's definition of proof of residency in MCL 168.497 and the requirement in MCL 168.497(5) that a challenged ballot be issued to any person who registers to vote in the 14-day period without providing a current Michigan driver's license or personal identification card does not unduly burden any of the rights in 1963 Const, art 2, § 4(1)(a) and (f).  The Secretary's AVR Policy also does not unduly burden the right in 1963 Const, art 2, § 4(1)(d).  Additionally, the Legislature's definition of proof of residency in MCL 168.497 and the requirement in MCL 168.497(5) concerning the issuance of challenged ballots do not violate equal protection.

Affirmed.

/s/ Patrick M. Meter
/s/ Michael F. Gadola

---

[12] The dissent lays out the list of documents the Secretary of State accepts as proof of residency when seeking to obtain a driver's license or personal identification card, which is more expansive than the list in MCL 169.497.  First, given the Legislature's duty to preserve the purity of elections, and to ensure that the votes of qualified electors are not unfairly diluted, the Legislature was within its rights to require a higher standard of proof of residency for voting purposes than for driving purposes.  As to the dissent's argument that the list the Legislature chose discriminates on the basis of income, we note that the more expansive list the dissent appears to prefer includes items such as utility bills, bank statements, mortgages, pay stubs, life insurance policies, and other documents that presume a certain economic status.  This appears unavoidable in any scheme designed to establish a person's residency.

EXHIBIT 3