# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>    Plaintiffs<br>v.<br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State, the Michigan BOARD OF STATE CANVASSERS,<br><br>    Defendants. | CASE NO.  20-cv-13134 |

**PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW Plaintiffs, Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, by and through their undersigned counsel, and file this Emergency Motion for Injunctive Relief and Memorandum of Law In Support Thereof, respectfully requesting the relief for the following reasons:

## FACTS

The facts relevant to this motion are set forth in the November 29, 2020 amended complaint ("Complaint") filed in the above-captioned proceeding, and its accompanying exhibits, filed concurrently with this motion, all of which are respectfully incorporated herein by reference.  We present only a summary.

1

After a general election and recount, Joe Biden has been declared the winner of Michigan's General Election for President by a plurality of 154,188 votes. But the vote count certified by defendants on November 23, 2020, is defective. Hundreds of thousands of votes counted toward Mr. Biden's final tally were the product of illegality, fraud and misappropriation. Plaintiffs support this claim in two independent ways.

### i. Counting and/or Creating Fraudulent Ballots

First, as set forth in the affidavit of Russell Ramsland, Jr. (Compl., Ex. 104), at least 289,866 (and likely many more) ballots were fraudulent.

> Something occurred in Michigan that is physically impossible, indicating that the results were manipulated on election night … The event as reflected in the data are the 4 spikes totaling 384,733 ballots allegedly processed in a combined interval of only two hour[s] and 38 minutes. This is physically impossible given the equipment available at the 4 referenced locations (precincts/townships). …. This calculation yields a sum of 94,867 ballots at the maximum number of ballots that could be processed. … [T]here were 289,866 more ballots processed in the time available for processing in four precincts/townships than there was processing capacity. *Id.* ¶14.

> [T]hese statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Michigan and in Wayne County, in particular for candidates for President contain at least 289,866 illegal votes that must be disregarded. *Id.* ¶15.

These fraudulent ballots alone are nearly twice Biden's purported margin of 154,188 ballots.

Separately, evidence gathered by Matt Braynard in the form of recorded calls and declarations of voters, and analyzed by Plaintiffs' expert, Williams M. Briggs, PhD (Compl., Exh. 101), shows, based on a statistically significant sample of 248 Michigan voters, two separate types of error indicative of widespread absentee ballot fraud. Dr. Briggs first estimates that 29,611 to 36,529 ballots were recorded for voters who had not requested them, and second, that 27,928 to 34,710 ballots were recorded for voters who did return their ballots were recorded as being unreturned (*i.e.,* lost or destroyed). *Id.* Taking the average of the two types or errors

together, Dr. Briggs estimates that 62,517, or 45% of total "unreturned" ballots, are "troublesome" and thus indicative fraud or other illegal conduct. *Id.* Mr. Braynard separately analyzed data from the National Change of Address ("NCOA") data base to identify Michigan voters that had moved out of state, as well as Michigan voters who had registered to vote in another State, before the Michigan election, and identified at least 13,248 out-of-state voters who voted in the Michigan 2020 General Election. *Id.* at 1.

Third, Eric Quinell, Ph.D. (Compl., Ex. 102) analyzed the statistically anomalous voting patterns in Wayne County (outside Detroit) and Oakland County – where there was both an extraordinary turnout surge from 2016 to 2020 and nearly 100% or even more of the "new" 2020 voters voted for Biden – resulting in a 15-point swing in the Democrat vs. Republican two-way vote shares (*i.e.*, shifting from 55/45 in 2016 to 70/30 in 2020 for Wayne County (outside Detroit) and 54/46 in 2016 to 72/28 in 2020 for Oakland County). *Id.* ¶¶ 18&20. Dr. Quinell estimates that there were 40,771 "excess" and likely fraudulent votes in Wayne County (outside Detroit) and 46,125 such votes for Oakland County, for a total of 86,896 fraudulent votes in these two counties. *Id.* ¶5.[1] Taken together, the ineligible or illegal ballots identified Dr. Briggs, Dr. Quinell and Mr. Braynard total 162,661 ballots, which is once again in excess of Biden's 154,188 vote plurality in Michigan, and provides a separate and independent ground from the Ramsland Affidavit to set aside the results of 2020 General Election in Michigan.

---

[1] A report from Dr. Stanley Young (Compl. Ex. 110, Chapter 1) reviewed data from the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat), reinforcing Dr. Quinell's analysis and showing that "excess" and likely fraudulent votes from these counties would alone be sufficient to overcome Biden's margin.

Fourth, a report from Robert Wilgus (*see* Compl., Ex. 110, Chapter 3) analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date at all. *Id.* at 14-15. No explanation has been provided for how more than two hundred thousand each of applications and ballots could make the roundtrip of being sent to a voter and then returned (i.e., received by Michigan agency) on the same day, much less the nearly 80,000 that made two roundtrips on the same day, and it is hard to conceive of an innocent explanation for how 200,000+ ballots could have no return date at all.

### ii. Foreign Interference and Hacking in Michigan

In addition, the Complaint includes an analysis of the Dominion software system by a former US Military Intelligence expert concludes that the system and software have been accessible and were certainly compromised by rogue actors, such as Iran and China. (*See* Compl., Ex.105). By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.

Another expert, whose name and testimony have been redacted to protect his safety, reviewed vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee and found significant

4

evidence of foreign interference and "several 'red flags' concerning the percentage of votes won by candidate Biden in counties using … Dominion Voting Systems." (*See* Compl., Ex. 111 ¶6). Affiant concludes that:

> [T]he results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points.  **Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted.**  *Id.* ¶13.

In addition, the Federal Bureau of Investigation ("FBI") and the Cybersecurity and Infrastructure Security Agency ("CISA") issued a joint advisory statement on October 30, 2020, warning states of Iranian cyberattacks and interference targeting state election websites and infrastructure. (*See* Compl. Ex. 8 at 1).

The substantial likelihood that hostile foreign governments, with or without active collusion or collaboration with the Defendants, is a separate and independent ground to grant the declaratory and injunctive relief requested in the Complaint and this Motion.

    **iii.**    **Ballot Stuffing and Other Michigan Election Code Violations**

The election process for the State of Michigan depended heavily on voting machines, tabulators and software purchased from Dominion Voting Systems Corporation. ("Dominion"), and more or less exclusively in key counties like Wayne County. Computerized vote recording and tabulations are controlled by software programs that were designed to cheat, and which were open to human manipulation.  In 2020, ballot stuffing is not simply counting votes of dead people, illegal aliens or out of state residents – all of which occurred here.  *See generally* Compl., Section II.

Manipulation of votes was apparent shortly after the polls closed on November 3, 2020. In particular, several witnesses testified to the delivery, in unmarked vans with out-of-state license plates, to the TCF Center of two shipments of tens of thousands each of "new" ballots that arrived on November 4, 2020, well after the 8:00 PM Election Day deadline. *See* Compl., Section II.B.1. Election workers, in collaboration with Michigan State, Wayne County, and City of Detroit employees and Democratic election challengers and activists, engaged in a pattern of illegal conduct to systematically deny Republic election challengers the opportunity to meaningfully supervise or observe ballot handling, counting and processing. *See* Compl., Section II.A. Without supervision or challengers, election officials could have processed tens or hundreds of thousands of illegal votes from these shipments and other forged, altered, duplicated, or outrighted fabricated votes. They could also have processed thousands of illegal mail-in ballots that were cast by third-parties, deceased voters, unregistered or out-of-state voters, blank ballots that were counted over and over, and/or double votes from people voting both absentee and in-person. *See* Compl., Section II.B and II.C.

With only 154,188 votes separating the candidates out of a total of 5,539,302 cast, this pattern of systematic and widespread violations of the Michigan Election Code by election workers to illegally count ineligible, illegal, duplicate or outright fictitious votes is more than sufficient to invalidate the final results. In the Complaint, Plaintiffs identified dozens of distinct violations of the Michigan Election Code in a single county, all supported by sworn testimony, *see* Compl. Section II. *See generally* Compl., Section II. While it may not be possible to precisely quantify the number of illegal votes, the testimony indicates that it was certainly in the tens of thousands (if not hundreds of thousands), *see, e.g.,* Compl., Section

6

II.B.1, it is not necessary for Plaintiffs to do so; instead, they merely need to show that "it appears that the irregularity affected the result." *Behrendt v. Wilcox*, 277 Mich. 232, 246 (Mich. 1936) (affirming set aside of election upon showing of numerous irregularities). *Accord Attorney General ex rel. McCall v. Kirby,* 120 Mich. 592, 595 (Mich. 1899) (setting aside election results where election law requirements were "wholly ignored … notwithstanding where everything was done in good faith"); *Mead v. Sheffield*, 278 Ga. 268, 272, 601 S.E.2d 99, 102 (1994) "[p]laintiffs need not show how the [] voters would have voted if their [absentee] ballots had been regular. [] only had to show that there were enough irregular ballots to place in doubt the result."). Unless Defendants are enjoined from certifying the election, Plaintiff will be left with no remedy because Michigan's electoral votes for President will not be awarded to the proper candidate.

## DISCUSSION

### Plaintiffs Have Standing

Each of Plaintiffs Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh are registered Michigan voters and are nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan. *See* Compl., "Parties". As such, they each have standing under the 2018 amendments to Article II of the Michigan Constitution, which provides that "[e]very citizen of the United States who is an elector qualified to vote in Michigan shall have the right," among other things, "to have the results of statewide elections audited, …, to ensure the accuracy and integrity of elections." Mich. Const. 1963, art. 2, §4(1)(h). Various provisions of the Michigan Election Code also give any citizen the right to bring an election challenge within 30 days of an election where, as here, it appears that a material fraud or error has been committed.

7

*See, e.g., Hamlin v. Saugatuck Twp.*, 299 Mich. App. 233, 240-241 (2013) (*citing Barrow v. Detroit Mayor*, 290 Mich. App. 530 (2010)); MCL § 168.31a (setting forth election audit requirements); MCL § 168.861 (*quo warranto* remedy for fraudulent or illegal voting). In addition, each Plaintiff has standing to bring this action as a candidate for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors), because Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

### Plaintiffs are Entitled to Injunctive Relief

"To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv) whether the public interest would be served by the issuance of the injunction." *Stein v. Thomas*, 222 F.Supp.3d 539, 542 (E.D. Mich. 2016) (*citing Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002)); *see also City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

All elements are met here.

While the U.S. Constitution itself accords no right to vote for presidential electors, "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added). The evidence shows not only that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Defendants committed a scheme and artifice to fraudulently and illegally manipulate the vote count to make certain the election of Joe Biden as President of the United States. Compl., Section I. This conduct violated Plaintiffs' equal protection and due process rights as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

The Michigan Court of Appeals has held that, in a civil action to vindicate Plaintiffs' right "to seek office in a fair election" the burden of proof is a "preponderance of the evidence". *Treasurer of the Committee to Elect Gerald D. Lostracco v. Fox*, 150 Mich.App. 617, 623 (Mich.App. 1986).

  **i.**  **Plaintiffs have a substantial likelihood of success.**

Through detailed fact and expert testimony including documentary evidence contained in the Complaint and its exhibits, Plaintiffs have made a compelling showing that Defendants' intentional actions jeopardized the rights of Michigan citizens to select their leaders under the process set out by the Michigan Legislature through the commission of election frauds that violated Michigan laws, including multiple provisions of the Michigan Election Code. MCL

§§ 168.730-738. These acts also violated the Equal Protection Clause in the United States Constitution, U.S. Const. Amend XIV.

The tally of ballots certified by Defendants giving Mr. Biden a 154,188 vote plurality cannot possibly stand in light of the hundreds of thousands of illegal mail-in ballots that were improperly counted and the vote manipulation caused by the Dominion software.

Plaintiffs' equal protection claim is straightforward. The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). *See also Reynolds v. Sims,* 377 U.S. 533, 554 (1964) (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (citing Ex parte Yarbrough, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562; *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463,476 (6th Cir. 2008) ("The right to vote is a fundamental right, preservative of all rights."). Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes

10

is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

"Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974); *see also Baker v. Carr,* 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). States may not, by arbitrary action or

other unreasonable impairment, burden a citizen's right to vote. *See Baker v. Carr*, 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "Having once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05. Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment of voters." *Id*. at 106-07; *see also Dunn v. Bloomstein*, 405 U.S. 330, 336 (1972) (providing that each citizen "has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction").

Additionally, as U.S. citizens qualified to vote in Michigan and as candidates for the electoral office of Presidential Elector, MCL §§ 168.42 & 168.43, Plaintiffs seeks redress under the Michigan Election Code and the Michigan Constitution, to vindicate their constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

The Mich. Const. 1963, art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

The Eleventh Circuit recently addressed a claim in 2018 related to the same Dominion software used in Michigan in the 2020 General Election. The Court found:

> In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that

> the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.

*Common Cause Georgia v. Kemp*, 347 F.Supp.3d 1270, 1294-1295, (11th Cir. 2018).

Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results, and grant the declaratory, emergency and permanent injunctive relief requested herein and in the Complaint, pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 General Election to ensure the accuracy and integrity of the election.

### ii. The Plaintiffs will suffer Irreparable Harm

Plaintiffs will suffer an irreparable harm due to the Defendants' myriad violations of Plaintiffs' rights under the U.S. and Michigan Constitutions detailed in the Complaint, in particular, Plaintiffs' fundamental right to vote, equal protection of the laws, due process, and their specific rights as candidates to electoral office.

> When Constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes an irreparable injury.

*Obama for America vs. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted). *See also Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) *aff'd sub nom., McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) (where a plaintiff's constitutional rights are at issue, the movant need only show that his rights are "threatened," from which showing "a finding of irreparable injury is mandated.").

The Michigan count was defective, including defective absentee ballots and out of state voters, then Michigan's election results are improper and suspect, resulting in Michigan's electoral college votes going to Democrats, including Joseph R. Biden, contrary to the votes of

13

the majority of Michigan's qualified electors. Plaintiffs will directly be impacted by their roles in the voting for the Presidential election as Electors to the Michigan Legislature.

### iii. The Balance of Equities

The third fact, whether "the balance of the equities tips in his favor," *Husted*, 697 F.3d at 428 (*quoting Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)), also favors granting the instant motion for injunctive relief. In balancing the equities, a court considering an election challenge "must weigh the character and magnitude of the asserted injury" to the constitutional rights that the plaintiff seeks to protect "against 'the precise interests put forward by the State as justifications for the burdens imposed by its rule … .'" *Stein*, 222 F.Supp.3d at 543 (*quoting Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). Here, the balance must tip into Plaintiffs' favor, as the State has presented no justification for its lawless behavior and wanton disregard of the Michigan Election Code. The only justification Defendants can put forward, were they to say the silent part out loud, is that imperative of ensuring a Biden victory overrides any constraints imposed by the Michigan Election Code.

### iv. The Public Interest

Finally, the public interest would be served by the grant of the temporary relief requested herein.

> The fundamental right invoked by Plaintiffs—the right to vote, and to have that vote conducted fairly and counted accurately—is the bedrock of our Nation. Without elections that are conducted fairly—and perceived to be fairly conducted—public confidence in our political institutions will swiftly erode.

*Stein*, 222 F.Supp.3d at 544. This Court granted the temporary relief requested by Ms. Stein in 2016, despite the fact that the vote margin separating her and President Trump was an order of

magnitude larger than Biden's margin,[2] her evidence of violations was minimal to non-existent (compared with the two dozen plus violations identified in sworn eyewitness testimony in Section II of the Complaint), and the Michigan election workers in key areas like Wayne County for the 2016 election were much more hostile to President Trump than they ever were to Jill Stein. Accordingly, if this Court found that temporary relief for Jill Stein in 2016 was in the public interest, then it must reach the same conclusion for Plaintiffs given that Trump (unlike Stein) has a realistic chance of winning and Plaintiffs have arguably presented more evidence of more kinds of election fraud than has ever been included in an election challenge to a court in a Michigan (or the United States for that matter). This conclusion is further supported by the 2018 enactment of the amendments to Article II of the Michigan Constitution, which are intended, among other things "to preserve the purity of elections, … [and] to guard against abuses of the electoral franchise …. ." Mich. Const. 1963, art. 4, §2.

**Plaintiffs Are Entitled to Emergency Injunctive Relief Prior to December 8, 2020**

Under *Bush v. Gore*, 531 U.S. 98 (2000), Plaintiffs are entitled to emergency injunctive relief that must be granted in advance of December 8, 2020, which is the "safe harbor" date for States to submit their slates of electors under 3 U.S.C. § 5. There, the Supreme Court granting an emergency application for stay of Florida recount because there was "no recount procedure in place … that comports with minimal constitutional safeguards," and any recount procedure that could meet constitutional requirements could not be completed by the 3 U.S.C. §5 safe harbor date. Accordingly,

---

[2] In 2016, Jill Stein received 51,463 votes (or slightly over one percent), while the winner she challenged, current President Trump, received 2,279,543 votes and nearly 50 percent of the vote. In 2020, the current margin between President Trump and Biden is 154,188 votes, based on the November 23, 2020 certification, which has not disqualified any of the illegal or ineligible votes discussed in the Complaint.

15

this Court must schedule and complete any required hearings, briefings and responses in time to issue a decision before December 8, 2020.

**Relief Requested**

Plaintiffs seek a de-certification of Michigan's election results or a stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds, as well as seeking the impounding of the voting machines made available and other equitable relief, on an emergency basis, due to the irreparable harm, and impending election voting for the electors, as stated in the Complaint. The low costs to Defendants and high potential harm to Plaintiffs make this a case with a substantial net harm that an immediate and emergency injunctive relief can prevent. Therefore, it is respectfully requested that the Court grant Plaintiffs' Motion. A proposed form of Order is attached.

Respectfully submitted, this 29th day of November 2020.

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
forthcoming

*Attorneys for Plaintiffs*

/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee

Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day e-filed the foregoing Plaintiffs' Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof using the CM/ECF system, and that I have delivered the filing to the Defendants by email and FedEx at the following addresses:

This 29th day of November, 2020.

    Governor Gretchen Whitmer
    P.O. Box 30013
    Lansing, Michigan 48909
    info@gretchenwhitmer.com

    Secretary of State Jocelyn Benson
    Bureau of Elections
    Richard H. Austin Building, 4th Floor
    430 W. Allegan
    Lansing, Michigan 48918
    Elections@Michigan.gov

    Board of State Canvassers
    Bureau of Elections
    Richard H. Austin Building, 1st Floor
    430 W. Allegan
    Lansing, Michigan 48918
    Elections@Michigan.gov


/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com


Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com