UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES
DAVID HOOPER, and DARREN WADE
RUBINGH,

       Plaintiffs,

v

GRETCHEN WHITMER, in her official
capacity as Governor of the State of
Michigan, JOCELYN BENSON, in her
official capacity as Michigan Secretary of
State and the Michigan BOARD OF STATE
CANVASSERS,

       Defendants,

CITY OF DETROIT,

       Intervening Defendant,

ROBERT DAVIS,

       Intervening Defendant,

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,

       Intervening Defendant.

_____

No. 2-20-cv-13134

HON. LINDA V. PARKER

MAG. R. STEVEN WHALEN

Gregory J. Rohl (P39185)
Attorney for Plaintiffs
41850 West 11 Mile Road, Suite 110
Novi, Michigan 48375
248.380.9404
gregoryrohl@yahoo.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Attorney for Proposed Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Proposed Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

Scott R. Eldridge
Attorney for Proposed Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson (P18690)
Attorney for Proposed Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

_____/

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTFFS'
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Dana Nessel
Attorney General

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

Dated:  December 2, 2020

# TABLE OF CONTENTS

Page

Table of Contents.................................................................................... i

Index of Authorities ............................................................................. iii

Concise Statement of Issue Presented ............................................... viii

Statement of Facts..................................................................................1

Argument.................................................................................................1

I.    Plaintiffs' request for a temporary restraining order or preliminary
      injunction should be denied because Plaintiffs have not demonstrated
      a likelihood of success on the merits of their constitutional claim or
      imminent irreparable harm, or that the balance of harms weighs in
      their favor. ....................................................................................2

      A.    Preliminary injunction factors............................................2

      B.    Plaintiffs have no likelihood of succeeding on the merits of
            their claims. .......................................................................3

            1.    Plaintiffs' claims are barred by laches......................3

            2.    Plaintiffs' claims are moot. ......................................7

            3.    Plaintiffs lack standing to bring their claims. ...........9

            4.    Plaintiffs' claims are barred by the Eleventh Amendment.......12

            5.    This Court should abstain from exercising jurisdiction
                  over Plaintiffs' claims............................................19

            6.    Plaintiffs' federal constitutional claims are without merit. ......31

            7.    Plaintiffs' state-law statutory claims are without merit............43

      C.    Plaintiffs cannot show an irreparable injury absent an
            injunction..........................................................................53

D.      The balance of harms and the public interest weigh against
        granting the injunction. ....................................................................54

Conclusion and Relief Requested............................................................55

Certificate of Service ...............................................................................56

# INDEX OF AUTHORITIES

Page

## Cases

*Abney v. Amgen, Inc.,* 443 F.3d 540 (6th Cir. 2006)...............................................52

*Alabama v. Pugh,* 438 U.S. 781 (1978)..................................................................12

*Albright v. Oliver*, 510 U.S. 266 (1994) ................................................................39

*Alden v. Maine*, 527 U.S. 706 (1999) ....................................................................12

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................................................9

*Balsam v. Sec'y of State*, 607 F. App'x 177 (3d Cir. 2015) ..................................16

*Barden Detroit Casino L.L.C. v. City of Detroit,* 59 F. Supp. 2d 641 (E.D. Mich. 1999)..........................................................................................................32

*Baskin v. Bath Tp. Bd. of Zoning Appeals*, 15 F.3d 569 (6th Cir. 1994) ...............19

*Bates v. Van Buren Tp.*, 122 F. App'x 803 (6th Cir. 2004) ...................................19

*Bognet v. Sec'y Pennsylvania,* __ F.3d __, 2020 U.S. App. LEXIS 35639 (3d Cir., November 13, 2020)....................................................................31, 37, 38

*Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680 (6th Cir. 2000)........................................................2

*Bush v. Gore*, 531 U.S. 98 (2000)....................................................................................................35, 37

*Bush v. Palm Beach County Canvassing Bd.,* 531 U.S. 70 (2000)........................32

*Carson v. Simon,* No. 20-CV-2030, 2020 U.S. Dist. LEXIS 188454 (D. Minn Oct. 11, 2020) ...............................................................................9, 10, 11

*Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535 (6th Cir. 2007)...................................................................................................52

*Cf. Tennessee Scrap Recyclers Ass'n v. Bredesen,* 556 F.3d 442 (6th Cir. 2009)........................................................................................................1

*Church of Scientology v. United States,* 506 U.S. 9 (1992) ....................................6

*Colegrove v. Green*, 328 U.S. 549 (1946) ...........................................................36

*Crookston v. Johnson,* 841 F.3d 396 (6th Cir. 2016).............................................4

*Davis v. Detroit Pub. Sch. Cmty. Dist.*, 2017 U.S. Dist. LEXIS 114749 (E.D. Mich., July 24, 2017).......................................................................................39

*DeFunis v. Odegaard*, 416 U.S. 312 (1974) ..........................................................6

*Edelman v. Jordan*, 415 U.S. 651 (1974) ............................................................13

*Elrod v. Burns,* 427 U.S. 347 (1976).............................................................52, 53

*Ford v. Wilder*, 469 F.3d 500 (6th Cir. 2006)........................................................7

*George v. Hargett*, 879 F.3d 711 (6th Cir. 2018) ................................................37

*Golden v. Gov't of the Virgin Islands* 2005 U.S. Dist LEXIS 45967 (D.V.I. Mar. 1, 2005)............................................................................................................5

*Gottfried v. Med. Planning Servs.*, 142 F.3d 326 (6th Cir. 1998) ...................28, 29

*Great Earth Cos. v. Simons*, 288 F.3d 878 (6th Cir. 2002) ...................................19

*Harrison v. NAACP*, 360 U.S. 167 (1959)............................................................29

*Healthcare Co. v. Upward Mobility, Inc.*, 784 F. App'x 390 (6th Cir. 2019).........19

*Hendon v. N.C. State Bd. Of Elections,* 710 F.2d 177 (4th Cir. 1983) ....................5

*Idaho v. Coeur D'Alene Tribe,* 521 U.S. 261 (1997)............................................14

*In re De Lorean Motor Co.,* 755 F.2d 1223 (6th Cir. 1985)....................................2

*Jon Jon's Inc. v. City of Warren*, 162 F. Supp.3d 592 (E.D. Mich. 2016).............39

*Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp.2d 853 (S.D. Ohio 2008) ...............................................................................................................1

*Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180 (1952)............27

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008) .........40

*Leary v. Daeschner,* 228 F.3d 729 (6th Cir. 2000) ....................................................1

*Los Angeles County v. Davis,* 440 U.S. 625 (1979)...................................................6

*Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941).....................................................2

*Massey v. Coon*, No. 87-3768, 1989 U.S. App. LEXIS 23130 (9th Cir. Jan. 3, 1989).............................................................................................................16

*McPherson v. Mich. High School Athletic Ass'n,* 119 F.3d 453 (6th Cir. 1997)..................................................................................................... 6, 11, 32

*Mosely v. Hairson*, 920 F.2d 409 (6th Cir. 1990)....................................................6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ..........26

*Nader v. Blackwell*, 230 F.3d 833 (6th Cir. 2000)...................................................4

*Nken v. Holder,* 556 U.S. 418 (2009).....................................................................53

*Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d 580 (6th Cir. 2012)...................................................................................................................40

*Obama for America v Husted*, 697 F3d 423 (6th Cir, 2012)...................................39

*PaineWebber, Inc. v. Cohen*, 276 F.3d 197 (6th Cir. 2001)....................................19

*Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984)....... 12, 14, 15, 17

*Philips v. Snyder,* 836 F.3d 707 (6th Cir. 2016) ..............................................39, 40

*Purcell v. Gonzalez,* 549 U.S. 1 (2006)..............................................................3, 4

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 206 L.Ed.2d 452 (2020)...................................................................................................................3

*Romine v. Compuserve Corp.*, 160 F.3d 337 (6th Cir. 1998)...........................19, 26

*See also In re Ohio Execution Protocol Litig.*, 709 F. App'x 779 (6th Cir. 2017)...................................................................................................................15

*Serv. Employees Int'l Union Local 1 v. Husted,* 698 F.3d 341 (6th Cir. 2012) ........3

*Six v. Newsom*, 462 F. Supp. 3d 1060 (C.D. Cal. 2020)........................................16

*Skaggs v. Brunner*, 588 F. Supp. 2d 828 (S.D. Ohio 2008) ....................................37

*Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176 (9th Cir. 1988) ................................................................................................................5

*Stein v. Cortes*, 223 F. Supp. 3d 423 (E.D. Penn, 2016) ...........................................4

*Stenberg v. Cheker Oil Co.,* 573 F.2d 921 (6th Cir. 1978)........................................2

*United States v. Hays*, 515 U.S. 737 (1995) ............................................................8

*Wesberry v. Sanders*, 376 U.S. 1 (1964)................................................................36

*White v. Morris*, 972 F.2d 350 (Table) (6th Cir. Aug. 6, 1992) ............................28

*William v. Rhodes*, 393 U.S. 23 (1968) ...................................................................3

## Statutes

3 USC 7 .....................................................................................................................5

Mich. Comp. Laws 168.46........................................................................................34

Mich. Comp. Laws 168.47...................................................................................5, 35

Mich. Comp. Laws 168.672......................................................................................43

Mich. Comp. Laws L 168.674(2).............................................................................43

Mich. Comp. Laws  168.678......................................................................................49

Mich. Comp. Laws 168.765a(10).............................................................................44

Mich. Comp. Laws 168.801......................................................................................34

Mich. Comp. Laws 168.821......................................................................................34

Mich. Comp. Laws 168.842(1) ................................................................................34

Mich. Comp. Laws 168.843.......................................................................................7

Mich. Comp. Laws § 168.46.....................................................................................17

Mich. Comp. Laws § 168.674.............................................................................42, 43

Mich. Comp. Laws § 168.730 ........................................................................ 41, 46, 51

Mich. Comp. Laws § 168.733(1) ................................................................... 41, 47

Mich. Comp. Laws § 168.733(4) ................................................................... 48

Mich. Comp. Laws § 168.734 ........................................................................ 48, 49

Mich. Comp. Laws § 168.764a ...................................................................... 50

Mich. Comp. Laws § 168.765(5) ................................................................... 50

Mich. Comp. Laws § 168.765a ...................................................................... 42, 44

Mich. Comp. Laws § 168.822(1) ................................................................... 3

Mich. Comp. Laws § 168.879 ........................................................................ 8, 34

Mich. Comp. Laws § 168.931(1)(h) .............................................................. 45, 51

**CONCISE STATEMENT OF ISSUE PRESENTED**

1.   Should Plaintiffs' request for a temporary restraining order or preliminary injunction be denied because they have not demonstrated a likelihood of success on the merits of their constitutional claims or imminent irreparable harm?

## STATEMENT OF FACTS

This case, the eighth? since Michigan held its general election on November 3, alleges the same litany of made-up and misrepresented "fraud" claims already rejected by various state courts. In fact, Plaintiff Stoddard has a case pending in state court where she has made similar allegations.

This action is just the latest in a series of post-election lawsuits raising far-fetched and nonsensical claims of fraud and irregularity in the conducting of the November 3 general election. Plaintiffs' claims, as in other pending cases, focus on the City of Detroit's election and in particular on activities that took place at Detroit's absent voter counting boards in the TCF Center.

Plaintiffs' amended complaint consists of over 200 numbered paragraphs and over 900 additional pages of affidavits and other documents, in which they raise the same litany of perceived fraud and irregularities. However, these claims have been addressed previously in various state-court actions and were succinctly explained by Christopher Thomas, Michigan's long-serving former Director of Elections, whose affidavit from a prior case is attached here. (Ex 1, Thomas Affidavit.) In addition, Plaintiffs' make a number of bizarre allegations concerning the use of Dominion voting machines and software, as well as allegations concerning the counting of ballots in Antrim County. These allegations are similarly erroneous and based upon an incomplete understanding of Michigan's

1

elections, as explained in the attached declaration of Director of Elections Jonathan Brater. (Ex 2, Brater dec.)

For the reasons explained in detail below, this Court should likewise reject Plaintiffs' conspiracy theories, and deny their motion for a temporary restraining order.

## ARGUMENT

I. **Plaintiffs' request for a temporary restraining order or preliminary injunction should be denied because Plaintiffs have not demonstrated a likelihood of success on the merits of their constitutional claim or imminent irreparable harm, or that the balance of harms weighs in their favor.**

### A. Preliminary injunction factors

A preliminary injunction is an extraordinary remedy "designed to preserve the relative positions of the parties until a trial on the merits can be held." *Cf. Tennessee Scrap Recyclers Ass'n v. Bredesen,* 556 F.3d 442, 447 (6th Cir. 2009). A court considers "four factors when determining whether to grant a temporary restraining order: '(1) whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of [a TRO] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of [a TRO].' " *Kendall Holdings, Ltd. v. Eden Cryogenics LLC,* 630 F. Supp.2d 853, 860 (S.D. Ohio 2008) (quoting *Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000)). No one factor is dispositive; rather the court must balance all four factors. *In re De Lorean Motor*

*Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985). The burden of persuasion is on the party seeking the injunctive relief. *Stenberg v. Cheker Oil Co.,* 573 F.2d 921, 925 (6th Cir. 1978).

### B. Plaintiffs have no likelihood of succeeding on the merits of their claims.

The Sixth Circuit has long held that in determining whether to grant an injunction, the movant must show a "strong likelihood of success on the merits." *See e.g. Ohio Republican Party v. Brunner,* 543 F.3d 357, 361 (6th Cir. 2008); *NEOCH v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006); *Summit County Democratic Cent. & Exec Comm. v. Blackwell,* 388 F.3d 547, 550 (6th Cir. 2004).

### 1. Plaintiffs' claims are barred by laches.

The defense of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160 (6th Cir. 1941). An action may be barred by the equitable defense of laches if: (1) the plaintiff delayed unreasonably in asserting their rights and (2) the defendant is prejudiced by this delay. *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). Laches applies in this case for both of these reasons.

Plaintiffs unreasonably delayed raising their claims before this Court. Plaintiffs filed this action on November 25, 2020 (ECF No. 6, Am. Cmplt., PageID.1-830)—more than 21 days after the November 3, 2020 general election,

3

and it was not served upon the Defendants until December 1, 2020 (ECF No. 21, Service, PageID.2109-2114).  The counting of votes in Michigan was completed by the 83 boards of county canvassers on November 17, and by the Board of State Canvassers on November 23.  Mich. Comp. Laws §§ 168.822(1), 168.841, 168.842(2), 168.845.  There is no reason why Plaintiffs' claims of irregularities on election day should not have been brought much sooner—if not promptly at the time of the purported events.

It is well-established that eleventh-hour requests for injunctions on the eve an election are disfavored.  "As a general rule, last-minute injunctions changing election procedures are strongly disfavored." *Serv. Employees Int'l Union Local 1 v. Husted,* 698 F.3d 341, 345 (6th Cir. 2012)(citing *Purcell v. Gonzalez,* 549 U.S. 1, 4-5 (2006)("Court orders affecting elections…can themselves result in voter confusion…As an election draws closer, that risk will increase.")); *William v. Rhodes*, 393 U.S. 23, 34-35 (1968) (affirming denial of request for injunction requiring last-minute changes to ballots, given risk of disrupting election process). The Supreme Court recently reaffirmed that principle in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 206 L.Ed.2d 452, 454 (2020) (staying portions of an injunction modifying process for mailing ballots on eve of primary election).  The Sixth Circuit has also recognized that the federal courts should not quickly "become entangled, as overseers and micromanagers, in the minutiae of state

election processes." *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).

In *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016), the Sixth Circuit stayed an injunction affecting election procedures, and the reasoning could just as readily apply in this case:

> There are many reasons to grant the stay. The first and most essential is that Crookston offers no reasonable explanation for waiting so long to file this action. When an election is "imminen[t] and when there is "inadequate time to resolve [] factual legal disputes" and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures. See *Purcell v. Gonzalez*, 549 U.S. 1, 5-6, 127 S. Ct. 5, 166 L.Ed.2d 1 (2006) (per curiam). That is especially true when a plaintiff has unreasonably delayed bringing his claim, as Crookston most assuredly has. See *Operating Engineers Local 324 Health Care Plan v. G & W Contr. Co.,* 783 F.3d 1045, 1053 (6th Cir. 2015); *Nader v. Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980). Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so.

But Plaintiffs' claims for injunctive relief here are not just last-minute—they are after the fact. Consequently, the rationale for laches is even more compelling. Now—after the votes have been counted and the results have been certified—Plaintiffs seek to raise claims of fraud.

Plaintiffs' delay is simply unreasonable. *See Stein v. Cortes*, 223 F. Supp. 3d 423, 437 (E.D. Penn, 2016)(holding that "prejudicial and unnecessary delay alone provides ample ground" to deny emergency injunctive relief); *see also*

*Golden v. Gov't of the Virgin Islands* 2005 U.S. Dist LEXIS 45967, \*15-17 (D.V.I. Mar. 1, 2005)(holding that plaintiffs lacked diligence by waiting to see whether their candidate of choice won, and that the doctrine of laches bars post-election "sand-bagging on the part of wily plaintiffs.")  The Ninth Circuit has also affirmed the application of laches in post-election lawsuits because doing otherwise would, "permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action." *Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176, 1180 (9th Cir. 1988)(quoting *Hendon v. N.C. State Bd. Of Elections,* 710 F.2d 177, 182 (4th Cir. 1983)).

The Defendants have most certainly been prejudiced by Plaintiffs' delay. The Board of State Canvassers certified the election results on November 23, 2020, and certificates of election have now been issued for all candidates.  (Ex. 3, Draft Minutes.)  Michigan's slate of electors was transmitted by the Governor to the U.S. Archivist the same day.  (Ex. 4, Electors transmittal.)  Further, the federal safe harbor is approaching in less than a week on December 8, and presidential electors are due to convene in less than two weeks—on December 14.  Mich. Comp. Laws § 168.47; 3 U.S.C. § 7.  Defendants cannot reasonably be expected to fully respond to the over 200-numbered paragraphs of Plaintiffs' complaint, or the over 1,500 pages of documents attached to it, in sufficient time to fully litigate and disprove

their baseless allegations between now and December 14, much less December 8, a situation owing solely to Plaintiffs' own failure to act.

Plaintiff has unreasonably delayed in raising his claims before this Court, and the consequences of his delay have prejudiced Defendants. This Court should refuse to issue an injunction under these circumstances.

### 2. Plaintiffs' claims are moot.

Even if this Court declines to apply laches, Plaintiffs' claims are moot. In general, a federal court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties, where the relief requested would have a real impact on the legal interests of those parties. *See Church of Scientology v. United States,* 506 U.S. 9, 12 (1992); *McPherson v. Mich. High School Athletic Ass'n,* 119 F.3d 453, 458 (6th Cir. 1997) (en banc). If "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," then the case is moot and the court has no jurisdiction. *Los Angeles County v. Davis,* 440 U.S. 625, 631 (1979). A "live" controversy is one that "persists in 'definite and concrete' form even after intervening events have made some change in the parties' circumstances." *Mosely v. Hairson*, 920 F.2d 409, 414 (6th Cir. 1990) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974)); *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) ("The test for mootness is whether the relief sought

7

would, if granted, make a difference to the legal interests of the parties.") (internal quotation marks and citation omitted).

In their amended complaint and the motion for injunctive relief, Plaintiffs request various forms of relief.  Among other things, they ask this Court to order the Defendants and non-party Wayne County to "de-certify the election results"; enjoin Governor Whitmer from transmitting the certified election results; order the Governor to transmit certified results that state President Trump is the winner of the election, order the impounding of voting machines and software for inspection by Plaintiffs; order a recount; and an order that no votes received or tabulated by non-certified machines be counted.  (ECF No. 6, Am. Complt., PageID 955, ¶ 233.)

But, as stated above, all 83 counties in Michigan finished canvassing their results for all elections by Tuesday, November 17, and reported their results for state office races to the Secretary of State and the Board of State Canvassers by the next day, *see* Mich. Comp. Laws § 168.843.  The Board of State Canvassers certified the results of the November 3 general election on November 23, and the Governor sent the slate of presidential electors the same day.  The time for requesting a special election based on mechanical errors or malfunctions in voting machines has expired.  *See* Mich. Comp. Laws §§ 168.831, 168.832.  So too, has

8

the time for requesting a recount for the office of President.  *See* Mich. Comp. Laws § 168.879.  And Michigan's electors will meet on December 14.

The named Defendants have already performed any duties they have under the law with respect to the conducting of and certification of the November 3 general election, and there is no mechanism available for de-certifying Michigan's election results or for retracting the slate of electors the Governor has already sent to the Archivist.  Moreover, as explained below, the named Defendants did not engage in any of the unlawful conduct alleged by Plaintiffs.  Even if Plaintiffs were somehow entitled to declaratory relief on their constitutional and statutory claims, which they are not, it would not make a difference in the legal interests of the parties.  Because Plaintiffs' claims are moot.

### 3.    Plaintiffs lack standing to bring their claims.

In some cases, vote dilution can be a cognizable injury that confers standing. *e.g.*, *United States v. Hays*, 515 U.S. 737, 744-45 (1995).  But it does not necessarily follow that all forms of vote dilution give rise to standing.  Plaintiffs have not explained, for instance, why the principles underlying standing in racial gerrymandering cases (where a state legislature or redistricting committee takes affirmative action that dilutes or restricts the votes of a specific minority population) should apply here, in a case based only upon unsubstantiated

9

allegations of breaches of state election law by unidentified individuals at unspecified times.

In *Gill v. Whitford*, the Supreme Court recognized that plaintiffs in past vote-dilution cases had standing when their claimed injuries were "individual and personal in nature," and the plaintiffs had alleged "facts showing disadvantage to themselves as individuals." 138 S. Ct. 1916, 1929-30 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964), and *Baker v. Carr*, 369 U.S. 186, 206 (1962)). This case is different. Plaintiffs broadly allege that their votes will be diluted, but they fail to explain why their votes would be "diluted" at all.  Simply put—diluted by whom?  The alleged "dilution" would affect all Michigan voters equally, giving no particular advantage to one class or group, or any identifiable disadvantage to the Plaintiffs.

Rather, the Plaintiffs' attempted claim of vote dilution is a generalized grievance based on their discontent with the results of the election.  But, that cannot support standing. In short, the prospect of hypothetical unlawful votes in the presidential election is not a harm unique to the Plaintiffs.  Other federal courts hearing challenges to state election laws leading to the November election have rejected similar vote dilution theories. In *Carson v. Simon,* No. 20-CV-2030, 2020 U.S. Dist. LEXIS 188454, *23-24 (D. Minn Oct. 11, 2020), the court—in its

analysis rejecting the plaintiffs' standing based on vote-dilution—succinctly

summarized the recent cases rejecting "vote dilution" standing:

> Illustrating this principle, in the many challenges to state election laws leading to the November election, other courts have rejected *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-1445JCMVCF, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (determining that plaintiffs' vote dilution theory was a generalized grievance and too speculative to confer standing); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (concluding that plaintiffs' vote dilution theory amounted to a generalized grievance); *Paher v. Cegavske*, No. 3:20-cv-00243MMDWGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (determining that plaintiffs' claim that their votes would be diluted as a result of an election conducted exclusively by vote-by-mail was too generalized); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (upholding a magistrate judge's conclusion that plaintiff's vote dilution claim was speculative and a generalized grievance as not clearly erroneous).

In particular, the Court noted that in *Paher*, this alleged injury was held to be too

generalized to confer standing because the claims were "materially grounded on

ostensible election fraud that may be conceivably raised *by any Nevada voter*."

*Paher* at *4 (emphasis in original). There, just as here, the plaintiffs alleged that

the votes are unlawful. The Court in *Carson* held that this was a generalized

grievance, affecting all Minnesota voters in the same way. *Carson*, at *25.  This

Court should reach the same conclusion: allegations of vote dilution due to the

counting of hypothetical, allegedly unlawful ballots is a generalized grievance that

does not confer standing.

Lastly, Plaintiffs allege that some of them have been nominated as presidential electors.  In fact, King, Sheridan, and Haggard appear to have been nominated as a presidential electors at the Michigan Republican State Convention. (Ex. 5, MRP Electors).  Plaintiffs Ritchard, Hooper, and Rubingh, however, have no such claim and so cannot have standing on that basis.   However, the nomination of Plaintiffs King, Sheridan, and Haggard does not grant them any additional basis for standing under their claims for vote-dilution or violations of state law.  In support of their standing as presidential electors, Plaintiffs cite to *McPherson v Blacker*, 146 U.S. 1, 27 (1896), but that case offers no basis for the standing of electors to raise claims challenging election results.  Similarly, *Bush v. Palm Beach Cty. Canvassing Bd.,* 531 U.S. 70, 76 (2000) (per curiam) does not address the standing of presidential electors.  So, Plaintiffs' claim of standing rests entirely upon *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020).  But that case from the Eighth Circuit is not binding on this Court, and that opinion was rooted heavily in the court's interpretation of Minnesota law.  *Id.*  Plaintiffs King, Sheridan, and Haggard fail to articulate any similar basis for their standing under Michigan law.

### 4.    Plaintiffs' claims are barred by the Eleventh Amendment.

Plaintiffs' Amended Complaint names three defendants:  Governor Gretchen Whitmer in her official capacity, Secretary of State Jocelyn Benson in her official

capacity, and the Board of State Canvassers.  Counts I through III of the Amended

Complaint raise claims under 42 U.S.C. §1983, while Count IV alleges violations

of state law.  Each count—even those framed as federal claims—are in reality

state-law claims barred by the Eleventh Amendment because they depend on

resolution of state-law issues.

The United States Constitution, Amendment XI, provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

The Eleventh Amendment to the United States Constitution prevents a state

from being sued in federal court without its consent.  *Alabama v. Pugh,* 438 U.S.

781, 782 (1978).  An unconsenting state is immune from lawsuits brought in

federal court by its own citizens, as well as by citizens of another state.  *Alden v.*

*Maine*, 527 U.S. 706, 712-713 (1999).  The Eleventh Amendment is a

constitutional restriction on the federal judicial power "based in large part on 'the

problems of federalism inherent in making one sovereign appear against its will in

the courts of the other.'"  *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S.

89, 100 (1984).

The U.S. Supreme Court has consistently ruled that the Eleventh

Amendment is a bar to lawsuits against states, state agencies or state departments

unless specifically overridden by an act of Congress, or unless the state has

consented to be sued.  *Id.*; *Pugh,* 438 U.S. at 782; *Edelman v. Jordan*, 415 U.S. 651 (1974).  Further, state officials acting in their official capacity are also not "persons" under § 1983.  *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989).

Applying this well-established framework, Plaintiffs' claims against the Board of State Canvassers are barred by the Eleventh Amendment.  Further, it is far from clear whether Plaintiffs' requested injunction is actually prospective in nature, as opposed to retroactive.  *See Edelman v. Jordan*, 415 U.S. 651, 666-667 (1974).  Plaintiffs do not seek to require state officials to conform their conduct to the law in the future, but rather to retroactively *undo* the actions of state officials, and—indeed—to substitute new actions in their place, in effect having this Court make determinations in place of state officials.  Such a request is not consistent with long-established principles of state sovereignty.  As a result, the *Ex Parte Young* exception to the Eleventh Amendment does not apply to these claims.

Moreover, even if Plaintiffs' claims for injunctive and declaratory relief had been properly pleaded, they would still be barred by the Eleventh Amendment.  "To interpret *Young* to permit a federal court-action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle…that Eleventh Amendment immunity represents a real

14

limitation on a federal court's federal-question jurisdiction." *Idaho v. Coeur D'Alene Tribe,* 521 U.S. 261, 270 (1997).  Federal courts cannot order state officials to conform to state law.  *See Pennhurst*, 465 U.S. at 106.  Here, each count of Plaintiffs' complaint—even Counts I, II, and III, which claim to raise violations of federal law—is predicated on the election being conducted contrary to Michigan law.  In fact, Plaintiffs' amended complaint explicitly requests a declaration that ballot fraud occurred in violation of state law.  (ECF No. 6, Am. Complt., PageID.956).  The Eleventh Amendment bars this Court's exercise of judicial power to issue Plaintiffs' requested relief.

Plaintiffs' complaint is filled with references to Michigan law and how the allegedly unlawful actions of election workers in Detroit and elsewhere violated state law. Count IV is premised entirely upon officials' alleged violations of state statutes.  (ECF No. 6, Am. Compl., ¶¶ 208-228.)  And, as stated above, even Counts I, II and III, although framed as violations of federal constitutional rights, are still based upon violations of Michigan law.  *Id.*, ¶179-180 PageID.938, ¶186-188 PageID. 940-941, ¶206 PageID.948, and ¶211-227 PageID.949-953.

Count I is pleaded as a federal claim under the Elections and Electors Clauses of the U.S. Constitution, but it is based solely on perceived violations of state law.  *Id.*, PageID.938, ¶180.  Although Plaintiffs have styled this claim as a federal cause of action, the substance of their allegations focuses entirely on state

officials' alleged failure to follow the requirements of the Michigan Election Code by allegedly failing to uphold the rights of election challengers and by failing to prevent fraudulent votes. Count II is pleaded as a claim under the Equal Protection Clause of the Fourteenth Amendment but is similarly premised upon the rights and access of election challengers and the alleged failure of the Defendants to comply with the Michigan Election Law. *Id.*, ¶186-190, PageID.940-943. Count III seeks to raise claims of substantive due process under the Fourteenth Amendment, but it likewise rests upon the same alleged violations of state law. *Id.*, ¶206, PageID.948. And, finally, Count IV expressly alleges only violations of state law. Accordingly, each of these claims requires this Court to adjudicate whether Defendants violated state law, either through "de-certifying" the election results, conducting a recount, or transmitting Plaintiffs' desired results. *Id.*, PageID.955-956.

This Court cannot make that determination. As the U.S. Supreme Court held in *Pennhurst*, federal courts are prohibited from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. at 106; *see also id.* at 117 ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the state itself."). *See also In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law in federal court for actions taken within the scope of his authority,

16

sovereign immunity bars the lawsuit regardless of whether the action seeks

monetary or injunctive relief.").

Framing the claims as federal causes of action does not enable this court to

reach these state law issues raised against state officials. *See*, e.g., *Balsam v. Sec'y

*of State*, 607 F. App'x 177, 183-84 (3d Cir. 2015) (holding that Eleventh

Amendment bars state law claims even when "premised on violations of the

federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 U.S. App. LEXIS

23130, at *4 (9th Cir. Jan. 3, 1989) (affirming dismissal of suit where "[a]lthough

on its face the complaint states a claim under the due process and equal protection

clauses of the Constitution, these constitutional claims are entirely based on the

failure of defendants to conform to state law" and "when a plaintiff alleges that a

state official has violated state law…the entire basis for the doctrine of

*Young*…disappears."); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal.

2020) (denying temporary restraining order in part because Fifth and Fourteenth

Amendment claims were predicated on violations of state law); *Acosta v.*

*Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) ("Even when

voters attempt to 'tie their state law claims into their federal claims,' the Eleventh

Amendment bars the state law claims." (quoting *Balsam*, 607 F. App'x at 183));

*Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 U.S. Dist. LEXIS 118606,

at *25-26 (M.D. Ala. July 28, 2017) (denying injunction where plaintiffs' federal

17

constitutional claims rested on premise that state officials failed to implement state law in a particular manner, and the requested injunction would have required the court to supervise and direct state officials in how they should carry out their duties).

As state officials, the Governor, the Secretary, and the Board are indisputably shielded by the Eleventh Amendment.  The actions sought to be enjoined are required by state law.  Mich. Comp. Laws § 168.46 requires that the "governor shall certify" the results of the election after State Board has ascertained the result.

All three of Plaintiffs' claims, including those nominally styled as federal claims, are barred under *Pennhurst* because they depend on an adjudication of Michigan law and state officials' application of it.  But "[a] federal court may not enjoin a state official to follow state law." *Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 479 (6th Cir. 2008).  *Pennhurst* made clear that there is no "greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  465 U.S. at 106.  Because Count IV is based entirely on violations of state law, and seeks to enjoin state officials, it is barred by the Eleventh Amendment. Counts I, II, and III—although purporting to raise claims based upon violations of federal law—depend entirely on whether state officials followed state law.  They are, therefore, barred for the same reasons

18

as Count IV—again, when an issue of state law is simply re-stated as a federal

cause of action, it is barred under *Pennhurst*.

As a result, all of Plaintiffs' claims are barred by the Eleventh Amendment.

### 5.    This Court should abstain from exercising jurisdiction over Plaintiffs' claims.

This Court should abstain from exercising jurisdiction at this time.  In Count

I, Plaintiffs argue that Defendants violated the Electors Clause of the U.S.

Constitution by failing to conduct the November 3 general election in accordance

with the election laws enacted by the Michigan Legislature.  (ECF No. 6, Am.

Compl., PageID 937-939, ¶¶ 177-181.)  In Count II, Plaintiffs argue that

Defendants violated the Equal Protection Clause by causing the debasement or

dilution of Plaintiffs' votes by failing to comply with Michigan's election laws.

*Id*., PageID 939-945, ¶¶ 183-197.  In Count III, Plaintiffs similarly allege that

Defendants violated their substantive due process rights by diluting their votes

through the counting of unlawful or illegal votes.  *Id*., PageID 945-948, ¶¶ 199-

207.  Finally, in Count IV, Plaintiffs allege state-law statutory violations.  *Id*.,

PageID 949-953, ¶¶ 209-228.  But the same or similar claims are already pending

before the Michigan state courts.  Thus, this Court should dismiss Plaintiffs' claims

or at least abstain under *Colorado River Water Conservation District v. United*

*States*, 424 U.S. 800 (1976).

In *Colorado River*, the Supreme Court held that federal courts may abstain from hearing a case solely because similar pending state court litigation exists. 424 U.S. 800, 817 (1976); *accord Romine v. Compuserve Corp.*, 160 F.3d 337, 339-41 (6th Cir. 1998). "[D]espite the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them, . . . considerations of judicial economy and federal-state comity may justify abstention in situations involving the contemporaneous exercise of jurisdiction by state and federal courts." *Romine*, 160 F.3d at 339 (quotation removed).  To abstain from exercising jurisdiction, a state court action must be "parallel." *Id.* at 340; *accord Baskin v. Bath Tp. Bd. of Zoning Appeals*, 15 F.3d 569, 571-72 (6th Cir. 1994).  If state proceedings are parallel, eight factors must weigh in favor of abstention.  *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 206-07 (6th Cir. 2001); *accord Great Earth Cos. v. Simons*, 288 F.3d 878, 886 (6th Cir. 2002).  "Exact parallelism is not required; it is enough if the two proceedings are substantially similar." *Romine*, 160 F.3d at 340 (quotation removed); *accord Bates v. Van Buren Tp.*, 122 F. App'x 803, 806 (6th Cir. 2004). "Where ... the parties are substantially similar and ... [the claims] are predicated on the same allegations as to the same material facts ... the actions must be considered 'parallel.' " *Romine*, 160 F.3d at 340; *accord Healthcare Co. v. Upward Mobility, Inc.*, 784 F. App'x 390, 394 (6th Cir. 2019).

As noted, similar claims are pending in the Michigan state courts.

20

a.   *Johnson et al v. Benson, et al*, **Michigan Supreme Court No. 162286.**

On November 26, two Republican voters and supporters of President Trump filed a petition for writ of mandamus and declaratory and injunctive relief in the Michigan Supreme Court against Secretary Benson, Governor Whitmer, the Board of State Canvassers and its chairperson.  (Ex. 6, Johnson Pet. w/o exhibits).  In Count I, the *Johnson* plaintiffs allege that defendants violated their substantive due process rights under the federal and state constitutions by failing to ensure a fair election process.  (*Id.,* ¶¶ 238-256.)  In Count II, the plaintiffs similarly allege defendants violated their right to equal protection under the federal and state constitutions by failing to ensure a fair and equal election and thus diluting or debasing their votes.  *Id.*, ¶¶ 258-263.  In Count III, the plaintiffs allege defendants violated the Electors Clause under the U.S. constitution by failing to implement or enforce election statutes enacted by the Michigan Legislature.  *Id.*, ¶¶ 265-269.  The *Johnson* Plaintiffs have moved for immediate consideration of their claims.  The facts underlying that complaint and the legal claims are similar if not identical to the facts and claims alleged in the instant case.

b.   *Bailey v. Antrim County*, **Antrim Circuit Court No. 20-9238.**

On or about November 23, an individual voter filed a complaint for declaratory and injunctive relief against Antrim County, alleging constitutional and

statutory violations based on purported fraud in the conducting of the November 3 general election in Antrim County based on its use of the Dominion Voting Systems election management system and voting machines.  (Ex. 7, Bailey Comp. w/o exhibits).  This case thus presents similar claims regarding the Dominion Voting Systems as the present case and remains pending before the Antrim Circuit Court.

c.   ***Donald J. Trump for President, Inc., et al. v. Secretary of State***, **Michigan Court of Appeals No. 355378.**

On November 4, the Trump committee and an individual voter and Republican poll challenger filed a complaint in the Michigan Court of Claims generally alleging that insufficient numbers of Republican election inspectors or challengers were present at unidentified absent voter counting boards in the State, and that challengers were being denied access to surveillance videotapes of AV ballot drop boxes at the unidentified absent voter counting boards.  The plaintiffs sought to halt the canvass.  (Ex. 8, Trump Comp. w/o exhibits.)  The Michigan Court of Claims denied the plaintiffs' motion for emergency and/or injunctive relief, (Ex. 9, Trump Order), and plaintiffs appealed to the Michigan Court of Appeals.  The plaintiffs filed their brief on appeal on November 30.  (Ex. 10, Trump COA Brf w/o appendix.)  This case and appeal thus present similar claims as to the issues of challengers and inspectors.

     **d.**    ***Stoddard, et al. v. Detroit Election Commission, et al.,*** **Wayne Circuit Court No. 20-014604.**

Also on or about November 4, the Election Integrity Fund and an Republican challenger at TCF, filed a complaint in Wayne Circuit Court against Detroit and Wayne County election officials alleging that a sufficient number of Republican election inspectors were not present at Detroit's absent voter counting board at TCF, and that ballots were being duplicated without the presence of Republican election inspectors. (Ex. 11, Stoddard Comp., w/o exhibits.) The plaintiffs sought injunctive relief to stop the duplication of ballots without a Republican inspector being present. The circuit court denied the request for injunctive relief, concluding that plaintiffs' claims that thousands of ballots had been changed or falsified were speculative. (Ex. 12, Stoddard Order.) The plaintiffs did not appeal, and their case remains pending in the circuit court.

     **e.**    ***Constantino, et al. v. City of Detroit, et al.*****, Wayne Circuit Court No. 20-014780.**

On or about November 8, another lawsuit was filed in Wayne Circuit Court against City of Detroit and Wayne County election officials. Plaintiffs Cheryl Constantino and Edward McCall, voters and Republican challengers, alleged a litany of errors in the processing of AV ballots at TCF, including that:

    a. Defendants systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets. When a voter's name

could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted.

b. Defendants instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.

c. After election officials announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in trays at the TCF Center. There were tens of thousands of these absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates.

d. Defendants instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline.

e. Defendants systematically used false information to process ballots, such as using incorrect or false birthdays. Many times, the election workers inserted new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900.

f. On a daily basis leading up to the election, City of Detroit election workers and employees coached voters to vote for Joe Biden and the Democrat party. These workers and employees encouraged voters to do a straight Democrat ballot. These election workers and employees went over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

g. Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes.

h. Defendant election officials and workers refused to record challenges to their processes and removed challengers from the site if they politely voiced a challenge.

i. After poll challengers started discovering the fraud taking place at the TCF Center, Defendant election officials and workers locked credentialed challengers out of the counting room so they could

24

not observe the process, during which time tens of thousands of ballots were processed.

j. Defendant election officials and workers allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate. In fact, election officials and workers repeatedly obstructed poll challengers from observing. Defendants permitted thousands of ballots to be filled out by hand and duplicated on site without oversight from poll challengers.

(Ex. 13, Constantino Compl., pp 3-4.) The plaintiffs requested injunctive relief, asking the state court to order the defendants to conduct an independent audit to determine the accuracy of the November 3 election; to prohibit the defendants from certifying the election results; and to issue an order voiding the election results. *Id.*, p 20. The circuit court denied the motion for injunctive relief on November 13. (Ex. 14, Constantino Order.) The court concluded that the claims of fraud and improprieties lacked credibility and were often based on misunderstandings of the law and the actual processes that occurred at TCF, as demonstrated by the affidavit of Christopher Thomas, Michigan's former, longstanding Director of Elections. *Id.* The plaintiffs appealed the denial of their request for injunctive relief to the Michigan Court of Appeals, which denied relief,[1]

---

[1] *See* Michigan Court of Appeals Docket No. 3553443, available at https://courts.michigan.gov/opinions_orders/case_search/pages/default.aspx?SearchType=1&CaseNumber=162245&CourtType_CaseNumber=1.

and the plaintiffs then appealed to the Michigan Supreme Court.  On November 23,

the Michigan Supreme Court denied leave to appeal, with two justices writing

separately.  (Ex. 15, Constantino MSC Order).  This case remains open and

pending before the Wayne Circuit Court.  In fact, Justice Zahra suggested that the

plaintiffs expedite resolution of their remaining issues before the Wayne Circuit

Court.  *Id.*

These five actions are sufficiently parallel to Plaintiffs' instant claims to

warrant abstention under *Colorado River.*

With the actions being parallel, the court must weigh eight factors to

determine if abstention is appropriate:

> (1) whether the state court has assumed jurisdiction over any res or property;
>
> (2) whether the federal forum is less convenient to the parties;
>
> (3) avoidance of piecemeal litigation;
>
> (4) the order in which jurisdiction was obtained;
>
> (5) whether the source of governing law is state or federal;
>
> (6) the adequacy of the state court action to protect the federal plaintiff's rights;
>
> (7) the relative progress of the state and federal proceedings; and
>
> (8) the presence or absence of concurrent jurisdiction.

*Cohen*, 276 F.3d at 206 (quotation removed).  Here, the third, fourth, fifth, sixth,

and seventh factors weigh in support of abstention.

26

The third factor, the avoidance of piecemeal litigation, "was paramount in *Colorado River* itself." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19 (1983). "Piecemeal litigation occurs when different courts adjudicate the identical issue, thereby duplicating judicial effort and potentially rendering conflicting results." *Romine*, 160 F.3d at 341. This factor weighs in favor of abstention. By allowing Plaintiffs to litigate their constitutional and statutory claims, and especially if the court were to decide Plaintiffs' motion for a preliminary injunction, the court would potentially duplicate the efforts of the state courts and risk conflicting orders. The Michigan Supreme Court currently has before it nearly identical factual and legal claims. There would likely be no further need for this action regardless of how the Michigan Supreme Court rules. Allowing Plaintiffs to continue here while there are appeals and cases pending in state court, would undermine just adjudication and fairness to the Defendants. "The legitimacy of the court system in the eyes of the public and fairness to the individual litigants . . . are endangered by duplicative suits that are the product of gamesmanship or that result in conflicting adjudications." *Romine*, 160 F.3d at 341.

The order in which jurisdiction was obtained, the fourth factor of *Colorado River* analysis, also supports abstention.  The state cases discussed above were all

27

filed well before this case, and several of the cases, *Trump*, S*toddard*, and *Constantino*, are far more advanced than this case.

The Michigan courts are also capable of protecting Plaintiffs' rights, the sixth *Colorado River* factor. The state courts can address and resolve federal constitutional questions, especially where equal protection and dur process principles overlap, and the state courts are certainly the better venue for interpreting and resolving state statutory claims. This factor weighs in favor abstention.

Last, the progress of the proceedings, factor number seven, also weighs in favor of abstention. No discovery has taken place in this case; the court has not reviewed the merits of the claims or Plaintiffs' motion for a temporary restraining order. But most of the state court litigation has advanced further than this action, and is or has already been to the Michigan appellate courts.

While abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Colorado River*, 424 U.S. at 813. Abstention is warranted because the driving principle of *Colorado River* abstention is "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colorado River*, 424 U.S. at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952)). Where sufficient relief may be provided in the state

proceedings that were filed first and are farther along than this federal proceeding, declining to abstain would contravene the spirit of the *Colorado River* doctrine. Thus, this Court should abstain from adjudicating Plaintiffs' Electors Clause, equal protection, substantive due process, and state statutory claims, and exercise its discretion to dismiss it, rather than simply stay the claim. *E.g., White v. Morris*, 972 F.2d 350 (Table), at *2 (6th Cir. Aug. 6, 1992); *Preston v. Eriksen*, 106 F.3d 401 (Table), at *4 (Jan. 14, 1997).

This Court should also abstain under the principles articulated by the Sixth Circuit in *Gottfried v. Med. Planning Servs.*, 142 F.3d 326 (6th Cir. 1998). In *Gottfried*, the Sixth Circuit recognized that under certain circumstances, a federal district court should refrain from exercising its jurisdiction based on considerations of "equity, comity, and our federalist judicial system" even though the case might not "precisely fit any of the jurisdictional doctrines normally applicable." *Id.* at 330.

The plaintiff in *Gottfried* wanted to picket outside the home, office, and abortion clinic of a doctor. But the doctor had obtained a state-court injunction years earlier restricting picketing at those locations that remained in effect. *Id.* at 328. Concerned she would be arrested if the injunction were to be enforced against her, the plaintiff filed suit asking that the federal court declare the injunction unconstitutional and enjoin the city from enforcing it against her. *Id.* The Sixth

29

Circuit determined that none of the recognized abstention doctrines applied, as the plaintiff had not been a party to the injunction and there was no ongoing state action. *Id.* at 329-30.  Nevertheless, the Court held that "equity, comity, and our federalist judicial system require the federal court to give the state judge the first chance to bring the injunction into compliance with constitutional law." *Id.* at 330.

In so holding, the Sixth Court relied on the rationale underlying the *Pullman* abstention doctrine, which "requires a federal court, faced with a constitutional challenge to an uncertain state law, to defer the constitutional question and avoid a direct confrontation if a decision from the state court 'might avoid in whole or in part the necessity for federal constitutional adjudication.' " *Id.* at 331 (quoting *Harrison v. NAACP*, 360 U.S. 167, 177 (1959)).  Based on this principle of constitutional avoidance, the *Gottfried* Court held that "a federal court should abstain when a nonparty to a state court injunction brings a First Amendment challenge to the injunction in federal court before requesting relief from the state court." *Id.* at 332. The Court further reasoned that this approach would be more efficient, as it would permit the state court to take into consideration changes in the law that had occurred and to reassess the continuing need for the injunction and its scope. *Id.*  Doing so also afforded the state court the respect due as an equal in the federalist judicial system. *Id.* at 332-333.

For all the same reasons articulated above in support of *Colorado River* abstention, abstention is warranted under *Gottfried*.  As the Court observed there:

> Treating an injunction like a statute, those who want to exercise their speech rights but do not wish to violate the injunction often file suit in federal court against a host of state and local officials for every imaginable constitutional violation, rather than simply asking the state judge who has ongoing jurisdiction over the matter for relief. This has become the pattern in today's litigious era, and it causes a host of problems that only multiply where, as here, the law has changed in the interim and a new state judge has inherited a permanent injunction drafted by a predecessor.

> Under these circumstances, we believe equity, comity, and our federalist judicial system require the federal court to give the state judge the first chance to bring the injunction into compliance with constitutional law.  [*Id*. at 330.]

Here, Plaintiffs could have filed their constitutional and statutory claims in state court. And regardless, there are pending state cases that may resolve Plaintiffs' concerns without the need for this Court's intervention and the threat of possibly conflicting decisions.  Waiting for the state court decisions preserves principles of comity as well.  This Court should thus abstain from resolving Plaintiffs' constitutional and statutory claims.

### 6.    Plaintiffs' federal constitutional claims are without merit.

Plaintiffs bring four counts, three of which raise federal causes of action. For the reasons stated below, none of these claims has any legal merit.

31

### a.   Electors and Elections Clauses

As an initial matter, Plaintiffs lack standing to bring claims under the Electors and Elections Clauses.  As the Third Circuit recently held, private plaintiffs lack standing to sue for alleged injuries attributable to a state government's violations of the Elections Clause.  *Bognet v. Sec'y Pennsylvania,* __ F.3d __, 2020 U.S. App. LEXIS 35639, *18 (3d Cir., November 13, 2020).  In that case, the Third Circuit also held that because the Elections Clause and Electors Clause have "considerable similarity," the same logic applies to alleged violations of the Electors Clause.  *Id.*

Even assuming Plaintiffs had standing, the claim based upon the Electors and Elections Clauses would still fail.  Count I of Plaintiffs' complaint contends that, because the Michigan Legislature has established laws for the administration of elections, including presidential elections, the Defendants violated the Electors Clause and the Elections Clause by "failing to follow the requirements of the Michigan Election Law."  (ECF No. 6, Am. Complt., ¶179-180, PageID.938).  It is worth noting that Plaintiffs' theory here would effectively constitutionalize *any and every* claimed violation of state election law—no matter how minor, fleeting, or inconsequential—any time there was a presidential election.  If adopted by this Court, Plaintiffs' argument would dramatically expand federal court oversight of state elections, and any deviation from state law by local officials anywhere in the

state would be a matter of federal review.  Plaintiffs offer no support for such an

expansive reading the Electors and Elections Clauses, and no other court appears to

have adopted this approach.  Indeed, as discussed in greater detail in the section

below addressing Plaintiffs' equal protection claim, such federal court

management of state elections has been rejected by other courts.

In *Bush v. Palm Beach County Canvassing Bd.,* 531 U.S. 70, 76 (2000) the

Supreme Court held that state legislatures enacting laws governing the selection of

presidential electors are acting under a grant of authority under Article II, § 1, cl. 2

of the U.S. Constitution.  The Supreme Court has also held that the power to define

the method of selecting presidential electors is exclusive to the state legislature,

*McPherson v. Blacker,* 146 U.S. 1, 27 (1892), and cannot be "taken or modified"

even by the state constitutions.  *Bush v. Gore,* 531 U.S. 98, 112-13 (2000)(C.J.

Rehnquist, concurring).  From this modest premise, Plaintiffs contend that any

violation of the Michigan Election Law is tantamount to a modification of the

Legislature's enactments.  But neither *Bush* nor *McPherson* hold as much.

But the principal problem with Plaintiffs' argument, of course, is that the

Defendants have done nothing to violate the Michigan Election Law.  The Eastern

District of Michigan has held that public officials are presumed to have "properly

discharged their official duties" and that the burden falls on the party asserting an

*ultra vires* act to show otherwise.  *Barden Detroit Casino L.L.C. v. City of Detroit,*

33

59 F. Supp. 2d 641, 661 (E.D. Mich. 1999)(citing *Bracy v. Gramley,* 520 U.S. 899, 909 (1997)).  Here, Plaintiffs have failed to offer evidence rebutting that presumption.  The Secretary of State, in fact, expressly issued instructions and guidance providing for how poll challengers may perform their functions while maintaining social distance to protect the health of election workers.  Plaintiffs fail to demonstrate how the Governor or Board of State Canvassers violated any provision of the Michigan Election Law.  The Plaintiffs have simply not alleged how the Defendants failed to follow the Legislature's enactments.  Absent from Plaintiffs' complaint is any reference to any act or decision by any of the Defendants that supposedly "violates" state law—let alone the Electors and Elections Clauses as a consequence thereof.

In *Bush v. Gore*, Justice Rhenquist observed that federal courts' review of state court decisions affecting presidential electors under Article II was still deferential:

> In order to determine whether a state court has infringed upon the legislature's authority, we necessarily must examine the law of the State as it existed prior to the action of the court. Though we generally defer to state courts on the interpretation of state law -- see, e.g., *Mullaney v. Wilbur*, 421 U.S. 684 [ ] (1975) -- there are of course areas in which the Constitution requires this Court to undertake an independent, if still deferential, analysis of state law.

*Bush,* 531 U.S. at 114.  Here, neither the Governor, the Secretary, nor the Board have "infringed" upon the authority of "the Legislature."

34

Further, the Defendants have not done anything to violate the Elections Clause.  The Elections Clause provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but Congress may at any time make or alter such Regulations, except as to the Place of chusing Senators.

Frankly, it is not entirely clear how this clause applies to the present case. The election was held on November 3, 2020 in conformity with state law.  As to the timing for counting ballots and certifying the results, the canvass of the votes at the precinct level must, by statute, commence immediately after the polls close. Mich. Comp. Laws § 168.801.  The boards of county canvassers must meet on the Thursday immediately following any election to commence the canvass of the counties' returns of votes, and the county canvass must be completed by the 14th day after an election, which is November 17 for this election cycle.  Mich. Comp. Laws §§ 168.821, 168.822.  The canvass began as required, and the county canvasses were completed.

Under Mich. Comp. Laws § 168.842(1), the Board of State Canvassers must meet on or before the twentieth day after the election to certify the results but must complete the canvas no later than the fortieth day.  The twentieth day for this election cycle was November 23, and the fortieth day is December 13.  The Board of Canvassers did, in fact, certify the results on November 23, 2020 at a meeting that was both widely-reported and streamed live over the internet.  No presidential

35

candidate subsequently requested a recount within the time provided under state law.  Mich. Comp. Laws § 168.879(1)(c).

Under Mich. Comp. Laws § 168.46, "[a]s soon as practicable after the state board of canvassers has" certified the results the Governor must certify the list of presidential electors to the U.S. Secretary of the Senate. *See also* 3 U.S.C. § 6. This, also, has already been done.

Lastly, § 47 provides that the presidential electors "shall convene" in the State's capitol "on the first Monday after the second Wednesday in December following their election," which is December 14 for this election cycle.  Mich. Comp. Laws § 168.47; 3 U.S.C. § 7.  If anything, Plaintiffs' requested relief imperils the ability of the State to comply with this statutory deadline.  As of today, less than 2 weeks remain before the electors must convene.  Plaintiffs would have this Court block the appointed electors from performing their duty.  More pointedly, Plaintiffs' requested relief—an order requiring the Governor to transmit results naming electors for a candidate *other than the one certified to have won the election*—would itself violate the Electors Clause because such electors would not have been appointed in the manner provided by state law.

Plaintiffs have failed to show that these Defendants failed to follow state law, or that the Electors and Elections Clauses were violated.  Accordingly, they are not likely to succeed on the merits of this claim.

36

### b.    Equal Protection Clause

"Equal protection of the laws" means that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.  Voting rights can be impermissibly burdened "by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).  "Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right [to vote]." *Reynolds*, 377 U.S. at 559 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964)).  "[A]ll who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be." *Reynolds*, 377 U.S. at 557–58 (quoting *Gray v. Sanders*, 372 U.S. 368, 379 (1963)).  Thus, "a law that would expressly give certain citizens a half-vote and others a full vote" would be violative of the Equal Protection Clause.  *Wesberry*, 376 U.S. at 19 (quoting *Colegrove v. Green*, 328 U.S. 549, 569 (1946)).

Here, no group has been given preference or advantage—indeed, it is impossible at this time to determine with any level of accuracy whether any supposed "invalid" votes were for or against any candidate for whom Plaintiffs voted.  Plaintiffs fail to identify by name a single voter who voted when they

37

should not have—let alone anything resembling widespread election fraud.

Similarly, Plaintiffs have not identified any election workers who supposedly

engaged in misconduct or malfeasance.  Upon information and belief, none of the

affiants have submitted any complaints of election fraud to a law enforcement

agency.

Moreover, there has simply been no valuation of any person's—or group of

persons'—votes as being more valuable than others.  There has been no disparate

treatment, and so nothing to violate "one-person, one-vote jurisprudence." *Bush*,

531 U.S. at 107 (citing *Gray*, 372 U.S. 368.)  See, e.g., *George v. Hargett*, 879

F.3d 711 (6th Cir. 2018) (method for counting votes on state proposal did not

violate equal protection); *State ex rel Skaggs v. Brunner*, 588 F. Supp. 2d 828 (S.D.

Ohio 2008) (counting provisional ballots of otherwise eligible voters did not dilute

vote). While Plaintiffs argue that some poll challengers were treated

inappropriately, that has no bearing on the validity or integrity of any votes.  As

argued elsewhere, the penalty for interfering with a poll challenger is to punish the

person who violated the law—not to punish voters by invalidating their votes for

reasons over which they had no control.

Also, the Third Circuit in *Bognet* rejected this precise claim:

Contrary to the Voter Plaintiffs' conceptualization, vote dilution under
the Equal Protection Clause is concerned with votes being weighed
differently. See *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501, 204
L. Ed. 2d 931 (2019) ("'[V]ote dilution' in the one-person, one-vote

38

cases refers to the idea that each vote must carry equal weight." (emphasis added)); cf. *Baten v. McMaster*, 967 F.3d 345, 355 (4th Cir. 2020), as amended (July 27, 2020) ("[N]o vote in the South Carolina system is diluted. Every qualified person gets one vote and each vote is counted equally in determining the final tally."). As explained below, the Voter Plaintiffs cannot analogize their Equal Protection claim to gerrymandering cases in which votes were weighted differently. Instead, Plaintiffs advance an Equal Protection Clause argument based solely on state officials' alleged violation of state law that does not cause unequal treatment. And if dilution of lawfully cast ballots by the "unlawful" counting of invalidly cast ballots "were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Trump for Pres. v. Boockvar*, 2020 U.S. Dist. LEXIS 188390, 2020 WL 5997680, at \*45-46. **That is not how the Equal Protection Clause works.**

*Bognet*, *supra,* at \*31-32 (emphasis added).  Similarly, the Eighth Circuit has held that, "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cnty. Election Bd*., 788 F.2d 1270, 1271 (7th Cir. 1986)).  And the Fifth Circuit has also recognized that the Constitution, "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980).

This Court should also adopt the reasoning of these courts and conclude that Plaintiffs have failed to state a claim for a violation of Equal Protection.

### c.    Due Process Clause

In Count III, Plaintiffs claim that violations of state election law constitute "widespread and systemic" violations of the Due Process Clause.  In particular,

Plaintiffs cite to their allegations that Republican poll challengers were denied a "meaningful" opportunity to observe the processing and counting of ballots, that election workers altered ballots, and other violations of state law that allowed for the counting of "ineligible, illegal, or duplicate ballots."  (ECF No. 6, Am. Complt., ¶206, PageID.948).

But the Supreme Court has never recognized the right to vote as a right qualifying for substantive due process protection.  *Davis v. Detroit Pub. Sch. Cmty. Dist.*, 2017 U.S. Dist. LEXIS 114749, *37 (E.D. Mich., July 24, 2017)(quoting *Philips v. Snyder*, 2014 U.S. Dist. LEXIS 16097, *16 (E.D. Mich., November 19, 2014)).  Instead, the Supreme Court has held that "[w]here a particular Amendment provides an explicit source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Jon Jon's Inc. v. City of Warren*, 162 F. Supp.3d 592, 605 (E.D. Mich. 2016) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)).  Vote-dilution claims are typically analyzed under the Equal Protection Clause.  Equal protection also applies when a state either classifies voters in disparate ways or places undue restrictions on the right to vote.  *Obama for America v Husted*, 697 F3d 423, 428 (6th Cir, 2012).  For the reasons stated in the argument above, there is no violation

40

of the Equal Protection Clause.  Consequently, there is also no violation of

substantive due process.

It is true that the Sixth Circuit has held that the Due Process Clause is

"implicated" in "exceptional cases where a state's voting system is fundamentally

unfair." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir.

2008).  *See also*, *Northeast Ohio Coalition for the Homeless v. Husted,* 696 F.3d

580, 597 (6th Cir. 2012).  But the *League of Women Voters* case involved "non-

unform rules, standards, and procedures," involving missing names from voter

rolls, inadequate numbers of voting machines, and refusal of assistance to disabled

voters which resulted in "massive disenfranchisement and unreasonable dilution of

the vote." *Id.*  And *NE Coalition for the Homeless* involved "poll-worker error

[that] cause[d] thousands of qualified voters to cast wrong-precinct ballots from the

correct polling locations." 696 F.3d at 597.  Neither circumstance is present in this

case.  Further, the Sixth Circuit in *Philips v. Snyder,* 836 F.3d 707, 716 (6th Cir.

2016) instructed that these cases were to be interpreted narrowly, and that they

"address[ed] whether states' entire election processes impaired citizens' abilities to

participate in state elections on an equal basis with other qualified voters."

*Phillips*, 836 F.3d at 716.  As a result, although case law recognizes that a

substantive due process right to vote *may* come into play upon a showing of

"fundamental unfairness," the necessary unfairness only arises when a profound

irregularity comprises "non-uniform rules, standards, and procedures."  Here,

Plaintiffs do not allege non-uniform rules or standards, and instead premise their

claim on alleged *violations* of the rules by unknown individuals.  As a result, their

claims fail to demonstrate any irregularity of such magnitude that it rises to a

constitutional violation.

Moreover, Plaintiffs' allegations are insufficient to establish widespread or

systemic violation of the Michigan Election Law.  For example, Plaintiffs' claims

about the ability of challengers to observe the counting of ballots are not consistent

with the statute.  All that is required is that the "board of election inspectors shall

provide space for the challengers within the polling place that enables the

challengers to observe the election procedure and each person applying to vote."

Mich. Comp. Laws § 168.733(1).  The statute does not, however, provide that

challengers get to stand a certain distance from the counting of the ballots, or that

their view must be sufficiently unobstructed.  Similarly, the Michigan Election

Law provides that "a political party [or interested organization] may designate not

more than 2 challengers to serve in a precinct at any 1 time," Mich. Comp. Laws §

168.730, and that "[a]n election challenger is authorized to challenge an election

procedure that is not being properly performed," Mich. Comp. Laws §

168.733(1)(d).  Plaintiffs do not appear to claim that there were *no* Republican

challengers—only that some were not allowed back in after leaving.  (ECF No. 6,

42

Am. Complt., ¶62-63 PageID.892-893).  Such claims simply fail to rise to the level of "fundamental unfairness."

### 7.    Plaintiffs' state-law statutory claims are without merit.

In Count IV, Plaintiffs allege various state-law statutory violations.  These claims demonstrate Plaintiffs' complete failure to understand the law and the roles of various election officials and are without merit.

### a.    Mich. Comp. Laws § 168.765a

Plaintiffs argue that "Defendants habitually and systematically disallowed election inspectors from the Republican Party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican Party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were cast."  (ECF No. 6, Am. Compl., PageID 79-80, ¶¶ 215-216.)  Plaintiffs cite Mich. Comp. Laws § 168.765a.  *Id*., PageID 79, ¶ 214.  These claims are without merit since none of the named Defendants engaged in any conduct preventing election inspectors from accessing TCF or have any duties with respect to the appointment of election inspectors.

In this argument, Plaintiffs appear to conflate election inspectors and election challengers.  A challenger is not the same thing as an election inspector—

challengers are appointed in different manners and have different responsibilities.
Compare *e.g.* Mich. Comp. Laws §§ 168.674 and 168.730.

For Election Day, city or township election commissioners must appoint at least three election inspectors to each election precinct, and "not less than a majority of the inspectors shall be present in the precinct polling place during the time the polls are open." Mich. Comp. Laws § 168.672. This is true for AVCBs associated with the precincts as well, and the inspectors appointed to AVCBs have the same authority as election inspectors at in-person voting precincts. Mich. Comp. Laws § 168.765a(1), (4).[2] The election commissioners "shall designate 1 appointed election inspector as chairperson," and "shall appoint at least 1 election inspector from each major political party and shall appoint an equal number, as nearly as possible, of election inspectors in each election precinct from each major political party." Mich. Comp. Laws § 168.674(2). With respect to AVCBs, section 765a(10) provides:

> Subject to this subsection, the clerk of a city or township may allow the election inspectors appointed to an absent voter counting board in that city or township to work in shifts. A second or subsequent shift of election inspectors appointed for an absent voter counting board may begin that shift at any time on election day as provided by the city or township clerk. However, an election inspector shall not leave the absent voter counting place after the tallying has begun until the polls close. If the election inspectors appointed to an absent voter counting

---

[2] Not every jurisdiction chooses to establish AVCBs for the processing and counting of AV ballots. Mich. Comp. Laws 168.765a(1) ("if a city or township decides to use absent voter counting boards").

board are authorized to work in shifts, at no time shall there be a gap between shifts and the election inspectors must never leave the absent voter ballots unattended. **At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place** and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.

Mich. Comp. Laws § 168.765a(10) (emphasis added). Under section 765a(4), more than one AVCB may be located in a building or place. Mich. Comp. Laws § 168.765a(4). Read in context, it is reasonable to conclude that subsection 765a(10) is intended to ensure proper staffing over the course of election day at an AVCB.

It is Defendants' understanding that the City of Detroit established 134 AVCBs for the November election and all 134 counting boards were located at the TCF Center—in one place. Section 765a, as Defendants interpret it, did not require the City of Detroit to have one Republican election inspector present at all times at TCF for each of the 134 AVCBs. In other words, the statutes did not require Detroit to have 134 Republican (and 134 Democratic) election inspectors present at TCF at all times that ballots were being processed and counted.

But regardless, Plaintiffs' claims are misdirected. The named Defendants did not engage in any activity at TCF and do not have any duties with respect to a jurisdiction's, like the City of Detroit, decision to establish an AVCB, where and how an AVCB will be held, or in the appointment of election inspectors to serve at AVCBs. The election inspectors for Detroit's AVCBs at TCF were appointed by

45

the City of Detroit's Board of Election Commissioners.  Mich. Comp. Laws §
168.765a(2).  Thus, who was appointed as an election inspector and how many
inspectors were appointed, Republican and Democratic, was determined by that
Board—not by the Secretary, the Governor, or the Board of State Canvassers.  And
while the Secretary of State exercises supervisory control over local election
officials, including clerks, election commissioners, and election inspectors, *see*
Mich. Comp. Laws § 168.21, the Secretary does not directly supervise an election
commission's appointment of inspectors, or directly supervise how many election
inspectors are present at a polling place or an AVCB at any given time.

And in any event, the Legislature has not imposed any specific penalty upon
election officials for failing to comply with section 765a.  At best, the election
commissioners or others could face a possible criminal prosecution.  Section
931(1)(h) makes it a misdemeanor for a person to "willfully fail to perform a duty
imposed upon that person by [the Michigan Election law], or disobey a lawful
instruction or order of the secretary of state as chief state election officer or of a
board of county election commissioners, board of city election commissioners, or
board of inspectors of election."  Mich. Comp. Laws § 168.931(1)(h).  There is no
statutory support for Plaintiffs' requested relief, which is to enjoin certification,
order a recount, or void the election.  (ECF No. 6, Am. Compl., PageID 953, ¶
228.)

46

### b.    Mich. Comp. Laws § 168.733.

Plaintiffs argue that "Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud."  (ECF. No. 6, Am. Complt., Page ID 951, ¶ 218.)  Here, Plaintiffs again conflate inspectors and challengers.

Challengers are appointed under Mich. Comp. Laws § 168.730.  Under section 733(2), "[t]he **board of election inspectors** shall provide space for each challenger, if any, at each counting board that enables the challengers to observe the counting of the ballots. A challenger at the counting board may do 1 or more of the activities allowed in subsection (1), as applicable."  Mich. Comp. Laws § 168.733(2) (emphasis added).  Subsection 733(1) provides, in pertinent part, for the following duties and authority of challengers:

A challenger may do 1 or more of the following:

 (a) Under the scrutiny of an election inspector, inspect without handling the poll books as ballots are issued to electors and the electors' names being entered in the poll book.

 (b) Observe the manner in which the duties of the election inspectors are being performed.

 (c) Challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector.

47

   (d) Challenge an election procedure that is not being properly performed.

   (e) Bring to an election inspector's attention any of the following:

      (i) Improper handling of a ballot by an elector or election inspector.

      (ii) A violation of a regulation made by the board of election inspectors pursuant to section 742.

      (iii) Campaigning being performed by an election inspector or other person in violation of section 744.

      (iv) A violation of election law or other prescribed election procedure.

   (f) Remain during the canvass of votes and until the statement of returns is duly signed and made.

   (g) Examine without handling each ballot as it is being counted.

   (h) Keep records of votes cast and other election procedures as the challenger desires.

   (i) Observe the recording of absent voter ballots on voting machines.

Mich. Comp. Laws § 168.733(1).  Section 733(3) provides that "disorderly conduct is sufficient cause for the expulsion of a challenger from the polling place or the counting board." Mich. Comp. Laws § 168.733(3).  And that "election inspectors and other election officials on duty shall protect a challenger in the discharge of his or her duties." *Id.*  Section 733(4) similarly provides that a "person shall not

threaten or intimidate a challenger while performing an activity allowed under subsection [733](1)." Mich. Comp. Laws § 168.733(4).[3]

The penalty or punishment for interfering with the rights of a challenger is set forth in section 734:

> Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding 2 years, or by both such fine and imprisonment in the discretion of the court.

Mich. Comp. Laws § 168.734.

Under these statutes, Plaintiffs claims against Defendants are misdirected and without merit. The named Defendants did not fail to do anything or interfere with any Republican challenger's rights at the TCF Center. The Governor and the Board of State Canvassers have no role in election-day activities conducted at the city and township level. Indeed, Plaintiffs make no allegations that that they do. And while the Secretary of State exercises supervisory control over local election officials, including city and township clerks and election inspectors, *see* Mich. Comp. Laws § 168.21, election inspectors have primary supervisory authority over

---

[3] The Secretary of State has published guidance on the rights of challengers and poll watchers. *See*, The Appointment, Rights and Duties of Election Challengers and Poll Watchers, available at https://www.michigan.gov/documents/SOS_ED_2_CHALLENGERS_77017_7.pdf.

49

polling places and AVCBs on Election Day.  *See* Mich. Comp. Laws § 168.678

("Each board of election inspectors shall possess full authority to maintain peace,

regularity and order at its polling place, and to enforce obedience to their lawful

commands during any . . . election[.]")  It is the election inspectors at the AVCBs

that have the duty to provide space for challengers and to ensure that their rights

are not being infringed upon—not the Defendants.  If Republican challengers were

experiencing difficulties at TCF it was the challengers' obligation to bring it to the

attention of the appointed election inspectors present at TCF, who could then have

sought further guidance from City of Detroit election officials present at TCF to

address or rectify the situation.

In addition, sections 733 and 734 do not provide Plaintiffs with a cause of

action or right enforceable through civil proceedings.  The Michigan Legislature

determined in section 734 that violations of the rights of challengers as set forth in

section 733 should be enforced through criminal proceedings.  If Republican

challengers believe that their rights were violated their remedy is to make a

complaint to law enforcement for investigation and possible prosecution.  *See*

Mich. Comp. Laws §§ 168.734, 168.931(1)(h), 168.939, 168.940, 168.941.

### c. Mich. Comp. Laws §§ 168.765 and 168.764a.

Plaintiffs allege that Defendants violated sections 765 and 764a. (ECF No. 6, Am. Complt., PageID 952, ¶¶ 220-224.) But this allegation too, is without merit since the statutes impose no duties or obligations on Defendants.

Section 765(5) provides that:

On or before 8 a.m. on election day, **the clerk** shall post in the clerk's office or otherwise make public the number of absent voter ballots the clerk distributed to absent voters and the number of absent voter ballot return envelopes containing the marked ballots of absent voters received by the clerk before election day and to be delivered to the board of election inspectors or the absent voter counting boards under this act.

Mich. Comp. Laws § 168.765(5) (emphasis added). That section goes on to provide that:

On or before 9 p.m. on election day, **the clerk** shall post in the clerk's office or otherwise make public the number of absent voter ballot return envelopes containing the marked ballots of absent voters received by the clerk on election day and delivered to the board of election inspectors . . . along with the total number of absent voter ballot return envelopes containing the marked ballots of absent voters received by the clerk both before and on election day and delivered to the board of election inspectors or the absent voter counting boards under this act. . . .

*Id*. (emphasis added). Section 764a instructs voters to return their completed AV ballots to the clerk's office by 8 p.m. on election day. Mich. Comp. Laws § 168.764a.

Section 765(5) does not impose any duty or obligation upon Secretary Benson, Governor Whitmer, or the Board. Rather, it imposes a duty on the local

51

clerks to post the required information.  With respect to Plaintiffs' claims it was the

obligation of the City of Detroit Clerk to post the required information by the

required time.  Defendants do not have any personal knowledge of whether the

City of Detroit met these reporting or disclosure requirements.  There is no

obligation under these statutes for the 1,500 or so local clerks to

contemporaneously report compliance with the requirements to the Secretary of

State (or any other Defendant) on election day.  Plaintiffs simply have no claim

against the named Defendants for the alleged violation of these statutes.

And regardless, the Legislature has not imposed any specific penalty upon

clerks for failing to comply with section 765(5).  At best, a clerk could face a

possible criminal prosecution.  Again, section 931(1)(h) provides that "[a] person

shall not willfully fail to perform a duty imposed upon that person by this act. . . ."

Mich. Comp. Laws § 168.931(1)(h).  But, as already stated above, there is no

support in Michigan law for the sweeping relief requested by Plaintiff for the

purported violation of these statutes.

### d.      Mich. Comp. Laws § 168.730.

Last, Plaintiffs allege that Secretary Benson and "election officials in Wayne

County" violated the rights of Republican challengers under sections 730 through

734 to participate and meaningfully observe the processing and counting of AV

ballots.  (ECF No. 6, Am. Complt., PageID 952-953, ¶¶ 225-227.)  Of course,

Wayne County is not a defendant here, and as explained above, Secretary Benson does not directly supervise the activities of election inspectors and challengers at polling places and AVCBs on election day, or the days before or after election day. Polling places and AVCBs are supervised by the appointed election inspectors and then by the city or township clerks and their deputies. Further, the remedy for interference with the rights of challengers is a subsequent criminal prosecution.

Because Plaintiffs' statutory claims as pleaded against the named Defendants are completely without merit, and Plaintiffs have no likelihood of succeeding on the merits of these claims.

### C. Plaintiffs cannot show an irreparable injury absent an injunction.

In considering issuing an injunction, courts must consider whether the plaintiff will suffer irreparable injury without the injunction. *Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535, 550 (6th Cir. 2007). "To demonstrate irreparable harm, the plaintiffs must show that . . . they will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.,* 443 F.3d 540, 552 (6th Cir. 2006). Irreparable harm may also exist where a plaintiff can demonstrate a substantial likelihood of success on the merits of the plaintiff's claim that his or her constitutional right has or will imminently be violated. *Elrod v. Burns,* 427 U.S. 347, 373-74 (1976).

But here, Plaintiffs' claims of harm are speculative because their allegations are vague, speculative, and fail to demonstrate that any single person voted where they were ineligible. Their supposed harms are, accordingly, entirely hypothetical and abstract. Thus, Plaintiffs cannot demonstrate a sufficient actual and imminent injury for purposes of showing irreparable harm. Furthermore, as discussed above, Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claims. *Elrod*, 427 U.S. at 373-374. Because Plaintiffs have not demonstrated irreparable harm, their motion for injunctive relief must be denied.

### D.   The balance of harms and the public interest weigh against granting the injunction.

Here, the balance of harms and public interest factors weigh in Defendant's favor. These factors "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).

Additionally, it is contrary to the public interest for courts to interfere in election laws in the run-up to an election. See, e.g., *Williams v Rhodes*, 393 U.S. 23, 34 (1968) (declining to order new ballots printed at a "late date" even where existing ballots unconstitutionally excluded a certain candidate); *North Carolina v League of Women Voters of N. Carolina*, 574 US 927 (2014) (granting stay to prevent interference with election procedures roughly one month before election); *Lair v Bullock*, 697 F3d 1200, 1214 (CA 9, 2012) (staying a district court's injunction "given the imminent nature of the election"); *Serv Emps Int'l Union*

54

*Local 1 v Husted*, 698 F3d 341, 345 (6th Cir., 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."); *NE Ohio Coal for the Homeless v Blackwell*, 467 F3d 999, 1012 (6th Cir., 2006) (vacating in part a temporary restraining order that "creates disorder in electoral processes"). As argued earlier with regard to laches, the same interests are at stake now in this post-election challenge. If the Court issues the injunction Plaintiffs request, it will upend the statutory process for election certification and the selection of presidential electors. Moreover, it will disenfranchise millions of Michigan voters in favor the preferences of a handful of people who disappointed with the official results. Surely, the public interest weighs in favor of judicial restraint.

Furthermore, Michigan courts have long recognized that the will of the majority should not be defeated as a result of errors by election officials. See *Gracey v. Grosse Pointe Farms Clerk,* 452 N.W.2d 471, 478 (1989) citing *Lindstrom v. Bd. of Canvassers,* 54 N.W. 280, 281 (1893), quoting McCrary on Elections, § 193; *Groesbeck v. Bd. of State Canvassers*, 232 N.W. 387 (1930).

## CONCLUSION AND RELIEF REQUESTED

For these reasons, Defendants respectfully request that this Honorable Court deny the motion for temporary restraining order, together with any other relief the Court determines to be appropriate under the circumstances.

Respectfully submitted,

DANA NESSEL
Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

Dated:  December 2, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2020, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Assistant Attorney General
Attorney for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659

56

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES
DAVID HOOPER, and DARREN WADE
RUBINGH,

        Plaintiffs,

v

GRETCHEN WHITMER, in her official
capacity as Governor of the State of
Michigan, JOCELYN BENSON, in her
official capacity as Michigan Secretary of
State and the Michigan BOARD OF STATE
CANVASSERS,

        Defendants,

CITY OF DETROIT,

        Intervening Defendant,

ROBERT DAVIS,

        Intervening Defendant,

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,

        Intervening Defendant.

_____

No. 2-20-cv-13134

HON. LINDA V. PARKER

MAG. R. STEVEN WHALEN

**STATE DEFENDANTS'
RESPONSE IN OPPOSITION
TO PLAINTFFS'
EMERGENCY MOTION FOR
TEMPORARY RESTRAINING
ORDER**

**EXHIBIT LIST**

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTFFS'
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

**EXHIBIT LIST**

1.  Constantino v City of Detroit Wayne Circuit 20-014780-AW Affidavit of Christopher Thomas
2.  Affidavit of Jonathan Brater
3.  Draft minutes 11.23.2020
4.  Electors Transmittal
5.  MRP Electors
6.  Johnson v Benson, et al MI Sup Ct 162286 Petition
7.  Bailey v Antrim Co Antrim Circuit 20-9238-CZ Complaint
8.  Trump v Benson Court of Claims 20-000225-MZ Complaint
9.  Trump v Benson Court of Claims 20-000225-MZ Order
10. Trump v Benson Court of Appeals 355378 Brief
11. Stoddard v City of Detroit, et al Wayne Circuit 20-014604-CZ Complaint
12. Stoddard v City of Detroit, et al Wayne Circuit 20-014604-CZ Order
13. Constantino v City of Detroit, et al Wayne Circuit 20-01780-AW Complaint
14. Constantino v City of Detroit, et al Wayne Circuit 20-014780-AW Order
15. Constantino MI Sup Ct 162245 Order

EXHIBIT 1

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,

Plaintiffs,

vs.

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

Defendants.

Case No. 20-014780-AW

Hon. Timothy M. Kenny

| | |
|---|---|
| GREAT LAKES JUSTICE CENTER<br>David A. Kallman (P34200)<br>Erin E. Mersino (P70886)<br>Jack C. Jordan (P46551)<br>Stephen P. Kallman (P75622)<br>5600 W. Mount Hope Hwy.<br>Lansing, MI 48917<br>(517) 322-3207<br>*Attorneys for Plaintiffs* | FINK BRESSACK<br>David H. Fink (P28235)<br>Darryl Bressack(P67820)<br>38500 Woodward Ave., Suite 350<br>Bloomfield Hills, MI 48304<br>(248) 971-2500<br>dfink@finkbressack.com<br>dbressack@finkbressack.com<br>*Attorneys for City of Detroit, City of Detroit*<br>*Election Commission and Janice Winfrey*<br><br>CITY OF DETROIT LAW DEPARTMENT<br>Lawrence T. García (P54890)<br>Charles N. Raimi (P29746)<br>James D. Noseda (P52563)<br>2 Woodward Ave., 5th Floor<br>Detroit, MI 48226<br>(313) 237-5037<br>garcial@detroitmi.goc<br>raimic@detroitmi.gov<br>nosej@detroitmi.gov<br>*Attorneys for City of Detroit, City of Detroit*<br>*Election Commission and Janice Winfrey* |

**AFFIDAVIT OF CHRISTOPHER THOMAS**

1

Document received by the MI Wayne 3rd Circuit Court.

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1.      I am a Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election.

2.      I served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. In June 1981 I was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs.

3.      In 2013, I was appointed to President Barack Obama's Commission on Election Administration and served until a final report was submitted to the President and Vice-President in January 2014.

4.      I am a founding member of the National Association of State Election Directors and severed as its president in 1997 and 2013.

5.      On November 2, 3 and 4, 2020, I worked at the TCF Center absent voter counting boards primarily as liaison with challenger parties and organizations. I provided answers to questions about processes at the counting board tables, resolved disputed about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers.  I have reviewed the complaint and affidavits in this case.

Document received by the MI Wayne 3rd Circuit Court.

6.     It is clear from the affidavits attached to the Complaint that these challengers do not understand absent voter ballot processing and tabulating. It is clear also that they did not operate through the leadership of their challenger party, because the issues they bring forward were by and large discussed and resolved with the leadership of their challenger party. The leadership on numerous occasions would ask me to accompany them to a particular counting board table to resolve an issue. I would always discuss the issue with counting board inspectors and their supervisors and the challengers. The affiants appear to have failed to follow this protocol established in a meeting with challenger organizations and parties on Thursday, October 29, 2020 at the TCF Center where a walk-through of the entire process was provided. A few basics are in order: The Qualified Voter File (QVF) is a statewide vote registration file and was not available to counting boards. E-pollbook (EPB) is a computer program used in election day precincts to create the poll list of voters casting ballots. Supplemental poll lists contain names of voters who cast an absent voter ballot on Sunday, Monday and Tuesday.   At the processing tables no ballots are scanned. A poll list is not used to confirm whether any specific voter's ballot is counted.

7.     To increase the accuracy of the poll list, the Detroit Department of Elections employed the Secretary of State e-pollbook (EPB) to assist in creating the poll list. For each of the counting boards, the EPB held all the names of voters who requested and returned an absent voter ballot by mid-afternoon Sunday, November 1. The download on Sunday was necessary to prepare for the pre-processing granted by a recently enacted law that allows larger municipalities to process ballots, but not to tabulate them, for 10 hours on Monday. (To clarify some apparent confusion by Plaintiffs, Wayne County does not tabulate City of Detroit absent voter ballots.)

8.     Absent voter ballots received Sunday after the download to EPB, all day Monday until 4 p.m. and Tuesday by 8 p.m. were not in the EPB. They would be added either by manually

Document received by the MI Wayne 3rd Circuit Court.

entering the voter names into the EPB or on supplemental paper poll lists printed from the Qualified Voter File (QVF).

9. Zachery Larsen is raising an issue about return ballot envelopes where the barcode on the label would not scan and the voter's name was not on the supplemental list. He was observing the correction of clerical errors, not some type of fraud. In every election, clerical errors result in voters being left off the poll list, whether it is a paper poll list or the EPB. These errors are corrected so that voters are not disenfranchised. Michigan law ensures that voters are not disenfranchised by clerical errors.

10. On Wednesday, November 4 it was discovered that the envelopes for some ballots that had been received prior to November 3 at 8 p.m., had not been received in the QVF. They would not scan into the EPB and were not on the supplemental paper list. Upon reviewing the voters' files in the QVF, Department of Elections staff found that the final step of processing receipt of the ballots was not taken by the satellite office employees. The last step necessary to receive a ballot envelope requires the satellite employee to enter the date stamped on the envelope and select the "save" button. They failed to select "save".

11. A team of workers was directed to correct those clerical errors by entering the date the ballots were received in the satellite office and selecting "save". This action then placed the voter into the Absent Voter Poll List in the QVF so that the ballot could be processed and counted. None of these ballots were received after 8 p.m. on election day. Most were received on Monday, November 2nd – the busiest day for the satellite offices.

12. The return ballot envelopes for each of these voters are marked with the date received and initialed by satellite employees who verified the voter signatures. By entering the date on which the ballot was received, no QVF data was altered. The date field was empty because

Document received by the MI Wayne 3rd Circuit Court.

the satellite workers did not select 'save', thus failing to complete the transaction. The "backdating" allegation is that on November 4 the staff entered the correct dates the ballots were received – all dates were November 3 or earlier.  The date of receipt was not backdated.

13.     These return ballot envelopes were discussed with several Republican challengers. Two challengers were provided a demonstration of the QVF process to show them how the error occurred, and they chose not to file a challenge to the individual ballots.

14.     The inspectors at the counting boards were able to manually enter voters into the EPB. The return ballot envelope could easily be observed and every key stroke of the EPB laptop operator was clearly visible on the large screen at one corner of the table. The Department of Elections, at some expense, provided large monitors (see attached photo) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot distancing barrier. Instead of creating problems for challengers, the monitors made observing the process very transparent.

15.     The EPB has an "Unlisted Tab" that allows inspectors to add the names of voters not listed. The EPB is designed primarily for use in election day polling places and reserves the Unlisted Tab to enter voters casting provisional ballots. In polling places, voters are verified by providing their date of birth. Consequently, the EPB is designed with a birthdate field that must be completed to move to the next step. When using this software in an absent voter counting board, a birthdate is not necessary to verify voters, as these voters are verified by signature comparisons (a process which was completed before the ballots were delivered to the TCF Center). Inspectors at the TCF Center did not have access to voters' birthdates. Therefore, due to the fact that the software (but not the law or the Secretary of State) requires the field be completed to move to the next step, 1/1/1900 was used as a placeholder. This is standard operating procedure and a standard date used

Document received by the MI Wayne 3rd Circuit Court.

by the State Bureau of Elections and election officials across the state to flag records requiring attention. The date of 1/1/1900 is recommended by the Michigan Secretary of State for instances in which a placeholder date is needed.

16.     When Republican challengers questioned the use of the 1/1/1900 date on several occasions, I explained the process to them. The challengers understood the explanation and, realizing that what they observed was actually a best practice, chose not to raise any challenges.

17.     Ballots are delivered to the TCF Center after they are processed at the Department of Elections main office on West Grand Boulevard. On election day, ballots are received from the post office and the satellite offices. It takes several hours to properly process ballots received on election day. It appears that some of the affidavits submitted by Plaintiffs are repeating false hearsay about ballots being delivered, when actually television reporters were bringing in wagons of audio-video equipment. All ballots were delivered the same way— from the back of the TCF Hall E.

18.     Early in the morning on Wednesday, November 4, approximately 16,000 ballots were delivered in a white van used by the city. There were 45 covered trays containing approximately 350 ballots each. The ballots were not visible as the trays had a sleeve that covered the ballots.

19.     The ballots delivered to the TCF Center had been verified by the City Clerk's staff prior to delivery in a process prescribed by Michigan law. Thus, when Jessy Jacob complains that she "was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" it was because that part of the process had already been completed by the City Clerk's Office in compliance with the statutory scheme.

Document received by the MI Wayne 3rd Circuit Court.

20.     It would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center. No voter not in the QVF or in the "Supplemental Sheets" could have been processed, or "assigned" to a "random name" because no ballot from a voter not in one of the two tracking systems, was brought to the TCF Center.

21.     Mr. Larsen complains he was not given a full opportunity to stand immediately behind or next to an election inspector. As stated, monitors were set up for this purpose. Moreover, election inspection were instructed to follow the same procedure for all challengers. The Detroit Health Code and safety during a pandemic required maintaining at least 6-feet of separation. This was relaxed where necessary for a challenger to lean in to observe something and then lean back out to return to the 6-foot distancing. The inspectors could see and copy the names of each person being entered into the e-pollbook. If an inspector did not fully accommodate a challenger's reasonable request and the issue was brought to the attention of a supervisor, it was remedied. Announcements were made over the public address  system to inform all inspectors of the rules. If what Mr. Larsen says is accurate, any inconvenience to him was temporary, had no effect on the processing of ballots, and certainly was not a common experience for challengers.

22.     Jessy Jacob alleges she was instructed by her supervisor to adjust the mailing date of absentee ballot packages being sent out to voters in September 2020.  The mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes.

Document received by the MI Wayne 3rd Circuit Court.

23.     Michigan Election Law requires clerks to safely maintain absent voter ballots and deliver them to the absent voter counting board. There is no requirement that such ballots be transported in sealed ballot boxes. To my knowledge, they are not sealed by any jurisdiction in Michigan in a ballot box prior to election day. Employees bring the ballot envelopes to the TCF Center, which is consistent with chain of custody. The only ballots brought to TCF that are not in envelopes are blank ballots used to duplicate ballots when necessary.

24.     At no time after ballots were delivered to TCF on Sunday, November 1, did any ballot delivery consisted of "tens of thousands of ballots".

25.     Reference is made to a "second round of new ballots" around 9:00 p.m. on Wednesday, November 4. At or about 9:00 p.m. on November 4, 2020 the Department of Elections delivered additional blank ballots that would be necessary to complete the duplication of military and overseas ballots. No new voted ballots were received. The affidavits are likely referring to blank ballots that were being delivered in order to process AV and military ballots in compliance with the law.

26.     In the reference to a "second round of new ballots" there are numerous misstatements indicative of these challengers' lack of knowledge and their misunderstanding of how an absent voter counting board operates. These statements include "confirm that the name on the ballot matched the name on the electronic poll list" – there are no names on ballots.

27.     No absentee ballots received after the deadline of 8:00 p.m. on November 3, 2020, were received by or processed at the TCF Center. Only ballots received by the deadline were processed.

28.     Plaintiffs reference "Supplement Sheets with the names of all persons who have registered to vote on either November 2, 2020 or November 3, 2020." Some of the names are

Document received by the MI Wayne 3rd Circuit Court.

voters who registered to vote on those days, but the vast majority are voters who applied for and voted an absent voter ballot.

29. Plaintiffs use "QVF" in place of "EPB". The QVF is a statewide voter registration file; an EPB for a counting board is a file of the voters who applied for and returned an absent voter ballot for that counting board.

30. There is no "election rule" requiring all absent voter ballots be recorded in the QVF by 9:00 p.m. on November 3, 2020.

31. Plaintiffs also misunderstand the process when they state ballots were "filled out by hand and duplicated on site." Instead, ballots were duplicated according to Michigan law. Michigan election law does not call for partisan challengers to be present when a ballot is duplicated; instead, when a ballot is duplicated as a result of a "false read," the duplication is overseen by one Republican and one Democratic inspector coordinating together. That process was followed.

32. Regarding access to TCF Hall E by challengers, there is also much misinformation contained in the statements of challengers. Under the procedure issued by the Secretary of State there may only be 1 challenger for each qualified challenger organization at a counting board. Detroit maintains 134 counting board, thus permitting a like number of challengers per organization.

33. In mid-afternoon on Wednesday, I observed that few challengers were stationed at the counting board tables. Rather, clusters of 5, 10 or 15 challengers were gathered in the main aisles at some tables. I conducted a conversation with leaders of the Republican Party and Democratic Party about the number of challengers in the room and their locations. It became clear that more than 134 challengers were present for these organizations. No one was ejected for this

9

Document received by the MI Wayne 3rd Circuit Court.

reason, but access to Hall E was controlled to ensure that challenger organizations had their full complement and did not exceed the ceiling any further than they already had.

34.     Challengers were instructed to sign out if they needed to leave Hall E. For a short period of time—a few hours—because there were too many challengers in Hall E for inspectors to safely do their jobs, new challengers were not allowed in until a challenger from their respective organization left the Hall. However, as stated above, each challenger organization, including Republican and Democrat, continued to have their complement of challengers inside of the Hall E.

35.     As stated previously, challengers are expected to be at their stations next to a counting board. Unfortunately, this was not the behavior being displayed. Instead, challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." I believed this to be inappropriate threatening of workers trying to do their jobs. Such action is specifically prohibited in Michigan election law. Nevertheless, challengers were permitted to remain.

36.     The laptop computers at the counting boards were not connected to the Internet. Some of the computers were used to process absent voter ballot applications in mid-October and were connected to the QVF. On election day and the day after election day, those computers were not connected and no inspector at the tables had QVF credentials that would enable them to access the QVF.

37.     The Qualified Voter File has a high level of security and limitation on access to the file. For example, it is not true that a person with QVF credentials in one city is able to access data in another city's file within the QVF. That is not possible.

Document received by the MI Wayne 3rd Circuit Court.

38.    A point of much confusion in these claims is centered on the law that permits a city clerk to verify the signatures on absent voter ballots before election day. Inspectors at absent voter counting boards do not verify the signatures on the return ballot envelopes. Department of Elections staff may use a voter's signature on an application to verify the voter's signature on return ballot envelope. Or the staff may use the voter's signature in the QVF to make the comparison. Often using the QVF is more efficient than the application signatures.

39.    I am not aware of any valid challenge being refused or ignored or of any challengers being removed because they were challenging ballots. Ballot challengers are an important part of the democratic process and were fully able to participate in the process at the TCF Center.

40.    In conclusion, upon reviewing Plaintiffs' Complaint, Affidavits, and Motion, I can conclude based upon my own knowledge and observation that Plaintiffs' claims are misplaced and that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.


Date:   November 11, 2020

CHRISTOPHER THOMAS

Subscribed and sworn to before me
this 11ᵗʰ day of _NOVEMBER_ , 2020.

_Nancy M. Black_
Notary Public) NANCY M. BLACK
County of: VAN BUREN, STATE OF MICHIGAN
My Commission Expires: 09-05-2025
ACTING IN BERRIEN COUNTY, MICHIGAN

Document received by the MI Wayne 3rd Circuit Court.

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES
DAVID HOOPER, and DARREN WADE
RUBINGH,

        Plaintiffs,

v

GRETCHEN WHITMER, in her official
capacity as Governor of the State of
Michigan, JOCELYN BENSON, in her
official capacity as Michigan Secretary of
State and the Michigan BOARD OF STATE
CANVASSERS,

        Defendants,

CITY OF DETROIT,

        Intervening Defendant,

ROBERT DAVIS,

        Intervening Defendant,

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,

        Intervening Defendant.

_____

No. 2-20-cv-13134

HON. LINDA V. PARKER

MAG. R. STEVEN WHALEN

1

Gregory J. Rohl (P39185)
Attorney for Plaintiffs
41850 West 11 Mile Road, Suite 110
Novi, Michigan 48375
248.380.9404
gregoryrohl@yahoo.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Attorney for Proposed Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Proposed Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

Scott R. Eldridge
Attorney for Proposed Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson (P18690)
Attorney for Proposed Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

_____/

2

## DECLARATION OF JONATHAN BRATER

I, Jonathan Brater, state as follows:

1.      I have been employed by the Secretary of State as Director of Elections since January 2, 2020 and in such capacity serve as Director of the Bureau of Elections (Bureau).

2.      I bring this declaration in support of Defendants' response in opposition to the Motion for a temporary restraining order.

3.      I am responsible for preparing the official documentation necessary for the Secretary of State to certify the November 3, 2020 general election.  In addition, the Bureau provides support to the county, city, and township clerks in their administration of the election.  I am personally knowledgeable about state and federal laws governing election administration in Michigan.  Additionally, I am familiar with the voting systems used in the State of Michigan, including the Dominion system used by Antrim County.

4.      In Michigan, there are three vendors that have been certified by the Michigan Board of State Canvassers for use in the State – Hart Intercivic, Dominion Voting Systems, and Election Systems and Software.  These vendors were each approved by the Board of State Canvassers in 2017.  Importantly, the clerk of each of Michigan's 83 counties determines in consultation with each city and township located within their county which vendor to use.  MCL 168.37a.

3

5.     With respect to the Dominion Voting System, Democracy Suite v. 5.5/5.5S is certified for use in Michigan, having been approved by the Board of State Canvassers in May 2019 after it was reviewed by an accredited Voting Systems Test Laboratory and approved by the bipartisan Election Assistance Commission.[1] Plaintiffs' claim that Defendants "disregarded" the January 24, 2020 decision of the State of Texas to refrain from certifying "the same Dominion Democracy Suite" in that state is not accurate for multiple reasons. Plaintiffs' First Amended Complaint, ¶10, ¶137. First, the Dominion equipment used in Michigan was certified prior to Texas decision referenced above. Second, the Texas decision related to different equipment. Plaintiffs could have easily discovered both the timing and that the version of Democracy Suite approved for use in Michigan, v. 5.5/5.5S, differs from the version tested in Texas, v. 5.5.A,[2] had they conducted even a cursory review of the Board of State Canvassers meeting minutes.[3]

---

[1] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl, U.S. Election Assistance Commission, Voting Systems Test Laboratories (VSTL), https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (last accessed December 2, 2020).

[2] https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf, State of Texas Report of Review of Dominion Voting Systems Democracy Suite 5.5-A (last accessed December 2, 2020).

[3] https://www.michigan.gov/documents/sos/Approved_Minutes_052319_Meeting_658692_7.pdf, Meeting of the Board of State Canvassers, May 23, 2019 (last accessed December 2, 2020).

6.     Antrim County uses the Dominion Voting Systems election management system and voting machines (tabulators), which count hand-marked paper ballots.  The election management system software is used to program tabulators and to report unofficial election results.

7.     It is my understanding that in October 2020, after Antrim County initially programmed its election software for the November Election, the county identified two local races where the ballot content had to be updated.  The county then received updated programming from its election programming vendor, Election Source.  The updated programming correctly updated the election software for the county.

8.     When the software was reprogrammed, the County also was required to update the software on all media drives that are placed into the tabulators to ensure the tabulators communicated properly with the election management system.  It is my understanding that the county did update the media drives that went into the tabulators in precincts that had the race change but did not update the media drives for the remainder of the county.  Because the clerk updated the media drives for all areas with race changes, the tabulators counted ballots correctly.

9.     Because the county did not update the media drives for the tabulators in the areas of the county that *did not* have changes to the race, those tabulators did

not communicate correctly with the county's election management system software that combines and reports unofficial election night results.

10.    After discovering this error, it is my understanding that the clerk worked to immediately correct the unofficial results by reviewing the physical totals tapes which are printed by each tabulator. I understand that she then hand-entered the results for each race and for each precinct in the county to get the corrected unofficial results.

11.    This error affected only how the results from the tabulators communicated with the election management software for unofficial reporting. It did not affect how tabulators counted ballots. This was an isolated error, and there is no evidence that would lead me to believe this user error occurred anywhere else in the state.  Further, there is no evidence leading me to believe that this was the result of intentional misconduct by an election official, was a result of software or equipment malfunction, or was caused by some sort of tampering.

12.    It is important to note that even if the error in reporting unofficial results on election night had not been immediately noticed and quickly fixed by the county clerk it would have been caught and identified during the county canvass. Michigan Election Law requires county clerks and the bipartisan Board of County Canvassers to meet and begin canvassing the election by 9:00 a.m. on the Thursday after the election.  MCL 168.821.  During the two-week county canvassing period,

two canvassers nominated by the Democratic Party and two canvassers nominated by the Republican Party verify the total number of ballots tabulated against the tabulator totals tape that is printed out after the close of polls, for each and every precinct in the county.  They verify the total number of voters against the list of voters in the poll book and ensure the two numbers match.[4]  This process is the reason I am confident the error in the reporting of unofficial results would have been caught before the Board of County Canvassers certified the results as official. This process is also described in a document published by the Secretary of State regarding the Antrim County incident. Plaintiffs claim the document, which they cite in their brief, "fails to address" what would happen if the error was not caught prior to the unofficial canvass, First Amended Complaint, ¶138,  but the document does in fact address this – it explains that the county canvass would catch the error. Plaintiffs could have determined this by reviewing the document they cited in their brief.

13.    Accordingly, Plaintiffs' claim that human error in the reporting of unofficial results is "only discoverable through a manual recount" is false. First Amended Complaint, ¶138.

---

[4] A complete step-by-step guide to the county canvass is available on the Bureau's website here:
https://www.michigan.gov/documents/sos/BCC_Manual_464331_7.pdf

14.    The error described above was not a result of "malfunctioning voting equipment or defective ballots"[5] as Plaintiffs allege in paragraph 126 of the First Amended Complaint. This was an isolated user error that did not impact *any* other county. There is no reason to think, despite plaintiffs' assertions (which are not accompanied by any supporting evidence), that this occurred in any other county in the State of Michigan. See Complt. ¶ 138. Plaintiffs' unfounded accusations that other counties using Dominion manipulated results are baseless. Plaintiffs' First Amended Complaint, ¶139.

15.    Plaintiffs; assertion that Dominion changed votes through the use of ranked choice voting, a method of electing candidates that is not authorized by the Michigan Election Law for use in federal- or state-level elections, is bizarre.[6] Complt. ¶ 140.

---

[5] And even if Plaintiffs' allegations regarding malfunctioning equipment were true (thereby triggering a special mail election under MCL 168.837), the total number of votes cast in Antrim County (16,044) is miniscule compared to the magnitude of Trump's loss in Michigan (154,188 votes). Notably, Trump won Antrim County by a vote of 9,748 to 5,960 for President-Elect Biden. https://mielections.us/election/results/2020GEN_CENR.html (last accessed December 2, 2020).

[6] Due to a consent decree it entered with the Department of Justice in 2019, the City of Eastpointe in Macomb County is the only jurisdiction in Michigan that uses ranked choice voting to elect city officers. *United States v City of Eastpointe*, Case No. 4:17-cv-10079, E.D. Mich. Notably, the voting system used in Macomb County is not Dominion, but Election Systems and Software (ES&S).

16.     The Board of State Canvassers certified the results of Michigan's November 3, 2020 election as official on November 23, 2020.[7] Further, the Certificate of Ascertainment awarding Michigan's 16 electoral votes to President-Elect Joseph R. Biden has already been signed and sealed by Governor Gretchen Whitmer and Secretary of State Jocelyn Benson, and filed with the Archivist of the United States, National Archives and Records Administration.[8] MCL 168.46, 3 USC 6.

17.     Mr. Ramsland's claims, cited by Plaintiffs in paragraphs 142 to 146, demonstrate a fundamental lack of understanding of basic facts about Michigan's election system. He includes in his claims two counties, Macomb and Oakland, that do not use Dominion Voting Systems.

18.     Mr. Ramlsand does not understand how unofficial election results are reported in Michigan. Mr. Ramsland assumes, for reasons that are not immediately apparent, that counting "was closed at 2:00 am" on November 4 and that ballot totals reported after that time must have been counted after that time as well. This is incorrect for two reasons. First, ballot counting is not "closed" at any particular

---

[7] Draft minutes of the November 23, 2020 meeting of the Board of State Canvassers, https://www.michigan.gov/documents/sos/112320_draft_minutes_708672_7.pdf (last accessed December 2, 2020).
[8] https://www.archives.gov/files/electoral-college/2020/ascertainment-michigan.pdf (last accessed December 2, 2020).

time – jurisdictions count ballots until they are finished counting ballots. Second, although unofficial totals are generally reported all at the same time,[9] those totals are the product of ballots that have been counted throughout the day. For example, an absent voter counting board in Kent County could have been counting ballots since 7 a.m. on November 3, but not finish until 3 a.m. on November 4, at which point totals would be reported reflecting all ballots counted since 7 a.m.

19.     Plaintiffs' various insinuations that large numbers of ballots were illegally counted or altered in Detroit are easily dismissed by a cursory review of election data reported from Detroit. Compared to 2016, turnout in Detroit increased from 247,369 to 256,514, an increase equivalent to 3.7 percent of 2016 turnout (substantially lower than the statewide increase of 15.4 percent). If a large number of ballots were illegally counted, one would expect turnout to be substantially higher. Donald Trump increased his vote share in Detroit from 3.1 percent in 2016 to 5.0 percent in 2020. If Trump votes had been altered or discarded, one would not expect his vote share to have increased. Additionally, there were approximately 174,000 absent voter ballots tabulated at the TCF center. The difference between the number of absent voter ballots tabulated and names in the poll books was under

---

[9] It is possible to provide interim unofficial results before all ballots have been tabulated (for example, Detroit provided interim unofficial totals for AV counting boards at several times on Wednesday, November 4), but most jurisdictions wait until all ballots in a precinct have been tabulated until unofficial results are reported.

10

150 (less than one tenth of one percent of all ballots tabulated), and there were fewer ballots tabulated than names in the poll books. If ballots had been illegally counted, there would be substantially more, not slightly fewer, ballots tabulated than names in the poll books.

20.    In addition to the false statements shared by Plaintiffs as described above, it is notable that:

a.    Plaintiffs also misconstrue MCL 168.765a, which requires the presence of "at least 1 election *inspector* from each major political party" at an absent voter counting board to perform official duties (such as delivering materials, signing statements of votes, etc.), as a requirement that at least 1 election *challenger* from each party be present to observe the count. Plaintiffs compound their error by alleging, without support, that ballot counting can only occur if at least one challenger from each major political party is present. First Amended Complaint, ¶¶214-216, 231.

b.    Plaintiffs falsely declare that "Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County. The TCF Center was the only facility within Wayne County authorized to count the ballots." First Amended Complaint, ¶58. In fact, absent voter ballots from the City of

Detroit were the only ballots processed and counted at the TCF Center on November 2-4, 2020.

c.  Plaintiffs erroneously claim that issuing and receiving an absent voter application and/or ballot on the same day is "anomal[ous,]" if not "impossibl[e,]" when in fact the Michigan Constitution requires clerks to issue absent voter ballots on demand when voters request one in person. MI Const. Art. 2 §4(f)-(g), First Amended Complaint, ¶¶16(f), 123. Plainly, same-date transactions are evidence of individuals applying for, completing, and returning a ballot in a single visit.

d.  Contrary to Plaintiffs' insinuation, the Secretary of State is not directly involved in the operations of boards of canvassers, and does not control the access of individual challengers to absent voter counting boards. First Amended Complaint, ¶¶194, 226-227.

18.  This declaration is based on personal knowledge.  If called as a witness, I can testify competently to the facts stated in this declaration.

_____

Jonathan Brater
Director of Elections

12

# EXHIBIT 3



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

**Meeting
of the
Board of State Canvassers**

**November 23, 2020**

| | |
|---|---|
| **Called to order:** | 1:07 p.m. |
| **Members present:** | Jeannette Bradshaw - Chairperson<br>Aaron Van Langevelde – Vice Chairperson<br>Julie Matuzak<br>Norman Shinkle |
| **Members absent:** | None. |
| **Agenda item:** | Consideration of meeting minutes for approval (October 15, 2020 meeting). |

**Board action on agenda item:** The Board approved the minutes of the October 15, 2020 meeting as submitted. Moved by Matuzak; supported by Van Langevelde. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

**Agenda item:** Canvass and certification of the November 3, 2020 general election.

**Board action on agenda item:** Three motions were offered.

(1) Based on an examination of the election returns received by the Secretary of State for the November 3, 2020 general election, the Board certified that the attached reports are true statements of the votes cast at the election for the offices certified by this Board, and for the Electors of President and Vice President of the United States; the Board further certified that the persons named on the attached listing were duly elected for the indicated offices, and State Proposals 20-1 and 20-2 passed. Moved by Matuzak; supported by Bradshaw. Ayes: Bradshaw, Van Langevelde, Matuzak. Nays: None. Abstention: Shinkle. Motion carried.

*Time of certification: 4:34 p.m.*

(2) The Board authorized the staff of the Bureau of Elections to represent the Board in any recount of votes cast at the November 3, 2020 general

election. Moved by Matuzak; supported by Shinkle. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

(3) The Board requested that the Michigan Legislature conduct an in-depth review of Michigan election processes and procedures to address concerns that have been raised by experts and citizens about our elections in order to assure our citizens that Michigan elections are accurate, transparent and fully protective of all citizens constitutional rights. Moved by Shinkle; supported by Matuzak. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

**Agenda item:**  Recording the results of the November 3, 2020 special election for the Michigan House of Representatives, 4th District, partial term ending January 1, 2021.

**Board action on agenda item:** The Board recorded the results of the November 3, 2020 special election for the office of State Representative, 4th District as certified by the Wayne County Board of Canvassers on November 17, 2020. Moved by Shinkle; supported by Van Langevelde. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

**Agenda item:**  Such other and further business as may be properly presented to the Board.

**Board action on agenda item:** None.

**Adjourned:**  9:40 p.m.

_____          _____
Chair Bradshaw                                Vice-Chair Van Langevelde


_____          _____
Member Matuzak                                Member Shinkle


_____
Date

2

# EXHIBIT 4

STATE OF MICHIGAN
## OFFICE OF THE GOVERNOR
LANSING

GRETCHEN WHITMER
GOVERNOR

GARLIN GILCHRIST II
LT. GOVERNOR

November 23, 2020

*VIA COURIER DELIVERY*

David S. Ferriero
Archivist of the United States
732 N. Capitol Street, NW
Suite A-734
Washington, D.C. 20401

Dear Mr. Ferriero,

Enclosed with this letter, please find three (3) original Certificates of Ascertainment bearing the Seal of the State of Michigan. These certificates contain my original signature, as well as the original signature of the Michigan Secretary of State, Jocelyn Benson.

If you have any questions or require additional information, please do not hesitate to contact Mark Totten, Chief Legal Counsel at (517) 241-0061 or at tottenm1@michigan.gov.

Sincerely,

Gretchen Whitmer
Governor

Enclosures

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov
Printed by members of:

STATE OF MICHIGAN

**GRETCHEN WHITMER**
GOVERNOR

**OFFICE OF THE GOVERNOR**
LANSING

**GARLIN GILCHRIST II**
LT. GOVERNOR

## CERTIFICATE OF ASCERTAINMENT OF THE ELECTORS OF THE PRESIDENT AND VICE PRESIDENT OF THE UNITED STATES OF AMERICA

I, Gretchen E. Whitmer, Governor of the State of Michigan, certify that at the general election held in Michigan on Tuesday, November 3, 2020:

The following persons nominated by the **Democratic Party**, each having received **2,804,040 votes**, were duly elected as Electors of the President and Vice President of the United States of America:

| | |
|---|---|
| **Chris Cracchiolo** | 5140 Arrowhead Ct., Williamsburg, MI 49690 |
| **Timothy E. Smith** | 14883 Crescent St., 105, Grand Haven, MI 49417 |
| **Blake Mazurek** | 3458 Olderidge Dr. NE, Grand Rapids, MI 49525 |
| **Bonnie J. Lauria** | 3931 Mines Rd., West Branch, MI 48661 |
| **Bobbie Walton** | 8412 Mapleview Dr., Davison, MI 48423 |
| **Mark Edward Miller** | 122 Sydelle Ave., Kalamazoo, MI 49006 |
| **Connor Wood** | 319 N. Bowen St., Jackson, MI 49202 |
| **Robin Smith** | 3004 Andrea Dr., Lansing, MI 48906 |
| **Walter C. Herzig III** | 320 Stratford Rd., Ferndale, MI 48220 |
| **Carolyn Holley** | 727 White St., Port Huron, MI 48060 |
| **Susan Nichols** | 44099 Deep Hollow Circle, Northville, MI 48168 |
| **Steven Rzeppa** | 2985 Anna Ct., Trenton, MI 48183 |
| **Helen Moore** | 8335 Indiana St., Detroit, MI 48204 |
| **Michael Kerwin** | 17517 Birchcrest Dr., Detroit, MI 48221 |
| **Chuck Browning** | 20091 Herzog Dr., Rockwood, MI 48173 |
| **Marseille Allen** | 4442 Jena Ln., Flint, MI 48507 |

Votes received by other candidates for the office of Elector of the President and Vice President of the United States of America are as follows:

The following persons nominated by the **Republican Party** each received **2,649,852 votes**: John Haggard; Kent Vanderwood; Terri Lynn Land; Gerald Wall; Amy Facchinello; Rose Rook; Hank Choate; Mari-Ann Henry; Clifford Frost; Stanley Grot; Marian Sheridan; Timothy King; Michele Lundgren; Mayra Rodriguez; Meshawn Maddock; and Kathy Berden.

The following persons nominated by the **Libertarian Party** each received **60,381 votes**:  David Holmer; Alexander Avery; Vicki Hall; Richard Hewer; Angela Thornton; Rafael Wolf; James Lewis Hudler; Jon Elgas; Greg Stempfle; Jim Fulner; Joseph LeBlanc; Claranna Gelineau;  Andrew Chadderdon; Scott Avery Boman; Connor Nepomuceno; and Andy Evans.

GEORGE W. ROMNEY BUILDING  •  111 SOUTH CAPITOL AVENUE  •  LANSING, MICHIGAN 48909
www.michigan.gov
Printed by members of:

The following persons nominated by the **Green Party** each received **13,718 votes**: Stephen Boyle; Destiny Clayton; Jean-Michel Creviere; Frank Foster, Jr.; Jennifer Kurland; Melissa Noelle Lambert; John Anthony La Pietra; Robin Laurain; Daniel Martin-Mills; Jessica McCallie-Arquette; Louis Novak; Jeffery Jon Rubley II; Rick Sauermilch; Amanda Slepr; N. J. Sparling; and Marcia Squier.

The following persons nominated by the **U.S. Taxpayers Party** each received **7,235 votes**: Mary Sears; Christine Schwartz; William Mohr II; Doug Levesque; Patrick Lambert; Aaron Nichols; Edward J. Sanger; Victoria Monroe; Lester Townsend; Christopher Rudy; William A. Kohn, Jr.; Paul Stahl; Marc Sosnowski; Cecile A. Harrity; Robert Gale; and Gerald Van Sickle.

The following persons nominated by the **Natural Law Party** each received **2,986 votes**: Connie Tewes; Mary Schutt; Dan Royer; Paul A. Natke; Shelly L. Reynolds; Donald Meyer; Gene Capatina; Ramzi Masri-Elyafaoui; Jacob Schlau; James Radatz; Daniel S. Smith; Mark Moylan; Guy Purdue; Nicholas Malzone; Robert Forreider; and Daniel B. Smith.

The following persons nominated by write-in candidate Brian T. Carroll each received **947 votes**: Michael Maturen; Robert Clark II; Jason Kennedy Duncan; Paul L. DuBois; Timothy Doubblestein; Jason Gatties; Lucy Ellen Moye; Lloyd A. Conway; Linnaea Joyce Licavoli; Tsai-Yi Watts; John Henry Svoboda; Benjamin Setterholm; Brandon Barry Mullins; Daniel Patrick Meloy; Elisa J. Kolk; and Matthew James Williams.

The following persons nominated by write-in candidate Jade Simmons each received **88 votes**: Cecilia Lester; Tyler Prough; James Ryans; Chelsea Slocum; Raymond Hall; Dana Morris; Janasia Johnson; Terrel Boyd; Constance Clay; Erika Couch; Tyrone Pickens; Karalyn Schubring; Michele Coleman; Grant Philson; Jherrard Hardeman; and Gertrude Taylor.

The following persons nominated by write-in candidate Tom Hoefling each received **32 votes**: Mark A. Aungst; Scott Suchecki; Richard Nagel; Mark Zimmerman; Justin Phillips; Kimberly Cleveland; Thomas Frederick; Kurt Richards; Georgia S. Halloran; Dawne Worden; Kim Millard; Alan G. Sides; DaWone Allison; Samuel Denson; Joshua Ohlman; and Suzanne M. Stuut.

The following persons nominated by write-in candidate Kasey Wells each received **5 votes**: Sandra Murrell; Ronald Klett; Andrew Colclasure; Charity Archer; Paul Atkins; Shiquita Reed; Mark Jeffrey; Brian W. Gibbs, Jr.; William W. Brown; Patricia Gorzelski; Anthony Jackson; Jeremy Mortensen; Justen Grieve; Shiesha Davis; Matthew Shepard; and Miranda Ames.

(cont.)

Given under my hand and the Great Seal of the State of Michigan.

Date:      November 23, 2020

Time:      5:30pm

GRETCHEN WHITMER
GOVERNOR

By the Governor:

SECRETARY OF STATE

3

EXHIBIT 5

CERTIFICATE OF THE REPUBLICAN PRESIDENTIAL ELECTORS ELECTED AT
THE MICHIGAN REPUBLICAN STATE CONVENTION, AUGUST 29-30, 2020

At Large – Meshawn Maddock
          1150 South Milford Rd.
          Milford, MI  48381

At Large – Kathy Berden
          4040 Mushroom Road
          Snover, MI  48472

District 1 – John Haggard
          9375 Pearl Avenue
          Charlevoix, MI  49720

District 2 – Kent Vanderwood
          5183 Olsen Springs Court
          Wyoming, MI  49509

District 3 – Terri Lynn Land
          7955 Byron Station Court
          Byron Center, MI  49315

District 4 – Gerald Wall
          10581 Eastridge Ct.
          Roscommon, MI  48653

District 5 – Amy Facchinello
          8351 Oxford Lane
          Grand Blanc, MI  48439

District 6 – Rose Rook
          50842 County Road 665
          Paw Paw, MI  49079

District 7 – Hank Choate
          11670 Culver Rd.
          Cement City, MI  49233

District 8 – Mari-Ann Henry
          895 Pinery Blvd.
          Lake Orion, MI  48362

District 9 – Clifford Frost
          2629 Irma
          Warren, MI  48092

District 10 – Stanley Grot
          11927 Hiawatha Drive
          Shelby Twp., MI  48315

District 11 – Marian Sheridan
        7259 White Oak Dr.
        West Bloomfield, MI  48324

District 12 – Timothy King
        1573 Mollie Street
        Ypsilanti, MI  48198

District 13 – Michele Lundgren
        55 Peterbro
        Apt. 101
        Detroit, MI  48201

District 14 – Mayra Rodriguez
        8 Carmel Lane
        Grosse Pointe Farms, MI  48236

EXHIBIT 6

RECEIVED by MSC 11/26/2020 2:44:12 AM

**STATE OF MICHIGAN**

**IN THE SUPREME COURT**

ANGELIC JOHNSON, and
LINDA LEE TARVER,
         PETITIONERS,

v

JOCELYN BENSON, in her official
capacity as Michigan Secretary of State;
JEANNETTE BRADSHAW, in her
official capacity as Chair of the Board of
State Canvassers for Michigan; BOARD
OF STATE CANVASSERS FOR
MICHIGAN; and GRETCHEN
WHITMER, in her official capacity as
Governor of Michigan,
         RESPONDENTS.

Supreme Court Case No. _____

**PETITION FOR
EXTRAORDINARY WRITS &
DECLARATORY RELIEF**

**IMMEDIATE CONSIDERATION
REQUESTED FOR DECISION
BEFORE DECEMBER 8, 2020**

SPECIAL COUNSEL FOR THOMAS MORE SOCIETY—
AMISTAD PROJECT

Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC*
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER*
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER*
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

*for identification purposes only
**COUNSEL FOR PETITIONERS**

RECEIVED by MSC 11/26/2020 2:44:12 AM

1.  Petitioners Angelic Johnson and Dr. Linda Lee Tarver (collectively, "Petitioners") sue for Extraordinary Writs against Respondents, their employees, agents, and successors in office, and Declaratory Relief, and in support allege the following upon information and belief:

## INTRODUCTION

1.  Our constitutional republic thrives only in proportion to the integrity and accuracy of its elections. Elections replete with error and dishonesty threaten its survival.

2.  Michigan citizens deserve honest, fair, and transparent elections from their state officials. The process should be open, and their votes should be protected with privacy.

3.  Michigan citizens deserve a process that ensures that their *legal* votes count but *illegal* votes do not. In fact, the United States and Michigan Constitutions require it, and for good reason, as shown further in this Petition.

4.  The Michigan Constitution provides: "All political power is inherent in the people." Const 1963, art 1, § 1. In 2018, the people of this state exercised this power when they, as registered voters, amended the constitution by approving Proposal 3. As a result of the passage of Proposal 3, the Michigan Constitution now provides in relevant part:

> (1) Every citizen of the United States who is an elector qualified to vote in Michigan ***shall*** have the following rights:
>
> (a) The right, once registered, to vote a secret ballot in all elections.
> * * *
> (h) ***The right to have the results of statewide elections audited, in such manner as prescribed by law, to ensure the accuracy and integrity of elections***.
>
> All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes.
> * * *
> (2) Except as otherwise provided in this constitution or in the constitution or laws of the United States the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, *to preserve the purity of elections*, to preserve the secrecy of the ballot, *to guard against abuses of the elective franchise*, and to provide for a system of voter registration and absentee voting. . . .

RECEIVED by MSC 11/26/2020 2:44:12 AM

Const 1963, art 2, § 4 (emphasis added).

5.      When the State legislature vests the right to vote for President in its people, as Michigan has done here, "the right to vote as the *legislature* has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v Gore*, 531 US 98, 104 (2000) (emphasis added).

6.      "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . .  It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush*, 531 US at 104-05 (quoting *Reynolds . Sims*, 377 US 533, 555 (1964)).  Permitting the counting of illegal votes creates the very debasement and dilution of the weight of a citizen's legal vote that the Fourteenth Amendment prohibits.

7.      The Michigan Constitution demands the same thing of its officials: "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin."  1963 Const, art 1, § 2.  Indeed, the Equal Protection Clause in the Michigan Constitution is coextensive with the Equal Protection Clause of the United States Constitution.  *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010).  Equal protection applies when a state either classifies voters in disparate ways or unduly restricts the right to vote.  *Obama for America v Husted*, 697 F3d 423, 428 (CA6, 2012).  *Promote the Vote v Sec'y of State*, Nos. 353977, 354096, 2020 Mich App LEXIS 4595, at *39 (Ct App July 20, 2020).

RECEIVED by MSC 11/26/2020 2:44:12 AM

8.      Likewise, Due Process and bedrock principles of fundamental fairness require this Court to look carefully behind the certification process at the actual ballot boxes, ballots, and other election evidence.  Indeed, the Due Process Clause of the Michigan Constitution commands that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law."  Const 1963, art 1, § 17; see also, MCL 168.10.

9.      This constitutional provision is nearly identical to the Due Process Clause of the United States Constitution, see US Const, Am XIV, § 1.  Accordingly, "[t]he due process guarantee of the Michigan Constitution is coextensive with its federal counterpart."  *Grimes v Van Hook-Williams*, 302 Mich App 521, 530; 839 NW2d 237 (2013); *Quinn v State & Governor*, No. 350235, 2020 Mich App LEXIS 5941, at *7 (Ct App Sep 10, 2020).

10.      In Michigan, the Secretary of State, Jocelyn Benson, a registered Democrat, acting unilaterally and without legislative approval, flooded the electoral process for the 2020 general election with absentee ballots.  The Secretary of State accomplished this partisan scheme by unilaterally sending absentee ballot request forms to every household in Michigan with a registered voter (no matter if the voter was still alive or lived at that address) and to non-registered voters who were temporarily living in Michigan or who were not United States citizens.

11.      Respondent Benson also permitted online requests for absentee ballots without signature verification, thereby allowing for fraud in obtaining an absentee ballot.

12.      Worse, Respondent Benson sent <u>unsolicited ballots</u> to countless thousands living in Michigan and in some cases to citizens of other states.

13.      The Michigan Legislature did not approve or authorize Benson's unilateral actions—and for good reason.

14. Predictably, a flood of unauthorized, absentee ballots ensured the dilution of lawful votes and precipitated an unfair 2020 general election, as the evidence adduced from election day at the TCF Center in Detroit, Michigan proves.

15. There are a few exceptional cases in which the Federal Constitution imposes a duty or confers a power on a particular branch of a State's government. Article II, section 1, clause 2 is one of them. It provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors for President and Vice President. US Const art II, § 1, cl 2. As the Supreme Court explained in *McPherson*, 146 US 1 (1892), this provision of the Constitution "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointment. *Id.* at 27. A significant departure from the legislative scheme for appointing Presidential electors defies this constitutional mandate.

16. Not even the Michigan Constitution can confer extra authority on the Secretary of State to change or alter the election procedures established by the State legislature. *McPherson*, 146 US at 35 (acknowledging that the State legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions"); see *also Bush v Palm Beach Cnty Canvassing Bd*, 531 US 70; 121 S Ct 471 (2000).

17. And perhaps most important for purposes of the current situation, the Secretary of State cannot rely on the declared pandemic as a rationale for circumventing legislative intent or for unilaterally implementing procedures that undermined the integrity of the 2020 general election. *Carson v Simon*, No 20-3139, 2020 US App LEXIS 34184, at *17-18 (CA8, Oct. 29, 2020) ("[T]he Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid. However well-intentioned and appropriate

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM

from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code.").

18.     The rule of law, as established by the United States Constitution and the Michigan Legislature, dictates that the Secretary of State follow these rules.  There is no pandemic exception. See *Democratic Nat'l Comm v State Legislature*, No 20A66, 2020 US LEXIS 5187, at *13 (Oct 26, 2020) (Kavanaugh, J., concurring in denial of application for stay) ("'[T]he design of electoral procedures is a legislative task,' including during a pandemic.") (internal citation omitted).

19.     This case seeks to protect and vindicate fundamental rights.  It is a civil rights action brought under the Fourteenth Amendment to the United States Constitution, Article II, section 1 of the United States Constitution, the Equal Protection and Due Process clauses of the Michigan Constitution, Article 2, section 4 of the Michigan Constitution, and MCL 168.479, as Petitioners have been "aggrieved by [a] determination made by the board of state canvassers."  Most important, this case seeks to restore the purity and integrity of elections in Michigan so that "We the people" can have confidence in their outcome, and thus, confidence that those who govern do so legitimately.

## JURISDICTION AND VENUE

20.     This action arises under the Constitution and laws of the United States, the Michigan Constitution of 1963, Michigan Court Rules 7.305 and 7.306, and MCL 168.1, *et seq*, including 168.109 and 168.479.

21.     The Michigan Constitution, Article 6, § 4 states that:

The supreme court shall have general superintending control over all courts; *power to issue, hear and determine prerogative and remedial writs*; and appellate jurisdiction as provided by rules of the supreme court.

Const 1963, art 6, § 4 (emphasis added).

6

RECEIVED by MSC 11/26/2020 2:44:12 AM

22.   "Mandamus is properly categorized as both an 'extraordinary' and a 'prerogative' writ." *O'Connell v Director of Elections*, 316 Mich App 91, 100, 891 NW 2d 240, 249 (2016). Thus, the Supreme Court has jurisdiction to hear and determine complaints for writs of mandamus, although that jurisdiction may not exclusively belong to the Supreme Court. *Id.* at 106.

23.   Here, MCL 168.479 expressly allows for "any person who feels aggrieved by any determination made by the board of state canvassers have the determination reviewed by mandamus or other appropriate remedy in the supreme court." (emphasis added).

24.   Petitioners demanded that Respondent Board of State Canvassers ("Board") exercise their constitutional duty and refuse to certify the general election without first conducting an audit or first determining the accuracy and integrity of the underlying votes. Affidavit of Ian Northon; **Appendix** 199 at ¶3, Ex A (Petitioners' Demand Letter to Board).

25.   MCL 168.878 expressly requires that Petitioners challenge a determination of the Board of State Canvassers "by no other action than mandamus."

26.   Over Petitioners' objections, Respondent Board certified the election on Monday, November 23, 2020, giving immediate rise to Petitioners' aggrieved status under MCL 168.479.

27.   Petitioners' claims for a temporary restraining order, declaratory judgment, relief under MCR 7.316(A)(7), and other relief such as mandamus is also authorized by the general doctrine of the Separation of Powers, and the Michigan Const 1963 art 2, § 4(1)(h), which deigns to ensure the accuracy and integrity of elections as a fundamental right, not just for Petitioners, but for all citizens of Michigan.

28.   Venue is proper because the Secretary, Board, and Governor are seated in the jurisdiction of this Court, and all Respondents reside and voted in the State of Michigan. Venue is also proper under MCL 168.1, *et seq*. because the Michigan Legislature delegated a specific

RECEIVED by MSC 11/26/2020 2:44:12 AM

type of election dispute and controversy over ballots and other election indicia to this Court by statute. See *also* MCL 168.10 (allowing any single supreme court justice to issue restraining orders over the ballots when there is danger of mishandling).

## NECESSITY FOR IMMEDIATE CONSIDERATION

29.     This Court previously granted immediate consideration of election-related cases. *Scott v Director of Elections*, 490 Mich 888, 889; 804 NW 2d 119 (2011).[1]

30.     Time is of the essence. Petitioners seek immediate consideration before the electors convene on December 8, 2020.

## PARTIES

31.     Petitioner Angelic Johnson is an adult citizen of the United States and a resident of Macomb County, Michigan. She is a member of Black Voices for Trump (hereinafter "Black Voices"). She legally voted in the November 2020 General Election in the State of Michigan, and she was a poll challenger at the TCF Center.

32.     Petitioner Dr. Linda Lee Tarver is an adult citizen of the United States and a resident of Ingham County, Michigan. Dr. Tarver is on the advisory board of Black Voices. Dr. Tarver legally voted in the November 2020 General Election in the State of Michigan.

33.     Respondent Jocelyn Benson is the Michigan Secretary of State. As the Secretary of State, Respondent Benson is the State's "chief election officer" with supervisory control over

---

[1] See also, Order of November 23, 2020 in *Constantino, et al, v City of Detroit, et al,* Case Nos 162245 & (27)(38)(39). Under a similar post-election challenge, Justice Zahra recognized in his concurrence: "[I] would order the most expedited consideration possible of the remaining issues. . . .";"I would have this Court retain jurisdiction [] under both its appellate authority and its superintending authority under Const. 1963, art 6, § 4"; "Federal law imposes tight time restrictions on Michigan's certification of our electors. Plaintiffs should not have to file appeals following our standard processes and procedure to obtain a final answer from this Court on such weighty issues."

RECEIVED by MSC 11/26/2020 2:44:12 AM

local election officials in the performance of their election related duties, including supervisory control over the election officials and workers at the TCF Center. MCL 168.21. Secretary Benson holds the power to "direct local election officials as to the proper methods of conducting elections." MCL 168.31(1)(b), 168.509n. Secretary Benson is responsible for "[e]stablish[ing] a curriculum for comprehensive training and accreditation of all [election] officials who are responsible for conducting elections." MCL 168.31(1)(j). Secretary Benson took an oath to support the United States and Michigan Constitution, Mich Const Art 11, § 1, and has a clear legal duty to enforce Michigan Election Law, the United States Constitution, and the Michigan Constitution. This clear legal duty involves no exercise of judgment or discretion. Secretary Benson is sued in her official capacity.

34.     Respondent Board was created pursuant to the Mich Const art 2, § 7 and is required to follow the United States and Michigan Constitutions and Michigan Election Law.

35.     MCL 168.22c requires the members of the Board to take the following oath prior to taking office: "I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of office." Mich Const art XI, § 1.

36.     The Board is required to "canvass the returns and determine the result of all elections for electors of president and vice president of the United States, state officers, United States senators, representatives in congress, circuit court judges, state senators, representatives elected by a district that is located in more than 1 county, and other officers as required by law." MCL 841. Further, the Board shall record the results of a county canvass, but only upon receipt of a *properly* certified certificate of a determination from a board of country canvassers. *Id.* (emphasis added).

RECEIVED by MSC 11/26/2020 2:44:12 AM

37.     Respondent Jeannette Bradshaw is the Chair of the Board of State Canvassers for Michigan.  The Board is supposed to certify Michigan election results when appropriate.  The Board's certification prompts the winning presidential candidate's selection of the 16 Michigan electors.  But if the election process cannot be certified, then the task reverts back to the Michigan Legislature under MCL 168.846 and the United States Constitution.

38.     Respondent Gretchen Whitmer is the Governor of the State of Michigan. As Michigan's chief executive, by statute, she will ostensibly transmit the State's certified results to the US Department of State and Congress on or before December 8, 2020. This ministerial task is corrupted, however, by the subordinate executive branch election officials and Respondents' failure to meaningfully investigate and determine the proper lawful vote counts when the general election was marked with inaccuracy and loss of integrity over absentee ballots and other serious statutory violations such as failure to require bipartisan oversight at absent voting counting boards.

## STATEMENT OF FACTS

39.     The Nation held its general election on November 3, 2020 ("Election").

40.     Registered Voters in Michigan allegedly cast 5,539,302 total votes for president.[2]

41.     Registered Voters in Michigan allegedly cast 3,507,410 absentee ballots according to statewide records.

42.     Petitioners' experts as explained below reveal that **at least 508,016 ballots** in Michigan were unlawful and did not conform to established Michigan Election Law. See generally, Expert Reports of Matthew Braynard and Dr. Qianying "Jennie" Zhang, attached hereto in Petitioner's **Appendix** 278-300.

---

[2] See Secretary of State, official election results at
https://mielections.us/election/results/2020GEN_CENR.html

RECEIVED by MSC 11/26/2020 2:44:12 AM

43.     This is a shocking total, exceeding 14.4% of the absentee ballots and over 9.1% of the total popular vote count.

44.     State records also report 878,102 total votes (absentee and in person) cast in Wayne County, Michigan.

45.     The TCF Center contained 134 Absent Voter Counting Boards ("AVCBs"), and it was the only facility within Wayne County authorized to count ballots for the City of Detroit.

46.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all the ballots throughout the City of Detroit.

47.     William Hartman is a member of the Wayne County Board of Canvassers.  He determined that about 71% of Detroit's AVCBs were left unbalanced and _unexplained_.  See Affidavit of William Hartman; **Appendix** 17-18 at ¶6 (emphasis in original).

48.     Monica Palmer, Chairperson of the Wayne County Board of Canvassers, said under oath that more than 70% of the AVCBs in Detroit did not balance and many had no explanation to why they did not balance.  See Affidavit of Monica Palmer, **Appendix** 24 at ¶16.

49.     Palmer and Hartman first refused to certify the election results based on these and other serious discrepancies and irregularities.  Affidavit of William Hartman; **Appendix** 18 at ¶7.

50.     Before the county canvassing deadline, the two Republican members of the Wayne County Board of Canvasser refused to certify the improper votes from Wayne County.[3]

51.     The two canvassers changed their minds after being given inaccurate assurances of a state-wide audit and under duress, only to change them again the next day once they were safely

---

[3] After being harassed and berated for several hours, and based on assurances of a full and independent audit, the two Republican Wayne County Board of Canvasser Members capitulated under inaccurate inducement, duress, and coercion. See Affidavits of Palmer and Hartmann, _supra_.

11

RECEIVED by MSC 11/26/2020 2:44:12 AM

outside and had consulted with independent counsel.  Affidavit of William Hartman; **Appendix** 19 at ¶12; Affidavit of Monica Palmer, **Appendix** 24 at ¶20.

52.      Among other problems, Palmer and Hartmann "found" 14,000 unaccounted for votes, which ostensibly changed the outcome of at least one judicial race, but left unresolved many unanswered questions.

53.      Other eyewitnesses as outlined below and in the attached Appendix saw serious irregularities in Detroit, elsewhere in Wayne County, and throughout the State.

I.      **Respondents' Failure to Allow Meaningful Observation Offends the State Statute and the Michigan and Federal Constitutions.**

54.      Michigan law generally allows the public the right to observe the counting of ballots. See MCL 168.765a(12)("At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.").

55.      The Michigan Constitution provides all lawful voters with "[t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."  Const 1963, art 2, § 4(1)(h).

56.      Indeed, "[a]ll rights set forth in this subsection shall be self-executing.  This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes." Id. (emphasis added).

57.      The public's right to observe applies to counting both in-person and absentee ballots.[4]

---

[4] Regrettably, Defendants and their agents have exclusive possession of the ballots, ballot boxes, and other indicia of voting irregularities so a meaningful audit cannot timely occur. Normally, "[a] person requesting access to voted ballots is entitled to a response from the public body within 5 to

RECEIVED by MSC 11/26/2020 2:44:12 AM

58.     Respondents and their agents failed to grant meaningful observation opportunities to the public over the absentee ballots.  See Affidavit of Angelic Johnson, **Appendix** 26 at ¶12; Affidavit of Zachary C. Larsen, **Appendix** 8 at ¶¶37-55; Affidavit of G Kline Preston IV, **Appendix** 53 at ¶8; Affidavit of Articia Boomer, **Appendix** 65 at ¶21; Affidavit of Phillip O'Halloran, **Appendix** 74 at ¶¶18-19; Affidavit of Robert Cushman, **Appendix** 95 at ¶3; Affidavit of Jennifer Seidl, **Appendix** 97 at ¶6; Affidavit of Andrew Sitto, **Appendix** 58 at ¶¶23; Affidavit of Kristina Karamo, **Appendix** 61 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 101 at ¶35, 102 at ¶42; Affidavit of Cassandra Brown **Appendix** 109 at ¶33; Affidavit of Adam di Angeli, **Appendix** 122 at ¶30; Affidavit of Kayla Toma **Appendix** 144 at ¶¶14-15, 146 at ¶21, 147 at ¶¶31-32; Affidavit of Matthew Mikolajczak, **Appendix** 156; Affidavit of Braden Giacobazzi, **Appendix** 161 at ¶¶3, 5, 162 at ¶8; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

59.     Wayne County is the most populous county in Michigan.

60.     Detroit is the largest city in Wayne County.

61.     The City of Detroit's observation procedures, for example, failed to ensure transparency and integrity as it did not allow the public to see election officials during key points of absentee ballot processing in the AVCBs at TCF Arena (f/k/a Cobo Hall).  *Id.*

62.     These irregularities were repeated elsewhere in Wayne County, including in Canton Township, and throughout the State. See generally, Affidavits of Cassandra Brown **Appendix** 109 at ¶34; Lucille Ann Huizinga, **Appendix** 185 at ¶31; Laurie Ann Knott, **Appendix** 180 at ¶¶34-35; Marilyn Jean Nowak **Appendix** 189 at ¶17; Marlene K. Hager, **Appendix** 192 at ¶¶19-23; and

---

10 business days; however, the public body in possession of the ballots may not provide access for inspection or copying until 30 days after certification of the election by the relevant board of canvassers." Op.Atty.Gen.2010, No. 7247, 2010 WL 2710362.

RECEIVED by MSC 11/26/2020 2:44:12 AM

Sandra Sue Workman **Appendix** 198 at ¶33 (allegedly sending ballots from Grand Rapids to TCF Center to be processed and counted).

63. For instance, when absentee ballots arrived, the ballots should have been in an envelope, signed, sealed (and delivered) by the actual voter. Often it was not.

64. Ballots were taken from their envelopes and inspected to determine whether any deficiencies would obstruct the ballot from being fed through a tabulation machine. If any deficiencies existed (or were created by tampering), the ballot was hand duplicated.

65. There are credible allegations that Democrat officials and election workers repeatedly scanned ballots in high-speed scanners, often counting the same ballot more than once. Affidavit of Articia Boomer, **Appendix** 64 at ¶¶10-11, 13; Affidavit of William Carzon, **Appendix** 140 at ¶8; Affidavit of Matthew Mikolajczak **Appendix** 154; Affidavit of Melissa Carone, **Appendix** 159 at ¶¶3-4.

66. The evidence will also show that these hand duplication efforts ignored the legislative mandate to have one person from each major party sign every duplicated vote (*i.e.*, one Republican and one Democrat had to sign each "duplicated" ballot and record it in the official poll book).

67. Several poll watchers, inspectors, and other whistleblowers witnessed the surge of unlawful practices described above. Affidavit of Melissa Carone, **Appendix** 159 at ¶9.

68. The evidence shows the unlawful practices provided cover for careless or unscrupulous officials or workers to mark choices for any unfilled elections or questions on the ballot, potentially and substantially affecting down ballot races where there are often significant undervotes, or causing the ballots to be discarded due to overvotes.

RECEIVED by MSC 11/26/2020 2:44:12 AM

II.     **Summary of Election Malfeasance at the TCF Center Shows Widespread Problems that only this Court can Alleviate in the Short Term.**

69.     There were many issues of mistake, fraud, and other malfeasance at the TCF Center during the Election and during the counting process thereafter.

70.     On election day, election officials at the TCF Center systematically processed and counted ballots from voters whose names failed to appear in either the Qualified Voter File ("QVF") or in the supplemental sheets.  When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted. See Affidavit of Zachary C. Larsen, **Appendix** 7 at ¶33; Affidavit of Robert Cushman, **Appendix** 95 at ¶7.

71.     On election day, election officials at the TCF Center instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶15.

72.     After the statutory deadlines passed and local officials had announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in unsecure trays at the TCF Center.

73.     There were tens of thousands of these late-arriving absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates. See Affidavit of John McGrath **Appendix** 135 at ¶8.

74.     Election officials at the TCF Center instructed election workers to process ballots that appeared after the election deadline and to inaccurately report or backdate those ballots as having been received before the November 3, 2020, deadline.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶17.

RECEIVED by MSC 11/26/2020 2:44:12 AM

75. Election officials at the TCF Center systematically used inaccurate information to process ballots. Affidavit of Cassandra Brown, **Appendix** 109 at ¶33.

76. Many times, the election workers overrode the software by inserting new names into the QVF after the election deadline or recording these new voters as having a birthdate of "1/1/1900," which is the "default" birthday.  See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

77. Each day before the election, City of Detroit election workers and employees coached voters to vote for Joe Biden and the Democratic Party candidates.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶8.

78. These workers, employees, and so-called consultants encouraged voters to vote a straight Democratic Party ticket.  These election workers went over to the voting booths with voters to watch them vote and to coach them as to which candidates they should vote for.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶8.

79. Before and after the statutory deadline, unsecured ballots arrived at the TCF Center loading garage, loose on the floor not in sealed ballot boxes—with no chain of custody and often with no secrecy envelopes.  Affidavit of Articia Boomer, **Appendix** 63 at ¶8, 64 at ¶¶9, 18.

80. Election officials and workers at the TCF Center duplicated ballots by hand without allowing poll challengers to check if the duplication was accurate.  See Affidavit Andrew Sitto, **Appendix** 57 at ¶9; Affidavit of Phillip O'Halloran **Appendix** 75 at ¶22; Affidavit of Eugene Dixon, **Appendix** 113 at ¶5.

RECEIVED by MSC 11/26/2020 2:44:12 AM

81.     In fact, election officials repeatedly obstructed poll challengers from observing. See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶33.

82.     Election officials violated the plain language of the law MCL 168.765a by permitting thousands of ballots to be filled out by hand and duplicated on site without oversight from bipartisan poll challengers.

83.     After poll challengers started uncovering the statutory violations at the TCF Center, election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots, if not more, were improperly processed. See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 101 at ¶32, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Anna England, **Appendix** 115 at ¶¶5,7; Affidavit of Matthew Mikolajczak **Appendix** 155; Affidavit of Braden Giacobazzi, **Appendix** 162 at ¶6.

## III.     Suspicious Funding and Training of Election Workers

84.     In September, the Detroit City council approved a $1 million contract for the staffing firm P.I.E. Management, LLC to hire up to 2,000 workers to work the polls and to staff the ballot counting machines at the TCF Center.  P.I.E. Management, LLC is owned and controlled by a Democratic Party operative.

85.     A week after approval, P.I.E. Management, LLC began advertising for workers, stating, "Candidates must be 16 years or older.  Candidates are required to attend a 3-hour training session before the General Election.  The position offers two shifts and pay-rates: 1) From 7 am to

17

RECEIVED by MSC 11/26/2020 2:44:12 AM

7 pm at $600.00; and 2) From 10 pm to 6 am at $650." Consequently, these temporary workers were earning at least $50 per hour—far exceeding prevailing rates at most rural communities.

86.     Upon information and belief, the evidence will show that this money and much more came from a single private source: Mark Zuckerberg and his spouse, through the charity called CTCL, which paid over $400 million nationwide to Democrat-favoring election officials and municipalities. See generally, Expert Report of James Carlson, **Appendix** 245-276.

87.     The improper private funding to Michigan exceeded $9.8 million. *Id.* at 252 and 255.

## IV.     Forging Ballots on the QVF

88.     Whistleblowers observed election officials processing ballots at the TCF Center without confirming that the voter was eligible to vote.  See Affidavit of Zachary C. Larsen, **Appendix** 4 at ¶12.

89.     Whistleblowers observed election officials assigning ballots to different voters, causing a ballot being counted for a non-eligible voter by assigning it to a voter in the QVF who had not yet voted. See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

## V.     Changing Dates on Ballots

90.     All lawful absentee ballots were supposed to be in the QVF system by 9:00 p.m. on November 3, 2020.

91.     This deadline had to bet met to ensure an accurate final list of absentee voters who returned their ballots before the statutory deadline of 8:00 p.m. on November 3, 2020.

92.     To have enough time to process the absentee ballots, Respondents told polling locations to collect the absentee ballots from the drop-boxes every hour on November 3, 2020.

93.     On November 4, 2020, a City of Detroit election whistleblower at the TCF Center was told to improperly pre-date the receive date for absentee ballots that were not in the QVF as if they had been received on or before November 3, 2020.  The Whistleblower swore she was told to alter the information in the QVF to inaccurately show that the absentee ballots had been timely received.  She estimates that this was done to thousands of ballots.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶17.

## VI.     Double Voting

94.     An election worker in the City of Detroit observed several people who came to the polling place to vote in-person, but they had already applied for an absentee ballot.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶10; Affidavit of Anna England, **Appendix** 124-125 at ¶45.

95.     Election officials allowed these people to vote in-person, and they did not require them to return the mailed absentee ballot or sign an affidavit that the voter lost or "spoiled" the mailed absentee ballot as required by law and policy.

96.     This illicit process allowed people to vote in person and to send in an absentee ballot, thereby voting twice.  This "double voting" was made possible by the unlawful ways in which election officials were counting and inputting ballots at the TCF Center from across the City's several polling places.

97.     The Secretary of State's absentee ballot scheme exacerbated this "double voting," as set forth further in this Petition. See also, Expert Report of Matthew Braynard, **Appendix** 282 at ¶6.

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM

## VII. First Wave of New Ballots

98. Early in the morning of November 4, 2020, tens of thousands of ballots were suddenly brought into the counting room at the TCF Center through the back door. See Affidavit of John McGrath **Appendix** 134 at ¶4 (around 3:00 a.m.); Affidavit of Articia Boomer, **Appendix** 64 at ¶18 (around 4:00 a.m.); Affidavit of William Carzon, **Appendix** 141 at ¶11 (around 4:00 a.m.); Affidavit Andrew Sitto, **Appendix** 57 at ¶16 (alleges about 4:30 a.m.).

99. These new ballots were brought to the TCF Center by vehicles with out-of-state license plates. See Affidavit of Andrew Sitto, **Appendix** 57 at ¶15.

100. Whistleblowers claim that all of these new ballots were cast for Joe Biden. See Affidavit of Andrew Sitto, **Appendix** 57 at ¶¶17-18.

101. Upon information and belief, inexplicably, these ballots still do not share or have the markings establishing the proper chain of custody from valid precincts and clerks and are among the approximately 70% of unmatched AVCB errors identified by Palmer and Hartmann.

## VIII. Second Wave of New Ballots

102. The ballot counters needed to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list—the list of all persons who had registered to vote on or before November 1, 2020 (the QVF).

103. The ballot counters were also provided with supplemental sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020.

104. The validation process for a ballot requires the name on the ballot match with a registered voter on either the QVF or the supplemental sheets.

105. At around 9:00 p.m. on Wednesday, November 4, 2020, several more boxes of ballots were brought to the TCF Center. This was a second wave of new ballots.

RECEIVED by MSC 11/26/2020 2:44:12 AM

106.    Election officials instructed the ballot counters to use the "default" date of birth of January 1, 1900, on all of these newly appearing ballots.  See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

107.    None of the names on these new ballots corresponded with any registered voter on the QVF or the supplemental sheets.  See Affidavit of John McGrath, **Appendix** 135 at ¶¶7, 14, 136 at ¶¶16-18.

108.    Despite election rules requiring all absentee ballots to be inputted into the QVF system before 9:00 p.m. the day before, election workers inputted these new ballots into the QVF, manually adding each voter to the list *after* the deadline.

109.    Upon information and belief, almost all of these new ballots were entered into the QVF using the "default" date of birth of January 1, 1900.  See Affidavit of John McGrath, **Appendix** 135 at ¶8; Affidavit of Kristina Karamo, **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi, **Appendix** 163 at ¶10; Affidavit of Kristy Klamer, **Appendix** 174 at ¶13.

110.    These newly received ballots were either fabricated or apparently cast by persons who were not registered to vote before the polls closed at 8:00 p.m. on election day.

111.    Upon information and belief, inexplicably, these ballots still do not share or have the markings establishing the proper chain of custody from valid precincts and clerks and are among the approximately 70% of unmatched AVCB errors identified by Palmer and Hartmann.

RECEIVED by MSC 11/26/2020 2:44:12 AM

See *generally* Affidavits of Monica Palmer and William Hartman, **Appendix** 17 at ¶6 and 24 at ¶14.

112.    This means there were more votes tabulated than there were ballots in over 71% of the 134 AVCBs in Detroit.  That equates to over 95 AVCB being significantly "off." *Id.*

113.    According to public testimony before the state canvassers on November 23, City of Detroit Election Consultant Daniel Baxter admitted in some instances the imbalances exceeded 600 votes per AVCB.  He did not reveal the total disparity.

**IX.    Concealing the Malfeasance in Violation of Michigan law.**

114.    Many election challengers were denied access to observe the counting process by election officials at the TCF Center.  See Affidavit of Angelic Johnson, **Appendix** 26 at ¶12; Affidavit of Zachary C. Larsen, **Appendix** 8 at ¶¶37-55; Affidavit of G Kline Preston IV, **Appendix** 53 at ¶8; Affidavit of Articia Boomer, **Appendix** 65 at ¶21; Affidavit of Phillip O'Halloran, **Appendix** 74 at ¶¶18-19; Affidavit of Robert Cushman, **Appendix** 95 at ¶3; Affidavit of Jennifer Seidl, **Appendix** 97 at ¶6; Affidavit of Andrew Sitto, **Appendix** 58 at ¶23; Affidavit of Kristina Karamo, **Appendix** 61 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 101 at ¶35, 102 at ¶42; Affidavit of Cassandra Brown **Appendix** 109 at ¶33; Affidavit of Adam di Angeli **Appendix** 122 at ¶30; Affidavit of Kayla Toma **Appendix** 144 at ¶¶14-15, 146 at ¶21, 147 at ¶¶31-32; Affidavit of Matthew Mikolajczak **Appendix** 156; Affidavit of Braden Giacobazzi **Appendix** 161 at ¶¶3, 5, 162 at ¶8; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

115.    After denying access to the counting rooms, election officials at the TCF Center used large pieces of cardboard to block the windows to the counting room, thereby preventing anyone from watching the ballot counting process.  See Affidavit of Zachary C. Larsen, **Appendix**

RECEIVED by MSC 11/26/2020 2:44:12 AM

10 at ¶52; Affidavit of John McGrath **Appendix** 135 at ¶10; Affidavit of Andrew Sitto, **Appendix** 58 at ¶22.

116.    Respondents have continued to conceal their efforts by refusing meaningful bipartisan access to inspect the ballots.  Even if Republicans were involved in oversight roles by statute (such as with the Wayne County Canvassing Board), the Republican members have been harassed, threatened, and doxed (including publicly revealing where their children go to school) to pressure them to capitulate and violate their statutory duties.  This conduct is beyond the pale and shocking to the conscience.  See Affidavit of William Hartman; **Appendix** 18 at ¶8; Affidavit of Monica Palmer, **Appendix** 24-25 at ¶¶18-22, and 24; Affidavit of Dr. Phillip O'Halloran, **Appendix** 76 at ¶24-25; Affidavit of Jennifer Seidl, **Appendix** 99 at ¶23, 100 at ¶¶27, 30-31, 101 at ¶¶36-37; Affidavit of Eugene Dixon, **Appendix** 114 at ¶9; Affidavit of Matthew Mikolajczak, **Appendix** 156; Affidavit of Mellissa Carone **Appendix** 160 at ¶12; Affidavit of Braden Giacobazzi, **Appendix** 161 at ¶3, 162 at ¶7, 163 at 12, 164 at ¶¶12-14; Affidavit of Kaya Toma **Appendix** 144 at ¶15; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

**X.      Unsecured QVF Access further Violating MCL 168.765a, *et seq*.**

117.    Whenever an absentee voter application or in-person absentee voter registration was finished, election workers at the TCF Center were instructed to input the voter's name, address, and date of birth into the QVF system.

118.    The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with Internet access.

119.    This access permits anyone with the proper credentials to edit when ballots were sent, received, and processed from any location with Internet access.

120.     Many of the counting computers within the counting room had icons that revealed that they were connected to the Internet.

121.     Respondent Benson executed a contract to give a private partisan group, Rock the Vote, unfettered real-time access to Michigan's QVF. See Rock the Vote Agreement, **Appendix** 327.

122.     She sold or gave Michigan citizens' private voter information to private groups in furtherance of her own partisan goals.

123.     Benson and the State repeatedly concealed this unlawful contract and have refused to tender a copy despite several lawful requests for the government contract under FOIA.

124.     Improper access to the QVF was one of the chief categories of serious concern identified by the Michigan Auditor General's Report, **Appendix** 207 at material finding #2.

125.     Upon information and belief, Benson made it worse, not better.  In the most charitable light, this was incredibly naïve.  More cynically, Benson likely acted in furtherance of her partisan political goals and in dereliction of her statutory and constitutional duties.

## XI.     Unsecured Ballots

126.     A poll challenger witnessed tens of thousands of ballots, and possibly more, being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container.

127.     Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops.  See Affidavit of Daniel Gustafson, **Appendix** 112 at ¶¶4-6; see the photo of the TCF Center below:

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM



128.    These ballot bins and containers did not have lids, were unsealed, and could not have a metal seal.  See Affidavit of Rhonda Webber, **Appendix** 43 at ¶3.

129.    Some ballots were found unsecured on the public sidewalk outside the Department of Elections in the City of Detroit, reinforcing the claim that boxes of ballots arrived at the TCF Center unsealed, with no chain of custody, and with no official markings.  A photograph of ballots found on the sidewalk outside the Department of Elections appears below:



130.    The City of Detroit held a drive-in ballot drop off where individuals would drive up and drop their ballots into an unsecured tray.  No verification was done.  This was not a secured drop-box with video surveillance.  To encourage this practice, free food and beverages were provided to those who dropped off their ballots using this method.  See Affidavit of Cynthia Cassell **Appendix** 28 at ¶3 and 29 ¶¶9-10.

RECEIVED by MSC 11/26/2020 2:44:12 AM

**XII.   Breaking the Seal of Secrecy Undermines Constitutional Liberties under Const Art 2, § 4(1)(a).**

131.   Many times, election officials at the TCF Center broke the seal of secrecy for ballots to check which candidates the individual voted for on his or her ballot, thereby violating the voter's expectation of privacy.  See Affidavit of Zachary C. Larsen; **Appendix** 5 at ¶16-18, 20.

132.   Voters in Michigan have a constitutional right to open elections, and the Michigan Legislature provided them the right to vote in secret.  Respondents' conduct, together with others, violates both of these hallmark principles.  See Affidavit of Jennifer Seidl, **Appendix** 99 at ¶18.

133.   In Michigan, it is well-settled that the election process is supposed to be transparent and the voter's ballot secret, not the other way around.

134.   Here, Respondents' absentee ballot scheme has improperly revealed voters' preferences exposing Petitioners' and similarly-situated voters to dilution or spoliation while simultaneously obfuscating the inner workings of the election process.

135.   Now the Respondents seek to perform an "audit" on themselves.

**XIII.   Statewide Irregularities Over Absentee Ballots Reveal Widespread Mistake or Fraud.**

136.   Whenever a person requested an absentee ballot either by mail or in-person, that person needed to sign the absentee voter application.

137.   When the voter returned their absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

138.   Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.  See Affidavit of Jennifer Seidl, **Appendix** 103 at ¶60.

RECEIVED by MSC 11/26/2020 2:44:12 AM

139.    Election officials at the TCF Center, for example, instructed workers not to validate or compare signatures on absentee ballot applications and absentee ballot envelopes to ensure their authenticity and validity.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶15.

140.    Michigan law requires absentee votes to be counted by election inspectors in a particular manner.  It requires, in relevant part:

> (10) The oaths administered under subsection (9) must be placed in an envelope provided for the purpose and sealed with the red state seal.  Following the election, the oaths must be delivered to the city or township clerk. Except as otherwise provided in subsection (12), a person in attendance at the absent voter counting place or combined absent voter counting place shall not leave the counting place after the tallying has begun until the polls close.  Subject to this subsection, the clerk of a city or township may allow the election inspectors appointed to an absent voter counting board in that city or township to work in shifts.  A second or subsequent shift of election inspectors appointed for an absent voter counting board may begin that shift at any time on election day as provided by the city or township clerk.  However, an election inspector shall not leave the absent voter counting place after the tallying has begun until the polls close.  If the election inspectors appointed to an absent voter counting board are authorized to work in shifts, at no time shall there be a gap between shifts and the election inspectors must never leave the absent voter ballots unattended.  **At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed**.  A person who causes the polls to be closed or who discloses an election result or in any manner characterizes how any ballot being counted has been voted in a voting precinct before the time the polls can be legally closed on election day is guilty of a felony.

MCL  168.765a (10) (emphasis added).

141.    Under MCL 168.31, the Secretary of State can issue instructions and rules consistent with Michigan statutes and the Constitution that bind local election authorities. Likewise, under MCL 168.765a(13), the Secretary can develop instructions consistent with the law for the conduct of Absent Voter Counting Boards ("AVCB") or combined AVCBs.  "The instructions developed under [] subsection [13] are binding upon the operation of an absent voter counting board or combined absent voter counting board used in an election conducted by a county, city, or township."  MCL 168.765a(13).

RECEIVED by MSC 11/26/2020 2:44:12 AM

142.   Benson also promulgated an election manual that requires bipartisan oversight:

Each ballot rejected by the tabulator must be visually inspected by an election inspector to verify the reason for the rejection.  **If the rejection is due to a false read the ballot must be duplicated by two election inspectors who have expressed a preference for different political parties.**  Duplications may not be made until after 8 p.m. in the precinct (place the ballot requiring duplication in the auxiliary bin).  At an AV counting board duplications can be completed throughout the day. NOTE: The Bureau of Elections has developed a video training series that summarizes key election day management issues, including a video on Duplicating Ballots.  These videos can be accessed at the Bureau of Elections web site at www.michigan.gov/elections; under "Information for Election Administrators"; Election Day Management Training Videos. Election Officials Manual, Michigan Bureau of Elections, Chapter 8, last revised October 2020.

https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf (emphasis added).

143.   Election officials at the TCF Center flouted § 168.765a because there were not, at all times, at least one inspector from each political party at the absentee voter counting place.  Rather, the many tables assigned to precincts under the authority of the AVCB were staffed by inspectors for only one party.  Those inspectors alone were deciding on the processing and counting of ballots.  See Affidavit of Jennifer Seidl, **Appendix** 98 at ¶9; Affidavit of Eugene Dixon, **Appendix** 113 at ¶5; Affidavit of Mellissa Carone, **Appendix** 159 at ¶5.

144.   This processing included the filling out of brand new "cure" or "duplicate" ballots.  The process the election officials sanctioned worked in this way.  When an absentee ballot was processed and approved for counting, it was fed into a counting machine.  Some ballots were rejected—that is, they were a "false read"—because of tears, staining (such as coffee spills), over-votes, and other errors.  In some of these cases, inspectors could visually inspect the rejected ballot and determine what was causing the machine to find a "false read."  When this happened, the inspectors could duplicate the ballot, expressing the voter's intent in a new ballot that could then be fed into the machine and counted.

145.     Under § 168.765a and the Secretary of State's controlling manual, as cited above, an inspector from each major party must be present and must sign to show that they approve of the duplication.

146.     Rather than following this controlling mandate, the AVCB was allowing a Democratic Party inspector only to fill out a duplicate.  Republicans would sign only "if possible." See Affidavit of Patricia Blackmer, **Appendix** 90 at ¶11.  A photograph evidencing this illicit process appears below:



147.     The TCF Center election officials allowed hundreds or thousands of ballots to be "duplicated" solely by the Democratic Party inspectors and then counted in violation of Michigan election law.  See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶¶4-5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Phillip O'Halloran, **Appendix** 75 at ¶22; Affidavit of Anna England, **Appendix** 115 at ¶8.

148.     According to eyewitness accounts, election officials at the TCF Center habitually and systematically disallowed election inspectors from the Republican Party to be present in the voter counting place and refused access to election inspectors from the

RECEIVED by MSC 11/26/2020 2:44:12 AM

Republican party to be within a close enough distance from the absentee voter ballots to see for whom the ballots were cast.

149.     Election officials at the TCF Center refused entry to official election inspectors from the Republican Party into the counting place to observe the counting of absentee voter ballots. Election officials even physically blocked and obstructed election inspectors from the Republican party by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.  See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 101 at ¶32, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Anna England, **Appendix** 115 at ¶¶5,7; Affidavit of Matthew Mikolajczak, **Appendix** 155; Affidavit of Braden Giacobazzi, **Appendix** 162 at ¶6.

150.     Absentee ballots from military members, who tend to vote Republican in the general elections, were counted separately at the TCF Center.  All (100%) of the military absentee ballots had to be duplicated by hand because the form of the ballot was such that election workers could not run them through the tabulation machines used at the TCF Center. See Affidavit of Janice Hermann, **Appendix** 82 at ¶16.

151.     These military ballots were supposed to be the last ones counted, but there was another large drop of ballots that occurred during the counting of the military absentee ballots. *Id*. see also, Affidavit of Robert Cushman, **Appendix** 95 at ¶¶4-5.

152.     Worse, the military absentee ballot count at the TCF Center occurred after the Republican challengers and poll watchers were kicked out of the counting room. *Id*. Affidavit of Jennifer Seidl, Appendix 102 at ¶42.

RECEIVED by MSC 11/26/2020 2:44:12 AM

153. The Michigan Legislature also requires City Clerks to post the following absentee voting information anytime an election is conducted that involves a state or federal office:

a. The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.

b. The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.

c. The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

See MCL 168.765(5).

154. Upon information and belief, the clerk for the City of Detroit failed to post by 8:00 a.m. on "Election Day" the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voter ballots returned both before and on "Election Day."

155. According to Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8 p.m. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day should not be counted.

156. The Michigan Legislature allows for early counting of absentee votes before the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

157. Upon information and belief, receiving tens of thousands more absentee ballots in the early morning hours after Election Day and after the counting of the absentee ballots had already concluded, without proper oversight, with tens of thousands of ballots attributed to just

RECEIVED by MSC 11/26/2020 2:44:12 AM

one candidate, Joe Biden, confirms that election officials failed to follow proper election protocols and established Michigan election law.  See Affidavit of John McGrath **Appendix** 134 at ¶4; Affidavit of Robert Cushman, **Appendix** 96 at ¶14.

158.    Missing the statutory deadline proscribed by the Michigan Legislature for turning in the absentee ballot or timely updating the QVF invalidates the vote under Michigan Election Law and the United States Constitution.

159.    Poll challengers observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the QVF or on any supplemental sheets. See Affidavit of Angelic Johnson **Appendix** 26 at ¶7; Affidavit of Adam di Angeli **Appendix** 129 at ¶61; see also, Affidavit of John McGrath, *supra*; Affidavit of Kristina Karamo, *supra*; Affidavit of Robert Cushman, *supra*; Affidavit of Jennifer Seidl, *supra*; Affidavit of Braden Giacobazzi, *supra*; Affidavit of Kristy Klamer, *supra*.

**XIV.    Flooding the Election with Absentee Ballots was Improper.**

160.    Michigan does not permit "mail-in" ballots *per se*, and for good reason: mail-in ballots facilitate fraud and dishonest elections.  See*, e.g., Veasey v Abbott*, 830 F3d 216, 256, 263 (CA5, 2016) (observing that "mail-in ballot fraud is a significant threat—unlike in-person voter fraud," and comparing "in-person voting—a form of voting with little proven incidence of fraud" with "mail-in voting, which the record shows is far more vulnerable to fraud").

RECEIVED by MSC 11/26/2020 2:44:12 AM

161.    Yet Respondent Benson's absentee ballot scheme, as explained in this Petition, achieved the same purpose as mail-in ballots—contrary to Michigan law. In the most charitable light, this was profoundly naïve and cut against the plain language and clear intent of the Michigan Legislature to limit fraud.  More cynically, this was an intentional effort to favor her preferred candidates.

162.    Upon information and belief, she put this scheme in place because it is generally understood that Republican voters were more likely to vote in-person.  This trend has been true for decades and proved true with this Election too.  See Expert Report of John McLaughlin, **Appendix** 301-303.

163.    To counter this (*i.e.,* the fact that Republicans are more likely than Democrats to vote in-person), Respondent Benson implemented a scheme to permit mail-in voting, leading to this dispute and the absentee ballot scheme that unfairly favored Democrats over Republicans.

164.    In her letter accompanying her absentee ballot scheme, Respondent Benson misstated, "You have the right to vote by mail in every election."  Playing on the fears created by the current pandemic, Respondent Benson encouraged voting "by email," stating, "During the outbreak of COVID-19, it also enables you to stay home and stay safe while still making your voice heard in our elections."  Affidavit of Christine Muise, **Appendix** 46 at ¶2, Ex A.

165.    Prior to election day, the Democratic Party's propaganda was to push voters to vote by mail and to vote early.  Democratic candidates used the fear of the current pandemic to promote this agenda—an agenda that would benefit Democratic Party candidates.  For example, on September 14, 2020, the Democratic National Committee announced the following:

> Today Biden for President and the Democratic National Committee are announcing new features on IWillVote.com—the DNC's voter participation website—that will help voters easily request and return their ballot by mail, as well as learn important information about the voting process in their state as they make their plan to vote.

RECEIVED by MSC 11/26/2020 2:44:12 AM

Previously, an individual could use the site to check or update their registration and find voting locations.  Now the new user experience will also guide a voter through their best voting-by-mail option . . . .

(available at https://democrats.org/news/biden-for-president-dnc-announce-new-vote-by-mail-features-on-iwillvote-com/ (last visited Nov. 17, 2020)).

According to the Associated Press:

"We have to make it easier for everybody to be able to vote, particularly if we are still basically in the kind of lockdown circumstances we are in now," Biden told about 650 donors. "But that takes a lot of money, and it's going to require us to provide money for states and insist they provide mail-in ballots."

(available at https://apnews.com/article/6cf3ca7d5a174f2f381636cb4706f505 (last visited Nov. 17, 2020)).

166.    Similar statements were repeatedly publicly on the Secretary of State's website:

**Voters are encouraged to vote at home with an absentee ballot** and to return their ballot as early as possible by drop box, in person at their city or township clerk's office, or well in advance of the election by mail.

https://www.michigan.gov/sos/0,4670,7-127-1633_101996---,00.html (emphasis added).

167.    The Michigan Legislature set forth detailed requirements for absentee ballots, and these requirements are necessary to prevent voter fraud because it is far easier to commit fraud via an absentee ballot than when voting in person.  See, e.g., *Griffin v Roupas*, 385 F3d 1128, 1130-31 (CA7, 2004) ("Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting").  Michigan law plainly limits the ways you may get an absentee ballot:

(1) Subject to section 761(3), at any time during the 75 days before a primary or special primary, but not later than 8 p.m. on the day of a primary or special primary, *an elector may apply for an absent voter ballot.  The elector shall apply in person or by mail* with the clerk of the township or city in which the elector is registered. The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election. Except as otherwise provided in section 761(2), the clerk of a city or township shall

RECEIVED by MSC 11/26/2020 2:44:12 AM

not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election.  An application received before a primary or special primary may be for either that primary only, or for that primary and the election that follows.  An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township in which the individual resides.  Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk or deputy clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.

(2) Except as otherwise provided in subsection (1) and subject to section 761(3), at any time during the 75 days before an election, but not later than 8 p.m. on the day of an election, an elector may apply for an absent voter ballot.  *The elector shall apply in person or by mail with the clerk of the township, city, or village in which the voter is registered*.  The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election.  Except as otherwise provided in section 761(2), the clerk of a city or township shall not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election.  An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township in which the individual resides.  Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.

(3) An application for an absent voter ballot under this section may be made in any of the following ways:

(a) By a written request **signed** by the voter.

(b) On an absent voter ballot application form provided for that purpose by the clerk of the city or township.

(c) On a federal postcard application.

(4) An applicant for an absent voter ballot **shall sign** the application.  Subject to section 761(2), a clerk or assistant clerk <u>shall not</u> deliver an absent voter ballot to an applicant <u>who does not sign the application</u>.  A person shall not be in possession of a signed absent voter ballot application except for the applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official.  A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.

RECEIVED by MSC 11/26/2020 2:44:12 AM

(5) The clerk of a city or township shall have absent voter ballot application forms *available in the clerk's office* at all times and shall furnish an absent voter ballot application form to anyone *upon a verbal or written request*.

MCL  168.759 (emphasis added).

168.    The Secretary of State sent *unsolicited* absentee ballot applications to every household in Michigan with a registered voter, no matter if the voter was still alive or lived at that address.

169.    The Secretary of State also sent absentee ballot requests to non-residents who were temporarily living in Michigan, such as out-of-state students who are unregistered to vote in Michigan.

170.    In many instances, the Secretary of State's absentee ballot scheme led to the Secretary of State sending ballot requests to individuals who did **_not_** request them.  See Affidavit of Christine Muise, **Appendix** 46 at ¶3. Affidavit of Rena M. Lindevaldesen, **Appendix** 167 at ¶¶1,3 and 168 ¶5.

## XV.    Expert Analysis of these statutory violations revels widespread inaccuracies and loss of election integrity.

171.    Petitioners retained experts who analyzed the State's database for the Election and related data sets, including its own call center results. See generally, Expert Report of Matthew Braynard, **Appendix** 278-288.

172.    Petitioners then retained an expert statistician to extrapolate the datasets statewide. See generally, Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 289-299.

### a.    *Unlawful unsolicited ballots cast in General Election*

173.    Braynard opined to a reasonable degree of scientific certainty that out of the 3,507,410 individuals who the State's database identifies as applying for and the State sending an

RECEIVED by MSC 11/26/2020 2:44:12 AM

absentee ballot, that in his sample of this universe, 12.23% of those absentee voters did not request an absentee ballot to the clerk's office. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶1.

174.    These data extrapolate with 99% confidence interval that between **326,460 and 531,467** of the absentee ballots the State issued that were counted were not requested by an eligible State voter (unsolicited). Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 293 at ¶1.

> b.    *Unsolicited ballots not cast in General Election*

175.    Out of the 139,190 individuals who the State's database identifies as having not requested (unsolicited) and not returned an absentee ballot, 24.14% of these absentee voters in the State did not request an absentee ballot. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶2.

176.    These data extrapolate with 99% confidence interval that between **28,932 and 38,409** of the absentee ballots the State issued were not requested by an eligible State voter (unsolicited). Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 293 at ¶2.

177.    Using the most conservative boundary, taken together, these data suggest Respondents violated Michigan Lection Law by sending unsolicited ballots to at least **355,392 people**. *Id.* See also, Affidavit of Sandra Sue Workman, **Appendix** 197 at ¶28.

> c.    *Absentee ballots were also cast but not properly counted (improperly destroyed or spoiled)*

178.    Out of the 139,190 individuals who the State's database identifies as having not returned an absentee ballot, 22.95% of those absentee voters did in fact mail back an absentee ballot to the clerk's office. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶3.

179.    This suggests many ballots were destroyed or not counted.

RECEIVED by MSC 11/26/2020 2:44:12 AM

180.    These data extrapolate with 99% confidence interval that between **29,682 and 39,048** of absentee ballots that voters returned but were not counted in the State's official records. Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 294 at ¶3.

181.    Out of the 51,302 individuals that had changed their address before the election who the State's database shows as having voted, 1.38% of those individuals denied casting a ballot. *Id.* at ¶4.

182.    This suggests that bad actors exploited Respondents' unlawful practice of sending unsolicited ballots and improperly harvested ballots on a widespread scale.

183.    Indeed, by not following the anti-fraud measures mandated by the Michigan Legislature, the Secretary of State's absentee ballot scheme invited the improper use of absentee ballots and promoted such unlawful practices as ballot harvesting. See Affidavit of Rhonda Weber, **Appendix** 43 at ¶7.

184.    Using the State's databases, the databases of the several states, and the NCOA database, at least **13,248** absentee or early voters were not residents of Michigan when they voted. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶5.

185.    Of absentee voters surveyed and when comparing databases of the several states, at least **317** individuals in Michigan voted in more than one state. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶6.

>        d.    *Respondents ignored other statutory signature requirements*

186.    The Secretary of State also sent ballots to people who requested ballots online, but failed to sign the request. See adverse Affidavit of Jonathan Brater, Head of Elections **Appendix** 317 at ¶10.

RECEIVED by MSC 11/26/2020 2:44:12 AM

187.    As of October 7, 2020, Brater admits sending at least **74,000 absentee ballots** without a signed request as mandated by the Michigan Legislature.  *Id.*

188.    By the Election, we must infer that the actual number of illegal ballots sent was much higher.

189.    According to state records, another **35,109 absentee votes** counted by Respondent Benson listed no address. See Braynard Report, *supra.*

190.    As a result of the absentee ballot scheme, the Secretary of State improperly flooded the election process with absentee ballots, many of which were fraudulent.

191.    The Secretary of State's absentee ballot scheme violated the checks and balances put in place by the Michigan Legislature to ensure the integrity and purity of the absentee ballot process and thus the integrity and purity of the 2020 general election.  See generally, Affidavits of Lucille Ann Huizinga, **Appendix** 185 at ¶31; Laurie Ann Knott, **Appendix** 180 at ¶¶34-35; Marilyn Jean Nowak **Appendix** 189 at ¶17; Marlene K. Hager, **Appendix** 192 at ¶¶19-23; and Sandra Sue Workman **Appendix** 198 at ¶33.

192.    Without limitation, according to state records, **3,373 votes counted** in Michigan were ostensibly from voters 100 years old or older.  See Braynard, *supra.*

193.    According to census data, however, there are only about 1,747 centenarians in Michigan,[5] and of those, we cannot assume a 100% voting rate.  See McLaughlin, *supra.*

---

[5] Based on the US Census, 0.0175 percent of Michigan's population is 100 years or older (1,729 centenarians of the total of 9,883,640 people in Michigan in 2010).  Census officials estimated Michigan's population at 9,986,857 as of July 2019, which puts the total centenarians at 1,747 or fewer.  Source: https://www.census.gov/content/dam/Census/library/publications/2012/dec/c2010sr-03.pdf

RECEIVED by MSC 11/26/2020 2:44:12 AM

194.   According to state records, at least **259 absentee ballots counted** listed their official address as "email" or "accessible by email," which are unlawful *per se* and suggests improper ballot harvesting.  See Braynard, *supra*.

195.   According to state records, at least 109 people voted absentee from the Center for Forensic Psychiatry at 8303 PLATT RD, SALINE, MI 48176 (not necessarily ineligible felons, but the State does house the criminally insane at this location), which implies improper ballot harvesting.

196.   According to state records, at least 63 people voted absentee at PO BOX 48531, OAK PARK, MI 48237, which is registered to a professional guardian and implies improper ballot harvesting.

197.   When compared against the national social security and deceased databases, at least **9 absentee voters** in Michigan are confirmed dead as of Election Day, which invalidates those unlawful votes.  See Braynard, *supra*.

198.   Taken together, these irregularities far exceed common sense requirements for ensuring accuracy and integrity.

e.     *Respondents did not fix other recent errors or serious irregularities either*

199.   These are the same types of serious concerns raised by the Michigan Auditor General in December 2019, **Appendix** 205-244.

200.   The Auditor General specifically found several violations of MCL 168.492:

i.   2,212 Electors voted more than once;

RECEIVED by MSC 11/26/2020 2:44:12 AM

    ii.    230 voters were over 122 years old;[6] *Id.* at 217.

    iii.    Unauthorized users had access to QVF; *Id.* at 219; and

    iv.    Clerk and Elected Officials had not completed required training. *Id.* at 225.

201.    The Auditor General found election officials had not completed required training to obtain or retain accreditation in 14% of counties, 14% of cities, and 23% of townships.  *Id.*

202.    The Auditor General found 32 counties, 83 cities, and 426 townships where the clerk had not completed initial accreditation training or, if already accredited, all continuing education training as required by law.  *Id.*

203.    The Auditor General found 12 counties, 38 cities, and 290 townships where the clerk had not completed the initial accreditation or continuing education training requirements and no other local election official had achieved full accreditation. *Id.*

204.    Not only were the Auditor General's red flags ignored by Respondent Benson, but she arguably made them worse through her absentee ballot scheme.

205.    This not only suggests malfeasance, but the scheme precipitated and revealed manifest fraud and exploitation at a level Michigan has never before encountered in its elections.

206.    The abuses permitted by the Secretary of State's ballot scheme were on display at the TCF Center, and elsewhere throughout the State.

207.    Because this absentee ballot scheme applied statewide, it undermined the integrity and purity of the general election statewide, and it dilutes the lawful votes of millions of Michigan voters.

---

[6] The oldest living person confirmed by the *Guinness Book of World Records* is 117 years old and she lives in Japan, not Michigan.

RECEIVED by MSC 11/26/2020 2:44:12 AM

## XVI.   Flooding the Election with Private Money also Violates Federal Law and Raises the Appearance of Impropriety.

208.   Inappropriate secrecy and lack of transparency began months before Election Day with an unprecedented and orchestrated infusion of hundreds of millions of dollars into local governments nationwide.

209.   More than $9.8 million in private money was poured into Michigan to create an unfair, two-tier election system in Michigan.  See Carlson Report, *supra*.

210.   This Election will be remembered for the evisceration of state statutes designed to treat voters equally, thereby causing disparate treatment of voters and thus violating the constitutional rights of millions of Michiganders and Americans citizens.

211.   To date, Petitioners and related experts and investigations have uncovered more than $400 million funneled through a collection of non-profits directly to local government coffers nationwide dictating to these local governments how they should manage the election, often contrary to state law.  See Carlson Report, *supra*.

212.   These funds were mainly used to: 1) pay "ballot harvesters" bounties, 2) fund mobile ballot pick up units, 3) deputize and pay political activists to manage ballots; 4) pay poll workers and election judges (a/k/a inspectors or adjudicators); 5) establish drop-boxes and satellite offices; 6) pay local election officials and agents "hazard pay" to recruit cities recognized as Democratic Party strongholds to recruit other cities to apply for grants from non-profits; 7) consolidate AVCBs and counting centers to facilitate the movement of hundreds of thousands of questionable ballots in secrecy without legally required bi-partisan observation; 8) implement a two-tier ballot "curing" plan that unlawfully counted ballots in Democrat Party strongholds and spoiled similarly situated ballots in Republican Party areas; and 9) subsidized and designed a scheme to remove the poll watchers from one political party so that the critical responsibility of

RECEIVED by MSC 11/26/2020 2:44:12 AM

determining the accuracy of the ballot and the integrity of the count could be done without oversight.

213.    The Help America Vote Act of 2002 (HAVA) controls how money is spent under federal law.  See 42 USC 15301, *et seq*; see also, MCL 168.18.  In turn, Congress used HAVA to create the non-regulatory Election Assistance Commission (EAC), which was delegated the responsibility of providing information, training standards, and funding management to states.  The mechanism for administrating HAVA is legislatively adopted state HAVA Plans.

214.    Michigan's HAVA Plan is undisputed.  See Certified Michigan HAVA State Plan of 2003, Terri Lynn Land Secretary, FR Vol. 69. No. 57 March 24 2004.

215.    These private funds exceeded the federal government's March 2020 appropriation under HAVA and CARES Acts to help local governments manage the general election during the pandemic.

216.    As these unmonitored funds flowed through the pipeline directly to hand-picked cities, the outlines of two-tiered treatment of the American voter began to take place.  Local governments in Democrat Party strongholds were flush with cash to launch public-private coordinated voter registration drives allowing private access directly to government voter registration files, access to early voting opportunities, the provision of incentives such as food, entertainment, and gifts for early voters, and the off-site collection of ballots.  Outside the urban core and immediate suburbs, unbiased election officials were unable to start such efforts for lack of funding.

217.    Difficult to trace private firms funded this scheme through private grants, which dictated methods and procedures to local election officials and where the grantors retained the right to "claw-back" all funds if election officials failed to reach privately set benchmarks—thus

RECEIVED by MSC 11/26/2020 2:44:12 AM

entangling the private-public partnership in ways that demand transparency—yet none has been given.

218.    The state officials implicated, and the private interests involved, have refused repeated demands for the release of communications outlining the rationale and plan behind spending more than $400 million provided directly to various election officials before the 2020 general election.

219.    These funds greased the skids of Democrat-heavy areas violating mandates of the Michigan Legislature, the Michigan HAVA Plan, the dictates of Congress under HAVA, and equal protection and Separation of Powers demanded under the United States Constitution.

220.    In Michigan specifically, CTCL had awarded eleven grants as of the time of this survey.  CTCL funded cities were:

     i.      Detroit ($3,512,000);

    ii.     Lansing ($443,742);

   iii.    East Lansing ($43,850);

    iv.    Flint ($475,625);

    v.     Ann Arbor ($417,000);

   vi.     Muskegon ($433,580);

  vii.     Pontiac ($405,564);

 viii.     Romulus ($16,645);

   ix.     Kalamazoo ($218,869); and

    x.     Saginaw ($402,878).

See Expert Report of James Carlson, **Appendix** 255 (last updated November 25, 2020).

RECEIVED by MSC 11/26/2020 2:44:12 AM

221.    In the 2016 election, then candidate Donald Trump only won Saginaw; then candidate Hillary Clinton won the remaining cities.

222.    In 2020, CTCL funneled **$9,451,235 (95.7%)** to the ten jurisdictions where candidate Clinton won and only **$402,878 (4.3%)** to where candidate Trump won. *Id.*

223.    On its face, this raises serious equal protection concerns under *Bush v Gore*, which requires city, county, and state officials to faithfully—and even-handedly—administer Michigan Election Law fairly between cities, counties, and across the state.

## XVII.  Private Money Improperly Flooded into Democratic Party strongholds

224.    Only the States themselves or certain federal agencies may spend money on federal elections under HAVA.

225.    Counties and cities cannot spend money on federal elections without going through the proper state and federal channels under HAVA transparency rules.

226.    CTCL's private federal elections grants to the City of Detroit for $3,512,000 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

227.    CTCL's private federal elections grants to the City of Lansing for $443,742 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

228.    CTCL's private federal elections grants to the City of Flint for $475,625 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

229.    CTCL's private federal election grants to the Michigan cities tortiously interfere with Petitioners' legal rights under federal law to legally-authorized, uniform, and fair federal elections.  See *The League of Women Voters v Blackwell*, 340 F Supp. 2d 823 (ND Ohio 2004).

230.    A government's election policy favoring certain demographic groups injures the disfavored demographic groups.  "Parity of reasoning suggests that a government can violate the

RECEIVED by MSC 11/26/2020 2:44:12 AM

Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v Red Clay Consol Sch Dist*, 122 A3d 784, 858 (Del Ch 2015).

231. Upon information and belief, the evidence will show that this flood of private money to Democratic-controlled areas improperly skewed the Election results for Joe Biden and unfairly prejudiced Petitioners.

232. Petitioners do not want progressive Democrat candidates to win in the general election, and the Petitioners are injured by CTCL's private federal election grants because they are targeted to cities with progressive voter patterns—causing more progressive Democrat votes and a greater chance that progressive Democrat candidates will win. See*, id.*

## XVIII. Irreparable Harm to Petitioners and All Legal Voters

233. Petitioners Johnson and Dr. Traver voted for the Republican Party candidates during the 2020 general election. These Petitioners voted for Donald J. Trump for President and John James for the United States Senate. But for the unlawful acts set forth in this Petition, President Trump will win Michigan's 16 electoral votes and John James would be elected to the United States Senate, thereby promoting Petitioners' political interests.

234. The unlawful acts set forth in this Petition have caused, and will continue to cause, Petitioners irreparable harm.

235. Based on the statutory violations and other misconduct, and evidence of widespread mistake, irregularities, and fraud, it is necessary to order appropriate relief, including, but not limited to, enjoining the statewide certification of the election results pending a full and independent investigation, this Court taking immediate custody and control of the ballots, poll books, and other indicia of the voting, ordering a recount of the election results, voiding the

RECEIVED by MSC 11/26/2020 2:44:12 AM

election, and ordering a new election as permitted by law for down ballot candidates, or at a minimum, voiding the illicit absentee ballots to remedy the unfairness, irregularities, and fraud.

236.     Petitioners have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested here is granted.

## FIRST CLAIM FOR RELIEF
### (Due Process)

237.     Petitioners incorporate by reference all stated paragraphs.

238.     Because of the acts, policies, practices, procedures, and customs, created, adopted, and enforced under color of state law, Respondents have deprived Petitioners of the right to due process guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of the Michigan Constitution.

239.     In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

240.     In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

241.     Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

242.     The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment.  *Harper v Va State Bd of Elections*, 383 US 663, 665 (1966); see *also Reynolds*, 377 US at 554 (["The Fourteenth Amendment protects the] the right of all qualified citizens to vote, in state as well as in federal elections.").

RECEIVED by MSC 11/26/2020 2:44:12 AM

243.    The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 at 562.

244.    Voters have a right to cast a ballot in an election free from the taint of intimidation and fraud, and confidence in the integrity of our electoral processes is essential to the functioning of our constitutional republic.

245.    Included within the right to vote, secured by the United States and Michigan Constitutions, is the right of qualified voters within a State to cast their ballots and have them counted if they are validly cast.  The right to have the vote counted means counted at full value without dilution or discount.

246.    Every voter in a federal election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes.

247.    Invalid or fraudulent votes debase and dilute the weight of each validly cast vote.

248.    The right to an accurate count is a right possessed by each voting elector, and when the importance of his vote is negated, even in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitutions of the United States and Michigan.

249.    Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct—such as the Secretary of State's absentee ballot scheme—can and did violate the right to due process by leading to the dilution of validly cast ballots.  See *Reynolds*, 377 US at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

RECEIVED by MSC 11/26/2020 2:44:12 AM

250.    The Due Process Clauses of the Fourteenth Amendment and the Michigan Constitution protect the right to vote from conduct by state officials which undermines the fundamental fairness of the electoral process.

251.    Separate from the Equal Protection Clause, the Fourteenth Amendment's Due Process Clause protects the fundamental right to vote against the disenfranchisement of a state electorate.  The Due Process Clause of the Michigan Constitution protects the same.

252.    When an election process reaches the point of patent and fundamental unfairness, as in this case, there is a due process violation.

253.    As a result, the right to vote, the right to have one's vote counted, and the right to have one's vote given equal weight are basic and fundamental constitutional rights incorporated in the Due Process Clause of the Fourteenth Amendment, the Due Process Clause of the Michigan Constitution, and 42 USC § 1983.

254.    Respondents have a duty to guard against the deprivation of the right to vote through the dilution of validly cast ballots caused by ballot fraud or election tampering.  The Secretary of State and the Board failed in their duties.

255.    The actions of election officials at the TCF Center and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Petitioners' votes in violation of the Due Process Clause of the Fourteenth Amendment, the Due Process Clause of the Michigan Constitution, and 42 USC § 1983.

256.    As a direct and proximate result of Respondents' violation of due process, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

RECEIVED by MSC 11/26/2020 2:44:12 AM

## **SECOND CLAIM FOR RELIEF**

### **(Equal Protection)**

257.     Petitioners incorporate by reference all stated paragraphs.

258.     Because of the acts, policies, practices, procedures, and customs, created, adopted, and enforced under color of state law, Respondents have deprived Petitioners of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Michigan Constitution's counterpart, and 42 USC § 1983.

259.     The actions of election officials at the TCF Center and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Petitioners' votes in violation of the equal protection guarantee of the Fourteenth Amendment and the Michigan Constitution.

260.     In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

261.     In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

262.     Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

263.     As a direct and proximate result of Respondents' violation of the equal protection guarantee of the United States and Michigan Constitutions, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## **THIRD CLAIM FOR RELIEF**

### **(Article II, section 1, clause 2)**

264.     Petitioners incorporate by reference all stated paragraphs.

RECEIVED by MSC 11/26/2020 2:44:12 AM

265.    Through the absentee ballot scheme created, adopted, and enforced by the Secretary of State under color of state law and without legislative authorization, Respondent Benson violated Article II, section 1, clause 2 of the United States Constitution.

266.    In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

267.    In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

268.    Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

269.    As a direct and proximate result of Respondent Benson's violation of the Michigan and United States Constitutions, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## FOURTH CLAIM FOR RELIEF
### (Mandamus and *Quo Warranto*)

270.    Because of the exigencies caused by the statewide certification of this unlawful scheme by the Board of Canvassers on November 23, 2020, Petitioners have no recourse to protect their civil liberties except through extraordinary relief from this Court.

271.    The last popular election unstained by Respondents' scheme installed the current Michigan Legislature.  By fundamental design, this Legislature is tasked with ensuring Petitioners' constitutional rights are upheld and safeguarded.  Moreover, under the United States Constitution, only the legislatures of the several states may select its electors when the statutes proscribed for a popular vote have been corrupted by executive branch officials.

RECEIVED by MSC 11/26/2020 2:44:12 AM

272.    The Michigan Legislature has delegated certain tasks to Respondents.  However, Respondents failed to follow the clear and unambiguous language of the election law statutes, as set forth in this Petition.

273.    This abuse of authority cuts at the root of the Separation of Powers and cannot be countenanced by this Court.  Moreover, the Michigan Legislature has provided this Court with unique authority to hear and resolve election disputes on an expedited basis.

274.    Moreover, because the Board of Canvassers certified the Election without conducting an audit and investigating the multiple allegations of election fraud and irregularities, Petitioners have been aggrieved by this determination, requiring this Court to issue the requested relief.

275.    As a direct and proximate result of Respondents' violations of the United States Constitution, the Michigan Constitution, and Michigan Election Law, Petitioners have been aggrieved and have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners ask this Court to narrowly tailor its relief to:

A)    ensure the Separation of Powers and protect the accuracy and integrity of the November 2020 General Election by giving the Michigan Legislature an opportunity to finish its constitutionally-mandated work to pick Michigan's electors;

B)    take custody and control of all ballots, ballot boxes, poll books, and other indicia of the Election from Respondents or their designee to prevent further irregularities and to ensure the Michigan Legislature and this Court have a chance to perform a constitutionally sound audit of lawful votes;

C)       segregate any ballots counted or certified inconsistent with Michigan Election Law;

D)       declare that Respondent Benson violated Petitioners' fundamental constitutional rights as explained in this Petition;

E)       segregate any ballots attributable to the Secretary of State's absentee ballot scheme and declare the Secretary of State's absentee ballot scheme unlawful;

F)       appoint a special master or committee from both chambers of the Michigan Legislature to investigate all claims of mistake, irregularity, and fraud at the TCF Center and to verify and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme.  The special master may recommend, including a recommendation with findings, that illegal votes can be separated from legal votes to determine a proper tabulation, or that the fraud is of such a character that the correct vote cannot be determined;

G)       alternatively, to enjoin Respondents or Governor Whitmer from finally certifying the election results and declaring winners of the 2020 general election to the United States Department of State or United States Congress until after a special master can be appointed to review and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme;

H)       alternatively, to enjoin Respondents from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to independently review the election procedures employed at the TCF Center and throughout the State;

I)       alternatively, to enjoin Respondents from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to review and certify the legality of all absentee ballots submitted in Wayne County and throughout the State;

RECEIVED by MSC 11/26/2020 2:44:12 AM

J)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

Dated:   November 26, 2020

THOMAS MORE SOCIETY—AMISTAD PROJECT

AS SPECIAL COUNSEL

*/s/ Ian A. Northon* _____
Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

*/s/ Robert J. Muise* _____
Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

*/s/ Erin E. Mersino* _____
Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

COUNSEL FOR PETITIONERS

RECEIVED by MSC 11/26/2020 2:44:12 AM

EXHIBIT 7



# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF ANTRIM

WILLIAM BAILEY

      Plaintiff

v.

ANTRIM COUNTY

      Defendant.

Case No. 20-9238-CZ

HON. _____

---

Matthew S. DePerno (P52622)
DePerno Law Office, PLLC
Attorney for Plaintiff
951 W. Milham Avenue
PO Box 1595
Portage, MI 49081
(269) 321-5064

---

## VERIFIED COMPLAINT

    NOW COMES Plaintiff, WILLIAM BAILEY, by and through his attorney, DePERNO

LAW OFFICE, PLLC and for his Complaint against ANTRIM COUNTY, states the following:

### JURISDICTION and VENUE

    1.    Plaintiff WILLIAM BAILEY ("Plaintiff") is an individual residing at 1592 N.

Intermediate Lake Road, Central Lake, Michigan 49622, Antrim County, Michigan. Plaintiff is a

registered voter and Antrim County, Michigan. On November 3, 2020 Plaintiff voted in person

in the 2020 presidential election at the polling location in Central Lake Township, Antrim

County.

    2.    Defendant ANTRIM COUNTY ("Defendant") is a public agency with its

registered office located at 203 E. Cayuga St., Bellaire, MI 49615.

3.      Defendant is tasked with the obligation to hold all elections in Antrim County in a fair and legal manner. Antrim County is made up of 22 precincts.

4.      The transactions that give rise to this cause of action occurred in Antrim County, State of Michigan.

5.      Plaintiff respectfully requests that this Honorable Court grant injunction relief, for all the reasons stated in his complaint, motion for temporary restraining order, supporting affidavit, exhibits, and accompanying brief, which are all incorporated herein by reference.

6.      Pursuant to MCL 600.4545(1), "[a]n action may be brought in the circuit court of any county of this state whenever it appears that material fraud or error has been committed at any election in such county at which there has been submitted any constitutional amendment, question, or proposition to the electors of the state or any county, township, or municipality thereof."

7.      Michigan's Constitution declares that "[n]o person shall be denied the equal protection of the laws ...." Mich. Const. 1963, art 1, §2.

8.      The Michigan Constitution's "purity of elections" clause states that "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Mich. Const. 1963, art 2, §4(2).

9.      Plaintiff requests relief as recognized in *Shoemaker v City of Southgate*, 24 Mich App 676; 180 NW2d 815 (1970).

10.     This action is properly filed in Antrim County Circuit Court pursuant to MCR 3.306(A)(2), Mich. Const. art. 1, §2 and art. 2, §4, MCL 600.4545, and MCL 600.605.

2

11.     Plaintiff requests this Court order "a speedy hearing" of this action and "advance it on the calendar" as provided by MCR 2.605(D).

12.     Venue is proper pursuant to MCR 3.306(D).

## COMMON ALLEGATIONS

13.     The general election was held on Tuesday, November 3, 2020.

14.     Antrim County uses the Dominion Voting Systems election management system and voting machines (tabulators) ("Dominion"). These tabulators were shown to miscount votes cast for President Donald Trump and instead count them for Presidential Candidate Joe Biden.

15.     Antrim County is just one of 47 counties in Michigan that uses the Dominion voting system to process ballots. As noted in the letter attached hereto from Senate President Pro Tempore Aric Nesbitt [Exhibit 1], "[t]his is particularly concerning when at least one other secretary of state, specifically in Texas, refused to certify Dominion Voting Systems for use because the examiner could not verify that the system was 'safe from fraudulent or unauthorized manipulation.'" This letter is signed by 40 Michigan State Senators and Representatives.

16.     The letter references that the allegations are "backed up by sworn affidavits of over 100 Michigan citizens, real people, willing to face legal consequences to their lives and livelihoods to stand by their assertions.

17.     In addition, the letter attached hereto from 22nd District Representative Lana Theis [Exhibit 2] expresses similar concerns about the issue in Antrim County with Dominion voting systems.

18.     At 9:30 am on Wednesday, November 4, 2020, unofficial results posted by the Antrim County Clerk showed that 16,047 voters had cast a ballot in the presidential election.

3

Presidential Candidate Joe Biden received 7,769 votes in the county and President Donald Trump received 4,509 [Exhibit 3].[1]

19.   Antrim County voted 62% in favor of President Trump in 2016.

20.   Democratic candidates Gary Peters and Dana Ferguson also outperformed their Republican opponents in the county.

21.   On Wednesday morning, November 4, 2020, Plaintiff turned on the television to watch the local news and was shocked to see an election map showing Antrim County in bright blue – meaning that the majority of voters in Antrim County had voted Democrat. Plaintiff immediately contacted Jim Gurr (who worked for Helena Township (Antrim County) election. Upon information and belief, Jim Gurr then contacted Defendant County Clerk Sheryl Guy's office and asked her office to review the results, which appeared skewed and incorrect.

22.   On November 5, 2020, Defendant County Clerk Sheryl Guy released amended results which showed that 18,059 residents had cast a ballot in the election [Exhibit 4].[2] Of those, Presidential Candidate Joe Biden received 7,289 votes in the county and President Donald Trump received 9,783; resulting in President Donald Trump receiving 54%, still significantly less than 2016.

23.   On November 21, 2020, Defendant County Clerk Sheryl Guy released second amended results[3] which now show 16,044 residents had cast a ballot in the election [Exhibit 5].[4] Of those, Presidential Candidate Joe Biden received 5,960 votes in the county and President

---

[1]   Only including pages 1-14 (results for President, Senator, Congress 1st District, State Legislature 105th District

[2] Only including pages 3-14. Pages 1-2 not available on Antrim County website.

[3] http://www.antrimcounty.org/elections.asp

[4] Only including pages 1-14.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (Phone) • (269) 321-5164 (Fax)

Donald Trump received 9,748; resulting in President Donald Trump receiving 60.75%, which was more in line and consistent with 2016.

24.     Of serious concern is why Presidential Candidate Joe Biden had more than 7,700 votes on election night.

25.     Of equal concern is why Presidential Candidate Joe Biden had 7,289 votes on November 5, 2020.

26.     Of equal concern is why Presidential Candidate Joe Biden's vote count dropped to 5,960 votes on November 21, 2020. What happened to the mysterious 1,740+ overvotes registered on election night?

27.     Of equal concern is why Defendant's vote count for registered voters dropped from 18,059 on November 5, 2020 to 16,044 on November 21, 2020. That is a startling 11.2% reducing in total voters.

28.     It is an obvious fact that Presidential Candidate Joe Biden received more votes than actually cast for him, including an extra 2,015 "phantom votes." But for Plaintiff contacting Jim Gurr, who contacted Defendant County Clerk Sheryl Guy's office, this mistake would not have been corrected.

29.     There are many other questions that remain unanswered, including but not limited to (1) whether the Dominion tabulators in Antrim County were tampered with, (2) whether they have the capacity to connect to the internet, (3) whether they had any open VPN ports during the election, (4) if connected to the internet, was the connection secure, (5) whether the machines were accessed via the use of removable media to transfer voting information, (6) whether the ballot images were preserved in every precinct per federal and state election law, (7) whether the audit logs were preserved and synchronized, (8) whether the audit logs were altered or edited by

5

any person operating the system, (9) whether Dominion pre-loaded any algorithms and configurations on the machines that alter the results, and if so, what algorithms and configurations were pre-loaded, and (10) whether the "purge option" that is built into Dominion utilized to cancel, switch, or manipulate votes, in the same way it has historically been utilized in Venezuela and Cuba.

30.     Plaintiff and others seek to learn the answers to these questions, including why Defendant initially registered "phantom voters" for Presidential Candidate Joe Biden and why the Dominion machines altered and switched votes for him.

31.     Secretary of State Benson released a statement blaming the county clerk for not updating certain "media drives," but her statement failed to provide any coherent explanation of how the Dominion Voting Systems software and vote tabulators produced such a massive miscount.[5]

32.     Secretary Benson continued: "After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county." *Id*.

33.     What Secretary Benson fails to address is what would have happened if no one "discover[ed] the error." Indeed, when Sheryl Guy testified before Michigan's Joint Oversight Committee on November 19, 2020, she failed to and was unable to answer this question.

34.     Tabulator errors related to Dominion occurred elsewhere in Michigan on election night. For instance, Wayne County and Oakland County used the same Dominion voting system tabulators as did Antrim County. In Oakland County, Democrat Melanie Hartman was wrongly

---

[5] https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf
(emphasis in original).

declared the winner of the commissioner's race by a 104-vote margin. A computer issue at the Rochester Hills clerk's office caused them to double-count some votes. After elections officials caught the error, Republican Adam Kochenderfer was declared the winner with 1,127 more votes than Hartman.[6]

35.     These vote tabulator failures are a mechanical malfunction that, under MCL 168.831-168.839, requires a "special election" in the precincts affected.

36.     Michigan's Election Code, MCL 168.831-168.839, provides the board of canvassers shall order a special election as governed by those precincts affected by the defect or mechanical malfunction. The board of county canvassers "is responsible for resolving any claims that malfunctioning voting equipment or defective ballots may have affected the outcome of a vote on an office appearing on the ballot." Michigan Manual for Boards of County Canvassers.

## COUNT 1
## CONSTITUTIONAL RIGHT TO ACCURACY AND INTEGRITY OF ELECTIONS

### Michigan Constitution – Article 2, Section 4, Paragraph 1(h)

37.     Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

38.     Plaintiff's constitutional rights have been violated. Plaintiff brings this action to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."

---

[6] https://www.freep.com/story/news/politics/elections/2020/11/08/election-misinformation-michigan-vote-antrim-county/6209693002/

7

39.     The Mich. Const., art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

40.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

**COUNT 2**
**VIOLATION OF "PURITY OF ELECTIONS" CLAUSE**

**Michigan Constitution – Article 2, Section 4, Paragraph 2**

41.     Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

42.     The Michigan Constitution's "purity of elections" clause states, "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of ballot, to guard against abuses of elective franchise, and to provide for a system of voter registration and absentee voting. Const. 1963, art 2, §4(2).

43.     "The phrase 'purity of elections' does not have a single precise meaning. But it unmistakably requires fairness and evenhandedness in the election laws of this state." *Barrow v Detroit Election Comm'n*, 305 Mich App 649, 676; 854 NW2d 489 (2014).

44.     Michigan statutes protect the purity of elections by allowing one person to case one vote and not permitting manipulation of votes through mechanical means or otherwise.

8

45.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

## COUNT 3
## ELECTION FRAUD; MCL 600.4545(2); MCL 158.861

46.     Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

47.     MCL 600.4545(1) permits an "[a]n action may be brought in the circuit court of any county of this state whenever it appears that material fraud or error has been committed at any election in such county at which there has been submitted any constitutional amendment, question, or proposition to the electors of the state or any county, township, or municipality thereof."

48.     Such action may be brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes before a recount pursuant to MCL 168.861, which states,

> "For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing."

49.     Based upon the allegations contained herein, material fraud or error occurred in this election so that the outcome of the election was affected.

50.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators thumb drives, related software, and the Clerk's "master

9

tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

## COUNT 4
## COMMON LAW ELECTION FRAUD

51.     Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

52.     MCR 3.306(B)(2) permits an action to request the issuance of a writ of quo warranto. An application to proceed by quo warranto must disclose sufficient facts and grounds and sufficient apparent merit to justify further inquiry.

53.     Quo warranto is warranted whenever it appears that material fraud or error has been committed at any election. This type of action is brought to challenge the validity of the election itself. *Barrow v Detroit Mayor*, 290 Mich App 530, 543; 820 NW2d 658 (2010). For all the reasons stated herein material fraud or error was committed during the election as it relates to the Dominion voting systems used in Antrim County's 22 precincts.

54.     This quo warranto claim is brought to remedy fraudulent or illegal voting or tampering with ballots via Dominion. Based upon the allegations contained herein, material fraud or error occurred in this election so that the outcome of the election was affected.

55.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

DePerno Law Office, PLLC • 951 W. Milham Avenue, PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 321-5164 (Fax)

## COUNT 5
## EQUAL PROTECTION VIOLATION

### Mich Const, art 1, § 2

56.    Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

57.    The Equal Protection Clause of the Michigan Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights." Mich Const, art I, § 2.

58.    This clause is coexistensive with the United States Constitution's Equal Protection Clause. *Harville v State Plumbing & Heating*, 218 Mich App 302, 305-306; 553 NW2d 377 (1996). See also *Bush v Gore*, 531 US 98, 104 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v Virginia Bd. of Elections*, 383 US 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Claus of the Fourteenth Amendment.")[7]

59.    The right to vote is a fundamental civil right and a political right. The Equal Protection Clause forbids election officials granting the right to vote on equal terms but later devaluing a person's vote through failing to use specific standards and uniform rules.

60.    Only specific standards and uniform rules provide sufficient guarantees of equal treatment. Every person has the right to vote, with their vote counted as one vote, and not have his or her vote diluted and voided out by the counting of an illegal vote.

---

[7] Most United States Supreme Court rulings concerning the right to vote frame the issue in terms of the Equal Protection Clause. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* §18.31(a) (2012 & Supp. 2015).

11

61.     Defendant's handling of the election, as described herein, establishes how rampant and systemic fraud devalued and diluted Plaintiff's civil and political rights.

62.     The illegal procedures, illegal standards, and illegal treatment of the ballots and the counting of ballots in Antrim County unconstitutionally burden the fundamental right to vote.

63.     Defendant has no legitimate interest in counting illegal and improper ballots, counting ballots more than once, improperly handling the collection and counting of ballots, or using the Dominion voting system to do the same in a way that dilutes and cancels out rightfully and properly cast votes.

64.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

## COUNT 6
## STATUTORY ELECTION LAW VIOLATIONS

### MCL 168.765(5)

65.     Plaintiff restates and incorporates as if set forth fully herein all preceding allegations contained in this Complaint.

66.     Michigan election law, MCL 168.765(5), requires Defendants to post the following absentee voting information anytime an election is conducted which involves a state or federal office:

> a.     The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.

12

b.      The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.

c.      The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

67.      Upon information and belief, Defendant failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day. Indeed, none of that information is available on Defendant's website.

68.      Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8:00 pm. MCL 168.764a. Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

69.      Upon information and belief, if Defendant received additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, then Defendant failed to follow proper election protocol.

70.      Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein, it is necessary to permit Plaintiff to immediately take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images, after which a manual recount of the election results and an independent audit of the November 3, 2020 election may be ordered to ensure the accuracy and integrity of the election.

13

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court grant the following relief:

A.     issue an order requiring allowing Plaintiff to take a forensic image of the 22 precinct tabulators, thumb drives, related software, the Clerk's "master tabulator," and conduct an investigation of those images.

B.     issue an order allowing Plaintiff to conduct an independent and non-partisan audit to determine the accuracy and integrity of the November 3, 2020 election;

C.     issue a protective order as requested in the attached Motion for TRO.

D.     grant such other and further relief as is equitable and just and grant him costs, expenses and attorney fees incurred in having to bring this action.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: November 23, 2020

Matthew S. DePerno (P62622)

## **VERIFICATION**

I, WILLIAM BAILEY, hereby state and affirm that I have read the foregoing Complaint and that it is true and accurate to the best of my information, knowledge, and belief.

DATED: November 23, 2020

William Bailey

14

EXHIBIT 8

## STATE OF MICHIGAN
## IN THE COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT,
INC, and
ERIC OSTERGREN,

      Plaintiffs,

v.

JOCELYN BENSON, in her official
Capacity as SECRETARY OF STATE

      Defendants.

Case No. 20- _000225_ -MZ

_Stephens_

---

## VERIFIED COMPLAINT FOR IMMEDIATE DECLARATORY
## AND INJUNCTIVE RELIEF

---

There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in the complaint.

## PARTIES

**A.   Plaintiffs Donald J. Trump for President, Inc., and Eric Ostergren**

1.    Donald J. Trump for President, Inc. of the United States of America and is a candidate for reelection in the 2020 general election. Donald J. Trump for President, Inc., is the campaign committee for President Trump and Vice President Pence.

2.    Eric Ostergren is a registered voter of Roscommon County, Michigan and credentialed and trained as an election "challenger." Eric Ostergren was excluded from the counting board during the absent voter ballot review process.

**B.      Joselyn Benson is Michigan's Secretary of State responsible for overseeing Oakland County's conduct of the 2020 presidential election.**

3.      Jocelyn Benson is Michigan's Secretary of State and is the "chief elections officer" responsible for overseeing the conduct of Michigan elections.  MCL 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); 168.31(1)(a) (the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state").  Local election officials must follow Secretary Benson's instructions regarding the conduct of elections.  Michigan law provides that Secretary Benson "[a]dvise and direct local election officials as to the proper methods of conducting elections."  MCL 168.31(1)(b).  *See also Hare v. Berrien Co Bd. of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Sec'y of State*, 2020 Mich. App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020).

4.      Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just, and lawful manner. *See* MCL 168.21; 168.31; 168.32. *See also League of Women Voters of Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018), *aff'd* 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989).

## JURISDICTION AND STANDING

5.      The Court of Claims has "exclusive" jurisdiction to "hear and determine any claim or demand, statutory or constitutional," or any demand for "equitable[ ] or declaratory relief or any demand for an extraordinary writ against the state or any of its departments or officers

2

notwithstanding another law that confers jurisdiction of the cast in the circuit court." MCL 600.6419(1)(a).

6.       Donald J. Trump has a special and substantial interest in assuring that Michigan processes the ballots of Michigan citizens case according to Michigan law so that every lawful Michigan voter's ballot is fairly and equally processed and counted. Eric Ostergren has a special and substantial interest under Michigan law as a credentialed election challenger to observe the processing of absent voter ballots.

7.       Plaintiffs raise statutory and constitutional claims asking this Court to order equitable, declaratory, and extraordinary relief against Secretary of State Benson. This Court has exclusive jurisdiction to hear these claims. Venue is appropriate in this Court.

8.       An actual controversy exists between Plaintiffs and Secretary of State Benson. Plaintiffs has suffered, or will suffer, an irreparable constitutional injury should Secretary Benson continue to fail to ensure that Michigan complies with Michigan law allowing challengers to meaningfully monitor the conduct of the election.

## BACKGROUND

9.       A general election is being held in the State of Michigan on November 3, 2020.

10.       MCL 168.765a, regarding Absent Voter Counting Boards, where absentee votes are processed and counted, states in relevant part as follows:

> At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.

11.       Michigan absent voter counting boards are not complying with this statute. These boards are being conducted without inspectors from each party being present.

12.     Further, a political party, incorporated organization, or organized committee of interested citizens may designate one "challenger" to serve at each counting board. MCL 168.730.

13.     An election challenger's appointed under MCL 168.730 has those responsibilities described at MCL 168.733.

14.     An election challenger's legal rights are as follows:

a.  An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL 168.733(1).

b.  An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL 168.733(1)(a).

c.  An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL 168.733(1)(b).

d.  An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL 168.733(1)(c).

e.  An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL 168.733(1)(d).

f.  An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL 168.744; and/or (4) any other violation of election law or other prescribed election procedure. MCL 168.733(1)(e).

g.  An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made. MCL 168.733(1)(f).

h.  An election challenger may examine each ballot as it is being counted. MCL 168.733(1)(g).

i.  An election challenger may keep records of votes cast and other election procedures as the challenger desires. MCL 168.733(1)(h).

4

j.  An election challenger may observe the recording of absent voter ballots on voting machines.  MCL 168.733(1)(i).

15.    Michigan values the important role challengers perform in assuring the transparency and integrity of elections.  For example,  Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger who is performing any activity described in Michigan law.  MCL 168.734(4); MCL 168.734.  It is a felony punishable by up to two years in state prison for any person to prevent the presence of a challenger exercising their rights or to fail to provide a challenger with "conveniences for the performance of the[ir] duties."  MCL 168.734.

16.    Local election jurisdictions locate ballot drop-off boxes without opportunity for challengers to observe the process, and as such Secretary Benson violates her constitutional and statutory authority and damages the integrity of Michigan elections.

17.    Michigan law requires that ballot containers be monitored by video surveillance. See Senate Bill 757 at 761d(4)(c).

18.    Secretary Benson is violating the Michigan Constitution and Michigan election law by allowing absent voter ballots to be processed and counted without allowing challengers to observe the video of the ballot boxes into which these ballots are placed.

19.    Plaintiffs asks Secretary Benson to segregate ballots cast in these remote and unattended ballot drop boxes and, before the ballots are processed, removed from their verifying envelopes, and counted, allow designated challengers to view the video of the remote ballot box.

20.    Secretary Benson's actions and her failure to act have undermined the constitutional right of all Michigan voters – including the voters bringing this action – to participate in fair and lawful elections.  These Michigan citizens' constitutional rights are being violated by Secretary

5

Benson's failure to prevent unlawful ballots to be processed and her failure to ensure that statutorily-authorized challengers have a right to do their job.

## COUNT I

### Secretary Benson violated the Equal Protection Clause of Michigan's Constitution

21.    Michigan's Constitution declares that "[n]o person shall be denied the equal protection of the laws …." Const 1963, art 1, § 2.

22.    This clause is coextensive with the United States Constitution's Equal Protection Clause. *Harville v. State Plumbing & Heating* 218 Mich. App. 302, 305-306; 553 N.W.2d 377 (1996). *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665, (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.")[1]

23.    Plaintiff seeks declaratory and injunctive relief requiring Secretary Benson to direct that election authorities comply with Michigan law mandating election inspectors from each party and allowing challengers access to video of ballot boxes before counting of relevant votes takes place.

---

[1] Most United States Supreme Court rulings concerning the right to vote frame the issue in terms of the Equal Protection Clause. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance & Procedure* §18.31(a) (2012 & Supp. 2015).

## COUNT II

**Secretary Benson and Oakland County violated Michigan voters' rights under the Michigan Constitution's "purity of elections" clause.**

24.     The Michigan Constitution's "purity of elections" clause states, "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." Const. 1963, art 2, §4(2).

25.     "The phrase 'purity of elections' does not have a single precise meaning. But it unmistakably requires fairness and evenhandedness in the election laws of this state." *Barrow v. Detroit Election Comm.*, 854 N.W.2d 489, 504 (Mich. Ct. App. 2014).

26.     Michigan statutes protect the purity of elections by allowing ballot challengers and election inspectors to monitor absentee ballots at counting boards.

27.     Plaintiff seeks declaratory and injunctive relief requiring Secretary Benson to direct that election authorities comply with Michigan law mandating election inspectors from each party and allowing challengers access to video of ballot boxes before counting of relevant votes takes place.

## COUNT III

**The Secretary of State is Violating of MCL 168.765a.**

28.     MCL 168.765a, regarding Absent Voter Counting Boards, where absentee votes are processed and counted, states in relevant part as follows:

> At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.

7

29.    Michigan absent voter counting boards, under the authority of Secretary Benson. are not complying with this statute. These boards are being conducted without inspectors from each party being present.

## PRAYER FOR RELIEF

These Michigan citizens and voters ask this Court to:

A.    Order "a speedy hearing" of this action and "advance it on the calendar" as provided by MCR 2.605(D);

B.    Mandate that Secretary Benson order all counting and processing of absentee votes cease immediately until an election inspector from each party is present at each absent voter counting board and until video is made available to challengers of each ballot box;

C.    Mandate that Secretary Benson order the immediate segregation of all ballots that are not being inspected and monitored as aforesaid and as is required under law.

D.    Award these Michigan citizens the costs, expenses, and expert witness fees they incurred in this action as allowed by law.

Dated:  November 4, 2020

Respectfully submitted,

/s/ *Mark F. (Thor) Hearne, II*
MARK F. (THOR) HEARNE, II
#P40231
STEPHEN S. DAVIS
J. MATTHEW BELZ
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

## VERIFICATION

STATE OF MICHIGAN      )
                       ) ss
COUNTY OF OAKLAND      )

    I, Eric Ostergrenbeing first duly sworn, depose and say that I am a resident of the state of Michigan and duly qualified as a voter in this state. While I may not have personal knowledge of all of the facts recited in this Complaint, the information contained therein has been collected and made available to me by others, and I declare, pursuant to MCR 2.114(B)(2), that the allegations contained in this Complaint are true to the best of my information, knowledge, and belief.

Subscribed and sworn to before me this 4th day of ~~October~~ November, 2020.

_____
Notary Public

_____ County, Michigan

My Commission Expires: 11-22-2023

Acting in _Midland_ County, Michigan

LORI A LECRONER
Notary Public – State of Michigan
County of Midland
My Commission Expires Nov 22, 2023
Acting in the County of Midland

# EXHIBIT 9

# STATE OF MICHIGAN

# COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT, INC.
and ERIC OSTEGREN,

**OPINION AND ORDER**

       Plaintiffs,

v

Case No.  20-000225-MZ

JOCELYN BENSON, in her official capacity as
Secretary of State,

Hon. Cynthia Diane Stephens

       Defendants.

_____/

      Pending before the Court are two motions.  The first is plaintiffs' November 4, 2020 emergency motion for declaratory relief under MCR 2.605(D).  For the reasons stated on the record and incorporated herein, the motion is DENIED.  Also pending before the Court is the motion to intervene as a plaintiff filed by the Democratic National Committee.  Because the relief requested by plaintiffs in this case will not issue, the Court DENIES as moot the motion to intervene.

      According to the allegations in plaintiffs' complaint, plaintiff Eric Ostegren is a credentialed election challenger under MCL 168.730.  Paragraph 2 of the complaint alleges that plaintiff Ostegren was "excluded from the counting board during the absent voter ballot review process."  The complaint does not specify when, where, or by whom plaintiff was excluded.  Nor does the complaint provide any details about why the alleged exclusion occurred.

-1-

The complaint contains allegations concerning absent voter ballot drop-boxes.  Plaintiffs allege that state law requires that ballot containers must be monitored by video surveillance. Plaintiff contends that election challengers must be given an opportunity to observe video of ballot drop-boxes with referencing the provision(s) of the statute that purportedly grant such access, . See MCL 168.761d(4)(c).

Plaintiffs' emergency motion asks the Court to order all counting and processing of absentee ballots to cease until an "election inspector" from each political party is allowed to be present at every absent voter counting board, and asks that this court require the Secretary of State to order the immediate segregation of all ballots that are not being inspected and monitored as required by law.  Plaintiffs argue that the Secretary of State's failure to act has undermined the rights of all Michigan voters.  While the advocate at oral argument posited the prayer for relief as one to order "meaningful access" to the ballot tabulation process, plaintiffs have asked the Court to enter a preliminary injunction to enjoin the counting of ballots.  A party requesting this "extraordinary and drastic use of judicial power" must convince the Court of the necessity of the relief based on the following factors:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued.  [*Davis v Detroit Fin Review Team*, 296 Mich App 568, 613; 821 NW2d 896 (2012).]

As stated on the record at the November 5, 2020 hearing, plaintiffs are not entitled to the extraordinary form of emergency relief they have requested.

## I.   SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

## A.  OSTEGREN CLAIM

Plaintiff Ostegren avers that he was removed from an absent voter counting board.  It is true that the Secretary of State has general supervisory control over the conduct of elections.  See MCL 168.21; MCL 168.31.  However, the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk.  See MCL 168.764d.  The complaint does not allege that the Secretary of State was a party to or had knowledge of, the alleged exclusion of plaintiff Ostegren from the unnamed absent voter counting board.  Moreover, the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements.  Thus, allegations regarding the purported conduct of an unknown local election official do not lend themselves to the issuance of a remedy against the Secretary of State.

## B.  CONNARN AFFIDAVIT

Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief.  The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note.  In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer."  She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20."  Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in

fraudulent activity in order to count invalid absent voter ballots that were received after election day.

This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

## C.  BALLOT BOX VIDEOS

It should be noted at the outset that the statute providing for video surveillance of drop boxes only applies to those boxes that were installed after October 1, 2020. See MCL 168.761d(2). There is no evidence in the record whether there are any boxes subject to this requirement, how many there are, or where they are. The plaintiffs have not cited any statutory authority that requires any video to be subject to review by election challengers. They have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of such boxes. The clear language of the statute directs that "[t]he city or township clerk must use video monitoring of that drop box to ensure effective monitoring of that drop box." MCL 168.761d(4)(c) Additionally, plaintiffs have not directed the Court's attention to any authority directing the

-4-

Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated from other ballots, and rendering it impossible for the Court to grant the requested relief against this defendant.  Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested.  As a result, plaintiffs are unable to show a likelihood of success on the merits.

## II.    MOOTNESS

Moreover, even if the requested relief could issue against the Secretary of State, the Court notes that the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day.  By the time this action was filed, the votes had largely been counted, and the counting is now complete.  Accordingly, and even assuming the requested relief were available against the Secretary of State—and overlooking the problems with the factual and evidentiary record noted above—the matter is now moot, as it is impossible to issue the requested relief.  See *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018)

IT IS HEREBY ORDERED that plaintiff's November 4, 2020 emergency motion for declaratory judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that proposed intervenor's motion to intervene is DENIED as MOOT.

This is not a final order and it does not resolve the last pending claim or close the case.

November 6, 2020

Cynthia Diane Stephens
Judge, Court of Claims

EXHIBIT 10

**STATE OF MICHIGAN**
**COURT OF APPEALS**

DONALD J. TRUMP FOR
PRESIDENT, INC., and
ERIC OSTERGREN,

        Plaintiffs-Appellants,

v.

JOCELYN BENSON, in her official
Capacity as SECRETARY OF STATE,

        Defendant-Appellee.

Court of Appeals No. 355378

Court of Claims No. 20-000225-MZ

**APPEAL INVOLVING AN
EMERGENCY ELECTION
DISPUTE**

**ORAL ARGUMENT REQUESTED**

---

Mark F. (Thor) Hearne, II (P40231)
Stephen S. Davis (*pro hac* pending)
TRUE NORTH LAW, LLC
112 S. Hanley Road, Suite 200
St. Louis, MO 63105
(314) 296-4000
thor@truenorthlawgroup.com

*Counsel for Plaintiffs-Appellants*

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Attorney General's Office
Post Office Box 30736
Lansing, MI 48989
(517) 335-7659
meingasth@michigan.gov

*Counsel for Defendant-Appellee*

---

**BRIEF IN SUPPORT OF APPLICATION FOR LEAVE TO APPEAL UNDER
MCR 7.105 AND IN SUPPORT OF MOTION FOR IMMEDIATE
CONSIDERATION UNDER MCR 7.211(C)(6)**

---

RECEIVED by MCOA 11/30/2020 11:21:02 PM

**TABLE OF CONTENTS**

Page

INDEX OF AUTHORITIES............................................................................... iii

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF QUESTIONS INVOLVED....................................................1

INTRODUCTION    ...........................................................................................2

BACKGROUND    .............................................................................................2

STANDARD OF REVIEW ...................................................................................6

ARGUMENT 7

    I.    Jocelyn Benson, as Michigan's Secretary of State and "Chief Election
        Officer," is the proper defendant. ...........................................................7

        A.    Secretary of State Jocelyn Benson is Michigan's "Chief Election
              Officer" required to enforce Michigan election law in a uniform
              and equal manner throughout the state. ......................................7

        B.    Michigan's election code provides for the critically important
              role of challengers as a bipartisan method to secure free and fair
              elections. ......................................................................................14

    II.    Judge Stephens was wrong to dismiss the plaintiffs' action as moot. . .................19

    III.    Jessica Connarn's affidavit is not hearsay. ...........................................22

CONCLUSION AND RELIEF SOUGHT .........................................................24

PROOF OF SERVICE..........................................................................................27

ADDENDUM  ......................................................................................................28

RECEIVED by MCOA 11/30/2020 11:21:02 PM

# INDEX OF AUTHORITIES

**CASES**

*Barrow v. Detroit Election Comm.*,
  854 N.W.2d 489 (Mich. Ct. App. 2014) .................................................................. 18

*Citizens Protecting Michigan's Constitution v. Secretary of State*,
  922 N.W.2d 404 (Mich. Ct. App. 2018), *aff'd* 921 N.W.2d 247 (Mich. 2018)........................ 10

*City of Novi v Robert Adell Children's Funded Trust*,
  701 N.W.2d 144 (Mich. 2005)............................................................................ 20

*Costantino, et al. v. City of Detroit, et al.*,
  No. 20-014780-AW (Wayne County Circuit Court filed Nov. 8, 2020) .................................... 4

*Davis v. Secretary of State*,
  2020 Mich. App. LEXIS 6128 (Mich. Ct. App. Sep. 16, 2020) ............................................ 9

*Donkers v Kovach*,
  745 N.W.2d 154 (Mich. Ct. App. 2007) ................................................................. 6

*Elher v. Misra*,
  878 N.W.2d 790 (Mich. 2016)............................................................................ 6

*Federated Publications, Inc. v. Lansing*,
  649 N.W.2d 383 (Mich. 2002)............................................................................ 20

*Fitzpatrick v. Secretary of State*,
  440 N.W.2d 45 (Mich. Ct. App. 1989) ................................................................. 10

*Gawlik v Rengachary*,
  714 N.W.2d 386 (Mich. Ct. App. 2006) ................................................................. 6

*Gleason v. Kincaid*,
  917 N.W.2d 685 (Mich. Ct. App. 2018) ................................................................ 21

*Hare v. Berrien County Board of Election*,
  129 N.W.2d 864 (Mich. 1964)............................................................................ 9

*Lawrence v. Blackwell*,
  430 F.3d 368 (6th Cir. 2005) .......................................................................... 22

*League of Women Voters of Michigan v. Secretary of State*,
  2020 Mich. App. LEXIS 709 (Mich. Ct. App. Jan. 27, 2020)............................................ 6, 10

RECEIVED by MCOA 11/30/2020 11:21:02 PM

*Merle v. United States*, 3
   51 F.3d 92 (3rd Cir. 2003) ............................................................... 21

*MGM Grand Detroit, LLC v Community Coalition for Empowerment, Inc.*,
   633 N.W.2d 357 (Mich. 2001) ........................................................ 20

*Michigan Alliance for Retired Americans v. Secretary of State*,
   2020 Mich. App. LEXIS 6931 (Mich. Ct. App. Oct. 16, 2020) ................... 6, 9, 15

*Mitchell v. Kalamazoo Anesthesiology*,
   908 N.W.2d 918 (Mich. Ct. App. 2017) ........................................... 6, 23

*Moore v. Ogilvie*,
   394 U.S. 814 (1969) ........................................................................ 21

*Paquin v. City of St. Ignace*,
   934 N.W.2d 650 (Mich. 2019) ..................................................... 20, 21

*People v. Corridore*,
   2019 Mich. App. LEXIS 3537 (Mich. Ct. App. June 27, 2019) ................ 23

*People v. Davis*,
   363 N.W.2d 35 (Mich. Ct. App. 1984) ............................................. 23

*People v. Douglas*,
   852 N.W.2d 587 (Mich. 2014) ........................................................ 23

*People v. Silver*,
   2015 Mich. App. LEXIS 1504 (Mich. Ct. App. July 28, 2015) ............... 23

*Rosario v. Rockefeller*,
   410 U.S. 752 (1973) ........................................................................ 21

**STATUTES**

Const. 1963, art 2, §4(2) .................................................................... 18

MCL 168.1 ...................................................................................... 10

MCL 168.21 ................................................................................. 9, 10

MCL 168.31 ................................................................................. 9, 10

MCL 168.32 ...................................................................................... 10

MCL 168.761d .................................................................................. 15

RECEIVED by MCOA 11/30/2020 11:21:02 PM

MCL 168.765a .................................................................................................. 15, 16

MCL 168.801 ......................................................................................................... 7

MCL 168.809 ......................................................................................................... 7

MCL 168.811 ......................................................................................................... 7

MCL 168.821 .................................................................................................... 7, 18

MCL 168.822 ................................................................................................. 7, 8, 9

MCL 168.841 ....................................................................................................... 18

MCL 168.842 ......................................................................................................... 9

MCL 168.932(f) ................................................................................................... 15

MCL 600.6446 ....................................................................................................... 1

MCL 168.810a ....................................................................................................... 7

## MICHIGAN RULES

MCR 7.203(B)(1) .................................................................................................... 1

MCR 7.205(A)(1) .................................................................................................... 1

MRE 801 .......................................................................................................... 23, 24

## OTHER AUTHORITIES

*Boards of County Canvassers Manual*, ch. 4, p. 13 ................................................ 18

*Michigan Election Officials' Manual* .................................................................... 18

RECEIVED by MCOA 11/30/2020 11:21:02 PM

## JURISDICTIONAL STATEMENT

The Michigan Court of Claims entered an Opinion and Order denying the motion for emergency injunctive relief filed by Donald J. Trump for President, Inc. (Trump campaign), and Eric Ostergren on November 6, 2020.   Appx. 1-6.   This Court has jurisdiction under MCL 600.6446 and MCR 7.203(B)(1).  This appeal is timely because it was filed on November 6, 2020. MCR 7.205(A)(1).

## STATEMENT OF QUESTIONS INVOLVED

1.      Is Secretary of State Jocelyn Benson, as Michigan's "chief election officer," the proper defendant who can grant the relief sought in the Trump campaign's and Eric Ostergren's motion for emergency injunctive relief?

> The Court of Claims said no.
> The Secretary of State said no.
> The Plaintiffs say yes.

2.      Is the plaintiffs' motion for emergency injunctive relief rendered moot because the Court of Claims' hearing was conducted after most of the absent voter ballots had been processed?

> The Court of Claims said yes.
> The Secretary of State said yes.
> The Plaintiffs say no.

3.      Was Jessica Connarn's affidavit describing her personal first-hand observations and including supporting evidence hearsay?

> The Court of Claims said yes.
> The Secretary of State said yes.
> The Plaintiffs say no.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

## INTRODUCTION

Because Michigan Secretary of State Jocelyn Benson (who is Michigan's chief election officer) did not require the local election officials she supervises and directs to comply with Michigan election law when conducting this year's general election, President Trump's campaign committee and a Michigan citizen, voter, and designated challenger, Eric Ostergren, filed a complaint in the Michigan Court of Claims and filed an emergency motion for declaratory judgment. *See* Appx. 30-48. The case was assigned to Judge Cynthia Stephens.

Judge Stephens denied the Plaintiffs' motion for emergency injunctive relief for three reasons. *First*, Judge Stephens held, "the relief requested [can] not issue against the Secretary of State. This is so, Judge Stephens concluded, even though Secretary of State Benson is Michigan's "chief elections officer" responsible for overseeing the conduct of Michigan elections which includes the obligation to exercise supervisory authority over local election officials. *Second*, Judge Stephens denied the relief requested in the verified petition because Judge Stephens ruled the Jessica Connarn sworn affidavit was hearsay. *Finally*, Judge Stephens denied the Plaintiffs' motion because she concluded it was moot. Judge Stephens is wrong on all three points. The Plaintiffs bring this Application for Leave to Appeal under Rule 7.105 and their Motion for Immediate Consideration under Rule 7.211(C)(6). Immediate consideration is sought because this concerns the conduct of the general election and the Electoral College meets on December 14.

## BACKGROUND

There is a difference between a ballot and a vote. A ballot is a piece of paper. A vote is a ballot that has been completed by a citizen registered to vote who is eligible to cast a ballot and who cast that ballot in compliance with Michigan election law by, among other things, verifying their identity and casting the ballot on or before Election Day. The Michigan election code

2

RECEIVED by MCOA 11/30/2020 11:21:02 PM

provides detailed rules for the conduct of elections.  The Michigan election code must be uniformly and equally followed by all Michigan election authorities so that all Michigan voters have an equal opportunity to cast a lawful ballot.

It is the task of Secretary Benson and Michigan election officials under her supervision and direction to assure that only ballots cast by individuals entitled to cast a vote are counted, that all ballots cast by lawful voters are counted, and that the election is uniformly and equally conducted in accord with the United States Constitution, Michigan's Constitution, and Michigan's election code.

A fraudulent ballot, if counted, disenfranchises a lawful vote cast by a Michigan citizen. Ballots that are ineligible to be counted will cancel out ballots eligible voters cast, effectively disenfranchising the lawful vote of a Michigan citizen.  Challengers play an important role in assuring the transparency and integrity of elections.  For example, Michigan law provides it is a felony punishable by up to two years in state prison for any person to threaten or intimidate a challenger or prevent a challenger from exercising their rights or failing to provide a challenger with "conveniences for the performance of the[ir] duties."  MCL 168.734.

Unfortunately, some local election jurisdictions, including Wayne County, did not conduct the general election as required by Michigan law.  And Secretary of State Benson did not require local election jurisdictions to allow challengers to meaningfully observe the conduct of the election and the tabulation and tallying of ballots.

Among other violations of Michigan's election code, election officials in Wayne County refused to permit statutorily designated challengers from meaningfully observing the conduct of the election and the processing and tabulation of ballots.  Some election officials pre-dated ballots that were not eligible to be counted by altering the date the ballot was received.  And challengers

RECEIVED by MCOA 11/30/2020 11:21:02 PM

were not allowed to review any video recordings of the remote unattended ballot drop boxes. *See* verified complaint, Appx. 33-34.[1]

The Plaintiffs brought this action in the Court of Claims asking the Court to order Secretary Benson to direct local election officials and election inspectors to provide meaningful access to observe the counting of absentee ballots. *See* Appx. 32-33 ¶¶10-15. The complaint was a verified complaint sworn and attested to by Eric Ostergren. Appx. 38. *See also* MCR 600.6434(2). The complaint was supported with an affidavit with an exhibit. *See* Appx. 64-60. Jessica Connarn testified in her affidavit that she personally witnessed a poll worker's distress because that poll worker was instructed to count ineligible ballots being tallied as lawful votes at the Detroit central counting board. Appx. 67. The verified complaint explained that the counting board had excluded Republican challengers from being able to meaningfully observe the processing of absentee ballots and that challengers were not allowed to observe the video surveillance of remote unattended ballot drop boxes. Appx. 30 ¶2, 32 ¶11, 37 ¶9.

---

[1] See also affidavits in support of complaint filed in the U.S. District Court for the Western District of Michigan in *Donald J. Trump for President, Inc., et al. v. Benson, et al.*, No. 1:20CV1083 (W.D. Mich. filed Nov. 11, 2020), Exhibit 1, ECF No. 1-1 (Deluca aff. ¶¶7-9, 16-18; Langer aff. ¶3; Papsdorf aff. ¶3; Frego aff. ¶9; Downing aff. ¶¶2-9, 11, 15, 22; Sankey aff. ¶¶5-8; Ostin aff. ¶¶5-7; Cavaliere aff. ¶3; Cassin aff. ¶4; Rose aff. ¶18; Zimmerman aff. ¶8; Langer aff. ¶3; Poplawski aff. ¶3; Henderson aff. ¶7; Fuqua-Frey aff. ¶5; Ungar aff. ¶4; Eilf aff. ¶¶9, 17; Jeup aff. ¶¶6-7; Tietz aff. ¶¶9-18; McCall aff. ¶¶5-6; Arnoldy aff. ¶¶5, 8-9) (regarding Republican challengers not being admitted to ballot counting boards). *See also id.* (Pettibone aff. ¶3; Kinney aff., p. 1; Wasilewski aff., p. 1; Schornak aff. ¶¶18-19; Dixon aff., p. 1; Kolanagireddy aff., p. 1; Kordenbrock aff. ¶¶3-4; Seidl aff., p. 1; Kerstein aff. ¶4; Harris aff. ¶3; Sitek aff. ¶4) (regarding lack of bipartisan teams of election workers duplicating ballots). *See also id.* (A. Seely aff. ¶15; Wasilewski aff., p. 1; Schornak aff. ¶13; Brunell aff. ¶¶17, 19; Papsdorf aff. ¶3; Spalding aff. ¶¶8, 11; Antonie aff. ¶3; Daavettila aff., p. 3; Atkins aff. ¶3; Harris aff. ¶3; Sherer aff. ¶21; Drzewiecki aff. ¶¶5-6; Klamer aff. ¶4; Rauf aff. ¶¶9-14; Roush aff. ¶¶5-7; Kinney aff. ¶5) (regarding ballot numbers not matching ballot envelopes and challengers thereto ignored). *See also id.* (Henderson aff. ¶8) (regarding counting table of election workers having lost eight ballot envelopes). *See also id.* (Meyers aff. ¶3, 4, 7) (regarding ballot drop box). *See also* affidavits submitted in support of complaint in *Costantino, et al. v. City of Detroit, et al.*, No. 20-014780-AW (Wayne County Circuit Court filed Nov. 8, 2020).

RECEIVED by MCOA 11/30/2020 11:21:02 PM

The verified complaint and motion seeking emergency relief was filed on November 4, the day after the general election when the Wayne County central counting board was still processing absentee ballots.  This case was assigned to Judge Cynthia Stephens.  Judge Stephens held a hearing on November 5 and issued an opinion and order on November 6.  Judge Stephens denied the Plaintiffs' emergency motion for declaratory judgment.  *See* Appx. 1,

An absent voter ballot, unlike a ballot cast in person, is not cast by an eligible voter who presents himself or herself at the polling place and validates their bona fides as an eligible voter with identification confirmed by a bipartisan team of election officials who also confirm the individual is an eligible registered voter whose name is in the poll book.  Rather, an absent voter ballot is delivered to the election inspectors by mail or by being deposited in an unattended remote ballot drop box.

Michigan's election code vests Secretary of State Jocelyn Benson, as Michigan's "chief election officer," with the responsibility to direct and oversee Michigan counties', townships', and villages' conduct of elections.  Michigan's election code contains a host of provisions intended to prevent fraudulent or ineligible ballots from being counted.  Michigan election law also requires that challengers be allowed to observe the casting, processing, and certification of ballots and that the remote and unattended ballot drop boxes be secure and monitored by video.  Because Secretary Benson did not require local election officials to allow challengers to meaningfully observe the conduct of the election and the video surveillance of the remote, unattended ballot drop boxes, the Plaintiffs brought this action.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

## STANDARD OF REVIEW

Plaintiffs filed an "emergency motion for declaratory relief under MCR 2.605(D)."  Appx. 1.  As this Court recently held in another case involving this election, *Michigan Alliance for Retired Americans v. Secretary of State*, "[t]his Court reviews de novo a trial court's decision on a motion for summary disposition in an action seeking declaratory relief."  2020 Mich. App. LEXIS 6931, *12 (Mich. Ct. App. Oct. 16, 2020) (citing *League of Women Voters of Mich. v. Secretary of State*, 2020 Mich. App. LEXIS 709, *7 (Mich. Ct. App. Jan. 27, 2020)).

Although this Court generally reviews "a trial judge's evidentiary decisions for an abuse of discretion," *Elher v. Misra*, 878 N.W.2d 790, 794 (Mich. 2016), this Court "review[s] de novo whether the trial judge properly interpreted and applied the rules of evidence to the facts." *Mitchell v. Kalamazoo Anesthesiology*, 908 N.W.2d 918, 925 (Mich. Ct. App. 2017) (citing *Donkers v Kovach*, 745 N.W.2d 154, 156 (Mich. Ct. App. 2007).   "An error of law may lead a trial court to abuse its discretion…." *Donkers*, 745 N.W.2d at 156 (quoting *Gawlik v Rengachary*, 714 N.W.2d 386, 391 (Mich. Ct. App. 2006).  "A trial judge abuses his or her discretion when the judge selects an outcome that is outside the range of principled outcomes." *Mitchell*, 908 N.W.2d at 325 (citing *Elher*, 878 N.W.2d at 790.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

# ARGUMENT

I. **Jocelyn Benson, as Michigan's Secretary of State and "Chief Election Officer," is the proper defendant.**

    A. **Secretary of State Jocelyn Benson is Michigan's "Chief Election Officer" required to enforce Michigan election law in a uniform and equal manner throughout the state.**

        The Michigan Legislature entrusted the conduct of elections to three administrative bodies who report to the Secretary of State; a "board of inspectors," a "board of county canvassers," and the "board of state canvassers."  The board of inspectors, among its other duties, canvasses the ballots and compares the ballots to the poll books.  *See* MCL 168.801.  "Such canvass shall be public and the doors to the polling places and at least 1 door in the building housing the polling places and giving ready access to them shall not be locked during such canvas."  *Id.*  The members of the board of inspectors (one from each party) are required to seal the ballots and election equipment and certify the statement of returns and tally sheets and deliver the statement of returns and tally sheet to the township or city clerk, who shall deliver it to the probate court judge, who will then deliver the statement of returns and tally sheet to the "board of county canvassers."  MCL 168.809.  "All election returns, *including poll lists, statements, tally sheets, absent voters' return envelopes bearing the statement required [to cast an absentee ballot] ... must be carefully preserved*."  MCL.168.810a and 168.811 (emphasis added).

        Each county has a board of county canvassers, which is "responsible for canvassing the votes cast within the county [it] serve[s].  The Board members certify elections for local, countywide and district offices which are contained entirely within the county they serve.  The Board members are also responsible for inspecting the county's ballot containers every four years."  *Michigan Election Officials' Manual*, p. 5.  *See also* MCL 168.821, *et seq.*

RECEIVED by MCOA 11/30/2020 11:21:02 PM

After the board of inspectors completes its duties, the board of county canvassers is to meet at the county clerk's office "no later than 9 a.m. on the Thursday after" the election.  November 5, 2020 is the date for the meeting.  MCL 168.821.  The board of county canvassers has power to summon and open ballot boxes, correct errors, and summon election inspectors to appear.  Among other duties and responsibilities, the board of county canvassers shall do the following provided in MCL 168.823(3).

The board of county canvassers shall correct obvious mathematical errors in the tallies and returns.  The board of county canvassers may, if necessary for a proper determination, summon the election inspectors before them, and require them to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  In the alternative to summoning the election inspectors before them, the board of county canvassers may designate staff members from the county clerk's office to count any ballots that the election inspectors failed to count, to make correct returns in case, in the judgment of the board of county canvassers after examining the returns, poll lists, or tally sheets, the returns already made are incorrect or incomplete, and the board of county canvassers shall canvass the votes from the corrected returns.  When the examination of the papers is completed, or the ballots have been counted, they shall be returned to the ballot boxes or delivered to the persons entitled by law to their custody, and the boxes shall be locked and sealed and delivered to the legal custodians.

The county board of canvassers shall "conclude the canvass at the earliest possible time and in every case no later than the fourteenth day after the election," which this year is November

RECEIVED by MCOA 11/30/2020 11:21:02 PM

17.  MCL 168.822(1).  But, "[i]f the board of county canvassers fails to certify the results of any election for any office or proposition by the fourteenth day after the election as provided, the board of county canvassers shall immediately deliver to the secretary of the board of state canvassers all records and other information pertaining to the election.  The board of state canvassers shall meet immediately and make the necessary determinations and certify the results within the 10 days immediately following the receipt of the records from the board of county canvassers."  MCL 168.822(2).

The Michigan board of state canvassers then meets at the Secretary of State's office the twentieth day after the election to announce its determination of the canvass "not later than the fortieth day after the election."  For this general election this year those dates are November 23 and December 3, respectively.  MCL 168.842.  Michigan law provides the Secretary of State may direct an expedited canvass of the returns for the election of electors for President and Vice President.

Jocelyn Benson is Michigan's Secretary of State and is the "chief election officer" responsible for overseeing the conduct of Michigan elections.  MCL 168.21 ("The secretary of state shall be the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act."); 168.31(1)(a) (the "Secretary of State shall … issue instructions and promulgate rules … for the conduct of elections and registrations in accordance with the laws of this state").

Local election officials must follow Secretary Benson's instructions regarding the conduct of elections.  Michigan law directs Secretary Benson to "[a]dvise and direct local election officials as to the proper methods of conducting elections."  MCL 168.31(1)(b).  *See also Hare v. Berrien County Board of Election*, 129 N.W.2d 864 (Mich. 1964); *Davis v. Secretary of State*, 2020 Mich.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

App. LEXIS 6128, at *9 (Mich. Ct. App. Sep. 16, 2020). With regard to absent voter ballots, for example, this Court has recently recognized that Secretary Benson "has issued instructions to clerks to transmit a ballot to a voter by mail only where adequate time exists for the voter to receive the ballot by mail, vote, and return the ballot before 8:00 p.m. on election day." *Michigan Alliance for Retired Americans v. Secretary of State*, 2020 Mich. App. LEXIS 6931, *5 (Mich. Ct. App. Oct. 16, 2020).

Secretary Benson is responsible for assuring Michigan's local election officials conduct elections in a fair, just, and lawful manner. *See* MCL 168.21; 168.31; 168.32. *See also League of Women Voters of Michigan v. Secretary of State*, 2020 Mich. App. LEXIS 709, *3 (Mich. Ct. App. Jan. 27, 2020); *Citizens Protecting Michigan's Constitution v. Secretary of State*, 922 N.W.2d 404 (Mich. Ct. App. 2018), *aff'd* 921 N.W.2d 247 (Mich. 2018); *Fitzpatrick v. Secretary of State*, 440 N.W.2d 45 (Mich. Ct. App. 1989). Secretary Benson directly oversees and supervises the work of election inspectors, counting boards, the boards of county canvassers and the board of state canvassers. Secretary Benson is the official ultimately responsible for ensuring that challengers be permitted to meaningfully observe the canvassing process at all levels.

Secretary Benson agrees that "Michigan election law designates the Secretary of State as Michigan's 'chief election officer' with *supervisory control over local election officials in the performance of their election related duties*."[2] *See also Powell v. Benson*, No. 2:20CV11023 (E.D. Mich. May 19, 2020), ECF No. 31, Consent Decree ¶5 ("Defendant Secretary Benson is the chief election officer of the State of Michigan and has supervisory control over local election officials in the performance of their duties under the Michigan Election Law, MCL 168.1 *et seq.* In this

---

[2] *Michigan's Election System Structure Overview*, Secretary of State website at: https://www.michigan.gov/sos/0,4670,7-127-1633_8716-27476--,00.html (emphasis added).

RECEIVED by MCOA 11/30/2020 11:21:02 PM

capacity, she oversees Michigan's absentee voting program and maintains and operates the Secretary of State's voter information website.").[3]

Secretary Benson's website also states, "Jocelyn Benson is Michigan's 43rd Secretary of State. In this role she is focused on ensuring elections are secure and accessible, and dramatically improving customer experiences for all who interact with our offices."[4] The website continues, "Benson is the author of *State Secretaries of State: Guardians of the Democratic Process*, the first major book on the role of the secretary of state in *enforcing election and campaign finance laws*." *Id.* (emphasis added).

According to Secretary Benson's website, "Michigan's elections system is administered by 1,603 county and local election officials making it the most decentralized elections system in the nation."[5] Michigan elections are run "primarily by more than 1,500 city and township clerks, with 83 county clerks also carrying significant responsibilities." Benson congressional testimony, pp. 1-2. Requiring all candidates and voters to sue every local election jurisdiction in Michigan (as Judge Stephens apparently believed) is contrary to Secretary Benson's acknowledged responsibility to enforce Michigan election law and oversee local election officials conducting the election under her supervision.

Secretary Benson has agreed in a pending federal case, that it is not necessary to name as a separate defendant every one of (or even some of) Michigan's eighty-three local election jurisdictions or Michigan's more than 1,520 election officials. See *Daunt v. Benson*, No. 1:20CV522 (W.D. Mich. 2020), pending before Federal District Judge Jonker in the U.S. District

---

[3] Available at: https://www.michigan.gov/documents/sos/consent_decree_696315_7.pdf.

[4] *Michigan Secretary of State Jocelyn Benson*, Secretary of State website at: https://www.michigan.gov/sos/0,4670,7-127-1640_9105---,00.html.

[5] Available at: https://www.michigan.gov/sos/0,4670,7-127-1633_8716-27476--,00.html.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

Court for the Western District of Michigan.  In *Daunt*, a Michigan registered voter did name local election jurisdictions in addition to Secretary Benson.  Secretary Benson stipulated that, "Plaintiff and State Defendants agree that the County Defendants are not necessary parties to this litigation. Though the city and county clerks play a role, the Secretary of State has the ultimate responsibility for maintaining Michigan's voter rolls."  ECF No. 27 (filed Sept. 17, 2020).  The local election officials and jurisdictions were dismissed and the case proceeded against just Secretary Benson.

Despite Secretary Benson's authority and responsibility as Michigan's "chief election officer," Judge Stephens denied the request for an injunction because "the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk" and "the relief requested [can] not issue against the Secretary of State, who is the only named defendant in this action…."  Appx. 3, 5.

Judge Stephens denied the motion for emergency declaratory judgment, in part, because she concluded that the plaintiffs "have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of [ballot drop] boxes," and because Judge Stephens believed Plaintiffs have not "directed the Court's attention to any authority directing the Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated…and rendering it impossible for the Court to grant the requested relief against this defendant."  Appx. 4-5.  Judge Stephens, thus, held that "the relief requested [can]not issue against the Secretary of State, who is the only named defendant in this action…."  *Id.* at 5.

But, less than a week earlier, on October 29, 2020, in *Carra*, Judge Stephens issued an order, acknowledged and cited in her opinion, that directed Secretary Benson to require local election officials to provide poll challengers meaningful access provided the challengers wore face

RECEIVED by MCOA 11/30/2020 11:21:02 PM

masks and practiced social distancing. Appx. 3 ("the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v. Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements"). Judge Stephens' order in *Carra v. Benson* directed Secretary Benson to instruct local election authorities to admit challengers. This is the precise relief, in part, these Plaintiffs requested in their emergency motion.

In *Carra v. Benson*, Judge Stephens entered a Stipulated Final Order on November 10, 2020. The Order stated Secretary Benson "shall issue amended written guidance to local election officials" regarding access of poll challengers and watchers.[6]

Judge Stephens' Order further provided Secretary Benson "shall provide this amended directive to local election officials in a manner most likely to ensure timely receipt." Order of November 10, 2020 in *Carra v. Benson*. Judge Stephens Order further stated that it would be enforced through contempt of court proceedings. *Id.* Clearly in *Carra v. Benson*, Judge Stephens

---

[6] Judge Stephens' amended order further provided:

"**Challengers / Poll Watchers:** Challengers and poll watchers have their rights and responsibilities established under law. Challengers and poll watchers are required to wear masks that cover their nose and mouth unless they cannot medically tolerate a face covering. Challengers and poll watchers who cannot medically tolerate a face covering should wear a face shield if possible. Election workers may require that challengers and poll watchers observe proper social distancing, meaning that challengers and poll watchers should maintain at least six (6) feet of distance between themselves and election workers, as much as possible. However, challengers may stand in closer proximity to election workers to have a challenge heard, observe the poll book, or perform other tasks established under law provided that these close personal interactions are as brief as reasonably possible. Once a challenge, observation, or other permitted task is complete, challengers and poll watchers should resume remaining six (6) feet away from voters and poll workers.

13

RECEIVED by MCOA 11/30/2020 11:21:02 PM

believed Secretary Benson was the proper defendant and that Judge Stephens had jurisdiction and authority to direct Secretary Benson to issue an amended directive to local election officials.

Judge Stephens' decision in this case is wrong.  Judge Stephens' decision is contrary to Michigan's election code, contrary to Secretary Benson's own declarations and contrary to Judge Stephens' own prior decision in *Carra*.  Accordingly, this Court should reverse the Court of Claims' decision holding that the "relief requested [can]not issue against the Secretary of State…." Appx. 5.

**B.    Michigan's election code provides for the critically important role of challengers as a bipartisan method to secure free and fair elections.**

Challengers provide the transparency and accountability to assure ballots are lawfully cast and counted as provided in Michigan's election code and voters can be confident the outcome of the election was honestly and fairly determined by eligible voters.  Challengers representing a political party, candidate, or organization interested in the outcome of the election provide a critically important role in protecting the integrity of elections including the prevention of voter fraud and other conduct (whether maliciously undertaken or by incompetence) that could affect the conduct of the election.  *See* MCL 168.730-738.

In her recent testimony before Congress, Secretary Benson emphasized the importance of protecting the bipartisan conduct of elections.

Although we all aspire to bipartisanship when it comes to strengthening our democratic institutions, election security is an area where we cannot afford to be divided.  Without a functioning voting system, which the American people trust to deliver accurate results, we cannot maintain a representative democracy.

Despite the politically charged environment, I am encouraged by the bipartisanship and spirit of cooperation that exists among election officials in our state and across the country, particularly when it comes to election security.

*Testimony of Jocelyn Benson Before the Committee on House Administration*,

RECEIVED by MCOA 11/30/2020 11:21:02 PM

United States Congress (May 8, 2019), p. 6.[7]

Bipartisan measures protecting election integrity comprise a fundamental and significant part of the Michigan election code.  For example, MCL 168.765a requires that absent voter counting boards be composed of bipartisan teams of election inspectors.

> At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.

Michigan absent voter counting boards, under the authority of Secretary Benson, did not comply with this statute.  These boards were processing and tallying ballots without inspectors from each party being present.  Former Detroit Director of Elections Daniel Baxter testified at the Michigan board of state canvassers' November 23 meeting that the law (MCL 168.765a) was not followed.  Former Detroit Director of Elections Baxter testified that the Wayne County counting board proceeded to process and tally absent voter ballots without bipartisan teams.  Board of state canvassers member Norman Shinkle questioned Former Director Baxter about the lack of Republican poll workers.

| | |
|---|---|
| Norman Shinkle: | Are you familiar with the law that says each major party should have one person of each party in every poll precinct? |
| Daniel Baxter: | Yes, I am familiar with that. |
| Norman Shinkle: | Okay, is it your opinion that we had 134 Republicans at the AB count board on election night? |
| Daniel Baxter: | No there were not 134 Republicans at the Central Counting Board on November 2nd, 3rd, or the 4th. |
| Norman Shinkle: | In your opinion, why wasn't the law followed in your opinion? |

---

[7] Available at:  https://www.michigan.gov/documents/sos/SOS_Benson_Testimony_CHA_Hearing_05_08_19_654675_7.pdf.

15

RECEIVED by MCOA 11/30/2020 11:21:02 PM

| Daniel Baxter: | Well, when we went to recruit Republican poll workers, we could not get the allotted number of poll workers to make sure that there were enough at each one of the tabulation stations – at each one of the central counting boards – and as such, we had to govern ourselves based upon standard operational procedures, which means that we continue to move forward with the tabulation of absentee ballots with the staff that we received, recruited, and trained.[8] |

Michigan law also requires that challengers be allowed to observe and challenge the conduct of the election. A political party, incorporated organization, or organized committee of interested citizens may designate one "challenger" to serve at each counting board. MCL 168.730. Michigan's election code provides that challengers shall have the following rights and responsibilities:

a. An election challenger shall be provided a space within a polling place where they can observe the election procedure and each person applying to vote. MCL 168.733(1).

b. An election challenger must be allowed opportunity to inspect poll books as ballots are issued to electors and witness the electors' names being entered in the poll book. MCL 168.733(1)(a).

c. An election Challenger must be allowed to observe the manner in which the duties of the election inspectors are being performed. MCL 168.733(1)(b).

d. An election challenger is authorized to challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector. MCL 168.733(1)(c).

e. An election challenger is authorized to challenge an election procedure that is not being properly performed. MCL 168.733(1)(d).

f. An election challenger may bring to an election inspector's attention any of the following: (1) improper handling of a ballot by an elector or election inspector; (2) a violation of a regulation made by the board of election inspectors with regard to the time in which an elector may remain in the polling place; (3) campaigning and fundraising being performed by an election inspector or other person covered by MCL 168.744; and/or (4) any

---

[8] Video of November 23, 2020 meeting of Michigan Board of State Canvassers, available at: https://www.youtube.com/watch?v=lytepDbGK5E.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

other violation of election law or other prescribed election procedure.  MCL 168.733(1)(e).

g.     An election challenger may remain present during the canvass of votes and until the statement of returns is duly signed and made.  MCL 168.733(1)(f).

h.     An election challenger may examine each ballot as it is being counted.  MCL 168.733(1)(g).

i.     An election challenger may keep records of votes cast and other election procedures as the challenger desires.  MCL 168.733(1)(h).

j.     An election challenger may observe the recording of absent voter ballots on voting machines.  MCL 168.733(1)(i).

Part of the county canvass process is "examin[ation of] the 'Challenged Voters' and 'Challenged Procedures' sections of the Poll Book" and absent voter ballot challenges.  *Boards of County Canvassers Manual*, ch. 4, p. 13.  Review of absent uniformed services voter or overseas voter ballots was still ongoing when Judge Stephens held her November 5 hearing.  Review of these ballots must be performed by bipartisan teams of election inspectors.  *See* MCL 168.733.  Challengers must be allowed to oversee the conduct of the election to assure transparency and public confidence in the conduct of the election.  *See id.*  The Michigan board of state canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide …."  *Michigan Election Officials' Manual*, p. 4.  *See also* MCL 168.841, *et seq*.

Jessica Connarn is an attorney who was acting as a Republican challenger at the TCF Center in Wayne County.  Appx 65.  Jessica Connarn's affidavit describes how an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date."  *Id.* at 66 ¶1.  Jessica Connarn also provided a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received.  *See id.* at 67-68.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

Jessica Connarn's affidavit demonstrates that poll workers in Wayne County were pre-dating absent voter ballots, so that absent voter ballots received after 8:00 p.m. on Election Day could be counted.

Secretary Benson failed to direct that local election officials must allow challengers to observe the video surveillance of remote, unattended ballot drop boxes.  Michigan's election code, MCL 168.932(f) prohibits "A person other than an absent voter," and certain others, such as an immediate family member, from possessing and returning an absent voter ballot.  *See also Michigan Alliance for Retired Americans v. Secretary of State*, 2020 Mich. App. LEXIS 6931, *23-24 (Mich. Ct. App. Oct. 16, 2020) ("On balance, the ballot-handling restrictions pass constitutional muster given the State's strong interest in preventing fraud.").  In prior litigation Judge Stephens invalidated this law that was intended to prevent vote fraud and "ballot harvesting."  This Court overturned Judge Stephens finding that she did not have authority to modify the Michigan Legislature's laws governing the conduct of the election.  Ballot harvesting, which Michigan law forbids, and this Court upheld, is especially relevant to remote, unattended ballot drop boxes.

Last month the Michigan Legislature amended Michigan's election code to allow election authorities to establish remote unattended ballot drop-off boxes.  *See* MCL 168.761d.  A remote, unattended ballot drop box is equivalent to a polling place where a person can deposit a ballot. But, unlike a polling place, there is no validation that the individual depositing a ballot in the box is an individual who is qualified to cast a vote or to lawfully deliver a ballot cast by a lawful voter.

The Michigan Constitution's "purity of elections" clause states, "the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective

RECEIVED by MCOA 11/30/2020 11:21:02 PM

franchise, and to provide for a system of voter registration and absentee voting." Const. 1963, art 2, §4(2). "The phrase 'purity of elections' does not have a single precise meaning. But it unmistakably requires fairness and evenhandedness in the election laws of this state." *Barrow v. Detroit Election Comm.*, 854 N.W.2d 489, 504 (Mich. Ct. App. 2014). Michigan statutes protect the purity of elections by allowing ballot challengers and bipartisan election inspectors to monitor absentee ballots at counting boards and the video surveillance of remote, unattended ballot drop boxes. This did not happen because Secretary Benson did not direct that local election officials under her direction and authority make sure challengers could observe these aspects of the conduct of the election.

## II.     Judge Stephens was wrong to dismiss the plaintiffs' action as moot.

Judge Stephens erroneously held this case has been mooted and relief unavailable because the counting of ballots "is now complete." Appx. 5. This action was filed on November 4, the day after the election when Wayne County was still processing ballots. Appx. 7. While it may be true that by the time Judge Stephens held a hearing on the afternoon of November 5, the initial counting of absent voter ballots had been largely completed, the work of the election inspectors was still ongoing and the preliminary ballot tallies had not yet been provided to the Wayne County board of county canvassers. Additionally, at the time of the hearing, the overseas and military absent voter ballots had not yet been processed or tallied.

The Michigan Supreme Court recognizes that it "does not reach moot questions or declare principles or rules of law that have no practical legal effect in the case before us *unless* the issue is one of public significance that is likely to recur, yet evade judicial review." *Paquin v. City of St. Ignace*, 504 Mich. 124, 149, 934 N.W.2d 650, 663 (Mich. 2019) (quoting *Federated Publications, Inc. v. Lansing*, 467 Mich. 98, 112; 649 NW2d 383 (Mich. 2002)) (emphasis added).

A party seeking to dismiss an action as moot – especially one of such profound importance as the laws governing the conduct of elections – must satisfy a "heavy burden required to demonstrate mootness." *Paquin*, 504 Mich. at 131 n.4 (citing *City of Novi v Robert Adell Children's Funded Trust*, 473 Mich. 242, 255; 701 N.W.2d 144 n.12 (Mich. 2005); *see also MGM Grand Detroit, LLC v Community Coalition for Empowerment, Inc*., 465 Mich. 303, 306-307; 633 N.W.2d 357 (Mich. 2001) ("[T]o get an appeal dismissed as moot, thus depriving a party seeking redress of a day in court, the party urging mootness on the court must make a very convincing showing that the opportunity for an appellate court to review the matter should be denied.  Not surprisingly, it is rare for a court to grant such a motion.").

This election is still not over, and the Electoral College does not meet until December 14. Additionally, there are countless opportunities for the issues brought up in this case to arise again. As we all know, Michigan conducts a presidential election every four years, United States House of Representative elections occur every two years, and United States Senate elections every six years.  Michigan state and local governments conduct their own elections even more frequently.

The "challenged action [will be] in its duration too short to be fully litigated prior to cessation or expiration." *Paquin*, 504 Mich. at 144.  Here, the "challenged action" is preventing designated challengers from meaningfully observing the processing of absent voter ballots and from reviewing the video surveillance of remote unattended ballot drop boxes.  This case was filed less than twenty-four hours after the Wayne County counting board began excluding challengers from the TCF Center, and the election inspectors continued counting without bipartisan teams and without allowing challengers to be present.  This failure to comply within Michigan law cannot be litigated on Election Day or the day after it occurs.  For this reason, *Paquin* and other cases recognized that an election ending does not make a case moot.  *Gleason v. Kincaid*, 323 Mich.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

App. 308, 316, 917 N.W.2d 685, 690 (Mich. Ct. App. 2018) (rejecting mootness argument on appeal because "the strict time constraints of the election process necessitate that, in all likelihood, such challenges often will not be completed before a given election occurs"); *see also Rosario v. Rockefeller*, 410 U.S. 752, 756 n.5 (1973) (noting that "[a]lthough the June primary election has been completed and the petitioners will be eligible to vote in the next scheduled New York primary, this case is not moot, since the question the petitioners raise is 'capable of repetition, yet evading review.'").

The Michigan Supreme Court in *Paquin* noted that there is some disagreement among courts about "whether the issue must be likely to recur as to the particular party involved in the case." *Paquin*, 504 Mich. at 145. The *Paquin* court appears to have adopted this requirement, although with relaxed standards. Federal courts have done the same. *See, e.g.*, *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (applying the "capable of repetition, yet evading review" exception without examining the likelihood of the plaintiffs running for office in the future); *Merle v. United States*, 351 F.3d 92, 95 (3rd Cir. 2003) (holding that the case was not moot because it was reasonable to expect that the plaintiff would seek to run for office again); *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005) ("[a]lthough Lawrence has not specifically stated that he plans to run in a future election, he is certainly capable of doing so, and under the circumstances it is reasonable to expect that he will do so."). Secretary Benson has two years left in her current term and will be supervising and directing many elections during this time.

Judge Stephens was wrong to deny the Plaintiffs' complaint and motion for emergency declaratory judgment to be moot. Likewise, this appeal is not moot.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

### III. Jessica Connarn's affidavit is not hearsay.

The plaintiffs submitted a sworn affidavit executed by Michigan attorney Jessica Connarn in support of their motion. Jessica Connarn was a Republican challenger at the TCF Center in Wayne County where absentee ballots were being processed. Appx 65. Jessica Connarn's affidavit describes how an election poll worker told Jessica Connarn that the poll worker "was being told to change the date on ballots to reflect that the ballots were received on an earlier date." *Id.* at 66 ¶1. Jessica Connarn also presented physical evidence – a photograph of a note handed to her by the poll worker in which the poll worker indicated she (the poll worker) was instructed to change the date ballots were received. *See id.* at 67-68. Jessica Connarn attempted to speak with the poll worker again in order to get the poll worker's name, photo, and additional information, but "upon returning to see if the poll worker was still at her location, I noticed the poll worker was moved up on to the adjudication stage where we were not able to communicate with her." *Id.* ¶4.

Jessica Connarn's affidavit describes a first-hand experience Jessica Connarn had with a specific election official and included physical evidence (a written note) the election official gave Jessica Connarn. Jessica Connarn observed that poll workers were being told to change the dates on ballots and that when Jessica Connarn investigated the situation, she swore in her affidavit that she was "yelled at" and told to go away. Jessica Connarn's affidavit and the note are attached in the Addendum and are also available at Appx. 67-69.

Judge Stephens ruled that Jessica Connarn's affidavit was "inadmissible as hearsay." Appx. 4. Judge Stephens wrote that "plaintiffs have not presented an argument as to why the Court should consider the [supplemental evidence], given the general prohibitions against hearsay evidence." *Id.* Judge Stephens is wrong.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

Plaintiffs did provide an argument.  Plaintiffs stated the affidavit and note was not hearsay because it reported Jessica Connarn's "firsthand personal knowledge…of what she physically observed…."  Appx. 12 (transcript p. 11).  Judge Stephens misapplied the rule of evidence regarding hearsay, and this Court should review the Court of Claims' decision de novo.  *See Mitchell*, 908 N.W.2d at 925.

Hearsay is a statement "offered in evidence to prove the truth of the matter asserted." *People v. Douglas*, 496 Mich. 557, 573, 852 N.W.2d 587, 596 (Mich. 2014).  *See also* MRE 801. "MRE 801(a) defines a statement for hearsay purposes as: (1) an oral or written assertion or, (2) nonverbal conduct of a person, if it is intended by him as an assertion. Crying can hardly be considered an oral or written assertion…." *People v. Davis*, 139 Mich. App. 811, 812, 363 N.W.2d 35, 36 (Mich. Ct. App. 1984).  "The record before us is void of any indication that the victim intended to make an assertion by her spontaneous act of crying.  This is an instance of behavior so patently involuntary that it cannot by any stretch of the imagination be treated as a verbal assertion by the victim within the scope of MRE 801(a)(2)." *Id.* at 813.

Jessica Connarn's first-hand personal observations of activity at the TCF Center are not hearsay. *People v. Corridore*, No. 338670, 2019 Mich. App. LEXIS 3537, at *41 (Mich. Ct. App. June 27, 2019) (observations are not hearsay); *People v. Silver*, No. 322651, 2015 Mich. App. LEXIS 1504, at *7 (Mich. Ct. App. July 28, 2015) (same).

Much of Jessica Connarn's affidavit contains her first-hand observations, and therefore, is not hearsay at all.  MRE 801(a).  Jessica Connarn's affidavit also presented physical evidence – the photograph Jessica Connarn took of the note written by an election official.  *See* Appx. 67-69. What Connarn testified to in her affidavit is not hearsay.  Jessica Connarn affirms and swears to what she personally saw and heard.  Jessica Connarn also swears she was "yelled at by the other

RECEIVED by MCOA 11/30/2020 11:21:02 PM

poll workers" and told to leave.  These are words Jessica Connarn heard and conduct of election officials that Jessica Connarn personally observed.  Appx. 67 ¶2.  MRE 801(c).  Jessica Connarn also personally observed that the poll worker who handed her the note "was nearly in tears" because of what the poll worker had been told.  Appx. 67 ¶1.  This observation is not hearsay.  *See People v. Davis*, 139 Mich. App. 811, 812-13, 363 N.W.2d 35, 36 (Mich. Ct. App. 1984) ("MRE 801(a) defines a statement for hearsay purposes as: (1) an oral or written assertion or, (2) nonverbal conduct of a person, if it is intended by him as an assertion.  Crying can hardly be considered an oral or written assertion…. The record before us is void of any indication that the victim intended to make an assertion by her spontaneous act of crying.  This is an instance of behavior so patently involuntary that it cannot by any stretch of the imagination be treated as a verbal assertion by the victim within the scope of MRE 801(a)(2).").  Connarn swore the poll worker "slipped me a note." Appx. 67 ¶2.  These are all first-hand, personal observations of conduct.  Because Jessica Connarn's sworn personal, first-hand observations are not hearsay, Judge Stephens was wrong to deny the Plaintiffs' motion on this basis.

## CONCLUSION AND RELIEF SOUGHT

The conduct of the general election in Wayne County was a disaster.  The Wayne County board of county canvassers found that more than seventy-one percent of the precincts did not balance.  More than *seventy-one percent!*  A precinct is out of balance when the number of ballots counted does not equal the number of names on the pollbook.  Some precincts were out of balance by as many as six hundred votes.  See testimony during Wayne County board of county canvassers on November 23, 2020.  *See* note 7, *supra*.  *See also* Addendum (affidavit of William Hartmann ¶6 and affidavit of Monica Palmer ¶7).

RECEIVED by MCOA 11/30/2020 11:21:02 PM

Two members of the Wayne County board of county canvassers, Chairwoman Monica Palmer and Member William Hartmann, voted to not certify the ballot tally. Chairwoman Palmer and Member Hartmann were personally harassed and threatened during the public comment portion of the meeting and received a number of threats against them and their family. Then, after a closed-door meeting in which the two Democratic members agreed to have Secretary Benson conduct an audit of Wayne County's election, Chairwoman Palmer and Member Hartmann agreed to certify the ballot tally. But Secretary Benson then said she would not conduct an audit of the Wayne County election. Chairwoman Palmer and Member Hartmann then withdrew their votes to certify the ballot tally. See Addendum (affidavits of Monica Palmer and William Hartmann). The matter then went to the board of state canvassers, where Vice-Chair Aaron Van Langevelde stated he understood his role was merely ministerial and he did not have the option of not certifying the Michigan state ballot tally. Another member, Norman Shinkle, would not vote to certify the ballot tally and abstained.[9]

This is no way to conduct an election. Irrespective of the ultimate outcome of this presidential election and the election of the United States Senator to represent Michigan and the election of candidates in the other state and federal races on the November 3 general election ballot, the conduct of the election, especially in Wayne County, has been an embarrassment to the State of Michigan and undermined the confidence Michigan citizens have in the integrity of Michigan elections. Kicking challengers and observers out of counting boards and denying challengers a meaningful opportunity to observe the conduct of the election and tallying of ballots further undermines confidence in the integrity of the election. If there is nothing to hide in the tallying of

---

[9] See November 23 meeting minutes, available at:  https://www.michigan.gov/sos/0,4670,7-127-1633_41221---,00.html.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

the ballots, why prevent challengers from having a meaningful opportunity to observe and, where appropriate, challenge the processing and tabulating of ballots?

The complaint and motion President Trump's campaign committee and Eric Ostergren filed and the relief they sought was not – and is not – moot. This Court is asked to reverse Judge Stephens' order denying the Plaintiffs' motion. This Court is asked to help restore public confidence in Michigan elections by issuing a decision holding that Michigan's Secretary of State must assure that the local election officials she oversees and supervises comply with Michigan's election laws and provide challengers a meaningful opportunity to perform the important role Michigan law designates for challengers.

We ask this Court to find that Secretary Benson violated the Michigan Constitution and Michigan election law by allowing absent voter ballots to be counted without allowing challengers to observe the processing and tallying of the ballots and without allowing challengers to observe the surveillance video of the remote unattended ballot drop boxes. Secretary Benson's failure to supervise and direct the manner in which local election officials conducted the election undermines the constitutional right of all Michigan voters to participate in fair and lawful elections.

The Plaintiffs ask this Court to reverse Judge Stephens' decision and order that designated challengers must be granted meaningful access to observe and review the tabulation and processing of absent voter ballots. The Plaintiffs ask this Court to order that the Secretary of State direct the election officials she oversees and supervises to assure that challengers have the meaningful ability to observe the processing and tabulation of absent voter ballots and to allow challengers to observe the surveillance video recordings of remote unattended ballot drop boxes.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

26

Dated: November 30, 2020            Respectfully submitted,

                                    */s/ Mark F. (Thor) Hearne, II*
                                    Mark F. (Thor) Hearne, II (P40231)
                                    Stephen S. Davis (*pro hac* pending)
                                    TRUE NORTH LAW, LLC
                                    112 S. Hanley Road, Suite 200
                                    St. Louis, MO 63105
                                    (314) 296-4000
                                    thor@truenorthlawgroup.com

                                    *Counsel for Plaintiffs-Appellants*


### PROOF OF SERVICE

The undersigned certifies that on November 30, 2020, he served the foregoing Brief in Support of Plaintiffs' Application for Leave to Appeal with Appellant's Appendix via First Class Mail and this Court's electronic filing system, which initiated electronic service upon Erik A. Grill, Assistant Attorney General, Civil Litigation, Elections, & Employment Division at grille@michigan.gov, and Heather Meingast, Assistant Attorney General, at meingasth@michigan.gov.

                                    */s/ Mark F. (Thor) Hearne, II*
                                    MARK F. (THOR) HEARNE, II
                                    *Counsel for Appellants*

RECEIVED by MCOA 11/30/2020 11:21:02 PM

# **ADDENDUM**

RECEIVED by MCOA 11/30/2020 11:21:02 PM



**STATE OF MICHIGAN**
**COURT OF CLAIMS**

DONALD J. TRUMP FOR )
PRESIDENT, INC., *et al.*, )
)
      Plaintiffs, )
)
v. )    No. 20-000225-MZ
)
SECRETARY OF STATE JOCELYN )
BENSON, )
)
      Defendant. )

**AFFIDAVIT OF JESSICA CONNARN**

I, Jessica Connarn, being first duly sworn, depose and state the following:

1.    I was working as the attorney acting as poll challenger with the Michigan Republican Party in a designated area of zone 12-15 when I was approached by a Republican Party poll challenger, who stated that a hired poll worker of the TCF Center, in Wayne County, Michigan, was nearly in tears because she was being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer.

2.    When I approached the poll worker, she stated to me that she was being told to change the date on ballots to reflect that the ballots were received on an earlier date. I went to inform a supervisor of this, and I was asked to get the poll worker's name. When I went back to the poll worker's table, I was yelled at by the other poll workers working at her table, who told me that I needed to go away and that I was not allowed to talk to the poll worker with whom I spoke earlier. The poll worker slipped me a note that read "entered receive date as 11/2/20 on 11/4/20." I have attached a photograph I took of this note as Exhibit 1.

3.    Based upon what I was told by this poll worker, I believe that poll workers working at the adjudication table were changing the dates ballots were received.

**Appx. 067**

RECEIVED by MCOA 11/30/2020 11:21:02 PM

4. I was told to obtain a photo of the poll worker and upon returning to see if the poll worker was still at her location, I noticed the poll worker was moved up on to the adjudication stage where we were not able to communicate with her.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of November, 2020.

_Jessica Connarn_
JESSICA CONNARN

Subscribed and sworn to before me this 4th day of November, 2020.

_Paul Garon_
Notary Public

_Wayne_ County, Michigan

My Commission Expires: _July 2021_                    11/4/2020

PAUL GARON

**Appx. 068**

RECEIVED by MCOA 11/30/2020 11:21:02 PM



RECEIVED by MCOA 11/30/2020 11:21:02 PM

EXHIBIT 1
**Appx. 069**

## **AFFIDAVIT**

The Affiant, William C. Hartmann, being first duly sworn, hereby deposes and states as follows:

1. My name is William C. Hartmann. I am an adult citizen, voter, and resident of the State of Michigan.

2. I am a member of the Board of Canvassers of Wayne County, Michigan.

3. I personally observed the Absent Voter Counting Boards in Detroit at TCF Center.

4. Since the election on November 3rd, I have attended the Wayne County Canvass on an almost daily basis.

5. On November 17, 2020, at 3:00 p.m. there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County. The meeting did not start until 5:00 p.m. We were told it was delayed so that representatives of the Democrat Board members could obtain additional affidavits.

6. At 5:00 p.m. an open meeting and discussion began to discuss the issue of whether to certify the vote. In my review of the results, I determined that approximately 71% of Detroit's 134 Absent Voter Counting Boards (AVCB) were left unbalanced and many *unexplained*. I informed the Board members of the discrepancies, but soon thereafter, a motion to certify was

RECEIVED by MCOA 11/30/2020 11:21:02 PM

made by Vice-Chairman Jonathan Kinloch. After further discussion, I renewed my concerns that the reason that the numbers did not balance for the majority of AVCB's in Detroit, and importantly, could not be explained. If the vote totals did not match, there should have been a documented reason explaining why.

7. The Board considered the ultimate question of whether to certify the vote, and the motion to certify the Wayne County elections failed 2-2.

8. This vote was followed by public derision from our two democrat colleagues. I, and Monica Palmer, who also voted against certification, were berated and ridiculed by members of the public and other Board members. This conduct included specious claims that I was racially motivated in my decision. This public ostracism continued for hours during which time we were not provided an opportunity to break for dinner and were not advised that we could depart and resume the hearing on another date.

9. I discussed a potential resolution with Vice-Chair Kinloch in confidence. Ms. Anderson-Davis told us that we must vote to certify on that night. We were told that we could not consider matters such as the unexplained reasons that most of Detroit's AVCB's did not balance and no one knew why. We

RECEIVED by MCOA 11/30/2020 11:21:02 PM

were informed that this consideration was outside of the scope of the Board's authority.

10. During the evening, Wayne County counsel, Ms. Janet Anderson-Davis, and my colleagues on the Board, continued to discuss irregularities in the AVCB's. Ms. Anderson-Davis advised the Board that the discrepancies were not a reason to reject the certification, and based on her explicit legal guidance, I was under the belief that I could not exercise my independent judgment in opposition to the certification. Therefore, I voted to certify the results.

11. Late in the evening, I was enticed to agree to certify based on the promise that a full and independent audit would take place. I would not have agreed to the certification but for the promise of an audit.

12. Vice-Chairman Jonathan Kinloch then assured us that if we voted to certify the election, a full, independent, and complete audit of Detroit's election, would be undertaken. We relied on this assurance in coming to an agreement. Without this assurance, I would not have agreed to certify Wayne County on November 17ᵗʰ.

13. After the meeting, I was made aware that Michigan Secretary of State, Jocelyn Benson made a public claim that the representations made by Mr. Kinlock, on which we had relied, would not be followed.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

c. I am also concerned about the use of private monies directing local officials regarding the management of the elections, how those funds were used and whether such funds were used to pay election workers. I have not received answers to these questions, and I believe the people of Michigan deserve these answers. Can we release the logs to the tabulators demonstrating what happened in Detroit?

d. Why do the pollbooks, Qualified Voter Files, and final tallies not match or balance?

e. 71% of Detroit AVCB's did not balance, why not?

f. Did the chairperson of each of Detroit's 134 AVCB's keep logs of shift changes?

g. Why were republicans *not* used in signing seals certified at the end of the night on Monday, and Wednesday evening before ballot boxes were documented, closed, and locked?

h. How many challenged ballots were counted?

i. Was any information placed directly into the Qualified Voter Files in the AVCB's?

j. How many voter birthdates were altered in the pollbooks?

RECEIVED by MCOA 11/30/2020 11:21:02 PM

k. Were ballots counted in TCF that were not reflected in the electronic pollbook or paper supplemental list?

l. Based upon information and belief, there were over 18,000 same-day registrations in Detroit on November 3. Were these new applicants verified as proper voters prior to the tabulation of their ballots?

18. I voted not to certify, and I still believe this vote should *not* be certified.

19. Until these questions are addressed, I remain opposed to certification of the Wayne County results.

19. The above information is true to the best of my information, knowledge, and belief.

I certify under penalty of perjury, that my statement and the evidence submitted with it, are all true and correct.

Printed Name: _William C. Hartmann_

Signed Name: _Willi. C. T̶d̶̶_

Date:

Sworn to before me this _18th_ day of November, 2020 at _6:39pm_

_Melissa Wojnar-Raycraft_
Notary Public  Melissa Wojnar-Raycraft

My Commission expires on: _Feb. 9, 2023_



Melissa Wojnar-Raycraft
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WAYNE
MY COMMISSION EXPIRES FEBRUARY 9, 2023
ACTING IN THE COUNTY OF _Wayne_

RECEIVED by MCOA 11/30/2020 11:21:02 PM

### AFFIDAVIT

I, Monica Palmer, being first duly sworn, and under oath, state:

1. I am the Chairperson of the Wayne County Board of Canvassers.

2. The Board is a four-member board, required to have two Republican and two Democrat members, and I serve as one of the Republican members.

3. On August 4, 2020, the Michigan primary election was held.

4. On August 18, 2020, the Board held a public meeting at the Board's office in Detroit. I attended the meeting with the other three members of the Board.

5. The Board reviewed the Wayne County election results and considered whether to certify the August 4, 2020 primary election.

6. As reflected in the meeting minutes, Wayne County Election Director Gregory Mahar gave the Board a report at the meeting that included the following findings:

   - Staff encountered difficulties while trying to canvass the City of Detroit absentee precincts. "He indicated that aside from receiving the poll books on the first Friday and Sunday after the canvass began, the list of voters received made it difficult to determine how many voters actually returned their ballot. He reported that the City of Detroit used the QVF printed list of voters but there was also a handwritten list of voters, which is common to use both, but the two lists combined put the precincts severely out of balance."

   - "Director Mahar also reported on the difficulties staff encountered with trying to retabulate any absentee precincts that were out of balance. He stated that according to the Election Management system, he could see the City of Detroit did not scan a single precinct within a batch. When multiple precincts are scanned within a batch, it makes it nearly impossible to retabulate a precinct without potentially disrupting a perfectly balanced precinct."

   - "Deputy Director Jennifer Redmond reported on the irregularities she encountered while trying to retabulate out of balance precincts. She indicated that in some cases staff could not retabulate because the number of physical ballots counted in the container did not match the number of voters according to the poll book. Staff also requested the applications to vote for Detroit precinct 444 and precinct 262. Both containers ha[d] fewer ballots in the container than the number of voters according to the poll book, but what was strange was there appeared to be some missing applications." *Id.*

7. It was reported that in the August 2020 primary that 72% of Detroit's absentee voting precincts were out of balance.

8. After discussion among the Board members, I voted along with all the other canvassers in a unanimous vote in favor of certifying the August 4, 2020 Primary Election.

9. Although certifying the primary election results, all Board members expressed serious concerns about the irregularities and inaccuracies. The Board unanimously approved a proposed joint resolution titled "Requesting a State Election Monitor and Investigation" that stated "Now Therefore Be it Resolved That, The Board of Canvassers for the County of Wayne, Michigan, request for the Secretary of State as Michigan's Chief Election Officer, to appoint a monitor to supervise the training and administration of the City of Detroit, Absentee Voter Counting Boards in the 2020 November General Election. Be it Finally Resolved, That, the Board of Canvassers for the County of Wayne, Michigan, request an investigation be conducted by the State Department of Elections into the training and processes used by the City of Detroit in the 2020 August Primary Election."

10. On November 3, 2020, the general election was held. I went to observe the election process at the TCF Center on November 3, 2020 and November 4, 2020.

11. Since November 5, I went to the Wayne County Canvas almost every day and helped the Wayne County staff.

12. On November 17, 2020, there was a board of Canvassers meeting scheduled to start at 3:00pm to determine whether or not to certify the November election. The meeting did not begin until 4:46pm.

13. Minutes before the meeting began at 4:46pm, I was given a report on the final canvas. We were not given an executive summary which was customary at most other certification meetings.

14. During this meeting, I determined that more than 70% of Detroit's 134 Absent Voter Counting Boards (AVCB) did not balance and many had no explanation to why they did not balance.

15. Vice-Chair Kinloch made a motion to certify the vote. I noted our prior reservations about unbalanced precincts in August 2020 and determined the record had discrepancies and irregularities and was incomplete.

16. A motion was made to certify the vote, and I voted not to certify. The vote to certify the Wayne County elections failed 2-2.

17. After the vote, my Democrat colleagues chided me and Mr. Hartmann for voting to not certify.

18. After the vote, public comment period began and dozens of people made personal remarks against me and Mr. Hartmann. The comments made accusations of racism and threatened me and members of my family. The public comment continued for over two hours and I felt pressured to continue the meeting without break.

19. After several hours of harsh comments, Vice-Chair Kinloch suggested a potential resolution. Wayne County Corporate Counsel Janet Anderson-Davis told me that I had to certify the vote that night. She told the members their role was ministerial and they could not use their discretion on matters like the record being incomplete. We were told that discretion was outside the board's authority.

20. After being told by Ms. Anderson-Davis that I could not use my discretion regarding the anomalies, I believed I had no choice but to certify the results despite my desire to oppose certification based on the incomplete record.

21. Additionally, we were presented with a resolution that promised a full, independent audit that would present answers to the incomplete record. I voted to agree to certify based on the promise of a full, independent audit. I would not have agreed to vote to certify but for that promise of a full, independent audit.

RECEIVED by MCOA 11/30/2020 11:21:02 PM

22. Vice-Chairman Jonathan Kinloch gave me assurances that voting for the certification of the November election would result in a full, independent audit of Detroit's unbalanced precincts. I relied on that assurance and voted to certify the election based on that assurance. Without that assurance I would not have voted to certify the Wayne County November election.

23. Later that evening, I was sent statements that Secretary Jocelyn Benson made saying that she did not view our audit resolution to be binding. Her comments disputed the representations made by Vice-Chair Kinloch on which I relied.

24. As a result of these facts, I rescind my prior vote to certify Wayne County elections.

25. I fully believe the Wayne County vote should not be certified.

26. The Wayne County election had serious process flaws which deserve investigation. I continue to ask for information to assure Wayne County voters that these elections were conducted fairly and accurately. Despite repeated requests, I have not received the requisite information and believe an additional 10 days of canvas by the State Board of Canvassers will help provide the information necessary.

27. I initially voted not to certify the election, and I still believe this vote should *not* be certified and the State Board of Canvassers should canvass for an additional period.

28. Until these questions are addressed, I remain opposed to certification of the Wayne County results.

The above information is true to the best of my information, knowledge, and belief.

I certify under penalty of perjury, that my statement and the evidence submitted with it, are all true and correct.

Printed Name: _Monica S Palmer_

Signed Name: _Monica J Palmer_
Date:
Sworn to before me this _18_ day of November 2020 at _9:33 pm_

My Commission expires on: _08/3/2022_

**JANICE L. DANIELS**
**NOTARY PUBLIC - STATE OF MICHIGAN**
**COUNTY OF OAKLAND**
My Commission Expires August 3, 2022
Acting in the County of _WAYNE_

RECEIVED by MCOA 11/30/2020 11:21:02 PM

EXHIBIT 11

**STATE OF MICHIGAN**
**IN THE THIRD JUDICIAL CIRCUIT COURT**
**COUNTY OF WAYNE**

SARAH STODDARD and                    )
ELECTION INTEGRITY FUND,               )
                                       )        Case No. 20-014604-CZ
       Plaintiffs,                     )        Hon. Timothy M. Kenny, Chief Judge
                                       )
v.                                     )
                                       )
CITY ELECTION COMMISSION of            )
the City of Detroit, and               )
                                       )
JANICE WINFREY, in her official        )
capacity as Detroit City Clerk and     )
chairperson of the City Election       )
Commission, and                        )
                                       )
WAYNE COUNTY BOARD OF                   )
CANVASSERS,                             )
                                       )
Defendants.                            )

There is no other pending or resolved civil action
arising out of the same transaction or occurrence
alleged in the Complaint.

**FIRST AMENDED VERIFIED COMPLAINT**
**FOR EMERGENCY AND PERMANENT INJUNCTIVE RELIEF**

**INTRODUCTION**

1.       This lawsuit challenges the ongoing action of the City Election Commission of the

City of Detroit and the Detroit City Clerk with respect to one-party control of the Absent Voter

Counting Board ("AVCB") operating out of TCF Center (formerly known as Cobo Hall).

Specifically, individual inspectors from a single major political party are "curing" rejected

absentee ballots – those absentee ballots that cannot be properly read by the electronic counting

machine -- including transposing the voter's perceived choices onto a new ballot, without the

Document received by the MI Wayne 3rd Circuit Court.

required oversight and signatures of two election inspectors—one from each major political party. These rejected absentee ballots are reviewed by only one inspector, in most cases a Democratic inspector, who then unilaterally decides how the voter intended to vote and creates a ballot that can be read reflecting the inspector's unilateral decision.

2.    This violates MCL 168.765a (10), which requires one inspector from each party to be present at the AVCB. It also violates the Secretary of State's rule, as set forth in her controlling Election Officials' Manual, requiring that any cured ballot bear the signature of two election inspectors who have expressed a preference for different political parties. *See* 168.765a(13). In application, this arrangement in the TCF Center fails to comply with Michigan law and invites fraud.

3.    This action seeks an order: (a) halting further "curing" of absentee ballots rejected by the counting machines until one inspector from each party is present to observe the cure and sign the cured ballot; and (b) segregating the rejected and cured ballots; and (c) halting certification until the statutorily-required inspectors can be located and used to ensure election integrity.

### PARTIES

4.    Plaintiffs are an individual Michigan citizen and election challenger working at the TCF Center in Detroit and a nonprofit organization devoted to ensuring election integrity that credentialed that individual as a challenger, the Election Integrity Fund. Both Plaintiffs have standing to enforce local officials' compliance with their clear legal duty under Michigan election laws and regulations that protect the purity of Michigan elections. Mich. Const. art. 4, section 2.

5.    The City Election Commission, which consists of the City Clerk, the City Council president, and the Corporation Counsel, is responsible for establishing and supervising the operation of an AVCB in the City of Detroit. The City Clerk is the chief election official for the

Document received by the MI Wayne 3rd Circuit Court.

City of Detroit and serves as chair of the Commission. The Commission and Clerk ("the City Defendants") had and have authority to allow and to halt the conduct complained of here, and to take the remedial actions sought by Plaintiff.

6.     The Wayne County Board of Canvassers, which consists of four members (Monica Palmer, Jonathan Kinloch, William Hartmann, and Allen Wilson), is responsible for canvassing the vote in Wayne County and the City of Detroit once the City Defendants have completed their canvass and delivered the results to the Wayne County Board of Canvassers. The Wayne County Board of Canvassers has the power, authority, and responsibility to ensure that all legally cast ballots are counted, and the concomitant responsibility to ensure that **only** legally cast ballots are counted. The Wayne County Board of Canvassers also has the statutory authority to correct erroneous, incorrect, and fraudulent tabulations of votes before sending the results to the Secretary of State. MCL 168.823. Per Michigan Law (MCL 168.821), the Wayne County Board of Canvassers could begin their canvass of the election results – including the correction of any mistakes or errors in the counting process – on November 5, 2020 at 9:00 A.M.

## BACKGROUND

7.     For 2020, the Defendants decided to establish a combined AVCB at TCF Center in Detroit, Michigan. This means that absentee ballots for hundreds of precincts are being processed and counted at the facility under the control of a single AVCB. At over 100 tables, groups of election inspectors (between one and approximately five inspectors per table) are processing and counting ballots.

8.     Under the Michigan Constitution, the legislature has authority to pass laws to regulate the conduct of elections and to ensure their purity and integrity. Pursuant to that authority,

Document received by the MI Wayne 3rd Circuit Court.

3

the Michigan Legislature passed MCL 168.765a, which requires absentee votes to be counted by election inspectors in a particular manner. It requires, in relevant part:

> (10) The oaths administered under subsection (9) must be placed in an envelope provided for the purpose and sealed with the red state seal. Following the election, the oaths must be delivered to the city or township clerk. Except as otherwise provided in subsection (12), a person in attendance at the absent voter counting place or combined absent voter counting place shall not leave the counting place after the tallying has begun until the polls close. Subject to this subsection, the clerk of a city or township may allow the election inspectors appointed to an absent voter counting board in that city or township to work in shifts. A second or subsequent shift of election inspectors appointed for an absent voter counting board may begin that shift at any time on election day as provided by the city or township clerk. However, an election inspector shall not leave the absent voter counting place after the tallying has begun until the polls close. If the election inspectors appointed to an absent voter counting board are authorized to work in shifts, at no time shall there be a gap between shifts and the election inspectors must never leave the absent voter ballots unattended. **<u>At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed</u>**. A person who causes the polls to be closed or who discloses an election result or in any manner characterizes how any ballot being counted has been voted in a voting precinct before the time the polls can be legally closed on election day is guilty of a felony.

*See* MCL 168.765a (10) (emphasis added).

9.      Pursuant to MCL 168.31, the Secretary of State has authority to issue instructions and rules that are consistent with the Michigan statutes and Constitution, and that bind local election authorities, including Defendants. Likewise, pursuant to MCL 168.765a(13), the Secretary has the authority to develop instructions consistent with the law for the conduct of AVCBs or combined AVCBs. "The instructions developed under [] subsection [13] are binding upon the operation of an absent voter counting board or combined absent voter counting board used in an election conducted by a county, city, or township."

Document received by the MI Wayne 3rd Circuit Court.

10.     Under her statutory authority, the Secretary of State promulgated an election manual that requires the following:

> *Each ballot rejected by the tabulator must be visually inspected by an election inspector to verify the reason for the rejection. **If the rejection is due to a false read the ballot must be duplicated by two election inspectors who have expressed a preference for different political parties.** Duplications may not be made until after 8 p.m. in the precinct (place the ballot requiring duplication in the auxiliary bin). At an AV counting board duplications can be completed throughout the day. NOTE: The Bureau of Elections has developed a video training series that summarizes key election day management issues, including a video on Duplicating Ballots. These videos can be accessed at the Bureau of Elections web site at www.michigan.gov/elections; under "Information for Election Administrators"; Election Day Management Training Videos. Election Officials Manual, Michigan Bureau of Elections, Chapter 8, last revised October 2020.*

> https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf

### COUNT I: INJUNCTIVE RELIEF

11.     Defendants are failing to comply with MCL 168.765a, in that there is not, at all times, at least one inspector from each political party at the absentee voter counting place. Rather, many of the tables assigned to precincts under the authority of the AVCB are staffed by inspectors of only one party. Those inspectors alone are making decisions regarding the processing and counting of ballots.

12.     This includes the filling out of brand new "cure" or "duplicate" ballots. The process Defendants have sanctioned works in the following manner. When an absentee ballot is processed and approved for counting, it is fed into a counting machine. Some ballots are rejected—that is, they are a "false read"—because of tears, staining (such as coffee spills) over-votes, and other errors. In some of these cases, inspectors can personally, visually inspect the rejected ballot and determine what is causing the machine to find a "false read." When this happens, the inspectors

5

Document received by the MI Wayne 3rd Circuit Court.

can duplicate the ballot, expressing the voter's intent in a new ballot that can then be fed into the machine and counted.

13.     However, under MCL 168.765a and the Secretary of State's controlling manual, as cited above, an inspector from each major party must be present and must actually sign to indicate that they approve of the duplication.

14.     Rather than following this controlling mandate, the AVCB is allowing a Democratic Party inspector only to fill out a duplicate. Republicans sign only "if available."

15.     On information and belief, Defendants are allowing hundreds or thousands of ballots to be "duplicated" solely by the Democratic Party inspectors and then counted.

16.     This is in clear violation of the law and Defendants should stop it immediately. The duplicated ballots should be preserved and segregated, and no further duplication of absentee ballots should occur unless an inspector from each major party is present.

WHEREFORE, Plaintiffs respectfully request that this Court grant temporary, preliminary, and permanent injunctive relief:

(1) Enjoining the all Defendants to immediately cease and desist from allowing any further duplication of absentee ballots until one inspector from each major party observes and approves the duplication process;

(2) Enjoining all Defendants to immediately preserve and segregate all duplicate ballots and the underlying ballots originally rejected by the tabulators;

(3) Enjoining the Wayne County Board of Canvassers from certifying or delivering election results to the Secretary of State or State Board of Canvassers until the ballots at issue have been properly verified by members of both major political parties and re-tabulated;

Document received by the MI Wayne 3rd Circuit Court.

(4) Enjoining the Wayne County Board of Canvassers to exercise their authority under MCL

168.823 to correct the errors identified herein; and,

(5) Granting such further and additional relief as is just and proper.

## VERIFICATION

I declare under the penalties of perjury that this verified complaint for Emergency and Permanent Injunctive Relief has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

Verification Dated: November 4, 2020

Dated: November 5, 2020

Respectfully submitted,

Edward D. Greim (pro hac forthcoming)

Special Counsel, Thomas More Society

7

Document received by the MI Wayne 3rd Circuit Court.

Missouri Bar No. 54034
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com


Ian A. Northon (P65082)
RHOADES MCKEE PC
55 Campau Ave NW #300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
smd@rhoadesmckee.com
Special Counsel, Thomas More Society
Counsel for Plaintiffs

Document received by the MI Wayne 3rd Circuit Court.

8

EXHIBIT 12

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Sarah Stoddard and
Election Integrity Fund,

                                     Hon. Timothy M. Kenny

v                                   Case No. 20-014604-CZ

City Election Commission of
The City of Detroit and
Janice Winfrey, in her official
Capacity as Detroit City Clerk and
Chairperson of the City Election
Commission, and
Wayne County Board of
Canvassers,

                                  /

# <u>OPINION & ORDER</u>

At a session of this Court
Held on: <u>November 6, 2020</u>
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: <u>Honorable Timothy M. Kenny</u>
                   Chief Judge
                   Third Judicial Circuit Court of Michigan

       Plaintiffs Sarah Stoddard and the Election Integrity Fund petition this Court for preliminary injunctive relief seeking:

1. Defendants be required to retain all original and duplicate ballots and poll books.
2. The Wayne County Board of Canvassers not certify the election results until both Republican and Democratic party inspectors compare the duplicate ballots with original ballots.
3. The Wayne County Board of Canvassers unseal all ballot containers and remove all duplicate and original ballots for comparison purposes.
4. The Court provide expedited discovery to plaintiffs, such as limited interrogatories and depositions.

1

When considering a petition for injunctive relief the Court must apply the following four-prong test:

1. The likelihood the party seeking the injunction will prevail on the merits.
2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.
3. The risk the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the injunction.
4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2d 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity" Id at 612 fn 135, quoting *Senior Accountants, Analysts & Appraisers Ass'n v. Detroit*, 218 Mich. App. 263, 269; 553 NW2d 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4) indicates that the plaintiff bears the burden of proving the preliminary injunction should be granted.

Plaintiffs' pleadings do not persuade this Court that they are likely to prevail on the merits for several reasons. First, this Court believes plaintiffs misinterpret the required placement of major party inspectors at the absent voter counting board location. MCL 168.765a (10) states in part "At least one election inspector from each major political party must be present at the absent voter counting place…" While plaintiffs contends the statutory section mandates there be a Republican and Democratic inspector at each table inside the room, the statute does not identify this requirement. This Court believes the plain language of the statute requires there be election inspectors at the TCF Center facility, the site of the absentee counting effort.

Pursuant to MCL 168.73a the County chairs for Republican and Democratic parties were permitted and did submit names of absent voter counting board inspectors to the City of Detroit Clerk. Consistent with MCL 168.674, the Detroit City Clerk did make appointments of inspectors. Both Republican and Democratic inspectors were present throughout the absent voter counting board location.

An affidavit supplied by Lawrence Garcia, Corporation Counsel for the City of Detroit, indicated he was present throughout the time of the counting of absentee

ballots at the TCF Center. Mr. Garcia indicated there were always Republican and Democratic inspectors there at the location. He also indicated he was unaware of any unresolved counting activity problems.

By contrast, plaintiffs do not offer any affidavits or specific eyewitness evidence to substantiate their assertions. Plaintiffs merely assert in their verified complaint "Hundreds or thousands of ballots were duplicated solely by Democratic party inspectors and then counted." Plaintiffs' allegation is mere speculation.

Plaintiffs' pleadings do not set forth a cause of action. They seek discovery in hopes of finding facts to establish a cause of action. Since there is no cause of action, the injunctive relief remedy is unavailable. *Terlecki v Stewart*, 278 Mich. App. 644; 754 NW2d 899 (2008).

The Court must also consider whether plaintiffs will suffer irreparable harm. Irreparable harm requires "A particularized showing of concrete irreparable harm or injury in order to obtain a preliminary injunction." *Michigan Coalition of State Employee Unions v Michigan Civil Service Commission*, 465 Mich. 212, 225; 634 NW2d 692, (2001).

In *Dunlap v City of Southfield*, 54 Mich. App. 398, 403; 221 NW2d 237 (1974), the Michigan Court of Appeals stated "An injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural."

In the present case, Plaintiffs allege that the preparation and submission of "duplicate ballots" for "false reads" without the presence of inspectors of both parties violates both state law, MCL 168.765a (10), and the Secretary of State election manual. However, Plaintiffs fail to identify the occurrence and scope of any alleged violation  The only "substantive" allegation appears in paragraph 15 of the First Amended Complaint, where Plaintiffs' allege "on information and belief" that hundreds or thousands of ballots have been impacted by this improper practice. Plaintiffs' Supplemental Motion fails to present any further specifics. In short, the motion is based upon speculation and conjecture. Absent any evidence of an improper practice, the Court cannot identify if this alleged violation occurred, and, if it did, the frequency of such violations. Consequently, Plaintiffs fail to move past mere apprehension of a future injury or to establish that a threatened injury is more than speculative or conjectural.

This Court finds that it is mere speculation by plaintiffs that hundreds or thousands of ballots have, in fact, been changed and presumably falsified. Even with this assertion, plaintiffs do have several other remedies available. Plaintiffs are entitled to bring their challenge to the Wayne County Board of Canvassers pursuant to MCL 168.801 *et seq.* and MCL 168.821 *et seq.* Additionally, plaintiffs can file for a recount of the vote if they believe the canvass of the votes suffers from fraud or mistake. MCL168.865-168.868. Thus, this Court cannot conclude that plaintiffs would experience irreparable harm if a preliminary injunction were not issued.

Additionally, this Court must consider whether plaintiffs would be harmed more by the absence of injunctive relief than the defendants would be harmed with one.

If this Court denied plaintiffs' request for injunctive relief, the statutory ability to seek relief from the Wayne County Board of Canvassers (MCL 168.801 et seq. and MCL 168.821 et seq.) and also through a recount (MCL 168.865-868) would be available. By contrast, injunctive relief granted in this case could potentially delay the counting of ballots in this County and therefore in the state. Such delays could jeopardize Detroit's, Wayne County's, and Michigan's ability to certify the election. This in turn could impede the ability of Michigan's elector's to participate in the Electoral College.

Finally, the Court must consider the harm to the public interest. A delay in counting and finalizing the votes from the City of Detroit without any evidentiary basis for doing so, engenders a lack of confidence in the City of Detroit to conduct full and fair elections. The City of Detroit should not be harmed when there is no evidence to support accusations of voter fraud.

Clearly, every legitimate vote should be counted. Plaintiffs contend this has not been done in the 2020 Presidential election. However, plaintiffs have made only a claim but have offered no evidence to support their assertions. Plaintiffs are unable to meet their burden for the relief sought and for the above-mentioned reasons, the plaintiffs' petition for injunctive relief is denied.

It is so ordered.

November 6, 2020
Date

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

4

EXHIBIT 13

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P. McCALL, Jr.,

Plaintiff,

-vs-

CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,

Defendants.

_____/

**COMPLAINT AND APPLICATION FOR SPECIAL LEAVE TO FILE QUO WARRANTO COMPLAINT**

**EXPEDITED CONSIDERATION REQUESTED**

**FILE NO:  20-_____-AW**

**JUDGE**

David A. Kallman                    (P34200)
Erin E. Mersino                      (P70886)
Jack C. Jordan                       (P46551)
Stephen P. Kallman              (P75622)
GREAT LAKES JUSTICE CENTER
Attorneys for Plaintiff
5600 W. Mount Hope Hwy.
Lansing, MI 48917
(517) 322-3207/Fax: (517) 322-3208

There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

GREAT LAKES JUSTICE CENTER

## APPLICATION FOR SPECIAL LEAVE TO FILE
## QUO WARRANTO COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their application for leave to file a complaint for quo warranto relief, and for their complaint, hereby states as follows:

1.      Pursuant to MCL 600.4545(2), Plaintiffs respectfully request that this Honorable Court grant them special leave to file Counts II and III of this complaint for quo warranto for all the reasons as stated in their complaint, motion for temporary restraining order, supporting affidavits, exhibits, and accompanying brief, which are all incorporated herein by reference.

2.      Plaintiffs request this relief as recognized in *Shoemaker v City of Southgate*, 24 Mich App 676, 680 (1970).

**WHEREFORE,** Plaintiffs request that his application for special leave to file Counts II and III of this complaint for quo warranto relief be granted and that this Honorable Court grant such other and further relief as appropriate.

Dated: November 8, 2020.                  */s/ David A. Kallman*
                                           David A. Kallman            (P34200)
                                           Attorney for Plaintiffs

## COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.** (hereinafter "Plaintiff")**,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their Complaint hereby states as follows:

## INTRODUCTION

1.      The election was held on November 3, 2020 and approximately 850,000 votes were

2

reported as cast in Wayne County, Michigan.

2.      Plaintiff brings this action to raise numerous issues of fraud and misconduct that occurred in order to protect the rights of all voters in Michigan, especially Wayne County.

3.      In summary, this Complaint raises numerous instances of fraud, including, but not limited to:

a.  Defendants systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets. When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted.

b.  Defendants instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.

c.  After election officials announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in trays at the TCF Center. There were tens of thousands of these absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates.

d.  Defendants instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline.

e.  Defendants systematically used false information to process ballots, such as using incorrect or false birthdays. Many times, the election workers inserted new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900.

f.  On a daily basis leading up to the election, City of Detroit election workers and

GREAT LAKES JUSTICE CENTER

— GREAT LAKES JUSTICE CENTER —

employees coached voters to vote for Joe Biden and the Democrat party. These workers and employees encouraged voters to do a straight Democrat ballot. These election workers and employees went over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

g. Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes.

h. Defendant election officials and workers refused to record challenges to their processes and removed challengers from the site if they politely voiced a challenge.

i. After poll challengers started discovering the fraud taking place at the TCF Center, Defendant election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

j. Defendant election officials and workers allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate. In fact, election officials and workers repeatedly obstructed poll challengers from observing. Defendants permitted thousands of ballots to be filled out by hand and duplicated on site without oversight from poll challengers.

## **PARTIES, JURISDICTION, AND VENUE**

4. Plaintiff Cheryl A. Costantino is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

5. Plaintiff Edward P. McCall, Jr. is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

6. Defendant City of Detroit is a municipality located in Wayne County tasked with

4

the obligation to hold all elections in a fair and legal manner.

7.      Defendant Election Commission is a department of the City of Detroit.

8.      Janice M. Winfrey, in her official capacity, is Clerk of the Defendant City of Detroit and the Chairman of the Defendant Detroit City Election Commission and is the city official who oversees and supervises all elections in the City of Detroit.

9.      Cathy M. Garrett, in her official capacity, is the Clerk of Defendant Wayne County, and is the county official who oversees and supervises all elections in Wayne County.

10.     Defendant Wayne County Board of Canvassers is the appointed body that is responsible for canvassing the votes cast within the county they serve. The Board members certify elections for all local, countywide and district offices which are contained entirely within the county they serve.

11.     This action is properly filed in Wayne County Circuit Court pursuant to MCR 3.306(A)(2), Mich. Const. art. 2, sec. 4, par. 1(h), MCL 600.4545, and MCL 600.605. Venue is proper pursuant to MCR 3.306(D).

## **GENERAL ALLEGATIONS**

12.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County.

13.     The TCF Center was the only facility within Wayne County authorized to count the ballots.

### **Forging Ballots on the Qualified Voter List**

14.     An attorney and former Michigan Assistant Attorney General was a certified poll challenger at the TCF Center (Exhibit A – Affidavit of Zachary Larsen).

15.     As Mr. Larsen watched the process, he was concerned that ballots were being

processed without confirmation that the voter was an eligible voter in the poll book because of information he had received from other poll challengers (Exhibit A).

16.     Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted. An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen (Exhibit A).

17.     Mr. Larsen was concerned that this practice of assigning names and numbers indicated that a ballot was being counted for a non-eligible voter who was not in either the poll book or the supplemental poll book. From his observation of the computer screen, the voters were not in the official poll book. Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned (Exhibit A).

18.     Because of Mr. Larsen's concern, he stepped behind the table and walked over to a spot behind where the first official was conducting her work. Understanding health concerns due to COVID-19, he attempted to stand as far away from this official as he reasonably could while also being able to visually observe the names on the supplemental poll book and on the envelopes (Exhibit A).

19.     As soon as Mr. Larsen moved to a location where he could observe the process by which the first official at this table was confirming the eligibility of the voters to vote, the first official immediately stopped working and glared at him. He stood still until she began to loudly and aggressively tell him that he could not stand where he was standing. She indicated that he needed to remain in front of the computer screen where he could not see what the worker was doing (Exhibit A).

20.    Both officials then began to tell Mr. Larsen that because of COVID, he needed to be six feet away from the table. He responded that he could not see and read the supplemental poll book from six feet away, and that he was attempting to keep his distance to the extent possible (Exhibit A).

21.    Just minutes before at another table, a supervisor had explained that the rules allowed Mr. Larsen to visually observe what he needed to see and then step back away. Likewise, on Election Day, he had been allowed to stand at equivalent distance from poll books in Lansing and East Lansing precincts without any problem. With this understanding, he remained in a position to observe the supplemental poll book (Exhibit A).

22.    Both officials indicated that Mr. Larsen could not remain in a position that would allow him to observe their activities; the officials indicated they were going to get their supervisor (Exhibit A).

23.    When the supervisor arrived, she reiterated that Mr. Larsen was not allowed to stand behind the official with the supplemental poll book, and he needed to stand in front of the computer screen. Mr. Larsen told her that was not true, and that he was statutorily allowed to observe the process, including the poll book (Exhibit A).

24.    The supervisor then pivoted to arguing that Mr. Larsen was not six feet away from the first official. Mr. Larsen told her that he was attempting to remain as far away as he could while still being able to read the names on the poll book (Exhibit A).

25.    The supervisor then stood next to the chair immediately to the left of the first official and indicated that Mr. Larsen was "not six feet away from" the supervisor and that she intended to sit in the chair next to the official with the poll book, so he would need to leave (Exhibit A).

GREAT LAKES JUSTICE CENTER

26.     This supervisor had not been at the table at any time during the process, and she had responsibility for numerous ACVBs. Further, the supervisor's choice of chairs was approximately three feet to the left of the first official and therefore in violation of the six-foot distance rule (Exhibit A).

27.     Accordingly, Mr. Larsen understood that this was a ruse to keep him away from a place where he could observe the confirmation of names in the supplemental poll book. The supervisor began to repeatedly tell him that he "needed to leave" so he responded that he would go speak with someone else and fill out a challenge form (Exhibit A).

28.     After Mr. Larsen observed and uncovered the fraud that was taking place and had the confrontation with the supervisor, he left the counting room to consult with another attorney about the matter around 1:30 p.m. to 2:00 p.m. (Exhibit A).

29.     It was at this point that election officials stopped permitting any further poll challengers to enter the counting room, including Mr. Larsen (Exhibit A).

30.     Election officials never allowed Mr. Larsen to re-enter the counting room to fulfill his duties as a poll challenger after he had discovered the fraud which was taking place.

### Illegal Voter Coaching and Identification Issues

31.     An election employee with the City of Detroit was working at a polling location for approximately three weeks prior to the election. This City of Detroit employee directly observed, on a daily basis, other City of Detroit election workers and employees coaching voters to vote for Joe Biden and the Democrat party. This employee witnessed these workers and employees encouraging voters to do a straight Democrat ballot and witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote (Exhibit B – Affidavit of Jessy Jacob).

8

32.     During the last two weeks while this same employee was working at the polling location, she was specifically instructed by her supervisor never to ask for a driver's license or any photo I.D. when a person was trying to vote (Exhibit B).

**Changing Dates on Ballots**

33.     All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020 (Exhibit B).

34.     On November 4, 2020, a City of Detroit election worker was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. She was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. She estimates that this was done to thousands of ballots (Exhibit B).

**Illegal Double Voting**

35.     The election employee observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot (Exhibit B).

36.     This would permit a person to vote in person and also send in his/her absentee ballot.

37.     Prior to the election, the Michigan Secretary of State sent ballot applications to deceased residents and to non-residents of the State of Michigan.

**First Round of New Ballots**

38.     At approximately 4:00 a.m. on November 4, 2020, tens of thousands of ballots were suddenly brought into the counting room through the back door (Exhibit C – Affidavit of Andrew Sitto).

39.     These new ballots were brought to the TCF Center by vehicles with out-of-state license plates (Exhibit C).

40.     It was observed that all of these new ballots were cast for Joe Biden (Exhibit C).

**Second Round of New Ballots**

41.     The ballot counters were required to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list; this was the list of all persons who had registered to vote on or before November 1, 2020 and is often referred to as the QVF (Exhibit D - Affidavit of Bob Cushman)

42.     The ballot counters were also provided with Supplemental Sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020 (Exhibit C).

43.     The validation process for a ballot requires the name on the ballot to be matched with a registered voter on either the QVF or the Supplemental Sheets.

44.     At approximately 9:00 p.m. on Wednesday, November 4, 2020, numerous boxes of ballots were brought to TCF Center (Exhibit D).

45.     Upon information and belief, the Wayne County Clerk's office instructed the ballot counters to use the date of birth of January 1, 1900 on all of these newly appearing ballots.

46.     None of the names of these new ballots corresponded with any registered voter on

the QVF or the Supplemental Sheets (Exhibit D).

47.     Despite election rules that required that all absentee ballots be inputted into the QVF system before 9:00 p.m. on November 3, 2020 (Exhibit B), the election workers inputted all of these new ballots into the QVF and manually added each voter to the list after 9:00 p.m. (Exhibit D).

48.     Upon information and belief, the vast majority of these new ballots indicated the voter's date of birth as January 1, 1900 entered into the QVF (Exhibit D).

49.     These newly received ballots were either fraudulent or apparently cast by persons who were not registered to vote prior to the polls closing at 8:00 p.m. on November 3, 2020.

### No Transparency - Denied Access

50.     Numerous election challengers were denied access to observe the counting process by the Defendants.

51.     After denying access to the counting rooms, election officials used large pieces of cardboard to block the windows to the counting room thereby preventing anyone from watching the ballot counting process (Exhibit C).

### Qualified Voter File Access

52.     Whenever an absentee vote application or in-person absentee voter registration was finished, election workers were instructed to input the voter's name, address, and date of birth into the QVF system (Exhibit B).

53.     The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with internet access (Exhibit B).

54.     This access permits anyone with the proper credentials to edit when ballots were

GREAT LAKES JUSTICE CENTER

sent, received, and processed from any location with internet access (Exhibit B).

55.    Many of the counting computers within the counting room had icons that indicated that they were connected to the internet (Exhibit F – Affidavit of Patrick J. Colbeck).

**Absentee Ballot Signatures**

56.    Whenever a person requested an absentee ballot either by mail or in-person, that person was required to sign the absentee voter application.

57.    When the voter returned his/her absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

58.    Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.

59.    Election officials at the TCF Center instructed workers to never validate or compare the signatures on absentee applications and the absentee envelopes to ensure their authenticity and validity (Exhibit B).

**Unsecured Ballots**

60.    A poll challenger witnessed tens of thousands of ballots being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container (Exhibit E – Affidavit of Daniel Gustafson).

61.    Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops (Exhibit E).

62.    Contrary to law, these ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal (Exhibit E).

**COUNT I – CONSTITUTIONAL RIGHT TO ACCURACY AND INTEGRITY OF ELECTIONS**
**MICHIGAN CONSTITUTION – ARTICLE 2, SECTION 4, PARAGRAPH 1(H)**

63.    Paragraphs 1 through 62 are hereby incorporated by reference as if fully restated

herein.

64.     Plaintiff brings this action to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

65.     The Mich. Const., art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

66.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

### COUNT II – STATUTORY QUO WARRANTO CLAIM – ELECTION FRAUD
### MCL 600.4545(2); MCL 168.861

67.     Paragraphs 1 through 66 are hereby incorporated by reference as if fully restated herein.

68.     MCL 600.4545(2) permits an action to request the issuance of a writ of quo warranto if the action is brought within 30 days after the election upon the request of "any citizen of the county by special leave of the court or a judge thereof."

69.     The statute also requires this action to "be brought against the municipality wherein such fraud or error is alleged to have been committed."

70.     Quo Warranto may be brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes before a recount pursuant to MCL 168.861, which states,

GREAT LAKES JUSTICE CENTER

> For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.

71. Based upon the allegations contained herein, material fraud or error occurred in this election so that the outcome of the election was affected.

72. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

### COUNT III – COMMON LAW QUO WARRANTO CLAIM – ELECTION FRAUD

73. Paragraphs 1 through 72 are hereby incorporated by reference as if fully restated herein.

74. MCR 3.306(B)(2) permits an action to request the issuance of a writ of quo warranto.

75. An application to proceed by quo warranto must disclose sufficient facts and grounds and sufficient apparent merit to justify further inquiry.

76. Quo warranto is warranted whenever it appears that material fraud or error has been committed at any election. This type of action is brought to challenge the validity of the election itself. *Barrow v Detroit Mayor*, 290 Mich App 530, 543 (2010). For all the reasons stated herein and in the attached affidavits, material fraud or error was committed during the election.

77. This Quo Warranto claim is brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes.

78. Based upon the allegations contained herein, material fraud or error occurred in this

GREAT LAKES JUSTICE CENTER

election so that the outcome of the election was affected.

79. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

## COUNT IV – EQUAL PROTECTION VIOLATION
### Mich Const, art I, § 2.

80. Paragraphs 1 through 79 are hereby incorporated by reference as if fully restated herein.

81. The Equal Protection Clause of the Michigan Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights." Mich Const, art I, § 2.

82. The right to vote is a fundamental civil right and a political right.

83. The Equal Protection Clause forbids election officials granting the right to vote on equal terms but later devaluing a person's vote through failing to use specific standards and uniform rules.

84. Only specific standards and uniform rules provide sufficient guarantees of equal treatment.

85. Every person has the right to vote, with their vote counted as one vote, and not have his or her vote diluted and voided out by the counting of an illegal vote.

86. Defendants handling of the election, as described above and as described in the attached affidavits, establish how rampant and systemic fraud devalued and diluted Plaintiff's civil and political rights.

GREAT LAKES JUSTICE CENTER

87. The illegal procedures, illegal standards, and illegal treatment of the ballots and the counting of ballots in Wayne County and in Detroit employed by Defendants unconstitutionally burden the fundamental right to vote.

88. Defendants have no legitimate interest in counting illegal and improper ballots, counting ballots more than once, illegally correcting and improperly duplicating ballots, adding false birthdates and voter information to ballots, and improperly handling the collection and counting of ballots in a way that dilutes and cancels out rightfully and properly cast votes.

89. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

### COUNT V – STATUTORY ELECTION LAW VIOLATIONS

90. Paragraphs 1 through 89 are hereby incorporated by reference as if fully restated herein.

### Violation of MCL 168.765a.

91. Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

92. Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were

— GREAT LAKES JUSTICE CENTER —

cast.

93.     Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots.  Defendants even physically blocked and obstructed election inspectors from the Republican party, including Plaintiff, by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

**Violation of MCL 168.733**

94.     MCL 168.733 requires:

(1) The board of election inspectors shall provide space for the challengers within the polling place that enables the challengers to observe the election procedure and each person applying to vote. A challenger may do 1 or more of the following:
      (a) Under the scrutiny of an election inspector, inspect without handling the poll books as ballots are issued to electors and the electors' names being entered in the poll book.
      (b) Observe the manner in which the duties of the election inspectors are being performed.
      (c) Challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector.
      (d) Challenge an election procedure that is not being properly performed.
      (e) Bring to an election inspector's attention any of the following:
      (i) Improper handling of a ballot by an elector or election inspector.
      (ii) A violation of a regulation made by the board of election inspectors pursuant to section 742.
      (iii) Campaigning being performed by an election inspector or other person in violation of section 744.
      (iv) A violation of election law or other prescribed election procedure.
      (f) Remain during the canvass of votes and until the statement of returns is duly signed and made.
      (g) Examine without handling each ballot as it is being counted.
      (h) Keep records of votes cast and other election procedures as the challenger desires.

(i) Observe the recording of absent voter ballots on voting machines.

95.     Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to  observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud.

96.     Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

97.     Michigan law requires that in order to register as an absentee voter, the application must be made in writing and received by the clerk by 5pm on the Friday before the election.

**Violation of MCL 168.765(5)**

98.     Michigan election law, MCL 168.765(5), requires Defendants to post the following absentee voting information anytime an election is conducted which involves a state or federal office:

a.      The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.

GREAT LAKES JUSTICE CENTER

b.     The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.

c.     The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

99.     Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

100.     Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm.  MCL 168.764a.  Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

101.     Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

102.     Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol.

103.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court:

A.     issue an order requiring Defendants to conduct an independent and non-partisan audit to determine the accuracy and integrity of the November 3, 2020 election;

B.     issue an *ex-parte* TRO prohibiting Defendants' from certifying the election results or continuing to count ballots until this matter can be heard by the Court.

C.     issue an preliminary injunction prohibiting Defendants' from certifying the election results until this matter can be heard by the Court.

D.     issue an order voiding the November 3, 2020 election results and order a new election to be held.

E.     Issue a protective order as requested in the attached Motion for TRO.

F.     grant such other and further relief as is equitable and just, and grant him costs, expenses and attorney fees incurred in having to bring this action.

**I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.**

Dated: November 8, 2020.

_____
Cheryl A. Constantino, Plaintiff

Dated: November 8, 2020.

*Edward P. McCall*
_____
Edward P. McCall, Plaintiff

Prepared By:

*/s/ David A. Kallman*
_____
David A. Kallman          (P34200)
Stephen P. Kallman        (P75622)
Jack C. Jordan            (P46551)
Erin E. Mersino          (P70886)
Attorneys for Plaintiff

Great Lakes Justice Center

21

I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.

Dated: November 8, 2020.

_____
Cheryl A. Costantino, Plaintiff

Dated: November 8, 2020.

_____
Edward P. McCall, Plaintiff

Prepared By:

_/s/ David A. Kallman_
David A. Kallman          (P34200)
Stephen P. Kallman        (P75622)
Jack C. Jordan            (P46551)
Erin E. Mersino           (P70886)
Attorneys for Plaintiff

Great Lakes Justice Center

21

EXHIBIT 14

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Cheryl A. Costantino and
Edward P. McCall, Jr.
              Plaintiffs,

                                  Hon. Timothy M. Kenny
                                  Case No. 20-014780-AW

City of Detroit; Detroit Election
Commission; Janice M. Winfrey,
in her official capacity as the
Clerk of the City of Detroit and
the Chairperson and the Detroit
Election Commission; Cathy Garrett,
In her official capacity as the Clerk of
Wayne County; and the Wayne County
Board of Canvassers,
              Defendants.

_____/

# OPINION & ORDER

At a session of this Court
Held on: November 13, 2020
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: Honorable Timothy M. Kenny
                  Chief Judge
                  Third Judicial Circuit Court of Michigan

This matter comes before the Court on Plaintiffs' motion for preliminary injunction,

protective order, and a results audit of the November 3, 2020 election.  The Court

having read the parties' filing and heard oral arguments, finds:

With the exception of a portion of Jessy Jacob affidavit, all alleged fraudulent claims

brought by the Plaintiffs related to activity at the TCF Center.  Nothing was alleged to

1

have occurred at the Detroit Election Headquarters on West Grand Blvd. or at any polling place on November 3, 2020.

The Defendants all contend Plaintiffs cannot meet the requirements for injunctive relief and request the Court deny the motion.

When considering a petition for injunction relief, the Court must apply the following four-pronged test:

1. The likelihood the party seeking the injunction will prevail on the merits.

2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.

3. The risk the party seeking the injunction would be harmed more by the absence an injunction than the opposing party would be by the granting of the injunction.

4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2nd 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Id*. at 612 fn 135 quoting *Senior Accountants, Analysts and Appraisers Association v Detroit*, 218 Mich. App. 263, 269; 553 NW2nd 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4) states that the Plaintiffs bear the burden of proving the preliminary injunction should be granted. In cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud. MCR 2.112 (B) (1)

Plaintiffs must establish they will likely prevail on the merits. Plaintiffs submitted seven affidavits in support of their petition for injunctive relief claiming widespread voter

2

fraud took place at the TCF Center.  One of the affidavits also contended that there was blatant voter fraud at one of the satellite offices of the Detroit City Clerk.  An additional affidavit supplied by current Republican State Senator and former Secretary of State Ruth Johnson, expressed concern about allegations of voter fraud and urged "Court intervention", as well as an audit of the votes.

In opposition to Plaintiffs' assertion that they will prevail, Defendants offered six affidavits from individuals who spent an extensive period of time at the TCF Center.  In addition to disputing claims of voter fraud, six affidavits indicated there were numerous instances of disruptive and intimidating behavior by Republican challengers.  Some behavior necessitated removing Republican challengers from the TCF Center by police.

After analyzing the affidavits and briefs submitted by the parties, this Court concludes the Defendants offered a more accurate and persuasive explanation of activity within the Absent Voter Counting Board (AVCB) at the TCF Center.

Affiant Jessy Jacob asserts Michigan election laws were violated prior to November 3, 2020, when City of Detroit election workers and employees allegedly coached voters to vote for Biden and the Democratic Party.  Ms. Jacob, a furloughed City worker temporarily assigned to the Clerk's Office, indicated she witnessed workers and employees encouraging voters to vote a straight Democratic ticket and also witnessed election workers and employees going over to the voting booths with voters in order to encourage as well as watch them vote.  Ms. Jacob additionally indicated while she was working at the satellite location, she was specifically instructed by superiors not to ask for driver's license or any photo ID when a person was trying to vote.

The allegations made by Ms. Jacob are serious.  In the affidavit, however, Ms. Jacob does not name the location of the satellite office, the September or October date these

3

acts of fraud took place, nor does she state the number of occasions she witnessed the alleged misconduct. Ms. Jacob in her affidavit fails to name the city employees responsible for the voter fraud and never told a supervisor about the misconduct.

Ms. Jacob's information is generalized. It asserts behavior with no date, location, frequency, or names of employees. In addition, Ms. Jacob's offers no indication of whether she took steps to address the alleged misconduct or to alter any supervisor about the alleged voter fraud. Ms. Jacob only came forward after the unofficial results of the voting indicated former Vice President Biden was the winner in the state of Michigan.

Ms. Jacob also alleges misconduct and fraud when she worked at the TCF Center. She claims supervisors directed her not to compare signatures on the ballot envelopes she was processing to determine whether or not they were eligible voters. She also states that supervisors directed her to "pre-date" absentee ballots received at the TCF Center on November 4, 2020. Ms. Jacob ascribes a sinister motive for these directives. Evidence offered by long-time State Elections Director Christopher Thomas, however, reveals there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined at the Detroit Election Headquarters on West Grand Blvd. Ms. Jacob was directed not to search for or compare signatures because the task had already been performed by other Detroit city clerks at a previous location in compliance with MCL 168.765a. As to the allegation of "pre-dating" ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process. Thomas Affidavit, #12. The entries reflected the date the City received the absentee ballot. *Id.*

The affidavit of current State Senator and former Secretary of State Ruth Johnson essentially focuses on the affidavits of Ms. Jacob and Zachery Larsen.  Senator Johnson believed the information was concerning to the point that judicial intervention was needed and an audit of the ballots was required.  Senator Johnson bases her assessment entirely on the contents of the Plaintiffs' affidavits and Mr. Thomas' affidavit.  Nothing in Senator Johnson's affidavit indicates she was at the TCF Center and witnessed the established protocols and how the AVCB activity was carried out. Similarly, she offers no explanation as to her apparent dismissal of Mr. Thomas' affidavit.  Senator Johnson's conclusion stands in significant contrast to the affidavit of Christopher Thomas, who was present for many hours at TCF Center on November 2, 3 and 4.  In this Court's view, Mr. Thomas provided compelling evidence regarding the activity at the TCF Center's AVCB workplace.  This Court found Mr. Thomas' background, expertise, role at the TCF Center during the election, and history of bipartisan work persuasive.

Affiant Andrew Sitto was a Republican challenger who did not attend the October 29th walk- through meeting provided to all challengers and organizations that would be appearing at the TCF Center on November 3 and 4, 2020.  Mr. Sitto offers an affidavit indicating that he heard other challengers state that several vehicles with out-of-state license plates pulled up to the TCF Center at approximately 4:30 AM on November 4th. Mr. Sitto states that "tens of thousands of ballots" were brought in and placed on eight long tables and, unlike other ballots, they were brought in from the rear of the room. Sitto also indicated that every ballot that he saw after 4:30 AM was cast for former Vice President Biden.

Mr. Sitto's affidavit, while stating a few general facts, is rife with speculation and guess-work about sinister motives.  Mr. Sitto knew little about the process of the absentee voter counting board activity.  His sinister motives attributed to the City of Detroit were negated by Christopher Thomas' explanation that all ballots were delivered to the back of Hall E at the TCF Center.  Thomas also indicated that the City utilized a rental truck to deliver ballots.  There is no evidentiary basis to attribute any evil activity by virtue of the city using a rental truck with out-of-state license plates.

Mr. Sitto contends that tens of thousands of ballots were brought in to the TCF Center at approximately 4:30 AM on November 4, 2020.  A number of ballots speculative on Mr. Sitto's part, as is his speculation that all of the ballots delivered were cast for Mr. Biden.  It is not surprising that many of the votes being observed by Mr. Sitto were votes cast for Mr. Biden in light of the fact that former Vice President Biden received approximately 220,000 more votes than President Trump.

Daniel Gustafson, another affiant, offers little other than to indicate that he witnessed "large quantities of ballots" delivered to the TCF Center in containers that did not have lids were not sealed, or did not have marking indicating their source of origin.  Mr. Gustafson's affidavit is another example of generalized speculation fueled by the belief that there was a Michigan legal requirement that all ballots had to be delivered in a sealed box.  Plaintiffs have not supplied any statutory requirement supporting Mr. Gustafson's speculative suspicion of fraud.

Patrick Colbeck's affidavit centered around concern about whether any of the computers at the absent voter counting board were connected to the internet.  The answer given by a David Nathan indicated the computers were not connected to the

internet.  Mr. Colbeck implies that there was internet connectivity because of an icon that appeared on one of the computers.  Christopher Thomas indicated computers were not connected for workers, only the essential tables had computer connectivity.  Mr. Colbeck, in his affidavit, speculates that there was in fact Wi-Fi connection for workers use at the TCF Center.  No evidence supports Mr. Colbeck's position.

This Court also reads Mr. Colbeck's affidavit in light of his pre-election day Facebook posts.  In a post before the November 3, 2020 election, Mr. Colbeck stated on Facebook that the Democrats were using COVID as a cover for Election Day fraud.  His predilection to believe fraud was occurring undermines his credibility as a witness.

Affiant Melissa Carone was contracted by Dominion Voting Services to do IT work at the TCF Center for the November 3, 2020 election.  Ms. Carone, a Republican, indicated that she "witnessed nothing but fraudulent actions take place" during her time at the TCF Center.  Offering generalized statements, Ms. Carone described illegal activity that included, untrained counter tabulating machines that would get jammed four to five times per hour, as well as alleged cover up of loss of vast amounts of data.  Ms. Carone indicated she reported her observations to the FBI.

Ms. Carone's description of the events at the TCF Center does not square with any of the other affidavits.  There are no other reports of lost data, or tabulating machines that jammed repeatedly every hour during the count.  Neither Republican nor Democratic challengers nor city officials substantiate her version of events.  The allegations simply are not credible.

Lastly, Plaintiffs rely heavily on the affidavit submitted by attorney Zachery Larsen. Mr. Larsen is a former Assistant Attorney General for the State of Michigan who alleged mistreatment by city workers at the TCF Center, as well as fraudulent activity by election workers.  Mr. Larsen expressed concern that ballots were being processed without confirmation that the voter was eligible.  Mr. Larsen also expressed concern that he was unable to observe the activities of election official because he was required to stand six feet away from the election workers.  Additionally, he claimed as a Republican challenger, he was excluded from the TCF Center after leaving briefly to have something to eat on November 4th.  He expressed his belief that he had been excluded because he was a Republican challenger.

Mr. Larsen's claim about the reason for being excluded from reentry into the absent voter counting board area is contradicted by two other individuals.  Democratic challengers were also prohibited from reentering the room because the maximum occupancy of the room had taken place.  Given the COVID-19 concerns, no additional individuals could be allowed into the counting area.  Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding.

Mr. Larsen's concern about verifying the eligibility of voters at the AVCB was incorrect.  As stated earlier, voter eligibility was determined at the Detroit Election Headquarters by other Detroit city clerk personnel.

The claim that Mr. Larsen was prevented from viewing the work being processed at the tables is simply not correct.  As seen in a City of Detroit exhibit, a large monitor was

8

at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed.  Mr. Jaffe confirmed his experience and observation that efforts were made to ensure that all challengers could observe the process.

Despite Mr. Larsen's claimed expertise, his knowledge of the procedures at the AVCB paled in comparison to Christopher Thomas'.  Mr. Thomas' detailed explanation of the procedures and processes at the TCF Center were more comprehensive than Mr. Larsen's.  It is noteworthy, as well, that Mr. Larsen did not file any formal complaint as the challenger while at the AVCB. Given the concerns raised in Mr. Larsen's affidavit, one would expect an attorney would have done so.  Mr. Larsen, however, only came forward to complain after the unofficial vote results indicated his candidate had lost.

In contrast to Plaintiffs' witnesses, Christopher Thomas served in the Secretary of State's Bureau of Elections for 40 years, from 1977 through 2017.  In 1981, he was appointed Director of Elections and in that capacity implemented Secretary of State Election Administration Campaign Finance and Lobbyist disclosure programs.  On September 3, 2020 he was appointed as Senior Advisor to Detroit City Clerk Janice Winfrey and provided advice to her and her management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting boards, satellite offices and drop boxes.  Mr. Thomas helped prepare the City of Detroit for the November 3, 2020 General Election.

As part of the City's preparation for the November 3rd election Mr. Thomas invited challenger organizations and political parties to the TCF Center on October 29, 2020 to have a walk-through of the entire absent voter counting facility and process.  None of Plaintiff challenger affiants attended the session.

On November 2, 3, and 4, 2020, Mr. Thomas worked at the TCF Center absent voter counting boards primarily as a liaison with Challenger Organizations and Parties.  Mr. Thomas indicated that he "provided answers to questions about processes at the counting board's resolved dispute about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers."

Additionally, Mr. Thomas resolved disputes about the processes and satisfactorily reduced the number of challenges raised at the TCF Center.

In determining whether injunctive relief is required, the Court must also determine whether the Plaintiffs sustained their burden of establishing they would suffer irreparable harm if an injunction were not granted.  Irreparable harm does not exist if there is a legal remedy provided to Plaintiffs.

Plaintiffs contend they need injunctive relief to obtain a results audit under Michigan Constitution Article 2, § IV, Paragraph 1 (h) which states in part "the right to have the results of statewide elections audited, in such as manner as prescribed by law, to ensure the accuracy and integrity of the law of elections."  Article 2, § IV, was passed by the voters of the state of Michigan in November, 2018.

A question for the Court is whether the phrase "in such as manner as prescribed by law" requires the Court to fashion a remedy by independently appointing an auditor to examine the votes from the November 3, 2020 election before any County certification of votes or whether there is another manner "as prescribed by law".

Following the adoption of the amended Article 2, § IV, the Michigan Legislature amended MCL 168.31a effective December 28, 2018.  MCL 168.31a provides for the Secretary of State and appropriate county clerks to conduct a results audit of at least

one race in each audited precinct. Although Plaintiffs may not care for the wording of the current MCL 168.31a, a results audit has been approved by the Legislature. Any amendment to MCL 168.31a is a question for the voice of the people through the legislature rather than action by the Court.

It would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers. The Court cannot defy a legislatively crafted process, substitute its judgment for that of the Legislature, and appoint an independent auditor because of an unwieldy process. In addition to being an unwarranted intrusion on the authority of the Legislature, such an audit would require the rest of the County and State to wait on the results. Remedies are provided to the Plaintiffs. Any unhappiness with MCL 168.31a calls for legislative action rather than judicial intervention.

As stated above, Plaintiffs have multiple remedies at law. Plaintiffs are free to petition the Wayne County Board of Canvassers who are responsible for certifying the votes. (MCL 168.801 and 168.821 et seq.) Fraud claims can be brought to the Board of Canvassers, a panel that consists of two Republicans and two Democrats. If dissatisfied with the results, Plaintiffs also can avail themselves of the legal remedy of a recount and a Secretary of State audit pursuant to MCL 168.31a.

Plaintiff's petition for injunctive relief and for a protective order is not required at this time in light of the legal remedy found at 52 USC § 20701 and Michigan's General Schedule #23 – Election Records, Item Number 306, which imposes a statutory obligation to preserve all federal ballots for 22 months after the election.

In assessing the petition for injunctive relief, the Court must determine whether there will be harm to the Plaintiff if the injunction is not granted, as Plaintiffs' existing legal

11

remedies would remain in place unaltered.  There would be harm, however, to the Defendants if the Court were to grant the requested injunction.  This Court finds that there are legal remedies for Plaintiffs to pursue and there is no harm to Plaintiffs if the injunction is not granted.  There would be harm, however, to the Defendants if the injunction is granted.  Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay.  It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races.  It would also undermine faith in the Electoral System.

Finally, the Court has to determine would there be harm to the public interest.  This Court finds the answer is a resounding yes.  Granting Plaintiffs' requested relief would interfere with the Michigan's selection of Presidential electors needed to vote on December 14, 2020.  Delay past December 14, 2020 could disenfranchise Michigan voters from having their state electors participate in the Electoral College vote.

Conclusion

Plaintiffs rely on numerous affidavits from election challengers who paint a picture of sinister fraudulent activities occurring both openly in the TCF Center and under the cloak of darkness.  The challengers' conclusions are decidedly contradicted by the highly-respected former State Elections Director Christopher Thomas who spent hours and hours at the TCF Center November 3rd and 4th explaining processes to challengers and resolving disputes.  Mr. Thomas' account of the November 3rd and 4th events at the TCF Center is consistent with the affidavits of challengers David Jaffe, Donna MacKenzie and Jeffrey Zimmerman, as well as former Detroit City Election Official, now contractor, Daniel Baxter and City of Detroit Corporation Counsel Lawrence Garcia.

Perhaps if Plaintiffs' election challenger affiants had attended the October 29, 2020 walk-through of the TCF Center ballot counting location, questions and concerns could have been answered in advance of Election Day.  Regrettably, they did not and, therefore, Plaintiffs' affiants did not have a full understanding of the TCF absent ballot tabulation process.  No formal challenges were filed.  However, sinister, fraudulent motives were ascribed to the process and the City of Detroit.  Plaintiffs' interpretation of events is incorrect and not credible.

Plaintiffs are unable to meet their burden for the relief sought and for the above mentioned reasons, the Plaintiffs' petition for injunctive relief is DENIED.  The Court further finds that no basis exists for the protective order for the reasons identified above. Therefore, that motion is DENIED.  Finally, the Court finds that MCL 168.31a governs the audit process.  The motion for an independent audit is DENIED.

It is so ordered.

This is not a final order and does not close the case.

November 13, 2020

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

13

# EXHIBIT 15

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 23, 2020

Bridget M. McCormack,
Chief Justice

162245 & (27)(38)(39)

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

CHERYL A. COSTANTINO and EDWARD P.
McCALL, JR.,
　　　　　　Plaintiffs-Appellants,

v

SC: 162245
COA: 355443
Wayne CC: 20-014780-AW

CITY OF DETROIT, DETROIT ELECTION
COMMISSION, DETROIT CITY CLERK,
WAYNE COUNTY CLERK, and WAYNE
COUNTY BOARD OF CANVASSERS,
　　　　　　Defendants-Appellees,

and

MICHIGAN DEMOCRATIC PARTY,
　　　　　　Intervening Defendant-Appellee.

_____/

　　　　On order of the Court, the motions for immediate consideration and the motion to file supplemental response are GRANTED. The application for leave to appeal the November 16, 2020 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

　　　　ZAHRA, J. (*concurring*).

　　　　Plaintiffs ask this Court to "enjoin the Wayne County Canvassers certification of the November 2020 election prior to their meeting [on] November 17, 2020 at 3:00 p.m." on the basis that "the audit [requested by plaintiffs pursuant to Const 1963, art 2, § 4(1)(h)] needs to occur prior to the election results being certified by the Wayne County Board of Canvassers." Plaintiffs contend that if "the results of the November 2020 election [are] certified . . . Plaintiffs will lose their right to audit its results, thereby losing the rights guaranteed under the Michigan Constitution." However, plaintiffs cite no support, and I have found none, for their proposition that an audit under Const 1963, art

2, § 4(1)(h)—which provides "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections"—must *precede* the certification of election results.  Indeed, the plain language of Const 1963, art 2, § 4(1)(h) does *not* require an audit to precede the certification of election results.  To the contrary, certified results would seem to be a *prerequisite* for such an audit.  For how can there be "[t]he right to have the results of statewide elections audited" absent any results, and, further, what would be properly and meaningfully audited other than final, and presumably certified, results?  See also *Hanlin v Saugatuck Twp*, 299 Mich App 233, 240-241 (2013) (allowing for a quo warranto action to be brought by a citizen within 30 days of an election in which it appears that a material fraud or error has been committed), citing *Barrow v Detroit Mayor*, 290 Mich App 530 (2010); MCL 168.31a (which sets forth election-audit requirements and does not require an audit to take place before election results are certified); MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.").

Even so, while plaintiffs are not precluded from seeking a future "results audit" under Const 1963, art 2, § 4(1)(h), the certification of the election results in Wayne County has rendered the instant case moot to the extent that plaintiffs ask this Court to enjoin that certification; there is no longer anything to enjoin.  While it is noteworthy that two members of the board later sought to rescind their votes for certification, see LeBlanc, *GOP Canvassers Try to Rescind Votes to Certify Wayne County Election*, Detroit            News            (November            19,            2020) <https://www.detroitnews.com/story/news/local/michigan/2020/11/19/gop-canvassers-attempt-rescind-votes-certify-wayne-county-vote/3775246001/> (accessed November 23, 2020) [https://perma.cc/2SS2-Y29V], plaintiffs have nonetheless provided no support, and I have found none, for their proposition that this effects a "decertification" of the county's election results, so it seems they presently remain certified.  Cf. *Makowski v Governor*, 495 Mich 465, 487 (2014) (holding that the Governor has the power to grant a commutation, but does not have the power to revoke a commutation).  Thus, I am inclined to conclude that the certification of the election by the Wayne County board has rendered the instant case moot—but only as to plaintiffs' request for injunctive relief.

Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the "very concerning" "allegations and issues raised by Plaintiffs," she "believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election."  Plaintiffs' affidavits present evidence to substantiate their allegations, which include claims of ballots being counted from voters whose names are not contained in the appropriate poll books, instructions being given to

disobey election laws and regulations, the questionable appearance of unsecured batches of absentee ballots after the deadline for receiving ballots, discriminatory conduct during the counting and observation process, and other violations of the law.  Plaintiffs, in my judgment, have raised important constitutional issues regarding the precise scope of Const 1963, art 2, § 4(1)(h)—a provision of striking breadth added to our Michigan Constitution just two years ago through the exercise of direct democracy and the constitutional initiative process—and its interplay with MCL 168.31a and other election laws.  Moreover, the current Secretary of State has indicated that her agency would conduct a postelection performance audit in Wayne County.  See Egan, *Secretary of State: Post-Election "Performance Audit" Planned in Wayne County*, Detroit Free Press (November 19, 2020) <https://www.freep.com/story/news/politics/elections/2020/11/19/benson-post-election-performance-audit-wayne/3779269001/> (accessed November 23, 2020) [https://perma.cc/WS95-XBPG].  This development would seem to impose at least some obligation upon plaintiffs both to explain why a constitutional audit is still required after the Secretary of State conducts the promised process audit and to address whether there is some obligation on their part to identify a specific "law" in support of Const 1963, art 2, § 4(1)(h) that prescribes the specific "manner" in which an audit pursuant to that provision must proceed.

In sum, at this juncture, plaintiffs have not asserted a persuasive argument that their case is not moot and that the entry of immediate injunctive relief is proper.  That is all that is now before this Court.  Accordingly, I concur in the denial of injunctive relief.  In addition to denying the relief currently sought in this Court, I would order the most expedited consideration possible of the remaining issues.  With whatever benefit such additional time allows, the trial court should meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants, as well as resolve necessary legal issues, including those identified in the separate statement of Justice VIVIANO.  I would also have this Court retain jurisdiction of this case under both its appellate authority and its superintending authority under Const 1963, art 6, § 4 (stating that, with certain limitations, "the supreme court shall have general superintending control over all courts").  Federal law imposes tight time restrictions on Michigan's certification of our electors.  Plaintiffs should not have to file appeals following our standard processes and procedures to obtain a final answer from this Court on such weighty issues.

Finally, I am cognizant that many Americans believe that plaintiffs' claims of electoral fraud and misconduct are frivolous and obstructive, but I am equally cognizant that many Americans are of the view that the 2020 election was not fully free and fair.  See, e.g., Monmouth University Polling Institute, *More Americans Happy About Trump Loss Than Biden Win* (November 18, 2020) <https://www.monmouth.edu/polling-institute/reports/monmouthpoll_us_111820/> (accessed November 23, 2020) [https://perma.cc/7DUN-CMZM] (finding that 32% of Americans "believe [Joe Biden] only won [the election] due to voter fraud").  The latter is a view that strikes at the core of

concerns about this election's lack of both "accuracy" and "integrity"—values that Const 1963, art 2, § 4(1)(h) appears designed to secure.

In sum, as explained above, I would order the trial court to expedite its consideration of the remaining issues, and I would retain jurisdiction in order to expedite this Court's final review of the trial court's decision. But, again, because plaintiffs have not asserted a persuasive argument that immediate injunctive relief is an appropriate remedy, I concur in the denial of leave to appeal and, by extension, the denial of that relief.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

Plaintiffs Cheryl Costantino and Edward McCall seek, among other things, an audit of the recent election results in Wayne County. Presently before this Court is their application for leave to appeal the trial court's ruling that plaintiffs are not likely to succeed and therefore are not entitled to a preliminary injunction to stop the certification of votes by defendant Wayne County Board of Canvassers. See MCL 168.824; MCL 168.825. The Court of Appeals denied leave, and this Court has now followed suit. For the reasons below, I would grant leave to answer the critical constitutional questions of first impression that plaintiffs have squarely presented concerning the nature of their right to an audit of the election results under Const 1963, art 2, § 4(1)(h).

The constitutional provision at issue in this case, which the people of Michigan voted to add in 2018 through Proposal 3, guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections." *Id.* The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so and that the Legislature cannot impose additional obligations on the exercise of this right. *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971).

The trial court failed to provide a meaningful interpretation of this constitutional language. Instead, it pointed to MCL 168.31a, which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4. But the trial court never considered whether MCL 168.31a accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right.

In passing over this constitutional text, the trial court left unanswered many questions pertinent to assessing the likelihood that plaintiffs would succeed on the

merits.[1]  As an initial matter, the trial court did not ask what showing, if any, plaintiffs must make to obtain an audit.  It appears that no such showing is required, as neither the constitutional text nor MCL 168.31a expressly provide for it.  None of the neighboring rights listed in Article 2, § 4, such as the right to vote by absentee ballot, requires citizens to present any proof of entitlement for the right to be exercised.  Yet, the trial court here ignored this threshold legal question and instead scrutinized the parties' bare affidavits, concluding that plaintiffs' allegations of fraud were not credible.[2]  The trial court's factual findings have no significance unless, to obtain an audit, plaintiffs were required to prove their allegations of fraud to some degree of certainty.

Wrapped up in this question is the meaning and design of Const 1963, art 2, § 4.  Is it a mechanism to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled?  To ascertain the type of audit the Constitution envisions, it is necessary to consider whether the term "audit" has a special meaning in the context of election administration.  In this regard, we should examine the various auditing practices in use around the time Proposal 3 was passed.  See Presidential Commission on Election Administration, *The American Voting Experience: Report and Recommendations* (January 2014), p 66 ("Different types of audits perform different functions.").  Some audits occur regardless of how close the election was.  They simply review the election process to verify that procedures were complied with, rules were followed, and technology performed as expected.  See *id.*; see also League of Women Voters, *Report on Election Auditing* (January 2009), p 3 ("Post-election audits routinely check voting system performance in contests, regardless of how close margins of victory appear.").  For these process-based audits, it would not appear critical whether they occur before the election results are finally certified, as the audit is intended to gather information that could be used to perfect voting systems going forward.

---

[1] The court also suggested that plaintiffs could seek a recount.  But, with few exceptions, the relevant recount provisions can be invoked only by candidates for office, which plaintiffs here were not.  Compare MCL 168.862 and MCL 168.879 (allowing candidates to request recounts) with MCL 168.880 (allowing any elector, in certain circumstances, to seek a recount of "votes cast upon the question of a proposed amendment to the constitution or any other question or proposition").

[2] The court's credibility determinations were made without the benefit of an evidentiary hearing.  Ordinarily, an evidentiary hearing is required where the conflicting affidavits create factual questions that are material to the trial court's decision on a motion for a preliminary injunction under MCR 3.310.  See 4 Longhofer, Michigan Court Rules Practice, Text (7th ed, 2020 update), § 3310.6, pp 518-519.  See also *Fancy v Egrin*, 177 Mich App 714, 723 (1989) (an evidentiary hearing is mandatory "where the circumstances of the individual case so require").

Other audits, by contrast, aim to ensure accuracy in a specific election and enable alteration of results if necessary.  The American Law Institute's recent *Principles of the Law, Election Administration*, drafted around the time Proposal 3 was passed, suggests that audits should be used in this manner:

> [I]f an audit exposes a problem, the number of randomly sampled ballots can be increased in order to ascertain whether or not the problem is one that threatens the accuracy of the determination of which candidate is the election's winner.  In an extreme case, when problems exposed by an audit were severe, the audit would need to turn into a full recount of all ballots in the election in order to provide the requisite confidence in the accuracy of the result (or, as necessary, to alter the result based on the findings of the audit-turned-recount).  In those circumstances when the audit exposes no such problem, election officials ordinarily would be able to complete the audit prior to the deadline for certifying the results of the election; when, however, the audit reveals the necessity of a full recount, then a state—depending on how it chooses to structure the relationship between certification and a recount—either could delay certification until completion of the recount or issue a preliminary certification that is subject to revision upon completion of the recount.  [ALI, Principles of the Law, Election Administration (2019), § 209, comment *c*.]

These audits, such as a risk-limiting audit, "are designed to be implemented before the certification of the results, and to inform election officials whether they should be confident in the results—or if they should bump the audit up to a full recount."  Pettigrew & Stewart, *Protecting the Perilous Path of Election Returns from the Precinct to the News*, 16 Ohio St Tech L J 587, 636 (2020) ("[Risk-limiting audits] conducted as part of the certification process currently provide the best mechanism through which the manipulation of election returns at the precinct level can be detected and, most importantly, remedied.").  A review of election laws conducted in early 2018 similarly recommended that audits be undertaken "after preliminary outcomes are announced, but before official certification of election results" because this allows for "correction of preliminary results if preliminary election outcomes are found to be incorrect."  Root et al, Center for American Progress, *Election Security in All 50 States: Defending America's Elections* (Feb 12, 2018), available at <https://www.americanprogress.org/issues/democracy/reports/2018/02/12/446336/ election-security-50-states/>.

Whether the constitutional right to an audit may be utilized to uncover evidence of fraud to challenge the results of an election will also need to be addressed.  In particular, how does the constitutional audit operate within our statutory framework and procedures for canvassing election returns, certifying the results, and disputing ballots on the basis of fraud?  We have long indicated that canvassing boards' role is ministerial and does not

involve investigating fraud. See *McLeod v State Bd of Canvassers*, 304 Mich 120 (1942); see also *People ex rel Williams v Cicott*, 16 Mich 283, 311 (1868)[3] (opinion of Christiancy, J.) (noting that the boards, "acting thus ministerially," are "often compelled to admit votes which they know to be illegal"); see generally Paine, *Treatise on the Law of Elections to Public Offices* (1888), § 603, p 509 ("The duties of county, district, and state canvassers are generally ministerial. . . . Unless authorized by statute, they cannot go behind those returns. . . . Questions of illegal voting and fraudulent practices are to be passed upon by another tribunal."). The Board of State Canvassers has more of a role in investigating fraud in recounts, although we have held that it cannot exclude votes on this basis. See MCL 168.872 (providing that if the board conducting a recount suspects fraud occurred during the election, it can make an investigation that produces a report that is submitted to the prosecuting attorney or to the circuit judges of the county); *May v Wayne Co Bd of Canvassers*, 94 Mich 505, 512 (1893) (holding that the board could not exclude votes during a recount based on fraud). These holdings may suggest that evidence of fraud uncovered in an audit is not a barrier to certification and instead may only be used to challenge an election in quo warranto and other related proceedings. See *The People ex rel Attorney General v Van Cleve*, 1 Mich 362, 364-366 (1850) (holding in a quo warranto proceeding that the certification "is but *prima facie* evidence" of the election results and that a party can "go behind all these proceedings[; that the party] may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office").

Consequently, it is imperative to determine the nature and scope of the audit provided for in Article 2, § 4, so we can determine when the audit occurs and whether it will affect the election outcome. These questions are important constitutional issues of first impression that go to the heart of our democracy and the power of our citizens to amend the Constitution to ensure the accuracy and integrity of elections. They deserve serious treatment. I would grant leave to appeal and hear this case on an expedited basis to resolve these questions.[4] For these reasons, I dissent.

---

[3] Overruled in part on other grounds by *Petrie v Curtis*, 387 Mich 436 (1972).

[4] In doing so, I would consider the parties' arguments regarding whether the matter is moot.



b1117t

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 23, 2020



Clerk