# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER, and DARREN WADE RUBINGH,

    Plaintiffs,

v

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,

    Defendants,

CITY OF DETROIT,

    Intervening Defendant,

ROBERT DAVIS,

    Intervening Defendant,

DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY,

    Intervening Defendant.

No. 2-20-cv-13134

HON. LINDA V. PARKER

MAG. R. STEVEN WHALEN

1

Gregory J. Rohl (P39185)
Attorney for Plaintiffs
41850 West 11 Mile Road, Suite 110
Novi, Michigan 48375
248.380.9404
gregoryrohl@yahoo.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Attorney for Proposed Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Proposed Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

Scott R. Eldridge
Attorney for Proposed Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson (P18690)
Attorney for Proposed Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

/

2

## DECLARATION OF JONATHAN BRATER

I, Jonathan Brater, state as follows:

1. I have been employed by the Secretary of State as Director of Elections since January 2, 2020 and in such capacity serve as Director of the Bureau of Elections (Bureau).

2. I bring this declaration in support of Defendants' response in opposition to the Motion for a temporary restraining order.

3. I am responsible for preparing the official documentation necessary for the Secretary of State to certify the November 3, 2020 general election. In addition, the Bureau provides support to the county, city, and township clerks in their administration of the election. I am personally knowledgeable about state and federal laws governing election administration in Michigan. Additionally, I am familiar with the voting systems used in the State of Michigan, including the Dominion system used by Antrim County.

4. In Michigan, there are three vendors that have been certified by the Michigan Board of State Canvassers for use in the State – Hart Intercivic, Dominion Voting Systems, and Election Systems and Software. These vendors were each approved by the Board of State Canvassers in 2017. Importantly, the clerk of each of Michigan's 83 counties determines in consultation with each city and township located within their county which vendor to use. MCL 168.37a.

3

5.      With respect to the Dominion Voting System, Democracy Suite v. 5.5/5.5S is certified for use in Michigan, having been approved by the Board of State Canvassers in May 2019 after it was reviewed by an accredited Voting Systems Test Laboratory and approved by the bipartisan Election Assistance Commission.[1] Plaintiffs' claim that Defendants "disregarded" the January 24, 2020 decision of the State of Texas to refrain from certifying "the same Dominion Democracy Suite" in that state is not accurate for multiple reasons. Plaintiffs' First Amended Complaint, ¶10, ¶137. First, the Dominion equipment used in Michigan was certified prior to Texas decision referenced above. Second, the Texas decision related to different equipment. Plaintiffs could have easily discovered both the timing and that the version of Democracy Suite approved for use in Michigan, v. 5.5/5.5S, differs from the version tested in Texas, v. 5.5.A,[2] had they conducted even a cursory review of the Board of State Canvassers meeting minutes.[3]

---

[1] https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl, U.S. Election Assistance Commission, Voting Systems Test Laboratories (VSTL), https://www.eac.gov/voting-equipment/voting-system-test-laboratories-vstl (last accessed December 2, 2020).

[2] https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf, State of Texas Report of Review of Dominion Voting Systems Democracy Suite 5.5-A (last accessed December 2, 2020).

[3] https://www.michigan.gov/documents/sos/Approved_Minutes_052319_Meeting_658692_7.pdf, Meeting of the Board of State Canvassers, May 23, 2019 (last accessed December 2, 2020).

6. Antrim County uses the Dominion Voting Systems election management system and voting machines (tabulators), which count hand-marked paper ballots. The election management system software is used to program tabulators and to report unofficial election results.

7. It is my understanding that in October 2020, after Antrim County initially programmed its election software for the November Election, the county identified two local races where the ballot content had to be updated. The county then received updated programming from its election programming vendor, Election Source. The updated programming correctly updated the election software for the county.

8. When the software was reprogrammed, the County also was required to update the software on all media drives that are placed into the tabulators to ensure the tabulators communicated properly with the election management system. It is my understanding that the county did update the media drives that went into the tabulators in precincts that had the race change but did not update the media drives for the remainder of the county. Because the clerk updated the media drives for all areas with race changes, the tabulators counted ballots correctly.

9. Because the county did not update the media drives for the tabulators in the areas of the county that *did not* have changes to the race, those tabulators did

5

not communicate correctly with the county's election management system software that combines and reports unofficial election night results.

10. After discovering this error, it is my understanding that the clerk worked to immediately correct the unofficial results by reviewing the physical totals tapes which are printed by each tabulator. I understand that she then hand-entered the results for each race and for each precinct in the county to get the corrected unofficial results.

11. This error affected only how the results from the tabulators communicated with the election management software for unofficial reporting. It did not affect how tabulators counted ballots. This was an isolated error, and there is no evidence that would lead me to believe this user error occurred anywhere else in the state. Further, there is no evidence leading me to believe that this was the result of intentional misconduct by an election official, was a result of software or equipment malfunction, or was caused by some sort of tampering.

12. It is important to note that even if the error in reporting unofficial results on election night had not been immediately noticed and quickly fixed by the county clerk it would have been caught and identified during the county canvass. Michigan Election Law requires county clerks and the bipartisan Board of County Canvassers to meet and begin canvassing the election by 9:00 a.m. on the Thursday after the election. MCL 168.821. During the two-week county canvassing period,

two canvassers nominated by the Democratic Party and two canvassers nominated by the Republican Party verify the total number of ballots tabulated against the tabulator totals tape that is printed out after the close of polls, for each and every precinct in the county. They verify the total number of voters against the list of voters in the poll book and ensure the two numbers match.[4] This process is the reason I am confident the error in the reporting of unofficial results would have been caught before the Board of County Canvassers certified the results as official. This process is also described in a document published by the Secretary of State regarding the Antrim County incident. Plaintiffs claim the document, which they cite in their brief, "fails to address" what would happen if the error was not caught prior to the unofficial canvass, First Amended Complaint, ¶138, but the document does in fact address this – it explains that the county canvass would catch the error. Plaintiffs could have determined this by reviewing the document they cited in their brief.

13. Accordingly, Plaintiffs' claim that human error in the reporting of unofficial results is "only discoverable through a manual recount" is false. First Amended Complaint, ¶138.

---

[4] A complete step-by-step guide to the county canvass is available on the Bureau's website here:
https://www.michigan.gov/documents/sos/BCC_Manual_464331_7.pdf

14. The error described above was not a result of "malfunctioning voting equipment or defective ballots"[5] as Plaintiffs allege in paragraph 126 of the First Amended Complaint. This was an isolated user error that did not impact *any* other county. There is no reason to think, despite plaintiffs' assertions (which are not accompanied by any supporting evidence), that this occurred in any other county in the State of Michigan. See Complt. ¶ 138. Plaintiffs' unfounded accusations that other counties using Dominion manipulated results are baseless. Plaintiffs' First Amended Complaint, ¶139.

15. Plaintiffs; assertion that Dominion changed votes through the use of ranked choice voting, a method of electing candidates that is not authorized by the Michigan Election Law for use in federal- or state-level elections, is bizarre.[6] Complt. ¶ 140.

---

[5] And even if Plaintiffs' allegations regarding malfunctioning equipment were true (thereby triggering a special mail election under MCL 168.837), the total number of votes cast in Antrim County (16,044) is miniscule compared to the magnitude of Trump's loss in Michigan (154,188 votes). Notably, Trump won Antrim County by a vote of 9,748 to 5,960 for President-Elect Biden. https://mielections.us/election/results/2020GEN_CENR.html (last accessed December 2, 2020).

[6] Due to a consent decree it entered with the Department of Justice in 2019, the City of Eastpointe in Macomb County is the only jurisdiction in Michigan that uses ranked choice voting to elect city officers. *United States v City of Eastpointe*, Case No. 4:17-cv-10079, E.D. Mich. Notably, the voting system used in Macomb County is not Dominion, but Election Systems and Software (ES&S).

8

16. The Board of State Canvassers certified the results of Michigan's November 3, 2020 election as official on November 23, 2020.[7] Further, the Certificate of Ascertainment awarding Michigan's 16 electoral votes to President-Elect Joseph R. Biden has already been signed and sealed by Governor Gretchen Whitmer and Secretary of State Jocelyn Benson, and filed with the Archivist of the United States, National Archives and Records Administration.[8] MCL 168.46, 3 USC 6.

17. Mr. Ramsland's claims, cited by Plaintiffs in paragraphs 142 to 146, demonstrate a fundamental lack of understanding of basic facts about Michigan's election system. He includes in his claims two counties, Macomb and Oakland, that do not use Dominion Voting Systems.

18. Mr. Ramlsand does not understand how unofficial election results are reported in Michigan. Mr. Ramsland assumes, for reasons that are not immediately apparent, that counting "was closed at 2:00 am" on November 4 and that ballot totals <u>reported</u> after that time must have been <u>counted</u> after that time as well. This is incorrect for two reasons. First, ballot counting is not "closed" at any particular

---

[7] Draft minutes of the November 23, 2020 meeting of the Board of State Canvassers, https://www.michigan.gov/documents/sos/112320_draft_minutes_708672_7.pdf (last accessed December 2, 2020).
[8] https://www.archives.gov/files/electoral-college/2020/ascertainment-michigan.pdf (last accessed December 2, 2020).

9

time – jurisdictions count ballots until they are finished counting ballots. Second, although unofficial totals are generally reported all at the same time,[9] those totals are the product of ballots that have been counted throughout the day. For example, an absent voter counting board in Kent County could have been counting ballots since 7 a.m. on November 3, but not finish until 3 a.m. on November 4, at which point totals would be reported reflecting all ballots counted since 7 a.m.

19. Plaintiffs' various insinuations that large numbers of ballots were illegally counted or altered in Detroit are easily dismissed by a cursory review of election data reported from Detroit. Compared to 2016, turnout in Detroit increased from 247,369 to 256,514, an increase equivalent to 3.7 percent of 2016 turnout (substantially lower than the statewide increase of 15.4 percent). If a large number of ballots were illegally counted, one would expect turnout to be substantially higher. Donald Trump increased his vote share in Detroit from 3.1 percent in 2016 to 5.0 percent in 2020. If Trump votes had been altered or discarded, one would not expect his vote share to have increased. Additionally, there were approximately 174,000 absent voter ballots tabulated at the TCF center. The difference between the number of absent voter ballots tabulated and names in the poll books was under

---

[9] It is possible to provide interim unofficial results before all ballots have been tabulated (for example, Detroit provided interim unofficial totals for AV counting boards at several times on Wednesday, November 4), but most jurisdictions wait until all ballots in a precinct have been tabulated until unofficial results are reported.

10

150 (less than one tenth of one percent of all ballots tabulated), and there were <u>fewer</u> ballots tabulated than names in the poll books. If ballots had been illegally counted, there would be substantially more, not slightly fewer, ballots tabulated than names in the poll books.

20. In addition to the false statements shared by Plaintiffs as described above, it is notable that:

   a. Plaintiffs also misconstrue MCL 168.765a, which requires the presence of "at least 1 election *inspector* from each major political party" at an absent voter counting board to perform official duties (such as delivering materials, signing statements of votes, etc.), as a requirement that at least 1 election *challenger* from each party be present to observe the count. Plaintiffs compound their error by alleging, without support, that ballot counting can only occur if at least one challenger from each major political party is present. First Amended Complaint, ¶¶214-216, 231.

   b. Plaintiffs falsely declare that "Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County. The TCF Center was the only facility within Wayne County authorized to count the ballots." First Amended Complaint, ¶58. In fact, absent voter ballots from the City of

11

Detroit were the only ballots processed and counted at the TCF Center on November 2-4, 2020.

c. Plaintiffs erroneously claim that issuing and receiving an absent voter application and/or ballot on the same day is "anomal[ous,]" if not "impossibl[e,]" when in fact the Michigan Constitution requires clerks to issue absent voter ballots on demand when voters request one in person. MI Const. Art. 2 §4(f)-(g), First Amended Complaint, ¶¶16(f), 123. Plainly, same-date transactions are evidence of individuals applying for, completing, and returning a ballot in a single visit.

d. Contrary to Plaintiffs' insinuation, the Secretary of State is not directly involved in the operations of boards of canvassers, and does not control the access of individual challengers to absent voter counting boards. First Amended Complaint, ¶¶194, 226-227.

18. This declaration is based on personal knowledge. If called as a witness, I can testify competently to the facts stated in this declaration.

_____
Jonathan Brater
Director of Elections