# EXHIBIT 6

RECEIVED by MSC 11/26/2020 2:44:12 AM

## STATE OF MICHIGAN
## IN THE SUPREME COURT

ANGELIC JOHNSON, and
LINDA LEE TARVER,
          PETITIONERS,

v

JOCELYN BENSON, in her official
capacity as Michigan Secretary of State;
JEANNETTE BRADSHAW, in her
official capacity as Chair of the Board of
State Canvassers for Michigan; BOARD
OF STATE CANVASSERS FOR
MICHIGAN; and GRETCHEN
WHITMER, in her official capacity as
Governor of Michigan,
          RESPONDENTS.

Supreme Court Case No. _____

## PETITION FOR EXTRAORDINARY WRITS & DECLARATORY RELIEF

## IMMEDIATE CONSIDERATION REQUESTED FOR DECISION BEFORE DECEMBER 8, 2020

SPECIAL COUNSEL FOR THOMAS MORE SOCIETY—
AMISTAD PROJECT

Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC*
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER*
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER*
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

*for identification purposes only
COUNSEL FOR PETITIONERS

RECEIVED by MSC 11/26/2020 2:44:12 AM

1.      Petitioners Angelic Johnson and Dr. Linda Lee Tarver (collectively, "Petitioners") sue for Extraordinary Writs against Respondents, their employees, agents, and successors in office, and Declaratory Relief, and in support allege the following upon information and belief:

## **INTRODUCTION**

1.      Our constitutional republic thrives only in proportion to the integrity and accuracy of its elections.  Elections replete with error and dishonesty threaten its survival.

2.      Michigan citizens deserve honest, fair, and transparent elections from their state officials.  The process should be open, and their votes should be protected with privacy.

3.      Michigan citizens deserve a process that ensures that their *legal* votes count but *illegal* votes do not.  In fact, the United States and Michigan Constitutions require it, and for good reason, as shown further in this Petition.

4.      The Michigan Constitution provides: "All political power is inherent in the people." Const 1963, art 1, § 1.  In 2018, the people of this state exercised this power when they, as registered voters, amended the constitution by approving Proposal 3.  As a result of the passage of Proposal 3, the Michigan Constitution now provides in relevant part:

> (1) Every citizen of the United States who is an elector qualified to vote in Michigan ***shall*** have the following rights:
>
> (a) The right, once registered, to vote a secret ballot in all elections.
> * * *
> (h) ***The right to have the results of statewide elections audited, in such manner as prescribed by law, to ensure the accuracy and integrity of elections***.
>
> All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes.
> * * *
> (2) Except as otherwise provided in this constitution or in the constitution or laws of the United States the legislature shall enact laws to regulate the time, place and manner of all nominations and elections, *to preserve the purity of elections*, to preserve the secrecy of the ballot, *to guard against abuses of the elective franchise*, and to provide for a system of voter registration and absentee voting. . . .

RECEIVED by MSC 11/26/2020 2:44:12 AM

Const 1963, art 2, § 4 (emphasis added).

5. When the State legislature vests the right to vote for President in its people, as Michigan has done here, "the right to vote as the *legislature* has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v Gore*, 531 US 98, 104 (2000) (emphasis added).

6. "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . . It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush*, 531 US at 104-05 (quoting *Reynolds . Sims*, 377 US 533, 555 (1964)). Permitting the counting of illegal votes creates the very debasement and dilution of the weight of a citizen's legal vote that the Fourteenth Amendment prohibits.

7. The Michigan Constitution demands the same thing of its officials: "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." 1963 Const, art 1, § 2. Indeed, the Equal Protection Clause in the Michigan Constitution is coextensive with the Equal Protection Clause of the United States Constitution. *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318; 783 NW2d 695 (2010). Equal protection applies when a state either classifies voters in disparate ways or unduly restricts the right to vote. *Obama for America v Husted*, 697 F3d 423, 428 (CA6, 2012). *Promote the Vote v Sec'y of State*, Nos. 353977, 354096, 2020 Mich App LEXIS 4595, at *39 (Ct App July 20, 2020).

RECEIVED by MSC 11/26/2020 2:44:12 AM

8.      Likewise, Due Process and bedrock principles of fundamental fairness require this Court to look carefully behind the certification process at the actual ballot boxes, ballots, and other election evidence.  Indeed, the Due Process Clause of the Michigan Constitution commands that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law."  Const 1963, art 1, § 17; see also, MCL 168.10.

9.      This constitutional provision is nearly identical to the Due Process Clause of the United States Constitution, see US Const, Am XIV, § 1.  Accordingly, "[t]he due process guarantee of the Michigan Constitution is coextensive with its federal counterpart."  *Grimes v Van Hook-Williams*, 302 Mich App 521, 530; 839 NW2d 237 (2013); *Quinn v State & Governor*, No. 350235, 2020 Mich App LEXIS 5941, at *7 (Ct App Sep 10, 2020).

10.     In Michigan, the Secretary of State, Jocelyn Benson, a registered Democrat, acting unilaterally and without legislative approval, flooded the electoral process for the 2020 general election with absentee ballots.  The Secretary of State accomplished this partisan scheme by unilaterally sending absentee ballot request forms to every household in Michigan with a registered voter (no matter if the voter was still alive or lived at that address) and to non-registered voters who were temporarily living in Michigan or who were not United States citizens.

11.     Respondent Benson also permitted online requests for absentee ballots without signature verification, thereby allowing for fraud in obtaining an absentee ballot.

12.     Worse, Respondent Benson sent <u>unsolicited ballots</u> to countless thousands living in Michigan and in some cases to citizens of other states.

13.     The Michigan Legislature did not approve or authorize Benson's unilateral actions—and for good reason.

14.     Predictably, a flood of unauthorized, absentee ballots ensured the dilution of lawful votes and precipitated an unfair 2020 general election, as the evidence adduced from election day at the TCF Center in Detroit, Michigan proves.

15.     There are a few exceptional cases in which the Federal Constitution imposes a duty or confers a power on a particular branch of a State's government.  Article II, section 1, clause 2 is one of them.  It provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct," electors for President and Vice President.  US Const art II, § 1, cl 2.  As the Supreme Court explained in *McPherson*, 146 US 1 (1892), this provision of the Constitution "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointment.  *Id.* at 27.  A significant departure from the legislative scheme for appointing Presidential electors defies this constitutional mandate.

16.     Not even the Michigan Constitution can confer extra authority on the Secretary of State to change or alter the election procedures established by the State legislature.  *McPherson*, 146 US at 35 (acknowledging that the State legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions"); see *also Bush v Palm Beach Cnty Canvassing Bd*, 531 US 70; 121 S Ct 471 (2000).

17.     And perhaps most important for purposes of the current situation, the Secretary of State cannot rely on the declared pandemic as a rationale for circumventing legislative intent or for unilaterally implementing procedures that undermined the integrity of the 2020 general election.  *Carson v Simon*, No 20-3139, 2020 US App LEXIS 34184, at *17-18 (CA8, Oct. 29, 2020) ("[T]he Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid.  However well-intentioned and appropriate

5

RECEIVED by MSC 11/26/2020 2:44:12 AM

from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code.").

18.     The rule of law, as established by the United States Constitution and the Michigan Legislature, dictates that the Secretary of State follow these rules.  There is no pandemic exception. See *Democratic Nat'l Comm v State Legislature*, No 20A66, 2020 US LEXIS 5187, at \*13 (Oct 26, 2020) (Kavanaugh, J., concurring in denial of application for stay) ("'[T]he design of electoral procedures is a legislative task,' including during a pandemic.") (internal citation omitted).

19.     This case seeks to protect and vindicate fundamental rights.  It is a civil rights action brought under the Fourteenth Amendment to the United States Constitution, Article II, section 1 of the United States Constitution, the Equal Protection and Due Process clauses of the Michigan Constitution, Article 2, section 4 of the Michigan Constitution, and MCL 168.479, as Petitioners have been "aggrieved by [a] determination made by the board of state canvassers."  Most important, this case seeks to restore the purity and integrity of elections in Michigan so that "We the people" can have confidence in their outcome, and thus, confidence that those who govern do so legitimately.

## JURISDICTION AND VENUE

20.     This action arises under the Constitution and laws of the United States, the Michigan Constitution of 1963, Michigan Court Rules 7.305 and 7.306, and MCL 168.1, *et seq*, including 168.109 and 168.479.

21.     The Michigan Constitution, Article 6, § 4 states that:

The supreme court shall have general superintending control over all courts; *power to issue, hear and determine prerogative and remedial writs*; and appellate jurisdiction as provided by rules of the supreme court.

Const 1963, art 6, § 4 (emphasis added).

RECEIVED by MSC 11/26/2020 2:44:12 AM

22.     "Mandamus is properly categorized as both an 'extraordinary' and a 'prerogative' writ." *O'Connell v Director of Elections*, 316 Mich App 91, 100, 891 NW 2d 240, 249 (2016). Thus, the Supreme Court has jurisdiction to hear and determine complaints for writs of mandamus, although that jurisdiction may not exclusively belong to the Supreme Court. *Id.* at 106.

23.     Here, MCL 168.479 expressly allows for "any person who feels aggrieved by any determination made by the board of state canvassers have the determination reviewed by mandamus or other appropriate remedy in the supreme court."  (emphasis added).

24.     Petitioners demanded that Respondent Board of State Canvassers ("Board") exercise their constitutional duty and refuse to certify the general election without first conducting an audit or first determining the accuracy and integrity of the underlying votes.  Affidavit of Ian Northon; **Appendix** 199 at ¶3, Ex A (Petitioners' Demand Letter to Board).

25.     MCL 168.878 expressly requires that Petitioners challenge a determination of the Board of State Canvassers "by no other action than mandamus."

26.     Over Petitioners' objections, Respondent Board certified the election on Monday, November 23, 2020, giving immediate rise to Petitioners' aggrieved status under MCL 168.479.

27.     Petitioners' claims for a temporary restraining order, declaratory judgment, relief under MCR 7.316(A)(7), and other relief such as mandamus is also authorized by the general doctrine of the Separation of Powers, and the Michigan Const 1963 art 2, § 4(1)(h), which deigns to ensure the accuracy and integrity of elections as a fundamental right, not just for Petitioners, but for all citizens of Michigan.

28.     Venue is proper because the Secretary, Board, and Governor are seated in the jurisdiction of this Court, and all Respondents reside and voted in the State of Michigan.  Venue is also proper under MCL 168.1, *et seq.* because the Michigan Legislature delegated a specific

RECEIVED by MSC 11/26/2020 2:44:12 AM

type of election dispute and controversy over ballots and other election indicia to this Court by statute.  See *also* MCL 168.10 (allowing any single supreme court justice to issue restraining orders over the ballots when there is danger of mishandling).

## NECESSITY FOR IMMEDIATE CONSIDERATION

29.     This Court previously granted immediate consideration of election-related cases. *Scott v Director of Elections*, 490 Mich 888, 889; 804 NW 2d 119 (2011).[1]

30.     Time is of the essence.  Petitioners seek immediate consideration before the electors convene on December 8, 2020.

## PARTIES

31.     Petitioner Angelic Johnson is an adult citizen of the United States and a resident of Macomb County, Michigan.  She is a member of Black Voices for Trump (hereinafter "Black Voices").  She legally voted in the November 2020 General Election in the State of Michigan, and she was a poll challenger at the TCF Center.

32.     Petitioner Dr. Linda Lee Tarver is an adult citizen of the United States and a resident of Ingham County, Michigan.  Dr. Tarver is on the advisory board of Black Voices.  Dr. Tarver legally voted in the November 2020 General Election in the State of Michigan.

33.     Respondent Jocelyn Benson is the Michigan Secretary of State.  As the Secretary of State, Respondent Benson is the State's "chief election officer" with supervisory control over

---

[1] See also, Order of November 23, 2020 in *Constantino, et al, v City of Detroit, et al,* Case Nos 162245 & (27)(38)(39).  Under a similar post-election challenge, Justice Zahra recognized in his concurrence: "[I] would order the most expedited consideration possible of the remaining issues. . . .";"I would have this Court retain jurisdiction [] under both its appellate authority and its superintending authority under Const. 1963, art 6, § 4"; "Federal law imposes tight time restrictions on Michigan's certification of our electors.  Plaintiffs should not have to file appeals following our standard processes and procedure to obtain a final answer from this Court on such weighty issues."

RECEIVED by MSC 11/26/2020 2:44:12 AM

local election officials in the performance of their election related duties, including supervisory control over the election officials and workers at the TCF Center.  MCL 168.21.  Secretary Benson holds the power to "direct local election officials as to the proper methods of conducting elections." MCL 168.31(1)(b), 168.509n.  Secretary Benson is responsible for "[e]stablish[ing] a curriculum for comprehensive training and accreditation of all [election] officials who are responsible for conducting elections."  MCL 168.31(1)(j).  Secretary Benson took an oath to support the United States and Michigan Constitution, Mich Const Art 11, § 1, and has a clear legal duty to enforce Michigan Election Law, the United States Constitution, and the Michigan Constitution.  This clear legal duty involves no exercise of judgment or discretion.  Secretary Benson is sued in her official capacity.

34.     Respondent Board was created pursuant to the Mich Const art 2, § 7 and is required to follow the United States and Michigan Constitutions and Michigan Election Law.

35.     MCL 168.22c requires the members of the Board to take the following oath prior to taking office: "I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of office." Mich Const art XI, § 1.

36.     The Board is required to "canvass the returns and determine the result of all elections for electors of president and vice president of the United States, state officers, United States senators, representatives in congress, circuit court judges, state senators, representatives elected by a district that is located in more than 1 county, and other officers as required by law." MCL  841.  Further, the Board shall record the results of a county canvass, but only upon receipt of a *properly* certified certificate of a determination from a board of country canvassers.  *Id.* (emphasis added).

RECEIVED by MSC 11/26/2020 2:44:12 AM

37.     Respondent Jeannette Bradshaw is the Chair of the Board of State Canvassers for Michigan.  The Board is supposed to certify Michigan election results when appropriate.  The Board's certification prompts the winning presidential candidate's selection of the 16 Michigan electors.  But if the election process cannot be certified, then the task reverts back to the Michigan Legislature under MCL 168.846 and the United States Constitution.

38.     Respondent Gretchen Whitmer is the Governor of the State of Michigan. As Michigan's chief executive, by statute, she will ostensibly transmit the State's certified results to the US Department of State and Congress on or before December 8, 2020. This ministerial task is corrupted, however, by the subordinate executive branch election officials and Respondents' failure to meaningfully investigate and determine the proper lawful vote counts when the general election was marked with inaccuracy and loss of integrity over absentee ballots and other serious statutory violations such as failure to require bipartisan oversight at absent voting counting boards.

## STATEMENT OF FACTS

39.     The Nation held its general election on November 3, 2020 ("Election").

40.     Registered Voters in Michigan allegedly cast 5,539,302 total votes for president.[2]

41.     Registered Voters in Michigan allegedly cast 3,507,410 absentee ballots according to statewide records.

42.     Petitioners' experts as explained below reveal that **at least 508,016 ballots** in Michigan were unlawful and did not conform to established Michigan Election Law. See generally, Expert Reports of Matthew Braynard and Dr. Qianying "Jennie" Zhang, attached hereto in Petitioner's **Appendix** 278-300.

---

[2] See Secretary of State, official election results at
https://mielections.us/election/results/2020GEN_CENR.html

RECEIVED by MSC 11/26/2020 2:44:12 AM

43.     This is a shocking total, exceeding 14.4% of the absentee ballots and over 9.1% of the total popular vote count.

44.     State records also report 878,102 total votes (absentee and in person) cast in Wayne County, Michigan.

45.     The TCF Center contained 134 Absent Voter Counting Boards ("AVCBs"), and it was the only facility within Wayne County authorized to count ballots for the City of Detroit.

46.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all the ballots throughout the City of Detroit.

47.     William Hartman is a member of the Wayne County Board of Canvassers.  He determined that about 71% of Detroit's AVCBs were left unbalanced and _unexplained_.  See Affidavit of William Hartman; **Appendix** 17-18 at ¶6 (emphasis in original).

48.     Monica Palmer, Chairperson of the Wayne County Board of Canvassers, said under oath that more than 70% of the AVCBs in Detroit did not balance and many had no explanation to why they did not balance.  See Affidavit of Monica Palmer, **Appendix** 24 at ¶16.

49.     Palmer and Hartman first refused to certify the election results based on these and other serious discrepancies and irregularities.  Affidavit of William Hartman; **Appendix** 18 at ¶7.

50.     Before the county canvassing deadline, the two Republican members of the Wayne County Board of Canvasser refused to certify the improper votes from Wayne County.[3]

51.     The two canvassers changed their minds after being given inaccurate assurances of a state-wide audit and under duress, only to change them again the next day once they were safely

---

[3] After being harassed and berated for several hours, and based on assurances of a full and independent audit, the two Republican Wayne County Board of Canvasser Members capitulated under inaccurate inducement, duress, and coercion. See Affidavits of Palmer and Hartmann, _supra_.

RECEIVED by MSC 11/26/2020 2:44:12 AM

outside and had consulted with independent counsel.  Affidavit of William Hartman; **Appendix** 19 at ¶12; Affidavit of Monica Palmer, **Appendix** 24 at ¶20.

52.     Among other problems, Palmer and Hartmann "found" 14,000 unaccounted for votes, which ostensibly changed the outcome of at least one judicial race, but left unresolved many unanswered questions.

53.     Other eyewitnesses as outlined below and in the attached Appendix saw serious irregularities in Detroit, elsewhere in Wayne County, and throughout the State.

## I.     Respondents' Failure to Allow Meaningful Observation Offends the State Statute and the Michigan and Federal Constitutions.

54.     Michigan law generally allows the public the right to observe the counting of ballots. See MCL 168.765a(12)("At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed.").

55.     The Michigan Constitution provides all lawful voters with "[t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."  Const 1963, art 2, § 4(1)(h).

56.     Indeed, "[a]ll rights set forth in this subsection shall be self-executing.  This subsection <u>shall be liberally construed in favor of voters' rights</u> in order to effectuate its purposes." Id. (emphasis added).

57.     The public's right to observe applies to counting both in-person and absentee ballots.[4]

---

[4] Regrettably, Defendants and their agents have exclusive possession of the ballots, ballot boxes, and other indicia of voting irregularities so a meaningful audit cannot timely occur. Normally, "[a] person requesting access to voted ballots is entitled to a response from the public body within 5 to

RECEIVED by MSC 11/26/2020 2:44:12 AM

58.     Respondents and their agents failed to grant meaningful observation opportunities to the public over the absentee ballots.  See Affidavit of Angelic Johnson, **Appendix** 26 at ¶12; Affidavit of Zachary C. Larsen, **Appendix** 8 at ¶¶37-55; Affidavit of G Kline Preston IV, **Appendix** 53 at ¶8; Affidavit of Articia Boomer, **Appendix** 65 at ¶21; Affidavit of Phillip O'Halloran, **Appendix** 74 at ¶¶18-19; Affidavit of Robert Cushman, **Appendix** 95 at ¶3; Affidavit of Jennifer Seidl, **Appendix** 97 at ¶6; Affidavit of Andrew Sitto, **Appendix** 58 at ¶¶23; Affidavit of Kristina Karamo, **Appendix** 61 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 101 at ¶35, 102 at ¶42; Affidavit of Cassandra Brown **Appendix** 109 at ¶33; Affidavit of Adam di Angeli, **Appendix** 122 at ¶30; Affidavit of Kayla Toma **Appendix** 144 at ¶¶14-15, 146 at ¶21, 147 at ¶¶31-32; Affidavit of Matthew Mikolajczak, **Appendix** 156; Affidavit of Braden Giacobazzi, **Appendix** 161 at ¶¶3, 5, 162 at ¶8; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

59.     Wayne County is the most populous county in Michigan.

60.     Detroit is the largest city in Wayne County.

61.     The City of Detroit's observation procedures, for example, failed to ensure transparency and integrity as it did not allow the public to see election officials during key points of absentee ballot processing in the AVCBs at TCF Arena (f/k/a Cobo Hall).  *Id.*

62.     These irregularities were repeated elsewhere in Wayne County, including in Canton Township, and throughout the State. See generally, Affidavits of Cassandra Brown **Appendix** 109 at ¶34; Lucille Ann Huizinga, **Appendix** 185 at ¶31; Laurie Ann Knott, **Appendix** 180 at ¶¶34-35; Marilyn Jean Nowak **Appendix** 189 at ¶17; Marlene K. Hager, **Appendix** 192 at ¶¶19-23; and

---

10 business days; however, the public body in possession of the ballots may not provide access for inspection or copying until 30 days after certification of the election by the relevant board of canvassers." Op.Atty.Gen.2010, No. 7247, 2010 WL 2710362.

RECEIVED by MSC 11/26/2020 2:44:12 AM

Sandra Sue Workman **Appendix** 198 at ¶33 (allegedly sending ballots from Grand Rapids to TCF Center to be processed and counted).

63.    For instance, when absentee ballots arrived, the ballots should have been in an envelope, signed, sealed (and delivered) by the actual voter.  Often it was not.

64.    Ballots were taken from their envelopes and inspected to determine whether any deficiencies would obstruct the ballot from being fed through a tabulation machine.  If any deficiencies existed (or were created by tampering), the ballot was hand duplicated.

65.    There are credible allegations that Democrat officials and election workers repeatedly scanned ballots in high-speed scanners, often counting the same ballot more than once. Affidavit of Articia Boomer, **Appendix** 64 at ¶¶10-11, 13; Affidavit of William Carzon, **Appendix** 140 at ¶8; Affidavit of Matthew Mikolajczak **Appendix** 154; Affidavit of Melissa Carone, **Appendix** 159 at ¶¶3-4.

66.    The evidence will also show that these hand duplication efforts ignored the legislative mandate to have one person from each major party sign every duplicated vote (*i.e.*, one Republican and one Democrat had to sign each "duplicated" ballot and record it in the official poll book).

67.    Several poll watchers, inspectors, and other whistleblowers witnessed the surge of unlawful practices described above. Affidavit of Melissa Carone, **Appendix** 159 at ¶9.

68.    The evidence shows the unlawful practices provided cover for careless or unscrupulous officials or workers to mark choices for any unfilled elections or questions on the ballot, potentially and substantially affecting down ballot races where there are often significant undervotes, or causing the ballots to be discarded due to overvotes.

RECEIVED by MSC 11/26/2020 2:44:12 AM

**II.      Summary of Election Malfeasance at the TCF Center Shows Widespread Problems that only this Court can Alleviate in the Short Term.**

69.     There were many issues of mistake, fraud, and other malfeasance at the TCF Center during the Election and during the counting process thereafter.

70.     On election day, election officials at the TCF Center systematically processed and counted ballots from voters whose names failed to appear in either the Qualified Voter File ("QVF") or in the supplemental sheets.  When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted. See Affidavit of Zachary C. Larsen, **Appendix** 7 at ¶33; Affidavit of Robert Cushman, **Appendix** 95 at ¶7.

71.     On election day, election officials at the TCF Center instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶15.

72.     After the statutory deadlines passed and local officials had announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in unsecure trays at the TCF Center.

73.     There were tens of thousands of these late-arriving absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates. See Affidavit of John McGrath **Appendix** 135 at ¶8.

74.     Election officials at the TCF Center instructed election workers to process ballots that appeared after the election deadline and to inaccurately report or backdate those ballots as having been received before the November 3, 2020, deadline.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶17.

RECEIVED by MSC 11/26/2020 2:44:12 AM

75.     Election officials at the TCF Center systematically used inaccurate information to process ballots. Affidavit of Cassandra Brown, **Appendix** 109 at ¶33.

76.     Many times, the election workers overrode the software by inserting new names into the QVF after the election deadline or recording these new voters as having a birthdate of "1/1/1900," which is the "default" birthday.  See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

77.     Each day before the election, City of Detroit election workers and employees coached voters to vote for Joe Biden and the Democratic Party candidates.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶8.

78.     These workers, employees, and so-called consultants encouraged voters to vote a straight Democratic Party ticket.  These election workers went over to the voting booths with voters to watch them vote and to coach them as to which candidates they should vote for.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶8.

79.     Before and after the statutory deadline, unsecured ballots arrived at the TCF Center loading garage, loose on the floor not in sealed ballot boxes—with no chain of custody and often with no secrecy envelopes.  Affidavit of Articia Boomer, **Appendix** 63 at ¶8, 64 at ¶¶9, 18.

80.     Election officials and workers at the TCF Center duplicated ballots by hand without allowing poll challengers to check if the duplication was accurate.  See Affidavit Andrew Sitto, **Appendix** 57 at ¶9; Affidavit of Phillip O'Halloran **Appendix** 75 at ¶22; Affidavit of Eugene Dixon, **Appendix** 113 at ¶5.

RECEIVED by MSC 11/26/2020 2:44:12 AM

81.     In fact, election officials repeatedly obstructed poll challengers from observing. See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶33.

82.     Election officials violated the plain language of the law MCL 168.765a by permitting thousands of ballots to be filled out by hand and duplicated on site without oversight from bipartisan poll challengers.

83.     After poll challengers started uncovering the statutory violations at the TCF Center, election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots, if not more, were improperly processed. See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 101 at ¶32, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Anna England, **Appendix** 115 at ¶¶5,7; Affidavit of Matthew Mikolajczak **Appendix** 155; Affidavit of Braden Giacobazzi, **Appendix** 162 at ¶6.

## III.    Suspicious Funding and Training of Election Workers

84.     In September, the Detroit City council approved a $1 million contract for the staffing firm P.I.E. Management, LLC to hire up to 2,000 workers to work the polls and to staff the ballot counting machines at the TCF Center.  P.I.E. Management, LLC is owned and controlled by a Democratic Party operative.

85.     A week after approval, P.I.E. Management, LLC began advertising for workers, stating, "Candidates must be 16 years or older.  Candidates are required to attend a 3-hour training session before the General Election.  The position offers two shifts and pay-rates: 1) From 7 am to

7 pm at $600.00; and 2) From 10 pm to 6 am at $650." Consequently, these temporary workers were earning at least $50 per hour—far exceeding prevailing rates at most rural communities.

86.     Upon information and belief, the evidence will show that this money and much more came from a single private source: Mark Zuckerberg and his spouse, through the charity called CTCL, which paid over $400 million nationwide to Democrat-favoring election officials and municipalities. See generally, Expert Report of James Carlson, **Appendix** 245-276.

87.     The improper private funding to Michigan exceeded $9.8 million. *Id.* at 252 and 255.

## IV.     Forging Ballots on the QVF

88.     Whistleblowers observed election officials processing ballots at the TCF Center without confirming that the voter was eligible to vote.  See Affidavit of Zachary C. Larsen, **Appendix** 4 at ¶12.

89.     Whistleblowers observed election officials assigning ballots to different voters, causing a ballot being counted for a non-eligible voter by assigning it to a voter in the QVF who had not yet voted. See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

## V.     Changing Dates on Ballots

90.     All lawful absentee ballots were supposed to be in the QVF system by 9:00 p.m. on November 3, 2020.

91.     This deadline had to bet met to ensure an accurate final list of absentee voters who returned their ballots before the statutory deadline of 8:00 p.m. on November 3, 2020.

92.     To have enough time to process the absentee ballots, Respondents told polling locations to collect the absentee ballots from the drop-boxes every hour on November 3, 2020.

93.     On November 4, 2020, a City of Detroit election whistleblower at the TCF Center was told to improperly pre-date the receive date for absentee ballots that were not in the QVF as if they had been received on or before November 3, 2020.  The Whistleblower swore she was told to alter the information in the QVF to inaccurately show that the absentee ballots had been timely received.  She estimates that this was done to thousands of ballots.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶17.

## VI.     Double Voting

94.     An election worker in the City of Detroit observed several people who came to the polling place to vote in-person, but they had already applied for an absentee ballot.  See Affidavit of Jessy Jacobs, **Appendix** 13 at ¶10; Affidavit of Anna England, **Appendix** 124-125 at ¶45.

95.     Election officials allowed these people to vote in-person, and they did not require them to return the mailed absentee ballot or sign an affidavit that the voter lost or "spoiled" the mailed absentee ballot as required by law and policy.

96.     This illicit process allowed people to vote in person and to send in an absentee ballot, thereby voting twice.  This "double voting" was made possible by the unlawful ways in which election officials were counting and inputting ballots at the TCF Center from across the City's several polling places.

97.     The Secretary of State's absentee ballot scheme exacerbated this "double voting," as set forth further in this Petition. See also, Expert Report of Matthew Braynard, **Appendix** 282 at ¶6.

RECEIVED by MSC 11/26/2020 2:44:12 AM

## VII.  First Wave of New Ballots

98.     Early in the morning of November 4, 2020, tens of thousands of ballots were suddenly brought into the counting room at the TCF Center through the back door.  See Affidavit of John McGrath **Appendix** 134 at ¶4 (around 3:00 a.m.); Affidavit of Articia Boomer, **Appendix** 64 at ¶18 (around 4:00 a.m.); Affidavit of William Carzon, **Appendix** 141 at ¶11 (around 4:00 a.m.); Affidavit Andrew Sitto, **Appendix** 57 at ¶16 (alleges about 4:30 a.m.).

99.     These new ballots were brought to the TCF Center by vehicles with out-of-state license plates.  See Affidavit of Andrew Sitto, **Appendix** 57 at ¶15.

100.    Whistleblowers claim that all of these new ballots were cast for Joe Biden.  See Affidavit of Andrew Sitto, **Appendix** 57 at ¶¶17-18.

101.    Upon information and belief, inexplicably, these ballots still do not share or have the markings establishing the proper chain of custody from valid precincts and clerks and are among the approximately 70% of unmatched AVCB errors identified by Palmer and Hartmann.

## VIII.  Second Wave of New Ballots

102.    The ballot counters needed to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list—the list of all persons who had registered to vote on or before November 1, 2020 (the QVF).

103.    The ballot counters were also provided with supplemental sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020.

104.    The validation process for a ballot requires the name on the ballot match with a registered voter on either the QVF or the supplemental sheets.

105.    At around 9:00 p.m. on Wednesday, November 4, 2020, several more boxes of ballots were brought to the TCF Center.  This was a second wave of new ballots.

RECEIVED by MSC 11/26/2020 2:44:12 AM

106.     Election officials instructed the ballot counters to use the "default" date of birth of January 1, 1900, on all of these newly appearing ballots.  See Affidavit of John McGrath **Appendix** 135 at ¶8; Affidavit of Kristina Karamo **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi **Appendix** 163 at ¶10; Affidavit of Kristy Klamer **Appendix** 174 at ¶13.

107.     None of the names on these new ballots corresponded with any registered voter on the QVF or the supplemental sheets.  See Affidavit of John McGrath, **Appendix** 135 at ¶¶7, 14, 136 at ¶¶16-18.

108.     Despite election rules requiring all absentee ballots to be inputted into the QVF system before 9:00 p.m. the day before, election workers inputted these new ballots into the QVF, manually adding each voter to the list *after* the deadline.

109.     Upon information and belief, almost all of these new ballots were entered into the QVF using the "default" date of birth of January 1, 1900.  See Affidavit of John McGrath, **Appendix** 135 at ¶8; Affidavit of Kristina Karamo, **Appendix** 61 at ¶6; Affidavit of Robert Cushman, **Appendix** 95 at ¶¶10-12, 96 at ¶16; Affidavit of Jennifer Seidl, **Appendix** 103 at ¶¶52-53; Affidavit of Braden Giacobazzi, **Appendix** 163 at ¶10; Affidavit of Kristy Klamer, **Appendix** 174 at ¶13.

110.     These newly received ballots were either fabricated or apparently cast by persons who were not registered to vote before the polls closed at 8:00 p.m. on election day.

111.     Upon information and belief, inexplicably, these ballots still do not share or have the markings establishing the proper chain of custody from valid precincts and clerks and are among the approximately 70% of unmatched AVCB errors identified by Palmer and Hartmann.

RECEIVED by MSC 11/26/2020 2:44:12 AM

See *generally* Affidavits of Monica Palmer and William Hartman, **Appendix** 17 at ¶6 and 24 at ¶14.

112.   This means there were more votes tabulated than there were ballots in over 71% of the 134 AVCBs in Detroit.  That equates to over 95 AVCB being significantly "off." *Id.*

113.   According to public testimony before the state canvassers on November 23, City of Detroit Election Consultant Daniel Baxter admitted in some instances the imbalances exceeded 600 votes per AVCB.  He did not reveal the total disparity.

**IX.    Concealing the Malfeasance in Violation of Michigan law.**

114.   Many election challengers were denied access to observe the counting process by election officials at the TCF Center.  See Affidavit of Angelic Johnson, **Appendix** 26 at ¶12; Affidavit of Zachary C. Larsen, **Appendix** 8 at ¶¶37-55; Affidavit of G Kline Preston IV, **Appendix** 53 at ¶8; Affidavit of Articia Boomer, **Appendix** 65 at ¶21; Affidavit of Phillip O'Halloran, **Appendix** 74 at ¶¶18-19; Affidavit of Robert Cushman, **Appendix** 95 at ¶3; Affidavit of Jennifer Seidl, **Appendix** 97 at ¶6; Affidavit of Andrew Sitto, **Appendix** 58 at ¶23; Affidavit of Kristina Karamo, **Appendix** 61 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 101 at ¶35, 102 at ¶42; Affidavit of Cassandra Brown **Appendix** 109 at ¶33; Affidavit of Adam di Angeli **Appendix** 122 at ¶30; Affidavit of Kayla Toma **Appendix** 144 at ¶¶14-15, 146 at ¶21, 147 at ¶¶31-32; Affidavit of Matthew Mikolajczak **Appendix** 156; Affidavit of Braden Giacobazzi **Appendix** 161 at ¶¶3, 5, 162 at ¶8; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

115.   After denying access to the counting rooms, election officials at the TCF Center used large pieces of cardboard to block the windows to the counting room, thereby preventing anyone from watching the ballot counting process.  See Affidavit of Zachary C. Larsen, **Appendix**

RECEIVED by MSC 11/26/2020 2:44:12 AM

10 at ¶52; Affidavit of John McGrath **Appendix** 135 at ¶10; Affidavit of Andrew Sitto, **Appendix** 58 at ¶22.

116.     Respondents have continued to conceal their efforts by refusing meaningful bipartisan access to inspect the ballots.  Even if Republicans were involved in oversight roles by statute (such as with the Wayne County Canvassing Board), the Republican members have been harassed, threatened, and doxed (including publicly revealing where their children go to school) to pressure them to capitulate and violate their statutory duties.  This conduct is beyond the pale and shocking to the conscience.  See Affidavit of William Hartman; **Appendix** 18 at ¶8; Affidavit of Monica Palmer, **Appendix** 24-25 at ¶¶18-22, and 24; Affidavit of Dr. Phillip O'Halloran, **Appendix** 76 at ¶24-25; Affidavit of Jennifer Seidl, **Appendix** 99 at ¶23, 100 at ¶¶27, 30-31, 101 at ¶¶36-37; Affidavit of Eugene Dixon, **Appendix** 114 at ¶9; Affidavit of Matthew Mikolajczak, **Appendix** 156; Affidavit of Mellissa Carone **Appendix** 160 at ¶12; Affidavit of Braden Giacobazzi, **Appendix** 161 at ¶3, 162 at ¶7, 163 at 12, 164 at ¶¶12-14; Affidavit of Kaya Toma **Appendix** 144 at ¶15; Affidavit of Kristy Klamer **Appendix** 172 at ¶¶4-5, 173 at ¶¶6-9.

**X.      Unsecured QVF Access further Violating MCL 168.765a,** *et seq***.**

117.     Whenever an absentee voter application or in-person absentee voter registration was finished, election workers at the TCF Center were instructed to input the voter's name, address, and date of birth into the QVF system.

118.     The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with Internet access.

119.     This access permits anyone with the proper credentials to edit when ballots were sent, received, and processed from any location with Internet access.

120.    Many of the counting computers within the counting room had icons that revealed that they were connected to the Internet.

121.    Respondent Benson executed a contract to give a private partisan group, Rock the Vote, unfettered real-time access to Michigan's QVF. See Rock the Vote Agreement, **Appendix** 327.

122.    She sold or gave Michigan citizens' private voter information to private groups in furtherance of her own partisan goals.

123.    Benson and the State repeatedly concealed this unlawful contract and have refused to tender a copy despite several lawful requests for the government contract under FOIA.

124.    Improper access to the QVF was one of the chief categories of serious concern identified by the Michigan Auditor General's Report, **Appendix** 207 at material finding #2.

125.    Upon information and belief, Benson made it worse, not better.  In the most charitable light, this was incredibly naïve.  More cynically, Benson likely acted in furtherance of her partisan political goals and in dereliction of her statutory and constitutional duties.

## XI.    Unsecured Ballots

126.    A poll challenger witnessed tens of thousands of ballots, and possibly more, being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container.

127.    Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops.  See Affidavit of Daniel Gustafson, **Appendix** 112 at ¶¶4-6; see the photo of the TCF Center below:

RECEIVED by MSC 11/26/2020 2:44:12 AM



128.    These ballot bins and containers did not have lids, were unsealed, and could not have a metal seal.  See Affidavit of Rhonda Webber, **Appendix** 43 at ¶3.

129.    Some ballots were found unsecured on the public sidewalk outside the Department of Elections in the City of Detroit, reinforcing the claim that boxes of ballots arrived at the TCF Center unsealed, with no chain of custody, and with no official markings.  A photograph of ballots found on the sidewalk outside the Department of Elections appears below:



130.    The City of Detroit held a drive-in ballot drop off where individuals would drive up and drop their ballots into an unsecured tray.  No verification was done.  This was not a secured drop-box with video surveillance.  To encourage this practice, free food and beverages were provided to those who dropped off their ballots using this method.  See Affidavit of Cynthia Cassell **Appendix** 28 at ¶3 and 29 ¶¶9-10.

RECEIVED by MSC 11/26/2020 2:44:12 AM

**XII.    Breaking the Seal of Secrecy Undermines Constitutional Liberties under Const Art 2, § 4(1)(a).**

131.    Many times, election officials at the TCF Center broke the seal of secrecy for ballots to check which candidates the individual voted for on his or her ballot, thereby violating the voter's expectation of privacy.  See Affidavit of Zachary C. Larsen; **Appendix** 5 at ¶16-18, 20.

132.    Voters in Michigan have a constitutional right to open elections, and the Michigan Legislature provided them the right to vote in secret.  Respondents' conduct, together with others, violates both of these hallmark principles.  See Affidavit of Jennifer Seidl, **Appendix** 99 at ¶18.

133.    In Michigan, it is well-settled that the election process is supposed to be transparent and the voter's ballot secret, not the other way around.

134.    Here, Respondents' absentee ballot scheme has improperly revealed voters' preferences exposing Petitioners' and similarly-situated voters to dilution or spoliation while simultaneously obfuscating the inner workings of the election process.

135.    Now the Respondents seek to perform an "audit" on themselves.

**XIII.    Statewide Irregularities Over Absentee Ballots Reveal Widespread Mistake or Fraud.**

136.    Whenever a person requested an absentee ballot either by mail or in-person, that person needed to sign the absentee voter application.

137.    When the voter returned their absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

138.    Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.  See Affidavit of Jennifer Seidl, **Appendix** 103 at ¶60.

RECEIVED by MSC 11/26/2020 2:44:12 AM

139.    Election officials at the TCF Center, for example, instructed workers not to validate or compare signatures on absentee ballot applications and absentee ballot envelopes to ensure their authenticity and validity.  See Affidavit of Jessy Jacobs, **Appendix** 14 at ¶15.

140.    Michigan law requires absentee votes to be counted by election inspectors in a particular manner.  It requires, in relevant part:

> (10) The oaths administered under subsection (9) must be placed in an envelope provided for the purpose and sealed with the red state seal.  Following the election, the oaths must be delivered to the city or township clerk. Except as otherwise provided in subsection (12), a person in attendance at the absent voter counting place or combined absent voter counting place shall not leave the counting place after the tallying has begun until the polls close.  Subject to this subsection, the clerk of a city or township may allow the election inspectors appointed to an absent voter counting board in that city or township to work in shifts.  A second or subsequent shift of election inspectors appointed for an absent voter counting board may begin that shift at any time on election day as provided by the city or township clerk.  However, an election inspector shall not leave the absent voter counting place after the tallying has begun until the polls close.  If the election inspectors appointed to an absent voter counting board are authorized to work in shifts, at no time shall there be a gap between shifts and the election inspectors must never leave the absent voter ballots unattended.  **At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed**.  A person who causes the polls to be closed or who discloses an election result or in any manner characterizes how any ballot being counted has been voted in a voting precinct before the time the polls can be legally closed on election day is guilty of a felony.

MCL  168.765a (10) (emphasis added).

141.    Under MCL 168.31, the Secretary of State can issue instructions and rules consistent with Michigan statutes and the Constitution that bind local election authorities. Likewise, under MCL 168.765a(13), the Secretary can develop instructions consistent with the law for the conduct of Absent Voter Counting Boards ("AVCB") or combined AVCBs.  "The instructions developed under [] subsection [13] are binding upon the operation of an absent voter counting board or combined absent voter counting board used in an election conducted by a county, city, or township."  MCL 168.765a(13).

RECEIVED by MSC 11/26/2020 2:44:12 AM

142.     Benson also promulgated an election manual that requires bipartisan oversight:

Each ballot rejected by the tabulator must be visually inspected by an election inspector to verify the reason for the rejection.  **If the rejection is due to a false read the ballot must be duplicated by two election inspectors who have expressed a preference for different political parties.**  Duplications may not be made until after 8 p.m. in the precinct (place the ballot requiring duplication in the auxiliary bin).  At an AV counting board duplications can be completed throughout the day. NOTE: The Bureau of Elections has developed a video training series that summarizes key election day management issues, including a video on Duplicating Ballots.  These videos can be accessed at the Bureau of Elections web site at www.michigan.gov/elections; under "Information for Election Administrators"; Election Day Management Training Videos. Election Officials Manual, Michigan Bureau of Elections, Chapter 8, last revised October 2020.

https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf (emphasis added).

143.     Election officials at the TCF Center flouted § 168.765a because there were not, at all times, at least one inspector from each political party at the absentee voter counting place. Rather, the many tables assigned to precincts under the authority of the AVCB were staffed by inspectors for only one party.  Those inspectors alone were deciding on the processing and counting of ballots.  See Affidavit of Jennifer Seidl, **Appendix** 98 at ¶9; Affidavit of Eugene Dixon, **Appendix** 113 at ¶5; Affidavit of Mellissa Carone, **Appendix** 159 at ¶5.

144.     This processing included the filling out of brand new "cure" or "duplicate" ballots. The process the election officials sanctioned worked in this way.  When an absentee ballot was processed and approved for counting, it was fed into a counting machine.  Some ballots were rejected—that is, they were a "false read"—because of tears, staining (such as coffee spills), over-votes, and other errors.  In some of these cases, inspectors could visually inspect the rejected ballot and determine what was causing the machine to find a "false read."  When this happened, the inspectors could duplicate the ballot, expressing the voter's intent in a new ballot that could then be fed into the machine and counted.

145.     Under § 168.765a and the Secretary of State's controlling manual, as cited above, an inspector from each major party must be present and must sign to show that they approve of the duplication.

146.     Rather than following this controlling mandate, the AVCB was allowing a Democratic Party inspector only to fill out a duplicate.  Republicans would sign only "if possible."  See Affidavit of Patricia Blackmer, **Appendix** 90 at ¶11.  A photograph evidencing this illicit process appears below:



147.     The TCF Center election officials allowed hundreds or thousands of ballots to be "duplicated" solely by the Democratic Party inspectors and then counted in violation of Michigan election law.  See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶¶4-5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Phillip O'Halloran, **Appendix** 75 at ¶22; Affidavit of Anna England, **Appendix** 115 at ¶8.

148.     According to eyewitness accounts, election officials at the TCF Center habitually and systematically disallowed election inspectors from the Republican Party to be present in the voter counting place and refused access to election inspectors from the

RECEIVED by MSC 11/26/2020 2:44:12 AM

Republican party to be within a close enough distance from the absentee voter ballots to see for whom the ballots were cast.

149.     Election officials at the TCF Center refused entry to official election inspectors from the Republican Party into the counting place to observe the counting of absentee voter ballots. Election officials even physically blocked and obstructed election inspectors from the Republican party by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.  See Affidavit of Zachary C. Larsen, **Appendix** 8-11 at ¶¶37-55; Affidavit of Janice Hermann, **Appendix** 81 at ¶5; Affidavit of Jennifer Seidl, **Appendix** 100 at ¶29, 101 at ¶32, 102 at ¶42; Affidavit of Cassandra Brown, **Appendix** 109 at ¶¶33; Affidavit of Anna England, **Appendix** 115 at ¶¶5,7; Affidavit of Matthew Mikolajczak, **Appendix** 155; Affidavit of Braden Giacobazzi, **Appendix** 162 at ¶6.

150.     Absentee ballots from military members, who tend to vote Republican in the general elections, were counted separately at the TCF Center.  All (100%) of the military absentee ballots had to be duplicated by hand because the form of the ballot was such that election workers could not run them through the tabulation machines used at the TCF Center. See Affidavit of Janice Hermann, **Appendix** 82 at ¶16.

151.     These military ballots were supposed to be the last ones counted, but there was another large drop of ballots that occurred during the counting of the military absentee ballots. *Id*. see also, Affidavit of Robert Cushman, **Appendix** 95 at ¶¶4-5.

152.     Worse, the military absentee ballot count at the TCF Center occurred after the Republican challengers and poll watchers were kicked out of the counting room. *Id*. Affidavit of Jennifer Seidl, Appendix 102 at ¶42.

RECEIVED by MSC 11/26/2020 2:44:12 AM

153.    The Michigan Legislature also requires City Clerks to post the following absentee voting information anytime an election is conducted that involves a state or federal office:

> a.      The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.
>
> b.      The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.
>
> c.      The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

See MCL 168.765(5).

154.    Upon information and belief, the clerk for the City of Detroit failed to post by 8:00 a.m. on "Election Day" the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voter ballots returned both before and on "Election Day."

155.    According to Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8 p.m.  MCL 168.764a.  Any absentee voter ballots received by the clerk after the close of the polls on election day should not be counted.

156.    The Michigan Legislature allows for early counting of absentee votes before the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

157.    Upon information and belief, receiving tens of thousands more absentee ballots in the early morning hours after Election Day and after the counting of the absentee ballots had already concluded, without proper oversight, with tens of thousands of ballots attributed to just

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM

one candidate, Joe Biden, confirms that election officials failed to follow proper election protocols and established Michigan election law.  See Affidavit of John McGrath **Appendix** 134 at ¶4; Affidavit of Robert Cushman, **Appendix** 96 at ¶14.

158.    Missing the statutory deadline proscribed by the Michigan Legislature for turning in the absentee ballot or timely updating the QVF invalidates the vote under Michigan Election Law and the United States Constitution.

159.    Poll challengers observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the QVF or on any supplemental sheets. See Affidavit of Angelic Johnson **Appendix** 26 at ¶7; Affidavit of Adam di Angeli **Appendix** 129 at ¶61; see also, Affidavit of John McGrath, *supra*; Affidavit of Kristina Karamo, *supra*; Affidavit of Robert Cushman, *supra*; Affidavit of Jennifer Seidl, *supra*; Affidavit of Braden Giacobazzi, *supra*; Affidavit of Kristy Klamer, *supra*.

## XIV.    Flooding the Election with Absentee Ballots was Improper.

160.    Michigan does not permit "mail-in" ballots *per se*, and for good reason: mail-in ballots facilitate fraud and dishonest elections.  See, e.g., *Veasey v Abbott*, 830 F3d 216, 256, 263 (CA5, 2016) (observing that "mail-in ballot fraud is a significant threat—unlike in-person voter fraud," and comparing "in-person voting—a form of voting with little proven incidence of fraud" with "mail-in voting, which the record shows is far more vulnerable to fraud").

RECEIVED by MSC 11/26/2020 2:44:12 AM

161.    Yet Respondent Benson's absentee ballot scheme, as explained in this Petition, achieved the same purpose as mail-in ballots—contrary to Michigan law. In the most charitable light, this was profoundly naïve and cut against the plain language and clear intent of the Michigan Legislature to limit fraud.  More cynically, this was an intentional effort to favor her preferred candidates.

162.    Upon information and belief, she put this scheme in place because it is generally understood that Republican voters were more likely to vote in-person.  This trend has been true for decades and proved true with this Election too.  See Expert Report of John McLaughlin, **Appendix** 301-303.

163.    To counter this (*i.e.,* the fact that Republicans are more likely than Democrats to vote in-person), Respondent Benson implemented a scheme to permit mail-in voting, leading to this dispute and the absentee ballot scheme that unfairly favored Democrats over Republicans.

164.    In her letter accompanying her absentee ballot scheme, Respondent Benson misstated, "You have the right to vote by mail in every election."  Playing on the fears created by the current pandemic, Respondent Benson encouraged voting "by email," stating, "During the outbreak of COVID-19, it also enables you to stay home and stay safe while still making your voice heard in our elections."  Affidavit of Christine Muise, **Appendix** 46 at ¶2, Ex A.

165.    Prior to election day, the Democratic Party's propaganda was to push voters to vote by mail and to vote early.  Democratic candidates used the fear of the current pandemic to promote this agenda—an agenda that would benefit Democratic Party candidates.  For example, on September 14, 2020, the Democratic National Committee announced the following:

> Today Biden for President and the Democratic National Committee are announcing new features on IWillVote.com—the DNC's voter participation website—that will help voters easily request and return their ballot by mail, as well as learn important information about the voting process in their state as they make their plan to vote.

RECEIVED by MSC 11/26/2020 2:44:12 AM

> Previously, an individual could use the site to check or update their registration and find voting locations.  Now the new user experience will also guide a voter through their best voting-by-mail option . . . .

(available at https://democrats.org/news/biden-for-president-dnc-announce-new-vote-by-mail-features-on-iwillvote-com/ (last visited Nov. 17, 2020)).

> According to the Associated Press:

> "We have to make it easier for everybody to be able to vote, particularly if we are still basically in the kind of lockdown circumstances we are in now," Biden told about 650 donors. "But that takes a lot of money, and it's going to require us to provide money for states and insist they provide mail-in ballots."

(available at https://apnews.com/article/6cf3ca7d5a174f2f381636cb4706f505 (last visited Nov. 17, 2020)).

166.    Similar statements were repeatedly publicly on the Secretary of State's website:

> <u>**Voters are encouraged to vote at home with an absentee ballot**</u> and to return their ballot as early as possible by drop box, in person at their city or township clerk's office, or well in advance of the election by mail.

https://www.michigan.gov/sos/0,4670,7-127-1633_101996---,00.html (emphasis added).

167.    The Michigan Legislature set forth detailed requirements for absentee ballots, and these requirements are necessary to prevent voter fraud because it is far easier to commit fraud via an absentee ballot than when voting in person.  See, e.g., *Griffin v Roupas*, 385 F3d 1128, 1130-31 (CA7, 2004) ("Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting").  Michigan law plainly limits the ways you may get an absentee ballot:

> (1) Subject to section 761(3), at any time during the 75 days before a primary or special primary, but not later than 8 p.m. on the day of a primary or special primary, *an elector may apply for an absent voter ballot.  The elector <u>shall</u> apply in person or by mail* with the clerk of the township or city in which the elector is registered.  The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election.  Except as otherwise provided in section 761(2), the clerk of a city or township shall

RECEIVED by MSC 11/26/2020 2:44:12 AM

not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election. An application received before a primary or special primary may be for either that primary only, or for that primary and the election that follows. An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township in which the individual resides. Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk or deputy clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.

(2) Except as otherwise provided in subsection (1) and subject to section 761(3), at any time during the 75 days before an election, but not later than 8 p.m. on the day of an election, an elector may apply for an absent voter ballot. *The elector shall apply in person or by mail with the clerk of the township, city, or village in which the voter is registered*. The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election. Except as otherwise provided in section 761(2), the clerk of a city or township shall not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election. An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township in which the individual resides. Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.

(3) An application for an absent voter ballot under this section may be made in any of the following ways:

(a) By a written request **signed** by the voter.

(b) On an absent voter ballot application form provided for that purpose by the clerk of the city or township.

(c) On a federal postcard application.

(4) An applicant for an absent voter ballot **shall sign** the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application. A person shall not be in possession of a signed absent voter ballot application except for the applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official. A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.

RECEIVED by MSC 11/26/2020 2:44:12 AM

(5) The clerk of a city or township shall have absent voter ballot application forms *available in the clerk's office* at all times and shall furnish an absent voter ballot application form to anyone *upon a verbal or written request.*

MCL 168.759 (emphasis added).

168.     The Secretary of State sent *unsolicited* absentee ballot applications to every household in Michigan with a registered voter, no matter if the voter was still alive or lived at that address.

169.     The Secretary of State also sent absentee ballot requests to non-residents who were temporarily living in Michigan, such as out-of-state students who are unregistered to vote in Michigan.

170.     In many instances, the Secretary of State's absentee ballot scheme led to the Secretary of State sending ballot requests to individuals who did ***not*** request them.  See Affidavit of Christine Muise, **Appendix** 46 at ¶3. Affidavit of Rena M. Lindevaldesen, **Appendix** 167 at ¶¶1,3 and 168 ¶5.

## XV.     Expert Analysis of these statutory violations revels widespread inaccuracies and loss of election integrity.

171.     Petitioners retained experts who analyzed the State's database for the Election and related data sets, including its own call center results. See generally, Expert Report of Matthew Braynard, **Appendix** 278-288.

172.     Petitioners then retained an expert statistician to extrapolate the datasets statewide. See generally, Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 289-299.

### a.     *Unlawful unsolicited ballots cast in General Election*

173.     Braynard opined to a reasonable degree of scientific certainty that out of the 3,507,410 individuals who the State's database identifies as applying for and the State sending an

absentee ballot, that in his sample of this universe, 12.23% of those absentee voters did not request an absentee ballot to the clerk's office. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶1.

174.    These data extrapolate with 99% confidence interval that between **326,460 and 531,467** of the absentee ballots the State issued that were counted were not requested by an eligible State voter (unsolicited). Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 293 at ¶1.

### b.    *Unsolicited ballots not cast in General Election*

175.    Out of the 139,190 individuals who the State's database identifies as having not requested (unsolicited) and not returned an absentee ballot, 24.14% of these absentee voters in the State did not request an absentee ballot. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶2.

176.    These data extrapolate with 99% confidence interval that between **28,932 and 38,409** of the absentee ballots the State issued were not requested by an eligible State voter (unsolicited). Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 293 at ¶2.

177.    Using the most conservative boundary, taken together, these data suggest Respondents violated Michigan Lection Law by sending unsolicited ballots to at least **355,392 people**. *Id.* See also, Affidavit of Sandra Sue Workman, **Appendix** 197 at ¶28.

### c.    *Absentee ballots were also cast but not properly counted (improperly destroyed or spoiled)*

178.    Out of the 139,190 individuals who the State's database identifies as having not returned an absentee ballot, 22.95% of those absentee voters did in fact mail back an absentee ballot to the clerk's office. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶3.

179.    This suggests many ballots were destroyed or not counted.

RECEIVED by MSC 11/26/2020 2:44:12 AM

180.    These data extrapolate with 99% confidence interval that between **29,682 and 39,048** of absentee ballots that voters returned but were not counted in the State's official records. Expert Report of Dr. Quanying "Jennie" Zhang, **Appendix** 294 at ¶3.

181.    Out of the 51,302 individuals that had changed their address before the election who the State's database shows as having voted, 1.38% of those individuals denied casting a ballot. *Id.* at ¶4.

182.    This suggests that bad actors exploited Respondents' unlawful practice of sending unsolicited ballots and improperly harvested ballots on a widespread scale.

183.    Indeed, by not following the anti-fraud measures mandated by the Michigan Legislature, the Secretary of State's absentee ballot scheme invited the improper use of absentee ballots and promoted such unlawful practices as ballot harvesting.  See Affidavit of Rhonda Weber, **Appendix** 43 at ¶7.

184.    Using the State's databases, the databases of the several states, and the NCOA database, at least **13,248** absentee or early voters were not residents of Michigan when they voted. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶5.

185.    Of absentee voters surveyed and when comparing databases of the several states, at least **317** individuals in Michigan voted in more than one state. See Expert Report of Matthew Braynard, **Appendix** 282 at ¶6.

> d.    *Respondents ignored other statutory signature requirements*

186.    The Secretary of State also sent ballots to people who requested ballots online, but failed to sign the request.  See adverse Affidavit of Jonathan Brater, Head of Elections **Appendix** 317 at ¶10.

RECEIVED by MSC 11/26/2020 2:44:12 AM

187.    As of October 7, 2020, Brater admits sending at least **74,000 absentee ballots** without a signed request as mandated by the Michigan Legislature.  *Id.*

188.    By the Election, we must infer that the actual number of illegal ballots sent was much higher.

189.    According to state records, another **35,109 absentee votes** counted by Respondent Benson listed no address. See Braynard Report, *supra.*

190.    As a result of the absentee ballot scheme, the Secretary of State improperly flooded the election process with absentee ballots, many of which were fraudulent.

191.    The Secretary of State's absentee ballot scheme violated the checks and balances put in place by the Michigan Legislature to ensure the integrity and purity of the absentee ballot process and thus the integrity and purity of the 2020 general election.  See generally, Affidavits of Lucille Ann Huizinga, **Appendix** 185 at ¶31; Laurie Ann Knott, **Appendix** 180 at ¶¶34-35; Marilyn Jean Nowak **Appendix** 189 at ¶17; Marlene K. Hager, **Appendix** 192 at ¶¶19-23; and Sandra Sue Workman **Appendix** 198 at ¶33.

192.    Without limitation, according to state records, **3,373 votes counted** in Michigan were ostensibly from voters 100 years old or older.  See Braynard, *supra.*

193.    According to census data, however, there are only about 1,747 centenarians in Michigan,[5] and of those, we cannot assume a 100% voting rate.  See McLaughlin, *supra.*

---

[5] Based on the US Census, 0.0175 percent of Michigan's population is 100 years or older (1,729 centenarians of the total of 9,883,640 people in Michigan in 2010).  Census officials estimated Michigan's population at 9,986,857 as of July 2019, which puts the total centenarians at 1,747 or fewer.  Source:
https://www.census.gov/content/dam/Census/library/publications/2012/dec/c2010sr-03.pdf

RECEIVED by MSC 11/26/2020 2:44:12 AM

194.    According to state records, at least **259 absentee ballots counted** listed their official address as "email" or "accessible by email," which are unlawful *per se* and suggests improper ballot harvesting.  See Braynard, *supra*.

195.    According to state records, at least 109 people voted absentee from the Center for Forensic Psychiatry at 8303 PLATT RD, SALINE, MI 48176 (not necessarily ineligible felons, but the State does house the criminally insane at this location), which implies improper ballot harvesting.

196.    According to state records, at least 63 people voted absentee at PO BOX 48531, OAK PARK, MI 48237, which is registered to a professional guardian and implies improper ballot harvesting.

197.    When compared against the national social security and deceased databases, at least **9 absentee voters** in Michigan are confirmed dead as of Election Day, which invalidates those unlawful votes.  See Braynard, *supra*.

198.    Taken together, these irregularities far exceed common sense requirements for ensuring accuracy and integrity.

> e.    *Respondents did not fix other recent errors or serious irregularities either*

199.    These are the same types of serious concerns raised by the Michigan Auditor General in December 2019, **Appendix** 205-244.

200.    The Auditor General specifically found several violations of MCL 168.492:

     i.    2,212 Electors voted more than once;

ii.   230 voters were over 122 years old;[6] *Id.* at 217.

iii.   Unauthorized users had access to QVF; *Id.* at 219; and

iv.   Clerk and Elected Officials had not completed required training. *Id.* at 225.

201.   The Auditor General found election officials had not completed required training to obtain or retain accreditation in 14% of counties, 14% of cities, and 23% of townships.  *Id.*

202.   The Auditor General found 32 counties, 83 cities, and 426 townships where the clerk had not completed initial accreditation training or, if already accredited, all continuing education training as required by law.  *Id.*

203.   The Auditor General found 12 counties, 38 cities, and 290 townships where the clerk had not completed the initial accreditation or continuing education training requirements and no other local election official had achieved full accreditation. *Id.*

204.   Not only were the Auditor General's red flags ignored by Respondent Benson, but she arguably made them worse through her absentee ballot scheme.

205.   This not only suggests malfeasance, but the scheme precipitated and revealed manifest fraud and exploitation at a level Michigan has never before encountered in its elections.

206.   The abuses permitted by the Secretary of State's ballot scheme were on display at the TCF Center, and elsewhere throughout the State.

207.   Because this absentee ballot scheme applied statewide, it undermined the integrity and purity of the general election statewide, and it dilutes the lawful votes of millions of Michigan voters.

---

[6] The oldest living person confirmed by the *Guinness Book of World Records* is 117 years old and she lives in Japan, not Michigan.

XVI.   **Flooding the Election with Private Money also Violates Federal Law and Raises the Appearance of Impropriety.**

208.    Inappropriate secrecy and lack of transparency began months before Election Day with an unprecedented and orchestrated infusion of hundreds of millions of dollars into local governments nationwide.

209.    More than $9.8 million in private money was poured into Michigan to create an unfair, two-tier election system in Michigan.  See Carlson Report, *supra*.

210.    This Election will be remembered for the evisceration of state statutes designed to treat voters equally, thereby causing disparate treatment of voters and thus violating the constitutional rights of millions of Michiganders and Americans citizens.

211.    To date, Petitioners and related experts and investigations have uncovered more than $400 million funneled through a collection of non-profits directly to local government coffers nationwide dictating to these local governments how they should manage the election, often contrary to state law.  See Carlson Report, *supra*.

212.    These funds were mainly used to: 1) pay "ballot harvesters" bounties, 2) fund mobile ballot pick up units, 3) deputize and pay political activists to manage ballots; 4) pay poll workers and election judges (a/k/a inspectors or adjudicators); 5) establish drop-boxes and satellite offices; 6) pay local election officials and agents "hazard pay" to recruit cities recognized as Democratic Party strongholds to recruit other cities to apply for grants from non-profits; 7) consolidate AVCBs and counting centers to facilitate the movement of hundreds of thousands of questionable ballots in secrecy without legally required bi-partisan observation; 8) implement a two-tier ballot "curing" plan that unlawfully counted ballots in Democrat Party strongholds and spoiled similarly situated ballots in Republican Party areas; and 9) subsidized and designed a scheme to remove the poll watchers from one political party so that the critical responsibility of

RECEIVED by MSC 11/26/2020 2:44:12 AM

determining the accuracy of the ballot and the integrity of the count could be done without oversight.

213.    The Help America Vote Act of 2002 (HAVA) controls how money is spent under federal law.  See 42 USC 15301, *et seq*; see also, MCL 168.18.  In turn, Congress used HAVA to create the non-regulatory Election Assistance Commission (EAC), which was delegated the responsibility of providing information, training standards, and funding management to states.  The mechanism for administrating HAVA is legislatively adopted state HAVA Plans.

214.    Michigan's HAVA Plan is undisputed.  See Certified Michigan HAVA State Plan of 2003, Terri Lynn Land Secretary, FR Vol. 69. No. 57 March 24 2004.

215.    These private funds exceeded the federal government's March 2020 appropriation under HAVA and CARES Acts to help local governments manage the general election during the pandemic.

216.    As these unmonitored funds flowed through the pipeline directly to hand-picked cities, the outlines of two-tiered treatment of the American voter began to take place.  Local governments in Democrat Party strongholds were flush with cash to launch public-private coordinated voter registration drives allowing private access directly to government voter registration files, access to early voting opportunities, the provision of incentives such as food, entertainment, and gifts for early voters, and the off-site collection of ballots.  Outside the urban core and immediate suburbs, unbiased election officials were unable to start such efforts for lack of funding.

217.    Difficult to trace private firms funded this scheme through private grants, which dictated methods and procedures to local election officials and where the grantors retained the right to "claw-back" all funds if election officials failed to reach privately set benchmarks—thus

RECEIVED by MSC 11/26/2020 2:44:12 AM

entangling the private-public partnership in ways that demand transparency—yet none has been given.

218.    The state officials implicated, and the private interests involved, have refused repeated demands for the release of communications outlining the rationale and plan behind spending more than $400 million provided directly to various election officials before the 2020 general election.

219.    These funds greased the skids of Democrat-heavy areas violating mandates of the Michigan Legislature, the Michigan HAVA Plan, the dictates of Congress under HAVA, and equal protection and Separation of Powers demanded under the United States Constitution.

220.    In Michigan specifically, CTCL had awarded eleven grants as of the time of this survey.  CTCL funded cities were:

i.    Detroit ($3,512,000);

ii.    Lansing ($443,742);

iii.    East Lansing ($43,850);

iv.    Flint ($475,625);

v.    Ann Arbor ($417,000);

vi.    Muskegon ($433,580);

vii.    Pontiac ($405,564);

viii.    Romulus ($16,645);

ix.    Kalamazoo ($218,869); and

x.    Saginaw ($402,878).

See Expert Report of James Carlson, **Appendix** 255 (last updated November 25, 2020).

RECEIVED by MSC 11/26/2020 2:44:12 AM

221.    In the 2016 election, then candidate Donald Trump only won Saginaw; then candidate Hillary Clinton won the remaining cities.

222.    In 2020, CTCL funneled **$9,451,235 (95.7%)** to the ten jurisdictions where candidate Clinton won and only **$402,878 (4.3%)** to where candidate Trump won. *Id.*

223.    On its face, this raises serious equal protection concerns under *Bush v Gore*, which requires city, county, and state officials to faithfully—and even-handedly—administer Michigan Election Law fairly between cities, counties, and across the state.

## XVII.  Private Money Improperly Flooded into Democratic Party strongholds

224.    Only the States themselves or certain federal agencies may spend money on federal elections under HAVA.

225.    Counties and cities cannot spend money on federal elections without going through the proper state and federal channels under HAVA transparency rules.

226.    CTCL's private federal elections grants to the City of Detroit for $3,512,000 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

227.    CTCL's private federal elections grants to the City of Lansing for $443,742 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

228.    CTCL's private federal elections grants to the City of Flint for $475,625 violate federal law—and thus in turn, offend the rights of voters under the Michigan Constitution.

229.    CTCL's private federal election grants to the Michigan cities tortiously interfere with Petitioners' legal rights under federal law to legally-authorized, uniform, and fair federal elections.  See *The League of Women Voters v Blackwell*, 340 F Supp. 2d 823 (ND Ohio 2004).

230.    A government's election policy favoring certain demographic groups injures the disfavored demographic groups.  "Parity of reasoning suggests that a government can violate the

Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v Red Clay Consol Sch Dist*, 122 A3d 784, 858 (Del Ch 2015).

231.    Upon information and belief, the evidence will show that this flood of private money to Democratic-controlled areas improperly skewed the Election results for Joe Biden and unfairly prejudiced Petitioners.

232.    Petitioners do not want progressive Democrat candidates to win in the general election, and the Petitioners are injured by CTCL's private federal election grants because they are targeted to cities with progressive voter patterns—causing more progressive Democrat votes and a greater chance that progressive Democrat candidates will win.  See*, id.*

## XVIII. Irreparable Harm to Petitioners and All Legal Voters

233.    Petitioners Johnson and Dr. Traver voted for the Republican Party candidates during the 2020 general election.  These Petitioners voted for Donald J. Trump for President and John James for the United States Senate.  But for the unlawful acts set forth in this Petition, President Trump will win Michigan's 16 electoral votes and John James would be elected to the United States Senate, thereby promoting Petitioners' political interests.

234.    The unlawful acts set forth in this Petition have caused, and will continue to cause, Petitioners irreparable harm.

235.    Based on the statutory violations and other misconduct, and evidence of widespread mistake, irregularities, and fraud, it is necessary to order appropriate relief, including, but not limited to, enjoining the statewide certification of the election results pending a full and independent investigation, this Court taking immediate custody and control of the ballots, poll books, and other indicia of the voting, ordering a recount of the election results, voiding the

election, and ordering a new election as permitted by law for down ballot candidates, or at a minimum, voiding the illicit absentee ballots to remedy the unfairness, irregularities, and fraud.

236.    Petitioners have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested here is granted.

## FIRST CLAIM FOR RELIEF
### (Due Process)

237.    Petitioners incorporate by reference all stated paragraphs.

238.    Because of the acts, policies, practices, procedures, and customs, created, adopted, and enforced under color of state law, Respondents have deprived Petitioners of the right to due process guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Due Process Clause of the Michigan Constitution.

239.    In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

240.    In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

241.    Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

242.    The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment.  *Harper v Va State Bd of Elections*, 383 US 663, 665 (1966); see *also Reynolds*, 377 US at 554 (["The Fourteenth Amendment protects the] the right of all qualified citizens to vote, in state as well as in federal elections.").

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM

243.    The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 at 562.

244.    Voters have a right to cast a ballot in an election free from the taint of intimidation and fraud, and confidence in the integrity of our electoral processes is essential to the functioning of our constitutional republic.

245.    Included within the right to vote, secured by the United States and Michigan Constitutions, is the right of qualified voters within a State to cast their ballots and have them counted if they are validly cast.  The right to have the vote counted means counted at full value without dilution or discount.

246.    Every voter in a federal election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes.

247.    Invalid or fraudulent votes debase and dilute the weight of each validly cast vote.

248.    The right to an accurate count is a right possessed by each voting elector, and when the importance of his vote is negated, even in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitutions of the United States and Michigan.

249.    Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct—such as the Secretary of State's absentee ballot scheme—can and did violate the right to due process by leading to the dilution of validly cast ballots.  See *Reynolds*, 377 US at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

RECEIVED by MSC 11/26/2020 2:44:12 AM

250.    The Due Process Clauses of the Fourteenth Amendment and the Michigan Constitution protect the right to vote from conduct by state officials which undermines the fundamental fairness of the electoral process.

251.    Separate from the Equal Protection Clause, the Fourteenth Amendment's Due Process Clause protects the fundamental right to vote against the disenfranchisement of a state electorate.  The Due Process Clause of the Michigan Constitution protects the same.

252.    When an election process reaches the point of patent and fundamental unfairness, as in this case, there is a due process violation.

253.    As a result, the right to vote, the right to have one's vote counted, and the right to have one's vote given equal weight are basic and fundamental constitutional rights incorporated in the Due Process Clause of the Fourteenth Amendment, the Due Process Clause of the Michigan Constitution, and 42 USC § 1983.

254.    Respondents have a duty to guard against the deprivation of the right to vote through the dilution of validly cast ballots caused by ballot fraud or election tampering.  The Secretary of State and the Board failed in their duties.

255.    The actions of election officials at the TCF Center and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Petitioners' votes in violation of the Due Process Clause of the Fourteenth Amendment, the Due Process Clause of the Michigan Constitution, and 42 USC § 1983.

256.    As a direct and proximate result of Respondents' violation of due process, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

RECEIVED by MSC 11/26/2020 2:44:12 AM

### SECOND CLAIM FOR RELIEF

#### (Equal Protection)

257.    Petitioners incorporate by reference all stated paragraphs.

258.    Because of the acts, policies, practices, procedures, and customs, created, adopted, and enforced under color of state law, Respondents have deprived Petitioners of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Michigan Constitution's counterpart, and 42 USC § 1983.

259.    The actions of election officials at the TCF Center and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Petitioners' votes in violation of the equal protection guarantee of the Fourteenth Amendment and the Michigan Constitution.

260.    In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

261.    In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

262.    Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

263.    As a direct and proximate result of Respondents' violation of the equal protection guarantee of the United States and Michigan Constitutions, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

### THIRD CLAIM FOR RELIEF

#### (Article II, section 1, clause 2)

264.    Petitioners incorporate by reference all stated paragraphs.

265.    Through the absentee ballot scheme created, adopted, and enforced by the Secretary of State under color of state law and without legislative authorization, Respondent Benson violated Article II, section 1, clause 2 of the United States Constitution.

266.    In Michigan, Respondents have a duty to ensure the accuracy and integrity of the election.

267.    In Michigan, Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses.

268.    Respondents have failed to satisfy these duties.  Therefore, Petitioners are entitled to mandamus to prevent further constitutional harm.

269.    As a direct and proximate result of Respondent Benson's violation of the Michigan and United States Constitutions, Petitioners have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## FOURTH CLAIM FOR RELIEF
### (Mandamus and *Quo Warranto*)

270.    Because of the exigencies caused by the statewide certification of this unlawful scheme by the Board of Canvassers on November 23, 2020, Petitioners have no recourse to protect their civil liberties except through extraordinary relief from this Court.

271.    The last popular election unstained by Respondents' scheme installed the current Michigan Legislature.  By fundamental design, this Legislature is tasked with ensuring Petitioners' constitutional rights are upheld and safeguarded.  Moreover, under the United States Constitution, only the legislatures of the several states may select its electors when the statutes proscribed for a popular vote have been corrupted by executive branch officials.

RECEIVED by MSC 11/26/2020 2:44:12 AM

272.    The Michigan Legislature has delegated certain tasks to Respondents.  However, Respondents failed to follow the clear and unambiguous language of the election law statutes, as set forth in this Petition.

273.    This abuse of authority cuts at the root of the Separation of Powers and cannot be countenanced by this Court.  Moreover, the Michigan Legislature has provided this Court with unique authority to hear and resolve election disputes on an expedited basis.

274.    Moreover, because the Board of Canvassers certified the Election without conducting an audit and investigating the multiple allegations of election fraud and irregularities, Petitioners have been aggrieved by this determination, requiring this Court to issue the requested relief.

275.    As a direct and proximate result of Respondents' violations of the United States Constitution, the Michigan Constitution, and Michigan Election Law, Petitioners have been aggrieved and have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners ask this Court to narrowly tailor its relief to:

A)    ensure the Separation of Powers and protect the accuracy and integrity of the November 2020 General Election by giving the Michigan Legislature an opportunity to finish its constitutionally-mandated work to pick Michigan's electors;

B)    take custody and control of all ballots, ballot boxes, poll books, and other indicia of the Election from Respondents or their designee to prevent further irregularities and to ensure the Michigan Legislature and this Court have a chance to perform a constitutionally sound audit of lawful votes;

RECEIVED by MSC 11/26/2020 2:44:12 AM

RECEIVED by MSC 11/26/2020 2:44:12 AM

C)      segregate any ballots counted or certified inconsistent with Michigan Election Law;

D)      declare that Respondent Benson violated Petitioners' fundamental constitutional rights as explained in this Petition;

E)      segregate any ballots attributable to the Secretary of State's absentee ballot scheme and declare the Secretary of State's absentee ballot scheme unlawful;

F)      appoint a special master or committee from both chambers of the Michigan Legislature to investigate all claims of mistake, irregularity, and fraud at the TCF Center and to verify and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme.  The special master may recommend, including a recommendation with findings, that illegal votes can be separated from legal votes to determine a proper tabulation, or that the fraud is of such a character that the correct vote cannot be determined;

G)      alternatively, to enjoin Respondents or Governor Whitmer from finally certifying the election results and declaring winners of the 2020 general election to the United States Department of State or United States Congress until after a special master can be appointed to review and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme;

H)      alternatively, to enjoin Respondents from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to independently review the election procedures employed at the TCF Center and throughout the State;

I)      alternatively, to enjoin Respondents from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to review and certify the legality of all absentee ballots submitted in Wayne County and throughout the State;

J)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

Dated:   November 26, 2020

THOMAS MORE SOCIETY—AMISTAD PROJECT

AS SPECIAL COUNSEL

*/s/ Ian A. Northon*
Ian A. Northon, Esq. (P65082)
Gregory G. Timmer (P39396)
RHOADES MCKEE, PC
55 Campau Avenue
Suite 300
Grand Rapids, MI 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
ggtimmer@rhoadesmckee.com

*/s/ Robert J. Muise*
Robert J. Muise, Esq. (P62849)
AMERICAN FREEDOM LAW CENTER
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

*/s/ Erin E. Mersino*
Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org

COUNSEL FOR PETITIONERS

RECEIVED by MSC 11/26/2020 2:44:12 AM