EXHIBIT 13

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

| | |
|---|---|
| **CHERYL A. COSTANTINO and EDWARD P. McCALL, Jr.,** | **COMPLAINT AND APPLICATION FOR SPECIAL LEAVE TO FILE QUO WARRANTO COMPLAINT** |
| **Plaintiff,** | |
| **-vs-** | **EXPEDITED CONSIDERATION REQUESTED** |
| **CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,** | **FILE NO: 20-_____-AW**<br><br>**JUDGE** |
| **Defendants.** | |

_____/

**David A. Kallman           (P34200)**
**Erin E. Mersino           (P70886)**
**Jack C. Jordan           (P46551)**
**Stephen P. Kallman           (P75622)**
**GREAT LAKES JUSTICE CENTER**
**Attorneys for Plaintiff**
**5600 W. Mount Hope Hwy.**
**Lansing, MI 48917**
**(517) 322-3207/Fax: (517) 322-3208**
_____

**There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.**

GREAT LAKES JUSTICE CENTER

## APPLICATION FOR SPECIAL LEAVE TO FILE
## QUO WARRANTO COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their application for leave to file a complaint for quo warranto relief, and for their complaint, hereby states as follows:

1.      Pursuant to MCL 600.4545(2), Plaintiffs respectfully request that this Honorable Court grant them special leave to file Counts II and III of this complaint for quo warranto for all the reasons as stated in their complaint, motion for temporary restraining order, supporting affidavits, exhibits, and accompanying brief, which are all incorporated herein by reference.

2.      Plaintiffs request this relief as recognized in *Shoemaker v City of Southgate*, 24 Mich App 676, 680 (1970).

**WHEREFORE,** Plaintiffs request that his application for special leave to file Counts II and III of this complaint for quo warranto relief be granted and that this Honorable Court grant such other and further relief as appropriate.

Dated: November 8, 2020.

*/s/ David A. Kallman*
David A. Kallman                    (P34200)
Attorney for Plaintiffs


## COMPLAINT

**NOW COMES** the above-named Plaintiffs, **CHERYL A. COSTANTINO AND EDWARD P. MCCALL, JR.** (hereinafter "Plaintiff")**,** by and through their attorneys, **GREAT LAKES JUSTICE CENTER**, and for their Complaint hereby states as follows:

## INTRODUCTION

1.      The election was held on November 3, 2020 and approximately 850,000 votes were

reported as cast in Wayne County, Michigan.

2.      Plaintiff brings this action to raise numerous issues of fraud and misconduct that occurred in order to protect the rights of all voters in Michigan, especially Wayne County.

3.      In summary, this Complaint raises numerous instances of fraud, including, but not limited to:

a.   Defendants systematically processed and counted ballots from voters whose name failed to appear in either the Qualified Voter File (QVF) or in the supplemental sheets. When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted.

b.   Defendants instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.

c.   After election officials announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots, without envelopes, arrived in trays at the TCF Center. There were tens of thousands of these absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates.

d.   Defendants instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received prior to November 3, 2020 deadline.

e.   Defendants systematically used false information to process ballots, such as using incorrect or false birthdays. Many times, the election workers inserted new names into the QVF after the election and recorded these new voters as having a birthdate of 1/1/1900.

f.   On a daily basis leading up to the election, City of Detroit election workers and

GREAT LAKES JUSTICE CENTER

employees coached voters to vote for Joe Biden and the Democrat party. These workers and employees encouraged voters to do a straight Democrat ballot. These election workers and employees went over to the voting booths with voters in order to watch them vote and coach them for whom to vote.

g. Unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes.

h. Defendant election officials and workers refused to record challenges to their processes and removed challengers from the site if they politely voiced a challenge.

i. After poll challengers started discovering the fraud taking place at the TCF Center, Defendant election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

j. Defendant election officials and workers allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate. In fact, election officials and workers repeatedly obstructed poll challengers from observing. Defendants permitted thousands of ballots to be filled out by hand and duplicated on site without oversight from poll challengers.

## **PARTIES, JURISDICTION, AND VENUE**

4. Plaintiff Cheryl A. Costantino is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

5. Plaintiff Edward P. McCall, Jr. is a resident of Wayne County, voted in the November 3, 2020 election, and was a poll challenger.

6. Defendant City of Detroit is a municipality located in Wayne County tasked with

the obligation to hold all elections in a fair and legal manner.

7.      Defendant Election Commission is a department of the City of Detroit.

8.      Janice M. Winfrey, in her official capacity, is Clerk of the Defendant City of Detroit and the Chairman of the Defendant Detroit City Election Commission and is the city official who oversees and supervises all elections in the City of Detroit.

9.      Cathy M. Garrett, in her official capacity, is the Clerk of Defendant Wayne County, and is the county official who oversees and supervises all elections in Wayne County.

10.     Defendant Wayne County Board of Canvassers is the appointed body that is responsible for canvassing the votes cast within the county they serve. The Board members certify elections for all local, countywide and district offices which are contained entirely within the county they serve.

11.     This action is properly filed in Wayne County Circuit Court pursuant to MCR 3.306(A)(2), Mich. Const. art. 2, sec. 4, par. 1(h), MCL 600.4545, and MCL 600.605. Venue is proper pursuant to MCR 3.306(D).

## GENERAL ALLEGATIONS

12.     Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all of the ballots for the County.

13.     The TCF Center was the only facility within Wayne County authorized to count the ballots.

### Forging Ballots on the Qualified Voter List

14.     An attorney and former Michigan Assistant Attorney General was a certified poll challenger at the TCF Center (Exhibit A – Affidavit of Zachary Larsen).

15.     As Mr. Larsen watched the process, he was concerned that ballots were being

GREAT LAKES JUSTICE CENTER

processed without confirmation that the voter was an eligible voter in the poll book because of information he had received from other poll challengers (Exhibit A).

16.     Mr. Larsen reviewed the running list of scanned in ballots in the computer system, where it appeared that the voter had already been counted as having voted. An official operating the computer then appeared to assign this ballot to a different voter as he observed a completely different name that was added to the list of voters at the bottom of a running tab of processed ballots on the right side of the screen (Exhibit A).

17.     Mr. Larsen was concerned that this practice of assigning names and numbers indicated that a ballot was being counted for a non-eligible voter who was not in either the poll book or the supplemental poll book. From his observation of the computer screen, the voters were not in the official poll book. Moreover, this appeared to be the case for the majority of the voters whose ballots he personally observed being scanned (Exhibit A).

18.     Because of Mr. Larsen's concern, he stepped behind the table and walked over to a spot behind where the first official was conducting her work. Understanding health concerns due to COVID-19, he attempted to stand as far away from this official as he reasonably could while also being able to visually observe the names on the supplemental poll book and on the envelopes (Exhibit A).

19.     As soon as Mr. Larsen moved to a location where he could observe the process by which the first official at this table was confirming the eligibility of the voters to vote, the first official immediately stopped working and glared at him. He stood still until she began to loudly and aggressively tell him that he could not stand where he was standing. She indicated that he needed to remain in front of the computer screen where he could not see what the worker was doing (Exhibit A).

GREAT LAKES JUSTICE CENTER

20.     Both officials then began to tell Mr. Larsen that because of COVID, he needed to be six feet away from the table. He responded that he could not see and read the supplemental poll book from six feet away, and that he was attempting to keep his distance to the extent possible (Exhibit A).

21.     Just minutes before at another table, a supervisor had explained that the rules allowed Mr. Larsen to visually observe what he needed to see and then step back away. Likewise, on Election Day, he had been allowed to stand at equivalent distance from poll books in Lansing and East Lansing precincts without any problem. With this understanding, he remained in a position to observe the supplemental poll book (Exhibit A).

22.     Both officials indicated that Mr. Larsen could not remain in a position that would allow him to observe their activities; the officials indicated they were going to get their supervisor (Exhibit A).

23.     When the supervisor arrived, she reiterated that Mr. Larsen was not allowed to stand behind the official with the supplemental poll book, and he needed to stand in front of the computer screen. Mr. Larsen told her that was not true, and that he was statutorily allowed to observe the process, including the poll book (Exhibit A).

24.     The supervisor then pivoted to arguing that Mr. Larsen was not six feet away from the first official. Mr. Larsen told her that he was attempting to remain as far away as he could while still being able to read the names on the poll book (Exhibit A).

25.     The supervisor then stood next to the chair immediately to the left of the first official and indicated that Mr. Larsen was "not six feet away from" the supervisor and that she intended to sit in the chair next to the official with the poll book, so he would need to leave (Exhibit A).

26.     This supervisor had not been at the table at any time during the process, and she had responsibility for numerous ACVBs. Further, the supervisor's choice of chairs was approximately three feet to the left of the first official and therefore in violation of the six-foot distance rule (Exhibit A).

27.     Accordingly, Mr. Larsen understood that this was a ruse to keep him away from a place where he could observe the confirmation of names in the supplemental poll book. The supervisor began to repeatedly tell him that he "needed to leave" so he responded that he would go speak with someone else and fill out a challenge form (Exhibit A).

28.     After Mr. Larsen observed and uncovered the fraud that was taking place and had the confrontation with the supervisor, he left the counting room to consult with another attorney about the matter around 1:30 p.m. to 2:00 p.m. (Exhibit A).

29.     It was at this point that election officials stopped permitting any further poll challengers to enter the counting room, including Mr. Larsen (Exhibit A).

30.     Election officials never allowed Mr. Larsen to re-enter the counting room to fulfill his duties as a poll challenger after he had discovered the fraud which was taking place.

### Illegal Voter Coaching and Identification Issues

31.     An election employee with the City of Detroit was working at a polling location for approximately three weeks prior to the election. This City of Detroit employee directly observed, on a daily basis, other City of Detroit election workers and employees coaching voters to vote for Joe Biden and the Democrat party. This employee witnessed these workers and employees encouraging voters to do a straight Democrat ballot and witnessed these election workers and employees going over to the voting booths with voters in order to watch them vote and coach them for whom to vote (Exhibit B – Affidavit of Jessy Jacob).

32.    During the last two weeks while this same employee was working at the polling location, she was specifically instructed by her supervisor never to ask for a driver's license or any photo I.D. when a person was trying to vote (Exhibit B).

**Changing Dates on Ballots**

33.    All absentee ballots that existed were required to be inputted into the QVF system by 9:00 p.m. on November 3, 2020. This was required to be done in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020. In order to have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-box once every hour on November 3, 2020 (Exhibit B).

34.    On November 4, 2020, a City of Detroit election worker was instructed to improperly pre-date the absentee ballots receive date that were not in the QVF as if they had been received on or before November 3, 2020. She was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid. She estimates that this was done to thousands of ballots (Exhibit B).

**Illegal Double Voting**

35.    The election employee observed a large number of people who came to the satellite location to vote in-person, but they had already applied for an absentee ballot. These people were allowed to vote in-person and were not required to return the mailed absentee ballot or sign an affidavit that the voter lost the mailed absentee ballot (Exhibit B).

36.    This would permit a person to vote in person and also send in his/her absentee ballot.

37.    Prior to the election, the Michigan Secretary of State sent ballot applications to deceased residents and to non-residents of the State of Michigan.

**First Round of New Ballots**

38.     At approximately 4:00 a.m. on November 4, 2020, tens of thousands of ballots were suddenly brought into the counting room through the back door (Exhibit C – Affidavit of Andrew Sitto).

39.     These new ballots were brought to the TCF Center by vehicles with out-of-state license plates (Exhibit C).

40.     It was observed that all of these new ballots were cast for Joe Biden (Exhibit C).

**Second Round of New Ballots**

41.     The ballot counters were required to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list; this was the list of all persons who had registered to vote on or before November 1, 2020 and is often referred to as the QVF (Exhibit D - Affidavit of Bob Cushman)

42.     The ballot counters were also provided with Supplemental Sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020 (Exhibit C).

43.     The validation process for a ballot requires the name on the ballot to be matched with a registered voter on either the QVF or the Supplemental Sheets.

44.     At approximately 9:00 p.m. on Wednesday, November 4, 2020, numerous boxes of ballots were brought to TCF Center (Exhibit D).

45.     Upon information and belief, the Wayne County Clerk's office instructed the ballot counters to use the date of birth of January 1, 1900 on all of these newly appearing ballots.

46.     None of the names of these new ballots corresponded with any registered voter on

the QVF or the Supplemental Sheets (Exhibit D).

47. Despite election rules that required that all absentee ballots be inputted into the QVF system before 9:00 p.m. on November 3, 2020 (Exhibit B), the election workers inputted all of these new ballots into the QVF and manually added each voter to the list after 9:00 p.m. (Exhibit D).

48. Upon information and belief, the vast majority of these new ballots indicated the voter's date of birth as January 1, 1900 entered into the QVF (Exhibit D).

49. These newly received ballots were either fraudulent or apparently cast by persons who were not registered to vote prior to the polls closing at 8:00 p.m. on November 3, 2020.

**No Transparency - Denied Access**

50. Numerous election challengers were denied access to observe the counting process by the Defendants.

51. After denying access to the counting rooms, election officials used large pieces of cardboard to block the windows to the counting room thereby preventing anyone from watching the ballot counting process (Exhibit C).

**Qualified Voter File Access**

52. Whenever an absentee vote application or in-person absentee voter registration was finished, election workers were instructed to input the voter's name, address, and date of birth into the QVF system (Exhibit B).

53. The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with internet access (Exhibit B).

54. This access permits anyone with the proper credentials to edit when ballots were

11

sent, received, and processed from any location with internet access (Exhibit B).

55.     Many of the counting computers within the counting room had icons that indicated that they were connected to the internet (Exhibit F – Affidavit of Patrick J. Colbeck).

**Absentee Ballot Signatures**

56.     Whenever a person requested an absentee ballot either by mail or in-person, that person was required to sign the absentee voter application.

57.     When the voter returned his/her absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

58.     Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.

59.     Election officials at the TCF Center instructed workers to never validate or compare the signatures on absentee applications and the absentee envelopes to ensure their authenticity and validity (Exhibit B).

**Unsecured Ballots**

60.     A poll challenger witnessed tens of thousands of ballots being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container (Exhibit E – Affidavit of Daniel Gustafson).

61.     Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops (Exhibit E).

62.     Contrary to law, these ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal (Exhibit E).

<u>**COUNT I – CONSTITUTIONAL RIGHT TO ACCURACY AND INTEGRITY OF ELECTIONS**</u>
**MICHIGAN CONSTITUTION – ARTICLE 2, SECTION 4, PARAGRAPH 1(H)**

63.     Paragraphs 1 through 62 are hereby incorporated by reference as if fully restated

herein.

64.     Plaintiff brings this action to vindicate his constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have:

> The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections.

65.     The Mich. Const., art. 2, sec. 4, further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

66.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

### COUNT II – STATUTORY QUO WARRANTO CLAIM – ELECTION FRAUD
### MCL 600.4545(2); MCL 168.861

67.     Paragraphs 1 through 66 are hereby incorporated by reference as if fully restated herein.

68.     MCL 600.4545(2) permits an action to request the issuance of a writ of quo warranto if the action is brought within 30 days after the election upon the request of "any citizen of the county by special leave of the court or a judge thereof."

69.     The statute also requires this action to "be brought against the municipality wherein such fraud or error is alleged to have been committed."

70.     Quo Warranto may be brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes before a recount pursuant to MCL 168.861, which states,

GREAT LAKES JUSTICE CENTER

> For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.

71.     Based upon the allegations contained herein, material fraud or error occurred in this election so that the outcome of the election was affected.

72.     Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

## COUNT III – COMMON LAW QUO WARRANTO CLAIM – ELECTION FRAUD

73.     Paragraphs 1 through 72 are hereby incorporated by reference as if fully restated herein.

74.     MCR 3.306(B)(2) permits an action to request the issuance of a writ of quo warranto.

75.     An application to proceed by quo warranto must disclose sufficient facts and grounds and sufficient apparent merit to justify further inquiry.

76.     Quo warranto is warranted whenever it appears that material fraud or error has been committed at any election. This type of action is brought to challenge the validity of the election itself. *Barrow v Detroit Mayor*, 290 Mich App 530, 543 (2010). For all the reasons stated herein and in the attached affidavits, material fraud or error was committed during the election.

77.     This Quo Warranto claim is brought to remedy fraudulent or illegal voting or tampering with ballots or ballot boxes.

78.     Based upon the allegations contained herein, material fraud or error occurred in this

GREAT LAKES JUSTICE CENTER

election so that the outcome of the election was affected.

79.    Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to issue a writ of quo warranto and order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

**COUNT IV – EQUAL PROTECTION VIOLATION**
**Mich Const, art I, § 2.**

80.    Paragraphs 1 through 79 are hereby incorporated by reference as if fully restated herein.

81.    The Equal Protection Clause of the Michigan Constitution provides that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights."  Mich Const, art I, § 2.

82.    The right to vote is a fundamental civil right and a political right.

83.    The Equal Protection Clause forbids election officials granting the right to vote on equal terms but later devaluing a person's vote through failing to use specific standards and uniform rules.

84.    Only specific standards and uniform rules provide sufficient guarantees of equal treatment.

85.    Every person has the right to vote, with their vote counted as one vote, and not have his or her vote diluted and voided out by the counting of an illegal vote.

86.    Defendants handling of the election, as described above and as described in the attached affidavits, establish how rampant and systemic fraud devalued and diluted Plaintiff's civil and political rights.

87. The illegal procedures, illegal standards, and illegal treatment of the ballots and the counting of ballots in Wayne County and in Detroit employed by Defendants unconstitutionally burden the fundamental right to vote.

88. Defendants have no legitimate interest in counting illegal and improper ballots, counting ballots more than once, illegally correcting and improperly duplicating ballots, adding false birthdates and voter information to ballots, and improperly handling the collection and counting of ballots in a way that dilutes and cancels out rightfully and properly cast votes.

89. Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

### COUNT V – STATUTORY ELECTION LAW VIOLATIONS

90. Paragraphs 1 through 89 are hereby incorporated by reference as if fully restated herein.

### Violation of MCL 168.765a.

91. Absent voter ballots must only be counted when "at all times" there is "at least 1 election inspector from each major political party." MCL 168.765a.

92. Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically disallowed election inspectors from the Republican party, including Plaintiff, to be present in the voter counting place and refused access to election inspectors from the Republican party, including Plaintiff, to be within a close enough distance from the absent voter ballots to be able to see for whom the ballots were

cast.

93.     Defendants refused entry to official election inspectors from the Republican party, including Plaintiff, into the counting place to observe the counting of absentee voter ballots.  Defendants even physically blocked and obstructed election inspectors from the Republican party, including Plaintiff, by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

**Violation of MCL 168.733**

94.     MCL 168.733 requires:

(1) The board of election inspectors shall provide space for the challengers within the polling place that enables the challengers to observe the election procedure and each person applying to vote. A challenger may do 1 or more of the following:
      (a) Under the scrutiny of an election inspector, inspect without handling the poll books as ballots are issued to electors and the electors' names being entered in the poll book.
      (b) Observe the manner in which the duties of the election inspectors are being performed.
      (c) Challenge the voting rights of a person who the challenger has good reason to believe is not a registered elector.
      (d) Challenge an election procedure that is not being properly performed.
      (e) Bring to an election inspector's attention any of the following:
      (i) Improper handling of a ballot by an elector or election inspector.
      (ii) A violation of a regulation made by the board of election inspectors pursuant to section 742.
      (iii) Campaigning being performed by an election inspector or other person in violation of section 744.
      (iv) A violation of election law or other prescribed election procedure.
      (f) Remain during the canvass of votes and until the statement of returns is duly signed and made.
      (g) Examine without handling each ballot as it is being counted.
      (h) Keep records of votes cast and other election procedures as the challenger desires.

(i) Observe the recording of absent voter ballots on voting machines.

95.     Per eyewitness accounts described in this Complaint and its attached sworn affidavits, Defendants habitually and systematically failed to provide space for election inspectors from the Republican party, including Plaintiff, to  observe election procedure, failed to allow the inspection of poll books, failed to share the names of the electors being entered in the poll books, failed to allow the examination of each ballot as it was being counted, and failed to keep records of obvious and observed fraud.

96.     Poll challengers, including Plaintiff, observed election workers and supervisors writing on ballots themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the State's Qualified Voter File or on any Supplemental voter lists.

97.     Michigan law requires that in order to register as an absentee voter, the application must be made in writing and received by the clerk by 5pm on the Friday before the election.

**Violation of MCL 168.765(5)**

98.     Michigan election law, MCL 168.765(5), requires Defendants to post the following absentee voting information anytime an election is conducted which involves a state or federal office:

a.      The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.

GREAT LAKES JUSTICE CENTER

b.    The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.

c.    The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

99.    Upon information and belief, Defendants failed to post by 8:00 a.m. on Election Day the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voters returned before on Election Day.

100.    Per Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8pm.  MCL 168.764a.  Any absentee voter ballots received by the clerk after the close of the polls on election day will not be counted.

101.    Michigan allows for early counting of absentee votes prior to the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

102.    Upon information and belief, receiving tens of thousands additional absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, indicates Defendants failed to follow proper election protocol.

103.    Based upon the above allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full investigation and court hearing, ordering a recount of the election results, or voiding the election and ordering a new election, to remedy the fraud.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court:

A.     issue an order requiring Defendants to conduct an independent and non-partisan audit to determine the accuracy and integrity of the November 3, 2020 election;

B.     issue an *ex-parte* TRO prohibiting Defendants' from certifying the election results or continuing to count ballots until this matter can be heard by the Court.

C.     issue an preliminary injunction prohibiting Defendants' from certifying the election results until this matter can be heard by the Court.

D.     issue an order voiding the November 3, 2020 election results and order a new election to be held.

E.     Issue a protective order as requested in the attached Motion for TRO.

F.     grant such other and further relief as is equitable and just, and grant him costs, expenses and attorney fees incurred in having to bring this action.

**I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.**

Dated: November 8, 2020.

_____
Cheryl A. Constantino, Plaintiff

Dated: November 8, 2020.

*Edward P. McCall*
_____
Edward P. McCall, Plaintiff

Prepared By:

*/s/ David A. Kallman*
_____
David A. Kallman          (P34200)
Stephen P. Kallman      (P75622)
Jack C. Jordan             (P46551)
Erin E. Mersino           (P70886)
Attorneys for Plaintiff

Great Lakes Justice Center

21

I HEREBY STATE AND AFFIRM THAT I HAVE HAD READ THE FOREGOING COMPLAINT AND THAT IT IS TRUE AND ACCURATE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.


Dated: November 8, 2020.

Cheryl A. Costantino, Plaintiff


Dated: November 8, 2020.

Edward P. McCall, Plaintiff


Prepared By:


*/s/ David A. Kallman*
David A. Kallman          (P34200)
Stephen P. Kallman        (P75622)
Jack C. Jordan            (P46551)
Erin E. Mersino           (P70886)
Attorneys for Plaintiff

Great Lakes Justice Center

21