# EXHIBIT 14

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Cheryl A. Costantino and
Edward P. McCall, Jr.
   Plaintiffs,

              Hon. Timothy M. Kenny
              Case No. 20-014780-AW

City of Detroit; Detroit Election
Commission; Janice M. Winfrey,
in her official capacity as the
Clerk of the City of Detroit and
the Chairperson and the Detroit
Election Commission; Cathy Garrett,
In her official capacity as the Clerk of
Wayne County; and the Wayne County
Board of Canvassers,
   Defendants.

_____/

# OPINION & ORDER

At a session of this Court
Held on: November 13, 2020
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: Honorable Timothy M. Kenny
       Chief Judge
       Third Judicial Circuit Court of Michigan

This matter comes before the Court on Plaintiffs' motion for preliminary injunction, protective order, and a results audit of the November 3, 2020 election. The Court having read the parties' filing and heard oral arguments, finds:

With the exception of a portion of Jessy Jacob affidavit, all alleged fraudulent claims brought by the Plaintiffs related to activity at the TCF Center. Nothing was alleged to

1

have occurred at the Detroit Election Headquarters on West Grand Blvd. or at any polling place on November 3, 2020.

The Defendants all contend Plaintiffs cannot meet the requirements for injunctive relief and request the Court deny the motion.

When considering a petition for injunction relief, the Court must apply the following four-pronged test:

1. The likelihood the party seeking the injunction will prevail on the merits.
2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.
3. The risk the party seeking the injunction would be harmed more by the absence an injunction than the opposing party would be by the granting of the injunction.
4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2nd 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Id*. at 612 fn 135 quoting *Senior Accountants, Analysts and Appraisers Association v Detroit*, 218 Mich. App. 263, 269; 553 NW2nd 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4) states that the Plaintiffs bear the burden of proving the preliminary injunction should be granted. In cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud. MCR 2.112 (B) (1)

Plaintiffs must establish they will likely prevail on the merits. Plaintiffs submitted seven affidavits in support of their petition for injunctive relief claiming widespread voter

2

fraud took place at the TCF Center. One of the affidavits also contended that there was blatant voter fraud at one of the satellite offices of the Detroit City Clerk. An additional affidavit supplied by current Republican State Senator and former Secretary of State Ruth Johnson, expressed concern about allegations of voter fraud and urged "Court intervention", as well as an audit of the votes.

In opposition to Plaintiffs' assertion that they will prevail, Defendants offered six affidavits from individuals who spent an extensive period of time at the TCF Center. In addition to disputing claims of voter fraud, six affidavits indicated there were numerous instances of disruptive and intimidating behavior by Republican challengers. Some behavior necessitated removing Republican challengers from the TCF Center by police.

After analyzing the affidavits and briefs submitted by the parties, this Court concludes the Defendants offered a more accurate and persuasive explanation of activity within the Absent Voter Counting Board (AVCB) at the TCF Center.

Affiant Jessy Jacob asserts Michigan election laws were violated prior to November 3, 2020, when City of Detroit election workers and employees allegedly coached voters to vote for Biden and the Democratic Party. Ms. Jacob, a furloughed City worker temporarily assigned to the Clerk's Office, indicated she witnessed workers and employees encouraging voters to vote a straight Democratic ticket and also witnessed election workers and employees going over to the voting booths with voters in order to encourage as well as watch them vote. Ms. Jacob additionally indicated while she was working at the satellite location, she was specifically instructed by superiors not to ask for driver's license or any photo ID when a person was trying to vote.

The allegations made by Ms. Jacob are serious. In the affidavit, however, Ms. Jacob does not name the location of the satellite office, the September or October date these

3

acts of fraud took place, nor does she state the number of occasions she witnessed the alleged misconduct. Ms. Jacob in her affidavit fails to name the city employees responsible for the voter fraud and never told a supervisor about the misconduct.

Ms. Jacob's information is generalized. It asserts behavior with no date, location, frequency, or names of employees. In addition, Ms. Jacob's offers no indication of whether she took steps to address the alleged misconduct or to alter any supervisor about the alleged voter fraud. Ms. Jacob only came forward after the unofficial results of the voting indicated former Vice President Biden was the winner in the state of Michigan.

Ms. Jacob also alleges misconduct and fraud when she worked at the TCF Center. She claims supervisors directed her not to compare signatures on the ballot envelopes she was processing to determine whether or not they were eligible voters. She also states that supervisors directed her to "pre-date" absentee ballots received at the TCF Center on November 4, 2020. Ms. Jacob ascribes a sinister motive for these directives. Evidence offered by long-time State Elections Director Christopher Thomas, however, reveals there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined at the Detroit Election Headquarters on West Grand Blvd. Ms. Jacob was directed not to search for or compare signatures because the task had already been performed by other Detroit city clerks at a previous location in compliance with MCL 168.765a. As to the allegation of "pre-dating" ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process. Thomas Affidavit, #12. The entries reflected the date the City received the absentee ballot. *Id.*

The affidavit of current State Senator and former Secretary of State Ruth Johnson essentially focuses on the affidavits of Ms. Jacob and Zachery Larsen. Senator Johnson believed the information was concerning to the point that judicial intervention was needed and an audit of the ballots was required. Senator Johnson bases her assessment entirely on the contents of the Plaintiffs' affidavits and Mr. Thomas' affidavit. Nothing in Senator Johnson's affidavit indicates she was at the TCF Center and witnessed the established protocols and how the AVCB activity was carried out. Similarly, she offers no explanation as to her apparent dismissal of Mr. Thomas' affidavit. Senator Johnson's conclusion stands in significant contrast to the affidavit of Christopher Thomas, who was present for many hours at TCF Center on November 2, 3 and 4. In this Court's view, Mr. Thomas provided compelling evidence regarding the activity at the TCF Center's AVCB workplace. This Court found Mr. Thomas' background, expertise, role at the TCF Center during the election, and history of bipartisan work persuasive.

Affiant Andrew Sitto was a Republican challenger who did not attend the October 29th walk- through meeting provided to all challengers and organizations that would be appearing at the TCF Center on November 3 and 4, 2020. Mr. Sitto offers an affidavit indicating that he heard other challengers state that several vehicles with out-of-state license plates pulled up to the TCF Center at approximately 4:30 AM on November 4th. Mr. Sitto states that "tens of thousands of ballots" were brought in and placed on eight long tables and, unlike other ballots, they were brought in from the rear of the room. Sitto also indicated that every ballot that he saw after 4:30 AM was cast for former Vice President Biden.

Mr. Sitto's affidavit, while stating a few general facts, is rife with speculation and guess-work about sinister motives. Mr. Sitto knew little about the process of the absentee voter counting board activity. His sinister motives attributed to the City of Detroit were negated by Christopher Thomas' explanation that all ballots were delivered to the back of Hall E at the TCF Center. Thomas also indicated that the City utilized a rental truck to deliver ballots. There is no evidentiary basis to attribute any evil activity by virtue of the city using a rental truck with out-of-state license plates.

Mr. Sitto contends that tens of thousands of ballots were brought in to the TCF Center at approximately 4:30 AM on November 4, 2020. A number of ballots speculative on Mr. Sitto's part, as is his speculation that all of the ballots delivered were cast for Mr. Biden. It is not surprising that many of the votes being observed by Mr. Sitto were votes cast for Mr. Biden in light of the fact that former Vice President Biden received approximately 220,000 more votes than President Trump.

Daniel Gustafson, another affiant, offers little other than to indicate that he witnessed "large quantities of ballots" delivered to the TCF Center in containers that did not have lids were not sealed, or did not have marking indicating their source of origin. Mr. Gustafson's affidavit is another example of generalized speculation fueled by the belief that there was a Michigan legal requirement that all ballots had to be delivered in a sealed box. Plaintiffs have not supplied any statutory requirement supporting Mr. Gustafson's speculative suspicion of fraud.

Patrick Colbeck's affidavit centered around concern about whether any of the computers at the absent voter counting board were connected to the internet. The answer given by a David Nathan indicated the computers were not connected to the

6

internet. Mr. Colbeck implies that there was internet connectivity because of an icon that appeared on one of the computers. Christopher Thomas indicated computers were not connected for workers, only the essential tables had computer connectivity. Mr. Colbeck, in his affidavit, speculates that there was in fact Wi-Fi connection for workers use at the TCF Center. No evidence supports Mr. Colbeck's position.

This Court also reads Mr. Colbeck's affidavit in light of his pre-election day Facebook posts. In a post before the November 3, 2020 election, Mr. Colbeck stated on Facebook that the Democrats were using COVID as a cover for Election Day fraud. His predilection to believe fraud was occurring undermines his credibility as a witness.

Affiant Melissa Carone was contracted by Dominion Voting Services to do IT work at the TCF Center for the November 3, 2020 election. Ms. Carone, a Republican, indicated that she "witnessed nothing but fraudulent actions take place" during her time at the TCF Center. Offering generalized statements, Ms. Carone described illegal activity that included, untrained counter tabulating machines that would get jammed four to five times per hour, as well as alleged cover up of loss of vast amounts of data. Ms. Carone indicated she reported her observations to the FBI.

Ms. Carone's description of the events at the TCF Center does not square with any of the other affidavits. There are no other reports of lost data, or tabulating machines that jammed repeatedly every hour during the count. Neither Republican nor Democratic challengers nor city officials substantiate her version of events. The allegations simply are not credible.

Lastly, Plaintiffs rely heavily on the affidavit submitted by attorney Zachery Larsen. Mr. Larsen is a former Assistant Attorney General for the State of Michigan who alleged mistreatment by city workers at the TCF Center, as well as fraudulent activity by election workers. Mr. Larsen expressed concern that ballots were being processed without confirmation that the voter was eligible. Mr. Larsen also expressed concern that he was unable to observe the activities of election official because he was required to stand six feet away from the election workers. Additionally, he claimed as a Republican challenger, he was excluded from the TCF Center after leaving briefly to have something to eat on November 4th. He expressed his belief that he had been excluded because he was a Republican challenger.

Mr. Larsen's claim about the reason for being excluded from reentry into the absent voter counting board area is contradicted by two other individuals. Democratic challengers were also prohibited from reentering the room because the maximum occupancy of the room had taken place. Given the COVID-19 concerns, no additional individuals could be allowed into the counting area. Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding.

Mr. Larsen's concern about verifying the eligibility of voters at the AVCB was incorrect. As stated earlier, voter eligibility was determined at the Detroit Election Headquarters by other Detroit city clerk personnel.

The claim that Mr. Larsen was prevented from viewing the work being processed at the tables is simply not correct. As seen in a City of Detroit exhibit, a large monitor was

8

at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed. Mr. Jaffe confirmed his experience and observation that efforts were made to ensure that all challengers could observe the process.

Despite Mr. Larsen's claimed expertise, his knowledge of the procedures at the AVCB paled in comparison to Christopher Thomas'. Mr. Thomas' detailed explanation of the procedures and processes at the TCF Center were more comprehensive than Mr. Larsen's. It is noteworthy, as well, that Mr. Larsen did not file any formal complaint as the challenger while at the AVCB. Given the concerns raised in Mr. Larsen's affidavit, one would expect an attorney would have done so. Mr. Larsen, however, only came forward to complain after the unofficial vote results indicated his candidate had lost.

In contrast to Plaintiffs' witnesses, Christopher Thomas served in the Secretary of State's Bureau of Elections for 40 years, from 1977 through 2017. In 1981, he was appointed Director of Elections and in that capacity implemented Secretary of State Election Administration Campaign Finance and Lobbyist disclosure programs. On September 3, 2020 he was appointed as Senior Advisor to Detroit City Clerk Janice Winfrey and provided advice to her and her management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting boards, satellite offices and drop boxes. Mr. Thomas helped prepare the City of Detroit for the November 3, 2020 General Election.

As part of the City's preparation for the November 3rd election Mr. Thomas invited challenger organizations and political parties to the TCF Center on October 29, 2020 to have a walk-through of the entire absent voter counting facility and process. None of Plaintiff challenger affiants attended the session.

On November 2, 3, and 4, 2020, Mr. Thomas worked at the TCF Center absent voter counting boards primarily as a liaison with Challenger Organizations and Parties. Mr. Thomas indicated that he "provided answers to questions about processes at the counting board's resolved dispute about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers."

Additionally, Mr. Thomas resolved disputes about the processes and satisfactorily reduced the number of challenges raised at the TCF Center.

In determining whether injunctive relief is required, the Court must also determine whether the Plaintiffs sustained their burden of establishing they would suffer irreparable harm if an injunction were not granted. Irreparable harm does not exist if there is a legal remedy provided to Plaintiffs.

Plaintiffs contend they need injunctive relief to obtain a results audit under Michigan Constitution Article 2, § IV, Paragraph 1 (h) which states in part "the right to have the results of statewide elections audited, in such as manner as prescribed by law, to ensure the accuracy and integrity of the law of elections." Article 2, § IV, was passed by the voters of the state of Michigan in November, 2018.

A question for the Court is whether the phrase "in such as manner as prescribed by law" requires the Court to fashion a remedy by independently appointing an auditor to examine the votes from the November 3, 2020 election before any County certification of votes or whether there is another manner "as prescribed by law".

Following the adoption of the amended Article 2, § IV, the Michigan Legislature amended MCL 168.31a effective December 28, 2018. MCL 168.31a provides for the Secretary of State and appropriate county clerks to conduct a results audit of at least

one race in each audited precinct. Although Plaintiffs may not care for the wording of the current MCL 168.31a, a results audit has been approved by the Legislature. Any amendment to MCL 168.31a is a question for the voice of the people through the legislature rather than action by the Court.

It would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers. The Court cannot defy a legislatively crafted process, substitute its judgment for that of the Legislature, and appoint an independent auditor because of an unwieldy process. In addition to being an unwarranted intrusion on the authority of the Legislature, such an audit would require the rest of the County and State to wait on the results. Remedies are provided to the Plaintiffs. Any unhappiness with MCL 168.31a calls for legislative action rather than judicial intervention.

As stated above, Plaintiffs have multiple remedies at law. Plaintiffs are free to petition the Wayne County Board of Canvassers who are responsible for certifying the votes. (MCL 168.801 and 168.821 et seq.) Fraud claims can be brought to the Board of Canvassers, a panel that consists of two Republicans and two Democrats. If dissatisfied with the results, Plaintiffs also can avail themselves of the legal remedy of a recount and a Secretary of State audit pursuant to MCL 168.31a.

Plaintiff's petition for injunctive relief and for a protective order is not required at this time in light of the legal remedy found at 52 USC § 20701 and Michigan's General Schedule #23 – Election Records, Item Number 306, which imposes a statutory obligation to preserve all federal ballots for 22 months after the election.

In assessing the petition for injunctive relief, the Court must determine whether there will be harm to the Plaintiff if the injunction is not granted, as Plaintiffs' existing legal

11

remedies would remain in place unaltered. There would be harm, however, to the Defendants if the Court were to grant the requested injunction. This Court finds that there are legal remedies for Plaintiffs to pursue and there is no harm to Plaintiffs if the injunction is not granted. There would be harm, however, to the Defendants if the injunction is granted. Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay. It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races. It would also undermine faith in the Electoral System.

Finally, the Court has to determine would there be harm to the public interest. This Court finds the answer is a resounding yes. Granting Plaintiffs' requested relief would interfere with the Michigan's selection of Presidential electors needed to vote on December 14, 2020. Delay past December 14, 2020 could disenfranchise Michigan voters from having their state electors participate in the Electoral College vote.

Conclusion

Plaintiffs rely on numerous affidavits from election challengers who paint a picture of sinister fraudulent activities occurring both openly in the TCF Center and under the cloak of darkness. The challengers' conclusions are decidedly contradicted by the highly-respected former State Elections Director Christopher Thomas who spent hours and hours at the TCF Center November 3rd and 4th explaining processes to challengers and resolving disputes. Mr. Thomas' account of the November 3rd and 4th events at the TCF Center is consistent with the affidavits of challengers David Jaffe, Donna MacKenzie and Jeffrey Zimmerman, as well as former Detroit City Election Official, now contractor, Daniel Baxter and City of Detroit Corporation Counsel Lawrence Garcia.

Perhaps if Plaintiffs' election challenger affiants had attended the October 29, 2020 walk-through of the TCF Center ballot counting location, questions and concerns could have been answered in advance of Election Day. Regrettably, they did not and, therefore, Plaintiffs' affiants did not have a full understanding of the TCF absent ballot tabulation process. No formal challenges were filed. However, sinister, fraudulent motives were ascribed to the process and the City of Detroit. Plaintiffs' interpretation of events is incorrect and not credible.

Plaintiffs are unable to meet their burden for the relief sought and for the above mentioned reasons, the Plaintiffs' petition for injunctive relief is DENIED. The Court further finds that no basis exists for the protective order for the reasons identified above. Therefore, that motion is DENIED. Finally, the Court finds that MCL 168.31a governs the audit process. The motion for an independent audit is DENIED.

It is so ordered.

This is not a final order and does not close the case.

November 13, 2020

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

13