# EXHIBIT 15

# Order

**Michigan Supreme Court**
Lansing, Michigan

November 23, 2020

162245 & (27)(38)(39)

CHERYL A. COSTANTINO and EDWARD P. McCALL, JR.,
    Plaintiffs-Appellants,

v

CITY OF DETROIT, DETROIT ELECTION COMMISSION, DETROIT CITY CLERK, WAYNE COUNTY CLERK, and WAYNE COUNTY BOARD OF CANVASSERS,
    Defendants-Appellees,

and

MICHIGAN DEMOCRATIC PARTY,
    Intervening Defendant-Appellee.

_____/

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

SC: 162245
COA: 355443
Wayne CC: 20-014780-AW

    On order of the Court, the motions for immediate consideration and the motion to file supplemental response are GRANTED. The application for leave to appeal the November 16, 2020 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

    ZAHRA, J. (*concurring*).

    Plaintiffs ask this Court to "enjoin the Wayne County Canvassers certification of the November 2020 election prior to their meeting [on] November 17, 2020 at 3:00 p.m." on the basis that "the audit [requested by plaintiffs pursuant to Const 1963, art 2, § 4(1)(h)] needs to occur prior to the election results being certified by the Wayne County Board of Canvassers." Plaintiffs contend that if "the results of the November 2020 election [are] certified . . . Plaintiffs will lose their right to audit its results, thereby losing the rights guaranteed under the Michigan Constitution." However, plaintiffs cite no support, and I have found none, for their proposition that an audit under Const 1963, art

2, § 4(1)(h)—which provides "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections"—must *precede* the certification of election results. Indeed, the plain language of Const 1963, art 2, § 4(1)(h) does *not* require an audit to precede the certification of election results. To the contrary, certified results would seem to be a *prerequisite* for such an audit. For how can there be "[t]he right to have the results of statewide elections audited" absent any results, and, further, what would be properly and meaningfully audited other than final, and presumably certified, results? See also *Hanlin v Saugatuck Twp*, 299 Mich App 233, 240-241 (2013) (allowing for a quo warranto action to be brought by a citizen within 30 days of an election in which it appears that a material fraud or error has been committed), citing *Barrow v Detroit Mayor*, 290 Mich App 530 (2010); MCL 168.31a (which sets forth election-audit requirements and does not require an audit to take place before election results are certified); MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.").

Even so, while plaintiffs are not precluded from seeking a future "results audit" under Const 1963, art 2, § 4(1)(h), the certification of the election results in Wayne County has rendered the instant case moot to the extent that plaintiffs ask this Court to enjoin that certification; there is no longer anything to enjoin. While it is noteworthy that two members of the board later sought to rescind their votes for certification, see LeBlanc, *GOP Canvassers Try to Rescind Votes to Certify Wayne County Election*, Detroit News (November 19, 2020) <https://www.detroitnews.com/story/news/local/michigan/2020/11/19/gop-canvassers-attempt-rescind-votes-certify-wayne-county-vote/3775246001/≥ (accessed November 23, 2020) [https://perma.cc/2SS2-Y29V], plaintiffs have nonetheless provided no support, and I have found none, for their proposition that this effects a "decertification" of the county's election results, so it seems they presently remain certified. Cf. *Makowski v Governor*, 495 Mich 465, 487 (2014) (holding that the Governor has the power to grant a commutation, but does not have the power to revoke a commutation). Thus, I am inclined to conclude that the certification of the election by the Wayne County board has rendered the instant case moot—but only as to plaintiffs' request for injunctive relief.

Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the "very concerning" "allegations and issues raised by Plaintiffs," she "believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election." Plaintiffs' affidavits present evidence to substantiate their allegations, which include claims of ballots being counted from voters whose names are not contained in the appropriate poll books, instructions being given to

Case 2:20-cv-13134-LVP-RSW ECF No. 31-16, PageID.2454 Filed 12/02/20 Page 4 of 8

3

disobey election laws and regulations, the questionable appearance of unsecured batches of absentee ballots after the deadline for receiving ballots, discriminatory conduct during the counting and observation process, and other violations of the law. Plaintiffs, in my judgment, have raised important constitutional issues regarding the precise scope of Const 1963, art 2, § 4(1)(h)—a provision of striking breadth added to our Michigan Constitution just two years ago through the exercise of direct democracy and the constitutional initiative process—and its interplay with MCL 168.31a and other election laws. Moreover, the current Secretary of State has indicated that her agency will conduct a postelection performance audit in Wayne County. See Egan, *Secretary of State: Post-Election "Performance Audit" Planned in Wayne County*, Detroit Free Press (November 19, 2020) <https://www.freep.com/story/news/politics/elections/2020/11/19/benson-post-election-performance-audit-wayne/3779269001/≥ (accessed November 23, 2020) [https://perma.cc/WS95-XBPG]. This development would seem to impose at least some obligation upon plaintiffs both to explain why a constitutional audit is still required after the Secretary of State conducts the promised process audit and to address whether there is some obligation on their part to identify a specific "law" in support of Const 1963, art 2, § 4(1)(h) that prescribes the specific "manner" in which an audit pursuant to that provision must proceed.

In sum, at this juncture, plaintiffs have not asserted a persuasive argument that their case is not moot and that the entry of immediate injunctive relief is proper. That is all that is now before this Court. Accordingly, I concur in the denial of injunctive relief. In addition to denying the relief currently sought in this Court, I would order the most expedited consideration possible of the remaining issues. With whatever benefit such additional time allows, the trial court should meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants, as well as resolve necessary legal issues, including those identified in the separate statement of Justice VIVIANO. I would also have this Court retain jurisdiction of this case under both its appellate authority and its superintending authority under Const 1963, art 6, § 4 (stating that, with certain limitations, "the supreme court shall have general superintending control over all courts"). Federal law imposes tight time restrictions on Michigan's certification of our electors. Plaintiffs should not have to file appeals following our standard processes and procedures to obtain a final answer from this Court on such weighty issues.

Finally, I am cognizant that many Americans believe that plaintiffs' claims of electoral fraud and misconduct are frivolous and obstructive, but I am equally cognizant that many Americans are of the view that the 2020 election was not fully free and fair. See, e.g., Monmouth University Polling Institute, *More Americans Happy About Trump Loss Than Biden Win* (November 18, 2020) <https://www.monmouth.edu/polling-institute/reports/monmouthpoll_us_111820/≥ (accessed November 23, 2020) [https://perma.cc/7DUN-CMZM] (finding that 32% of Americans "believe [Joe Biden] only won [the election] due to voter fraud"). The latter is a view that strikes at the core of

concerns about this election's lack of both "accuracy" and "integrity"—values that Const 1963, art 2, § 4(1)(h) appears designed to secure.

In sum, as explained above, I would order the trial court to expedite its consideration of the remaining issues, and I would retain jurisdiction in order to expedite this Court's final review of the trial court's decision. But, again, because plaintiffs have not asserted a persuasive argument that immediate injunctive relief is an appropriate remedy, I concur in the denial of leave to appeal and, by extension, the denial of that relief.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

Plaintiffs Cheryl Costantino and Edward McCall seek, among other things, an audit of the recent election results in Wayne County. Presently before this Court is their application for leave to appeal the trial court's ruling that plaintiffs are not likely to succeed and therefore are not entitled to a preliminary injunction to stop the certification of votes by defendant Wayne County Board of Canvassers. See MCL 168.824; MCL 168.825. The Court of Appeals denied leave, and this Court has now followed suit. For the reasons below, I would grant leave to answer the critical constitutional questions of first impression that plaintiffs have squarely presented concerning the nature of their right to an audit of the election results under Const 1963, art 2, § 4(1)(h).

The constitutional provision at issue in this case, which the people of Michigan voted to add in 2018 through Proposal 3, guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections." *Id*. The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so and that the Legislature cannot impose additional obligations on the exercise of this right. *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971).

The trial court failed to provide a meaningful interpretation of this constitutional language. Instead, it pointed to MCL 168.31a, which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4. But the trial court never considered whether MCL 168.31a accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right.

In passing over this constitutional text, the trial court left unanswered many questions pertinent to assessing the likelihood that plaintiffs would succeed on the

Case 2:20-cv-13134-LVP-RSW ECF No. 31-16, PageID.2456 Filed 12/02/20 Page 6 of 8

5

merits.[1] As an initial matter, the trial court did not ask what showing, if any, plaintiffs must make to obtain an audit. It appears that no such showing is required, as neither the constitutional text nor MCL 168.31a expressly provide for it. None of the neighboring rights listed in Article 2, § 4, such as the right to vote by absentee ballot, requires citizens to present any proof of entitlement for the right to be exercised. Yet, the trial court here ignored this threshold legal question and instead scrutinized the parties' bare affidavits, concluding that plaintiffs' allegations of fraud were not credible.[2] The trial court's factual findings have no significance unless, to obtain an audit, plaintiffs were required to prove their allegations of fraud to some degree of certainty.

Wrapped up in this question is the meaning and design of Const 1963, art 2, § 4. Is it a mechanism to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled? To ascertain the type of audit the Constitution envisions, it is necessary to consider whether the term "audit" has a special meaning in the context of election administration. In this regard, we should examine the various auditing practices in use around the time Proposal 3 was passed. See Presidential Commission on Election Administration, *The American Voting Experience: Report and Recommendations* (January 2014), p 66 ("Different types of audits perform different functions."). Some audits occur regardless of how close the election was. They simply review the election process to verify that procedures were complied with, rules were followed, and technology performed as expected. See *id.*; see also League of Women Voters, *Report on Election Auditing* (January 2009), p 3 ("Post-election audits routinely check voting system performance in contests, regardless of how close margins of victory appear."). For these process-based audits, it would not appear critical whether they occur before the election results are finally certified, as the audit is intended to gather information that could be used to perfect voting systems going forward.

---

[1] The court also suggested that plaintiffs could seek a recount. But, with few exceptions, the relevant recount provisions can be invoked only by candidates for office, which plaintiffs here were not. Compare MCL 168.862 and MCL 168.879 (allowing candidates to request recounts) with MCL 168.880 (allowing any elector, in certain circumstances, to seek a recount of "votes cast upon the question of a proposed amendment to the constitution or any other question or proposition").

[2] The court's credibility determinations were made without the benefit of an evidentiary hearing. Ordinarily, an evidentiary hearing is required where the conflicting affidavits create factual questions that are material to the trial court's decision on a motion for a preliminary injunction under MCR 3.310. See 4 Longhofer, Michigan Court Rules Practice, Text (7th ed, 2020 update), § 3310.6, pp 518-519. See also *Fancy v Egrin*, 177 Mich App 714, 723 (1989) (an evidentiary hearing is mandatory "where the circumstances of the individual case so require").

Other audits, by contrast, aim to ensure accuracy in a specific election and enable alteration of results if necessary. The American Law Institute's recent *Principles of the Law, Election Administration*, drafted around the time Proposal 3 was passed, suggests that audits should be used in this manner:

> [I]f an audit exposes a problem, the number of randomly sampled ballots can be increased in order to ascertain whether or not the problem is one that threatens the accuracy of the determination of which candidate is the election's winner. In an extreme case, when problems exposed by an audit were severe, the audit would need to turn into a full recount of all ballots in the election in order to provide the requisite confidence in the accuracy of the result (or, as necessary, to alter the result based on the findings of the audit-turned-recount). In those circumstances when the audit exposes no such problem, election officials ordinarily would be able to complete the audit prior to the deadline for certifying the results of the election; when, however, the audit reveals the necessity of a full recount, then a state— depending on how it chooses to structure the relationship between certification and a recount—either could delay certification until completion of the recount or issue a preliminary certification that is subject to revision upon completion of the recount. [ALI, Principles of the Law, Election Administration (2019), § 209, comment *c*.]

These audits, such as a risk-limiting audit, "are designed to be implemented before the certification of the results, and to inform election officials whether they should be confident in the results—or if they should bump the audit up to a full recount." Pettigrew & Stewart, *Protecting the Perilous Path of Election Returns from the Precinct to the News*, 16 Ohio St Tech L J 587, 636 (2020) ("[Risk-limiting audits] conducted as part of the certification process currently provide the best mechanism through which the manipulation of election returns at the precinct level can be detected and, most importantly, remedied."). A review of election laws conducted in early 2018 similarly recommended that audits be undertaken "after preliminary outcomes are announced, but before official certification of election results" because this allows for "correction of preliminary results if preliminary election outcomes are found to be incorrect." Root et al, Center for American Progress, *Election Security in All 50 States: Defending America's Elections* (Feb 12, 2018), available at <https://www.americanprogress.org/issues/democracy/reports/2018/02/12/446336/election-security-50-states/>.

Whether the constitutional right to an audit may be utilized to uncover evidence of fraud to challenge the results of an election will also need to be addressed. In particular, how does the constitutional audit operate within our statutory framework and procedures for canvassing election returns, certifying the results, and disputing ballots on the basis of fraud? We have long indicated that canvassing boards' role is ministerial and does not

involve investigating fraud. See *McLeod v State Bd of Canvassers*, 304 Mich 120 (1942); see also *People ex rel Williams v Cicott*, 16 Mich 283, 311 (1868)[3] (opinion of Christiancy, J.) (noting that the boards, "acting thus ministerially," are "often compelled to admit votes which they know to be illegal"); see generally Paine, *Treatise on the Law of Elections to Public Offices* (1888), § 603, p 509 ("The duties of county, district, and state canvassers are generally ministerial. . . . Unless authorized by statute, they cannot go behind those returns. . . . Questions of illegal voting and fraudulent practices are to be passed upon by another tribunal."). The Board of State Canvassers has more of a role in investigating fraud in recounts, although we have held that it cannot exclude votes on this basis. See MCL 168.872 (providing that if the board conducting a recount suspects fraud occurred during the election, it can make an investigation that produces a report that is submitted to the prosecuting attorney or to the circuit judges of the county); *May v Wayne Co Bd of Canvassers*, 94 Mich 505, 512 (1893) (holding that the board could not exclude votes during a recount based on fraud). These holdings may suggest that evidence of fraud uncovered in an audit is not a barrier to certification and instead may only be used to challenge an election in quo warranto and other related proceedings. See *The People ex rel Attorney General v Van Cleve*, 1 Mich 362, 364-366 (1850) (holding in a quo warranto proceeding that the certification "is but *prima facie* evidence" of the election results and that a party can "go behind all these proceedings[; that the party] may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office").

Consequently, it is imperative to determine the nature and scope of the audit provided for in Article 2, § 4, so we can determine when the audit occurs and whether it will affect the election outcome. These questions are important constitutional issues of first impression that go to the heart of our democracy and the power of our citizens to amend the Constitution to ensure the accuracy and integrity of elections. They deserve serious treatment. I would grant leave to appeal and hear this case on an expedited basis to resolve these questions.[4] For these reasons, I dissent.

---

[3] Overruled in part on other grounds by *Petrie v Curtis*, 387 Mich 436 (1972).

[4] In doing so, I would consider the parties' arguments regarding whether the matter is moot.



b1117t

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 23, 2020



Clerk