## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES
DAVID HOOPER, and DAREN WADE
RUBINGH,

               Plaintiffs,

    v.

GRETCHEN WHITMER, in her official
capacity as Governor of Michigan,
JOCELYN BENSON, in her official
capacity as Michigan Secretary of State,
and MICHIGAN BOARD OF STATE
CANVASSERS.

               Defendants.


and

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,

               Intervenor-Defendants.

CIVIL ACTION

Case No. 2:20-CV-13134

Hon. Linda V. Parker

## INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.     Whether Plaintiffs are entitled to preliminary injunctive relief.

      Intervenor-Defendants' Answer:  No.

II.    Whether Plaintiffs are entitled to permanent injunctive relief.

      Intervenor-Defendants' Answer:  No.

## <u>CONTROLLING AND APPROPRIATE AUTHORITY</u>

*Lance v. Coffman*, 549 U.S. 437, 442 (2007)

*Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020)

*CenTra, Inc. v. Estrin*, 639 F. Supp. 2d 790 (E.D. Mich. 2009)

*Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992 (M.D. Pa. Nov. 21, 2020)

*Costantino v. City of Detroit*, No. 20-014780-AW (Mich. Cir. Ct. Nov. 13, 2020)

# INTRODUCTION

Plaintiffs seek unprecedented and wholly unjustified relief. Based on what Plaintiffs describe as an international conspiracy to rig the election for Joe Biden, Plaintiffs now ask this Court to "de-certify" Michigan's election or "stay the delivery of the certified results to the Electoral College." Mot. at 16. Far from preserving the status quo, Plaintiffs' requested relief would dramatically alter it by wreaking havoc on Michigan's ability to have its chosen slate of electors represented in the Electoral College and by violating the constitutional rights of millions of Michiganders.

At the outset, the Court should deny Plaintiffs' motion because the Court lacks jurisdiction to hear this case and Plaintiffs have not stated viable constitutional claims. Nor does the Constitution permit the type of judicial oversight into Michigan's election procedures that Plaintiffs seek. Plaintiffs' motion thus provides no basis for their extraordinary demand to "decertify" election results.

Regardless, Plaintiffs have no likelihood of success on the merits given the paltry "evidence" submitted with their motion. Plaintiffs' extraordinary claims of vote-rigging demand extraordinary proof. Instead, Plaintiffs have presented this Court with scientifically unsound expert reports, wild conspiracy theories, and speculative allegations of election law violations (many of which have already been considered and rejected by other courts). Indeed, just yesterday Attorney General Barr confirmed the Department of Homeland Security and Department of Justice

have investigated allegations of electoral fraud and the specific claim that voting machines were hacked and found no substance to those claims. *See* Ex. 3.

In short, as detailed in Intervenor-Defendants' motion to dismiss, PageID.1908-1941, Plaintiffs cannot even state a plausible claim for relief, let alone show they are likely to prevail on the merits. Nor do the other injunction factors favor Plaintiffs. The Court should deny the motion.

## BACKGROUND

### A.    The General Election and Pending Post-Election Challenges

In the weeks leading up to, and on, November 3, 2020, a record 5.5 million Michiganders voted in the presidential election. Ex. 4. Those votes have been processed and canvassed by a dedicated team of election officials, operating under intense scrutiny in the midst of a public health crisis. The presidential election was not close: by more than 150,000 votes, the people of Michigan decisively chose Joseph R. Biden, Jr. to be the next President of the United States.  *See id.*

Dissatisfied with that outcome, the Trump Campaign and its supporters have sought to accomplish through the courts what they were unable to do at the polls. As detailed more extensively in Intervenor-Defendants' motion to dismiss, state court plaintiffs have already (unsuccessfully) lobbed unsupported charges of mistreatment of election observers, counting of ineligible ballots, pre-dating of absentee ballots, ballot tabulators miscounting votes for Trump, and unsecured ballots being delivered

2

in large bins or vans. *See* PageID.1919-1921. Michigan state courts have universally found these allegations meritless. *See id.* Additionally, another group of plaintiffs contesting the election results recently filed a Petition in the Michigan Supreme Court, raising many of the same issues and claims Plaintiffs raise here, and seeking strikingly similar relief, including a request to enjoin certification. *See* PageID.2026-2080. All of these state court actions remain ongoing.

### B.    Michigan's Post-Election Procedures and Deadlines

Under Michigan law, the Michigan State Board of Canvassers was required to canvass results of the 2020 General Election by November 23, 2020. MCL § 168.842. The State Board did so by a 3-0 vote, certifying the results "for the Electors of President and Vice President," among other offices. Ex. 5. That evening, Governor Whitmer signed the Certificates of Ascertainment for the slate of electors for Joseph R. Biden and Kamala Harris. Ex. 6. Those certificates have already been transmitted to and received by the National Archives. *See id.* There are no procedures under Michigan law to "de-certify" an election that has already been certified.

Under the federal statutory timetable unique to presidential elections, the Electoral College must meet on "the first Monday after the second Wednesday in December," 3 U.S.C. § 7—this year, December 14. The federal "safe harbor" date, which gives conclusive effect to a state's electoral votes if they are submitted by a certain date, occurs even earlier—this year, December 8. *Id.* § 5.

Michigan law also sets forth procedures to conduct an audit of an election. MCL § 168.31a. Secretary of State Benson has already announced the state will conduct such an audit. Ex. 7.

## LEGAL STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy [] that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *CenTra, Inc. v. Estrin*, 639 F. Supp. 2d 790, 806 (E.D. Mich. 2009) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). The movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs' motion fails on each of these factors.

Moreover, a temporary injunction that requests an affirmative act, like the one Plaintiffs request here to decertify the election, *see* Mot. at 16, is "tantamount to a mandatory injunction [and] requires a higher [] burden to issue than required of an order merely preserving the status quo." *Albino-Martinez v. Adducci*, 454 F. Supp. 3d 642, 646 (E.D. Mich. 2020).

Finally, because Plaintiffs also seek "a stay in the delivery of the certified results to the Electoral College"—a request which Plaintiffs describe as merely "preserv[ing] the status quo," but which could, in reality, have a permanent,

prejudicial effect on Michigan's ability to meet the federal safe harbor deadline for its chosen electors—this Court should require Plaintiffs to demonstrate actual success on the merits. As the Sixth Circuit has explained, "[w]e ought not to grant temporary relief which would finally dispose of the case on its merits" unless plaintiffs have shown they have "prevail[ed] on the merits of the case." *Dunn v. Retail Clerks Int'l Ass'n, AFL-CIO, Local 1529*, 299 F.2d 873, 874 (6th Cir. 1962).

## ARGUMENT

## I. Plaintiffs are not likely to succeed on the merits of their claims.

### A. This Court lacks jurisdiction to hear this case.

Before even reaching the myriad problems that plague Plaintiffs' case on the merits, this Court should first deny Plaintiffs' motion due to the jurisdictional defects plainly apparent from their request for a temporary injunction and the federalism concerns their request raises. Plaintiffs seek a remedy which a federal court cannot provide, and lack Article III standing. The Court should deny the motion due to these fatal flaws alone. Indeed, given that well-established principles of abstention warrant deference to the ongoing state court proceedings, it would be particularly inappropriate for the Court to impose the dramatically status quo altering relief plaintiffs seek here. *See* PageID.1923-1928.

#### 1. Plaintiffs' requested relief is barred by the Eleventh Amendment.

As Intervenor-Defendants detailed in their motion to dismiss, Plaintiffs' request that a federal court direct a state officer to comply with state law is barred

under the Eleventh Amendment, regardless of their efforts to dress up their state law concerns in the clothing of federal claims. *See* PageID.1926-1928; *Pennhurst State School & Hospital v. Halderman*, 469 U.S. 89, 106 (1984).

Plaintiffs' emergency motion confirms this fatal flaw. While some of their allegations concern fantastical conspiracy theories that belong more appropriately in the fact-free outer reaches of the Internet, *see* Mot. at 2-5, what Plaintiffs assert at bottom are violations of the Michigan Election Code. *Id*. at 5-7. Indeed, in arguing the merits of their case, Plaintiffs pivot to these less outlandish (though still baseless) claims, arguing that "Defendants' intentional actions . . . violated Michigan laws, including multiple provisions of the Michigan Election Code." *Id*. at 9. Plaintiffs attempt to explain how this failure to follow state law violates the federal Constitution, *see id.* at 10-12, but cannot do so. *See, e.g., Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A violation of state law does not . . . transgress against the Constitution."); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("[T]he Constitution is not an empty ledger awaiting the entry of an aggrieved litigant's recitation of alleged state law violations…."). Plaintiffs ask for a federal injunction directing a state official to comply with state law, a request jurisdictionally barred by the Eleventh Amendment.

### 2. Plaintiffs lack standing.

The Court should also deny Plaintiffs' motion because Plaintiffs do not have standing. *See* PageID.1928-1931. Standing requires that plaintiffs have suffered an injury which is fairly traceable to and redressable by Defendants. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs fail all three prongs.

First, Plaintiffs fail to demonstrate how they have been injured by any of the purported violations they allege, all of which are premised on the idea that their votes were diluted by illegal votes. Mot. at 10-12. But even if that were true (and it is not) such a generalized grievance is one shared by every Michigan voter and does not provide Article III standing. *See, e.g.*, *Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120, at *11-14 (3d Cir. Nov. 13, 2020); *Donald J. Trump for President, Inc. v. Cegavske*, No 2:20-Cv-1445, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020). Plaintiffs note that they have the right to certain remedies under state law, including an election audit and an election contest. Mot. at 7. But the granting of statutory rights of action in state court does not provide Article III standing to adjudicate different rights in federal court. *Cf. Spokeo*, 136 S. Ct. at 1547-48 ("Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.") (internal quotation mark and citation omitted).

Plaintiffs' claims to standing under the Elections and Electors Clauses fare no better. These, too, have all the hallmarks of a generalized grievance insufficient for Article III standing. *See Lance v. Coffman*, 549 U.S. 437, 442 (2007). And that certain Plaintiffs were candidates to be electors in Michigan does nothing to confer standing under either clause. *Bognet*, 2020 WL 6686120, at *6-7.

Second, Plaintiffs have demonstrated neither traceability nor redressability. Any purported injuries they may have suffered due to failure to follow the Michigan Election Code were caused by local officials not before this Court. Regarding Plaintiffs' outlandish claims of massive voter fraud by nefarious actors, any purported injuries here would be the result of criminal actors whose actions would break any causal chain between Defendants' actions and Plaintiffs' injuries. *Cf. James v. Meow Media, Inc.*, 300 F.3d 683, 699 (6th Cir. 2002) ("Generally, a third party's criminal action . . . break[s] the chain of causation."). In any event, Plaintiffs still fail to demonstrate that a federal court can take any action to de-certify an election that has already been certified. This too is fatal to Plaintiffs' claims.

## B.   Plaintiffs still have not stated viable claims.

Plaintiffs also have not demonstrated a likelihood of success on the merits because they have not stated viable claims. *First,* Plaintiffs have not stated a viable equal protection claim. Plaintiffs' equal protection injury relies entirely on purported vote dilution based on counting allegedly ineligible votes. Mot at 10-12. But "[i]f

8

dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law . . . into a potential federal equal protection claim." *Bognet*, 2020 WL 6686120, at *11 (quoting *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680 at *45-46 (W.D. Pa. Oct. 10, 2020)). This is not the law. Plaintiffs' claims are outside the scope of the Equal Protection Clause.

Plaintiffs also have not stated viable claims for violations of the Michigan Election Code and Michigan Constitution. *See* Mot. at 12. Plaintiffs note that the Michigan Constitution states that all Michigan citizens have "[t]he right to have the results of statewide elections audited, in such a manner as prescribed by law. . . ." *See id.* (quoting Mich. Const. art. II, § 4(1)(h)). Michigan has provided procedures for the Secretary of State to conduct an audit after the election, and the Secretary has stated that she will do so. *See* Ex. 7. Plaintiffs cannot demonstrate that the cited provisions entitle them to more than this, and surely the Michigan Constitution does not require the disenfranchisement of voters, which is the relief Plaintiffs request.[1]

### C.   Plaintiffs' purported evidence does not support their claim.

---

[1] Plaintiffs' Amended Complaint purports to raise claims under the Due Process Clause and Elections and Electors Clause, but Plaintiffs never assert that they have a likelihood of success on either claim in their motion for emergency relief. *See* Mot. at 9-13. To the extent Plaintiffs seek relief for these purported violations, these, too, fail to raise viable claims for the reasons detailed in Intervenors-Defendants' Motion to Dismiss. *See* PageID.1936-1938.

The factual record further demonstrates that Plaintiffs are unlikely to succeed on the merits of their claims. In their motion, Plaintiffs rely on scientifically unsound expert reports, absurd conspiracy theories, and rehashed allegations of election law violations. None of this so-called evidence supports Plaintiffs' allegations of voter fraud or provides a legitimate basis for disenfranchising millions of Michigan voters.

1.      Plaintiffs' Statistical Analyses Are Flawed and Unreliable.

Plaintiffs' statistical analyses do not stand up to basic scrutiny and cannot support injunctive relief. *AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779-81 (10th Cir. 2009) (affirming denial of a preliminary injunction based primarily on a finding that the expert testimony was unreliable). Dr. Briggs, Plaintiffs' lead statistical expert, relies on a telephone survey of 248 respondents conducted by Matt Braynard. Mot. at 2-3. As the attached expert report of Dr. Ansolabehere[2] makes clear (attached as Ex. 1), Mr. Braynard's survey was riddled with flaws—a scientifically unacceptable non-response rate (*id.* ¶¶ 31, 41), a failure to ensure that the person answering the questions was the intended target (*id*. ¶¶ 33-36), a failure to ask about permanent absentee voters who do not need to request an absentee ballot each cycle (*id*. ¶¶ 53-55), the inability to determine whether ballots were not counted due to voter errors (*id.* ¶¶ 57-59), a failure to account for memory errors and social

---

[2] Dr. Ansolabehere is the Frank G. Thompson Professor of Government in the Department of Government at Harvard University.

desirability bias (*id.* ¶¶ 60-61), and inconsistent data totals across questions (*id.* ¶¶ 62-81).

Dr. Briggs compounds these problems by making his own errors in analyzing Braynard's survey data. He admits that he did not verify that the survey was representative or that the data were accurate. PageID.1543 ("I assume survery [sic] respondents are representative and the data is accurate."); *see also* Ex. 1, ¶¶ 4, 29. When analyzing the significance of the number of voters who received absentee ballots without requesting them ("Error #1"), Dr. Briggs fails to consider permanent absentee voters, who receive ballots without requesting them. *Id.* ¶¶ 53-55. And when analyzing the significance of the number of absentee ballots that were sent but unrecorded ("Error #2"), he fails to account for late, undeliverable, rejected, and spoiled ballots—reasons why no vote would be recorded even though the person said they voted. *Id.* ¶¶ 57-59. Briggs's findings should be given no weight.

Plaintiffs' other attempts to claim "statistical anomalies" in absentee voting patterns fare even less well. Plaintiffs rely on two pages of analysis by Robert Wilgus to claim that questions regarding absentee ballot and application dates raise concerns. Mot. at 4. But Plaintiffs fail to provide any credentials for Mr. Wilgus, and his analysis of absentee ballots is devoid of any observable methodology. PageID.1784-1785. Mr. Wilgus even admits that his findings "warrant further

investigation" and that he intends to share his data with an analytics firm "to see what they can tease out if [sic] it." PageID.1785.

Plaintiffs likewise point to an analysis by Thomas Davis observing that there was a higher percentage of Democratic absentee voters than Republican voters in almost every precinct. FAC ¶ 124 (citing PageID.1787). This is readily explained by Davis's own statement that "the Democratic party had encouraged people to vote absentee, while the Republican party had encouraged voting in-person." PageID.1786. Davis's claim that it is anomalous that the percentages of Republican and Democratic absentee voters in 2020 track each other across precincts is also baseless, given that his analysis of the 2016 Michigan data shows similar correlation. *Id*.

Next, Plaintiffs point to changes in voter turnout patterns between 2016 and 2020 to support their claims of fraud. Plaintiffs rely on an affidavit by Dr. Eric Quinnell identifying increased turnout for Joe Biden in Wayne and Oakland Counties to argue that the election results are "anomalous" and "suspicious." Mot. at 3; *see also* PageID.1568-1569. As the attached expert report of Dr. Jonathan Rodden demonstrates (attached as Ex. 2), Dr. Quinnell's methodology is fundamentally flawed insofar as his "red flags" or "anomalies" are self-manufactured due to his misunderstanding of the data and basic voting patterns. *See* Ex. 2 at 7-19. Plaintiffs also rely on an analysis by Dr. Stanley Young, who claims

that the Democratic swings from 2016 to 2020 are statistical anomalies. Mot. at 3 n.1 (citing PageID.1776). By this faulty logic, any significant shift in votes in a given election would be by definition "anomalous" and "suspicious." Neither analysis accounts for the fact that voter attitudes and turnout simply shifted between 2016 and 2020, especially in districts that lean Democratic. And neither analysis connects the allegedly "anomalous" shifts to any actual evidence of voter fraud.

Plaintiffs next rely again on Mr. Braynard to make an even more attenuated claim that over 12,120 ineligible voters cast ballots from out of state. Mot. at 3. But all Plaintiffs put forward is a copy of a Twitter post, which identifies "indicators of someone no longer eligible to vote due to residence." PageID.1571. There is no explanation how or when the National Change of Address Database was queried, what methodology was used, whether the data is even accurate, or why Mr. Braynard would be qualified to conduct the analysis. Even in 2020, a tweet is not an expert report admissible in federal court. It is inadmissible hearsay and should be ignored.

Finally, Plaintiffs rely on Dr. Bouchard to assert that a "statistical impossibility" occurred when President-elect Biden jumped ahead by approximately 140,000 votes on November 4, 2020. FAC ¶ 121. But it is well-documented that heavily populated Democratic counties released the counts for large groups of ballots all at once, causing spikes for President-Elect Biden. Ex. 8. In addition, a widely reported clerical error on the morning of November 4, 2020 was quickly

corrected. Ex. 9. Dr. Bouchard fails to grapple with any of these possibilities and instead speculates, without evidence, that these spikes are evidence that President Trump's vote counts were depressed or President-Elect Biden's vote counts were inflated. PageID.1800. Dr. Bouchard, like all of Plaintiffs' other experts, lends no support to Plaintiffs' wild claims of systemic voter fraud.

2.    Plaintiffs' Conspiracy Theories about Dominion Are Unsubstantiated.

Plaintiffs also rely on unfounded conspiracy theories about Dominion Voting Systems and alleged foreign interference. Mot. at 4-5, 10, 12-13. Although the FAC stitches together a disjointed array of allegations, *see generally* FAC Sec. IV,[3] the motion itself is principally based on two *unsubstantiated, anonymous* affidavits. Mot. at 4-5.

First, Plaintiffs cite an "analysis" by an anonymous "US Military Intelligence expert" who purports to conclude that the voting "systems and software have been accessible and were certainly compromised by rogue actors, such as Iran and China." Mot. at 4; *see also* PageID.1595-1596. But this hard-to-follow affidavit provides no

---

[3] Claims that the Dominion machines were connected to the internet making them vulnerable to hacking are misconstrued or wrong. *Compare* PageID.1494-1500, 1501-1502, *with* Ex. 10. Other claims are hearsay or do not assert that any improper vote counting occurred. *See, e.g.*, FAC ¶¶ 166-74; PageID.1535-1540; PageID.966-993; PageID.1503-1504; PageID.1505-1519; PageID.1597-1603; PageID.1604-1651. Assertions that Dominion has ties to regimes in Venezuela and the Philippines are also false. *Compare* FAC ¶¶ 156-57, and PageID.958-965, PageID.1520-1524 *with* Ex. 11.

factual basis for that conclusion. It consists of unexplained website screen captures that do not reveal improper access by anyone to any Dominion systems in the 2020 election. It is also unauthenticated and inadmissible. *See* Fed. R. Evid. 901. Further, this purported expert opinion is inadmissible under Federal Rule of Evidence 702, which requires that the testimony come from someone "qualified as an expert" and be "the product of reliable principles and methods."

Plaintiffs also cite to a Joint Cybersecurity Advisory from the FBI and Cybersecurity & Infrastructure Security Agency ("CISA") to bolster their theory, *see* Mot. at 5; PageID.1525-1534, but that Advisory does not mention Michigan nor Dominion anywhere. Indeed, the Director of CISA later stated that "we have no evidence any foreign adversary was capable of . . . changing vote tallies." Ex. 12.

Plaintiffs next rely on an anonymous affidavit by an individual who claims to have conducted some sort of statistical analysis and to have "found significant evidence of foreign interference" and "several 'red flags' concerning the percentage of votes won by candidate Biden in counties using . . . Dominion Voting Systems." Mot. at 4-5 (internal quotation marks omitted); PageID.1828. But the purported analysis is wholly unexplained and conclusory. It does not lay out the data or methods used to reach its conclusions, including: (1) how Census data was used to conclude that Dominion was the cause of any alleged disparity, PageID.1830-1831; (2) how it was determined that between 162,400 and 276,080 votes were impacted,

15

PageID.1832; or (3) why the data "strongly suggest a systemic, system-wide algorithm was enacted by an outside agent," *id.* It is difficult to discern what (if anything) the so-called expert's scatterplot chart actually demonstrates and from where the "predicted Biden ratio" data is derived, but on its face it appears to show that most of both the red larger dots (Michigan counties using Dominion systems) and the blue larger dots (Michigan counties using other voting systems) fall above the diagonal line, outperforming expectations; it is not just the red larger dots that do. PageID.1829-1830.

Notably, just yesterday, United States Attorney General William Barr repudiated this "algorithm" claim and stated that "DHS and DOJ have looked into" allegations "that machines were programmed essentially to skew the election results" and that "so far, we haven't seen anything to substantiate that." Ex. 3.

Finally, Plaintiffs put misplaced reliance on the affidavit of Russell James Ramsland, Jr. *See* FAC ¶¶ 11, 120, 138-146; PageID.1572-1579. As Intervenor-Defendants' expert Dr. Rodden explains, Ramsland's affidavit "lacks even a basic level of clarity or transparency about research methods or data sources that would be expected in a scientific communication." Ex. 2 at 2. Mr. Ramsland provides no basis to conclude that he has personal knowledge about any actual vote counting errors. Instead he speculates based only on supposed and inadequately explained "anomalies and red flags." PageID.1573. For example, ignoring the obvious

possibility that late-counted absentee ballots in fact favored Mr. Biden, Mr. Ramsland hypothesizes that increased vote totals for Mr. Biden after 2:00 a.m. on November 4 "could easily be produced . . . by pre-loading . . . blank ballots . . . [and] then casting them almost all for Biden." PageID.1575-1576. Mr. Ramsland's speculation is apparent: He admits that "it will be impossible to know for certain" whether his theories are true without "a thorough forensic analysis," which he did not perform. PageID.1573. Mr. Ramsland's analysis is as flawed here as it was in Georgia. Ex. 13. It cannot be a proper basis for the relief sought.[4]

### 3.   The Alleged Election Code Violations Lack Merit.

Plaintiffs assert that there were "dozens of distinct violations of the Michigan Election Code" in Wayne County. Mot. at 6. But far from demonstrating fraud or misconduct, the more than 100 affidavits recycled by Plaintiffs, *see* PageID.994-1227, reflect minor grievances and speculative concerns that have largely already been rejected. Plaintiffs also fail to identify any significant number of miscounted

---

[4] Plaintiffs cite *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1294-95 (N.D. Ga 2018), which they incorrectly attribute to the Eleventh Circuit. Mot. 12-13. But nothing in that lawsuit or the *Curling* case materials attached to Plaintiffs' FAC, *see generally* PageID.1652-1770, supports their theory. *Common Cause* was about the operation of Georgia's "computerized registration system." 347 F. Supp. 3d at 1294. And the expert declarations cited there from the 2018 *Curling* case (and subsequent challenges) concerned issues limited to only Georgia's election. 347 F. Supp. 3d at 1294 (citing *Curling v. Kemp*, 334 F. Supp. 3d 1303 (N.D. Ga. 2018)). Plaintiffs offer no reason to believe that these alleged problems relate in any way to Michigan's election system.

ballots. They acknowledge that "it may not be possible to precisely quantify the number of illegal votes," but baselessly contend that "it was certainly in the tens of thousands (if not hundreds of thousands)." Mot. at 6. Given the limited number of ballots, Plaintiffs fail to show that the conduct alleged "affect[ed] the result" of the election. *See* Mot. at 7 (quoting *Behrendt v. Wilcox*, 277 Mich. 232, 246 (Mich. 1936)).

### a. *Unsupported Claims of Tampering and Miscounting*

Plaintiffs reassert allegations of ballot tampering and miscounting, *see* FAC Sec. II.B-C, that were addressed in a separate lawsuit, *Costantino v. City of Detroit*. *See* FAC ¶¶ 81-83, 86, 90, 93, 96, 99, 100, 191. In that case, the Michigan Third Judicial Circuit scrutinized the same allegations and many of the same affidavits, concluding that the "[p]laintiffs' interpretation of events is incorrect." *Costantino v. City of Detroit*, No. 20-014780-AW, slip op. at 11 (Mich. Cir. Ct. Nov. 13, 2020) (attached as Ex. 14).[5] As the *Costantino* court found, these affiants simply "did not have a full understanding of the TCF absent ballot tabulation process." *Id*. at 13.

Even what Plaintiffs call the "most egregious example of election workers' fraudulent and illegal behavior," FAC ¶ 82, proves unfounded. The *Costantino* court

---

[5] The Plaintiffs in *Costantino* unsuccessfully attempted to appeal this ruling. *See Costantino v. City of Detroit*, No. 355443 (Mich. Ct. App. Nov. 16, 2020) (attached as Ex. 15); *Costantino v. City of Detroit*, No. 162245 (Mich. Nov. 23, 2020) (attached as Ex. 16).

specifically examined and rejected the claim that "unmarked vans with out-of-state license plates" may have delivered "tens of thousands" of ballots to the TCF Center "well after the 8:00 PM Election Day deadline," Mot. 6; *see* FAC Sec. II.B.1, finding it to be "rife with speculation and guess-work about sinister motives" and lacking foundation. Ex. 14 at 5-6. Plaintiffs recycle the declaration of Melissa Carone, who observed food delivery vans arrive and two hours later saw news reports of new ballots delivered to the TCF Center. The *Costantino* court found her speculation that the vans dropped off fraudulent ballots "simply not credible." *Id.* at 7.[6] Instead, the court found that "all ballots were delivered to the back of Hall E at the TCF Center"; that "the City utilized a rental truck to deliver ballots"; and that "[t]here is no evidentiary basis to attribute any evil activity" to this process. *Id.* at 11.

Plaintiffs also claim that "poll workers . . . were pre-dating absent voter ballots," citing the affidavit of a Republican poll challenger who "believe[s] that poll workers . . . [changed] the dates ballots were received" based on information purportedly provided to her by an unnamed poll worker. FAC ¶ 88. These claims rest on hearsay and have already been rejected. The *Costantino* court found that poll workers "completed a data field inadvertently left blank during the initial absentee

---

[6] Similarly, the affidavit of Matt Ciantar states that on November 4, 2020, he witnessed a van arrive at a post office in Plymouth, Michigan, which dropped off 3-4 clear plastic bags having "what looked like a black security zip tie." PageID.1312. Based on this limited set of facts, Mr. Ciantar guesses what "could be" in those bags: "ballots going to the TCF center or coming from the TCF center." PageID.1313.

ballot verification credit process," and that "[t]he entries reflected the date the City received the absentee ballot." Ex. 14 at 4. Indeed, "[n]o ballot could have been 'backdated,' because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center." Thomas Aff. ¶ 20 (attached as Ex. 17). In another case, *Trump v. Benson* (attached at Ex. 18), the Michigan Court of Claims determined that the poll challenger's statement was double hearsay and that a related sticky note constituted hearsay as well.[7]

Plaintiffs' affiants also label routine election tasks as misconduct and fraud. Articia Bomer, for instance, saw election workers manually correcting unscannable ballots and baldly asserted that she "believe[s]" they "were changing votes that had been cast for" Republicans. FAC ¶ 91. This is not "eyewitness testimony of election workers manually changing votes for Trump to votes for Biden," *id.,* but rather observation of a routine election task combined with unfounded speculation.[8]

---

[7] Plaintiffs also object that "when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900." FAC ¶ 85. But while "[i]n polling places, voters are verified by providing their date of birth," absentee "voters [were] verified by signature comparisons . . . before ballots were delivered to the TCF Center." Ex. 17, Thomas Aff. ¶ 15. Since "[i]nspectors at the TCF Center did not have access to voters' birthdates," but the software still required a birthdate, "1/1/1900 was used as a placeholder" under "standard operating procedure" recommended by the Secretary of State. *Id.*

[8] Other affidavits also jump to unsupported conclusions. *See, e.g.*, PageID.1012 (alleging that poll workers who retraced votes on ballots to make them readable by the tabulation machines also "added votes where there was no[ne]"); FAC Ex. 3 at 65 (alleging without support that corrected ballots "should have been overvoted and not counted").

Plaintiffs also allege that some ballots "*could . . .* have [been] processed" (emphasis added) despite being "cast by third-parties, deceased voters, unregistered or out-of-state voters, blank ballots that were counted over and over, and/or double votes from people voting both absentee and in-person." Mot. 6; *see* FAC Sec. II.C. Besides being wholly speculative,[9] these allegations suffer from the same two flaws as the others. First, they demonstrate only general process misunderstandings by Plaintiffs. For instance, Plaintiffs allege that signatures were not verified at the TCF Center, FAC ¶ 96, but in fact "there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined" prior to the time ballots arrived there. *See* Ex. 14 at 4. Second, even if Plaintiffs' allegations plausibly amounted to misconduct, they would concern only a small and ultimately inconsequential number of ballots. *See, e.g.*, FAC ¶¶ 94-99.

### b. Unsubstantiated Complaints About Challenger Access

Plaintiffs also reassert prior rejected claims that election officials prevented Republican challengers from monitoring ballot processing and counting and treated them differently from Democratic challengers. *See* FAC ¶¶ 62-80.[10] But these

---

[9] For example, Plaintiffs' reliance on Marian Sheridan's affidavit is misplaced, as Ms. Sheridan does not explain where she got the ballot data she purports to be analyzing, or the methodology she uses to draw conclusions about the data, and does not provide the data for review. PageID.1541-1542.

[10] For these allegations Plaintiffs rely entirely on affidavits submitted previously by other plaintiffs in *Trump v. Benson*, 1:20-CV-1083 (W.D. Mich. Nov. 11, 2020),

allegations of inconveniences and minor complaints do not constitute statutory or constitutional violations, let alone ones altering Michigan's now-certified election.

Plaintiffs' claims that they could not see the ballot processing have already been rejected. Although challengers were required to comply with distancing requirements, the court in *Costantino* found that it was "simply not correct" that they were "prevented from viewing the work being processed at the tables" because "a large monitor" at every table allowed individuals to "maintain a safe distance from poll workers to see what exactly was being performed." *See* Ex. 14 at 8-9.[11]

Plaintiffs also reassert the now thoroughly debunked claim that Wayne County excluded Republican challengers. Notably, 90 of their 102 affiants were present in the room in Wayne County, along with many other Republican challengers, putting the total at or above the limit of 134. *See* Ex. 17, Thomas Aff. ¶¶ 32, 33; Ex. 19, MacKenzie Aff. ¶¶ 6, 7. Some Republican and Democratic challengers were denied readmittance when the room reached "maximum occupancy" and, because of "COVID-19 concerns, no additional individuals could be allowed into the counting area." Ex. 14 at 8.[12] Even then, as a nonpartisan observer noted, "there still remained a 1:1 ratio of Republican to Democratic

---

which was voluntarily dismissed. Plaintiffs' allegations in FAC Sec. II.A are almost copied verbatim from that dismissed complaint. *See* FAC at ¶¶ 27-37, 40-44.

[11] *See also* Ex. 17, Thomas Aff. ¶ 14; Ex. 23, Temkin Aff. ¶ 5; Ex. 24, Grund Aff. ¶ 8.

[12] *See also* Ex. 20, Jaffe Aff. ¶ 31; Ex. 21, Zimmerman Aff. ¶ 17.

challengers." Ex. 23, Temkin Aff. ¶ 9.

As for Plaintiffs' allegation that poll workers disregarded their challenges, their own affidavits show they did not follow established processes and generally lacked proper training. Michigan law requires good cause for any challenge, *see* MCL § 168.727, but Plaintiffs' affiants indiscriminately challenged ballots in bulk or raised the same improper challenges over and over. *See, e.g.*, FAC Ex. 3 at 25, Gaicobazzi Aff. ¶ 10; *id.* at 74-75, Gorman Aff. ¶¶ 15, 19; *id.* at 86, Daavettila Aff. ¶ 3. For example, challengers repeatedly challenged "ballots for whom the voter records did not exist in the poll books," FAC ¶ 75, even though absent voter ballots received after November 1 would not *be* in the pollbook but "added either by manually entering the voter names into the EPB or on supplemental paper poll lists." Ex. 17, Thomas Aff. ¶ 8.

Otherwise, Plaintiffs only allege feeling generally mistreated, FAC ¶¶ 70-73, which is not a statutory or constitutional violation. Nor do they paint a complete or accurate picture. "[T]here were numerous instances of disruptive and intimidating behavior by Republican challengers," which "necessitated removing Republican challengers from the TCF Center by police."  Ex. 14. at 3.[13]

## II.     The equities do not favor an injunction.

---

[13] *See also, e.g.*, Ex. 19, MacKenzie Aff. ¶ 21; Ex. 20, Jaffe Aff. ¶¶ 13, 18-20; Ex. 22, Correll Aff. ¶ 10; Ex. 21, Zimmerman Aff. ¶¶ 7, 10, 17.

Because Plaintiffs have not shown a likelihood of success on their claims, the Court need not consider the remaining three preliminary injunction factors. As the Sixth Circuit has explained, "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Mich. State v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). But even if the Court were to reach these factors, it would find that the equities strongly counsel against an injunction.

### A.   Plaintiffs have not demonstrated irreparable harm.

"A plaintiff seeking a preliminary injunction must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Here, Plaintiffs utterly fail to demonstrate irreparable harm.

*First*, because Plaintiffs have not shown a likelihood of success of the merits of their constitutional claims, Plaintiffs' assertion that they will suffer per se irreparable harm, *see* Mot. at 13, is meritless as well. *See, e.g.*, *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573, 578 (6th Cir. 2002). In any event, such a *per se* rule is typically appropriate only in cases involving First Amendment claims or other claims involving ongoing constitutional deprivations. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (acknowledging "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury").[14]

---

[14] Plaintiffs' cases do not demonstrate otherwise. In both cases Plaintiffs cite, *see* Mot. at 13, the constitutional injury at issue was a First Amendment injury. *See Am.*

24

Separately, while Plaintiffs claim "irreparable injury" to "their specific rights as candidates to electoral office," Mot. at 13, the Supreme Court has long held that there is no absolute constitutional right to be a candidate for office or to be elected to that office. *See Snowden v. Hughes*, 321 U.S. 1, 7 (1944) (holding an individual has no property or liberty interest in being elected); *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983) (candidates do not have an absolute right to appear on the ballot). Nor is there a constitutional right to have one's preferred candidate of choice appear on a ballot, much less to have that candidate elected. *See*, *e.g.*, *Zielasko v. Ohio*, 873 F.2d 957, 961 (6th Cir. 1989) ("no one is guaranteed the right to vote for a specific [candidate]"); *Becker v. Fed. Election Comm'n*, 230 F.3d 381, 390 (1st Cir. 2000) (voters' "assert[ion] that their preferred candidate now has less chance of being elected . . . is hardly a restriction on voters' rights"); *Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (voter's "wish that the Democratic primary voters had chosen a different presidential candidate . . . do[es] not state a legal harm").

*Second*, Plaintiffs have not demonstrated irreparable harm because any injury may be redressed by state remedies. As the court observed in *Costantino*:

> Plaintiffs have multiple remedies at law. . . Fraud claims can be brought
> to the Board of Canvassers, a panel that consists of two Republicans

---

*Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003) (Establishment Clause violation); *Obama for America vs. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (considering equal protection claim not for any alleged "dilution" of the right to vote, but for a *burden* on the right to vote, which constitutes an injury under the First and Fourteenth Amendments).

and two Democrats. If dissatisfied with the results, Plaintiffs can also avail themselves to the legal remedy of a recount and a Secretary of State audit pursuant to MCL 168.31a.

Ex. 14 at 11. As noted *supra* at 4, the State has announced it will conduct a statewide audit of the election results. What's more, Plaintiffs themselves have identified additional state law remedies for "fraudulent or illegal voting." Mot. at 8 (identifying state law "*quo warranto* remedy" under MCL § 168.861). Because Plaintiffs assert they have various other forms of redress, Plaintiffs would not suffer irreparable harm if this Court denies their motion.

*Third*, and finally, Plaintiffs' extreme delay in bringing this suit undermines any contention of irreparable harm. *See, e.g.*, Wright & Miller, 11A *Federal Practice and Procedure*, § 2948.1 (3d ed., Apr. 2017 update) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). The grievances Plaintiffs raise occurred (if they occurred at all), on November 3rd and 4th. Indeed, nearly all of Plaintiffs' affidavits describe activity which occurred on Election Day or the day after. *See generally* PageID.994-. Yet Plaintiffs waited until November 29—nearly four weeks after Election Day—to file this motion. This Court should consider Plaintiffs' inexcusable delay in determining whether they are now entitled to the "emergency" injunctive relief they seek.

**B.    The balance of the equities and the public interest counsels strongly against an injunction.**

The balance of equities and public interest cut sharply against granting injunctive relief. Plaintiffs' request that this Court "de-certify" Michigan's election results or order a "stay in the delivery of the certified results to the Electoral College," Mot. at 16, could wreak havoc Michigan's ability to have its chosen slate of electors and would violate the constitutional rights of millions of Michiganders, all while undermining public confidence and trust in the election's results.

Given the unique statutory timetables for finalizing the results of presidential elections, courts have recognized that states have a significant interest in meeting the federal "safe harbor" deadline to ensure that Congress recognizes its chosen slate of electors. *See, e.g., Stein v. Cortes*, 223 F. Supp. 3d 423, 442 (E.D. Pa. 2016) (explaining failure to meet safe harbor deadline would be "prejudicial" to Pennsylvania and denying presidential candidate's recount request where relief jeopardized state's ability to meet that deadline).

Indeed, far from supporting Plaintiffs' request for a temporary injunction, the Court's decision in *Stein v. Thomas*, 222 F.Supp.3d 539 (E.D. Mich. 2016) undermines it. In that case, Jill Stein filed a petition for a recount of the presidential election, which she was entitled to under Michigan law. State law, however, required Michigan officials to wait several days before beginning the recount. *Id.* at 542. Such delay would have made it difficult, if not impossible, for a recount to be completed before the federal "safe harbor" deadline. *See id.* Under those circumstances, the

district court entered an order requiring the state to start the recount two days early, and to take steps "to assure that the recount is completed in time to comply with the 'safe harbor' provision." *Id.* at 545. In contrast, Plaintiffs' requested relief—"de-certification" of Michigan's election results or a stay in the delivery of the certified results to the Electoral College—could significantly jeopardize, or even prevent, Michigan from meeting the "safe harbor" deadline.[15]

For that reason, in the past several weeks, courts have rightly refused to enjoin states' certification procedures or interfere with states' ability to send their chosen slate of electoral votes to Congress. *See Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020) (construing Trump Campaign's request to enjoin Pennsylvania's certification of results as a request "to disenfranchise almost seven million voters," and refusing to do so), *aff'd*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020); *Wood v. Raffensperger*, No. 1:20-cv-04561-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) (denying request to enjoin Georgia from certifying its election results,

---

[15] Contrary to Plaintiffs' assertion, *see* Mot. at 14-15, *Stein* does not stand for the proposition that a plaintiff contesting the election results is entitled to any and all injunctive relief before the federal "safe harbor" date. Of course, the district court in *Stein* determined the plaintiffs had established a likelihood of success of the merits of their constitutional claim before granting relief, 222 F. Supp. at 542-43— something the Plaintiffs have not demonstrated here. And notably, the court in *Stein* did not order "de-certification" of Michigan's election results, nor did it enjoin Michigan from sending its electoral votes to Congress while Stein's recount proceeded.

concluding that "interfer[ing] with the result of an election that has already concluded would be unprecedented and harm the public in countless ways"); *Kelly v. Commonwealth*, 68 MAP 2020 (Pa. Nov. 28, 2020) (Wecht. J., concurring) (explaining court could not enjoin the state's certification of election results because "there is no basis in law by which the courts may grant Petitioners' request to ignore the results of an election"). This Court should find the same.

## CONCLUSION

For the reasons set forth above, Intervenor-Defendants respectfully request that the Court deny Plaintiffs' Motion.

Dated: December 2, 2020.                              Respectfully submitted,

Marc E. Elias (DC #442007)
John M. Geise (DC # 1032700)*
Jyoti Jasrasaria (DC #1671527)*
Christina A. Ford (DC #1655542)*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
jgeise@perkinscoie.com
jjasrasaria@perkinscoie.com
christinaford@perkinscoie.com


William B. Stafford (WA #39849)*
Jonathan P. Hawley (WA #56297)*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
wstafford@perkinscoie.com
jhawley@perkinscoie.com


John F. Walsh (CO #16642)*
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, Colorado 80202
Telephone: (720) 274-3154
john.walsh@wilmerhale.com

/s/*Scott R. Eldridge*
Scott R. Eldridge (P66452)
MILLER CANFIELD
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
Telephone: (517) 483-4918
eldridge@millercanfield.com


Mary Ellen Gurewitz (P25724)
CUMMINGS & CUMMINGS
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
Telephone: (248) 733-3405
maryellen@cummingslawpllc.com


Seth P. Waxman (DC #257337)
Brian M. Boynton (DC #483187)*
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 663-6000
seth.waxman@wilmerhale.com
brian.boynton@wilmerhale.com

*Counsel for Intervenor-Defendants DNC Services Corporation/Democratic National Committee and Michigan Democratic Party*

*\*Admission forthcoming*

**PROOF OF SERVICE**

Scott Eldridge certifies that on the 2nd day of December 2020, he served a copy of the

above document in this matter on all counsel of record and parties via the court's ECF system.

s/   *Scott R. Eldridge*
Scott Eldridge

# Exhibit 1

Response to Report of William Briggs

Stephen Ansolabehere

December 2, 2020

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

Stephen Ansolabehere, Ph.D.

Statement of Inquiry

1.  I have been asked to evaluate the report of Dr. William Briggs, dated November 23, 2020.

2.  I am compensated at the rate of $550 an hour.

Summary Assessment

3.  Based on my review, I find the estimates and analyses in Dr. Briggs report to be unreliable and the analysis is not up to scientific standards of survey research, data analysis, or election analysis.  There are substantial errors in the design of the survey and errors and inconsistencies in the data used in the analysis that are of sufficient magnitude to invalidate any calculations or estimates based on these data.  The survey design and implementation fail to meet basic scientific standards of survey research and statistical analysis of surveys.  And, the interpretation of the data does not account for obvious and important features of absentee voting, including permanent absentee voters who do not need to request ballots to receive them and late, rejected, invalid, and spoiled absentee ballots.  The errors in design, analysis, and interpretation of the data are so massive that there is no foundation for drawing any conclusions or inferences based on Dr. Briggs' report.

4.  In his report, Dr. Briggs evaluates survey data that was provided to him by a third party and assumes that "the respondents [to the survey] are representative and the data are accurate."  There is no indication in his report that any analysis was conducted by him or by those who provided the data to him to verify the correctness or integrity of the data he was

provided, the quality of the survey, or the representativeness of the sample on which he based his analysis.  It is standard scientific practice in the field of survey research to give careful scrutiny to data before conducting any statistical analyses, including understanding the structure and wording of the survey questions, the sampling method and response rate, and the characteristics of the sample, such as demographic and behavioral indicators.

5.  In his report, Dr. Briggs defines two types of errors.  Those people who received absentee ballots even though the survey indicates that they did not request an absentee ballot are called Error #1. Those people who returned absentee ballots even though the election office did not record an absentee vote from them are called Error #2.  These two errors combined he calls "troublesome ballots."  Based on the information in Dr. Briggs' report, it is my conclusion, that neither assumption is justified. The estimates of Error #1 and Error #2 that he presents reflect defects in the design of the survey, fatal data errors evident in the survey toplines, calculation errors, and errors in the interpretation of the data.  It is my professional judgment that none of the estimates and projections in his report are valid.

6.  The design of the survey contaminates the data and any estimates, rendering them invalid.  Specifically, in Question 1 of the survey the surveyor asks to speak to a specific person. Some of the respondents are flagged as "Reached Target," while others are flagged as "Uncertain" or "What is this about?"  Both groups of people (Reached Target and Uncertain) are then asked Question 2, Did you request an absentee ballot?  This is a serious survey design error, because some or perhaps all of the people flagged as "Uncertain" are not the Target of the interview.  As a result, the design of the very first question of the survey allows some people

2

who were not the Target to be treated as if they were the Target in the remaining questions.  This leads to the contamination of all results. This fact is evident in the Topline Tables that were attached to Dr. Briggs' report.

7.   The survey suffers from ambiguously worded questions, which introduces measurement errors in any estimates.  Question 2 asks respondents whether they requested an absentee ballot.  They question does not clearly state what a request for an absentee ballot means.  Perhaps the most troublesome example for this question is how those who are permanent absentee voters ought to respond to it.  Permanent absentee voters are sent an absentee ballot automatically; they do not need to request a ballot for a particular election in order for the election office to mail one to them.  Michigan allows for permanent absentee voting, as do three other states in his analysis -- Arizona, Pennsylvania, and Wisconsin.  Georgia allows permanent absentee voting each election cycle for those 65 years of age or older.  Both "yes" and "no" may be viewed as correct answers to this question. Respondents who are permanent absentee voter might respond yes because they did sign up for that status, or they might as correctly respond no because they did not have to request a ballot in order to have one sent to them.  The questionnaire provides no way to clarify such cases.  There is no follow up question to disambiguate permanent absentee voters from others.  This is just one example of the substantial problems with the wording and structure of Question 2.

7.   The wording of Question 3 is also very problematic.  First, it does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast.  Some or possibly all of the cases in question are late ballots, and thus not

necessarily included in the absentee vote record. Second, Question 3 asks whether someone

voted. Survey questions asking whether someone voted are notoriously subject to social

desirability biases that lead to inflation in the estimated number of voters.

8.   There are errors and inconsistencies in survey data for every state, including for the

state of Michigan.  Appended to Dr. Briggs' report are a series of tables, called Topline Tables,

for each state.  The Topline Tables, or toplines for short, provide the basic statistics about the

survey reported for each question, as well as the questions themselves and the response

categories for each question. There are errors in the spreadsheet of toplines indicating data

inconsistencies, including for the State of Michigan. For example, in the topline tables for

Michigan, the number of respondents to Question 1 who are supposed to be asked Question 2

does not sum to the number of respondents to Question 2.  The same accounting discrepancy

arises in Arizona, Pennsylvania, and Wisconsin, but not in Georgia.  In Michigan and Arizona,

there are too many respondents to Question 2.  In Pennsylvania and Wisconsin, there are too few

respondents to Question 2.  These errors infect and bias responses to Q2 and Q3.  Generally,

such errors indicate fundamental problems with the management of the survey and the databases

generated by the survey.  In standard survey practice, the presence of discrepancies in these

topline tables indicates fatal flaws in the data, and lead researchers to attempt to clarify the

problems and possibly discard the data altogether.  Dr. Briggs' report makes no mention of these

inconsistencies and errors and assumes that the underlying data are correct.  These errors and

inconsistencies reveal that the data are not correct.

9.   The survey has extremely low response rates.  The response rate for the Michigan survey is .008, just eight tenths of one percent.  That means that 99.2 percent of people who the survey firm sought to interview in the State of Michigan could not be contacted, refused to participate, or were not in fact the correct person.  Surveys with such a low response rate are not accepted in scientific publications, except on rare occasions and with proper analyses that ensure that the respondents in fact are representative.  When researchers have low response rates, they must offer affirmative proof of representativeness or attempt to correct for biases.  Neither is done here.

10.   In performing his analysis, Dr. Briggs extrapolates from a poorly designed survey with an extraordinarily high non-response rate and evident data errors and inconsistencies. The high non-response rate, the data errors, and the survey design flaws are all evident in the topline tables that Dr. Briggs appended to his report.  These data should not have been relied on for this analysis given that they are not correct, and the respondents to the survey are highly unlikely to represent the population in question.  This is not up to scientific standards.

11.   The interpretation of the data as evidence of "errors" and "troublesome ballots" fails to account for the rules and realities of absentee voting.  First, Dr. Briggs calls Error #1 absentee ballots that were received by voters but were not "requested." This interpretation fails to consider permanent absentee voters, who receive ballots without requesting them.  All five states in his report allow for permanent absentee voting for some or all registrants.  Second, Dr. Briggs calls Error #2 ballots that were sent by voters but not recorded.  This interpretation fails to account for late, undeliverable, rejected, and spoiled ballots.  Most jurisdictions, for example, do not record

late ballots in the tally of returned absentee ballots.  The results in his analysis, if they are real, are likely the consequence of the normal practice of absentee voting in compliance with state election procedures and laws.

II.  Qualifications

12.  I am the Frank G. Thompson Professor of Government in the Department of Government at Harvard University in Cambridge, MA.  Formerly, I was an Assistant Professor at the University of California, Los Angeles, and I was Professor of Political Science at the Massachusetts Institute of Technology, where I held the Elting R. Morison Chair and served as Associate Head of the Department of Political Science.  I am the Principal Investigator of the Cooperative Congressional Election Study (CCES), a survey research consortium of over 250 faculty and student researchers at more than 50 universities, directed the Caltech/MIT Voting Technology Project from its inception in 2000 through 2004, and served on the Board of Overseers of the American National Election Study from 1999 to 2013.  I am an election analyst for and consultant to CBS News' Election Night Decision Desk.  I am a member of the American Academy of Arts and Sciences (inducted in 2007).  My curriculum vitae is attached to this report as Appendix A.

13.  I have worked as a consultant to the Brennan Center in the case of *McConnell v. FEC*, 540 U.S. 93 (2003).  I have testified before the U.S. Senate Committee on Rules, the U.S. Senate Committee on Commerce, the U.S. House Committee on Science, Space, and Technology, the U.S. House Committee on House Administration, and the Congressional Black Caucus on matters

of election administration in the United States. I filed an amicus brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009) and an amicus brief with Professor Nathaniel Persily and others in the case of *Evenwel v. Abbott* 138 S.Ct. 1120 (2015). I have served as a testifying expert for the Gonzales intervenors in *State of Texas v. United States* before the U.S. District Court in the District of Columbia (No. 1:11-cv-01303); the Rodriguez plaintiffs in *Perez v. Perry*, before the U.S. District Court in the Western District of Texas (No. 5:11-cv-00360); for the San Antonio Water District intervenor in *LULAC v. Edwards Aquifer Authority* in the U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG); for the Department of Justice in *State of Texas v. Holder*, before the U.S. District Court in the District of Columbia (No. 1:12-cv-00128); for the Guy plaintiffs in *Guy v. Miller* in U.S. District Court for Nevada (No. 11-OC-00042-1B)**;** for the Florida Democratic Party in *In re Senate Joint Resolution of Legislative Apportionment* in the Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490); for the Romo plaintiffs in *Romo v. Detzner* in the Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412); for the Department of Justice in *Veasey v. Perry*, before the U.S. District Court for the Southern District of Texas, Corpus Christi Division (No. 2:13cv00193); for the Harris plaintiffs in *Harris v. McCrory* in the U. S. District Court for the Middle District of North Carolina (No. 1:2013cv00949); for the Bethune-Hill plaintiffs in *Bethune-Hill v. Virginia State Board of Elections* in the U.S. District Court for the Eastern District of Virginia (No. 3: 2014cv00852); for the Fish plaintiffs in *Fish v. Kobach* in the U.S. District Court for the District of Kansas ( No. 2:16-cv-02105-JAR); and for intervenors in *Voto Latino, et al. v. Hobbs*, in the U.S. District Court for the District of Arizona (No. 2:19-cv-05685-DWL). I served as an expert witness and filed an

7

Affidavit in the North Carolina State Board of Elections hearings regarding absentee ballot fraud in the 2018 election for Congressional District 9 in North Carolina.  I currently am an expert witness *Wood v. Raffensperger*, in Fulton County, Georgia, Superior Court, (No. 2020CV342959).

14.  My areas of expertise include American government, with particular expertise in electoral politics, representation, and public opinion, as well as statistical methods in social sciences and survey research methods.  I have authored numerous scholarly works on voting behavior and elections, the application of statistical methods in social sciences, legislative politics and representation, and distributive politics.  This scholarship includes articles in such academic journals as the Journal of the Royal Statistical Society, American Political Science Review, American Economic Review, the American Journal of Political Science, Legislative Studies Quarterly, Quarterly Journal of Political Science, Electoral Studies, and Political Analysis.  I have published articles on issues of election law in the Harvard Law Review, Texas Law Review, Columbia Law Review, New York University Annual Survey of Law, and Election Law Journal, for which I am a member of the editorial board.  I have coauthored three scholarly books on electoral politics in the United States, The End of Inequality:  Baker v. Carr and the Transformation of American Politics, Going Negative:  How Political Advertising Shrinks and Polarizes the Electorate, and The Media Game:  American Politics in the Media Age.  I am coauthor with Benjamin Ginsberg, and Ken Shepsle of American Government:  Power and Purpose.

III.  Sources

8

15.  I have relied on the report of Dr. William Briggs, especially the appended Topline Tables.

16.  I have relied on the Election Assistance Commission, "Election Administration and Voting Survey (EAVS) for 2018:  https://www.eac.gov/research-and-data/studies-and-reports.  I present data from 2018 because it is the most recent federal election for which data on absentee and permanent absentee voting is available.  The 2018 data are instructive about the magnitude of permanent absentee voters and of the magnitude of unreturned, late, rejected, and spoiled absentee ballots.  The 2020 data are not yet reported.

17.  I have relied on the report of Matthew Braynard in *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW (ED. Mich.2020).

IV.  Findings

18.  In my professional judgment there are fundamental flaws in the survey design, and survey data set out in Dr. Briggs' report.  These flaws created biases in the estimates and analyses that are sufficiently large to completely explain the data that Dr. Briggs presents as nothing more than errors in the data collection process.  Perhaps most troubling the survey is likely highly unrepresentative because it has a response rate less than 1 percent; the survey data are contaminated by respondents who should not have been included in the survey, and the basic data in the Topline summaries of the data do not add up, indicating fatal flaws in the implementation of the survey.

A.  Critique of Interpretation

   i.  The survey data and its interpretation does not account for Permanent Absentee
   and Early Voters (PEV).

19.  The analysis of Question 2 is used to estimate the number of people who received but did not request an absentee ballot.  Dr. Briggs calls this Error #1.

20.  The interpretation of these data as an Error in balloting does not account for the presence of a large number of Permanent Absentee and Early Voters (PEVs) in Arizona, Michigan, Pennsylvania, and Wisconsin, and "rollover" absentee voters in Georgia.  PEVs are automatically sent their absentee ballots.  They do not need to request that a ballot be sent for a particular election.  Dr. Briggs' interpretation of the responses to Question 2 as indicative of an Error #1 fails to take into account the large number of people in Michigan and in the other four states in his study who are PEVs. There are other problems with Question 2 as discussed below.

21.  There are a sizable number of PEVs in all of the states under study. Table 1 presents data from the number of absentee ballots sent in 2018 and the number of permanent absentee ballots sent in to voters in Arizona, Georgia (rollover ballots), Michigan, Pennsylvania, and Wisconsin.  According to figures from the Election Assistance Commission for 2018, there were over half a million PEVs in the state of Michigan in 2018.  The number of permanent absentee

ballots sent in Arizona, Michigan, and Wisconsin far exceeds the estimated Error #1 in the first

table in Dr. Briggs' report.  Those data cover 2018 and are presented to indicate the likely

magnitude of PEVs in the states in 2020.

22.  The number of PEVs in Michigan was even larger in 2020 Preliminary figures (as of

September, 2020) from the Office of the Secretary of State of Michigan reveal that the number of

PEVs in the November 2020 election was approximately 2 million, and that PEVs accounted for

roughly two-thirds of absentee ballots sent this for the 2020 general election in the State of

Michigan.[1]  The other states saw similarly large numbers of PEVs in 2020.  For example, the

State of Georgia, which allows voters who are disabled or over 65 to sign up to have absentee

ballots sent to them, reported at least 582,000 "rollover" ballots in Georgia in 2020.[2]

23.  The number of registered voters who were sent a ballot without having to request one

in the State of Michigan far exceeds the total number of absentee ballots that Dr. Briggs

classifies as Error #1.  The number of PEVs was 2 million in the November 2020 election.  The

maximum number of people who received an absentee ballot but said that they did not request

one in Dr. Briggs' assessment is 36,529.

---

[1] Dave Boucher, "Michigan sets record for number of absentee ballot requests for Nov. election" Detroit Free Press September 10, 2002.  https://www.freep.com/story/news/politics/elections/2020/09/10/michigan-absentee-voting-election-november-2020/5768768002/
Ray Hole, "Michigan receives record number of requests for absentee ballots," wwmt.com, September 10, 2020, https://wwmt.com/news/local/michigan-receives-record-number-of-request-for-absentee-ballots
[2] Stephen Fowler, "Nearly 800,000 Georgians Have Already Requested Absentee Ballots for November" GA Today gpb.org, September 2, 2020. https://www.gpb.org/news/2020/09/02/nearly-800000-georgians-have-already-requested-absentee-ballots-for-november

24.  The survey makes no effort to distinguish PEVs from other sorts of absentee voters. Not accounting for PEVs is a serious error in survey design and interpretation of the survey numbers.

| Table 1.  Permanent Absentee Voters in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | |
| --- | --- | --- | --- |
| | Total Absentee Ballots Sent | Permanent Absentee Ballots Sent (i.e., ballots sent automatically without a specific ballot request) | Permanent Absentee Ballots as a Percent of Total |
| Arizona | 2,672,384 | 2,545,198 | 95.2% |
| Georgia | 281,490 | * | * |
| Michigan | 1,123,415 | 549,894 | 48.9% |
| Pennsylvania | 216,575 | 6,340 | 2.9% |
| Wisconsin | 168,788 | 54,113 | 32.1% |
| Source: EAC, EAVS 2018. Note: * means no data reported. | | | |

ii.  The interpretation of Question 3 fails to account for the proper handling of late, invalid, and spoiled absentee ballots by Local Election Offices.

25. The analysis of Question 3 is used to estimate the number of people who stated that they returned an absentee ballot but for whom no vote was recorded.  Dr. Briggs calls this Error #2.

26. The interpretation does not account absentee ballots that are in fact not received or counted by election officers because the ballots are not returned by the postal system, are spoiled, are returned late, or are rejected.  Such ballots are the obvious explanation for the data observed, but no effort in the survey or the analysis is made to ascertain the likelihood that these ballots.  There are further problems with Question 3, as discussed below.

27. It is my experience researching elections over the past two decades that "uncounted" absentee ballots are a normal part of the election process. Table 2 presents counts of rejected, late, undelivered, and voided absentee ballots in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin for 2018, the most recent federal election for which systematic data on absentee voting are available.  An undeliverable absentee ballot is one that was returned to the election office as not being deliverable to the address on the voter registration lists.  The final column presents the number of sent absentee ballots for which the status of a ballot sent by the election office to a voter was not received and its status is not known.  These are likely ballots that simply were not returned by voters or were lost or delayed in the US Postal System, as happens in every election in my experience.

28. The magnitude of ballots that are returned to the office but are rejected, spoiled or late is quite large.  The sum of these columns is comparable in magnitude to the magnitude of "Error #2" in Dr. Briggs' report.  These figures are not definitive of the numbers in 2020, which have not yet been reported.  Rather they are demonstrative of the fact that there are sound, documented administrative reasons that returned absentee ballots are not recorded as having voted, especially tardiness, spoilage, and rejection for lack of signatures, valid envelopes, and the like.  These are ballots that are not allowed to be counted under law, and they are comparable in magnitude to the estimates of the Error #2 reported by Dr. Briggs for each state.

| Table 2.  Rejected, Undelivered, Voided, and Late Absentees in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin in 2018 | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Rejected Absentee Ballots | Undeliverable Absentee Ballots | Spoiled/Voided Absentee Ballots | Late Absentee Ballots | Status Unknown |
| Arizona | 8,567 | 102,896 | 27,804 | 2,515 | 642,210 |
| Georgia | 7,512 | 2,322 | 252 | 3,525 | 36,255 |
| Michigan | 6,013 | 791 | 19,679 | 2,207 | 41,120 |
| Pennsylvania | 8,714 | * | * | 8,162 | 20,622 |
| Wisconsin | 2,517 | 1,718 | 2,794 | 1,445 | 12,407 |
| Source: EAC, EAVS 2018. Note: * means no data reported. | | | | | |

B.  Critique of Survey Design

29.  Dr. Briggs offers no assessment of the design of the survey that generated the data that he presents.  Rather, he assumes that the data are accurate.  Also, there is no report of the survey design, beyond the information embedded in the topline tables.  It would be standard for any scientifically sound report of survey data to describe fully the survey instrument used in a study and to make it publicly available.

30.  It is my understanding that Matthew Braynard designed and conducted these surveys. The methodology that he used is described in an expert by Mr. Braynard in *King v. Whitmer*, No. 2:20-cv-13134-LVP-RSW (ED. Mich.2020).  I evaluated that report as well as Dr. Briggs' report.

i.  The surveys have unacceptably high non-response rates.

31.  The response rate to the survey is measured as the number of people who answered the first substantive question (Q2) in the survey divided by the number of people who the surveyor sought to contact. The response rate for the Michigan survey is .008, meaning 99.2 percent of people did not respond to this survey.  The response rate is similarly low in the other four states.  It is .006 in Arizona, .004 in Georgia, .015 in Pennsylvania, and .004 in Wisconsin.

These are extremely low response rates, and such low response rates pose a critical threat to any inferences one might draw from the data.

32. Mr. Braynard, in his report, identifies that the survey attempts to interview all registered voters who were recorded as requesting but not returning an absentee ballot.  Mr. Braynard's firm attempted to match phone numbers to records of registered voters in each of the states and then attempted to interview all of the people associated with each registration record of interest.

33. The appendix to Dr. Briggs' report presents Unreturned_Absentee Live ID Topline tables for each of the five states being studied, including Michigan.  It is evident from the Topline tables that a there are significant shortfalls in the ability of the survey firm to match phone numbers to registration records.  The Data Loads correspond to the number of matched phone numbers that were loaded into the survey system to be called.  They are only a fraction of the population of all Unreturned Absentees.

34. The toplines also list Completes.  These are phone numbers for which an interview commenced, an answering machine was reached, or a returned call was requested.  For the State of Michigan, there were 70,030 Data Loads for Michigan, which is just half of the 139,190 unreturned absentee ballots in the State.  Of the Data Loads, i.e., attempted calls, there were only 3,815 people who either responded to the survey, were left a message on an answering machine, or refused.  These are called "Completes," even though most refused the call.  Only 5 percent of the people that Mr. Braynard attempted to interview even got to the point of being classified as a

Complete.  That is, 95 percent of the attempted survey contacts had already failed before the survey had begun.

35.  There is no description in Dr. Briggs' report of the generation of "Data Loads" or the methodology for determining matches of phone numbers to registration records.  No explanation is offered as to why the researchers could load only 70,030 phone numbers, rather than attempt calls to all 139,190 Michigan registrants who did not return their absentee ballots.  Based on my experience conducting survey research, the likely problem is the difficult matching phone numbers to voter files and the large number voter file records that list no numbers.  Mismatches, either false positives or false negatives, will generate errors in surveys.  Incorrectly matched phone numbers will lead the survey to interview the wrong person (a false positive), and errors in matching may lead to researcher to exclude the person from the survey when in fact a valid number could have been found (a false negative).[3]  Errors in phone matching make it entirely possible that the survey interviews the wrong person.  Past research on phone surveys using registration-based samples, such as those reported by Dr. Briggs, find very high rates with which the wrong person answers a call, ranging from 30 to 60 percent.[4]  And, as discussed below, there is evidence of such incorrect interviews in these studies.

36.  Dr. Briggs offers no analysis of why the survey failed to identify a higher number of valid phone numbers for the people the researchers sought to interview.  There is no analysis

---

[3] Alan S. Gerber and Donald P. Green, "Can Registration-Based Sampling Improve the Accuracy of Midterm Election Forecasts?" Public Opinion Quarterly 70 (2006): 197-223, esp. page 202.
[4] Pew Research Center, "Comparing Survey Sampling Strategies:  Random-Digit Dialing vs. Voter Files," 2018. https://www.pewresearch.org/methods/2018/10/09/comparing-survey-sampling-strategies-random-digit-dial-vs-voter-files/,  See page 25-26.

17

comparing the characteristics of those people for whom a valid phone number could be found and those people for whom a valid phone number could not be found.

37. Once the survey commences, there is first a screener question to determine whether the person interviewed should continue with the interview.  That is Question 1.  Question 2 asks "Did you request an Absentee Ballot in the State of  <state name>?"  People could answer Yes, No, some other answer, Refuse to answer, or Hang up.  This is the first substantive question for the purpose of Dr. Briggs' analysis, as it is used to measure Error #1.

38. The response rate to the survey is the number of valid responses to Question 2.  That is the total number of responses to the question, less the number of people who refused or hung up.  The second column of Table 3 is the percent of people the researchers sought to interview (all Unreturned Absentee Ballots) who ultimately gave a valid response to Question 2.

39. The response rate for Michigan is just .008, or eight-tenths of one percent.

40. Once the entire survey process had been completed over 99 percent of people who the researcher sought to interview were not interviewed in Michigan.  That was true in Arizona, Georgia, and Wisconsin.  In Pennsylvania, 98.5 percent of those that the researchers set out to study were ultimately not included in the study for one reason or another.

41. In most disciplines of study that I am familiar with these surveys would not a scientifically acceptable or reliable samples simply because of their exceedingly low response

rates.  For example, I am as associate editor of the Harvard Data Sciences Review, which broadly covers fields of statistics and data sciences, and specialty fields, such as, political science, public opinion, survey methodology, and economics, in which I have published.  Papers with such high non-responses are rejected on their face as not plausibly valid studies.

42. Dr. Briggs' assumption that those who responded to the question are representative of the relevant population under study (i.e., the other 99 percent of people who could not or would not participate in the survey) is not warranted.  When survey have high non-response rates, it is standard practice to analyze information about the sample and the target population, such as demographic characteristics or behavioral and attitudinal statistics, to confirm that the assumption of representativeness of a sample can be maintained.  That is true even when the response rates are quite high.  When the response rates are very low, such an analysis is a necessity in order to determine whether there is any scientific value to the survey.  No such analysis is offered here.

| Table 3. Response Rates to Surveys Reported by Dr. William Briggs | | |
|---|---|---|
| State | "Completes"/ Unreturned Absentee Ballots | Question 2 Valid Response/ Unreturned Absentee Ballots |
| Arizona | .011 | .006 |
| Georgia | .110 | .004 |
| Michigan | .027 | .008 |
| Pennsylvania | .109 | .015 |
| Wisconsin | .048 | .004 |

Note:  Ballots is the number of registered voters the survey sought to reach.  See Table 1 of Briggs' report.

"Completes" is the number of "complete" contacts in the firsts part of each state's topline report.

Question 2 Response is the number of respondents who answered Question 2 and did not Refuse or Hangup.

ii.  The survey has an unacceptably high interview breakoff rate.

43.   The breakoff rate in surveys is the rate at which people who start the survey breakoff, for whatever reason. The interview may be stopped by the respondent or by the surveyor. In the toplines these are indicated as refusals and hang ups. The breakoff rate is measured as the number of people answering the last question in the survey divided by the number of Completes. The opposite of the breakoff rate is the survey completion rate.

44.   The breakoff rates are extremely high in these surveys. The breakoff rates are 87.8 percent in Arizona, 98.8 percent in Georgia, 93.5 percent in Michigan, 95.4 percent in Pennsylvania, and 90.6 percent in Wisconsin. In Michigan, the breakoff rate of 95.4 percent means that once the survey began only 4.6 percent made it to the end.

45.   The breakoff rate is a quality control indicator for survey researchers.  Very high breakoff rates, such as observed here, are signs of quality control problems with the survey itself,

such as hostile or poorly trained interviewers or poorly worded questions.  Any experienced survey researcher uses high breakoff rates to catch quality control failures.  These surveys have extremely high rates of survey failures, which indicates that were quality control problems and there was no effort to correct them.

iii.  The screening question improperly allows people to take the survey who should not.

46.  A second substantial flaw in the survey is that the instructions allow people who are not affirmatively determined to be the correct person to take the survey.

47.  Past research has documented that phone surveys using registered voter lists are often answered by someone other than the person who was listed on the registered voter file. The two most common problems are that the wrong number was matched to the voter list and that someone other than the person the research sought to speak with answered the phone.  The latter occurs most often with landlines.[5]

48.  Question 1 (Q1) of the survey asks "May I please speak to <lead on screen>?" "Lead on screen" is the name of from the voter registration list that is linked to the phone number that the survey has dialed.  Responses to Q1 are listed as reached target, uncertain/other, refused, and hang up.  For example, in the first table (Georgia), the responses are "Reached Target [Go to

---

[5] Pew Research Center, "Comparing Survey Sampling Strategies:  Random-Digit Dialing vs. Voter Files," 2018. https://www.pewresearch.org/methods/2018/10/09/comparing-survey-sampling-strategies-random-digit-dial-vs-voter-files/,  See page 25-26.

Q2]" and "[Go to Q2]," without further explanation.  For other states the toplines describe this second response category as "Uncertain" or "What's this about?"  Importantly, both cases classified as "Reached Target" and as "Uncertain" are instructed to "Go to Q2."

49. This is an error in the branching design of the survey.  People who are not affirmatively identified as the correct person for the interview are allowed to answer the remaining questions in the survey.  For example, Reponses to Questions 2 and 3 show evidence that spouses and other family members are asked Questions 2 and 3, even though they were not the person whose absentee voting records are in question.

50. A significant percent and number of respondents who are listed as not giving an affirmative answer to Question 1 are in fact kept in the survey and asked Question 2.  Table 4 shows the percent and number of respondents who were inappropriately asked Questions 2 and 3 because they were not affirmatively identified as "the target."  This error in the survey design affects 13 percent of cases in Arizona and Michigan, 16 percent of cases in Pennsylvania, and 25 percent of cases in Georgia.  It is not possible to calculate the percent in Wisconsin because the topline report pools the "Reached Target" and "Uncertain" in a single response category.

51. This survey branching error contaminates all of the results, and it is of sufficient magnitude to alter the results significantly, and perhaps explain away all of the findings entirely. The number of respondents in Georgia who were improperly asked Question 2 is larger than the number of respondents who said that they did not request an absentee ballot.  In Pennsylvania it

explains most of the people who did not request an absentee ballot.  In Arizona and Michigan, it can explain half of those who did not request an absentee ballot.

52. These figures and aspects of the survey design show that the data for Q2 and Q3 were contaminated by improper branching from Q1.  This information was available to, and even reported by, Dr. Briggs, but he did not take them into account in calculating or interpreting his Error #1 and Error #2.

| Table 4.  Respondents Who Were Not the Target of the Survey Were Allowed to Answer the Survey | |
|---|---|
| State | Percent and Number of respondents to Q1 who were NOT the target registrant, but who were asked Q2 |
| Arizona | 12.6% [N=335] |
| Georgia | 25.0% [N=255] |
| Michigan | 12.9% [N=142] |
| Pennsylvania | 15.7% [N=422] |
| Wisconsin | * |
| * The Topline Table for Wisconsin pools respondents who were coded as "Reached Target" and "Uncertain" and "What is this about?" It is not possible to identify how many Wisconsin respondents were inappropriately asked Question 2. | |

    iv. Question 2 (did you request an absentee ballot) does not ascertain Permanent

    Absentee Voters or disambiguate Permanent Absentee Voters from Other Voters.


  53. Question 2 is not sufficiently clear and specific to answer the question that the researcher wants to answer.  The survey does not ascertain whether respondents are permanent absentee voters or have a designated person who may request a ballot on their behalf, even though Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin allow for some or all voters to be permanent absentee voters. Permanent absentee voters do not need to request a ballot in order for one to be sent to them for a specific election.


  55. The presence of permanent absentee voters in the registration system creates ambiguity in the interpretation of the question. Some permanent absentee voters may answer yes because the registered as for permanent absentee status, while others may say no because they do not need to request a ballot to receive one. The ambiguity of Question 2, and the failure to disambiguate permanent absentee voters from other absentee voters in the responses, introduces measurement error in the survey.  Additional survey questions are required to distinguish different types of absentee voters.


  56. The measurement error will create errors in the survey that are of the form of Error #1 described by Dr. Briggs.  These are cases that would be wrongly identified as people who were erroneously sent a ballot, even though they did not request one. In fact, they did not need to request one.  The survey data cannot be used to draw the conclusion that some survey respondents received an absentee ballot in error.

v.  The survey cannot determine whether there was an error in handling of the

ballot.

57.  Dr. Briggs describes a second sort of error in absentee balloting that arises because people say that they returned a ballot, but no absentee ballot is received or recorded by the election office.

58. It is my experience working with election administrators and researching election administration as part of the Caltech/MIT Voting Technology Project that many absentee ballots are not recorded or counted because of some ballots are not received on time or are not properly prepared and submitted.  Late absentees are not accepted, and they are usually not recorded in the tally of ballots received. Ballots that are spoiled, unsigned or in the incorrect envelopes or rejected for some other reason are not counted.  The fact that there is no record of a vote or of a received absentee ballot is not necessarily evidence of an error in the handling of the ballot. Instead it may be evidence of correct treatment of ballots by the election officials in accordance with state laws.

59. Question 3 does not ascertain when the ballot was mailed back or how it was mailed. There is no follow up question asking when the ballot was sent, whether it was signed, whether it was witnessed (in states where that is a requirement), and in what envelope it was sent.  In short, the question does not allow one to determine whether or not the ballot was returned in compliance with state laws, and thus whether there was or was not an error in handling the

25

ballot.  It is incorrect for Dr. Briggs to conclude that ballots that were not received or recorded are in fact errors.

### vi.  Question 3 is subject to memory errors and social desirability bias.

60. Question 3 asks people whether they voted.  Specifically, it asks people who said that they requested an absentee ballot whether they returned an absentee ballot, that is, whether they voted that ballot.

61.  It has long been understood in political science that respondents to surveys over report voting in elections.  The most commonly identified sorts of biases are memory errors and social desirability bias in questions asking people whether they voted.[6]  In the context of this survey such biases would lead to overstatement of Yes responses to Question 3.

### C.  Critique of the Survey Databases and Data Analyses

62. There are obvious data errors and inconsistencies revealed in the Topline reports that are appended to Dr. Briggs' report.  As I understand his report, these are the data and reports that he relied on them in making his estimates and projections.  Dr. Briggs states that he assumes that "the data is accurate."  I have examined the accounting in the Topline tables and discovered that the data do not add up.  A routine analysis to check the consistency and integrity of data reported

---

[6] See for example, Allyson L. Holbrook and Jon A. Krosnick, "Social Desirability Bias in Voter Turnout Reports:  Test Using the Item Count Technique," *Public Opinion Quarterly* 74 (2010): 37-67. See also Stephen Ansolabehere and Eitan Hersh, ,"Validation:  What Big Data Reveal About Survey Misreporting and the Real Electorate," *Political Analysis* 20 (2012): 437-459

in the toplines is standard practice in the survey research field. I have performed such a check, and it reveals that the data lack integrity and are not correct. They should not be assumed to be accurate.

      i.  The figures on responses to Q1 simply do not add up for the State of Wisconsin.

63.  The Topline table for Wisconsin reports that 2,261 people were coded as either "A-Reached Target" or "B-What Is This About?/Uncertain."  An additional, 1,677 respondents were coded as "X=Refused."  No other response categories are reported.  The sum of 1,677 and 2,261 is 3,938.  The bottom of the table reports the "Sum of All Responses" is 3,495.  The rows clearly do not total to the reported bottom line.

64.  All other survey questions and calculations for this table branch off of Question 1. Therefore, errors in this question infect responses to Questions 2 and 3 and make it unacceptable for anyone to rely on them to form conclusions.  This error is a red flag for survey researchers indicating lack of data integrity.  It should have signaled to the analyst, in this instance Dr. Briggs, that there is a problem with the programs that generated the data for this and other states.

      ii.  The survey data for Questions 1 and 2 cannot be reconciled.

65. I have examined the accounting across questions to make sure that the number of cases that are indicated as passing from Question 1 to Question 2 are the same as the number of

cases reported for Question 2.  For Georgia, the data across questions are consistent, but for Arizona, Michigan, Pennsylvania, and Wisconsin there are substantial and idiosyncratic discrepancies. The accounting for Q1 and Q2 is shown in Table 5.

66. First, consider Georgia.  Question 1 has two categories:  Reached Target and Uncertain.  There are 767 Reached Target and 255 Uncertain.  Those sum to 1,022.  Those two groups are then asked Question 2.  Question 2 has several response categories.  There are 591 Yes responses, 128 No responses, 175 "other" responses across various options (e.g., "member)[Go to Q3]"), 70 Refused, and 58 Hang ups.  These sum to 1,022.  For Georgia the total number of responses to Q2 equals the total number of respondents coded for Q2, and the data appear to be okay.  But, looking at the other states, reveals inconsistencies that lead me to doubt the integrity and veracity of any of the data presented here, including Georgia.

67. Second, consider Arizona. The topline table for Q1 has 2,147 respondents who are either "Reached Target" or "Uncertain" and are instructed to Go to Q2. Applying the same accounting used for Georgia in Arizona, there are 2,489 respondents listed in Q2.  That is there are more than 300 respondents who answered Q2 but were not indicated in the accounting for Q1 as directed to that question.  There is no other way indicated in the survey data to get to Q2 without going through Q1.

68. Third, consider Michigan. The topline table for Q1 has 1,100 respondents who are either "Reached Target" or "Uncertain."  However, there are 1,515 respondents to Q2.  An

28

additional 415 people were asked Q2 than were indicated as allowed to under the branching rules of the survey.

69. Fourth, consider Pennsylvania.  The topline table for Q1 has 2,684 respondents who are either "Reached Target" or "Uncertain."  However, there are 2,537 respondents to Q2.  That is, 147 fewer people were asked Q2 than were supposed to have been asked.

70.  Fifth, consider Wisconsin.  The topline table for Q1 has 3,938 respondents who are either "Reached Target" or "Uncertain."  However, there are 2,723 respondents to Q2.  That is, 1,215 fewer people were asked Q2 than were supposed to have been asked.

| Table 5. Accounting Discrepancies in the number of cases reported in Toplines for Question 1 and Question 2 by State | | | |
|---|---|---|---|
| State | Question 1 Number of Cases "Reached Target" or "Uncertain/Other" | Question 2 Number of Cases "Sum of All Responses" | Difference Number (%) |
| Arizona | 2,147 | 2,489 | -342* |
| Georgia | 1,022 | 1,022 | 0 |
| Michigan | 1,100 | 1,515 | -415 |
| Pennsylvania | 2,684 | 2,537 | +147 |
| Wisconsin | 3,938 | 2,723 | +1,215 |
| Source:  Toplines appended with Dr. William Briggs' report. | | | |

* Negative values mean there are fewer Reached Target or Uncertain responses to Question 1 than there are to Question 2.  Positive values mean there are more Reached Target or Uncertain responses to Question 1 than there are to Question 2.

71. I attempted to resolve this by removing refusals and hang ups, to determine whether this would account for apparent discrepancies. It did not. The accounting in Michigan and Arizona were not resolved by removing the hang ups or refusals. And, doing so created accounting discrepancies elsewhere. Georgia developed a deficit of cases, and the deficits in Pennsylvania and Wisconsin worsened.

72. These errors in the spreadsheets will also contaminate the data in Q3, as the classification of respondents according to Q1 and Q2 determines whether the individual is asked Q3.

73. In my experience running, designing, and analyzing large scale surveys through the Cooperative Congressional Election Study and serving on the board of the American National Election Study, errors such as these usually have two sources.  This is indicative of either there are (i) errors in the program that the program that assigns questions to people, or (ii) errors in the program that generates the spreadsheet.  Either sort of error is catastrophic for this analysis, and the render the estimates, projections, and inferences in Dr. Briggs' report entirely unreliable.

74. The most rudimentary check of the toplines reveals errors and inconsistencies throughout the data that Dr. Briggs relied on.  This leads me to conclude that the data are not correct.  Dr. Briggs erred in his assumption that they are.

iii.  There are inconsistencies in calculations.

75.  I performed a sensitivity analysis of Dr. Briggs' calculations of the estimated ranges of Error #1 and Error #2.  Specifically, I sought to explore how various discrepancies in the accounting might affect the estimates presented in Dr. Briggs' report.  The figures he presents are extrapolations from a few hundred survey responses to tens of thousands of absentee requests. Thus, errors in a few dozen cases out of the few hundred survey responses that he identifies as errors would be highly consequential.

76.  In performing the sensitivity analysis, I discovered that there were substantial inconsistencies in the way that Dr. Briggs calculated the rates of Error #1 and Error #2 using the survey data.

77.  Consider, first, the calculation of Error #1.  I converted the first table in Dr. Briggs' report from counts to percentages.  I did this by dividing his lower and upper bound estimates for Error #1 by the total number of ballots.  These are reported in the second column of Table 6. Second, I calculated the percent of people who responded NO or NO on behalf of their spouse to Question 2 and divided by the number of responses to Question 2.  Third, I report two different Numbers of Cases used in making the calculations:  the number of cases reported as "Sum of All

Responses" in the topline tables and that number less respondents who refused to answer. Finally, I calculated the percent of respondents who answered No to Q2 or whose spouse answered No to Q2 using the two different numbers of cases in column 4.  I underline the number that was used by Dr. Briggs to estimate Error #1 for each state.  These calculations are shown in the fifth column of Table 6.

| Table 6.  Calculation Inconsistencies in the Estimates for Error #1 | | | | |
|---|---|---|---|---|
| State | Range Of Error #1 Expressed in Percentages | Question 2 Number of Cases "Sum of All Responses" | Number of Cases | Percent of Respondents Who answered No to Q2 |
| Arizona | 40.2 to 44.3% | 885 No 21 Spouse - No | 2,489 2,126 (less refusals) | 36.4% 42.6% |
| Georgia | 12.3 to 16.5% | 128 No 14 Spouse - No | 964 894 (less refusals) | 14.7% 15.9% |
| Michigan | 21.3 to 26.2% | 239 No 17 Spouse - No | 1,515 1,106 (less refusals) | 16.9% 23.1% |
| Pennsylvania | 19.6 to 22.6% | 531 No 25 Spouse - No | 2,537 2,430 (less refusals) | 21.9% 22.9% |
| Wisconsin | 16.9 to 19.9% | 379 No 4 Spouse - No | 2,723 2,162 (less refusals) | 14.1% 17.7% |
| Source:  Toplines appended with Dr. William Briggs' report. | | | | |

78. Dr. Briggs is inconsistent in his calculations.  In Georgia and Pennsylvania, the denominator is the sum of all responses (that is, all cases who reach Q2).  But, in Arizona, Michigan, and Wisconsin he excludes some respondents from the total number of cases.  The effect of excluding those cases is to inflate the estimates by 6.2 percentage points for Arizona, by 6.2 percentage points for Michigan, and by 3.6 percentage points for Wisconsin.  In Arizona and Wisconsin, the estimate using all cases in the denominator lies outside of the range of possible rates of Error #1 provided by Dr. Briggs.  The estimates he offers are highly sensitive to which denominator he chooses to use in making his calculations.  This shows a lack of rigor in performing the analysis that was presented.

79. Similar inconsistencies arise in the analysis of Question 3 for the estimation of the rate of Error #2.  Table 7 parallels Table 6, but for Question 3.  The second column shows the ranges of Error #2 expressed in Percentages.  The third column shows the Number of respondents who answered Yes or Yes on behalf of their spouse.  The fourth column is the number of respondents to Q2 and to Q3.  The fifth column is the Percent of Survey Respondents who Answered Yes to Question 3.

80. Different denominators are used for the calculation of Error #2 in different states.  In two instances (Georgia and Pennsylvania), Dr. Briggs uses the number of responses to Q2 as the denominator.  In three instances (Arizona, Michigan, and Wisconsin), Dr. Briggs uses the number of responses to Q3, and does not adjust for refusals, as was done in Table 6.  He offers no explanation of his calculations, or why he chose different denominators in different instances.

33

It is highly unusual to see different statistical formulas used for the computation of what is supposed to be the same quantity for different cases (in this instance the states) in the same report.  The basic statistical methods deployed here lack rigor.

81.  Dr. Briggs' estimates fail the sensitivity analysis suggested by his own calculations. The ranges presented in his report are not robust to variations in the formulas that he himself uses. In his report he reports a range of possible values for Error #1 and Error #2.  Values outside of those ranges are highly unlikely to occur.  The sensitivity analysis I have conducted reveals that simply using the different formulas he deploys yields values that fall outside the ranges that he presents.  He uses the Number of Cases for Q2 in calculating Error #2 for Georgia and Pennsylvania and the Number of Cases for Q3 in calculating Error #2 for Arizona, Michigan, and Wisconsin.  Consistently using the Number of Cases for Q2 produces estimated values of Error #2 that are below the lower bound estimates for Arizona (14.3 versus 15.2), for Michigan (16.0 versus 20.6), and for Wisconsin (11.9 versus 14.4).  Hence, the estimated range of Error #2 presented in Dr. Briggs' report is not robust even to variations in the way he calculates that rate from the survey data.

| Table 7.  Calculation Inconsistencies in the Estimates for Error #2 | | | | |
|---|---|---|---|---|
| State | Range Of Error #2 Expressed in Percentages | Question 2 Number of Cases "Sum of All Responses" | Number of Cases | Percent of Respondents Who answered Yes to Q3 |
| Arizona | 15.2 to 18.3% | 344 Yes | Q2:  2,489 | 14.3% |

|  |  | 11 Spouse - Yes | Q3:  2,129 | <u>16.7%</u> |
|---|---|---|---|---|
| Georgia | 22.9 to 28.2% | 240 Yes | Q2:  964 | <u>26.4%</u> |
|  |  | 17 Spouse - Yes | Q3:  623 | 41.3% |
| Michigan | 20.6 to 24.9% | 232 Yes | Q2:  1,515 | 16.0% |
|  |  | 10 Spouse - Yes | Q3:  1,090 | <u>22.2%</u> |
| Pennsylvania | 16.3 to 19.1% | 452 Yes | Q2:  2,537 | <u>18.2%</u> |
|  |  | 11 Spouse - Yes | Q3:  1,137 | 40.7% |
| Wisconsin | 14.4 to 17.3% | 316 Yes | Q2:  2,723 | 11.9% |
|  |  | 9 Spouse - Yes | Q3:  2,154 | <u>15.1%</u> |
| Source:  Toplines appended with Dr. William Briggs' report. | | | | |

D.  Sensitivity

82.  A further exercise in sensitivity analysis is to measure the effect on the analysis of Q2 of the inclusion of people who should not have been included. To see the potential effect of the inclusion of these people in the analysis, assume that all of the people who answered Uncertain Q1 in fact answered No to Question 2. That is an assumption for the sake of sensitivity analysis.

83.  What is the potential effect of this branching error alone (excluding all other issues) on the survey estimates? Table 8 entertains that possibility. The Adjusted Percent who

Responded No to Q2 subtracts the Number of Uncertain Cases from the Numerator and Denominator.  The rate of Error #1 cases is substantially reduced in every one of the states by the exclusion of these cases. In every case, the adjusted rate is far below the estimate provided in Dr. Briggs' report. In Georgia, that rate falls entirely to 0.  That is, the branching error can completely account for his Error #1 results in Georgia.

| Table 8.  Calculation Inconsistencies in the Estimates for Error #1 | | | | |
|---|---|---|---|---|
| State | Range Of Error #1 Expressed in Percentages | Question 2 Number of Cases "Sum of All Responses" | Number of "Uncertain" Responses to Q1 | Adjusted Percent of Respondents Who answered No to Q2 (without "Uncertain" cases) |
| Arizona | 40.2 to 44.3% | 885 No 21 Spouse - No | 335 | 26.7% |
| Georgia | 12.3 to 16.5% | 128 No 14 Spouse - No | 255 | 0% |
| Michigan | 21.3 to 26.2% | 239 No 17 Spouse - No | 142 | 13.9% |
| Pennsylvania | 19.6 to 22.6% | 531 No 25 Spouse - No | 422 | 5.3% |
| Wisconsin | 16.9 to 19.9% | 379 No 4 Spouse - No | unknown | No calculation Possible |

Source:  Toplines appended with Dr. William Briggs' report.

E.  Conclusion

84. The estimates and projections presented by Dr. Briggs are based on survey data collected in Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin. My overall assessment of these data is that they are unreliable and riddled with accounting and survey design errors. These errors are of sufficient magnitude and severity as to make the estimates completely uninformative.

85. The data are not accurate.  The Topline summaries of the survey data appended to Dr. Briggs' report reveal fatal accounting errors in the data.  No sound estimates or inferences can be drawn based on these data.

86. The design of the survey is improperly structured so that people who were not identified as the Target of the study (i.e., the registered voter whose ballot is in question) were asked whether they had requested a ballot and whether they returned one.

87. The magnitude of the accounting errors evident in the Toplines and the number of people improperly asked Questions 2 and 3 exceeds the number of people coded as Error #1 and Error #2.

88. The questions are ambiguous and do not allow researchers to determine whether people were permanent absentee voters or whether they submitted legally acceptable ballots in a timely manner.

89. The survey respondents are highly unlikely to be representative. The surveys have unacceptably low response rates and breakoff rates. In Michigan specifically, 99 percent of people who the researchers sought to interview did not ultimately end up in the sample, participate in the study or complete Question 2. Scientific research standards do not allow researchers to assume that a sample survey a 99 percent non-response rate is representative of the population of interest. The breakoff rate exceeds 90 percent, indicating serious quality control problems in conducting the survey, which will also produce biases in the data. No effort is made to show that the sample is representative or to correct for possible biases.

90. The interpretation of the surveys is deeply flawed. The interpretation of Error #1 does not account for the large number of Permanent Absentee Voters in these states – approximately 2 million in Michigan. These registrants are sent a ballot without requesting one. The interpretation of Error #2 does not account for the fact that thousands of absentee ballots are not legally acceptable because they are late, spoiled, or invalid.

91. Each of these problems would create significant biases in the estimates and projections offered in Dr. Briggs' report. The multitude of weaknesses with the survey design, the data itself, and the interpretation lead me to conclude that no valid estimates and conclusions

can be made based on these data.  Dr. Briggs assumed at the outset that the respondents are representative to the surveys and the data are accurate.  Neither assumption is correct.  Indeed, the information contained in and appended to Dr. Briggs' report showed that to be evident.  Even the most basic review of the information about the survey reveal the deep flaws in the design and errors and inconsistencies in the accounting of the survey design.  These data and the analyses based on them do not meet the standards for scientifically acceptable research.

Signed at Cambridge, Massachusetts on the date below.

Date: December 2, 2020

_____

Stephen Ansolabehere.

# Exhibit A

# STEPHEN  DANIEL  ANSOLABEHERE

**Department of Government**
**Harvard University**
**1737 Cambridge Street**
**Cambridge, MA 02138**
**sda@gov.harvard.edu**

## EDUCATION

| | | |
|---|---|---|
| Harvard University | Ph.D., Political Science | 1989 |
| University of Minnesota | B.A., Political Science | 1984 |
| | B.S., Economics | |

## PROFESSIONAL  EXPERIENCE

### ACADEMIC  POSITIONS

| | |
|---|---|
| 2016-present | Frank G. Thompson Professor of Government, Harvard University |
| 2008-present | Professor, Department of Government, Harvard University |
| 2015-present | Director, Center for American Politics, Harvard University |
| 1998-2009 | Elting Morison Professor, Department of Political Science, MIT (Associate Head, 2001-2005) |
| 1995-1998 | Associate Professor, Department of Political Science, MIT |
| 1993-1994 | National Fellow, The Hoover Institution |
| 1989-1993 | Assistant Professor, Department of Political Science, University of California, Los Angeles |

### FELLOWSHIPS AND HONORS

| | |
|---|---|
| American Academy of Arts and Sciences | 2007 |
| Carnegie Scholar | 2000-02 |
| National Fellow, The Hoover Institution | 1993-94 |
| Harry S. Truman Fellowship | 1982-86 |

2

## PUBLICATIONS

### *Books*

2019        *American Government*, 15th edition.  With Ted Lowi, Benjamin Ginsberg
                and Kenneth Shepsle.  W.W. Norton.

2014        *Cheap and Clean:  How Americans Think About Energy in the Age of Global
                Warming*.  With David Konisky.  MIT Press.
                Recipient of the Donald K. Price book award.

2008        *The End of Inequality:  One Person, One Vote and the Transformation of
                American Politics*.  With James M. Snyder, Jr.,  W. W. Norton.

1996        *Going Negative:  How Political Advertising Divides and Shrinks the American
                Electorate*.   With Shanto Iyengar.  The Free Press.  Recipient of the Goldsmith
                book award.

1993        *Media Game:  American Politics in the Television Age*.  With Roy Behr and
                Shanto Iyengar.  Macmillan.

### *Journal Articles*

2021        "The CPS Voting and Registration Supplement Overstates Turnout" *Journal of
                Politics* Forthcoming (with Bernard Fraga and Brian Schaffner)

2021        "Congressional Representation: Accountability from the Constituent's Perspective,"
                *American Journal of Political Science* forthcoming (with Shiro Kuriwaki)

2020        "Proximity, NIMBYism, and Public Support for Energy Infrastructure"
                *Public Opinion Quarterly* (with David Konisky and Sanya Carley)
                https://doi.org/10.1093/poq/nfaa025

2020        "Understanding Exponential Growth Amid a Pandemic: An Internal Perspective,"
                *Harvard Data Science Review* 2 (October) (with Ray Duch, Kevin DeLuca,
                Alexander Podkul, Liberty Vittert)

2020        "Unilateral Action and Presidential Accountability,"  *Presidential Studies Quarterly*
                50 (March):  129-145. (with Jon Rogowski)

3

2019        "Backyard Voices: How Sense of Place Shapes Views of Large-Scale Energy
            Transmission Infrastructure" *Energy Research & Social Science*
            forthcoming(with Parrish Bergquist, Carley Sanya, and David Konisky)

2019        "Are All Electrons the Same? Evaluating support for local transmission lines
            through an experiment" *PLOS ONE*  14 (7): e0219066
            (with Carley Sanya and David Konisky)
             https://doi.org/10.1371/journal.pone.0219066

2018        "Learning from Recounts" Election Law Journal 17: 100-116 (with Barry C. Burden,
            Kenneth R. Mayer, and Charles Stewart III)
            https://doi.org/10.1089/elj.2017.0440

2018        "Policy, Politics, and Public Attitudes Toward the Supreme Court" *American
            Politics Research* (with Ariel White and Nathaniel Persily).
            https://doi.org/10.1177/1532673X18765189

2018        "Measuring Issue-Salience in Voters' Preferences" *Electoral Studies* (with Maria
            Socorro Puy) 51 (February):  103-114.

2018        "Divided Government and Significant Legislation:  A History of Congress," *Social
            Science History* (with Maxwell Palmer and Benjamin Schneer).42 (1).

2017         "ADGN:   An Algorithm for Record Linkage Using Address, Date of Birth
            Gender and Name,"  *Statistics and Public Policy*  (with Eitan Hersh)

2017        "Identity Politics" (with Socorro Puy) *Public Choice*. 168:  1-19.
            DOI 10.1007/s11127-016-0371-2

2016        "A 200-Year Statistical History of the Gerrymander" (with Maxwell Palmer) *The
            Ohio State University Law Journal*

2016        "Do Americans Prefer Co-Ethnic Representation?  The Impact of Race on House
            Incumbent Evaluations" (with Bernard Fraga)  *Stanford University Law Review*
            68:  1553-1594

2016        Revisiting Public Opinion on Voter Identification and Voter Fraud in an Era of
            Increasing Partisan Polarization" (with Nathaniel Persily) *Stanford Law Review*
            68:  1455-1489

2015        "The Perils of Cherry Picking Low Frequency Events in Large Sample Surveys"
            (with Brian Schaffner and Samantha Luks)  *Electoral Studies* 40 (December):
            409-410.

2015        "Testing *Shaw v. Reno*:  Do Majority-Minority Districts Cause Expressive
            Harms?" (with Nathaniel Persily)  *New York University Law Review* 90

2015        "A Brief Yet Practical Guide to Reforming U.S. Voter Registration, *Election Law
            Journa*l, (with Daron Shaw and Charles Stewart) 14:  26-31.

2015        "Waiting to Vote," *Election Law Journa*l, (with Charles Stewart) 14:  47-53.

2014        "Mecro-economic Voting:  Local Information and Micro-Perceptions of the
            Macro-Economy" (With Marc Meredith and Erik Snowberg), *Economics and
            Politics* 26 (November):  380-410.

2014        "Does Survey Mode Still Matter?"  *Political Analysis* (with Brian Schaffner) 22:
            285-303

2013        "Race, Gender, Age, and Voting" *Politics and Governance*, vol. 1, issue 2.
            (with Eitan Hersh)
             http://www.librelloph.com/politicsandgovernance/article/view/PaG-1.2.132

2013        "Regional Differences in Racially Polarized Voting: Implications for the
            Constitutionality of Section 5 of the Voting Rights Act" (with Nathaniel Persily
            and Charles Stewart) 126 *Harvard Law Review* F 205 (2013)
            http://www.harvardlawreview.org/issues/126/april13/forum_1005.php

2013        "Cooperative Survey Research" *Annual Review of Political Science* (with
            Douglas Rivers)

2013        "Social Sciences and the Alternative Energy Future" *Daedalus* (with Bob Fri)

2013        "The Effects of Redistricting on Incumbents," *Election Law Journal*
            (with James Snyder)

2012        "Asking About Numbers:  How and Why" *Political Analysis* (with Erik
            Snowberg and Marc Meredith). doi:10.1093/pan/mps031

2012         "Movers, Stayers, and Registration" *Quarterly Journal of Political Science*
            (with Eitan Hersh and Ken Shepsle)

2012        "Validation:   What Big Data Reveals About Survey Misreporting and the Real
            Electorate" *Political Analysis* (with Eitan Hersh)

2012        "Arizona Free Enterprise v. Bennett and the Problem of Campaign Finance"
            *Supreme Court Review* 2011(1):39-79

2012        "The American Public's Energy Choice" *Daedalus* (with David Konisky)

2012        "Challenges for Technology Change" *Daedalus* (with Robert Fri)

2011        "When Parties Are Not Teams:  Party positions in single-member district and proportional representation systems" *Economic Theory* 49 (March) DOI: 10.1007/s00199-011-0610-1  (with James M. Snyder Jr. and William Leblanc)

2011        "Profiling Originalism" *Columbia Law Review* (with Jamal Greene and Nathaniel Persily).

2010        "Partisanship, Public Opinion, and Redistricting" *Election Law Journal* (with Joshua Fougere and Nathaniel Persily).

2010        "Primary Elections and Party Polarization" *Quarterly Journal of Political Science* (with Shigeo Hirano, James Snyder, and Mark Hansen)

2010         "Constituents' Responses to Congressional Roll Call Voting," *American Journal of  Political Science*  (with Phil Jones)

2010         "Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act" *Harvard Law Review* April, 2010.  (with Nathaniel Persily, and Charles H. Stewart III)

2010        "Residential Mobility and the Cell Only Population," *Public Opinion Quarterly* (with Brian Schaffner)

2009         "Explaining Attitudes Toward Power Plant Location,"  *Public Opinion Quarterly* (with David Konisky)

2009        "Public risk perspectives on the geologic storage of carbon dioxide," *International Journal of Greenhouse Gas Control* (with Gregory Singleton and Howard Herzog) 3(1):  100-107.

2008        "A Spatial Model of the Relationship Between Seats and Votes"  (with William Leblanc) *Mathematical and Computer Modeling* (November).

2008        "The Strength of Issues:  Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting"  (with Jonathan Rodden and James M. Snyder, Jr.)  *American Political Science Review* (May).

2008        "Access versus Integrity in Voter Identification Requirements." *New York*

*University Annual Survey of American Law,* vol 63.

2008        "Voter Fraud in the Eye of the Beholder" (with Nathaniel Persily) *Harvard Law Review* (May)

2007        "Incumbency Advantages in U. S. Primary Elections," (with John Mark Hansen, Shigeo Hirano, and James M. Snyder, Jr.) *Electoral Studies* (September)

2007        "Television and the Incumbency Advantage" (with Erik C. Snowberg and James M. Snyder, Jr). *Legislative Studies Quarterly.*

2006        "The Political Orientation of Newspaper Endorsements" (with Rebecca Lessem and James M. Snyder, Jr.). *Quarterly Journal of Political Science* vol. 1, issue 3.

2006        "Voting Cues and the Incumbency Advantage:  A Critical Test" (with Shigeo Hirano, James M. Snyder, Jr., and Michiko Ueda) *Quarterly Journal of Political Science* vol. 1, issue 2.

2006        "American Exceptionalism?  Similarities and Differences in National Attitudes Toward Energy Policies and Global Warming" (with David Reiner, Howard Herzog, K. Itaoka, M. Odenberger, and Fillip Johanssen) *Environmental Science and Technology* (February 22, 2006), http://pubs3.acs.org/acs/journals/doilookup?in_doi=10.1021/es052010b

2006        "Purple America" (with Jonathan Rodden and James M. Snyder, Jr.) *Journal of Economic Perspectives* (Winter).

2005        "Did the Introduction of Voter Registration Decrease Turnout?" (with David Konisky). *Political Analysis.*

2005        "Statistical Bias in Newspaper Reporting:  The Case of Campaign Finance" *Public Opinion Quarterly* (with James M. Snyder, Jr., and Erik Snowberg).

2005        "Studying Elections" *Policy Studies Journal* (with Charles H. Stewart III and R. Michael Alvarez).

2005        "Legislative Bargaining under Weighted Voting" *American Economic Review* (with James M. Snyder, Jr., and Michael Ting)

2005        "Voting Weights and Formateur Advantages in Coalition Formation:  Evidence from Parliamentary Coalitions, 1946 to 2002" (with James M. Snyder, Jr., Aaron B. Strauss, and Michael M. Ting) *American Journal of Political Science.*

2005   "Reapportionment and Party Realignment in the American States"  *Pennsylvania Law Review* (with James M. Snyder, Jr.)

2004   "Residual Votes Attributable to Voting Technologies" (with Charles Stewart) *Journal of Politics*

2004   "Using Term Limits to Estimate Incumbency Advantages When Office Holders Retire Strategically" (with James M. Snyder, Jr.).  *Legislative Studies Quarterly* vol. 29, November 2004, pages 487-516.

2004   "Did Firms Profit From Soft Money?" (with James M. Snyder, Jr., and Michiko Ueda)  *Election Law Journal* vol. 3, April 2004.

2003   "Bargaining in Bicameral Legislatures" (with James M. Snyder, Jr. and Mike Ting)  *American Political Science Review,* August, 2003.

2003   "Why Is There So Little Money in U.S. Politics?" (with James M. Snyder, Jr.) *Journal of Economic Perspectives*, Winter, 2003.

2002   "Equal Votes, Equal Money:  Court-Ordered Redistricting and the Public Spending in the American States" (with Alan Gerber and James M. Snyder, Jr.) *American Political Science Review*, December, 2002.
      Paper awarded the Heinz Eulau award for the best paper in the American Political Science Review.

2002   "Are PAC Contributions and Lobbying Linked?" (with James M. Snyder, Jr. and Micky Tripathi) *Business and Politics* 4, no. 2.

2002   "The Incumbency Advantage in U.S. Elections:  An Analysis of State and Federal Offices, 1942-2000"  (with James Snyder)  *Election Law Journal,* 1, no. 3.

2001   "Voting Machines, Race, and Equal Protection."  *Election Law Journal*, vol. 1, no. 1

2001   "Models, assumptions, and model checking in ecological regressions" (with Andrew Gelman, David Park, Phillip Price, and Larraine Minnite) *Journal of the Royal Statistical Society,* series A, 164:  101-118.

2001   "The Effects of Party and Preferences on Congressional Roll Call Voting." (with James Snyder and Charles Stewart)  *Legislative Studies Quarterly* (forthcoming).
      Paper awarded the *Jewell-Lowenberg Award* for the best paper published on legislative politics in 2001.  Paper awarded the *Jack Walker Award* for the best paper published on party politics in 2001.

| | |
|---|---|
| 2001 | "Candidate Positions in Congressional Elections," (with James Snyder and Charles Stewart). *American Journal of Political Science* 45 (November). |
| 2000 | "Old Voters, New Voters, and the Personal Vote," (with James Snyder and Charles Stewart) *American Journal of Political Science* 44 (February). |
| 2000 | "Soft Money, Hard Money, Strong Parties," (with James Snyder)  *Columbia Law Review* 100 (April):598 - 619. |
| 2000 | "Campaign War Chests and Congressional Elections," (with James Snyder)  *Business and Politics*. 2 (April):  9-34. |
| 1999 | "Replicating Experiments Using Surveys and Aggregate Data:  The Case of Negative Advertising."  (with Shanto Iyengar and Adam Simon)  *American Political Science Review* 93 (December). |
| 1999 | "Valence Politics and Equilibrium in Spatial Models," (with James Snyder),  *Public Choice.* |
| 1999 | "Money and Institutional Power," (with James Snyder), *Texas Law Review* 77 (June, 1999):  1673-1704. |
| 1997 | "Incumbency Advantage and the Persistence of Legislative Majorities," (with Alan Gerber), *Legislative Studies Quarterly* 22 (May 1997). |
| 1996 | "The Effects of Ballot Access Rules on U.S. House Elections," (with Alan Gerber), *Legislative Studies Quarterly* 21 (May 1996). |
| 1994 | "Riding the Wave and Issue Ownership: The Importance of Issues in Political Advertising and News," (with Shanto Iyengar) *Public Opinion Quarterly* 58:  335-357. |
| 1994 | "Horseshoes and Horseraces:  Experimental Evidence of the Effects of Polls on Campaigns," (with Shanto Iyengar) *Political Communications* 11/4 (October-December):  413-429. |
| 1994 | "Does Attack Advertising Demobilize the Electorate?"  (with Shanto Iyengar),  *American Political Science Review* 89 (December). |
| 1994 | "The Mismeasure of Campaign Spending:  Evidence from the 1990 U.S. House Elections," (with Alan Gerber) *Journal of Politics* 56 (September). |
| 1993 | "Poll Faulting," (with Thomas R. Belin) *Chance* 6 (Winter):  22-28. |

| 1991 | "The Vanishing Marginals and Electoral Responsiveness," (with David Brady and Morris Fiorina) *British Journal of Political Science* 22 (November):  21-38. |
|------|---|
| 1991 | "Mass Media and Elections:  An Overview," (with Roy Behr and Shanto Iyengar) *American Politics Quarterly* 19/1 (January):  109-139. |
| 1990 | "The Limits of Unraveling in Interest Groups," *Rationality and Society* 2:  394-400. |
| 1990 | "Measuring the Consequences of Delegate Selection Rules in Presidential Nominations," (with Gary King) *Journal of Politics* 52:  609-621. |
| 1989 | "The Nature of Utility Functions in Mass Publics," (with Henry Brady) *American Political Science Review* 83: 143-164. |

### *Special Reports and Policy Studies*

| 2010 | *The Future of Nuclear Power*, Revised. |
|------|---|
| 2006 | *The Future of Coal.* MIT Press.  Continued reliance on coal as a primary power source will lead to very high concentrations of carbon dioxide in the atmosphere, resulting in global warming.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – develop a road map for technology research and development policy in order to address the challenges of carbon emissions from expanding use of coal for electricity and heating throughout the world. |
| 2003 | *The Future of Nuclear Power.*  MIT Press.  This cross-disciplinary study – drawing on faculty from Physics, Economics, Chemistry, Nuclear Engineering, and Political Science – examines the what contribution nuclear power can make to meet growing electricity demand, especially in a world with increasing carbon dioxide emissions from fossil fuel power plants. |
| 2002 | "Election Day Registration." A report prepared for DEMOS.  This report analyzes the possible effects of Proposition 52 in California based on the experiences of 6 states with election day registration. |
| 2001 | *Voting:  What Is, What Could Be.*  A report of the Caltech/MIT Voting Technology Project.  This report examines the voting system, especially technologies for casting and counting votes, registration systems, and polling place operations, in the United States.  It was widely used by state and national governments in formulating election  reforms following the 2000 election. |

2001        "An Assessment of the Reliability of Voting Technologies."  A report of the Caltech/MIT Voting Technology Project.  This report provided the first nationwide assessment of voting equipment performance in the United States.  It was prepared for the Governor's Select Task Force on Election Reform in Florida.

## *Chapters in Edited Volumes*

2016        "Taking the Study of Public Opinion Online"  (with Brian Schaffner) *Oxford Handbook of Public Opinion*, R. Michael Alvarez, ed. Oxford University Press: New York, NY.

2014        "Voter Registration:  The Process and Quality of Lists*" The Measure of American Elections*, Barry Burden, ed..

2012        "Using Recounts to Measure the Accuracy of Vote Tabulations:  Evidence from New Hampshire Elections, 1946-2002" in Confirming Elections, R. Michael Alvarez, Lonna Atkeson, and Thad Hall, eds.  New York: Palgrave, Macmillan.

2010        "Dyadic Representation"  in Oxford Handbook on Congress, Eric Schickler, ed., Oxford University Press.

2008        "Voting Technology and Election Law" in *America Votes!,* Benjamin Griffith, editor, Washington, DC:  American Bar Association.

2007        "What Did the Direct Primary Do to Party Loyalty in Congress"  (with Shigeo Hirano and James M. Snyder Jr.) in *Process, Party and Policy Making: Further New Perspectives on the History of Congress*, David Brady and Matthew D. McCubbins (eds.), Stanford University Press, 2007.

2007        "Election Administration and Voting Rights" in *Renewal of the Voting Rights Act*, David Epstein and Sharyn O'Hallaran, eds.  Russell Sage Foundation.

2006        "The Decline of Competition in Primary Elections,"  (with John Mark Hansen, Shigeo Hirano, and James M. Snyder, Jr.) *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds.  Washington, DC:  Brookings.

2005        "Voters, Candidates and  Parties"  in *Handbook of Political Economy*, Barry Weingast and Donald Wittman, eds.  New York: Oxford University Press.

2003        "Baker v. Carr in Context, 1946 – 1964" (with Samuel Isaacharoff) in *Constitutional Cases in Contex*t, Michael Dorf, editor. New York: Foundation Press.

| 2002 | "Corruption and the Growth of Campaign Spending"(with Alan Gerber and James Snyder).  *A User's Guide to Campaign Finance*, Jerry Lubenow, editor.  Rowman and Littlefield. |
|------|------|
| 2001 | "The Paradox of Minimal Effects," in Henry Brady and Richard Johnston, eds., *Do Campaigns Matter*?  University of Michigan Press. |
| 2001 | "Campaigns as Experiments," in Henry Brady and Richard Johnson, eds., Do *Campaigns Matter*?  University of Michigan Press. |
| 2000 | "Money and Office," (with James Snyder) in David Brady and John Cogan, eds., *Congressional Elections:  Continuity and Change*.  Stanford University Press. |
| 1996 | "The Science of Political Advertising," (with Shanto Iyengar) in *Political Persuasion and Attitude Change*, Richard Brody, Diana Mutz, and Paul Sniderman, eds.  Ann Arbor, MI:  University of Michigan Press. |
| 1995 | "Evolving Perspectives on the Effects of Campaign Communication," in Philo Warburn, ed., *Research in Political Sociology*, vol. 7, JAI. |
| 1995 | "The Effectiveness of Campaign Advertising: It's All in the Context," (with Shanto Iyengar) in *Campaigns and Elections American Style*, Candice Nelson and James A. Thurber, eds.  Westview Press. |
| 1993 | "Information and Electoral Attitudes:  A Case of Judgment Under Uncertainty," (with Shanto Iyengar), in *Explorations in Political Psychology*, Shanto Iyengar and William McGuire, eds.  Durham:  Duke University Press. |

### *Working Papers*

| 2009 | "Sociotropic Voting and the Media" (with Marc Meredith and Erik Snowberg), American National Election Study Pilot Study Reports, John Aldrich editor. |
|------|------|
| 2007 | "Public Attitudes Toward America's Energy Options:  Report of the 2007 MIT Energy Survey" CEEPR Working Paper 07-002 and CANES working paper. |
| 2006 | "Constituents' Policy Perceptions and Approval of Members' of Congress"  CCES Working Paper 06-01 (with Phil Jones). |
| 2004 | "Using Recounts to Measure the Accuracy of Vote Tabulations:  Evidence from New Hampshire Elections, 1946 to 2002"  (with Andrew Reeves). |
| 2002 | "Evidence of Virtual Representation:  Reapportionment in California,"  (with |

Ruimin He and James M. Snyder).

1999 "Why did a majority of Californians vote to lower their own power?" (with James Snyder and Jonathan Woon).  Paper presented at the annual meeting of the American Political Science Association, Atlanta, GA, September, 1999. Paper received the award for the best paper on Representation at the 1999 Annual Meeting of the APSA.

1999 "Has Television Increased the Cost of Campaigns?" (with Alan Gerber and James Snyder).

1996 "Money, Elections, and Candidate Quality,"  (with James Snyder).

1996 "Party Platform Choice - Single- Member District and Party-List Systems,"(with James Snyder).

1995 "Messages Forgotten"  (with Shanto Iyengar).

1994 "Consumer Contributors and the Returns to Fundraising:  A Microeconomic Analysis," (with Alan Gerber), presented at the Annual Meeting of the American Political Science Association, September.

1992 "Biases in Ecological Regression," (with R. Douglas Rivers) August, (revised February 1994).  Presented at the Midwest Political Science Association Meetings, April 1994, Chicago, IL.

1992 "Using Aggregate Data to Correct Nonresponse and Misreporting in Surveys" (with R. Douglas Rivers).  Presented at the annual meeting of the Political Methodology Group, Cambridge, Massachusetts, July.

1991 "The Electoral Effects of Issues and Attacks in Campaign Advertising" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Political Science Association, Washington, DC.

1991 "Television Advertising as Campaign Strategy:  Some Experimental Evidence" (with Shanto Iyengar).  Presented at the Annual Meeting of the American Association for Public Opinion Research, Phoenix.

1991 "Why Candidates Attack:  Effects of Televised Advertising in the 1990 California Gubernatorial Campaign," (with Shanto Iyengar).  Presented at the Annual Meeting of the Western Political Science Association, Seattle, March.

1990 "Winning is Easy, But It Sure Ain't Cheap."  Working Paper #90-4, Center for the American Politics and Public Policy, UCLA.  Presented at the Political Science Departments at Rochester University and the University of Chicago.

*Research Grants*

| | |
|---|---|
| 1989-1990 | Markle Foundation.  "A Study of the Effects of Advertising in the 1990 California Gubernatorial Campaign."  Amount: $50,000 |
| 1991-1993 | Markle Foundation.  "An Experimental Study of the Effects of Campaign Advertising."  Amount: $150,000 |
| 1991-1993 | NSF.  "An Experimental Study of the Effects of Advertising in the 1992 California Senate Electoral."  Amount: $100,000 |
| 1994-1995 | MIT Provost Fund.  "Money in Elections:  A Study of the Effects of Money on Electoral Competition."  Amount: $40,000 |
| 1996-1997 | National Science Foundation. "Campaign Finance and Political Representation."  Amount: $50,000 |
| 1997 | National Science Foundation.  "Party Platforms:  A Theoretical Investigation of Party Competition Through Platform Choice."  Amount: $40,000 |
| 1997-1998 | National Science Foundation.  "The Legislative Connection in Congressional Campaign Finance.   Amount: $150,000 |
| 1999-2000 | MIT Provost Fund.  "Districting and Representation."  Amount:  $20,000. |
| 1999-2002 | Sloan Foundation.  "Congressional Staff Seminar." Amount:  $156,000. |
| 2000-2001 | Carnegie Corporation. "The Caltech/MIT Voting Technology Project."  Amount:  $253,000. |
| 2001-2002 | Carnegie Corporation.  "Dissemination of Voting Technology Information."  Amount:  $200,000. |
| 2003-2005 | National Science Foundation. "State Elections Data Project."  Amount: $256,000. |
| 2003-2004 | Carnegie Corporation.  "Internet Voting."  Amount:  $279,000. |
| 2003-2005 | Knight Foundation.  "Accessibility and Security of Voting Systems."  Amount: $450,000. |
| 2006-2008 | National Science Foundation, "Primary Election Data Project,"  $186,000 |

| | |
|---|---|
| 2008-2009 | Pew/JEHT.  "Measuring Voting Problems in Primary Elections, A National Survey."  Amount: $300,000 |
| 2008-2009 | Pew/JEHT. "Comprehensive Assessment of the Quality of Voter Registration Lists in the United States:  A pilot study proposal"  (with Alan Gerber).  Amount:  $100,000. |
| 2010-2011 | National Science Foundation, "Cooperative Congressional Election Study," $360,000 |
| 2010-2012 | Sloan Foundation, "Precinct-Level U. S. Election Data," $240,000. |
| 2012-2014 | National Science Foundation, "Cooperative Congressional Election Study, 2010-2012 Panel Study" $425,000 |
| 2012-2014 | National Science Foundation, "2012 Cooperative Congressional Election Study," $475,000 |
| 2014-2016 | National Science Foundation, "Cooperative Congressional Election Study, 2010-2014 Panel Study" $510,000 |
| 2014-2016 | National Science Foundation, "2014 Cooperative Congressional Election Study," $400,000 |
| 2016-2018 | National Science Foundation, "2016 Cooperative Congressional Election Study," $485,000 |
| 2018-2020 | National Science Foundation, "2018 Cooperative Congressional Election Study,"  $844,784. |
| 2019-2022 | National Science Foundation, RIDIR:  "Collaborative Research:  Analytic Tool for Poststratification and small-area estimation for survey data." $942,607 |

### *Professional Boards*

Editor, Cambridge University Press Book Series, Political Economy of Institutions and Decisions, 2006-2016

Member, Board of the Reuters International School of Journalism, Oxford University, 2007 to present.

Member, Academic Advisory Board, Electoral Integrity Project, 2012 to present.

15

Contributing Editor, *Boston Review*, The State of the Nation.

Member, Board of Overseers, American National Election Studies, 1999 - 2013.

Associate Editor, Public Opinion Quarterly, 2012 to 2013.

Editorial Board of Harvard Data Science Review, 2018 to present.
Editorial Board of American Journal of Political Science, 2005 to 2009.
Editorial Board of Legislative Studies Quarterly, 2005 to 2010.
Editorial Board of Public Opinion Quarterly, 2006 to present.
Editorial Board of the Election Law Journal, 2002 to present.
Editorial Board of the Harvard International Journal of Press/Politics, 1996 to 2008.
Editorial Board of Business and Politics, 2002 to 2008.
Scientific Advisory Board, Polimetrix, 2004 to 2006.


*Special Projects and Task Forces*

Principal Investigator, Cooperative Congressional Election Study, 2005 – present.

CBS News Election Decision Desk, 2006-present

Co-Director, Caltech/MIT Voting Technology Project, 2000-2004.

Co-Organizer, MIT Seminar for Senior Congressional and Executive Staff, 1996-2007.

MIT Energy Innovation Study, 2009-2010.
MIT Energy Initiative, Steering Council, 2007-2008
MIT Coal Study, 2004-2006.
MIT Energy Research Council, 2005-2006.
MIT Nuclear Study, 2002-2004.
Harvard University Center on the Environment, Council, 2009-present


**Expert Witness, Consultation, and Testimony**

| | |
|---|---|
| 2001 | Testimony on Election Administration, U. S. Senate Committee on Commerce. |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on Science, Space, and Technology |
| 2001 | Testimony on Voting Equipment, U.S. House Committee on House Administration |
| 2001 | Testimony on Voting Equipment, Congressional Black Caucus |
| 2002-2003 | *McConnell v. FEC*, 540 U.S. 93 (2003), consultant to the Brennan Center. |
| 2009 | Amicus curiae brief with Professors Nathaniel Persily and Charles Stewart on behalf of neither party to the U.S. Supreme Court in the case of *Northwest* |

| | |
|---|---|
| | *Austin Municipal Utility District Number One v. Holder*, 557 U.S. 193 (2009). |
| 2009 | Testimony on Voter Registration, U. S. Senate Committee on Rules. |
| 2011-2015 | *Perez v. Perry*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360).   Exert witness on behalf of Rodriguez intervenors. |
| 2011-2013 | *State of Texas v. United States,* the U.S. District Court in the District of Columbia (No. 1:11-cv-01303), expert witness on behalf of the Gonzales intervenors. |
| 2012-2013 | *State of Texas v. Holder*, U.S. District Court in the District of Columbia (No. 1:12-cv-00128), expert witness on behalf of the United States. |
| 2011-2012 | *Guy v. Miller* in U.S. District Court for Nevada (No. 11-OC-00042-1B), expert witness on behalf of the Guy plaintiffs. |
| 2012 | *In re Senate Joint Resolution of Legislative Apportionment*,  Florida Supreme Court (Nos. 2012-CA-412, 2012-CA-490), consultant for the Florida Democratic Party. |
| 2012-2014 | *Romo v. Detzner*, Circuit Court of the Second Judicial Circuit in Florida (No. 2012 CA 412), expert witness on behalf of Romo plaintiffs. |
| 2013-2014 | *LULAC v. Edwards Aquifer Authority*, U.S. District Court for the Western District of Texas, San Antonio Division (No. 5:12cv620-OLG,), consultant and expert witness on behalf of the City of San Antonio and San Antonio Water District |
| 2013-2014 | *Veasey v. Perry*, U. S. District Court for the Southern District of Texas, Corpus Christi Division (No. 2:13-cv-00193), consultant and expert witness on behalf of the United States Department of Justice. |
| 2013-2015 | *Harris v. McCrory,* U. S. District Court for the Middle District of North Carolina (No. 1:2013cv00949), consultant and expert witness on behalf of the Harris plaintiffs.  (later named *Cooper v. Harris*) |
| 2014 | Amicus curiae brief, on behalf of neither party, Supreme Court of the United States, *Alabama Democratic Conference v. State of Alabama*. |
| 2014- 2016 | *Bethune-Hill v. Virginia State Board of Elections*, U. S. District Court for the Eastern District of Virginia (No. 3:2014cv00852), consultant and expert on behalf of the Bethune-Hill plaintiffs. |
| 2015 | Amicus curiae brief in support of Appellees, Supreme Court of the United States, *Evenwell v. Abbott* |
| 2016-2017 | *Perez v. Abbott*, U. S. District Court in the Western District of Texas (No. 5:11-cv-00360).   Exert witness on behalf of Rodriguez intervenors. |
| 2017-2018 | Fish v. Kobach, U. S. District Court in the District of Kansas (No. 2:16-cv-02105-JAR).  Expert witness of behalf of the Fish plaintiffs. |

# Exhibit 2

December 2, 2020

*King et al. v. Whitmer et al.,* Case No. 2:20-CV-13134

United States District Court for Eastern District of Michigan

Expert Report of Jonathan Rodden, PhD

737 Mayfield Avenue
Stanford, CA 94305

_____
Jonathan Rodden, PhD

## I.   INTRODUCTION AND SUMMARY

On Tuesday, December 1, 2020, I received declarations from Dr. Eric Quinnell and Mr. James Ramsland, Jr. Each of these declarations makes rather strong claims to have demonstrated "anomalies" or "irregularities" in the results of the presidential election in Michigan on November 3, 2020. I have been asked by Counsel to assess the validity of their claims. Unfortunately, these reports do not meet basic standards for scientific inquiry. For the most part, they are not based on discernable logical arguments. Without any citations to relevant scientific literature about statistics or elections, the authors identify common and easily explained patterns in the 2020 election results, and without explanation, assert that they are somehow "anomalous." These reports lacks a basic level of clarity or transparency about research methods or data sources that would be expected in a scientific communication. In any event, neither report contains evidence of "anomalies" or fraud.

## II.   QUALIFICATIONS

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab ("the Lab")—a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences. In my affiliation with the Lab, I am engaged in a variety

of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as an Appendix to this report.

    In my current academic work, I conduct research on the relationship between the patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy, Proceedings of the National Academy of Science*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was recently selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy published

in the last year, and another received an award from the American Political Science Association section on social networks.

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured in more popular publications like the *Wall Street Journal*, the *New York Times*, and *Boston Review*. I have recently completed a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. My PhD students frequently take academic and private sector jobs as statisticians and data scientists. I frequently work with geo-coded voter files and other large administrative data sets, including in recent paper published in the *Annals of Internal Medicine* and *The New England Journal of Medicine.* I have developed a national data set of geo-coded precinct-level election results that has

been used extensively in policy-oriented research related to redistricting and representation.[1]

I have been accepted and testified as an expert witness in six recent election law cases: *Romo v. Detzner,* No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP* v. *Ferguson-Florissant Sch. Dist.,* No. 4:2014-CV-02077 (E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections,* No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Committee et al. v. Hobbs et al.*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Virginia State Board of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson et al. v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018). I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, voting, ballots, and election administration. I am being compensated at the rate of $500/hour for my work in this case. My compensation is not dependent upon my conclusions in any way.

## III.   DATA SOURCES

I have collected 2016 geospatial precinct-level data on Michigan from the Metric Geometry and Gerrymandering Group at Tufts University. I obtained digitized 2020 Michigan precinct boundary files from the Michigan Geographic

---

[1] The dataset can be downloaded at http://projects.iq.harvard.edu/eda/home.

Information Systems Department. I obtained precinct-level data on 2020 election results from the Wayne County Clerk's office. I created a national county-level dataset on election results, including those in Michigan, using information assembled from county election administrators by the New York Times and Associated Press. I have also collected yearly county-level population estimates for Michigan from the U.S. Census Department.

## IV.   QUINNELL REPORT

Dr. Quinnell's report uses a two-step process to document what are purported to be "anomalies" in Michigan's election results. The first step is to make a bivariate scatterplot of county size against Biden's vote share. Dr. Quinnell discovers that Wayne and Oakland Counties are relatively large and tend to vote for Democrats. He believes this to be somehow anomalous and worthy of further investigation. Next, he examines precinct-level data from those two counties, from which he ascertains that relative to places like Detroit, Biden's improvement over Hillary Clinton's 2016 performance was concentrated in middle-class and relatively affluent, suburban, majority-white communities like Livonia and Grosse Pointe. For reasons that are unclear, even though the same pattern was visible in virtually every suburb in the United States, Dr. Quinnell opines that these increased Democratic suburban vote shares in Michigan are "excessive" and somehow suspicious. I respond to each of these claims in turn.

6

*Are Wayne and Oakland Counties Anomalous?*

First, Dr. Quinnell presents a pair of county-level scatterplots. On the horizontal axis, he appears to plot the total number of votes cast in a county in the 2020 election. On the vertical axis, he evidently plots the number of votes cast for Joseph Biden. The second graph does the same thing for Trump votes. Of course, as the number of votes cast increases, the number of votes cast for both candidates increases. But Dr. Quinnell asserts that there is something anomalous about Oakland and Wayne counties, which are by far the largest counties in Michigan in terms of population. They are also relatively urban counties, and in the United States, urban counties tend to vote disproportionately for Democratic candidates.

To demonstrate that the Democratic vote shares in these two counties are "anomalous," Dr. Quinnell fits a linear model from the *other* counties—excluding Wayne and Oakland—and extends it throughout the graph. It is not clear what purpose this serves. Evidently, Dr. Quinnell believes that if a larger, more urban county is more Democratic, given its size, than other counties, we should be suspicious of its vote share. This is an odd claim, since urbanization and population density are perhaps the strongest county-level predictors of voting behavior in the United States. In Figure 1, I present essentially the same graph as Dr. Quinnell, but I display a linear fit based on all of the observations, rather than a subset. I also use

7

data markers that are sized according to the population size of the county. In this graph, it is difficult to see what is anomalous about Oakland or Wayne County.

**Figure 1: Total Votes Cast and Biden Votes, Michigan Counties, 2020**



In any case, it is not clear why it makes sense to plot votes for candidates against total votes cast as the basis for an "anomaly" search. It is simply not surprising, for instance, that Wayne County has a high Democratic vote share than other counties. Later in his report, Dr. Quinnell works with a definition of "anomaly" in which we should be suspicious of geographic units where one of the candidates gains an unusual vote share vis-à-vis the previous election. In Figure 2, I take this approach, plotting Hillary Clinton's vote share in 2016 on the horizontal axis, and Joseph Biden's vote share in 2020 on the vertical axis. I also include a 45-degree line, so that counties above the line are those where Biden out-performed Clinton,

8

and those below the line are counties where Trump improved on his 2016 performance.

**Table 2: Biden Vote Share in 2020 and Clinton Vote Share in 2016, Michigan Counties**



This graph demonstrates, once again, that there is nothing anomalous about Wayne or Oakland counties. Biden's vote share in 2020 is very similar to Clinton's vote share in 2016. In Oakland County, it is only slightly higher. In fact, Biden's largest gains were in more suburban counties in the middle of the graph, where the Democratic vote share is typically around 50 percent or slightly lower. In short, it is quite puzzling to argue that the 2020 election results in Wayne and Oakland counties were anomalous as a general matter, especially if one is concerned about fraud that might have benefited the Democratic candidate. These counties were relative

laggards relative to other counties in the statewide shift toward the Democratic presidential candidate. But let us now turn to the precinct-level data.

*Are there Anomalies in the Precinct Vote Tallies in Wayne County?*

Dr. Quinnell appears to have collected precinct-level election data from Wayne County, Michigan, and merged them together with data from the 2016 election. He appears to have done the same for Oakland County. I have been unable to locate precinct-level results for 2020 in Oakland County, but for Wayne County, I have collected precinct-level election results for 2020 and 2016. I have consulted precinct boundary maps for both elections, and determined which precincts had similar geography in the two elections. For those precincts (the vast majority), I merged the data sets together, so as to examine changes in support for the parties over time.

Dr. Quinnell begins his discussion of Wayne County with a pair of scatterplots using data from the 2020 election. Once again, he appears that he plots total votes cast by precinct on the horizontal axis, and total votes for Biden on the vertical axis. He then does the same for Trump votes. He does not explain the purpose of these graphs, or what he expects the reader to learn from them. In the city of Detroit, absentee ballots are not attributed to the voter's assigned geographic precinct, but rather, to special, larger geographic units that are used for tabulation: Absent Voter

Counting Board (AVCB) districts. These units are not at all comparable to geographic precincts. For this reason, one can only conduct precinct-level analysis in the city of Detroit by focusing on *Election Day* votes. Yet for some reason, when making his plots, Dr. Quinnell puts the Detroit AVCB districts into the same dataset with *total votes* (Election-Day and absentee) at the level of geographic precincts from all around Wayne County.

This mixing of "apples and oranges" makes little sense, and is responsible for manufacturing what Dr. Quinnell calls an "anomaly." Since the AVCB units are larger aerial units used for counting, they are much larger than typical precincts. Moreover, as was true in states all around the United States, absentee ballots in Michigan were overwhelmingly Democratic in 2020. This is in large part because the incumbent president exhorted his followers not to make use of absentee ballots, and vote instead on Election Day. Dr. Quinnell appears to have plotted precincts and AVCB districts on the same graph, and made a trendline based only on the (much smaller) precincts. He plots the AVCB districts with darker data markers, and notes that they are above the precinct-based trendline in the Biden graph. This is not the least bit surprising. It is merely a way of visualizing the well-known fact that absentee ballots, in Detroit as elsewhere in the United States, favored Democratic candidates in 2020.

In Figure 3 below, I make a plot like Dr. Quinnell's—with total votes on the horizontal axis and Biden votes on the vertical axis—but I exclude the Detroit AVCB districts. For comparison, I include the Detroit Election-Day totals (in red), but note that these are not strictly comparable to the rest of Wayne County (black data markers), for which I plot totals including both Election Day and absentee. I include a 45-degree line as well. As the data markers get closer to the 45-degree line, precincts get closer to 100 percent Biden vote share. That is to say, the 45-degree line is the point where the number of votes cast, and the number of votes cast for Biden, are identical.

**Figure 3: Ballots Cast and Biden Votes, Wayne County Precincts**



12

There is nothing the least bit anomalous about Figure 3. The red data markers—Detroit's Election-Day precincts—are quite close to the 45-degee line, indicating that Biden's vote share was often above 90 percent. This is extremely common in urban core precincts in almost every U.S. city other than Miami or Salt Lake City.[2] In fact, in the 2008 election, there were thousands of urban core precincts around the United States where President Obama received 100 percent of the vote. As we move to the right on the graph, precincts get larger, and their political behavior becomes more heterogeneous. In Wayne County, given its history of dramatic urban population loss, the smaller precincts on the left side of the graph are more urban, and have higher minority populations, and as we move to the right on the graph, the precincts become larger, more suburban, and have larger white populations. Since minorities, renters, and urban dwellers tend to vote for Democrats, precinct size is negatively correlated with Democratic voting in Wayne County. That is, the data markers get further from the 45-degree line. As we can see in Figure 1, however, the political behavior of Wayne County's suburban precincts is heterogeneous, and as we shall see below, much more amenable to change over time.

Next, Dr. Quinnell turns his attention to *changes* in voting from the 2016 to the 2020 election. He seems to believe that voting behavior should be strictly the

---

[2] Jonathan Rodden. 2019. *Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. New York: Basic Books.

13

same from one election to another, and that if some neighborhoods change their voting behavior from one election to the next, this is evidence of fraud. In 25 years of election research, I have never encountered this claim before. Dr. Quinnell defends this claim by suggesting that "voting totals of precincts may presume to follow a semi-normal distribution with enough data points" (page 4).

There is simply not true. Raw vote totals will not follow a normal distribution if some precincts are much larger than others. As can be seen in Figure 1, due to large population shifts in the presence of a relatively stable precinct structure, Wayne County's precincts vary greatly in size, and the distribution of registered voters across precincts departs substantially from a normal distribution. The same is true for the distribution of voting-age population. Thus, it would be quite strange if the distribution of total votes cast, or votes cast for a particular candidate across precincts, *did* follow a normal a normal distribution.

Perhaps Dr. Quinnell means to claim that the distribution of vote *shares* should approximate a normal distribution. This is also quite mistaken. A very large literature dating back to the earliest mathematical analyses of elections has explained, and demonstrated using high-quality data analysis, that distributions of vote shares across districts, counties, or precincts in two-party systems are very frequently non-normal. In their classic 1979 book, Graham Gudgin and Peter Taylor argue that if the partisan divide in a country with two political parties is correlated

with some social characteristic—for instance race or social class—that is not uniformly distributed in space, but rather, is concentrated in certain districts, the distribution of vote shares will be skewed. They presented evidence that because working-class voters were concentrated in neighborhoods near factories, the distribution of support across electoral districts for Labor parties in Britain and Australia was highly skewed for much of 20th century.[3] More recently, I have demonstrated that support for the Democratic Party in the United States typically has a pronounced right skew across districts, counties, and often precincts—meaning that Democrats are highly concentrated in urban core areas like Detroit.[4] The fact that the Labour Party consistently wins by extremely large margins in urban districts in London, or that the Democrats win by extremely large margins in urban Detroit or Lansing, has nothing to do with fraud.

Perhaps Dr. Quinnell actually means to say, instead, that the distribution of the *change from one election to the next* in votes or vote shares across geographic units should always have a normal distribution. But this argument would make no more sense than an argument about levels. Members of politically relevant groups— for instance young people, racial minorities, or college graduates—are typically not

---

[3] See Graham Gudgin and Peter Taylor, 1979, *Seats, Votes, and the Spatial Organisation of Elections*. London: Pion. For a literature review, see Jonathan Rodden, 2010, "The Geographic Distribution of Political Preferences." *Annual Review of Political Science* 13,55.
[4] Jonathan Rodden. 2019. *Why Cities Lose: The Deep Roots of the Urban-Rural Divide*. New York: Basic Books.

uniformly or randomly distributed across geographic units, especially in the United States. If an incumbent candidate pursues policies and rhetoric that attract or repel a geographically clustered group, we can expect to see a non-normal distribution of changes in vote shares.

For instance, it appears that Donald Trump's appeals in the 2020 election resonated with Cuban and Venezuelan Americans in South Florida, and with *Tejano* voters in Texas. As a result, Trump experienced surprisingly large increases in vote shares in counties where those groups made up a large share of the population. This translated into a highly skewed (that is to say, non-normal) distribution of *changes* in the Republican vote share from 2016 to 2020. Dr. Quinnell appears to believe that when a geographically concentrated group, like Hispanics in a given community, changes its voting behavior more than other groups from one election to another, this is evidence of fraud. In this view, one must conclude that the elections in Texas and Florida were fraudulent. A far more reasonable explanation is that different groups responded differently to the incumbent's record and the candidates' campaigns.

Dr. Quinnell's claims about Wayne and Oakland counties are difficult to follow. He appears not to be concerned with very high Democratic vote shares in Detroit, and more densely populated parts of Oakland county. Rather, he believes that vote *gains* for Biden vis-à-vis Hillary Clinton in relatively affluent, whiter parts

of Wayne County, such as Grosse Pointe, Northville Township, and Livonia were "excessive" (page 4). He does not explain his methods, but seems to estimate predicted voting behavior based on past voting behavior, and refers to votes as "excessive," and hence evidently suspicious, if they are higher than predicted in a particular precinct. This is simply another way of saying that we should be suspicious if some segment of a distinct group of geographically proximate voters—Hispanic voters in South Florida or affluent suburban whites in Michigan—change their voting behavior in response to an incumbent's policies or behavior or the campaign promises of the candidates. Most observers would view such change as a fundamental feature to be anticipated in a democracy.

Is there reason to believe that shifts toward the Democratic candidate in relatively affluent white precincts are outside the norm in Wayne County? Figure 4 plots Joseph Biden's 2020 vote share against Hillary Clinton's 2016 vote share in Wayne County (excluding Detroit), including a 45-degree line, such that data markers above the line indicate precincts where Biden's vote share exceed Clinton's, and those below the line indicate precincts where Biden underperformed relative to Clinton.

Most of the data markers are above the line, especially on the left and in the middle of the graph, indicating that Biden outperformed Clinton in more Republican areas. This is a typical pattern associated with the 2020 election that we have seen

17

throughout the United States. While Senate, U.S. House, and state legislative votes were more stable, the Democratic *presidential* vote increased in white, relatively educated suburban areas, like those above the 45-degree line in Figure 4. It should also be noted that some of the precincts experiencing the largest increases in Democratic vote share were in Redford township—an area where the African-American population is rapidly increasing, more than tripling between the last two decennial censuses.

**Figure 4: Biden 2020 Vote Share and Clinton 2016 Vote Share, Wayne County, Excluding the City of Detroit**



As we move to the right on the graph, the observations begin to fall below the line, indicating that Biden slightly under-performed Clinton in many of the very

Democratic, urban majority-minority precincts. This is also a pattern that can be seen in many other metro areas.

**Figure 5: Increase in Democratic Vote Share in Presidential Election, 2016 to 2020, Wayne County Precincts**



Figure 5 provides another way to visualize the changes in vote shares that Dr.

Quinnell views as suspicious. Yellow is associated with slight gains for Trump, or

very small gains for Biden. As the colors get darker, Biden's gains increase. We can see that Biden did not make significant gains in much of Detroit. Rather, his improvements were largely concentrated in more sparsely populated, suburban, white parts of Wayne County, like Livonia, Plymouth, and Grosse Pointe. The same pattern repeats itself in metro areas throughout the United States. In short, Figures 4 and 5 provide no hint of anything anomalous. If anything, Wayne County is something of a microcosm of metropolitan areas around the United States in the 2020 election.

Dr. Quinnell claims to have identified an unusual pattern involving "new" voters. These claims are difficult to understand. The ballot is secret in the United States, and there is no way to identify the votes of first-time voters vis-à-vis habitual voters. He seems to be concerned that some of the precincts that experienced relatively large increases in total votes cast from 2016 to 2020 also experienced large increases in votes for Biden. This is also not surprising. In Wayne County, it is clearly the case that Biden's gains were largest in precincts where turnout was higher in 2020 than in 2016. While Trump made gains in communities where turnout was increasing in rural America, Biden's gains came largely in suburban communities where turnout was increasing. In much of the urban core, both turnout and the Democratic vote share were relatively flat or decreasing. Again, Wayne County

appears to be a microcosm of metropolitan America. Nothing in the data provided by Dr. Quinnell is indicative or suggestive of fraud.

## V.   RAMSLAND REPORT

On page three of his report, Mr. Ramsland presents some very odd turnout numbers for selected municipalities and precincts in Michigan. For instance, he states that the turnout in the City of North Muskegon was 782 percent. He does not explain where he obtained these strange numbers, and no citations are provided. Precinct level election results as well as counts of registered voters are readily available on the web pages of county election administrators for the relevant counties. I found the data for each of the relevant precincts, and include it in Table 1 below. The sources for the data in Table 1 are listed in the appendix to this report. There is nothing remarkable at all about these turnout numbers. Most of these are rural townships, and turnout has been quite high in rural Michigan in recent years— especially in the era of Donald Trump. Perhaps one might raise an eyebrow at the fact that 30 of 31 registered voters turned out on Grand Island, a tiny island off the Upper Peninsula in Lake Superior, but very high turnout is not so unusual in a small, tight-knit community.

## Table 1: Turnout in Select Michigan Precincts

| Precinct | Turnout |
|---|---|
| City of North Muskegon 1 | 73.53% |
| City of North Muskegon 2 | 82.20% |
| Zeeland Charter Township 1 | 74.46% |
| Zeeland Charter Township 2 | 80.35% |
| Zeeland Charter Township 3 | 80.84% |
| Zeeland Charter Township 4 | 84.40% |
| City of Muskegon 1 | 52.65% |
| City of Muskegon 2 | 60.24% |
| City of Muskegon 3 | 50.97% |
| City of Muskegon 4 | 51.66% |
| City of Muskegon 5 | 45.97% |
| City of Muskegon 6 | 44.69% |
| City of Muskegon 7 | 53.73% |
| City of Muskegon 8 | 44.15% |
| City of Muskegon 9 | 42.77% |
| City of Muskegon 10 | 57.02% |
| City of Muskegon 11 | 60.19% |
| City of Muskegon 12 | 70.94% |
| City of Muskegon 13 | 68.14% |
| City of Muskegon 14 | 83.72% |
| Spring Lake Township 1 | 72.65% |
| Spring Lake Township 2 | 82.18% |
| Spring Lake Township 3 | 77.03% |
| Spring Lake Township 4 | 81.91% |
| Spring Lake Township 5 | 84.15% |
| Spring Lake Township 6 | 66.74% |
| Greenwood Township | 76.47% |
| Hart Township | 68.50% |
| Leavitt Township | 60.77% |
| Newfield Township | 64.46% |
| Otto Township | 70.28% |
| Pentwater Township | 86.00% |
| Shelby Township 1 | 60.22% |
| Shelby Township 2 | 29.85% |
| Weare Township | 71.68% |
| City of Hart | 86.40% |
| Grand Island Township | 96.77% |

| | |
|---|---|
| Tallmadge Charter Township 1 | 76.44% |
| Tallmadge Charter Township 2 | 80.38% |
| Tallmadge Charter Township 3 | 81.25% |
| City of Fenton 1 | 73.00% |
| City of Fenton 2 | 76.81% |
| City of Fenton 3 | 75.22% |
| City of Fenton 4 | 63.66% |
| Bohemia Township | 66.28% |

Next, Mr. Ramsland makes a rather inscrutable claim that election results may have been altered in Michigan because voting machines were set to perform ranked choice voting, which Mr. Ramsland refers to as a "feature enhancement." From this discussion, it seems likely that Mr. Ramsland is not familiar with ranked choice voting. It involves a different type of ballot, in which voters rank their preferences among candidates. This type of ballot was not used in Michigan. Even if all of the ballots in Michigan were somehow counted or processed using ranked choice voting, but using ballots that only allowed voters to select one candidate, the result would be the same. Ranked choice voting is a system where in the first round of counting, if one candidate has a majority, the process is over, and no votes are redistributed. If there were multiple candidates and voters' choices were ranked, there would then be a second round, where the lowest-ranked candidate would be dropped, and those voters who ranked that candidate first would then have their second-choice votes tallied. But clearly, nothing of the sort happened in Michigan. Jo Jorgensen, the Libertarian candidate, was credited with 60,381 votes in Michigan. Significant votes

were also recorded throughout the state for three additional parties as well as five write-in candidates.

He also seems to believe that ranked choice voting would somehow produce non-integer vote totals. This is simply not the case. Ranked-choice voting is no more capable of producing non-integer vote totals than is the winner-take-all plurality system. I have examined precinct-level vote totals from election clerks around Michigan, and have seen no non-integer vote totals. It appears that Mr. Ramsland may have been thrown off by election-night reporting by Edison Research that contained Biden and Trump vote totals that were not always whole numbers. One obvious possibility is that when sharing data on election night, workers at Edison Research multiplied total votes cast by vote shares that had been rounded when they were producing the field for total vote numbers for their data feed.

Finally, Mr. Ramsland expresses concern about the fact that as additional votes were counted in Michigan throughout the evening and into the next day, Biden's share of the vote increased. This exact phenomenon was widely anticipated before the election by scholars and reported in the media. The incumbent Republican presidential candidate made very strong negative statements about voting by mail, and encouraged his supporters to vote on Election Day. Moreover, provisional ballots very frequently favor Democrats. It was not possible to process absentee votes until November 2 in Michigan, which meant that it was likely that absentee

ballots would be counted later in the process, and counting would drag on after Election Day.

Thus, every knowledgeable election watcher understood that in states like Michigan, where absentee and provisional ballots were likely to be counted after election-day votes, observers would observe what analysts refer to as a "blue shift" as votes were counted late at night and in the days to follow. This was not the least bit surprising. Unlike Michigan, Florida is accustomed to handling a heavy volume of mail ballots, and has laws that encourage early counting of absentee ballots, for instance by letting counties process absentee ballots weeks in advance. The early results announced in Florida included pre-tabulated mail ballots, which led to early results that were skewed toward Democrats, eventually shifting toward Republicans. If Mr. Ramsland wishes to argue that shifts toward one party or another in vote counts over time are indicative of fraud, he would be required to argue that Florida's election was fraudulent as well. In reality, there are obvious explanations why different states, and different counties, would count more Democratic or Republican ballots earlier or later in the counting process. By no means does this constitute evidence related to fraud.

## VI.   CONCLUSION

The visions of fraud and conspiracy that motivate these reports are difficult to pin down. It is not clear whether the authors believe that nefarious actors within

certain counties have attempted to alter votes in targeted precincts, or whether they believe that programmers have implemented a statewide or national scheme. They have not explained what pattern of results might be consistent with any such story. The data presented in these reports have nothing to do with fraud, and the authors do not even attempt to link their so-called "anomalies" to theories about how fraud might be carried out. The data presented in the Ramsland report is of unknown origin and bears no resemblance to the data published by county clerks. The data presented in the Quinnell report merely captures a well-known nation-wide phenomenon in which the Democratic candidate gained votes in suburban areas. These reports provide no evidence of anomalies or fraud in Michigan's 2020 election.

**Appendix:**
**Data Sources for Table 1**

https://www.co.muskegon.mi.us/DocumentCenter/View/10306/Precinct-Results-11-3-2020

https://www.miottawa.org/appImages/ElectionManagement/precinctFile-203.pdf

https://www.oscodacountymi.com/wp-content/uploads/2020-November-Official-Results-by-Township.pdf

https://oceana.mi.us/elections/november-3-2020-general-election-results-per-precinct/

https://www.algercounty.gov/document_center/Departments/Clerk_RoD/Elections/2020/November%203,%202020%20General%20(official).pdf

https://www.gc4me.com/departments/county_clerks1/docs/Elections/202011/Canvass%20Results-11-17-2020%2020-55-47%20PM.pdf

https://www.ontonagoncounty.org/wp-content/uploads/2020/11/November-3-2020-General-Election-4.pdf

# Jonathan Rodden

Stanford University
Department of Political Science
Encina Hall Central
616 Serra Street
Stanford, CA 94305

Phone:  (650) 723-5219
Fax:    (650) 723-1808
Email:  jrodden@stanford.edu

## Personal

Born on August 18. 1971, St. Louis, MO.

United States Citizen.

## Education

Ph.D. Political Science, Yale University, 2000.

Fulbright Scholar, University of Leipzig, Germany, 1993–1994.

B.A., Political Science, University of Michigan, 1993.

## Academic Positions

Professor, Department of Political Science, Stanford University, 2012–present.

Senior Fellow, Hoover Institution, Stanford University, 2012–present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2020–present.

Director, Spatial Social Science Lab, Stanford University, 2012–present.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, 2010–2012.

Associate Professor, Department of Political Science, Stanford University, 2007–2012.

Fellow, Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, 2006–2007.

Ford Career Development Associate Professor of Political Science, MIT, 2003–2006.

Visiting Scholar, Center for Basic Research in the Social Sciences, Harvard University, 2004.

Assistant Professor of Political Science, MIT, 1999–2003.

Instructor, Department of Political Science and School of Management, Yale University, 1997–1999.

## Publications

### Books

*Why Cities Lose: The Deep Roots of the Urban-Rural Divide.* Basic Books, 2019.

*Decentralized Governance and Accountability: Academic Research and the Future of Donor Programming.* Co-edited with Erik Wibbels, Cambridge University Press, 2019.

*Hamilton's Paradox: The Promise and Peril of Fiscal Federalism*, Cambridge University Press, 2006. Winner, Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

*Fiscal Decentralization and the Challenge of Hard Budget Constraints*, MIT Press, 2003. Co-edited with Gunnar Eskeland and Jennie Litvack.

### Peer Reviewed Journal Articles

Partisan Dislocation: A Precinct-Level Measure of Representation and Gerrymandering, 2020, *Political Analysis* forthcoming (with Daryl DeFord Nick Eubank).

Who is my Neighbor? The Spatial Efficiency of Partisanship, 2020, *Statistics and Public Policy* (with Nick Eubank).

Handgun Ownership and Suicide in California, 2020, *New England Journal of Medicine* 382:2220-2229 (with David M. Studdert, Yifan Zhang, Sonja A. Swanson, Lea Prince, Erin E. Holsinger, Matthew J. Spittal, Garen J. Wintemute, and Matthew Miller).

Viral Voting: Social Networks and Political Participation, 2020, *Quarterly Journal of Political Science* (with Nick Eubank, Guy Grossman, and Melina Platas).

It Takes a Village: Peer Effects and Externalities in Technology Adoption, 2020, *American Journal of Political Science* (with Romain Ferrali, Guy Grossman, and Melina Platas). Winner, 2020 Best Conference Paper Award, American Political Science Association Network Section.

Assembly of the LongSHOT Cohort: Public Record Linkage on a Grand Scale, 2019, *Injury Prevention* (with Yifan Zhang, Erin Holsinger, Lea Prince, Sonja Swanson, Matthew Miller, Garen Wintemute, and David Studdert).

Crowdsourcing Accountability: ICT for Service Delivery, 2018, *World Development* 112: 74-87 (with Guy Grossman and Melina Platas).

Geography, Uncertainty, and Polarization, 2018, *Political Science Research and Methods* doi:10.1017/psrm.2018.12 (with Nolan McCarty, Boris Shor, Chris Tausanovitch, and Chris Warshaw).

Handgun Acquisitions in California after Two Mass Shootings, 2017, *Annals of Internal Medicine* 166(10):698-706. (with David Studdert, Yifan Zhang, Rob Hyndman, and Garen Wintemute).

Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 2015, *Election Law Journal* 14,4:1-15 (with Jowei Chen).

The Achilles Heel of Plurality Systems: Geography and Representation in Multi-Party Democracies, 2015, *American Journal of Political Science* 59,4: 789-805 (with Ernesto Calvo). Winner, Michael Wallerstein Award for best paper in political economy, American Political Science Association.

Why has U.S. Policy Uncertainty Risen Since 1960?, 2014, *American Economic Review: Papers and Proceedings* May 2014 (with Nicholas Bloom, Brandice Canes-Wrone, Scott Baker, and Steven Davis).

Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures, 2013, *Quarterly Journal of Political Science* 8: 239-269 (with Jowei Chen).

How Should We Measure District-Level Public Opinion on Individual Issues?, 2012, *Journal of Politics* 74, 1: 203-219 (with Chris Warshaw).

Representation and Redistribution in Federations, 2011, *Proceedings of the National Academy of Sciences* 108, 21:8601-8604 (with Tiberiu Dragu).

Dual Accountability and the Nationalization of Party Competition: Evidence from Four Federatons, 2011, *Party Politics* 17, 5: 629-653 (with Erik Wibbels).

The Geographic Distribution of Political Preferences, 2010, *Annual Review of Political Science* 13: 297–340.

Fiscal Decentralization and the Business Cycle: An Empirical Study of Seven Federations, 2009, *Economics and Politics* 22,1: 37–67 (with Erik Wibbels).

Getting into the Game: Legislative Bargaining, Distributive Politics, and EU Enlargement, 2009, *Public Finance and Management* 9, 4 (with Deniz Aksoy).

The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting, 2008. *American Political Science Review* 102, 2: 215–232 (with Stephen Ansolabehere and James Snyder).

Does Religion Distract the Poor? Income and Issue Voting Around the World, 2008, *Comparative Political Studies* 41, 4: 437–476 (with Ana Lorena De La O).

Purple America, 2006, *Journal of Economic Perspectives* 20,2 (Spring): 97–118 (with Stephen Ansolabehere and James Snyder).

Economic Geography and Economic Voting: Evidence from the U.S. States, 2006, *British Journal of Political Science* 36, 3: 527–47 (with Michael Ebeid).

Distributive Politics in a Federation: Electoral Strategies, Legislative Bargaining, and Government Coalitions, 2004, *Dados* 47, 3 (with Marta Arretche, in Portuguese).

Comparative Federalism and Decentralization: On Meaning and Measurement, 2004, *Comparative Politics* 36, 4: 481-500. (Portuguese version, 2005, in *Revista de Sociologia e Politica* 25).

Reviving Leviathan: Fiscal Federalism and the Growth of Government, 2003, *International Organization* 57 (Fall), 695–729.

Beyond the Fiction of Federalism: Macroeconomic Management in Multi-tiered Systems, 2003, *World Politics* 54, 4 (July): 494–531 (with Erik Wibbels).

The Dilemma of Fiscal Federalism: Grants and Fiscal Performance around the World, 2002, *American Journal of Political Science* 46(3): 670–687.

Strength in Numbers: Representation and Redistribution in the European Union, 2002, *European Union Politics* 3, 2: 151–175.

Does Federalism Preserve Markets? *Virginia Law Review* 83, 7 (with Susan Rose-Ackerman). Spanish version, 1999, in *Quorum* 68.

## Working Papers

Federalism and Inter-regional Redistribution, Working Paper 2009/3, Institut d'Economia de Barcelona.

Representation and Regional Redistribution in Federations, Working Paper 2010/16, Institut d'Economia de Barcelona (with Tiberiu Dragu).

## Chapters in Books

Political Geography and Representation: A Case Study of Districting in Pennsylvania (with Thomas Weighill), forthcoming 2021.

Decentralized Rule and Revenue, 2019, in Jonathan Rodden and Erik Wibbels, eds., *Decentralized Governance and Accountability*, Cambridge University Press.

Geography and Gridlock in the United States, 2014, in Nathaniel Persily, ed. *Solutions to Political Polarization in America*, Cambridge University Press.

Can Market Discipline Survive in the U.S. Federation?, 2013, in Daniel Nadler and Paul Peterson, eds, *The Global Debt Crisis: Haunting U.S. and European Federalism*, Brookings Press.

Market Discipline and U.S. Federalism, 2012, in Peter Conti-Brown and David A. Skeel, Jr., eds, *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press.

Federalism and Inter-Regional Redistribution, 2010, in Nuria Bosch, Marta Espasa, and Albert Sole Olle, eds., *The Political Economy of Inter-Regional Fiscal Flows*, Edward Elgar.

Back to the Future: Endogenous Institutions and Comparative Politics, 2009, in Mark Lichbach and Alan Zuckerman, eds., *Comparative Politics: Rationality, Culture, and Structure* (Second Edition), Cambridge University Press.

The Political Economy of Federalism, 2006, in Barry Weingast and Donald Wittman, eds., *Oxford Handbook of Political Economy*, Oxford University Press.

Fiscal Discipline in Federations: Germany and the EMU, 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

The Political Economy of Pro-cyclical Decentralised Finance (with Erik Wibbels), 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

Globalization and Fiscal Decentralization, (with Geoffrey Garrett), 2003, in Miles Kahler and David Lake, eds., *Governance in a Global Economy: Political Authority in Transition*, Princeton University Press: 87-109. (Updated version, 2007, in David Cameron, Gustav Ranis, and Annalisa Zinn, eds., *Globalization and Self-Determination: Is the Nation-State under Siege?* Routledge.)

Introduction and Overview (Chapter 1), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Soft Budget Constraints and German Federalism (Chapter 5), 2003, in Rodden, et al, *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Federalism and Bailouts in Brazil (Chapter 7), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Lessons and Conclusions (Chapter 13), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

4

*Online Interactive Visualization*

Stanford Election Atlas, 2012 (collaboration with Stephen Ansolabehere at Harvard and Jim Herries at ESRI)

*Other Publications*

How America's Urban-Rural Divide has Shaped the Pandemic, 2020, *Foreign Affairs*, April 20, 2020.

An Evolutionary Path for the European Monetary Fund? A Comparative Perspective, 2017, Briefing paper for the Economic and Financial Affairs Committee of the European Parliament.

Representation and Regional Redistribution in Federations: A Research Report, 2009, in *World Report on Fiscal Federalism*, Institut d'Economia de Barcelona.

On the Migration of Fiscal Sovereignty, 2004, *PS: Political Science and Politics* July, 2004: 427–431.

Decentralization and the Challenge of Hard Budget Constraints, *PREM Note* 41, Poverty Reduction and Economic Management Unit, World Bank, Washington, D.C. (July).

Decentralization and Hard Budget Constraints, *APSA-CP* (Newsletter of the Organized Section in Comparative Politics, American Political Science Association) 11:1 (with Jennie Litvack).

Book Review of *The Government of Money* by Peter Johnson, *Comparative Political Studies 32,7: 897-900.*

# Fellowships and Honors

Fund for a Safer Future, Longitudinal Study of Handgun Ownership and Transfer (LongSHOT), GA004696, 2017-2018.

Stanford Institute for Innovation in Developing Economies, Innovation and Entrepreneurship research grant, 2015.

Michael Wallerstein Award for best paper in political economy, American Political Science Association, 2016.

Common Cause Gerrymandering Standard Writing Competition, 2015.

General support grant from the Hewlett Foundation for Spatial Social Science Lab, 2014.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2012.

Sloan Foundation, grant for assembly of geo-referenced precinct-level electoral data set (with Stephen Ansolabehere and James Snyder), 2009-2011.

Hoagland Award Fund for Innovations in Undergraduate Teaching, Stanford University, 2009.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, beginning Fall 2010.

Research Grant on Fiscal Federalism, Institut d'Economia de Barcelona, 2009.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2008.

United Postal Service Foundation grant for study of the spatial distribution of income in cities, 2008.

Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

Fellow, Center for Advanced Study in the Behavioral Sciences, 2006-2007.

National Science Foundation grant for assembly of cross-national provincial-level dataset on elections, public finance, and government composition, 2003-2004 (with Erik Wibbels).

MIT Dean's Fund and School of Humanities, Arts, and Social Sciences Research Funds.

Funding from DAAD (German Academic Exchange Service), MIT, and Harvard EU Center to organize the conference, "European Fiscal Federalism in Comparative Perspective," held at Harvard University, November 4, 2000.

Canadian Studies Fellowship (Canadian Federal Government), 1996-1997.

Prize Teaching Fellowship, Yale University, 1998-1999.

Fulbright Grant, University of Leipzig, Germany, 1993-1994.

Michigan Association of Governing Boards Award, one of two top graduating students at the University of Michigan, 1993.

W. J. Bryan Prize, top graduating senior in political science department at the University of Michigan, 1993.

## Other Professional Activities

International Advisory Committee, Center for Metropolitan Studies, Sao Paulo, Brazil, 2006–2010.

Selection committee, Mancur Olson Prize awarded by the American Political Science Association Political Economy Section for the best dissertation in the field of political economy.

Selection committee, Gregory Luebbert Best Book Award.

Selection committee, William Anderson Prize, awarded by the American Political Science Association for the best dissertation in the field of federalism and intergovernmental relations.

## Courses

### Undergraduate

Politics, Economics, and Democracy

Introduction to Comparative Politics

Introduction to Political Science

Political Science Scope and Methods

Institutional Economics

Spatial Approaches to Social Science

### Graduate

Political Economy of Institutions

Federalism and Fiscal Decentralization

Politics and Geography

# Consulting

2017. Economic and Financial Affairs Committee of the European Parliament.

2016. Briefing paper for the World Bank on fiscal federalism in Brazil.

2013-2018: Principal Investigator, SMS for Better Governance (a collaborative project involving USAID, Social Impact, and UNICEF in Arua, Uganda).

2019: Written expert testimony in *McLemore, Holmes, Robinson, and Woullard v. Hosemann*, United States District Court, Mississippi.

2019: Expert witness in *Nancy Corola Jacobson v. Detzner*, United States District Court, Florida.

2018: Written expert testimony in *League of Women Voters of Florida v. Detzner* No. 4:18-cv-002510, United States District Court, Florida.

2018: Written expert testimony in *College Democrats of the University of Michigan, et al. v. Johnson, et al.*, United States District Court for the Eastern District of Michigan.

2017: Expert witness in *Bethune-Hill v. Virginia Board of Elections*, No. 3:14-CV-00852, United States District Court for the Eastern District of Virginia.

2017: Expert witness in *Arizona Democratic Party, et al. v. Reagan, et al.*, No. 2:16-CV-01065, United States District Court for Arizona.

2016: Expert witness in *Lee v. Virginia Board of Elections*, 3:15-cv-357, United States District Court for the Eastern District of Virginia, Richmond Division.

2016: Expert witness in *Missouri NAACP v. Ferguson-Florissant School District*, United States District Court for the Eastern District of Missouri, Eastern Division.

2014-2015: Written expert testimony in *League of Women Voters of Florida et al. v. Detzner, et al.*, 2012-CA-002842 in Florida Circuit Court, Leon County (Florida Senate redistricting case).

2013-2014: Expert witness in *Romo v Detzner*, 2012-CA-000412 in Florida Curcuit Court, Leon County (Florida Congressional redistricting case).

2011-2014: Consultation with investment groups and hedge funds on European debt crisis.

2011-2014: Lead Outcome Expert, Democracy and Governance, USAID and Social Impact.

2010: USAID, Review of USAID analysis of decentralization in Africa.

2006–2009: World Bank, Independent Evaluations Group. Undertook evaluations of World Bank decentralization and safety net programs.

2008–2011: International Monetary Fund Institute. Designed and taught course on fiscal federalism.

1998–2003: World Bank, Poverty Reduction and Economic Management Unit. Consultant for *World Development Report*, lecturer for training courses, participant in working group for assembly of decentralization data, director of multi-country study of fiscal discipline in decentralized countries, collaborator on review of subnational adjustment lending.

Last updated: October 19, 2020

# Exhibit 3

# The Washington Post

*Democracy Dies in Darkness*

# Barr says he hasn't seen fraud that could affect the election outcome

By **Matt Zapotosky**, **Devlin Barrett** and **Josh Dawsey**

Dec. 1, 2020 at 7:58 p.m. EST

Attorney General William P. Barr said Tuesday that he has "not seen fraud on a scale that could have effected a different outcome in the election," undercutting claims that President Trump and his allies have made — without evidence — of widespread and significant voting irregularities.

His comments to the Associated Press, while caveated, make Barr the highest-ranking Trump administration official to break with the president on his allegation that the election was stolen, and they might offer political cover to other Republicans to stake out similar positions.

Trump himself, though, has shown no sign of backing down, and some of his Capitol Hill allies were critical of Barr's assertions. Trump's relationship with his attorney general was already deteriorating, with the president frustrated that Barr was unwilling to launch aggressive measures to support his fraud claims or take other steps that might benefit his reelection campaign.

At the same time Barr's comments became public Tuesday, the Justice Department revealed that the attorney general had, in October, secretly appointed U.S. Attorney John Durham of Connecticut as special counsel examining how the FBI investigated the Trump campaign in 2016 and beyond — a move that might hearten Trump and his allies.

Barr assigned Durham to run the investigation last year, but the order to install him as special counsel is likely to ensure that his work is not shut down by the incoming administration of Joe Biden, a concern voiced by people close to Barr.

Under Justice Department regulations, special counsels can be dismissed only for misconduct or some other good cause, making it more difficult for the next attorney general to end Durham's investigation, in addition to the political cost that would come with short-circuiting the probe.

Barr has been accused of using his position as the country's top law enforcement official to help Trump win reelection and amplify his unfounded claims of electoral malfeasance.

Before the election, he warned repeatedly and forcefully about possible fraud in mass mail-in voting, echoing the president's attacks on the practice. Afterward, he reversed long-standing Justice Department policy and authorized prosecutors to take overt steps to pursue allegations of "vote tabulation irregularities" in certain cases before results were certified. To date, none have done so.

Barr's memo, though, authorized actions only in cases that could change the outcome of the election, and officials have previously told The Washington Post that they were aware of no such investigations or evidence that would warrant

them.

Since it became clear that Biden won, Trump and his allies have sought to discredit the election's results, mounting unsuccessful court challenges and publicly decrying what they claim to be fraud and other irregularities. But even with Barr's directive in place, the attorney general met Trump and his allies' claims with silence. A group of 16 assistant U.S. attorneys even wrote to Barr to say they had not seen evidence of any substantial anomalies.

A person who spoke with Trump on Monday said he was railing against governors in Republican states — particularly in Georgia and Arizona — who would not back up his claims of fraud and were proceeding to certify election results. Barr's comments take away another valuable ally in his cause, which is expected to go nowhere, but Trump nevertheless is unlikely to give it up until at least after the electoral college votes Dec. 14, this person said.

An administration official, like others speaking on the condition of anonymity to detail a sensitive topic, told The Post that in recent months, Barr and Trump have "barely spoken," though they did have a conversation the week before Thanksgiving.

Before the election, the president was frustrated that Durham was not producing public results that might discredit his political opponents and aid his reelection bid. Then, Trump became upset that the Justice Department was not doing more to support his claims of massive fraud, nor coming out publicly to support his claims, officials said.

Trump has made his displeasure known. In October, after it was reported that Durham would not release a report before the election, the president said that the delay was "a disgrace" and that he would relay his thoughts directly to Barr.

"If that's the case, I'm very disappointed," Trump said during an interview with radio host Rush Limbaugh. "I think it's a terrible thing. And I'll say it to his face."

This past weekend, Trump took aim at the Justice Department and the FBI over their failure to back his election fraud claims.

"Where are they? I've not seen anything," he told Fox News. The president also suggested that the bureau and the Justice Department were possibly "involved," though he did not offer any evidence or further clarity.

Administration officials said those public disputes have also played out in private. Trump has complained to advisers about his attorney general, two officials said, and the frustration has filtered to Barr even as the men have talked less frequently.

The president has also been annoyed that Barr has expressed support for FBI Director Christopher A. Wray, whose public statements contradicting Trump — about election security and domestic extremism — have made him a frequent target of the president's rage, an administration official said.

"There have been clashes," the official said.

In the Associated Press interview, Barr said the FBI and the Justice Department had looked into some fraud claims, and suggested they had not found what the president and his allies have asserted. Barr seemed to take particular aim at one claim by lawyer Sidney Powell, who alleged a grand conspiracy in which election software changed votes.

"There's been one assertion that would be systemic fraud, and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, we

Barr did not rule out any instances of fraud or election irregularities. He said that most of the claims of fraud that had come to the department were "very particularized to a particular set of circumstances or actors or conduct. They are not systemic allegations. And those have been run down; they are being run down."

"Some have been broad and potentially cover a few thousand votes," he said. "They have been followed up on."

After the interview was published, a Justice Department spokesperson issued a statement attacking some of the reporting on it and declaring, "The Department will continue to receive and vigorously pursue all specific and credible allegations of fraud as expeditiously as possible."

In a statement, Rudolph W. Giuliani, Trump's personal attorney, and Jenna Ellis, a legal adviser to the campaign, said, "With all due respect to the Attorney General, there hasn't been any semblance of a Department of Justice investigation." The two lawyers have been leading Trump's effort to attack the results of the election, and though they have appeared with Powell, they have said publicly that she is not formally working for Trump. Powell did not return an email seeking comment.

In recent weeks, officials said, Trump has been speaking with Giuliani and Ellis extensively, believing that his other advisers are too skeptical about his claims or too pessimistic about his chances.

"Nonetheless, we will continue our pursuit of the truth through the judicial system and state legislatures, and continue toward the Constitution's mandate and ensuring that every legal vote is counted and every illegal vote is not," their statement said. "Again, with the greatest respect to the Attorney General, his opinion appears to be without any knowledge or investigation of the substantial irregularities and evidence of systemic fraud."

Some Republicans similarly took aim at the Justice Department after Barr's comments. Rep. Matt Gaetz (Fla.) said on Fox Business that the department "has a lot of egg on their face having not discovered a lot of the fraud as it was occurring." Sen. Ron Johnson (Wis.) called on Barr to show more of what investigators had discovered.

"I think there is still enough questions outstanding," Johnson said, according to CNN.

Even as news broke of Barr's statements to the Associated Press, Trump was tweeting about "hundreds of thousands of fraudulent (FAKE) ballots" and a news conference advancing similar claims. Barr was spotted at the White House, though an official said that was for a meeting with Chief of Staff Mark Meadows, not the president.

In the interview with the Associated Press, Barr endeavored to make clear that whatever disputes Trump might have with the election, the Justice Department is not the appropriate institution to resolve them. The department, he said, examines crimes, while state or local officials audit voting results.

"There's a growing tendency to use the criminal justice system as sort of a default fix-all, and people don't like something, they want the Department of Justice to come in and 'investigate,' " Barr said.

Senate Minority Leader Charles E. Schumer (D-N.Y.) surmised that Barr's comments would probably result in the attorney general being terminated.

"I guess he's the next one to be fired, since he now too says there's no fraud," Schumer said. "Trump seems to fire anyone in that regard."

Christopher Krebs, who had led the Department of Homeland Security's Cybersecurity and Infrastructure Security

Agency on cybersecurity matters — Christopher Krebs — after Krebs publicly defended the integrity of the election count. Shortly before his dismissal, Krebs refuted allegations made by the president's supporters that election systems had been manipulated, tweeting that "59 election security experts all agree, 'in every case of which we are aware, these claims either have been unsubstantiated or are technically incoherent.' "

Durham's appointment as special counsel, meanwhile, drew a more predictable reaction, as it was embraced by Republicans and decried by Democrats.

Sen. Lindsey O. Graham (R-S.C.), chairman of the Senate Judiciary Committee, said he hoped that Democrats would show "the same respect" they gave to former special counsel Robert S. Mueller III when he led the Russia inquiry. "This important investigation must be allowed to proceed free from political interference," said Graham. "The American people deserve a full accounting of this wrongdoing."

Rep. Adam B. Schiff (D-Calif.), chairman of the House Intelligence Committee, said that the Durham appointment smacked of politics and that the attorney general "is using the special counsel law for a purpose it was not intended: to continue a politically motivated investigation long after Barr leaves office."

The attorney general's order, signed Oct. 19 but kept secret until now, said that after consulting with Durham, Barr had "determined that, in light of extraordinary circumstances relating to these matters, the public interest warrants Mr. Durham continuing this investigation pursuant to the powers and independence afforded by the Special Counsel regulations."

A Justice Department official said the White House was not made aware of the appointment at the time and learned only Tuesday.

As special counsel, Durham is authorized to investigate "whether any federal official, employee, or any other person or entity violated the law in connection with the intelligence, counter-intelligence, or law-enforcement activities directed at the 2016 presidential campaigns, individuals associated with those campaigns, and individuals associated with the administration of President Donald J. Trump, including but not limited to Crossfire Hurricane and the investigation of Special Counsel Robert S. Mueller III."

Crossfire Hurricane is the name FBI agents gave to their investigation of Trump campaign associates whom they suspected might be involved with Russian election interference. Mueller took over that probe after Trump fired Wray's predecessor, James B. Comey.

In a letter to lawmakers Tuesday explaining his decision, Barr said that although he had expected Durham to finish his work by the summer, delays created by the coronavirus pandemic and the discovery of additional information pushed back that timeline.

"In advance of the presidential election, I decided to appoint Mr. Durham as a Special Counsel to provide him and his team with the assurance that they could complete their work, without regard to the outcome of the election," Barr wrote.

The letter states that Barr waited to make that decision public until after the election, though it does not indicate why he waited until December to do so. Some lawyers questioned whether he had misused Justice Department regulations to appoint a department employee — Durham — as special counsel, when the regulation states that a special counsel

"shall be selected from outside the United States Government."

Barr's order appointing Durham seems to try to circumvent that requirement by citing another department regulation stating that the attorney general can appoint a Justice Department officer to "conduct any kind of legal proceeding."

The incoming Biden administration could, in theory, rewrite the special counsel regulation to make it easier to dismiss Durham or otherwise change his mandate, but that would probably provoke anger among Republicans.

"What Barr thinks he's doing is ensuring Durham's work can continue beyond the end of this administration, because the regulations don't allow the attorney general to fire the special counsel except for cause," said Gregory A. Brower, a former senior FBI official. "The next administration may be stuck with Durham, but as long as Durham is playing it straight, that's not a terrible thing. Arguably the new administration doesn't have a dog in this fight."

---

Updated December 2, 2020

## Election 2020: Biden defeats Trump

---

Barr says he hasn't seen fraud that could affect the election outcome

'Someone's going to get killed': GOP election official in Georgia blames President Trump for fostering violent threats

**Analysis |** Trump's dwindling prospects to overturn the election: A guide

**Exclusive |** 20 days of fantasy and failure: Inside Trump's quest to overturn the election

**Election results under attack:** Here are the facts

**Full election results**

---

**Your profile is incomplete**
Before you can contribute to our community, please visit your Profile page in order to complete your profile.

# **Exhibit 4**

**Michigan.**gov

SOS  FAQs  Online  Contact

The Office of

# Secretary of State Jocelyn Benson

## 2020 Michigan Election Results
**Date:** 11/03/2020 **Type:** General, **Official**
**Updated:** 11/23/2020@05:05 PM
**Counties:** 83/83

☰ Races ▾   ℹ Info ▾   ⬇ Data ▾

### President of the United States 4 Year Term (1) Position

| | | Votes | Percent | |
|---|---|---|---|---|
| Democratic | Biden, Joseph R. | 2,804,040 | 50.62% | |
| Republican | Trump, Donald J. | 2,649,852 | 47.84% | |
| Libertarian | Jorgensen, Jo | 60,381 | 1.09% | |
| US Taxpayers | Blankenship, Don | 7,235 | 0.13% | |
| Green | Hawkins, Howie | 13,718 | 0.25% | |
| Natural Law | De La Fuente, Rocky | 2,986 | 0.05% | |
| Write-In | Carroll, Brian T. | 963 | 0.02% | |
| Write-In | Hoefling, Tom | 32 | 0.00% | |
| Write-In | Hunter, Tara Renee | 1 | 0.00% | |
| Write-In | Simmons, Jade | 89 | 0.00% | |
| Write-In | Wells, Kasey | 5 | 0.00% | |
| | **Total Votes:** | 5,539,302 | | |

# Exhibit 5



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

**Meeting
of the
Board of State Canvassers**

**November 23, 2020**

| | |
|---|---|
| **Called to order:** | 1:07 p.m. |
| **Members present:** | Jeannette Bradshaw - Chairperson<br>Aaron Van Langevelde – Vice Chairperson<br>Julie Matuzak<br>Norman Shinkle |
| **Members absent:** | None. |
| **Agenda item:** | Consideration of meeting minutes for approval (October 15, 2020 meeting). |
| | **Board action on agenda item:** The Board approved the minutes of the October 15, 2020 meeting as submitted. Moved by Matuzak; supported by Van Langevelde. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried. |
| **Agenda item:** | Canvass and certification of the November 3, 2020 general election. |
| | **Board action on agenda item:** Three motions were offered. |

(1) Based on an examination of the election returns received by the Secretary of State for the November 3, 2020 general election, the Board certified that the attached reports are true statements of the votes cast at the election for the offices certified by this Board, and for the Electors of President and Vice President of the United States; the Board further certified that the persons named on the attached listing were duly elected for the indicated offices, and State Proposals 20-1 and 20-2 passed. Moved by Matuzak; supported by Bradshaw. Ayes: Bradshaw, Van Langevelde, Matuzak. Nays: None. Abstention: Shinkle. Motion carried.

*Time of certification: 4:34 p.m.*

(2) The Board authorized the staff of the Bureau of Elections to represent the Board in any recount of votes cast at the November 3, 2020 general

election. Moved by Matuzak; supported by Shinkle. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

(3) The Board requested that the Michigan Legislature conduct an in-depth review of Michigan election processes and procedures to address concerns that have been raised by experts and citizens about our elections in order to assure our citizens that Michigan elections are accurate, transparent and fully protective of all citizens constitutional rights. Moved by Shinkle; supported by Matuzak. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

**Agenda item:**  Recording the results of the November 3, 2020 special election for the Michigan House of Representatives, 4th District, partial term ending January 1, 2021.

**Board action on agenda item:** The Board recorded the results of the November 3, 2020 special election for the office of State Representative, 4th District as certified by the Wayne County Board of Canvassers on November 17, 2020. Moved by Shinkle; supported by Van Langevelde. Ayes: Bradshaw, Van Langevelde, Matuzak, Shinkle. Nays: None. Motion carried.

**Agenda item:**  Such other and further business as may be properly presented to the Board.

**Board action on agenda item:** None.

**Adjourned:**  9:40 p.m.

_____          _____
Chair Bradshaw                                          Vice-Chair Van Langevelde

_____          _____
Member Matuzak                                       Member Shinkle

_____
Date

2

# Exhibit 6

STATE OF MICHIGAN

**OFFICE OF THE GOVERNOR**

LANSING

GRETCHEN WHITMER
GOVERNOR

GARLIN GILCHRIST II
LT. GOVERNOR

## CERTIFICATE OF ASCERTAINMENT OF THE ELECTORS OF THE PRESIDENT AND VICE PRESIDENT OF THE UNITED STATES OF AMERICA

I, Gretchen E. Whitmer, Governor of the State of Michigan, certify that at the general election held in Michigan on Tuesday, November 3, 2020:

The following persons nominated by the **Democratic Party**, each having received **2,804,040 votes**, were duly elected as Electors of the President and Vice President of the United States of America:

| | |
|---|---|
| **Chris Cracchiolo** | 5140 Arrowhead Ct., Williamsburg, MI 49690 |
| **Timothy E. Smith** | 14883 Crescent St., 105, Grand Haven, MI 49417 |
| **Blake Mazurek** | 3458 Olderidge Dr. NE, Grand Rapids, MI 49525 |
| **Bonnie J. Lauria** | 3931 Mines Rd., West Branch, MI 48661 |
| **Bobbie Walton** | 8412 Mapleview Dr., Davison, MI 48423 |
| **Mark Edward Miller** | 122 Sydelle Ave., Kalamazoo, MI 49006 |
| **Connor Wood** | 319 N. Bowen St., Jackson, MI 49202 |
| **Robin Smith** | 3004 Andrea Dr., Lansing, MI 48906 |
| **Walter C. Herzig III** | 320 Stratford Rd., Ferndale, MI 48220 |
| **Carolyn Holley** | 727 White St., Port Huron, MI 48060 |
| **Susan Nichols** | 44099 Deep Hollow Circle, Northville, MI 48168 |
| **Steven Rzeppa** | 2985 Anna Ct., Trenton, MI 48183 |
| **Helen Moore** | 8335 Indiana St., Detroit, MI 48204 |
| **Michael Kerwin** | 17517 Birchcrest Dr., Detroit, MI 48221 |
| **Chuck Browning** | 20091 Herzog Dr., Rockwood, MI 48173 |
| **Marseille Allen** | 4442 Jena Ln., Flint, MI 48507 |

Votes received by other candidates for the office of Elector of the President and Vice President of the United States of America are as follows:

The following persons nominated by the **Republican Party** each received **2,649,852 votes**: John Haggard; Kent Vanderwood; Terri Lynn Land; Gerald Wall; Amy Facchinello; Rose Rook; Hank Choate; Mari-Ann Henry; Clifford Frost; Stanley Grot; Marian Sheridan; Timothy King; Michele Lundgren; Mayra Rodriguez; Meshawn Maddock; and Kathy Berden.

The following persons nominated by the **Libertarian Party** each received **60,381 votes**: David Holmer; Alexander Avery; Vicki Hall; Richard Hewer; Angela Thornton; Rafael Wolf; James Lewis Hudler; Jon Elgas; Greg Stempfle; Jim Fulner; Joseph LeBlanc; Claranna Gelineau; Andrew Chadderdon; Scott Avery Boman; Connor Nepomuceno; and Andy Evans.

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov
Printed by members of:

The following persons nominated by the **Green Party** each received **13,718 votes**: Stephen Boyle; Destiny Clayton; Jean-Michel Creviere; Frank Foster, Jr.; Jennifer Kurland; Melissa Noelle Lambert; John Anthony La Pietra; Robin Laurain; Daniel Martin-Mills; Jessica McCallie-Arquette; Louis Novak; Jeffery Jon Rubley II; Rick Sauermilch; Amanda Slepr; N. J. Sparling; and Marcia Squier.

The following persons nominated by the **U.S. Taxpayers Party** each received **7,235 votes**: Mary Sears; Christine Schwartz; William Mohr II; Doug Levesque; Patrick Lambert; Aaron Nichols; Edward J. Sanger; Victoria Monroe; Lester Townsend; Christopher Rudy; William A. Kohn, Jr.; Paul Stahl; Marc Sosnowski; Cecile A. Harrity; Robert Gale; and Gerald Van Sickle.

The following persons nominated by the **Natural Law Party** each received **2,986 votes**: Connie Tewes; Mary Schutt; Dan Royer; Paul A. Natke; Shelly L. Reynolds; Donald Meyer; Gene Capatina; Ramzi Masri-Elyafaoui; Jacob Schlau; James Radatz; Daniel S. Smith; Mark Moylan; Guy Purdue; Nicholas Malzone; Robert Forreider; and Daniel B. Smith.

The following persons nominated by write-in candidate Brian T. Carroll each received **947 votes**: Michael Maturen; Robert Clark II; Jason Kennedy Duncan; Paul L. DuBois; Timothy Doubblestein; Jason Gatties; Lucy Ellen Moye; Lloyd A. Conway; Linnaea Joyce Licavoli; Tsai-Yi Watts; John Henry Svoboda; Benjamin Setterholm; Brandon Barry Mullins; Daniel Patrick Meloy; Elisa J. Kolk; and Matthew James Williams.

The following persons nominated by write-in candidate Jade Simmons each received **88 votes**: Cecilia Lester; Tyler Prough; James Ryans; Chelsea Slocum; Raymond Hall; Dana Morris; Janasia Johnson; Terrel Boyd; Constance Clay; Erika Couch; Tyrone Pickens; Karalyn Schubring; Michele Coleman; Grant Philson; Jherrard Hardeman; and Gertrude Taylor.

The following persons nominated by write-in candidate Tom Hoefling each received **32 votes**: Mark A. Aungst; Scott Suchecki; Richard Nagel; Mark Zimmerman; Justin Phillips; Kimberly Cleveland; Thomas Frederick; Kurt Richards; Georgia S. Halloran; Dawne Worden; Kim Millard; Alan G. Sides; DaWone Allison; Samuel Denson; Joshua Ohlman; and Suzanne M. Stuut.

The following persons nominated by write-in candidate Kasey Wells each received **5 votes**: Sandra Murrell; Ronald Klett; Andrew Colclasure; Charity Archer; Paul Atkins; Shiquita Reed; Mark Jeffrey; Brian W. Gibbs, Jr.; William W. Brown; Patricia Gorzelski; Anthony Jackson; Jeremy Mortensen; Justen Grieve; Shiesha Davis; Matthew Shepard; and Miranda Ames.

(cont.)

Given under my hand and the Great Seal of the State of Michigan.

Date:     November 23, 2020

Time:     5:30pm

GRETCHEN WHITMER
GOVERNOR

By the Governor:

SECRETARY OF STATE

# Exhibit 7



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

Nov. 19, 2020



**Statement from Secretary of State Jocelyn Benson on planned audits
to follow certification of the Nov. 3, 2020, general election**

Throughout my tenure as Michigan Secretary of State, and indeed long before, I have spoken repeatedly on the importance of post-election audits to ensure Michiganders can trust the outcome of our elections as an accurate reflection of the will of the people.

I'm thrilled that we are on track to perform a statewide risk-limiting audit of November's general election, which we've been building towards and planning for over the last 22 months, as well as local procedural audits of individual jurisdictions.

For example, earlier this year following the March 10 presidential primary my office conducted Michigan's first statewide risk-limiting audit pilot, which demonstrated the results of our elections are accurate and provided an extra layer of security as we prepared for November's election.

The statewide risk-limiting audit will be accompanied by the routine local procedural audits that will review the accuracy and process of elections in local communities, as have been carried out following the November 2019 election and May 2020 election. And as always, under state law our department conducts these audits after the Board of State Canvassers has certified the election. This is because it is only after statewide certification that election officials have legal access to the documentation needed to conduct such audits.

Importantly, while the Risk Limiting Audit is a proactive, voluntary, and planned action our office is taking to confirm the integrity of our elections and identify areas for future improvement, local procedural audits consider clerical errors identified before and on election day, in addition to issues identified during canvasses. This a typical, standard procedure following election certification, and one that will be carried out in Wayne County and any other local jurisdictions where the data shows notable clerical errors following state certification of the November election.

Notably, audits are neither designed to address nor performed in response to false or mythical allegations of "irregularities" that have no basis in fact. Where evidence exists of actual fraud or wrongdoing, it should be submitted in writing to the Bureau of Elections, which refers all credible allegations to the Attorney General's office for further investigation.

# Exhibit 8

 REUTERS    **World**    **Business**    **Markets**    **Breakingviews**    **Video**    **More** 

**EVERYTHINGNEWS**

NOVEMBER 10, 2020 / 11:50 AM / UPDATED 22 DAYS AGO

# Fact check: Vote spikes in Wisconsin, Michigan and Pennsylvania do not prove election fraud

By Reuters Staff



Social media users have been sharing posts claiming that during the night of Nov. 3 to Nov. 4 there were vote dumps of hundreds of thousands of mail-in ballots only for Democrat Joe Biden in Wisconsin, Michigan and Pennsylvania, suggesting this proves voter fraud allegations. These vote spikes did occur, but they also included Trump votes, accounted for largely left-leaning urban counties, and one state experienced a clerical error.

Reuters Fact Check. REUTERS

The posts (here , here , here , here) appear to originate from a tweet (here) by Nick Adams, who describes himself as a bestselling author endorsed by President Trump (twitter.com/NickAdamsinUSA). The tweet, posted at 12:48 a.m. GMT on Nov. 5, 2020, says: "Between 3:40-4:30AM, they "found" 140,000 mail in ballots for Biden in Wisconsin. Between 3:30-5:00AM, they "found" 200,000 mail in ballots for Biden in Michigan. Between 2:00-4:00AM, they "found" 1,000,000 mail in ballots in Pennsylvania. All for Biden. None for Trump." Comments and captions say, "Fraud!!"; "Fraud gone rampant"; "A fraud is a fraud."

A spokesman for data analysis website FiveThirtyEight ( fivethirtyeight.com/ ) told Reuters via email that the jumps in Michigan and Wisconsin were due to counties releasing large batches of results all at once and that the votes were not just for Biden. One large jump of almost 140,000 ballots in Michigan was due to a clerical error that has since been resolved. In Pennsylvania both the Trump and Biden campaign gained around 1 million votes on the night of Nov. 3 to Nov. 4.

Reuters has previously debunked claims that vote spikes prove Democrats are trying to steal the election in Wisconsin and Michigan ( here ).

## WISCONSIN

The posts claim that 140,000 ballots for Biden were found in Wisconsin on the night of Nov. 3 to Nov. 4.

There was a jump in votes for Biden on the night of Nov. 3 to Nov. 4, but this was because Milwaukee County, home to the largest city in the states of Wisconsin, reported its 170,000 absentee votes, which were overwhelmingly Democrat ( here ).

FiveThirtyEight published a graph of the jump in votes in Wisconsin at 8:27 a.m. EST on Nov. 4 on its election live blog (here) alongside this explanation by reporter Maggie Koerth: "Biden was down in Wisconsin before the Milwaukee absentee results came in early this morning. The boost pushed him up past Trump, but the race in this state is still very, very tight."

FiveThirtyEight told Reuters that it is not true that Biden received all the votes in the overnight dump: "These batches were NOT 100% Biden votes; behind the blue line, there is also a red line representing the thousands of votes Trump gained. There are also counter examples, where Trump's line shoots up suddenly when a favorable batch of results are reported."

## MICHIGAN

The social media posts claim that 200,000 mail in ballots for Biden were found in Michigan on the night of Nov. 3 to Nov. 4.

There was a jump in votes for Biden in Michigan of approximately 200,000 around 6:00 a.m. EST as shown in the FiveThirtyEight election blog update at 8:27 a.m. EST on Nov. 4 ( here ),

which explains that this was due to a "tranche" of new votes from Wayne County, home to
Detroit, where Biden led Trump at the time 67% to 32%.

FiveThirtyEight told Reuters this overnight vote increase in Michigan also did not solely
consist of votes for Biden.

The spike in Democrat votes in Michigan was just after 6:00 a.m. EST, not 3:30-5:00 a.m. as the
posts suggest.

There was also confusion over the Biden vote count in Michigan during the night of Nov. 3 to
Nov. 4, when Biden received 153,710 votes in Shiawassee County, instead of 15,371, meaning
his vote count jumped by much more than expected ( here , here ).

Several social media users pointed out the jump in votes (archive.is/nQzbT , archive.is/bUjJb),
including President Trump (here) . The tweets showed screenshots of the change in vote
tallies on the elections map by Decision Desk HQ, an election data service
(results.decisiondeskhq.com/), where Biden's count jumped from 1,992,356 to 2,130,695
while Trump's tally stayed at 2,200,902.

However, Decision Desk HQ explained in a Twitter thread that the jump in votes was as a
result of a "clerical error" in Shiawassee County, where an extra zero had been added to
Biden's vote tally here . Decision Desk HQ updated its data to show that Biden received 15,371
votes in Shiawassee (here).

## PENNSYLVANIA

The posts claim that there was a spike of 1,000,000 mail in votes for Biden in Pennsylvania on
the night of Nov. 3 to Nov. 4.

The FiveThirtyEight election blog update at 8:29 a.m. EST on Nov. 4 by Dan Hopkins, which shows a graph of the Pennsylvania vote count on the night of Nov. 3 to Nov. 4 ( here ) does not show a dump of 1 million votes for Biden alone. Between 12 a.m. and 6 a.m. EST the graph says that both Trump and Biden's votes increased by approximately 1 million. The biggest increase was from midnight to 3 a.m. after which the tallies stayed very stable, not 2:00-4:00 a.m. as the social media posts suggest.

## VERDICT

Partly false. The vote spikes did occur, but they were not only Biden votes and can be explained by pro-Biden county vote dumps and a clerical error. The timings of when ballots were received in Michigan and Pennsylvania are not accurate.

This article was produced by the Reuters Fact Check team. Read more about our fact-checking work here .

*Our Standards: The Thomson Reuters Trust Principles.*

# Exhibit 9


https://nyti.ms/3jUvqER

< Tracking Viral Misinformation

# No, Joe Biden Wasn't Suddenly Awarded 138,000 Votes in Michigan

**Nov. 4, 2020**
By Jack Nicas

Early Wednesday, images of an election map suggested that Joseph R. Biden Jr. had suddenly received 138,339 votes in Michigan, or 100 percent of the newly counted ballots in an update of the state's tally.

The images quickly set off claims of election fraud across social media, amplified by President Trump, who shared them on Twitter with the caption: "WHAT IS THIS ALL ABOUT?"



In reality, Mr. Biden didn't receive those votes. They were briefly added to his unofficial totals on an election map because of a typo in a small Michigan county that was caught and corrected in roughly half an hour.

"All it was is there was an extra zero that got typed in," said Abigail Bowen, the elections clerk in Shiawassee County in Michigan, just northwest of Detroit. "It was caught quickly," she added. "That's why we have these checks and balances."

When Ms. Bowen and her team sent the county's unofficial vote counts to Michigan officials early Wednesday, they accidentally reported Mr. Biden's tally as 153,710, when it should have been 15,371, she said. About 20 minutes later, she said a state elections official called her to ask if the number was a typo; Shiawassee County doesn't even have that many residents. Ms. Bowen said she corrected the figure and the number was updated.

"All of these numbers are unofficial, so even if it wouldn't have been caught last night, it absolutely would have been caught before we would have submitted our official results," she said. A team of two Republican and two Democratic canvassers review all of the county's poll books, ballot summaries and tabulator tapes to confirm the results before they are finalized, she said.

"As far as Shiawassee County, I feel the election went very well," she said.

Yet on social media, the county represented a stark example of voter fraud. Posts that highlighted the apparent sudden boost in Mr. Biden's count in Michigan were shared more than 100,000 times, and conservative websites posted stories with headlines like: "Very Odd: Michigan Found Over 100,000 Ballots and Every Single One Has Joe Biden's Name on It."

Matt Mackowiak, a Texas Republican consultant, posted the screenshots of the election map on Twitter and watched them quickly go viral, eventually shared by the president himself. Twitter eventually labeled Mr. Mackowiak's post as disputed or misleading, and the company stopped people from sharing it as easily.

Mr. Mackowiak said in an interview that after posting the screenshots, he saw other Twitter posts suggesting the data was the result of a typo. He deleted his original tweet and posted a correction. "I certainly wasn't intending to make a typo appear fraudulent," he said. "It didn't occur to me that it could be a typo, but of course we're all going on very little sleep."

Yet his correction was read by a small fraction of the people that his initial post had reached, and thousands of people continued to cite his images as evidence of a stolen election hours later. He said that he wished Twitter could help his correction reach all the people who saw his original post, but that is not an option on the site.

Mr. Mackowiak said that he didn't think that he had shared misinformation, because the election maps were indeed wrong for a moment, but he added that he also didn't think the election was being stolen.

"I haven't seen a lot of reasons to doubt the integrity of the election," he said.

Mr. Mackowiak took the screenshots from an election map by Decision Desk HQ, an election-data provider. Posts from the company on Twitter showed that it removed the votes from Mr. Biden's count by 5:45 a.m. Michigan time on Thursday, shortly after they were added.

"We accurately reported what was provided at the time by election officials. When corrected data was available, we reported that," said Drew McCoy, Decision Desk's president. He said there were layers of security to ensure that the final counts were accurate. "This is a complex and large endeavor, reporting on a national election with thousands of races and thousands of counties," he said.

# Exhibit 10

**OFFICIAL WEBSITE OF MICHIGAN.GOV**

The Office of
# Secretary of State Jocelyn Benson



SOS / ELECTIONS / ELECTION SECURITY IN MICHIGAN

# Fact Checks

In the 2020 election cycle, Michiganders have been inundated by more election misinformation than ever before. It has come in the form of robocalls, text messages, social media posts and even meritless lawsuits and investigations seeking nothing but media attention. This page provides accurate information debunking these spurious claims and allegations.

## Civic groups cannot access or edit the voter file

Civic groups cannot log into, access, edit or modify the state's Qualified Voter File. This includes Rock the Vote.

As **was announced in June**, the Michigan Department of State (MDOS) has worked with the nonpartisan voter education group Rock the Vote to build a secure API ("application programming interface") to facilitate the voter registration of eligible Michigan citizens. The tool, which exists in other states and which other organizations can use as well, allows organizations to collect voter registration applications electronically and securely submit them to Michigan's online voter registration system. To do so, the voter must provide all information needed to register to vote online in Michigan. Organizations using the tool do not receive any type of payment from MDOS and they do not have access to voter information that is not publicly available.

When a voter registration application was submitted to the online voter registration tool by a group using the API, that organization's name is indicated only for record-keeping purposes. This does not mean the group can log into or edit the Qualified Voter File – they can't.

## All Michigan counties certified their elections

The boards of county canvassers in all of Michigan's 83 counties have certified their results in the Nov. 3 general election. Each board is comprised of two Republicans and two Democrats appointed by the local county commission. Michigan law requires that they review local elections and certify the official results. Although the Board of Wayne County

Canvassers initially deadlocked 2-2 in its Nov. 17 vote to certify, later in the same meeting, members voted 4-0 to certify. The initial vote was taken after some canvassers expressed concern about precincts that were out of balance in Detroit. However, out-of-balance precincts are common in Michigan and across the nation. They essentially represent clerical errors where the number of people who were checked into each poll book doesn't exactly match the number of votes counted or ballots submitted. There are many reasons why this can occur: for example, a voter being checked in at the right polling place but the wrong precinct, or a voter checking in but leaving with their ballot if the line was long. In fact, based on data reported at the Board of Wayne County Canvassers meeting, 72% of all Detroit precincts were balanced or explained, compared to just 42% in 2016, when both the boards of county and state canvassers certified the election.

## Detroit officials say absentee ballot counting was transparent and accurate

Various statements released by Detroit officials and election advisors make clear that absentee ballot counting was observed by hundreds of Republicans and Democrats, as well as independent media, and that only ballots received by 8 p.m. on Election Day were counted. Claims to the contrary were found by Wayne County Circuit Court Chief Judge Timothy Kenny, originally appointed by Republican Governor John Engler, to be **"incorrect and not credible" in his order** denying the requests of a lawsuit. **A more detailed explanation is available here**.

## Security protections prevent voting in another person's name

In Michigan, absentee ballots are not counted until a voter has twice provided signatures matching the one on file with their local election clerk. Similarly, upon arriving at a polling place, voters are asked to provide photo ID or sign an affidavit confirming their identity and eligibility to vote. Voting in another person's name – regardless of if it is the other person's maiden name or the person has moved – is illegal and any voter with actual evidence of such an act should report it immediately, in writing, to law enforcement so that it can be investigated and referred for prosecution. Actual occurrences of voter fraud are exceedingly rare.

## Deceased voters' ballots are not counted

Ballots of voters who have died are rejected in Michigan, even if the voter cast an absentee ballot and then died before Election Day. Those who make claims otherwise are wrong, and the lists circulating claiming to show this is happening are not accurate. Many of the lists do not contain enough information to accurately compare them to the Michigan Qualified Voter File. MDOS and news organizations have drawn samples and reviewed samples of lists claiming to show votes cast by deceased individuals in Michigan. We are not aware of a single confirmed case showing that a ballot was actually cast on behalf of a deceased individual. **A more detailed explanation is available here**.

## Unofficial election results are a good snapshot of the election

Michigan's unofficial election results are a good snapshot of what the final results will look like. It's not unusual to see reporting errors in unofficial results. They're quickly caught and corrected. While some errors in unofficial results were identified and corrected, they were errors in how the unofficial results were REPORTED, not errors that affected how ballots were actually COUNTED. In Michigan voters use paper ballots and paper tallies that are secured and stored. No voter was disenfranchised by these errors. The official results come after the bipartisan boards of county canvassers review and certify results.

## Isolated user error in Antrim County did not affect election results, has no impact on other counties or states

The error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected, did not affect the way ballots were actually tabulated, and would have been identified in the county canvass before official results were reported even if it had not been identified earlier. **A more detailed explanation is available here**.

**Additional information** 

https://www.dominionvoting.com
https://www.cisa.gov/rumorcontrol

## Your ballot will not be invalidated because you used a Sharpie

The use of a Sharpie to mark a ballot will not invalidate or cancel a ballot or vote. If the marker does bleed through to the other side, ballots are designed so that the bleed through does not touch or come near a voting area on the other side of the ballot. It will not alter or

cancel any vote on the opposite side. The Sharpie is the recommended marking instrument by the tabulator manufacturer and is preferable to an ink pen because it dries quickly and will not leave residue on the ballot scanner.

## Ballots received after the deadline are not counted, regardless of postmark

Michigan's election clerks count valid ballots that they received at their offices or in their official ballot drop boxes by 8 p.m. on Election Day. Ballots received thereafter, regardless of the postmark, are not counted.

## Department of State election results site only includes counties that have finished counting

Because Michigan's election system is decentralized, results are reported from local jurisdictions to counties, and only after a county has all jurisdictions reporting are its results added to our website. Media get real time results from local and county sites.

## Complete results will not be available on election night

After polling places close on election night, jurisdictions across the state will begin to report voting results. However, in many jurisdictions, these results will only include the ballots voted in the polling places on Election Day, and not the jurisdiction's absentee ballots. This is because absentee ballots take much longer to process and count than the ballots that voters use at polling places, and are often counted in separate locations focused on processing them accurately and efficiently. Security checks must be performed, envelopes must be opened, and the ballots must be tracked, flattened and run through the tabulation machine. Other states provide election clerks weeks to prepare absentee ballots before Election Day. Florida gives clerks 40 days. The Michigan Legislature provided clerks only 10 hours. For this reason, complete, unofficial results from all jurisdictions will not be available in Michigan on election night, and it likely won't be possible to determine winners in close statewide races on Election Night, either. In the August primary, 1.6 million absentee ballots were cast, and it took about 40 hours until all jurisdictions reported results. More than 3 million voters have requested absentee ballots for the November general election, so it will likely take 80 hours, meaning that all jurisdictions will not report full results until Friday, Nov. 6. They could come sooner, however, thanks to the extraordinary work of local clerks, and the resources

provided by the state, including the recruitment of more than 30,000 election workers and provision of federal funds for automatic envelope openers and more ballot tabulation machines.

## Poll challengers and watchers must follow rules

There are rules regarding the conduct of poll challengers and watchers. In Michigan, neither can speak directly to voters or record activity taking place in a polling place. Both must wear masks. Challengers are allowed to step behind the processing table while watchers cannot. Challenges cannot be issued without the challenger providing a good reason they believe the voter is ineligible. If the voter is able to demonstrate they are eligible, they will vote a challenged ballot, which will be tabulated as normal, but is marked so that it could be retrieved later if the voter is found to be ineligible. If the voter cannot demonstrate eligibility at the polling place, the voter may cast a provisional ballot, which will not be tabulated unless the voter can prove eligibility within six days.

## Ballot counting machines are secure

Michigan uses all paper ballots, which are counted by tabulator machines. Vote tallies are printed and the paper record of the tallies as well as the paper ballots are stored in secure locations after counting is finished. The machines are not connected to the internet until all counting is finished and copies of the tally have been printed. Then some jurisdictions may connect a machine to send UNOFFICIAL results to the county clerk, while a copy of the paper tally is also driven to the county clerk.

## Absentee ballots are secure and will be counted fairly



To obtain an absentee ballot in Michigan, a voter must first submit an application with a signature that matches the one the clerk has file for them. Unless this is done, no voter can even get a ballot. Once a voter does receive a ballot, they again must provide a matching signature on the back of the ballot return envelope. Their vote will not be counted unless they provide a matching signature. All valid absentee ballots received by 8 p.m. on Nov. 3 will be counted. Each will be counted by a bipartisan pair of election workers – one from each major political party – who are trained to process ballots without any political bias and in accordance with the law.

## More registered voters leads to stronger democracy

When more people participate in our democracy, it better reflects the will of the people. For decades, Michigan has had one of the best motor-voter systems in the country, resulting in a great voter registration rate among eligible citizens. Voters made the system even stronger when they amended our state constitution in 2018 to require automatic voter registration. Unless they opt out, all eligible citizens are now registered when conducting a driver's license or state identification transaction with our office. Additionally, residents who are already registered have their registration reviewed for validity every time they conduct such a transaction with the Department. Michigan's registration list includes both active and inactive voters. Federal law requires that inactive voters remain on the list for several years before they can be removed. If an inactive voter – for example, someone who has not voted in recent elections – chooses to vote again, they are again listed as active.

## Your personal information is safe when you vote absentee

All registered voters are listed in the state's qualified voter file, which is a custom built, modern system continuously monitored to ensure its security. Voting absentee does not add a voter's information to any other database.

Absentee voting is a safe, secure and time-tested method of voting.

## Absentee applications are mailed every election

Applications to vote absentee have been available on the MDOS website for many years, and have been frequently mailed to voters by both political parties, candidate campaigns and numerous non-partisan organizations. By mailing absentee applications to all registered voters as the COVID-19 pandemic began in Michigan, MDOS ensured that every voter knew they had the new right to safely cast an absentee ballot from home.

Additionally, some residents received applications for voters who have moved or died. By marking the envelope with this information and returning it to sender, they advancing the multi-year process required by federal law to maintain the voter registration list.



**SOS Home**                          **MICHIGAN.GOV HOME**
**FAQ**                               **ADA**
**Online Services**                   **MICHIGAN NEWS**
**Forms**                             **POLICIES**
**Contact the Secretary of State**
**FOIA**

**COPYRIGHT 2020 STATE OF MICHIGAN**

# Exhibit 11



Return to **Election 2020: Setting the Record Straight**

November 26, 2020

# STATEMENT FROM DOMINION ON SIDNEY POWELL'S CHARGES

While Dominion Voting Systems is not named as a defendant, on Wednesday, November 25, 2020, Sidney Powell released what appears to be a very rough draft of a lawsuit against the Republican governor and secretary of state of Georgia alleging a bizarre election fraud conspiracy that—were it possible—would necessarily require the collaboration of thousands of participants, including state officeholders, bipartisan local elections officials, thousands of volunteer Election Day poll watchers in thousands of locations across the state of Georgia, federal and state government technology testing agencies, private elections service companies, and independent third-party auditors. This quite simply did not occur.

Dominion Voting Systems is the gold standard for transparent and accountable voting equipment. The allegations included in the draft complaint are baseless, senseless, physically impossible, and unsupported by any evidence whatsoever. We stand with the state and local elected officials and bipartisan election volunteers that this suit maliciously maligns.

In Powell's error-filled document, she repeats a number of baseless allegations about Dominion Voting Systems, which she has made in public since Election Day.

The allegations about DVS most relevant to the election outcome in Georgia are that votes tallied on a Dominion vote tabulator were somehow manipulated on a statewide basis to elevate the count in

Case 2:20-cv-13134-LVP-RSW   ECF No. 36-11, PageID.2651   Filed 12/03/20   Page 3 of 6

favor of the Democratic presidential candidate. It is important to understand that this is not possible—not on a machine-by-machine basis, not by alleged hacking, not by manipulating software, and not by imagined ways of "sending" votes to overseas locations.  But even if it *were* possible, it would have been discovered in the statewide handcount of votes.

Dominion's systems are secure as certified by the U.S. Election Assistance Commission (EAC). In fact, *all* voting systems must provide assurance that they work accurately and reliably as intended under federal U.S. EAC and state certification and testing requirements. Further, Dominion source code is verified and secure. Third-party test labs chosen by the bipartisan U.S. EAC and accredited by the National Institute of Standards and Technology (NIST) perform complete source code reviews on every tabulation system that is federally certified in the U.S.

Every vote from a Dominion device in Georgia is documented on an auditable paper trail and creates a verifiable paper ballot available for hand-counting. In fact, the Georgia handcounts, independent audits, and machine tests have all *repeatedly* affirmed that the machine counts were accurate.

In addition, Powell makes a number of allegations that go beyond Dominion's role in Georgia's elections—which is only to provide the ballot tabulation systems. For the record, again, Dominion does not develop voter-registration systems, poll-books, signature verification software, or provide vote-by-mail printing. These parts of the voting process are instead supported by other companies and controlled by the state and local officials who run elections in hundreds of thousands of voting places across the country.

These assertions in the Powell filing are non-sensical and unsupported by any presentation of evidence. However, to respond to some of her specific assertions about Dominion:

- ✅ Dominion was not "founded by oligarchs and dictators." It was founded in Toronto, Canada, and it is now a proud nonpartisan American company. Dominion has attested to its ownership— *under penalty of perjury*—to local, state, and federal agencies,

Privacy - Terms

including the Committee on Foreign Investment in the United States, which includes all U.S. national security agencies.

✅ Dominion is not, and never has been, owned by Smartmatic. Neither has Smartmatic ever been a subsidiary of Dominion, as the complaint asserts. Dominion is an entirely separate company —they do not collaborate in any way and have no affiliate relationships or financial ties. Dominion does not use Smartmatic. These are all facts verifiable in the public record as well as in regulatory and legal filings.

✅ Dominion has no ties to the Venezuelan government, nor any other foreign government, including China and Iran. Dominion has never participated in any elections in Venezuela and has no connection or relationship with the now deceased former Venezuelan dictator Hugo Chavez. Other companies *have* serviced elections in Venezuela, *but Dominion is not one of them*.

✅ Dominion does not have operations in Germany including an "Office of the General Counsel."

✅ Dominion Voting Systems are in fact auditable—and are audited and tested regularly by multiple government agencies and independent third parties. All electronic devices used in the U.S. must be designed to be audited.

✅ Dominion's system does in fact include a paper ballot backup to verify results. In fact, thousands of elections officials in Georgia just completed the largest vote recount in American history using the paper ballots produced by Dominion devices.

✅ Dominion's system cannot be manipulated by a technician in the way Powell alleges. This has been confirmed by the government agencies that have certified Dominion equipment.

✅ Despite repeated counts and audits, there is no evidence of any kind that any voting system deleted, lost, or changed votes in Georgia, or in any of the other 28 states that use Dominion devices. Certifications and audits have instead shown the accuracy, transparency, and reliability of Dominion's systems.

✅ The federal government agency that oversees U.S. election security verified that there is no evidence that this election was in any way compromised. In fact, they have called it the most secure election in American history.

- Servers that run Dominion software are located in local election offices, and data never leaves the control of local election officials.

- There were no "glitches" with Dominion's voting systems, and no unauthorized or last-minute software updates occurred.

- There were no "data breaches" of Dominion software by anyone, let alone rogue foreign actors.

- Human errors did occur in some counties but were resolved quickly by county officials before the canvass process.

- Votes are not processed outside the United States. Votes are counted and reported by county and state election officials—not by Dominion, or any other election technology company.

- Election safeguards—from testing and certification of voting systems to canvassing and auditing—prevent malicious actors from tampering with results.

Sidney Powell's wild and reckless allegations are not only demonstrably false, they have led to stalking, harassment, and death threats to Dominion employees. This criminal activity has been duly reported to the appropriate law enforcement agencies, and we intend to hold Ms. Powell, and those aiding and abetting her fraudulent actions, accountable for any harm that may occur as a result.

Return to **Election 2020: Setting the Record Straight**



**PRODUCTS**

EMS ENGINE
**Democracy Suite®**

IN-PERSON AND ACCESSIBLE VOTING
**ImageCast® X**

CENTRAL TABULATION

Founded in 2003, Dominion Voting Systems is a leading industry supplier of election technology across the U.S., Canada and globally.

Privacy - Terms

ImageCast® Central

COMBINATION VOTING AND TABULATION
ImageCast® Precinct
ImageCast® Evolution

Optional Solutions

## ABOUT

Dominion Difference
Dominion Secure
Careers

## INFO

Customer Support

1-866-654-VOTE (8683)

Contact Us

U.S.: Denver, CO
CANADA: Toronto, ON

Privacy Policy | Terms of Use | Site Map

Copyright © 2020 Dominion Voting Systems Corp.
All Rights Reserved.

Privacy · Terms

# Exhibit 12





# STATEMENT FROM CISA DIRECTOR KREBS FOLLOWING FINAL DAY OF VOTING

Original release date: November 04, 2020

WASHINGTON – Following the final day of voting, Director of the Cybersecurity and Infrastructure Security Agency, Christopher Krebs, issued the following statement:

"Over the last four years, the Cybersecurity and Infrastructure Security Agency (CISA) has been a part of a whole-of-nation effort to ensure American voters decide American elections. Importantly, after millions of Americans voted, we have no evidence any foreign adversary was capable of preventing Americans from voting or changing vote tallies.

"We are only here because of the hard work of state and local election officials and private sector partners who have focused efforts on enhancing the security and resilience of elections. The United States government supported these partners throughout the election, bringing the full range of capabilities to bear in securing systems and pushing back against malicious actors seeking to disrupt our process and interfere in our election. CISA will continue to support our state and local partners as they move toward their certification deadlines and the official outcome of the 2020 election.

"We will remain vigilant for any attempts by foreign actors to target or disrupt the ongoing vote counting and final certification of results. The American people are the last line of defense against foreign influence efforts and we encourage continued patience in the coming days and weeks. Keep calm, continue to look to your state and local election officials for trusted information on election results and visit CISA.gov/rumorcontrol for facts on election security."

#Protect2020

### ###

**Keywords:** Cybersecurity, Election security

**Last Published Date:** November 4, 2020



# Exhibit 13



**ELECTIONS**

# Trump lawsuit confuses Michigan and Minnesota locations in affidavit claiming voter fraud

**Savannah Behrmann** USA TODAY

Published 6:32 p.m. ET Nov. 20, 2020

WASHINGTON – An affidavit from President Donald Trump's legal team that claimed to prove widespread voter fraud confused two "M" states: Michigan and Minnesota.

The affidavit was as part of a larger lawsuit actually filed in Georgia by pro-Trump and conservative attorney L. Lin Wood that sought to discredit that state's election results by pointing to alleged discrepancies and problems with Dominion Voting Systems.

Trump, his legal team, and his supporters have continued to tout unsubstantiated claims that Dominion Voting Systems has led to widespread fraud in several states.

**Fact check:** What's true and what's false about the 2020 election

To point out the supposed problems with Dominion Voting Systems in Georgia, the affidavit, filed as analysis from Texas resident and cybersecurity expert Russell Ramsland, was intended to show supposed errors in Michigan, as both states use Dominion Voting Systems to tabulate election results.

However, the Ramsland affidavit appeared to confuse townships in Minnesota for Michigan.

Ramsland highlighted a number of "statistical anomalies and red flags" he claimed proved "that election results have been manipulated within the Dominion/Premier system in Michigan."

He specifically highlighted several precincts in Michigan where the number of votes cast appeared to exceed the number of registered voters in the county.

**'It cannot be done':** Biden lawyer says Michigan electoral plot would be unconstitutional

Many of the municipalities cited in the Michigan (MI) document, such as Albertville, Houston, Monticello, Runeberg, Lake Lillian, Brownsville, Wolf Lake, Height of Land, Detroit Lakes, Frazee, and Kandiyohi, are located in Minnesota (MN).

The affidavit was filed Tuesday. A federal judge dismissed Wood's lawsuit on Thursday, which sought to halt the certification of Georgia's election, saying it came too late and lacked merit.

**More:** In Pennsylvania, Trump wants questioned ballots or the entire election thrown out. His claims of fraud remain baseless.

Georgia completed a hand recount and audit of votes on Thursday, confirming President-elect Joe Biden won the state.

The "risk-limiting audit" found Biden won Georgia by 12,284 votes, a narrower margin than the 14,196-vote lead he held immediately following the election. Local election administrators identified uncounted ballots in four counties. Each was the result of human error.

On Friday, saying "numbers don't lie," Georgia Secretary of State Brad Raffensperger certified those election results.

Trump's legal team had promoted the affidavit as proof of widespread evidence of voter fraud.

**Election 2020 live updates:** Georgia election official certifies Biden victory

Ramsland had claimed in the affidavit that "excess ballots" were allegedly processed, but it is unclear where the data listed came from.

According to actual data from the Minnesota Secretary of State, there were 4,202 registered voters in Monticello P-2, but only 3,776 votes were cast in the presidential election.

USA TODAY has reached out to Wood for comment.

This Georgia lawsuit that mixed-up Michigan and Minnesota is just one of several filed by Trump's legal team that have been dismissed.

# Exhibit 14

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Cheryl A. Costantino and
Edward P. McCall, Jr.
                Plaintiffs,

                                      Hon. Timothy M. Kenny
                                        Case No. 20-014780-AW

City of Detroit; Detroit Election
Commission; Janice M. Winfrey,
in her official capacity as the
Clerk of the City of Detroit and
the Chairperson and the Detroit
Election Commission; Cathy Garrett,
In her official capacity as the Clerk of
Wayne County; and the Wayne County
Board of Canvassers,
                Defendants.

_____/

# **OPINION & ORDER**

At a session of this Court
Held on: November 13, 2020
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: Honorable Timothy M. Kenny
                 Chief Judge
                 Third Judicial Circuit Court of Michigan

This matter comes before the Court on Plaintiffs' motion for preliminary injunction,

protective order, and a results audit of the November 3, 2020 election.  The Court

having read the parties' filing and heard oral arguments, finds:

With the exception of a portion of Jessy Jacob affidavit, all alleged fraudulent claims

brought by the Plaintiffs related to activity at the TCF Center.  Nothing was alleged to

1

have occurred at the Detroit Election Headquarters on West Grand Blvd. or at any polling place on November 3, 2020.

The Defendants all contend Plaintiffs cannot meet the requirements for injunctive relief and request the Court deny the motion.

When considering a petition for injunction relief, the Court must apply the following four-pronged test:

1. The likelihood the party seeking the injunction will prevail on the merits.

2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.

3. The risk the party seeking the injunction would be harmed more by the absence an injunction than the opposing party would be by the granting of the injunction.

4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2nd 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Id*. at 612 fn 135 quoting *Senior Accountants, Analysts and Appraisers Association v Detroit*, 218 Mich. App. 263, 269; 553 NW2nd 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4)  states that the Plaintiffs bear the burden of proving the preliminary injunction should be granted.  In cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud.  MCR 2.112 (B) (1)

Plaintiffs must establish they will likely prevail on the merits.  Plaintiffs submitted seven affidavits in support of their petition for injunctive relief claiming widespread voter

2

fraud took place at the TCF Center.  One of the affidavits also contended that there was blatant voter fraud at one of the satellite offices of the Detroit City Clerk.  An additional affidavit supplied by current Republican State Senator and former Secretary of State Ruth Johnson, expressed concern about allegations of voter fraud and urged "Court intervention", as well as an audit of the votes.

In opposition to Plaintiffs' assertion that they will prevail, Defendants offered six affidavits from individuals who spent an extensive period of time at the TCF Center.  In addition to disputing claims of voter fraud, six affidavits indicated there were numerous instances of disruptive and intimidating behavior by Republican challengers.  Some behavior necessitated removing Republican challengers from the TCF Center by police.

After analyzing the affidavits and briefs submitted by the parties, this Court concludes the Defendants offered a more accurate and persuasive explanation of activity within the Absent Voter Counting Board (AVCB) at the TCF Center.

Affiant Jessy Jacob asserts Michigan election laws were violated prior to November 3, 2020, when City of Detroit election workers and employees allegedly coached voters to vote for Biden and the Democratic Party.  Ms. Jacob, a furloughed City worker temporarily assigned to the Clerk's Office, indicated she witnessed workers and employees encouraging voters to vote a straight Democratic ticket and also witnessed election workers and employees going over to the voting booths with voters in order to encourage as well as watch them vote.  Ms. Jacob additionally indicated while she was working at the satellite location, she was specifically instructed by superiors not to ask for driver's license or any photo ID when a person was trying to vote.

The allegations made by Ms. Jacob are serious.  In the affidavit, however, Ms. Jacob does not name the location of the satellite office, the September or October date these

3

acts of fraud took place, nor does she state the number of occasions she witnessed the alleged misconduct. Ms. Jacob in her affidavit fails to name the city employees responsible for the voter fraud and never told a supervisor about the misconduct.

Ms. Jacob's information is generalized. It asserts behavior with no date, location, frequency, or names of employees. In addition, Ms. Jacob's offers no indication of whether she took steps to address the alleged misconduct or to alter any supervisor about the alleged voter fraud. Ms. Jacob only came forward after the unofficial results of the voting indicated former Vice President Biden was the winner in the state of Michigan.

Ms. Jacob also alleges misconduct and fraud when she worked at the TCF Center. She claims supervisors directed her not to compare signatures on the ballot envelopes she was processing to determine whether or not they were eligible voters. She also states that supervisors directed her to "pre-date" absentee ballots received at the TCF Center on November 4, 2020. Ms. Jacob ascribes a sinister motive for these directives. Evidence offered by long-time State Elections Director Christopher Thomas, however, reveals there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined at the Detroit Election Headquarters on West Grand Blvd. Ms. Jacob was directed not to search for or compare signatures because the task had already been performed by other Detroit city clerks at a previous location in compliance with MCL 168.765a. As to the allegation of "pre-dating" ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process. Thomas Affidavit, #12. The entries reflected the date the City received the absentee ballot. *Id.*

4

The affidavit of current State Senator and former Secretary of State Ruth Johnson essentially focuses on the affidavits of Ms. Jacob and Zachery Larsen.  Senator Johnson believed the information was concerning to the point that judicial intervention was needed and an audit of the ballots was required.  Senator Johnson bases her assessment entirely on the contents of the Plaintiffs' affidavits and Mr. Thomas' affidavit.  Nothing in Senator Johnson's affidavit indicates she was at the TCF Center and witnessed the established protocols and how the AVCB activity was carried out.  Similarly, she offers no explanation as to her apparent dismissal of Mr. Thomas' affidavit.  Senator Johnson's conclusion stands in significant contrast to the affidavit of Christopher Thomas, who was present for many hours at TCF Center on November 2, 3 and 4.  In this Court's view, Mr. Thomas provided compelling evidence regarding the activity at the TCF Center's AVCB workplace.  This Court found Mr. Thomas' background, expertise, role at the TCF Center during the election, and history of bipartisan work persuasive.

Affiant Andrew Sitto was a Republican challenger who did not attend the October 29th walk- through meeting provided to all challengers and organizations that would be appearing at the TCF Center on November 3 and 4, 2020.  Mr. Sitto offers an affidavit indicating that he heard other challengers state that several vehicles with out-of-state license plates pulled up to the TCF Center at approximately 4:30 AM on November 4th.  Mr. Sitto states that "tens of thousands of ballots" were brought in and placed on eight long tables and, unlike other ballots, they were brought in from the rear of the room.  Sitto also indicated that every ballot that he saw after 4:30 AM was cast for former Vice President Biden.

Mr. Sitto's affidavit, while stating a few general facts, is rife with speculation and guess-work about sinister motives.  Mr. Sitto knew little about the process of the absentee voter counting board activity.  His sinister motives attributed to the City of Detroit were negated by Christopher Thomas' explanation that all ballots were delivered to the back of Hall E at the TCF Center.  Thomas also indicated that the City utilized a rental truck to deliver ballots.  There is no evidentiary basis to attribute any evil activity by virtue of the city using a rental truck with out-of-state license plates.

Mr. Sitto contends that tens of thousands of ballots were brought in to the TCF Center at approximately 4:30 AM on November 4, 2020.  A number of ballots speculative on Mr. Sitto's part, as is his speculation that all of the ballots delivered were cast for Mr. Biden.  It is not surprising that many of the votes being observed by Mr. Sitto were votes cast for Mr. Biden in light of the fact that former Vice President Biden received approximately 220,000 more votes than President Trump.

Daniel Gustafson, another affiant, offers little other than to indicate that he witnessed "large quantities of ballots" delivered to the TCF Center in containers that did not have lids were not sealed, or did not have marking indicating their source of origin.  Mr. Gustafson's affidavit is another example of generalized speculation fueled by the belief that there was a Michigan legal requirement that all ballots had to be delivered in a sealed box.  Plaintiffs have not supplied any statutory requirement supporting Mr. Gustafson's speculative suspicion of fraud.

Patrick Colbeck's affidavit centered around concern about whether any of the computers at the absent voter counting board were connected to the internet.  The answer given by a David Nathan indicated the computers were not connected to the

6

internet.  Mr. Colbeck implies that there was internet connectivity because of an icon

that appeared on one of the computers.  Christopher Thomas indicated computers were

not connected for workers, only the essential tables had computer connectivity.  Mr.

Colbeck, in his affidavit, speculates that there was in fact Wi-Fi connection for workers

use at the TCF Center.  No evidence supports Mr. Colbeck's position.

This Court also reads Mr. Colbeck's affidavit in light of his pre-election day Facebook

posts.  In a post before the November 3, 2020 election, Mr. Colbeck stated on

Facebook that the Democrats were using COVID as a cover for Election Day fraud.  His

predilection to believe fraud was occurring undermines his credibility as a witness.

Affiant Melissa Carone was contracted by Dominion Voting Services to do IT work at

the TCF Center for the November 3, 2020 election.  Ms. Carone, a Republican,

indicated that she "witnessed nothing but fraudulent actions take place" during her time

at the TCF Center.  Offering generalized statements, Ms. Carone described illegal

activity that included, untrained counter tabulating machines that would get jammed four

to five times per hour, as well as alleged cover up of loss of vast amounts of data.  Ms.

Carone indicated she reported her observations to the FBI.

Ms. Carone's description of the events at the TCF Center does not square with any

of the other affidavits.  There are no other reports of lost data, or tabulating machines

that jammed repeatedly every hour during the count.  Neither Republican nor

Democratic challengers nor city officials substantiate her version of events.  The

allegations simply are not credible.

Lastly, Plaintiffs rely heavily on the affidavit submitted by attorney Zachery Larsen. Mr. Larsen is a former Assistant Attorney General for the State of Michigan who alleged mistreatment by city workers at the TCF Center, as well as fraudulent activity by election workers.  Mr. Larsen expressed concern that ballots were being processed without confirmation that the voter was eligible.  Mr. Larsen also expressed concern that he was unable to observe the activities of election official because he was required to stand six feet away from the election workers.  Additionally, he claimed as a Republican challenger, he was excluded from the TCF Center after leaving briefly to have something to eat on November 4th.  He expressed his belief that he had been excluded because he was a Republican challenger.

Mr. Larsen's claim about the reason for being excluded from reentry into the absent voter counting board area is contradicted by two other individuals.  Democratic challengers were also prohibited from reentering the room because the maximum occupancy of the room had taken place.  Given the COVID-19 concerns, no additional individuals could be allowed into the counting area.  Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding.

Mr. Larsen's concern about verifying the eligibility of voters at the AVCB was incorrect.  As stated earlier, voter eligibility was determined at the Detroit Election Headquarters by other Detroit city clerk personnel.

The claim that Mr. Larsen was prevented from viewing the work being processed at the tables is simply not correct.  As seen in a City of Detroit exhibit, a large monitor was

8

at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed. Mr. Jaffe confirmed his experience and observation that efforts were made to ensure that all challengers could observe the process.

Despite Mr. Larsen's claimed expertise, his knowledge of the procedures at the AVCB paled in comparison to Christopher Thomas'. Mr. Thomas' detailed explanation of the procedures and processes at the TCF Center were more comprehensive than Mr. Larsen's. It is noteworthy, as well, that Mr. Larsen did not file any formal complaint as the challenger while at the AVCB. Given the concerns raised in Mr. Larsen's affidavit, one would expect an attorney would have done so. Mr. Larsen, however, only came forward to complain after the unofficial vote results indicated his candidate had lost.

In contrast to Plaintiffs' witnesses, Christopher Thomas served in the Secretary of State's Bureau of Elections for 40 years, from 1977 through 2017. In 1981, he was appointed Director of Elections and in that capacity implemented Secretary of State Election Administration Campaign Finance and Lobbyist disclosure programs. On September 3, 2020 he was appointed as Senior Advisor to Detroit City Clerk Janice Winfrey and provided advice to her and her management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting boards, satellite offices and drop boxes. Mr. Thomas helped prepare the City of Detroit for the November 3, 2020 General Election.

As part of the City's preparation for the November 3rd election Mr. Thomas invited challenger organizations and political parties to the TCF Center on October 29, 2020 to have a walk-through of the entire absent voter counting facility and process. None of Plaintiff challenger affiants attended the session.

9

On November 2, 3, and 4, 2020, Mr. Thomas worked at the TCF Center absent voter counting boards primarily as a liaison with Challenger Organizations and Parties. Mr. Thomas indicated that he "provided answers to questions about processes at the counting board's resolved dispute about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers."

Additionally, Mr. Thomas resolved disputes about the processes and satisfactorily reduced the number of challenges raised at the TCF Center.

In determining whether injunctive relief is required, the Court must also determine whether the Plaintiffs sustained their burden of establishing they would suffer irreparable harm if an injunction were not granted. Irreparable harm does not exist if there is a legal remedy provided to Plaintiffs.

Plaintiffs contend they need injunctive relief to obtain a results audit under Michigan Constitution Article 2, § IV, Paragraph 1 (h) which states in part "the right to have the results of statewide elections audited, in such as manner as prescribed by law, to ensure the accuracy and integrity of the law of elections." Article 2, § IV, was passed by the voters of the state of Michigan in November, 2018.

A question for the Court is whether the phrase "in such as manner as prescribed by law" requires the Court to fashion a remedy by independently appointing an auditor to examine the votes from the November 3, 2020 election before any County certification of votes or whether there is another manner "as prescribed by law".

Following the adoption of the amended Article 2, § IV, the Michigan Legislature amended MCL 168.31a effective December 28, 2018. MCL 168.31a provides for the Secretary of State and appropriate county clerks to conduct a results audit of at least

one race in each audited precinct.  Although Plaintiffs may not care for the wording of the current MCL 168.31a, a results audit has been approved by the Legislature.  Any amendment to MCL 168.31a is a question for the voice of the people through the legislature rather than action by the Court.

It would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers.  The Court cannot defy a legislatively crafted process, substitute its judgment for that of the Legislature, and appoint an independent auditor because of an unwieldy process.  In addition to being an unwarranted intrusion on the authority of the Legislature, such an audit would require the rest of the County and State to wait on the results.  Remedies are provided to the Plaintiffs.  Any unhappiness with MCL 168.31a calls for legislative action rather than judicial intervention.

As stated above, Plaintiffs have multiple remedies at law.  Plaintiffs are free to petition the Wayne County Board of Canvassers who are responsible for certifying the votes.  (MCL 168.801 and 168.821 et seq.) Fraud claims can be brought to the Board of Canvassers, a panel that consists of two Republicans and two Democrats.  If dissatisfied with the results, Plaintiffs also can avail themselves of the legal remedy of a recount and a Secretary of State audit pursuant to MCL 168.31a.

Plaintiff's petition for injunctive relief and for a protective order is not required at this time in light of the legal remedy found at 52 USC § 20701 and Michigan's General Schedule #23 – Election Records, Item Number 306, which imposes a statutory obligation to preserve all federal ballots for 22 months after the election.

In assessing the petition for injunctive relief, the Court must determine whether there will be harm to the Plaintiff if the injunction is not granted, as Plaintiffs' existing legal

11

remedies would remain in place unaltered.  There would be harm, however, to the Defendants if the Court were to grant the requested injunction.  This Court finds that there are legal remedies for Plaintiffs to pursue and there is no harm to Plaintiffs if the injunction is not granted.  There would be harm, however, to the Defendants if the injunction is granted.  Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay.  It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races.  It would also undermine faith in the Electoral System.

Finally, the Court has to determine would there be harm to the public interest.  This Court finds the answer is a resounding yes.  Granting Plaintiffs' requested relief would interfere with the Michigan's selection of Presidential electors needed to vote on December 14, 2020.  Delay past December 14, 2020 could disenfranchise Michigan voters from having their state electors participate in the Electoral College vote.

Conclusion

Plaintiffs rely on numerous affidavits from election challengers who paint a picture of sinister fraudulent activities occurring both openly in the TCF Center and under the cloak of darkness.  The challengers' conclusions are decidedly contradicted by the highly-respected former State Elections Director Christopher Thomas who spent hours and hours at the TCF Center November 3rd and 4th explaining processes to challengers and resolving disputes.  Mr. Thomas' account of the November 3rd and 4th events at the TCF Center is consistent with the affidavits of challengers David Jaffe, Donna MacKenzie and Jeffrey Zimmerman, as well as former Detroit City Election Official, now contractor, Daniel Baxter and City of Detroit Corporation Counsel Lawrence Garcia.

Perhaps if Plaintiffs' election challenger affiants had attended the October 29, 2020 walk-through of the TCF Center ballot counting location, questions and concerns could have been answered in advance of Election Day.  Regrettably, they did not and, therefore, Plaintiffs' affiants did not have a full understanding of the TCF absent ballot tabulation process.  No formal challenges were filed.  However, sinister, fraudulent motives were ascribed to the process and the City of Detroit.  Plaintiffs' interpretation of events is incorrect and not credible.

Plaintiffs are unable to meet their burden for the relief sought and for the above mentioned reasons, the Plaintiffs' petition for injunctive relief is DENIED.  The Court further finds that no basis exists for the protective order for the reasons identified above.  Therefore, that motion is DENIED.  Finally, the Court finds that MCL 168.31a governs the audit process.  The motion for an independent audit is DENIED.

It is so ordered.

This is not a final order and does not close the case.


November 13, 2020

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

# Exhibit 15

# Court of Appeals, State of Michigan

## ORDER

Cheryl A Costantino v City of Detroit

Docket No.    355443

LC No.        20-014780-AW

Michael J. Riordan
  Presiding Judge

Cynthia Diane Stephens

Anica Letica
  Judges

The motion for immediate consideration is GRANTED.

The motion for peremptory reversal pursuant to MCR 7.211(C)(4) is DENIED for failure to persuade the Court of the existence of manifest error requiring reversal and warranting peremptory relief without argument or formal submission.

The application for leave to appeal is DENIED.

Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

November 16, 2020
Date

Chief Clerk

# Exhibit 16

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

November 23, 2020

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

162245 & (27)(38)(39)

CHERYL A. COSTANTINO and EDWARD P.
McCALL, JR.,
             Plaintiffs-Appellants,

v

CITY OF DETROIT, DETROIT ELECTION
COMMISSION, DETROIT CITY CLERK,
WAYNE COUNTY CLERK, and WAYNE
COUNTY BOARD OF CANVASSERS,
             Defendants-Appellees,

and

MICHIGAN DEMOCRATIC PARTY,
             Intervening Defendant-Appellee.

SC: 162245
COA: 355443
Wayne CC: 20-014780-AW

_____/

On order of the Court, the motions for immediate consideration and the motion to file supplemental response are GRANTED. The application for leave to appeal the November 16, 2020 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

ZAHRA, J. (*concurring*).

Plaintiffs ask this Court to "enjoin the Wayne County Canvassers certification of the November 2020 election prior to their meeting [on] November 17, 2020 at 3:00 p.m." on the basis that "the audit [requested by plaintiffs pursuant to Const 1963, art 2, § 4(1)(h)] needs to occur prior to the election results being certified by the Wayne County Board of Canvassers." Plaintiffs contend that if "the results of the November 2020 election [are] certified . . . Plaintiffs will lose their right to audit its results, thereby losing the rights guaranteed under the Michigan Constitution." However, plaintiffs cite no support, and I have found none, for their proposition that an audit under Const 1963, art

2, § 4(1)(h)—which provides "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections"—must *precede* the certification of election results. Indeed, the plain language of Const 1963, art 2, § 4(1)(h) does *not* require an audit to precede the certification of election results. To the contrary, certified results would seem to be a *prerequisite* for such an audit. For how can there be "[t]he right to have the results of statewide elections audited" absent any results, and, further, what would be properly and meaningfully audited other than final, and presumably certified, results? See also *Hanlin v Saugatuck Twp*, 299 Mich App 233, 240-241 (2013) (allowing for a quo warranto action to be brought by a citizen within 30 days of an election in which it appears that a material fraud or error has been committed), citing *Barrow v Detroit Mayor*, 290 Mich App 530 (2010); MCL 168.31a (which sets forth election-audit requirements and does not require an audit to take place before election results are certified); MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.").

Even so, while plaintiffs are not precluded from seeking a future "results audit" under Const 1963, art 2, § 4(1)(h), the certification of the election results in Wayne County has rendered the instant case moot to the extent that plaintiffs ask this Court to enjoin that certification; there is no longer anything to enjoin. While it is noteworthy that two members of the board later sought to rescind their votes for certification, see LeBlanc, *GOP Canvassers Try to Rescind Votes to Certify Wayne County Election*, Detroit News (November 19, 2020) <https://www.detroitnews.com/story/news/local/michigan/2020/11/19/gop-canvassers-attempt-rescind-votes-certify-wayne-county-vote/3775246001/> (accessed November 23, 2020) [https://perma.cc/2SS2-Y29V], plaintiffs have nonetheless provided no support, and I have found none, for their proposition that this effects a "decertification" of the county's election results, so it seems they presently remain certified. Cf. *Makowski v Governor*, 495 Mich 465, 487 (2014) (holding that the Governor has the power to grant a commutation, but does not have the power to revoke a commutation). Thus, I am inclined to conclude that the certification of the election by the Wayne County board has rendered the instant case moot—but only as to plaintiffs' request for injunctive relief.

Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the "very concerning" "allegations and issues raised by Plaintiffs," she "believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election." Plaintiffs' affidavits present evidence to substantiate their allegations, which include claims of ballots being counted from voters whose names are not contained in the appropriate poll books, instructions being given to

disobey election laws and regulations, the questionable appearance of unsecured batches of absentee ballots after the deadline for receiving ballots, discriminatory conduct during the counting and observation process, and other violations of the law. Plaintiffs, in my judgment, have raised important constitutional issues regarding the precise scope of Const 1963, art 2, § 4(1)(h)—a provision of striking breadth added to our Michigan Constitution just two years ago through the exercise of direct democracy and the constitutional initiative process—and its interplay with MCL 168.31a and other election laws. Moreover, the current Secretary of State has indicated that her agency will conduct a postelection performance audit in Wayne County. See Egan, *Secretary of State: Post-Election "Performance Audit" Planned in Wayne County*, Detroit Free Press (November 19, 2020) <https://www.freep.com/story/news/politics/elections/2020/11/19/benson-post-election-performance-audit-wayne/3779269001/> (accessed November 23, 2020) [https://perma.cc/WS95-XBPG]. This development would seem to impose at least some obligation upon plaintiffs both to explain why a constitutional audit is still required after the Secretary of State conducts the promised process audit and to address whether there is some obligation on their part to identify a specific "law" in support of Const 1963, art 2, § 4(1)(h) that prescribes the specific "manner" in which an audit pursuant to that provision must proceed.

In sum, at this juncture, plaintiffs have not asserted a persuasive argument that their case is not moot and that the entry of immediate injunctive relief is proper. That is all that is now before this Court. Accordingly, I concur in the denial of injunctive relief. In addition to denying the relief currently sought in this Court, I would order the most expedited consideration possible of the remaining issues. With whatever benefit such additional time allows, the trial court should meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants, as well as resolve necessary legal issues, including those identified in the separate statement of Justice VIVIANO. I would also have this Court retain jurisdiction of this case under both its appellate authority and its superintending authority under Const 1963, art 6, § 4 (stating that, with certain limitations, "the supreme court shall have general superintending control over all courts"). Federal law imposes tight time restrictions on Michigan's certification of our electors. Plaintiffs should not have to file appeals following our standard processes and procedures to obtain a final answer from this Court on such weighty issues.

Finally, I am cognizant that many Americans believe that plaintiffs' claims of electoral fraud and misconduct are frivolous and obstructive, but I am equally cognizant that many Americans are of the view that the 2020 election was not fully free and fair. See, e.g., Monmouth University Polling Institute, *More Americans Happy About Trump Loss Than Biden Win* (November 18, 2020) <https://www.monmouth.edu/polling-institute/reports/monmouthpoll_us_111820/> (accessed November 23, 2020) [https://perma.cc/7DUN-CMZM] (finding that 32% of Americans "believe [Joe Biden] only won [the election] due to voter fraud"). The latter is a view that strikes at the core of

concerns about this election's lack of both "accuracy" and "integrity"—values that Const 1963, art 2, § 4(1)(h) appears designed to secure.

In sum, as explained above, I would order the trial court to expedite its consideration of the remaining issues, and I would retain jurisdiction in order to expedite this Court's final review of the trial court's decision.  But, again, because plaintiffs have not asserted a persuasive argument that immediate injunctive relief is an appropriate remedy, I concur in the denial of leave to appeal and, by extension, the denial of that relief.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

Plaintiffs Cheryl Costantino and Edward McCall seek, among other things, an audit of the recent election results in Wayne County.  Presently before this Court is their application for leave to appeal the trial court's ruling that plaintiffs are not likely to succeed and therefore are not entitled to a preliminary injunction to stop the certification of votes by defendant Wayne County Board of Canvassers.  See MCL 168.824; MCL 168.825.  The Court of Appeals denied leave, and this Court has now followed suit.  For the reasons below, I would grant leave to answer the critical constitutional questions of first impression that plaintiffs have squarely presented concerning the nature of their right to an audit of the election results under Const 1963, art 2, § 4(1)(h).

The constitutional provision at issue in this case, which the people of Michigan voted to add in 2018 through Proposal 3, guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."  *Id.*  The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so and that the Legislature cannot impose additional obligations on the exercise of this right.  *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971).

The trial court failed to provide a meaningful interpretation of this constitutional language.  Instead, it pointed to MCL 168.31a, which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4.  But the trial court never considered whether MCL 168.31a accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right.

In passing over this constitutional text, the trial court left unanswered many questions pertinent to assessing the likelihood that plaintiffs would succeed on the

merits.[1]  As an initial matter, the trial court did not ask what showing, if any, plaintiffs must make to obtain an audit.  It appears that no such showing is required, as neither the constitutional text nor MCL 168.31a expressly provide for it.  None of the neighboring rights listed in Article 2, § 4, such as the right to vote by absentee ballot, requires citizens to present any proof of entitlement for the right to be exercised.  Yet, the trial court here ignored this threshold legal question and instead scrutinized the parties' bare affidavits, concluding that plaintiffs' allegations of fraud were not credible.[2]  The trial court's factual findings have no significance unless, to obtain an audit, plaintiffs were required to prove their allegations of fraud to some degree of certainty.

Wrapped up in this question is the meaning and design of Const 1963, art 2, § 4. Is it a mechanism to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled?  To ascertain the type of audit the Constitution envisions, it is necessary to consider whether the term "audit" has a special meaning in the context of election administration.  In this regard, we should examine the various auditing practices in use around the time Proposal 3 was passed.  See Presidential Commission on Election Administration, *The American Voting Experience: Report and Recommendations* (January 2014), p 66 ("Different types of audits perform different functions.").  Some audits occur regardless of how close the election was.  They simply review the election process to verify that procedures were complied with, rules were followed, and technology performed as expected.  See *id.*; see also League of Women Voters, *Report on Election Auditing* (January 2009), p 3 ("Post-election audits routinely check voting system performance in contests, regardless of how close margins of victory appear.").  For these process-based audits, it would not appear critical whether they occur before the election results are finally certified, as the audit is intended to gather information that could be used to perfect voting systems going forward.

---

[1] The court also suggested that plaintiffs could seek a recount.  But, with few exceptions, the relevant recount provisions can be invoked only by candidates for office, which plaintiffs here were not.  Compare MCL 168.862 and MCL 168.879 (allowing candidates to request recounts) with MCL 168.880 (allowing any elector, in certain circumstances, to seek a recount of "votes cast upon the question of a proposed amendment to the constitution or any other question or proposition").

[2] The court's credibility determinations were made without the benefit of an evidentiary hearing.  Ordinarily, an evidentiary hearing is required where the conflicting affidavits create factual questions that are material to the trial court's decision on a motion for a preliminary injunction under MCR 3.310.  See 4 Longhofer, Michigan Court Rules Practice, Text (7th ed, 2020 update), § 3310.6, pp 518-519.  See also *Fancy v Egrin*, 177 Mich App 714, 723 (1989) (an evidentiary hearing is mandatory "where the circumstances of the individual case so require").

Other audits, by contrast, aim to ensure accuracy in a specific election and enable alteration of results if necessary.  The American Law Institute's recent *Principles of the Law, Election Administration*, drafted around the time Proposal 3 was passed, suggests that audits should be used in this manner:

> [I]f an audit exposes a problem, the number of randomly sampled ballots can be increased in order to ascertain whether or not the problem is one that threatens the accuracy of the determination of which candidate is the election's winner.  In an extreme case, when problems exposed by an audit were severe, the audit would need to turn into a full recount of all ballots in the election in order to provide the requisite confidence in the accuracy of the result (or, as necessary, to alter the result based on the findings of the audit-turned-recount).  In those circumstances when the audit exposes no such problem, election officials ordinarily would be able to complete the audit prior to the deadline for certifying the results of the election; when, however, the audit reveals the necessity of a full recount, then a state— depending on how it chooses to structure the relationship between certification and a recount—either could delay certification until completion of the recount or issue a preliminary certification that is subject to revision upon completion of the recount.  [ALI, Principles of the Law, Election Administration (2019), § 209, comment *c*.]

These audits, such as a risk-limiting audit, "are designed to be implemented before the certification of the results, and to inform election officials whether they should be confident in the results—or if they should bump the audit up to a full recount."  Pettigrew & Stewart, *Protecting the Perilous Path of Election Returns from the Precinct to the News*, 16 Ohio St Tech L J 587, 636 (2020) ("[Risk-limiting audits] conducted as part of the certification process currently provide the best mechanism through which the manipulation of election returns at the precinct level can be detected and, most importantly, remedied.").  A review of election laws conducted in early 2018 similarly recommended that audits be undertaken "after preliminary outcomes are announced, but before official certification of election results" because this allows for "correction of preliminary results if preliminary election outcomes are found to be incorrect."  Root et al, Center for American Progress, *Election Security in All 50 States: Defending America's Elections* (Feb 12, 2018), available at <https://www.americanprogress.org/issues/democracy/reports/2018/02/12/446336/ election-security-50-states/>.

Whether the constitutional right to an audit may be utilized to uncover evidence of fraud to challenge the results of an election will also need to be addressed.  In particular, how does the constitutional audit operate within our statutory framework and procedures for canvassing election returns, certifying the results, and disputing ballots on the basis of fraud?  We have long indicated that canvassing boards' role is ministerial and does not

involve investigating fraud.  See *McLeod v State Bd of Canvassers*, 304 Mich 120 (1942); see also *People ex rel Williams v Cicott*, 16 Mich 283, 311 (1868)[3] (opinion of Christiancy, J.) (noting that the boards, "acting thus ministerially," are "often compelled to admit votes which they know to be illegal"); see generally Paine, *Treatise on the Law of Elections to Public Offices* (1888), § 603, p 509 ("The duties of county, district, and state canvassers are generally ministerial. . . .  Unless authorized by statute, they cannot go behind those returns. . . .  Questions of illegal voting and fraudulent practices are to be passed upon by another tribunal.").  The Board of State Canvassers has more of a role in investigating fraud in recounts, although we have held that it cannot exclude votes on this basis.  See MCL 168.872 (providing that if the board conducting a recount suspects fraud occurred during the election, it can make an investigation that produces a report that is submitted to the prosecuting attorney or to the circuit judges of the county); *May v Wayne Co Bd of Canvassers*, 94 Mich 505, 512 (1893) (holding that the board could not exclude votes during a recount based on fraud).  These holdings may suggest that evidence of fraud uncovered in an audit is not a barrier to certification and instead may only be used to challenge an election in quo warranto and other related proceedings.  See *The People ex rel Attorney General v Van Cleve*, 1 Mich 362, 364-366 (1850) (holding in a quo warranto proceeding that the certification "is but *prima facie* evidence" of the election results and that a party can "go behind all these proceedings[; that the party] may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office").

Consequently, it is imperative to determine the nature and scope of the audit provided for in Article 2, § 4, so we can determine when the audit occurs and whether it will affect the election outcome.  These questions are important constitutional issues of first impression that go to the heart of our democracy and the power of our citizens to amend the Constitution to ensure the accuracy and integrity of elections.  They deserve serious treatment.  I would grant leave to appeal and hear this case on an expedited basis to resolve these questions.[4]  For these reasons, I dissent.

---

[3] Overruled in part on other grounds by *Petrie v Curtis*, 387 Mich 436 (1972).

[4] In doing so, I would consider the parties' arguments regarding whether the matter is moot.



b1117t

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 23, 2020



Clerk

# Exhibit 17

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,                          Case No. 20-014780-AW

      Plaintiffs,                          Hon. Timothy M. Kenny

vs.

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

      Defendants.

| | |
|---|---|
| GREAT LAKES JUSTICE CENTER | FINK BRESSACK |
| David A. Kallman (P34200) | David H. Fink (P28235) |
| Erin E. Mersino (P70886) | Darryl Bressack(P67820) |
| Jack C. Jordan (P46551) | 38500 Woodward Ave., Suite 350 |
| Stephen P. Kallman (P75622) | Bloomfield Hills, MI 48304 |
| 5600 W. Mount Hope Hwy. | (248) 971-2500 |
| Lansing, MI 48917 | dfink@finkbressack.com |
| (517) 322-3207 | dbressack@finkbressack.com |
| *Attorneys for Plaintiffs* | *Attorneys for City of Detroit, City of Detroit* |
| | *Election Commission and Janice Winfrey* |
| | |
| | CITY OF DETROIT LAW DEPARTMENT |
| | Lawrence T. García (P54890) |
| | Charles N. Raimi (P29746) |
| | James D. Noseda (P52563) |
| | 2 Woodward Ave., 5th Floor |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | garcial@detroitmi.goc |
| | raimic@detroitmi.gov |
| | nosej@detroitmi.gov |
| | *Attorneys for City of Detroit, City of Detroit* |
| | *Election Commission and Janice Winfrey* |

**AFFIDAVIT OF CHRISTOPHER THOMAS**

1

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1.      I am a Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election.

2.      I served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. In June 1981 I was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs.

3.      In 2013, I was appointed to President Barack Obama's Commission on Election Administration and served until a final report was submitted to the President and Vice-President in January 2014.

4.      I am a founding member of the National Association of State Election Directors and severed as its president in 1997 and 2013.

5.      On November 2, 3 and 4, 2020, I worked at the TCF Center absent voter counting boards primarily as liaison with challenger parties and organizations. I provided answers to questions about processes at the counting board tables, resolved disputed about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers.  I have reviewed the complaint and affidavits in this case.

6.      It is clear from the affidavits attached to the Complaint that these challengers do not understand absent voter ballot processing and tabulating. It is clear also that they did not operate through the leadership of their challenger party, because the issues they bring forward were by and large discussed and resolved with the leadership of their challenger party. The leadership on numerous occasions would ask me to accompany them to a particular counting board table to resolve an issue. I would always discuss the issue with counting board inspectors and their supervisors and the challengers. The affiants appear to have failed to follow this protocol established in a meeting with challenger organizations and parties on Thursday, October 29, 2020 at the TCF Center where a walk-through of the entire process was provided. A few basics are in order: The Qualified Voter File (QVF) is a statewide vote registration file and was not available to counting boards. E-pollbook (EPB) is a computer program used in election day precincts to create the poll list of voters casting ballots. Supplemental poll lists contain names of voters who cast an absent voter ballot on Sunday, Monday and Tuesday.   At the processing tables no ballots are scanned. A poll list is not used to confirm whether any specific voter's ballot is counted.

7.      To increase the accuracy of the poll list, the Detroit Department of Elections employed the Secretary of State e-pollbook (EPB) to assist in creating the poll list. For each of the counting boards, the EPB held all the names of voters who requested and returned an absent voter ballot by mid-afternoon Sunday, November 1. The download on Sunday was necessary to prepare for the pre-processing granted by a recently enacted law that allows larger municipalities to process ballots, but not to tabulate them, for 10 hours on Monday. (To clarify some apparent confusion by Plaintiffs, Wayne County does not tabulate City of Detroit absent voter ballots.)

8.      Absent voter ballots received Sunday after the download to EPB, all day Monday until 4 p.m. and Tuesday by 8 p.m. were not in the EPB. They would be added either by manually

3

entering the voter names into the EPB or on supplemental paper poll lists printed from the Qualified Voter File (QVF).

9.      Zachery Larsen is raising an issue about return ballot envelopes where the barcode on the label would not scan and the voter's name was not on the supplemental list. He was observing the correction of clerical errors, not some type of fraud. In every election, clerical errors result in voters being left off the poll list, whether it is a paper poll list or the EPB. These errors are corrected so that voters are not disenfranchised. Michigan law ensures that voters are not disenfranchised by clerical errors.

10.     On Wednesday, November 4 it was discovered that the envelopes for some ballots that had been received prior to November 3 at 8 p.m., had not been received in the QVF. They would not scan into the EPB and were not on the supplemental paper list. Upon reviewing the voters' files in the QVF, Department of Elections staff found that the final step of processing receipt of the ballots was not taken by the satellite office employees. The last step necessary to receive a ballot envelope requires the satellite employee to enter the date stamped on the envelope and select the "save" button. They failed to select "save".

11.     A team of workers was directed to correct those clerical errors by entering the date the ballots were received in the satellite office and selecting "save". This action then placed the voter into the Absent Voter Poll List in the QVF so that the ballot could be processed and counted. None of these ballots were received after 8 p.m. on election day. Most were received on Monday, November 2nd – the busiest day for the satellite offices.

12.     The return ballot envelopes for each of these voters are marked with the date received and initialed by satellite employees who verified the voter signatures. By entering the date on which the ballot was received, no QVF data was altered. The date field was empty because

the satellite workers did not select 'save', thus failing to complete the transaction. The "backdating" allegation is that on November 4 the staff entered the correct dates the ballots were received – all dates were November 3 or earlier.  The date of receipt was not backdated.

13.     These return ballot envelopes were discussed with several Republican challengers. Two challengers were provided a demonstration of the QVF process to show them how the error occurred, and they chose not to file a challenge to the individual ballots.

14.     The inspectors at the counting boards were able to manually enter voters into the EPB. The return ballot envelope could easily be observed and every key stroke of the EPB laptop operator was clearly visible on the large screen at one corner of the table. The Department of Elections, at some expense, provided large monitors (see attached photo) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot distancing barrier. Instead of creating problems for challengers, the monitors made observing the process very transparent.

15.     The EPB has an "Unlisted Tab" that allows inspectors to add the names of voters not listed. The EPB is designed primarily for use in election day polling places and reserves the Unlisted Tab to enter voters casting provisional ballots. In polling places, voters are verified by providing their date of birth. Consequently, the EPB is designed with a birthdate field that must be completed to move to the next step. When using this software in an absent voter counting board, a birthdate is not necessary to verify voters, as these voters are verified by signature comparisons (a process which was completed before the ballots were delivered to the TCF Center). Inspectors at the TCF Center did not have access to voters' birthdates. Therefore, due to the fact that the software (but not the law or the Secretary of State) requires the field be completed to move to the next step, 1/1/1900 was used as a placeholder. This is standard operating procedure and a standard date used

by the State Bureau of Elections and election officials across the state to flag records requiring attention. The date of 1/1/1900 is recommended by the Michigan Secretary of State for instances in which a placeholder date is needed.

16.     When Republican challengers questioned the use of the 1/1/1900 date on several occasions, I explained the process to them. The challengers understood the explanation and, realizing that what they observed was actually a best practice, chose not to raise any challenges.

17.     Ballots are delivered to the TCF Center after they are processed at the Department of Elections main office on West Grand Boulevard. On election day, ballots are received from the post office and the satellite offices. It takes several hours to properly process ballots received on election day. It appears that some of the affidavits submitted by Plaintiffs are repeating false hearsay about ballots being delivered, when actually television reporters were bringing in wagons of audio-video equipment. All ballots were delivered the same way— from the back of the TCF Hall E.

18.     Early in the morning on Wednesday, November 4, approximately 16,000 ballots were delivered in a white van used by the city. There were 45 covered trays containing approximately 350 ballots each. The ballots were not visible as the trays had a sleeve that covered the ballots.

19.     The ballots delivered to the TCF Center had been verified by the City Clerk's staff prior to delivery in a process prescribed by Michigan law. Thus, when Jessy Jacob complains that she "was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" it was because that part of the process had already been completed by the City Clerk's Office in compliance with the statutory scheme.

20.     It would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center. No voter not in the QVF or in the "Supplemental Sheets" could have been processed, or "assigned" to a "random name" because no ballot from a voter not in one of the two tracking systems, was brought to the TCF Center.

21.     Mr. Larsen complains he was not given a full opportunity to stand immediately behind or next to an election inspector. As stated, monitors were set up for this purpose. Moreover, election inspection were instructed to follow the same procedure for all challengers. The Detroit Health Code and safety during a pandemic required maintaining at least 6-feet of separation. This was relaxed where necessary for a challenger to lean in to observe something and then lean back out to return to the 6-foot distancing. The inspectors could see and copy the names of each person being entered into the e-pollbook. If an inspector did not fully accommodate a challenger's reasonable request and the issue was brought to the attention of a supervisor, it was remedied. Announcements were made over the public address  system to inform all inspectors of the rules. If what Mr. Larsen says is accurate, any inconvenience to him was temporary, had no effect on the processing of ballots, and certainly was not a common experience for challengers.

22.     Jessy Jacob alleges she was instructed by her supervisor to adjust the mailing date of absentee ballot packages being sent out to voters in September 2020.  The mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes.

23.     Michigan Election Law requires clerks to safely maintain absent voter ballots and deliver them to the absent voter counting board. There is no requirement that such ballots be transported in sealed ballot boxes. To my knowledge, they are not sealed by any jurisdiction in Michigan in a ballot box prior to election day. Employees bring the ballot envelopes to the TCF Center, which is consistent with chain of custody. The only ballots brought to TCF that are not in envelopes are blank ballots used to duplicate ballots when necessary.

24.     At no time after ballots were delivered to TCF on Sunday, November 1, did any ballot delivery consisted of "tens of thousands of ballots".

25.     Reference is made to a "second round of new ballots" around 9:00 p.m. on Wednesday, November 4. At or about 9:00 p.m. on November 4, 2020 the Department of Elections delivered additional blank ballots that would be necessary to complete the duplication of military and overseas ballots. No new voted ballots were received. The affidavits are likely referring to blank ballots that were being delivered in order to process AV and military ballots in compliance with the law.

26.     In the reference to a "second round of new ballots" there are numerous misstatements indicative of these challengers' lack of knowledge and their misunderstanding of how an absent voter counting board operates. These statements include "confirm that the name on the ballot matched the name on the electronic poll list" – there are no names on ballots.

27.     No absentee ballots received after the deadline of 8:00 p.m. on November 3, 2020, were received by or processed at the TCF Center. Only ballots received by the deadline were processed.

28.     Plaintiffs reference "Supplement Sheets with the names of all persons who have registered to vote on either November 2, 2020 or November 3, 2020." Some of the names are

voters who registered to vote on those days, but the vast majority are voters who applied for and voted an absent voter ballot.

29.     Plaintiffs use "QVF" in place of "EPB". The QVF is a statewide voter registration file; an EPB for a counting board is a file of the voters who applied for and returned an absent voter ballot for that counting board.

30.     There is no "election rule" requiring all absent voter ballots be recorded in the QVF by 9:00 p.m. on November 3, 2020.

31.     Plaintiffs also misunderstand the process when they state ballots were "filled out by hand and duplicated on site." Instead, ballots were duplicated according to Michigan law. Michigan election law does not call for partisan challengers to be present when a ballot is duplicated; instead, when a ballot is duplicated as a result of a "false read," the duplication is overseen by one Republican and one Democratic inspector coordinating together. That process was followed.

32.     Regarding access to TCF Hall E by challengers, there is also much misinformation contained in the statements of challengers. Under the procedure issued by the Secretary of State there may only be 1 challenger for each qualified challenger organization at a counting board. Detroit maintains 134 counting board, thus permitting a like number of challengers per organization.

33.     In mid-afternoon on Wednesday, I observed that few challengers were stationed at the counting board tables. Rather, clusters of 5, 10 or 15 challengers were gathered in the main aisles at some tables. I conducted a conversation with leaders of the Republican Party and Democratic Party about the number of challengers in the room and their locations. It became clear that more than 134 challengers were present for these organizations. No one was ejected for this

reason, but access to Hall E was controlled to ensure that challenger organizations had their full complement and did not exceed the ceiling any further than they already had.

34. Challengers were instructed to sign out if they needed to leave Hall E. For a short period of time—a few hours—because there were too many challengers in Hall E for inspectors to safely do their jobs, new challengers were not allowed in until a challenger from their respective organization left the Hall. However, as stated above, each challenger organization, including Republican and Democrat, continued to have their complement of challengers inside of the Hall E.

35. As stated previously, challengers are expected to be at their stations next to a counting board. Unfortunately, this was not the behavior being displayed. Instead, challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." I believed this to be inappropriate threatening of workers trying to do their jobs. Such action is specifically prohibited in Michigan election law. Nevertheless, challengers were permitted to remain.

36. The laptop computers at the counting boards were not connected to the Internet. Some of the computers were used to process absent voter ballot applications in mid-October and were connected to the QVF. On election day and the day after election day, those computers were not connected and no inspector at the tables had QVF credentials that would enable them to access the QVF.

37. The Qualified Voter File has a high level of security and limitation on access to the file. For example, it is not true that a person with QVF credentials in one city is able to access data in another city's file within the QVF. That is not possible.

38.    A point of much confusion in these claims is centered on the law that permits a city clerk to verify the signatures on absent voter ballots before election day. Inspectors at absent voter counting boards do not verify the signatures on the return ballot envelopes. Department of Elections staff may use a voter's signature on an application to verify the voter's signature on return ballot envelope. Or the staff may use the voter's signature in the QVF to make the comparison. Often using the QVF is more efficient than the application signatures.

39.    I am not aware of any valid challenge being refused or ignored or of any challengers being removed because they were challenging ballots. Ballot challengers are an important part of the democratic process and were fully able to participate in the process at the TCF Center.

40.    In conclusion, upon reviewing Plaintiffs' Complaint, Affidavits, and Motion, I can conclude based upon my own knowledge and observation that Plaintiffs' claims are misplaced and that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.


Date:   November 11, 2020                        CHRISTOPHER THOMAS


Subscribed and sworn to before me
this 11th day of NOVEMBER, 2020.

Notary Public) NANCY M. BLACK
County of: VAN BUREN, STATE OF MICHIGAN
My Commission Expires: 09-05-2025
ACTING IN BERRIEN COUNTY, MICHIGAN

11

# Exhibit 18

# STATE OF MICHIGAN

# COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT, INC.
and ERIC OSTEGREN,

               Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

               Defendants.

_____/

**OPINION AND ORDER**

Case No.  20-000225-MZ

Hon. Cynthia Diane Stephens

Pending before the Court are two motions.  The first is plaintiffs' November 4, 2020 emergency motion for declaratory relief under MCR 2.605(D).  For the reasons stated on the record and incorporated herein, the motion is DENIED.  Also pending before the Court is the motion to intervene as a plaintiff filed by the Democratic National Committee.  Because the relief requested by plaintiffs in this case will not issue, the Court DENIES as moot the motion to intervene.

According to the allegations in plaintiffs' complaint, plaintiff Eric Ostegren is a credentialed election challenger under MCL 168.730.  Paragraph 2 of the complaint alleges that plaintiff Ostegren was "excluded from the counting board during the absent voter ballot review process."  The complaint does not specify when, where, or by whom plaintiff was excluded.  Nor does the complaint provide any details about why the alleged exclusion occurred.

The complaint contains allegations concerning absent voter ballot drop-boxes.  Plaintiffs allege that state law requires that ballot containers must be monitored by video surveillance. Plaintiff contends that election challengers must be given an opportunity to observe video of ballot drop-boxes with referencing the provision(s) of the statute that purportedly grant such access, . See MCL 168.761d(4)(c).

Plaintiffs' emergency motion asks the Court to order all counting and processing of absentee ballots to cease until an "election inspector" from each political party is allowed to be present at every absent voter counting board, and asks that this court require the Secretary of State to order the immediate segregation of all ballots that are not being inspected and monitored as required by law.  Plaintiffs argue that the Secretary of State's failure to act has undermined the rights of all Michigan voters.  While the advocate at oral argument posited the prayer for relief as one to order "meaningful access" to the ballot tabulation process, plaintiffs have asked the Court to enter a preliminary injunction to enjoin the counting of ballots.  A party requesting this "extraordinary and drastic use of judicial power" must convince the Court of the necessity of the relief based on the following factors:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued.  [*Davis v Detroit Fin Review Team*, 296 Mich App 568, 613; 821 NW2d 896 (2012).]

As stated on the record at the November 5, 2020 hearing, plaintiffs are not entitled to the extraordinary form of emergency relief they have requested.

## I.    SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

### A. OSTEGREN CLAIM

Plaintiff Ostegren avers that he was removed from an absent voter counting board. It is true that the Secretary of State has general supervisory control over the conduct of elections. See MCL 168.21; MCL 168.31. However, the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk. See MCL 168.764d. The complaint does not allege that the Secretary of State was a party to or had knowledge of, the alleged exclusion of plaintiff Ostegren from the unnamed absent voter counting board. Moreover, the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements. Thus, allegations regarding the purported conduct of an unknown local election official do not lend themselves to the issuance of a remedy against the Secretary of State.

### B. CONNARN AFFIDAVIT

Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief. The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note. In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer." She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20." Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in

fraudulent activity in order to count invalid absent voter ballots that were received after election day.

This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

## C. BALLOT BOX VIDEOS

It should be noted at the outset that the statute providing for video surveillance of drop boxes only applies to those boxes that were installed after October 1, 2020. See MCL 168.761d(2). There is no evidence in the record whether there are any boxes subject to this requirement, how many there are, or where they are. The plaintiffs have not cited any statutory authority that requires any video to be subject to review by election challengers. They have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of such boxes. The clear language of the statute directs that "[t]he city or township clerk must use video monitoring of that drop box to ensure effective monitoring of that drop box." MCL 168.761d(4)(c) Additionally, plaintiffs have not directed the Court's attention to any authority directing the

-4-

Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated from other ballots, and rendering it impossible for the Court to grant the requested relief against this defendant. Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested. As a result, plaintiffs are unable to show a likelihood of success on the merits.

## II.    MOOTNESS

Moreover, even if the requested relief could issue against the Secretary of State, the Court notes that the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day. By the time this action was filed, the votes had largely been counted, and the counting is now complete. Accordingly, and even assuming the requested relief were available against the Secretary of State—and overlooking the problems with the factual and evidentiary record noted above—the matter is now moot, as it is impossible to issue the requested relief. See *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018)

IT IS HEREBY ORDERED that plaintiff's November 4, 2020 emergency motion for declaratory judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that proposed intervenor's motion to intervene is DENIED as MOOT.

This is not a final order and it does not resolve the last pending claim or close the case.

November 6, 2020

Cynthia Diane Stephens
Judge, Court of Claims

# Exhibit 19

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD
P. MCCALL, JR.,

       Plaintiffs,

    v.                          Case No. 20-014780-AW

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE M. WINFREY, in
her official capacity as the CLERK OF THE
CITY OF DETROIT and the Chairperson of
the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official
capacity as the CLERK OF WAYNE
COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

       Defendants,

    v.

MICHIGAN DEMOCRATIC PARTY,

       [Proposed] Intervenor Defendant.
_____/

### AFFIDAVIT OF DONNA M. MACKENZIE

    I, Donna M. MacKenzie, having been duly sworn according to law, do hereby depose and state as follows.

    1.     I am at least 18 years of age and have personal knowledge of the below facts, which are true and accurate to the best of my knowledge and belief.

    2.     I am a U.S. citizen and a resident of and registered voter in Michigan. I am an attorney licensed in Michigan and currently practice with the law firm of Olsman MacKenzie Peacock & Wallace.

1

3.      On Wednesday, November 4, 2020, I served as a credentialed challenger for the Michigan Democratic Party at TCF Center in Detroit, Michigan, where Detroit's absent voter ballots were counted. I was present at TCF Center from approximately 9:00am until 2:30pm.

4.      The ballot counting process was very transparent. Each ballot counting table had six election workers, each of whom had a specific task that would be performed for each ballot. For example, one worker would open the envelope, another would remove the ballot from the secrecy sleeve, and so on. Each table also had a computer monitor, which was angled in the corner of the table so that all observers could see it.

5.      When issues were raised by challengers, they were immediately brought to the attention of supervisors, who calmly and politely addressed the issues and allowed the challengers and observers to view the ballots. Although some challengers had to be admonished not to touch the ballots, they were given the opportunity to look at ballots whenever issues arose.

6.      My impression was that, throughout the approximately five-and-a-half hours I served at TCF Center, there were many more Republican Party challengers than Democratic Party challengers. There were certainly more Republican challengers when I left around 2:30pm.

7.      Challengers were allowed to move freely about the facility and observe ballot counting. Although social distancing requirements were sometimes observed, all of the counting occurred in full view of the challengers. There were more than enough challengers to have observers at each table, and I recall that at one point, approximately 10 Republican challengers were gathered around a table where no ballots were actively being processed because all of the counting tables that were actively processing ballots were adequately staffed.

8.      In addition to viewing counting myself, I also spoke with other challengers, both Democrats and Republicans, about their experiences and what they saw in the facility.

9.      Any time a question was asked or an issue raised by a challenger, a crowd would gather and word would spread through the facility very quickly.

10.     I saw no evidence of election workers backdating absentee ballots or otherwise processing invalid absentee ballots, and I did not hear of anyone else witnessing or challenging such activities.

11.     I saw no evidence of election workers processing or counting ballots from voters who were not included in the Qualified Voter File or supplemental sheets or assigning ballots to random names in the system, and I did not hear of anyone else witnessing or challenging such activities.

12.     I saw no evidence of election workers using false information or incorrect birthdays to process absentee ballots, and I did not hear of anyone else witnessing or challenging such activities.

13.     I saw no evidence of election workers neglecting to verify the signatures on absentee ballots before processing them, and I did not hear of anyone else witnessing or challenging such activities.

14.     I saw no evidence of election workers removing ballots from their secrecy sleeves before deciding whether the ballots should be processed, and I did not hear of anyone else witnessing or challenging such activities.

15.     I saw no evidence of election officials processing or counting ballots received after the election deadline or falsely reporting that late ballots were received on time, and I did not hear of anyone else witnessing or challenging such activities.

16.     I saw no evidence of election officials refusing to record challenges or challengers being asked to leave after voicing challenges, and I did not hear of anyone else witnessing or

challenging such activities. I frequently saw Republican challengers who asked for ballot numbers and wrote those numbers down on their own personal notepad, but they did not voice any challenge to the ballots. At no point did I witness a ballot challenge going unrecorded or unaddressed by election workers.

17.     I saw no evidence of election officials locking challengers out of the facility so they could not observe the process, and I did not hear of anyone else witnessing such activities. While some challengers waited outside when the room was at capacity, at no point did I witness or hear of any counting that occurred without challengers present.

18.     I saw no evidence of election workers duplicating ballots without allowing challengers to check the accuracy of the duplication, and I did not hear of anyone else witnessing such activities. In fact, when I did witness a duplication, the election workers went out of their way to make sure the challengers could view the ballot. Although challengers were not permitted to touch the ballot, election officials offered to move the ballot around the table and flip it over so that everyone could get a clear look at it.

19.     I saw no evidence of unsecured or otherwise questionable ballots being delivered to TCF Center, and I did not hear of anyone else witnessing or challenging such activities.

20.     I decided to leave around 2:30pm because most of the counting had stopped. By that time, it seemed that fewer than half of the counting tables were still processing ballots.

21.     I observed frequent objectionable behavior on the part of Republican challengers. For example, I saw Republican challengers (identifiable because they were wearing wristbands or lanyards) approach tables for the sole purpose of attempting to slow down the process and intimidate election workers. By the time I left at 2:30pm, the atmosphere in the TCF Center had grown tense and the Republican challengers had become more aggressive.

22.     In short, what I witnessed in the TCF Center was an organized, methodical, and completely transparent process. The only issues I saw were problems caused by the Republican challengers, who frequently engaged in disruptive, intimidating, and aggressive behavior.

23.     Further, Affiant sayeth not.


_____        11/11/2020
                                                 _____
Donna M. MacKenzie                                      Date


Subscribed and sworn to (or affirmed) before me on this _11th__ day of November, 2020.


_____
                          Electronic Notary Public
Notary Public

NANCY M METALLO
Notary Public - State of Florida
Commission # HH 2726
Expires on May 21, 2024

Notarized online using audio-video communication


My commission expires on _____.
                          05/21/2024

# Exhibit 20

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD
P. MCCALL, JR.,

        Plaintiffs,

     v.                                  Case No. 20-014780-AW

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE M. WINFREY, in
her official capacity as the CLERK OF THE
CITY OF DETROIT and the Chairperson of
the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official
capacity as the CLERK OF WAYNE
COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

        Defendants,

    v.

MICHIGAN DEMOCRATIC PARTY,

        [Proposed] Intervenor Defendant.
_____/

**AFFIDAVIT OF DAVID JAFFE**

I, David Jaffe, having been duly sworn according to law, do hereby depose and state as follows.

1.      I am at least 18 years of age and have personal knowledge of the below facts, which are true and accurate to the best of my knowledge and belief.

2.      I am a United States citizen and a resident of and registered voter in Michigan, and I am an attorney licensed to practice in Michigan.  I served as a law clerk to Chief Judge James Browning of the U.S. Court of Appeals for the Ninth Circuit, and to (then) Justice William Rehnquist of the Supreme Court of the United States.  I currently have my own solo law practice,

1

and have in the past been a partner at Honigman Miller Schwartz and Cohn and the Vice President, General Counsel and Secretary of Guardian Industries Corp. (among other positions).

3.      On November 2, 3, and 4, 2020, I served as a credentialed challenger for the Michigan Democratic Party at the Detroit Absent Voter Counting Board (AVCB) at TCF Center in Detroit, Michigan, where the Detroit absent voter ballots were being counted.  In addition, I was the team leader for the Democratic Party challengers.  I have been an election challenger at many elections in Michigan, including at the AVCB at TCF Center for the August 2020 primary election.  I was present in the counting room at TCF Center on Monday, November 2 for the pre-processing of ballots and on November 3 and 4 for the continued processing and tabulation of the ballots.

4.      Michigan law provides that the Democratic Party and the Republican Party are each permitted to appoint challengers to serve in precincts and in AVCBs.

5.      In addition, the law provides that other organizations may apply for permission to have challengers in those locations. In addition to challengers from the two parties, I personally saw challengers with credentials from an organization identified as the Election Integrity Fund (EIF), as well as from the NAACP and the Lawyers Committee for Civil Rights.

6.      I was present on Monday, November 2 from approximately 9:00 am until approximately 8:00 pm, on Tuesday, November 3, from 6:00 a.m. until approximately 3:30 a.m. on Wednesday, November 4, and again on Wednesday, November 4 from approximately 9:30 a.m. until shortly after 6:00 a.m. on Thursday, November 5.

7.      During most of the time I was present on November 3 and during the day and early evening of November 4, there appeared to me to be at least 100 Republican Party

challengers inside the AVCB at TCF.  As the night of November 4 progressed, some challengers from each group left the room.

8.     During that time, there were also many challengers from EIF, and I saw the EIF and Republican Party challengers regularly conferring with each other.  It was evident to me that they were coordinating their efforts.

9.     This meant that the Republican Party effectively had many more challengers in the room than did the Democratic Party.

10.     It was my perception that all challengers had a full opportunity to observe what was going on and to raise issues with supervisors and election officials.

11.     The political parties and other authorized challenging organizations were invited to a walkthrough of the Detroit AVCB set up at TCF Center on Thursday, October 29, 2020, and were also given a detailed explanation of the procedure which would be followed and the opportunity to ask questions.  We all had access to the Michigan Election Law, the Secretary of State's Election Officials Manual, and other materials.  Nevertheless, it was my observation that many of the Republican and EIF challengers were not well trained and did not understand the process by which ballots were handled or tabulated in an AVCB.

12.     Over the course of the pre-processing and tabulation, Democratic challengers reported to me about their observations and, of course, I was observing the work being done. From time to time I, or other Democratic, Republican, and other challengers, observed minor procedural errors by election inspectors, called those errors to the attention of supervisors, and were satisfied that the supervisors had corrected the error and explained proper procedure to the election inspectors.  I spoke with several Republican challengers who expressed their view, and in a couple of cases their surprise, that there were no material issues in the counting.

13.     I received very few reports of unresolved issues from Democratic challengers, but did receive many reports of conduct by Republican or EIF challengers that was aggressive, abusive toward the elections inspectors (and in some cases toward Democratic challengers), and/or clearly designed to obstruct and delay the counting of votes.

14.     There was a person from the Election Integrity Fund, who was identified to me as Timothy Griffin, who appeared to be playing a supervisory role.  I observed that he initially came into the counting area in the early morning of November 3, evidently representing himself as a duly credentialed challenger.  I have been advised that Mr. Griffin is a resident of and a voter in Virginia.  After a short while, I observed Mr. Griffin in the area near the door that was provided for poll observers and the press.

15.     Under Michigan law, mobile phones and other electronic devices were not permitted in the counting room while polls were open – from 7:00 a.m. to 8:00 p.m. on November 3.  I left my mobile phone in my car when I arrived at TCF Center on November 3, and returned to my car to retrieve it after the polls closed at 8:00 p.m.

16.     Mr. Griffin remained in the observer area through the day and evening.  I personally saw Republican Party challengers and EIF challengers conferring with him frequently.  I (and other Democratic challengers) observed Mr. Griffin using a cell phone on November 3, and mentioned this observation to elections officials.  I saw elections officials talking with him, evidently directing him to stop using his phone, but I was advised that he continued to do so.   It was clear that elections officials had not confiscated his phone.  I observed and received reports of numerous Republican challengers using their phones in the counting room during the period when phones were not allowed.

17.     Because of COVID, there was an effort to maintain distance between the elections inspectors processing ballots at the tables.  In addition, challengers were directed to attempt to maintain a six-foot distance, while being permitted to move closer for particular observations.

18.     The elections officials at TCF Center advised us that all persons in the room were required to wear face masks.  Officials occasionally made public address announcements reminding all present of this requirement.  I observed that many of Republican and EIF challengers were scornful of the mask requirement and other attempts to protect the workers and the other persons at TCF Center.

19.     Several Republican challengers who refused to comply with the mandate to wear masks, and removed masks in close proximity to elections inspectors, were escorted from the counting room by Detroit police officers.  Others were engaged in conversations with elections officials, in which they evidently received warnings.

20.     Throughout my time at TCF Center, I observed that Republican and EIF challengers repeatedly refused to maintain the mandated distance from the elections inspectors, and instead hovered over them, often questioning them in a hostile and belligerent manner, treating them with shocking disrespect.  I observed that almost all of the Republican and EIF challengers were white, while most of the Detroit elections inspectors were Black, and found it startling and telling that this crowd of white challengers was behaving so aggressively toward the mostly Black workers.

21.     The challengers were directed to address questions and concerns to elections supervisors, who were clearly identified by their white shirts with Detroit Elections Department insignia, or to team leaders (who were above the supervisors), who were clearly identified by their black shirts with Detroit Elections Department insignia.  We were also permitted to interact

with the senior elections officials who were present, including Mr. Daniel Baxter, the Detroit Director of Elections.  We were instructed not to talk unnecessarily to the elections inspectors so as not to interfere with their work.

22.     Nevertheless, I repeatedly witnessed Republican and EIF challengers confronting and interrogating elections inspectors, asking their names and political affiliation, and demanding explanations of the counting procedures, election laws, and what they were doing.  I repeatedly witnessed elections supervisors and officials spend their time explaining to the Republican and EIF challengers the process and the roles of inspectors, supervisors, and challengers.

23.     One of the things that we asked the Democratic Party challengers to do was to try to protect the elections inspectors from abuse and interference, and to intercede and seek assistance from supervisors when the Republican and EIF challengers were materially interfering with the work of the inspectors or were particularly intimidating and offensive.

24.     I observed Republican or EIF challengers were removed from the room after intimidating and disorderly conduct, or filming in the counting room in violation of the rules.

25.     It appeared to me that while some of the Republican challengers were there in good faith, attempting to monitor the procedure, the greater number of Republican and EIF challengers were intentionally interfering with the work of the elections inspectors so as to delay the count of the ballots and to harass and intimidate election inspectors.

26.     Ballots which cannot be read by the tabulators, because, for example, they are torn or stained, must be duplicated.  In addition, all of the military and overseas ballots must be duplicated because they are submitted on forms that cannot be read by the tabulators.

27.     I repeatedly watched the duplication procedure, which was undertaken by three elections inspectors as follows: one would read off the votes from the original ballot, the second would record these votes on the duplicated ballot, and the third would watch to ensure accuracy. The original would be placed in an envelope identified for that purpose, and the duplicate would be sent to be tabulated.

28.     The inspectors endeavored to keep the process visible to challengers while maintain social distancing to the extent possible.  The elections officials required that there be an opportunity for one Republican and one Democratic challenger, and one challenger from another group (such as EIF) to observe directly, and that other challengers move back from the table.

29.     In my judgment this procedure allowed the challengers from each party, and often EIF, to confirm the accuracy of the duplication, and I did not receive complaints from Democratic challengers that they were unable to see.  Some Republican and EIF challengers expressed dissatisfaction with the positions at which they were asked to stand.  In the situations I observed, when a challenger politely stated that he or she could not see and asked for a different place, the challenger was accommodated.  In a number of cases the election inspectors paused after each duplication to show the original and the duplicate to the challengers (from any organization) so that they each had the opportunity to confirm the accuracy of the duplication.

30.     However, Republican and EIF challengers often tried to shove their way closer to watch the duplication process, both slowing it down and endangering the inspectors.  They often began a discussion of where they could stand by shouting aggressively at the inspectors and supervisors, rather than by asking for a better vantage point.  This approach served to harass and intimidate the election workers and to delay the process.

31.     At one point in the early afternoon of Wednesday, the elections officials evidently determined that there were too many challengers in the room.  They then directed that no additional challengers be admitted so that the numerical restriction could be honored.  There remained many Republican, EIF, Democratic, and other challengers in the room.  I wanted to bring in additional Democratic challengers, but accepted the determination of the elections officials.

32.     After this happened, people who seemed to be Republican and EIF challengers and their supporters began pounding on the doors and windows while chanting and shouting.

33.     I heard elections inspectors say that there were frightened by the shouting and pounding.  I felt that the conduct going on outside the room was that of a mob, and found it threatening, even though there were police officers present.

34.     Further, Affiant sayeth not.

David Jaffe

_____
David Jaffe

11/10/2020

_____
Date

State of Florida, County of Palm Beach

Subscribed and sworn to (or affirmed) before me on this _____10_____ day of November, 2020.

Lillianna Alcida Lee Garibaldi

_____
Notary Public

My commission expires on _____10/27/2023_____.

LILLIANNA ALCIDA LEE
GARIBALDI
Notary Public - State of Florida
Commission # GG926405
Expires on October 27, 2023

Electronic Notary Public
Notarized online using audio-video communication

8

# Exhibit 21

## <u>AFFIDAVIT OF JOSEPH ZIMMERMAN</u>

JOSEPH ZIMMERMAN, BEING OF FULL AGE, ON HIS OATH, DEPOSES AND SAYS:

1. I am over the age of 21 years and if sworn as a witness I am competent to testify about the matters set forth herein based on personal knowledge except where the matter is indicated to be based on information and belief.

2. I am currently a second-year law student at the University of Michigan.  Prior to law school, I served in the United States Air Force for four years. I was honorably discharged from the service with the rank of captain.  During my four years of service, I was stationed at FE Warren Air Force Base in Cheyenne, Wyoming where my duties included operating nuclear weapons.

3. I am a registered voter in Ann Arbor, Michigan.

4. I volunteered as a poll worker in Ann Arbor on November 3, counting ballots all night until approximately 5:30 a.m. in the morning on November 4.  On the morning of November 4, I learned via social media that there was a need for non-partisan challengers at the absentee voting counting board (AVCB) at TCF Center in Detroit because of tensions there overnight.  Upon learning of the need, I decided that it was my duty to keep working to ensure a free and fair election, so I headed out to TCF, arriving around 11:00 a.m.

5. I entered TCF as a non-partisan challenger credentialed by the Lawyers Committee for Civil Rights Under Law (LCCRUL), and registered as such when I entered the room.

6. I was present at the TCF Center between approximately 11:00 a.m. and 4:00 p.m. on November 4.  During my time there, I was regularly patrolling inside the AVCB counting room in an attempt to provide support to election inspectors and challengers whenever a tense situation arose.  Such situations arose often and, in my observations, were exclusively attributable to aggressive and intimidating actions by Republican challengers.  As someone who had been a poll worker in Ann Arbor the night before, I was familiar with the process of counting ballots.  I witnessed no improper actions by any election inspector.  The only improprieties I

saw were from Republican challengers. As a veteran, I was particularly shocked by the fact that Republic challengers attempted to stop the counting of military ballots (more on that below).

7.  From the moment I arrived, I observed aggressive and intimidating actions by Republican challengers. On several occasions, I saw five to ten such challengers crowd around a table at once, encroaching on the personal space of election workers (much less than six feet away) and harassing them with repetitive questions. I had been trained that our job as challengers was to observe and, if necessary, challenge particular ballots—not to speak directly to election workers, let alone interrogate or badger them, which is what I was observing.

8.  On several occasion, I received a text message from other non-partisan challengers asking me to come to wherever they were in the room because they were the only non-Republican challenger at a table at which several Republican challengers were acting menacingly.

9.  I witnessed one Republican challenger be removed from the room for filming the proceedings. I had been trained that filming inside the AVCB was prohibited conduct by a challenger.

10. The dynamic I witnessed was particularly striking when compared to my experience as an election inspector in Ann Arbor, where challengers stood a respectful distance away and allowed me to do my job. By contrast, at TCF, it was difficult not to notice the racial dynamic of aggressive, mostly white, challengers invading the personal space of election workers, who were mostly Black, and repeatedly questioning them and making it difficult for inspectors to continue with their work.

11. Around 1:00 p.m., things slowed down in the AVCB. An election inspector told me that most of the regular absentee ballots had been counted and that they were waiting for the military ballots to arrive and be counted.

12. Meanwhile, between 1:00-2:00 p.m. challengers from both parties (and non-partisan challengers like me) were receiving news on their phones about the progress of the election. Specifically, challengers became aware that Wisconsin

2

had been called for Joe Biden by news networks and that the networks were predicting that Detroit's ballots might put Joe Biden in the lead in Michigan.

13. The military ballots arrived in the room just before 2:00 p.m.

14. I neither saw nor heard of any other ballots being brought into the room around that time despite the fact that I was circulating throughout the room.

15. Around that time, I headed towards the front of the room to pick up a delivery of additional masks that were being brought for the challengers, and I realized how heated things were becoming outside the counting room. There were approximately 20-30 Republican challengers standing near the door to the counting room yelling at police officers.

16. Around 2:00 p.m., word rapidly circulated through the room via social media that the Trump campaign had filed a lawsuit to stop the count in Detroit, although I later learned that a lawsuit had not yet been filed at that time.

17. Around 2:30 p.m., it was announced that the counting room had hit COVID capacity and that no one else would be allowed in the room. I could not precisely count the number of challengers for each party, but my observation at that time, and throughout my time at TCF, was that the number of Republican challengers seemed roughly proportionate to the number of Democratic challengers. Indeed, as I said above, I repeatedly saw Republican challengers congregating in groups to aggressively question or challenge poll workers in settings where there was no Democratic challenger or only one Democratic or non-partisan challenger.

18. Around the time that the room closed, I witnessed a Republican challenger in his 30s or 40s with short hair and glasses in a tan sweatshirt or sweater standing by the window to the room writing messages to someone on the outside of the room. A short time later, I saw and heard the man with the tan sweatshirt say to another challenger, "We are going to start yelling 'STOP THE COUNT.'" And that is what he did, beginning to yell it loudly inside the AVCB center. The chant did not catch on inside, but it did catch on outside, and the Republican challengers gathered in the lobby outside were chanting and yelling for approximately a half an hour and banging on the all-glass wall that separated the counting room from the lobby.

3

19.     I also witnessed approximately 5–10 Republican challengers standing outside the glass doors filming what was going on inside, which was prohibited. That was when workers inside the counting room began covering the windows, and my understanding was that they were doing so to prevent prohibited filming of the AVCB.

20.     As the chanting was going on outside, I heard several Republican challengers inside discussing a plan to begin challenging every single vote on the grounds of "pending litigation." And that is what they did: repeatedly challenging the counting of military ballots for no reason other than "pending litigation".

21.     Eventually, the Republican challengers stopped challenging every military ballot after several Republican challengers were removed from continuing to make such challenges without a lawful basis. Shortly after it became clear that the military votes would be counted despite the efforts to stop that from happening, I decided that it was time to leave and make room for new observers.

22.     I am still processing my emotions from what I witnessed in TCF Center on November 4th. Honestly, the whole thing mostly just made me sad. I do not understand how people can be so tied up in who they want to be elected so much that they would be willing to harass poll workers and seek to stop the counting of votes—military votes, no less—in the way that I witnessed. As someone who served in the military, I was willing to sacrifice my life so that we would all have the right to vote. I thought that that was something we all believe in as Americans. It broke my heart to see that some of my fellow Americans disagree, and that they were willing to try to undermine this sacred right.

4

## AFFIRMATION

I affirm that the contents of this affidavit are true and correct to the best of my knowledge.

Signature of the person making this affidavit: _____

Affirmed before me this 10 day of  Nov ,  2020 at   3:02 pm

My commission expires on  2/10/2026

Signature of Officer Administering Oath _Julie M Aust_    Title Notary Public

JULIE MARIE AUST
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires 02-10-2026
Acting in the County of Washtenaw

5

# Exhibit 22

## AFFIDAVIT OF RAYMOND CORRELL

RAYMOND CORRELL, BEING OF FULL AGE, ON HIS OATH, DEPOSES AND SAYS:

1. I am over the age of 21 and if sworn as a witness, I am competent to testify about the matters set forth herein, based upon personal knowledge, except where the matter is indicated to be based on information and belief.

2. I am a registered voter in Waterford Township, Michigan.

3. On November 4, 2020, I received an e-mail from the Michigan Education Association requesting nonpartisan observers at the TCF Center while the remaining absentee votes were counted.

4. I arrived at 11:30 am and was credentialed as a nonpartisan observer for the Lawyers' Committee for Civil Rights Under Law. I was allowed inside with my credentials.

5. I was outraged when I heard that Republicans were claiming that they were not allowed inside the TCF Center, because I observed one Republican and one Democrat at each table. I was asked to sign in as I entered the building. I was asked to sign out when I left. Each party had 134 people that were allowed inside. When the party reached 134, nobody else from that party was allowed inside. When I arrived, both Republicans and Democrats had 134 people present, and therefore, people from both parties were waiting outside. After the building reached capacity, nobody was allowed inside, regardless of political affiliation.

6. People were standing right over the election workers while they processed ballots. And, challengers were able to observe the ballots so closely that one Republican even challenged a ballot by claiming that the postmark on its envelope wasn't valid. The election worker handling the ballot showed the challenger the postmark to satisfy the challenge.

7. I observed one table where a Republican challenger was objecting to every ballot to ask to for its identifying information, which was provided to him each time. He was objecting simply to cause a delay. Many Republican challengers were frivolously challenging every single vote. They were also ignoring social distancing rules.

8. I was at the front of the room when the doors were locked. People outside then started yelling and screaming that they were not allowed to come in. They started pounding on the glass, and people were legitimately concerned that the glass might break from the pounding. The people outside were allowed to protest, but they became very disruptive. The people inside were scared. Because there were ballots being counted right under the windows that were being pounded on, the windows were covered up with cardboard after the protesting became too distracting.

9. I watched another Republican challenger challenge every ballot. As ballots were being duplicated, she stated, "I challenge all of those ballots from this one on." She did not give a basis for her challenge. I replied that I was watching the ballots being counted and that they should all be counted.

10. What was striking about the events at the TCF Center was that the most disruptive people were angry white people attempting to disenfranchise Black voters and intimidate Black election workers. I was impressed by the patience of the election workers, who were visibly affected by the

## AFFIRMATION

I affirm that the contents of this affidavit are true and correct to the best of my knowledge.

Signature of the person making this affidavit: _____

Affirmed before me this 17th day of Nov, 2020 at 3806 Island Pk Drive, Waterford, Mi

My commission expires on 11-03-2025

Signature of Officer Administering Oath _____

Title _____

JEAN A. LANKFORD
Notary Public, State of Michigan
County of Oakland
My Commission Expires Nov. 03, 2025
Acting in the County of Oakland

# Exhibit 23

## AFFIDAVIT OF ELIZABETH TEMKIN

I, Elizabeth Temkin, being of full age, on my oath, deposes and says:

1.  My name is Elizabeth Temkin. I live in Ann Arbor, Michigan, and am a registered voter there. I am currently a third-year law student at the University of Michigan.

2.  On November 4, 2020, I served as a credentialed non-partisan challenger with credentials from the Lawyers' Committee for Civil Rights at the City of Detroit Absent Voter Counting Boards (AVCB), in the TCF Center, 1 Washington Boulevard, Detroit, Michigan, 48226. I served as a non-partisan challenger on November 4th from approximately noon through 7:00 p.m.

3.  I heard about the need for non-partisan poll challengers at the Detroit AVCBs from an email sent by Brain Remlinger, another University of Michigan law student, to our student listserv on the morning of November 4th.

4.  When I entered the AVCBs around noon, the room was quite full of people, with at least equal numbers of Republican and Democratic challengers. At the first AVCB table I was observing, the Republican and Democratic challengers were both standing immediately behind the election inspector, quite close to the table. There was also a second Republican challenger, standing immediately behind the first one. The election inspectors repeatedly asked the second Republican challenger to move back because they were only permitted one challenger at each of the AVCB tables.

5.  At each of the AVCB tables there was a visible computer monitor, that faced outward, that was easy to see. At all tables I observed, the monitor showed a list of the ballots already scanned, and when the election inspector scanned a ballot, the monitor would show the relevant identifying information. The election inspector would read out the number on the ballot,

1

a number corresponding to the computer system, and the name and address of the voter. You would see this information that was read out loud as it came up on the monitors. If any notes had to be input into the system on any given ballot, those notes would also show up on the monitor. I never observed anyone being told that they were not allowed to see the monitor and I, and the other challengers near me, were fully able to see the monitor at our AVCB table. One issue that I observed was when the ballot numbers did not match, which I did observe occurring periodically. Each time this occurred, there were Republican challengers present who noted it.

6.     There were also a row of computers in the middle of the room. From what I saw, there would be an elections official seated at the computer and there would be a Republican and a Democratic challenger either next to them or directly behind them looking at the monitor of those computers as well. I was able to observe this as the Republican challengers were wearing badges that were quite long white strips of paper or cardstock, and the Democratic challengers had on green stickers. I could see people with each of the identifying characteristics at each of the screens with the elections workers.

7.     I was at the table marked ICC#4, AV#17 for around three hours, from approximately 1:00 p.m. to 4:00 p.m. The Republican challenger at this table asked the elections official questions that I understood to be inappropriate, because we were not supposed to be talking to the people counting other than to lodge objections, and if there were questions, we were supposed to ask them to one of the elections official supervisors. While at this same table, a man who I took to be a supervisor of the Republican challengers, told the Republican challenger at the table with me to "write as much stuff down as possible, because we need to get as many thrown out as we can." I understood him to be a supervisor of the Republican challengers because I observed when other Republican challengers at AVCB tables had an issue,

2

they would raise their hand, and he would go over and speak with them. He was wearing the long white badge around his neck that was the credential for the Republican challengers. This man was white, over 6 feet tall, of average build, dressed in a suit, had glasses, and appeared to be in his 40s or 50s. He had paper slips that he was providing to other Republican challengers for them to take notes.

8. Sometime between approximately 2:30–3:00 p.m., word got around that a lawsuit had been filed. At 3:12 p.m., this same man mentioned in the previous paragraph told the Republican challenger at the table I was stationed at that she should be challenging every single ballot because of the allegations in the lawsuit. The Republican challenger at my table communicated that she was challenging every ballot to the election official supervisor. Shortly thereafter, the lawyer who had trained the non-partisan challengers earlier in the day, came around to tell me that I should be objecting to each of the Republican's challenges because they were being made in bad faith in order to delay or obstruct the process, as there was nothing in the challenge particular to each ballot. From that point on, I would say aloud for each ballot, "As a non-partisan challenger, I object to the challenge made to this ballot as I believe it was made in bad faith. I am here to make sure every vote is counted, and there is a Republican challenger present at this table. I believe this challenge is being made to delay, obstruct, or harass the counting process." I informed the election inspectors at my table and the supervisor in our area that I was going to be objecting to each Republican challenge in this way and asked that it please be noted in the records somehow. After informing the workers of this, I then said that same statement aloud for each of the ballots being challenged on these grounds, over and over again.

9. In the mid-afternoon, the room was quite full and indeed there more challengers from each party than there were tables in the room when I understood that additional challengers

3

were not being let into the room. I had another law school classmate that had arrived to be a non-partisan challengers who was locked out at this time who I was in communication with, as well as a number of other friends, who were not Republican party challengers, who I later learned were also not able to enter the room as credential challengers. Additional challengers were not being permitted into the room unless someone with the same type of credentials left the room. There was a large crowd gathered outside the room and a larger police presence than there previously had been by the door, monitoring who was coming in. It was my understanding that there was a cap on how many people could be in the room. While this was occurring outside the room in the mid- to late-afternoon, nothing had changed within the room in terms of the party challengers; there still remained a 1:1 ratio of Republican to Democratic challengers, with more party challengers than there were tables actually in the room.

10.     The crowd outside began banging on the doors and the glass walls, which made people frightened. When this initially began, some of the workers started to scatter from near the doorway, but their supervisor directed them that even though it was upsetting, they must not leave the table and the ballots. You could feel the room shaking while the crowd outside was banging on the glass walls. It seemed like a sizable crowd outside the room, but in the building, and there were rumors inside the room that there was a larger growing crowd outside the building. The table I was observing, had finished a batch, and so took a few minute break at this point. Both workers and other challengers—from what I overheard and observed—and I were afraid that the door was going to be broken down.

11.     At multiple points throughout the day, I observed challengers being removed by the police. This occurred when the challenger became belligerent in a way that was impeding

4

the process or where they challenger refused to wear their mask for COVID-19 precautions properly (or, indeed, at all).

12.    I observed the ballot duplication process related to the military and overseas ballots later in the day, approximately shortly after 5:00 p.m. I observed this process at ICC#3, AV#14 and ICC#1, AV#2. For this process, one election official would open the ballot and read out the number of the ballot. The next election official had a blank ballot and would announce the number of the duplicate ballot. There was one Republican challenger and one Democratic challenger standing behind the election officials. The Republican challenger was taking notes on this process per ballot, and when asked the poll workers to show him the ballot, the worker then showed the challengers both the original ballot and the duplicated ballot. This was an extremely open process, and I observed no efforts by any workers to hide anything as related to this process. The elections officials were very much listening to the challengers and repeating ballot numbers whenever asked. There were between 4 and 6 poll workers per table, all confirming that the information was correct. I observed ample confirmation of identity and ballot numbers. There was a lot of care taken making sure everything was accurate.

13.    I understood that initially the military and overseas ballots were brought into the center of the room, next to a raised platform. This center area appeared to be the distribution area for the room. Once the elections workers there sorted them, they were brought out to each of the AVCB tables throughout the room. This center are, where ballots were distributed from, was located in full view of the press, where there were cameras recording.

14.    At certain points during the day, certain election inspectors were adamant that they wanted more room for COVID-19 precautions. I observed Republican challengers not respecting repeated requests to move back. I would say the challengers were never a full six feet

5

away from the election inspectors; we were a few feet away, and able to hear. If a challenger

ever could not hear and asked for something to be repeated, the elections inspector would repeat

the ballot number or the identifying information.

I swear under penalty of perjury that the foregoing is true and correct. Executed on

November 11, 2020

_Elizbeth Temkin_
Elizabeth Temkin

Sworn to before me before me this 11 day of November, 2020 at 1:21 pm.

_Julie M. Aust_
Notary Public

My Commission expires on: 2/10/2026.

JULIE MARIE AUST
Notary Public, State of Michigan
County of Washtenaw
My Commission Expires 02-10-2026
Acting in the County of Washtenaw

6

# Exhibit 24

## AFFIDAVIT OF MELANIE GRUND

MELANIE GRUND, BEING OF FULL AGE, ON HER OATH, DEPOSES AND SAYS:

1.  I am over the age of 21 and if sworn as a witness, I am competent to testify about the matters set forth herein, based upon personal knowledge, except where the matter is indicated to be based on information and belief.

2.  I am a registered voter in Berkley, Michigan.

3.  In the evening of November 3, 2020, I saw a social media post stating that sixty Democratic challengers were needed at the TCF Center while absentee ballots were being counted, because sixty Republican challengers had arrived. I wasn't available that night.

4.  On the morning of November 4, 2020, I saw another social media post seeking more Democratic challengers at TCF Center and instructing people to email Mike at 2020 Victory, which I did around 8:00 a.m. I was told that if I could be there at 9:00 a.m. I could go through the credentialing process.

5.  I arrived at 9 a.m. and was trained as a Democratic challenger upon arrival. I went through a COVID screening and then received a packet of instructions about what was not allowed at the tables. I was trained on the packet and then received credentials.  Our role was to make sure that

challengers were proper, mitigate any intimidation, and protect the workers.  We were instructed not to get involved in the counting unless warranted, not to talk to the people counting, and to make sure that we had grounds for any challenges we may bring.  We were instructed to wear masks and stay six feet apart.

6.     After I was trained, I was required to sign in with my affiliation and the time of my arrival before entering the counting room.

7.     I felt like the Democratic challengers did a good job of staying in our lanes. There were two of us in a row, and we monitored three tables at a time. On the other hand, we were swarmed by groups of Republican challengers multiple times.  There were enough of them there to surround us.  I felt outnumbered.

8.     The tables all had monitors, which were on the same corner at every table. The tables were set up in a square so that anyone could look at any time to see what the person scanning the ballots was doing.  Because of this, there was no need for any challenger to get close enough to an election worker to look over their shoulders, but Republican challengers got very close to them and did so multiple times.

9.     The Republican challengers were very focused on the problem ballot box. They kept asking how the box was getting the middle of the room and

would comment that they didn't know whether the ballots were being changed by the election workers.

10.    Things got really ugly in the room during the day, and the Republican challengers became more and more aggressive.  At one point, an election worker at my table picked up a ballot.  The election worker had not even opened the envelope the ballot was in, and a Republican challenger said, "I challenge that ballot." I incredulously remarked that the ballot had not even been opened yet. The Republican challenger waited for the ballot to be opened, and then reiterated, "I challenge that ballot." She did not articulate a basis for her challenge, and none of the challenges ever amounted to anything.

11.    Around 1 p.m., I watched a Republican challenger supervisor tell a group of challengers to "be super aggressive but professional."  If the election workers would lean over to get a personal item from their bag, like a chapstick or something similar, the Republican challengers accused them of taking things out of their bags to somehow tamper with the ballots.

12.    By 5:30 p.m., the military ballots were being counted.  We had been told that the Republican challengers had been instructed to challenge all of the military ballots on the basis of pending litigation.  We were asked to say

"I object to the challenge.  There is no basis for a challenge to all of the ballots.  I want to see all of the votes counted."

13.   I noticed that I did not observe any Republican challengers who were Black, Hispanic, or otherwise people of color.  In contrast, the election workers were predominantly Black.  I am Caucasian, and I feel that the entire experience was a tangible, illustrative example of my privilege because I did not react the same way to the Republican challengers as the people who were counting the ballots and particularly to the pounding and screaming coming from outside the room.  I felt protected but they were afraid.  They were exhausted, and half of the people in the room were there for the purpose of making the election inspectors' jobs difficult.  The presence of the Democratic and non-partisan challengers was much more necessary than it should have been.

## AFFIRMATION

I affirm that the contents of this affidavit are true and correct to the best of my knowledge.

Signature of the person making this affidavit: *Melanie L Shun*

Affirmed before me this _17_ day of _November, 2020_ at _1:45 pm_

My commission expires on _April 30, 2024_.

Signature of Officer Administering Oath _Giancarlo Guz_

Title _Notary Public, State of Michigan County of Oakland_

GIANCARLO J. GUZMAN
Notary Public, State of Michigan
County of Oakland
My Commission Expires Apr. 30, 2024
Acting in the County of _Oakland_