# Exhibit 17

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,   Case No. 20-014780-AW

    Plaintiffs,   Hon. Timothy M. Kenny

vs.

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

    Defendants.

| GREAT LAKES JUSTICE CENTER | FINK BRESSACK |
|---|---|
| David A. Kallman (P34200) | David H. Fink (P28235) |
| Erin E. Mersino (P70886) | Darryl Bressack(P67820) |
| Jack C. Jordan (P46551) | 38500 Woodward Ave., Suite 350 |
| Stephen P. Kallman (P75622) | Bloomfield Hills, MI 48304 |
| 5600 W. Mount Hope Hwy. | (248) 971-2500 |
| Lansing, MI 48917 | dfink@finkbressack.com |
| (517) 322-3207 | dbressack@finkbressack.com |
| *Attorneys for Plaintiffs* | *Attorneys for City of Detroit, City of Detroit Election Commission and Janice Winfrey* |
| | |
| | CITY OF DETROIT LAW DEPARTMENT |
| | Lawrence T. García (P54890) |
| | Charles N. Raimi (P29746) |
| | James D. Noseda (P52563) |
| | 2 Woodward Ave., 5th Floor |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | garcial@detroitmi.goc |
| | raimic@detroitmi.gov |
| | nosej@detroitmi.gov |
| | *Attorneys for City of Detroit, City of Detroit Election Commission and Janice Winfrey* |

**<u>AFFIDAVIT OF CHRISTOPHER THOMAS</u>**

1

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1. I am a Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election.

2. I served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. In June 1981 I was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs.

3. In 2013, I was appointed to President Barack Obama's Commission on Election Administration and served until a final report was submitted to the President and Vice-President in January 2014.

4. I am a founding member of the National Association of State Election Directors and severed as its president in 1997 and 2013.

5. On November 2, 3 and 4, 2020, I worked at the TCF Center absent voter counting boards primarily as liaison with challenger parties and organizations. I provided answers to questions about processes at the counting board tables, resolved disputed about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers. I have reviewed the complaint and affidavits in this case.

2

6. It is clear from the affidavits attached to the Complaint that these challengers do not understand absent voter ballot processing and tabulating. It is clear also that they did not operate through the leadership of their challenger party, because the issues they bring forward were by and large discussed and resolved with the leadership of their challenger party. The leadership on numerous occasions would ask me to accompany them to a particular counting board table to resolve an issue. I would always discuss the issue with counting board inspectors and their supervisors and the challengers. The affiants appear to have failed to follow this protocol established in a meeting with challenger organizations and parties on Thursday, October 29, 2020 at the TCF Center where a walk-through of the entire process was provided. A few basics are in order: The Qualified Voter File (QVF) is a statewide vote registration file and was not available to counting boards. E-pollbook (EPB) is a computer program used in election day precincts to create the poll list of voters casting ballots. Supplemental poll lists contain names of voters who cast an absent voter ballot on Sunday, Monday and Tuesday. At the processing tables no ballots are scanned. A poll list is not used to confirm whether any specific voter's ballot is counted.

7. To increase the accuracy of the poll list, the Detroit Department of Elections employed the Secretary of State e-pollbook (EPB) to assist in creating the poll list. For each of the counting boards, the EPB held all the names of voters who requested and returned an absent voter ballot by mid-afternoon Sunday, November 1. The download on Sunday was necessary to prepare for the pre-processing granted by a recently enacted law that allows larger municipalities to process ballots, but not to tabulate them, for 10 hours on Monday. (To clarify some apparent confusion by Plaintiffs, Wayne County does not tabulate City of Detroit absent voter ballots.)

8. Absent voter ballots received Sunday after the download to EPB, all day Monday until 4 p.m. and Tuesday by 8 p.m. were not in the EPB. They would be added either by manually

3

entering the voter names into the EPB or on supplemental paper poll lists printed from the Qualified Voter File (QVF).

9. Zachery Larsen is raising an issue about return ballot envelopes where the barcode on the label would not scan and the voter's name was not on the supplemental list. He was observing the correction of clerical errors, not some type of fraud. In every election, clerical errors result in voters being left off the poll list, whether it is a paper poll list or the EPB. These errors are corrected so that voters are not disenfranchised. Michigan law ensures that voters are not disenfranchised by clerical errors.

10. On Wednesday, November 4 it was discovered that the envelopes for some ballots that had been received prior to November 3 at 8 p.m., had not been received in the QVF. They would not scan into the EPB and were not on the supplemental paper list. Upon reviewing the voters' files in the QVF, Department of Elections staff found that the final step of processing receipt of the ballots was not taken by the satellite office employees. The last step necessary to receive a ballot envelope requires the satellite employee to enter the date stamped on the envelope and select the "save" button. They failed to select "save".

11. A team of workers was directed to correct those clerical errors by entering the date the ballots were received in the satellite office and selecting "save". This action then placed the voter into the Absent Voter Poll List in the QVF so that the ballot could be processed and counted. None of these ballots were received after 8 p.m. on election day. Most were received on Monday, November 2nd – the busiest day for the satellite offices.

12. The return ballot envelopes for each of these voters are marked with the date received and initialed by satellite employees who verified the voter signatures. By entering the date on which the ballot was received, no QVF data was altered. The date field was empty because

the satellite workers did not select 'save', thus failing to complete the transaction. The "backdating" allegation is that on November 4 the staff entered the correct dates the ballots were received – all dates were November 3 or earlier. The date of receipt was not backdated.

13. These return ballot envelopes were discussed with several Republican challengers. Two challengers were provided a demonstration of the QVF process to show them how the error occurred, and they chose not to file a challenge to the individual ballots.

14. The inspectors at the counting boards were able to manually enter voters into the EPB. The return ballot envelope could easily be observed and every key stroke of the EPB laptop operator was clearly visible on the large screen at one corner of the table. The Department of Elections, at some expense, provided large monitors (see attached photo) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot distancing barrier. Instead of creating problems for challengers, the monitors made observing the process very transparent.

15. The EPB has an "Unlisted Tab" that allows inspectors to add the names of voters not listed. The EPB is designed primarily for use in election day polling places and reserves the Unlisted Tab to enter voters casting provisional ballots. In polling places, voters are verified by providing their date of birth. Consequently, the EPB is designed with a birthdate field that must be completed to move to the next step. When using this software in an absent voter counting board, a birthdate is not necessary to verify voters, as these voters are verified by signature comparisons (a process which was completed before the ballots were delivered to the TCF Center). Inspectors at the TCF Center did not have access to voters' birthdates. Therefore, due to the fact that the software (but not the law or the Secretary of State) requires the field be completed to move to the next step, 1/1/1900 was used as a placeholder. This is standard operating procedure and a standard date used

5

by the State Bureau of Elections and election officials across the state to flag records requiring attention. The date of 1/1/1900 is recommended by the Michigan Secretary of State for instances in which a placeholder date is needed.

16. When Republican challengers questioned the use of the 1/1/1900 date on several occasions, I explained the process to them. The challengers understood the explanation and, realizing that what they observed was actually a best practice, chose not to raise any challenges.

17. Ballots are delivered to the TCF Center after they are processed at the Department of Elections main office on West Grand Boulevard. On election day, ballots are received from the post office and the satellite offices. It takes several hours to properly process ballots received on election day. It appears that some of the affidavits submitted by Plaintiffs are repeating false hearsay about ballots being delivered, when actually television reporters were bringing in wagons of audio-video equipment. All ballots were delivered the same way— from the back of the TCF Hall E.

18. Early in the morning on Wednesday, November 4, approximately 16,000 ballots were delivered in a white van used by the city. There were 45 covered trays containing approximately 350 ballots each. The ballots were not visible as the trays had a sleeve that covered the ballots.

19. The ballots delivered to the TCF Center had been verified by the City Clerk's staff prior to delivery in a process prescribed by Michigan law. Thus, when Jessy Jacob complains that she "was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" it was because that part of the process had already been completed by the City Clerk's Office in compliance with the statutory scheme.

6

20. It would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center. No voter not in the QVF or in the "Supplemental Sheets" could have been processed, or "assigned" to a "random name" because no ballot from a voter not in one of the two tracking systems, was brought to the TCF Center.

21. Mr. Larsen complains he was not given a full opportunity to stand immediately behind or next to an election inspector. As stated, monitors were set up for this purpose. Moreover, election inspection were instructed to follow the same procedure for all challengers. The Detroit Health Code and safety during a pandemic required maintaining at least 6-feet of separation. This was relaxed where necessary for a challenger to lean in to observe something and then lean back out to return to the 6-foot distancing. The inspectors could see and copy the names of each person being entered into the e-pollbook. If an inspector did not fully accommodate a challenger's reasonable request and the issue was brought to the attention of a supervisor, it was remedied. Announcements were made over the public address system to inform all inspectors of the rules. If what Mr. Larsen says is accurate, any inconvenience to him was temporary, had no effect on the processing of ballots, and certainly was not a common experience for challengers.

22. Jessy Jacob alleges she was instructed by her supervisor to adjust the mailing date of absentee ballot packages being sent out to voters in September 2020. The mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes.

23. Michigan Election Law requires clerks to safely maintain absent voter ballots and deliver them to the absent voter counting board. There is no requirement that such ballots be transported in sealed ballot boxes. To my knowledge, they are not sealed by any jurisdiction in Michigan in a ballot box prior to election day. Employees bring the ballot envelopes to the TCF Center, which is consistent with chain of custody. The only ballots brought to TCF that are not in envelopes are blank ballots used to duplicate ballots when necessary.

24. At no time after ballots were delivered to TCF on Sunday, November 1, did any ballot delivery consisted of "tens of thousands of ballots".

25. Reference is made to a "second round of new ballots" around 9:00 p.m. on Wednesday, November 4. At or about 9:00 p.m. on November 4, 2020 the Department of Elections delivered additional blank ballots that would be necessary to complete the duplication of military and overseas ballots. No new voted ballots were received. The affidavits are likely referring to blank ballots that were being delivered in order to process AV and military ballots in compliance with the law.

26. In the reference to a "second round of new ballots" there are numerous misstatements indicative of these challengers' lack of knowledge and their misunderstanding of how an absent voter counting board operates. These statements include "confirm that the name on the ballot matched the name on the electronic poll list" – there are no names on ballots.

27. No absentee ballots received after the deadline of 8:00 p.m. on November 3, 2020, were received by or processed at the TCF Center. Only ballots received by the deadline were processed.

28. Plaintiffs reference "Supplement Sheets with the names of all persons who have registered to vote on either November 2, 2020 or November 3, 2020." Some of the names are

8

voters who registered to vote on those days, but the vast majority are voters who applied for and voted an absent voter ballot.

29. Plaintiffs use "QVF" in place of "EPB". The QVF is a statewide voter registration file; an EPB for a counting board is a file of the voters who applied for and returned an absent voter ballot for that counting board.

30. There is no "election rule" requiring all absent voter ballots be recorded in the QVF by 9:00 p.m. on November 3, 2020.

31. Plaintiffs also misunderstand the process when they state ballots were "filled out by hand and duplicated on site." Instead, ballots were duplicated according to Michigan law. Michigan election law does not call for partisan challengers to be present when a ballot is duplicated; instead, when a ballot is duplicated as a result of a "false read," the duplication is overseen by one Republican and one Democratic inspector coordinating together. That process was followed.

32. Regarding access to TCF Hall E by challengers, there is also much misinformation contained in the statements of challengers. Under the procedure issued by the Secretary of State there may only be 1 challenger for each qualified challenger organization at a counting board. Detroit maintains 134 counting board, thus permitting a like number of challengers per organization.

33. In mid-afternoon on Wednesday, I observed that few challengers were stationed at the counting board tables. Rather, clusters of 5, 10 or 15 challengers were gathered in the main aisles at some tables. I conducted a conversation with leaders of the Republican Party and Democratic Party about the number of challengers in the room and their locations. It became clear that more than 134 challengers were present for these organizations. No one was ejected for this

9

reason, but access to Hall E was controlled to ensure that challenger organizations had their full complement and did not exceed the ceiling any further than they already had.

34. Challengers were instructed to sign out if they needed to leave Hall E. For a short period of time—a few hours—because there were too many challengers in Hall E for inspectors to safely do their jobs, new challengers were not allowed in until a challenger from their respective organization left the Hall. However, as stated above, each challenger organization, including Republican and Democrat, continued to have their complement of challengers inside of the Hall E.

35. As stated previously, challengers are expected to be at their stations next to a counting board. Unfortunately, this was not the behavior being displayed. Instead, challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." I believed this to be inappropriate threatening of workers trying to do their jobs. Such action is specifically prohibited in Michigan election law. Nevertheless, challengers were permitted to remain.

36. The laptop computers at the counting boards were not connected to the Internet. Some of the computers were used to process absent voter ballot applications in mid-October and were connected to the QVF. On election day and the day after election day, those computers were not connected and no inspector at the tables had QVF credentials that would enable them to access the QVF.

37. The Qualified Voter File has a high level of security and limitation on access to the file. For example, it is not true that a person with QVF credentials in one city is able to access data in another city's file within the QVF. That is not possible.

38. A point of much confusion in these claims is centered on the law that permits a city clerk to verify the signatures on absent voter ballots before election day. Inspectors at absent voter counting boards do not verify the signatures on the return ballot envelopes. Department of Elections staff may use a voter's signature on an application to verify the voter's signature on return ballot envelope. Or the staff may use the voter's signature in the QVF to make the comparison. Often using the QVF is more efficient than the application signatures.

39. I am not aware of any valid challenge being refused or ignored or of any challengers being removed because they were challenging ballots. Ballot challengers are an important part of the democratic process and were fully able to participate in the process at the TCF Center.

40. In conclusion, upon reviewing Plaintiffs' Complaint, Affidavits, and Motion, I can conclude based upon my own knowledge and observation that Plaintiffs' claims are misplaced and that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.

Date: November 11, 2020

CHRISTOPHER THOMAS

Subscribed and sworn to before me
this 11th day of NOVEMBER, 2020.

Nancy M. Black
Notary Public, NANCY M. BLACK
County of VAN BUREN, STATE OF MICHIGAN
My Commission Expires: 09-05-2025
ACTING IN BERRIEN COUNTY, MICHIGAN

11