# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>          Plaintiffs,<br><br>     v.<br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>          Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## RESPONSE TO PLAINTIFFS' EMERGENCY MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

The City of Detroit (the "City") respectfully submits this Response to Plaintiffs' Emergency Motion for Declaratory, Emergency and Permanent Injunctive Relief.

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................... iii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES........................... vi

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS .....................................................................5

    A.    Plaintiffs' Allegations Relating to Supposed Electoral Fraud
in Detroit Have Been Rejected by the Michigan Courts Which
Have Addressed Them ..............................................................5

    B.    Plaintiffs' "Expert" Analyses are Woefully Deficient............................16

    C.    Allegations Regarding Dominion ........................................................19

ARGUMENT ......................................................................................20

  II.  Applicable Legal Standards................................................................20

  III.  The Motion Should be Denied Because Plaintiffs Do Not Have
Standing to Pursue this Lawsuit .......................................................21

    A.    Plaintiffs Do Not Have Standing to Pursue Claims Under
the Electors and Election Clauses ............................................22

    B.    Plaintiffs Do Not Have Standing to Pursue Their Equal
Protection, Due Process or Michigan Electoral Law Theories...............24

  IV.  This Motion Should be Denied Because this Case Should be
Dismissed Under Abstention Principles ...............................................26

    A.    This Court Should Abstain Under the Inter-Related
*Colorado River*, *Pullman* and *Burford* Doctrines .................................26

    B.    Deference to State Courts is Warranted Pursuant to the
Electoral Count Act of 1877 ....................................................29

  V.  Plaintiffs' Motion Must be Denied Pursuant to the Doctrine of Laches........30

  VI.  Plaintiffs Cannot be Entitled to Injunctive Relief ..........................................31

    A.    Applicable Law ...................................................................31

    B.    There is Virtually no Likelihood of Plaintiffs'
Prevailing on the Merits ...........................................................31

    C.    Plaintiffs Would Suffer No Harm if an Injunction Does Not Enter .......35

    D.    Issuance of an Injunction Would Harm the City and
the Public in an Almost Unimaginable Manner......................................35

CONCLUSION ......................................................................................................36

# INDEX OF AUTHORITIES

## Cases

*Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*,
481 F.3d 423 (6th Cir. 2007)................................................................28

*Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779
(W.D. Tex. 2015)...................................................................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................................................20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................................20

*Blachy v. Butcher*, 221 F.3d 896 (6th Cir.2000)......................................21

*Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270 (7th Cir. 1986)....................32

*Bognet v. Secretary Commonwealth of Pennsylvania*, ---F3d.----,
2020 WL 668120 (3rd Cir., Nov. 13, 2020)............................................24

Bonnell v. Lorenzo, 241 F.3d 800 (6th Cir. 2001) ..................................31

*Burford v. Sun Oil Co.,* 319 U.S. 315 (1943) ..........................................29

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)......................................23

*Chirco v. Crosswinds Communities, Inc.,* 474 F.3d 227 (6th Cir.2007) ................30

*Colorado River Water Conservation District v. United States*,
424 U.S. 800 (1976) .............................................................................26

*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002) ....................................21

*Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078,
2020 WL 6821992 (M.D. Pa. Nov. 21, 2020), *aff'd sub nom. Donald
J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL
7012522 (3d Cir. Nov. 27, 2020) ..........................................................34

*Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371,
2020 WL 7012522 (3d Cir. Nov. 27, 2020) ...........................................35

*Frank v. Dana Corp.*, 547 F.3d 564 (6th Cir. 2008)..................................21

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir. 2000) ...................31

*Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326 (6th Cir. 1998) ..................26

*Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77 (1975) ......................26

*Hotze v. Hollins*, No. 4:20-CV-03709, 2020 WL 6437668 (S.D. Tex., Nov. 2,
2020)......................................................................................................24

*L. Lin Wood, Jr. v Raffensperger*, No. 1:20-CV-04651-SDG,
  2020 WL 6817513 (N.D. Ga., Nov. 20, 2020)......................................................24

*Lance v. Coffman*, 549 U.S. 437 (2007) ..............................................................23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..................................................22

*Martel v. Condos*, No. 5:20-cv-131, —— F.Supp.3d ——,
  2020 WL 5755289 (D. Vt. Sept. 16, 2020) ........................................................25

*Minn. Voters All. v. Ritchie*, 720 F.3d 1029 (8th Cir. 2013) ................................32

*Ottawa Tribe of Oklahoma v. Logan,* 577 F.3d 634 (6th Cir. 2009) ......................30

*Paher v. Cegavske*, 457 F. Supp. 3d 919 (D. Nev. 2020)......................................25

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941) ..................26

*Reynolds v. Sims*, 377 U.S. 533 (1964)........................................................ 25, 31

*Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873 (6th Cir. 2006) ........................21

*United States v. Hays*, 515 U.S. 737 (1995) ........................................................25

*Valley Forge Christian Coll. v. Americans United for Separation
  of Church and State, Inc.*, 454 U.S. 464 (1982)................................................22

*Waskul v. Washtenaw Cty. Cmty. Mental Health*,
  221 F. Supp. 3d 913 (E.D. Mich. 2016) ............................................................31

**Statutes**

3 U.S.C. § 5 ........................................................................................................29

Electoral Count Act of 1877 ................................................................................29

M.C.L. § 168.727 ..................................................................................................7

**Other Authorities**

U.S. Const. art. III, § 2 ........................................................................................21

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................................................21

## STATEMENT OF THE ISSUES PRESENTED

I.   Should Plaintiffs' Motion be denied because Plaintiffs do not have standing?

The City answers: "Yes."

II.   Should Plaintiffs' Motion be denied under abstention principles?

The City answers: "Yes."

III.   Should Plaintiffs' Motion be denied based on laches?

The City answers: "Yes."

IV.   Should Plaintiffs' Motion be denied because Plaintiffs cannot meet the standards for injunctive relief?

The City answers "Yes"

## **CONTROLLING OR MOST APPROPRIATE AUTHORITIES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Burford v. Sun Oil Co.,* 319 U.S. 315 (1943)

*Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976)

*Costantino v. Detroit et al*, Wayne County Circuit Case No. 20-014780-AW

*Courtney v. Smith*, 297 F.3d 455 (6th Cir. 2002)

*Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020)

*Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941)

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982)

U.S. Const. art. III, § 2

Fed. R. Civ. P. 9(b)

U.S. attorneys and FBI agents have been working to follow up specific complaints and information they've received, but to date, we have not seen fraud on a scale that could have effected a different outcome in the election.

There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results. And the DHS and DOJ have looked into that, and so far, we haven't seen anything to substantiate that

- U.S. Attorney General William Barr, statement to the Associated Press[1]

## **INTRODUCTION**

This is the lawsuit that one-time Trump legal team member Sidney Powell has been promising would be "biblical." Perhaps, plaintiffs should have consulted with Proverbs 14:5, which teaches that "a faithful witness does not lie, but a false witness breathes out lies."

Few lawsuits breathe more lies than this one. The allegations are little more than fevered rantings of conspiracy theorists built on the work of other conspiracy theorists. Plaintiffs rely on affidavits of so-called "experts"—really confidence men who spread lie after lie under cover of academic credential—which misstate obviously false statistics. These "experts" use academic jargon as if that could transmute their claims from conspiracy theory to legal theory. The key "factual"

---

[1]      https://apnews.com/article/election-2020-joe-biden-donald-trump-elections-william-barr-b1f1488796c9a98c4b1a9061a6c7f49d?cid=ed_npd_bn_tw_bn.

allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been debunked.

The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City of Detroit at the TCF Center have been rejected by every court which has considered them. The claims were rejected in *Stoddard v. City Election Commission of the City of Detroit*, Wayne County Circuit Court Case No. 20-014604-CZ, Opinion and Order (Nov 6, 2020), from which no appeal has been filed. The claims were rejected by the Michigan Court of Claims in *Donald J. Trump for President Inc. v. Benson*, Mich. Court of Claims Case No. 20-000225-MZ, Opinion and Order (Nov. 5, 2020) (Ex. 1). The campaign waited until *December* 1, 2020 to file a brief in support of its application for leave to appeal to the Michigan Court of Appeals. And, importantly, the claims were tested and found wanting in *Costantino v. Detroit et al*, Wayne County Circuit Case No. 20-014780-AW, in an Opinion and Order entered by Chief Judge Timothy M. Kenny on Nov. 13, 2020. The Complaint in this lawsuit explicitly relies on the same allegations as those made in the *Costantino* matter, but fails to advise this Court that those claims were rejected in that case, with Plaintiffs' applications to the Michigan Court of Appeals and Michigan Supreme Court being expeditiously denied. *See Costantino v. Detroit*, Mich COA Case No. 355443, Order (Nov 16, 2020) (Ex. 2); *Costantino v Detroit*, No. 162245, 2020 WL 6882586, at *1 (Mich, Nov 23, 2020) (Ex. 3).

If any of the claims in this lawsuit had merit, that would have been demonstrated in those cases. If any of the conspiracy theories in this case had merit, they would have been brought in those cases or by the Trump campaign. Donald J Trump for President Inc. would have pushed the claims in the lawsuit it filed in the Western District of Michigan on November 11, 2020, rather than voluntarily dismissing the case under Fed. R. Civ. P. 41(a)(1)(A) on November 18, 2020, after being served with a Motion to Dismiss and concurrences. *See Donald J. Trump for President Inc. v. Benson*, WD Mich. Case No. 1:20-cv-1083. Or the Trump campaign would have pursued the claims in the Michigan Court of Claims in the lawsuit they filed on November 4, 2020, *supra*. But, even the Trump campaign lawsuits have avoided the off-the-wall claims included this lawsuit, with the campaign famously attempting to distance itself from Sidney Powell and this lawsuit (after a press event highlighting Ms. Powell as part of the "super-team").

It is difficult to know whether Plaintiffs and their counsel actually believe any of the ridiculous claims they allege or whether this entire lawsuit is designed solely as a fundraising exercise, a talking point, something they can use to bolster their imaginary claims of widespread voter fraud. But, the fact that the Complaint is frivolous, does not mean that this lawsuit is not dangerous to our democracy. Plaintiffs seek nothing less than a court-ordered coup d'état. They, quite literally,

ask that the results for the selection of Michigan's Presidential electors in the November 3, 2020 election "be set aside."

If Plaintiffs actually believed they were making legitimate claims, they would have filed their motions months, or years ago. After all, the globe-spanning conspiracy claims regarding Dominion supposedly go back for years. But no lawsuit was filed related to the 2016 lawsuit, when Donald Trump won by narrow margins in Michigan, Georgia and Wisconsin. Instead, Plaintiffs waited almost a full month after the 2020 election was held to file this "lawsuit." Then, they waited days before bothering to serve the Complaint and file their so-called "emergency" Motion. They were likely waiting to file a remarkably similar Motion in Georgia, with the same "experts" making the same specious arguments. Unsurprisingly, the case they filed in Wisconsin also finds a way to challenge enough votes to overcome Trump's deficit there.

Descending even farther into conspiracy theory does not—and cannot—change the outcome. The law is the law. Plaintiffs do not have standing. This lawsuit is barred by laches. This lawsuit is barred by abstention doctrines. And, the facts are the facts. Numerous public servants and journalists have started the process of debunking the hundreds of pages of nonsense in Plaintiffs' Complaint, Motion and Exhibits. It would take far more pages than allowed by the Local Rules to include

all of the information disproving Plaintiffs' claims, but some of the highlights are

identified in the following Statement of Facts.

## STATEMENT OF FACTS

### A. Plaintiffs' Allegations Relating to Supposed Electoral Fraud in Detroit Have Been Rejected by the Michigan Courts Which Have Addressed Them

#### 1. Republican Challengers

Plaintiffs repeatedly assert that Republican challengers were not given

"meaningful" access to the ballot processing and tabulation at the Absent Voter

Counting Board located in Hall E of the TCF Center. Nearly all of Plaintiffs'

requested relief is predicated on this claim. The theory is that if certain challengers

were not in the TCF Center, the ballots counted there should be deemed "unlawfully

cast," somehow in violation of Plaintiffs' constitutional rights. The legal theory is

nonsensical. But it is also important to note that the underlying claim is false.

Challengers are allocated one per respective party or organization to each

counting board. The only challenger right specifically listed with respect to absent

voter ballots is to observe the recording of absentee ballots on voting machines.

M.C.L. § 168.733(1)(e)(i) ("A challenger may do 1 or more of the following: …

Observe the recording of absent voter ballots on voting machines.") This

requirement was met at all times.

In *Constantino*, the City submitted an affidavit and supplemental affidavit from

Christopher Thomas disproving plaintiffs' claims. Because so many of the claims in

this lawsuit are duplicative of the claims in that lawsuit, the City is attaching to this brief, the affidavits submitted by Mr. Thomas in state court. (Ex. 4 and 5). Mr. Thomas's knowledge of Michigan election law is unparalleled; he served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. (Thomas Aff. ¶ 1, Ex. 4). In June 1981, he was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs. (*Id.*). Mr. Thomas was brought in to serve as Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. (*Id.* ¶ 2). In this capacity, he advised the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election. (*Id.*). Mr. Thomas had oversight and was involved in nearly all aspects of the election in the City, including the processing and tabulation at the TCF Center. (*Id.*).

As Mr. Thomas attested, while six feet of separation was necessary for health reasons, the Department of Elections at some expense, provided large monitors (photo attached to Mr. Thomas' affidavit) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot

distancing barrier. (Thomas Aff. ¶ 14, Ex. 4). The monitors made observing the process very transparent. (*Id*.).

When it became clear that the number of challengers had reached or exceeded the lawful quota and the room had become over-crowded, for a short period of time, *additional* challengers were not admitted until challengers from their respective parties voluntarily departed. This is affirmed by Christopher Thomas and others. (Thomas Aff., ¶¶ 32-35 Ex. 4; see also Garcia Aff., Ex. 6).

Plaintiffs also claim that election workers at the TCF Center did not record certain challenges. Apparently, Plaintiffs are asserting that any "challenge" that someone makes up must be recorded. However, challengers' rights and responsibilities are subject to the law. At a polling place, a challenger can challenge "the voting rights of a person who the challenger has good reason to believe is not a registered elector." M.C.L. § 168.733. Under a separate section, at a polling place, a qualified challenger may question "the right of an individual attempting to vote who has previously applied for an absent voter ballot and who on election day is claiming to have never received the absent voter ballot or to have lost or destroyed the absent voter ballot." M.C.L. § 168.727. In that situation, an election inspector is to make a report about the challenge. The statute further provides that:

> A challenger shall not make a challenge indiscriminately and without good cause. A challenger shall not handle the poll books while observing election procedures or the ballots during the counting of the ballots. A challenger shall not interfere with or unduly delay the work

of the election inspectors. An individual who challenges a qualified and registered elector of a voting precinct for the purpose of annoying or delaying voters is guilty of a misdemeanor.

M.C.L. § 168.727.

Plaintiffs provide little detail of the so-called challenges which were "disregarded." But, as Christopher Thomas attests, he is not aware of any valid challenge being refused or ignored. (Thomas Aff ¶ 39, Ex. 4). All election workers were instructed to record valid challenges. What election workers did not need to record were the numerous frivolous and legally invalid challenges which were made. Republican making wholesale challenges based on complete misunderstandings of law. (*Id.* ¶ 39). Challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. (*Id.* ¶ 35). In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." (*Id.*). Yelling "Stop the vote" or all absent ballots are invalid are not legitimate challenges and there was no requirement that they be record. That was an abuse of the process and a violation of the law.

## 2. Allegations of "Pre-Dating"

Plaintiffs' allegations of "pre-dating" are based on the affidavits of Jessica Connarn and Jessy Jacob initially submitted in the *Costantino* Complaint. (First Amended Complaint ("FAC") ¶¶ 88 and 90). These claims have been thoroughly

debunked. Ms. Connarn's claims were addressed by the Michigan Court of Claims which held:

> Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief. The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note. In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer." She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20." Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in fraudulent activity in order to count invalid absent voter ballots that were received after election day.
>
> This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note—which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

(*See* Ex. 7).

The reliance on the "pre-dating" allegations in the *Costantino* matter is misplaced. Those allegations were made by Jessy Jacob, a furloughed City employee, with no known prior election experience, who was given a limited

assigned to the Department of Elections on a short-term basis. (Ex. 8, Affidavit of

Daniel Baxter, ¶ 7). Her claim appears to have been based on flawed semantics,

because all absentee ballots she handled at the TCF Center had been received by

8:00 p.m. on November 3, 2020. The ballots had all been painstakingly verified by

City employees (in a public process) before they were brought to the TCF Center

for tabulation. No ballots were backdated; instead, for a small number of ballots,

election workers at the TCF Center were directed to enter the date received into the

computer system, as stamped on the envelope. Ms. Jacob was simply marking the

date the ballot had been received. (Thomas Aff ¶¶ 12, 20). All dates on the

envelopes were on or before November 3, 2020; no ballots received by the Detroit

City Clerk after 8:00 p.m. on November 3, 2020 were even brought to the TCF

Center. (*Id*. ¶¶ 20, 27). Absentee ballots were not "backdated" in the Qualified

Voter File; they were properly "dated" in the system, based upon time stamps on

the ballot envelopes. The court in Costantino agreed, holding:

> Ms. Jacob also alleges misconduct and fraud when she worked at the
> TCF Center. She claims supervisors directed her not to compare
> signatures on the ballot envelopes she was processing to determine
> whether or not they were eligible voters. She also states that supervisors
> directed her to "pre-date" absentee ballots received at the TCF Center
> on November 4, 2020. Ms. Jacob ascribes a sinister motive for these
> directives. Evidence offered by long-time State Elections Director
> Christopher Thomas, however, reveals there was no need for
> comparison of signatures at the TCF Center because eligibility had been
> reviewed and determined at the Detroit Election Headquarters on West
> Grand Blvd. Ms. Jacob was directed not to search for or compare
> signatures because the task had already been performed by other Detroit

10

> city clerks at a previous location in compliance with MCL 168.765a.
> As to the allegation of "pre-dating" ballots, Mr. Thomas explains that
> this action completed a data field inadvertently left blank during the
> initial absentee ballot verification process. Thomas Affidavit, #12. The
> entries reflected the date the City received the absentee ballot. *Id.*

(*See* Ex. 9, Opinion and Order of Wayne County Circuit Order). Notably, prior to

the filing of these lawsuits, Ms. Jacob did not report any of the issues addressed in

her affidavit to any of her supervisors. (*See* Ex. 8, Baxter Affidavit, ¶ 16).

It was physically impossible for any election worker at the TCF Center to have

counted or processed a ballot for someone who was not an eligible voter or whose

ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot

could have been "backdated," because no ballot received after 8:00 p.m. on

November 3, 2020 was ever at the TCF Center. (Ex. 4, Thomas Aff., ¶¶ 19-20).

### 3.  Allegations Regarding Ballot Duplication

Plaintiffs allege that the ballot duplication process was not followed. As Mr.

Thomas attested, ballots were duplicated according to Michigan law. Contrary to

Plaintiffs' assertion, Michigan election law does not require partisan challengers to

be present when a ballot is duplicated; instead, when a ballot is duplicated as a result

of a "false read," the duplication is overseen by one Republican and one Democratic

inspector coordinating together. That process was followed. (Thomas Aff., ¶ 31).

And, again, partisan challengers were at the TCF Center during the entire process.

As the Wayne County Circuit Court held in the *Stoddard* matter:

An affidavit supplied by Lawrence Garcia, Corporation Counsel for the City of Detroit, indicated he was present throughout the time of the counting of absentee ballots at the TCF Center. Mr. Garcia indicated there were always Republican and Democratic inspectors there at the location. He also indicated he was unaware of any unresolved counting activity problems.

By contrast, plaintiffs do not offer any affidavits or specific eyewitness evidence to substantiate their assertions. Plaintiffs merely assert in their verified complaint "Hundreds or thousands of ballots were duplicated solely by Democratic party inspectors and then counted." Plaintiffs' allegation is mere speculation.

(Ex. 10, Opinion and Order).

### 4. Allegations Regarding Ballots Supposedly Counted More than Once

Plaintiffs claim challengers observed ballots repeatedly run through tabulation machines, including "a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine." (FAC ¶ 94). This same claim was made by Melissa Carone, a contractor working for Dominion, who claimed that stacks of 50 ballots were fed through tabulators as many as eight times. (Exh. 5 to FAC, ¶¶4-5). Whatever the challengers and Ms. Carone think they saw, ballots cannot be counted in that manner. If they were correct, hundreds of extra votes would show up in numerous precinct (or absent voter counting boards). This would obviously be caught very quickly on site. (Ex. 5, Thomas Supp. Aff). What the challengers and Ms. Carone claim they saw would also be caught by the Detroit Department of Elections and the County Canvassing Board during the canvassing which occurs

after every election as a matter of law. (*Id*.). While precincts are often off by a few votes at the end of the process due to human error, the result of repeatedly scanning ballots would lead to precincts being off by hundreds or thousands of votes.

Plaintiffs also note that challengers reported that "when a voter was not in the poll book, the election officials would enter a new record for that voter with a birth date of January 1, 1900." (FAC ¶¶ 14, 85, 190 & 191). This claim is actually true, but not evidence of anything improper. As Christopher Thomas attested, and as was explained to Republican challengers on Wednesday, November 4, 2020, the Detroit counting boards were using the Secretary of State e-pollbook, comprised of a downloaded instance (i.e. snapshot) of the Qualified Voter File ("QVF") as it existed late afternoon on Sunday, November 1. (Thomas Aff. ¶ 7, Ex. 4). Since the e-pollbook had not been specifically modified for the AVCB environment, procedural adjustments were required to record ballots. (*Id*. ¶ 15). Specifically, to add a voter in the e-pollbook (or "EPB"), the voter's birthdate needs to be entered. (*Id.*). This is not a legal requirement, but essentially a quirk in the design of the software. (*Id*.). In a *polling place*, where e-pollbook is designed to work, provisional ballots are entered into the e-pollbook manually by inspectors. (*Id*.). The voter as part of the provisional ballot process completes a new voter registration application which contains a birthdate. (*Id*.). In that situation, at a polling place, the date of birth is a data point used to verify the voter. (*Id*.). Thus, the system includes a tab for birthdates. (*Id*.).

At an *AVCB*, the inspectors do not have access to a voter's date of birth; moreover, there is no need for that data point to be included, because the voter's signature is the data point used for verification purposes. (*Id.*). Nevertheless, to process the vote, the e-pollbook requires the date of birth data field to be filled out. (*Id.*). Thus, inspectors were directed to enter the consistent date of birth of January 1, 1900. (*Id.*). The use of January 1, 1900 as a substitute for an actual date of birth is a standard practice by election clerks. (*Id.*). The Republican challengers who questioned the process were satisfied with the explanation and did not lodge (what would have been an obviously frivolous) challenge. (*Id.* ¶ 16). Nevertheless, that claim is raised repeatedly as evidence of "fraud" in this case and others.

### 5.  Allegations Regarding Tabulating Machines

Perhaps the most baseless of Plaintiffs' allegations is a conspiracy theory about vote tabulators. Plaintiffs cite two instances of errors—one in Antrim County and one in Oakland County (Rochester Hills) to insinuate that the tabulating system used in many counties was flawed. The warped logic: because there was an isolated error in Antrim County which uses the same software as Wayne County, and an isolated error in Rochester Hills, which does not use the same software, the votes in Detroit must be thrown out.

The Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other

14

Counties or States," explaining what happened in Antrim County. (Ex. 11). The statement explains that the "error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier." (*Id.*). Essentially, the County installed an update on certain tabulators, but not others. (*Id.*). The tabulators worked correctly, but when they communicated back to the County, the discrepancy in the software versions led to a discrepancy in the reporting. (*Id.*). This was quickly discovered and would certainly have been uncovered in the post-election canvass. (*Id.*).

The Republican clerk of Rochester County, Tina Barton, discredited the allegations of fraud in that City. Officials realized they had mistakenly counted votes from the city of Rochester Hills twice, according to the Michigan Department of State. Oakland County used software from a company called Hart InterCivic, not Dominion, though the software was not at fault. Ms. Barton stated in a video she posted online: "As a Republican, I am disturbed that this is intentionally being mischaracterized to undermine the election process …. This was an isolated mistake that was quickly rectified."[2]

---

[2]     https://www.bridgemi.com/michigan-government/gop-calls-michigan-election-probe-officials-say-their-claims-are-weak.

## B. Plaintiffs' "Expert" Analyses are Woefully Deficient

Plaintiffs rely on "experts" to amplify their factual allegations and create their grand conspiracy. Essentially, the "experts" attempt to provide cover for the lie that there was somehow fraud in Detroit, accounting for hundreds of thousands of "extra" votes (even though there were slightly less votes in Detroit in 2020 than there were in 2016). Of course, to the extent those "experts" are relying on "facts" which are not true or are misinterpreting those facts, their analysis is of no value to this Court.

Plaintiffs' "experts" pepper their reports with speculation, innuendo and "facts" which are simply not true. Plaintiffs' "expert" Russell James Ramsland Jr., an unsuccessful Republican candidate for Congress in 2016, is particularly reckless with the facts. He extrapolates extraordinary vote discrepancies from the well-publicized Antrim County error in reporting early unofficial results. In doing so, he either intentionally ignores the Secretary of State's report or simply does not do his homework. In his November 24, 2020 affidavit, appended as Exhibit 24 of the First Amended Complaint, he reports "In Michigan we have seen reports of 6,000 votes in Antrim County that were switched from Donald Trump to Joe Biden *and were only discoverable through a hand counted manual recount*." (Ramsland Affidavit ¶10; emphasis added). With the slightest due diligence any actual expert would know

that there were no hand recounts in Michigan as of that date.[3] Equally troubling, the

logical explanation by the Secretary of State, released more than two weeks before

this affidavit was prepared and which is discussed in the Amended Complaint, is not

even discussed. Presumably, this "expert" did not bother to inquire once he had a

conspiracy theory to run with.

Similarly, Mr. Ramsland, who is referenced 23 times in the Amended

Complaint, explicitly relies upon the affidavit of Melissa Carone in support of his

claim that "ballots can be run through again effectively duplicating them."

(Ramsland Affidavit; FAC Exh. 24 at ¶13). It is understandable that inexperienced

challengers and Ms. Carone (who is a service contractor with no election experience)

might not understand that there are safeguards in place to prevent double counting

of ballots in this way, but that does not excuse Plaintiffs' "experts," who choose to

rely on these false claims.

Dr. Eric Quinnell (misspelled as Quinell throughout the Amended Complaint)

offers a creative, but pointless, "expert" analysis, which can be summarized as

follows: "it's surprising that Joe Biden did so much better than Donald Trump in

some places." Dr. Quinnell posits that he should be able to predict what voters will

---

[3] Plaintiffs, who include three nominees to be Trump electors, the Republican County Chair for Antrim County, the Republican County Chair of Oceana County and the Chair of the Wayne County Eleventh Congressional District, as well as their attorneys, should also know that there was no hand recount in Antrim County.

do, and because they did not do what he expected he has encountered results that he calls "incredibly mathematically anomalous." He compares results from 2016 and 2020, and when President Trump does not keep all of his 2016 voters, Dr. Quinnell interprets that to mean that more than 100% of new voters voted for President-Elect Biden. While academically interesting and perhaps amusing for a cocktail party analysis, there is absolutely no legal significance to his "analysis."

William Briggs offers some charts and predictions, based upon surveys. But, again, not a shred of evidence of voter fraud is even purportedly found in his brief report. And, much of his "analysis" is based upon a telephone survey by Matt Braynard, in which Braynard tries to extrapolate the results of that survey to establish proof of voter fraud. Of course, no such survey could establish the legal elements of fraud. But, here, there is not even an attempt to make the process look scientific. We are not told about survey methods, the skills of the interviewers, or even Mr. Braynard's expert credentials. Dr. Quinnell admits in his executive summary that "a team of unpaid citizen volunteer(s)" collaborated in a statistical analysis vote analysis. (FAC, Exh. 22) .

Emblematic of Plaintiffs' carelessness with the facts is another "expert" report that was so weak that after last week's filing of the Complaint he was outed in public news media reports, apparently leading to his deletion from the Amended Complaint. Paragraph 18 of the original Complaint introduced "Expert Navid

Kashaverez-Nia" and alleged that "[h]e concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden." Notably, the "expert" report relied on a finding that in "Edison County, MI, Vice President Biden received more than 100% of the votes…" The fact that there is no Edison County in Michigan (or anywhere in the United States) was not only was missed by this "expert," its inclusion in a nine page report was also was not noticed by any of the Plaintiffs or their counsel—that is, not until it became a public embarrassment when it was reported by the press.

### C. Allegations Regarding Dominion

Plaintiffs, with either no experience with Michigan election law, or no interest in being candid with this Court, weave a fantastical tale about how a theoretical software weakness could upend Michigan's election results. The fundamental problems with their analyses are: *not a shred of evidence suggests a single vote was not counted in Michigan*; and; *any problem with vote counts could be addressed by a hand recount in this State that preserves the paper ballots that are scanned by the tabulating machines*.

So, even if everything in the Amended Complaint about the theoretical possibility that Dominion equipment could be compromised were true (it is not) the preservation of paper ballots would allow the vote count to be tested. Here, however,

19

Plaintiffs and their counsel want to cast doubt upon the integrity of our elections, not correct any errors in the vote count. If the Trump campaign took these allegations seriously, they would have sought a recount. But, the time to demand a recount has passed, and nobody seriously thought that a recount would change a 154,000 vote win for President-Elect Joe Biden.

The Plaintiffs' claims regarding Dominion are so detached from reality that the Trump campaign and Rudy Giuliani have publicly distanced themselves from Plaintiffs' counsel and have literally disavowed her involvement on their legal team. And, as noted above, Attorney General Bill Barr yesterday announced that neither the Department of Homeland Security nor the Department of Justice could find any evidence to support these wild allegations. Rather than respond point by point to these strange claims, the City attached a detailed, public response released by Dominion Voting Systems on November 26, 2020. (Ex. 12).

## **ARGUMENT**

## **II.    Applicable Legal Standards**

A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.* Claims that are "conceivable" or "possible," but not plausible, fall short of the standard. *Twombly* at 570.

In alleging fraud, a party must state with particularity the "circumstances constituting fraud." Fed. R. Civ. P. 9(b). The complaint must "alert the defendants to the precise misconduct with which they are charged" to protect them "against spurious charges of immoral and fraudulent behavior." *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (internal quotations omitted). A complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (internal quotations omitted).

### III. The Motion Should be Denied Because Plaintiffs Do Not Have Standing to Pursue this Lawsuit

Article III of the United States Constitution restricts the jurisdiction of federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "To satisfy this 'case-or-controversy' requirement, 'a plaintiff must establish three elements: (1) an injury in fact that is concrete and particularized; (2) a connection between the injury and the conduct at issue—the injury must be fairly traceable to the defendant's action; and (3) [a] likelihood that the injury would be redressed by a favorable decision of the Court.'" *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002), *quoting Blachy v. Butcher*, 221 F.3d 896, 909 (6th Cir.2000).

The first requirement—that plaintiffs establish an "injury in fact"—limits justiciability to those cases involving a well-defined injury to the plaintiff, which allows the parties to develop the necessary facts and seek responsive remedies. As the Supreme Court has repeatedly instructed, "[t]he requirement of 'actual injury redressable by the court' . . . tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) . To this end, the Supreme Court "repeatedly has rejected claims of standing predicated on the right, possessed by every citizen, to require that the Government be administered according to law." *Id.* at 482–83. Moreover, the Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992).

### A. Plaintiffs Do Not Have Standing to Pursue Claims Under the Electors and Election Clauses

Count I of the Complaint purports to bring a claim under the Elections and Electors clause of the U.S. Constitution. But, the underlying "factual allegations"

are the same "allegations" made throughout the Complaint: that Defendants supposedly failed to follow the Michigan Election Code, relating to election challengers and the processing and tabulation of ballots in Detroit. *See*, *e.g.*, FAC ¶ 180. Plaintiffs *do not* allege that their ballots were not counted or that they were not allowed to vote. Plaintiffs' claim is precisely the type of claim that is "predicated on the right, possessed by every citizen, to require that the Government be administered according to law" that is insufficient to confer standing. *See*, *e.g.*, *Valley Forge*, 454 U.S. at 472.

Plaintiffs reliance on *Carson v. Simon* is misplaced. Brief at 8, *citing Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020). *Carson* is an outlier that erroneously conflated candidates for electors with candidates for office based on a quirk of Minnesota law. *Id.* Meanwhile, the Supreme Court has been clear that citizens do not have Article III standing under the clauses. *See*, *e.g.*, *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (Holding plaintiffs did not have standing because the "only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past."). And, other courts have held that neither citizens, nor electors, nor candidates themselves have standing under the clause. *See*, *e.g.*, *Bognet v. Secretary Commonwealth of Pennsylvania*, ---F3d.----, 2020 WL 668120 (3rd Cir., Nov. 13,

2020); *Hotze v. Hollins*, No. 4:20-CV-03709, 2020 WL 6437668 at *2 (S.D. Tex.,

Nov. 2, 2020); *L. Lin Wood, Jr. v Raffensperger*, No. 1:20-CV-04651-SDG, 2020

WL 6817513, at *5 (N.D. Ga., Nov. 20, 2020).

Additionally, these particular Plaintiffs do not have standing for the claims,

because they are actually purporting to bring claims that, if they could be brought,

could only be brought by the Michigan Legislature. Plaintiffs are effectively seeking

to enforce "rights" of that body, not rights that are particular to themselves. *See*, *e.g.*,

*Bognet*, 2020 WL 6686120, at *7 (concluding that the plaintiffs' Elections and

Electors Clause claims "belong, if they belong to anyone, only to the Pennsylvania

General Assembly") (citation omitted).

### B. Plaintiffs Do Not Have Standing to Pursue Their Equal Protection, Due Process or Michigan Electoral Law Theories

The equal protection, due process and Michigan Election Law theories (Counts

II – IV) also rely on the allegations relating to the processing and tabulation of votes

in Detroit. *See* FAC ¶¶ 118-192, 206, 211, 213-228. Once again, Plaintiffs do not—

and cannot—allege an actual, particularized injury in fact. They do not claim they

were denied the right to vote; instead, they claim that the grant of the franchise to

others, somehow infringed on their right to equal protection, due process and

compliance with Michigan law. The apparent remedy for allowing the "wrong type

of people" to vote, is to take away the vote from everyone. Setting aside just how

absurd this theory is, it is clear that these Plaintiffs do not have standing to pursue it.

Plaintiffs are alleging an "injury" identical to the injury supposedly incurred by every Michigan voter. Under Plaintiffs' theory, the "effect" of an erroneously counted vote will proportionally impact every Michigan voter to the same mathematical degree. Because the approximately 5.5 million Michigan voters in the Presidential election suffer the identical incremental dilution, the alleged injury constitutes a quintessential generalized injury incapable of conferring standing. Federal courts have addressed this "novel" voter dilution claim, with each court finding the claim fails to constitute an injury in fact. *See Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020); *Martel v. Condos*, No. 5:20-cv-131, ⸺ F.Supp.3d ⸺, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015).

This is not to say that a claim under the label of "voter dilution" can never be brought in federal court; but such claims can only survive with facts starkly different from the case at bar. First, voter dilution claims may be appropriate in cases of racial gerrymandering, where the legislature impermissibly relied on race when drawing legislative districts. *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 744–45 (1995). Second, voter dilution claims may proceed in apportionment cases, where un-updated legislative districts disfavor voters in specific districts merely due to the voter's geographic location. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964). Neither theory provides any support for Plaintiffs' claims. The injury in the colorable

dilution claims is particularized to a specific group. In contrast to the specific class of minority voters in a racially gerrymandered district, or voters living in a growing but un-reapportioned district, the supposed dilution here is shared in proportion by *every* single Michigan voter. In alleging a generalized injury rather than an actual and particularized injury in fact, Plaintiffs lack standing.

IV. **This Motion Should be Denied Because this Case Should be Dismissed Under Abstention Principles**

A. **This Court Should Abstain Under the Inter-Related *Colorado River*, *Pullman* and *Burford* Doctrines**

The *Colorado River* doctrine counsels deference to parallel state court proceedings. *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).. The related *Pullman* abstention doctrine "is built upon the traditional avoidance of unnecessary constitutional decisions and the sovereign respect due to state courts." *Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 331 (6th Cir. 1998) (*citing Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 500–01 (194)1). Abstention is appropriate "when the state-law questions have concerned matters peculiarly within the province of the local courts, we have inclined toward abstention." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 83–84 (1975). Indeed, "[w]here there is an action pending in state court that will likely resolve the state-law questions underlying the federal claim, [the Supreme Court has] regularly ordered abstention." *Id.* at 84 (1975).

While there is much extraneous noise in the Complaint, it is clear from the actual legal Counts that virtually all of the "factual" assertions actually relevant to the Counts relate to the processing and tabulation of ballots in the City of Detroit, and, primarily the processing and tabulation of absentee ballots at the TCF Center. *See*, *e.g.*, FAC ¶¶ 180-192, 206, 211, 213-228. The integrity of the process in Detroit has already been litigated in state court in active lawsuits (all of which denied any injunctive or declaratory relief based on the specious claims). The "facts" identified in the Counts—which are the only "facts" actually offered in support of the relief in the Counts—are claims that election officials: did not allow Republican challengers to observe the counting and processing of ballots; discriminated against Republican challengers; added "batches" of ballots; added voters to the Qualified Voter File; changed dates on ballots; altered votes on ballots; double counted ballots; violated ballot security; accepted "unsecured" ballots; counted ineligible ballots; and, failed to check ballot signatures. Each and every one of those allegations is false. But, the one thing they all have in common is that they are based entirely on the claims raised in cases in Michigan state courts. In fact, each and every one of those allegations is based on the allegations and "evidence" submitted in the *Costantino* matter.[4]

---

[4] The other allegations in the Complaint are essentially offered to provide "support" for the central theory that there was somehow widespread fraud in Detroit that resulted in President Elect Biden receiving 154,000 more votes than Donald Trump in the State.

All of Plaintiffs' claims (frivolous as they may be) are being litigated in State Court. The fact that the Plaintiffs here may, incredibly enough, be making even more frivolous allegations than the litigants in *Costantino* does not change the fact that the same underlying issue—the integrity of the process employed in Detroit—is already in suit. The Wayne County Circuit Court has already decided that the claims were frivolous and not worth of injunctive relief. The Michigan Court of Appeals and the Michigan Supreme Court reviewed the trial court's decision on an expedited basis and did not disagree. The claims remain before Judge Kenny, which is the proper court to see them through to their inevitable dismissal with prejudice.[5]

Abstention is also warranted under *Burford* abstention doctrine, which "requires a federal court to abstain from jurisdiction where to assume jurisdiction would 'be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Adrian Energy Assocs. v. Michigan Pub. Serv. Comm'n*, 481 F.3d 414, 423 (6th Cir. 2007) (*referencing Burford v. Sun Oil*

---

[5] The claims were also brought in *Donald J. Trump for President, Inc. v. Benson*, Mich. Court of Claims Case No. 20-000225-MZ (filed Nov. 4, 2020) and *Stoddard v. City Election Commission of the City of Detroit*, Wayne County Circuit Court Case No. 20-014604-CZ (filed Nov. 5, 2020) Various pre-election lawsuits filed in Michigan made somewhat related claims against the Secretary of State: *Cooper-Keel v. Benson*, Mich. Court of Claims Case No. 20-000091-MM (filed May 20, 2020); *Black v. Benson*, Mich. Court of Claims Case No. 20-000096-MZ (filed May 26, 2020); *Davis v Benson*, Mich. Court of Claims Case No. 20-000099-MM (filed May 28, 2020); *Election Integrity Fund v. Benson*, Mich. Court of Claims Case No. 20-000169-MM; *Ryan v. Benson*, Mich. Court of Claims Case No. 20-000198-MZ (filed Oct. 5, 2020).

*Co.,* 319 U.S. 315 (1943). The doctrine applies where the lawsuit could result in a "potential disruption of a state administrative scheme." *Id.*, 481 F.3d at 423. Here, the relief Plaintiffs seek would lead to an unprecedented disruption of Michigan election law.

### B. Deference to State Courts is Warranted Pursuant to the Electoral Count Act of 1877

Additionally, due to the autonomy federal courts provide state courts in resolving election disputes, abstention is particularly appropriate in the instant case. *Id.* The importance of allowing state courts the initial opportunity to settle disputes concerning the Presidential election is reflected in the Electoral Count Act of 1877. Section 5 of the Electoral Count Act applies if the state has provided, "by laws enacted prior to the day fixed for the appointment of the electors"—that is, through laws enacted before Election Day—for its "final determination" of any "controversy or contest" by "*judicial or other methods or procedures*," and such "determination" has been made "at least six days before the time fixed for the meeting of electors." 3 U.S.C. § 5 (emphasis added). This safe harbor provision states that if the determination is made "pursuant to such law" existing before Election Day, then that determination "shall be conclusive, and shall govern in the counting of the electoral votes . . . so far as the ascertainment of the electors appointed by such State is concerned." *Id.* Thus, in recognizing the important role state courts play in the

resolution of election disputes under state law, this court should abstain from hearing this case. *See Harrison*, 360 U.S. at 177.[6]

## V.   Plaintiffs' Motion Must be Denied Pursuant to the Doctrine of Laches

"Laches arises from an extended failure to exercise a right to the detriment of another party." *Ottawa Tribe of Oklahoma v. Logan,* 577 F.3d 634, 639 n. 6 (6th Cir. 2009). The elements of the claim are: "(1) lack of diligence by the party against whom the defense is asserted, here the plaintiffs, and (2) prejudice to the party asserting the defense." *Chirco v. Crosswinds Communities, Inc.,* 474 F.3d 227, 231 (6th Cir.2007) (citation omitted)).

All of Plaintiffs' claims arise from allegations relating to supposed events which occurred well-before the election (including years before the election) or on the 3rd and 4th of November. If Plaintiffs had legitimate claims regarding Dominion, they could have brought those claims years ago. If Plaintiffs had legitimate claims relating to the processing and tabulation of ballots in Detroit, they could have brought the claims at the time. Instead of bringing the claims when they were timely (albeit still frivolous), they issued press releases and fundraised. Plaintiffs chose to wait until after the election had been certified. The claims cannot proceed.

---

[6] The claims are also barred under estoppel doctrines, including the prohibition against collateral attacks. The claims have been tested and rejected.

## VI. Plaintiffs Cannot be Entitled to Injunctive Relief

### A. Applicable Law

When evaluating a request for injunctive relief, a court "must consider four factors: '(1) whether the movant has a strong likelihood of success on the merits: (2) whether the movant would suffer irreparable injury without the injunction: (3) whether issuance of the injunction would cause substantial harm to others: and (4) whether the public interest would be served by issuance of the injunction.'" *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 221 F. Supp. 3d 913, 917 (E.D. Mich. 2016) (*citing* Bonnell v. Lorenzo, 241 F.3d 800, 809 (6th Cir. 2001)).

While no single factor is controlling, "if 'there is simply no likelihood of success on the merits,' that is usually 'fatal.'" *Waskul* at 917 (*citing Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

### B. There is Virtually no Likelihood of Plaintiffs' Prevailing on the Merits

Plaintiffs cannot prevail for all the reasons stated above and because their claims are demonstrably false and are not fit for inclusion in a document filed with a court. Plaintiffs also cannot prevail because their legal theories are untenable. As discussed above, Plaintiffs equal protection, due process, and state law claims are predicated on their "voter dilution" theories. Equal protection voter dilution claims exist only in a narrow set of circumstances. *See, e.g., Reynolds*, 377 U.S. at 568 ("Simply stated, an individual's right to vote for state legislators is unconstitutionally

31

impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). In those unique cases, the plaintiffs can allege disparate treatment from similarly situated voters. *See, e.g., id.* at 537 (Plaintiffs alleging devalued voting power when compared to similarly situated voters in other parts of the state).

In contrast, the gravamen of Plaintiffs' claim—that Michigan voters will have the value of their votes diluted—falls far wide of the mark. Plaintiffs allege breaches of the Michigan Election Code due to a lack of access provided to poll watchers, as well as a number of often hyper-localized violations of the Michigan Election Code. However, even if Plaintiffs successfully showed an impermissible lack of meaningful access for poll watchers, such a showing is plainly insufficient to prove fraudulent votes were *actually* counted. And with regard to the allegations of localized Election Code violations, the fundamental principle currently at play is that "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013), *quoting Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986). No case supports the notion that the Equal Protection Clause of the U.S. Constitution can be turned into the weapon of oppression sought by Plaintiffs.

The Michigan law claims fair no better. Plaintiffs allege violations of M.C.L. §§ 168.730, 168.733, 168.764a, 168.765a and 168.765.5 (all supposedly at the TCF

Center) but for each claim either don't understand the statute or rely on facts that have been rejected by Michigan courts, especially the Circuit Court, Court of Appeals and Supreme Court in *Costantino*.

M.C.L. §§ 168.730 and 168.733 relate to allowing partisan challengers to observe the process. As the *Costantino* court concluded, the truth of the matter is that Republican challengers were always in the TCF Center, and, as long as they were not yelling and causing disruptions (including by chanting "stop the vote"), they were allowed to observe the process in full compliance with the law. Even if the allegations were true, they could not possibly entitle Plaintiffs to any *post-election* remedy. The "remedy" is in the statute itself, and unsurprisingly, does not include disenfranchisement of all voters.

M.C.L. § 168.765(5) relates to a deadline to post certain information relating to absentee ballots. Tellingly, as has been the case each time plaintiffs filed Complaints derived from the same allegations, the allegation is made "upon information and belief." FAC ¶ 221. No plaintiff has ever presented an iota of evidence, let alone a claim not made "upon information and belief" about this issue.

M.C.L. § 168.764a provides that ballots received after 8:00 p.m. on election day cannot be counted. This allegation is also based "upon information and belief." FAC ¶ 224. Obviously, an "information and belief" allegation is woefully deficient to obtain any relief, let alone the extraordinary relief Plaintiffs' seek.

MCL § 168.765a provides for ballots to be duplicated under the supervision of *inspectors* (i.e. paid workers) from both major parties. Plaintiffs' claim is based on their conflation of the role of ballot *inspectors* and ballot *challengers*. Plaintiffs' false claim about Republicans being excluded from the TCF Center, relates to challengers, not inspectors. There was a short period of time when excess overflow challengers of all parties were not able to enter the TCF Center until a challenger of their party left, but there was never a time when *inspectors* were disallowed.

In any event, Plaintiffs bring "novel" claims ostensibly available to every Michigan voter in the event any voting error resulting in an erroneously counted vote is detected. Their supposed remedy—the rejection of hundreds of thousands, if not millions, of votes. No such legal theory exists. As a district court recently held in one of the Trump election lawsuits brought in Pennsylvania, "[t]his Court has been unable to find any case in which a plaintiff has sought such a drastic remedy in the contest of an election, in terms of the sheer volume of votes asked to be invalidated." *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020), *aff'd sub nom. Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020).

### C. Plaintiffs Would Suffer No Harm if an Injunction Does Not Enter

Plaintiffs cannot show how an injunction would protect them from irreparable injury. The election is over. President-Elect Biden carried the State by 154,000 votes. The results have been certified. The supposed injuries claimed by Plaintiffs, a harm to their voting rights, would not be avoided by the injunction they seek; they would be exacerbated.

### D. Issuance of an Injunction Would Harm the City and the Public in an Almost Unimaginable Manner

In contrast, the City and the public at large would be severely harmed by the requested relief.  The City is tasked with managing elections for all candidates, not just for the candidates for President. The proposed injunction would put an abrupt stop to the orderly process of this election and undo the timely certification of all elections.

As aptly stated by the Third Circuit, "tossing out millions of mail-in ballots would be drastic and unprecedented, disenfranchising a huge swath of the electorate and upsetting all down-ballot races too." *Donald J. Trump for President, Inc. v. Pennsylvania*, No. 20-3371, 2020 WL 7012522, at *1 (3d Cir. Nov. 27, 2020). "Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof. The public must have confidence that our Government honors and respects their votes." *Id.* at *9. The "public interest strongly

favors finality, counting every lawful voter's vote, and not disenfranchising millions of … voters who voted by mail." *Id.*

The preservation of our democracy requires zealous protection against threats external and internal. Plaintiffs would inflict generational damage in their naked pursuit of power. Their request must be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City of Detroit respectfully requests that this Court enter an Order: (1) denying Plaintiffs' Motion, (2) compelling Plaintiffs to publicly file unredacted versions of all affidavits previously submitted with redactions, and (2) requiring Plaintiffs to pay all costs and fees incurred by all Defendants and Intervenor-Defendants.

December 2, 2020                    Respectfully submitted,

**FINK BRESSACK**

By:    /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
Charles N. Raimi (P29746)

James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.goc
raimic@detroitmi.gov
nosej@detroitmi.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on December 2, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

**FINK BRESSACK**

By: */s/ John L. Mack*
John L. Mack (P80710)
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel.: (248) 971-2500
jmack@finkbressack.com

## INDEX OF EXHIBITS

1. *Donald J. Trump for President Inc. v. Benson*, Mich. Court of Claims Case No. 20-000225-MZ, Opinion and Order (Nov. 5, 2020)

2. *Costantino v. Detroit*, Mich COA Case No. 355443, Order (Nov 16, 2020)

3. *Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich, Nov 23, 2020)

4. Affidavit of Chris Thomas

5. Supplemental Affidavit of Chris Thomas

6. Affidavit of Lawrence Garcia

7. Court of Claims Opinion and Order

8. Affidavit of Daniel Baxter

9. Opinion and Order, Costantino

10. Opinion and Order, Stoddard

11. SOS Statement Antrim County

12. Dominion Press Release

# EXHIBIT 1

# STATE OF MICHIGAN

# COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT, INC.
and ERIC OSTEGREN,

          Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

          Defendants.

_____/

**OPINION AND ORDER**

Case No.  20-000225-MZ

Hon. Cynthia Diane Stephens

 

Pending before the Court are two motions.  The first is plaintiffs' November 4, 2020 emergency motion for declaratory relief under MCR 2.605(D).  For the reasons stated on the record and incorporated herein, the motion is DENIED.  Also pending before the Court is the motion to intervene as a plaintiff filed by the Democratic National Committee.  Because the relief requested by plaintiffs in this case will not issue, the Court DENIES as moot the motion to intervene.

According to the allegations in plaintiffs' complaint, plaintiff Eric Ostegren is a credentialed election challenger under MCL 168.730.  Paragraph 2 of the complaint alleges that plaintiff Ostegren was "excluded from the counting board during the absent voter ballot review process."  The complaint does not specify when, where, or by whom plaintiff was excluded.  Nor does the complaint provide any details about why the alleged exclusion occurred.

-1-

The complaint contains allegations concerning absent voter ballot drop-boxes. Plaintiffs allege that state law requires that ballot containers must be monitored by video surveillance. Plaintiff contends that election challengers must be given an opportunity to observe video of ballot drop-boxes with referencing the provision(s) of the statute that purportedly grant such access, . See MCL 168.761d(4)(c).

Plaintiffs' emergency motion asks the Court to order all counting and processing of absentee ballots to cease until an "election inspector" from each political party is allowed to be present at every absent voter counting board, and asks that this court require the Secretary of State to order the immediate segregation of all ballots that are not being inspected and monitored as required by law. Plaintiffs argue that the Secretary of State's failure to act has undermined the rights of all Michigan voters. While the advocate at oral argument posited the prayer for relief as one to order "meaningful access" to the ballot tabulation process, plaintiffs have asked the Court to enter a preliminary injunction to enjoin the counting of ballots. A party requesting this "extraordinary and drastic use of judicial power" must convince the Court of the necessity of the relief based on the following factors:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Davis v Detroit Fin Review Team*, 296 Mich App 568, 613; 821 NW2d 896 (2012).]

As stated on the record at the November 5, 2020 hearing, plaintiffs are not entitled to the extraordinary form of emergency relief they have requested.

## I.    SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

## A.  OSTEGREN CLAIM

Plaintiff Ostegren avers that he was removed from an absent voter counting board.  It is true that the Secretary of State has general supervisory control over the conduct of elections.  See MCL 168.21; MCL 168.31.  However, the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk.  See MCL 168.764d.  The complaint does not allege that the Secretary of State was a party to or had knowledge of, the alleged exclusion of plaintiff Ostegren from the unnamed absent voter counting board.  Moreover, the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements.  Thus, allegations regarding the purported conduct of an unknown local election official do not lend themselves to the issuance of a remedy against the Secretary of State.

## B.  CONNARN AFFIDAVIT

Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief.  The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note.  In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer."  She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20."  Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in

fraudulent activity in order to count invalid absent voter ballots that were received after election day.

This "supplemental evidence" is inadmissible as hearsay.  The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence.  See MRE 801(c).  The note— which is vague and equivocal—is likewise hearsay.  And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence.  See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections.  Rather, any alleged action would have been taken by some unknown individual at a polling location.

## C.  BALLOT BOX VIDEOS

It should be noted at the outset that the statute providing for video surveillance of drop boxes only applies to those boxes that were installed after October 1, 2020.  See MCL 168.761d(2). There is no evidence in the record whether there are any boxes subject to this requirement, how many there are, or where they are.  The plaintiffs have not cited any statutory authority that requires any video to be subject to review by election challengers.  They have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of such boxes. The clear language of the statute directs that "[t]he city or township clerk must use video monitoring of that drop box to ensure effective monitoring of that drop box." MCL 168.761d(4)(c) Additionally, plaintiffs have not directed the Court's attention to any authority directing the

Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated from other ballots, and rendering it impossible for the Court to grant the requested relief against this defendant.  Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested.  As a result, plaintiffs are unable to show a likelihood of success on the merits.

## II.    MOOTNESS

Moreover, even if the requested relief could issue against the Secretary of State, the Court notes that the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day.  By the time this action was filed, the votes had largely been counted, and the counting is now complete.  Accordingly, and even assuming the requested relief were available against the Secretary of State—and overlooking the problems with the factual and evidentiary record noted above—the matter is now moot, as it is impossible to issue the requested relief.  See *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018)

IT IS HEREBY ORDERED that plaintiff's November 4, 2020 emergency motion for declaratory judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that proposed intervenor's motion to intervene is DENIED as MOOT.

This is not a final order and it does not resolve the last pending claim or close the case.

November 6, 2020

Cynthia Diane Stephens
Judge, Court of Claims

# EXHIBIT 2

## Court of Appeals, State of Michigan

## ORDER

Cheryl A Costantino v City of Detroit

Docket No.    355443

LC No.      20-014780-AW

Michael J. Riordan
   Presiding Judge

Cynthia Diane Stephens

Anica Letica
   Judges

The motion for immediate consideration is GRANTED.

The motion for peremptory reversal pursuant to MCR 7.211(C)(4) is DENIED for failure to persuade the Court of the existence of manifest error requiring reversal and warranting peremptory relief without argument or formal submission.

The application for leave to appeal is DENIED.

*Michael J Riordan*

Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

November 16, 2020
Date

Chief Clerk

# EXHIBIT 3

# Order

Michigan Supreme Court
Lansing, Michigan

November 23, 2020

162245 & (27)(38)(39)

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

CHERYL A. COSTANTINO and EDWARD P.
McCALL, JR.,
           Plaintiffs-Appellants,

v

CITY OF DETROIT, DETROIT ELECTION
COMMISSION, DETROIT CITY CLERK,
WAYNE COUNTY CLERK, and WAYNE
COUNTY BOARD OF CANVASSERS,
           Defendants-Appellees,

and

MICHIGAN DEMOCRATIC PARTY,
           Intervening Defendant-Appellee.

SC: 162245
COA: 355443
Wayne CC: 20-014780-AW

_____/

On order of the Court, the motions for immediate consideration and the motion to file supplemental response are GRANTED. The application for leave to appeal the November 16, 2020 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the question presented should be reviewed by this Court.

ZAHRA, J. (*concurring*).

Plaintiffs ask this Court to "enjoin the Wayne County Canvassers certification of the November 2020 election prior to their meeting [on] November 17, 2020 at 3:00 p.m." on the basis that "the audit [requested by plaintiffs pursuant to Const 1963, art 2, § 4(1)(h)] needs to occur prior to the election results being certified by the Wayne County Board of Canvassers." Plaintiffs contend that if "the results of the November 2020 election [are] certified . . . Plaintiffs will lose their right to audit its results, thereby losing the rights guaranteed under the Michigan Constitution." However, plaintiffs cite no support, and I have found none, for their proposition that an audit under Const 1963, art

2, § 4(1)(h)—which provides "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections"—must *precede* the certification of election results.  Indeed, the plain language of Const 1963, art 2, § 4(1)(h) does *not* require an audit to precede the certification of election results.  To the contrary, certified results would seem to be a *prerequisite* for such an audit.  For how can there be "[t]he right to have the results of statewide elections audited" absent any results, and, further, what would be properly and meaningfully audited other than final, and presumably certified, results?  See also *Hanlin v Saugatuck Twp*, 299 Mich App 233, 240-241 (2013) (allowing for a quo warranto action to be brought by a citizen within 30 days of an election in which it appears that a material fraud or error has been committed), citing *Barrow v Detroit Mayor*, 290 Mich App 530 (2010); MCL 168.31a (which sets forth election-audit requirements and does not require an audit to take place before election results are certified); MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.").

Even so, while plaintiffs are not precluded from seeking a future "results audit" under Const 1963, art 2, § 4(1)(h), the certification of the election results in Wayne County has rendered the instant case moot to the extent that plaintiffs ask this Court to enjoin that certification; there is no longer anything to enjoin.  While it is noteworthy that two members of the board later sought to rescind their votes for certification, see LeBlanc, *GOP Canvassers Try to Rescind Votes to Certify Wayne County Election*, Detroit News (November 19, 2020) <https://www.detroitnews.com/story/news/local/michigan/2020/11/19/gop-canvassers-attempt-rescind-votes-certify-wayne-county-vote/3775246001/> (accessed November 23, 2020) [https://perma.cc/2SS2-Y29V], plaintiffs have nonetheless provided no support, and I have found none, for their proposition that this effects a "decertification" of the county's election results, so it seems they presently remain certified.  Cf. *Makowski v Governor*, 495 Mich 465, 487 (2014) (holding that the Governor has the power to grant a commutation, but does not have the power to revoke a commutation).  Thus, I am inclined to conclude that the certification of the election by the Wayne County board has rendered the instant case moot—but only as to plaintiffs' request for injunctive relief.

Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by the affiants offered by plaintiffs, among whom is Ruth Johnson, Michigan's immediate past Secretary of State, who testified that, given the "very concerning" "allegations and issues raised by Plaintiffs," she "believe[s] that it would be proper for an independent audit to be conducted as soon as possible to ensure the accuracy and integrity of th[e] election."  Plaintiffs' affidavits present evidence to substantiate their allegations, which include claims of ballots being counted from voters whose names are not contained in the appropriate poll books, instructions being given to

disobey election laws and regulations, the questionable appearance of unsecured batches of absentee ballots after the deadline for receiving ballots, discriminatory conduct during the counting and observation process, and other violations of the law. Plaintiffs, in my judgment, have raised important constitutional issues regarding the precise scope of Const 1963, art 2, § 4(1)(h)—a provision of striking breadth added to our Michigan Constitution just two years ago through the exercise of direct democracy and the constitutional initiative process—and its interplay with MCL 168.31a and other election laws. Moreover, the current Secretary of State has indicated that her agency will conduct a postelection performance audit in Wayne County. See Egan, *Secretary of State: Post-Election "Performance Audit" Planned in Wayne County*, Detroit Free Press (November 19, 2020) <https://www.freep.com/story/news/politics/elections/2020/11/19/benson-post-election-performance-audit-wayne/3779269001/> (accessed November 23, 2020) [https://perma.cc/WS95-XBPG]. This development would seem to impose at least some obligation upon plaintiffs both to explain why a constitutional audit is still required after the Secretary of State conducts the promised process audit and to address whether there is some obligation on their part to identify a specific "law" in support of Const 1963, art 2, § 4(1)(h) that prescribes the specific "manner" in which an audit pursuant to that provision must proceed.

In sum, at this juncture, plaintiffs have not asserted a persuasive argument that their case is not moot and that the entry of immediate injunctive relief is proper. That is all that is now before this Court. Accordingly, I concur in the denial of injunctive relief. In addition to denying the relief currently sought in this Court, I would order the most expedited consideration possible of the remaining issues. With whatever benefit such additional time allows, the trial court should meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants, as well as resolve necessary legal issues, including those identified in the separate statement of Justice VIVIANO. I would also have this Court retain jurisdiction of this case under both its appellate authority and its superintending authority under Const 1963, art 6, § 4 (stating that, with certain limitations, "the supreme court shall have general superintending control over all courts"). Federal law imposes tight time restrictions on Michigan's certification of our electors. Plaintiffs should not have to file appeals following our standard processes and procedures to obtain a final answer from this Court on such weighty issues.

Finally, I am cognizant that many Americans believe that plaintiffs' claims of electoral fraud and misconduct are frivolous and obstructive, but I am equally cognizant that many Americans are of the view that the 2020 election was not fully free and fair. See, e.g., Monmouth University Polling Institute, *More Americans Happy About Trump Loss Than Biden Win* (November 18, 2020) <https://www.monmouth.edu/polling-institute/reports/monmouthpoll_us_111820/> (accessed November 23, 2020) [https://perma.cc/7DUN-CMZM] (finding that 32% of Americans "believe [Joe Biden] only won [the election] due to voter fraud"). The latter is a view that strikes at the core of

concerns about this election's lack of both "accuracy" and "integrity"—values that Const 1963, art 2, § 4(1)(h) appears designed to secure.

In sum, as explained above, I would order the trial court to expedite its consideration of the remaining issues, and I would retain jurisdiction in order to expedite this Court's final review of the trial court's decision.  But, again, because plaintiffs have not asserted a persuasive argument that immediate injunctive relief is an appropriate remedy, I concur in the denial of leave to appeal and, by extension, the denial of that relief.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

Plaintiffs Cheryl Costantino and Edward McCall seek, among other things, an audit of the recent election results in Wayne County.  Presently before this Court is their application for leave to appeal the trial court's ruling that plaintiffs are not likely to succeed and therefore are not entitled to a preliminary injunction to stop the certification of votes by defendant Wayne County Board of Canvassers.  See MCL 168.824; MCL 168.825.  The Court of Appeals denied leave, and this Court has now followed suit.  For the reasons below, I would grant leave to answer the critical constitutional questions of first impression that plaintiffs have squarely presented concerning the nature of their right to an audit of the election results under Const 1963, art 2, § 4(1)(h).

The constitutional provision at issue in this case, which the people of Michigan voted to add in 2018 through Proposal 3, guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."  *Id.*  The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so and that the Legislature cannot impose additional obligations on the exercise of this right.  *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971).

The trial court failed to provide a meaningful interpretation of this constitutional language.  Instead, it pointed to MCL 168.31a, which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4.  But the trial court never considered whether MCL 168.31a accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right.

In passing over this constitutional text, the trial court left unanswered many questions pertinent to assessing the likelihood that plaintiffs would succeed on the

merits.[1]  As an initial matter, the trial court did not ask what showing, if any, plaintiffs must make to obtain an audit.  It appears that no such showing is required, as neither the constitutional text nor MCL 168.31a expressly provide for it.  None of the neighboring rights listed in Article 2, § 4, such as the right to vote by absentee ballot, requires citizens to present any proof of entitlement for the right to be exercised.  Yet, the trial court here ignored this threshold legal question and instead scrutinized the parties' bare affidavits, concluding that plaintiffs' allegations of fraud were not credible.[2]  The trial court's factual findings have no significance unless, to obtain an audit, plaintiffs were required to prove their allegations of fraud to some degree of certainty.

Wrapped up in this question is the meaning and design of Const 1963, art 2, § 4.  Is it a mechanism to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled?  To ascertain the type of audit the Constitution envisions, it is necessary to consider whether the term "audit" has a special meaning in the context of election administration.  In this regard, we should examine the various auditing practices in use around the time Proposal 3 was passed.  See Presidential Commission on Election Administration, *The American Voting Experience: Report and Recommendations* (January 2014), p 66 ("Different types of audits perform different functions.").  Some audits occur regardless of how close the election was.  They simply review the election process to verify that procedures were complied with, rules were followed, and technology performed as expected.  See *id.*; see also League of Women Voters, *Report on Election Auditing* (January 2009), p 3 ("Post-election audits routinely check voting system performance in contests, regardless of how close margins of victory appear.").  For these process-based audits, it would not appear critical whether they occur before the election results are finally certified, as the audit is intended to gather information that could be used to perfect voting systems going forward.

---

[1] The court also suggested that plaintiffs could seek a recount.  But, with few exceptions, the relevant recount provisions can be invoked only by candidates for office, which plaintiffs here were not.  Compare MCL 168.862 and MCL 168.879 (allowing candidates to request recounts) with MCL 168.880 (allowing any elector, in certain circumstances, to seek a recount of "votes cast upon the question of a proposed amendment to the constitution or any other question or proposition").

[2] The court's credibility determinations were made without the benefit of an evidentiary hearing.  Ordinarily, an evidentiary hearing is required where the conflicting affidavits create factual questions that are material to the trial court's decision on a motion for a preliminary injunction under MCR 3.310.  See 4 Longhofer, Michigan Court Rules Practice, Text (7th ed, 2020 update), § 3310.6, pp 518-519.  See also *Fancy v Egrin*, 177 Mich App 714, 723 (1989) (an evidentiary hearing is mandatory "where the circumstances of the individual case so require").

Other audits, by contrast, aim to ensure accuracy in a specific election and enable alteration of results if necessary.  The American Law Institute's recent *Principles of the Law, Election Administration*, drafted around the time Proposal 3 was passed, suggests that audits should be used in this manner:

> [I]f an audit exposes a problem, the number of randomly sampled ballots can be increased in order to ascertain whether or not the problem is one that threatens the accuracy of the determination of which candidate is the election's winner.  In an extreme case, when problems exposed by an audit were severe, the audit would need to turn into a full recount of all ballots in the election in order to provide the requisite confidence in the accuracy of the result (or, as necessary, to alter the result based on the findings of the audit-turned-recount).  In those circumstances when the audit exposes no such problem, election officials ordinarily would be able to complete the audit prior to the deadline for certifying the results of the election; when, however, the audit reveals the necessity of a full recount, then a state—depending on how it chooses to structure the relationship between certification and a recount—either could delay certification until completion of the recount or issue a preliminary certification that is subject to revision upon completion of the recount.  [ALI, Principles of the Law, Election Administration (2019), § 209, comment *c*.]

These audits, such as a risk-limiting audit, "are designed to be implemented before the certification of the results, and to inform election officials whether they should be confident in the results—or if they should bump the audit up to a full recount."  Pettigrew & Stewart, *Protecting the Perilous Path of Election Returns from the Precinct to the News*, 16 Ohio St Tech L J 587, 636 (2020) ("[Risk-limiting audits] conducted as part of the certification process currently provide the best mechanism through which the manipulation of election returns at the precinct level can be detected and, most importantly, remedied.").  A review of election laws conducted in early 2018 similarly recommended that audits be undertaken "after preliminary outcomes are announced, but before official certification of election results" because this allows for "correction of preliminary results if preliminary election outcomes are found to be incorrect."  Root et al, Center for American Progress, *Election Security in All 50 States: Defending America's Elections* (Feb 12, 2018), available at <https://www.americanprogress.org/issues/democracy/reports/2018/02/12/446336/election-security-50-states/>.

Whether the constitutional right to an audit may be utilized to uncover evidence of fraud to challenge the results of an election will also need to be addressed.  In particular, how does the constitutional audit operate within our statutory framework and procedures for canvassing election returns, certifying the results, and disputing ballots on the basis of fraud?  We have long indicated that canvassing boards' role is ministerial and does not

involve investigating fraud.  See *McLeod v State Bd of Canvassers*, 304 Mich 120 (1942); see also *People ex rel Williams v Cicott*, 16 Mich 283, 311 (1868)[3] (opinion of Christiancy, J.) (noting that the boards, "acting thus ministerially," are "often compelled to admit votes which they know to be illegal"); see generally Paine, *Treatise on the Law of Elections to Public Offices* (1888), § 603, p 509 ("The duties of county, district, and state canvassers are generally ministerial. . . .  Unless authorized by statute, they cannot go behind those returns. . . .  Questions of illegal voting and fraudulent practices are to be passed upon by another tribunal.").  The Board of State Canvassers has more of a role in investigating fraud in recounts, although we have held that it cannot exclude votes on this basis.  See MCL 168.872 (providing that if the board conducting a recount suspects fraud occurred during the election, it can make an investigation that produces a report that is submitted to the prosecuting attorney or to the circuit judges of the county); *May v Wayne Co Bd of Canvassers*, 94 Mich 505, 512 (1893) (holding that the board could not exclude votes during a recount based on fraud).  These holdings may suggest that evidence of fraud uncovered in an audit is not a barrier to certification and instead may only be used to challenge an election in quo warranto and other related proceedings.  See *The People ex rel Attorney General v Van Cleve*, 1 Mich 362, 364-366 (1850) (holding in a quo warranto proceeding that the certification "is but *prima facie* evidence" of the election results and that a party can "go behind all these proceedings[; that the party] may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office").

Consequently, it is imperative to determine the nature and scope of the audit provided for in Article 2, § 4, so we can determine when the audit occurs and whether it will affect the election outcome.  These questions are important constitutional issues of first impression that go to the heart of our democracy and the power of our citizens to amend the Constitution to ensure the accuracy and integrity of elections.  They deserve serious treatment.  I would grant leave to appeal and hear this case on an expedited basis to resolve these questions.[4]  For these reasons, I dissent.

---

[3] Overruled in part on other grounds by *Petrie v Curtis*, 387 Mich 436 (1972).

[4] In doing so, I would consider the parties' arguments regarding whether the matter is moot.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

November 23, 2020



b1117t

Clerk

# EXHIBIT 4

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,                          Case No. 20-014780-AW

      Plaintiffs,                          Hon. Timothy M. Kenny

vs.

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

      Defendants.

---

| GREAT LAKES JUSTICE CENTER | FINK BRESSACK |
|---|---|
| David A. Kallman (P34200) | David H. Fink (P28235) |
| Erin E. Mersino (P70886) | Darryl Bressack(P67820) |
| Jack C. Jordan (P46551) | 38500 Woodward Ave., Suite 350 |
| Stephen P. Kallman (P75622) | Bloomfield Hills, MI 48304 |
| 5600 W. Mount Hope Hwy. | (248) 971-2500 |
| Lansing, MI 48917 | dfink@finkbressack.com |
| (517) 322-3207 | dbressack@finkbressack.com |
| *Attorneys for Plaintiffs* | *Attorneys for City of Detroit, City of Detroit* |
| | *Election Commission and Janice Winfrey* |
| | |
| | CITY OF DETROIT LAW DEPARTMENT |
| | Lawrence T. García (P54890) |
| | Charles N. Raimi (P29746) |
| | James D. Noseda (P52563) |
| | 2 Woodward Ave., 5th Floor |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | garcial@detroitmi.goc |
| | raimic@detroitmi.gov |
| | nosej@detroitmi.gov |
| | *Attorneys for City of Detroit, City of Detroit* |
| | *Election Commission and Janice Winfrey* |

---

**AFFIDAVIT OF CHRISTOPHER THOMAS**

1

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1.      I am a Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 until December 12, 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election.

2.      I served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. In June 1981 I was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs.

3.      In 2013, I was appointed to President Barack Obama's Commission on Election Administration and served until a final report was submitted to the President and Vice-President in January 2014.

4.      I am a founding member of the National Association of State Election Directors and severed as its president in 1997 and 2013.

5.      On November 2, 3 and 4, 2020, I worked at the TCF Center absent voter counting boards primarily as liaison with challenger parties and organizations. I provided answers to questions about processes at the counting board tables, resolved disputed about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers.  I have reviewed the complaint and affidavits in this case.

6. It is clear from the affidavits attached to the Complaint that these challengers do not understand absent voter ballot processing and tabulating. It is clear also that they did not operate through the leadership of their challenger party, because the issues they bring forward were by and large discussed and resolved with the leadership of their challenger party. The leadership on numerous occasions would ask me to accompany them to a particular counting board table to resolve an issue. I would always discuss the issue with counting board inspectors and their supervisors and the challengers. The affiants appear to have failed to follow this protocol established in a meeting with challenger organizations and parties on Thursday, October 29, 2020 at the TCF Center where a walk-through of the entire process was provided. A few basics are in order: The Qualified Voter File (QVF) is a statewide vote registration file and was not available to counting boards. E-pollbook (EPB) is a computer program used in election day precincts to create the poll list of voters casting ballots. Supplemental poll lists contain names of voters who cast an absent voter ballot on Sunday, Monday and Tuesday.   At the processing tables no ballots are scanned. A poll list is not used to confirm whether any specific voter's ballot is counted.

7. To increase the accuracy of the poll list, the Detroit Department of Elections employed the Secretary of State e-pollbook (EPB) to assist in creating the poll list. For each of the counting boards, the EPB held all the names of voters who requested and returned an absent voter ballot by mid-afternoon Sunday, November 1. The download on Sunday was necessary to prepare for the pre-processing granted by a recently enacted law that allows larger municipalities to process ballots, but not to tabulate them, for 10 hours on Monday. (To clarify some apparent confusion by Plaintiffs, Wayne County does not tabulate City of Detroit absent voter ballots.)

8. Absent voter ballots received Sunday after the download to EPB, all day Monday until 4 p.m. and Tuesday by 8 p.m. were not in the EPB. They would be added either by manually

3

entering the voter names into the EPB or on supplemental paper poll lists printed from the Qualified Voter File (QVF).

9. Zachery Larsen is raising an issue about return ballot envelopes where the barcode on the label would not scan and the voter's name was not on the supplemental list. He was observing the correction of clerical errors, not some type of fraud. In every election, clerical errors result in voters being left off the poll list, whether it is a paper poll list or the EPB. These errors are corrected so that voters are not disenfranchised. Michigan law ensures that voters are not disenfranchised by clerical errors.

10. On Wednesday, November 4 it was discovered that the envelopes for some ballots that had been received prior to November 3 at 8 p.m., had not been received in the QVF. They would not scan into the EPB and were not on the supplemental paper list. Upon reviewing the voters' files in the QVF, Department of Elections staff found that the final step of processing receipt of the ballots was not taken by the satellite office employees. The last step necessary to receive a ballot envelope requires the satellite employee to enter the date stamped on the envelope and select the "save" button. They failed to select "save".

11. A team of workers was directed to correct those clerical errors by entering the date the ballots were received in the satellite office and selecting "save". This action then placed the voter into the Absent Voter Poll List in the QVF so that the ballot could be processed and counted. None of these ballots were received after 8 p.m. on election day. Most were received on Monday, November 2nd – the busiest day for the satellite offices.

12. The return ballot envelopes for each of these voters are marked with the date received and initialed by satellite employees who verified the voter signatures. By entering the date on which the ballot was received, no QVF data was altered. The date field was empty because

4

the satellite workers did not select 'save', thus failing to complete the transaction. The "backdating" allegation is that on November 4 the staff entered the correct dates the ballots were received – all dates were November 3 or earlier.  The date of receipt was not backdated.

13.     These return ballot envelopes were discussed with several Republican challengers. Two challengers were provided a demonstration of the QVF process to show them how the error occurred, and they chose not to file a challenge to the individual ballots.

14.     The inspectors at the counting boards were able to manually enter voters into the EPB. The return ballot envelope could easily be observed and every key stroke of the EPB laptop operator was clearly visible on the large screen at one corner of the table. The Department of Elections, at some expense, provided large monitors (see attached photo) to keep the inspectors safe and provide the challengers with a view of what was being entered, without crossing the 6-foot distancing barrier. Instead of creating problems for challengers, the monitors made observing the process very transparent.

15.     The EPB has an "Unlisted Tab" that allows inspectors to add the names of voters not listed. The EPB is designed primarily for use in election day polling places and reserves the Unlisted Tab to enter voters casting provisional ballots. In polling places, voters are verified by providing their date of birth. Consequently, the EPB is designed with a birthdate field that must be completed to move to the next step. When using this software in an absent voter counting board, a birthdate is not necessary to verify voters, as these voters are verified by signature comparisons (a process which was completed before the ballots were delivered to the TCF Center). Inspectors at the TCF Center did not have access to voters' birthdates. Therefore, due to the fact that the software (but not the law or the Secretary of State) requires the field be completed to move to the next step, 1/1/1900 was used as a placeholder. This is standard operating procedure and a standard date used

by the State Bureau of Elections and election officials across the state to flag records requiring attention. The date of 1/1/1900 is recommended by the Michigan Secretary of State for instances in which a placeholder date is needed.

16.     When Republican challengers questioned the use of the 1/1/1900 date on several occasions, I explained the process to them. The challengers understood the explanation and, realizing that what they observed was actually a best practice, chose not to raise any challenges.

17.     Ballots are delivered to the TCF Center after they are processed at the Department of Elections main office on West Grand Boulevard. On election day, ballots are received from the post office and the satellite offices. It takes several hours to properly process ballots received on election day. It appears that some of the affidavits submitted by Plaintiffs are repeating false hearsay about ballots being delivered, when actually television reporters were bringing in wagons of audio-video equipment. All ballots were delivered the same way— from the back of the TCF Hall E.

18.     Early in the morning on Wednesday, November 4, approximately 16,000 ballots were delivered in a white van used by the city. There were 45 covered trays containing approximately 350 ballots each. The ballots were not visible as the trays had a sleeve that covered the ballots.

19.     The ballots delivered to the TCF Center had been verified by the City Clerk's staff prior to delivery in a process prescribed by Michigan law. Thus, when Jessy Jacob complains that she "was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" it was because that part of the process had already been completed by the City Clerk's Office in compliance with the statutory scheme.

20.     It would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center. No voter not in the QVF or in the "Supplemental Sheets" could have been processed, or "assigned" to a "random name" because no ballot from a voter not in one of the two tracking systems, was brought to the TCF Center.

21.     Mr. Larsen complains he was not given a full opportunity to stand immediately behind or next to an election inspector. As stated, monitors were set up for this purpose. Moreover, election inspection were instructed to follow the same procedure for all challengers. The Detroit Health Code and safety during a pandemic required maintaining at least 6-feet of separation. This was relaxed where necessary for a challenger to lean in to observe something and then lean back out to return to the 6-foot distancing. The inspectors could see and copy the names of each person being entered into the e-pollbook. If an inspector did not fully accommodate a challenger's reasonable request and the issue was brought to the attention of a supervisor, it was remedied. Announcements were made over the public address  system to inform all inspectors of the rules. If what Mr. Larsen says is accurate, any inconvenience to him was temporary, had no effect on the processing of ballots, and certainly was not a common experience for challengers.

22.     Jessy Jacob alleges she was instructed by her supervisor to adjust the mailing date of absentee ballot packages being sent out to voters in September 2020.  The mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes.

23.     Michigan Election Law requires clerks to safely maintain absent voter ballots and deliver them to the absent voter counting board. There is no requirement that such ballots be transported in sealed ballot boxes. To my knowledge, they are not sealed by any jurisdiction in Michigan in a ballot box prior to election day. Employees bring the ballot envelopes to the TCF Center, which is consistent with chain of custody. The only ballots brought to TCF that are not in envelopes are blank ballots used to duplicate ballots when necessary.

24.     At no time after ballots were delivered to TCF on Sunday, November 1, did any ballot delivery consisted of "tens of thousands of ballots".

25.     Reference is made to a "second round of new ballots" around 9:00 p.m. on Wednesday, November 4. At or about 9:00 p.m. on November 4, 2020 the Department of Elections delivered additional blank ballots that would be necessary to complete the duplication of military and overseas ballots. No new voted ballots were received. The affidavits are likely referring to blank ballots that were being delivered in order to process AV and military ballots in compliance with the law.

26.     In the reference to a "second round of new ballots" there are numerous misstatements indicative of these challengers' lack of knowledge and their misunderstanding of how an absent voter counting board operates. These statements include "confirm that the name on the ballot matched the name on the electronic poll list" – there are no names on ballots.

27.     No absentee ballots received after the deadline of 8:00 p.m. on November 3, 2020, were received by or processed at the TCF Center. Only ballots received by the deadline were processed.

28.     Plaintiffs reference "Supplement Sheets with the names of all persons who have registered to vote on either November 2, 2020 or November 3, 2020." Some of the names are

voters who registered to vote on those days, but the vast majority are voters who applied for and voted an absent voter ballot.

29.     Plaintiffs use "QVF" in place of "EPB". The QVF is a statewide voter registration file; an EPB for a counting board is a file of the voters who applied for and returned an absent voter ballot for that counting board.

30.     There is no "election rule" requiring all absent voter ballots be recorded in the QVF by 9:00 p.m. on November 3, 2020.

31.     Plaintiffs also misunderstand the process when they state ballots were "filled out by hand and duplicated on site." Instead, ballots were duplicated according to Michigan law. Michigan election law does not call for partisan challengers to be present when a ballot is duplicated; instead, when a ballot is duplicated as a result of a "false read," the duplication is overseen by one Republican and one Democratic inspector coordinating together. That process was followed.

32.     Regarding access to TCF Hall E by challengers, there is also much misinformation contained in the statements of challengers. Under the procedure issued by the Secretary of State there may only be 1 challenger for each qualified challenger organization at a counting board. Detroit maintains 134 counting board, thus permitting a like number of challengers per organization.

33.     In mid-afternoon on Wednesday, I observed that few challengers were stationed at the counting board tables. Rather, clusters of 5, 10 or 15 challengers were gathered in the main aisles at some tables. I conducted a conversation with leaders of the Republican Party and Democratic Party about the number of challengers in the room and their locations. It became clear that more than 134 challengers were present for these organizations. No one was ejected for this

reason, but access to Hall E was controlled to ensure that challenger organizations had their full complement and did not exceed the ceiling any further than they already had.

34.     Challengers were instructed to sign out if they needed to leave Hall E. For a short period of time—a few hours—because there were too many challengers in Hall E for inspectors to safely do their jobs, new challengers were not allowed in until a challenger from their respective organization left the Hall. However, as stated above, each challenger organization, including Republican and Democrat, continued to have their complement of challengers inside of the Hall E.

35.     As stated previously, challengers are expected to be at their stations next to a counting board. Unfortunately, this was not the behavior being displayed. Instead, challengers were congregating in large groups standing in the main aisles and blocking Election Inspectors' movement. In one instance, challengers exhibited disorderly behavior by chanting "Stop the Vote." I believed this to be inappropriate threatening of workers trying to do their jobs. Such action is specifically prohibited in Michigan election law. Nevertheless, challengers were permitted to remain.

36.     The laptop computers at the counting boards were not connected to the Internet. Some of the computers were used to process absent voter ballot applications in mid-October and were connected to the QVF. On election day and the day after election day, those computers were not connected and no inspector at the tables had QVF credentials that would enable them to access the QVF.

37.     The Qualified Voter File has a high level of security and limitation on access to the file. For example, it is not true that a person with QVF credentials in one city is able to access data in another city's file within the QVF. That is not possible.

38.     A point of much confusion in these claims is centered on the law that permits a city clerk to verify the signatures on absent voter ballots before election day. Inspectors at absent voter counting boards do not verify the signatures on the return ballot envelopes. Department of Elections staff may use a voter's signature on an application to verify the voter's signature on return ballot envelope. Or the staff may use the voter's signature in the QVF to make the comparison. Often using the QVF is more efficient than the application signatures.

39.     I am not aware of any valid challenge being refused or ignored or of any challengers being removed because they were challenging ballots. Ballot challengers are an important part of the democratic process and were fully able to participate in the process at the TCF Center.

40.     In conclusion, upon reviewing Plaintiffs' Complaint, Affidavits, and Motion, I can conclude based upon my own knowledge and observation that Plaintiffs' claims are misplaced and that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.


Date:   November 11, 2020

CHRISTOPHER THOMAS

Subscribed and sworn to before me
this 11ᵗʰ day of _NOVEMBER_, 2020.

_Nancy M. Black_
Notary Public) NANCY M. BLACK
County of: VAN BUREN, STATE OF MICHIGAN
My Commission Expires: 09-05-2025
ACTING IN BERRIEN COUNTY, MICHIGAN



# EXHIBIT 5

STATE OF MICHIGAN
IN THE COURT OF APPEALS

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,

       COA Case No.: 355443

     Plaintiffs/Appellants,

       Cir. Ct. Case No. 20-014780-AW
vs.       Hon. Timothy M. Kenny

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

     Defendants/Appellees.

and

MICHIGAN DEMOCRATIC PARTY,

     Intervenor Defendant/Appellee,

| GREAT LAKES JUSTICE CENTER | FINK BRESSACK |
|---|---|
| David A. Kallman (P34200) | David H. Fink (P28235) |
| Erin E. Mersino (P70886) | Darryl Bressack(P67820) |
| Jack C. Jordan (P46551) | 38500 Woodward Ave., Suite 350 |
| Stephen P. Kallman (P75622) | Bloomfield Hills, MI 48304 |
| 5600 W. Mount Hope Hwy. | (248) 971-2500 |
| Lansing, MI 48917 | dfink@finkbressack.com |
| (517) 322-3207 | dbressack@finkbressack.com |
| *Attorneys for Plaintiffs* | *Attorneys for City of Detroit, City of Detroit* |
| | *Election Commission and Janice Winfrey* |
| | |
| WAYNE COUNTY CORPORATION | CITY OF DETROIT LAW DEPARTMENT |
| COUNSEL | Lawrence T. García (P54890) |
| James W. Heath (P65419) | Charles N. Raimi (P29746) |
| Janet Anderson-Davis (P29499) | James D. Noseda (P52563) |
| 500 Griswold, 21st Floor | 2 Woodward Ave., 5th Floor |
| Detroit, MI 48226 | Detroit, MI 48226 |
| (313) 347-5813 | (313) 237-5037 |
| *Attorneys for Wayne County Defendants* | garcial@detroitmi.goc |
| | raimic@detroitmi.gov |

1

nosej@detroitmi.gov
*Attorneys for City of Detroit, City of Detroit*
*Election Commission and Janice Winfrey*

CUMMINGS & CUMMINGS
Mary Ellen Gurewitz (P25724)
423 N. Main St., Suite 200
Royal Oak, MI 48067
(248) 733-3405
*Attorneys for Intervenor Defendant*

MILLER CANFIELD
Scott R. Eldridge (P66452)
One Michigan Avenue, Suite 900
Lansing, MI 48933
(517) 483-4918
*Attorneys for Intervenor Defendant*

PERKINS COIE LLP
Marc E. Elias
John M. Devan
Jyoti Jasrasaria
700 Thirteenth Street NW, Ste. 800
Washington, DC 20005
(313) 654-6200
*Attorneys for Intervenor Defendant*

PERKINS COIE LLP
Kevin J. Hamilton
Jonathan P. Hawley
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
(206) 359-8000
*Attorneys for Intervenor Defendant*

## SUPPLEMENTAL AFFIDAVIT OF CHRISTOPHER THOMAS

## SUBMITTED IN SUPPORT OF CITY OF DETROIT, DETROIT ELECTION COMMISSION AND JANICE WINFREY'S RESPONSE TO APPLICATION FOR LEAVE TO APPEAL

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1.     I have served as a Senior Advisor to Detroit City Clerk Janice Winfrey beginning on September 3, 2020 and continuing until December 12, 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Election matters and general preparation for the November 3, 2020 General Election.

2.     I submitted an affidavit which was attached as Exhibit 1 to the Response filed by the City of Detroit, Detroit Election Commission and Janice Winfrey to Plaintiffs' Motion for an Ex-Parte Temporary Restraining Order, Show Cause Order and Preliminary Injunction.

3.     This supplemental affidavit is intended to supplement the earlier affidavit by including information obtained subsequent to the earlier affidavit and to respond to claims made in an affidavit submitted to the trial court which I did not have an opportunity to review before my affidavit was completed.

4.     In his affidavit, Zachery Larsen stated he saw an inspector at Counting Board 23, type into the computer system a name other than that of the voter appearing on the envelope because the voter was already in the EPB. But, if the voter was already checked in, the inspector would not have the envelope with a ballot in it. Mr. Larsen asserts he saw the name "Pope" typed into the EPB when there was already a person with that last name in the EPB. But, at Counting Board 23, there are three people with the last name Pope who voted in the election. One returned their ballot in October and therefore would have been in the EPB (since the information was downloaded from the Qualified Voter File on Sunday November 1, 2020). The two other voters with the last name of Pope voted on Monday, November 1, so their names would not be in the EPB. Mr. Larsen apparently observed one of those voters being hand entered into the system, as was necessary if they were not already in the EPB.

5.     The City has conducted an internal inquiry with respect to Mr. Larsen's assertions regarding Counting Board 23. At that Counting Board, 2,855 ballots were tabulated with 2,856 associated envelopes. Each envelope is associated with validly registered voters and applications for absent voter ballots. The only voters whose names were typed into the system at that Counting Board were voters whose barcode did not bring up a ballot and whose name did not appear on the

3

supplemental list. All such ballot envelopes were signed, verified and date/time-stamped as having been received before 8:00 p.m. on Tuesday, November 3, 2020.

6.  My understanding is that affiant Melissa Carone had been hired by a third party to clear ink backups on tabulating machines. Her main allegation—that hundreds or thousands of ballots were counted twice—cannot be true. She says she saw on a computer that 50 of the same ballots had been counted 8 times, and that she saw numerous similar instances "countless times" throughout the day. She does not say she saw multiple scans; just that she saw the numbers on various computers. If what she said were true, at the very least, 350 extra votes would show up in at least one precinct (or an absent voter counting board). Indeed, according to her, large numbers of of extra votes would show up in "countless" precincts. However, a mistake like that would obviously be caught very quickly on site. What Ms. Carone thinks she saw would also be caught by the Detroit Department of Elections and the Wayne County Canvassing Board during the canvassing which occurs after every election as a matter of law.

7.  Ms. Carone's speculation about 100,000 new ballots is not possible. On Sunday roughly 150,000 absent voter ballots were delivered to TCF for the Monday pre-processing; on Tuesday roughly 7,000 ballots were delivered and on Wednesday around 3 – 3:30 a.m. the final roughly 16,000 ballots were delivered. If 100,000 instead of 16,000 ballots had been delivered, Detroit's total turnout would be 84,000 ballots more than what is publicly reported. Her claim about the 100,000 new ballots appears to be based on a repeatedly debunked conspiracy theory in which a clerk in Shiawassee County accidentally typed in an extra 0 and quickly discovered and fixed the error. See, e.g. https://www.factcheck.org/2020/11/clerical-error-prompts-unfounded-claims-about-michigan-results/.

4

8.    In conclusion, I have seen nothing which would change my conclusions, based upon my own knowledge and observation, that Plaintiffs' claims are misplaced and that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.


Date:   November 16, 2020

CHRISTOPHER THOMAS


Subscribed and sworn to before me
this _16th_ day of _NOVEMBER_, 2020.

Notary Public
County of MACOMB, ACTING IN OAKLAND
My Commission Expires: 8/8/24
NOTARIZED USING ELECTRONIC/REMOTE TECHNOLOGY
NOTARY LOCATED IN OAKLAND COUNTY, MI
SIGNATORY LOCATED IN BERRIEN COUNTY, MI

KIMBERLY S. HUNT
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Aug 8, 2024
ACTING IN COUNTY OF OAKLAND

5

# EXHIBIT 6

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and,
EDWARD P. MCCALL, JR.,                          Case No. 20-014780-AW

        Plaintiffs,                             Hon. Timothy M. Kenny

vs.

CITY OF DETROIT; DETROIT ELECTION
COMMISSION; JANICE WINFREY, in her official
capacity as the CLERK OF THE CITY and the
Chairperson of the DETROIT ELECTION COMMISSION;
CATHY M. GARRETT, in her official capacity as the
CLERK OF WAYNE COUNTY; and the WAYNE COUNTY
BOARD OF CANVASSERS,

        Defendants.

---

| GREAT LAKES JUSTICE CENTER | FINK BRESSACK |
|---|---|
| David A. Kallman (P34200) | David H. Fink (P28235) |
| Erin E. Mersino (P70886) | Darryl Bressack(P67820) |
| Jack C. Jordan (P46551) | 38500 Woodward Ave., Suite 350 |
| Stephen P. Kallman (P75622) | Bloomfield Hills, MI 48304 |
| 5600 W. Mount Hope Hwy. | (248) 971-2500 |
| Lansing, MI 48917 | dfink@finkbressack.com |
| (517) 322-3207 | dbressack@finkbressack.com |
| *Attorneys for Plaintiffs* | *Attorneys for City of Detroit, City of Detroit Election Commission and Janice Winfrey* |
| | CITY OF DETROIT LAW DEPARTMENT |
| | Lawrence T. García (P54890) |
| | Charles N. Raimi (P29746) |
| | James D. Noseda (P52563) |
| | 2 Woodward Ave., 5th Floor |
| | Detroit, MI 48226 |
| | (313) 237-5037 |
| | garcial@detroitmi.goc |
| | raimic@detroitmi.gov |
| | nosej@detroitmi.gov |
| | *Attorneys for City of Detroit, City of Detroit Election Commission and Janice Winfrey* |

## AFFIDAVIT OF LAWRENCE T. GARCIA

Being duly sworn, Lawrence T. García, deposes and states the following as true, under oath:

1. For almost three years, I have served the City of Detroit as Corporation Counsel and as one of three commissioners on Detroit's Election Commission, as identified by the 2012 Detroit City Charter, Section 3-102.

2. From the morning of Tuesday, November 3, 2020 until roughly ten o'clock on the evening of Wednesday, November 4, 2020, I personally witnessed efforts to prepare, process and count absentee voter ("AV") ballots cast in the November 3, 2020 election by Detroiters.

3. I witnessed no irregularities in the processing of AV ballots cast in the recent election.

4. On Tuesday and Wednesday of this week, I spent at least 18 hours inside the Central Counting Board ("CCB") in Hall E of the TCF Center where AV ballots were counted.

5. During my time in the CCB, I personally recognized and spoke with election challengers from both the democratic and republican parties, as well as challengers who identified themselves as non-partisan, and I personally witnessed election inspectors fielding concerns from both republican and democrat election challengers.

6. All poll workers taking part in the recent election work were identified by name, as well as their stated political party preference in an official, poll worker list that was available for inspection and that was published to both the republican and democratic parties of Michigan well in advance of the AV ballot counting that took place this week.

7. Having been present at the CCB during all or most of the time at issue in this dispute, I do not see how any of the things alleged would tend to benefit one candidate to the exclusion of others – with the sole exception of the alleged, illegal delivery of late, false ballots, which I find incredible.

I affirm that the representations above are true.

*Lawrence T. Garcia*

Lawrence T. García

Subscribed and sworn to before me
This _11th_ day of November 2020

*Nancy A. Goldpaugh*

Notary Public
County of Wayne, State of Michigan

My Commission Expires: _8.4.2023_

NANCY A. GOLDPAUGH
NOTARY PUBLIC – STATE OF MICHIGAN
COUNTY OF WAYNE
My Commission Expires August 4, 2023
Acting in the County of _Wayne_

# EXHIBIT 7

# STATE OF MICHIGAN

# COURT OF CLAIMS

DONALD J. TRUMP FOR PRESIDENT, INC.
and ERIC OSTEGREN,

    Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

    Defendants.

_____/

**OPINION AND ORDER**

Case No.  20-000225-MZ

Hon. Cynthia Diane Stephens

   Pending before the Court are two motions.  The first is plaintiffs' November 4, 2020 emergency motion for declaratory relief under MCR 2.605(D).  For the reasons stated on the record and incorporated herein, the motion is DENIED.  Also pending before the Court is the motion to intervene as a plaintiff filed by the Democratic National Committee.  Because the relief requested by plaintiffs in this case will not issue, the Court DENIES as moot the motion to intervene.

   According to the allegations in plaintiffs' complaint, plaintiff Eric Ostegren is a credentialed election challenger under MCL 168.730.  Paragraph 2 of the complaint alleges that plaintiff Ostegren was "excluded from the counting board during the absent voter ballot review process."  The complaint does not specify when, where, or by whom plaintiff was excluded.  Nor does the complaint provide any details about why the alleged exclusion occurred.

The complaint contains allegations concerning absent voter ballot drop-boxes.  Plaintiffs allege that state law requires that ballot containers must be monitored by video surveillance. Plaintiff contends that election challengers must be given an opportunity to observe video of ballot drop-boxes with referencing the provision(s) of the statute that purportedly grant such access, . See MCL 168.761d(4)(c).

Plaintiffs' emergency motion asks the Court to order all counting and processing of absentee ballots to cease until an "election inspector" from each political party is allowed to be present at every absent voter counting board, and asks that this court require the Secretary of State to order the immediate segregation of all ballots that are not being inspected and monitored as required by law.  Plaintiffs argue that the Secretary of State's failure to act has undermined the rights of all Michigan voters.  While the advocate at oral argument posited the prayer for relief as one to order "meaningful access" to the ballot tabulation process, plaintiffs have asked the Court to enter a preliminary injunction to enjoin the counting of ballots.   A party requesting this "extraordinary and drastic use of judicial power" must convince the Court of the necessity of the relief based on the following factors:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued.  [*Davis v Detroit Fin Review Team*, 296 Mich App 568, 613; 821 NW2d 896 (2012).]

As stated on the record at the November 5, 2020 hearing, plaintiffs are not entitled to the extraordinary form of emergency relief they have requested.

I.   SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS

## A.  OSTEGREN CLAIM

Plaintiff Ostegren avers that he was removed from an absent voter counting board.  It is true that the Secretary of State has general supervisory control over the conduct of elections.  See MCL 168.21; MCL 168.31.  However, the day-to-day operation of an absent voter counting board is controlled by the pertinent city or township clerk.  See MCL 168.764d.  The complaint does not allege that the Secretary of State was a party to or had knowledge of, the alleged exclusion of plaintiff Ostegren from the unnamed absent voter counting board.  Moreover, the Court notes that recent guidance from the Secretary of State, as was detailed in matter before this Court in *Carra et al v Benson et al*, Docket No. 20-000211-MZ, expressly advised local election officials to admit credentialed election challengers, provided that the challengers adhered to face-covering and social-distancing requirements.  Thus, allegations regarding the purported conduct of an unknown local election official do not lend themselves to the issuance of a remedy against the Secretary of State.

## B.  CONNARN AFFIDAVIT

Plaintiffs have submitted what they refer to as "supplemental evidence" in support of their request for relief.  The evidence consists of: (1) an affidavit from Jessica Connarn, a designated poll watcher; and (2) a photograph of a handwritten yellow sticky note.  In her affidavit, Connarn avers that, when she was working as a poll watcher, she was contacted by an unnamed poll worker who was allegedly "being told by other hired poll workers at her table to change the date the ballot was received when entering ballots into the computer."  She avers that this unnamed poll worker later handed her a sticky note that says "entered receive date as 11/2/20 on 11/4/20."  Plaintiffs contend that this documentary evidence confirms that some unnamed persons engaged in

fraudulent activity in order to count invalid absent voter ballots that were received after election day.

This "supplemental evidence" is inadmissible as hearsay. The assertion that Connarn was informed by an unknown individual what "other hired poll workers at her table" had been told is inadmissible hearsay within hearsay, and plaintiffs have provided no hearsay exception for either level of hearsay that would warrant consideration of the evidence. See MRE 801(c). The note— which is vague and equivocal—is likewise hearsay. And again, plaintiffs have not presented an argument as to why the Court could consider the same, given the general prohibitions against hearsay evidence. See *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 105; 776 NW2d 114 (2009). Moreover, even overlooking the evidentiary issues, the Court notes that there are still no allegations implicating the Secretary of State's general supervisory control over the conduct of elections. Rather, any alleged action would have been taken by some unknown individual at a polling location.

## C.  BALLOT BOX VIDEOS

It should be noted at the outset that the statute providing for video surveillance of drop boxes only applies to those boxes that were installed after October 1, 2020. See MCL 168.761d(2). There is no evidence in the record whether there are any boxes subject to this requirement, how many there are, or where they are. The plaintiffs have not cited any statutory authority that requires any video to be subject to review by election challengers. They have not presented this Court with any statute making the Secretary of State responsible for maintaining a database of such boxes. The clear language of the statute directs that "[t]he city or township clerk must use video monitoring of that drop box to ensure effective monitoring of that drop box." MCL 168.761d(4)(c) Additionally, plaintiffs have not directed the Court's attention to any authority directing the

Secretary of State to segregate the ballots that come from such drop-boxes, thereby undermining plaintiffs' request to have such ballots segregated from other ballots, and rendering it impossible for the Court to grant the requested relief against this defendant.  Not only can the relief requested not issue against the Secretary of State, who is the only named defendant in this action, but the factual record does not support the relief requested.  As a result, plaintiffs are unable to show a likelihood of success on the merits.

## II.   MOOTNESS

Moreover, even if the requested relief could issue against the Secretary of State, the Court notes that the complaint and emergency motion were not filed until approximately 4:00 p.m. on November 4, 2020—despite being announced to various media outlets much earlier in the day.  By the time this action was filed, the votes had largely been counted, and the counting is now complete.  Accordingly, and even assuming the requested relief were available against the Secretary of State—and overlooking the problems with the factual and evidentiary record noted above—the matter is now moot, as it is impossible to issue the requested relief.  See *Gleason v Kincaid*, 323 Mich App 308, 314; 917 NW2d 685 (2018)

IT IS HEREBY ORDERED that plaintiff's November 4, 2020 emergency motion for declaratory judgment is DENIED.

IT IS HEREBY FURTHER ORDERED that proposed intervenor's motion to intervene is DENIED as MOOT.

This is not a final order and it does not resolve the last pending claim or close the case.

November 6, 2020

Cynthia Diane Stephens
Judge, Court of Claims

# EXHIBIT 8

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

**CHERYL A. COSTANTINO and,**
**EDWARD P. McCALL, JR.,**

Plaintiffs,

vs.

**CITY OF DETROIT; DETROIT ELECTION**
**COMMISSION; JANICE WINFREY, in her official**
**capacity as the CLERK OF THE CITY and the**
**Chairperson of the DETROIT ELECTION COMMISSION;**
**CATHY M. GARRETT, in her official capacity as the**
**CLERK OF WAYNE COUNTY; and the WAYNE COUNTY**
**BOARD OF CANVASSERS,**

Defendants.

Case No. 20-014780-AW

Hon. Timothy M. Kenny

---

| | |
|---|---|
| GREAT LAKES JUSTICE CENTER<br>David A. Kallman (P34200)<br>Erin E. Mersino (P70886)<br>Jack C. Jordan (P46551)<br>Stephen P. Kallman (P75622)<br>5600 W. Mount Hope Hwy.<br>Lansing, MI 48917<br>(517) 322-3207<br>*Attorneys for Plaintiffs* | FINK BRESSACK<br>David H. Fink (P28235)<br>Darryl Bressack(P67820)<br>38500 Woodward Ave., Suite 350<br>Bloomfield Hills, MI 48304<br>(248) 971-2500<br>dfink@finkbressack.com<br>dbressack@finkbressack.com<br>*Attorneys for City of Detroit, City of Detroit*<br>*Election Commission and Janice Winfrey*<br><br>CITY OF DETROIT LAW DEPARTMENT<br>Lawrence T. García (P54890)<br>Charles N. Raimi (P29746)<br>James D. Noseda (P52563)<br>2 Woodward Ave., 5th Floor<br>Detroit, MI 48226<br>(313) 237-5037<br>garcial@detroitmi.goc<br>raimic@detroitmi.gov<br>nosej@detroitmi.gov<br>*Attorneys for City of Detroit, City of Detroit*<br>*Election Commission and Janice Winfrey* |

---

**AFFIDAVIT OF DANIEL BAXTER**

Being duly sworn, Daniel Baxter, deposes and states the following as true, under oath:

1. From 1985 until 2019, I was employed by the Detroit Department of Elections, with a two year hiatus, from 2013 to 2015, when I served as the Director of Elections for Montgomery County, Alabama.

2. From 2005 until 2019, except during my tenure at Montgomery County, I served as Director of the Detroit Department of Elections.

3. Since September 1, 2020, I have served as Special Project Election Consultant for the Detroit Department of Elections, charged with administering all activities associated with the Central Counting Board for the November 3, 2020 General Election.

4. I was present at the Central Counting Board at the TCF Center, where absentee ballots were counted on Monday, November 2, 2020 from 5:30 AM until after midnight; on Tuesday, November 3, 2020 from 6:00 AM until midnight; and on Wednesday, November 4, 2020, from 7:00 AM until Thursday, November 5, 2020, at 6:00 AM.

5. The Detroit Department of Elections completed its final count at or around 10:00 PM on Wednesday, November 4, 2020.

6. The Detroit Department of Elections has submitted its final count to the Wayne County Board of Canvassers.

7. Jessy Jacob was a furloughed employee from another City department, assigned to the Department of Elections for limited, short-term, purposes, in September, 2020. Despite her long tenure with the City of Detroit, her tenure with the Department of Elections was brief, and her responsibilities were limited.

8. Ms. Jacob helped support work at two Absentee Voting Satellite Locations.

9. Ms. Jacob's affidavit, dated November 7, 2020, suggests that she did not understand many of the processes that she observed, and for which she was not responsible.

10. During training, all staff were instructed that their primary responsibility when voters came to the satellite locations was to facilitate the services requested by the voter.

11. If a voter was interested in voting by absentee ballot, staff were instructed to issue the voter an application, verify the voter's identity through a form of identification approved by the State of Michigan and issue a ballot based on Department of Elections procedures.

12. Staff was also instructed that if a voter did not have appropriate proof of identity, the voter should not be turned away; instead, the voter was to be offered an Affidavit of Voter Not in Possession of Photo ID.

13. Staff was instructed that the Department of Elections is strictly non-partisan, meaning the Department and its employees do not offer opinions on candidates or on proposals.

14. If a voter was issued an absent voter ballot and then applied for a second ballot at a satellite office, the voter would be required to request in writing that the first ballot be spoiled. If that does not occur, the Qualified Voter File alerts the satellite staff that there is an absent voter ballot already issued. In order to prevent double voting, until the first ballot is canceled, a second ballot cannot be issued. In the event the first ballot is returned, it is verified in the Qualified Voter File and rejected as a duplicate.

15. After her work on the election was completed, Ms. Jacob was again furloughed.

16. Prior to the filing of this lawsuit, Ms. Jacob did not report any of the issues addressed in her affidavit to any of her supervisors.

I affirm that the representations above are true.

Further, Affiant sayeth not.

Date:   November 11, 2020

DANIEL BAXTER

Subscribed and sworn to before me
this _11th_ day of _November_ , 2020.

Notary Public
County of: _Wayne County_
My Commission Expires: _11/24/2021_

CAROL J ALDRIDGE
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Nov 24, 2021
ACTING IN COUNTY OF

# EXHIBIT 9

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Cheryl A. Costantino and
Edward P. McCall, Jr.
                         Plaintiffs,

                                                    Hon. Timothy M. Kenny
                                                    Case No. 20-014780-AW

City of Detroit; Detroit Election
Commission; Janice M. Winfrey,
in her official capacity as the
Clerk of the City of Detroit and
the Chairperson and the Detroit
Election Commission; Cathy Garrett,
In her official capacity as the Clerk of
Wayne County; and the Wayne County
Board of Canvassers,
                         Defendants.

_____/

# **OPINION & ORDER**

At a session of this Court
Held on: November 13, 2020
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: Honorable Timothy M. Kenny
                Chief Judge
                Third Judicial Circuit Court of Michigan

This matter comes before the Court on Plaintiffs' motion for preliminary injunction,

protective order, and a results audit of the November 3, 2020 election.  The Court

having read the parties' filing and heard oral arguments, finds:

With the exception of a portion of Jessy Jacob affidavit, all alleged fraudulent claims

brought by the Plaintiffs related to activity at the TCF Center.  Nothing was alleged to

1

have occurred at the Detroit Election Headquarters on West Grand Blvd. or at any polling place on November 3, 2020.

The Defendants all contend Plaintiffs cannot meet the requirements for injunctive relief and request the Court deny the motion.

When considering a petition for injunction relief, the Court must apply the following four-pronged test:

1. The likelihood the party seeking the injunction will prevail on the merits.

2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.

3. The risk the party seeking the injunction would be harmed more by the absence an injunction than the opposing party would be by the granting of the injunction.

4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2nd 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity." *Id*. at 612 fn 135 quoting *Senior Accountants, Analysts and Appraisers Association v Detroit*, 218 Mich. App. 263, 269; 553 NW2nd 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4)  states that the Plaintiffs bear the burden of proving the preliminary injunction should be granted.  In cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud.  MCR 2.112 (B) (1)

Plaintiffs must establish they will likely prevail on the merits.  Plaintiffs submitted seven affidavits in support of their petition for injunctive relief claiming widespread voter

fraud took place at the TCF Center.  One of the affidavits also contended that there was

blatant voter fraud at one of the satellite offices of the Detroit City Clerk.  An additional

affidavit supplied by current Republican State Senator and former Secretary of State

Ruth Johnson, expressed concern about allegations of voter fraud and urged "Court

intervention", as well as an audit of the votes.

In opposition to Plaintiffs' assertion that they will prevail, Defendants offered six

affidavits from individuals who spent an extensive period of time at the TCF Center.  In

addition to disputing claims of voter fraud, six affidavits indicated there were numerous

instances of disruptive and intimidating behavior by Republican challengers.  Some

behavior necessitated removing Republican challengers from the TCF Center by police.

After analyzing the affidavits and briefs submitted by the parties, this Court

concludes the Defendants offered a more accurate and persuasive explanation of

activity within the Absent Voter Counting Board (AVCB) at the TCF Center.

Affiant Jessy Jacob asserts Michigan election laws were violated prior to November

3, 2020, when City of Detroit election workers and employees allegedly coached voters

to vote for Biden and the Democratic Party.  Ms. Jacob, a furloughed City worker

temporarily assigned to the Clerk's Office, indicated she witnessed workers and

employees encouraging voters to vote a straight Democratic ticket and also witnessed

election workers and employees going over to the voting booths with voters in order to

encourage as well as watch them vote.  Ms. Jacob additionally indicated while she was

working at the satellite location, she was specifically instructed by superiors not to ask

for driver's license or any photo ID when a person was trying to vote.

The allegations made by Ms. Jacob are serious.  In the affidavit, however, Ms. Jacob

does not name the location of the satellite office, the September or October date these

acts of fraud took place, nor does she state the number of occasions she witnessed the alleged misconduct.  Ms. Jacob in her affidavit fails to name the city employees responsible for the voter fraud and never told a supervisor about the misconduct.

Ms. Jacob's information is generalized.  It asserts behavior with no date, location, frequency, or names of employees.  In addition, Ms. Jacob's offers no indication of whether she took steps to address the alleged misconduct or to alter any supervisor about the alleged voter fraud.  Ms. Jacob only came forward after the unofficial results of the voting indicated former Vice President Biden was the winner in the state of Michigan.

Ms. Jacob also alleges misconduct and fraud when she worked at the TCF Center. She claims supervisors directed her not to compare signatures on the ballot envelopes she was processing to determine whether or not they were eligible voters.  She also states that supervisors directed her to "pre-date" absentee ballots received at the TCF Center on November 4, 2020.  Ms. Jacob ascribes a sinister motive for these directives. Evidence offered by long-time State Elections Director Christopher Thomas, however, reveals there was no need for comparison of signatures at the TCF Center because eligibility had been reviewed and determined at the Detroit Election Headquarters on West Grand Blvd.  Ms. Jacob was directed not to search for or compare signatures because the task had already been performed by other Detroit city clerks at a previous location in compliance with MCL 168.765a.  As to the allegation of "pre-dating" ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process.  Thomas Affidavit, #12.  The entries reflected the date the City received the absentee ballot.  *Id.*

4

The affidavit of current State Senator and former Secretary of State Ruth Johnson essentially focuses on the affidavits of Ms. Jacob and Zachery Larsen.  Senator Johnson believed the information was concerning to the point that judicial intervention was needed and an audit of the ballots was required.  Senator Johnson bases her assessment entirely on the contents of the Plaintiffs' affidavits and Mr. Thomas' affidavit.  Nothing in Senator Johnson's affidavit indicates she was at the TCF Center and witnessed the established protocols and how the AVCB activity was carried out.  Similarly, she offers no explanation as to her apparent dismissal of Mr. Thomas' affidavit.  Senator Johnson's conclusion stands in significant contrast to the affidavit of Christopher Thomas, who was present for many hours at TCF Center on November 2, 3 and 4.  In this Court's view, Mr. Thomas provided compelling evidence regarding the activity at the TCF Center's AVCB workplace.  This Court found Mr. Thomas' background, expertise, role at the TCF Center during the election, and history of bipartisan work persuasive.

Affiant Andrew Sitto was a Republican challenger who did not attend the October 29th walk- through meeting provided to all challengers and organizations that would be appearing at the TCF Center on November 3 and 4, 2020.  Mr. Sitto offers an affidavit indicating that he heard other challengers state that several vehicles with out-of-state license plates pulled up to the TCF Center at approximately 4:30 AM on November 4th.  Mr. Sitto states that "tens of thousands of ballots" were brought in and placed on eight long tables and, unlike other ballots, they were brought in from the rear of the room.  Sitto also indicated that every ballot that he saw after 4:30 AM was cast for former Vice President Biden.

Mr. Sitto's affidavit, while stating a few general facts, is rife with speculation and guess-work about sinister motives. Mr. Sitto knew little about the process of the absentee voter counting board activity. His sinister motives attributed to the City of Detroit were negated by Christopher Thomas' explanation that all ballots were delivered to the back of Hall E at the TCF Center. Thomas also indicated that the City utilized a rental truck to deliver ballots. There is no evidentiary basis to attribute any evil activity by virtue of the city using a rental truck with out-of-state license plates.

Mr. Sitto contends that tens of thousands of ballots were brought in to the TCF Center at approximately 4:30 AM on November 4, 2020. A number of ballots speculative on Mr. Sitto's part, as is his speculation that all of the ballots delivered were cast for Mr. Biden. It is not surprising that many of the votes being observed by Mr. Sitto were votes cast for Mr. Biden in light of the fact that former Vice President Biden received approximately 220,000 more votes than President Trump.

Daniel Gustafson, another affiant, offers little other than to indicate that he witnessed "large quantities of ballots" delivered to the TCF Center in containers that did not have lids were not sealed, or did not have marking indicating their source of origin. Mr. Gustafson's affidavit is another example of generalized speculation fueled by the belief that there was a Michigan legal requirement that all ballots had to be delivered in a sealed box. Plaintiffs have not supplied any statutory requirement supporting Mr. Gustafson's speculative suspicion of fraud.

Patrick Colbeck's affidavit centered around concern about whether any of the computers at the absent voter counting board were connected to the internet. The answer given by a David Nathan indicated the computers were not connected to the

6

internet.  Mr. Colbeck implies that there was internet connectivity because of an icon that appeared on one of the computers.  Christopher Thomas indicated computers were not connected for workers, only the essential tables had computer connectivity.  Mr. Colbeck, in his affidavit, speculates that there was in fact Wi-Fi connection for workers use at the TCF Center.  No evidence supports Mr. Colbeck's position.

This Court also reads Mr. Colbeck's affidavit in light of his pre-election day Facebook posts.  In a post before the November 3, 2020 election, Mr. Colbeck stated on Facebook that the Democrats were using COVID as a cover for Election Day fraud.  His predilection to believe fraud was occurring undermines his credibility as a witness.

Affiant Melissa Carone was contracted by Dominion Voting Services to do IT work at the TCF Center for the November 3, 2020 election.  Ms. Carone, a Republican, indicated that she "witnessed nothing but fraudulent actions take place" during her time at the TCF Center.  Offering generalized statements, Ms. Carone described illegal activity that included, untrained counter tabulating machines that would get jammed four to five times per hour, as well as alleged cover up of loss of vast amounts of data.  Ms. Carone indicated she reported her observations to the FBI.

Ms. Carone's description of the events at the TCF Center does not square with any of the other affidavits.  There are no other reports of lost data, or tabulating machines that jammed repeatedly every hour during the count.  Neither Republican nor Democratic challengers nor city officials substantiate her version of events.  The allegations simply are not credible.

Lastly, Plaintiffs rely heavily on the affidavit submitted by attorney Zachery Larsen. Mr. Larsen is a former Assistant Attorney General for the State of Michigan who alleged mistreatment by city workers at the TCF Center, as well as fraudulent activity by election workers. Mr. Larsen expressed concern that ballots were being processed without confirmation that the voter was eligible. Mr. Larsen also expressed concern that he was unable to observe the activities of election official because he was required to stand six feet away from the election workers. Additionally, he claimed as a Republican challenger, he was excluded from the TCF Center after leaving briefly to have something to eat on November 4th. He expressed his belief that he had been excluded because he was a Republican challenger.

Mr. Larsen's claim about the reason for being excluded from reentry into the absent voter counting board area is contradicted by two other individuals. Democratic challengers were also prohibited from reentering the room because the maximum occupancy of the room had taken place. Given the COVID-19 concerns, no additional individuals could be allowed into the counting area. Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding.

Mr. Larsen's concern about verifying the eligibility of voters at the AVCB was incorrect. As stated earlier, voter eligibility was determined at the Detroit Election Headquarters by other Detroit city clerk personnel.

The claim that Mr. Larsen was prevented from viewing the work being processed at the tables is simply not correct. As seen in a City of Detroit exhibit, a large monitor was

8

at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed. Mr. Jaffe confirmed his experience and observation that efforts were made to ensure that all challengers could observe the process.

Despite Mr. Larsen's claimed expertise, his knowledge of the procedures at the AVCB paled in comparison to Christopher Thomas'. Mr. Thomas' detailed explanation of the procedures and processes at the TCF Center were more comprehensive than Mr. Larsen's. It is noteworthy, as well, that Mr. Larsen did not file any formal complaint as the challenger while at the AVCB. Given the concerns raised in Mr. Larsen's affidavit, one would expect an attorney would have done so. Mr. Larsen, however, only came forward to complain after the unofficial vote results indicated his candidate had lost.

In contrast to Plaintiffs' witnesses, Christopher Thomas served in the Secretary of State's Bureau of Elections for 40 years, from 1977 through 2017. In 1981, he was appointed Director of Elections and in that capacity implemented Secretary of State Election Administration Campaign Finance and Lobbyist disclosure programs. On September 3, 2020 he was appointed as Senior Advisor to Detroit City Clerk Janice Winfrey and provided advice to her and her management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting boards, satellite offices and drop boxes. Mr. Thomas helped prepare the City of Detroit for the November 3, 2020 General Election.

As part of the City's preparation for the November 3rd election Mr. Thomas invited challenger organizations and political parties to the TCF Center on October 29, 2020 to have a walk-through of the entire absent voter counting facility and process. None of Plaintiff challenger affiants attended the session.

On November 2, 3, and 4, 2020, Mr. Thomas worked at the TCF Center absent voter counting boards primarily as a liaison with Challenger Organizations and Parties. Mr. Thomas indicated that he "provided answers to questions about processes at the counting board's resolved dispute about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers."

Additionally, Mr. Thomas resolved disputes about the processes and satisfactorily reduced the number of challenges raised at the TCF Center.

In determining whether injunctive relief is required, the Court must also determine whether the Plaintiffs sustained their burden of establishing they would suffer irreparable harm if an injunction were not granted. Irreparable harm does not exist if there is a legal remedy provided to Plaintiffs.

Plaintiffs contend they need injunctive relief to obtain a results audit under Michigan Constitution Article 2, § IV, Paragraph 1 (h) which states in part "the right to have the results of statewide elections audited, in such as manner as prescribed by law, to ensure the accuracy and integrity of the law of elections." Article 2, § IV, was passed by the voters of the state of Michigan in November, 2018.

A question for the Court is whether the phrase "in such as manner as prescribed by law" requires the Court to fashion a remedy by independently appointing an auditor to examine the votes from the November 3, 2020 election before any County certification of votes or whether there is another manner "as prescribed by law".

Following the adoption of the amended Article 2, § IV, the Michigan Legislature amended MCL 168.31a effective December 28, 2018. MCL 168.31a provides for the Secretary of State and appropriate county clerks to conduct a results audit of at least

10

one race in each audited precinct.  Although Plaintiffs may not care for the wording of the current MCL 168.31a, a results audit has been approved by the Legislature.  Any amendment to MCL 168.31a is a question for the voice of the people through the legislature rather than action by the Court.

It would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers.  The Court cannot defy a legislatively crafted process, substitute its judgment for that of the Legislature, and appoint an independent auditor because of an unwieldy process.  In addition to being an unwarranted intrusion on the authority of the Legislature, such an audit would require the rest of the County and State to wait on the results.  Remedies are provided to the Plaintiffs.  Any unhappiness with MCL 168.31a calls for legislative action rather than judicial intervention.

As stated above, Plaintiffs have multiple remedies at law.  Plaintiffs are free to petition the Wayne County Board of Canvassers who are responsible for certifying the votes.  (MCL 168.801 and 168.821 et seq.) Fraud claims can be brought to the Board of Canvassers, a panel that consists of two Republicans and two Democrats.  If dissatisfied with the results, Plaintiffs also can avail themselves of the legal remedy of a recount and a Secretary of State audit pursuant to MCL 168.31a.

Plaintiff's petition for injunctive relief and for a protective order is not required at this time in light of the legal remedy found at 52 USC § 20701 and Michigan's General Schedule #23 – Election Records, Item Number 306, which imposes a statutory obligation to preserve all federal ballots for 22 months after the election.

In assessing the petition for injunctive relief, the Court must determine whether there will be harm to the Plaintiff if the injunction is not granted, as Plaintiffs' existing legal

remedies would remain in place unaltered.  There would be harm, however, to the Defendants if the Court were to grant the requested injunction.  This Court finds that there are legal remedies for Plaintiffs to pursue and there is no harm to Plaintiffs if the injunction is not granted.  There would be harm, however, to the Defendants if the injunction is granted.  Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay.  It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races.  It would also undermine faith in the Electoral System.

Finally, the Court has to determine would there be harm to the public interest.  This Court finds the answer is a resounding yes.  Granting Plaintiffs' requested relief would interfere with the Michigan's selection of Presidential electors needed to vote on December 14, 2020.  Delay past December 14, 2020 could disenfranchise Michigan voters from having their state electors participate in the Electoral College vote.

Conclusion

Plaintiffs rely on numerous affidavits from election challengers who paint a picture of sinister fraudulent activities occurring both openly in the TCF Center and under the cloak of darkness.  The challengers' conclusions are decidedly contradicted by the highly-respected former State Elections Director Christopher Thomas who spent hours and hours at the TCF Center November 3rd and 4th explaining processes to challengers and resolving disputes.  Mr. Thomas' account of the November 3rd and 4th events at the TCF Center is consistent with the affidavits of challengers David Jaffe, Donna MacKenzie and Jeffrey Zimmerman, as well as former Detroit City Election Official, now contractor, Daniel Baxter and City of Detroit Corporation Counsel Lawrence Garcia.

Perhaps if Plaintiffs' election challenger affiants had attended the October 29, 2020 walk-through of the TCF Center ballot counting location, questions and concerns could have been answered in advance of Election Day. Regrettably, they did not and, therefore, Plaintiffs' affiants did not have a full understanding of the TCF absent ballot tabulation process. No formal challenges were filed. However, sinister, fraudulent motives were ascribed to the process and the City of Detroit. Plaintiffs' interpretation of events is incorrect and not credible.

Plaintiffs are unable to meet their burden for the relief sought and for the above mentioned reasons, the Plaintiffs' petition for injunctive relief is DENIED. The Court further finds that no basis exists for the protective order for the reasons identified above. Therefore, that motion is DENIED. Finally, the Court finds that MCL 168.31a governs the audit process. The motion for an independent audit is DENIED.

It is so ordered.

This is not a final order and does not close the case.

November 13, 2020

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

# EXHIBIT 10

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Sarah Stoddard and
Election Integrity Fund,

                                              Hon. Timothy M. Kenny

v                                            Case No. 20-014604-CZ

City Election Commission of
The City of Detroit and
Janice Winfrey, in her official
Capacity as Detroit City Clerk and
Chairperson of the City Election
Commission, and
Wayne County Board of
Canvassers,

_____/

# <u>OPINION & ORDER</u>

At a session of this Court
Held on: <u>November 6, 2020</u>
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: <u>Honorable Timothy M. Kenny</u>
Chief Judge
Third Judicial Circuit Court of Michigan

      Plaintiffs Sarah Stoddard and the Election Integrity Fund petition this Court for
preliminary injunctive relief seeking:

1.    Defendants be required to retain all original and duplicate ballots and poll books.
2.    The Wayne County Board of Canvassers not certify the election results until both
Republican and Democratic party inspectors compare the duplicate ballots with
original ballots.
3.    The Wayne County Board of Canvassers unseal all ballot containers and remove
all duplicate and original ballots for comparison purposes.
4.    The Court provide expedited discovery to plaintiffs, such as limited
interrogatories and depositions.

When considering a petition for injunctive relief the Court must apply the following four-prong test:

1. The likelihood the party seeking the injunction will prevail on the merits.
2. The danger the party seeking the injunction will suffer irreparable harm if the injunction is not granted.
3. The risk the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the injunction.
4. The harm to the public interest if the injunction is issued. *Davis v City of Detroit Financial Review Team*, 296 Mich. App. 568, 613; 821 NW2d 896 (2012).

In the *Davis* opinion, the Court also stated that injunctive relief "represents an extraordinary and drastic use of judicial power that should be employed sparingly and only with full conviction of its urgent necessity" Id at 612 fn 135, quoting *Senior Accountants, Analysts & Appraisers Ass'n v. Detroit*, 218 Mich. App. 263, 269; 553 NW2d 679 (1996).

When deciding whether injunctive relief is appropriate MCR 3.310 (A)(4) indicates that the plaintiff bears the burden of proving the preliminary injunction should be granted.

Plaintiffs' pleadings do not persuade this Court that they are likely to prevail on the merits for several reasons. First, this Court believes plaintiffs misinterpret the required placement of major party inspectors at the absent voter counting board location. MCL 168.765a (10) states in part "At least one election inspector from each major political party must be present <u>at the absent voter counting place</u>…" While plaintiffs contends the statutory section mandates there be a Republican and Democratic inspector at each table inside the room, the statute does not identify this requirement. This Court believes the plain language of the statute requires there be election inspectors at the TCF Center facility, the site of the absentee counting effort.

Pursuant to MCL 168.73a the County chairs for Republican and Democratic parties were permitted and did submit names of absent voter counting board inspectors to the City of Detroit Clerk. Consistent with MCL 168.674, the Detroit City Clerk did make appointments of inspectors. Both Republican and Democratic inspectors were present throughout the absent voter counting board location.

An affidavit supplied by Lawrence Garcia, Corporation Counsel for the City of Detroit, indicated he was present throughout the time of the counting of absentee

ballots at the TCF Center.  Mr. Garcia indicated there were always Republican and Democratic inspectors there at the location.  He also indicated he was unaware of any unresolved counting activity problems.

By contrast, plaintiffs do not offer any affidavits or specific eyewitness evidence to substantiate their assertions.  Plaintiffs merely assert in their verified complaint "Hundreds or thousands of ballots were duplicated solely by Democratic party inspectors and then counted."  Plaintiffs' allegation is mere speculation.

Plaintiffs' pleadings do not set forth a cause of action.  They seek discovery in hopes of finding facts to establish a cause of action.  Since there is no cause of action, the injunctive relief remedy is unavailable.  *Terlecki v Stewart*, 278 Mich. App. 644; 754 NW2d 899 (2008).

The Court must also consider whether plaintiffs will suffer irreparable harm. Irreparable harm requires "A particularized showing of concrete irreparable harm or injury in order to obtain a preliminary injunction."  *Michigan Coalition of State Employee Unions v Michigan Civil Service Commission*, 465 Mich. 212, 225; 634 NW2d 692, (2001).

In *Dunlap v City of Southfield*, 54 Mich. App. 398, 403; 221 NW2d 237 (1974), the Michigan Court of Appeals stated "An injunction will not lie upon the mere apprehension of future injury or where the threatened injury is speculative or conjectural."

In the present case, Plaintiffs allege that the preparation and submission of "duplicate ballots" for "false reads" without the presence of inspectors of both parties violates both state law, MCL 168.765a (10), and the Secretary of State election manual.  However, Plaintiffs fail to identify the occurrence and scope of any alleged violation  The only "substantive" allegation appears in paragraph 15 of the First Amended Complaint, where Plaintiffs' allege "on information and belief" that hundreds or thousands of ballots have been impacted by this improper practice.  Plaintiffs' Supplemental Motion fails to present any further specifics.  In short, the motion is based upon speculation and conjecture.  Absent any evidence of an improper practice, the Court cannot identify if this alleged violation occurred, and, if it did, the frequency of such violations.  Consequently, Plaintiffs fail to move past mere apprehension of a future injury or to establish that a threatened injury is more than speculative or conjectural.

This Court finds that it is mere speculation by plaintiffs that hundreds or thousands of ballots have, in fact, been changed and presumably falsified. Even with this assertion, plaintiffs do have several other remedies available. Plaintiffs are entitled to bring their challenge to the Wayne County Board of Canvassers pursuant to MCL 168.801 *et seq.* and MCL 168.821 *et seq.* Additionally, plaintiffs can file for a recount of the vote if they believe the canvass of the votes suffers from fraud or mistake. MCL168.865-168.868. Thus, this Court cannot conclude that plaintiffs would experience irreparable harm if a preliminary injunction were not issued.

Additionally, this Court must consider whether plaintiffs would be harmed more by the absence of injunctive relief than the defendants would be harmed with one.

If this Court denied plaintiffs' request for injunctive relief, the statutory ability to seek relief from the Wayne County Board of Canvassers (MCL 168.801 et seq. and MCL 168.821 et seq.) and also through a recount (MCL 168.865-868) would be available. By contrast, injunctive relief granted in this case could potentially delay the counting of ballots in this County and therefore in the state. Such delays could jeopardize Detroit's, Wayne County's, and Michigan's ability to certify the election. This in turn could impede the ability of Michigan's elector's to participate in the Electoral College.

Finally, the Court must consider the harm to the public interest. A delay in counting and finalizing the votes from the City of Detroit without any evidentiary basis for doing so, engenders a lack of confidence in the City of Detroit to conduct full and fair elections. The City of Detroit should not be harmed when there is no evidence to support accusations of voter fraud.

Clearly, every legitimate vote should be counted. Plaintiffs contend this has not been done in the 2020 Presidential election. However, plaintiffs have made only a claim but have offered no evidence to support their assertions. Plaintiffs are unable to meet their burden for the relief sought and for the above-mentioned reasons, the plaintiffs' petition for injunctive relief is denied.

It is so ordered.

November 6, 2020
Date

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

4

# EXHIBIT 11



STATE OF MICHIGAN
JOCELYN BENSON, SECRETARY OF STATE
DEPARTMENT OF STATE
LANSING

November 7, 2020

## Isolated User Error in Antrim County Does Not Affect Election Results,

## Has no Impact on Other Counties or States

The error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier. This further explanation of the issue is based on the Bureau of Elections' preliminary review of the issue. The County Clerk and County Board of Canvassers will be able to provide any further detail during the ongoing county canvass.

Antrim County uses the Dominion Voting Systems election management system and voting machines (tabulators), which count hand-marked paper ballots. Counties use election management systems to program tabulators and also to report unofficial election results.

After Antrim County initially programmed its election software for the November Election, the county identified in October two local races where the ballot content had to be updated. The county received updated programming from its election programming vendor, Election Source. The updated programming correctly updated the election software for the county.

When the software was reprogrammed, the County also had to update the software on all of the media drives that are placed in tabulators to ensure tabulators communicate properly with the election management system. The county did update the media drives that went into the tabulators with the corrected local races, but did not update the media drives on the tabulators for the rest of the county. Because the Clerk correctly updated the media drives for the tabulators with changes to races, and because the other tabulators did not have changes to races, all tabulators counted ballots correctly.

However, because the county did not update the media drives for the tabulators that did not have changes to races, those tabulators did not communicate properly with the County's central election management system software when the county combined and reported unofficial results. Every tabulator recorded ballots correctly but the unofficial reports were erroneous.

These errors can always be identified and corrected because every tabulator prints a paper totals tape showing how the ballots for each race were counted. After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county.

Again, all ballots were properly tabulated. The user error affected only how the results from the tabulators communicated with the election management system for unofficial reporting. Even if the error had not been noticed and quickly fixed, it would have been caught and identified

during the county canvass when printed totals tapes are reviewed. This was an isolated error, there is no evidence this user error occurred elsewhere in the state, and if it did it would be caught during county canvasses, which are conducted by bipartisan boards of county canvassers. The Antrim County Canvass is currently ongoing, and the Board of County Canvassers and County Clerk will be able to provide any further necessary details during the course of the county canvass.

As with other isolated user errors that have occurred in the reporting of unofficial results both in this and previous elections, this is not the result of any intentional misconduct by an election official or because of software or equipment malfunctioning or failing to work properly. Municipal and county clerks are dedicated public servants who work hard and with integrity. Sometimes they make honest mistakes, and when they do there are many checks and balances in the election system to ensure they can be identified and corrected so that the official results reflect the complete, accurate count of all votes.

Additional information

https://www.dominionvoting.com
https://www.cisa.gov/rumorcontrol

# EXHIBIT 12



☰ Menu

Return to **Election 2020: Setting the Record Straight**

November 26, 2020

# STATEMENT FROM DOMINION ON SIDNEY POWELL'S CHARGES

While Dominion Voting Systems is not named as a defendant, on Wednesday, November 25, 2020, Sidney Powell released what appears to be a very rough draft of a lawsuit against the Republican governor and secretary of state of Georgia alleging a bizarre election fraud conspiracy that—were it possible—would necessarily require the collaboration of thousands of participants, including state officeholders, bipartisan local elections officials, thousands of volunteer Election Day poll watchers in thousands of locations across the state of Georgia, federal and state government technology testing agencies, private elections service companies, and independent third-party auditors. This quite simply did not occur.

Dominion Voting Systems is the gold standard for transparent and accountable voting equipment. The allegations included in the draft complaint are baseless, senseless, physically impossible, and unsupported by any evidence whatsoever. We stand with the state and local elected officials and bipartisan election volunteers that this suit maliciously maligns.

In Powell's error-filled document, she repeats a number of baseless allegations about Dominion Voting Systems, which she has made in public since Election Day.

The allegations about DVS most relevant to the election outcome in Georgia are that votes tallied on a Dominion vote tabulator were somehow manipulated on a statewide basis to elevate the count in

Privacy - Terms

favor of the Democratic presidential candidate. It is important to understand that this is not possible—not on a machine-by-machine basis, not by alleged hacking, not by manipulating software, and not by imagined ways of "sending" votes to overseas locations. But even if it *were* possible, it would have been discovered in the statewide handcount of votes.

Dominion's systems are secure as certified by the U.S. Election Assistance Commission (EAC). In fact, *all* voting systems must provide assurance that they work accurately and reliably as intended under federal U.S. EAC and state certification and testing requirements. Further, Dominion source code is verified and secure. Third-party test labs chosen by the bipartisan U.S. EAC and accredited by the National Institute of Standards and Technology (NIST) perform complete source code reviews on every tabulation system that is federally certified in the U.S.

Every vote from a Dominion device in Georgia is documented on an auditable paper trail and creates a verifiable paper ballot available for hand-counting. In fact, the Georgia handcounts, independent audits, and machine tests have all *repeatedly* affirmed that the machine counts were accurate.

In addition, Powell makes a number of allegations that go beyond Dominion's role in Georgia's elections—which is only to provide the ballot tabulation systems. For the record, again, Dominion does not develop voter-registration systems, poll-books, signature verification software, or provide vote-by-mail printing. These parts of the voting process are instead supported by other companies and controlled by the state and local officials who run elections in hundreds of thousands of voting places across the country.

These assertions in the Powell filing are non-sensical and unsupported by any presentation of evidence. However, to respond to some of her specific assertions about Dominion:

- ✓ Dominion was not "founded by oligarchs and dictators." It was founded in Toronto, Canada, and it is now a proud nonpartisan American company. Dominion has attested to its ownership— *under penalty of perjury*—to local, state, and federal agencies,

Privacy - Terms

including the Committee on Foreign Investment in the United States, which includes all U.S. national security agencies.

- Dominion is not, and never has been, owned by Smartmatic. Neither has Smartmatic ever been a subsidiary of Dominion, as the complaint asserts. Dominion is an entirely separate company —they do not collaborate in any way and have no affiliate relationships or financial ties. Dominion does not use Smartmatic. These are all facts verifiable in the public record as well as in regulatory and legal filings.

- Dominion has no ties to the Venezuelan government, nor any other foreign government, including China and Iran. Dominion has never participated in any elections in Venezuela and has no connection or relationship with the now deceased former Venezuelan dictator Hugo Chavez. Other companies *have* serviced elections in Venezuela, *but Dominion is not one of them.*

- Dominion does not have operations in Germany including an "Office of the General Counsel."

- Dominion Voting Systems are in fact auditable—and are audited and tested regularly by multiple government agencies and independent third parties. All electronic devices used in the U.S. must be designed to be audited.

- Dominion's system does in fact include a paper ballot backup to verify results. In fact, thousands of elections officials in Georgia just completed the largest vote recount in American history using the paper ballots produced by Dominion devices.

- Dominion's system cannot be manipulated by a technician in the way Powell alleges. This has been confirmed by the government agencies that have certified Dominion equipment.

- Despite repeated counts and audits, there is no evidence of any kind that any voting system deleted, lost, or changed votes in Georgia, or in any of the other 28 states that use Dominion devices. Certifications and audits have instead shown the accuracy, transparency, and reliability of Dominion's systems.

- The federal government agency that oversees U.S. election security verified that there is no evidence that this election was in any way compromised. In fact, they have called it the most secure election in American history.

- ✅ Servers that run Dominion software are located in local election offices, and data never leaves the control of local election officials.

- ✅ There were no "glitches" with Dominion's voting systems, and no unauthorized or last-minute software updates occurred.

- ✅ There were no "data breaches" of Dominion software by anyone, let alone rogue foreign actors.

- ✅ Human errors did occur in some counties but were resolved quickly by county officials before the canvass process.

- ✅ Votes are not processed outside the United States. Votes are counted and reported by county and state election officials—not by Dominion, or any other election technology company.

- ✅ Election safeguards—from testing and certification of voting systems to canvassing and auditing—prevent malicious actors from tampering with results.

Sidney Powell's wild and reckless allegations are not only demonstrably false, they have led to stalking, harassment, and death threats to Dominion employees. This criminal activity has been duly reported to the appropriate law enforcement agencies, and we intend to hold Ms. Powell, and those aiding and abetting her fraudulent actions, accountable for any harm that may occur as a result.

Return to **Election 2020: Setting the Record Straight**



Founded in 2003, Dominion Voting Systems is a leading industry supplier of election technology across the U.S., Canada and globally.

## PRODUCTS

EMS ENGINE
Democracy Suite®

IN-PERSON AND ACCESSIBLE VOTING
ImageCast® X

CENTRAL TABULATION

Privacy - Terms

ImageCast® Central

COMBINATION VOTING AND TABULATION
ImageCast® Precinct
ImageCast® Evolution

Optional Solutions

## ABOUT

Dominion Difference
Dominion Secure
Careers

## INFO

Customer Support

1-866-654-VOTE (8683)

Contact Us

U.S.: Denver, CO
CANADA: Toronto, ON

Privacy Policy   Terms of Use   Site Map

Copyright © 2020 Dominion Voting Systems Corp.
All Rights Reserved.

Privacy - Terms