## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

TIMOTHY KING, *et al.*,

                Plaintiffs,

     v.

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, *et al.*,

                Defendants.

CIVIL ACTION

No. 2:20-cv-13134-LVP-RSW

Hon. Linda V. Parker

## MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF OF MICHIGAN STATE CONFERENCE NAACP

Eugene Driker (P12959)
Stephen E. Glazek (P23186)
Daniel M. Share (P26903)
Barris, Sott, Denn & Driker, P.L.L.C.
333 West Fort Street, Suite 1200
Detroit, MI 48226
(313) 965-9725

Kristen Clarke (*pro hac vice* pending)
Jon Greenbaum (*pro hac vice* pending)
Ezra Rosenberg (*pro hac vice* pending)
Julie Houk (*pro hac vice* pending)
LAWYERS COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW
Washington, D.C. 20005
Telephone: (202) 662-8300

Amicus Curiae Michigan State Conference NAACP (Michigan NAACP), through its counsel, for its motion for leave to file a brief in support of Defendants Gretchen Whitmer, Jocelyn Benson, and Michigan Board of State Canvassers' position, states as follows:

1.    Amicus is the Michigan NAACP. The Michigan NAACP has a significant interest in this action because Plaintiffs seek to disenfranchise more than 5.5 million Michigan citizens who voted in the November 3, 2020 election. Such disenfranchisement will directly affect the members of the Michigan NAACP whose votes will be invalidated if Plaintiffs' relief is granted. In addition, the Michigan NAACP has invested significant resources in voter education and outreach as part of its mission to enhance civic participation in vulnerable communities, especially Black communities that have historically been the target of voter suppression efforts.

2.    Amicus seeks leave to submit the brief attached as **Exhibit A** to explain how the extraordinary relief sought by Plaintiffs would undermine the NAACPs efforts by destroying trust in election systems in those communities, and will require NAACP to divert and expend additional resources to rebuild that trust, and protect the right to vote.

3.    Although there is no federal rule or statute governing participation by amicus curiae at the district court level, see *United States v. Gotti*, 755 F.Supp. 1157, 1158 (E.D.N.Y. 1991), a federal district court has the inherent authority to invite participation by amicus curiae to assist the court in its proceedings. *United States v. Louisiana*, 751 F.Supp. 608, 620 (E.D. La. 1990); *United States v. Michigan*, 116 F.R.D. 655, 660 (W.D. Mich. 1987).

The decision to invite or accept participation by an amicus is committed to the sound discretion of the court. *Alexander v. Hall*, 64 F.R.D. 152, 155 (D.S.C. 1974).

4.     The classic role of the amicus curiae is to assist in a case of general public interest, supplement the efforts of counsel, and draw the court's attention to law or facts that may otherwise escape consideration. *Miller-Wohl Co., Inc. v. Commissioner of Labor and Indus.*, 694 F.2d 203, 204 (9 Cir. 1982); see also *New England Patriots Football Club, Inc., v. University of Colorado*, 592 F.2d 1196, 1198 n. 3 (1st Cir. 1979) (historically, the role of an amicus was "to aid the court in resolving doubtful issues of law"). There is no requirement that an amicus be disinterested. *Funbus Systems, Inc. v California Public Utilities Commission*, 801 F.2d 1120, 1125 (9 Cir. 1986); *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982).

5.     As explained in the attached Brief, Plaintiffs' case hinges on a series of claims they could and should have asserted months before the election as well as spurious, unsubstantiated, and inadmissible evidence of purported election irregularities, and seeks to disenfranchise every Michigan citizen.

6.     Plaintiffs filed this case in a brazen attempt to throw the election to their preferred candidate. In all, several dozen lawsuits have been filed across the country by President Trump and his allies, including the Plaintiffs and their counsel, and not one has been successful in substantiating allegations of election improprieties or overturning the results of an election. This case should be seen as part of that larger frivolous effort, and like the others should be summarily dismissed.

7.      Counsel for Amicus sought concurrence from counsel for the parties to the relief requested in this motion that Amicus be granted leave to file its amicus brief. Counsel for Defendants Gretchen Whitmer, Jocelyn Benson, and Michigan Board of State Canvassers do not object to the filing. Counsel for Intervenor-Defendants Robert Davis, the City of Detroit, the Democratic National Committee, and the Michigan Democratic Party do not object to the filing. Counsel for Amicus has not yet received a response from counsel for the Plaintiffs.

For the reasons set forth above, the Michigan NAACP respectfully requests that the court **GRANT** leave to file the attached amicus brief in support of the Defendants' position.

Dated:  December 3, 2020                              Respectfully submitted,


BARRIS, SOTT, DENN & DRIKER,          Kristen Clarke (*pro hac vice* pending)
PLLC                                                  Jon Greenbaum (*pro hac vice* pending)
                                                      Ezra Rosenberg (*pro hac vice* pending)
By:  ___/s/ Eugene Driker_____          Julie Houk (*pro hac vice* pending)
Eugene Driker (P12959)                      LAWYERS COMMITTEE FOR CIVIL
Stephen E. Glazek (P23186)                  RIGHTS UNDER LAW
Daniel M. Share (P26903)                    1500 K Street NW, Suite 900
333 West Fort Street, Suite 1200            Washington, DC 20005
Detroit, MI  48226                          Telephone: (202) 662-8300
(313) 965-9725                              kclarke@lawyerscommittee.org
edriker@bsdd.com                            jgreenbaum@lawyerscommittee.org
sglazek@bsdd.com                            erosenberg@lawyerscommittee.org
dshare@bsdd.com


                                            *Attorneys for Amicus Curiae*

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

TIMOTHY KING, *et al.*,

                   Plaintiffs,

      v.

GRETCHEN WHITMER, in her official
capacity as Governor of the State of
Michigan, *et al.*,

                   Defendants.

CIVIL ACTION

No. 2:20-cv-13134-LVP-RSW

Hon. Linda V. Parker

## *AMICUS CURIAE* BRIEF OF MICHIGAN STATE CONFERENCE NAACP

Eugene Driker (P12959)
Stephen E.  Glazek (P23186)
Daniel M.  Share (P26903)
Barris, Sott, Denn & Driker, P.L.L.C.
333 West Fort Street, Suite 1200
Detroit, MI  48226
(313) 965-9725

Kristen Clarke (*pro hac vice* pending)
Jon Greenbaum (*pro hac vice* pending)
Ezra Rosenberg (*pro hac vice* pending)
Julie Houk (*pro hac vice* pending)
LAWYERS COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW
Washington, D.C. 20005
Telephone: (202) 662-8300

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………ii

INTEREST OF *AMICUS CURIAE*……………………………………………...v

I.  INTRODUCTION………………………………………………………..1

II.  PETITIONERS SEEK AN UNPRECEDENTED REMEDY
UNAVAILABLE AS A MATTER OF LAW…………………………………2

III.  LACHES BARS THIS ATTEMPT TO NULLIFY AN ELECTION
IN WHICH OVER 5.5 MILLION MICHIGAN CITIZENS VOTED…………...6

   A.  There was a Delay………………………………………………7

   B.  The Prejudice is Clear and Overwhelming………………………...9

IV.  PETITIONERS' PURPORTED EXPERT REPORTS ARE INADMISSABLE...11

V.  CONCLUSION…...…………………………………………………18

i

## TABLE OF AUTHORITIES

**Cases**

*Amtrak v. Morgan,* 536 US 101 (2002) ............................................................... 7

*Berry v. Chrysler*, 150 F.2d 1002 (6th Cir. 1945) .............................................. 7

*Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171 (6th Cir. 2009) ..................... 17

*Bush v. Gore,* 531 U.S. 98 (2000) ................................................................... 3, 4

*Carnes v. Livingston County Bd. of Ed.*, 341 Mich. 600, 67 N.W.2d 795 (1954) .............. 6

*Costantino v. City of Detroit*, No. 162245, order (Mich. Sup. Ct. Nov. 23, 2020) ............ 8

*Costantino v. City of Detroit*, No. 20-014780, opinion (Wayne Cty. Cir. Ct. November 13, 2020) ........... 8

*Costello v. United States*, 365 U.S. 265 (1961) ................................................. 7

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) ........................ 12, 17, 18

*E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F.3d 436 (6th Cir. 2006) .............. 7

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ................................................ 17

*Gent v. CUNA Mutual Ins. Society,* 611 F.3d 79 (1st Cir. 2010) ...................... 9

*Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) ............................................... 5

*Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177 (4th Cir. 1983) .............. 9

*Herron v. Herron*, 255 F.2d 589 (5th Cir. 1958) .............................................. 7

*Kay v. Austin*, 621 F.2d 809 (6th Cir. 1980) .............................................. 7, 10

*League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ................ 5

*Powell v. Power*, 436 F.2d 84 (2d Cir. 1970) .................................................. 5

*R.S.B. Ventures, Inc. v. FDIC*, 514 F. App'x 853  (11th Cir. 2013) ................ 9

*Reynolds v. Sims*, 377 US 533 (1964) .............................................................. 10

*Rosenbrock v. School Dist. No. 3*, 344 Mich. 335, 74 N.W.2d 32 (1955) .................... 5, 6

*Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (11th Cir. 1988).......... 9

*Thompson v. Cihak*, 254 Mich. 641, 236 N.W. 893 (1931) ................................... 5

*Toney v. White*, 488 F.2d 310 (5th Cir. 1973) ................................................ 9

*Trump v. Pennsylvania,* 2020 WL 7012522 (3rd Cir. 11/27/20) ........................... 3

*United States v. Classic*, 313 U.S. 299 (1941) ................................................ 4

*Warf v. Board of Elections of Green County, Ky.*, 619 F.3d 553 (6th Cir. 2010) .............. 5

*William v. Rhodes*, 393 U.S. 23 (1968) ........................................................ 7

*Wood v. Raffensberger*, 2020 WL 6817513 (N.D.GA, 11/20/20)........................... 3

**Statutes**

EAC 3 U.S.C. §5 .................................................................................... 4

52 U.S.C. § 10502(e) ............................................................................. 16

EAC §2, 3 U.S.C §2 ............................................................................... 4

M.C.L. 168.730(1) ................................................................................. 8

M.C.L. 168.765a(13) .............................................................................. 8

MCL § 168.507a(1) ............................................................................... 16

MCL §§168.43, 45................................................................................. 3

**Other Authorities**

A. Lynn Phillips et. al., *What's Good in Theory May Be Flawed in Practice:*
*Potential Legal Consequences of Poor Implementation of A Theoretical Sample*,
9 Hastings Bus. L.J. 77 (2012) ................................................................. 13

Mich. Const. art. II, sec. 1 ................................................................................. 10

Morley, *Postponing Federal Elections Due To Election Emergencies,*
77 Wash. & Lee L. Rev. Online 179 (2020) ....................................................... 5

Richard L. Hasen, "Beyond the Margin of Litigation: Reforming U.S. Election
   Administration to Avoid Electoral Meltdown", 62 Wash. & Lee L. Rev. 937 (2005).. 11

## <u>INTEREST OF</u> *AMICUS CURIAE*

This brief is submitted on behalf of the Michigan State Conference NAACP (Michigan NAACP). The Michigan NAACP has a significant interest in this action because Petitioners seek to disenfranchise more than 5.5 million Michigan citizens who voted in the November 3, 2020 election. Such disenfranchisement will directly affect the members of the Michigan NAACP whose votes will be invalidated if the Petition is granted. In addition, the Michigan NAACP has invested significant resources in voter education and outreach as part of its mission to enhance civic participation in vulnerable communities, especially Black communities that have historically been the target of voter suppression efforts. The extraordinary relief sought by Petitioners would undermine the NAACP's efforts by destroying trust in election systems in those communities, and will require Petitioners to divert and expend additional resources to rebuild that trust, and protect the right to vote.[1]

---

[1] This brief was not authored in whole or in party by counsel representing a party in this case, nor did such counsel or a party make a monetary contribution intended to fund the preparation or submission of this brief. Other than *amicus curiae* and its counsel, no person made a monetary contribution to assist in preparation of this brief.

v

## I.      INTRODUCTION

During the 2020 General Election, in the midst of the COVID-19 pandemic, over 5.5 million Michigan voters exercised their right to vote, which is the highest level of turnout in the state in over 60 years. David Eggert, *Record 5.5M voted in Michigan; highest percentage in decades*, APNews (Nov. 5, 2020), https://apnews.com/article/record-votes-michigan-highest-turnout-1f7802d2a2e67966ba8ccb02e3d1cbed.      This    extraordinary collective act of civic participation is a testament to both the commitment of voters, and the hard work of election officials across the state who spent months planning, coordinating, and implementing complicated procedures to make sure voters could cast their ballots safely and effectively.

In this case, a small group of Michigan voters seek to undo those remarkable efforts and disenfranchise every Michigan citizen, on the basis of outlandish conspiracy theories and entirely baseless accusations of official misconduct. No other court in our nation has ever invalidated all the votes cast in a state during a national election, and substituted *its own choice* over the will of the electorate. Yet Plaintiffs seek exactly that extraordinary remedy here on the basis of an imagined international conspiracy, of spurious, unsubstantiated, and inadmissible evidence of purported fraud targeting mostly Black voters, and of concerns already determined meritless by Michigan state courts about Republican challengers' access to absentee ballot counting. Plaintiffs primary basis of support are a series of "expert" reports based on flimsy and scientifically unsound analysis. The hodge-podge of unsupported rumors, junk science, and thinly veiled attacks on Black

voters that Plaintiffs rely upon would not be enough to invalidate even a single vote, let alone the votes of all 5.5 million Michigan voters.

Plaintiffs filed this case in a brazen attempt to throw the election to their preferred candidate. Indeed, Plaintiffs effectively admit that this is their goal, seeking not just de-certification of results in Michigan on the basis of their nonsensical allegations, but also an order requiring the Governor declare President Trump the winner of the election in Michigan. ECF No. 6, PageID.955, ¶ 233(3). In all, several dozen lawsuits have been filed across the country by President Trump and his allies, including by Plaintiffs' counsel, and not one has been successful in substantiating allegations of election improprieties or overturning the results of an election. This case should be seen as part of that larger frivolous effort, and like the others should be summarily dismissed.

## II.   PETITIONERS SEEK AN UNPRECEDENTED REMEDY UNAVAILABLE AS A MATTER OF LAW

Plaintiffs here seek extraordinary and unprecedented relief – nothing short of the disenfranchisement of millions of Michigan voters, by having either this Court decide the winner of the 2020 Presidential Election, or delaying certification so that the state legislature must make that determination. This Court should decline to grant this relief.

First, the relief sought is simply unprecedented. Plaintiffs cite no case or other authority – because there is none – in which a state court has summarily ignored the duly certified results of a presidential election and voided the votes of millions of individuals to have the state legislature displace its own statutory framework and pick presidential electors. Not only is there no such authority in Michigan, either by statute or in the case

2

law, but state and federal judges around the country have recently declined to award such relief based on similar claims. *See, e.g., Trump v. Pennsylvania,* 2020 WL 7012522 (3rd Cir. 11/27/20) (declining to grant leave to file an amended complaint seeking the "drastic remedy" of "throwing out millions of votes" and requiring the Pennsylvania legislature to select presidential electors); *Wood v. Raffensberger*, 2020 WL 6817513 (N.D.GA, 11/20/20) (" . . . Wood seeks an extraordinary remedy: to prevent Georgia's certification of the votes cast in the General Election, after millions of people had lawfully cast their ballots. To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways. [Citations omitted]. Granting injunctive relief here would breed confusion, undermine the public's trust in the election, and potentially disenfranchise over one million Georgia voters. Viewed in comparison to the lack of any demonstrable harm to Wood, this Court finds no basis in fact or in law to grant him the relief he seeks").

Second, the relief sought by Plaintiffs here would radically impinge not only on the statutory scheme of the Michigan legislature but also on the fundamental right to vote. Michigan has chosen to exercise its power under the Electors Clause by choosing the electors by popular vote. *See* MCL §§168.43, 45 (providing for the selection of presidential electors by registered voters on the general election date set by Congress). In *Bush v. Gore,* 531 U.S. 98 (2000) (*per curiam)* the Court noted that once the state legislature has established that presidential electors will be selected by popular vote, the fundamental right to vote is implicated. *Id. at* 104. This fundamental right to vote includes "the right of qualified voters within a state to cast their ballots and have them counted." *United States*

*v. Classic*, 313 U.S. 299, 315 (1941). Plaintiffs' proposed relief would deprive voters in the November 3 election of this fundamental right to vote by replacing the legislature's carefully designed process for conducting, canvassing and certifying the results of the election of presidential electors with a bespoke procedure involving investigations by a special master and the legislature itself.

Furthermore, Plaintiffs in effect would deprive the state of the safe harbor afforded by the Electoral Count Act ("EAC"), 3 U.S.C. §5, which provides that where a state chooses its presidential electors according to laws enacted prior to election day and certifies those results at least six days before the electoral college vote – this year the safe harbor date is December 8 – the results of the state's selection of electors are conclusive and cannot be questioned by Congress.  Michigan's duly authorized executive officers have certified the election and qualified Michigan's electoral slate for this safe harbor protection. Plaintiffs – having waited more than three weeks after the election to bring their claims – have now asked this Court to order a massive review of the election with little more than a week to go before the safe harbor date.  This is simply not practical—let alone fair for Michigan voters—and the Court should weigh the equities here in favor of allowing the state to take advantage of the safe harbor date. *See, e.g., Bush v. Gore*, 531 U.S. at 110 (declining to sanction a recount procedure that would not meet the safe harbor deadline).[2]

---

[2] Moreover, Plaintiffs' cannot rely on EAC §2, 3 U.S.C §2 to circumvent the safe harbor process. Section 2 provides that "[w]henever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct."  This provision is not a general license to overturn the results of a duly conducted and certified election by throwing the decision back to the legislature, but rather was designed to address specific

Finally, even if this Court were to find errors in election administration—it should not—such errors cannot generally form the basis of throwing out election results under federal or state law in Michigan. Courts have refused to "believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error." *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970); *see also League of Women Voters v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) ("[T]he federal courts should not be asked to count and validate ballots and enter into the details of the administration of the election."). The Sixth Circuit is in accord, observing that only in "extraordinary circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation." *Warf v. Board of Elections of Green County, Ky.*, 619 F.3d 553, 559 (6th Cir. 2010). Federal Courts "have uniformly declined to endorse [constitutional challenges] with respect to garden variety election irregularities." *Id*. citing *Griffin v. Burns*, 570 F.2d 1065, 1076 (1st Cir. 1978).

Similarly, Michigan law does not contemplate invalidating an election for slight irregularities, especially where voters are not to blame for those irregularities. *Rosenbrock v. School Dist. No. 3*, 344 Mich. 335, 74 N.W.2d 32 (1955); *Thompson v. Cihak*, 254 Mich. 641, 236 N.W. 893 (1931). The Michigan Supreme Court has held that even the failure of election officials to comply with the technical requirements of statutory directives should

---

situations where "any considerable number of voters had been prevented from coming to the polls" due to a natural disaster or other emergency. *See* Morley, *Postponing Federal Elections Due To Election Emergencies,* 77 Wash. & Lee L. Rev. Online 179, 188-189 (2020) (discussing legislative history). Section 2 cannot justify the massive and unprecedented relief sought here.

not permit the disenfranchisement of voters, "when there is no reason to conclude that the will of a majority of those present and voting was thwarted." *Carnes v. Livingston County Bd. of Ed.*, 341 Mich. 600, 67 N.W.2d 795 (1954). While courts will consider evidence that irregularities consisted of "fraud or coercion," "fraudulent intentions may not be lightly assumed . . . but must be shown by satisfactory proofs." *Id.*; *Rosenbrock*, 344 Mich. at 339.

Plaintiffs' Amended Complaint does not include any concrete evidence of fraud or impropriety, systemic or otherwise. Instead, Plaintiffs ask the Court to assume widespread fraud and impropriety based on entirely implausible and unsubstantiated allegations of voting machine manipulation, weak and scientifically unsound "expert" analysis, purported limitations on Republican challengers' access to absentee ballot counting in Wayne County, and finally vague anecdotes from Republican challengers about alleged election administration irregularities. This generalized evidence does not include a single concrete and particularized example of fraud or irregularity, let alone evidence sufficient to invalidate all 5.5 million Michigan votes. Consequently, as a matter of law, Plaintiffs' claims cannot justify the extreme and unprecedented relief requested.

## III. LACHES BARS THIS ATTEMPT TO NULLIFY AN ELECTION IN WHICH OVER 5.5 MILLION MICHIGAN CITIZENS VOTED

Plaintiffs argue, among other things, that the 2020 General Election in Michigan should be voided because of concerns over access limitations placed on Republican challengers in Wayne County. ECF No. 6, PageID.891-898, ¶¶ 58-80. But Plaintiffs knew or should have known the state-imposed limits on challengers observing the counting of absentee ballots, and they had ample opportunity to raise objections to those limits before

6

Election Day. The law requires challenges to election procedures to be raised before the election is conducted. This rule protects voters and reflects common sense: pre-election challenges allow problems to be fixed *before* the election is held, without disrupting votes *after* they have been cast.

This bedrock rule of election law is a forceful application of laches. The equitable doctrine of *laches* "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Amtrak v. Morgan*, 536 US 101, 121-22 (2002). "Laches consists of two elements: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party." *E.E.O.C. v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 439 (6th Cir. 2006); *Costello v. United States*, 365 U.S. 265, 282 (1961); *see also Herron v. Herron*, 255 F.2d 589, 593 (5th Cir. 1958) ("laches may be asserted by motion to dismiss for failure to state a claim—provided that the complaint shows affirmatively that the claim is barred.") citing *Berry v. Chrysler*, 150 F.2d 1002, 1003-04 (6th Cir. 1945). Moreover "any claims against the state [election] procedure [must] be pressed expeditiously". *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980)) citing to *William v. Rhodes*, 393 U.S. 23, 34-35 (1968). In this case the vote has occurred. The votes have been counted.  The count has been certified. It only remains for the designated presidential electors to confirm their votes for the winning candidates.

### A.    There was a Delay

There was undoubtedly a delay here. Plaintiffs filed this lawsuit one month after Election Day, and weeks after counting had been completed across the state. The Plaintiffs raise claims about the alleged lack of meaningful access Republican challengers had to the

absentee ballot counting process in Wayne County. ECF No. 6, PageID.891-898, ¶¶ 58-80. As an initial matter, those same claims, and much of the same evidence, had already been considered and dismissed in a motion for emergency relief filed by separate plaintiffs in the state court system. *See* ECF No. 31-14, *Costantino v. City of Detroit*, No. 20-014780, opinion (Wayne Cty. Cir. Ct. November 13, 2020) *leave to appeal denied by* ECF No. 31-16, *Costantino v. City of Detroit*, No. 162245, order (Mich. Sup. Ct. Nov. 23, 2020).

Moreover, the claims amount to dissatisfaction with state-imposed limits on challenger access to the counting of absentee ballot counting process that were in effect in advance of Election Day. For instance, Plaintiffs raise objections to the number of Republican challengers allowed to observe the counting process. But Michigan law was clear well in advance of Election Day, stating that parties are entitled to designate "2 challengers to serve in precincts at any 1 time" and "not more than 1 challenger to serve at each counting board." M.C.L. 168.730(1). In addition, Plaintiffs allege that challengers had difficulty observing the process because of distancing requirements. But challengers were notified of social distancing requirements by at least October 28, when Secretary of State Benson issued updated guidance relating to challengers and counting boards that further described public health measures planned for the 2020 presidential election. M.C.L. 168.765a(13); *November 3, 2020 Election Polling Place Safety and Accessibility*, Mich. Bureau of Elections, (Oct. 28, 2020), https://www.michigan.gov/documents/sos/Michigan_BOE_Safe_

Election_Guidelines_10_16_2020_705272_7.pdf.[3]

Plaintiffs provide no excuse for their failure to raise these claims prior to Election Day, or even during the counting process itself. If the Plaintiffs had brought these claims on a timely basis, there would have been an opportunity to address the issue without voiding the entire Election. Instead, Plaintiffs sat on their claims for weeks, watched as all votes were cast and counted, found the results disagreeable, and now raise these claims as a vehicle in a cynical attempt to throw the election to their preferred candidate. This is precisely why federal courts require plaintiffs to file challenges expeditiously. Otherwise, parties could "'lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983) (quoting *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)). "[C]ourts have been wary lest the granting of post-election relief encourage sandbagging on the part of wily plaintiffs." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (11th Cir. 1988).

### B.    The Prejudice is Clear and Overwhelming

The Petitioners' delay in asserting claims about problems challengers experienced on Election Day clearly prejudice the Defendants. While the Petitioners waited to assert their claims the Defendants planned, coordinated, and expended resources to conduct the

---

[3] On a motion to dismiss, the Court may take judicial notice of publicly available material on government websites. *R.S.B. Ventures, Inc. v. FDIC*, 514 F. App'x 853  856 n.2 (11th Cir. 2013) (taking judicial notice of the information on the FDIC's website); *Gent v. CUNA Mutual Ins. Society*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of facts from the Center for Disease Control and Prevention website).

2020 General Election in accordance with their understanding of Michigan election law, successfully defended that understanding against legal challenges, and counted the votes of over 5.5 million Michigan citizens. Petitioners' failure to assert their claims until now, just days before Michigan is due to submit its votes in the Electoral College, threatens the Defendants' interest in the validity of an election it spent significant time, energy and resources conducting. *Kay*, 621 F.2d at 813 ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made."). Petitioners' delay undoubtedly causes significant prejudice to the Defendants.

More important, Petitioners' delay in asserting their claims would be severely detrimental to the over 5.5 million eligible Michigan voters who lawfully cast ballots during the 2020 General Election. Petitioners explicitly acknowledge that they seek to throw out the Presidential choice of every voter in Michigan, and instead have this Court decide the winner of the Presidential Election. ECF No. 6, PageID.955, ¶ 233(1).[4] There is no *post-hoc* remedy which justifies the arbitrary deprivation of the right of suffrage, which is a "fundamental" political right in a free democratic society. *Reynolds v. Sims*, 377 US 533, 561-62 (1964). *See also,* Mich. Const. art. II, sec. 1; Richard L. Hasen, "Beyond the

---

[4] Petitioners focused their grievances on the Presidential Election. They do not however address how their request for relief, if granted, would affect the many other offices which were determined in the November 3 election. Consideration of this aspect makes clear the breathtaking scope of what the Petitioners seek. They want the Presidential Election thrown out and their choice of Michigan's electors installed by fiat but are totally unconcerned with the will of the voters or the havoc their remedy would have on the people and government of the State of Michigan.

Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown", 62 Wash. & Lee L. Rev. 937 (2005) ("Courts should see it as in the public interest in election law cases to aggressively apply *laches* so as to prevent litigants from securing options over election administration problems.").

Plaintiffs attempt to void the entire election based on allegations of improprieties at the TCF Center in Detroit, where Wayne County's absentee ballots were counted, is simply another attempt by Republican candidates and their allies to delegitimize the voice of Black voters. For the last month, groups have filed legal challenge after legal challenge alleging a massive conspiracy to deprive Republican challengers access to vote counting in large cities, in an attempt to hide purportedly fraudulent activity. Plaintiffs claims are simply a continuation of this trend, focusing almost entirely on Wayne County, where nearly half of Michigan's Black population lives. In truth, Plaintiffs are asking this Court to be suspicious of vote counting in any county that is home to a large Black population, and to shift the burden to those communities to prove that their votes are legitimate. For the foregoing reasons, Plaintiffs' claims are not only untimely, but unconscionable.

## IV.   PETITIONERS' PURPORTED EXPERT REPORTS ARE INADMISSABLE

Plaintiffs' claims of purported fraud rely heavily on the reports of several "experts", all of which are fatally flawed and should be dismissed.  Most significantly, Plaintiffs cite to the report of William M. Briggs (the "Briggs Report") as evidence of widespread absentee ballot fraud. Briggs conducted a statistical analysis of "survey" data provided by Matthew Braynard. In his Report, Briggs states that he "assume[s] survey respondents are

representative and the data is accurate." ECF No. 6-21, PageID.1543. However, Briggs does not independently evaluate the survey or the data, or provide any evidence suggesting that Braynard observed basic standards of survey methodology. In fact, Braynard conducted his survey utilizing scientifically unsound methods, did not include a representative sample, and did not take basic precautions to ensure accuracy. As a result, Briggs' entire analysis is undermined by his reliance on this data, and he does not meet the high standards for qualifications, reliability of data and applicability to the facts of the case that are required of experts under Fed. R. Civ. Proc. 702. See generally *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589-595 (1993).

As an initial matter, Briggs' reliance on Braynard's data is problematic, because of the Braynard's serious lack of qualifications and objectivity. There is no evidence in Briggs' report or in the Amended Complaint that Braynard has the expertise necessary to undertake the survey described in the Report, or to opine as to the inferential statistics in it. In truth, Braynard has not published a single peer-reviewed article in any relevant scientific field, and, as noted in a Report he submitted in another case seeking to overturn the results of the Election in Michigan, has never been accepted as an expert by any court. (*See* Ex. 1: *Johnson v. Benson* Braynard Report.)

More to the point, Braynard's background as a political operative raises serious questions about the objectivity of the survey he conducted. After working for the 2016 Trump campaign, he has spent the past four years as Executive Director of an organization called Look Ahead America, working with over thirty other former Trump campaign staffers with the goal of registering and turning out likely Trump voters. In addition to the

$40,000 Petitioners paid him (Ex. 1 at 4), Braynard has personally received over $600,000 on behalf of his "Voter Integrity Project.," *See* Voter Integrity Project, GiveSendGo Campaign, https://givesendgo.com/voterintegrity; Matt Braynard, Gab (Nov. 16, 2020), https://gab.com/mattbraynard/posts/105223610078696550, last accessed on Dec. 3, 2020 (noting Braynard's refusal to publicly disclose invoices for purported expenditures). The "Voter Integrity Project" includes both former Trump campaign staff and current White House staff, including a senior advisor to President Trump—and according to Braynard— is "in frequent communication" with the Trump campaign and legal team, to which he has been providing his research. Ellie Rushing and William Bender, *Pro-Trump 'voter integrity' group that is calling Pennsylvania voters has ties to White House*, Philadelphia Inquirer

(Nov. 13, 2020), https://www.inquirer.com/politics/pennsylvania/voter-integrity-fund-pennsylvania-georgia-wisconsin-trump-2020-20201113.html; David Corn, *Former Trump Aide Challenging Vote Count Once Praised a Right-Wing Assassin*, Mother Jones (Nov. 13, 2020), https://www.motherjones.com/politics/2020/11/matt-braynard-trump/.

Briggs' reliance on Braynard's data is even more problematic because all available evidence suggests fundamental and fatal problems with the survey. Most importantly, Braynard's analysis violates a core principle of survey methodology: the sample surveyed must be representative of the population for which the surveyor intends to draw conclusions. *See, e.g.*, A. Lynn Phillips et. al., *What's Good in Theory May Be Flawed in Practice: Potential Legal Consequences of Poor Implementation of A Theoretical Sample*, 9 Hastings Bus. L.J. 77, 90–93 (2012) (discussing nonresponse and coverage biases in

survey methodology). Braynard did not ensure a representative sample for his alleged voter survey. He simply instructed his staff to make phone calls to "a sample" of the voters on the list. (Ex. 1 at 3, 7- 10). Braynard has in fact admitted that his investigation was not random, but rather "focus[ed] on areas with exceptionally high Democratic turnout." Ryan Briggs and Miles Bryan, *Former Trump staffer fishing for fraud with thousands of cold calls to Pa. voters is short on proof*, WHYY (Nov. 13, 2020), https://whyy.org/articles/former-trump-staffer-fishing-for-fraud-with-thousands-of-cold-calls-to-pa-voters-is-short-on-proof/. The sample was further biased by Braynard's staff, who reportedly left voicemails with individuals reported as having cast ballots in the General Election, asking for call backs if the voter did not cast a ballot. Rushing and Bender, *supra* IV.

In addition, Braynard failed to take basic steps to ensure respondents were providing accurate responses to his "survey". Braynard relied on a crude and unreliable technique for verifying that respondents were the voters in question: simply matching their names to the registration record. (*See* Ex. 1 at 6.) Braynard does not indicate he took any additional steps to verify voter identities to protect against false positives, including having the respondent confirm address or other demographic information. Braynard also fails to show that questions were designed to promote accurate responses. Proper formulation of questions is an essential component of accurate measurement, and even surveys with a representative sample, which this was not, can be undermined by ambiguous or biased questioning. Pew Research Center, *Questionnaire Design*, https://www.pewresearch.org/methods/u-s-survey-research/questionnaire-design/ last accessed Dec. 1, 2020. Applying for and submitting an absentee ballot can be confusing, especially for voters utilizing it for the first

time, as many did in Michigan this November. In this context, poorly constructed questions carry the risk of soliciting inaccurate responses. Here, publicly available evidence suggests not only that questions were biased, but so were the questioners. Briggs and Bryan, *supra* IV (reporting suspicious cold calls and voicemails and manipulative behavior by survey callers).

Given that there is no evidence to assume that Braynard's survey was representative or accurate, and, indeed plenty of evidence to suggest just the opposite, Briggs' entire analysis is flawed. Indeed, Briggs' own qualifications and reliability are suspect for relying on what is clearly a flawed biased survey. Numerous academics who have reviewed Braynard's analysis here have flatly rejected Braynard's methodology and conclusions as "completely without merit" and found that reliance on his conclusions would be "irresponsible and unethical." Francesca Paris, *Williams prof disavows own finding of mishandled GOP ballots*, BERKSHIRE EAGLE(Nov. 24, 2020), https://www.berkshireeagle.com/news/local/williams-prof-disavows-own-finding-of-mishandled-gop-ballots/article_9cfd4228-2e03-11eb-b2ac-bb9c8b2bfa7f.html.

In addition, Braynard's analysis of out-of-state voters is overly simplistic and misleading. Plaintiffs rely on evidence compiled by Braynard that suggests that over 13,000 voters in Michigan were ineligible because they lived in another state. Braynard calculated that figure by supposedly compared data from the National Change of Address ("NCOA") database and voter data from other states provided by L2 Political with Michigan's voter data from L2 Political, matching names from one list to the other. But the NCOA database does not reflect changes in legal residency but rather changes in

mailing address, making its use in comparison to voter registration records unreliable as an indicator of continued eligibility. *See, e.g.*, *VOTER REGISTRATION – Information on Federal Enforcement Efforts and State and Local List Management*, U.S. Gov't Accountability Office Report (June 2019) at 48-49, https://www.gao.gov/assets/710/700268.pdf, last accessed on Dec. 3, 2020 ("[A]n indication of a change in address in NCOA data does not necessarily reflect a change in residence.").

Such a bare comparison of lists is highly likely to result in false positives, including identification of students, military personnel, and others who continue to reside and lawfully vote in Michigan while temporarily located elsewhere, as well as voters who share the same or similar names as individuals residing at other addresses. Further, voters who moved from between cities or townships in-state but did so within sixty days of Election Day (*i.e.* on or after September 4, 2020) continued to be eligible to vote at their former address in the November 3, 2020, election, either in person or by absentee ballot. *See* MCL § 168.507a(1). Moreover, voters who moved out of Michigan within thirty days of the election are permitted to cast absentee ballots for the Presidential contest in Michigan. 52 U.S.C. § 10502(e).

The problems with Plaintiffs' experts go beyond Briggs' and Braynard. Plaintiffs rely heavily on the "expert" analysis of Eric Quinnell to support allegations of fraudulent conduct in Oakland and Wayne Counties. Quinnell is most certainly not qualified to be conducting they type of election based statistical analysis that he conducts here, as he is a professional engineer in "circuit architecture and processing." ECF No. 6-29,

PageID.1807. Quinnell's analysis comes down to this: increased turnout in Wayne and Oakland Counties is "suspicious". ECF No. 6, PageID.911, ¶ 114. This "analysis" fails to identify even a single illegal vote. Worse, it effectively suggests that increases in turnout in counties that are home to some of the largest Black communities in the state should somehow raise suspicions of fraud. But the increase in turnout in Wayne County, just 10%, was significantly below the statewide average, 14%, while Oakland was right at the statewide average, 15%. Julie Mack, *See 2020 election turnout by Michigan county compared to 2016*, MLive (Nov. 5, 2020), https://www.mlive.com/politics/2020/11/see-2020-election-turnout-by-michigan-county-compared-to-2016.html.

Under the Federal Rules of Evidence, courts must determine whether evidence presented by an expert "rests on a reliable foundation," "is relevant to the task at hand" and "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93, 597. In other words, "misleading junk science" must be excluded. *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 176-177 (6th Cir. 2009) (internal citations omitted). Indeed, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). But *ipse dixit* and junk science are all Plaintiffs have here. No evidence is provided to suggest Braynard adhered to basic principles of survey methodology, and every indication is that he employed scientifically unsound practices. Consequently, Briggs' Report relying on Braynard's survey is entirely without merit, and

unworthy of consideration by this or any court. For the foregoing reasons, this Court should ignore Briggs' "expert" report and any other evidence arising from Braynard's analysis. Further, the Court should not admit any of the other "expert" reports until the witnesses' credentials can be suitably examined and qualified under Fed. R. Civ. Proc. 702 and *Daubert*.

## V. CONCLUSION

For the reasons set forth above, non-parties Michigan NAACP respectfully requests that this Court deny the Petition for original action.

Dated:  December 3, 2020                              Respectfully submitted,


BARRIS, SOTT, DENN & DRIKER,                Kristen Clarke (*pro hac vice* pending)
PLLC                                                            Jon Greenbaum (*pro hac vice* pending)
                                                                    Ezra Rosenberg (*pro hac vice* pending)
By:   /s/ Eugene Driker                               Julie Houk (*pro hac vice* pending)
Eugene Driker (P12959)                            LAWYERS COMMITTEE FOR CIVIL
Stephen E. Glazek (P23186)                      RIGHTS UNDER LAW
Daniel M. Share (P26903)                         1500 K Street NW, Suite 900
333 West Fort Street, Suite 1200              Washington, DC 20005
Detroit, MI  48226                                    Telephone: (202) 662-8300
(313) 965-9725                                         kclarke@lawyerscommittee.org
edriker@bsdd.com                                   jgreenbaum@lawyerscommittee.org
sglazek@bsdd.com                                  erosenberg@lawyerscommittee.org
dshare@bsdd.com


                                                               *Attorneys for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing was filed electronically and served on all counsel of record via the ECF system of the U.S. District Court for the Eastern District of Michigan.

                                    __/s/ Eugene Driker_____