IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL HAGGARD,
CHARLES JAMES RITCHARD, JAMES DAVID          CASE NO.  20-cv-13134
HOOPER and DAREN WADE RUBINGH,

      Plaintiffs
v.

GRETCHEN WHITMER, in her official capacity
as Governor of the State of Michigan,
JOCELYN BENSON, in her official capacity as
Michigan Secretary of State, the Michigan
BOARD OF STATE CANVASSERS,

      Defendants.

PLAINTIFFS' RESPONSE TO RESPONSES IN OPPOSITION TO MOTION FOR
DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND
MEMORANDUM IN SUPPORT THEREOF

# Table of Contents

I.   PRELIMINARY MATTERS ........................................................ 4

  A.  Plaintiffs Have Standing ................................................... 4

    1.  Elector Standing under Electors and Elections Clause ............ 4

    2.  Voter Standing for Equal Protection and Due Process Claims 6

    3.  Standing Under Michigan Constitution and Michigan Election Code ................................................................................... 8

  B.  Laches ............................................................................ 8

  C.  Mootness ....................................................................... 10

  D.  Eleventh Amendment ...................................................... 10

  E.  Abstention ..................................................................... 11

  F.  Federal Jurisdiction ........................................................ 15

II.  RESPONSES TO FACT AND EXPERT WITNESSES ................. 17

  A.  Defendants and Defendant-Intervenor Have Failed to Rebut Factual Testimony ............................................................................. 17

  B.  Defendants and Defendant-Intervenor Have Failed to Rebut Expert Testimony ............................................................................. 18

  C.  Defendants and Defendant-Intervenors Have Failed Altogether to Address Dominion Testimony ............................................................. 20

III. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF ....... 20

  A.  Plaintiffs have a substantial likelihood of success. ............... 21

  B.  The Plaintiffs will suffer Irreparable Harm ......................... 23

  C.  The Balance of Equities & The Public Interest .................... 24

  D.  Plaintiffs Reiterate Request for Emergency Injunctive Relief Prior to December 8, 2020. ........................................................................ 24

IV.  RELIEF REQUESTED ......................................................... 25

# INDEX OF AUTHORITIES

Page

**Cases**

*Bognet v. Sec'y of Commonwealth*, No. 20-2314, 2020 WL 6686120 (3d Cir. Nov. 13, 2020)   5

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020) ……………………………………………..6

*McPherson v. Blacker*, 146 U.S. 1, 27 (1892) …………………………………………..7

*Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam)………………..7

*Baker v. Carr*, 369 U.S. 186 (1962)………………………………………………………8

*Reynolds v. Sims*, 377 U.S. 533 (1964).  ………………………………………………..8

*George v. Haslam*, 112 F.Supp.3d 700, 710 (M.D. Tenn. 2015) ………………………………8

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 560-561 (1992) …………………………….9

*Hamlin v. Saugatuck Twp.*, 299 Mich. App. 233, 240-241 (2013) …………………………..9

*Meade v. Pension Appeals and Review Committee*, 966 F.2d 190, 195 (6th Cir. 1992) ……….9

*Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973) ………………………………………10

*Alabama v. Pugh*, 438 U.S. 781, 782 (1978) 11

*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015).  12

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976) 12

*Harman v. Forssenius*, 380 U.S. 528, 534, (1965) 12

*Louisville Bedding Co. v. Perfect Fit Indus.*, 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS 9599  ………………………………………………………………………..14, f.n. 1

Guaranty Trust Co. v. York, 326 U.S. 99 (1945),……………………………………....16

Holmberg v. Armbrecht, 327 U.S. 392, 395 (1946) ……………………………………16

N.A.A.C.P. v. Ala. ex. rel. Patterson, 357 U.S. 449, 455 (1958)
………………………………………………………………………...16

Roosevelt, Kermit III, Light from Dead Stars: The Procedural Adequate and Independent State Ground Reconsidered, 103 Columbia L. Rev. 1888, 1890 (citing Barr v. City of Columbia, 378 U.S. 146, 149 (1964);
…………………………………………………………………….....16

Boddie v. Connecticut, 401 U.S. 371 (1971) ……………………………………...17

Ortwein v. Schwab, 410 U.S. 656 (1973);  ……………………………………………..17

Sosna v. Iowa, 419 U.S. 393 (1975) ……………………………………………..………17

Priorities United States v. Nessel, 2020 U.S. Dist. LEXIS 177888, *37-38 ( E.D. Mich. September 17, 2020); …………………………………………………………………17

OCA-Greater Houston v. Texas, 867 F.3d 604, 615 (5th Cir. 2017)  …………………..17

Stein v. Thomas, 222 F.Supp.3d 539, 542 (E.D. Mich. 2016) ………………………..17

Cnty./Ohio Valley Sch. Bd., 310 F.3d 927, 928 (6th Cir. 2002)) …………………………  .. 21

City of Pontiac Retired Employees Ass'n v. Schimmel, 751 F.3d 427, 430 (6th Cir. 2014)… 21

Baker v. Carr, 369 U.S. 186 (1962) …………………………………………………23

Reynolds v. Sims, 377 U.S. 533 ……………………………………………………23

Obama for America vs. Husted, 697 F.3d 423, 436 (6th Cir. 2012) …………………………25

Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky., 354 F.3d 438, 445 (6th Cir. 2003)……………………………………………………………………………25

McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky., 545 U.S. 844 (2005) ………… ..25

Bush v. Gore, 531 U.S. 98 (2000) ………………………………………………25

3 U.S.C. §5 …………………………………………………………………25


MCL § 168.31a (setting forth election audit requirements)……………………………9

MCL § 168.861 (quo warranto remedy for fraudulent or illegal voting). ……………..9

MCL §§ 168.730-738  ………………………………………………………22

MCL §§ 168.730-738………………………………………………………………23

, MCL §§ 168.730-738 …………………………………………………………..22

MCL §§ 168.730-738…………………………………………………………..23

**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| **TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,** | **CASE NO.  20-cv-13134** |
| **Plaintiffs** | |
| **v.** | |
| **GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State, the Michigan BOARD OF STATE CANVASSERS,** | |
| **Defendants.** | |

**PLAINTIFFS' RESPONSE TO RESPONSES IN OPPOSITION TO MOTION FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW Plaintiffs, Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, by and through their undersigned counsel, and file this Response, and Memorandum of Law In Support Thereof, to Defendants' and Intervenor-Defendants Response in Plaintiffs' November 29, 2020 Motion for Declaratory, Emergency and Permanent Injunctive Relief ("TRO Motion"). ECF No. 7.

*Then you will know the truth, and the truth will set you free.*

John 8:32

1

The 2020 Michigan election result certified by the defendants does not reflect the voice of Michigan voters.  It is a lie.  But how do you prove a lie that is so repugnant to democratic society that a fair-minded public and even well-intentioned government officials dare to  contemplate its premise?  Without the assistance of subpoenas, court-ordered discovery or any input from law enforcement, you start with the public record; with statistical analysis; with eye witness accounts of what took place.  Then you move to expert analysis.  The Amended Complaint does precisely that.

Russell Ramsland, in both his initial and rebuttal reports, explains in detail that in the early morning hours of November 4, Michigan election officials tabulated 384,733 votes in four precincts whose machinery could not possibly have counted more than 94,867 votes during that time.  Defendants submit testimony that,  in general, votes are reported in delayed batches.  But, critically they do not state *pro hac verba* that the precise vote tabulations identified by Ramsland was the product of a delayed batch.  Thus, Ramsland's testimony remains unrebutted, and compels the unavoidable conclusion that 289,866 ballots tabulated on November 4 must be disregarded.

Redacted witness referred to as "Spider", a former member of the 305 Military Intelligence unit responsible for protecting this country from enemy guided missiles, explains vulnerabilities with the Dominion system.   He sets forth in 17 pages of detailed analysis and evidence that the Dominion voting system used throughout Michigan, and in other states, was compromised and infiltrated by agents of China and Iran.  Defendants respond with silence.

2

Dozens of fact witnesses in sworn affidavits report of illegal vote switching, double voting, dead people voting, ballot destruction, forging dates on ballots, tampering with voter information, and harassment and assault of Republican election observers. The defendants' response, is "so what", if it happened it was legal.

At this early stage of litigation, Plaintiffs ask this court to preserve the status quo through a temporary restraining order, until a hearing can be set, preventing defendants from facilitating the empowerment of the Democratic slate of Presidential Electors, to the detriment of Plaintiffs.  Defendants' certified vote count does not represent real votes; it is the product of fraud, illegality and cheating, which disenfranchises all lawful Michigan voters regardless of party or preference.  Only the truth will allow voters in this state to find comfort and confident in their election process, and uphold the democratic values this country was founded upon.

## STATEMENT FACTS

The facts relevant to this Response are set forth in the November 29, 2020 First Amended Complaint ("Complaint"), ECF No. 6, filed in the above-captioned proceeding, and its accompanying exhibits, and the TRO Motion.

## DISCUSSION

This brief will first in Section I respond to, and dispose of, Defendants and Defendant-Intervenors specious legal arguments for denial of Plaintiffs' TRO Motion on grounds of: (1)

standing, (2) laches, (3) mootness, (4) the Eleventh Amendment, (5) abstention, and (6) federal jurisdiction.

In Section II, Plaintiffs respond to Defendant and Defendant Intervenors fact and expert witnesses, and will demonstrate that these witnesses have in large part failed to respond to, much less rebutted, the specific factual allegations made in the Complaint, and/or that the responses made are based on speculation, circular reasoning, or bald assertions unsupported by evidence.

In Section III, Plaintiffs will respond to Defendant and Defendant Intervenors claims that Plaintiffs have not met the requirements for injunctive relief, which are: (1) substantial likelihood of success on the merits, and in particular that Plaintiffs have adequately pled their Constitutional and statutory claims; (2) irreparable injury, (3) the balance of equities tips in their favor, and (4) the requested relief is in the public interest.

## I.   PRELIMINARY MATTERS

### A.   Plaintiffs Have Standing

Each of Plaintiffs Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh are registered Michigan voters and are nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan. *See* ECF No. 6, "Parties".

### 1.   Elector Standing under Electors and Elections Clause

Defendants and Defendant-Intervenors' arguments on standing rely more or less exclusively on the Third Circuit's decision in *Bognet v. Sec'y of Commonwealth*, No. 20-2314, 2020 WL 6686120 (3d Cir. Nov. 13, 2020), where the court found that electors lacked standing based on the particularities of a Pennsylvania law that are not present here.  In

particular, the *Bognet* court did not discuss the significance of State law provisions pursuant to which Presidential Electors are candidates for office.

State Defendants correctly note that *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), which affirmed that Presidential Electors have both Article III and Prudential standing under the Electors and Elections Clauses, "was rooted heavily in the court's interpretation of Minnesota law." ECF No. 31 at 12. What State Defendants neglect to mention is that the *Carson* court relied on provisions of Minnesota law treating electors as candidates for office are nearly identical to the corresponding provision of the Michigan Election Code because in both States a vote cast for a party's candidate for President and Vice-President are deemed to be cast for that party's Electors. Compare the relevant provisions of Minnesota election law, Minn. Stat. §208.04(1) and MCL § 168.45.

> When presidential electors … are to be voted for, ***a vote cast for the party candidate for president and vice-president shall be deemed a vote cast for that party's electors*** … as filed with the secretary of state.

> Minn. Stat. § 208.04(1) (emphasis added).

> Marking a cross (X) or a check mark (✓) in the circle under the party name of a political party, at the general November election in a presidential year, ***shall not be considered and taken as a direct vote for the candidates of that political party for president and vice-president or either of them, but, as to the presidential vote, as a vote for the entire list or set of presidential electors chosen by that political party*** and certified to the secretary of state pursuant to this chapter

> MCL § 168.45 (emphasis added).

The *Carson* court concluded that, "[b]ecause Minnesota law plainly treats presidential electors as candidate, we do, too." *Carson*, 978 F.3d at 1057.

In other words, a vote for President Trump and Vice-President Pence in Michigan—and Minnesota—***is a vote for each Republican electors***, and just as in Minnesota, illegal conduct aimed at harming candidates for President similarly injures Presidential Electors. As

5

such, Plaintiff Elector candidates "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *See also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).  Notably, Defendant and Defendant Intervenors have cited no Sixth Circuit or Michigan precedent in support of their position, nor have they shown any relevant similarity between Pennsylvania and Michigan law on election of electors.

### 2.      Voter Standing for Equal Protection and Due Process Claims

Defendant and Defendant-Intervenors misrepresent Plaintiffs' Equal Protection and Due Process claims, both in terms of substance and for standing purposes, insofar as they claim that Plaintiffs' claims are based solely on a theory of vote dilution that "will proportionally impact every Michigan voter to the same mathematical degree," (ECF No. 39 at 25; *see also* ECF No. 31 at 10 ("The alleged 'dilution' would affect all Michigan voters equally …"), and therefore is a "generalized grievance," rather than the concrete and particularized injury required for Article III standing.  ECF No. 36 at 7; *see also* ECF No. 31 at 11.

This is incorrect.

Plaintiff's, on behalf of themselves and other similarly situated voters allege, first, and with great particularity, that Defendants have both violated Michigan Election Code and applied the Michigan Election Code to dilute the votes of Michigan's Republican voters (or voters for Republican candidates) with illegal, ineligible, duplicate or fictitious that Defendants, in collaboration with public employees, Dominion and Democratic poll watchers and activists, have caused to be counted as votes for Democratic candidates. The fact and

6

expert witness testimony describes and quantifies the myriad means by which Defendants and their collaborators illegally inflated the vote tally for Biden and other Democrats, in districts that were overwhelmingly Democratic such as the City of Detroit, including: double voting, dead voting, double counting of same vote, forgery of ballot and voter information, illegally completing or modifying ineligible ballots, ballot switching (Trump to Biden), changing dates or backdating absentee ballots, failure to match signatures, etc., etc. *See* ECF No. 6, Section II and III. Thus, the vote dilution resulting from this systemic and illegal conduct did not affect all Michigan voters equally; it had the intent and effect of inflating the number of votes for Democratic candidates and reducing the number of votes for Trump and Republican candidates.

Further, Plaintiffs have presented evidence that, not only did Defendants dilute the votes of Plaintiffs and similarly-situated voters for Republican candidates, they sought to actively disenfranchise such voters to reduce their voting power, in clear violation of "one person, one vote." *See generally Baker v. Carr*, 369 U.S. 186 (1962); *Reynolds v. Sims*, 377 U.S. 533 (1964). Defendants engaged in several schemes to devalue Republican votes as detailed in the Complaint, including Republican ballots being destroyed or discarded, or **"1 person, 0 votes,"** vote switching **"1 person, -1 votes,"** (Dominion and election workers switching votes from Trump/Republican to Biden/Democrat), and Dominion algorithmic manipulation, or for Republicans, **"1 person, 1/2 votes,"** and for Democrats, **"1 person, 1.5 votes."** *See e.g.,* ECF No. 6, Section II.C (ballot destruction/discarding) Ex. 101 (Dr. Briggs Testimony regarding potential ballot destruction), Ex. 104 (Ramsland testimony regarding additive algorithm), Section IV (multiple witnesses regarding Dominion vote manipulation).

7

Plaintiffs' injury is that "the relative values of their particular votes [were] devalued," and as such, "theirs is not a generalized grievance about a law not being followed that is applicable to all," *George v. Haslam*, 112 F.Supp.3d 700, 710 (M.D. Tenn. 2015), as Defendant and Defendant Intervenors claim. Plaintiffs have thus met the requirements for stand: (1) the injuries of their rights under the Equal Protection and Due Process clauses that concrete and particularized for themselves, and similarly situated voters, whose votes have been debased (2) that are actual or imminent and (3) are causally connected to Defendants conduct because the debasement of their votes is a direct and intended result of the conducts of the Defendants and the public employee election workers they supervise. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555 560-561 (1992).

### 3. Standing Under Michigan Constitution and Michigan Election Code

As such, they each have standing under the 2018 amendments to Article II of the Michigan Constitution, which provides that "[e]very citizen of the United States who is an elector qualified to vote in Michigan shall have the right," among other things, "to have the results of statewide elections audited, …, to ensure the accuracy and integrity of elections." Mich. Const. 1963, art. 2, §4(1)(h). Various provisions of the Michigan Election Code also give any citizen the right to bring an election challenge within 30 days of an election where, as here, it appears that a material fraud or error has been committed. *See, e.g., Hamlin v. Saugatuck Twp.*, 299 Mich. App. 233, 240-241 (2013) (*citing Barrow v. Detroit Mayor*, 290 Mich. App. 530 (2010)); MCL § 168.31a (setting forth election audit requirements); MCL § 168.861 (*quo warranto* remedy for fraudulent or illegal voting).

### B. Laches

Defendants and Defendant Intervenor assert that Plaintiffs claims are barred by laches. *See* ECF No. 31 at 3-7; ECF No. 39 at 30. Laches consists of two elements, neither of which are

8

met here: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party. *Meade v. Pension Appeals and Review Committee*, 966 F.2d 190, 195 (6th Cir. 1992). The bar is even higher in the voting rights or election context, where defendants asserting the equitable defense must show that the delay was due to a "deliberate" choice to bypass judicial remedies and they must do so "by clear and convincing" evidence. *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973). The cases relied on by State Defendants are inapposite as the plaintiffs in those cases waited *years* to file a challenge on the eve of an election, *see* ECF No. 31 at 5 (*discussing Crookston v. Johnson*, 841 F.3d 396, 398, (6th Cir. 2016) (Plaintiff waited "nearly four years" to file claim), whereas here Plaintiffs filed mere days after the completion of counting.

Further, the "delay" in filing after Election Day is almost entirely due to Defendants failure to promptly complete counting until weeks after November 3, 2020—Michigan county boards did not complete counting until November 17, 2020, and Defendant Michigan Board of State Canvassers did not do so until November 23, 2020, ECF No. 31 at 4—a mere *two days* before Plaintiffs filed their initial complaint on November 25, 2020. Plaintiffs admittedly would have preferred to file sooner, but Plaintiffs needed some time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint, and this additional time was once again a function of the sheer volume of evidence of illegal conduct by Defendants and their collaborators. Defendants cannot now assert the equitable affirmative defense of laches, when any prejudice they may suffer, is entirely a result of their own actions and misconduct.

Moreover, much of the misconduct identified in the Complaint was not apparent on Election Day, as the evidence of voting irregularities was not discovered until weeks after the

election.  William Hartman explains in a sworn statement dated November 18, 2020, that "on November 17th there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County" and he had "determined that approximately 71% of Detroit's 134 Absentee Voter Counting Boards were left unbalanced and unexplained."  He and Michele Palmer voted not to Certify and only agreed upon a representation of a full audit, but then reversed when they learned there would be no audit.  (*See* ECF No. 6, Ex. 11 &12.)  Further, the certification that followed despite 71% of precincts showing voting irregularities was one of the points where the extent of voter fraud and the pressure to hide any investigation of that fraud became the clearest. Id.  Furthermore, it is disingenuous to try to bottle this slowly counted election into one day when in fact waiting for late arriving mail ballots and counting mail ballots persisted long after "Election Day."

### C.     Mootness

State Defendants throw in a mootness argument that is similarly without merit.  *See* ECF No. 31 at 7-9.  This argument is based on the false premise that this Court cannot order any of the relief requested in the Complaint or the TRO Motion.  This Court can grant the primary relief requested by Plaintiffs – de-certification of Michigan's election results and an injunction prohibiting State Defendants from transmitting the results – as discussed in Section I.E. on abstention below.  There is also no question that this Court can order other types of declaratory and injunctive relief requested by Plaintiffs, in particular, impounding Dominion voting machines and software for inspection, nor have State Defendants claimed otherwise.

### D.     Eleventh Amendment

State Defendants assert that Plaintiffs' claims are barred by the Eleventh Amendment, but the cases address circumstances that are not present here. *See* ECF No. 31 at 13 (*discussing*

*Alabama v. Pugh*, 438 U.S. 781, 782 (1978) (dismissing prison inmate lawsuit under the Eighth and Fourteenth Amendment claims where Alabama had not consented to civil actions against it).

While the contours of the Eleventh Amendment's jurisdictional bar are ambiguous in many cases, this is not one of them. The Sixth Circuit recently addressed the scope of Eleventh Amendment sovereign immunity in the election context in *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015). In *Russell*, the court held that federal courts do in fact have the power to provide injunctive relief where the defendant, "The Secretary of State and members of the State Board of Elections," were like State Defendants, "empowered with expansive authority to "administer the election laws of the state."" *Russell*, 784 F.3d at 1047 (internal quotations omitted). The court held that the Eleventh Amendment did not bar a federal court from "[e]njoining a statewide official under Young based on his obligation to enforce a law is appropriate" where the injunctive relief requested sought to enjoin actions (namely, prosecution) that was within the scope of the official's statutory authority. *Id.*

This is precisely what the Plaintiffs request in the Amended Complaint, namely, equitable and injunctive relief to prospectively enjoin the Defendants from taking actions that are within the scope of their statutory authority, in particular, Secretary Benson as chief election officer, including but not limited to seeking a permanent injunction "enjoining Secretary Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College." (See ECF No. 6 ¶1). Under *Russell,* the Eleventh Amendment is no bar to this Court granting the requested relief.

### E.   Abstention

State Defendants spill a lot of ink making an abstention claim based on *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 808 (1976) ("*Colorado River*"), a case addressing concurrent federal and state jurisdiction over water rights. *See* ECF No. 31 at 19-20.

11

Presumably they did so because the case setting the standard for federal abstention in the voting rights and state election law context, *Harman v. Forssenius*, 380 U.S. 528, 534, (1965) is not favorable to their cause. In *Harman*, the Supreme Court rejected

The Supreme Court rejected the Defendant state's argument that federal courts should dismiss voting rights claims based on federal abstention, emphasizing that abstention may be appropriate where "the federal constitutional question is dependent upon, or may be materially altered by, the determination of an ***uncertain issue of state law***," and "deference to state court adjudication only be made where the issue of state law is uncertain." *Harman*, 380 U.S. at 534 (citations omitted). But if state law in question "is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," then "it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* (citation omitted).

The State Defendants go on to describe several ongoing state proceedings where there is some overlap with the claims and specific unlawful conduct identified in the Complaint. *See* ECF No. 31 at 21-26. But State Defendants have ***not identified any uncertain issue of state law that would justify abstention***. *See* ECF No 31 at 21-26. Instead, as described below the overlaps are over factual matters and the credibility of witnesses, and the finding of these courts would not resolve any uncertainty about state law that would impact Plaintiffs constitutional claims (Electors and Elections Clauses and Equal Protection and Due Process Clauses).

Defendants' reliance on *Colorado River* is also misplaced insofar as they contend that abstention would avoid "piecemeal" litigation, *see id.* at 38, because abstention would result in exactly that. The various Michigan State proceedings raise a number of isolated factual and legal issues in separate proceedings, whereas Plaintiffs' Complaint addresses most of the legal claims and factual evidence submitted in Michigan State courts, and also introduces a number of new

12

issues as well that are not present in any of the State proceedings.  According, the interest in judicial economy and avoidance of "piecemeal" would be best served by this Court retaining federal question jurisdiction and supplemental jurisdiction over State law claims.

Defendants cited to four cases brought in the State courts in Michigan, none of which have the same plaintiffs, and all of which are ongoing and have not been resolved by final orders or judgments.  (See ECF Nos. 31-6 to 31-15.)[1]

- <u>Donald J. Trump v. Benson</u>, Court of Claims, 20-000225.  The court denied declaratory relief on November 6, 2020 stating, "This is not a final order and it does not resolve the last pending claim or close the case."  The Appeal filed related thereto was withdrawn also without prejudice.

-  <u>Constantino v. City of Detroit</u>, Wayne Circuit Court, No. 20-014780.  The court stated that Plaintiff has multiple legal remedies and that "This is not a final order and it does not resolve the last pending claim or close the case.

- <u>Johnson v. Benson</u>, Michigan Supreme Court No. 162286.  The Complaint seeks declaratory relief and equitable relief, but not based on the identical claims or brought by these Plaintiffs.

- <u>Stoddard v City Election Commission</u>, Wayne Circuit Court No. 20-014604.  Court denied injunctive relief, without prejudice; involves different parties as well as non-identical issues.

- <u>Bailey v. Antrim County</u>, Antrim Circuit Court, No. 20-9238.  Plaintiff seeks equitable declaratory relief, but has not submitted similar evidentiary issues as in this case; not final, involves different parties as well as non-identical issues.

---

[1] The significant differences between the instant proceeding and the foregoing State proceedings would also prevent issue preclusion.  A four-element framework finds issue preclusion appropriate if: (1) the disputed **issue** is identical to that in the previous action, (2) the **issue** was actually litigated in the previous action, (3) resolution of the issue was necessary to support a final judgment in the prior action, and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding.  *See Louisville Bedding Co. v. Perfect Fit Indus*., 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS 9599 (citing *Graco Children's Products, Inc. v. Regalo International, LLC*, 77 F. Supp. 2d 660, 662 (E.D. Pa. 1999). None of these requirements have been met with respect to Plaintiffs or the claims in the Complaint.

Of equal importance is the fac that the isolated claims in State court do not appear to present evidence demonstrating that a sufficient number of illegal ballots were counted to affect the result of the 2020 General Election.  The fact and expert witnesses presented in the Complaint do.  As summarized below, the Complaint alleges and provides supporting evidence that the number of illegal votes is potentially multiples of Biden's 154,188 margin in Michigan. (See ECF No. 6 ¶16).

A. A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (*see* Ex. 104 ¶14);

B. A report from Dr. Louis Bouchard finding to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4), *see* Ex. 110 at 28);

C. A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (*See* Ex. 101);

D. A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (*See* Ex. 102);

E. A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (*See* Ex. 110);

F. A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date (*i.e.*, consistent with eyewitness testimony described in Section II below).  (*See*

14

Ex. 110);

G. A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precinct, but that the Democrat advantage (*i.e.*, the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated.  (*See* Ex. 110); and

H. A report by an affiant whose name must be redacted to protect his safety who concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points.  Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400.  However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (*See* Ex. 111 ¶13).

### F.      Federal Jurisdiction

Article I, § 4 and Article II, § 1 of the U.S. Constitution grant plenary authority to state legislatures to enact laws that govern the conduct of elections. Unlike the situation where a court is situated in diversity jurisdiction and deciding an entirely state-law matter, as presented in Guaranty Trust Co. v. York, 326 U.S. 99 (1945), in this action this Court has "no duty … to approximate as closely as may be State law in order to vindicate without discrimination a right derived solely from a State." Holmberg, 327 U.S. at 395. Rather, the duty here is that "of federal courts, sitting as national courts throughout the country, to apply their own principles in enforcing an equitable right" created under the U.S. Constitution. Id.

 "[F]ederal jurisdiction is not defeated if the nonfederal ground relied on by the state court is 'without any fair or substantial support ….'" N.A.A.C.P. v. Ala. ex. rel. Patterson, 357 U.S. 449, 455 (1958)(quoting Ward v. Board of County Commissioners, 253 U.S. 17, 22 (1920)).

15

"State procedural rules have been held insufficient to bar federal review if they are 'not strictly or regularly followed,' if they are 'novel and unforeseeable,' ... or if they impose undue burdens on the assertion of federal rights." Roosevelt, Kermit III, Light from Dead Stars: The Procedural Adequate and Independent State Ground Reconsidered, 103 Columbia L. Rev. 1888, 1890 (citing Barr v. City of Columbia, 378 U.S. 146, 149 (1964); Daniel J. Meltzer, State Court Forfeitures of Federal Rights, 99 Harv. L. Rev. 1128, 1137-45 (1986); Douglas v. Alabama, 380 U.S. 415, 422-23 (1965)).

Consistently, this Court has reviewed such deprivation of access to the courts under a Due Process Clause, and Equal Protection framework. See, e.g., Boddie v. Connecticut, 401 U.S. 371 (1971); Ortwein v. Schwab, 410 U.S. 656 (1973); but see Sosna v. Iowa, 419 U.S. 393 (1975) (declining to apply Boddie the restriction of access did not amount to a "total deprivation").  "In short, 'within the limits of practicability, a state must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." Bodie, 401 U.S. at 377. (internal citations omitted).

When a state fails to correct a violation of the state's Constitution in the context of federal elections and fails to provide any avenue for relief for federal election challengers, it violates the U.S. Constitution.  The definition of "voting" appears to include all stages of applying for an absentee ballot. Priorities United States v. Nessel, 2020 U.S. Dist. LEXIS 177888, *37-38 ( E.D. Mich. September 17, 2020); see also OCA-Greater Houston v. Texas, 867 F.3d 604, 615 (5th Cir. 2017) (Interpreting the VRA and stating that "'[t]o vote,' therefore, plainly contemplates more than the mechanical act of filling out the ballot sheet. It includes steps in the voting process before entering the ballot box, 'registration,' and it includes steps in the voting process after leaving the ballot box, 'having such ballot counted properly.' Indeed, the

16

definition lists 'casting a ballot' as only one example in a non-exhaustive list of actions that qualify as voting.").

## II.   RESPONSES TO FACT AND EXPERT WITNESSES

### A.   Defendants and Defendant-Intervenor Have Failed to Rebut Factual Testimony

Defendants have submitted a number of affidavits, consisting mostly of recycled testimony from ongoing State proceedings, that purports to rebut Plaintiffs' fact witnesses all of which boil down to: (1) they did not see what they thought they saw; (2) maybe they did see what they thought they saw, but it was legal on the authority of the very government officials engaged in or overseeing the unlawful conduct; (3) the illegal conduct described could not have occurred because it is illegal; and/or (4) sure it happened, but those were independent criminal actions by public employees over whom State Defendants had no control.

Below are a few examples of State Defendant affiants' non-responsive responses, evasions and circular reasoning, followed by Plaintiff testimony and evidence that remains unrebutted by their testimony.

- **Illegal or Double Counted Absentee Ballots.**  Affiant Brater asserts that Plaintiffs' allegation regarding illegal vote counting can be "cursorily dismissed by a review of election data," and asserts that if illegal votes were counted, there would be discrepancies in between the numbers of votes and numbers in poll books.  ECF No. 31-3 ¶19.  Similarly, Christopher Thomas, asserts that ballots could not, as Plaintiffs allege, *see* FAC, Carrone Aff., have been counted multiple times because "a mistake like that would be caught very quickly on site," or later by the Wayne County Canvassing Board.  ECF No. 39-6 ¶6.  Mr. Brater and Mr. Thomas fails to acknowledge that **is precisely what happened**, where the Wayne County Canvassing Board  found that over 70% of Detroit Absentee Voting Board ("AVCB") were unbalanced, and that two members of Wayne County Board of Canvassers initially refused to certify results and conditioned certification on a manual recount and answers to questions such as "[w]hy the pollbooks, Qualified Voter Files, and final tallies do not match or balance."  FAC ¶¶105-107 & Ex. 11-12 (Affidavits of Wayne County Board of Canvasser Chairperson Monica Palmer and Member William C. Hartmann). Further, Plaintiffs' affiants testified to observing poll workers assigning ballots to different voters than the one named on the ballot. FAC ¶86 & Larsen Aff.

- **Illegal Conduct Was Impossible Because It Was Illegal.**  Mr. Thomas wins the prize in this round for tautological and circular reasoning for his assertion that "[i]t would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November," and "no ballot could have been backdated," because no ballots received after the deadline "were ever at the TCF Center," nor could the ballot of an ineligible voter been "brought to the TCF Center." ECF No. 39-5 ¶20; *id.* ¶27. That is because it would have been illegal, you understand.  The City of Detroit's absentee voter ballot quality control was so airtight and foolproof that only 70% of their precincts were unbalanced for 2020 General Election, which exceeded the standards for excellence established in the August 2020 primary where 72% of AVCB were unbalanced.  FAC Ex. 11 ¶¶7&14.

State Defendants Affiants did not, however, dismiss all of Plaintiff Affiants' claims and made key admissions that the conduct alleged did in fact occur, while baldly asserting, without evidence, that this conduct was legal and consistent with Michigan law.

- **Election Workers at TCF Center Did Not Match Signatures for Absentee Ballots.**

- **Election Workers Used Fictional Birthdates for Absentee Voters.**  ECF No. 39-5 ¶15. The software made them do it.

- **Election Workers Altered Dates for Absentee Ballot Envelopes.**  Mr. Thomas does not dispute Affiant Jacob's testimony that "she was instructed by her supervisor to adjust the mailing date of absentee ballot packages" sent to voters, but asserts this was legal because "[t]he mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes."

### B. Defendants and Defendant-Intervenor Have Failed to Rebut Expert Testimony

As a general matter, Defendants and Defendant-Intervenors present testimony from Michigan, Wayne County and City of Detroit Election Officials that are apparently meant as both fact and expert witnesses simultaneously, but their testimony should be rejected as inadmissible or irrelevant, insofar as they simply dismiss or issue blanket denials of testimony submitted by Plaintiffs' affiant.  They do not, however, respond to the specific allegations made by Plaintiffs' affiants, nor do they provide evidence, or analysis of data in their sole possession and control, that could rebut Plaintiffs' specific examples.

Below are a few of the most significant examples:

- **Ramsland Testimony: November 4 Voting "Spike."** Mr. Brater dismisses Ramsland's analysis of the November 4 voting spikes where 384,733 ballots in four precincts/townships were tallied in 2 hours and 38 minutes, with the blanket assertion that Mr. Ramsland "does not understand how unofficial election results are reported in Michigan," and that unofficial totals "are the products that have been counted throughout the day." ECF No. 31-3 ¶18. Mr. Brater, however, says nothing about the specific event cited by Ramsland, nor does he offer any analysis or evidence using election data within control of Defendants to refute Mr. Ramsland or demonstrate that his purported explanation accounts for the events in Wayne County or other counties on Election Night. As such, Mr. Braten's assertion is unsupported speculation that must be dismissed.

- **Ramsland Testimony: "Ranked Choice Voting" Algorithm.** Defendant-Intervenors expert Dr. Rodden seeks to dismiss and ridicule Mr. Ramsland testimony for failing to understand what ranked-choice voting is, ECF No. 13-2 at 24, but Dr. Rodden's response indicates he has not carefully read Mr. Ramsland's testimony, where he is taking the term from Dominion's own user guide. FAC ¶141 & Ex. 104 ¶14. Mr. Ramsland instead uses the term "additive algorithm" to describe what Dominion refers to as the RCV method. FAC ¶141 & Ex. 104 ¶14. More importantly, Dr. Rodden **acknowledges that Election Night data included fractional votes**, speculating that these votes were when "workers at Edison Research multiplied total votes cast by vote shares that had been rounded;" ECF No. 13-2 at 24. Thus their only disagreement concerns the cause for fractional votes – which both agree are non-sensical as votes can only have integer values – not the existence of this data, and his only response is his own speculation, rather than his expert opinion.

- **Wilgus Testimony.** Defendant-Intervenors mischaracterize the report submitted by Robert Wilgus as a statistical analysis. ECF No. 36 at 11. It is not. Mr. Wilgus is an IT professional who simply performed a query in a voter database obtained through a FOIA request, which tallied the values in certain fields. FAC Ex. 110. As such, it is sorting and tallying entries in database fields; there was no statistical analysis. Further, this same data is in the possession of Defendant, including among other things, voting records where the ballot application, or absentee ballots, were sent and returned on same date, yet they failed to provide any analysis or evidence that the raw numbers tabulated by Mr. Wilgus using a simply database query are wrong, or to explain the meaning of the data in their possession. Mr. Brater's speculation that these results may be accounted for by in-person absentee voters is similarly non-responsive. ECF No. 31-3 ¶20.c. Defendants or Mr. Brater have access to State, County and City records that could identify how many of these hundreds of thousands of voters were in-person absentee voters, so that Plaintiffs and this Court could focus on the remainder not accounted by Mr. Brater's assertion.

The following Plaintiff expert witnesses have also submitted rebuttal testimony in

response to the Defendant Intervenor exhibits.

- **Briggs Rebuttal.** William Briggs, with a PhD in statistics from Cornell, provides as Exhibit 1 hereto his in-depth response to Stephen Ansolabehere's rebuttal of Briggs' original

19

report.  In essence, Briggs shows that Ansolabehere's critiques are not supported with evidence, fail basic logic tests, do not consider the methods applied and speak to insignificant matters.  As an example, the critique of a low response rate is accounted for in his analysis and he explains the marginally larger prediction interval that he originally applied to account for this.

- **Quinnell Rebuttal.**  In response to the paper submitted by Jonathan Rodden with a Political Science PhD, Eric Quinnell, a PhD in Computer arithmetic, provides a response attached as Exhibit 2.

- **Ramsland Rebuttal.**  Mr. Ramsland has submitted his rebuttal as Exhibit 3, which provides more detail on data and methodology.

- **Redacted Affiant Rebuttal.** DNC's response to the complaint at the bottom of pg. 15 "the purported analysis is wholly unexplained and conclusory" and does not lay out the data or methods.  This critique fails to rebut the clearly described analysis with any form of evidence whatsoever.  The Redacted Affiant provides a follow-up report to expand on his sources and methods that is attached as Exhibit 4.

### C.   Defendants and Defendant-Intervenors Have Failed Altogether to Address Dominion Testimony

Defendants and Defendant-Intervenors have failed altogether to respond to evidence presented by Plaintiffs regarding Dominion voting fraud and manipulation, except to point and sputter, dismissing it as an "unfounded conspiracy theory," DNC Brief at 14, "bizarre", ECF No. 31-3, Brater aff. at ¶15, etc, without responding to, much less rebutting, Plaintiffs' allegation.

Defendant-Intervenors' only attempt to respond to Plaintiffs, other than non-responsive ridicule and insults, is by attaching ***Dominion press release*** as if it were an objective authority to whom this Court should refer, rather than a co-conspirator in Defendants' fraudulent scheme alleged in great detail by Plaintiffs.  ECF No. 36-11.

## III.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

 "To determine whether to grant a preliminary injunction or temporary restraining order, a district court must consider: (i) whether the movant has a strong likelihood of success on the merits; (ii) whether the movant would suffer irreparable injury without the injunction; (iii) whether issuance of the injunction would cause substantial harm to others; and (iv)

whether the public interest would be served by the issuance of the injunction." *Stein v. Thomas*, 222 F.Supp.3d 539, 542 (E.D. Mich. 2016) (*citing Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002)); *see also City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

All elements are met here, and Defendant and Defendant Intervenor responses have not shown otherwise.

### A.      Plaintiffs have a substantial likelihood of success.

Through detailed fact and expert testimony including documentary evidence contained in the Complaint and its exhibits, Plaintiffs have  made a compelling showing that Defendants' intentional actions jeopardized the rights of Michigan citizens to select their leaders under the process set out by the Michigan Legislature through the commission of election frauds that violated Michigan laws, including multiple provisions of the Michigan Election Code.  These acts also violated the Equal Protection and Due Process Clauses of the United States Constitution. U.S. Const. Amend XIV.

Defendants and Defendant-Intervenors misrepresent Plaintiffs' constitutional claims. Plaintiffs allege both vote dilution and voter disenfranchisement, both of which are claims under the Equal Protection and Due Process Clause, due to the actions of Defendants in collusion with public employees and voting systems like Dominion.  The Complaint describes in great detail Defendants' actions to dilute the votes of Republican voters through counting and even manufacturing hundreds of thousands of illegal, ineligible, duplicative or outright fraudulent ballots.

While the U.S. Constitution itself accords no right to vote for presidential electors, "[w]hen the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the

equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added). The evidence shows not only that Defendants failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Defendants committed a scheme and artifice to fraudulently and illegally manipulate the vote count to make certain the election of Joe Biden as President of the United States. This conduct violated Plaintiffs' equal protection and due process rights as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

But Defendants' actions also disenfranchised Republican voters in violation of the U.S. Constitution's "one person, one vote" requirement by:

- **Republican Ballot Destruction: "1 Person, 0 Votes."** Fact and witness expert testimony alleges and provides strong evidence that tens or even hundreds of thousands of Republican votes were destroyed, thus completely disenfranchising that voter.

- **Republican Vote Switching: "1 Person, -1 Votes."** Plaintiffs' fact and expert witnesses further alleged and provided supporting evidence that in many cases, Trump/Republican votes were switched or counted as Biden/Democrat votes. Here, the Republican voter was not only disenfranchised by not having his vote counted for his chosen candidates, but the constitutional injury is compounded by adding his or her vote to the candidates he or she opposes.

- **Dominion Algorithmic Manipulation: For Republicans, "1 Person, 0.5 Votes," while for Democrats "1 Person, 1.5 Votes.** Plaintiffs presented evidence in the Complaint regarding Dominion's algorithmic manipulation of ballot tabulation, such that Republican voters in a given geographic region, received less weight per person, than Democratic voters in the same or other geographic regions. *See* ECF No. 6, Ex. 104. This unequal treatment is the 21st century of the evil that the Supreme Court sought to remedy in the apportionment cases beginning with *Baker v. Carr*, 369 U.S. 186 (1962), and *Reynolds v. Sims*, 377 U.S. 533 (1964). Further, Dominion has done so in collusion with State actors, including Defendants, so this form of discrimination is under color of law.

This Court, in considering Plaintiffs' constitutional and voting rights claims under a "totality of the circumstances" and thus must consider the cumulative effect of the specific

instances or categories of Defendants' voter dilution and disenfranchisement claims. Taken together, these various forms of unlawful and unconstitutional conduct destroyed or shifted tens or hundreds of thousands of Trump votes, and illegally added tens or hundreds of thousand of Biden votes, changing the result of the election, and **effectively disenfranchising the majority of Michigan voters.**

While Plaintiffs allege several categories of traditional "voting fraud", Plaintiffs have also alleged new forms of voting dilution and disenfranchisement made possible by new technology.  The potential for voter fraud inherent in electronic voting was increased as a direct result of  Defendants' and Defendant-Intervenors' to transform traditional in-person paper voting – for which there are significant protections from fraud in place – to near universal absentee voting with electronic tabulation – while at the same time eliminating through legislation or litigation – and when that failed by refusing to enforce – traditional protections against voting fraud (voter ID, signature matching, witness and address requirements, etc.).

Thus, while Plaintiffs' claims include novel elements due to changes in technology and voting practices, that does not nullify the Constitution or Plaintiffs' rights thereunder. Defendants and Defendant-Intervenors have implemented likely the most wide-ranging and comprehensive scheme of voting fraud yet devised, integrating new technology with old fashioned urban machine corruption and skullduggery. The fact that this scheme is novel does not make it legal, or prevent this Court from fashioning appropriate injunctive relief to protect Plaintiffs' right and prevent Defendants from enjoying the benefits of their illegal conduct.

### B.     The Plaintiffs will suffer Irreparable Harm

Plaintiffs will suffer an irreparable harm due to the Defendants' myriad violations of Plaintiffs' rights under the U.S. Constitution, the Michigan Constitution and the Michigan Election Code, and Defendant and Defendant Intervenors have not shown otherwise.

23

In this Response, Plaintiffs have refuted and rebutted their arguments in detail, in particular, regarding standing, equitable defenses, and jurisdictional claims, as well as establishing their substantial likelihood of success. Having disposed of those arguments, and shown a substantial likelihood of success, this Court should presume that the requirement to show irreparable injury has been satisfied.

> When Constitutional rights are threatened or impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore constitutes an irreparable injury.

*Obama for America vs. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted).  *See also Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.,* 354 F.3d 438, 445 (6th Cir. 2003) *aff'd sub nom., McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) (where a plaintiff's constitutional rights are at issue, the movant need only show that his rights are "threatened," from which showing "a finding of irreparable injury is mandated.").

### C.    The Balance of Equities & The Public Interest

Defendant and Defendant Intervenors make a few half-hearted attempts on this element, but add nothing new or that merits a response.

### D.    Plaintiffs Reiterate Request for Emergency Injunctive Relief Prior to December 8, 2020.

Under *Bush v. Gore*, 531 U.S. 98 (2000), Plaintiffs are entitled to emergency injunctive relief that must be granted in advance of December 8, 2020, which is the "safe harbor" date for States to submit their slates of electors under 3 U.S.C. § 5. There, the Supreme Court granting an emergency application for stay of Florida recount because there was "no recount procedure in place … that comports with minimal constitutional safeguards," and any recount procedure that could meet constitutional requirements could not be completed by the 3 U.S.C. §5 safe harbor date.  Accordingly,

24

this Court must schedule and complete any required hearings, briefings and responses in time to issue a decision before December 8, 2020.

## IV.   RELIEF REQUESTED

Plaintiffs seek a de-certification of Michigan's election results or a stay in the delivery of the certified results to the Electoral College to preserve the status quo while this case proceeds, as well as seeking the impounding of the voting machines made available and other equitable relief, on an emergency basis, due to the irreparable harm, and impending election voting for the electors, as stated in the Complaint.

Respectfully submitted, this 3rd day of December 2020.

/s Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700

2911 Turtle Creek Blvd, Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice
forthcoming

*Attorneys for Plaintiffs*

/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.
41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day e-filed the foregoing Plaintiffs' Motion for

Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof

using the CM/ECF system, and that I have delivered the filing to the Defendants by email and

FedEx at the following addresses:

This 29th day of November, 2020.

        Governor Gretchen Whitmer
        P.O. Box 30013
        Lansing, Michigan 48909
        info@gretchenwhitmer.com

        Secretary of State Jocelyn Benson
        Bureau of Elections
        Richard H. Austin Building, 4th Floor
        430 W. Allegan
        Lansing, Michigan 48918
        Elections@Michigan.gov

        Board of State Canvassers
        Bureau of Elections
        Richard H. Austin Building, 1st Floor
        430 W. Allegan
        Lansing, Michigan 48918
        Elections@Michigan.gov

/s/ Sidney Powell*
Sidney Powell PC
Texas Bar No. 16209700
*Application for admission pro hac vice
Forthcoming

/s/ Scott Hagerstrom
Michigan State Bar No. 57885
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

/s/ Gregory J. Rohl P39185
The Law Offices of Gregory J. Rohl, P.C.

27

41850 West 11 Mile Road, Suite 110
Novi, MI 48375
248-380-9404
gregoryrohl@yahoo.com


Howard Kleinhendler
New York Bar No. 2657120
Howard Kleinhendler Esquire
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

# Response to Stephen Ansolabehere's Comments Regarding Absentee Ballots Across Several States

## William M. Briggs

## December 3, 2020

## 1    Summary

The criticisms made by Stephen Ansolabehere in response to my original report on absentee ballots are not relevant, make simple errors in logic, and even, in part, work against him to show my original argument could be made even stronger.

Ansolabehere repeatedly charges that because I was brief in saying "I assume survey respondents are representative and the data is accurate" that therefore the respondents were not representative and the data not accurate. This is a silly error and a wholly unwarranted conclusion. Not only was this data entirely typical of phone surveys, and therefore the data having all the usual strengths and weaknesses of the genre, it was extraordinary in that calls with respondents were recorded. The designers of the survey evidently knew its quality would be attacked—and were prepared for it.

There were no fatal errors in the survey data or calculations, as the well-paid Ansolabehere falsely claims. (*Five hundred fifty* American dollars per hour for the many hours he spent on his comments? My work is entirely pro bono.) Instead, I took pains to put forward the most conservative case, interpreting the data in a way that actually reduced the number of troublesome ballots.

Although Ansolabehere made many mistakes, I thank him for the opportunity of allowing me to make a point I neglected to emphasize in my original presentation. This is the striking unity of results across several battleground states. The data shows either an amazing coincidence in accumulated troublesome ballots in just those places they were needed most for Biden, or the data shows something more interesting happened.

What follows are answers to specific criticisms.

## 2    Rebuttal

Ansolabehere pads his account with many extraneous words and arguments. I will be much briefer, while also answering every substantial criticism he made.

### 2.1    Error Definition

My original definition of errors were this:

**Error #1**: being recorded as sent an absentee ballot without requesting one.

**Error #2**: sending back an absentee ballot and having it recorded as not returned.

These followed directly from the survey design. The survey began by asking "Q1 - May I please speak to <lead on screen>?" If the person was available, they were asked "Q2 - Did you request an absentee ballot?"

Finally, if they said yes to that, respondents were asked "Q3 - Did you mail back that ballot?"

Ansolabehere finds ambiguity in these three simple questions via a wonderful display of specious argument, one he repeats in many places. He basically says that because the questions *could* have been

1

misinterpreted in the various ways he suggests, they therefore *were* misinterpreted by a sufficient number of respondents, thus rendering the survey useless.

My answer is that this is a dumb argument. He has no evidence misinterpretations were made in the way he suggests. He could have spent the same amount of (expensive) time and came up with reasons why the survey was *not* misinterpreted.

For instance, the election was in the news and people were riled. They therefore welcomed the chance to set the record straight, and to ensure their legal ballots were counted. They were thus even more honest than they normally would be with telephone pollsters.

Of course, I have no evidence this, or other similar stories, are true. Just as Ansolabehere has no evidence his charges are true. All we can do, then, is to treat this survey like we treat all surveys: analyze the data as it is presented.

## 2.2   Ambiguous Wording

I will give one specific example of Ansolabehere trying to discover ambiguity. They are all much the same. He says:

> The wording of Question 3 is also very problematic. First, it does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast. Some or possibly all of the cases in question are late ballots, and thus not necessarily included in the absentee vote record. Second, Question 3 asks whether someone voted. Survey questions asking whether someone voted are notoriously subject to social desirability biases that lead to inflation in the estimated number of voters.

Again, Ansolabehere uses the possibility of a thing as proof the thing existed. There no evidence, not one bit, that ballots were sent back late. Indeed, as all news reports indicate, especially in Pennsylvania, certain late ballots were warmly accepted.

His second point is the same: because people lie on surveys, therefore they lied here in sufficient number. Would Ansolabehere apply this same reasoning to his own words? It is clearly nonsense. If accepted, his argument would toss out *all* surveys about voting.

## 2.3   Response Rate

Ansolabehere charges "The survey has extremely low response rates." He must know that the response rate here was not atypical. That is, it was low like many telephone polls are. But low does not imply too low. He must know this. Further, the mathematical extrapolations I made accounted for the size of the data.

Perhaps because Ansolabehere is a specialist in government, he does not know that when samples are low the confidence we have in extrapolations is wider. I will give one example, using Georgia, though this works for data from any state.

The original estimates of Error #2 for Georgia were that between 31,559–38,866 ballots were sent back but recorded as not returned, a "plus or minus" window of 7,307 votes. If we suppose we had *double* the response rate on the survey, in the same proportions as the original, then the Error #2 estimate becomes 32,945–38,096, a window of 5,151 votes. The 95% prediction interval shrinks, as expected, as we become more confident.

It does not shrink by much, of course, showing the analysis method is robust. If instead we allow a full ten times the original response rate, the plus-or-minus window shrinks to 2,234 votes.

Response rate is not a problem, and has been fully accounted for.

## 2.4   Top line Number Interpretations

Ansolabehere produces a lot of quibbles about the survey numbers, and uses the possibility of different interpretations of the numbers to say my entire analysis can't be trusted.

It is true that differences can exist in interpreting the top line numbers. I was aware of this when I did the analysis, which is why I everywhere used conservative interpretations. If I instead use one of the interpretations Ansolabehere suggests, the case about troublesome votes is made is even stronger.

I will use Georgia again as an example, though this applies to all states.

Again, the first question asked to speak to the relevant person. In Georgia, 767 were recorded as "Reached target", and an additional 255 were recorded as "'What is this about?'/Uncertain [Go to Q2]." I summed these two numbers to reach a total of 1,022.

One quibble is that the 255 who were uncertain should not be used in the total. If not, the sample size is, of course, reduced to 767. Yet we still have 142 who said "No" when asked if they received an absentee ballot. The ratio 142/767 is larger than 142/1022, meaning it will look like even more errors were made (of type Error #1).

The original estimate of **Error #1** (being recorded as sent an absentee ballot without requesting one) for Georgia was the window of 16,938–22,771. If we reduce the sample to 767 by excluding the disputed 255, the new estimate is 22,481–30,042. It goes up in just the way we expect it to. This proves using the full 1,022 is the conservative choice.

Another way to interpret the top lines is to use all people who got to the point of Question 1. Ansolabehere disingenuously prefers this because it makes his case appear stronger.

Besides the two options to Question 1 already mentioned (reached target, uncertain), there were also "Refused" and "Hangup". I treated these as non-responses, which is the usual interpretation. A person who hangs up without responding is the same as the person who never answers, as far as the answering the question goes.

In the spirit of generosity, though, let's use all 1,175 who reached Question 1 (instead of the original 1,022), including the hangups and refusals. The window for Error #1 becomes 14,778–19,903. The window shrinks, as Ansolabehere desires. *But not by enough.* This is still a large and troublesome window. The same is true for each state investigated.

Even stronger, the window for Error #2, the more significant error, *does not change.* This is because the calculations for this window are conditional only on those who answered Question 2 and 3.

Lastly, Ansolabehere disputes whether the answers spouses or other household members gave should be allowed. I used them in the totals. Ansolabehere would exclude them. This is really a nitpicking point because the total of these answers were small.

Here is proof. Again, the original window for Error#2 in Georgia was 31,559–38,866. This was conditional on the 257 respondents or their spouses or household members who said they mailed a ballot back. If we remove the 17 spouses or household members, the window becomes 29,372–36,512. It shrinks a bit. But again, *not by enough.*

All comments made here hold for all states.

# 3   Conclusion

The doubts cast on my original analysis by Ansolabehere either fail simple tests of logic, or are so small as to make no practical difference in the conclusion.

All his logical errors can be dismissed. Suggesting, as he often does, that mistakes *can* be made or that ambiguity *might* exist in the survey, is not proof that either *does* exist. I could have spent an equal amount of (unremunerated in my case) time suggesting ways the survey was better than most political polls. For instance, people are aware now more than ever of the importance of this election and they took greater care with their answers. I did not do this in the original report because I, unlike Ansolabehere, know the true value of such speculations.

The various numerical quibbles Ansolabehere has with the survey numbers either strengthen my case, or they are so small as to make no practical difference. Even with his own difficult-to-justify assumptions, the analysis reveals there still exist very large numbers of troublesome ballots in each battleground state. There are enough suspicious ballots left, even using his numbers, that could have changed the outcome of the election.

Finally, I reemphasize the remarkable coincidence that the amount of troublesome ballots was important to the election outcome in each state.

## 4   Declaration of William M. Briggs, PhD

1. My name is William M. Briggs. I am over 18 years of age and am competent to testify in this action. All of the facts stated herein are true and based on my personal knowledge.

2. I received a Ph.D of Statistics from Cornell University in 2004.

3. I am currently a statistical consultant. I make this declaration in my personal capacity.

4. I have analyzed data regarding responses to questions relating to mail ballot requests, returns and related issues.

5. I attest to a reasonable degree of professional certainty that the resulting analysis are accurate.

I declare under the penalty of perjury that the foregoing is true and correct.

3 December 2020

William M. Briggs

December 3, 2020

*King et al. v. Whitmer et al.,* Case No. 2:20-CV-13134

United States District Court for Eastern District of Michigan

Expert Response of Eric Quinnell, PhD

Eric Quinnell, Ph.D.

## I.    SUMMARY

Today I reviewed a report from Jonathan Rodden, PhD, which makes arguments and responses to initial declarations from my affidavit which used publicly available data sourced from the actual vote counts in 2020 and 2016 General Election in Wayne and Oakland County.

My data analysis identifies statistical anomalies in a large selection of precincts outside Detroit in both Wayne and Oakland County. Dr. Rodden's responses mainly involve questioning why I do not cite "relevant literature" in attempted explanations of the data, as well as why I bother using the standard normal distribution in precinct level comparisons and vote differences as compared to their extremely-localized precinct histories. Rather than arguing line-by-line pedantic points, for which I am not compensated directly, the timeframe required of this response is prohibitive. Instead, allow me to instead focus on the larger method.

## II.    THE NULL HYPOTHESIS

Mathematically, the "null hypothesis" is defined that there is no quantitative relationship between two sampled populations and is by definition the default conclusion until proven otherwise.  In this case, the null hypothesis states the large movement from Republican or moderate counties in 2016 that then in 2020 voted excessively Democrat is explained by experimental error or mere chance until proven otherwise.

In efforts to explain that phenomena exist with some sort of meaning or relationship, it is a scientific and engineering "standard" to compare against a "standard normal distribution" and apply a testable hypothesis to attempt explanations to any anomalous deviations or new observations.  This is why we call it the "standard" method and use the "standard" models for comparison. A hypothesis that

2

provides a both a prediction and a repeatable test that is successfully mathematically verified will un-seat the null hypothesis and become the new default explanation. Only then do we no longer need the standard normal.

Dr. Rodden offers many hypotheses against the null hypothesis that may explain such a distribution visualization for the voter pattern data, such as self-sourced GIS data analysis, geographical distribution, or demographic shifts mainly focused around his own research. For example, Dr. Rodden claims that the democratic share of votes in the suburbs is a "national trend" and therefore should be expected – this theory is testably true in some places, but fails in places like San Francisco, Chicago, Philadelphia, and other democratic strongholds not located in "swing states". Claiming a "national trend" based on self-referenced data without a hard-quantitative proof that has extremely present and available counter-examples is invalid speculation. This theory already certainly seems to immediately fail the requirement to overthrow the null hypothesis at a 3-sigma level. For non-Dr. Rodden sources, one can easily find analysis to the counter.

While Dr. Rodden is a presumed expert in the particular field of producing theories to describe voter pattern behaviors – allow me to contrast that against my field of engineering, where the burden of proving a hypothesis is exceedingly higher than that required for mere publication.  Machines and devices that hypothesize without full 3-sigma proofs are presumed to fail unless proven beyond a probabilistic academic inference, with such failure presuming significant possibilities of harm and economic damage.

These mathematical anomalous vote gains, until explained and/or investigated, are of a large enough quantitative magnitude and consequence that the barrier of speculation should be held to engineering and mathematical standards, not to those of political science and editorial publications.

3

## III.   TESTING THE HYPOTHESIS

Is Dr. Rodden able to test his hypothesis of Democratic suburban dominance with privileged access to ballots? Does he have population migration patterns in the Oakland County township of Troy, where not only did all voters that voted in 2016 again vote for their candidate, but both Trump and Biden benefitted from additional turnout? The additional turnout I cite as "new votes" are those above and beyond that from 2016. Here Trump gained 1,646 votes above 2016 (which 1st order seems like a shift directly from the losses in the Libertarian column), and Biden gained 6,677 votes above 2016. Note there were only 6,132 new registered voters above 2016.

In statistics, any "new population" may be added and absorbed to the whole – this population seems to have 8,000 voters who didn't appear in 2016 that parachuted in and voted 80 Dem / 20 Rep – which is in complete opposition to Troy's moderate voting history. In a technique called "resampling", any new population that is added to an existing one is expected to behave and slightly change the behavior of the existing mass, testable by re-simulating the same dataset with the existing distribution mathematical qualities. Resampling in this case puts this new population deep into the tail of its own distribution, indicating again a completely new phenomena that needs explaining. Why would a populous increase its own turnout by 15% over 2016, and 98% of that turnout go to one candidate?  Mathematically, this behavior is anomalous to its own dataset.

Furthermore, the null-hypothesis dataset in Oakland county currently sees the following to-the-precinct correlating behavior of each party's participation in absentee ballot voting. An expert at such a rate should have no trouble generating (and likely already has) this graph with available data on absentee vote ratios of total:

4



Oakland County 2020 Presidential election absentee voting% by precinct

What "literature" exists to explain that absentee ballot requests are a single variable – with a perfect scalar multiple of Democrats above Republicans – with a Pearson coefficient of 0.797? Every precinct where a Republican voted by absentee *guaranteed* roughly 1.7 Democrats to vote absentee, regardless of precinct. This "national phenomenon" of mathematically *non-independent variables* is not ubiquitous in all the Michigan counties nor in national data. Permit me to pile this onto the stack of "anomalies" we need to test for, as this sort of thing doesn't happen in nature and certainly shows something non-normal (there's that null hypothesis again).

## IV. CONCLUSIONS

In other arguments, Dr. Rodden proceeds to cite a multitude of either unconnected or subjective historical data trends outside Michigan and mostly centered around his own research – including an overbearing litany of publications and curriculum vitae completely unrelated to the task at hand.

Finally, Dr. Rodden continues to say that my work alleged some sort of "fraud". I allege no such thing in my affidavit – that would be the lawyer's inference and theory in their brief, not my statement. I offer no hypothesis; I merely state the fact

5

that the null hypothesis currently shows abnormalities requiring an explanation to maintain faith in the fidelity of the vote.

Furthermore, my aim is that I may tell my descendants without doubt that not only does their vote actually matter, but that any behaviors that are statistically improbable are always properly investigated such that we may collectively always have faith in the fidelity of our vote.

## V.   QUALIFICATIONS

I hold a PhD in Computer Arithmetic from The University of Texas at Austin. I am an electrical engineer that has built working silicon computation devices in the 100s of millions, perhaps billions, around the world. I hold a litany of patents and publications, which are likely irrelevant to this particular case, save for the declaration that my data is scrutinized to the highest level.

I welcome external cross-checking of my calculations which are, as aforementioned, applied to a publicly available data set. All my analysis is as a volunteer citizen wishing to apply my skills to help reconcile the voting situation at hand which, at least for myself, I identify as anomalies that need an attempted explanation.

December 3, 2020

*King et al. v. Whitmer et al.,* **Case No. 2:20-CV-13134**

**United States District Court for Eastern District of Michigan**

**Expert Report of  Russell J. Ramsland, Jr.**

_____
**Russell J. Ramsland, Jr.**

1) There are many reasons to be concerned about the Dominion Voting System and the results it produces.  It is well documented and demonstrated that it's heritage and software origins are extremely unsettling, given its close relationship to Smartmatic and Scytl, facts that have only become clearer with the 4 redacted declarations I have now seen from Spider.  For this reason, any analysis as to the integrity of any election conducted using Dominion should be executed with a healthy degree of skepticism, and evidence of abnormal results should be over-weighted, if anything.

Our team has extensive experience as white hat hackers and employ many methodologies and tools to trace and certify connections between servers, network nodes and other digital properties and probe for network system vulnerabilities. In addition to Robtex and Spiderfoot, we also employ such tools as Whois, GeoIpLookup, nslookup, host, ipinfo.io, etc.

From our own company's work, I can attest to the credibility and veracity of the information contained in the four redacted declarations by Spider.  Along with several others, we have found many of the same connections, relationships and vulnerabilities. Further, Clarity Elections and Scytl are integral to the network as well as Dominion and Edison Research and they too have multiple vulnerabilities and their vulnerabilities represent further vulnerabilities into Dominion.

For instance, inside the SCYTL System at a point called staging.scytl.us, malware called QSnatch is visible.  QSnatch represents a deep vulnerability to any election system that touches it such as Dominion and Edison Research. QSnatch characteristics include:
- **CGI password logger -** This installs a fake version of the device admin login page, logging successful authentications and passing them to the legitimate login page.
- **Credential scraper** – This grabs the credentials of any administrator whose system loads any information into Scytl or Clarity Elections which includes Dominion and Edison Research. This means the credentials of every county election official of every state where Dominion manages elections in the U.S. are vulnerable to being compromised and utilized by unauthorized persons. This includes all counties in Georgia and the counties in Michigan which use Dominion.
- **SSH backdoor –** This allows the cyber actor to execute arbitrary code on a device.
- **Exfiltration –** When run, steals a predetermined list of files which includes system configuration & log files.  Encrypted with hacker's public key and sent to their infrastructure over HTTPS.
- **Webshell functionality –** Allows an attacker remote access
- **Persistence & Mitigation –** The malware itself can make it impossible to run needed firmware updates. Once infected, a full factory reset must be done on the device prior to doing a firmware update to stop vulnerability.

**Here is its location**:

scytl.us          scytl.us          staging.scytl.us          13.32.202.17          13.32.202.17 - qsnatch (gener...

**Here it can be seen embedded:**

```
"iid": 14271845,
"type": "ip",
"indicator": "13.32.202.112",
"risk": "none",
"risk_recommended": "none",
"manualrisk": 0,
"retired": null,
"stamp_added": "2020-08-16 07:19:05",
"stamp_updated": "2020-09-21 18:57:23",
"stamp_seen": "2020-09-15 01:15:00",
"stamp_probed": "2020-09-21 18:57:23",
"stamp_retired": null,
```

Source code for Dominion can easily be obtained on the dark web so that an attacker knows all the vulnerable points and can plan and plant any malicious code the attacker desires. Here is a small sample of what can be seen on Pirates Bay TORR:

```
"ProductCode","ProductName","ProductVersion","OpSystemCode"
Type"
11818,"OpenElect","1.0","189","1422","English","Voting"
15134,"Hart Voting System Software Files
(BallotNow)","3.3.12","189","2049","English","Voting"
15134,"Hart Voting System Software Files
(BallotNow)","3.3.12","366","2049","English","Voting"
15542,"Open Elect Release","1.2","51","1422","English","Vo"
16786,"OpenElect","1.3","51","1422","English","Voting"
17345,"Installed files for D-Suite 4.14-D,WinEDS 3.1.012, \
4.0.175","2016-01-12","786","2530","English","Voting"
17429,"Democracy Suite Election Event Designer (EED) Insta'
File","4.14.37","365","2530","English","Voting"
17430,"Democracy Suite ImageCast Central (ICC) Installed
File","4.14.17","365","2530","English","Voting"
17431,"Democracy Suite Adjudication (ADJ) Installed
File","2.4.1.3201","365","2530","English","Voting"
```

2) The use of an algorithm being used in the vote counting is evident from a number of perspectives. First, there is the apparent product of decimal places being used in points instead of whole number votes that can be viewed from the NYT times Edison data. In the two-time series shown below, note the percentages in Series 357 that shows 3 decimal places displayed in the percentage distribution of the 3,616,879 votes. One might argue that the issue is simply due to the fact only 3 decimal places are displayed, and that if 20 or 30 decimal places were displayed, one would see whole numbers appear as votes instead of points with decimal places, and therefore there is no evidence in this illustration that an allocative algorithm was utilized. The problem with this is two-fold. The first is the percentages do not come close to 100% regardless of rounding. But the difference between the 98.2% displayed and 100% might be due to Jo Jorgenson. The presence of Jo Jorgenson as a third-party candidate is exactly the scenario for which RCV was supposedly concocted and contrary to Dr. Rodden assertion that Dominion RCV voting is incapable of producing non-integer vote totals, Dominion's own manual doesn't agree with him. See "Fixed Precision Decimals" in the manual page below:

***Source: Democracy Suite EMS Results Tally & Reporting User Guide Version: 5.11-CO::7 May 28, 2019***

Chapter 11 - Ranked Choice Voting

separately. By leaving it unchecked all results will not be separated per precinct. This option is relevant for STV, because calculating surplus transfer for each precinct separately will create a higher total surplus transfer remainder than when surplus transfer is not separated per precinct.

- **Pause After Round**: When this option is selected the tabulation session will pause the tabulation session after each round. If it is not selected the session will continue until the end or until a manual tie break is required.

- **Fixed Precision Decimals**: This option allows you to specify how many decimals the votes should be represented during calculation, this is relevant only for the STV and Points IRV methods where votes and points are expressed as fractional values.

- **Skip Overvoted Rankings**: This option allows the algorithm to skip over-voted rankings and proceed to the next ranking. No over-votes will be recorded if this option is used and consequently not be shown in RCV reports. If this option is not selected, overvotes will be recorded for this contest when the algorithm reaches an overvoted ranking.

- **Votes to include in threshold calculation**: The user has the option between two variations of calculating the threshold value used to elect candidates:

  - **Continuing Ballots Per Round**: Each round the total number of ballots assigned to candidates is calculated and used in the division that calculates the threshold. This means the threshold will lower as an increasing amount of ballots are exhausted in subsequent rounds.

  - **Continuing Ballots 1st round**: Each round will re-use the total number of ballots assigned to candidates in the first round for each subsequent round. Therefore the threshold will remain the same throughout the tabulation.

NOTE: If first round suspension option is used, the suspended ballots will not be included in this threshold calculation.

- **Perform Elimination Transfer in Last round**: The tabulation system will stop early if it detects that the number of continuing candidates is equal to the number of positions left to be elected plus one. For example, if the number of positions to elect is one, and if the system detects that only two candidates remain at the start of the round, the candidate with the least amount of votes is eliminated and the remaining candidate is elected without going into another round. This option allows the algorithm to perform the elimination transfer for the elimination transfer to the winning candidate if that winning candidate did not yet reach the threshold. Note: This option only applies the IRV or Points IRV methods.

- **Assign Skipped Rankings to the set of Exhausted Ballots**: This option allows the algorithm to assign Skipped Rankings to the set of Exhausted Ballots. If this option is not selected, any rankings that are left

Further, from the NYT Edison data displayed below, it is also clear from Series 358 that with only 2 decimals showing in the Biden percentage of 0.45, the total fraction displayed cannot get anywhere near 100% regardless of any truncation in the Trump percentage.

https://static01.nyt.com/elections-assets/2020/data/api/2020-11-03/race-page/michigan/president.json

**Example:**

/data/races/0/timeseries/357/

```
▼ 357:
  ▼ vote_shares:
      trumpd:        0.534
      bidenj:        0.448
    votes:           3616879
    eevp:            64
    eevp_source:     "edison"
    timestamp:       "2020-11-04T06:58:47Z"
▼ 358:
  ▼ vote_shares:
      trumpd:        0.533
      bidenj:        0.45
    votes:           3643075
    eevp:            64
    eevp_source:     "edison"
    timestamp:       "2020-11-04T07:00:37Z"
```

Hence, calculating the "points" for each candidate from the NYT Edison time series by multiplying the votes by the percentage to show the calculated votes/ (TV = Trump Votes) (BV = Biden Votes)

| state | timestamp | eevp | trump | biden | TV | BV |
|---|---|---|---|---|---|---|
| michigan | 2020-11-04T06:54:48Z | 64 | 0.534 | 0.448 | 1925865.66 | 1615707.52 |
| michigan | 2020-11-04T06:56:47Z | 64 | 0.534 | 0.448 | 1930247.664 | 1619383.808 |
| michigan | 2020-11-04T06:58:47Z | 64 | 0.534 | 0.448 | 1931413.386 | 1620361.792 |
| michigan | 2020-11-04T07:00:37Z | 64 | 0.533 | 0.45 | 1941758.975 | 1639383.75 |
| michigan | 2020-11-04T07:01:46Z | 64 | 0.533 | 0.45 | 1945297.562 | 1642371.3 |
| michigan | 2020-11-04T07:03:17Z | 65 | 0.533 | 0.45 | 1948885.185 | 1645400.25 |

3) The second piece of evidence that an algorithm is being utilized comes from our observation that the percentage of the votes submitted in each batch that went towards a candidate remain unchanged for a long series of time and for a number of *consecutive* batches is extremely concerning. Further, the percentage for Trump decreases in a mathematically extremely consistent pattern. The red arrows indicate the impossible consistencies.  The statistical impossibility of the consistent percentage reported to Biden approaches zero. This makes clear an algorithm in the election system is allocating votes based on a percentage.



**The top graph:**
The cumulative spread in percentage between Trump and Biden at any point in time
during the vote counting is shown in this graph, where Trump is positive percentage.
In other words, a point on the line in this graph represents which candidate is in the lead
at any point in time, and by how much. Movement of the line in this graph indicates
change in the magnitude a candidate is winning by. If the line slopes up, the votes are
moving in a direction that favors Trump. If the line slopes down, the votes are moving in
a direction that favors Biden.

**The middle graph:**
The total accumulated votes counted at any point in time for each candidate is represented in this graph. Red is Trump. Blue is Biden.
**The lower graph:**
Each bar on this graph represents what percentage of the votes submitted in each batch went towards a candidate, where Trump is positive and Biden is negative.

**Analysis:**
There are multiple highly anomalous features in this visualization of the Michigan, USA 2020 General Election vote count data. It is important to understand the context of the lower graph and analysis. Every batch of vote counts released represents various groups of people and their votes. These groups of people's votes are expected to have variance, even if multiple batches were produced out of the same geographic area. Large numbers of votes between multiple candidates are unlikely to have the same percentage of going towards a candidate multiple times in different batches.
What we see in the lower graph instead of the expected variance in percentage of votes going to Trump or Biden in each batch are easily distinguishable trends, which are realistically improbable. The statistical probability of that pattern occurring throughout the graph approaches zero.
The observation of these trends not only strongly suggests fraud, but also suggests automated and algorithmic tampering of vote counts.

There is a mechanical correlation between the suspected algorithmically generated vote count releases (labeled in blue on the bottom graph) and the relative difference between the line in the upper graph and zero (an intersection with the line at y=0 in the upper graph indicates a change in which candidate is leading). Furthermore, as soon as the line in the upper graph intersects with y=0, the algorithmically generated vote count releases switch to the opposing side - possibly to either maintain or eek in a Biden victory.
Once the majority of apparent real and organic votes ceased to be counted, we are left with large swaths of released vote counts that repeatedly have the same exact percentage of votes in each release going to Biden. By exact, I mean exact. That is until stray batches of apparent organic votes are released, and then the percentage of votes in each release from the apparent algorithmically generated vote counts going to Biden seem to adjust slightly to account for the change, which then continue to repeat in each release, until the next stray organic batch, and the cycle repeats. It is difficult to come up with a realistic scenario where this described phenomenon is not the result of an algorithm behind the scenes.

4) The suggestion that the information included in the "Spike Chart" of my original affidavit could be simply tabulated votes that were suddenly all reported is erroneous. The spike data came from Edison Research data and Oakland, the largest spike, was for November 7th, well past any "pent up" tabulated vote batches. Later data we found direct from Dominion to the NYT that did not pass through Edison confirms this and even adds further granularity.

5) That there are problems in the Dominion System is clear from a visit our team made to Central Lake Township in Antrim Michigan on behalf of a local lawsuit filed by Michigan attorney Robert Marsh. Below is the field report submitted to me by our team.

**ASOG Forensics Report on Central Lake Township in Antrim Michigan**

**Report Date 11/29/2020**
**Report Version 1.4**

On 11/27/2020 the ASOG forensics team visited Central Lake Township in Antrim Michigan on behalf of a local lawsuit filed by Michigan attorney Robert Marsh.

The clerk of Central Lake Township – at around 10:30am – Ms. Judith L. Kosloski, presented to us "two separate paper totals tape" from Tabulator ID 2.

One dated "Poll Opened Nov. 03/2020 06:38:48" (Roll 1)
Another dated "Poll Opened Nov. 06/2020 09:21:58" (Roll 2)

We were then told by her that on November 5, 2020, Ms. Kosloski was notified by Connie Wing of the County Clerk's Office and asked to bring the tabulator and ballots to the County Clerk's office for re-tabulation.  They ran the ballots and printed "Roll 2".  She noticed a difference in the votes and brought it up to the clerk, but canvasing still occurred, and her objections were not addressed.

Our team analyzed both rolls and compared the results.

Roll 1 had 1,494 total votes
Roll 2 had 1,491 votes (Roll 2 had 3 less ballots because 3 ballots were damaged in the process.)

"Statement of Votes Cast from Antrim" shows that only 1,491 votes were counted, and the 3 ballots that were damaged were not entered into final results.

Ms. Kosloski stated that she and her assistant manually refilled out the three ballots, curing them, and ran them through the ballot counting system - but the final numbers do not reflect the inclusion of those 3 damaged ballots.

http://www.antrimcounty.org/downloads/official_results_2nd_amended.pdf
Source: http://www.antrimcounty.org/elections.asp

In comparing the numbers on both rolls, *we estimate 1,474 votes changed* across the two rolls, between the first and the second time the exact same ballots were run through the County Clerk's vote counting machine - *which is almost the same number of voters that voted in total.*

The five most significant changes in vote totals are in the screenshots below:

- On Election night, Trump received 566 votes, Biden received 340.  On the recount, Trump had 1 less vote at 565 while Biden was unchanged at 340. This is particularly odd since 3 votes less were tabulated. So

potentially Trump could have lost between 3 and 4 votes overall on a very small sample – but that did not happen.



- A Proposed Initiated Ordinance to Authorize One (1) Marihuana (sic) Retailer Establishment Within the Village of Central Lake (1). – On election night, it was a tie vote. Then, on the recount, when 3 ballots were not counted, the proposal passed with 1 vote being removed from the No vote.



• For the School Board Member for Central Lake Schools (3) there were 742 votes added to this vote total.  Since multiple people were elected, this did not change the result of both candidates being elected, but you do see a change in who had more votes.  If it were a single person election, this would have changed the outcome, but this goes to the fact that votes can be and were changed during the second machine counting.



• For the School Board Member for Ellsworth Schools (2) it shows *657 votes being removed* from this election.  In this case, only 3 people who were eligible to vote actually voted. Since there were 2 votes allowed for each voter to cast, the recount is correct to have 6 votes.   But on election night, there is a major calculation issue:



- In State Proposal 20-1 (1), there is a major change in votes in this category.

  Proposal 1 is a fairly technical and complicated proposed amendment to the Michigan Constitution to change the disposition and allowable uses of future revenue generated from oil and gas bonuses, rentals and royalties from state-owned land.  There were 774 votes for YES during the election, to 1,083 votes for YES on the recount.

  Information about the proposal: https://crcmich.org/publications/statewide-ballot-proposal-20-1-michigan-natural-resources-trust-fund



**Process**

Our team interviewed Ms. Kosloski on the process of tabulation and how the system works.

Essentially, the Township Clerk is given two Compact Flash Cards and a Security Key.   One CF card (also known as ISD Card) goes into the

"ADMINISTRATOR" in the "CF CARD 2" Slot and the other in the "POLL WORKER" in the "CF CARD 1" Slot.  The security key is used on the "SECURITY KEY" connector on top.

Pre-election, Ms. Kosloski was given the cards by the County Clerk's office.  The County Clerk is Sheryl Guy.

Once the printed ballots are hand-marked by voters, they are run through the machine. At the close of the polls, they run the totals on the print and bring the two CF Cards and security key back to the County Clerk for loading into the server.  The cards and keys are not given back to the Township Clerk – these essential technical data sources for the Townships are thereafter held by the County Clerk.

On November 6th, at the request of the County Clerk, and with no explanation, Ms. Kosloski was told to bring the tabulator serial number AAFAJHX0226 and sealed ballots to the Country Clerk's office.  There, she was presented with two CF Cards and a security key.  Then, they re-ran the original election day ballots.  During this process, 3 ballots were damaged and not tabulated on the "Roll 2" results.  Again, under the oversight of the canvassing board, Ms. Kowloski cured those ballots, and re-ran them, but they appear to have not been counted in the final vote totals.

**Conclusion**

The ASOG forensics team believes that a software change loaded into Tabulator ID 2 on November 6th did occur, and this caused the vote totals to change.  The change happened on the Tabulator unit, but did so using software configurations from the Country Clerk. The Clear Lake Township Clerk Ms. Kosloski has never been told why they needed to re-tabulate the ballots.

The forensics team would like access to the CF Cards and Security Key for Roll 1 and the CF Cards and Security Key for Roll 2.  We also request unrestricted access to the machine that programs the CF Cards, which we believe is called the "Election Event Designer" software of Dominion Democracy Suite – or like-software that was used to program these CF Cards.

We do not believe that the Secretary of State report addresses this, and states the issue at the time was not on the printed totals tape. The Secretary even states "Because the Clerk correctly updated the media drives for the tabulators with changes to races, and because the other tabulators did not have changes to races, all tabulators counted ballots correctly."  This is <u>not</u> the case.

We believe this directly contradicts the Sectary of State fact check document. (Link below.)

November 7, 2020 Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States - Jocelyn Benson – Secretary of State of Michigan

https://www.michigan.gov/documents/sos/Antrim_Fact_Check_707197_7.pdf

Excerpt from document:
"These errors can always be identified and corrected because every tabulator prints a paper totals tape showing how the ballots for each race were counted. After discovering the error in reporting the unofficial results, the clerk worked diligently to report correct unofficial results by reviewing the printed totals tape on each tabulator and hand-entering the results for each race, for each precinct in the county. Again, all ballots were properly tabulated. The user error affected only how the results from the tabulators communicated with the election management system for unofficial reporting.

Even if the error had not been noticed and quickly fixed, it would have been caught and identified during the county canvass when printed totals tapes are reviewed. This was an isolated error, there is no evidence this user error occurred elsewhere in the state, and if it did it would be caught during county canvasses, which are conducted by bipartisan boards of county canvassers."


**Summary**

If this had been a user setup issue, then the test ballots they run to verify the results they get by comparing them with the test matrix should have caught that. When they made the software change that that used to tabulate the 11/6/20 re-run, there should be a log of the test ballots run through the system and verified against the test matrix.  This alone might not show fraud, but it is a crucial part of the software configuration validation process and apparently was not done.

We believe to a reasonable degree of professional certainty that this shows fraud and that vote changing at the local tabulator level has occurred due to a software change in all precincts were Dominion software was used in Michigan. This small sample amplified in a large population area would have major results.  Without the explanation of why there was a re-tabulation, why the issue of numbers being off to a significant degree when a vote change was noted, and no further investigation occurred – and when 3 ballots were removed from the totals that changed the final outcome of one proposal, constitutes a definitive indication of fraud.

6) Finally, Dr. Rodden was correct in his noting of excessive turnout figures listed in my affidavit for some precincts in MI based on new data from Michigan.  The source of that original data was State level data that no longer exists or some unexplained reason.  It existed at
https://data.michigan.gov/
https://mielections.us/election/results/2020GEN_CENR.html

Currently, new data published by the various counties does change.  However, at this point we see the current State of Michigan published data as follows:

| County | Precinct | Turnout |
|---|---|---|
| Ottawa | Spring Lake Township, Precinct 6 - B | 120.00% |
| Allegan | City of South Haven, Ward 3, Precinct 2 (Van Buren County) | 100.00% |
| Alger | Grand Island Town Prec 1 | 96.77% |
| Ottawa | Tallmadge Charter Township, Precinct 3 - C | 95.24% |
| Macomb | GROSSE POINTE SHORES-3 | 94.00% |
| Oakland | Fenton, Precinct 2 | 93.33% |
| Ottawa | Zeeland Charter Township, Precinct 4 - D | 90.59% |
| Muskegon | Ravenna Township Precinct 1 | 89.72% |
| Barry | Thornapple Township, Precinct 1 | 89.23% |
| Oakland | Novi Township, Precinct 1 | 89.13% |
| Kent | Byron Township Precinct 4 | 89.08% |
| Ottawa | Jamestown Charter Township, Precinct 2 | 88.88% |
| Barry | Thornapple Township, Precinct 2 | 88.88% |
| Oakland | Lyon Township, Precinct 8 | 88.78% |
| Livingston | Oceola Township, Precinct 5 | 88.53% |
| Ottawa | Holland Charter Township, Precinct 4 - B | 88.28% |
| Oakland | Lake Angelus, Precinct 1 | 88.21% |
| Ottawa | Port Sheldon Township, Precinct 1 - A | 88.19% |
| Genesee | Grand Blanc Township, Precinct 10 | 87.96% |
| Ottawa | Blendon Township, Precinct 2 - B | 87.91% |
| Kent | Vergennes Township Precinct 1 | 87.75% |
| Washtenaw | York Township, Precinct 2 | 87.69% |
| Oakland | Oakland Township, Precinct 3 | 87.68% |
| Livingston | City of Brighton, Precinct 4 | 87.60% |
| Sanilac | Flynn Township, Precinct 1 | 87.37% |
| Ottawa | Blendon Township, Precinct 1 - B | 87.04% |
| Oakland | Southfield Township, Precinct 4 | 87.03% |
| Oakland | Huntington Woods, Precinct 3 | 87.00% |
| Washtenaw | York Township, Precinct 3 | 86.97% |
| Sanilac | Delaware Township, Precinct 1 | 86.95% |
| Sanilac | Wheatland Township, Precinct 1 | 86.90% |
| Washtenaw | City of Dexter, Precinct 2 | 86.84% |
| Kent | Cascade Charter Township Precinct 8 | 86.83% |
| Oakland | Lyon Township, Precinct 6 | 86.81% |
| Oakland | Southfield Township, Precinct 3 | 86.79% |

The data shows 469 precincts with voter turn-out above 80%, according to current Michigan county records.  Normalizing the current public data votes to 80% turnout (still 15%+/- above normal), the excess votes are at least 27,599 over the maximum that could be expected.

Declaration of NAME {redacted}.

Pursuant to 28 U.S.C Section 1746, I, **{redacted}**, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

3. I am a US citizen and I reside at **{redacted}** location in the United States of America.

4. The following link analysis was gathered through open source methodologies and are easily verifiable.

5. As Dominion and Smartmatic makes claims that they are not connected in any way, not only are they connected but their business registration was in the same building on a foreign island to obfuscate their business dealings.

https://offshoreleaks.icij.org/nodes/101732449



https://offshoreleaks.icij.org/nodes/101724285



I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 23th, 2020.

## Smartmatic SSL Certificate

Declaration of NAME {redacted}.

Pursuant to 28 U.S.C Section 1746, I, **{redacted}**, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

3. I am a US citizen and I reside at **{redacted}** location in the United States of America.

4. Researching Smartmatic's website and reading their public manuals about the reuse of SSL certificate's, I started to investigate Smartmatic's SSL certificates. Upon searching their website is currently behind Cloudflare yet using the same SSL certificate it made it easy to locate where Smartmatic's website was located. Smartmatic's website is in the Philippine's on their Election commission's server (Comelec.gov.ph).









5.  As can be seen in the images above the SSL certificate used was registered by the email address jesus.suarez@smartmatic.com on the 9th of April 2016.







### About

DevOps SysAdmin and Information Security Professional with more than 20 years of experience. Specialized in Security and IT Management, IT Risk Assessment and Management, IT architecture, automated deployments on Linux environment and cloud using DevOps tools. Very interested in

**Linked**in

| People ▼ | Jesús Alberto | Suárez Méndez |
|---|---|---|



**Master Information Security Specialist**
Smartmatic
Aug 2008 - Mar 2017 · 8 years 8 months

Caracas, Venezuela

Design, deployment, operation and support on security of network and infrastructure in Smartmatic projects. Provide Security Architecture based on Risk Assessment. Develop Business Continuity and Disaster Recovery Plan. Perform Vulnerability assessment, ethical hacking and penetration testing. Advisor on information security issues.



**Bancaribe**
9 years 11 months

**Security Specialist**
Aug 2003 - Aug 2008 · 5 years 1 month

Caracas, Venezuela

Planification and Management of Information Security System. Vulnerability and Risk Management. Leader of risk assessment and security evaluation team on Software Development Life Cicle projects. Advisor on information security issues and methodologies. Support on Incident Response Team.

**Information Security Administrator**
May 2001 - Aug 2003 · 2 years 4 months

Caracas, Venezuela

6. As seen from Jesus' LinkedIn profile, he was employed by Smartmatic as their Master Information Security Specialist from August 2008 – March 2017, within the time frame of the registered SSL certificate for Smartmatic and within Venezuela.

7. This evidence shows that Smartmatic was indeed connected to Venezuela as well as shows that their dealings with the Philippine's is still on-going as their website is in their election commission servers with matching and current SSL certificates.


I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 23th, 2020.

# Smartmatic SSL Certificate

Declaration of ███████████
Pursuant to 28 U.S.C Section 1746, I, ██████████, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I was an electronic intelligence analyst under 305th Military Intelligence with experience gathering SAM missile system electronic intelligence. I have extensive experience as a white hat hacker used by some of the top election specialists in the world. The methodologies I have employed represent industry standard cyber operation toolkits for digital forensics and OSINT, which are commonly used to certify connections between servers, network nodes and other digital properties and probe to network system vulnerabilities.

3. I am a US citizen and I reside at ██████████ location in the United States of America.

4. Researching Smartmatic's website and reading their public manuals about the reuse of SSL certificate's, I started to investigate Smartmatic's SSL certificates. Upon searching their website is currently behind Cloudflare yet using the same SSL certificate it made it easy to locate where Smartmatic's website was located. Smartmatic's website is in the Philippine's on their Election commission's server (Comelec.gov.ph), as seen below:









## TLS Handshake

| | |
|---|---|
| **Version** | TLSv1.2 |
| **Cipher Suite** | TLS_RSA_WITH_AES_128_CBC_SHA (0x002F) |

## Certificate Chain

**ea6217e8b940ce5d847dc3067767eaf9134034024c185978a77a3f58691c68fe**

C=ph, L=Manila, O=Comelec, CN=cntfw02

C=ph, L=Manila, O=Comelec, CN=Comelec WebAdmin CA, emailAddress=jesus.suarez@smartmatic.com





5.  As can be seen in the images above the SSL certificate used was registered by the email address jesus.suarez@smartmatic.com on the 9th of April 2016.



4





| | |
|---|---|
| 25.smtp.starttls.tls.certificate.parsed.validity.length | 685711621 |
| 25.smtp.starttls.tls.certificate.parsed.validity.start | 2016-04-09T12:33:00Z |
| 25.smtp.starttls.tls.certificate.parsed.version | 3 |
| 25.smtp.starttls.tls.cipher_suite.id | 0x002F |
| 25.smtp.starttls.tls.cipher_suite.name | TLS_RSA_WITH_AES_128_CBC_SHA |
| 25.smtp.starttls.tls.ocsp_stapling | False |
| 25.smtp.starttls.tls.validation.browser_error | x509: certificate signed by unknown authority |
| 25.smtp.starttls.tls.validation.browser_trusted | False |
| 25.smtp.starttls.tls.version | TLSv1.2 |
| 443.https.dhe.support | False |
| 443.https.dhe_export.support | False |
| 443.https.rsa_export.support | False |
| alexa_rank | 117344 |
| domain | comelec.gov.ph |
| ports | 25 |
| protocols | 25/smtp |
| tags | smtp |
| updated_at | 2020-11-30T12:20:01+00:00 |

6







**Master Information Security Specialist**
Smartmatic

Aug 2008 - Mar 2017 · 8 years 8 months

Caracas, Venezuela

Design, deployment, operation and support on security of network and infrastructure in Smartmatic projects. Provide Security Architecture based on Risk Assessment. Develop Business Continuity and Disaster Recovery Plan. Perform Vulnerability assessment, ethical hacking and penetration testing. Advisor on information security issues.



**Bancaribe**
9 years 11 months

**Security Specialist**

Aug 2003 - Aug 2008 · 5 years 1 month

Caracas, Venezuela

Planification and Management of Information Security System. Vulnerability and Risk Management. Leader of risk assessment and security evaluation team on Software Development Life Cicle projects. Advisor on information security issues and methodologies. Support on Incident Response Team.

**Information Security Administrator**

May 2001 - Aug 2003 · 2 years 4 months

Caracas, Venezuela

6. As seen from Jesus' LinkedIn profile, he was employed by Smartmatic as their Master Information Security Specialist from August 2008 – March 2017, within the time frame of the registered SSL certificate for Smartmatic and within Venezuela.

7. This evidence shows that Smartmatic was indeed connected to Venezuela as well as shows that their dealings with the Philippine's is still on-going as their website is in their election commission servers with matching and current SSL certificates.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this December 3rd, 2020.



8

**Declaration of** ████████████

Pursuant to 28 U.S.C Section 1746, I, ████████████, make the following declaration.

1.    I am over the age of 21 years and am a resident of Monroe County, Florida.

2.    I am under no legal disability that would prevent me from giving this declaration.

3.    I hold a Bachelor of Science degree in Mathematics and a Master of Science degree in Statistics.

4.    For thirty years, I have conducted statistical data analysis for companies in various industries, including aerospace, consumer packaged goods, disease detection and tracking, and fraud detection.

5.    From November 13th, 2020 through November 28th, 2020, I conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election.  This data included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee.

6.     The analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting

machines provided by Dominion Voting Systems.   These red flags occurred in several States in the country, including Michigan.

7.   I began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias. Here, I posed the following question: "Do any voting machine types appear to have unusual results?"  The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results.

8.   Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Michigan.

9.   For this statistical analysis I conducted multi-variable stepwise regression analysis using US Census data to develop a predictive model.  The model predicts the percentage of votes candidate Biden "should" receive in any county based on the social, economic, ethnic, and demographic make-up of the county.   Development of the model used the actual results from the 2020 US Election, as provided by Edison Research.  This regression technique is a common tool used in

many industries, and I have successfully used this technique and US census data for many clients across many years.

10.     For any one county, the actual percentage of votes won by candidate Biden will not perfectly match the value predicted by the model.   However, a good model gives estimates that are too high (compared to actual results) approximately half the time, and too low approximately half the time.   My model underestimates candidate Biden's actual results in 45% of US counties, and overestimates Biden's actual performance in 55% of US counties.  This is statistical evidence of a good and useful model.

11.     The predictions from this model, based on US census data, allow us to examine if actual results from Dominion machines show an unusual pattern.   By comparing actual Biden results against our predictions, we can see whether the differences are "random" – or if they follow any unusual patterns.   Random chance variation will cause the actual results from any one county to be above or below our prediction. But the Dominion machines show variation of Biden over-performing too often for it to be considered random chance.   In fact, the actual results from counties with Dominion machines follow a very predictable

mathematical pattern compared to our predicted values (see point 17 below). The unusual aspect of the actual results from counties with Dominion machines is not random. That is why we conclude some external, non-random force is in effect in conjunction with Dominion machines.

12. The results from most, if not all counties using the Dominion machines is three to five point six percentage points higher in favor of candidate Biden than the results should be. This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties. The results from "Dominion" counties do not match the results from the rest of the counties in the United States. The results are certainly statistically significant, with a p-value of < 0.00004. This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring. This pattern appears in multiple States, including Michigan, and the margin of votes implied by the unusual activity would easily sway the election results.

13. The following graph shows the pattern. The large red dots are counties in Michigan that use Dominion voting machines. Almost all

of them are above the blue prediction line, when in normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline).  The p-value of statistical analysis regarding the centerline for the red dots (Michigan counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random" statistical anomaly.  Some external force caused this anomaly.



14.   To confirm that Dominion machines were the source of the pattern/anomaly, I conducted further analysis using propensity scoring using U.S. census variables (Including ethnicities, income, professions, population density and other social/economic data) , which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so abnormalities in the margin for Biden are driven by other characteristics unrelated to the election.

15.   After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines.  This approach again showed a highly statistically significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county.  The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines.

16.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was

enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points.

17.   To estimate the percentage of votes impacted in Michigan, I developed a separate regression analysis equation for only counties using Dominion machines.   Surprisingly (and this was another red flag) this equation is almost identical to our prediction equation, except for the y-intercept value.

The two equations are:

National Model:    Actual Biden = 0 + 1x(Predicted Biden)

Dominion County Model:   Actual Biden =  0.056 +1.02 (Predicted Biden)

These equations are almost identical, except the model for Dominion counties is 0.056  (5.6 percentage points) above our predicted results.   This means our original predictive model predicts *just as well* for Dominion counties as it does for non-Dominion counties – if you simply *add 5.6 percentage points to our prediction value when predicting Biden results in Dominion counties*.    For this reason, the best estimate of the impact of Dominion machines is 5.6 percentage points.

18.    If some external force influenced votes by some set percentage, this is exactly the pattern we would expect to see in the data. The actual results on those machines would follow my predictive model with actual results varying randomly above or below those predictions, except the actual results would all be adjusted up or down by whatever was the set percentage.  This is exactly what I see in the data.

19.    I have updated my estimate of the number of votes impacted, and its associated confidence interval.   To estimate the number of votes impacted in Michigan I take the 5.6% value and calculate:

(0.056)x(Total Trump and Biden Presidential Votes in Michigan in Dominion Counties) =

(0.056)x(4,639,192)   =   259,794 votes impacted

A 95% confidence interval calculated on the 0.056 value yields an upper bound of 0.072, so a 95% confidence interval on estimate votes impacted in Michigan has an upper bound of:

(0.072)x(4,639,192) = 334,022 votes impacted

20.    The empirical specification exploits variation in counties with and without voting system vulnerabilities. My focus is on Dominion machines because it is the best proxy for vulnerabilities that have been

exploited (e.g., see the other cited affidavits that provide technical evidence that foreign adversaries accessed the unencrypted Edison network during the election and before). However, I could also expand the proxy to include counties with ES&S machines, which also have many of the same vulnerabilities. To the extent my proxy omits variation in other counties that also have vulnerabilities, I will underestimate the number of fraudulent votes for Biden. I opted for this approach for simplicity to focus exclusively on Dominion and highlight the unique role that these machines played in systematically swaying votes

21.   United States Attorney General Barr's comments are not germane to the analysis presented here on the broader case. My results show that there is an economically and statistically significant margin for Biden that would easily flip the election results in the battleground states, especially Michigan. This evidence does not explain how the manipulation of votes may have occurred—just that there is a meaningful difference between counties with and without Dominion machines even after accounting for many cross-sectional differences across these areas.

I declare under penalty of perjury that the forgoing is true and correct. Executed this December 3rd, 2020.

