# Response to Stephen Ansolabehere's Comments Regarding Absentee Ballots Across Several States

William M. Briggs

December 3, 2020

## 1 Summary

The criticisms made by Stephen Ansolabehere in response to my original report on absentee ballots are not relevant, make simple errors in logic, and even, in part, work against him to show my original argument could be made even stronger.

Ansolabehere repeatedly charges that because I was brief in saying "I assume survey respondents are representative and the data is accurate" that therefore the respondents were not representative and the data not accurate. This is a silly error and a wholly unwarranted conclusion. Not only was this data entirely typical of phone surveys, and therefore the data having all the usual strengths and weaknesses of the genre, it was extraordinary in that calls with respondents were recorded. The designers of the survey evidently knew its quality would be attacked—and were prepared for it.

There were no fatal errors in the survey data or calculations, as the well-paid Ansolabehere falsely claims. (*Five hundred fifty* American dollars per hour for the many hours he spent on his comments? My work is entirely pro bono.) Instead, I took pains to put forward the most conservative case, interpreting the data in a way that actually reduced the number of troublesome ballots.

Although Ansolabehere made many mistakes, I thank him for the opportunity of allowing me to make a point I neglected to emphasize in my original presentation. This is the striking unity of results across several battleground states. The data shows either an amazing coincidence in accumulated troublesome ballots in just those places they were needed most for Biden, or the data shows something more interesting happened.

What follows are answers to specific criticisms.

## 2 Rebuttal

Ansolabehere pads his account with many extraneous words and arguments. I will be much briefer, while also answering every substantial criticism he made.

### 2.1 Error Definition

My original definition of errors were this:
  **Error #1**: being recorded as sent an absentee ballot without requesting one.
  **Error #2**: sending back an absentee ballot and having it recorded as not returned.

These followed directly from the survey design. The survey began by asking "Q1 - May I please speak to <lead on screen>?" If the person was available, they were asked "Q2 - Did you request an absentee ballot?"

Finally, if they said yes to that, respondents were asked "Q3 - Did you mail back that ballot?"

Ansolabehere finds ambiguity in these three simple questions via a wonderful display of specious argument, one he repeats in many places. He basically says that because the questions *could* have been

1

misinterpreted in the various ways he suggests, they therefore *were* misinterpreted by a sufficient number of respondents, thus rendering the survey useless.

My answer is that this is a dumb argument. He has no evidence misinterpretations were made in the way he suggests. He could have spent the same amount of (expensive) time and came up with reasons why the survey was *not* misinterpreted.

For instance, the election was in the news and people were riled. They therefore welcomed the chance to set the record straight, and to ensure their legal ballots were counted. They were thus even more honest than they normally would be with telephone pollsters.

Of course, I have no evidence this, or other similar stories, are true. Just as Ansolabehere has no evidence his charges are true. All we can do, then, is to treat this survey like we treat all surveys: analyze the data as it is presented.

## 2.2 Ambiguous Wording

I will give one specific example of Ansolabehere trying to discover ambiguity. They are all much the same. He says:

> The wording of Question 3 is also very problematic. First, it does not ascertain whether the ballot was mailed back in a timely manner so as to be included in the record of ballots cast. Some or possibly all of the cases in question are late ballots, and thus not necessarily included in the absentee vote record. Second, Question 3 asks whether someone voted. Survey questions asking whether someone voted are notoriously subject to social desirability biases that lead to inflation in the estimated number of voters.

Again, Ansolabehere uses the possibility of a thing as proof the thing existed. There no evidence, not one bit, that ballots were sent back late. Indeed, as all news reports indicate, especially in Pennsylvania, certain late ballots were warmly accepted.

His second point is the same: because people lie on surveys, therefore they lied here in sufficient number. Would Ansolabehere apply this same reasoning to his own words? It is clearly nonsense. If accepted, his argument would toss out *all* surveys about voting.

## 2.3 Response Rate

Ansolabehere charges "The survey has extremely low response rates." He must know that the response rate here was not atypical. That is, it was low like many telephone polls are. But low does not imply too low. He must know this. Further, the mathematical extrapolations I made accounted for the size of the data.

Perhaps because Ansolabehere is a specialist in government, he does not know that when samples are low the confidence we have in extrapolations is wider. I will give one example, using Georgia, though this works for data from any state.

The original estimates of Error #2 for Georgia were that between 31,559–38,866 ballots were sent back but recorded as not returned, a "plus or minus" window of 7,307 votes. If we suppose we had *double* the response rate on the survey, in the same proportions as the original, then the Error #2 estimate becomes 32,945–38,096, a window of 5,151 votes. The 95% prediction interval shrinks, as expected, as we become more confident.

It does not shrink by much, of course, showing the analysis method is robust. If instead we allow a full ten times the original response rate, the plus-or-minus window shrinks to 2,234 votes.

Response rate is not a problem, and has been fully accounted for.

## 2.4 Top line Number Interpretations

Ansolabehere produces a lot of quibbles about the survey numbers, and uses the possibility of different interpretations of the numbers to say my entire analysis can't be trusted.

It is true that differences can exist in interpreting the top line numbers. I was aware of this when I did the analysis, which is why I everywhere used conservative interpretations. If I instead use one of the interpretations Ansolabehere suggests, the case about troublesome votes is made is even stronger.

I will use Georgia again as an example, though this applies to all states.

Again, the first question asked to speak to the relevant person. In Georgia, 767 were recorded as "Reached target", and an additional 255 were recorded as "'What is this about?'/Uncertain [Go to Q2]." I summed these two numbers to reach a total of 1,022.

One quibble is that the 255 who were uncertain should not be used in the total. If not, the sample size is, of course, reduced to 767. Yet we still have 142 who said "No" when asked if they received an absentee ballot. The ratio 142/767 is larger than 142/1022, meaning it will look like even more errors were made (of type Error #1).

The original estimate of **Error #1** (being recorded as sent an absentee ballot without requesting one) for Georgia was the window of 16,938–22,771. If we reduce the sample to 767 by excluding the disputed 255, the new estimate is 22,481–30,042. It goes up in just the way we expect it to. This proves using the full 1,022 is the conservative choice.

Another way to interpret the top lines is to use all people who got to the point of Question 1. Ansolabehere disingenuously prefers this because it makes his case appear stronger.

Besides the two options to Question 1 already mentioned (reached target, uncertain), there were also "Refused" and "Hangup". I treated these as non-responses, which is the usual interpretation. A person who hangs up without responding is the same as the person who never answers, as far as the answering the question goes.

In the spirit of generosity, though, let's use all 1,175 who reached Question 1 (instead of the original 1,022), including the hangups and refusals. The window for Error #1 becomes 14,778–19,903. The window shrinks, as Ansolabehere desires. *But not by enough.* This is still a large and troublesome window. The same is true for each state investigated.

Even stronger, the window for Error #2, the more significant error, *does not change.* This is because the calculations for this window are conditional only on those who answered Question 2 and 3.

Lastly, Ansolabehere disputes whether the answers spouses or other household members gave should be allowed. I used them in the totals. Ansolabehere would exclude them. This is really a nitpicking point because the total of these answers were small.

Here is proof. Again, the original window for Error#2 in Georgia was 31,559–38,866. This was conditional on the 257 respondents or their spouses or household members who said they mailed a ballot back. If we remove the 17 spouses or household members, the window becomes 29,372–36,512. It shrinks a bit. But again, *not by enough.*

All comments made here hold for all states.

# 3   Conclusion

The doubts cast on my original analysis by Ansolabehere either fail simple tests of logic, or are so small as to make no practical difference in the conclusion.

All his logical errors can be dismissed. Suggesting, as he often does, that mistakes *can* be made or that ambiguity *might* exist in the survey, is not proof that either *does* exist. I could have spent an equal amount of (unremunerated in my case) time suggesting ways the survey was better than most political polls. For instance, people are aware now more than ever of the importance of this election and they took greater care with their answers. I did not do this in the original report because I, unlike Ansolabehere, know the true value of such speculations.

The various numerical quibbles Ansolabehere has with the survey numbers either strengthen my case, or they are so small as to make no practical difference. Even with his own difficult-to-justify assumptions, the analysis reveals there still exist very large numbers of troublesome ballots in each battleground state. There are enough suspicious ballots left, even using his numbers, that could have changed the outcome of the election.

Finally, I reemphasize the remarkable coincidence that the amount of troublesome ballots was important to the election outcome in each state.

# 4 Declaration of William M. Briggs, PhD

1. My name is William M. Briggs. I am over 18 years of age and am competent to testify in this action. All of the facts stated herein are true and based on my personal knowledge.
2. I received a Ph.D of Statistics from Cornell University in 2004.
3. I am currently a statistical consultant. I make this declaration in my personal capacity.
4. I have analyzed data regarding responses to questions relating to mail ballot requests, returns and related issues.
5. I attest to a reasonable degree of professional certainty that the resulting analysis are accurate.

I declare under the penalty of perjury that the foregoing is true and correct.

*[signature]* 3 December 2020

William M. Briggs