## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**WILLIAM FEEHAN,**

                             **Plaintiff,**                    **CASE NO.  2:20-cv-1771**

             **v.**

**WISCONSIN ELECTIONS COMMISSION,**
  **and its members ANN S. JACOBS,**
  **MARK L. THOMSEN, MARGE**
  **BOSTELMAN, JULIE M. GLANCEY,**
  **DEAN KNUDSON, ROBERT F.**
  **SPINDELL, JR., in their official**
  **capacities, GOVERNOR TONY EVERS,**
  **in his official capacity,**

                             **Defendants.**

---

## AMENDED COMPLAINT FOR
## DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF

---

### NATURE OF THE ACTION

1.  This civil action brings to light a massive election fraud, multiple violations of Wisconsin Statutes Chapters 5 – 12 (hereafter, "Wisconsin Election Code"), *see, e.g.,* Wis. Stat. §§ 5.03, *et. seq.*, in addition to the Election and Electors Clauses and Equal Protection Clause of the U.S. Constitution.  These violations occurred during the 2020 General Election in the City of Milwaukee, southeastern Wisconsin counties, and throughout the State of Wisconsin, as set forth in the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses. *See* Exh. 19, Declaration of affiant presenting statistical analysis prediction of 105,639 fraudulent ballots cast for Joe Biden in the

1

City of Milwaukee and Exh. 17, Declaration of Russell James Ramsland, Jr. wherein he demonstrates it is statistically impossible for Joe Biden to have won Wisconsin.

2. The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing" techniques. *See* Exh. 16, U. S. Senator Elizabeth Warren (D. Mass.) letter of December 6, 2019 concerning the dangers of private equity control and censorship of election technology in the United States.

3. The fraud has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose. *See* Exh. 18, Joint Cybersecurity Advisory issued on October 30, 2020 by the U.S. Department of Justice Federal Bureau of Investigation (FBI) and the Cybersecurity & Infrastructure Security Agency (CISA) warning election officials about actual election system hacking events by Iranian agents in an attempt to manipulate the November 3, 2020 election. This Amended Complaint details an especially egregious range of conduct in Milwaukee County and the City of Milwaukee, along with Dane County, La Crosse County, Waukesha County, St. Croix County, Washington County, Bayfield County, Ozaukee County and various other counties throughout Wisconsin employing Dominion Systems, though this conduct occurred throughout the State at the direction of Wisconsin state election officials.

4. The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Wisconsin, that collectively

2

add up to multiples of Biden's purported lead in the State of 20,565 votes.

5.   While this Amended Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Wisconsin's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief requested herein.

### Dominion Voting Systems Fraud and Manipulation

6.   The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used by the Wisconsin Elections Commission.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

7.   Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  See Exh. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report") and Exh. 8, Statement by Ana Mercedes Diaz Cardozo outlining actual examples of election manipulation by hacking and misuse of technology in Venezuelan elections.  Notably, Chavez "won" every election thereafter.

8.   As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the

3

leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times. . . .

Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. *Id.* ¶¶ 10 & 14.

9. A core requirement of the Smartmatic software design ultimately adopted by Dominion for Wisconsin's elections was the software's ability to hide its manipulation of votes from any audit. As the whistleblower explains:

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

10. The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs. Essentially this allows

4

an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[1] *See* Exh. 14, Declaration of Ronald Watkins regarding manipulation of Dominion software and built-in optical ballot scanning systems to contrive an election outcome in multiple states.

11. This Amended Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code (pursuant to Wisconsin Statute § 5.905) is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. *See* 52 U.S.C. § 20701.

12. These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In certifying Dominion Voting Systems Democracy Suite, Wisconsin officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. *See* Exh. 11.

13. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and

---

[1] *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti. *See* Ex. 9, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

5

Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[2]

14.   In addition to the Dominion computer fraud, this Amended Complaint identifies several additional categories of "traditional" voting fraud that occurred as a direct result of Defendant Wisconsin Election Commission ("WEC") and other Defendants directing Wisconsin clerks and other election officials to ignore or violate the express requirements of the Wisconsin Election Code. First, the WEC issued "guidance" to county and municipal clerks not to reject "indefinitely confined" absentee voters, even if the clerks possess "reliable information" that the voter is no longer indefinitely confined, in direct contravention of Wisconsin Statute § 6.86(2)(6), which states that clerks must remove such voters. Second, the WEC issued further guidance directing clerks – in violation of Wisconsin Statute § 6.87(6)(d), which states that an absentee envelope certification "is missing the address of a witness, the ballot may not be counted" – to instead fill in the missing address information.

15.   This Amended Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

    A.  A report from Dr. William Briggs, showing that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots;

    B.  Reports from Redacted Expert Witnesses who can show an algorithm was used

---

[2] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Exh. 10 ("Appel Study")).

to pick a winner.

16.   In the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020.  *See* Exh. 12 (copy of redacted witness affidavit).

17.   These and other "irregularities" demonstrate that at least 318,012 illegal ballots were counted in Wisconsin.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

## JURISDICTION AND VENUE

18.   This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

19.   This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

20.   The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

21.   This Court has jurisdiction over the related Wisconsin constitutional claims and state-law claims under 28 U.S.C. § 1367.

22.   Venue is proper because a substantial part of the events or omissions giving rise to the

7

claim occurred in the Eastern District. 28 U.S.C. § 1391(b) & (c).

23.   Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

24.   Plaintiff William Feehan, is a registered Wisconsin voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Wisconsin.  Mr. Feehan is a resident of the City of La Crosse and La Crosse County, Wisconsin.

25.   Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

26.   Plaintiff Feehan has standing to bring this action as a voter and as a candidate for the office of Elector under Wis. Stat. §§ 5.10, et seq (election procedures for Wisconsin electors).  As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials in implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000)

8

(per curiam).

27.   Plaintiff brings this action to prohibit certification of the election results for the Office of President of the United States in the State of Wisconsin and to obtain the other declaratory and injunctive relief requested herein.  Those results were certified by Defendants on November 30, 2020, indicating a plurality for Mr. Biden of 20,565 votes out of 3,240,867 cast.

28.   The Defendants are Wisconsin Elections Commission ("WEC"), a state agency, and its members Ann S. Jacobs, Mark L. Thomsen, Marge Bostelman, Julie M. Glancey, Dean Knudson, and Robert F. Spindell, Jr., in their official capacities

29.   Defendant Governor Tony Evers is named as a defendant in his official capacity as Wisconsin's governor.

30.   Defendant WEC was created in 2015 by the Wisconsin Legislature as an independent agency under the Executive branch to administer Wisconsin's election laws. Wis. Stat. §§ 5.03 & 15.61.   The WEC is authorized to adopt administrative rules pursuant to Chapter 227 of the Wisconsin Statutes, but nothing under Wisconsin's election laws authorizes the WEC to issue any documents, make any oral determinations or instruct governmental officials administering elections to perform any act contrary to Wisconsin law governing elections.

31.   Furthermore, the Wisconsin Legislature also created municipal elections commissions for municipalities with a population greater than 500,000 and a county elections commissions for counties with a population greater than 750,000.   Wis Stat. § 7.20.   As a result, the City of Milwaukee Elections Commission was created as well as the Milwaukee County Elections Commission and the Dane County Elections Commission. These county and municipal elections commissions are responsible for administering the elections in their respective jurisdictions.

## STATEMENT OF FACTS

32.  Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Wisconsin Constitution.

33.  The United States Constitution sets forth the authority to regulate federal elections. With respect to the appointment of presidential electors, the Constitution provides:

> Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

U.S. CONST. art. II, § 1 ("Electors Clause").

34.  None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

35.  The WEC certified the Presidential Election results on November 30, 2020.  The Presidential election results in Wisconsin show a difference of 20,565 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

36.  Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results pending a full investigation and court hearing, and to order an independent audit of the November 3, 2020 election to ensure the accuracy and integrity of the election.

10

## I.  VIOLATIONS OF WISCONSIN ELECTION CODE

### A.  WEC Directed Clerks to Violate Wisconsin Election Code Requirements for Absentee Voting by "Indefinitely Confined" without Photo ID.

37.  The Wisconsin State Legislature adopted Act 23 in 2011 to require Wisconsin electors to present an identification containing a photograph, such as a driver's license, to either a municipal or county clerk, when registering to vote and when voting. Wis. Stat. §§ 6.34; 6.79 (2). The Wisconsin State Legislature adopted the photo ID requirement to deter the casting of ballots by persons either not eligible to vote or persons fraudulently casting multiple ballots. *League of Women Voters of Wisconsin Education Network, Inc. v. Walker,* 851 N.W.2d 302, 314 (Wis. 2014).

38.  Wisconsin's absentee voting is governed by Wisconsin Statutes § 6.84 - § 6.89.  Under Wisconsin Statutes §6.86, every absentee elector applicant must present a photo ID when registering to vote absentee except absentee voters who registered as "indefinitely confined," Wis. Stat. §6.86 (ac), meaning someone confined "because of age, physical illness or infirmity or is disabled for an indefinite period." Wis. Stat. § 6.86(2)(a).  As a result, Wisconsin election procedures for voting absentee based on "indefinitely confined" status circumvent the photo ID requirement, creating an avenue for fraudulent voting.

39.  In order to ensure that only those who are "indefinitely confined" may use the "indefinitely confined" absentee ballot in an election, Wisconsin Statutes §6.86 provides that any elector who files an application for an absentee ballot based on indefinitely confined status may not use the absentee ballot if the electoral is no longer "indefinitely confined."  Wisconsin Statutes § 6.86(2)(b) further provides that the municipal clerk "shall remove the name of any other elector from the list upon request of the elector or upon receipt of reliable information that an elector no longer qualifies for the service."

40.  Despite this clear statutory requirement, the Administrator of the Wisconsin Election

11

Commission, Meagan Wolfe, issued a written directive on May 13, 2020 to the clerks across the State of Wisconsin stating that the clerks cannot remove an allegedly "indefinitely confined" absentee voter from the absentee voter register if the clerk had "reliable information" that an allegedly "indefinitely confined" absentee voter is no longer "indefinitely confined." The directive specifically stated:

> Can I deactivate an absentee request if I believe the voter is not indefinitely confined? No. All changes to status must be made in writing and by the voter's request. Not all medical illnesses or disabilities are visible or may only impact the voter intermittently. (*See* WEC May 13, 2020 Guidance Memorandum).

41.   The WEC's directive thus directly contradicts Wisconsin law, which specifically provides that clerks "shall" remove an indefinitely confined voter from the absentee voter list if the clerk obtains "reliable information" that the voter is no longer indefinitely confined.

42.   As a result of the directive, clerks did not remove from the absentee voter lists maintained by their jurisdictions the absentee voters who claimed "indefinitely confined" status but who in fact were no longer "indefinitely confined." This resulted in electors who were allegedly "indefinitely confined" absentee voters casting ballots as "indefinitely confined" absentee voters who were not actually "indefinitely confined" absentee voters.

## B. WEC Directed Clerks to Violate Wisconsin Law Prohibiting Counting of Absentee Ballot Certificates Missing Witness Addresses.

43.   In 2015, the Wisconsin Legislature passed Act 261, amending Wisconsin's election laws, including a requirement, codified as Wisconsin Statute § 6.87(d), that absentee ballots include both elector and witness certifications, which must include the address of the witness.   If the address of the witness is missing from the witness certification, however, "the ballot may not be counted." *Id.*

44.   On October 18, 2016, WEC reacted to this legislation by issuing a memorandum, which,

among other things, permitted clerks to write in the witness address onto the absentee ballot certificate itself, effectively nullifying this express requirement. (*See* WEC October 18, 2016 Guidance Memorandum). Wisconsin election officials reiterated this unlawful directive in publicly posted training videos. For example, in a Youtube video posted before the November 3, 2020 General Election by Clarie Woodall-Voog of the Milwaukee Elections Commission, Ms. Woodall-Voog advised clerks that missing items "like witness address may be written in red."[3]

### C. WEC Directed Clerks to Illegally Cure Absentee Ballots by Filling in Missing Information on Absentee Ballot Certificates and Envelopes.

45. On October 19, 2020, WEC instructed its clerks that, without any legal basis in the Wisconsin Election Code, they could simply fill in missing witness or voter certification information using, e.g., personal knowledge, voter registration information, or calling the voter or witness. The WEC further advised that voters or witnesses could cure any missing information at the polling place, again without citing any authority to do so under Wisconsin Election Code.

## II. EXPERT WITNESS TESTIMONY: EVIDENCE OF WIDESPREAD VOTER FRAUD

### A. Approximately 15,000 Wisconsin Mail-In Ballots Were Lost, and Approximately 18,000 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.

46. The attached report of William M. Briggs, Ph.D., Exh. 2 ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Wisconsin voters collected by Matt Braynard, which was conducted from November 15-17, 2020. *See* Exh. 3 ("Braynard Survey"). The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots

---

[3] *See* https://www.youtube.com/watch?v=hbm-pPaYiqk (video a 10:43 to 11:07).

but whose votes went missing (*i.e.*, marked as unreturned)." Exh. 2. Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors out of a total of 96,771 unreturned mail-in ballots for the State of Wisconsin.

47. With respect to **Error #1**, Dr. Briggs' analysis estimated that **16,316-19,273 ballots** out of the total 96,771 unreturned ballots were recorded for voters who had **not** requested them. *Id.* With respect to **Error #2**, he found **13,991 – 16,757 ballots** out of 96,771 unreturned ballots recorded for voters who **did return their ballots were recorded as being unreturned.** *Id.* Taking the average of the two types of errors together, **29,594 ballots, or 31% of the total, are "troublesome."**

48. These errors are not only conclusive evidence of widespread fraud by the State of Wisconsin, but they are fully consistent with the fact witness statements cited above regarding the evidence about Dominion presented below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

49. With respect to **Error #1**, Dr. Briggs' analysis demonstrates that approximately **17,795 absentee ballots were sent to someone besides the registered voter named in the request**, and thus could have been filled out by anyone and then submitted in the name of another voter. Regarding ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.

50. With respect to **Error #2**, Dr. Briggs' analysis indicates that approximately **15,374 absentee ballots were either lost or destroyed** (consistent with allegations of Trump ballot

destruction) **and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.** Dr. Briggs' analysis shows that 31% of "unreturned ballots" suffer from one of the two errors above – which is consistent with his findings in the four other States analyzed (Arizona 58%, Georgia 39%, Pennsylvania 37%, and Wisconsin 45%) – and provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

**B. Nearly 7,000 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Wisconsin.**

51. Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Exh. 3. Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.[4] *Id.*

**C. A Statistical Study Reveals that Biden Overperformed in those Precincts that Relied on Dominion Voting Machines**

52. From November 13th, 2020 through November 28th, 2020, the Affiant conducted in-depth statistical analysis of publicly available data on the 2020 U.S. Presidential Election. This data included vote counts for each county in the United States, U.S. Census data, and type of voting machine data provided by the U.S. Election Assistance Committee. The Affiant's analysis yielded several "red flags" concerning the percentage of votes won by candidate Biden in counties using voting machines provided by Dominion Voting Systems. These red flags occurred in several

---

[4] Mr. Braynard posted the results of his analysis on Twitter. *See* https://twitter.com/MattBraynard/status/1329700178891333634?s=20. This Complaint includes a copy of his Report, (attached hereto as Exh. 3).

States in the country, including Wisconsin.  (*See* attached hereto as Exh. 4, copy of redacted Affiant, B.S. Mathematics and M.S. Statistics).

53.  The Affiant began by using Chi-Squared Automatic Interaction Detection (CHAID), which treats the data in an agnostic way—that is, it imposes no parametric assumptions that could otherwise introduce bias.  Affiant posed the following question: "Do any voting machine types appear to have unusual results?"   The answer provided by the statistical technique/algorithm was that machines from Dominion Voting Systems (Dominion) produced abnormal results.  *Id.*

54.  Subsequent graphical and statistical analysis shows the unusual pattern involving machines from Dominion occurs in at least 100 counties and multiple States, including Wisconsin. The results from the vast majority of counties using the Dominion machines is 3 to 5.6 percentage points higher in favor of candidate Biden.  This pattern is seen easily in graphical form when the results from "Dominion" counties are overlaid against results from "non-Dominion" counties.  The results from "Dominion" counties do not match the results from the rest of the counties in the United States.  The results are clearly statistically significant, with a p-value of $< 0.00004$.  This translates into a statistical impossibility that something unusual involving Dominion machines is *not* occurring.  This pattern appears in multiple States, including Wisconsin, and the margin of votes implied by the unusual activity would easily sway the election results.  *Id.*

55.  The following graph shows the pattern.  The large red dots are counties in Wisconsin that use Dominion voting machines.  Almost all of them are above the blue prediction line, when in normal situations approximately half of them would be below the prediction line (as evidence by approximately half the counties in the U.S. (blue dots) that are below the blue centerline).  The p-value of statistical analysis regarding the centerline for the red dots (Wisconsin counties with Dominion machines) is 0.000000049, pointing to a statistical impossibility that this is a "random"

16

statistical anomaly.   Some external force caused this anomaly:



*Id.*

56.   To confirm that Dominion machines were the source of the pattern/anomaly, Affiant conducted further analysis using propensity scoring using U.S. census variables (including ethnicities, income, professions, population density and other social/economic data) , which was used to place counties into paired groups. Such an analysis is important because one concern could be that counties with Dominion systems are systematically different from their counterparts, so abnormalities in the margin for Biden are driven by other characteristics unrelated to the election. *Id.*

57.   After matching counties using propensity score analysis, the only difference between the groups was the presence of Dominion machines.   This approach again showed a highly statistically

significant difference between the two groups, with candidate Biden again averaging three percentage points higher in Dominion counties than in the associated paired county. The associated p-value is < 0.00005, against indicating a statistical impossibility that something unusual is not occurring involving Dominion machines. *Id.*

58. The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between three and five point six percentage points. **Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440.** *Id.*

59. The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- returned ballots that were deemed unreturned by the state: 15,374

- unreturned mail ballots unlawfully ordered by third parties: 17,795

- votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 6,966

- Votes that were improperly relying on the "indefinitely confined" exemption to voter ID: 96,437

- And excess votes arising from the statistically significant outperformance of Dominion machines on behalf of Joe Biden: 181,440

*In Conclusion, the Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.*

### III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS

60. The State of Wisconsin, in many locations, used either Sequoia, a subsidiary of Dominion Systems, and or Dominion Systems, Democracy Suite 4.14-D first, and then included Dominion

Systems Democracy Suite 5.0-S on or about January 27, 2017, which added a fundamental modification: *"dial-up and wireless results transmission capabilities to the ImageCast Precinct and results transmission using the Democracy Suite EMS Results Transfer Manager module."* (*See* Exh. 5, attached hereto, a copy of the Equipment for WI election systems).

### A. Dominion's Results for 2020 General Election Demonstrate Dominion Manipulated Election Results.

61. Affiant Keshel's findings that reflect the discussion cited above:

While Milwaukee County is focal for transparency and observation violations, including reporting statistically impossible vote counts in the early morning hours away from scrutiny, Dane County has surged far past support totals for President Obama, despite expected difficulties mobilizing student voters to polls. President Trump has reconsolidated the Republican base in suburban Milwaukee and far surpassed his 2016 support levels but has been limited in margin growth by historically improbable Democratic support in these strongholds, which defy years of data in Wisconsin in which the Republican party surged as the Democratic Party plunged. Finally, in strong Trump counties showing a double inversion cycle (one party up, the other down), particularly in rural and exurban Wisconsin, Trump's totals are soaring, and against established trends, Biden's totals are at improbable levels of support despite lacking registration population

(*See* attached hereto, Exh. 9, Aff. of Seth Keshel, MBA)

| County | Rep '08 | Dem '08 | Rep '12 | Dem '12 | Rep '16 | Dem '16 | Rep '20 | Dem '20 | Dem Percentage of Obama 2008 Votes |
|---|---|---|---|---|---|---|---|---|---|
| Ozaukee | 32,172 | 20,579 | 36,077 | 19,159 | 30,464 | 20,170 | 33,912 | 26,515 | 128.8% |
| % Increase | N/A | N/A | 12.1% | (6.9%) | (15.6%) | 5.3% | 11.3% | 31.5% | |
| ---- | | | | | | | | | |
| Dane | 73,065 | 205,984 | 83,644 | 216,071 | 71,275 | 217,697 | 78,789 | 260,157 | 126.3% |
| % Increase | N/A | N/A | 14.5% | 4.9% | (14.8%) | 0.8% | 10.5% | 19.5% | |
| ---- | | | | | | | | | |
| Waukesha | 145,152 | 85,339 | 162,798 | 78,779 | 142,543 | 79,224 | 159,633 | 103,867 | 121.7% |
| % Increase | N/A | N/A | 12.2% | (7.7%) | (12.4%) | 0.6% | 12.0% | 31.1% | |
| ---- | | | | | | | | | |
| Racine | 45,954 | 53,408 | 49,347 | 53,008 | 46,681 | 42,641 | 54,475 | 50,154 | 117.6% |
| % Increase | N/A | N/A | 7.4% | (0.7%) | (5.4%) | (19.6%) | 16.7% | 17.6% | |

*Id.*

62. Keshel provides a graph reflecting the voter returns in a time-series. The highly unlikely

19

and remarkably convenient attainment of this block of votes provides for a stunning depiction of the election and generates many questions. The analysis provided by Plaintiff's multiple experts, including data, statistics and cyber, will reveal clear evidence of the multiple frauds that combined to change the outcome of the 2020 election.



*See Id.*

### B. Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

63. **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public. (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020). Rather than engaging in an open and transparent process to give credibility to Wisconsin's

Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

64. **Texas.** The same Dominion Democracy Suite was denied certification in Texas by the Secretary of State on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[5]

65. **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

66. A District Judge found that Dominion's BMD ballots are not voter verifiable, and they cannot be audited in a software independent way. The credibility of a BMD ballot can be no greater than the credibility of Dominion's systems, which copious expert analysis has shown is deeply compromised. Similar to the issues in Wisconsin, Judge Totenberg of the District Court of Georgia

---

[5]  See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, ... such interpretation **for elector verification**, and print **an elector verifiable paper ballot;**" and (2) "produce paper ballots which are marked with the elector's choices **in a format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2). Plaintiffs and other voters who wish to vote in-person are required to vote on **a system that does none of those things**. Rather, the evidence shows that the Dominion BMD system does **not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code**.

*See* Order, pp. 81-82. (Emphasis added).

67.   This case was later affirmed in a related case, in the Eleventh Circuit in 2018 related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (11th Cir. 2018). The Court found,

> **In summary, while further evidence will be necessary in the future, the Court finds that the combination of the statistical evidence and witness declarations in the record here (and the expert witness evidence in the related *Curling* case which the Court takes notice of) persuasively demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff has shown a substantial likelihood of proving that the Secretary's failure to properly maintain a reliable and secure voter registration system has and will continue to result in the infringement of the rights of the voters to cast their vote and have their votes counted.**

*Id. at* 1294-1295.

68.   The expert witness in the above litigation in the United States District Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to the acute security vulnerabilities, *see* Exh. 107, wherein he testified or found:

> A.  "The scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes to be counted" "The voting system is being operated in Fulton County in a manner that escalates

the security risk to an extreme level" "Votes are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail." 50% or more of voter selections in some counties were visible to poll workers. Dominion employees maintain near exclusive control over the EMS servers. "In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion system laptop, suggesting that multiple Windows updates have been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an "extreme security risk."

E. There is evidence of transfer of control the systems out of the physical perimeters and place control with a third party off site.

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

## C. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

### 1. Evidence of Vulnerability to Foreign Hackers.

69. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY

ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified**

**Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT)

23

actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Exh. 18.)

70. An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China. (*See* Exh. 12, Spider Declaration, (who remains redacted for security reasons).)

71. The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. (*See* Exh. 12, Spider Declaration. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

72. Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries. On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling"

24

to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…

(*See* Exh. 13, Aff. of Computer analysis, at par. 32).

73. The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Wisconsin uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net)"

74. This Declarant further explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(*See Id.* at ¶32).

75. This Declarant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and specifically the port that Wisconsin uses:

> "Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of GERMANY. Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore servers. Wisconsin Port.
>
> China is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service

25

company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server [for] Dominion Software.

(*See Id.* at par. 21).

76.   The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

> **The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

> Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX." (*See Id.* at pars. 67-69)

> "The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id.* at par. 73)

### 2.   Background of Dominion Connections to Smartmatic and Hostile Foreign Governments.

77.   An expert analysis by Russ Ramsland agrees with the data reflecting the use of an algorithm that causes the spike in the data feed, which is shown to be an injection of votes to change the outcome, because natural reporting does not appear in such a way.

78.   And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl -- and was reported with decimal points, which is contrary to one vote as one ballot: **"The fact that we observed raw vote data coming directly that includes**

26

**decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

79.  The report concludes that **"**Based on the foregoing, I believe these statistical anomalies and impossibilities compels the conclusion to a reasonable degree of professional certainty that the vote count in Wisconsin, in particular for candidates for President contain at least 119,430 (Para. 13) up to 384,085 (Para. 15) illegal votes that must be disregarded. In my opinion, it is not possible at this time to determine the true results of the Wisconsin vote for President of the United States."

### The History of Dominion Voting Systems

80.  Plaintiff can also show Smartmatic's incorporation and inventors who have backgrounds evidencing their foreign connections, including Serbia, specifically its identified inventors:

> Applicant:  SMARTMATIC, CORP.
>
> Inventors: Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[6]

81.  Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (*See* Exh. 17, Cardozo Aff. ¶8).

---

[6] *See* Patents Assigned to Smartmatic Corp., *available at:*
https://patents.justia.com/assignee/smartmatic-corp

### 3. US Government Warnings Regarding Hacking by Hostile Foreign Governments.

82. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

> This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related disinformation in mid-October 2020.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* Exh. 18, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)

### D. Additional Independent Findings of Dominion Flaws.

83. Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiff has since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1. Central Operator Can Remove, Discard or Manipulate Votes.

84. Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Exh. 106, Watkins aff. ¶11). ¶8.

85. Mr. Watkins further testifies that the user manual makes clear that the system allows for

28

threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary

determinations on where the vote goes stating:

> 9. During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

> 10. Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

> 11. The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named "NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. *Id.* ¶¶ 9-11.

### 2. Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

86. The Dominion System put in place by its own design violates the intent of Federal law

on the requirement to preserve and retain records – which clearly requires preservation of all

records requisite to voting in such an election.

> **§ 20701.** Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that,

29

if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

*See* 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

87. Plaintiff has since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election. Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication. (Exh. 106 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power. Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was

30

to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. (*Id.* ¶¶6, 9, 10).

88. Specific vulnerabilities of the systems in question that have been well documented

or reported include:

A. Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (*See* Exh. 2, Appel Study).

B. Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

C. October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and its ties to Venezuela.** (*See* Exh. 15). Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are. *Id.*

D. Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that has played a significant role in the U.S. market over the last decade."[7] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be

---

[7] *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017), *available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E. Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[8]

F. Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble-plagued companies" ' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (*See* Exh. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[9]

---

[8] *Smartmatic-TIM Running Out of Time to Fix Glitches*, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

[9] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:*

89. The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

> This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
>
> The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

*See* H.R. 2722.

**E. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

90. Dr. Eric Coomer is listed as the co-inventor for several patents on ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[10]  He joined Dominion in 2010, and most recently served as Voting Systems

---

https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems  have-been-left-exposed-online-despite-official-denials.

[10] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014); (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and

33

Officer of Strategy and Director of Security for Dominion. Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia. Dr. Coomer's patented ballot adjudication technology into Dominion voting machines sold throughout the United States, including those used in Wisconsin. *See* Exh. 6 (Jo Oltmann Affidavit).

91. In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[11] He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. *See Id.*[12]

92. Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media. An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history). (*See Id.*)

93. Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity. Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (*See* Id).

---

Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[11] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[12] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW! I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason. You are controlled by fear, reaction and bullsh[*]t. Get your shit together. F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt. *Id.* (July 21, 2016 Facebook post).[13]

94. In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Amended Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud. I don't know who is doing it, or how much is happening, but I know it is going on a lot." This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (*See* also Exh. 6)

95. Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (*Id.*)

---

[13] In this and other quotations from Dr. Coomer's social media, Plaintiff has redacted certain profane terms.

35

96. Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

97. Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1. "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present. In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

98. By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***. It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive, and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump. Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches"

36

uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (*Id.*)

99. In sum, as set forth above, for a host of independent reasons, the Wisconsin election results concluding that Joe Biden received 20,608 more votes that President Donald Trump must be set aside.

## COUNT I

### Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.

100. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

101. The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const. art. II, §1, cl. 2 (emphasis added). Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

102. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932). Regulations for presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

103. Defendants are not part of the Wisconsin Legislature and cannot exercise legislative power. Because the United States Constitution reserves for the Wisconsin Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict

37

with existing legislation.

104. Section I details three separate instances where Defendants violated the Wisconsin Election Code. First, WEC May 23, 2020 "guidance" on the treatment of "indefinitely confined" voters, who are exempt from Wisconsin's photo ID requirement for absentee ballot application, that directly contravened the express requirement in Wisconsin Election Code that clerks "shall" remove an allegedly "indefinitely confined" voter if the clerk has "reliable information" that that voter is not, or is no longer, "indefinitely confined."

105. Second, the WEC's October 18, 2016 guidance directed clerks to violate the express requirements of Wisconsin Statutes § 6.87(6)(d), which states "[i]f a certificate is missing the address of a witness the ballot may not be counted," when it directed clerks to fill in missing information on absentee ballot envelopes.

106. Third, WEC and Wisconsin election officials violated Wisconsin Election Code, or acted *ultra vires*, insofar as they filled in missing witness or voter information on absentee ballots and permitted voters to cure ballots without statutory authorization. Section II provides expert witness testimony quantifying the number of illegal or ineligible ballots that were counted, and lawful ballots that were not, as a result of these and Defendants' other violations.

107. A report from Dr. William Briggs, shows that there were approximately 29,594 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

108. Evidence compiled by Matt Braynard, Exh. 3, using the National Change of Address ("NCOA") Database shows that 6,207 Wisconsin voters in the 2020 General Election moved out-

of-state prior to voting, and therefore were ineligible.  Mr. Braynard also identified 765 Wisconsin voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election.  The merged number is 6,966 ineligible voters whose votes must be removed from the total for the 2020 General Election.

109.  Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted.  Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

110.  Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Wisconsin should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Governor Evers and Other Defendants Violated The Equal Protection Clause of the Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C. § 1983

### Invalid Enactment of Regulations & Disparate Treatment of Absentee vs. Mail-In Ballots

111.  Plaintiff refers to and incorporate by reference each of the prior paragraphs of this Amended Complaint as though the same were repeated at length herein.

112.  The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the

39

franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

113. The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

114. The disparate treatment of Wisconsin voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

115. In statewide and federal elections conducted in the State of Wisconsin, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiff, in having the election laws enforced fairly and uniformly.

116. As set forth in Section I above, Defendants failed to comply with the requirements

40

of the Wisconsin Election Code and thereby diluted the lawful ballots of the Plaintiff and of other Wisconsin voters and electors in violation of the United States Constitution guarantee of Equal Protection. Further, Defendants enacted regulations, or issued guidance, that had the intent and effect of favoring one class of voters – Democratic absentee voters – over Republican voters. Further, all of these invalidly enacted rules by Defendant Wisconsin executive and administrative agencies, had the intent and effect of eliminating protections against voter fraud, and thereby enabled and facilitated the counting of fraudulent, unlawful and ineligible votes, which were quantified in Section II. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

117. Defendants have acted and will continue to act under color of state law to violate Plaintiff's right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution. Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of the Wisconsin Constitution, and the Wisconsin Election Code.

118. Plaintiff seeks declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

119. The Briggs analysis identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving

41

absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

120. In addition, Plaintiff asks this Court to order that no ballot processed by a counting board in the Wisconsin Counties can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted. Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Wisconsin law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

**COUNT III**

**Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983**

**Denial of Due Process On The Right to Vote**

122. Plaintiff refers to and incorporate by reference each of the prior paragraphs of this Amended Complaint as though the same were repeated at length herein.

123. The right of qualified citizens to vote in a state election involving federal

candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper,* 383 U.S. at 665. *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections."). Indeed, ever since the Slaughter-House Cases, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges and Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to vote in federal elections. *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)). *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

124. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

125. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

43

"Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes debase and dilute the weight of each validly cast vote. *Reynolds*, 377 U.S. at 555.

126. The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

127. The right to an honest count is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States. *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

128. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("the right

of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

129. Section I details the Defendants violations of the Wisconsin Election Code. Section II provides estimates of the number of fraudulent, illegal or ineligible votes counted, and demonstrates that this number is many times larger than Biden's margin of victory.

130. Plaintiff seeks declaratory and injunctive relief enjoining Defendants from certifying the results of the General Election, or in the alternative, conduct a recount or recanvas in which they allow a reasonable number of challengers to meaningfully observe the conduct of the Wisconsin Board of State Canvassers and the Wisconsin county Boards of Canvassers and that these canvassing boards exercise their duty and authority under Wisconsin law, which forbids certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

## COUNT IV

### Wide-Spread Ballot Fraud

131. Plaintiff realleges all preceding paragraphs as if fully set forth herein.

132. The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

133. Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

45

134.   The results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Wisconsin's vote tallies to be inflated by somewhere between 3 and 5.6 percentage points. Statistical estimating yields that in Wisconsin, the best estimate of the number of impacted votes is 181,440. *Id.*

135.   The Reports cited above show a total amount of illegal votes identified that amount to 318,012 or over 15 times the margin by which candidate Biden leads President Trump in the state of Wisconsin.

136.   The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See*, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

137.   Plaintiff has no adequate remedy at law. Plaintiff contests the results of Wisconsin's 2020 General Election because it is fundamentally corrupted by fraud. Defendants intentionally violated multiple provisions of the Wisconsin Election Code to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

## PRAYER FOR RELIEF

138.  Accordingly, Plaintiff seeks temporary restraining order instructing Defendants to de-certify the results of the General Election for the Office of President.

139.  Alternatively, Plaintiff seeks an order instructing the Defendants to certify the results of the General Election for Office of the President in favor of President Donald Trump.

140.  In the alternative, Plaintiff seeks a temporary restraining order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Wisconsin Election Code, including, without limitation, the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Wisconsin Election Code violations set forth in Section II of this Amended Complaint.

141.  Order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Wisconsin and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Wisconsin cannot reasonably rely on the results of the

mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Wisconsin should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Wisconsin should be directed to vote for President Donald Trump.

142.  For these reasons, Plaintiff asks this Court to enter a judgment in his favor and provide the following emergency relief:

1.  An order directing Governor Evers and the Wisconsin Elections Commission to de-certify the election results;

2.  An order enjoining Governor Evers from transmitting the currently certified election results the Electoral College;

3.  An order requiring Governor Evers to transmit certified election results that state that President Donald Trump is the winner of the election;

4.  An immediate temporary restraining order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs, ballot applications, ballot return envelopes, ballot images, paper ballots, and all "election materials" referenced in Wisconsin Statutes § 9.01(1)(b)11. related to the November 3, 2020 Wisconsin election for forensic audit and inspection by the Plaintiff;

5.  An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

48

6.  A declaratory judgment declaring that Wisconsin's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

7.  A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

8.  A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

9.  A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

10. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

11. Immediate production of 48 hours of security camera recordings of all voting central count facilities and processes in Milwaukee and Dane Counties for November 3, 2020 and November 4, 2020.

12. Plaintiff further requests the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and his reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

49

Respectfully submitted, this 3rd day of December, 2020.

                          LEAD COUNSEL FOR PLAINTIFF

                          /s Sidney Powell**
                          Sidney Powell PC
                          Texas Bar No. 16209700
                          (517) 763-7499
                          sidney@federalappeals.com

                          Of Counsel:

                          Julia Z. Haller (D.C. Bar No. 466921) **
                          Brandon Johnson (D.C. 491730) **
                          Emily P. Newman (Virginia Bar No. 84265) **

                          2911 Turtle Creek Blvd.
                          Suite 300
                          Dallas, Texas 75219

                          Howard Kleinhendler
                          New York Bar No. 2657120
                          Howard Kleinhendler Esquire
                          369 Lexington Avenue, 12th Floor
                          New York, New York 10017
                          (917) 793-1188
                          howard@kleinhendler.com

                          L. Lin Wood **
                          GA Bar No. 774588
                          L. LIN WOOD, P.C.
                          P.O. Box 52584
                          Atlanta, GA 30305-0584
                          Telephone: (404) 891-1402

                          ** Applications for admission forthcoming

Local Counsel for Plaintiff

Michael D. Dean
Wis. Bar No.01019171
P.O. Box 2545
Brookfield, WI 53008
(262) 798-8044
miked@michaelddeanllc.com


Daniel J. Eastman
Wis. Bar No.1011433
P.O. Box 158
Mequon, Wisconsin 53092
(414) 881-9383
daneastman@me.com