## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER, and DAREN WADE RUBINGH, | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 2:20-CV-13134 |
| GRETCHEN WHITMER, in her official capacity as Governor of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State, and MICHIGAN BOARD OF STATE CANVASSERS. | Hon. Linda V. Parker |
| Defendants. | |
| and | |
| DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY, | |
| Intervenor-Defendants. | |

## INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Intervenor-Defendants DNC Services Corporation/Democratic National Committee and Michigan Democratic Party hereby move to dismiss Plaintiffs' first amended complaint in its entirety on the following grounds: (1) Plaintiffs' action is

moot; (2) Plaintiffs' action is barred by laches; (3) doctrines of federalism and comity favor abstention; (4) Plaintiffs' claims are barred by the Eleventh Amendment; (5) Plaintiffs lack standing; and (6) Plaintiffs have failed to state viable claims on which relief can be granted.

Pursuant to Local Rule 7.1(a), counsel for Intervenor-Defendants sought concurrence in writing setting forth in detail the bases for this motion and inviting a conference to discuss the same; however, counsel conveyed that it could not respond to the request until after the interlocutory appeals are decided, thereby making this motion necessary.

WHEREFORE, for the reasons stated more fully in the accompanying brief, Intervenor-Defendants respectfully request that the Court dismiss this action in its entirety, and award any other relief that the Court deems appropriate under the circumstances.

Dated: December 22, 2020.               Respectfully submitted,

/s/ *Scott R. Eldridge*
Scott R. Eldridge (P66452)
MILLER CANFIELD
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
Telephone: (517) 483-4918
eldridge@millercanfield.com

Mary Ellen Gurewitz (P25724)
CUMMINGS & CUMMINGS
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
Telephone: (248) 733-3405
maryellen@cummingslawpllc.com

Marc E. Elias (DC #442007)
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com

William B. Stafford (WA #39849)
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
wstafford@perkinscoie.com

Seth P. Waxman (DC #257337)
Brian M. Boynton (DC #483187)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 663-6000
seth.waxman@wilmerhale.com

brian.boynton@wilmerhale.com

John F. Walsh (CO #16642)
WILMER CUTLER PICKERING HALE
AND DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, Colorado 80202
Telephone: (720) 274-3154
john.walsh@wilmerhale.com

*Counsel for Intervenor-Defendants DNC
Services Corporation/Democratic
National Committee and Michigan
Democratic Party*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER, and DAREN WADE RUBINGH, | |
| Plaintiffs, | CIVIL ACTION |
| v. | Case No. 2:20-CV-13134 |
| GRETCHEN WHITMER, in her official capacity as Governor of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State, and MICHIGAN BOARD OF STATE CANVASSERS. | Hon. Linda V. Parker |
| Defendants. | |
| and | |
| DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY, | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.........................................................ii

CONTROLLING AND APPROPRIATE AUTHORITY .......................................iii

I.      INTRODUCTION .........................................................................................1

II.     BACKGROUND ............................................................................................2

III.    LEGAL STANDARD .....................................................................................6

IV.     ARGUMENT...................................................................................................7

   A.  Plaintiffs' action is moot.............................................................................7

   B.  Plaintiffs' action is barred by laches..........................................................8

   C.  Principles of federalism and comity strongly favor abstention.....................9

   D.  The Eleventh Amendment bars Plaintiffs' claims......................................12

   E.  Plaintiffs lack standing. ...........................................................................13

   F.  Plaintiffs fail to state a claim on which relief can be granted. ..................15

       1.  Plaintiffs' claims are not plausible....................................................15

       2.  Plaintiffs have not pleaded a viable equal protection claim. ..............18

       3.  Plaintiffs have not pleaded a due process claim. ...............................19

       4.  Plaintiffs have not stated an Elections and Electors Clause claim. ..........20

       5.  Plaintiffs' claim under the Michigan Constitution and Michigan Election Code fails a matter of law. ..........................................................22

   G.  Plaintiffs are not entitled to the relief they seek. .......................................23

V.      CONCLUSION..............................................................................................24

## STATEMENT OF ISSUES PRESENTED

I.      Whether Plaintiffs' action is moot.

        Intervenor-Defendants' Answer:  Yes.

II.     Whether Plaintiffs' action is barred by laches.

        Intervenor-Defendants' Answer:  Yes.

III.    Whether principles of federalism and comity require this Court to abstain.

        Intervenor-Defendants' Answer:  Yes.

IV.     Whether the Eleventh Amendment bars Plaintiffs' claims.

        Intervenor-Defendants' Answer:  Yes.

V.      Whether Plaintiffs lack Article III standing and prudential standing.

        Intervenor-Defendants' Answer:  Yes.

VI.     Whether Plaintiffs fail to state a claim on which relief can be granted where Plaintiffs' claims are not plausible; Plaintiffs have not pleaded a viable equal protection claim; Plaintiffs have not pleaded a viable due process claim; Plaintiff have not pleaded a viable claim under the Elections and Electors Clauses; and Plaintiffs' claim under the Michigan Constitution and Michigan Election Code fails as a matter of law.

        Intervenor-Defendants' Answer:  Yes.

# CONTROLLING AND APPROPRIATE AUTHORITY

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)

*Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984)

*Lance v. Coffman*, 549 U.S. 437 (2007) (per curiam)

*Costantino v. City of Detroit*, No. 20-014780-AW (Mich. Cir. Ct. Nov. 13, 2020)

*Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020)

*Donald J. Trump for President, Inc. v. Secretary of Commonwealth*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020)

## I.    INTRODUCTION

On December 7, 2020, the Court denied Plaintiffs' motion for preliminary injunctive relief, finding that "Plaintiffs are far from likely to succeed in this matter." (ECF No. 62 at Pg ID 3329.) As the Court noted, "this lawsuit seems to be less about achieving the relief Plaintiffs seek . . . and more about the impact of their allegations on People's faith in the democratic process and their trust in our government." (*Id.*) Unfortunately, the Court's concerns about the purpose of this lawsuit have only become more warranted over the past few weeks.

The people have spoken, the results have been certified, and the presidential electors' votes have been cast. As the Court has already found, Plaintiffs' claims fail for multiple, independent reasons. They are baseless as a matter of law. They are premised on specious allegations that are not well-pleaded. The relief they seek is beyond the power of a federal court of limited jurisdiction faithfully serving its circumscribed role in our democratic system of government. And the action is even more moot now than it was when the Court last considered it.

Courts do not decide who wins elections in a democracy; voters do. And they have. But Plaintiffs refuse to accept reality and dismiss this action themselves. Plaintiffs instead continue to "ask this Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters." (*Id.* at Pg ID 3330.) The Court already explained that "[t]his, the Court cannot, and will

not, do." (*Id*.) Plaintiffs apparently did not get the message. Intervenors must respectfully and regrettably ask the Court to repeat it. This Court has already denied Plaintiffs' motion for emergency relief. It should now dismiss this lawsuit with prejudice and close the case.

## II.   BACKGROUND

More than 5.5 million Michiganders cast ballots in November's presidential election. It was not close. The Board of State Canvassers ("State Board") certified that President-elect Joe Biden prevailed over President Donald Trump by 154,188 votes. (*See* ECF No. 6 ¶ 31.) But that has not stopped the Trump Campaign and its allies from repeatedly filing meritless lawsuits, including this one.

Plaintiffs initiated this lawsuit three weeks after election day and after the State Board certified the election for President-elect Biden. *See id*. Plaintiffs' complaint is hard to follow, but its basic gist is that Michigan election officials engaged in a massive, shadowy, transnational conspiracy to manufacture "hundreds of thousands of illegal, ineligible, duplicate, or purely fictitious ballots in the State of Michigan" to elect Biden. *Id.* ¶¶ 2–3, 17. The complaint purports to "incorporate[]" by reference" the entirety of other state court complaints not before this Court, *id.* ¶¶ 81–100, and is riddled with conclusory allegations as to the fraudulent manufacturing of ballots to "rig" the election for Biden, *id.* ¶¶ 84, 112. Plaintiffs' complaint is also "supported" by "expert" declarations written for other lawsuits,

concerning entirely different issues, in different states. *See id.* ¶¶ 8, 10, 157–58.

From these incredible allegations, Plaintiffs assert various causes of action under the U.S. and Michigan Constitutions as well as assorted provisions of Michigan's Election Code. Among other requests, Plaintiffs ask this Court to order Defendants to "decertify" the election and affirmatively certify results "in favor of President Donald Trump." *Id.* ¶¶ 229–30, 233.

On December 7, 2020, this Court issued an order denying Plaintiffs' emergency motion for declaratory, emergency, and permanent injunctive relief for many reasons, all relevant to this motion. In particular, the Court concluded that "the Eleventh Amendment bars Plaintiffs' claims against Defendants," (ECF No. 62 at Pg ID 3307); that "this matter is moot," (*id.*); that "Plaintiffs' delay results in their claims being barred by laches," (*id.* at Pg ID 3313); that "abstention is appropriate," (*id.* at Pg ID 3317); that Plaintiffs lack standing to pursue their equal protection claim and their Elections Clause and Electors Clause claims (*id.* at Pg ID 3319, 3324); and that Plaintiffs are unlikely to succeed on the merits of their claims at least in part because their legal theories do not establish claims under the Elections Clause, Electors Clause, or Equal Protection Clause (*id.* at Pg ID 3325, 3328).

Despite that Plaintiffs' claims were roundly rejected by this Court, they not only noticed an interlocutory appeal of the denial of their emergency motion—which they initially directed to the wrong circuit and upon which they have taken no further

action (ECF Nos. 64, 65, 67)—but also filed a petition for certiorari in the U.S. Supreme Court before judgment seeking emergency mandamus relief under 28 U.S.C. § 1651. (Attached as Ex. 1.) The U.S. Supreme Court has taken no action.

In the meantime, the post-election process continued to run its course. Most significantly, on December 14, 2020, Michigan's presidential electors met and formally cast their electoral votes for President-elect Biden.[1] This was the final step in Michigan's electoral process, and the 2020 presidential election is now complete.

Notably, none of the extensive litigation over or intense scrutiny on Michigan's election processes in the weeks since election day has unearthed any credible evidence that the election was affected by fraud. Rather, every single request for relief (not voluntarily dismissed) has been rejected thus far.[2] *See Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ, slip op. at 5 (Mich. Ct. Cl. Nov. 6, 2020) (ECF No. 14-6) (denying Trump Campaign's emergency motion and noting "problems with the factual and evidentiary record"); *Donald J. Trump*

---

[1] This is undeniably a matter of common knowledge of which this Court may take judicial notice pursuant to Federal Rule of Evidence 201. *See* Fed. R. Evid. 201 (providing that a court may take judicial notice of a fact that is either "(1) generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[2] "Courts may [] take judicial notice of public records" like court opinions when ruling on motions to dismiss. *Geiling v. Wirt Fin. Servs., Inc.*, No. 14-11027, 2014 WL 8473822, at *6 (E.D. Mich. Dec. 31, 2014) (collecting cases), *aff'd*, No. 15-1393, 2017 WL 6945559 (6th Cir. June 8, 2017).

*for President, Inc. v. Benson*, No. 355378, slip op. at 1 (Mich. Ct. App. Dec. 4, 2020) (attached as Ex. 2) (denying leave to appeal); *Donald J. Trump for President, Inc. v. Benson*, No. 162320, slip op. at 1 (Mich. Dec. 11, 2020) (attached as Ex. 3) (same); *Stoddard v. City Election Comm'n*, No. 20-014604-CZ, slip op. at 4 (Mich. Cir. Ct. Nov. 6, 2020) (ECF No. 14-10) (denying motion for injunctive relief and finding "it is mere speculation by plaintiffs that hundreds or thousands of ballots have, in fact, been changed and presumably falsified"); *Costantino v. City of Detroit*, No. 20-014780-AW, slip op. at 13 (Mich. Cir. Ct. Nov. 13, 2020) (ECF No. 14-12) ("It would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers."); *Costantino v. City of Detroit*, No. 355443, slip op. at 1 (Mich. Ct. App. Nov. 16, 2020) (ECF No. 14-13) (denying leave to appeal); *Costantino v. City of Detroit*, No. 162245, slip op. at 1 (Mich. Nov. 23, 2020) (ECF No. 14-14) (same); *Johnson v. Benson*, No. 162286, slip op. at 1 (Mich. Dec. 9, 2020) (attached as Ex. 4) (denying petition for extraordinary writs and declaratory relief).[3]

---

[3] Likewise, every federal court challenge to Biden's victory has been rejected. *See, e.g.*, *Donald J. Trump for President, Inc. v. Sec'y of Commonwealth*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020) (affirming refusal to enjoin certification of Pennsylvania's election results); *Bognet v. Sec'y of Commonwealth*, 980 F.3d 336 (3d Cir. 2020) (affirming denial of preliminary relief based on claim of vote dilution by purportedly illegal ballots); *Wood v. Raffensperger*, No. 1:20-cv-04561-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020), *aff'd*, No. 20-14418 (11th Cir. Dec. 5, 2020) (rejecting motion to enjoin Georgia from certifying election results).

## III. LEGAL STANDARD

"[W]here subject matter jurisdiction is challenged under Rule 12(b)(1), . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court presumes that all well-pleaded material allegations in the complaint are true, *see Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)). Courts need not accept as true legal conclusions or unwarranted factual inferences. *See Total Benefits Plan.*, 552 F.3d at 434. Where, as here, a complaint expressly alleges "fraud," Rule 9(b) requires pleading with "particularity." This pleading standard requires "[a]t a minimum" that allegations of fraud "specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (alteration in original) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

# IV.   ARGUMENT

## A.   Plaintiffs' action is moot.

As this Court put it two weeks ago, "this ship has sailed." (ECF No. 62 at Pg ID 3307.) At this point, the ship has crossed the horizon and passed from sight.

"The case or controversy requirement in Article III of the Constitution determines the power of the federal courts to entertain a suit." *Hanrahan v. Mohr*, 905 F.3d 947, 960 (6th Cir. 2018) (quoting *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 429 (6th Cir. 2013)). A case becomes "moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). In other words, "[m]ootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief." *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986).

If "[t]his lawsuit was moot well before it was filed on November 25" (ECF No. 62 at Pg ID 3307), it is certainly moot now. Not only has nothing occurred to disturb the series of settled events and passed deadlines that this Court laid out on December 7 (*id.* at Pg ID 3308–09), but since then, on December 14, Michigan's presidential electors met and formally cast their electoral votes for President-elect Biden. To the extent there was ever any possibility that this Court could grant Plaintiffs' requested relief (there was not), there no longer is. There is no question

that "[w]hat relief the Court could grant Plaintiffs is no longer available." (*Id.* at Pg ID 3308.) As this Court has already concluded, "Plaintiffs' requested relief concerning the 2020 General Election is moot." (*Id.* at Pg ID 3310.) That conclusion alone is fatal to Plaintiffs' lawsuit and reason alone to dismiss.

## B.     Plaintiffs' action is barred by laches.

This Court also found two weeks ago that "Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes." (ECF No. 62 at Pg ID 3313.) "The Court conclude[d] that Plaintiffs' delay results in their claims being barred by laches." (*Id.*) That conclusion, too, requires dismissal.

"In this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* at 473 (quoting *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)). Both requirements are easily met here, as this Court already found and Intervenor-Defendants need not repeat. (ECF No. 62 at Pg ID 3311–13.)

Ultimately, Plaintiffs should not be permitted to lie in wait to gauge election results and file suit only after their preferred candidate does not prevail, let alone

after those election results are certified. "[T]he failure to require prompt pre-election action . . . as a prerequisite to post-election relief may permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) (en banc) (quoting *Toney v. White*, 476 F.2d 203, 209 (5th Cir. 1973)). If Plaintiffs really believed that Dominion Voting Systems was engaged in scheme to rig elections that dated back to "a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez" (ECF No. 6 ¶ 6), they should have filed suit *before* the election. They certainly should not have waited until three weeks *after* the election.

## C. Principles of federalism and comity strongly favor abstention.

The relief Plaintiffs seek calls for an extraordinary intrusion on state sovereignty by a federal court. This Court has already recognized that "abstention is appropriate under the *Colorado River* doctrine." (ECF No. 62 at Pg ID 3317.)

The *Pullman* and *Buford* abstention doctrines also counsel that the claims Plaintiffs raise should be addressed in state court. *Pullman* recognizes that "federal courts should avoid the unnecessary resolution of federal constitutional issues and that state courts provide the authoritative adjudication of questions of state law." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985)); *see also R.R. Comm'n v. Pullman Co.*, 312

U.S. 496, 501 (1941). Under *Pullman*, the court should abstain if (1) "state law is unclear," and (2) "a clarification of that law would preclude the need to adjudicate the federal question." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). Both requirements are met here.

*First*, Plaintiffs' federal constitutional claims focus on questions of state law. The complaint is premised on multiple alleged "violations of the Michigan Election Code," including provisions related to poll challengers, inspectors, and the counting of ballots. (ECF No. 6 ¶¶ 1, 208–28.) Whether such violations occurred is a question of state law that a state court can and should adjudicate.

*Second*, clarification of these state law issues would preclude the need to adjudicate the federal questions in this case. Indeed, if a state court concludes that election officials did not "deviate from the requirements of the Michigan Election Code," *id.* ¶ 179, Plaintiffs' Elections and Electors Clauses claim vanishes. Similarly, Plaintiffs' Equal Protection Clause and Due Process Clause claims are based on Defendants' alleged "fail[ure] to comply with the requirements of the Michigan Election Code," which Plaintiffs allege "diluted the[ir] lawful ballots." *Id.* ¶¶ 188, 205. Numerous other cases that allege near-identical instances of illegality and fraud—on which Plaintiffs' federal constitutional claims are premised—are pending in state court. *See supra* at 4–5. If these state courts definitively interpret Michigan law, there would be nothing left for this Court to decide. Allowing

Michigan courts to interpret these state law questions thus "may obviate the federal claims" and "eliminate the need to reach the federal question," and this Court should therefore abstain. *GTE N., Inc. v. Strand*, 209 F.3d 909, 921 (6th Cir. 2000).

Finally, Plaintiffs' claims are precluded under *Burford* abstention, which is appropriate, as here,

> where timely and adequate state-court review is available and (1) a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council*, 491 U.S. 350, 361 (1989)); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943). As Plaintiffs themselves note, the U.S. Constitution delegates *to the states* the responsibility for determining the "Manner" in which each appoints presidential electors. U.S. Const. art. I, § 4, cl. 1. Indeed, as Plaintiffs' complaint also notes, Michigan has an extensive Election Code that provides for an orderly certification of election results. Because the State has "primary authority over the administration of elections," *Hunter*, 635 F.3d at 232, abstention is proper—this case implicates an area where "the State's interests are paramount" and thus "would best be adjudicated in a state forum." *Caudill*, 301 F.3d at 660 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)).

**D.     The Eleventh Amendment bars Plaintiffs' claims.**

Likewise, this Court "conclude[d] that the Eleventh Amendment bars Plaintiffs' claims against Defendants." (ECF No. 62 at Pg ID 3307.)

As the Supreme Court explained in *Pennhurst State School & Hospital v. Halderman*, the Eleventh Amendment prohibits federal courts from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. 89, 106 (1984). This is true even when state law claims are styled as federal causes of action. *See, e.g.*, *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law").

Count IV, which alleges *only* violations of Michigan law, is indisputably barred under *Pennhurst*. The same is true of Plaintiffs' other claims, each of which, although cloaked in the garb of a federal cause of action, ultimately asks the Court to determine that state officials violated state law and compel state officials to do what Plaintiffs believe *Michigan* law requires. (*See* ECF No. 62 at Pg ID 3302–07.)

### E.    Plaintiffs lack standing.

As a final jurisdictional barrier to Plaintiffs' suit, this Court found that Plaintiffs lack standing to bring their constitutional claims. (*See* ECF No. 62 at Pg ID 3317–24.) To avoid dismissal on Article III grounds, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs fail to establish a sufficient injury in fact, and they lack prudential standing to bring Count I.

*First*, Plaintiffs do not allege harms sufficient to establish Article III standing on any of their claims. Plaintiffs do not allege that they were deprived of the right to vote; instead, they allege they are harmed by violations of Michigan law which "diluted" their votes. (ECF No. 6 ¶¶ 188, 205.) But this purported injury of vote-dilution-through-unlawful balloting has been repeatedly rejected as a viable basis for standing, and for good reason: any purported vote dilution somehow caused by counting allegedly improper votes would affect *all* Michigan voters and candidates, not just Plaintiffs, and therefore constitutes a generalized grievance insufficient for standing. *See Bognet*, 980 F.3d at 353–55 (rejecting identical theory for standing and explaining that "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause"); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-

1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (similar).

Plaintiffs also claim they have suffered harm as a result of alleged violations of the Elections and Electors Clauses, but that injury too "is precisely the kind of undifferentiated, generalized grievance about the conduct of government" insufficient for standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam); *accord Wood*, 2020 WL 6817513, at *5.

*Second*, Plaintiffs lack prudential standing to bring their Elections and Electors Clauses claim. "Even if an injury in fact is demonstrated, the usual rule"— applicable here—"is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiffs' Count I, by contrast, "rest[s] . . . on the legal rights or interests of third parties,'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004)—specifically, *the Michigan Legislature's* purported rights under the Elections and Electors Clauses. (*See* ECF No. 6 ¶ 179 (alleging "Defendants are not part of the Michigan Legislature and cannot exercise legislative power").) But Plaintiffs have no authority to assert the rights of the Michigan Legislature. *See Lance*, 549 U.S. at 442 (rejecting notion that "private citizens acting on their own behalf" can bring Elections Clause claim); *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (per curiam) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly."); *Bognet*, 980 F.3d at 349–50

(similar). "Absent a 'hindrance' to the [Legislature's] ability to defend its own rights, this prudential limitation on standing cannot be excused." *Corman*, 287 F. Supp. 3d at 572 (quoting *Kowalski*, 543 U.S. at 130). Plaintiffs have not attempted to identify such a hindrance and Count I should be dismissed on this additional ground.

**F.    Plaintiffs fail to state a claim on which relief can be granted.**

Even if this Court had jurisdiction to consider Plaintiffs' claims, their complaint should be dismissed under Rule 12(b)(6). Plaintiffs' ludicrous allegations of widespread fraud and malfeasance are the antithesis of plausible claims for relief.

**1.    Plaintiffs' claims are not plausible.**

Under the Federal Rules, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. While Rule 8 "does not require 'detailed factual allegations,' [] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). The shortcomings in Plaintiffs' complaint become even more apparent when considered through the lens of Rule 9(b), which demands Plaintiffs "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Plaintiffs' complaint does not satisfy the standards of Rule 8, much less Rule 9(b). The complaint suggests a massive, coordinated effort among election software systems, local election officials, and hostile foreign actors to perpetrate electoral

15

fraud and swing a presidential election. (*See, e.g.*, ECF No. 6 ¶ 112 (alleging an "interstate fraudulent scheme to rig the 2020 General Election for Joe Biden").) The Supreme Court has instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. It challenges both experience and common sense to accept Plaintiffs' overarching theory that widespread fraud occurred during the most scrutinized election in modern history, particularly based on the allegations advanced in the complaint.

Even a quick glance at these allegations reveals their utter lack of plausibility. For example, Plaintiffs cite as "[p]erhaps [their] most probative evidence" a witness's claim that she saw two vans arrive at TCF Center on November 4, which she assumed were for food but "never saw any food coming out of these vans." (ECF No. 6 ¶ 84.) The witness "noted the coincidence that 'Michigan had discovered over 100,000 more ballots—not even two hours after the last van left,'" which Plaintiffs conclude evidences an "illegal vote dump." *Id*. But though Plaintiffs would like to draw such an extraordinary inference, the witness did not see 100,000 ballots come out of the vans. (*See* ECF No. 6-5.) And seeing two vans in downtown Detroit does not render plausible a claim that those vans were brimming with fraudulent ballots.[4]

---

[4] Plaintiffs' allegations of fraud at TCF Center have already been rejected, including

The Court should not accept unwarranted factual inferences. *See Total Benefits Plan.*, 552 F.3d at 434; *see also United States v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) ("[I]nferences and implications are not what Civil Rule 9(b) requires. It demands specifics—at least if the claimant wishes to raise allegations of fraud.").

Similarly, Plaintiffs allege massive fraud in election software, explaining that their expert found a "dramatic shift in votes between the two major party candidates as the tabulation of the turnout increased, and more importantly, the change in voting share before and after 2 AM on November 4, 2020." (ECF No. 6 ¶ 142.) But even under the traditional pleading standard, "[w]here a complaint pleads facts that are 'merely *consistent* with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (emphasis added) (quoting *Twombly*, 550 U.S. at 557). Here, the sequencing of vote tabulation is instead consistent with the opposite inference—namely, the well-reported fact that absentee ballots, which could not be processed and counted in Michigan until election day, heavily favored President-elect Biden. Given that "obvious alternative explanation" for the facts alleged by Plaintiffs, *Twombly*, 550

---

in *Costantino*, the case Plaintiffs try to incorporate by reference. (*See* ECF No. 14-12 at Pg ID 2008 (describing an affidavit as "rife with speculation and guess-work about sinister motives"); *id.* at Pg ID 2009 ("[T]he allegations [in the affidavit] are simply not credible."); *id.* at Pg ID 2010 (affidavits contradicted by other individuals present); *id.* at Pg ID 2011 (affiant lacked knowledge of vote-counting process).)

U.S. at 567, this Court need not credit Plaintiffs' inferences and allegations.[5]

### 2.    Plaintiffs have not pleaded a viable equal protection claim.

Plaintiffs have not stated a cognizable equal protection claim. (*See* ECF No. 62 at Pg ID 3325–28.) Count II alleges that "Defendants['] fail[ure] to comply with the requirements of the Michigan Election Code [] diluted [their] lawful ballots." (ECF No. 6 ¶ 188.) This is not an equal protection injury. Vote dilution is a viable basis for federal claims only in certain contexts, such as when laws structurally devalue one community's votes over another's. *See, e.g.*, *Bognet*, 980 F.3d at 355 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently."). But Plaintiffs' "conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 354; *see also Wood*, 2020 WL 6817513, at *8–10 (concluding that vote-dilution injury is not "cognizable in the equal protection framework"). Indeed, "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-

---

[5] Far from supporting the complaint, the attached exhibits only prove this point, and also make conclusory and implausible allegations. They include an anonymous declaration claiming that the Dominion voting system—which has been vetted by both the federal and dozens of state governments—was "certainly compromised by rogue actors, such as Iran and China" (ECF No. 6-25 ¶ 21), and another anonymous declaration alleging, without factual basis, that "the vote counting was abruptly stopped in five states using Dominion software" (ECF No. 6-1 ¶ 26).

protection problem, then it would transform every violation of state election law . . .
into a potential federal equal-protection claim.'" *Bognet*, 980 F.3d at 355 (quoting
*Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL
5997680 at *45–46 (W.D. Pa. Oct. 10, 2020)).

Plaintiffs also briefly insinuate an equal protection claim by alleging that
Defendants "violate[d] Plaintiffs' right to be present and have actual observation and
access to the electoral process" (ECF No. 6 ¶ 193), but this too lacks merit. Courts
have repeatedly held "there is no individual constitutional right to serve as a poll
watcher." *Boockvar*, 2020 WL 5997680, at *7 (quoting *Pa. Democratic Party v.
Boockvar*, 238 A.3d 345, 385 (Pa. 2020)). Plaintiffs cite no authority to the contrary.

### 3.   Plaintiffs have not pleaded a due process claim.

With Count III, Plaintiffs attempt to convert their purported violations of
Michigan's Election Code into a due process violation, once again alleging that these
violations of state law diluted their votes. (*See* ECF No. 6 ¶¶ 203–05.) But as
discussed *supra* at 18–19, vote dilution is a context-specific theory of constitutional
harm premised on the Equal Protection Clause, *not* the Due Process Clause, and at
any rate, Plaintiffs have failed to plead a cognizable vote-dilution claim.

Even if this Court construed Plaintiffs' allegations as attempting to state a
"fundamental fairness" due process claim, the complaint would still fall short. "The
Constitution is not an election fraud statute," *Minn. Voters All. v. Ritchie*, 720 F.3d

1029, 1031 (8th Cir. 2013), and it "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). Even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) (quoting *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987)). As the Ninth Circuit has explained,

> [A] court will strike down an election on substantive due process grounds if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures.

*Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998). In other words, the sort of unconstitutional irregularities that courts have entertained under the Due Process Clause consist of widescale disenfranchisement. But Plaintiffs' complaint does not allege disenfranchisement at all. To the contrary, it is *Plaintiffs* who seek to negate the votes cast by millions of eligible Michigan voters. Count III therefore does not state a due process claim and must be dismissed.

### 4. Plaintiffs have not stated an Elections and Electors Clause claim.

Count I alleges that Defendants "fail[ed] to follow the requirements of the Michigan Election Code." (ECF No. 6 ¶ 180.) This is not a violation of the Elections and Electors Clauses; it is simply not the case, as Plaintiffs suggest, that any deviation from statutory election procedures automatically constitutes a violation of

these Clauses. (*See* ECF No. 62 at Pg ID 3324–25.)

Indeed, the distinction between an *actual* federal claim under the Elections and Electors Clauses and a state law claim masquerading as a federal claim (like Count I) becomes clear after examining other cases brought under these Clauses. In *Cook v. Gralike*, for example, the Supreme Court struck down a Missouri law mandating a particular ballot designation for any congressional candidate who refused to commit to term limits after concluding that such a statute constituted a "'regulation' of congressional elections" under the Elections Clause. 531 U.S. 510, 525–26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1). And in *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, the Supreme Court upheld a law that delegated the redistricting process to an independent commission after reaffirming that "the Legislature" as used in the Elections Clause includes "the State's lawmaking processes." 576 U.S. 787, 824 (2015). In these cases, the task of federal courts was to measure state laws against *federal* mandates set out under the Elections Clause—in the former, what is a "regulation"; in the latter, who is "the Legislature." No such federal question is posed here. Instead, the only issue is whether Defendants followed Michigan's Election Code. Count I, like Plaintiffs' other claims, is premised solely on violations of state law. It does not raise an Elections and Electors Clauses claim and should therefore be dismissed.

**5.      Plaintiffs' claim under the Michigan Constitution and Michigan Election Code fails a matter of law.**

Count IV of Plaintiffs' complaint alleges that Defendants violated several provisions of Michigan's Election Code, primarily related to the rights of election challengers and inspectors, which they then assert gives them the right to conduct a free-wheeling audit and "void[] the election" under Article II, section 4 of the Michigan Constitution. (ECF No. 6 ¶¶ 208–28.)[6]

But Plaintiffs omit essential text from the constitutional provision they seek to vindicate, which states that Michigan voters have the right to an audit only "*in such a manner as prescribed by law*." Mich. Const. art. II, § 4(1)(h) (emphasis added). Since passing that constitutional amendment in 2018, Michigan has indeed implemented procedures, under Michigan law, for the Secretary of State to conduct an audit after an election. *See* Mich. Comp. Laws § 168.31a. Indeed, the Secretary has confirmed that the State *will* conduct an audit of the 2020 general election, as Michigan law requires[7]—and the *Costantino* court denied a motion seeking an audit

---

[6] For this claim, Plaintiffs rely on the *Costantino* complaint, which they seek to "incorporate[] by reference." (ECF No. 6 ¶ 81.) Plaintiffs place entire allegations from *Costantino* in their own Complaint even though *Costantino*'s claims have been found unlikely to succeed, and two appeals of that ruling have been rejected. It hardly needs stating Plaintiffs cannot assert injuries of parties not before this Court.

[7] *See Statement from Secretary of State Jocelyn Benson on Planned Audits to Follow Certification of the Nov. 3, 2020, General Election*, Mich. Sec'y of State (Nov. 19, 2020),      https://www.michigan.gov/documents/sos/SOS_Sstatement_on_Audits_

of Wayne County's returns for this very reason. *See Costantino v. City of Detroit*, No. 20-014780-AW, slip op. at 5 (Mich. Cir. Ct. Dec. 8, 2020) (attached as Ex. 5). Plaintiffs are entitled to nothing more under the state's constitution or law. Indeed, it is Plaintiffs' request for an extralegal audit and order "voiding the election" that would rewrite the statutory and constitutional provisions under which they purport to bring this claim. (ECF No. 6 ¶ 228.) Count IV should therefore be dismissed.

**G.    Plaintiffs are not entitled to the relief they seek.**

Lastly, rather than *remedying* a constitutional violation, Plaintiffs' requested relief would *create* one. No court has ever done what Plaintiffs ask this Court to do—throw out the election results, discard 5.5 million votes, and declare the losing candidate the victor by judicial proclamation. The Court already declined Plaintiffs' invitation "to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters" (ECF No. 62 at Pg ID 3330), standing in good company with other courts that have rejected lawsuits advancing similar— and similarly spurious—attacks on our democratic system. *See, e.g.*, *Wood*, 2020 WL 6817513, at *13 ("To interfere with the result of an election that has already concluded would be unprecedented and harm the public in countless ways."); *Feehan v. Wis. Elections Comm'n*, No. 20-cv-1771-pp, 2020 WL 7250219, at *1

_____

708290_7.pdf. The Court can take judicial notice of this public document published on the Secretary of State's website. *See, e.g.*, *Geiling*, 2014 WL 8473822, at *6.

(E.D. Wis. Dec. 9, 2020) ("Federal judges do not appoint the president in this country. One wonders why the plaintiffs came to federal court and asked a federal judge to do so."), *appeal docketed*, No. 20-3448 (7th Cir. Dec. 16, 2020); *Bowyer v. Ducey*, No. CV-20-02321-PHX-DJH, 2020 WL 7238261, at *16 (D. Ariz. Dec. 9, 2020) ("Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They most certainly cannot be the basis for upending Arizona's 2020 General Election.").

As another federal court stated last month when the Trump Campaign sought an order prohibiting Pennsylvania's officials from certifying election results, "[t]his Court has been unable to find any case in which a plaintiff has sought such a drastic remedy in the contest of an election, in terms of the sheer volume of votes asked to be invalidated." *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *1 (M.D. Pa. Nov. 21, 2020), *aff'd*, No. 20-3371 (3d Cir. Nov. 27, 2020). America is a democracy. "Voters, not lawyers, choose the President. Ballots, not briefs, decide elections." *Boockvar*, 2020 WL 7012522 at *9.

## V.    CONCLUSION

For the foregoing reasons, Intervenor-Defendants respectfully request that the Court dismiss Plaintiffs' amended complaint.

Dated: December 22, 2020.          Respectfully submitted,


Marc E. Elias (DC #442007)              */s/ Scott R. Eldridge*
PERKINS COIE LLP                        Scott R. Eldridge (P66452)
700 Thirteenth Street NW, Suite 800     MILLER CANFIELD
Washington, DC 20005                    One Michigan Avenue, Suite 900
Telephone: (202) 654-6200               Lansing, Michigan 48933
melias@perkinscoie.com                  Telephone: (517) 483-4918
                                        eldridge@millercanfield.com

William B. Stafford (WA #39849)         Mary Ellen Gurewitz (P25724)
PERKINS COIE LLP                        CUMMINGS & CUMMINGS
1201 Third Avenue, Suite 4900           423 North Main Street, Suite 200
Seattle, Washington 98101               Royal Oak, Michigan 48067
Telephone: (206) 359-8000               Telephone: (248) 733-3405
wstafford@perkinscoie.com               maryellen@cummingslawpllc.com

John F. Walsh (CO #16642)               Seth P. Waxman (DC #257337)
WILMER CUTLER PICKERING                 Brian M. Boynton (DC #483187)
HALE AND DORR LLP                       WILMER CUTLER PICKERING
1225 Seventeenth Street, Suite 2600     HALE AND DORR LLP
Denver, Colorado 80202                  1875 Pennsylvania Avenue NW
Telephone: (720) 274-3154               Washington, D.C. 20006
john.walsh@wilmerhale.com               Telephone: (202) 663-6000
                                        seth.waxman@wilmerhale.com
                                        brian.boynton@wilmerhale.com


*Counsel for Intervenor-Defendants*


25

CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

IN RE: TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners.

**PETITION FOR WRIT OF CERTIORARI PURSUANT TO 28 U.S.C. § 1651(a), On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan**

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorney for Plaintiffs/Petitioners
    TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD,
    CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and
    DAREN WADE RUBINGH
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
Attorney for Defendants/Respondents
        Attorneys for GRETCHEN WHITMER, in her official capacity as Governor of
        the State of Michigan, JOCELYN BENSON, as Michigan Secretary of State
        and the Michigan BOARD OF STATE CANVASSERS
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
        Attorneys for Intervenor Defendant and
        Respondent City of Detroit
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
        Attorney for Robert Davis
46350 Grand River Ave.
Novi, MI 48374
248 568-9712 Email: aap43@hotmail.com
MARY ELLEN GUREWITZ
Attorney for Intervenor
        Democratic National Committee
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
        Attorney for Intervenor Defendant
        Michigan Democratic Party
Miller, Canfield,
One Michigan Avenue; Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
       Attorney for Michigan State Conference NAACP
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

ISSUES PRESENTED

I.  THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND UTTERLY IGNORGED THE DOZENS OF AFFIDAVITS, TESTIMONIALS, EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING PROCESS.

A. WHETHER THE PETITIONERS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO 42 USC§ 1983: (Count I) VIOLATION OF THE ELECTIONS AND ELECTORS CLAUSES; (Count II) VIOLATION OF THE FOURTEEN AMENDMENT EQUAL PROTECTION CLAUSE AND (Count III) DENIAL OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND A VIOLATION OF THE MICHIGAN ELECTION CODE?

B.  WHETHER THE PETITIONERS PRESENTED SUFFICIENT EVIDENCE WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST?

II.  WHETHER THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEMENTH AMENDMENT IMMUNITY?

III.  WHETHER THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE BARRED AS BEING MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY?

IV.  WHETHER THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS?

V.  WHETHER THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER WITHOUT ANY SHOWING OF PARALLEL STATE COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT?

VI.  WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE PETITIONERS CLEARLY HAVE STANDING?

VII.  WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?

PARTIES TO THE PROCEEDINGS AND STANDING

All parties appear in the caption of the case on the cover page.

Each of the following Plaintiffs/Petitioners are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and, John Earl Haggard, a resident of Charlevoix, Michigan;

Each of these Plaintiffs/Petitioners has standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors).As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." Carson v. Simon, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); see also McPherson v. Blacker, 146 U.S. 1, 27 (1892); Bush v. Palm Beach Cty. Canvassing Bd., 531 U.S. 70, 76 (2000) (per curiam). Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020. The certified results showed a plurality of 154,188 votes in favor of former Vice-President Joe Biden over President Trump.

Petitioner James Ritchard is a registered voter residing in Oceana County. He is  the Republican Party Chairman of Oceana County.  Petitioner James David Hooper is a registered voter residing in Wayne County. He is the Republican Party Chairman for the Wayne County Eleventh District. Petitioner Daren Wade Ribingh is a registered voter residing in Antrim County. He is the Republican Party Chairman of Antrim County.

Respondent Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.  Respondent Jocelyn Benson ("Secretary Benson") is named as a defendant/respondent in her official capacity as Michigan's Secretary of State. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. Respondent Michigan Board of State Canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide…." Michigan Election Officials' Manual, p. 4. See also MCL 168.841, etseq. On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

iii

TABLE OF CONTENTS

ISSUES PRESENTED………………………………………………   i

PARTIES TO THE PROCEEDINGS AND STANDING…………………  iii

TABLE OF CONTENTS…………………………………………..   iv

INDEX TO APPENDICES…………………………………………..   vi

TABLE OF AUTHORITIES…………………………………………   vii

INTRODUCTION………………………………………………………   1

OPINION BELOW…………………………………………………   3

JURISDICTION……………………………………………………   3

CONSTITUTIONAL AND STATUTORY PROVISIONS…………………5

STATEMENT OF THE CASE……………………………………………  6

REASONS IN SUPPORT OF GRANTING WRIT OF CERTIORARI   10

ARGUMENTS

   I.  THE TRIAL COURT ERRED WHEN IT DENIED THE
PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR
ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND
PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD
PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF
WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE
OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES
AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND
UTTERLY IGNORED THE DOZENS OF AFFIDAVITS, TESTIMONIALS,
EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE
PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING
PROCESS.                                         10

   A. THE PETITIONERS HAVE PRESENTED SUFFICIENT
EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO 42 USC§ 1983:
VIOLATION OF THE ELECTIONS AND ELECTORS CLAUSES;
VIOLATION OF THE 14TH AMENDMENT EQUAL PROTECTION CLAUSE
AND (Ct III) DENIAL OF THE 14th AMENDMENT DUE PROCESS
CLAUSE AND A VIOLATION OF THE MICHIGAN ELECTION CODE.  11

B.  THE PETITIONERS PRESENTED SUFFICIENT EVIDENCE
WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A
PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE
ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE
PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE
ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF
EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE
PUBLIC INTEREST.                                                    12

II.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE
PETITIONERS EMERGENCY MOTION AND REQUEST FOR
PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE
PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE
BARRED BY ELEMENTH AMENDMENT IMMUNITY.          14

III.  THE DISTRICT COURT ERREONEOUSLY HELD THAT THE
PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE
BARRED AS BEING MOOT WHEN THE ELECTORAL COLLEGE HAS YET
TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF
REQUESTED IS TIMELY.                                            15

IV.  THE DISTRICT COURT ERRED WHEN IT HELD THAT THE
PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES
WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE
ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND
THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE
FILING BY THE PETITIONERS.                                      16

V.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE
PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE
IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER
WITHOUT ANY SHOWING OF PARALLEL STATE COURT
PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF
SOUGHT.                                                              20

VI.  THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE
PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE
REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE
PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL
PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND
THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND
VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN
REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE
PETITIONERS CLEARLY HAVE STANDING.                        22

v

VII.   WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?                         24

CONCLUSION.............................................................   25

CERTIFICATE OF SERVICE..........................................

## INDEX TO APPENDICES

Lower Court King Et al vs. Whitmer Et al, Case No. 20-cv-13134, US District Court, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831)

|     |                                                              | Page No. |
| --- | ------------------------------------------------------------ | -------- |
| 1.  | Civil Docket For Case 20-cv-13134                            | 1-12     |
| 2.  | Exhibit 1   R. 6  Amended Complaint                          | 13-97    |
| 3.  | Exhibit 2   R. 6-1  Redacted Declaration                     | 98-105   |
| 4.  | Exhibit 3   R 6-2   Ballot Making Devices (BMD) Cannot Assure Will of Voters | 106-133 |
| 5   | Exhibit 4   R 6-3   Affidavits including Abbie Helminen, Andrew Mill, Anna Pennala, Etc.    234 pages | 134-367 |
| 6.  | Exhibit 5   R. 6-4  Constantino  v. City of Detroit          | 368-444  |
| 7.  | Exhibit 6   R. 6-5  Mellissa Carona                          | 445-447  |
| 8.  | Exhibit 7   R. 6-6  Jessica Connard                          | 448-451  |
| 9.  | Exhibit 8   R. 6-7  Matt Ciantar                             | 452-454  |
| 10. | Exhibit 9   R. 6-8  Dominion Voting System Contract          | 455-615  |
| 11. | Exhibit 10 R. 6-9  Texas-Preliminary Statement, Dominion Voting System | 616-618 |
| 12  | Exhibit 11 R. 6-10 Kayla Toma                                | 619-625  |
| 13. | Exhibit 12 R. 6-11 Monica Palmer                             | 626-631  |
| 14  | Exhibit 13 R. 6-12 William Hartmann                          | 626-631  |
| 15  | Exhibit 14 R. 6-13 Patrick Colbeck                           | 637-643  |
| 16  | Exhibit 15 R. 6-14 Patrick Colbeck                           | 644-645  |
| 17  | Exhibit 16 R  6-15  Carlos Malony, Member of Congress        | 646-647  |
| 18  | Exhibit 17 R. 6-16 US Senators Letter                        | 648-662  |

19      Exhibit 18 R. 6-17 Ann Cardozo                                663-667
20      Exhibit 19 R. 6-18 Cybersecurity Advisory, IRAN               668-677
21      Exhibit 20 R. 6-19 Joseph Oltrann                             678-683
22      Exhibit 21 R. 6-20 Marian Sheridan                            684-685
23      Exhibit 22 R. 6-21 Analysis of Surveys                        686-705
24      Exhibit 23  R. 6-22 Statistical Voting Analysis in the Michigan 2020
Presidential Election                                                 706-713
25      Exhibit 24 R. 6-23 Matt Braynard on Twitter                   714
26      Exhibit 25 R. 6-24 Russel James Ramsland, Jr.                 715-722
27      Exhibit 26 R. 6-25 Electronic Intelligence Analyst            723-739
28      Exhibit 27 R. 6-26 Ronald Watkins                             740-746
29      Exhibit 28 R. 6-27 Harri Hursti                               747-803
30      Exhibit 29 R. 6-28 Electronic J. Alex Halderman               804-913
31      Exhibit 30 R. 6-29 Michigan 2020 Voter Analysis
report, 11-17-20                                                      914-970
32      Exhibit 31 R. 6-30 Redacted Declaration                       971-974
33.     Exhibit 32 R. 7 Motion for Temporary Restraining Order  975-992
34.     Exhibit 33 R. 49  Reply to response Re: Emergency Motion for
Temporary Restraining Order                                           993-1025
35.     Exhibit 34 R. 49-1  Response to Stephen Ansolabehere's Comments
Regarding Absentee Ballots Across
Several States                                                        1026-1029
35.     Exhibit 35 R. 49-2 Expert report of Eric Quinnell, PhD  1030-1035
36.     Exhibit 36 R. 49-3 Expert Report of Russell  J.              1036-1068
37.     Exhibit 37 R. 49-4       Redacted Affidavit                   1069-1077
38.     Exhibit 38 R. 57 Supplemental Brief Re: Motion for Temporary
Restraining Order.                                                    1078-1082
39.     Exhibit 39 R. 57-1  Freehan v. Wisconsin
Elections Comm                                                        1083-1092
40.     Exhibit 40 R. 57-2   Amended Complaint Freehan vs. Wisconsin
Elections Committee                                                   1093-1143
41      Exhibit 41 R. 60  Response to Emergency Motion for Temporary
Restaining Order                                                      144-1146
42.     Exhibit 42 R. 62,  OPINION AND ORDER DENYING
PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY,
EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" PgID 3295-
3330                                                                  1147-1182
43.     Exhibit 42, R. 64 Notice of Appeal                            1183

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE**

<u>Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky.</u>, 354 F.3d
438, 445 (6th Cir. 2003) *aff'd sub nom.*                            22

<u>Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n</u>,
576 U.S. 787 (U.S. 2015)                                            6, 7

<u>Baker v. Carr</u>, 369 U.S. 186 (1962)                              20

<u>Barrow v. Detroit Mayor</u>, 290 Mich. App. 530 (2010                21

<u>Bush v. Gore</u>, 531 U.S. 98, 113 (2000)                          3, 5, 22

<u>Cheney v. U.S. Dist. Court</u>, 542 U .S. 367 (2004)                 4

<u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800,
808 (1976)                                                          16-18

<u>Ex Parte Republic of Peru</u>, 63 S.Ct. 793 (1943)                  4

<u>FTC v. Dean Foods Co.</u>, 86 S.Ct. 1738 (1966)                     5

<u>George v. Haslam</u>, 112 F.Supp.3d 700, 710 (M.D. Tenn. 2015)      21

<u>Graco Children's Products, Inc. v. Regalo International</u>, LLC,
77 F. Supp. 2d 660, 662 (E.D. Pa. 1999)                            18

*<u>In RocheEvaporated Milk Ass'n</u>*, 63 S.Ct. 938, 941 (1943),    5

<u>Hamlin v. Saugatuck Twp.</u>,299 Mich. App. 233 (2013)             20-21

<u>Harman v. Forssenius</u>, 380 U.S. 528 (1965)                      17, 25

<u>Louisville Bedding Co. v. Perfect Fit Indus</u>., 186 F. Supp. 2d 752
Dist. LEXIS 9599                                                    18

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992)            21

<u>McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky</u>.,
545 U.S. 844 (2005)                                                22

Meade v. Pension Appeals and Review Committee,
966 F.2d 190 (6th Cir. 1992)                                      15

Obama for America vs. Husted, 697 F.3d 423 (6th Cir. 2012)

Ohio Citizens for Responsible Energy, Inc. v. NRC,
479 U.S. 1312 (1986)                                             4

Reynolds v. Sims, 377 U.S. 533 (1964)                            20

Russell v. Lundergan-Grimes, 784 F.3d 1037 (6th Cir. 2015).      11, 14
Smiley v. Holm, 285 U.S. 355, 365(1932)                          3, 6-7

State of Texas v. Commonwealth of Pennsylvania Et al,
SCt Case No. 22O155                                              4

Toney v. White, 488 F.2d 310 (5th Cir. 1973)                     15

**STATUTES, RULES, CONSTITUTIONAL CITATIONS**

U.S. CONST. art. I, § 4 ("Elections Clause").                    5, 6

U.S. CONST. art. II, § 1 ("Electors Clause").                    6

U.S. Const. art. II, §1, cl. 2                                    5

**Fourteenth Amendment of the United States Constitution**       **5**

**28 U.S.C. § 1331**                                             **1**

28 U.S.C. §§ 2201and 2202                                        3

28 U.S.C. § 1391(b) &(c)                                         3

28 USC § 1254(1)                                                 4

28 U.S.C.§ 1367                                                  3

Article III, §2 of the United States Constitution                4

28 U.S.C. § 1651(a)                                              4

**28 U.S.C. § 1651(a)**                                         **5**

ix

42 U.S.C. §§ 1983 and 1988, and under MCL 168.86       6

**250 U.S.C. § 20701**       **1**

The Mich. Const., art.2, sec.4,       7

**MCL § 168.31a**       **25**

**MCL § 168.861**       **25**

**Michigan Election Code, MCL §§ 168.730-738,**       **23**

**MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).**       **23**

MCL § 168.730 & § 168.733(1)       6

MCL § 168.31(1)(a)       6

MCL 168.765a;       6

MCL 168.733       6

MCL §§ 168.42 & 168.43.       6

**MCL § 168.31a**       **21**

**MCL § 168.861**       **21**

**MCL §§ 168.730-738**       **1**

Rule 57, Fed. R. Civ. P.       3

CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, the Petitioners herein disclose the following:  There is no parent or publicly held company owning 10% or more of Respondent's stock or corporate interest.

x

## INTRODUCTION

Petitioners file this motion seeking immediate relief in anticipation of their petition for certiorari from the judgment of the District Court dated December 7, 2020, dismissing their case after denying their motion for a Temporary Restraining Order. (R.62). Petitioners filed a notice of appeal to the Sixth Circuit on December 8, 2020. (R.64). Because of the exigencies of time, they have not presented their case to the Sixth Circuit but, rather, will seek certiorari before judgment in the court of appeals pursuant to S. Ct. R. 11.  This motion for immediate preliminary relief seeks to maintain the status quo so that the passage of time and the actions of Respondents do not render the case moot, depriving this Court of the opportunity to resolve the weighty issues presented herein and Respondents of any possibility of obtaining meaningful relief.

Petitioners seek review of the district court's order denying any meaningful consideration of credible allegations of massive election fraud, multiple violations of the Michigan Election Code, see, e.g., MCL §§ 168.730-738 and Equal Protection Clause of the U.S. Constitution that occurred during the 2020 General Election throughout the State of Michigan. Petitioners presented substantial evidence consisting of sworn declarations of dozens of eyewitnesses and of experts identifying statistical anomalies and mathematical impossibilities, as well as a multistate, conspiracy, facilitated by foreign actors, including China and Iran, designed to deprive Petitioners to their rights to a fair and lawful election. The district court ignored it all. It failed to hear from a single witness or consider any expert and made findings without any examination of the record.

1

The scheme and artifice to defraud illegally and fraudulently manipulate the vote count to manufacture the "election" of Joe Biden as President of the United States. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run the vote tabulation by domestic and foreign actors for that very purpose. The petition detailed an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State with the cooperation and control of Michigan state election officials, including Respondents.

The multifaceted schemes and artifices to defraud implemented by Respondents and their collaborators resulted in the unlawful counting, or outright manufacturing, of hundreds of thousands of illegal, ineligible, duplicate, or purely fictitious ballots in Michigan. The same pattern of election fraud and vote-counting fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona, and Wisconsin. See Ex. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report"). Unlike some other petitions currently pending, this case presented an enormous amount of evidence in sworn statements and expert reports. According to the final certified tally in Michigan, Mr. Biden had a slim margin of 146,000 votes.

The election software and hardware from Dominion Voting Systems ("Dominion") used by the Michigan Board of State Canvassers was created to achieve election fraud. See Ex. 1, Redacted Declaration of

Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

The trial court did not examine or even comment on Petitioners' expert witnesses, including Russell James Ramsland, Jr. (Ex. 101, "Ramsland Affidavit"), who testified that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan. This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below). This, by itself, requires that the district court grant the declaratory and injunctive relief Petitioners sought. Andrew W. Appel, et al., "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

In addition to the Dominion computer fraud, Petitioners identified multiple means of "traditional" voting fraud and Michigan Election Code violations, supplemented by harassment, intimidation, discrimination, abuse, and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity, or fairness from the vote counting process. Systematic violations of the Michigan Election Code cast significant doubt on the results of the election and call for this Court to set aside the 2020 Michigan General Election and grant the declaratory and injunctive relief requested herein. King Et al vs. Whitmer Et al, No. 20-cv-13134, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831.

3

## OPINION BELOW

Judge Linda Parker, in the Eastern District of Michigan, without an evidentiary hearing or even oral argument, denied Petitioners "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief." The court held the Eleventh Amendment bars Petitioners claims against Respondents (R, 62, PgID, 3307); Petitioners claims for relief concerning the 2020 General Election were moot (R, 62, PgID, 3310); Petitioners claims were barred by laches as a result of "delay" (R,62, PgID, 3313); and abstention is appropriate under the *Colorado River* doctrine; (R, 62, PgID 3317). The Court further held that petitioners lacked standing. (R, 62, PgID 3324).

The Court stated, "it appears that Petitioners' claims are in fact state law claims disguised as federal claims" (R, 62, PgID 3324) and held there was no established equal protection claim (R, 62, PgID 3324). The Court declined to discuss the remaining preliminary injunction factors extensively. (R, 62, PgID, 3329). Opinion and Order Attached Denying Petitioner's' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief. (R. 62).

## JURISDICTION

The district Court had subject matter over these federal questions under 28 U.S.C. § 1331 because it presents numerous claims based on federal law and the U.S. Constitution. The district court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential

4

electors presents a federal constitutional question." <u>Bush v. Gore</u>, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); <u>Smiley v. Holm</u>, 285 U.S. 355, 365(1932).

The district court had authority to grant declaratory relief under 28 U.S.C. §§ 2201and 2202 and by Fed. R. Civ. P.  5 7 .  The district court had supplemental jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C.§ 1367.

This Court has jurisdiction under 28 USC § 1254(1) because the case is in the Court of Appeals for the Sixth Circuit and petitioners are parties in the case.  This Court should grant certiorari before judgment in the Court of Appeals pursuant to Supreme Court Rule 11 because "the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." The United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existing legislation.  Moreover, Petitioners Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, are candidates for the office of Presidential Electors who have a direct and personal stake in the outcome of the election and are therefore entitled to challenge the manner in which the election was conducted and the votes tabulated under the authority of this Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000).

Additionally, this Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a) and United States Supreme Court Rule 20, Procedure on a Petition for an Extraordinary Writ. Petitioners will suffer irreparable harm if they do not obtain immediate relief. The Electors are set to vote on December 14, 2020. The issues raised are weighty as they call into question who is the legitimate winner of the 2020 presidential election. These exceptional circumstances warrant the exercise of the Court's discretionary powers, particularly as this case will supplement the Court's understanding of  a related pending case, State of Texas v. Commonwealth of Pennsylvania et al, S.Ct. Case No. 220155.

The All Writs Act authorizes an individual Justice or the full Court to issue an injunction when (1) the circumstances presented are "critical and exigent"; (2) the legal rights at issue are "indisputably clear"; and (3) injunctive relief is "necessary or appropriate in aid of the Court's jurisdiction." *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986) (Scalia, J., in chambers) (citations and alterations omitted).

A submission directly to this Court for a Writ of Certiorari, a Stay of Proceeding and a Preliminary Injunction is an extraordinary request, but it has its foundation. While such relief is rare, this Court will grant it "where a question of public importance is involved, or where the question is of such a nature that it is peculiarly appropriate that such action by this Court should be taken." *Ex Parte Peru*, 318 U.S. 578, 585 (1943). *See also* Cheney v. U.S. Dist. Court, 542 U.S. 367, 380–81 (2004).

6

Here, Petitioners and the public will suffer irreparable harm if this Court does not act without delay. Once the electoral votes are cast, subsequent relief would be pointless. In *Federal Trade Commission v. Dean Foods Co.*, 384 U.S. 597 (1966), the Court affirmed the Seventh Circuit, finding authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where the statute itself was silent on whether injunctive relief was available regarding an application by the FTC. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Id.* at 1743. This Court rendered a similar decision in *Roche v. Evaporated Milk Assn*, 319 U.S. 21 (1943), granting a writ of mandamus, even though there was no appealable order and no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by unauthorized action of the district court obstructing the appeal."

CONSTITUTIONAL AND STATUTORY PROVISIONS

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for president. U.S. Const. art. II, §1, cl. 2.

The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, §4, cl. 1.

The Constitution of Michigan, Article II, § 4, clause 1(h) states: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections. All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

 The Michigan Election Code provides voting procedures and rules for the State of Michigan.  M.C.L. § 168.730, designation, qualifications, and number of challengers,  M.C.L. § 168.733,challengers, space in polling place, rights, space at counting board, expulsion for cause, protection, threat or intimidation, MCL § 168.31(1)(a) Secretary of state, duties as to elections, rule MCL 168.765a absent voter counting board.

STATEMENT OF THE CASE

Petitioners brought this case to vindicate their constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."

The Mich. Const., art.2, sec.4, par. 1(h) further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

These state-law procedures, in turn, implicate Petitioners' rights under federal law and the U.S. Constitution.  "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. at 104.   "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson* v. *Celebrezze*, 460 U.S. 780, 794-795 (1983) (footnote omitted).

9

Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, this Court should exercise its authority to issue the writ of certiorari and stay the vote for the Electors in Michigan.

## Fact Witness Testimony of Voting Fraud & Other Illegal Conduct

Respondents and their collaborators have executed a multifaceted scheme to defraud Michigan voters, resulting in the *unlawful counting of hundreds of thousands* of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan. Evidence included in Respondents' complaint and reflected in Section IV herein shows with specificity the minimum number of ballots that should be discounted, which is more than sufficient to overturn and reverse the certified election results. This evidence, provided in the form of dozens of affidavits and reports from fact and expert witnesses, further shows that the entire process in Michigan was so riddled with fraud and illegality that certified results cannot be relied upon for any purpose by anyone involved in the electoral system.

There were three broad categories of illegal conduct by election workers in collaboration with other state, county and/or city employees and Democratic poll watchers and activists.

*First*, election workers illegally forged, added, removed or otherwise altered information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A.     Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden.

B.     Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900.

C.     Changing dates on absentee ballots received after the 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline.

D.     Changing votes for Trump and other Republican candidates.

E.     Adding votes to "undervote" ballots and removing votes from "overvote" ballots.[1]

*Second*, to facilitate and cover up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.     Denied Republican election challengers' access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted.

B.     Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting, and locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

---

[1] As explained in *Bush v. Gore*, "overvote" ballots are those where "the [voting] machines had failed to detect a vote for President," 531 U.S. at 102, while "overvote" ballots are those "which contain more than one" vote for President. *Id.* at 107.

11

C.      Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center.

D.      Systematically discriminated against Republican poll watchers and favored Democratic poll watchers.

E.      Ignored or refused to record Republican challenges to the violations outlined herein.

F.      Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate.

G.      Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going over to the voting booths with voters in order to watch them vote and coach them for whom to vote. As a result, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines).

H.      Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.

*Third*, election workers in some counties committed several additional categories of violations of the Michigan Election Code to enable them to accept and count other illegal, ineligible or duplicate ballots, or reject Trump or Republican ballots, including:

A.      Permitting illegal double voting by persons that had voted by absentee ballot and in person.

B.      Counting ineligible ballots – and in many cases – multiple times.

12

C.    Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Respondents.

D.    Counting "spoiled" ballots.

E.    Systematically violating of ballot secrecy requirements.

F.    Counted unsecured ballots that arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline, in particular, tens of thousands of ballots that arrived on November 4, 2020.

G.    Accepting and counting ballots from deceased voters.

<u>Expert Witness Testimony Regarding Voting Fraud</u>

In addition to the above fact witnesses, this Complaint presented expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

(1) A report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes tabulated by four precincts on November 4, 2020 in two hours and thirty-eight minutes, that derived from the processing of nearly 290,000 more ballots than available machine counting capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws).

(2) A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

13

(3) A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100%, and frequently more than 100%, of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes were accepted and tabulated from these precincts.

Foreign actors interfered in this election. As explained in the accompanying redacted declaration of a former electronic intelligence analyst who served in the 305th Military Intelligence Unit with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent U.S. general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer, Dominion's security director, is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

Another expert explains that U.S. intelligence services had developed tools to infiltrate foreign voting systems, including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were probably transferred to former Vice-President Biden. (Ex. 109).

14

These and other irregularities provide substantial grounds for this Court to stay or set aside the results of the 2020 General Election in Michigan and provide the other declaratory and injunctive relief requested herein.

Irreparable harm will inevitably result for both the public and the Petitioners if the Petitioners were required to delay this Court's review by first seeking relief in the United States Court of Appeals, Sixth Circuit. Once the electoral votes are cast, subsequent relief would be pointless and the petition would be moot. As such, petitioners are requesting this Honorable Court grant the petition under the most extraordinary of circumstances. A request which, although rare, is not without precedent.

Similar relief was granted in FTC v. Dean Foods Co., 86 S.Ct. 1738 (1966) affirming the Seventh Circuit, involving an application by the FTC and a holding by this Court that found authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where statute itself was silent on whether injunctive relief was available. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Id.* at 1743. A similar decision was reached in In *Roche Evaporated Milk Ass'n,* 63 S.Ct. 938, 941 (1943), the Supreme Court granted a writ of mandamus where there was no appealable order or where no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ

thwarted by unauthorized action of the district court obstructing the appeal."

For these reasons, this Honorable Court should exercise its authority to review this pending application, to stay the Electoral College Vote pending disposition of the forthcoming petition for writ of certiorari and to allow Petitioners a full and fair opportunity to be heard.

ARGUMENT

**I.  THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONERS' EMERGENCY MOTION BECAUSE PETITIONERS PRESENTED A PRIMA FACIE CASE OF WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE OF MICHIGAN IN THE PROCESSING AND TABULATION OF POLLING-PLACE VOTES AND ABSENTEE BALLOTS**.

The record includes overwhelming evidence of widespread systemic election fraud and numerous serious irregularities and mathematical impossibilities not only in the state of Michigan but numerous states utilizing the Dominion system. Sworn witness testimony of "Spider", a former member of the 305th Military Intelligence Unit, explains how Dominion was compromised and infiltrated by agents of hostile nations China and Iran, among others. (R. 49, PgID, 3074). Moreover, expert Russell Ramsland testified that 289,866 ballots must be disregarded as a result of voting machines counting 384,733 votes in two hours and thirty-eight minutes when the actual, available voting machinery was incapable of counting more than 94,867 votes in that time frame. (R. 49, PgID, 3074). According to the final certified tally in Michigan, Mr. Biden has a slim margin of 146,000 votes over President Trump.

16

In the United States, voting is a sacrament without which this Republic cannot survive. Election integrity and faith in the voting system distinguishes the United States from failed or corrupt nations around the world. Our very freedom and all that Americans hold dear depends on the sanctity of our votes.

Judge Parker issued a Notice of Determination of Motion without Oral Argument (R. 61, PgID, 3294) on this most sensitive and important matter. She ignored voluminous evidence presented by Petitioners proving widespread voter fraud, impossibilities, and irregularities that undermines public confidence in our election system and leaves Americans with no reason to believe their votes counted.  It the face of all Petitioners' evidence, it cannot be said that the vote tally from Michigan reflects the will of the people.  From abuses of absentee ballots, fraudulent ballots, manufactured ballots, flipped votes, trashed votes, and injected votes, not to mention the Dominion algorithm that shaved votes by a more than 2% margin from Trump and awarded them to Biden, the Michigan results must be decertified, the process of seating electors stayed, and such other and further relief as the Court finds is in the public interest, or the Petitioners show they are entitled.

**A. PETITIONERS PRESENTED SUFFICIENT EVIDENCE, WHICH WAS IGNORED BY THE DISTRICT COURT, TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS, THAT PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF INTERLOCUTORY RELIEF, THAT THE BALANCE OF EQUITIES TIPS IN THIER FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST**.

Respondents have submitted a number of affidavits, consisting mostly of recycled testimony from ongoing State proceedings, that purport to rebut Plaintiffs' fact witnesses all of which boil down to: (1) they did not see what they thought they saw; (2) maybe they did see what they thought they saw, but it was legal on the authority of the very government officials engaged in or overseeing the unlawful conduct; (3) the illegal conduct described could not have occurred because it is illegal; and/or (4) even if it happened, those were independent criminal acts by public employees over whom State Respondents had no control.

Below are a few examples of State Defendant affiants' non-responsive responses, evasions and circular reasoning, followed by Plaintiff testimony and evidence that remains unrebutted by their testimony.

- **Illegal or Double Counted Absentee Ballots**. Affiant Brater asserts that Plaintiffs' allegation regarding illegal vote counting can be "cursorily dismissed by a review of election data," and asserts that if illegal votes were counted, there would be discrepancies in between the numbers of votes and numbers in poll books. ECF No. 31-3 ¶19. Similarly, Christopher Thomas, asserts that ballots could not, as Plaintiffs allege, see FAC, Carrone Aff., have been counted multiple times because "a mistake like that would be caught very quickly on site," or later by the Wayne County Canvassing Board. ECF No. 39-6 ¶6. Mr. Brater and Mr. Thomas fail to acknowledge that is precisely what happened: The Wayne County Canvassing Board found that over 70% of Detroit Absentee Voting Board ("AVCB") were unbalanced, and that two members of Wayne County Board of Canvassers initially refused to certify results and conditioned certification on a manual recount and answers to questions such as "[w]hy the pollbooks, Qualified Voter Files, and final tallies do not match or balance." FAC ¶¶105-107 & Ex. 11-12 (Affidavits of Wayne County Board of Canvasser Chairperson Monica Palmer and Member William C. Hartmann). Further, Plaintiffs' affiants testified to observing poll workers assigning ballots to different voters than the one named on the ballot. FAC ¶86 & Larsen Aff. Defendants do not address this allegation, leaving it un-rebutted.

18

- **Illegal Conduct Was Impossible Because It Was Illegal**. Mr. Thomas wins the Begging the Question prize in this round for circular reasoning that "[i]t would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November," and "no ballot could have been backdated," because no ballots received after the deadline "were ever at the TCF Center," nor could the ballot of an ineligible voter been "brought to the TCF Center." ECF No. 39-5 ¶20; id. ¶27. That is because it would have been illegal, you understand. The City of Detroit's absentee voter ballot quality control was so airtight and foolproof that only 70% of their precincts were unbalanced for 2020 General Election, which exceeded the standards for excellence established in the August 2020 primary where 72% of AVCB were unbalanced. FAC Ex. 11 ¶¶7&14.

State Respondents Affiants did not, however, dismiss all of Plaintiff Affiants' claims. Rather, they made key admissions that the conduct alleged did in fact occur, while baldly asserting, without evidence, that this conduct was legal and consistent with Michigan law. Defendants admitted that:

- Election Workers at TCF Center Did Not Match Signatures for Absentee Ballots.

- Election Workers Used Fictional Birthdates for Absentee Voters. ECF No. 39- 5 ¶15. The software made them do it.

Election Workers Altered Dates for Absentee Ballot Envelopes. Mr. Thomas does not dispute Affiant Jacob's testimony that "she was instructed by her supervisor to adjust the mailing date of absentee ballot packages" sent to voters, but asserts this was legal because "[t]he mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes."  This is not a factual assertion but a legal

conclusion—and wrong to boot. Michigan law the Michigan Constitution provides all registered voters the right to request and vote by an absentee ballot without giving a reason. MICH. CONST. art. 2, § 4. M.C.L. § 168.759(3). That statute limits the procedures for requesting an absentee ballot to three specified ways: An application for an absent voter ballot under this section may be made in any of the following ways: By a written request signed by the voter on an absent voter ballot application form provided for that purpose by the clerk of the city or township. Or on a federal postcard application. M.C.L. § 168.759(3) (emphasis added). The Michigan Legislature thus did not include the Secretary of State as a means for distributing absentee ballot applications. *Id*. § 168.759(3)(b). Under the statute's plain language, the Legislature explicitly gave *only local clerks* the power to distribute absentee voter ballot applications. *Id.* Secretary Benson lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan.

Secretary Benson also violated Michigan law when she launched a program in June 2020 allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. The Michigan Legislature did not approve or authorize Secretary Benson's unilateral actions. MCL § 168.759(4) states in relevant part: "An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application." MCL § 168.761(2), in turn, states: "The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot. Signature comparisons must be made with the digitized signature in the qualified voter file." Nowhere does Michigan Law authorize counting of an absent voter's ballot without verifying the voter's signature.

**II. THE DISTRICT COURT ERRED WHEN IT DISMISSED PETITIONERS' EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION BY HOLDING THAT THE PETITIONERS STATE-LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEVENTH AMENDMENT IMMUNITY.**

The Sixth Circuit recently addressed the scope of Eleventh Amendment sovereign immunity in the election context in *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015). In *Russell*, the appellate court held that federal courts do in fact have the power to provide injunctive relief where the defendants, "The Secretary of State and members of the State Board of Elections," were, like State Respondents in this case, "empowered with expansive authority to "administer the election laws of the state." *Russell*, 784 F.3d at 1047 (internal quotations omitted).

> The appellate court held that the Eleventh Amendment does not bar"[e]njoining a statewide official under *Young* based on his obligation to enforce a law is appropriate" where the injunctive relief requested sought to enjoin actions (namely, prosecution) that was within the scope of the official's statutory authority." *Id.*

This is precisely what the Petitioners request in the Amended Complaint, namely, equitable and injunctive relief "enjoining Secretary [of State] Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College." (See ECF No. 6 ¶1). Under *Russell,* the Eleventh Amendment is no bar to this Court granting the requested relief. (R. 49, PgID 3083).

**III. THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY.**

This Court can grant the primary relief requested by Petitioners – de- certification of Michigan's election results and an injunction prohibiting State Respondents from transmitting the certified results – as discussed below in Section I.E. on abstention. There is also no question that this Court can order other types of declaratory and injunctive relief requested by Petitioners – in particular, impounding Dominion voting machines and software for inspection – nor have State Respondents claimed otherwise. (R. 49, PgID 3082). The District Court erroneously held that the Petitioners claims seeking a preliminary injunction were barred as being moot when the Electoral College has yet to certify the national election and as such the relief is timely.

**IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS' CLAIMS WERE BARRED BY LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ADDRESS HARM THAT IS CONTINUING AND FORTHCOMING, AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS.**

Laches consists of two elements, neither of which are met here: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party. *Meade v. Pension Appeals and Review Committee*, 966 F.2d 190, 195 (6th Cir. 1992). The bar is even higher in the voting rights or election context, where Respondents asserting the equitable defense must show that the delay was due to a "deliberate" choice to bypass judicial remedies and they must do so "by clear and

22

convincing" evidence. *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973). Petitioners' "delay" in filing is a direct result of Respondents failure to complete counting until November 17, 2020. Further, Petitioners' filed their initial complaint on November 25, 2020, two days after the Michigan Board of State Canvassers certified the election on November 23, 2020. (R. 49, PgID 3082).

Additionally, the "delay" in filing after Election Day is almost entirely due to Respondents failure to promptly complete counting until weeks after November 3, 2020. Michigan county boards did not complete counting until November 17, 2020, and Defendant Michigan Board of State Canvassers did not do so until November 23, 2020, ECF No. 31 at 4—a mere two days before Petitioners filed their initial complaint on November 25, 2020. Petitioners admittedly would have preferred to file sooner, but needed time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint, and this additional time was once again a function of the sheer volume of evidence of illegal conduct by Respondents and their collaborators. Respondents cannot now assert the equitable defense of laches, when any prejudice they may suffer is entirely a result of their own actions and misconduct.

Moreover, much of the misconduct identified in the Complaint was not apparent on Election Day, as the evidence of voting irregularities was not discoverable until weeks after the election. William Hartman explains in a sworn statement dated November 18, 2020, that "on November 17th there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County" and he had "determined that approximately 71% of Detroit's 134 Absentee Voter

23

Counting Boards were left unbalanced and unexplained." He and Michele Palmer voted *not* to Certify and only later agreed to certify after a representation of a full audit, but then reversed when they learned there would be no audit. (See ECF No. 6, Ex. 11 &12.) Further, filing a lawsuit while Wayne County was still deliberating whether or not to certify, despite the demonstrated irregularities, would have been premature.  Respondents appropriately exhausted their non-judicial remedies by awaiting the decision of the administrative body charged with determining whether the vote count was valid. Id.

It is also disingenuous to try to bottle this slowly counted election into a single day when in fact waiting for late arriving mail ballots and counting mail ballots persisted long after "Election Day."

**III. THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS' CLAIMS BASED ON *COLORADO RIVER* ABSTENTION WITHOUT IDENTIFYING ANY PARALLEL STATE-COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT**.

The District Court accepted State Respondent' abstention claim arguments based on Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 808 (1976), a case addressing concurrent federal and state jurisdiction over water rights. See ECF No. 31 at 19-20. Presumably it did so because the case setting the standard for federal abstention in the voting rights and state election law context, Harman v. Forssenius, 380 U.S. 528, 534, (1965) is not favorable to the Respondents.

This Court rejected the argument that federal courts should dismiss voting rights claims based on federal abstention, emphasizing that abstention may be appropriate where "the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law," and "deference to state court adjudication only be made where the issue of state law is uncertain." Harman, 380 U.S. at 534 (citations omitted). But if state law in question "is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," then "it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* (citation omitted).

Respondents described several ongoing state proceedings where there is some overlap with the claims and specific unlawful conduct identified in the Complaint. See ECF No. 31 at 21-26. But State Respondents have not identified any uncertain issue of state law that would justify abstention. See ECF No 31 at 21-26. Instead, as described below, the overlaps involve factual matters and the credibility of witnesses, and the finding of these courts would not resolve any uncertainty about state law that would impact Petitioners' constitutional claims (Electors and Elections Clauses and Equal Protection and Due Process Clauses).

Respondents' reliance on *Colorado River* is also misplaced insofar as they contend that abstention would avoid "piecemeal" litigation, *see id.* at 38, because abstention would result in exactly that. The various Michigan State proceedings raise a number of isolated factual and legal issues in separate proceedings, whereas Plaintiffs' Complaint addresses most of the legal claims and factual evidence submitted in

25

Michigan State courts, and also introduces a number of new issues that are not present in any of the State proceedings. Accordingly, the interest in judicial economy and avoidance of "piecemeal" litigation would be best served by retaining jurisdiction over the federal and state law claims.

Respondents cited to four cases brought in the State courts in Michigan, none of which have the same plaintiffs, and all of which are ongoing and have not been resolved by final orders or judgments. (See ECF Nos. 31-6 to 31-15.)

The significant differences between this case and the foregoing State proceedings would also prevent issue preclusion. A four-element framework finds issue preclusion appropriate if: (1) the disputed issue is identical to that in the previous action, (2) the issue was actually litigated in the previous action, (3) resolution of the issue was necessary to support a final judgment in the prior action, and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. See <u>Louisville Bedding Co.</u> <u>v. Perfect Fit Indus</u>., 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS 9599 (citing <u>Graco Children's Products, Inc. v. Regalo International, LLC</u>, 77 F. Supp. 2d 660, 662 (E.D. Pa. 1999). None of these requirements have been met with respect to petitioners or the claims in the Complaint.

Of equal importance is the fact that the isolated claims in State court do not appear to present evidence demonstrating that a sufficient number of illegal ballots were counted to affect the result of the 2020 General Election. The fact and expert witnesses presented in the Complaint do. As summarized below, the Complaint alleges and

26

provides supporting evidence that the number of illegal votes is potentially multiples of Biden's 154,188 margin in Michigan. (See ECF No. 6 ¶16).

   A.   A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (see Ex. 104 ¶14).

   B.   A report from Dr. Louis Bouchard finding it to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4, see Ex. 110 at 28).

   C.   A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (See Ex. 101).

   D.   A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts when compared to the 2016 election, and thus indicates that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (See Ex. 102).

   E.   A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016, almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (See Ex. 110).

   F.   A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (i.e., the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date (i.e., consistent with eyewitness testimony described in Section II below). (See Ex. 110).

G.     A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precincts, but that the Democrat advantage (i.e., the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated. (See Ex. 110).

H.     A report by an affiant whose name must be redacted to protect his safety concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five-point six percentage points. Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (See Ex. 111 ¶13).

## IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT PETITIONERS, WHO ARE CANDIDATES FOR THE OFFICE OF PRESIDENTIAL ELECTOR, LACKED STANDING TO PURSUE THEIR EQUAL PROTECTION AND OTHER CLAIMS

Petitioners are not simply voters seeking to vindicate their rights to an equal and undiluted vote, as guaranteed by Michigan law and the Equal Protection Clause of the U.S. Constitution, as construed by this court in *Reynolds v. Sims*, 377 U.S. 533 (1964) and its progeny. Rather, Petitioners are candidates for public office. Having been selected by the Republican Party of Michigan at its 2019 Fall convention, and their names having been certified as such to the Michigan Secretary of States pursuant to Michigan Election Law 168.42, they were nominated to the office of Presidential Electors in the November 2020 election pursuant to MCL § 168.43. Election to this office is limited to individuals who have been citizens of the United States for 10 years, and registered voters of the district (or the

state) for at least 1 year, and carries specific responsibilities defined by law, namely voting in the Electoral College for President and Vice-President.  MCL §168.47. While their names do not appear on the ballot, Michigan Law makes it clear that the votes cast by voters in the presidential election are actually votes for the presidential electors nominated by the party of the presidential candidate listed on the ballot. MCL § 168.45.[2]

The standing of Presidential Electors to challenge fraud, illegality and disenfranchisement in a presidential election rests on a constitutional and statutory foundation—as if they are candidates, not voters.[3]  Theirs is not a generalized grievance shared by all other voters; they are particularly aggrieved by being wrongly denied the responsibility, emoluments and honor of serving as members of the Electoral College, as provided by Michigan law. Petitioners have the requisite legal standing, and the district court must be reversed on this point. As in the Eighth Circuit case of *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020),"[b]ecause Minnesota law plainly treats presidential electors as candidates, we do, too." *Id*. at 1057.  And this Court's opinion in *Bush v. Gore*, 531 U.S. 98 (2000) (failure to set state-wide standards for recount of votes for presidential electors violated federal Equal Protection), leaves no doubt that presidential candidates have standing to raise post-election challenges to the

---

[2] This section provides: " Marking a cross (X) or a check mark ( ) in the circle under the party name of a political party, at the general November election in a presidential year, shall not be considered and taken as a direct vote for the candidates of that political party for president and vice-president or either of them, but, as to the presidential vote, as a vote for the entire list or set of presidential electors chosen by that political party and certified to the secretary of state pursuant to this chapter."
[3] *See* https://sos.ga.gov/index.php/Elections/voter_registration_statistics, last visited November 5, 2020.

manner in which votes are tabulated and counted.  The district court therefore clearly erred in concluding that Petitioners lack standing to raise this post-election challenge to the manner in which the vote for *their* election for public office was conducted.

There is further support for Petitioners' standing in the Court's recent decision in *Carney v. Adams* involving a challenge to the Delaware requirement that you had to be a member of a major political party to apply for appointment as a judge.  In Adams, the Court reiterated the standard doctrine about generalized grievance not being sufficient to confer standing and held that *Adams* didn't have standing because he "has not shown that he was 'able and ready' to apply for a judicial vacancy in the imminent future".  In this case, however, Petitioners were not only "able and ready" to serve as presidential electors, they were nominated to that office in accordance with Michigan law.

The Respondents have presented compelling evidence that Respondents not only failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Respondents executed a scheme and artifice to fraudulently and illegally manipulate the vote count to ensure the election of Joe Biden as President of the United States. This conduct violated Petitioners' equal protection and due process rights, as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

In considering Petitioners' constitutional and voting rights claims under a "totality of the circumstances" standard, this Court must consider the cumulative effect of the specific instances or categories of Respondents' voter dilution and disenfranchisement claims. Taken together, these various forms of unlawful and unconstitutional conduct destroyed or shifted tens or hundreds of thousands of Trump votes, and illegally added tens or hundreds of thousands of Biden votes, changing the result of the election, and effectively disenfranchising the majority of Michigan voters. If such errors are not address we may be in a similar situation as Kenya, where voting has been viewed as not simply irregular but a complete sham.  (Coram: Maraga, CJ & P, Mwilu, DCJ & V-P, Ojwang, Wanjala, Njoki and Lenaola, SCJJ)

## CONCLUSION

WHEREFORE, the Petitioners respectfully request this Honorable Court enter an emergency order instructing Respondents to de-certify the results of the General Election for the Office of the President, pending disposition of the forthcoming Petition for Certiorari. Alternatively, Petitioners seek an order instructing the Respondents to certify the results of the General Election for Office of the President in favor of President Donald Trump.

Petitioners seek an emergency order prohibiting Respondents from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing

or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of the petition.

Petitioners respectfully request an order of preservation and production of all registration data, ballots, envelopes, voting machines necessary for a final resolution of this dispute.

Respectfully submitted,

*/s/ Howard Kleinhendler*
HOWARD KLEINHENDLER
Howard Kleinhendler Esquire
Suite 300
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

SIDNEY POWELL
Sidney Powell, P.C.
2911 Turtle Creek, Blvd,

Dallas, Texas 75219
 (517) 763-7499
 sidney@federaappeals.com

*Of Counsel*
JULIA Z. HALLER
BRANDON JOHNSON
EMILY P. NEWMAN

STEFANIE LAMBERT JUNTTILA
500 Griswold Street, Suite 2340
Detroit, Michigan 48301
(248) 270-6689
attorneystefanielambert@gmail.com

L. LIN WOOD
L. LIN WOOD, P.C.
P.O.Box 52584
Atlanta, GA 30305
(404) 891-1402

SCOTT HAGERSTROM
222 West Genesee
Lansing, Michigan 48933
Date:  December 10, 2020

Gregory J Rohl
41850 West 11 Mile Road, Suite 110
Novi MI 48375

32

<u>CERTIFICATE OF COMPLIANCE</u>

The attached Writ of Certiorari complies with the type-volume limitation. As required by Supreme Court Rule 33.1(h), I certify that the document contains 8,324 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

Respectfully submitted,

<u>/s/ Howard Kleinhendler</u>
HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorneys for Plaintiffs/Petitioners
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

Date:  December 11, 2020

CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners,

v.

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan
BOARD OF STATE CANVASSERS

Defendants/Respondents,

and

CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY, and ROBERT DAVIS,

Intervenor-Defendants/Respondents.

PROOF OF SERVICE

STATE OF MICHIGAN)
                 )ss
COUNTY OF WAYNE )

STEFANIE LAMBERT JUNTTILA, affirms, deposes and states that on the 11th day of December, 2020, she did cause to be served the following:

1.  PETITION FOR WRIT OF CERTIORARI On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan;
2.  Attached Exhibits;
3.  Certificate of Conformity;
4.  Proof of Service

UPON:

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
Attorneys as Law
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
Attorney at Law
46350 Grand River Ave.
Novi, MI 48374
248 568-9712
Email: aap43@hotmail.com

MARY ELLEN GUREWITZ
Attorney at Law
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
Attorney at Law
Miller, Canfield,
One Michigan Avenue
Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
Attorney at Law
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

By email and by placing said copies in a properly addressed envelope with sufficient

postage fully prepaid, and placing in a U.S. Mail Receptacle.

FURTHER AFFIANT SAYETH NOT.

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA

# Court of Appeals, State of Michigan

## ORDER

| | |
|---|---|
| Donald J Trump for President Inc v Secretary of State | Stephen L. Borrello<br>Presiding Judge |
| Docket Nos.   355378; 355397 | Patrick M. Meter |
| LC No.       2020-000225-MZ | Amy Ronayne Krause<br>Judges |

The motions for immediate consideration are GRANTED.

The motion to intervene filed by the City of Detroit is DENIED, without prejudice to refiling the motion in the proceedings below should the City of Detroit still deem intervention necessary.

The Democratic National Committee's motion for leave to file amicus brief in Docket No. 355378 is GRANTED, and the brief received on December 3, 2020 is accepted for filing.

The applications for leave to appeal are DENIED.  However, the Democratic National Committee shall retain its status as amicus curiae in the Court of Claims.

We respond to our dissenting colleague because his assertions are not supported by law or by fact.  As the defendant correctly points out, Michigan's election results have been certified.  Once the election results have been certified, "[a] candidate for office who believes he or she is aggrieved on account of fraud or mistake in the canvass or returns of the votes by the election inspectors may petition for a recount of the votes cast for that office in any precinct or precincts as provided by in this chapter." MCL 168.862; see also MCL 168.847, MCL 168.867; MCL 168.879.  Recounts are remedial in nature. *Attorney General v Board of State Canvassers*, 318 Mich App 242, 252; 896 NW2d 485 (2016), lv den 500 Mich 917 (2016).  " 'The purpose of a recount is to determine whether the results of the first count of the ballots should stand or should be changed because of fraud or mistake in the canvass of the votes . . . ' " *Id.*, quoting *Michigan Education Ass'n Political Action Committee v Secretary of State*, 241 Mich App 432, 440; 616 NW2d 234 (2000), lv den 463 Mich 997 (2001).

Here, plaintiff filed its purportedly emergent application on November 6, 2020, but did not perfect the filing until 11:21 p.m. on November 30, 2020, when it filed its brief in support.  The Wayne County Board of Canvassers certified the results of the November 3rd election on November 17, 2020, almost a full two weeks before plaintiff perfected the instant application.  The Michigan Board of State Canvassers certified the presidential election results on November 23, 2020, a full week before plaintiff perfected its application.[1]  Plaintiff does not address whether the certification of the election

---

[1] The Secretary of State represents that the Governor has sent Michigan's official slate of presidential electors to the United States Secretary of the Senate.

result by the Board of State Canvassers had any impact on the viability of its suit below or on the viability of the instant application.

Perhaps the reason for plaintiff failing to discuss the impact of the certification is because such action by the Michigan State Board of Canvassers clearly rendered plaintiff's claims for relief moot. The Michigan State Board of Canvassers' certification of the presidential election results and the legislative directive found in MCL 168.862, requires plaintiff to pursue its fraud allegations by way of a recount of the ballots cast in Wayne County. Because plaintiff failed to follow the clear law in Michigan relative to such matters, their action is moot. MCL 168.862.

Presiding Judge

Meter, J., would grant leave to appeal in each case, with the direction that the Clerk draw a random 3 judge panel to decide the cases within 3 days of filing of these orders, without oral argument.

The issue of mootness is more than the "elephant in the room". The issues are not moot because state electors have not yet been seated, the Electoral College has not yet been assembled, and Congress has not yet convened to consider whether to exercise its powers under Art.2, Sec. 1 and Am 20.

Further plaintiff's prayer for segregation of absentee ballots has, on information, not yet been ordered by defendant Secretary of State. Also, the right of plaintiff to election inspectors and to observe video of ballot drop boxes is self-evident under state law, thus entitling plaintiff to, at the least, declaratory relief.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_December 4, 2020_
Date

Chief Clerk

# Order

**Michigan Supreme Court**
**Lansing, Michigan**

December 11, 2020

Bridget M. McCormack,
Chief Justice

162320 & (20) (24) (25)

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

DONALD J. TRUMP FOR PRESIDENT, INC.,
and ERIC OSTERGREN,
   Plaintiffs-Appellants,

v           SC: 162320
            COA: 355378
            Ct of Claims: 2020-000225-MZ

SECRETARY OF STATE,
    Defendant-Appellee.

_____/

   On order of the Court, the motions for immediate consideration are GRANTED. The application for leave to appeal the December 4, 2020 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court. The motion to intervene is DENIED as moot.



   I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 11, 2020



          Clerk

p1209t

# Order

**Michigan Supreme Court**
Lansing, Michigan

December 9, 2020

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

162286 & (3)(5)(6)(9)(10)

ANGELIC JOHNSON and LINDA LEE
TARVER,
             Petitioners,

v                                                          SC: 162286

SECRETARY OF STATE, CHAIRPERSON OF
THE BOARD OF STATE CANVASSERS,
BOARD OF STATE CANVASSERS, and
GOVERNOR,
             Respondents.

_____/

On order of the Court, the motions for immediate consideration are GRANTED. The petition for extraordinary writs and declaratory relief is considered, and it is DENIED, because the Court is not persuaded that it can or should grant the requested relief. The motions to intervene are DENIED as moot.

CLEMENT, J. (*concurring*).

I concur in the Court's order denying the relief sought in this complaint. Indeed, I do so in large part due to the legal authority cited by Justice VIVIANO in dissent. It is undeniable that the legal authority in this area has not been the subject of much litigation, and therefore there is little caselaw on point. However, there are many *seemingly* apparent answers—many of which are discussed at some length by Justice VIVIANO— and when these answers are combined with the defects in petitioners' presentation of their case, I do not think it is an appropriate exercise of this Court's discretion to prolong the uncertainty over the legal status of this election's outcome. This Court routinely chooses not to hear cases which raise interesting and unsettled legal questions in the abstract when we conclude the case would be a poor practical vehicle for addressing those questions—which is my view of this case and these questions. Moreover, I believe it would be irresponsible to continue holding out the possibility of a judicial solution to a dispute that it appears must be resolved politically.

I think it is important at the outset to have a basic understanding of how elections in Michigan work. On Election Day, votes are cast. Once Election Day is over, the votes in each race are then counted at the precinct level. See MCL 168.801 ("Immediately on closing the polls, the board of inspectors of election in each precinct shall proceed to canvass the vote."). Those results are then forwarded to the county. See MCL 168.809. The results are then canvassed by the board of county canvassers, see MCL 168.822(1), which declares the winners of county and local races, MCL 168.826(1), while tabulating

the results of elections for various statewide and other races within that county and forwarding those results to the Board of State Canvassers, MCL 168.824(1) and 168.828. The Board of State Canvassers then canvasses the figures from around the state, MCL 168.842(1), tabulating the figures and declaring the winners of the various races that the Board of State Canvassers must manage, MCL 168.844 and 168.845. Once the canvassing is finished, the county clerk (for county and local offices) and the Secretary of State (for higher offices) issues a certificate of election to the named winners. MCL 168.826(2) and 168.845.

At no point in this process is it even proper for these individuals to investigate fraud, illegally cast votes, or the like. "[I]t is the settled law of this State that canvassing boards are bound by the return, and cannot go behind it, especially for the purpose of determining frauds in the election. Their duties are purely ministerial and clerical." *McQuade v Furgason*, 91 Mich 438, 440 (1892). *After* a certificate of election is issued, it is possible to challenge whether it was issued to the right individual. Usually this is done via a court action seeking what is called a writ of "quo warranto." See MCL 600.4501 *et seq.* There are debates at the margins about exactly how this process might work—as noted by Justice VIVIANO, there is some dispute about who has standing to maintain an action for quo warranto and whether it can commence before an allegedly wrongful officeholder takes office—but this is the basic outline: the votes are counted, a certificate of election is issued, and *then* we debate whether said certificate was issued to the wrong individual. This is because of the limited authority of the canvassing board to simply tally votes cast.

> The duties of these [canvassing] boards are simply ministerial: their whole duty consists in ascertaining who are elected, and in authenticating and preserving the evidence of such election. It surely cannot be maintained that their omissions or mistakes are to have a controlling influence upon the election itself. It is true that their certificate is the authority upon which the person who receives it enters upon the office, and it is to him *prima facie* evidence of his title thereto; but it is only *prima facie* evidence. [*People ex rel Attorney General v Van Cleve*, 1 Mich 362, 366 (1850).]

It is in this context that I believe we must read petitioners' complaint. At no point does their complaint ask that we declare that a particular slate of presidential electors was duly elected. Nor does their prayer for relief ask that we order the Secretary of State to perform an audit of this election under Const 1963, art 2, § 4(1)(h). Indeed, it is not entirely clear exactly what the nature of petitioners' complaint even is; while MCR 2.111(B)(1) requires that a complaint lay out each "cause of action," the complaint recites several vague counts ("Due Process," "Equal Protection," and "Article II, section 1, clause 2") that are not recognized causes of action themselves. The only recognized cause of action is Count Four, which asks for "Mandamus and *Quo Warranto*." These

certainly are recognized causes of action at common law, although they are distinct causes of action that are addressed to different problems. "[T]o obtain a writ of mandamus, the plaintiff must have a clear legal right to the performance of the specific duty sought to be compelled and the defendants must have a clear legal duty to perform the same." *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 666 (1988). Quo warranto, by contrast, is "the only way to try titles to office finally and conclusively . . . ." *Lindquist v Lindholm*, 258 Mich 152, 154 (1932). Combining them makes it unclear what petitioners are asking this Court to *do*—command a public officer to perform a legal duty (and if so, which officer, and what duty?), or test title to office?[1] I believe this confusion is reflected in the fact that Justices VIVIANO and ZAHRA focus on the constitutional right to an audit that the petitioners do not actually ask for in their prayer for relief. Rather, the prayer for relief asks for a variety of essentially interim steps—taking control of ballots, segregating ballots the petitioners believe were unlawful, enjoining officials from taking action predicated on the vote counts—but does not ask for any actual electoral outcome to be changed. This only begins the problems with this proceeding.

Next, there is a problem of jurisdiction. There has, admittedly, never been litigation like this before in Michigan, so we have no precedents we can draw upon as a definitive resolution. However, the face of petitioners' complaint strongly suggests there is a jurisdictional problem. The gist of petitioners' complaint is that they are unsatisfied with the recent decision of the Board of State Canvassers to declare a winner in the election for presidential electors in Michigan. But this Court has no apparent jurisdiction to review this decision. As noted, the canvassing process is not the time to allege that an election was marred with fraud. Petitioners allege that sections of the Michigan Election Law, like MCL 168.479 and MCL 168.878, allow for decisions of the Board of State Canvassers to be challenged by a mandamus action in the Michigan Supreme Court. But these sections appear to be inapplicable—MCL 168.479 is in the chapter on initiative and referendum, where the responsibilities of the Board of State Canvassers are far more involved than merely tabulating votes, and MCL 168.878 is in the chapter on recounts, which is also not implicated here. Even if either statute were applicable here, there is no theory that the petitioners have put forward suggesting that the Board of State Canvassers failed to perform a legal duty it was obliged to perform. Instead, as noted by Justice VIVIANO, in this context the role of the canvassing board is ministerial, with no function other than to tabulate the votes cast and determine which candidate (or candidates) received the most votes. To the extent that petitioners are trying to revisit the determination of the Board of State Canvassers, it appears they cannot, at least absent the unlikely scenario of the board simply having performed its computations incorrectly, which is not alleged here.

---

[1] Notably, none of the named defendants are alleged to be usurpers to any office, which indicates that plaintiffs have not satisfied the pleading requirements for a quo warranto action under MCL 600.4505(1).

Petitioners also ask that we enjoin respondents "from finally certifying the election results and declaring winners of the 2020 general election . . . ." As an initial matter, this would seem to be moot—it has been widely reported that this already has occurred. A "past event cannot be prevented by injunction." *Rood v Detroit*, 256 Mich 547, 548 (1932). Even had that not happened, however, it does not appear that the law contemplates any role for the courts in this process. As noted by Justice VIVIANO, the ordinary process by which a Michigan election result can be challenged is via quo warranto proceedings. We have said

> that you may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office. And this is as it should be. In a republican government, where the exercise of official power is but a derivative from the people, through the medium of the ballot box, it would be a monstrous doctrine that would subject the public will and the public voice, thus expressed, to be defeated by either the ignorance or the corruption of any board of canvassers. [*Van Cleve*, 1 Mich at 365-366.]

However, when the Board of State Canvassers must declare the winner of an election—as it must with presidential electors, MCL 168.46—the Legislature has, in MCL 168.846, apparently suppressed quo warranto proceedings and reserved to itself the prerogative of determining who the winner is. Such an arrangement is consistent with how disputes over elections to the United States Congress and the Michigan Legislature are resolved, see US Const, art I, § 5, cl 1; Const 1963, art 4, § 16, as well as the plenary authority that state legislatures have over the selection of presidential electors under federal law, see US Const, art II, § 1, cl 2; 3 USC 2.[2] As Justice VIVIANO observes, the language of MCL 168.846 was formerly in the Michigan Constitution of 1850. When it was, we observed that it

> does not permit the regularity of elections to the more important public offices to be tried by the courts. It has provided that in all cases, where . . . the result of elections is to be determined by the Board of State Canvassers, there shall be no judicial inquiry beyond their decision. . . .
>
> This provision was doubtless suggested by the serious difficulties

---

[2] One could fairly question whether it is constitutional for MCL 168.846 to reserve to the Legislature the prerogative to settle disputes over elections to offices required by the Michigan Constitution—a Legislature inclined to abuse this power could conceivably nullify an election that the Michigan Constitution requires to be held. But the Michigan Constitution does not require that presidential electors be themselves popularly elected, and reserving final decision-making authority in the Legislature as to that specific office is consistent with federal constitutional and statutory law.

which would attend inquiries into contested elections, where the ballots of a great number of election precincts would require to be counted and inspected; and probably, also, to discourage the needless litigation of the right to the higher public offices at the instance of disappointed candidates where the public interest does not appear to require it.  A legislative body can exercise a discretion in such cases, and could not be compelled to enter upon such an inquiry except upon a preliminary showing which the courts are not at liberty to require.  [*People ex rel Royce v Goodwin*, 22 Mich 496, 501-502 (1871).]

These jurisdictional problems seemingly put to rest petitioners' allegations about how absentee ballots were handled in this election.  They ask that we "segregate any ballots counted or certified inconsistent with Michigan Election Law" and, in particular, "any ballots attributable to the Secretary of State's absentee ballot scheme"—a reference to the Secretary of State's decision to send out unsolicited absentee ballot applications to voters.  Whatever the legality of this decision on the Secretary of State's part, it does not appear that the courts are the proper forum for challenging the validity of *any* votes cast in the race for presidential electors (as well as some other offices).  For those offices where it might be challengeable, the proper means would be a quo warranto action.  That said, I would note that laches may apply here—the time to challenge this scheme may have been before the applications were mailed out (or at least before the absentee ballots were cast), rather than waiting to see the election outcome and then challenging it if unpalatable.

These jurisdictional concerns are not the only problem with this petition.  Petitioners' prayer for relief does not ask that we direct the Secretary of State to conduct an audit of this election, although their briefing does invoke the right to an audit under Const 1963, art 2, § 4(1)(h)—added to our Constitution two years ago as part of Proposal 18-3.  To the extent that the petitioners are trying to get a writ of mandamus against the Secretary of State to perform an immediate audit under the constitutional language,[3] I

---

[3] Justice VIVIANO says I am "mistaken in suggesting that petitioners here have not asked for an audit," because petitioners' complaint declares several times that the respondents "owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses."  In my view, asserting what citizens are owed is a far cry from demanding actual relief—particularly in light of the conceptual confusion that pervades this petition.  The fact that Justice VIVIANO must patch together what the petitioners are apparently after by combining the petition's allegations with its prayer for relief and the accompanying brief goes to show how weakly it is presented.  Moreover, as noted by Justice VIVIANO, petitioners' brief asks us to "enter an order requiring that the Michigan Legislature convene a joint convention to analyze and audit the election returns" or that this Court "should oversee an independent audit."  Given the nature of the writ of quo warranto, it is simply not a proper vehicle for receiving any audit-related relief.  As

would note at the outset that they have apparently made a procedural misstep.  Although the Michigan Constitution gives this Court jurisdiction over mandamus actions, see Const 1963, art 6, § 4 (stating that "the supreme court shall have . . . power to issue, hear and determine prerogative and remedial writs"), we have provided by rule that such actions must begin in either the Court of Appeals or the Court of Claims, MCR 3.305(A)(1).  "Reasons of policy dictate that such complaints be directed to the first tribunal within the structure of Michigan's one court of justice having competence to hear and act upon them."  *People v Flint Muni Judge*, 383 Mich 429, 432 (1970).  This is why the court rule for original actions in our Court refers only to proceedings for superintending control, which extends to either the lower courts or certain other judicial entities, MCR 7.306(A)(1) and (2), not the executive branch.  We have indicated a willingness to disregard such errors in the past, see, e.g., *McNally v Wayne Co Bd of Canvassers*, 316 Mich 551, 555-556 (1947), but petitioners' audit-related arguments begin in a bad position.

More importantly, there is no apparent purpose to which the audit sought by the petitioners can be put in light of the above-mentioned jurisdictional limits on the judiciary's ability to revisit the outcome of this election.  Given the apparent inability of canvassing boards to investigate fraud, there is a fundamental disconnect between petitioners' allegations of fraud and their request for an audit.  Justice ZAHRA "would have ordered an immediate evidentiary hearing before a special master for the purpose of ferreting out whether there is any substance to the very serious-but-as-yet-unchallenged allegations of irregularities and outright violations of Michigan Election Law that petitioners assert took place before the vote was certified . . . ."  But such an evidentiary hearing is unnecessary—in any event, those boards of canvassers had no authority to perform (or at least act on) such a factual investigation.  Moreover, the boards have certified the results and certificates of election have been issued; it is difficult to see how any judicial proceeding could undo that process.  I fail to see how those certification choices can be taken back any more than the Governor can take back a pardon once issued.  Cf. *Makowski v Governor*, 495 Mich 465 (2014).  This is not to say that certificates of election cannot be challenged; rather, it is to say that an election contest needs to take the form of a challenge to the certificate of election, rather than a challenge to the ministerial certification process.

There is also reason to believe that the right to an audit does not extend to changing the outcome of an election.  The statute that implements the right to an audit

---

noted, mandamus might be, at least to the extent that petitioners seek to compel the Secretary of State to perform a clear legal duty.  But that would not extend to this Court's performing said audit; nowhere in the law is it *this Court's* legal duty to perform any audit.  The same can also be said of the Legislature, which is in addition not even a named defendant in this action, so it is hard to imagine how we would order the Legislature to do anything even if that were *not* an assault on the separation of powers.

makes clear that it "is not a recount and does not change any certified election results." MCL 168.31a(2). While one might argue that the statute does not completely vindicate the petitioners' constitutional "right to have the results of statewide elections audited," Const 1963, art 2, § 4(1)(h), it seems important to note that the Constitution provides that the audit shall be performed "in such a manner as prescribed by law," *id*. There is a somewhat confusing internal contradiction in the constitutional text, as the audit right is the only one said to be "as prescribed by law," but all of the rights in § 4(1) are said to be "self-executing." However, I see nothing to be gained in judicial exploration of this tension and examination of the scope of the audit right conveyed in § 4(1)(h) if there is no purpose to which the results could be applied. Moreover, deferring to the audit right as it is expressed in MCL 168.31a(2) would be consistent with the outcome of the remainder of the cases that have come to us which implicate Proposal 18-3. While this Court has denied leave in each of these cases and thus has taken no institutional position, see MCR 7.301(E), the consistent result has been to unsettle the least amount possible of the Michigan Election Law as possible when provisions of it are challenged under Proposal 18-3. We have thus left in place the statutory deadline of 8 p.m. on Election Day for absentee ballots to be received and counted as well as certain statutory voter registration requirements, and denied a prior challenge seeking an audit outside the boundaries of MCL 168.31a. See *League of Women Voters v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161671), denying lv from ___ Mich App ___ (2020), recon den ___ Mich ___ (2020); *Promote the Vote v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161740), denying lv from ___ Mich App ___ (2020); *Priorities USA v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161753), denying lv from ___ Mich App ___ (2020); *Costantino v Detroit*, ___ Mich ___ (2020) (Docket No. 162245). As I have been the only member of the Court in the majority on all of these cases and the instant case, I cannot speak for my colleagues, but for my own part I can say that a desire to unsettle as little of the Michigan Election Law as possible has animated my approach to these cases.

Petitioners' remaining requests in their prayer for relief put them in the curious position of volunteers in defense of the Legislature's needs. Thus, they ask that we "take immediate custody and control of all ballots, ballot boxes, poll books, and other indicia of the Election . . . to prevent further irregularities, and to ensure that the Michigan Legislature and this Court have a chance to perform a constitutionally sound audit of lawful votes." But if the Legislature needs to seize records, it has some authority to do so, see MCL 4.541, and if it needs judicial assistance in this regard, it is free to ask us. They similarly ask that we "appoint a special master or committee from both chambers of the Michigan Legislature to investigate all claims of mistake, irregularity, and fraud at the TCF Center . . . ." But the separation of powers makes it unthinkable that we would direct the Legislature to convene a committee to investigate anything—that branch's choice to investigate is its own.[4] For our part, there is no need for a special master to

---

[4] Justice VIVIANO suggests the possibility that the "results of an audit could be used by petitioners to convince the Legislature to take up the matter and to prevail in that venue,"

investigate anything if it is not in service of a cause of action that the petitioners enjoy. As noted, during the vote-counting process, the question of fraud is not one that the canvassing boards can investigate; after the vote-counting is complete, the issue is one that must be raised in either a quo warranto proceeding or, as apparently is the case here, before the Legislature itself.

If the scope of the constitutional right to an audit that animates Justices ZAHRA's and VIVIANO's dissenting statements were squarely presented and likely to be dispositive, I would be open to hearing this case. But the scope of that right is not very well presented (as noted, it does not appear in petitioners' prayer for relief), it does not appear to be dispositive, and petitioners' complaint is marred by further problems besides these. Although we have no absolutely definitive answers for these questions, it appears very much that petitioners are erroneously seeking to make the investigation of fraud a part of the canvassing process, and doing so by invoking statutes (MCL 168.479, MCL 168.878) that do not purport to give the judiciary the jurisdiction they ask us to exercise, which is all the more a problem given that MCL 168.846 appears to make the Legislature the exclusive arbiter of who is the proper winner of a presidential election. Petitioners also gesture toward an audit right which MCL 168.31a indicates is too circumscribed to give them the outcome they seek, and even if MCL 168.31a is narrower than the constitutional audit right of Const 1963, art 2, § 4(1)(h), it remains the case that MCL 168.846 apparently makes the Legislature the arbiter of this dispute to the exclusion of the judiciary. Petitioners further ask that we enjoin actions that have already occurred (the certification of the winners of this election), that we retroactively invalidate absentee ballots whose issuance they did not challenge in advance of the election, and that we preserve evidence for the Legislature to review that it either can gather for itself or that it has not asked us to assist in preserving. I simply do not believe this is a compelling case to hear.

In short, even if this petition can be construed as requesting an audit, what it requests is beyond the bounds of MCL 168.31a; and even if petitioners received said audit, it appears that it could not be used to revisit the canvassing process, because MCL 168.846 apparently reserves to the Legislature rather than the judiciary the final say on who Michigan's presidential electors are. For us to scrutinize these admittedly unresolved questions further, we must do so on the strength of a petition we may not have jurisdiction to entertain and within the four corners of which it is not clear what actual cause of action it is pleading, what relief it is seeking, or on what theory it believes it is owed relief from the named defendants. In light of these myriad difficulties—only some of which implicate the apparent merits of the legal issues the petitioners attempt to

---

but their success or failure before the Legislature is a political rather than a legal question. *Nobody* asserts that the right created by Const 1963, art 2, § 4(1)(h) entitles the petitioners to information on the schedule they prefer to try and persuade the Legislature to take action.

present to us—I consider it imprudent to hear this matter, a conclusion only amplified by my view that it is irresponsible to continue holding out the possibility of a judicial solution to a political dispute that needs to be resolved with finality.   Petitioners' complaint casts more heat than light on the legal questions it gestures toward, and would not help us in providing a definitive interpretation of the law in this area.   I therefore concur with our order denying petitioners relief.

ZAHRA, J. (*dissenting*).

Just two years ago, through the exercise of direct democracy and the constitutional initiative process, the people of Michigan amended our Constitution to expand greatly how Michigan residents may exercise their right to vote.   Among the additions to the Michigan Constitution effected by what was then known as Ballot Proposal 2018-3 (Proposal 3) were provisions that: (i) require the Secretary of State automatically to register to vote all Michigan residents conducting certain business with the Secretary of State, unless the resident specifically declines registration; (ii) allow same-day registration with proof of Michigan residency; and (iii) permit no-reason absentee voting. Critics of Proposal 3 argued that these changes would increase opportunities for voter fraud and weaken the integrity of the electoral process, thereby placing in doubt the accuracy and integrity of Michigan's election returns.[5]   Proponents responded that Proposal C would promote and ensure the accuracy and integrity of elections by constitutionally guaranteeing the right to audit the results.[6]

In the wake of the very next election cycle to follow the adoption of these sweeping election reforms of 2018, petitioners filed an original action in this Court under Const 1963, art 6, § 4 and MCL 600.217(3) "seeking extraordinary writs of mandamus, prohibition, and declaratory and injunctive relief."   In support of their claims, petitioners invoke MCL 168.479, which specifies that "any person who feels aggrieved by any determination made by the board of state canvassers may have the determination reviewed by mandamus or other appropriate remedy in the supreme court."[7]   Petitioners

---

[5] See Mack, *Michigan Approves Proposal 3's Election Reforms*, MLive (updated January 29, 2019)

<https://www.mlive.com/news/2018/11/hold_michigan_proposal_3s_elec.html> (accessed December 8, 2020) [https://perma.cc/A8Z9-B46G].

[6] *Id.*

[7] Justice CLEMENT's statement concurring in the Court's order argues that MCL 168.479(1) does not confer jurisdiction in this Court to hear petitioners' challenge because it is located in the chapter on initiatives and referenda.   But the plain language of MCL 168.479(1) is broad: "[A]ny person who feels aggrieved by *any determination* made by the board of state canvassers may have the determination reviewed by mandamus or other appropriate remedy in the supreme court" (emphasis added).

request, among other things, appointment of a special master to investigate their claims of election irregularities and fraud and to "independently review the election procedures employed at the TCF Center and throughout the State,"[8] presumably pursuant to Const 1963, art 2, § 4(1)(h)—which was among the provisions added to the Michigan Constitution by Proposal 3 and which guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such manner as prescribed by law, to ensure the accuracy and integrity of elections."

Based on the pleadings alone, a majority of the Court today denies petitioners' requested relief through a short form order of denial that concludes the majority "is not persuaded that it can or should grant the requested relief." I dissent from the summary dismissal of petitioners' action, without ordering immediate oral argument and additional briefing. As pointed out in the statements of my colleagues, there are threshold questions that must be answered before addressing the substantive merits of petitioners' claims. But rather than summarily dismissing this action because procedural questions exist, I would have ordered immediate oral argument and briefing to address these threshold questions, as well as the meaning and scope of implementation of Const 1963, art 2, § 4(1)(h).

The matter before us is an original action asking the Court to invoke the power of mandamus, superintending control, and other extraordinary writs to provide declaratory relief. As such, this matter should be distinguished from a typical application seeking leave to appeal from the Court of Appeals. Original actions are limited to a small class of cases particularly described in Const 1963, art 6, § 4. Original actions should, therefore, be afforded very close review, particularly when they raise matters under Michigan election law.

Here, petitioners have presented a significant constitutional question pertaining to the process and scope of the constitutional right to an election audit—a right explicitly placed in our Constitution by the people themselves, in whom "[a]ll political power is

---

Moreover, it would be strange to suggest that MCL 168.479(1) applies only to initiatives and referenda, as precisely that sort of limiting language is found not in MCL 168.479(1) but, rather, MCL 168.479(2), which provides in relevant part that any person who "feels aggrieved by any determination made by the board of state canvassers *regarding the sufficiency or insufficiency of an initiative petition . . . .*" (emphasis added). Therefore, on the basis of the statutory text, I am not nearly as confident as Justice CLEMENT that MCL 168.479(1) does not confer jurisdiction in this Court to hear petitioners' challenge. But to the extent we have questions about the Court's jurisdiction, I would explore them at oral argument.

[8] Petition for Extraordinary Writs & Declaratory Relief, p 53.

11

inherent . . . ."  Const 1963, art 1, § 1.  Not only that, but Const 1963, art 2, § 4(1)(h) has remarkable resonance for the precise controversy now before this Court because, even when viewed in hindsight, it seems unlikely that the people of Michigan could have crafted language that would more directly address this circumstance than they have already done in ratifying this very provision.  Accordingly, I believe we owe it to the people of Michigan to fully and completely review the claims asserted by petitioners. For this reason, I would have immediately ordered oral arguments and briefing to assess, as expeditiously as was practicable, whether petitioners are properly before this Court and, if so, both provide guidance as to the meaning and scope of the right to an audit under Const 1963, art 2, § 4(1)(h), and determine whether petitioners are entitled to any of the other relief they seek.

MARKMAN, J., joins the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

For the second time in recent weeks, individuals involved in last month's election have asked this Court to order an audit of the election results under Const 1963, art 2, § 4. See *Costantino v Detroit*, ___ Mich ___ (2020) (Docket No 162245).  As in that case, petitioners here allege that election officials engaged in fraudulent and improper conduct in administering the election.  In support of these claims, petitioners have submitted hundreds of pages of affidavits and expert reports detailing the alleged improprieties. Here, as in *Costantino*, I would grant leave to appeal so we can determine the nature and scope of the constitutional right to an election audit.[9]  After all, "[i]t is emphatically the province and duty of the judicial department to say what the law is."  *Marbury v Madison*, 5 US (1 Cranch) 137, 177 (1803).  But I write separately to highlight the lack of clarity in our law regarding the procedure to adjudicate claims of fraud in the election of presidential electors.[10]

The case before the Court is no small matter.  Election disputes pose a unique test of a representative democracy's ability to reflect the will of the people when it matters most.  See Foley, *Ballot Battles: The History of Disputed Elections in the United States* (New York: Oxford University Press, 2016), pp 17-18.  But it is a test our country has survived, one way or another, since its inception.  The Founding Fathers faced their share of contested elections, as have subsequent generations.  See generally *id.*

---

[9] Because of the time constraints imposed by federal law on the appointment of and balloting by federal electors, I would hear and decide this case on an expedited basis so that, if we accept petitioners' interpretation of the constitutional right to an election audit, they will be able to exercise that right in a timely and meaningful manner.

[10] I do not address whether a claim of fraud could be adjudicated or investigated in the context of a recount.

But in the context of presidential elections, all these episodes pale in comparison to the contest of 1876, which resulted in challenges and changes that helped set the stage for the present dispute.[11]  As with the current case, many of the ballot-counting contests in 1876 focused on the work of canvassing boards and the function of courts; they also involved the role of Congress itself, which created an electoral commission to adjudicate the dispute and help Congress select a victor.  See Nagle, *How Not to Count Votes*, 104 Colum L Rev 1732 (2004) (reviewing books on the 1876 election); see also Ewing, *History and Law of the Hayes-Tilden Contest Before the Electoral Commission: The Florida Case, 1876-77* (Washington, DC: Cobden Publishing Co, 1910), pp 148-153 (discussing the litigation in Florida courts over the role of canvassing boards).

Among the modes for challenging the election in 1876 (and in the earlier election of 1872, among others) were lawsuits brought to obtain a writ of quo warranto.  See Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla L Rev 541, 573 (2004).  With no common-law action available to directly contest an election, Bickerstaff, *Counts, Recounts, and Election Contests: Lessons from the Florida Presidential Election*, 29 Fla St U L Rev 425, 431 (2002), the archaic writ of quo warranto became the tool in England and in this country to dispute an ostensibly successful candidate's right to office.  *Conscientious Congressman's Guide*, 56 Fla L Rev at 570-571.[12]  A quo warranto proceeding was instituted to "try titles to office" based on claims that the officeholder had wrongfully intruded into or usurped the office.  See *Gildemeister v Lindsay*, 212 Mich 299, 303 (1920) (citation and quotation marks omitted); see also Cooley, *Constitutional Limitations* (5th ed), p 788 ("[T]he proper proceeding in which to try [challenges to election results] in the courts is by *quo warranto*, when no special statutory tribunal is created for the purpose.").

The problem, as the elections in the 1870s revealed, was that quo warranto actions were ill-suited to keep pace with the Electoral College: in the two presidential elections of that decade, none of the proceedings "even had their trial phase completed before the electors balloted."  *Conscientious Congressman's Guide*, 56 Fla L Rev at 573.  In response, Congress passed the Electoral Count Act in 1887.  *Id*. at 542, 583.  The statute encourages states to adopt procedures to try election contests involving presidential

---

[11] As Justice COOLEY wrote of the 1876 election, "the country is thoroughly warned, that in any close election the falsification of the result is not so difficult that unscrupulous men are not likely to contemplate it," and the practice of relying on state determinations of the vote "makes the remedy exceedingly uncertain, if dishonest men, who have control of the State machinery of elections, shall venture to employ it to defeat the will of the people."  Cooley, *The Method of Electing the President*, 5 Int'l Rev 198, 201 (1878).

[12] Quo warranto challenges date back to the middle ages.  See Sutherland, *Quo Warranto Proceedings in the Reign of Edward I, 1278-1294* (Oxford: Clarendon Press, 1963), pp 1-6 (noting the king's extensive use of quo warranto in the thirteenth century).

electors.  *Id*. at 585.  As it currently stands, the results of any determination made under these procedures will be binding on Congress if the determination comes at least six days before the electors meet to vote.  3 USC 5.

Why is the history relevant now?  Surely, one might think, after the passage of nearly 150 years our state has adopted efficient procedures to address election disputes, especially when the presidency is at stake.  In many states, this is true.  In almost all, postelection contests for legislative seats are ultimately decided by the legislatures themselves, although some states have provided for preliminary determinations by the courts or independent commissions.  See Douglas, *Procedural Fairness in Election Contests*, 88 Ind L J 1, 5-8, 24-29 (2013); see also *Berdy v Buffa*, 504 Mich 876, 877-879 (2019) (noting that such provisions are commonplace and holding that they only apply to postelection contests of a challenged election result).[13]  For disputed gubernatorial elections, a plurality of states have enacted legislation allowing the losing candidate to contest the election in court, either at the trial or appellate court level; others place the decision in the hands of the legislature or a nonjudicial tribunal.  *Procedural Fairness*, 88 Ind L J at 9-20.  Although only about 20 states have specific provisions for presidential-election disputes, parties often can bring these challenges under the state's general election-contest statutes.  *Id*. at 29-34.[14]

Unfortunately, while the vast majority of states have adopted legislation creating a mechanism for the summary or expedited resolution of election contests, Michigan has not.  Cf. Wyo Stat Ann 22-17-103 (requiring election contests to be expedited); NJ Stat Ann 19:29-5 (requiring summary proceedings); Neb Rev Stat 32-1110 (requiring summary proceedings with a hearing not later than 15 days after the "matter is at issue").  Indeed, as the controversies arising out of the 2020 general election have shown, there is rampant confusion in our state concerning the proper mechanism for contesting elections in general, and presidential elections in particular, on the basis of fraud.  Much of the litigation so far this year has focused on the decisions of the canvassing boards.  But "[w]e have long indicated that canvassing boards' role is ministerial and does not involve investigating fraud."  *Constantino*, ___ Mich at ___; slip order at 6-7 (VIVIANO, J., dissenting) (collecting sources).  There is simply no statutory framework for the boards to adjudicate fraud.  And, strikingly, the Legislature has not, in any other statute, expressly provided a mechanism for determining disputes specific to presidential electors as envisioned in the Electoral Count Act.

---

[13] The same is true of contests in congressional elections.  See US Const, art 1, § 5.

[14] The American Law Institute has recently issued model frameworks for states to consider adopting in order to comprehensively regulate both election disputes in general and presidential-election disputes in particular.  American Law Institute, Principles of the Law, Election Administration: Non-Precinct Voting and Resolution of Ballot-Counting Disputes (2019), Parts II and III.

And thus, we remain one of the only states without any clear framework to enable and regulate election contests.  See *Procedural Fairness*, 88 Ind L J at 10; Douglas, *Discouraging Election Contests*, 47 U Rich L Rev 1015, 1028 (2013).[15]  Instead, our state has various elements that do not quite add up to a coherent system.  As noted, our Legislature has codified the ancient writ of quo warranto.  See MCL 600.4501 *et seq*. and MCR 3.306; see also MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing.").  Under these proceedings, the court can determine the "right of the defendant to hold the office."  MCL 600.4505.  But these actions usually must be brought by the attorney general—only if she refuses can a private citizen seek leave of court to make the claim.  MCL 600.4501.  And our caselaw has suggested that to prevail in the action, the plaintiff must present evidence that he or she is entitled to the office.  See *Marian v Beard*, 259 Mich 183, 187 (1932) ("The [quo warranto] suit by a citizen, on leave of court, is a private action, and, therefore, the plaintiff must allege in the information the facts which give him the right to sue.  Such allegations necessarily include the . . . showing of title in plaintiff.") (citations and comma omitted); *Barrow v Detroit Mayor*, 290 Mich App 530, 543 (2010) (noting caselaw).  Our statutes and court rule do not specify when these actions can be brought, but traditionally they required the defendant to have assumed office; thus one commentator has concluded that our framework "effectively preclude[s] election contests . . . ."  *Discouraging Election Contests*, 47 U Rich L Rev at 1028; see also *Procedural Fairness*, 88 Ind L J at 11.[16]  With respect to presidential electors, whose office exists for only a short period, it is not at all clear how a quo warranto action could timely form the basis for an effective challenge.  Nonetheless, we have stated that " '[t]he only way to try titles to office finally and conclusively is by quo warranto.' "  *Sempliner v FitzGerald*, 300 Mich 537, 544-545 (1942), quoting *Frey v Michie*, 68 Mich 323, 327 (1888).

---

[15] See also Developments in the Law, *Postelection Remedies*, 88 Harv L Rev 1298, 1303 n 22 (1975) (noting that, at the time, Michigan was one of "[f]our states [that] do not generally provide for election contests, but do make available the writ of quo warranto"); Nat'l Conference of State Legislatures, *After the Voting Ends: The Steps to Complete an Election* (October 28, 2020) ("Forty-four states have statutes pertaining to election contests.    The    states    lacking    such    statutes    are . . . Michigan . . . .") <https://www.ncsl.org/research/elections-and-campaigns/after-the-voting-ends-the-steps-to-complete-an-election.aspx> (last accessed Dec 8, 2020) [https://perma.cc/5RQ7-UGR9].

[16] The lead opinion in *In re Servaas*, 484 Mich 634, 643 n 15 (2009) (opinion of WEAVER, J.), suggested that quo warranto actions could be launched without regard to whether the defendant was currently in office.  But as the dissenters cogently observed, quo warranto historically applied only "to claims that a public official is *currently* exercising invalid title to office."  *Id*. at 664 (MARKMAN, J., dissenting).

Despite the apparent exclusiveness of the quo warranto proceeding, MCL 168.846 provides that "[w]hen the determination of the board of state canvassers is contested, the legislature in joint convention shall decide which person is elected." This statute contains language that previously appeared in our 1850 Constitution as Article 8, § 5.[17]  Under that constitutional provision, we held that the Legislature had "discretion" and that we could not require our coordinate branch to act. *People ex rel Royce v Goodwin*, 22 Mich 496, 502 (1871); see also *Dingeman v Bd of State Canvassers*, 198 Mich 135, 137 (1917) ("The legislature, bound by no hard and fast rule, may or may not, in its discretion, entertain contests."). We further explained that the rationale for taking these disputes out of the courts was the "serious difficulties which would attend inquiries into contested elections, where the ballots of a great number of election precincts would require to be counted and inspected . . . ." *Goodwin*, 22 Mich at 501; see also *Dingeman*, 198 Mich at 137 ("The determination of the legislature is a finality, and private parties, ambitious to fill these offices, or litigious in character, cannot compel action by the legislature or go

---

[17] The statute and constitutional provision have interesting histories. As described by one law professor from the period, Const 1850, art 8, § 5 ended the prevailing practice of having "all contests concerning elections to office . . . decided by the courts." Wells, *Reilly-Jennison: An Address to the People on the Recent Judicial Contest*, Detroit Free Press (March 27, 1883), p 4; see also University of Michigan, Michigan Law, *William P. Wells*, Faculty, 1874-1891 <https://www.law.umich.edu/historyandtraditions/faculty/Faculty_Lists/Alpha_Faculty/Pages/WilliamPWells.aspx> (accessed Dec 7, 2020) [https://perma.cc/V2PS-Z8ET]. But with the passage of this new constitutional section in 1850, "the power to decide election contests was taken away from the courts, in respect to the State officers named, and such other officers as the Legislature, by subsequent statutes, might add to the list." Wells, *Reilly-Jennison*, p 4. This constitutional provision was carried over in the 1908 Constitution, see Const 1908, art 16, § 4. For some unknown reason, in 1917 the Legislature enacted the same substantive rule in statutory form. 1917 PA 201, chap XIX, § 12. It has remained there since and is now codified at MCL 168.846. See 1925 PA 351, part 4, chap XVI, § 11; 1954 PA 116, § 846. In the meantime, the voters amended the constitutional provision in 1935 so that the Legislature could prescribe rules by which the Board of State Canvassers would oversee election contests. See Ballot Proposal No. 1, 1935, amending Const 1908, art 16, § 4 ("In all cases of tie vote or contested election for any state office, except a member of the legislature, any recount or other determination thereof may be conducted by the board of state canvassers under such laws as the legislature may prescribe."). At the convention that produced our current Constitution, the constitutional provision was considered to be "legislative in character" and thus was excluded altogether from the constitutional text. 1 Official Record, Constitutional Convention 1961, p 846 (Exclusion Report 2016). The convention committee that recommended the exclusion noted that statutes already governed this issue and the Legislature had authority over this area. *Id.*

elsewhere and secure delay in carrying out the recorded will of the electorate.").  As a result, in *Goodwin*, which involved a petition for a writ of quo warranto, we stated that this constitutional language "does not permit the regularity of elections to the more important public offices to be tried by the courts."  *Goodwin*, 22 Mich at 501.  This rule has been followed in numerous cases, including in elections for the judiciary—but it has not been cited or discussed by this Court or the Court of Appeals in many decades.[18]  But the Senate's rules currently provide for these contests.  Senate Rule 1.202(d) (February 12, 2019).[19]

The plain language of MCL 168.846, and the caselaw interpreting that language from our earlier constitutions, would appear to apply to contested presidential elections.  And, since it is arguable whether quo warranto applies before a defendant assumes office, MCL 168.846 may offer the only route for contesting a presidential election before it becomes final.[20]  But the statute does not provide for any definite or detailed procedures to determine election contests, as the Electoral Count Act appears to contemplate.  3 USC 5.  Compare, e.g., Cal Election Code 16400 and 16401 (providing for contests of "any

---

[18] See *Vance v St Clair Co Bd of Canvassers*, 95 Mich 462, 466 (1893) ("Contests respecting the title to that office [i.e., the circuit judgeship] must be made before the Legislature.  That body finally determines the very matters which the board of canvassers in the present case propose to pass upon."); *Dingeman*, 198 Mich at 136, 139 ("It is, and must be, conceded that the Constitution has vested in the legislature sitting in joint convention the power of finally determining the question who was elected to the office of circuit judge. . . .  Running through all these cases is the rule, to my mind clear and distinct, that wherever by the organic law, whether Federal, State, or municipal, a tribunal is created to finally determine the right to an office, that tribunal is exclusive, and there, and there only, may the right to the office be tested.  By the organic law of this State the legislature, sitting in joint convention, is made such tribunal as to the office here involved."); see also *McLeod v Kelly*, 304 Mich 120, 126-127 (1942) (applying *Dingeman*); *Behrendt v Bd of State Canvassers*, 269 Mich 247, 248 (1934) (same); *Wilson v Atwood*, 270 Mich 317 (1935) (rejecting petition for leave to file quo warranto action regarding the office of Secretary of State when, under the constitutional provision in effect at the time, the Legislature did not properly meet in joint convention to hear the election contest).

[19] Although I did not locate any reference to this procedure in the Standing Rules of the House of Representatives or the Joint Rules of the House and Senate.

[20] The petitioners here have, in fact, recently filed a petition with the Legislature to obtain an election audit and other relief.  See Feather, CW7 News, *Voters Petition Michigan Legislature to Audit Election Results, Call SOS Under Oath*, <http://cw7michigan.com/news/local/voters-petition-michigan-legislature-to-audit-election-results-call-sos-under-oath> (accessed December 7, 2020) [https://perma.cc/PL2G-M3RV].

election" and requiring it to be brought within 10 days "[i]n cases involving presidential electors"); Del Code Ann, tit 15, § 5921 (requiring "[a]ny person intending to contest the election of any one declared by the Governor to have been chosen an elector of President and Vice President" to file a declaration within 10 days of the Governor's proclamation). And it is discretionary with the Legislature—they can take up the matter or not. *Dingeman*, 198 Mich at 137; compare Ark Code Ann 7-5-806(c) (requiring the Legislature to vote on whether "the prayers shall be granted" in various contested elections concerning executive offices). As things appear to stand, then, unless the Legislature can be convinced to review the matter, individuals alleging fraud in an election can obtain review, if at all, in a quo warranto action only when executive officials decline to initiate the action, only by leave of the court, and, mostly likely, only after it is too late to matter.

This backdrop makes the current case all the more important, as it involves a new tool for detecting fraud in elections. The voters in 2018 enacted sweeping changes to our election system. One of the new concepts introduced was an election audit. Article 2, § 4(1)(h) provides to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections." *Id.* "The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so . . . ." *Costantino*, ___ Mich at ___; slip order at 4 (VIVIANO, J., dissenting), citing *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971). The Legislature has provided for these audits in MCL 168.31a, "which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4." *Costantino*, ___ Mich at ___; slip order at 4 (VIVIANO, J., dissenting).

Petitioners here, like the plaintiffs in *Costantino*, seek to use this new right to obtain an audit of the election results.[21] With that audit in hand, they apparently hope to

---

[21] Justice CLEMENT is mistaken in suggesting that petitioners here have not asked for an audit under Const 1963, art 2, § 4. In each of their claims for relief, petitioners state that "Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses." They claim to be aggrieved because the Board of State Canvassers certified the election "without conducting an audit . . . ." Their prayer for relief asks us to collect the ballots and election materials so that "the Michigan Legislature and this Court [will] have a chance to perform a constitutionally sound audit of lawful votes[.]" If there was any lingering doubt, the petitioners' brief here makes it clear, presenting as a numbered issue of "whether the nature and scope of article 2, § 4 requires a meaningful audit before Michigan's electors may be seated." For good measure, the brief asks the Court to "enter an order requiring that the Michigan Legislature convene a joint convention to analyze and audit the election returns . . . ." See also *id.* ("This Court should oversee an independent audit—or require the Michigan

find further support for their challenge to the election.  As my dissent in *Costantino* explained, the nature of the right granted in Article 4, § 4(1)(h) is an important issue this Court should resolve.  A full resolution involves answering many questions, such as whether MCL 168.31a "accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right" and whether the party seeking an audit must make some showing of entitlement, such as by presenting evidence of fraud.  *Costantino*, ___ Mich at ___; slip order at 4-5.

But the core question this case and *Costantino* have presented is whether the petitioners are entitled to an audit in time for it to make any difference in their election challenges.  In other words, is this right a means "to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled?"  *Id.* at ___; slip order at 5.  This gets to the heart of the struggle with these election disputes.  The path for citizens of our state to raise serious claims of election wrongdoing, implicating the heart of our democratic institutions, is unclear and underdeveloped.  This void in our law might suggest that the audit right in Article 2, § 4 was not intended to support election challenges.  On the other hand, the very fact that the mechanisms for election challenges are so opaque might be a reason why the right to an audit is so critical.  Moreover, to the extent the current system puts decisions in the hands of the Legislature, MCL 168.846, a timely audit might be essential for parties to convince the Legislature to entertain an election contest.  And as I pointed out in *Costantino*, Article 2, § 4 was passed at a time when audits were increasingly viewed as a tool to measure the accuracy of election results so that recounts and other procedures could be employed if the audit uncovered problems.  *Costantino*, ___ Mich at ___; slip order at 6.

Whatever the answer may be, the importance of the issue cannot be denied.  Indeed, few topics so closely affect the maintenance of our democratic principles.  As noted above, our laws governing election contests are underdeveloped in the context of the election of presidential electors.  This uncertainty—particularly the lack of any laws that *clearly* govern the determination of presidential-election contests, although MCL 168.846 arguably applies—jeopardizes our ability to take advantage of the safe harbor in 3 USC 5, i.e., Congress's guarantee to respect the state's determination of election disputes over electors.  For this reason, and perhaps even more importantly to provide our citizens with a coherent, fair, and efficient mechanism for adjudicating claims of fraud in the election of presidential electors, I respectfully urge the Legislature to consider enacting legislation creating such a mechanism.

---

Legislature to take back this constitutional function . . . .").  Short of a magical incantation, it seems to me that petitioners have done all they can to put the issue directly before the Court.

By closing the courthouse door on these petitioners, the Court today denies them any ability to have their claims fully considered by the judiciary.[22]  That is because petitioners, rightly thinking that time is short, have filed this case as an original action in this Court.  As a result, they have received no decision below and now will go without any answer.  I believe it is incumbent upon the Court, in these circumstances, to provide

---

[22] Justice CLEMENT declares it "irresponsible" for us even to consider the issues presented by this case.  *Ante* at 1, 9.  I would beg to differ.  Considering jurisprudentially significant constitutional claims is our core responsibility.  The fact that the claims arise in a high-profile case or one that may have national implications is no reason for us to shy away from our duty to decide them.  As I have discussed at some length here (and in *Costantino*), our election contest laws are underdeveloped and unclear.  That murkiness may explain why the petitioners here (and parties in related cases like *Costantino*) have had such difficulty navigating them.  Justice CLEMENT appears to agree that the law is unsettled: her concurrence repeatedly hedges on every significant question in the case, and she ultimately concludes that she has "no absolutely definitive answers for" them. *Ante* at 8.  So we have real work to do in this case to clarify the law in this area—work that only this Court can do.

In addition, despite claiming she has not reached any "definitive answers," Justice CLEMENT's reasons for voting to deny are premised on certain conclusions regarding the nature of the right to an audit and other issues in the case.  For example, she says "there is no apparent purpose to which the audit sought by the petitioners can be put in light of the above-mentioned jurisdictional limits on the judiciary's ability to revisit the outcome of this election." *Ante* at 6.  This suggests that the audit right has no role to play in election contests because such contests cannot come before the courts.  And because she believes the matter is for the Legislature, she sees no need to resolve the "tension" she perceives in the text of Article 2, § 4. *Ante* at 7.   Of course, this conclusion overlooks the possibility that the results of an audit could be used by petitioners to convince the Legislature to take up the matter and to prevail in that venue.  Baked into the concurrence's rationales, then, are determinations about the scope and nature of the audit right, this Court's jurisdiction, and the respective roles of the courts and Legislature—all of which are questions at the heart of the case and any of which is significant enough, in my opinion, to merit a full opinion from this Court.  Thus, in professing not to answer any question in this case, Justice CLEMENT assumes the answer to a number of them.  I would instead take direct aim at resolving these issues, but only after hearing the case.

guidance so that, no matter the outcome, the people are able to understand and exercise their constitutional rights in an effective and meaningful manner.[23]   Accordingly, I dissent.

MARKMAN, J., joins the statement of VIVIANO, J.

---

[23] In hearing the case, I would consider all matters necessary to reach a resolution, including whether this Court has jurisdiction to hear this original action or provide any or all of the relief requested.  Because the Court has declined to hear this case, I, of course, reach no final conclusions on any of the issues addressed above.



t1209

I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 9, 2020



Clerk

STATE OF MICHIGAN

IN THE THIRD JUDICIAL CIRCUIT COURT FOR THE COUNTY OF WAYNE

Cheryl A. Costantino and
Edward P. McCall, Jr.
                    Plaintiffs,

                                            Hon. Timothy M. Kenny
                                            Case No. 20-014780-AW

City of Detroit; Detroit Election
Commission; Janice M. Winfrey,
in her official capacity as the
Clerk of the City of Detroit and
the Chairperson and the Detroit
Election Commission; Cathy Garrett,
In her official capacity as the Clerk of
Wayne County; and the Wayne County
Board of Canvassers,
                    Defendants.

_____/

## OPINION & ORDER

At a session of this Court
Held on: December 8, 2020
In the Coleman A. Young Municipal Center
County of Wayne, Detroit, MI

PRESENT: Honorable Timothy M. Kenny
              Chief Judge
              Third Judicial Circuit Court of Michigan

Plaintiffs Cheryl A. Costantino and Edward P. McCall, Jr. initially sought injunctive relief from this Court requesting an "independent, non-partisan audit" before Wayne County Board of Canvassers certified the November 3, 2020 general election.   On November 13, 2020, this Court denied Plaintiffs' motion for the requested injunctive relief.

1

After the entry of this court's order, the Wayne County Board of Canvassers certified the Wayne votes on November 17, 2020. The Board of State Canvassers certified the vote on November 23, 2020. Pursuant to MCL 168.845, the Board of State Canvassers delivered the statement and certificate of vote totaled determinations to the Michigan Secretary of State. On November 23, 2020 pursuant to MCL 168.46, Governor Whitmer filed the certificate of the names and addresses of the electors of this state chosen as electors of President and Vice President of the United States.

Plaintiffs renewed their motion for a results audit of Wayne County election results pursuant to Michigan Constitution Article 2, Section 4 (1)(h). Rather than the original request for an "independent, nonpartisan" audit, they now seek to have the audit conducted by the Wayne County Clerk. Plaintiffs' request that the Clerk complete the audit before December 14, 2020, the date Michigan Electors are scheduled to vote in the Electoral College.

The Defendant Wayne County Clerk claims Plaintiffs' motion should be denied, because the Michigan Secretary of State, rather than the County Clerk, is statutorily responsible for conducting the audit. The County Clerk also contends that the Secretary of State has already committed to conducting an audit of the Wayne County election results and has not been joined as a party defendant to this motion.

The remaining defendants are not part of the Plaintiffs' relief request. Defendants City of Detroit and Detroit Election Commission seek sanctions against Plaintiffs, claiming the present motion is frivolous.

Michigan Constitution Article 2, Section 4 (1)(h), indicates that a citizen has "the right to have the results of statewide elections audited in such a manner as prescribed by law to ensure the accuracy and the integrity of elections." This constitutional language was

2

part of an amendment to the 1963 Michigan Constitution.  The amendment was passed in the November 2018 general election.

In December 2018, the Michigan Legislature passed an amendment to MCL 168.31a that was given immediate effect.  The amendment provided direction to the Michigan Secretary of State regarding its responsibilities for carrying out election audits as required under the amended Michigan Constitution Article 2, Section 4.

The 2018 amendment to MCL 168.31a (1) retained earlier language that the Secretary of State may audit election precincts.  It also sets forth the Secretary of State's audit training and supervisory responsibilities for statewide election audits.  MCL 168.31a (2).

This Court believes that Michigan Constitution Article 2, Section 4 (1)(h) and MCL 168.31a must be read together.  When done so, the Court finds that MCL 168.31a tracks the requirements of Michigan Constitution Article 2, Section 4 (1)(h).  In the present case, when Plaintiffs' exercise their right under Article 2, Section 4, an audit is required to be conducted.  MCL 168.31a prescribes the procedure and format for such an audit.  However, MCL 168.31a also provides the Secretary of State with the discretion to audit election precincts in statewide elections if no elector of the state exercises the constitutional right to have an audit.

Plaintiffs have the right, pursuant to the Michigan Constitution to have an audit of the November 3, 2020 general election.  In light of Plaintiffs' motion, the Court must determine whether the Wayne County Clerk will conduct the audit, when will it be conducted, and what type and scope of audit will occur.

As stated earlier, Michigan Constitution Article 2, Section 4 indicates that Michigan citizens have "the right to have the results of statewide elections audited in such a

3

manner as prescribed by law to ensure the accuracy and integrity of elections." The Michigan Legislature supplied the required "as prescribed by law" in December 2018 by giving immediate effect to the amendment to MCL 168.31a. The statute MCL 168.31a (1) authorizes the Secretary of State to audit the election precincts. MCL 168.31a (2) authorizes the Secretary of State to prescribe the procedure for the election audits and the training and certifying of county clerks and their staffs for conducting the election audits, randomly selected by the Secretary of State in their counties. This section also directs the Secretary of State to supervise each county clerk in the performance of the election audits that are conducted. A review of MCL 168.31a does not authorize county clerks to conduct the election audit independently. This Court failed to find any legal authority permitting the Court to approve Plaintiffs' motion for the Wayne County Clerk to implement an audit of the Wayne County election results.

A reading of MCL 168.31a is silent on the issue of when the audit of a statewide election is to occur. Some guidance, however, can be gleaned from MCL 168.847 which indicates the Secretary of State may authorize the release of all ballots, ballot boxes, voting machines and equipment after 30 days following certification of an election by the Board of State Canvassers. Comparing these statutes, the Court fails to find guidance on the timing of any constitutional or statutory audit performed by the Secretary of State under these authorities. The Michigan Legislature has given the Secretary of State the responsibility for carrying out statewide audits, leaving the details to the Secretary's discretion. This Court could not find any statutory mandate for the commencement date of the audit.

MCL 168.31a (2) also guides the type and scope of the statewide election audit the Secretary of State will conduct. The statute indicates that there is to be an audit of a

4

random sample of precincts throughout the county. *Id.* Each audited precinct shall include a results audit of a statewide race or ballot question. *Id.* The audit does not constitute a recount of the vote. *Id.* When considering Plaintiffs' motion for an audit, the Court considered the information provided by all parties. The Court notes the December 2, 2020 press release by the Michigan Bureau of Elections that indicates the Secretary of State will conduct a risk-limiting audit. The Secretary describes the scheduled audit as "the gold standard in validating election results." Plaintiffs do not contest that the Secretary of State has exercised her discretion to conduct the audit as provided by MCL 168.31a (1).

In reviewing the present motion, the Court finds that Plaintiffs' request for the audit of the November 3, 2020 general election should properly be directed to the Michigan Secretary of State. MCL 168.31a. This Court finds no legal authority that permits the Wayne County Clerk to conduct an audit of Wayne County election results or that separates the audit from the oversight of the Secretary of State. In light of the statutory authority establishing the procedure to implement the constitutional right to an election audit, it appears to this Court that Plaintiffs' motion should be filed before the Court of Claims pursuant to MCL 600.6419 requesting mandamus relief.

In conclusion, the Court recognizes Plaintiffs' constitutional right to an audit. This Court concludes that the Michigan Secretary of State is the one to carry out that audit pursuant to MCL 168.31a. Since the Secretary of State has made a public commitment to do an audit of the Wayne County vote, Plaintiffs' motion for the audit is premature. If the Secretary of State were not to comply with the audit right asserted by Plaintiffs, they could file a mandamus petition with the Michigan Court of Claims.

For the reasons stated above, the Plaintiffs' motion for the Wayne County Clerk to complete an audit before December 14, 2020 is DENIED.

As this is an issue of first impression on a public question, no costs or attorney fees are assessed against Plaintiff.

December 8, 2020

Hon. Timothy M. Kenny
Chief Judge
Third Judicial Circuit Court of Michigan

6