CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

IN RE: TIMOTHY KING, MARIAN ELLEN SHERIDAN,  JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners.

## PETITION FOR WRIT OF CERTIORARI PURSUANT TO 28 U.S.C. § 1651(a),  On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorney for Plaintiffs/Petitioners
    TIMOTHY KING, MARIAN ELLEN SHERIDAN,  JOHN EARL HAGGARD,
    CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and
    DAREN WADE RUBINGH
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
Attorney for Defendants/Respondents
 Attorneys for GRETCHEN WHITMER, in her official capacity as Governor of
 the State of Michigan, JOCELYN BENSON, as Michigan Secretary of State
 and the Michigan BOARD OF STATE CANVASSERS
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
 Attorneys for Intervenor Defendant and
 Respondent City of Detroit
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
 Attorney for Robert Davis
46350 Grand River Ave.
Novi, MI 48374
248 568-9712 Email: aap43@hotmail.com
MARY ELLEN GUREWITZ
Attorney for Intervenor
 Democratic National Committee
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
 Attorney for Intervenor Defendant
 Michigan Democratic Party
Miller, Canfield,
One Michigan Avenue; Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
     Attorney for Michigan State Conference NAACP
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

ISSUES PRESENTED

I.  THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND UTTERLY IGNORGED THE DOZENS OF AFFIDAVITS, TESTIMONIALS, EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING PROCESS.

A. WHETHER THE PETITIONERS HAVE PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO 42 USC§ 1983: (Count I) VIOLATION OF THE ELECTIONS AND ELECTORS CLAUSES; (Count II) VIOLATION OF THE FOURTEEN AMENDMENT EQUAL PROTECTION CLAUSE AND (Count III) DENIAL OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE AND A VIOLATION OF THE MICHIGAN ELECTION CODE?

B.  WHETHER THE PETITIONERS PRESENTED SUFFICIENT EVIDENCE WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST?

II.  WHETHER THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEMENTH AMENDMENT IMMUNITY?

III.  WHETHER THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE BARRED AS BEING MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY?

IV.   WHETHER THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS?

V.   WHETHER THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER WITHOUT ANY SHOWING OF PARALLEL STATE COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT?

VI.   WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE PETITIONERS CLEARLY HAVE STANDING?

VII.   WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?

PARTIES TO THE PROCEEDINGS AND STANDING

All parties appear in the caption of the case on the cover page.

Each of the following Plaintiffs/Petitioners are registered Michigan voters and nominees of the Republican Party to be a Presidential Elector on behalf of the State of Michigan: Timothy King, a resident of Washtenaw County, Michigan; Marian Ellen Sheridan, a resident of Oakland County, Michigan; and, John Earl Haggard, a resident of Charlevoix, Michigan;

Each of these Plaintiffs/Petitioners has standing to bring this action as voters and as candidates for the office of Elector under MCL §§ 168.42 & 168.43 (election procedures for Michigan electors). As such, Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." Carson v. Simon, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws); see also McPherson v. Blacker, 146 U.S. 1, 27 (1892); Bush v. Palm Beach Cty. Canvassing Bd., 531 U.S. 70, 76 (2000) (per curiam). Each brings this action to set aside and decertify the election results for the Office of President of the United States that was certified by the Michigan Secretary of State on November 23, 2020. The certified results showed a plurality of 154,188 votes in favor of former Vice-President Joe Biden over President Trump.

Petitioner James Ritchard is a registered voter residing in Oceana County. He is  the Republican Party Chairman of Oceana County.  Petitioner James David Hooper is a registered voter residing in Wayne County. He is the Republican Party Chairman for the Wayne County Eleventh District. Petitioner Daren Wade Ribingh is a registered voter residing in Antrim County. He is the Republican Party Chairman of Antrim County.

Respondent Gretchen Whitmer (Governor of Michigan) is named herein in her official capacity as Governor of the State of Michigan.  Respondent Jocelyn Benson ("Secretary Benson") is named as a defendant/respondent in her official capacity as Michigan's Secretary of State. Jocelyn Benson is the "chief elections officer" responsible for overseeing the conduct of Michigan elections. Respondent Michigan Board of State Canvassers is "responsible for approv[ing] voting equipment for use in the state, certify[ing] the result of elections held statewide…." Michigan Election Officials' Manual, p. 4. See also MCL 168.841, etseq. On March 23, 2020, the Board of State Canvassers certified the results of the 2020 election finding that Joe Biden had received 154,188 more votes than President Donald Trump.

TABLE OF CONTENTS

ISSUES PRESENTED…………………………………………… i

PARTIES TO THE PROCEEDINGS AND STANDING………………… iii

TABLE OF CONTENTS…………………………………………….. iv

INDEX TO APPENDICES…………………………………………….. vi

TABLE OF AUTHORITIES…………………………………………… vii

INTRODUCTION………………………………………………………… 1

OPINION BELOW…………………………………………………… 3

JURISDICTION……………………………………………………… 3

CONSTITUTIONAL AND STATUTORY PROVISIONS………………… 5

STATEMENT OF THE CASE…………………………………………… 6

REASONS IN SUPPORT OF GRANTING WRIT OF CERTIORARI     10

ARGUMENTS

    I.  THE TRIAL COURT ERRED WHEN IT DENIED THE
PETITIONERS' EMERGENCY MOTION WITOUT EVEN A HEARING OR
ORAL ARGUMENT FOR DECLARATORY, EMERGENCY, AND
PERMANENT INJUNCTIVE RELIEF WHEN THE PETITIONERS HAD
PRESENTED A PRIMA FACIE CASE SETTING FORTH CLAIMS OF
WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE
OF MICHIGAN IN THE PROCESSING AND TABULATION OF VOTES
AND ABSENTEE BALLOT.  THE TRIAL COURT COMPLETELY AND
UTTERLY IGNORED THE DOZENS OF AFFIDAVITS, TESTIMONIALS,
EXPERT OPINIONS, DIAGRAMS AND PHOTOS THAT SUPPORTED THE
PETITIONERS' CLAIM SEEKING AN INJUNCTION OF THE VOTING
PROCESS.                                                    10

    A. THE PETITIONERS HAVE PRESENTED SUFFICIENT
EVIDENCE TO SUPPORT THREE CLAIMS PURSUANT TO 42 USC§ 1983:
VIOLATION OF THE ELECTIONS AND ELECTORS CLAUSES;
VIOLATION OF THE 14TH AMENDMENT EQUAL PROTECTION CLAUSE
AND (Ct III) DENIAL OF THE 14th AMENDMENT DUE PROCESS
CLAUSE AND A VIOLATION OF THE MICHIGAN ELECTION CODE.  11

Case 2:20-cv-13134-LVP-RSW   ECF No. 72-1, PageID.3473   Filed 12/22/20   Page 8 of 49

B.  THE PETITIONERS PRESENTED SUFFICIENT EVIDENCE WHICH WAS IGNORED BY THE DISTRICT TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTALBLISHED LIKEHOOD OF SUCCESS ON THE MERITS, THAT THE PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF AND THAT THE BALANCE OF EQUITIES TIPS IN THIE FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.                                         12

II.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION WHEN THE COURT HELD THAT THE PETITIONERS STATE LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEMENTH AMENDMENT IMMUNITY.          14

III.  THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE BARRED AS BEING MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY.                                         15

IV.  THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS CLAIMS WERE BARRED BY THE DOCTRINE OF LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ARE ADDRESSING HARM THAT IS CONTINUING AND FORTHCOMING AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS.                             16

V.  THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS CLAIMS BASED ON THE ABSTENTION DOCTRINE IDENTIFIED IN THE US SUPREME COURT CASE OF COLORADO RIVER WITHOUT ANY SHOWING OF PARALLEL STATE COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT.                                               20

VI.  THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE PETITIONERS FAILED TO SHOW THAT THEIR INJURY CAN BE REDRESSED BY THE RELIEF SOUGHT AND HELD THAT THE PETITIONERS POSSESS NO STANDING TO PURSUE THEIR EQUAL PROTECTION CLAIM WHEN GIVEN THE EVIDENCE PRESENTED AND THE RELIEF SOUGHT, THE ISSUE OF VOTER FRAUD AND VALIDATION OF ELECTION IS THE VERY RELIEF THAT A COURT CAN REDRESS PURSUANT TO THE EQUAL PROTECTION AND THE PETITIONERS CLEARLY HAVE STANDING.                   22

VII.   WHETHER THE DISTRICT COURT ERRED WHEN IT FOUND THAT PETITIONERS CLAIMS WERE BARRED BECAUSE THE COURT DETERMINED THE PETITIONERS "ASSERT NO PARTICULARIZED STAKE IN THE LITIGATION" AND FAILED TO ESTABLISH AN INJURY-IN-FACT AND THUS LACK STANDING TO BRING THEIR ELECTIONS CLAUSE AND ELECTORS CLAUSE CLAIMS WHEN THE PETITIONERS ARE THE VERY INDIVIDUALS WHO CAN ASSERT THIS CLAIM AND HAVE PROPER STANDING TO DO SO?                                24

CONCLUSION…………………………………………………   25

CERTIFICATE OF SERVICE……………………………………

## INDEX TO APPENDICES

Lower Court King Et al vs. Whitmer Et al, Case No. 20-cv-13134, US District Court, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831)

|     |                                                                 | Page No. |
|-----|-----------------------------------------------------------------|----------|
| 1.  | Civil Docket For Case 20-cv-13134                               | 1-12     |
| 2.  | Exhibit 1   R. 6  Amended Complaint                            | 13-97    |
| 3.  | Exhibit 2   R. 6-1  Redacted Declaration                      | 98-105   |
| 4.  | Exhibit 3   R 6-2   Ballot Making Devices (BMD) Cannot Assure Will of Voters | 106-133 |
| 5   | Exhibit 4   R 6-3   Affidavits including Abbie Helminen, Andrew Mill, Anna Pennala, Etc.    234 pages | 134-367 |
| 6.  | Exhibit 5   R. 6-4  Constantino  v. City of Detroit           | 368-444  |
| 7.  | Exhibit 6   R. 6-5  Mellissa Carona                            | 445-447  |
| 8.  | Exhibit 7   R. 6-6  Jessica Connard                            | 448-451  |
| 9.  | Exhibit 8   R. 6-7  Matt Ciantar                               | 452-454  |
| 10. | Exhibit 9   R. 6-8  Dominion Voting System Contract           | 455-615  |
| 11. | Exhibit 10 R. 6-9  Texas-Preliminary Statement, Dominion Voting System | 616-618 |
| 12  | Exhibit 11 R. 6-10 Kayla Toma                                 | 619-625  |
| 13. | Exhibit 12 R. 6-11 Monica Palmer                              | 626-631  |
| 14  | Exhibit 13 R. 6-12 William Hartmann                           | 626-631  |
| 15  | Exhibit 14 R. 6-13 Patrick Colbeck                            | 637-643  |
| 16  | Exhibit 15 R. 6-14 Patrick Colbeck                            | 644-645  |
| 17  | Exhibit 16 R  6-15  Carlos Malony, Member of Congress         | 646-647  |
| 18  | Exhibit 17 R. 6-16 US Senators Letter                         | 648-662  |

19      Exhibit 18 R. 6-17 Ann Cardozo                                          663-667
20      Exhibit 19 R. 6-18 Cybersecurity Advisory, IRAN            668-677
21      Exhibit 20 R. 6-19 Joseph Oltrann                                     678-683
22      Exhibit 21 R. 6-20 Marian Sheridan                                 684-685
23      Exhibit 22 R. 6-21 Analysis of Surveys                          686-705
24      Exhibit 23  R. 6-22 Statistical Voting Analysis in the Michigan 2020
Presidential Election                                                                     706-713
25      Exhibit 24 R. 6-23 Matt Braynard on Twitter                   714
26      Exhibit 25 R. 6-24 Russel James Ramsland, Jr.             715-722
27      Exhibit 26 R. 6-25 Electronic Intelligence Analyst         723-739
28      Exhibit 27 R. 6-26 Ronald Watkins                                  740-746
29      Exhibit 28 R. 6-27 Harri Hursti                                         747-803
30      Exhibit 29 R. 6-28 Electronic J. Alex Halderman           804-913
31      Exhibit 30 R. 6-29 Michigan 2020 Voter Analysis
report, 11-17-20                                                                         914-970
32      Exhibit 31 R. 6-30 Redacted Declaration                       971-974
33.     Exhibit 32 R. 7 Motion for Temporary Restraining Order  975-992
34.     Exhibit 33 R. 49  Reply to response Re: Emergency Motion for
Temporary Restraining Order                                               993-1025
35.     Exhibit 34 R. 49-1  Response to Stephen Ansolabehere's Comments
Regarding Absentee Ballots Across
Several States                                                                        1026-1029
35.     Exhibit 35 R. 49-2 Expert report of Eric Quinnell, PhD  1030-1035
36.     Exhibit 36 R. 49-3 Expert Report of Russell  J.            1036-1068
37.     Exhibit 37 R. 49-4       Redacted Affidavit                     1069-1077
38.     Exhibit 38 R. 57 Supplemental Brief Re: Motion for Temporary
Restraining Order.                                                                 1078-1082
39.     Exhibit 39 R. 57-1  Freehan v. Wisconsin
Elections Comm                                                                    1083-1092
40.     Exhibit 40 R. 57-2   Amended Complaint Freehan vs. Wisconsin
Elections Committee                                                            1093-1143
41      Exhibit 41 R. 60  Response to Emergency Motion for Temporary
Restaining Order                                                                  144-1146
42.     Exhibit 42 R. 62,  OPINION AND ORDER DENYING
PLAINTIFFS' "EMERGENCY MOTION FOR DECLARATORY,
EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF" PgID 3295-
3330                                                                                     1147-1182
43.     Exhibit 42, R. 64 Notice of Appeal                              1183

## TABLE OF AUTHORITIES

CASES                                                                    PAGE

Am. Civil Liberties Union of Kentucky v. McCreary Cnty., Ky., 354 F.3d
438, 445 (6th Cir. 2003) aff'd sub nom.                                   22

Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,
576 U.S. 787 (U.S. 2015)                                                  6, 7

Baker v. Carr, 369 U.S. 186 (1962)                                       20

Barrow v. Detroit Mayor, 290 Mich. App. 530 (2010                       21

Bush v. Gore, 531 U.S. 98, 113 (2000)                                    3, 5, 22

Cheney v. U.S. Dist. Court, 542 U .S. 367 (2004)                        4

Colorado River Water Conservation Dist. v. United States, 424 U.S. 800,
808 (1976)                                                               16-18

Ex Parte Republic of Peru, 63 S.Ct. 793 (1943)                          4

FTC v. Dean Foods Co., 86 S.Ct. 1738 (1966)                             5

George v. Haslam, 112 F.Supp.3d 700, 710 (M.D. Tenn. 2015)             21

Graco Children's Products, Inc. v. Regalo International, LLC,
77 F. Supp. 2d 660, 662 (E.D. Pa. 1999)                                 18

In RocheEvaporated Milk Ass'n, 63 S.Ct. 938, 941 (1943),               5

Hamlin v. Saugatuck Twp.,299 Mich. App. 233 (2013)                     20-21

Harman v. Forssenius, 380 U.S. 528 (1965)                              17, 25

Louisville Bedding Co. v. Perfect Fit Indus., 186 F. Supp. 2d 752
Dist. LEXIS 9599                                                        18

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992)                    21

McCreary Cnty., Ky., v. Am. Civil Liberties Union of Ky.,
545 U.S. 844 (2005)                                                     22

Meade v. Pension Appeals and Review Committee,
966 F.2d 190 (6th Cir. 1992)                                    15

Obama for America vs. Husted, 697 F.3d 423 (6th Cir. 2012)

Ohio Citizens for Responsible Energy, Inc. v. NRC,
479 U.S. 1312 (1986)                                           4

Reynolds v. Sims, 377 U.S. 533 (1964)                          20

Russell v. Lundergan-Grimes, 784 F.3d 1037 (6th Cir. 2015).    11, 14
Smiley v. Holm, 285 U.S. 355, 365(1932)                        3, 6-7

State of Texas v. Commonwealth of Pennsylvania Et al,
SCt Case No. 22O155                                            4

Toney v. White, 488 F.2d 310 (5th Cir. 1973)                   15

**STATUTES, RULES, CONSTITUTIONAL CITATIONS**

U.S. CONST. art. I, § 4 ("Elections Clause").                  5, 6

U.S. CONST. art. II, § 1 ("Electors Clause").                  6

U.S. Const. art. II, §1, cl. 2                                 5

**Fourteenth Amendment of the United States Constitution**     **5**

**28 U.S.C. § 1331**                                           **1**

28 U.S.C. §§ 2201and 2202                                      3

28 U.S.C. § 1391(b) &(c)                                       3

28 USC § 1254(1)                                               4

28 U.S.C.§ 1367                                                3

Article III, §2 of the United States Constitution             4

28 U.S.C. § 1651(a)                                            4

**28 U.S.C. § 1651(a)**                                        **5**

42 U.S.C. §§ 1983 and 1988, and under MCL 168.86    6

**250 U.S.C. § 20701**    **1**

The Mich. Const., art.2, sec.4,    7

**MCL § 168.31a**    **25**

**MCL § 168.861**    **25**

**Michigan Election Code, MCL §§ 168.730-738,**    **23**

**MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).**    **23**

MCL § 168.730 & § 168.733(1)    6

MCL § 168.31(1)(a)    6

MCL 168.765a;    6

MCL 168.733    6

MCL §§ 168.42 & 168.43.    6

**MCL § 168.31a**    **21**

**MCL § 168.861**    **21**

**MCL §§ 168.730-738**    **1**

Rule 57, Fed. R. Civ. P.    3

CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, the Petitioners herein disclose the following: There is no parent or publicly held company owning 10% or more of Respondent's stock or corporate interest.

<u>INTRODUCTION</u>

Petitioners file this motion seeking immediate relief in anticipation of their petition for certiorari from the judgment of the District Court dated December 7, 2020, dismissing their case after denying their motion for a Temporary Restraining Order. (R.62). Petitioners filed a notice of appeal to the Sixth Circuit on December 8, 2020. (R.64). Because of the exigencies of time, they have not presented their case to the Sixth Circuit but, rather, will seek certiorari before judgment in the court of appeals pursuant to S. Ct. R. 11.  This motion for immediate preliminary relief seeks to maintain the status quo so that the passage of time and the actions of Respondents do not render the case moot, depriving this Court of the opportunity to resolve the weighty issues presented herein and Respondents of any possibility of obtaining meaningful relief.

Petitioners seek review of the district court's order denying any meaningful consideration of credible allegations of massive election fraud, multiple violations of the Michigan Election Code, see, e.g., MCL §§ 168.730-738 and Equal Protection Clause of the U.S. Constitution that occurred during the 2020 General Election throughout the State of Michigan. Petitioners presented substantial evidence consisting of sworn declarations of dozens of eyewitnesses and of experts identifying statistical anomalies and mathematical impossibilities, as well as a multistate, conspiracy, facilitated by foreign actors, including China and Iran, designed to deprive Petitioners to their rights to a fair and lawful election. The district court ignored it all. It failed to hear from a single witness or consider any expert and made findings without any examination of the record.

1

The scheme and artifice to defraud illegally and fraudulently manipulate the vote count to manufacture the "election" of Joe Biden as President of the United States. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing." It has now been amplified and rendered virtually invisible by computer software created and run the vote tabulation by domestic and foreign actors for that very purpose. The petition detailed an especially egregious range of conduct in Wayne County and the City of Detroit, though this conduct occurred throughout the State with the cooperation and control of Michigan state election officials, including Respondents.

The multifaceted schemes and artifices to defraud implemented by Respondents and their collaborators resulted in the unlawful counting, or outright manufacturing, of hundreds of thousands of illegal, ineligible, duplicate, or purely fictitious ballots in Michigan. The same pattern of election fraud and vote-counting fraud writ large occurred in all the swing states with only minor variations in Michigan, Pennsylvania, Arizona, and Wisconsin. See Ex. 101, William M. Briggs, Ph.D. "An Analysis Regarding Absentee Ballots Across Several States" (Nov. 23, 2020) ("Dr. Briggs Report"). Unlike some other petitions currently pending, this case presented an enormous amount of evidence in sworn statements and expert reports. According to the final certified tally in Michigan, Mr. Biden had a slim margin of 146,000 votes.

The election software and hardware from Dominion Voting Systems ("Dominion") used by the Michigan Board of State Canvassers was created to achieve election fraud. See Ex. 1, Redacted Declaration of

Dominion Venezuela Whistleblower ("Dominion Whistleblower Report"). The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

The trial court did not examine or even comment on Petitioners' expert witnesses, including Russell James Ramsland, Jr. (Ex. 101, "Ramsland Affidavit"), who testified that Dominion alone is responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan. This is almost twice the number of Mr. Biden's purported lead in the Michigan vote (without consideration of the additional illegal, ineligible, duplicate or fictitious votes due to the unlawful conduct outlined below). This, by itself, requires that the district court grant the declaratory and injunctive relief Petitioners sought. Andrew W. Appel, et al., "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019), attached hereto as Exhibit 2 ("Appel Study").

In addition to the Dominion computer fraud, Petitioners identified multiple means of "traditional" voting fraud and Michigan Election Code violations, supplemented by harassment, intimidation, discrimination, abuse, and even physical removal of Republican poll challengers to eliminate any semblance of transparency, objectivity, or fairness from the vote counting process. Systematic violations of the Michigan Election Code cast significant doubt on the results of the election and call for this Court to set aside the 2020 Michigan General Election and grant the declaratory and injunctive relief requested herein. King Et al vs. Whitmer Et al, No. 20-cv-13134, Eastern District of Michigan, Exhibits 1-43, PgID 958-1831.

3

## OPINION BELOW

Judge Linda Parker, in the Eastern District of Michigan, without an evidentiary hearing or even oral argument, denied Petitioners "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief." The court held the Eleventh Amendment bars Petitioners claims against Respondents (R, 62, PgID, 3307); Petitioners claims for relief concerning the 2020 General Election were moot (R, 62, PgID, 3310); Petitioners claims were barred by laches as a result of "delay" (R,62, PgID, 3313); and abstention is appropriate under the *Colorado River* doctrine; (R, 62, PgID 3317). The Court further held that petitioners lacked standing. (R, 62, PgID 3324).

The Court stated, "it appears that Petitioners' claims are in fact state law claims disguised as federal claims" (R, 62, PgID 3324) and held there was no established equal protection claim (R, 62, PgID 3324). The Court declined to discuss the remaining preliminary injunction factors extensively. (R, 62, PgID, 3329). Opinion and Order Attached Denying Petitioner's' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief. (R. 62).

## JURISDICTION

The district Court had subject matter over these federal questions under 28 U.S.C. § 1331 because it presents numerous claims based on federal law and the U.S. Constitution. The district court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential

4

electors presents a federal constitutional question." <u>Bush v. Gore</u>, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); <u>Smiley v. Holm</u>, 285 U.S. 355, 365(1932).

The district court had authority to grant declaratory relief under 28 U.S.C. §§ 2201and 2202 and by Fed. R. Civ. P. 57. The district court had supplemental jurisdiction over the related Michigan constitutional claims and state-law claims under 28 U.S.C.§ 1367.

This Court has jurisdiction under 28 USC § 1254(1) because the case is in the Court of Appeals for the Sixth Circuit and petitioners are parties in the case. This Court should grant certiorari before judgment in the Court of Appeals pursuant to Supreme Court Rule 11 because "the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." The United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers, including but not limited to Secretary Benson, have no authority to unilaterally exercise that power, much less flout existing legislation. Moreover, Petitioners Timothy King, Marian Ellen Sheridan, John Earl Haggard, Charles James Ritchard, James David Hooper, and Daren Wade Rubingh, are candidates for the office of Presidential Electors who have a direct and personal stake in the outcome of the election and are therefore entitled to challenge the manner in which the election was conducted and the votes tabulated under the authority of this Court's decision in *Bush v. Gore*, 531 U.S. 98 (2000).

Additionally, this Court has jurisdiction pursuant to the All Writs Act, 28 U.S.C. § 1651(a) and United States Supreme Court Rule 20, Procedure on a Petition for an Extraordinary Writ. Petitioners will suffer irreparable harm if they do not obtain immediate relief. The Electors are set to vote on December 14, 2020. The issues raised are weighty as they call into question who is the legitimate winner of the 2020 presidential election. These exceptional circumstances warrant the exercise of the Court's discretionary powers, particularly as this case will supplement the Court's understanding of  a related pending case, <u>State of Texas v. Commonwealth of</u> <u>Pennsylvania et al</u>, S.Ct. Case No. 220155.

The All Writs Act authorizes an individual Justice or the full Court to issue an injunction when (1) the circumstances presented are "critical and exigent"; (2) the legal rights at issue are "indisputably clear"; and (3) injunctive relief is "necessary or appropriate in aid of the Court's jurisdiction." <u>*Ohio Citizens for Responsible Energy, Inc. v. NRC*</u>, 479 U.S. 1312 (1986) (Scalia, J., in chambers) (citations and alterations omitted).

A submission directly to this Court for a Writ of Certiorari, a Stay of Proceeding and a Preliminary Injunction is an extraordinary request, but it has its foundation. While such relief is rare, this Court will grant it "where a question of public importance is involved, or where the question is of such a nature that it is peculiarly appropriate that such action by this Court should be taken." *Ex Parte Peru*, 318 U.S. 578, 585 (1943). *See also* <u>Cheney v. U.S. Dist. Court</u>, 542 U.S. 367, 380–81 (2004).

6

Here, Petitioners and the public will suffer irreparable harm if this Court does not act without delay. Once the electoral votes are cast, subsequent relief would be pointless. In *Federal Trade Commission v. Dean Foods Co.,* 384 U.S. 597 (1966), the Court affirmed the Seventh Circuit, finding authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where the statute itself was silent on whether injunctive relief was available regarding an application by the FTC. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." *Id.* at 1743. This Court rendered a similar decision in *Roche v. Evaporated Milk Assn*, 319 U.S. 21 (1943), granting a writ of mandamus, even though there was no appealable order and no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by unauthorized action of the district court obstructing the appeal."

CONSTITUTIONAL AND STATUTORY PROVISIONS

The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for president. U.S. Const. art. II, §1, cl. 2.

The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, §4, cl. 1.

The Constitution of Michigan, Article II, §4, clause 1(h) states: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections. All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

 The Michigan Election Code provides voting procedures and rules for the State of Michigan.  M.C.L. § 168.730, designation, qualifications, and number of challengers,  M.C.L. § 168.733,challengers, space in polling place, rights, space at counting board, expulsion for cause, protection, threat or intimidation, MCL § 168.31(1)(a) Secretary of state, duties as to elections, rule MCL 168.765a absent voter counting board.

8

STATEMENT OF THE CASE

Petitioners brought this case to vindicate their constitutional right to a free and fair election ensuring the accuracy and integrity of the process pursuant to the Michigan Constitution, art. 2, sec. 4, par. 1(h), which states all Michigan citizens have: "The right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections."

The Mich. Const., art.2, sec.4, par. 1(h) further states, "All rights set forth in this subsection shall be self-executing. This subsection shall be liberally construed in favor of voters' rights in order to effectuate its purposes."

These state-law procedures, in turn, implicate Petitioners' rights under federal law and the U.S. Constitution. "When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. at 104. "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation." *Anderson* v. *Celebrezze*, 460 U.S. 780, 794-795 (1983) (footnote omitted).

Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, this Court should exercise its authority to issue the writ of certiorari and stay the vote for the Electors in Michigan.

<u>Fact Witness Testimony of Voting Fraud & Other Illegal Conduct</u>

Respondents and their collaborators have executed a multifaceted scheme to defraud Michigan voters, resulting in the *unlawful counting of hundreds of thousands* of illegal, ineligible, duplicate or purely fictitious ballots in the State of Michigan. Evidence included in Respondents' complaint and reflected in Section IV herein shows with specificity the minimum number of ballots that should be discounted, which is more than sufficient to overturn and reverse the certified election results. This evidence, provided in the form of dozens of affidavits and reports from fact and expert witnesses, further shows that the entire process in Michigan was so riddled with fraud and illegality that certified results cannot be relied upon for any purpose by anyone involved in the electoral system.

There were three broad categories of illegal conduct by election workers in collaboration with other state, county and/or city employees and Democratic poll watchers and activists.

*First*, election workers illegally forged, added, removed or otherwise altered information on ballots, the Qualified Voter File (QVF) and Other Voting Records, including:

A.    Fraudulently adding "tens of thousands" of new ballots and/or new voters to QVF in two separate batches on November 4, 2020, all or nearly all of which were votes for Joe Biden.

B.    Forging voter information and fraudulently adding new voters to the QVF Voters, in particular, e.g., when a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted and recorded these new voters as having a birthdate of 1/1/1900.

C.    Changing dates on absentee ballots received after the 8:00 PM Election Day deadline to indicate that such ballots were received before the deadline.

D.    Changing votes for Trump and other Republican candidates.

E.    Adding votes to "undervote" ballots and removing votes from "overvote" ballots.[1]

*Second*, to facilitate and cover up the voting fraud and counting of fraudulent, illegal or ineligible voters, election workers:

A.    Denied Republican election challengers' access to the TCF Center, where all Wayne County, Michigan ballots were processed and counted.

B.    Denied Republic poll watchers at the TCF Center meaningful access to view ballot handling, processing, or counting, and locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots were processed.

---

[1] As explained in *Bush v. Gore*, "overvote" ballots are those where "the [voting] machines had failed to detect a vote for President," 531 U.S. at 102, while "overvote" ballots are those "which contain more than one" vote for President. *Id.* at 107.

11

C.    Engaged in a systematic pattern of harassment, intimidation and even physical removal of Republican election challengers or locking them out of the TCF Center.

D.    Systematically discriminated against Republican poll watchers and favored Democratic poll watchers.

E.    Ignored or refused to record Republican challenges to the violations outlined herein.

F.    Refused to permit Republican poll challengers to observe ballot duplication and other instances where they allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate.

G.    Unlawfully coached voters to vote for Joe Biden and to vote a straight Democrat ballot, including by going over to the voting booths with voters in order to watch them vote and coach them for whom to vote. As a result, Democratic election challengers outnumbered Republicans by 2:1 or 3:1 (or sometimes 2:0 at voting machines).

H.    Collaborated with Michigan State, Wayne County and/or City of Detroit employees (including police) in all of the above unlawful and discriminatory behavior.

*Third*, election workers in some counties committed several additional categories of violations of the Michigan Election Code to enable them to accept and count other illegal, ineligible or duplicate ballots, or reject Trump or Republican ballots, including:

A.    Permitting illegal double voting by persons that had voted by absentee ballot and in person.

B.    Counting ineligible ballots – and in many cases – multiple times.

12

C.     Counting ballots without signatures, or without attempting to match signatures, and ballots without postmarks, pursuant to direct instructions from Respondents.

D.     Counting "spoiled" ballots.

E.     Systematically violating of ballot secrecy requirements.

F.     Counted unsecured ballots that arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline, in particular, tens of thousands of ballots that arrived on November 4, 2020.

G.     Accepting and counting ballots from deceased voters.

<u>Expert Witness Testimony Regarding Voting Fraud</u>

In addition to the above fact witnesses, this Complaint presented expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

(1) A report from Russel Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes tabulated by four precincts on November 4, 2020 in two hours and thirty-eight minutes, that derived from the processing of nearly 290,000 more ballots than available machine counting capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws).

(2) A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots.

13

(3) A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland  Counties showing that Biden gained nearly 100%, and frequently more than 100%, of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes were accepted and tabulated from these precincts.

Foreign actors interfered in this election. As explained in the accompanying redacted declaration of a former electronic intelligence analyst who served in the 305th Military Intelligence Unit with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent U.S. general election in 2020. This Declaration further includes a copy of the patent records for Dominion Systems in which Eric Coomer, Dominion's security director, is listed as the first of the inventors of Dominion Voting Systems. (See Attached hereto as Ex. 105, copy of redacted witness affidavit, November 23, 2020).

Another expert explains that U.S. intelligence services had developed tools to infiltrate foreign voting systems, including Dominion. He states that Dominion's software is vulnerable to data manipulation by unauthorized means and permitted election data to be altered in all battleground states. He concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were probably transferred to former Vice-President Biden. (Ex. 109).

14

These and other irregularities provide substantial grounds for this Court to stay or set aside the results of the 2020 General Election in Michigan and provide the other declaratory and injunctive relief requested herein.

Irreparable harm will inevitably result for both the public and the Petitioners if the Petitioners were required to delay this Court's review by first seeking relief in the United States Court of Appeals, Sixth Circuit. Once the electoral votes are cast, subsequent relief would be pointless and the petition would be moot. As such, petitioners are requesting this Honorable Court grant the petition under the most extraordinary of circumstances. A request which, although rare, is not without precedent.

Similar relief was granted in FTC v. Dean Foods Co., 86 S.Ct. 1738 (1966) affirming the Seventh Circuit, involving an application by the FTC and a holding by this Court that found authority under 28 U.S.C. § 1651(a) to enjoin merger violating Clayton Act, where statute itself was silent on whether injunctive relief was available. "These decisions furnish ample precedent to support jurisdiction of the Court of Appeals to issue a preliminary injunction preventing the consummation of this agreement upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile." Id. at 1743. A similar decision was reached in In Roche Evaporated Milk Ass'n, 63 S.Ct. 938, 941 (1943), the Supreme Court granted a writ of mandamus where there was no appealable order or where no appeal had been perfected because "[o]therwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ

15

thwarted by unauthorized action of the district court obstructing the appeal."

For these reasons, this Honorable Court should exercise its authority to review this pending application, to stay the Electoral College Vote pending disposition of the forthcoming petition for writ of certiorari and to allow Petitioners a full and fair opportunity to be heard.

ARGUMENT

**I.  THE TRIAL COURT ERRED WHEN IT DENIED THE PETITIONERS' EMERGENCY MOTION BECAUSE PETITIONERS PRESENTED A PRIMA FACIE CASE OF WIDESPREAD VOTER IRREGULARITIES AND FRAUD IN THE STATE OF MICHIGAN IN THE PROCESSING AND TABULATION OF POLLING-PLACE VOTES AND ABSENTEE BALLOTS**.

The record includes overwhelming evidence of widespread systemic election fraud and numerous serious irregularities and mathematical impossibilities not only in the state of Michigan but numerous states utilizing the Dominion system. Sworn witness testimony of "Spider", a former member of the 305th Military Intelligence Unit, explains how Dominion was compromised and infiltrated by agents of hostile nations China and Iran, among others. (R. 49, PgID, 3074). Moreover, expert Russell Ramsland testified that 289,866 ballots must be disregarded as a result of voting machines counting 384,733 votes in two hours and thirty-eight minutes when the actual, available voting machinery was incapable of counting more than 94,867 votes in that time frame. (R. 49, PgID, 3074). According to the final certified tally in Michigan, Mr. Biden has a slim margin of 146,000 votes over President Trump.

16

In the United States, voting is a sacrament without which this Republic cannot survive. Election integrity and faith in the voting system distinguishes the United States from failed or corrupt nations around the world. Our very freedom and all that Americans hold dear depends on the sanctity of our votes.

Judge Parker issued a Notice of Determination of Motion without Oral Argument (R. 61, PgID, 3294) on this most sensitive and important matter. She ignored voluminous evidence presented by Petitioners proving widespread voter fraud, impossibilities, and irregularities that undermines public confidence in our election system and leaves Americans with no reason to believe their votes counted.  It the face of all Petitioners' evidence, it cannot be said that the vote tally from Michigan reflects the will of the people.  From abuses of absentee ballots, fraudulent ballots, manufactured ballots, flipped votes, trashed votes, and injected votes, not to mention the Dominion algorithm that shaved votes by a more than 2% margin from Trump and awarded them to Biden, the Michigan results must be decertified, the process of seating electors stayed, and such other and further relief as the Court finds is in the public interest, or the Petitioners show they are entitled.

**A. PETITIONERS PRESENTED SUFFICIENT EVIDENCE, WHICH WAS IGNORED BY THE DISTRICT COURT, TO WARRANT A PRELIMINARY INJUNCTION WHERE THE PROFFERED EVIDENCE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS, THAT PETITIONERS WOULD SUFFER IRREPARABLE HARM IN THE ABSENCE OF INTERLOCUTORY RELIEF, THAT THE BALANCE OF EQUITIES TIPS IN THIER FAVOR AND THAT AN INJUNCTION IS IN THE PUBLIC INTEREST**.

17

Respondents have submitted a number of affidavits, consisting mostly of recycled testimony from ongoing State proceedings, that purport to rebut Plaintiffs' fact witnesses all of which boil down to: (1) they did not see what they thought they saw; (2) maybe they did see what they thought they saw, but it was legal on the authority of the very government officials engaged in or overseeing the unlawful conduct; (3) the illegal conduct described could not have occurred because it is illegal; and/or (4) even if it happened, those were independent criminal acts by public employees over whom State Respondents had no control.

Below are a few examples of State Defendant affiants' non-responsive responses, evasions and circular reasoning, followed by Plaintiff testimony and evidence that remains unrebutted by their testimony.

- **Illegal or Double Counted Absentee Ballots**. Affiant Brater asserts that Plaintiffs' allegation regarding illegal vote counting can be "cursorily dismissed by a review of election data," and asserts that if illegal votes were counted, there would be discrepancies in between the numbers of votes and numbers in poll books. ECF No. 31-3 ¶19. Similarly, Christopher Thomas, asserts that ballots could not, as Plaintiffs allege, see FAC, Carrone Aff., have been counted multiple times because "a mistake like that would be caught very quickly on site," or later by the Wayne County Canvassing Board. ECF No. 39-6 ¶6. Mr. Brater and Mr. Thomas fail to acknowledge that is precisely what happened: The Wayne County Canvassing Board found that over 70% of Detroit Absentee Voting Board ("AVCB") were unbalanced, and that two members of Wayne County Board of Canvassers initially refused to certify results and conditioned certification on a manual recount and answers to questions such as "[w]hy the pollbooks, Qualified Voter Files, and final tallies do not match or balance." FAC ¶¶105-107 & Ex. 11-12 (Affidavits of Wayne County Board of Canvasser Chairperson Monica Palmer and Member William C. Hartmann). Further, Plaintiffs' affiants testified to observing poll workers assigning ballots to different voters than the one named on the ballot. FAC ¶86 & Larsen Aff. Defendants do not address this allegation, leaving it un-rebutted.

- **Illegal Conduct Was Impossible Because It Was Illegal**. Mr. Thomas wins the Begging the Question prize in this round for circular reasoning that "[i]t would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November," and "no ballot could have been backdated," because no ballots received after the deadline "were ever at the TCF Center," nor could the ballot of an ineligible voter been "brought to the TCF Center." ECF No. 39-5 ¶20; id. ¶27. That is because it would have been illegal, you understand. The City of Detroit's absentee voter ballot quality control was so airtight and foolproof that only 70% of their precincts were unbalanced for 2020 General Election, which exceeded the standards for excellence established in the August 2020 primary where 72% of AVCB were unbalanced. FAC Ex. 11 ¶¶7&14.

State Respondents Affiants did not, however, dismiss all of Plaintiff Affiants' claims. Rather, they made key admissions that the conduct alleged did in fact occur, while baldly asserting, without evidence, that this conduct was legal and consistent with Michigan law. Defendants admitted that:

- Election Workers at TCF Center Did Not Match Signatures for Absentee Ballots.

- Election Workers Used Fictional Birthdates for Absentee Voters. ECF No. 39- 5 ¶15. The software made them do it.

Election Workers Altered Dates for Absentee Ballot Envelopes. Mr. Thomas does not dispute Affiant Jacob's testimony that "she was instructed by her supervisor to adjust the mailing date of absentee ballot packages" sent to voters, but asserts this was legal because "[t]he mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes."  This is not a factual assertion but a legal

19

conclusion—and wrong to boot. Michigan law the Michigan Constitution provides all registered voters the right to request and vote by an absentee ballot without giving a reason. MICH. CONST. art. 2, § 4. M.C.L. § 168.759(3). That statute limits the procedures for requesting an absentee ballot to three specified ways: An application for an absent voter ballot under this section may be made in any of the following ways: By a written request signed by the voter on an absent voter ballot application form provided for that purpose by the clerk of the city or township.  Or on a federal postcard application. M.C.L. § 168.759(3) (emphasis added). The Michigan Legislature thus did not include the Secretary of State as a means for distributing absentee ballot applications. *Id*. § 168.759(3)(b). Under the statute's plain language, the Legislature explicitly gave *only local clerks* the power to distribute absentee voter ballot applications. *Id.* Secretary Benson lacked authority to distribute even a single absentee voter ballot application—much less the *millions* of absentee ballot applications Secretary Benson chose to flood across Michigan.

Secretary Benson also violated Michigan law when she launched a program in June 2020 allowing absentee ballots to be requested online, *without* signature verification as expressly required under Michigan law. The Michigan Legislature did not approve or authorize Secretary Benson's unilateral actions. MCL § 168.759(4) states in relevant part: "An applicant for an absent voter ballot shall sign the application. Subject to section 761(2), a clerk or assistant clerk shall not deliver an absent voter ballot to an applicant who does not sign the application." MCL § 168.761(2), in turn, states:  "The qualified voter file must be used to determine the genuineness of a signature on an application for an absent voter ballot. Signature comparisons must be made with the digitized signature in the qualified voter file."  Nowhere does Michigan Law authorize counting of an absent voter's ballot without verifying the voter's signature.

**II. THE DISTRICT COURT ERRED WHEN IT DISMISSED PETITIONERS' EMERGENCY MOTION AND REQUEST FOR PRELIMINARY INJUNCTION BY HOLDING THAT THE PETITIONERS STATE-LAW CLAIMS AGAINST RESPONDENTS WERE BARRED BY ELEVENTH AMENDMENT IMMUNITY.**

The Sixth Circuit recently addressed the scope of Eleventh Amendment sovereign immunity in the election context in *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1045 (6th Cir. 2015). In *Russell*, the appellate court held that federal courts do in fact have the power to provide injunctive relief where the defendants, "The Secretary of State and members of the State Board of Elections," were, like State Respondents in this case, "empowered with expansive authority to "administer the election laws of the state." *Russell*, 784 F.3d at 1047 (internal quotations omitted).

> The appellate court held that the Eleventh Amendment does not bar"[e]njoining a statewide official under *Young* based on his obligation to enforce a law is appropriate" where the injunctive relief requested sought to enjoin actions (namely, prosecution) that was within the scope of the official's statutory authority." *Id.*

This is precisely what the Petitioners request in the Amended Complaint, namely, equitable and injunctive relief "enjoining Secretary [of State] Benson and Governor Whitmer from transmitting the currently certified election results to the Electoral College." (See ECF No. 6 ¶1). Under *Russell,* the Eleventh Amendment is no bar to this Court granting the requested relief. (R. 49, PgID 3083).

**III. THE DISTRICT COURT ERREONEOUSLY HELD THAT THE PETITIONERS CLAIMS SEEKING A PRELIMINARY INJUNCTION WERE MOOT WHEN THE ELECTORAL COLLEGE HAS YET TO CERTIFY THE NATIONAL ELECTION AND AS SUCH THE RELIEF REQUESTED IS TIMELY.**

This Court can grant the primary relief requested by Petitioners – de- certification of Michigan's election results and an injunction prohibiting State Respondents from transmitting the certified results – as discussed below in Section I.E. on abstention. There is also no question that this Court can order other types of declaratory and injunctive relief requested by Petitioners – in particular, impounding Dominion voting machines and software for inspection – nor have State Respondents claimed otherwise. (R. 49, PgID 3082). The District Court erroneously held that the Petitioners claims seeking a preliminary injunction were barred as being moot when the Electoral College has yet to certify the national election and as such the relief is timely.

**IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT THE PETITIONERS' CLAIMS WERE BARRED BY LACHES WHEN THE CLAIMS WERE IN FACT TIMELY MADE AND ADDRESS HARM THAT IS CONTINUING AND FORTHCOMING, AND THE RESPONDENTS ARE NOT PREJUDICIED BY ANY DELAYS IN THE FILING BY THE PETITIONERS.**

Laches consists of two elements, neither of which are met here: (1) unreasonable delay in asserting one's rights; and (2) a resulting prejudice to the defending party. *Meade v. Pension Appeals and Review Committee*, 966 F.2d 190, 195 (6th Cir. 1992). The bar is even higher in the voting rights or election context, where Respondents asserting the equitable defense must show that the delay was due to a "deliberate" choice to bypass judicial remedies and they must do so "by clear and

convincing" evidence. *Toney v. White*, 488 F.2d 310, 315 (5th Cir. 1973). Petitioners' "delay" in filing is a direct result of Respondents failure to complete counting until November 17, 2020. Further, Petitioners' filed their initial complaint on November 25, 2020, two days after the Michigan Board of State Canvassers certified the election on November 23, 2020. (R. 49, PgID 3082).

Additionally, the "delay" in filing after Election Day is almost entirely due to Respondents failure to promptly complete counting until weeks after November 3, 2020. Michigan county boards did not complete counting until November 17, 2020, and Defendant Michigan Board of State Canvassers did not do so until November 23, 2020, ECF No. 31 at 4—a mere two days before Petitioners filed their initial complaint on November 25, 2020. Petitioners admittedly would have preferred to file sooner, but needed time to gather statements from dozens of fact witnesses, retain and engage expert witnesses, and gather other data supporting their Complaint, and this additional time was once again a function of the sheer volume of evidence of illegal conduct by Respondents and their collaborators. Respondents cannot now assert the equitable defense of laches, when any prejudice they may suffer is entirely a result of their own actions and misconduct.

Moreover, much of the misconduct identified in the Complaint was not apparent on Election Day, as the evidence of voting irregularities was not discoverable until weeks after the election. William Hartman explains in a sworn statement dated November 18, 2020, that "on November 17th there was a meeting of the Board of Canvassers to determine whether to certify the results of Wayne County" and he had "determined that approximately 71% of Detroit's 134 Absentee Voter

Counting Boards were left unbalanced and unexplained." He and Michele Palmer voted *not* to Certify and only later agreed to certify after a representation of a full audit, but then reversed when they learned there would be no audit. (See ECF No. 6, Ex. 11 &12.) Further, filing a lawsuit while Wayne County was still deliberating whether or not to certify, despite the demonstrated irregularities, would have been premature.  Respondents appropriately exhausted their non-judicial remedies by awaiting the decision of the administrative body charged with determining whether the vote count was valid. Id.

It is also disingenuous to try to bottle this slowly counted election into a single day when in fact waiting for late arriving mail ballots and counting mail ballots persisted long after "Election Day."

**III. THE DISTRICT COURT ERRED WHEN IT DISMISSED THE PETITIONERS' CLAIMS BASED ON *COLORADO RIVER* ABSTENTION WITHOUT IDENTIFYING ANY PARALLEL STATE-COURT PROCEEDINGS THAT ADDRESS THE IDENTICAL RELIEF SOUGHT**.

The District Court accepted State Respondent' abstention claim arguments based on <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800, 808 (1976), a case addressing concurrent federal and state jurisdiction over water rights. See ECF No. 31 at 19-20. Presumably it did so because the case setting the standard for federal abstention in the voting rights and state election law context, <u>Harman v. Forssenius</u>, 380 U.S. 528, 534, (1965) is not favorable to the Respondents.

This Court rejected the argument that federal courts should dismiss voting rights claims based on federal abstention, emphasizing that abstention may be appropriate where "the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law," and "deference to state court adjudication only be made where the issue of state law is uncertain." Harman, 380 U.S. at 534 (citations omitted). But if state law in question "is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question," then "it is the duty of the federal court to exercise its properly invoked jurisdiction." *Id.* (citation omitted).

Respondents described several ongoing state proceedings where there is some overlap with the claims and specific unlawful conduct identified in the Complaint. See ECF No. 31 at 21-26. But State Respondents have not identified any uncertain issue of state law that would justify abstention. See ECF No 31 at 21-26. Instead, as described below, the overlaps involve factual matters and the credibility of witnesses, and the finding of these courts would not resolve any uncertainty about state law that would impact Petitioners' constitutional claims (Electors and Elections Clauses and Equal Protection and Due Process Clauses).

Respondents' reliance on *Colorado River* is also misplaced insofar as they contend that abstention would avoid "piecemeal" litigation, *see id.* at 38, because abstention would result in exactly that. The various Michigan State proceedings raise a number of isolated factual and legal issues in separate proceedings, whereas Plaintiffs' Complaint addresses most of the legal claims and factual evidence submitted in

25

Michigan State courts, and also introduces a number of new issues that are not present in any of the State proceedings. Accordingly, the interest in judicial economy and avoidance of "piecemeal" litigation would be best served by retaining jurisdiction over the federal and state law claims.

Respondents cited to four cases brought in the State courts in Michigan, none of which have the same plaintiffs, and all of which are ongoing and have not been resolved by final orders or judgments. (See ECF Nos. 31-6 to 31-15.)

The significant differences between this case and the foregoing State proceedings would also prevent issue preclusion. A four-element framework finds issue preclusion appropriate if: (1) the disputed issue is identical to that in the previous action, (2) the issue was actually litigated in the previous action, (3) resolution of the issue was necessary to support a final judgment in the prior action, and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. See <u>Louisville Bedding Co.</u> <u>v. Perfect Fit Indus</u>., 186 F. Supp. 2d 752, 753-754, 2001 U.S. Dist. LEXIS 9599 (citing <u>Graco Children's Products, Inc. v. Regalo International, LLC</u>, 77 F. Supp. 2d 660, 662 (E.D. Pa. 1999). None of these requirements have been met with respect to petitioners or the claims in the Complaint.

Of equal importance is the fact that the isolated claims in State court do not appear to present evidence demonstrating that a sufficient number of illegal ballots were counted to affect the result of the 2020 General Election. The fact and expert witnesses presented in the Complaint do. As summarized below, the Complaint alleges and

26

provides supporting evidence that the number of illegal votes is
potentially multiples of Biden's 154,188 margin in Michigan. (See ECF
No. 6 ¶16).

    A.    A report from Russell Ramsland, Jr. showing the "physical
impossibility" of nearly 385,000 votes injected by four precincts/township
on November 4, 2020, that resulted in the counting of nearly 290,000
more ballots processed than available capacity (which is based on
statistical analysis that is independent of his analysis of Dominion's
flaws), a result which he determined to be "physically impossible" (see
Ex. 104 ¶14).

    B.    A report from Dr. Louis Bouchard finding it to be
"statistically impossible" the widely reported "jump" in Biden's vote tally
of 141,257 votes during a single time interval (11:31:48 on November 4),
see Ex. 110 at 28).

    C.    A report from Dr. William Briggs, showing that there were
approximately 60,000 absentee ballots listed as "unreturned" by voters
that either never requested them, or that requested and returned
their ballots. (See Ex. 101).

    D.    A report from Dr. Eric Quinell analyzing the anomalous
turnout figures in Wayne and Oakland Counties showing that Biden
gained nearly 100% and frequently more than 100% of all "new" voters
in certain townships/precincts when compared to the 2016 election,
and thus indicates that nearly 87,000 anomalous and likely fraudulent
votes came from these precincts. (See Ex. 102).

    E.    A report from Dr. Stanley Young that looked at the entire
State of Michigan and identified nine "outlier" counties that had both
significantly increased turnout in 2020 vs. 2016, almost all of which went
to Biden totaling over 190,000 suspect "excess" Biden votes (whereas
turnout in Michigan's 74 other counties was flat). (See Ex. 110).

    F.    A report from Robert Wilgus analyzing the absentee ballot
data that identified a number of significant anomalies, in particular,
224,525 absentee ballot applications that were both sent and returned
on the same day, 288,783 absentee ballots that were sent and
returned on the same day, and 78,312 that had the same date for all
(i.e., the absentee application was sent/returned on same day as the
absentee ballot itself was sent/returned), as well as an additional
217,271 ballots for which there was no return date (i.e., consistent with
eyewitness testimony described in Section II below). (See Ex. 110).

G.     A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precincts, but that the Democrat advantage (i.e., the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated. (See Ex. 110).

H.     A report by an affiant whose name must be redacted to protect his safety concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five-point six percentage points. Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (See Ex. 111 ¶13).

## IV. THE DISTRICT COURT ERRED WHEN IT HELD THAT PETITIONERS, WHO ARE CANDIDATES FOR THE OFFICE OF PRESIDENTIAL ELECTOR, LACKED STANDING TO PURSUE THEIR EQUAL PROTECTION AND OTHER CLAIMS

Petitioners are not simply voters seeking to vindicate their rights to an equal and undiluted vote, as guaranteed by Michigan law and the Equal Protection Clause of the U.S. Constitution, as construed by this court in *Reynolds v. Sims*, 377 U.S. 533 (1964) and its progeny. Rather, Petitioners are candidates for public office.  Having been selected by the Republican Party of Michigan at its 2019 Fall convention, and their names having been certified as such to the Michigan Secretary of States pursuant to Michigan Election Law 168.42, they were nominated to the office of Presidential Electors in the November 2020 election pursuant to MCL § 168.43.  Election to this office is limited to individuals who have been citizens of the United States for 10 years, and registered voters of the district (or the

28

state) for at least 1 year, and carries specific responsibilities defined by law, namely voting in the Electoral College for President and Vice-President.  MCL §168.47. While their names do not appear on the ballot, Michigan Law makes it clear that the votes cast by voters in the presidential election are actually votes for the presidential electors nominated by the party of the presidential candidate listed on the ballot. MCL § 168.45.[2]

The standing of Presidential Electors to challenge fraud, illegality and disenfranchisement in a presidential election rests on a constitutional and statutory foundation—as if they are candidates, not voters.[3]  Theirs is not a generalized grievance shared by all other voters; they are particularly aggrieved by being wrongly denied the responsibility, emoluments and honor of serving as members of the Electoral College, as provided by Michigan law. Petitioners have the requisite legal standing, and the district court must be reversed on this point. As in the Eighth Circuit case of *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020),"[b]ecause Minnesota law plainly treats presidential electors as candidates, we do, too." *Id*. at 1057.  And this Court's opinion in *Bush v. Gore*, 531 U.S. 98 (2000) (failure to set state-wide standards for recount of votes for presidential electors violated federal Equal Protection), leaves no doubt that presidential candidates have standing to raise post-election challenges to the

---

[2] This section provides: " Marking a cross (X) or a check mark ( ) in the circle under the party name of a political party, at the general November election in a presidential year, shall not be considered and taken as a direct vote for the candidates of that political party for president and vice-president or either of them, but, as to the presidential vote, as a vote for the entire list or set of presidential electors chosen by that political party and certified to the secretary of state pursuant to this chapter."
[3] *See* https://sos.ga.gov/index.php/Elections/voter_registration_statistics, last visited November 5, 2020.

manner in which votes are tabulated and counted.  The district court therefore clearly erred in concluding that Petitioners lack standing to raise this post-election challenge to the manner in which the vote for *their* election for public office was conducted.

There is further support for Petitioners' standing in the Court's recent decision in *Carney v. Adams* involving a challenge to the Delaware requirement that you had to be a member of a major political party to apply for appointment as a judge.  In Adams, the Court reiterated the standard doctrine about generalized grievance not being sufficient to confer standing and held that *Adams* didn't have standing because he "has not shown that he was 'able and ready' to apply for a judicial vacancy in the imminent future".  In this case, however, Petitioners were not only "able and ready" to serve as presidential electors, they were nominated to that office in accordance with Michigan law.

The Respondents have presented compelling evidence that Respondents not only failed to administer the November 3, 2020 election in compliance with the manner prescribed by the Michigan Legislature in the Michigan Election Code, MCL §§ 168.730-738, but that Respondents executed a scheme and artifice to fraudulently and illegally manipulate the vote count to ensure the election of Joe Biden as President of the United States. This conduct violated Petitioners' equal protection and due process rights, as well their rights under the Michigan Election Code and Constitution. *See generally* MCL §§ 168.730-738 & Mich. Const. 1963, art. 2, §4(1).

In considering Petitioners' constitutional and voting rights claims under a "totality of the circumstances" standard, this Court must consider the cumulative effect of the specific instances or categories of Respondents' voter dilution and disenfranchisement claims. Taken together, these various forms of unlawful and unconstitutional conduct destroyed or shifted tens or hundreds of thousands of Trump votes, and illegally added tens or hundreds of thousands of Biden votes, changing the result of the election, and effectively disenfranchising the majority of Michigan voters. If such errors are not address we may be in a similar situation as Kenya, where voting has been viewed as not simply irregular but a complete sham.  (Coram: Maraga, CJ & P, Mwilu, DCJ & V-P, Ojwang, Wanjala, Njoki and Lenaola, SCJJ)

## CONCLUSION

WHEREFORE, the Petitioners respectfully request this Honorable Court enter an emergency order instructing Respondents to de-certify the results of the General Election for the Office of the President, pending disposition of the forthcoming Petition for Certiorari. Alternatively, Petitioners seek an order instructing the Respondents to certify the results of the General Election for Office of the President in favor of President Donald Trump.

Petitioners seek an emergency order prohibiting Respondents from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with the Michigan Election Code, including the tabulation of absentee and mail-in ballots Trump Campaign's watchers were prevented from observing

31

or based on the tabulation of invalidly cast absentee and mail-in ballots which (i) lack a secrecy envelope, or contain on that envelope any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference, (ii) do not include on the outside envelope a completed declaration that is dated and signed by the elector, (iii) are delivered in-person by third parties for non-disabled voters, or (iv) any of the other Michigan Election Code violations set forth in Section II of the petition.

Petitioners respectfully request an order of preservation and production of all registration data, ballots, envelopes, voting machines necessary for a final resolution of this dispute.

Respectfully submitted,

*/s/ Howard Kleinhendler*
HOWARD KLEINHENDLER
Howard Kleinhendler Esquire
Suite 300
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

SIDNEY POWELL
Sidney Powell, P.C.
2911 Turtle Creek, Blvd,

Dallas, Texas 75219
 (517) 763-7499
 sidney@federaappeals.com

*Of Counsel*
JULIA Z. HALLER
BRANDON JOHNSON
EMILY P. NEWMAN

STEFANIE LAMBERT JUNTTILA
500 Griswold Street, Suite 2340
Detroit, Michigan 48301
(248) 270-6689
attorneystefanielambert@gmail.com

L. LIN WOOD
L. LIN WOOD, P.C.
P.O.Box 52584
Atlanta, GA 30305
(404) 891-1402

SCOTT HAGERSTROM
222 West Genesee
Lansing, Michigan 48933
Date: December 10, 2020

Gregory J Rohl
41850 West 11 Mile Road, Suite 110
Novi MI 48375

32

<u>CERTIFICATE OF COMPLIANCE</u>

The attached Writ of Certiorari complies with the type-volume limitation. As required by Supreme Court Rule 33.1(h), I certify that the document contains 8,324 words, excluding the parts of the document that are exempted by Supreme Court Rule 33.1(d).

Respectfully submitted,


<u>/s/ Howard Kleinhendler</u>
HOWARD KLEINHENDLER
Attorney for Plaintiff/Petitioners
369 Lexington Avenue, 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

SIDNEY POWELL
STEFANIE LAMBERT JUNTTILA
Attorneys for Plaintiffs/Petitioners
500 Griswold Street, Suite 2340
Detroit, MI 48226
(248) 270-6689
attorneystefanielambert@gmail.com

Date:  December 11, 2020

CASE NO.

IN THE SUPREME COURT OF THE UNITED STATES

TIMOTHY KING, MARIAN ELLEN SHERIDAN,  JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,

Plaintiffs/Petitioners,

v.

GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan
BOARD OF STATE CANVASSERS

Defendants/Respondents,

and

CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY, and ROBERT DAVIS,

Intervenor-Defendants/Respondents.

PROOF OF SERVICE

STATE OF MICHIGAN)
                                      )ss
COUNTY OF WAYNE  )

STEFANIE LAMBERT JUNTTILA, affirms, deposes and states that on the 11th day of December, 2020, she did cause to be served the following:

1.  PETITION FOR WRIT OF CERTIORARI On Petition for a Writ of Certiorari to the United States Federal District Court for the Eastern District of Michigan;
2.  Attached Exhibits;
3.  Certificate of Conformity;
4.  Proof of Service

UPON:

ERIK A. GRILL
HEATHER S. MEINGAST
Michigan Department of Attorney General
Civil Litigation, Employment & Elections Division
PO Box 30736
Lansing, MI 48909
517-335-7659
Email: grille@michigan.gov

DARRYL BRESSACK
DAVID H. FINK and NATHAN J. FINK
Attorneys as Law
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
248-971-2500
Email: dbressack@finkbressack.com

ANDREW A. PATERSON, JR.
Attorney at Law
46350 Grand River Ave.
Novi, MI 48374
248 568-9712
Email: aap43@hotmail.com

MARY ELLEN GUREWITZ
Attorney at Law
Cummings & Cummings Law PLLC
423 North Main Street; Suite 200
Royal Oak, MI 48067
313-204-6979
Email: megurewitz@gmail.com

SCOTT R. ELDRIDGE
Attorney at Law
Miller, Canfield,
One Michigan Avenue
Suite 900
Lansing, MI 48933-1609
517-483-4918
Email: eldridge@millercanfield.com

DANIEL M. SHARE
EUGENE DRIKER
STEPHEN E. GLAZEK
Attorney at Law
Barris, Sott, Denn & Driker, PLLC
333 West Fort Street; 12th Floor
Detroit, MI 48226
313-965-9725
Email: dshare@bsdd.com

EZRA D. ROSENBERG
Lawyers' Committee for Civil Rights Under Law
1500 K Street, NW; Suite 900
Washington, DC 20005
202-662-8345
Email: erosenberg@lawyerscommittee.org

JON GREENBAUM
Lawyers' Committee for Civil Rights Under Law
District Of Columbia
1500 K Street NW
Ste 9th Floor
Washington, DC 20005
202-662-8315
Email: jgreenbaum@lawyerscommittee.org

By email and by placing said copies in a properly addressed envelope with sufficient

postage fully prepaid, and placing in a U.S. Mail Receptacle.


FURTHER AFFIANT SAYETH NOT.


/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA