# Order

**Michigan Supreme Court**
Lansing, Michigan

December 9, 2020

162286 & (3)(5)(6)(9)(10)

Bridget M. McCormack,
*Chief Justice*

David F. Viviano,
*Chief Justice Pro Tem*

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
*Justices*

ANGELIC JOHNSON and LINDA LEE TARVER,
        Petitioners,

v                                      SC: 162286

SECRETARY OF STATE, CHAIRPERSON OF THE BOARD OF STATE CANVASSERS, BOARD OF STATE CANVASSERS, and GOVERNOR,
        Respondents.
_____/

      On order of the Court, the motions for immediate consideration are GRANTED. The petition for extraordinary writs and declaratory relief is considered, and it is DENIED, because the Court is not persuaded that it can or should grant the requested relief. The motions to intervene are DENIED as moot.

      CLEMENT, J. (*concurring*).

      I concur in the Court's order denying the relief sought in this complaint. Indeed, I do so in large part due to the legal authority cited by Justice VIVIANO in dissent. It is undeniable that the legal authority in this area has not been the subject of much litigation, and therefore there is little caselaw on point. However, there are many *seemingly* apparent answers—many of which are discussed at some length by Justice VIVIANO— and when these answers are combined with the defects in petitioners' presentation of their case, I do not think it is an appropriate exercise of this Court's discretion to prolong the uncertainty over the legal status of this election's outcome. This Court routinely chooses not to hear cases which raise interesting and unsettled legal questions in the abstract when we conclude the case would be a poor practical vehicle for addressing those questions—which is my view of this case and these questions. Moreover, I believe it would be irresponsible to continue holding out the possibility of a judicial solution to a dispute that it appears must be resolved politically.

      I think it is important at the outset to have a basic understanding of how elections in Michigan work. On Election Day, votes are cast. Once Election Day is over, the votes in each race are then counted at the precinct level. See MCL 168.801 ("Immediately on closing the polls, the board of inspectors of election in each precinct shall proceed to canvass the vote."). Those results are then forwarded to the county. See MCL 168.809. The results are then canvassed by the board of county canvassers, see MCL 168.822(1), which declares the winners of county and local races, MCL 168.826(1), while tabulating

the results of elections for various statewide and other races within that county and forwarding those results to the Board of State Canvassers, MCL 168.824(1) and 168.828. The Board of State Canvassers then canvasses the figures from around the state, MCL 168.842(1), tabulating the figures and declaring the winners of the various races that the Board of State Canvassers must manage, MCL 168.844 and 168.845.  Once the canvassing is finished, the county clerk (for county and local offices) and the Secretary of State (for higher offices) issues a certificate of election to the named winners.  MCL 168.826(2) and 168.845.

At no point in this process is it even proper for these individuals to investigate fraud, illegally cast votes, or the like.  "[I]t is the settled law of this State that canvassing boards are bound by the return, and cannot go behind it, especially for the purpose of determining frauds in the election.  Their duties are purely ministerial and clerical." *McQuade v Furgason*, 91 Mich 438, 440 (1892).  *After* a certificate of election is issued, it is possible to challenge whether it was issued to the right individual.  Usually this is done via a court action seeking what is called a writ of "quo warranto."  See MCL 600.4501 *et seq*.  There are debates at the margins about exactly how this process might work—as noted by Justice VIVIANO, there is some dispute about who has standing to maintain an action for quo warranto and whether it can commence before an allegedly wrongful officeholder takes office—but this is the basic outline: the votes are counted, a certificate of election is issued, and *then* we debate whether said certificate was issued to the wrong individual.  This is because of the limited authority of the canvassing board to simply tally votes cast.

> The duties of these [canvassing] boards are simply ministerial: their whole duty consists in ascertaining who are elected, and in authenticating and preserving the evidence of such election.  It surely cannot be maintained that their omissions or mistakes are to have a controlling influence upon the election itself.  It is true that their certificate is the authority upon which the person who receives it enters upon the office, and it is to him *prima facie* evidence of his title thereto; but it is only *prima facie* evidence. [*People ex rel Attorney General v Van Cleve*, 1 Mich 362, 366 (1850).]

It is in this context that I believe we must read petitioners' complaint.  At no point does their complaint ask that we declare that a particular slate of presidential electors was duly elected.  Nor does their prayer for relief ask that we order the Secretary of State to perform an audit of this election under Const 1963, art 2, § 4(1)(h).  Indeed, it is not entirely clear exactly what the nature of petitioners' complaint even is; while MCR 2.111(B)(1) requires that a complaint lay out each "cause of action," the complaint recites several vague counts ("Due Process," "Equal Protection," and "Article II, section 1, clause 2") that are not recognized causes of action themselves.  The only recognized cause of action is Count Four, which asks for "Mandamus and *Quo Warranto*."  These

certainly are recognized causes of action at common law, although they are distinct causes of action that are addressed to different problems. "[T]o obtain a writ of mandamus, the plaintiff must have a clear legal right to the performance of the specific duty sought to be compelled and the defendants must have a clear legal duty to perform the same." *State Bd of Ed v Houghton Lake Community Sch*, 430 Mich 658, 666 (1988). Quo warranto, by contrast, is "the only way to try titles to office finally and conclusively . . . ." *Lindquist v Lindholm*, 258 Mich 152, 154 (1932). Combining them makes it unclear what petitioners are asking this Court to *do*—command a public officer to perform a legal duty (and if so, which officer, and what duty?), or test title to office?[1] I believe this confusion is reflected in the fact that Justices VIVIANO and ZAHRA focus on the constitutional right to an audit that the petitioners do not actually ask for in their prayer for relief. Rather, the prayer for relief asks for a variety of essentially interim steps—taking control of ballots, segregating ballots the petitioners believe were unlawful, enjoining officials from taking action predicated on the vote counts—but does not ask for any actual electoral outcome to be changed. This only begins the problems with this proceeding.

Next, there is a problem of jurisdiction. There has, admittedly, never been litigation like this before in Michigan, so we have no precedents we can draw upon as a definitive resolution. However, the face of petitioners' complaint strongly suggests there is a jurisdictional problem. The gist of petitioners' complaint is that they are unsatisfied with the recent decision of the Board of State Canvassers to declare a winner in the election for presidential electors in Michigan. But this Court has no apparent jurisdiction to review this decision. As noted, the canvassing process is not the time to allege that an election was marred with fraud. Petitioners allege that sections of the Michigan Election Law, like MCL 168.479 and MCL 168.878, allow for decisions of the Board of State Canvassers to be challenged by a mandamus action in the Michigan Supreme Court. But these sections appear to be inapplicable—MCL 168.479 is in the chapter on initiative and referendum, where the responsibilities of the Board of State Canvassers are far more involved than merely tabulating votes, and MCL 168.878 is in the chapter on recounts, which is also not implicated here. Even if either statute were applicable here, there is no theory that the petitioners have put forward suggesting that the Board of State Canvassers failed to perform a legal duty it was obliged to perform. Instead, as noted by Justice VIVIANO, in this context the role of the canvassing board is ministerial, with no function other than to tabulate the votes cast and determine which candidate (or candidates) received the most votes. To the extent that petitioners are trying to revisit the determination of the Board of State Canvassers, it appears they cannot, at least absent the unlikely scenario of the board simply having performed its computations incorrectly, which is not alleged here.

---

[1] Notably, none of the named defendants are alleged to be usurpers to any office, which indicates that plaintiffs have not satisfied the pleading requirements for a quo warranto action under MCL 600.4505(1).

Petitioners also ask that we enjoin respondents "from finally certifying the election results and declaring winners of the 2020 general election . . . ." As an initial matter, this would seem to be moot—it has been widely reported that this already has occurred. A "past event cannot be prevented by injunction." *Rood v Detroit*, 256 Mich 547, 548 (1932). Even had that not happened, however, it does not appear that the law contemplates any role for the courts in this process. As noted by Justice VIVIANO, the ordinary process by which a Michigan election result can be challenged is via quo warranto proceedings. We have said

> that you may go to the ballots, if not beyond them, in search of proof of the due election of either the person holding, or the person claiming the office. And this is as it should be. In a republican government, where the exercise of official power is but a derivative from the people, through the medium of the ballot box, it would be a monstrous doctrine that would subject the public will and the public voice, thus expressed, to be defeated by either the ignorance or the corruption of any board of canvassers. [*Van Cleve*, 1 Mich at 365-366.]

However, when the Board of State Canvassers must declare the winner of an election—as it must with presidential electors, MCL 168.46—the Legislature has, in MCL 168.846, apparently suppressed quo warranto proceedings and reserved to itself the prerogative of determining who the winner is. Such an arrangement is consistent with how disputes over elections to the United States Congress and the Michigan Legislature are resolved, see US Const, art I, § 5, cl 1; Const 1963, art 4, § 16, as well as the plenary authority that state legislatures have over the selection of presidential electors under federal law, see US Const, art II, § 1, cl 2; 3 USC 2.[2] As Justice VIVIANO observes, the language of MCL 168.846 was formerly in the Michigan Constitution of 1850. When it was, we observed that it

> does not permit the regularity of elections to the more important public offices to be tried by the courts. It has provided that in all cases, where . . . the result of elections is to be determined by the Board of State Canvassers, there shall be no judicial inquiry beyond their decision. . . .
>
> This provision was doubtless suggested by the serious difficulties

---

[2] One could fairly question whether it is constitutional for MCL 168.846 to reserve to the Legislature the prerogative to settle disputes over elections to offices required by the Michigan Constitution—a Legislature inclined to abuse this power could conceivably nullify an election that the Michigan Constitution requires to be held. But the Michigan Constitution does not require that presidential electors be themselves popularly elected, and reserving final decision-making authority in the Legislature as to that specific office is consistent with federal constitutional and statutory law.

which would attend inquiries into contested elections, where the ballots of a great number of election precincts would require to be counted and inspected; and probably, also, to discourage the needless litigation of the right to the higher public offices at the instance of disappointed candidates where the public interest does not appear to require it. A legislative body can exercise a discretion in such cases, and could not be compelled to enter upon such an inquiry except upon a preliminary showing which the courts are not at liberty to require. [*People ex rel Royce v Goodwin*, 22 Mich 496, 501-502 (1871).]

These jurisdictional problems seemingly put to rest petitioners' allegations about how absentee ballots were handled in this election. They ask that we "segregate any ballots counted or certified inconsistent with Michigan Election Law" and, in particular, "any ballots attributable to the Secretary of State's absentee ballot scheme"—a reference to the Secretary of State's decision to send out unsolicited absentee ballot applications to voters. Whatever the legality of this decision on the Secretary of State's part, it does not appear that the courts are the proper forum for challenging the validity of *any* votes cast in the race for presidential electors (as well as some other offices). For those offices where it might be challengeable, the proper means would be a quo warranto action. That said, I would note that laches may apply here—the time to challenge this scheme may have been before the applications were mailed out (or at least before the absentee ballots were cast), rather than waiting to see the election outcome and then challenging it if unpalatable.

These jurisdictional concerns are not the only problem with this petition. Petitioners' prayer for relief does not ask that we direct the Secretary of State to conduct an audit of this election, although their briefing does invoke the right to an audit under Const 1963, art 2, § 4(1)(h)—added to our Constitution two years ago as part of Proposal 18-3. To the extent that the petitioners are trying to get a writ of mandamus against the Secretary of State to perform an immediate audit under the constitutional language,[3] I

---

[3] Justice VIVIANO says I am "mistaken in suggesting that petitioners here have not asked for an audit," because petitioners' complaint declares several times that the respondents "owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses." In my view, asserting what citizens are owed is a far cry from demanding actual relief—particularly in light of the conceptual confusion that pervades this petition. The fact that Justice VIVIANO must patch together what the petitioners are apparently after by combining the petition's allegations with its prayer for relief and the accompanying brief goes to show how weakly it is presented. Moreover, as noted by Justice VIVIANO, petitioners' brief asks us to "enter an order requiring that the Michigan Legislature convene a joint convention to analyze and audit the election returns" or that this Court "should oversee an independent audit." Given the nature of the writ of quo warranto, it is simply not a proper vehicle for receiving any audit-related relief. As

would note at the outset that they have apparently made a procedural misstep. Although the Michigan Constitution gives this Court jurisdiction over mandamus actions, see Const 1963, art 6, § 4 (stating that "the supreme court shall have . . . power to issue, hear and determine prerogative and remedial writs"), we have provided by rule that such actions must begin in either the Court of Appeals or the Court of Claims, MCR 3.305(A)(1). "Reasons of policy dictate that such complaints be directed to the first tribunal within the structure of Michigan's one court of justice having competence to hear and act upon them." *People v Flint Muni Judge*, 383 Mich 429, 432 (1970). This is why the court rule for original actions in our Court refers only to proceedings for superintending control, which extends to either the lower courts or certain other judicial entities, MCR 7.306(A)(1) and (2), not the executive branch. We have indicated a willingness to disregard such errors in the past, see, e.g., *McNally v Wayne Co Bd of Canvassers*, 316 Mich 551, 555-556 (1947), but petitioners' audit-related arguments begin in a bad position.

More importantly, there is no apparent purpose to which the audit sought by the petitioners can be put in light of the above-mentioned jurisdictional limits on the judiciary's ability to revisit the outcome of this election. Given the apparent inability of canvassing boards to investigate fraud, there is a fundamental disconnect between petitioners' allegations of fraud and their request for an audit. Justice ZAHRA "would have ordered an immediate evidentiary hearing before a special master for the purpose of ferreting out whether there is any substance to the very serious-but-as-yet-unchallenged allegations of irregularities and outright violations of Michigan Election Law that petitioners assert took place before the vote was certified . . . ." But such an evidentiary hearing is unnecessary—in any event, those boards of canvassers had no authority to perform (or at least act on) such a factual investigation. Moreover, the boards have certified the results and certificates of election have been issued; it is difficult to see how any judicial proceeding could undo that process. I fail to see how those certification choices can be taken back any more than the Governor can take back a pardon once issued. Cf. *Makowski v Governor*, 495 Mich 465 (2014). This is not to say that certificates of election cannot be challenged; rather, it is to say that an election contest needs to take the form of a challenge to the certificate of election, rather than a challenge to the ministerial certification process.

There is also reason to believe that the right to an audit does not extend to changing the outcome of an election. The statute that implements the right to an audit

---

noted, mandamus might be, at least to the extent that petitioners seek to compel the Secretary of State to perform a clear legal duty. But that would not extend to this Court's performing said audit; nowhere in the law is it *this Court's* legal duty to perform any audit. The same can also be said of the Legislature, which is in addition not even a named defendant in this action, so it is hard to imagine how we would order the Legislature to do anything even if that were *not* an assault on the separation of powers.

makes clear that it "is not a recount and does not change any certified election results." MCL 168.31a(2). While one might argue that the statute does not completely vindicate the petitioners' constitutional "right to have the results of statewide elections audited," Const 1963, art 2, § 4(1)(h), it seems important to note that the Constitution provides that the audit shall be performed "in such a manner as prescribed by law," *id*. There is a somewhat confusing internal contradiction in the constitutional text, as the audit right is the only one said to be "as prescribed by law," but all of the rights in § 4(1) are said to be "self-executing." However, I see nothing to be gained in judicial exploration of this tension and examination of the scope of the audit right conveyed in § 4(1)(h) if there is no purpose to which the results could be applied. Moreover, deferring to the audit right as it is expressed in MCL 168.31a(2) would be consistent with the outcome of the remainder of the cases that have come to us which implicate Proposal 18-3. While this Court has denied leave in each of these cases and thus has taken no institutional position, see MCR 7.301(E), the consistent result has been to unsettle the least amount of the Michigan Election Law as possible when provisions of it are challenged under Proposal 18-3. We have thus left in place the statutory deadline of 8 p.m. on Election Day for absentee ballots to be received and counted as well as certain statutory voter registration requirements, and denied a prior challenge seeking an audit outside the boundaries of MCL 168.31a. See *League of Women Voters v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161671), denying lv from ___ Mich App ___ (2020), recon den ___ Mich ___ (2020); *Promote the Vote v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161740), denying lv from ___ Mich App ___ (2020); *Priorities USA v Secretary of State*, ___ Mich ___ (2020) (Docket No. 161753), denying lv from ___ Mich App ___ (2020); *Costantino v Detroit*, ___ Mich ___ (2020) (Docket No. 162245). As I have been the only member of the Court in the majority on all of these cases and the instant case, I cannot speak for my colleagues, but for my own part I can say that a desire to unsettle as little of the Michigan Election Law as possible has animated my approach to these cases.

Petitioners' remaining requests in their prayer for relief put them in the curious position of volunteers in defense of the Legislature's needs. Thus, they ask that we "take immediate custody and control of all ballots, ballot boxes, poll books, and other indicia of the Election . . . to prevent further irregularities, and to ensure that the Michigan Legislature and this Court have a chance to perform a constitutionally sound audit of lawful votes." But if the Legislature needs to seize records, it has some authority to do so, see MCL 4.541, and if it needs judicial assistance in this regard, it is free to ask us. They similarly ask that we "appoint a special master or committee from both chambers of the Michigan Legislature to investigate all claims of mistake, irregularity, and fraud at the TCF Center . . . ." But the separation of powers makes it unthinkable that we would direct the Legislature to convene a committee to investigate anything—that branch's choice to investigate is its own.[4] For our part, there is no need for a special master to

---

[4] Justice VIVIANO suggests the possibility that the "results of an audit could be used by petitioners to convince the Legislature to take up the matter and to prevail in that venue,"

investigate anything if it is not in service of a cause of action that the petitioners enjoy. As noted, during the vote-counting process, the question of fraud is not one that the canvassing boards can investigate; after the vote-counting is complete, the issue is one that must be raised in either a quo warranto proceeding or, as apparently is the case here, before the Legislature itself.

If the scope of the constitutional right to an audit that animates Justices ZAHRA's and VIVIANO's dissenting statements were squarely presented and likely to be dispositive, I would be open to hearing this case. But the scope of that right is not very well presented (as noted, it does not appear in petitioners' prayer for relief), it does not appear to be dispositive, and petitioners' complaint is marred by further problems besides these. Although we have no absolutely definitive answers for these questions, it appears very much that petitioners are erroneously seeking to make the investigation of fraud a part of the canvassing process, and doing so by invoking statutes (MCL 168.479, MCL 168.878) that do not purport to give the judiciary the jurisdiction they ask us to exercise, which is all the more a problem given that MCL 168.846 appears to make the Legislature the exclusive arbiter of who is the proper winner of a presidential election. Petitioners also gesture toward an audit right which MCL 168.31a indicates is too circumscribed to give them the outcome they seek, and even if MCL 168.31a is narrower than the constitutional audit right of Const 1963, art 2, § 4(1)(h), it remains the case that MCL 168.846 apparently makes the Legislature the arbiter of this dispute to the exclusion of the judiciary. Petitioners further ask that we enjoin actions that have already occurred (the certification of the winners of this election), that we retroactively invalidate absentee ballots whose issuance they did not challenge in advance of the election, and that we preserve evidence for the Legislature to review that it either can gather for itself or that it has not asked us to assist in preserving. I simply do not believe this is a compelling case to hear.

In short, even if this petition can be construed as requesting an audit, what it requests is beyond the bounds of MCL 168.31a; and even if petitioners received said audit, it appears that it could not be used to revisit the canvassing process, because MCL 168.846 apparently reserves to the Legislature rather than the judiciary the final say on who Michigan's presidential electors are. For us to scrutinize these admittedly unresolved questions further, we must do so on the strength of a petition we may not have jurisdiction to entertain and within the four corners of which it is not clear what actual cause of action it is pleading, what relief it is seeking, or on what theory it believes it is owed relief from the named defendants. In light of these myriad difficulties—only some of which implicate the apparent merits of the legal issues the petitioners attempt to

---

but their success or failure before the Legislature is a political rather than a legal question. *Nobody* asserts that the right created by Const 1963, art 2, § 4(1)(h) entitles the petitioners to information on the schedule they prefer to try and persuade the Legislature to take action.

present to us—I consider it imprudent to hear this matter, a conclusion only amplified by my view that it is irresponsible to continue holding out the possibility of a judicial solution to a political dispute that needs to be resolved with finality. Petitioners' complaint casts more heat than light on the legal questions it gestures toward, and would not help us in providing a definitive interpretation of the law in this area. I therefore concur with our order denying petitioners relief.

ZAHRA, J. (*dissenting*).

Just two years ago, through the exercise of direct democracy and the constitutional initiative process, the people of Michigan amended our Constitution to expand greatly how Michigan residents may exercise their right to vote. Among the additions to the Michigan Constitution effected by what was then known as Ballot Proposal 2018-3 (Proposal 3) were provisions that: (i) require the Secretary of State automatically to register to vote all Michigan residents conducting certain business with the Secretary of State, unless the resident specifically declines registration; (ii) allow same-day registration with proof of Michigan residency; and (iii) permit no-reason absentee voting. Critics of Proposal 3 argued that these changes would increase opportunities for voter fraud and weaken the integrity of the electoral process, thereby placing in doubt the accuracy and integrity of Michigan's election returns.[5] Proponents responded that Proposal C would promote and ensure the accuracy and integrity of elections by constitutionally guaranteeing the right to audit the results.[6]

In the wake of the very next election cycle to follow the adoption of these sweeping election reforms of 2018, petitioners filed an original action in this Court under Const 1963, art 6, § 4 and MCL 600.217(3) "seeking extraordinary writs of mandamus, prohibition, and declaratory and injunctive relief." In support of their claims, petitioners invoke MCL 168.479, which specifies that "any person who feels aggrieved by any determination made by the board of state canvassers may have the determination reviewed by mandamus or other appropriate remedy in the supreme court."[7] Petitioners

---

[5] See Mack, *Michigan Approves Proposal 3's Election Reforms*, MLive (updated January 29, 2019)

<https://www.mlive.com/news/2018/11/hold_michigan_proposal_3s_elec.html> (accessed December 8, 2020) [https://perma.cc/A8Z9-B46G].

[6] *Id*.

[7] Justice CLEMENT's statement concurring in the Court's order argues that MCL 168.479(1) does not confer jurisdiction in this Court to hear petitioners' challenge because it is located in the chapter on initiatives and referenda. But the plain language of MCL 168.479(1) is broad: "[A]ny person who feels aggrieved by *any determination* made by the board of state canvassers may have the determination reviewed by mandamus or other appropriate remedy in the supreme court" (emphasis added).

request, among other things, appointment of a special master to investigate their claims of election irregularities and fraud and to "independently review the election procedures employed at the TCF Center and throughout the State,"[8] presumably pursuant to Const 1963, art 2, § 4(1)(h)—which was among the provisions added to the Michigan Constitution by Proposal 3 and which guarantees to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such manner as prescribed by law, to ensure the accuracy and integrity of elections."

Based on the pleadings alone, a majority of the Court today denies petitioners' requested relief through a short form order of denial that concludes the majority "is not persuaded that it can or should grant the requested relief." I dissent from the summary dismissal of petitioners' action, without ordering immediate oral argument and additional briefing. As pointed out in the statements of my colleagues, there are threshold questions that must be answered before addressing the substantive merits of petitioners' claims. But rather than summarily dismissing this action because procedural questions exist, I would have ordered immediate oral argument and briefing to address these threshold questions, as well as the meaning and scope of implementation of Const 1963, art 2, § 4(1)(h).

The matter before us is an original action asking the Court to invoke the power of mandamus, superintending control, and other extraordinary writs to provide declaratory relief. As such, this matter should be distinguished from a typical application seeking leave to appeal from the Court of Appeals. Original actions are limited to a small class of cases particularly described in Const 1963, art 6, § 4. Original actions should, therefore, be afforded very close review, particularly when they raise matters under Michigan election law.

Here, petitioners have presented a significant constitutional question pertaining to the process and scope of the constitutional right to an election audit—a right explicitly placed in our Constitution by the people themselves, in whom "[a]ll political power is

---

Moreover, it would be strange to suggest that MCL 168.479(1) applies only to initiatives and referenda, as precisely that sort of limiting language is found not in MCL 168.479(1) but, rather, MCL 168.479(2), which provides in relevant part that any person who "feels aggrieved by any determination made by the board of state canvassers *regarding the sufficiency or insufficiency of an initiative petition* . . . ." (emphasis added). Therefore, on the basis of the statutory text, I am not nearly as confident as Justice CLEMENT that MCL 168.479(1) does not confer jurisdiction in this Court to hear petitioners' challenge. But to the extent we have questions about the Court's jurisdiction, I would explore them at oral argument.

[8] Petition for Extraordinary Writs & Declaratory Relief, p 53.

inherent . . . ." Const 1963, art 1, § 1. Not only that, but Const 1963, art 2, § 4(1)(h) has remarkable resonance for the precise controversy now before this Court because, even when viewed in hindsight, it seems unlikely that the people of Michigan could have crafted language that would more directly address this circumstance than they have already done in ratifying this very provision. Accordingly, I believe we owe it to the people of Michigan to fully and completely review the claims asserted by petitioners. For this reason, I would have immediately ordered oral arguments and briefing to assess, as expeditiously as was practicable, whether petitioners are properly before this Court and, if so, both provide guidance as to the meaning and scope of the right to an audit under Const 1963, art 2, § 4(1)(h), and determine whether petitioners are entitled to any of the other relief they seek.

      MARKMAN, J., joins the statement of ZAHRA, J.

      VIVIANO, J. (*dissenting*).

For the second time in recent weeks, individuals involved in last month's election have asked this Court to order an audit of the election results under Const 1963, art 2, § 4. See *Costantino v Detroit*, ___ Mich ___ (2020) (Docket No 162245). As in that case, petitioners here allege that election officials engaged in fraudulent and improper conduct in administering the election. In support of these claims, petitioners have submitted hundreds of pages of affidavits and expert reports detailing the alleged improprieties. Here, as in *Costantino*, I would grant leave to appeal so we can determine the nature and scope of the constitutional right to an election audit.[9] After all, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v Madison*, 5 US (1 Cranch) 137, 177 (1803). But I write separately to highlight the lack of clarity in our law regarding the procedure to adjudicate claims of fraud in the election of presidential electors.[10]

The case before the Court is no small matter. Election disputes pose a unique test of a representative democracy's ability to reflect the will of the people when it matters most. See Foley, *Ballot Battles: The History of Disputed Elections in the United States* (New York: Oxford University Press, 2016), pp 17-18. But it is a test our country has survived, one way or another, since its inception. The Founding Fathers faced their share of contested elections, as have subsequent generations. See generally *id*.

---

[9] Because of the time constraints imposed by federal law on the appointment of and balloting by federal electors, I would hear and decide this case on an expedited basis so that, if we accept petitioners' interpretation of the constitutional right to an election audit, they will be able to exercise that right in a timely and meaningful manner.

[10] I do not address whether a claim of fraud could be adjudicated or investigated in the context of a recount.

Case 2:20-cv-13134-LVP-RSW   ECF No. 72-4, PageID.3529   Filed 12/22/20   Page 12 of 20

12

But in the context of presidential elections, all these episodes pale in comparison to the contest of 1876, which resulted in challenges and changes that helped set the stage for the present dispute.[11] As with the current case, many of the ballot-counting contests in 1876 focused on the work of canvassing boards and the function of courts; they also involved the role of Congress itself, which created an electoral commission to adjudicate the dispute and help Congress select a victor. See Nagle, *How Not to Count Votes*, 104 Colum L Rev 1732 (2004) (reviewing books on the 1876 election); see also Ewing, *History and Law of the Hayes-Tilden Contest Before the Electoral Commission: The Florida Case, 1876-77* (Washington, DC: Cobden Publishing Co, 1910), pp 148-153 (discussing the litigation in Florida courts over the role of canvassing boards).

Among the modes for challenging the election in 1876 (and in the earlier election of 1872, among others) were lawsuits brought to obtain a writ of quo warranto. See Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla L Rev 541, 573 (2004). With no common-law action available to directly contest an election, Bickerstaff, *Counts, Recounts, and Election Contests: Lessons from the Florida Presidential Election*, 29 Fla St U L Rev 425, 431 (2002), the archaic writ of quo warranto became the tool in England and in this country to dispute an ostensibly successful candidate's right to office. *Conscientious Congressman's Guide*, 56 Fla L Rev at 570-571.[12] A quo warranto proceeding was instituted to "try titles to office" based on claims that the officeholder had wrongfully intruded into or usurped the office. See *Gildemeister v Lindsay*, 212 Mich 299, 303 (1920) (citation and quotation marks omitted); see also Cooley, *Constitutional Limitations* (5th ed), p 788 ("[T]he proper proceeding in which to try [challenges to election results] in the courts is by *quo warranto*, when no special statutory tribunal is created for the purpose.").

The problem, as the elections in the 1870s revealed, was that quo warranto actions were ill-suited to keep pace with the Electoral College: in the two presidential elections of that decade, none of the proceedings "even had their trial phase completed before the electors balloted." *Conscientious Congressman's Guide*, 56 Fla L Rev at 573. In response, Congress passed the Electoral Count Act in 1887. *Id.* at 542, 583. The statute encourages states to adopt procedures to try election contests involving presidential

---

[11] As Justice COOLEY wrote of the 1876 election, "the country is thoroughly warned, that in any close election the falsification of the result is not so difficult that unscrupulous men are not likely to contemplate it," and the practice of relying on state determinations of the vote "makes the remedy exceedingly uncertain, if dishonest men, who have control of the State machinery of elections, shall venture to employ it to defeat the will of the people." Cooley, *The Method of Electing the President*, 5 Int'l Rev 198, 201 (1878).

[12] Quo warranto challenges date back to the middle ages. See Sutherland, *Quo Warranto Proceedings in the Reign of Edward I, 1278-1294* (Oxford: Clarendon Press, 1963), pp 1-6 (noting the king's extensive use of quo warranto in the thirteenth century).

electors. *Id*. at 585. As it currently stands, the results of any determination made under these procedures will be binding on Congress if the determination comes at least six days before the electors meet to vote. 3 USC 5.

Why is the history relevant now? Surely, one might think, after the passage of nearly 150 years our state has adopted efficient procedures to address election disputes, especially when the presidency is at stake. In many states, this is true. In almost all, postelection contests for legislative seats are ultimately decided by the legislatures themselves, although some states have provided for preliminary determinations by the courts or independent commissions. See Douglas, *Procedural Fairness in Election Contests*, 88 Ind L J 1, 5-8, 24-29 (2013); see also *Berdy v Buffa*, 504 Mich 876, 877-879 (2019) (noting that such provisions are commonplace and holding that they only apply to postelection contests of a challenged election result).[13] For disputed gubernatorial elections, a plurality of states have enacted legislation allowing the losing candidate to contest the election in court, either at the trial or appellate court level; others place the decision in the hands of the legislature or a nonjudicial tribunal. *Procedural Fairness*, 88 Ind L J at 9-20. Although only about 20 states have specific provisions for presidential-election disputes, parties often can bring these challenges under the state's general election-contest statutes. *Id*. at 29-34.[14]

Unfortunately, while the vast majority of states have adopted legislation creating a mechanism for the summary or expedited resolution of election contests, Michigan has not. Cf. Wyo Stat Ann 22-17-103 (requiring election contests to be expedited); NJ Stat Ann 19:29-5 (requiring summary proceedings); Neb Rev Stat 32-1110 (requiring summary proceedings with a hearing not later than 15 days after the "matter is at issue"). Indeed, as the controversies arising out of the 2020 general election have shown, there is rampant confusion in our state concerning the proper mechanism for contesting elections in general, and presidential elections in particular, on the basis of fraud. Much of the litigation so far this year has focused on the decisions of the canvassing boards. But "[w]e have long indicated that canvassing boards' role is ministerial and does not involve investigating fraud." *Costantino*, ___ Mich at ___; slip order at 6-7 (VIVIANO, J., dissenting) (collecting sources). There is simply no statutory framework for the boards to adjudicate fraud. And, strikingly, the Legislature has not, in any other statute, expressly provided a mechanism for determining disputes specific to presidential electors as envisioned in the Electoral Count Act.

---

[13] The same is true of contests in congressional elections. See US Const, art 1, § 5.

[14] The American Law Institute has recently issued model frameworks for states to consider adopting in order to comprehensively regulate both election disputes in general and presidential-election disputes in particular. American Law Institute, Principles of the Law, Election Administration: Non-Precinct Voting and Resolution of Ballot-Counting Disputes (2019), Parts II and III.

And thus, we remain one of the only states without any clear framework to enable and regulate election contests. See *Procedural Fairness*, 88 Ind L J at 10; Douglas, *Discouraging Election Contests*, 47 U Rich L Rev 1015, 1028 (2013).[15] Instead, our state has various elements that do not quite add up to a coherent system. As noted, our Legislature has codified the ancient writ of quo warranto. See MCL 600.4501 *et seq*. and MCR 3.306; see also MCL 168.861 ("For fraudulent or illegal voting, or tampering with the ballots or ballot boxes before a recount by the board of county canvassers, the remedy by quo warranto shall remain in full force, together with any other remedies now existing."). Under these proceedings, the court can determine the "right of the defendant to hold the office." MCL 600.4505. But these actions usually must be brought by the attorney general—only if she refuses can a private citizen seek leave of court to make the claim. MCL 600.4501. And our caselaw has suggested that to prevail in the action, the plaintiff must present evidence that he or she is entitled to the office. See *Marian v Beard*, 259 Mich 183, 187 (1932) ("The [quo warranto] suit by a citizen, on leave of court, is a private action, and, therefore, the plaintiff must allege in the information the facts which give him the right to sue. Such allegations necessarily include the . . . showing of title in plaintiff.") (citations and comma omitted); *Barrow v Detroit Mayor*, 290 Mich App 530, 543 (2010) (noting caselaw). Our statutes and court rule do not specify when these actions can be brought, but traditionally they required the defendant to have assumed office; thus one commentator has concluded that our framework "effectively preclude[s] election contests . . . ." *Discouraging Election Contests*, 47 U Rich L Rev at 1028; see also *Procedural Fairness*, 88 Ind L J at 11.[16] With respect to presidential electors, whose office exists for only a short period, it is not at all clear how a quo warranto action could timely form the basis for an effective challenge. Nonetheless, we have stated that " '[t]he only way to try titles to office finally and conclusively is by quo warranto.' " *Sempliner v FitzGerald*, 300 Mich 537, 544-545 (1942), quoting *Frey v Michie*, 68 Mich 323, 327 (1888).

---

[15] See also Developments in the Law, *Postelection Remedies*, 88 Harv L Rev 1298, 1303 n 22 (1975) (noting that, at the time, Michigan was one of "[f]our states [that] do not generally provide for election contests, but do make available the writ of quo warranto"); Nat'l Conference of State Legislatures, *After the Voting Ends: The Steps to Complete an Election* (October 28, 2020) ("Forty-four states have statutes pertaining to election contests. The states lacking such statutes are . . . Michigan . . . .") <https://www.ncsl.org/research/elections-and-campaigns/after-the-voting-ends-the-steps-to-complete-an-election.aspx> (last accessed Dec 8, 2020) [https://perma.cc/5RQ7-UGR9].

[16] The lead opinion in *In re Servaas*, 484 Mich 634, 643 n 15 (2009) (opinion of WEAVER, J.), suggested that quo warranto actions could be launched without regard to whether the defendant was currently in office. But as the dissenters cogently observed, quo warranto historically applied only "to claims that a public official is *currently* exercising invalid title to office." *Id*. at 664 (MARKMAN, J., dissenting).

Despite the apparent exclusiveness of the quo warranto proceeding, MCL 168.846 provides that "[w]hen the determination of the board of state canvassers is contested, the legislature in joint convention shall decide which person is elected." This statute contains language that previously appeared in our 1850 Constitution as Article 8, § 5.[17] Under that constitutional provision, we held that the Legislature had "discretion" and that we could not require our coordinate branch to act. *People ex rel Royce v Goodwin*, 22 Mich 496, 502 (1871); see also *Dingeman v Bd of State Canvassers*, 198 Mich 135, 137 (1917) ("The legislature, bound by no hard and fast rule, may or may not, in its discretion, entertain contests."). We further explained that the rationale for taking these disputes out of the courts was the "serious difficulties which would attend inquiries into contested elections, where the ballots of a great number of election precincts would require to be counted and inspected . . . ." *Goodwin*, 22 Mich at 501; see also *Dingeman*, 198 Mich at 137 ("The determination of the legislature is a finality, and private parties, ambitious to fill these offices, or litigious in character, cannot compel action by the legislature or go

---

[17] The statute and constitutional provision have interesting histories. As described by one law professor from the period, Const 1850, art 8, § 5 ended the prevailing practice of having "all contests concerning elections to office . . . decided by the courts." Wells, *Reilly-Jennison: An Address to the People on the Recent Judicial Contest*, Detroit Free Press (March 27, 1883), p 4; see also University of Michigan, Michigan Law, *William P. Wells*, Faculty, 1874-1891 <https://www.law.umich.edu/historyandtraditions/faculty/Faculty_Lists/Alpha_Faculty/Pages/WilliamPWells.aspx> (accessed Dec 7, 2020) [https://perma.cc/V2PS-Z8ET]. But with the passage of this new constitutional section in 1850, "the power to decide election contests was taken away from the courts, in respect to the State officers named, and such other officers as the Legislature, by subsequent statutes, might add to the list." Wells, *Reilly-Jennison*, p 4. This constitutional provision was carried over in the 1908 Constitution, see Const 1908, art 16, § 4. For some unknown reason, in 1917 the Legislature enacted the same substantive rule in statutory form. 1917 PA 201, chap XIX, § 12. It has remained there since and is now codified at MCL 168.846. See 1925 PA 351, part 4, chap XVI, § 11; 1954 PA 116, § 846. In the meantime, the voters amended the constitutional provision in 1935 so that the Legislature could prescribe rules by which the Board of State Canvassers would oversee election contests. See Ballot Proposal No. 1, 1935, amending Const 1908, art 16, § 4 ("In all cases of tie vote or contested election for any state office, except a member of the legislature, any recount or other determination thereof may be conducted by the board of state canvassers under such laws as the legislature may prescribe."). At the convention that produced our current Constitution, the constitutional provision was considered to be "legislative in character" and thus was excluded altogether from the constitutional text. 1 Official Record, Constitutional Convention 1961, p 846 (Exclusion Report 2016). The convention committee that recommended the exclusion noted that statutes already governed this issue and the Legislature had authority over this area. *Id.*

elsewhere and secure delay in carrying out the recorded will of the electorate."). As a result, in *Goodwin*, which involved a petition for a writ of quo warranto, we stated that this constitutional language "does not permit the regularity of elections to the more important public offices to be tried by the courts." *Goodwin*, 22 Mich at 501. This rule has been followed in numerous cases, including in elections for the judiciary—but it has not been cited or discussed by this Court or the Court of Appeals in many decades.[18] But the Senate's rules currently provide for these contests. Senate Rule 1.202(d) (February 12, 2019).[19]

The plain language of MCL 168.846, and the caselaw interpreting that language from our earlier constitutions, would appear to apply to contested presidential elections. And, since it is arguable whether quo warranto applies before a defendant assumes office, MCL 168.846 may offer the only route for contesting a presidential election before it becomes final.[20] But the statute does not provide for any definite or detailed procedures to determine election contests, as the Electoral Count Act appears to contemplate. 3 USC 5. Compare, e.g., Cal Election Code 16400 and 16401 (providing for contests of "any

---

[18] See *Vance v St Clair Co Bd of Canvassers*, 95 Mich 462, 466 (1893) ("Contests respecting the title to that office [i.e., the circuit judgeship] must be made before the Legislature. That body finally determines the very matters which the board of canvassers in the present case propose to pass upon."); *Dingeman*, 198 Mich at 136, 139 ("It is, and must be, conceded that the Constitution has vested in the legislature sitting in joint convention the power of finally determining the question who was elected to the office of circuit judge. . . . Running through all these cases is the rule, to my mind clear and distinct, that wherever by the organic law, whether Federal, State, or municipal, a tribunal is created to finally determine the right to an office, that tribunal is exclusive, and there, and there only, may the right to the office be tested. By the organic law of this State the legislature, sitting in joint convention, is made such tribunal as to the office here involved."); see also *McLeod v Kelly*, 304 Mich 120, 126-127 (1942) (applying *Dingeman*); *Behrendt v Bd of State Canvassers*, 269 Mich 247, 248 (1934) (same); *Wilson v Atwood*, 270 Mich 317 (1935) (rejecting petition for leave to file quo warranto action regarding the office of Secretary of State when, under the constitutional provision in effect at the time, the Legislature did not properly meet in joint convention to hear the election contest).

[19] Although I did not locate any reference to this procedure in the Standing Rules of the House of Representatives or the Joint Rules of the House and Senate.

[20] The petitioners here have, in fact, recently filed a petition with the Legislature to obtain an election audit and other relief. See Feather, CW7 News, *Voters Petition Michigan Legislature to Audit Election Results, Call SOS Under Oath*, <http://cw7michigan.com/news/local/voters-petition-michigan-legislature-to-audit-election-results-call-sos-under-oath> (accessed December 7, 2020) [https://perma.cc/PL2G-M3RV].

election" and requiring it to be brought within 10 days "[i]n cases involving presidential electors"); Del Code Ann, tit 15, § 5921 (requiring "[a]ny person intending to contest the election of any one declared by the Governor to have been chosen an elector of President and Vice President" to file a declaration within 10 days of the Governor's proclamation). And it is discretionary with the Legislature—they can take up the matter or not. *Dingeman*, 198 Mich at 137; compare Ark Code Ann 7-5-806(c) (requiring the Legislature to vote on whether "the prayers shall be granted" in various contested elections concerning executive offices). As things appear to stand, then, unless the Legislature can be convinced to review the matter, individuals alleging fraud in an election can obtain review, if at all, in a quo warranto action only when executive officials decline to initiate the action, only by leave of the court, and, mostly likely, only after it is too late to matter.

This backdrop makes the current case all the more important, as it involves a new tool for detecting fraud in elections. The voters in 2018 enacted sweeping changes to our election system. One of the new concepts introduced was an election audit. Article 2, § 4(1)(h) provides to "[e]very citizen of the United States who is an elector qualified to vote in Michigan . . . [t]he right to have the results of statewide elections audited, in such a manner as prescribed by law, to ensure the accuracy and integrity of elections." *Id*. "The provision is self-executing, meaning that the people can enforce this right even without legislation enabling them to do so . . . ." *Costantino*, ___ Mich at ___; slip order at 4 (VIVIANO, J., dissenting), citing *Wolverine Golf Club v Secretary of State*, 384 Mich 461, 466 (1971). The Legislature has provided for these audits in MCL 168.31a, "which prescribes the minimum requirements for statewide audits and requires the Secretary of State to issue procedures for election audits under Article 2, § 4." *Costantino*, ___ Mich at ___; slip order at 4 (VIVIANO, J., dissenting).

Petitioners here, like the plaintiffs in *Costantino*, seek to use this new right to obtain an audit of the election results.[21] With that audit in hand, they apparently hope to

---

[21] Justice CLEMENT is mistaken in suggesting that petitioners here have not asked for an audit under Const 1963, art 2, § 4. In each of their claims for relief, petitioners state that "Respondents owe citizens an audit of election results that is meaningful and fair and to safeguard against election abuses." They claim to be aggrieved because the Board of State Canvassers certified the election "without conducting an audit . . . ." Their prayer for relief asks us to collect the ballots and election materials so that "the Michigan Legislature and this Court [will] have a chance to perform a constitutionally sound audit of lawful votes[.]" If there was any lingering doubt, the petitioners' brief here makes it clear, presenting as a numbered issue of "whether the nature and scope of article 2, § 4 requires a meaningful audit before Michigan's electors may be seated." For good measure, the brief asks the Court to "enter an order requiring that the Michigan Legislature convene a joint convention to analyze and audit the election returns . . . ." See also *id*. ("This Court should oversee an independent audit—or require the Michigan

find further support for their challenge to the election. As my dissent in *Costantino* explained, the nature of the right granted in Article 4, § 4(1)(h) is an important issue this Court should resolve. A full resolution involves answering many questions, such as whether MCL 168.31a "accommodates the full sweep of the Article 2, § 4 right to an audit or whether it imposes improper limitations on that right" and whether the party seeking an audit must make some showing of entitlement, such as by presenting evidence of fraud. *Costantino*, ___ Mich at ___; slip order at 4-5.

But the core question this case and *Costantino* have presented is whether the petitioners are entitled to an audit in time for it to make any difference in their election challenges. In other words, is this right a means "to facilitate challenges to election results, or does it simply allow for a postmortem perspective on how the election was handled?" *Id*. at ___; slip order at 5. This gets to the heart of the struggle with these election disputes. The path for citizens of our state to raise serious claims of election wrongdoing, implicating the heart of our democratic institutions, is unclear and underdeveloped. This void in our law might suggest that the audit right in Article 2, § 4 was not intended to support election challenges. On the other hand, the very fact that the mechanisms for election challenges are so opaque might be a reason why the right to an audit is so critical. Moreover, to the extent the current system puts decisions in the hands of the Legislature, MCL 168.846, a timely audit might be essential for parties to convince the Legislature to entertain an election contest. And as I pointed out in *Costantino*, Article 2, § 4 was passed at a time when audits were increasingly viewed as a tool to measure the accuracy of election results so that recounts and other procedures could be employed if the audit uncovered problems. *Costantino*, ___ Mich at ___; slip order at 6.

Whatever the answer may be, the importance of the issue cannot be denied. Indeed, few topics so closely affect the maintenance of our democratic principles. As noted above, our laws governing election contests are underdeveloped in the context of the election of presidential electors. This uncertainty—particularly the lack of any laws that *clearly* govern the determination of presidential-election contests, although MCL 168.846 arguably applies—jeopardizes our ability to take advantage of the safe harbor in 3 USC 5, i.e., Congress's guarantee to respect the state's determination of election disputes over electors. For this reason, and perhaps even more importantly to provide our citizens with a coherent, fair, and efficient mechanism for adjudicating claims of fraud in the election of presidential electors, I respectfully urge the Legislature to consider enacting legislation creating such a mechanism.

---

Legislature to take back this constitutional function . . . ."). Short of a magical incantation, it seems to me that petitioners have done all they can to put the issue directly before the Court.

By closing the courthouse door on these petitioners, the Court today denies them any ability to have their claims fully considered by the judiciary.[22] That is because petitioners, rightly thinking that time is short, have filed this case as an original action in this Court. As a result, they have received no decision below and now will go without any answer. I believe it is incumbent upon the Court, in these circumstances, to provide

---

[22] Justice CLEMENT declares it "irresponsible" for us even to consider the issues presented by this case. *Ante* at 1, 9. I would beg to differ. Considering jurisprudentially significant constitutional claims is our core responsibility. The fact that the claims arise in a high-profile case or one that may have national implications is no reason for us to shy away from our duty to decide them. As I have discussed at some length here (and in *Costantino*), our election contest laws are underdeveloped and unclear. That murkiness may explain why the petitioners here (and parties in related cases like *Costantino*) have had such difficulty navigating them. Justice CLEMENT appears to agree that the law is unsettled: her concurrence repeatedly hedges on every significant question in the case, and she ultimately concludes that she has "no absolutely definitive answers for" them. *Ante* at 8. So we have real work to do in this case to clarify the law in this area—work that only this Court can do.

In addition, despite claiming she has not reached any "definitive answers," Justice CLEMENT's reasons for voting to deny are premised on certain conclusions regarding the nature of the right to an audit and other issues in the case. For example, she says "there is no apparent purpose to which the audit sought by the petitioners can be put in light of the above-mentioned jurisdictional limits on the judiciary's ability to revisit the outcome of this election." *Ante* at 6. This suggests that the audit right has no role to play in election contests because such contests cannot come before the courts. And because she believes the matter is for the Legislature, she sees no need to resolve the "tension" she perceives in the text of Article 2, § 4. *Ante* at 7. Of course, this conclusion overlooks the possibility that the results of an audit could be used by petitioners to convince the Legislature to take up the matter and to prevail in that venue. Baked into the concurrence's rationales, then, are determinations about the scope and nature of the audit right, this Court's jurisdiction, and the respective roles of the courts and Legislature—all of which are questions at the heart of the case and any of which is significant enough, in my opinion, to merit a full opinion from this Court. Thus, in professing not to answer any question in this case, Justice CLEMENT assumes the answer to a number of them. I would instead take direct aim at resolving these issues, but only after hearing the case.

guidance so that, no matter the outcome, the people are able to understand and exercise their constitutional rights in an effective and meaningful manner.[23]  Accordingly, I dissent.

      MARKMAN, J., joins the statement of VIVIANO, J.

---

[23] In hearing the case, I would consider all matters necessary to reach a resolution, including whether this Court has jurisdiction to hear this original action or provide any or all of the relief requested.  Because the Court has declined to hear this case, I, of course, reach no final conclusions on any of the issues addressed above.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 9, 2020



t1209

Clerk