## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>           Plaintiffs,<br><br> v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>           Defendants<br> and<br><br>CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY,<br><br>       Intervenor-Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR <u>REFERRAL TO STATE BAR DISCIPLINARY BODIES</u>

Intervenor-Defendant City of Detroit (the "City"), by and through counsel,

respectfully moves for sanctions against Plaintiffs and their counsel pursuant to

Federal Rule of Civil Procedure 11. The City further moves for disciplinary action and referrals to be initiated against counsel.

The undersigned counsel certifies that counsel communicated in writing with opposing counsel, explaining the nature of the relief to be sought by way of this motion and seeking concurrence in the relief; opposing counsel thereafter denied concurrence. Such concurrence was sought on December 15, 2020 and January 5, 2021.

The City also served Plaintiffs with a Motion for Sanctions under Fed. R. Civ. P. 11 on December 15, 2020. Plaintiffs did not withdraw or correct any of the false factual allegations and frivolous legal theories in their pleadings during the 21 day "safe harbor" period.[1] Thus, this Motion is timely.

---

[1] No lawyer for the Plaintiffs responded to the email message forwarding the Rule 11 motion. Instead, at least two of their attorneys made public statements, with military analogies and references to opposing counsel as "the enemy." According to the news website Law and Crime, Plaintiffs' counsel, Sidney Powell, when asked about the proposed Rule 11 motion, "replied cryptically: 'We are clearly over the target.'" Ex. 1. Similarly, Plaintiffs' counsel, L. Lin Wood, posted the following on his Twitter account on December 17, 2020:

> When you get falsely accused by the likes of David Fink & Marc Elias of Perkins Coie (The Hillary Clinton Firm) in a propaganda rag like Law & Crime, you smile because you know you are over the target & the enemy is running scared!

L. Lin Wood (@llinwood), Twitter (Dec. 17, 2020). Perhaps the lack of civility is related to counsels' failure to apply for admission to the Eastern District of Michigan's bar. at least they would have been compelled to review and affirm their commitment to our court's Civility Principles.

This Motion is supported by the accompanying Brief.

**Sanctions Pursuant to Fed. R. Civ. P. 11(b)(1)**

1.      Sanctions should be imposed under Fed. R. Civ. P. 11(b)(1) when a pleading or other filing is presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

2.      Sanctions pursuant to the sub-rule should be imposed against Plaintiffs and their counsel because they initiated the instant suit for improper purposes, including harassing the City and frivolously undermining "People's faith in the democratic process and their trust in our government." Opinion and Order Denying Plaintiffs' "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief," ECF No. 62, PageID.3329-30.

3.      Plaintiffs and their counsel understood that the mere filing of a suit (no matter how frivolous) could, without any evidence, raise doubts in the minds of millions of Americans about the legitimacy of the 2020 presidential election. As this Court noted, "Plaintiffs ask th[e] Court to ignore the orderly statutory scheme established to challenge elections and to ignore the will of millions of voters." *Id.* PageID.3330.

4.      The Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in

Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were devoid of merit and thus could only have been filed for improper purposes.

## Sanctions Pursuant to Fed. R. Civ. P. 11(b)(2)

5.     Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriately entered where the claims, defenses, and other legal contentions are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

6.     Sanctions pursuant to Rule 11(b)(2) should be imposed against counsel for Plaintiffs because the causes of action asserted in the Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) were frivolous and legally deficient under existing law and because Plaintiffs failed to present any non-frivolous arguments to extend, modify, or reverse existing law.

7.     The majority of Plaintiffs' claims were moot. As this Court noted, "[t]he time has passed to provide most of the relief Plaintiffs request in their Amended Complaint; the remaining relief is beyond the power of any court. For these reasons, this matter is moot." ECF No. 62, PageID.3307.

8.     Plaintiffs' claims were also barred by laches because "they waited too long to knock on the Court's door." *Id.* at PageID.3310. Indeed, "Plaintiffs showed

no diligence in asserting the claims at bar." *Id.* at PageID.3311. This delay prejudiced the City. *Id.* at PageID.3313.

9. Plaintiffs lacked standing to pursue their claims. *Id.* at PageID.3317-3324.

10. Plaintiffs' claim for violation of the Elections and Electors Clauses is frivolous. As this Court held, "Plaintiffs ask the Court to find that any alleged deviation from state election law amounts to a modification of state election law and opens the door to federal review. Plaintiffs cite to no case – and this Court found none – supporting such an expansive approach." *Id.* at PageID.3325.

11. Plaintiffs' due process and equal protection clause claims are also baseless. With regard to the due process claim, this Court held that "Plaintiffs do not pair [the due process claim] with anything the Court could construe as a developed argument. The Court finds it unnecessary, therefore, to further discuss the due process claim." *Id.* at PageID.3317. As to the equal protection claim, this Court stated that "[w]ith nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.* at PageID.3328.

12. For each of Plaintiffs' claims, Plaintiffs did not identify valid legal theories and the controlling law contradicted the claims. The claims were not

warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

13.     Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7) was without any legal basis because, as described above, the underlying claims are baseless, and the requests for relief were frivolous.

14.     Plaintiffs' Emergency Motion to Seal (ECF No. 8) was without any legal basis because Plaintiffs seek to anonymously file supposed evidence of a broad conspiracy to steal the 2020 presidential election without providing any authority whatsoever to attempt to meet their heavy burden to justify the sealed filing of these documents.

**Sanctions Pursuant to Fed. R. Civ. P. 11(b)(3)**

15.     Sanctions can be imposed under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.

16.     Sanctions should be entered against Plaintiffs and their counsel pursuant to Fed. R. Civ. P. 11(b)(3) because the factual contentions raised in the complaints and motions were false.

17.     The key "factual" allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been

debunked. The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center have been rejected by every court which has considered them. If any of the claims in this lawsuit had merit, that would have been demonstrated in those cases. The City refers the Court to its Response to Plaintiffs' Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief for a detailed debunking of Plaintiffs' baseless factual contentions. ECF No. 39, PageID.2808-2933.

### Disciplinary Proceedings

18.     E. D. Mich. LR 83.22 authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court."

19.     The Rule also authorizes the Court to refer counsel to the Chief Judge of this District for disbarment or suspension proceedings.

20.     And, the Rule authorizes the Court to refer counsel to the Michigan Attorney Discipline Board and to the disciplinary authorities of counsels' home jurisdictions for purposes of disciplinary proceedings.

WHEREFORE, for the foregoing reasons and the reason stated in the accompanying brief, the City of Detroit respectfully requests that this Court enter an Order:

(a) Imposing monetary sanctions against Plaintiffs and their counsel in an amount determined by this Court to be sufficient to deter future misconduct (such amount should be, at the least, the amount that Plaintiffs' counsel have collected in their fundraising campaigns, directly or through entities they own or control, for their challenges to the 2020 election);

(b) Requiring Plaintiffs and their counsel to pay all costs and attorney fees incurred by the City in relation to this matter (as well as costs and fees incurred by all other Defendants);

(c) Requiring Plaintiffs and/or their counsel to post a bond of $100,000 prior to the filing of any appeal of this action (and to maintain their present appeal);

(d) Requiring Plaintiffs and their counsel to post a bond of $100,000 prior to filing, in any court, an action against the City, or any other governmental entity or their employees, relating to or arising from the facts alleged in this matter;

(e) Requiring Plaintiffs to post a substantial bond, in an amount determined by the Court, prior to filing an action in the Eastern District of Michigan;

(f) Requiring Plaintiffs and their counsel to obtain certification from a magistrate judge that the proposed claims are not frivolous or asserted for an

improper purpose, before filing an action in the Eastern District of Michigan (and, if the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, requiring the plaintiff[s] to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]);

(g) Requiring Plaintiffs and their counsel to certify, via affidavit, under penalty of perjury, that they have paid all amounts required to fully satisfy any non-appealable orders for sanctions entered by any court, prior to filing an action in the Eastern District of Michigan;

(h) Barring Plaintiffs' counsel from practicing law in the Eastern District of Michigan (after the issuance of a show cause order);

(i) Referring Plaintiffs' counsel to the Chief Judge of this District for initiation of disbarment proceedings;

(j) Referring all Plaintiffs' counsel to the Michigan Attorney Grievance Commission (and also to the disciplinary authorities of their home jurisdictions, including: Sidney Powell to the Michigan Bar and to the Texas bar; L. Lin Wood to the Michigan Bar and to the Georgia bar; Greg Rohl to the Michigan bar; Emily Newman to the Michigan Bar and to the Virginia bar; Julia Haller to the Michigan Bar and to the Washington D.C. bar; Brandon Johnson to the Michigan Bar and to

the Washington D.C. bar; Scott Hagerstrom to the Michigan bar; Howard Kleinhendler to the Michigan Bar and to the New York bar); and,

(k) Granting any other relief that the Court deems just or equitable.

January 5, 2021                    Respectfully submitted,

**FINK BRESSACK**

By:    /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

**CITY OF DETROIT**
**LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
nosej@detroitmi.gov

x

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| TIMOTHY KING, MARIAN ELLEN SHERIDAN, JOHN EARL HAGGARD, CHARLES JAMES RITCHARD, JAMES DAVID HOOPER and DAREN WADE RUBINGH,<br><br>        Plaintiffs,<br><br>  v.<br><br><br>GRETCHEN WHITMER, in her official capacity as Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,<br><br>        Defendants. | No. 2:20-cv-13134<br><br>Hon. Linda V. Parker |

## BRIEF IN SUPPORT OF
## THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO STATE BAR DISCIPLINARY BODIES

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.......................................................................II

STATEMENT OF THE ISSUES PRESENTED................................................. IV

CONTROLLING OR MOST APPROPRIATE AUTHORITIES...........................V

INTRODUCTION ........................................................................................1

ARGUMENT ...............................................................................................4

I.   Rule 11 Standards.................................................................................4

II.  The Complaint was Filed for an Improper Purpose .........................................5

III. The Factual Assertions in the Complaint Were Frivolous and Based on Assertions Which Had Been Rejected by Michigan Courts.................................13

   A.   Allegations Regarding Republican Challengers .....................................13

   B.   Allegations of "Pre-Dating"...........................................................14

   C.   Allegations Regarding Ballots Supposedly Counted More than Once...15

   D.   Allegations Regarding Tabulating Machines.........................................16

   E.   The Declarations and Analyses "Supporting" the Complaint Were Full of Intentional Lies ..................................................................................18

IV. Plaintiffs' Legal Theories Were Frivolous.................................................27

V.  The Sanctions Which Should be Imposed Pursuant to Rule 11 .....................31

VI. Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief Judge for Disbarment......................................................................................35

CONCLUSION ..........................................................................................38

# INDEX OF AUTHORITIES

**Cases**

*Bognet v. Secy Commonwealth of Pennsylvania*,
  980 F.3d 336 (3rd Cir. Nov. 13, 2020)..................................................28

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261
  (D. Ariz. Dec. 9, 2020) ........................................................ 2, 3, 18, 19

*Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020) ......13

*Costantino v. Detroit*, Opinion and Order,
  Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)...........13

*DeGeorge v. Warheit*, 276 Mich. App. 587, 741 N.W.2d 384 (2007) ...................37

*Ex parte Young*, 209 U.S. 123 (1908).......................................................29

*Feathers v Chevron U.S.A., Inc*., 141 F.3d 26 (6th Cir. 1998) ...............................33

*Feehan v. Wisconsin Elections Comm'n*,
  No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020)...........................2

*Georgia Republican Party v. Secy of State of Georgia*,
  No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) .............................28

*Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996).............................................36

*INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*,
  815 F.2d 391 (6th Cir. 1987) ........................................................... 5, 31

*Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020)...24

*King v. Whitmer*,
  No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020) .......................1

*Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)................................... 5, 31

*Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992)......................31

*Ortman v. Thomas*, 99 F.3d 807 (6th Cir. 1996) ....................................................33

*Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020)..................................2

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984)..........................29

*Roberson v. Norfolk Southern Railway Co.*,
    2020 WL 4726937 (E.D. Mich. Aug. 14, 2020) ...................................................32

*SLS v. Detroit Public Schools*,
    No. 08-14615, 2012 WL 3489653 (E.D. Mich. Aug. 15, 2012) ..........................32

*Stephenson v. Central Michigan University*,
    No. 12-10261, 2013 WL 306514 (E.D. Mich. Jan. 25, 2013).............................32

*Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11, 2020) ..9

*Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866 (5th Cir. 1988) ........................36

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) ..........6

**Statutes and Rules**

E. D. Mich. LR 83.20.................................................................................35

E. D. Mich. LR 83.22.................................................................................36

Fed. R. Civ. P. 11(b)(1).......................................................................Passim

Fed. R. Civ. P. 11(b)(2).......................................................................Passim

Fed. R. Civ. P. 11(b)(3).......................................................................Passim

Fed. R. Civ. P. 11(c)(5)...............................................................................4

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

I.        Should the Court sanction Plaintiffs and their counsel pursuant to Fed.

R. Civ. P. 11?

   The City answers: "Yes."


II.        Should the Court discipline Plaintiffs' counsel, refer them to the Chief

Judge of this District for disbarment proceedings and refer them to the Michigan

Attorney Grievance Commission and their home state bars for disciplinary

proceedings?

   The City answers: "Yes."

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

Fed. R. Civ. P. 11(b)(1)

Fed. R. Civ. P. 11(b)(2)

Fed. R. Civ. P. 11(b)(3)

E. D. Mich. LR 83.22

*Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020)

*Constantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020)

*Ex parte Young*, 209 U.S. 123 (1908)

*King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198 (E.D. Mich. Dec. 7, 2020)

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990)

# **INTRODUCTION**

This Court has already concluded that Plaintiffs present "nothing but speculation and conjecture" and that "this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court— and more about the impact of their allegations on People's faith in the democratic process and their trust in our government." *King v. Whitmer*, No. CV 20-13134, 2020 WL 7134198, at *13 (E.D. Mich. Dec. 7, 2020). Now, it is time for Plaintiffs and their counsel to answer for that misconduct.

It is indelibly clear that this lawsuit was filed for an improper purpose, and the failure to dismiss or amend the Complaint after service of a Rule 11 motion warrants the strongest possible sanctions. There are so many objectively false allegations in the Complaint that it is not possible to address all of them in a single brief. This brief will address some of the more extreme examples.

For instance, Plaintiffs claim that their self-proclaimed experts include a military intelligence analyst, but when they accidentally disclosed his name, the "expert" was revealed to have washed out of the training course for military intelligence. Plaintiffs' counsel did not redact the information to "protect" the "informant," they did so to hide their fraud on the court.[2]

---

[2] In addition to this case, Plaintiffs' attorneys filed three other remarkably similar, and similarly frivolous, "release the kraken" lawsuits. The requested relief

Plaintiffs' "expert" reports are rife with misstatements of Michigan law and election procedures. Those reports lack the simplest foundation of technical expertise, fail to use even elementary statistical methods and reach conclusions that lack any persuasive value. But, those unscientific conclusions, based upon false premises and faulty techniques are presented here as though they embody the uncontroverted truth.

Plaintiffs have no apparent interest in the accuracy of their allegations and there is no innocent explanation for the numerous misrepresentations. They claim that turnout in some jurisdictions in the State exceeded 100%, even up to 781.91%, with turnout for Detroit at 139.29%. *See* Ramsland Aff., ECF No. 6-24, PageID.1574. But they had to know that claim was false; the actual results were readily available at the time Plaintiffs and their "experts" made the claim, and show turnout well below 100%, including in Detroit at 50.88%. Ex. 2.[3]

---

was quickly denied or the case was dismissed for each. *See Feehan v. Wisconsin Elections Comm'n*, No. 20-CV-1771, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Bowyer v. Ducey*, CV-20-02321, 2020 WL 7238261 (D. Ariz. Dec. 9, 2020); and *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga. Dec. 7, 2020) (Ex. 3).

[3] Plaintiffs made the same claim about Michigan in the lawsuit they filed in Georgia, but apparently because the "expert" confused the postal code abbreviation for Minnesota with that of Michigan, used Minnesota jurisdictions to make the argument that turnout exceeded 100%. Ex. 4. The fact that Plaintiffs' counsel discovered the error regarding postal abbreviations (after it was widely mocked in the media), but then proceeded to make the same false claim here, substituting Michigan jurisdictions, shows that the point was to make the claim, not to present the truth. As stated by the district court in the Arizona "kraken" lawsuit when

Meanwhile, President Trump continues to use these lawsuits in his desperate campaign to thwart the will of the voters. On January 2, 2021, during a call with Georgia's Secretary of State, Brad Raffensperger, in which the President is heard attempting to extort Secretary Raffensperger into committing election fraud, Trump trotted out the same hoary canards as the Plaintiffs falsely argue to this Court:

> I mean there's turmoil in Georgia and other places. You're not the only one, I mean, we have other states that I believe will be flipping to us very shortly. And this is something that — you know, as an example, I think it in Detroit, I think there's a section, a good section of your state actually, which we're not sure so we're not going to report it yet. But in Detroit, we had, I think it was, 139 percent of the people voted. That's not too good.

*See* Ex. 5, pp. 3-4 (Transcript of January 2, 2021 Telephone Call, as transcribed for the Washington Post).[4]

The City gave Plaintiffs and their counsel the opportunity to retract their lies and baseless legal claims, and they have refused. The extent of the factual and legal errors in this Complaint would warrant sanctions under any circumstances, but here the Court's processes are being perverted to undermine our democracy and to upset

---

dismissing the claims, and as equally applicable here, "[t]he various affidavits and expert reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *13 (D. Ariz. Dec. 9, 2020).

[4] President Trump also continues to use this lawsuit (and the suits filed in other swing states which voted for President-Elect Biden) to fundraise. As of early December 2020, Trump had reportedly raised $207.5 million in post-election fundraising. Ex. 6.

the peaceful transition of power.  The Plaintiffs and all of their attorneys deserve the harshest sanctions this Court is empowered to order.

## ARGUMENT

### I.    Rule 11 Standards

Sanctions under Fed. R. Civ. P. 11(b)(1) are appropriate when a pleading or other filing is presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. Fed. R. Civ. P. 11(b)(1). Sanctions under Fed. R. Civ. P. 11(b)(2) are appropriate where the claims, defenses, and other legal contentions of the offending party are not warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law. Fed. R. Civ. P. 11(b)(2). Sanctions are appropriate under Fed. R. Civ. P. 11(b)(3) where factual contentions do not have evidentiary support or will likely not have evidentiary support after a reasonable opportunity for further investigation or discovery.[5]

To determine whether a party's pleading is frivolous or was filed for an improper purpose, courts use an objective standard of reasonableness under the circumstances and then weigh the evidence to determine if the pleadings, motions or

---

[5] Monetary sanctions cannot be imposed against a represented party for violation of Fed. R. Civ. P. 11(b)(2). *See* Fed. R. Civ. P. 11(c)(5). Thus, the City requests non-monetary sanctions, as identified below, against Plaintiffs for violation of 11(b)(2) and monetary and non-monetary sanctions against counsel.

papers are well-grounded in facts or warranted by existing law. *Mann v. G &G Mfg., Inc.*, 900 F.2d 953 (6th Cir. 1990).[6]

## II.     The Complaint was Filed for an Improper Purpose

It is clear that this lawsuit was not filed for any purpose consistent with the Federal Rules of Civil Procedure. This Court has already addressed many of the reasons that the Plaintiffs "are far from likely to succeed in this matter." *King*, 2020 WL 7134198, at *13. The claims are barred by Eleventh Amendment Immunity; the claims are barred by mootness and laches; Plaintiffs lack standing; and, even if Plaintiffs could show a violation of state law, they have not offered a colorable claim under federal statutory or constitutional law. To make matters worse, Plaintiffs were always aware that their Complaint was deficient; no other inference can be drawn from their failure to serve the Defendants before this Court issued its December 1, 2020, text-only order.[7]

---

[6] Moreover, for the purposes of Rule 11 sanctions, a showing of "good faith," is not sufficient to avoid sanctions. *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391 (6th Cir. 1987).

[7] A similar circumstance was noted on January 4, 2021, in a ruling by the United States District Court for the District of Columbia, addressing another groundless Trump election lawsuit:

[Plaintiffs'] failure to make any effort to serve or formally notify any Defendant — even after a reminder by the Court in its Minute Order — renders it difficult to believe that the suit is meant seriously. Courts are not instruments through which parties engage in such gamesmanship or symbolic political gestures. As a result, at the conclusion of this litigation, the Court will determine whether to issue an order to show

This lawsuit is the quintessential example of a case filed for an improper purpose. As this Court concluded, in denying preliminary relief:

> this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.

*King*, at *13. Plaintiffs' counsel have not hidden their contempt for our courts and for our democracy. Plaintiffs' counsel Sidney Powell claims that courts have rejected the election lawsuits, "because the corruption goes deep and wide."[8] She re-tweets calls to impose martial law, to "suspend the December Electoral College vote," and to "set up Military Tribunals immediately." @sidneypowell1, Twitter (Nov. 30, 2020). Her co-counsel, L. Lin Wood, unabashedly expresses his contempt for our democratic processes and openly promotes a military coup:

> Georgia, Michigan, Arizona, Nevada, Wisconsin, Minnesota & Pennsylvania are states in which martial law should be imposed & machines/ballots seized. 7 states under martial law. 43 states not under martial law. I like those numbers. Do it @realDonaldTrump! Nation supports you. (@llinwood, Twitter (Dec. 20, 2020)).

> Patriots are praying tonight that @realDonaldTrump will impose martial law in disputed states, seize voting machines for forensic

---

cause why this matter should not be referred to its Committee on Grievances for potential discipline of Plaintiffs' counsel.

*Wisconsin Voters Alliance v. Pence*, No. 1:20-cv-03791 (D.C. Jan. 4, 2021) (Ex. 7).

[8] Quote from video interview of Sidney Powell, promoted on her twitter account at https://twitter.com/AKA_RealDirty/status/1338401580299681793.

examination, & appoint @SidneyPowell as special counsel to investigate election fraud. (Dec. 19, 2020).

When arrests for treason begin, put Chief Justice John Roberts, VP Mike Pence @VP @Mike_Pence, & Mitch McConnell @senatemajldr at top of list. (Jan. 1, 2021).

If Pence is arrested, @SecPompeo will save the election. Pence will be in jail awaiting trial for treason. He will face execution by firing squad. He is a coward & will sing like a bird & confess ALL. (Jan. 1, 2021).[9]

These are the lawyers who are trying to use this Court's processes to validate their conspiracy theories and to support their goal of overturning the will of the people in a free and fair election. They were given an opportunity to dismiss or amend their Complaint, but they chose to continue to use this case to spread their false messages.

Those false messages are not the result of occasional errors or careless editing. Those false messages are deliberately advanced by these attorneys to support their goals of undermining our democracy. Like Sidney Powell, L. Lin Wood, is a QAnon disciple.[10] He recently stated:

This country's going to be shocked when they find the truth about who's been occupying the Oval Office for some periods of years. They're going to be shocked at the level of pedophilia. They are going

---

[9] While Mr. Wood's wrath was initially focused on Democrats, he has shifted to attacking Republican officials (and judges and justices who he views as Republican) for their perceived disloyalty to Trump and refusal to abuse the Constitution.

[10] A judge in Delaware is currently considering revoking Mr. Wood's right to practice in Delaware, where he is currently representing former Trump adviser Carter Page, based on his conduct in suits challenging the results of the general election as a plaintiff in Georgia and as counsel in Wisconsin. Ex. 8.

to be shocked at what I believe is going to be a revelation in terms of people who are engaged in Satanic worship."[11]

A review of Mr. Wood's Twitter account reveals a dark strain of paranoia—the same strain which infects this lawsuit.

Mr. Wood repeatedly makes false allegations about the 2020 election, the most secure in our country's history.[12] The following is a sampling of his tweets:

> There should be NO Electoral College vote in any state today. Fraud is rampant in all state elections. If U.S. Supreme Court does not have courage to act, I believe our President @realDonaldTrump has the courage. (Dec. 14, 2020).

> We The People must now launch massive campaign to prevent our state electors from EVER casting vote in Electoral College for Joe Biden & Kamala Harris. Unless you want them to vote for Communism. In that event, get out of our country & go enjoy your life in Communist China. (Dec. 20, 2020).

> Joe Biden & Kamala Harris are Communists by either ideology, corruptness or extortion. Still want your state electors to vote for Biden on 1/6? Want Communism & tyranny or a free America where you can enjoy life, liberty & pursuit of happiness? (Dec. 20, 2020).

---

[11]     https://welovetrump.com/2020/11/23/lin-wood-americans-will-be-shocked-at-level-of-pedophilia-satanic-worship-occupying-oval-office-for-years-before-trump/.

[12]  The November 2020 general election was declared by the federal government to be the most secure in the nation's history. *See* Joint Statement from Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees ("CISA"), issued Nov 12, 2020 ("The November 3rd election was the most secure in American history.") (Ex. 9). The CISA statement further concluded "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised." *Id.* Five days after this statement was released, Chris Krebs, director of CISA, was terminated by presidential tweet.

When courts refuse to accept his invitation to disregard the fundamental tenets of

our democracy, he blames corruption and communism in the judiciary:

> Attempted theft of Presidential election will NOT stand. Not on our
> watch, Patriots. Communists & Communist sympathizers have
> infiltrated our judicial system, including lawyers & judges in Georgia.
> (Dec. 23, 2020).

> Communism has infiltrated ALL levels of our government, including
> our judiciary. Communism infiltrates by ideology, by
> corruption/money & by extortion. (Dec. 20, 2020).

> Too many of us have been asleep at switch in the past. … We believed
> too many of our judges. Many are corrupt & traitors. (Dec. 19, 2020).

> Some state & federal lower court rulings to date are troubling. Courage
> lacking in some members of judiciary. (Dec. 10, 2020).

> We CANNOT trust courts to save our freedom. They are IGNORING
> massive evidence of fraud & unlawful election procedures. (Dec. 13,
> 2020).

> We have had reports of judges & their families being threatened. This
> would certainly explain some of the bizarre rulings by lower courts that
> have refused to even mention the overwhelming evidence of fraud in
> cases filed by @SidneyPowell. (Dec. 14, 2020).

When, the Supreme Court denied *certiorari* in Texas's lawsuit against the "swing

states" which voted for Joe Biden,[13] and when the Supreme Court took no action on

the nonsensical direct appeal in this case, Mr. Wood displayed his utter contempt for

that institution:

> It is time for Chief Justice John Roberts to resign, admit his corruption
> & ask for forgiveness. Roberts has betrayed his sacred oath office. He

---

[13] *Texas v. Pennsylvania*, No. 155 ORIG., 2020 WL 7296814 (U.S. Dec. 11,
2020).

has betrayed his country. He has betrayed We The People. (Dec. 19, 2020).

I think many are today learning why SCOTUS is rejecting petitions seeking FAIR review. Roberts & Breyer are "anti-Trumpers" They should resign immediately. CJ Roberts has other reasons to resign. He is a disgrace to office & to country. (Dec. 17, 2020).

Corruption & deceit have reached most powerful office in our country - the Chief Justice of U.S. Supreme Court. This is a sad day for our country but a day on which we must wake up & face the truth. Roberts is reason that SCOTUS has not acted on election cases. (Dec. 17, 2020).

Justice John Roberts is corrupt & should resign immediately. Justice Stephen Breyer should also resign immediately. (Dec. 17, 2020).

I am disappointed. I thought Justices Roberts & Breyer would avoid public scandal & simply resign. Only a fool wants their dirty laundry aired in public. Maybe I should consider filing a formal motion for recusal & hang their laundry on the clothesline to be exposed to sunlight? (Jan. 2, 2021).

This is the same L. Lin Wood who appears on the pleadings of this case, but who has apparently chosen not to be sworn into the bar for the Eastern District of Michigan and to affirm our Civility Principles.

Sidney Powell—who President Trump has reportedly considered appointing as "special counsel," who apparently has the ear of the President and who has advocated for martial law—is less prolific on Twitter but shares Mr. Wood's perspective. She has tweeted that "[t]his 'election' was stolen from the voters in a massive fraud." @sidneypowell1, Twitter (Jan. 2, 2021). And, like Mr. Wood, she channels 19502 McCarthy paranoia, seeing communists around every electoral

corner, stating "[i]t is impossible not to see the fraud here unless one is a communist or part of it or part of the coup." @sidneypowell1, Twitter (Jan. 2, 2021).[14]

As poorly presented as their pleadings were, as careless as they were in vetting their allegations and expert reports, and as detached as their claims are from the law and reality, the Plaintiffs and their counsel were provided 21 days to take corrective action. So, 21 days before filing this motion, the City gave Plaintiffs an opportunity to withdraw or amend their contemptuous pleadings. Rather than withdraw or amend their Complaint, they chose to stand firm with their objectively false claims, ridiculously incompetent expert reports and patently unsupportable arguments.

Why was this Complaint not dismissed or amended? Surely, in light of this Court's December 7, 2020, Opinion and Order, Plaintiffs cannot be expecting to obtain judicial relief. Then, what purpose can this lawsuit serve? The answer to that question goes to the heart of Rule 11. Much can be inferred from Plaintiffs' actions. Initially, this was one of several lawsuits used to support calls for state legislatures to reject the will of the voters, to ignore the statutory process for selecting presidential electors, and to instead elect a slate of Trump electors (six of whom are Plaintiffs in this case). When the Michigan Legislature did not attempt to select a

---

[14] Perhaps her motivation is less paranoid and more venal. The front page of her website, "defendingtherepublic.org," has a prominently placed "contribute here" form, soliciting donations for her "Legal Defense Fund for Defending the American Republic."

slate of electors inconsistent with the will of the voters, despite the personal demands of the President of the United States, who summoned their leaders to the White House, this lawsuit took on a different meaning. It was then used to support arguments for the United States Congress to reject the Michigan electors on January 6, 2021. On Saturday, January 2, 2021, false claims made by "experts" in this case were cited by Donald Trump in his apparent attempt to extort Georgia Secretary of State Brad Raffensperger. And, most ominously, these claims are referenced and repeated by L. Lin Wood and others in support of martial law.

Irrespective of these attempts to overturn our democratic processes, the continued pendency of this lawsuit accomplishes exactly the harm addressed by this Court in its December 7, 2021, Opinion and Order. By undermining "People's faith in the democratic process and their trust in our government," this lawsuit is being used to delegitimize the presidency of Joe Biden.

While the First Amendment may protect the right of political fanatics to spew their lies and unhinged conspiracy theories, it does not grant anyone a license to abuse our courts for purposes which are antithetical to our democracy and to our judicial system. Plaintiffs and their counsel cannot be allowed to use the court system to undermine the constitutional and statutory process by which we select our leaders.

### III. The Factual Assertions in the Complaint Were Frivolous and Based on Assertions Which Had Been Rejected by Michigan Courts

The Complaint in this matter relies heavily on affidavits submitted in *Costantino v. Detroit*, Wayne County Circuit Court Case No. 20-014780-AW. The Plaintiffs here either incorporate the affidavits into their allegations or attach them as exhibits to their Complaint.

#### A. Allegations Regarding Republican Challengers

The Complaint repeatedly asserts that Republican challengers were not given "meaningful" access to the ballot processing and tabulation at the Absent Voter Counting Board located in Hall E of the TCF Center. First Amended Complaint ("Compl.") at ¶¶ 13, 42, 47, 57, 59-61. This claim was disproven long before Plaintiffs raised it here. As Judge Kenny concluded in *Costantino*, while six feet of separation was necessary for health reasons, "a large monitor was at the table where individuals could maintain a safe distance from poll workers to see what exactly was being performed." *Costantino v. Detroit*, Opinion and Order, Wayne County Circuit Court Case No. 20-014780-AW (Nov. 13, 2020) (Ex. 10). This had been proven with photographic evidence. *See*, *e.g.*, Ex. 11 (Nov. 11, 2020 Affidavit of Christopher Thomas at last page). And, prior to the filing of this case, the Michigan Supreme Court had already rejected the application for appeal from the trial court's ruling, deeming the same claims unworthy of injunctive relief. *See Costantino v Detroit*, No. 162245, 2020 WL 6882586 (Mich. Nov. 23, 2020).

13

Similarly, the Complaint repeats the false claim that Republican challengers were exclusively barred from entering the TCF Center. Compl. ¶¶ 62-63. Judge Kenny rejected this claim, finding that there was a short period of time, where Republican *and* Democratic challengers were "prohibited from reentering the room because the maximum occupancy of the room had taken place." *Costantino* Opinion, at *8. As stated by the court, "[g]iven the COVID-19 concerns, no additional individuals could be allowed into the counting area ... Democratic party challenger David Jaffe and special consultant Christopher Thomas in their affidavits both attest to the fact that neither Republican nor Democratic challengers were allowed back in during the early afternoon of November 4th as efforts were made to avoid overcrowding." *Id.*

## B. Allegations of "Pre-Dating"

Plaintiffs' allegations of "pre-dating" were also based on claims initially submitted and rejected in *Costantino*. Compl. ¶¶ 88 and 90.

The claims come from Jessy Jacob, a furloughed City employee, with no known prior election experience, who was assigned to the Department of Elections on a short-term basis. Ex. 12 (Affidavit of Daniel Baxter, ¶ 7). Her claim regarding pre-dating is demonstrably false because all absentee ballots she handled at the TCF Center had been received by 8:00 p.m. on November 3, 2020. For a small number of ballots, election workers at the TCF Center were directed to enter the date the

ballots were received into the computer system, as stamped on the envelope. Ex. 11. Ms. Jacob was simply marking the date the ballot had been received. *Id*. Thus, as explained by the court in Costantino, "[a]s to the allegation of 'pre-dating' ballots, Mr. Thomas explains that this action completed a data field inadvertently left blank during the initial absentee ballot verification process." *Costantino* Opinion, \*4. As the court noted, "[t]he entries reflected the date the City received the absentee ballot." *Id.*

### C. Allegations Regarding Ballots Supposedly Counted More than Once

Plaintiffs claim challengers observed ballots repeatedly run through tabulation machines, including "a stack of about fifty ballots being fed multiple times into a ballot scanner counting machine." Compl. ¶ 94. This allegation primarily comes from Melissa Carone, a contractor working for Dominion, who claimed that stacks of 50 ballots were fed through tabulators as many as eight times. Exh. 5 to Compl., ¶¶ 4-5.[15] The allegation was obviously false when it was first raised by Carone in *Costantino*. Whatever Carone and other challengers think they saw, ballots cannot be counted in that manner. If they were correct, hundreds of extra votes would show up in numerous precinct (or absent voter counting boards). This would obviously be

---

[15] The Complaint states that "[p]erhaps the most probative evidence comes from Melissa Carone …." Compl. ¶ 84.

caught very quickly on site during the tabulation process or soon thereafter during the County and State canvasses. Ex. 13 (Thomas Dec. 10, 2020 Aff. ¶¶ 18-20).

But, by the time the Plaintiffs here latched onto the absurd allegation, it had already been conclusively disproven by the Wayne County canvass. Detroit had 501 precincts and 134 absent voter counting boards. Less than 36% of the total were out of balance. *Id.* ¶ 12. A counting board is out of balance if there are: (1) more ballots than voters or (2) more voters than ballots. In total 591 voters and ballots account for the imbalances. *Id.* When voters and ballots are separated in Detroit there are 148 more names than ballots—out of 174,384 votes there are 148 more names in the poll books than there are ballots. *Id.* The fact that there were more names than ballots shows that ballots were not counted more than once. The total imbalance was .0008 (eight ten-thousandths of a 1%). *Id.* Of the 94 Detroit out of balance counting boards, there were 87 with an imbalance of 11 or fewer voters/ballots; within those 87 counting boards, 48 were imbalanced by 3 or fewer voters/ballots. *Id.* There were seven counting boards with higher imbalances that range from 13 more ballots to 71 fewer voters. *Id.* This minimal level of imbalance conclusively demonstrated that the allegation was false, weeks before Plaintiffs filed this case.

### D. Allegations Regarding Tabulating Machines

Perhaps the most baseless of Plaintiffs' allegations is a conspiracy theory about Dominion vote tabulators. Plaintiffs in the first election cases initially cited

two instances of errors—one in Antrim County and one in Oakland County (Rochester Hills) to insinuate that the tabulating system used in many counties was flawed. Certainly understanding the weakness of the initial theory, Plaintiffs here wove in a nonsensical tale that a theoretical software weakness upended Michigan's election results. This Court readily recognized that the claims could not hold up.

The Michigan Department of State released a statement titled "Isolated User Error in Antrim County Does Not Affect Election Results, Has no Impact on Other Counties or States," explaining what happened in Antrim County. Ex. 14. The statement explains that the "error in reporting unofficial results in Antrim County Michigan was the result of a user error that was quickly identified and corrected; did not affect the way ballots were actually tabulated; and would have been identified in the county canvass before official results were reported even if it had not been identified earlier." *Id*. Essentially, the County installed an update on certain tabulators, but not others. *Id*. The tabulators worked correctly, but when they communicated back to the County, the discrepancy in the software versions led to a discrepancy in the reporting. *Id*. This was quickly discovered and would certainly have been uncovered in the post-election canvass. *Id*. In fact, the integrity of the vote in Antrim County was conclusively proven by the recent audit of the paper ballots.

The Republican clerk of Rochester County, Tina Barton, discredited the allegations of fraud in that City. Officials realized they had mistakenly counted votes

17

from Rochester Hills twice, according to the Michigan Department of State. Oakland County used software from a company called Hart InterCivic, not Dominion, though the software was not at fault. Ms. Barton stated in a video she posted online: "As a Republican, I am disturbed that this is intentionally being mischaracterized to undermine the election process …. This was an isolated mistake that was quickly rectified." Ex. 15.[16] Plaintiffs knew all of this before they filed this lawsuit.[17]

### E. The Declarations and Analyses "Supporting" the Complaint Were Full of Intentional Lies

The Complaint also relies heavily on "expert" declarations and affidavits, many heavily redacted. As the district court held in *Bowyer*, "the 'expert reports'

---

[16] An audit of the paper ballots in Antrim County conclusively demonstrated that the claim was false. The official tally was only off by 11 net votes. Ex. 16.

[17] The Plaintiffs here added in a string of falsehoods about Dominion software. The district court in Bowyer addressed those claims head on: "The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election. […] These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election." *Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020). Just like here, "what is present is a lengthy collection of phrases beginning with the words 'could have, possibly, might,' and 'may have.'" *Id.* Ramsland, similar to his claims here, "asserts there was 'an improbable, and *possibly impossible* spike in processed votes' in Maricopa and Pima Counties at 8:46 p.m. on November 3, 2020 … [however, the defendant] points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed." *Id.* "Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards." *Id.*

reach implausible conclusions, often because they are derived from wholly unreliable sources." *See Bowyer v. Ducey*, No. CV-20-02321, 2020 WL 7238261, at *14 (D. Ariz. Dec. 9, 2020).

From the outset, the "Michigan 2020 Voting Analysis Report" appended to the Amended Complaint departs from any rational statistical analysis. PageID.1771-1801. Stanley Young identifies nine counties as "outliers," because those counties reported larger increases in Democratic votes for President. PageID.1776. His analysis, however, is based entirely on raw vote totals with no consideration of percentage changes. Not surprisingly, eight of the nine counties he identifies are among the nine counties with the largest voting age population. Much of the remaining analysis by Young and the other experts focuses on these counties, which are allegedly "outliers."

This sloppy analysis is followed by "another anomaly that indicates suspicious results." His "anomaly" is nothing more than the fact that President Trump did not do as well with "mail-in votes" as he did with election day votes. PageID.1777. Of course, that was widely expected and understood, for an election in which President Trump discouraged absentee voting and Democrats promoted it.

Revealing an almost incomprehensible ignorance of Michigan election law for supposed "experts," Dr. Quinnell, together with Dr. Young, offer the finding that in two Michigan counties (Wayne and Oakland) demonstrate "excessive vote in

favor of Biden often in excess of new Democrat registrations." PageID.1778. Apparently, none of the experts, none of the Plaintiffs and none of the Plaintiffs' attorneys are aware that Michigan does not have party registration.

### 1. Spyder/Spider

Plaintiffs' "experts" rely on the partially redacted declaration of "Spider" or "Spyder," who Plaintiffs identify as "a former US Military Intelligence expert" and a "former electronic intelligence analyst with 305th Military Intelligence" Compl. ¶¶ 17, 161. But this was a lie *by Plaintiffs' counsel*. Plaintiffs did not properly redact the declarant's name when they filed the same affidavit in a different court, and it was publicly disclosed that the declarant's name was Joshua Merritt. While in the Army, Merritt enrolled in a training program at the 305th Military Intelligence Battalion, the unit he cites in his declaration, but he never completed the entry-level training course. A spokeswoman for the U.S. Army Intelligence Center of Excellence, which includes the battalion, stated "[h]e kept washing out of courses … [h]e's not an intelligence analyst." Ex. 17. According to the Washington Post, "Merritt blamed 'clerks' for Powell's legal team, who he said wrote the sentence [and] said he had not read it carefully before he signed his name swearing it was true. *Id.* He stated that "My original paperwork that I sent in didn't say that." *Id.* He later stated that "he had decided to remove himself from the legal effort altogether" (which has not happened). *Id.*

It is a near certainty that if Plaintiffs are compelled to publicly file unredacted declarations and affidavits, as they should be, numerous other redacted names and assertions will reveal that the redactions were made to keep the public from discovering more fraud perpetrated on this Court.

## 2.  Russell James Ramsland, Jr.

Plaintiffs' "expert" Russell James Ramsland Jr. extrapolates large vote discrepancies from the Antrim County error in reporting early *unofficial* results. In doing so, he intentionally ignores the Secretary of State's report or simply does not do his homework. Ramsland reports "In Michigan we have seen reports of 6,000 votes in Antrim County that were switched from Donald Trump to Joe Biden *and were only discoverable through a hand counted manual recount*." Ramsland Affidavit ¶10; emphasis added. But, there were no hand recounts in Michigan as of that date.[18] The Secretary of State report is not even discussed. Incredibly, Ramsland has since doubled down on his perjury, after gaining access to a voting machine in Antrim County. He now claims, in support for the request for Certiorari to the Supreme Court in this action, that "[w]e observed an error rate of 68.05%" which

---

[18] Plaintiffs, who include six nominees to be Trump electors, including the Republican County Chair for Antrim County, the Republican County Chair of Oceana County and the Chair of the Wayne County Eleventh Congressional District, as well as their attorneys, should also know that when the expert report was prepared there had been no hand recount in Antrim County. An actual hand recount did occur at a later time, and that recount confirmed the accuracy of the official results, within 11 votes.

"demonstrated a significant and fatal error in security and election integrity."

Although the basis for the percentage is unclear, the Antrim County clerk stated that

"the 68% error rate reported by Ramsland may be related to [the] original error

updating the ballot information." Ex. 18. The clerk of the Republican-heavy County

said: "[t]he equipment is great — it's good equipment … [i]t's just that we didn't

know what we needed to do (to properly update ballot information) … [w]e needed

to be trained on the equipment that we have." *Id.* The claim was also proven to be

false by the hand recount audit of the paper ballots in Antrim County, which added

11 net votes to the tally, not the 15,000 predicted by Ramsland. Ex. 16.

Ramsland makes the claim that turnout throughout the state was statistically

improbable; but as discussed above, he bases this on fabricated statistics. He claims

turnout of 781.91% in North Muskegon, where the publicly-available official results

were known, as of election night, to be approximately 78%. Ex. 2. He claims turnout

of 460.51% (or, elsewhere on the same chart, 90.59%) in Zeeland Charter Township,

where it was already known to be 80%. *Id*. The *only* result out of 19 (not including

the duplicates) that Ramsland got right was for Grand Island Township, with a

turnout of 96.77%, comprised of 30 out of the township's 31 registered voters. *Id.*[19]

---

[19] Ramsland also claims it was "suspicious" that Biden's share of the vote increased as absentee ballots were tabulated. But, that suspicion require Ramsland to close his eyes to the incontrovertible fact that for the 2020 general election, absentee ballots favored Biden throughout the country, even in the deep red state of

President Trump repeated this blatantly false claim in his tape-recorded January 2, 2021 telephone conversation with Brad Raffensperger. Ex. 5.

Similarly, Ramsland relies upon the affidavit of Mellissa Carone in support of his claim that "ballots can be run through again effectively duplicating them." Ramsland Affidavit; Compl. Exh. 24 at ¶13. It is understandable that inexperienced challengers and Ms. Carone (who was a service contractor with no election experience) with conspiratorial mindsets might not understand that there are safeguards in place to prevent double counting of ballots in this way, but that does not excuse Plaintiffs' "experts," who choose to rely on these false claims, even after the official canvass had conclusively disproven the allegations.[20]

### 3.    William Briggs/Matt Braynard

Plaintiffs rely on an "analysis" by William M. Briggs of "survey" results apparently posted in a tweet by Matt Braynard. Braynard's survey was submitted in

---

Tennessee. https://tennesseestar.com/2020/11/05/republicans-dominate-the-2020-tennessee-election-cycle/.

[20] Emblematic of Plaintiffs' contempt for facts is another "expert" report that was filed with the original Complaint in this case, but not submitted with the Amended Complaint. Paragraph 18 of the original Complaint introduced "Expert Navid Kashaverez-Nia" and alleged that "[h]e concludes that hundreds of thousands of votes that were cast for President Trump in the 2020 general election were transferred to former Vice-President Biden." Notably, the "expert" relied on a finding that in "Edison County, MI, Vice President Biden received more than 100% of the votes.…" There is no Edison County in Michigan (or anywhere in the United States). The fabrication was only removed after it was discovered and reported by the news media.

a different case (*Johnson v. Secy of State*, Michigan Supreme Court Original Case No. 162286),[21] so its underlying falsehoods have been exposed. Braynard misrepresents Michigan election laws, and completely disregards standard analytical procedures to reach his contrived conclusions. He refers to voters who have "indefinitely confined status," something which has never existed in our state. He refers to individuals "who the State's database identifies as applying for *and the State sending an absentee ballot*," when, in Michigan, absentee ballots are never sent by the State. He refers repeatedly to "early voters," when Michigan has absentee voters, but, unlike some other states, has never allowed "early voting." He apparently believes (incorrectly) that every time a voter's residence changes before election day that voter is disenfranchised. Mr. Thomas addresses these factual and legal errors in the attached Affidavit. Ex. 13.

The disturbing inadequacy of Braynard's survey is also explained in the affidavit of Dr. Charles Stewart III, the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology. Dr. Stewart's credentials are impeccable and directly applicable to the subject matter. Ex. 20

---

[21] The "survey" as submitted in *Johnson* is attached here as Ex. 19. The request for relief was denied by the Supreme Court *Johnson*. *See Johnson v. Secy of State*, No. 162286, 2020 WL 7251084 (Mich. Dec. 9, 2020).

(Affidavit of Charles Stewart II) (originally submitted in *Johnson*).[22] At the request of the City of Detroit, Dr. Stewart reviewed the Braynard survey and came to the unqualified opinion that "Mr. Braynard's conclusions are without merit." (*Id.* ¶10). He explains the basis for his opinion in clear and understandable detail.

Briggs' analysis of Braynard's report estimate that "29,611 to 36,529 ballots out of the total 139,190 unreturned ballots (21.27% - 26.24%) were recorded for voters who had not requested them." Braynard says 834 people agreed to answer the question of whether they requested an absentee ballot. But he does not report how many respondents did not answer. More to the point, he does not explain how he confirms that these respondents understood what it meant for them to "request" an absentee ballot. Some might have gone to their local clerk's office to vote, where they signed a form, received a ballot and voted, without realizing that that form is an absentee ballot "request." Braynard concludes that certain people who failed to return a ballot never requested that ballot. But he does not address the possibility that the very people (139,190 out of more than 3.5 million) who would neglect to return a ballot would likely be those who might forget that they had requested one.

Braynard offers a baffling array of inconsistent numbers. On Page 8 of his report, he refers to "96,771 individuals who the State's database identifies as having

---

[22] Dr. Stewart is uniquely suited to address these issues. He is a member of the Caltech/MIT Voting Technology Project and the founding director of the MIT Election Data and Science Lab.

not returned an absentee ballot," when for his first two opinions that number is 139,190. On page 8, he reports a percentage of 15.37% not having mailed back their ballots, but on page 5 he identifies that percentage as 22.95%. Then, the actual numbers of individuals answering the question in that manner, described on page 8 (241 out of 740), would establish a percentage of 32.56%. If this were not sloppy enough, at the top of page 9, he reports, with no explanation "Based on these results, 47.52% of our sample of these absentee voters in the State did not request an absentee ballot." Even if his percentages were completely off and inconsistent, the data would be meaningless. Braynard ignores Michigan election procedures when he declares that there is evidence of illegal activity because some voters are identified in the State's database as having not returned an absentee ballot when those voters "did in fact mail back an absentee ballot...." But, when millions of citizens voted absentee, some of those mailed ballots were not received by election day. He also does not consider the possibility of a voter either not remembering accurately or not reporting accurately whether a ballot was mailed.[23]

Braynards' analysis of address changes is equally invalid. He misrepresents how change of address notifications work. It is not at all uncommon for one person

---

[23] A slightly modified version of the Briggs/Braynard analysis was rejected by the *Bowyer* court. *Bowyer*, 2020 WL 7238261, at *14 ("The sheer unreliability of the information underlying Mr. Briggs' 'analysis' of Mr. Braynard's 'data' cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.").

to move and file a change of address that appears to affect more household members, or a person might file a change of address for convenience during a temporary period away from home, without changing their legal residence. Stewart Aff ¶ 21. Every year, tens of thousands of Michigan voters spend long periods of time in other states (e.g., Florida or Arizona) without changing their permanent residence or voting address. Clerks have procedures in place to address these issues. Even voters who do make a permanent move can vote at their prior residence for sixty days if they do not register to vote at their new address.[24]

## IV.   Plaintiffs' Legal Theories Were Frivolous

Rule 11 places the failure to plead colorable legal theories squarely on the attorney making the claim. In addition to pleading false allegations, this lawsuit has always been legally dubious.

---

[24] It is not possible that these experts were simply negligent. They consistently ignore the obvious explanations for their so-called anomalies. For instance, Bouchard intentionally ignores the fact that unofficial results are released on a rolling basis, i.e. in "data dumps" accounting for hours of tabulation, to claim it was somehow anomalous for there to be large increases in the number of votes between data releases. Quinnell ignores the fact that voter turnout and preferences will change between elections based on the identities of the candidates, when he claims it was somehow anomalous for turnout to have increased for the 2020 election and for Biden to have picked up votes in suburban areas (a phenomenon seen throughout the country). He also ignores the well-known fact that urban core precincts in this country are strongholds for the Democratic Party, when he claims there was something anomalous about the fact that such precincts in Detroit strongly favored Biden. Many of these issues are addressed in the responses, and supporting exhibits, to Plaintiffs' Motion for Temporary Restraining Order. ECF Nos. 31, 36 and 39.

First, even if there had been a semblance of truth to any of Plaintiffs' allegations, the lawsuit would still have been frivolous because the relief requested could, in no way, be supported by the claims. As this Court stated, the relief Plaintiffs seek is to "disenfranchise the votes of the more than 5.5 million Michigan citizens who, with dignity, hope, and a promise of a voice, participated in the 2020 General Election." *King*, 2020 WL 7134198, at *1. Nothing Plaintiffs allege—or could allege—could lead to the "stunning" and "breathtaking" relief sought. *See*, *e.g.*, *Id.* (Stating Plaintiffs "seek relief that is stunning in its scope and breathtaking in its reach.")

Second, there has never been a colorable basis for Plaintiffs' attorneys to assert that the Plaintiffs had standing. The Complaint does not allege that Plaintiffs were denied the right to vote—an injury which would be particularized to the individual Plaintiffs—it alleges Plaintiffs' votes were diluted. As numerous courts have concluded, a dilution theory does not satisfy the Article III requirements of causation and "injury in fact." *See*, *e.g.*, *Georgia Republican Party v. Secy of State of Georgia*, No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020); *Bognet v. Secy Commonwealth of Pennsylvania*, 980 F.3d 336 (3rd Cir. Nov. 13, 2020).

Importantly, as this Court concluded, even if Plaintiffs had met those two elements, the Plaintiffs would still not meet the redressability element, because "an order de-certifying the votes of approximately 2.8 million people would not reverse

28

the dilution of Plaintiffs' vote." *King*, 2020 WL 7134198, at *9. Counsel for Plaintiffs knew, or should have known, that their clients did not have Article III standing.

Third, there was never a legitimate basis to believe the lawsuit could proceed in the face Eleventh Amendment immunity. The one possibly applicable exception, *Ex Parte Young*, "does not apply, however, to *state law* claims against state officials, regardless of the relief sought." *King*, at *4 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) and *Ex Parte Young*, 209 U.S. 123 (1908)). As this Court noted, the issue has been long settled by the Supreme Court. *See Pennhurst*, at 106. And, with respect to the § 1983 claim, before this lawsuit was filed "the Michigan Board of State Canvassers had already certified the election results and Governor Whitmer had transmitted the State's slate of electors to the United States Archivist … [therefore] [t]here is no continuing violation to enjoin." *King*, at *5.

Fourth, there was never a basis to believe this case was not moot as of the date it was filed. As this Court stated, "[t]he Michigan Election Code sets forth detailed procedures for challenging an election, including deadlines for doing so … Plaintiffs did not avail themselves of the remedies established by the Michigan legislature." *Id.*, at *6. The deadline to pursue any such remedies had passed by the time the Complaint was filed, therefore, "[a]ny avenue for this Court to provide meaningful relief" was foreclosed from the start. *Id.*

Fifth, there was no reason for Plaintiffs' counsel to believe the case would not be barred by laches. As this Court concluded, the relief sought was barred by laches because "Plaintiffs could have lodged their constitutional challenges much sooner than they did, and certainly not three weeks after Election Day and one week after certification of almost three million votes." *Id.*, at *7.

Sixth, there was no reason to believe that alleging violations of the Michigan Election Code could support a claim for violation of the Elections & Electors Clauses. As this Court concluded, "Plaintiffs cite to no case—and this Court found none—supporting such an expansive approach." *Id.*, at *12.

Seventh, there was no basis to believe that the allegations could support an equal protection claim. The equal protection claim "is not supported by any allegation that Defendants' alleged schemes caused votes for President Trump to be changed to votes for Vice President Biden" with "the closest Plaintiffs get" being a statement by one affiant stating "I *believe* some of these workers were changing votes that had been cast for Donald Trump ..." *Id.* (citing to record). Similarly, "[t]he closest Plaintiffs get to alleging that election machines and software changed votes for President Trump to Vice President Biden in Wayne County is an amalgamation of theories, conjecture, and speculation that such alterations were *possible.*" *Id.* (citing to record). It was patently obvious from the day this lawsuit was filed, that "[w]ith nothing but speculation and conjecture that votes for President Trump were

30

destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails." *Id.*, at *13 (citation omitted).

## V.     The Sanctions Which Should be Imposed Pursuant to Rule 11

This lawsuit, and the lawsuits filed in the other states, are not just damaging to our democratic experiment, they are also deeply corrosive to the judicial process itself. When determining what sanctions are appropriate, the Court should consider the nature of each violation, the circumstances in which it was committed, the circumstances of the individuals to be sanctioned, the circumstances of the parties who were adversely affected by the sanctionable conduct, and those sanctioning measures that would suffice to deter that individual from similar violations in the future. *Orlett v. Cincinnati Microwave, Inc.*, 954 F.2d 414 (6th Cir. 1992). Moreover, when considering the type of sanctions to impose, the Court should be mindful that the primary purpose of Rule 11 is to deter future, similar actions by the sanctioned party. *Mann,* 900 F.2d at 962.

Accordingly, this Court should impose monetary sanctions against Plaintiffs and their counsel in an amount sufficient to deter future misconduct. *See*, *e.g.*, *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir. 1987) (courts have wide discretion in determining amount of monetary sanctions necessary to deter future conduct). Here, an appropriate sanction amount is, at the least, the amount that Plaintiffs' counsel have collected in their fundraising

campaign, directly or through entities they own or control, for their challenges to the 2020 election. They should not be allowed to profit from their misconduct.

It is also appropriate for Plaintiffs and their counsel to pay all costs and attorney fees incurred by Defendants. *See*, *e.g.*, *id.*; *see also Roberson v. Norfolk Southern Railway Co.*, 2020 WL 4726937, at *7 (E.D. Mich. Aug. 14, 2020) (awarding costs incurred by Defendant as a sanction against Plaintiff and Plaintiff's counsel for filing frivolous claims unsupported by law). In *Stephenson v. Central Michigan University*, No. 12-10261, 2013 WL 306514, at *14 (E.D. Mich. Jan. 25, 2013), attorney fees and costs were awarded as sanctions after the plaintiff's refusal to withdraw her frivolous claims during the 21-day safe harbor period provided by Rule 11. Sanctions were warranted because the plaintiff "brought a frivolous lawsuit which lacked evidentiary support, and continued to pursue her claims once the lack of support was evident ...." *Id*. The same applies here. Plaintiffs' claims were frivolous from the start, yet they refused to withdraw them when provided the opportunity. As a result, Defendants should be reimbursed for their attorney fees and costs.

Plaintiffs should also be required to post a bond of $100,000 to maintain their present (frivolous) appeal and for each additional appeal in this action. *See*, *e.g.*, *SLS v. Detroit Public Schools*, No. 08-14615, 2012 WL 3489653, at *1 (E.D. Mich. Aug. 15, 2012) (requiring the plaintiff to file $300,000.00 security bond).

To protect against their future filing of frivolous lawsuits in this District, Plaintiffs and their counsel should be required to obtain pre-clearance by a magistrate judge of any proposed lawsuit. If the magistrate determines that the proposed claims are frivolous or asserted for an improper purpose, the plaintiff[s] would be required to post a bond before filing the proposed action in an amount the magistrate determines is sufficient to protect the defendant[s]. *See, e.g.*, *Feathers v Chevron U.S.A., Inc*., 141 F.3d 26, 269 (6th Cir. 1998) ("There is nothing unusual about imposing prefiling restrictions in matters with a history of repetitive or vexatious litigation."); *see also*, *Ortman v. Thomas*, 99 F.3d 807, 811 (6th Cir. 1996) (permanently enjoining plaintiff from filing action based on particular factual or legal claims without first obtaining certification from a United States Magistrate that the claim is not frivolous).

Much of this brief addresses attorney misconduct, but this is the rare case where the Plaintiffs themselves deserve severe sanctions. Each plaintiff in this case is an experienced Michigan politician; each plaintiff was selected as a candidate to serve as a Trump elector; and, each plaintiff had to know that the Complaint is rife with false allegations. None of the Plaintiffs had any legitimate basis to believe any of the factual assertions in the Complaint, yet they signed on. And, indeed, they signed on to claims they had to know were false, including the numerous claims by their supposed experts.

The Plaintiffs know that Michigan does not have party registration. They know that Michigan does not have "early voting." They know that the nine counties identified as "outliers" because of larger raw vote shifts are simply some of the largest counties in the State. They know that the State does not mail ballots to voters. They know that it is common in Michigan for voters to vote absentee by appearing at the clerk's office, signing an application, receiving a ballot and returning it, all on the same day. They know that some absentee ballots are mailed by voters but received too late to be counted. They know that counting fifty ballots eight or ten times (as alleged by Mellissa Carone) would be found and corrected at multiple stages of the tabulation and canvassing process. They know that there could not have been a hand recount in Antrim County before the lawsuit was filed. They know that absentee ballots took longer to tabulate than in-person ballots and that Biden supporters were more likely to vote absentee than Trump supporters. And, these experienced Michigan politicians know that their "experts" based their findings on disregarding all of these facts.

In a case of this magnitude, intended to upend the election of the President of the United States, the Plaintiffs owed this Court the highest degree of due diligence before filing suit. Instead, there are only two possibilities—these six Plaintiffs did not read the Complaint and the expert reports supporting it; or, they did read the Complaint and the faulty expert reports and did not care that false representations

34

were being made to this Court. Either way, this case cries out for sanctions to deter this behavior in the future.

## VI.    Plaintiffs' Counsel Should also be Disciplined and Referred to the Chief Judge for Disbarment

In addressing attorney misconduct, the most important sanction here is not a Rule 11 sanction, but a disciplinary action pursuant to the Local Rules. The message must be sent that the Eastern District of Michigan does not tolerate frivolous lawsuits. The out of state attorneys appearing on the pleadings for the Plaintiffs never sought admission to the Eastern District of Michigan and never affirmed their acceptance of our Civility Principles. They have demonstrated their unwillingness to be guided by those principles, and they should be barred from returning to our courts.

E. D. Mich. LR 83.20(a)(1) defines "practice in this court," to include: "appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court."[25] "When misconduct or allegations of misconduct that, if substantiated, would warrant

---

[25] The Rule requires that a "person practicing in this court must know these rules, including the provisions for sanctions for violating the rules." Under 83.20(j) an attorney "who practices in this court" is subject to the Michigan Rules of Professional Conduct, "and consents to the jurisdiction of this court and the Michigan Attorney Grievance Commission and Michigan Attorney Discipline Board for purposes of disciplinary proceedings."

discipline of an attorney" who is a member of the bar or has "practiced in this court" come to the attention of a judicial officer by complaint or otherwise, the judicial officer may refer the matter to: (1) the Michigan Attorney Grievance Commission, (2) another disciplinary authority that has jurisdiction over the attorney, or (3) the chief district judge for institution of disciplinary proceedings ..." LR 83.22.

This case clearly warrants the full imposition of each disciplinary option in the Local Rules. This Court should enter an Order requiring Plaintiffs' to show cause why they should not be disciplined. LR 83.22(d) authorizes the Court to levy punishments other than suspension or disbarment on a practicing attorney whose conduct has violated the Rules of Professional Conduct, the Local Rules, the Federal Rules of Civil or Bankruptcy Procedure, orders of the Court, or who has engaged in conduct considered to be "unbecoming of a member of the bar of this court." In *Holling v. U.S.*, 934 F. Supp. 251 (E.D. Mich. 1996), this Court levied monetary sanctions and a formal reprimand against counsel for raising frivolous arguments. "Enforcing Rule 11 is the judge's duty, albeit unpleasant. A judge would do a disservice by shying away from administering criticism … where called for." *Id.*, at 253 n. 6 (quoting *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988)). The conduct of Plaintiffs' counsel in knowingly asserting false and frivolous claims while seeking relief with massive implications for our democracy warrants the strongest possible disciplinary action.

The Court should refer Plaintiffs' counsel to the Chief Judge of this District for disbarment proceedings and to their state bars for disciplinary actions. It appears that only one of the Plaintiffs' attorneys in the case—Greg Rohl—is admitted to practice in this District; he should be barred from further practice in the District.[26] The other attorneys should be prohibited from obtaining admission to this District or practicing in it in any manner, including, where, as here, they do not seek formal admission, but sign the pleadings.

All Plaintiffs' attorneys should also be referred for disciplinary proceedings to the Michigan Attorney Grievance Commission as well as to the disciplinary authorities in their home states (Sidney Powell, Texas; L. Lin Wood, Georgia; Emily

---

[26] Greg Rohl is the one attorney for Plaintiffs currently admitted to the Eastern District of Michigan. He has previously been sanctioned for filing a case which was deemed "frivolous from its inception" and ordered to pay over $200,000 in costs and attorney fees. *See DeGeorge v. Warheit*, 276 Mich. App. 587, 589, 741 N.W.2d 384 (2007). He was then held in criminal contempt and sentenced to jail—affirmed by the Court of Appeals—for attempting to transfer assets to evade payment. *Id.* The Court of Appeals noted that a bankruptcy court had concluded that Rohl "intended to hinder, delay and defraud … and create a sham transaction to prevent [a creditor] from reaching Rohl's interest in his law firm through the appointment of a receiver." *Id.* at 590. Rohl was also suspended by the Michigan Attorney Discipline Board in 2016 based on his convictions for disorderly conduct, in violation of M.C.L. § 750.1671F, "telecommunications service - malicious use, in violation of M.C.L. § 750.540E" and based on his admissions to at least two additional allegations of professional misconduct. Ex. 21. Those prior sanctions and disciplines were insufficient to discourage Mr. Rohl from filing the case at bar, leaving this Court with only one way to stop his behavior—he should be barred from practice in the Eastern District of Michigan.

Newman, Virginia; Julia Halller, D.C.; Brandon Johnson, D.C.; Howard Kleinhendler, New York). Those authorities can determine the appropriate response.

It is only by responding with the harshest possible discipline that these attorneys and those who would follow in their footsteps will learn to respect the integrity of the court system.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City of Detroit respectfully requests that this Court enter an Order sanctioning Plaintiffs and their counsel and initiating disciplinary proceedings in the manner identified in the Motion.

January 5, 2021

Respectfully submitted,

**FINK BRESSACK**

By: /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
*Attorneys for City of Detroit*
38500 Woodward Ave., Ste. 350
Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkbressack.com
dbressack@finkbressack.com
nfink@finkbressack.com

**CITY OF DETROIT
LAW DEPARTMENT**
Lawrence T. Garcia (P54890)
James D. Noseda (P52563)
*Attorneys for City of Detroit*
2 Woodward Ave., 5th Floor

38

Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
nosej@detroitmi.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

**FINK BRESSACK**

By:     */s/* Nathan J. Fink
        Nathan J. Fink (P75185)
        38500 Woodward Ave., Ste. 350
        Bloomfield Hills, MI 48304
        Tel.: (248) 971-2500
        nfink@finkbressack.com