# EXHIBIT 13

## AFFIDAVIT OF CHRISTOPHER THOMAS

Being duly sworn, Christopher Thomas, deposes and states the following as true, under oath:

1.      I have served as a Senior Advisor to Detroit City Clerk Janice Winfrey since September 2020. In this capacity I advise the Clerk and management staff on election law procedures, implementation of recently enacted legislation, revamped absent voter counting board, satellite offices and drop boxes, Bureau of Elections matters and general preparation for the November 3, 2020 General Election. I was involved in nearly all aspects of the election in the City, including the processing and tabulation at the TCF Center.

2.      I served in the Secretary of State Bureau of Election for 40 years beginning in May 1977 and finishing in June 2017. In June 1981, I was appointed Director of Elections and in that capacity implemented four Secretaries of State election administration, campaign finance and lobbyist disclosure programs.

3.      In 2013, I was appointed to President Barack Obama's Commission on Election Administration and served until a final report was submitted to the President and Vice-President in January 2014.

4.      I am a founding member of the National Association of State Election Directors and served as its president in 1997 and 2013.

5.      I have reviewed the Motion for Leave to File Bill of Complaint ("Motion"), the proposed Bill of Complaint ("BOC") and attached Declarations. This Affidavit addresses some of the factual errors in those documents.

6.      In November 2020, City of Detroit absentee ballots were counted at 134 absent voter counting boards in Hall E of the TCF Center, a large convention center in downtown Detroit.

1

Contrary to several statements made by the Plaintiff, the City of Detroit tabulates absentee ballots for Detroit voters, not the County of Wayne.

7. The City of Detroit is the only jurisdiction in the State of Michigan that is eligible to tabulate absent voter ballots by ballot style rather than by physical precinct. By law, jurisdictions with 250 or more precincts (Detroit is the only such jurisdiction in Michigan) may tabulate by ballot style. So, absent voter ballots in the City of Detroit are tabulated by absent voter counting boards, not by precincts.

8. A Detroit counting board is not the same as a precinct. A precinct has geographic dimensions that allow it to be shown on a map. A Detroit counting board by comparison is an aggregate of 1 or more precincts with the same ballot style. A ballot style is defined by its political geography, and encompasses ballots for which all offices, candidates, and proposals are the same. Detroit has 501 physical precincts that operate in various building locations across the city on election day. These 501 precincts do not count absent voter ballots on election day; they only counted ballots of voters who appeared at the precinct polling place marked a ballot and inserted it into a precinct tabulator. Absent voter ballots for voters who reside in the precincts are tabulated by absent voter counting boards, most of which include absent voter ballots of voters from several precincts. The absent voter ballots from Detroit's 501 precincts are distributed among 134 absent voter counting boards, depending on the ballot style.

9. According to Plaintiff, "the TCF was the only facility within Wayne County authorized to count ballots for the City of Detroit." (BOC ¶95). That is not correct. The TCF Center was the only facility within Wayne County authorized to count absentee ballots for the City of Detroit. Votes cast at polling places on election day were counted at those polling places, not at the TCF Center.

10.     Plaintiff asserts, based upon the Cicchetti Declaration, that there were 174,384 absentee ballots in Wayne County "not tied to a registered voter." (BOC at ¶97). Mr. Cicchetti clearly misunderstood whatever statistics he is referencing. His statement "174,384 absentee ballots out of 566,694 ballots tabulated (about 30.8%) were counted without a registration number for precincts in the City of Detroit" is apparently based upon his belief that absent voter ballots could only be reported as related to specific physical precincts. As noted above, however, the City of Detroit absent voter ballots are counted by ballot styles, meaning the counting boards do not correspond to a specific precinct as most have ballots from multiple precincts. The Wayne County Clerk reports the 134 absent voter counting boards separate from the precincts. No registration number is included because the percentage turnout of a counting board containing several different precincts has no meaning and is not directly related to the specific precincts. Thus, there is no requirement to report registration totals of the various precincts within each counting board. In fact, there is no legal requirement to report voter registration numbers for any precincts or counting boards. There were over 174,000 absentee ballots counted at the TCF Center, but they were not counted "without a registration number." Every ballot counted had a corresponding application executed by a registered voter in the City of Detroit. They were counted with a rigorous process of verification and tabulation.

11.     There is reference to Wayne County and Detroit precincts, being "unbalanced," a situation which occurs when the number of votes does not match the number of ballots in the precincts. This is generally the result of human error and occurs in each election cycle, especially in more populated areas throughout the country. The minor imbalances in precincts and counting boards in Wayne County and Detroit for the November general election accounts for a vanishingly small number of votes. In the

3

August 2020 election, 53.6% of Wayne County precincts and counting boards were *balanced*, while in November 2020, 71.9% were *balanced*. The percentage of out-of-balance precincts, with an imbalance of 5 or more, was also lower in November 2020 than August 2020, with 8.1% being out of balance by more than 5 in August and 5.7% out of balance by 5 or more in November.

12.     The City of Detroit had 501 precincts and 134 absent voter counting boards. Less than 36% of the total were out of balance. A counting board is out of balance if there are: (1) more ballots than voters or (2) more voters than ballots. In total 591 voters and ballots account for the imbalances. When voters and ballots are separated there are 148 more names than there are ballots, meaning that out of 174,384 votes there are 148 more names in the poll books than there are ballots. The imbalance is .0008 (eight ten-thousandths of a 1%). Of the 94 out of balance counting boards, there are 87 counting board with an imbalance of 11 or fewer voters/ballots; within the 87 counting boards, 48 are imbalanced by 3 or fewer voters/ballots. There are seven counting boards with higher imbalances that range from 13 more ballots to 71 fewer voters. Jurisdictions throughout the State, including jurisdictions with far fewer voters than Detroit, also had out of balance precincts. Indeed, the predominantly white jurisdiction of Livonia had a higher percentage of precincts out of balance than the predominantly African American City of Detroit. Nevertheless, in discussions at the Wayne County Canvassing Board one canvassing board member proposed the certification of all jurisdictions in Wayne County other than Detroit. None of the out of balance statistics suggest impropriety or provided a reason to not certify. This occurs everywhere in every election because elections are run by human beings who make mistakes.

13.    On November 2, 3 and 4, 2020, I worked at the TCF Center absent voter counting boards primarily as liaison with challenger parties and organizations. I provided answers to questions about processes at the counting board tables, resolved disputes about process and directed leadership of each organization or party to adhere to Michigan Election Law and Secretary of State procedures concerning the rights and responsibilities of challengers. I have reviewed the claims in this case.

14.    It is clear from the affidavits and the claims made by Plaintiff that the witnesses identified—Melissa Carone, Jessy Jacob and Zachary Larsen—do not understand absent voter ballot processing and tabulating. The affidavits of those witnesses were first submitted in *Costantino v. Detroit et al*, Wayne County Circuit Case No. 20-014780-AW. I submitted Affidavits to the Michigan courts in response to the affidavits of those witnesses.

15.    A few basics about how the vote count is managed helps explain some of the misunderstandings of the witnesses. The Qualified Voter File (QVF) is a statewide vote registration file and was not available to counting boards. E-pollbook (EPB) is a computer program used in election day precincts to create the poll list of voters casting ballots. Supplemental poll lists contain names of voters who cast an absent voter ballot on Sunday, Monday and Tuesday. At the processing tables no ballots are scanned. A poll list is not used to confirm whether any specific voter's ballot is counted.

16.    To increase the accuracy of the poll list, the Detroit Department of Elections employed the Michigan Secretary of State EPB to assist in creating the poll list. For each of the absent voter counting boards, the EPB held all the names of voters who requested an absent voter ballot by mid-afternoon Sunday, November 1. The download on Sunday was necessary to prepare

for the pre-processing granted by a recently enacted state law that allows larger municipalities to process ballots, but not to tabulate them, for 10 hours on Monday.

17.   Absent voter ballots received Sunday after the download to EPB, all day Monday until 4 p.m. and Tuesday by 8:00 p.m. were not in the EPB. They would be added either by manually entering the voter names into the EPB or on supplemental paper poll lists printed from the QVF.

18.   The affidavit of Mellissa Carone is particularly inaccurate and troubling. She was not an Election Inspector, nor was she a challenger. She was a contract worker, working for Dominion Voting Systems, to assist with occasional malfunctions of the tabulating machines. She has no known training in election law or procedures, and her affidavit and public statements have displayed a startling ignorance of how votes are counted.

19.   Ms. Carone believes that she saw evidence that ballots were counted more than once at the TCF Center. Her main allegation—that hundreds or thousands of ballots were counted twice—cannot possibly be true. She says she saw on a computer that 50 of the same ballots had been counted 8 times, and that she saw numerous similar instances "countless times" throughout the day. She does not say she saw multiple scans; just that she saw the numbers on various scanners. If what she said were true, at the very least, 350 extra votes would show up for at least one absent voter counting board, resulting in that board being grossly out of balance. According to her affidavit, large numbers of extra votes would show up in "countless" precincts. However, a mistake like that would be caught very quickly on site. What Ms. Carone thinks she saw would also be caught by the Detroit Department of Elections and the Wayne County Canvassing Board during the canvassing which occurs after every election as a matter of law. A slight disparity between the number of voters and the number of ballots might occur, but nothing like the numbers

she describes could possibly occur and be missed by the Department of Elections, the Election Inspectors, the challengers and the Wayne County Board of Canvassers.

20.    Ms. Carone's misunderstanding of what she observed may stem from the fact that as a routine part of the tabulation process, ballots are often fed through the high-speed reader more than once. For instance, if there is a jam in the reader, all ballots in the stack may need to be pulled out and run through again. Or, if there is a problem ballot (e.g., stains, tears, stray markings, ballot from a different counting board, etc.) in a stack, the problem ballot, and the several that were scanned by the high-speed machine after the problem was detected, will need to be re-scanned. At times, it will be most efficient to re-run several ballots, while at others, it will be more efficient to re-scan the entire batch. To an untrained observer it may appear that the ballot is being counted twice, however, the election worker will have cancelled the appropriate count on the computer screen. Any human error in the process would be identified during the canvass. If not, the number of voters at the absent voter counting board would be dramatically different than the number of counted votes.

21.    Ms. Carone's speculation about 100,000 new ballots is also not possible. On Sunday, November 1, 2020, roughly 140,000 absent voter ballots were delivered to TCF for the Monday pre-processing; on Monday and Tuesday there were approximately 20,000 ballots delivered; and, on Wednesday at around 3-3:30 a.m., the final roughly 16,000 ballots were delivered. If 100,000 instead of 16,000 ballots had been delivered, Detroit's total turnout would be 84,000 ballots more than what was reported. Her reference to an announcement "on the news" of the discovery of 100,000 new ballots in Michigan appears to be based on a repeatedly debunked conspiracy theory in which a clerk in Shiawassee County accidentally typed in an extra 0 and quickly discovered and fixed the error, *See, e.g.*, https://www.factcheck.org/2020/11/clerical-

7

error-prompts-unfoundedclaims-about-michigan-results/. Regardless of the source of her confusion, there is no way 100,000 new ballots could have been surreptitiously brought to the TCF Center as she describes.

22.     Ballots are delivered to the TCF Center after they are processed at the Department of Elections main office on West Grand Boulevard. On election day, ballots are received from the post office and the satellite offices. It takes several hours to properly process ballots received on election day. Ms. Carone might have heard false rumors about ballots being delivered, when actually television reporters were bringing in wagons of audio-video equipment. All ballots were delivered the same way— from the back of the TCF Hall E.

23.     Plaintiff is using the Affidavit of Jessy Jacob to assert that signatures on absentee ballots were not verified. The Affidavit, however, demonstrates nothing more than that Ms. Jacob did not understand the process. She states that "[w]hile I was at the TCF Center, I was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file." Ms. Jacob, who had no prior experience as an Election Inspector, did not understand that signature verification had occurred before any ballots were delivered to the TCF Center.

24.     Michigan law permits a city clerk to verify the signatures on absent voter ballots before election day. Inspectors at absent voter counting boards do not verify the signatures on the return ballot envelopes. Before ballots were delivered to the TCF Center for counting, Department of Elections staff complete the verification process. Staff may use a voter's signature on an application that was previously verified by the QVF to verify the voter's signature on the ballot envelope, or the staff may use the voter's signature in the QVF to make the comparison

8

25.     The BOC asserts that "Wayne County made the policy decision to ignore Michigan's statutory signature-verification requirement for absentee ballots." (BOC at ¶93) There is no basis for this claim. Under Michigan law, the verification is done at the City, not the County level, and the City of Detroit followed strict procedures to verify signatures.

26.     The ballots delivered to the TCF Center had been verified by the Detroit City Clerk's staff prior to delivery in a process prescribed by Michigan law. Thus, when Jessy Jacob states that she "was instructed not to look at any of the signatures on the absentee ballots, and I was instructed not to compare the signature on the absentee ballot with the signature on file" it was because that part of the process had already been completed by the City Clerk's satellite office staff in compliance with state law.

27.     The Affidavit of Jessy Jacob is also used to support the allegations of ballots being "back-dated." It is once again clear that the allegations arise from the fact that Ms. Jacob did not understanding what she was observing. On Wednesday, November 4 it was discovered that there had been an operator error at the satellite offices with respect to the verification of a relatively small number of ballots. While the ballot envelopes had been initialed as having been verified and stamped as having been received prior to November 3 at 8 p.m., the election worker[s] had not completed the final clerical step of selecting the "save" button in the computer system. Thus, those ballots would not scan into the EPB at the TCF Center and were not on the supplemental paper list.

28.     A team of employees was directed to correct those clerical errors by entering the date the ballots were received in the satellite office and selecting "save." The date of receipt was not being backdated; it was being noted in the system. Completing this clerical step placed the voter into the Absent Voter Poll List in the QVF so that the ballot could be processed and counted.

Again, none of these ballots were received after 8:00 p.m. on election day. Most were received on Monday, November 2nd - the busiest day for the satellite offices. Two challengers were provided a demonstration of the QVF process to show them how the error occurred, and they chose not to file a challenge to the individual ballots.

29.    It would have been impossible for any election worker at the TCF Center to count or process a ballot for someone who was not an eligible voter or whose ballot was not received by the 8:00 p.m. deadline on November 3, 2020. No ballot could have been "backdated," because no ballots received after 8:00 p.m. on November 3, 2020 were ever at the TCF Center. No voter not in the QVF or in the "Supplemental Sheets" could have been processed, or "assigned" to a "random name" because no ballot from a voter not in one of the two tracking systems, was brought to the TCF Center.

30.    Jessy Jacob alleges she was instructed by her supervisor to adjust the mailing date of absentee ballot packages being sent out to voters in September 2020. The mailing date recorded for absentee ballot packages would have no impact on the rights of the voters and no effect on the processing and counting of absentee votes. Any adjustment to mailing date was done to more accurately reflect the date the ballot would be mailed, which in many cases was done on a date after the day the application was processed.

31.    Michigan Election Law requires clerks to safely maintain absent voter ballots and deliver them to the absent voter counting board. There is no requirement that such ballots be transported in sealed ballot boxes. To my knowledge, they are not sealed by any jurisdiction in Michigan in a ballot box prior to election day. Employees bring the ballot envelopes to the TCF Center, which is consistent with chain of custody. The only ballots brought to TCF that are not in envelopes are blank ballots used to duplicate ballots when necessary.

32.     At no time after ballots were delivered to TCF on Sunday, November 1, did any ballot delivery consisted of "tens of thousands of ballots".

33.     Contrary to the affidavit of Jessy Jacob, there is no legal requirement that all absent voter ballots be recorded in the QVF by 9:00 p.m. on November 3, 2020.

34.     The QVF has a high level of security and limitation on access to the file. For example, it is not true (as claimed by Jessy Jacob) that a person with QVF credentials in one city is able to access data in another city's file within the QVF. That is not possible.

35.     In his affidavit, Zachery Larsen raises an issue about return ballot envelopes where the barcode on the label would not scan and the voter's name was not on the supplemental list. He was observing the correction of clerical errors, not some type of fraud. In every election, clerical errors result in voters being left off the poll list, whether it is a paper poll list or the EPB. These errors are corrected so that voters are not disenfranchised. Michigan law ensures that voters are not disenfranchised by clerical errors.

36.     Mr. Larsen also states that he saw an inspector at Counting Board 23 type into the computer system a name other than that of the voter appearing on the envelope because the voter was already in the EPB. But, if the voter were already checked in, the inspector would not have the envelope with a ballot in it. Mr. Larsen asserts he saw the name "Pope" typed into the EPB when there was already a person with that last name in the EPB. But, at Counting Board 23, there are three people with the last name Pope who voted in the election. One returned their ballot in October and therefore would have been in the EPB (since the information was downloaded from the QVF on Sunday November 1, 2020). The two other voters with the last name of Pope voted on Monday, November 1, so their names would not be in the EPB. Mr. Larsen apparently observed

one of those voters being hand entered into the system, as was necessary if they were not already in the EPB.

37.     The City has conducted an internal inquiry with respect to Mr. Larsen's assertions regarding Counting Board 23. At that Counting Board, 2,855 ballots were tabulated with 2,856 associated envelopes. Each envelope is associated with validly registered voters and applications for absent voter ballots. The only voters whose names were typed into the system at that Counting Board were voters whose barcode did not bring up a ballot and whose name did not appear on the supplemental list. All such ballot envelopes were signed, verified and date/time-stamped as having been received before 8:00 p.m. on Tuesday, November 3, 2020.

38.     Mr. Larsen also objects that he was not given a full opportunity to stand immediately behind or next to an election inspector operating the EPB laptop computer. In anticipation of viewing problems due to necessary social distancing to address COVID-19 concerns, large monitors were set up at each absent voter counting board. Moreover, election inspectors were instructed to follow the same procedure for all challengers. The Detroit Health Code and safety during a pandemic required maintaining at least 6-feet of separation. This was relaxed where necessary for a challenger to lean in to observe something and then lean back out to return to the 6-foot distancing. The challengers could see and copy the names of each person being entered into the EPB. If an inspector did not fully accommodate a challenger's reasonable request and the issue was brought to the attention of a supervisor, it was remedied. Announcements were made over the public address system to inform all inspectors of the rules. If what Mr. Larsen says is accurate, any inconvenience to him was temporary and had no effect on the processing of ballots.

39.     It is clear also that Mr. Larsen did not operate through the leadership of his challenger party, because the issues he brings forward were by and large discussed and resolved

with the leadership of their challenger party. The leadership on numerous occasions would ask me to accompany them to a particular counting board table to resolve an issue. I would always discuss the issue with counting board inspectors and their supervisors and the challengers. Mr. Larsen appears to have failed to follow this protocol, which was established in a meeting with challenger organizations and parties on Thursday, October 29, 2020 at the TCF Center where a walk-through of the entire process was provided. Indeed, in the *Costantino* matter, counsel for plaintiffs acknowledged that Mr. Larsen had not attended that meeting.

40.     Mr. Larsen makes some allegations relating to ballots without "secrecy sleeves," but many ballots were returned without the secrecy sleeves. Michigan law does not invalidate ballots returned without a secrecy sleeve.

41.     In mid-afternoon on Wednesday, November 4, 2020, I observed that few challengers were stationed at the counting board tables. Rather, clusters of 5, 10 or 15 challengers were gathered in the main aisles at some tables. I conducted a conversation with leaders of the Republican Party and Democratic Party about the number of challengers in the room and their locations. It became clear that more than 134 challengers were present for these organizations. No one was ejected for this reason, but access to Hall E was controlled to ensure that challenger organizations had their full complement and did not exceed the ceiling any further than they already had. Challengers were instructed to sign out if they needed to leave Hall E. For a short period of time—a few hours—because there were too many challengers in Hall E for inspectors to safely do their jobs, new challengers were not allowed in until a challenger from their respective organization left the Hall. However, each challenger organization, including Republican and Democrat, continued to have their challengers inside of Hall E.

42.     I am not aware of any valid challenge being refused or ignored or of any challengers being removed because they were challenging ballots. Ballot challengers are part of the electoral process in Michigan and were fully able to participate in the process at the TCF Center.

43.     The description of the Biden/Trump votes in Michigan is incorrect. (BOC at ¶77) Based upon the certified totals, Vice President Biden received 2,804,040 votes, and President Trump received 2,649,852 votes, for a margin of 154,188 votes.

44.     The statement that "only 587,618 Michigan voters requested absentee ballots" in 2016 (BOC at ¶88) is not correct; Dr. Cicchetti acknowledges that the number is 1,277,405, in his Declaration (Declaration ¶17). *See also* https://www.eac.gov/sites/default/files/eac_assets/ 1/6/Michigan_-_EAVS_2016_Data_Brief_-_508.pdf.

45.     During my employment with the Secretary of State, the Bureau of Elections compiled unofficial results from the 83 counties, adding county totals only after the ballots are tabulated in a county. The real "election night reporting" is done by the county clerks. The county clerks compile results from cities and townships in their respective counties. In Michigan, there are over 1,500 cities and townships. Typically, precinct results are the first returns to be publicly posted on county clerk websites. These returns begin appearing within an hour after the 8 p.m. closing of the polls and continue until nearly complete around midnight. Absent voter ballot results are slower to appear on county websites. Some jurisdictions will report partial mail ballot returns after 8 p.m.; however, most jurisdiction do not report mail ballot returns until all tabulation is completed. In election years before 2020, the bulk of mail ballots were reported between midnight and 5 a.m. The mail ballots for November 2020 continued to be reported well into Wednesday with some final results being reported on Thursday.

46.     In conclusion, upon reviewing the various affidavits and statements made by Plaintiff, I can readily conclude based upon my own knowledge and observation that there was no fraud, or even unrectified procedural errors, associated with processing of the absentee ballots for the City of Detroit.

I affirm that the representations above are true.

Further, Affiant sayeth not.

Date: December 10, 2020

CHRISTOPHER THOMAS

Subscribed and sworn to before me
this 10th day of December, 2020.

KIMBERLY S. HUNT, Notary Public
County of Macomb
My Commission Expires:  08/08/24
Acting in the County of Macomb
Notarized using electronic/remote technology
Notary located in Macomb County, State of Michigan
Signatory located in BERRIEN County, State of MICHIGAN

KIMBERLY S. HUNT
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Aug 8, 2024
ACTING IN COUNTY OF Macomb

15