# EXHIBIT 20

STATE OF MICHIGAN
IN THE SUPREME COURT

ANGELIC JOHNSON and,
LINDA LEE TARVER,　　　　　　　　　　　　　MSC No. 162286

　　　　Petitioners,

vs.

JOCELYN BENSON, in her official capacity as Michigan Secretary of State; JEANNETTE BRADSHAW, in her official capacity as Chair of the Board of State Canvassers for Michigan; BOARD OF STATE CANVASSERS FOR MICHIGAN; and GRETCHEN WHITMER, in her official capacity as Governor of Michigan,

　　　　Respondents,

| | |
|---|---|
| RHOADES MCKEE, PC<br>Ian A. Northon, Esq. (P65082)<br>Gregory G. Timmer (P39396)<br>55 Campau Avenue, Suite 300<br>Grand Rapids, MI 49503<br>Tel.: (616) 233-5125<br>Fax: (616) 233-5269<br>ian@rhoadesmckee.com<br>ggtimmer@rhoadesmckee.com<br>*Attorneys for Petitioners* | FINK BRESSACK<br>David H. Fink (P28235)<br>Darryl Bressack(P67820)<br>Nathan J. Fink (P75185)<br>38500 Woodward Ave., Suite 350<br>Bloomfield Hills, MI 48304<br>(248) 971-2500<br>dfink@finkbressack.com<br>dbressack@finkbressack.com<br>nfink@finkbressack.com<br>*Attorneys for Proposed Intervenor-Respondent City of Detroit* |
| AMERICAN FREEDOM LAW CENTER<br>Robert J. Muise, Esq. (P62849)<br>PO Box 131098<br>Ann Arbor, Michigan 48113<br>Tel: (734) 635-3756<br>Fax: (801) 760-3901<br>rmuise@americanfreedomlawcenter.org<br>*Attorneys for Petitioners* | CITY OF DETROIT LAW DEPARTMENT<br>Lawrence T. García (P54890)<br>Charles N. Raimi (P29746)<br>James D. Noseda (P52563)<br>2 Woodward Ave., 5th Floor<br>Detroit, MI 48226<br>(313) 237-5037<br>garcial@detroitmi.goc<br>nosej@detroitmi.gov |

GREAT LAKES JUSTICE CENTER
Erin Elizabeth Mersino, Esq. (P70886)
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
(517) 322-3207
erin@greatlakesjc.org
*Attorneys for Petitioners*

*Attorneys for Proposed Intervenor-Respondent City of Detroit*

## AFFIDAVIT OF CHARLES STEWART III

Being duly sworn, Charles Stewart III, deposes and states the following as true, under oath:

1. I am the Kenan Sahin Distinguished Professor of Political Science at the Massachusetts Institute of Technology, where I have been on the faculty since 1985. In that time, I have done research and taught classes at the graduate and undergraduate levels in the fields of American politics, research methodology, elections, and legislative politics.

2. Since November 2020 I have been a member of the Caltech/MIT Voting Technology Project (VTP). The VTP is the nation's oldest academic project devoted to the study of voting machines, voting technology, election administration, and election reform. I have been the MIT director of the project for 15 years.

3. I am the founding director of the MIT Election Data and Science Lab (MEDSL), which was founded in January 2016. MEDSL is devoted to the impartial, scientific analysis of elections and election administration (sometimes called election science) in the United States.

4. I have been the author or co-author of numerous peer-reviewed publications and books in political science, and in particular, the area of election administration and election science.

5.	I have attached an abridged version of my curriculum vitae to this statement, as Appendix 1.

6.	As a part of my academic research, I have regularly designed public opinion surveys to probe questions related to the conduct of elections in the United States. I have been the principal investigator of modules pertaining to election science that were part of the Cooperative Election Study in 2012, 2013, 2014, 2016, 2018, 2019, and 2020.

7.	I was the principal investigator of the project that led to the creation and design of the Survey of the Performance of American Elections (SPAE).  The SPAE is the only large-scale academic survey that focuses on the experience of voters in federal elections.  I supervised the development of the survey instrument and the reporting of the results. This survey, which interviews over 10,000 voters following every presidential election, has been implemented following the 2008, 2012, 2016, and 2020 elections.

8.	I have reviewed the reports written by Mr. Matthew Braynard and Professor Qianying (Jennie) Zhang and submitted in this case.

**Mr. Braynard's Report**

9.	Mr. Braynard claims that he has evidence concerning whether individuals from the Michigan voter file actually voted and whether those individuals identified as having voted were actually qualified to vote on Election Day.

10.	It is my opinion, based on my knowledge as an expert in the fields of political science, election administration, and survey research, that Mr. Braynard's conclusions are without merit.

11. Mr. Braynard states on page 6 that he received what he claims to be the Michigan voter registration database and a file of absentee ballot voters from the company L2 Political. It is important to note that Mr. Braynard did not receive a "raw" copy of the Qualified Voter File (QVF) directly from the state, but from an intermediary. L2 is known to augment information in state voter files, so that they can be of use to political campaigns. Mr. Braynard offers no discussion of whether L2 made any enhancements to the files he used and, if they did, whether those enhancements affected his analysis.

12. The central data-gathering method in this report is based on calling samples of individuals who were in either one of the files provided to Mr. Brainard by L2. Mr. Brainard does not discuss where he got those phone numbers. I know, because I purchased a copy of the QVF in May of this year, that the QVF does not have phone numbers. Therefore, the telephone numbers Mr. Braynard used had to be added by someone else. They may have been added by L2, but they may have been added through another process that is not specified in the report.

13. Mr. Braynard generally describes his approach on page 6. He claims that a full description of his analysis is attached in Exhibit 2, but it is not in fact attached. All we can gather from the description we do have is that he, or his call center staff, drew a random sample from the two L2-provided datasets and made some telephone calls. The very brief description of the research raises numerous questions that one would normally address in a report of this nature. Among these questions are

- How was the randomization implemented?
- What efforts were made to "convert" non-responses to responses?
- Who was the call center?
- Over what period of time were the calls made?

- What precisely was that the script that callers followed as they talked to people they reached?

- What quality assurance measures were taken by the call center staff to ensure that the callers followed the protocol and recorded results accurately?

14. On page 7, point 1, Mr. Braynard states that the callers spoke to 834 individuals. He gives no indication of how many people had to be called to reach these 834. With telephone surveys, it is common for response rates to be around 2% – 5%. With such low response rates, it is necessary to understand whether the respondents were at all representative of the universe they are intended to represent. Without serious attention to this question of representativeness, we have no assurance that the results of the survey are not tainted by a problem known in the profession as non-response bias. This issue of non-response bias attends all of the analyses Mr. Braynard presents.

15. In this section, Mr. Braynard also writes that 12.23% of his sample of individuals who were in the absentee-ballot request file did not, in fact, request an absentee ballot. He reaches this conclusion based on a naïve interpretation of the responses. The fact that 12.23% of this sample <u>says</u> they did not request an absentee ballot does not support a conclusion that 12.23% of people who are recorded as requesting an absentee ballot did not actually request one. Instead, the most likely conclusion is that the lion's share—if not all—of these responses were given by people who were called by mistake.

16. My criticism in the previous paragraph is based on what is known about the quality of database matching between voter files and commercial telephone lists. In 2018, the Pew Research Center issued a report that, among other things, addressed the problem of

matching telephone numbers to voter files.[1] That report found that firms who do this type of matching are successful between 55% and 91% of the time. In other words, for data sets of the type Mr. Braynard is using, between 45% and 9% of the telephone numbers will be incorrect. Therefore, if 12% of the sample stated they did not request an absentee ballot, it is likely that the callers were simply talking to the wrong people.

17. On page 7, point 2, Mr. Braynard claims that 24.19% of those who are recorded as not returning an absentee ballot did not request one. This analysis has essentially the same flaws as the analysis under point 1.

18. On page 8, point 3, Mr. Braynard claims that 15.37% of those who are recorded as having not returned an absentee ballot did, in fact, return one. These results were quite unremarkable and are entirely consistent with a well-known problem in the study of political participation called "social desirability bias." Social desirability bias is the tendency of survey subjects to give socially desirable responses instead of answering with their true feelings or behaviors. This is especially problematic in studying sensitive topics, of which politics is one.

19. The problem of over-stating that one has participated in an election has led to a large literature on this topic. It is common practice among survey researchers to gauge the degree of over-reporting. For instance, in the 2016 Cooperative Election Study, follow-up research established that 29% of those who had originally stated to the researchers that they had voted by mail had, in fact, not voted at all. Therefore, it is reasonable to conclude that the results reported under point 3 are due to misreporting by respondents.

20. On page 9, point 4, Mr. Braynard reports the analysis of a sample of individuals who are reported as having voted absentee or early and who also match to the NCOA database.

---

[1] Pew Research Center, "Commercial Voter Files and the Study of U.S. Politics," February 15, 2018, https://www.pewresearch.org/methods/2018/02/15/commercial-voter-files-and-the-study-of-u-s-politics/.

He reports that 1% of these individuals denied that they actually cast a ballot. There are two problems here. First, the numbers in this section are inconsistent. Is it 1.11%, as in the summary, or 1.38%, as in the body of the report? Second, it is my understanding that Michigan does not have early voting. My conclusion, therefore, is that this claim has all of the hallmarks of analysis intended for another state that got inadvertently cut and pasted into this report.

21. On page 9, point 5, Mr. Braynard claims that he identified a number of voters who were no longer residents of Michigan on Election Day. There are at least two problems with this analysis. First, there are legitimate reasons why a resident of Michigan would file an NCOA notice that they had moved outside of the state, and still would be residents of the state. I myself have done this in the couple of times in my lifetime, when I had opportunities to spend a year in another state as a part of my profession. Students, military members assigned to a post outside of Michigan, and others pursuing business opportunities on a short-term basis are likely to file an NCOA form so that critical mail, such as bills, is forwarded to them during the period of their temporary absence. In addition, without Exhibit 2, it is impossible to judge precisely what Mr. Braynard did to arrive at the numbers that are reported in the section.

22. Finally, on page 10, point 6, Mr. Braynard claims to have found at least 234 individuals in Michigan who voted in multiple states. First, there are two numbers in the section, 234 and 317. Again, this looks like a case of cut-and-paste report writing. More importantly, his conclusion is based on an assumption that the matching is 100% correct. It is my experience that matching that "finds" double voting often does so because of false matches. Therefore, if one were to further investigate these cases, it is likely that the number of multiple voters is significantly less that the numbers reflected here. And, even if there were a couple dozen multiple voters in Michigan, this hardly reflects widespread fraud in the conduct of the election.

23. In addition to these substantive problems, the report has numerous careless errors which reflect on the seriousness with which we should take his analysis. For instance, in the very first paragraph of his report, Mr. Braynard refers to the state of Wisconsin, rather than to Michigan. This raises the obvious question of whether Mr. Braynard is simply cutting and pasting from reports written about other states, using equally dubious methodologies to reach similarly baseless conclusions. If Mr. Braynard cannot keep track of which state he is analyzing, I worry about the quality of the analysis underlying the report.

24. On page 3, Mr. Braynard states that he has attached a copy of his resume as Exhibit 1. However, Exhibit 1 was not attached to the report. Therefore, there is no independent way to judge Mr. Braynard's training or actual experience in data analysis based on evidence in his report. What he describes however on page 3 does not give me confidence that he is qualified to design credible survey research in this area. He describes working for a small, if important, data analysis firm, Election Data Services, where he worked under the supervision of a PhD political scientist doing work appropriate to a recent graduate with a business degree. He owns a firm that reportedly engages in statistical analysis and consulting for political campaigns. However, owning a firm that provides statistical and data analysis is quite different from being able to design and implement that analysis.

### Report of Qianying "Jennie" Zhang

25. Dr. Zhang's report adds nothing to Mr. Braynard's analysis. Dr. Zhang merely recapitulates the claims in Mr. Braynard's report and then calculates a series of confidence intervals around those estimates.

26. Dr. Zhang writes that she assumes the sampling was done correctly and that the answers reflect the true behavior of the respondents. In other words, she assumes the data are good but, as I have shown, they are not. Dr. Zhang is not, nor does she claim to be, an expert in survey research. I have no doubts about the calculations that she performed. However, there is also no reason for an expert in survey research to ask a professor of finance to calculate confidence intervals. The calculation of confidence intervals is a routine task undertaken by survey researchers in their normal capacity many times every day—usually automated using statistical software. The failure of Mr. Braynard to calculate confidence intervals himself underscores the fact that he is not an expert in the area of public opinion research.

27. I will note inconsistencies in some of the numbers between Mr. Braynard's and Dr. Zhang's reports. For instance, Mr. Braynard claims that there were 139,129 absentee voters who were sent a ballot but who failed to return the absentee ballot; Dr. Zhang puts this number at 139,190. This is a small discrepancy, but it does make me wonder what data Dr. Zhang was looking at.

I affirm that the representations above are true.

Further, Affiant sayeth not.

Date: December 4, 2020

*CHARLES STEWART III*

Subscribed and sworn to before me
this 4th day of December, 2020.

KIMBERLY S. HUNT, Notary Public
County of Macomb
My Commission Expires: 08/08/24
Acting in the County of Macomb
Notarized using electronic/remote technology
Notary located in Macomb County, State of Michigan
Signatory located in MIDDLESEX County, State of MASSACHUSETTS

KIMBERLY S. HUNT
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Aug 8, 2024
ACTING IN COUNTY OF MACOMB

**Curriculum Vitae**

**CHARLES HAINES STEWART III**

Kenan Sahin Distinguished Professor of Political Science
The Massachusetts Institute of Technology
Department of Political Science
Cambridge, Massachusetts   02139
617-253-3127
CStewart@mit.edu

**Education**

| | |
|---|---|
| 1985 | Ph.D., Stanford University. |
| 1983 | A.M., Stanford University |
| 1979 | B.A., Emory University |

**Professional experience**

*Teaching*

| | |
|---|---|
| 1985–1989 | Assistant Professor of Political Science |
| 1989–1999 | Associate Professor of Political Science |
| 1990–1993 | Cecil and Ida Green Career Development Associate Professor of Political Science (3-yr. term) |
| 1999–present | Professor of Political Science |
| 2007–present | Kenan Sahin Distinguished Professor of Political Science |
| 2016-present | Affiliate Faculty, Institute for Data, Systems, and Society |

*Administrative*

| | |
|---|---|
| 2002–2005 | Associate Dean of Humanities, Arts, and Social Sciences |
| 2002–present | Co-director, Caltech/MIT Voting Technology Project |
| 2005–2010 | Head of the Department of Political Science |
| 2015–present | Director, MIT Election Data and Science Lab |

**Awards (abbreviated)**

| | |
|---|---|
| 1994 | Mary Parker Follett Award, for Best Published Essay or Article, 1993-1994, Politics and History Section, American Political Science Association (with Barry Weingast). |
| 1999 | Franklin L. Burdette Pi Sigma Alpha Award, for Best Paper Presented at the 1998 Annual Meeting of the American Political Science Association. ("Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives") |

| | |
|---|---|
| 2002 | Jewell-Loehenberg Award, for best article to have appeared in the *Legislative Studies Quarterly*, Legislative Studies Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.) |
| 2002 | Jack Walker Award, honoring an article or published paper of unusual significance and importance to the field, Political Organizations and Parties Section, American Political Science Association (with Steven Ansolabehere and James M. Snyder, Jr.) |
| 2011 | Elected Fellow, American Academy of Arts and Sciences |
| 2013 | Patrick J. Fett Award, honoring the best paper on the scientific study of Congress and the Presidency at the previous meeting of the Midwest Political Science Association ("The Value of Committee Assignments in Congress since 1994") |

**Grants (abbreviated)**

| | |
|---|---|
| 1991–93 | National Science Foundation, "The Development of the Committee System in the House, 1870-1946," SES-91-12345 |
| 2003–06 | John S. and James L. Knight Foundation, "Internet and Electronic Voting" |
| 2005–07 | National Science Foundation, "Collaborative Research: U.S. Senate Elections Data Base, 1871–1913" (with Wendy Schiller). |
| 2007–10 | Pew Charitable Trusts and JEHT Foundation, "The 2008 Survey of the Performance of American Elections" |
| 2008–10 | Ewing Marion Kauffman Foundation, "Congressional and Executive Staff Seminar" |
| 2012–13 | Pew Charitable Trusts, "Measuring Elections" |
| 2013–15 | Pew Charitable Trusts, "Measuring Elections" |
| 2013–14 | Democracy Fund, "Voting in America: Matching Problems to Solutions" |
| 2013–14 | William and Flora Hewlett Foundation, "Voting in America: Matching Problems to Solutions" |
| 2014–17 | Democracy Fund, "Polling Place of the Future" |
| 2016–17 | Pew Charitable Trusts, "The 2016 Survey of the Performance of American Elections |
| 2017–21 | William and Flora Hewlett Foundation, "The MIT Election Data and Science Lab" |
| 2018–21 | Democracy Fund, "The MIT Election Data and Science Lab" |
| 2017–18 | Carnegie Foundation of New York, Andrew Carnegie Fellow |
| 2017–19 | Joyce Foundation, "State Election Landscapes" |

**Publications (abbreviated)**

*Books*

| | |
|---|---|
| 2015 | *Electing the Senate.* Princeton. University Press (with Wendy Schiller) |
| 2014 | *Measuring American Elections*. Cambridge University Press (with Barry Burden) |
| 2012 | *Fighting for the Speakership: The House and the Rise of Party Government.* Princeton University Press (with Jeffery A. Jenkins). |
| 2010 | *Committees in the U.S. Congress, 1993–2010.* CQ Press (with Garrison Nelson). |

2002  *Committees in the United States Congress, 1789–1946*, 4 vols.  Congressional Quarterly Press (with David Canon and Garrison Nelson).
2001  *Analyzing Congress.*  W. W. Norton. [2nd edition, 2012]
1989  *Budget Reform Politics: The Design of the Appropriations Process in the House, 1865-1921.* Cambridge University Press.

*Chapters in edited collections*
2020  "Polling Place Quality and Access" (with Robert Stein and Christopher Mann) in *The Future of Election Administration,* eds. Mitchell Brown, Bridgett A. King, and Kathleen Hale. Palgrave MacMillan.
2020  "The Elections Performance Index: Past, Present, and Future" in *The Future of Election Administration*, eds. Mitchell Brown, Bridgett A. King, and Kathleen Hale. Palgrave MacMillan.
2017  "Election Administration in 2016: A Tale of Two Cities" (with Terry Susan Fine) in *Conventional Wisdom, Parties, and Broken Barriers in the 2016 Election*, eds. Jennifer C. Lucas, Christopher J. Galdieri, and Tauna Starbuck Sisco.
2014  "Measuring American Elections" in *Measuring American Elections,* eds. Barry C. Burden and Charles Stewart III.
2014  "The Performance of Election Machines and the Decline of Residual Votes in the U.S." in *Measuring American Elections*, eds. Barry C. Burden and Charles Stewart III.
2014  "Understanding Voter Attitudes toward Election Fraud Across the United States." (With Thad E. Hall) in *Advancing Electoral Integrity*, eds. Pippa Norris, Richard W. Frank, and Ferran Martinez i Coma.
2014  "What Hath HAVA Wrought? Consequences, Intended and Unintended, of the Post-*Bush v. Gore* Reforms," in *Bush v. Gore Ten Years Later,* eds. R. Michael Alvarez and Bernard Grofman.
2011  "Congressional Committees in a Partisan Era: The End of Institutionalization as We Know It?" in *New Directions in Congressional Politics*, ed. Jamie Ll. Carson, Routledge.
2008  "Function follows Form: Voting Technology and the Law," in *America Votes!,* ed. Benjamin E. Griffith American Bar Association.
2008  "Improving the Measurement of Election System Performance in the United States" in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles*, eds. Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, Russell Sage.
2006  "Architect or Tactician?  Henry Clay and the Institutional Development of the U.S. House of Representatives" in *Process, Party, and Policy Making: New Advances in the Study of the History of Congress*, eds David W. Brady and Mathew D. McCubbins, Stanford University Press.
2005  "Congress in the Constitutional System," in *Institutions of Democracy: The Legislative Branch,* ed. Sarah Binder and Paul Quirk, Oxford University Press.
2002  "The Evolution of the Committee System in the U.S. Senate" (with David Canon), in *Senate Exceptionalism,* ed., Bruce Oppenheimer, Ohio University Press.
2002  "Order from Chaos: The Transformation of the Committee System in the House, 1810–1822," in *Party, Process, and Political Change in Congress:  New Perspectives on the History of Congress,* eds. David Brady and Mathew McCubbins, Stanford University Press.
2001  "The Evolution of the Committee System in Congress," in *Congress Reconsidered,* 7th edition, eds., Lawrence Dodd and Bruce I. Oppenheimer.  Congressional Quarterly Press.
1992  "Committees from Randall to Clark," in *The Atomistic Congress,* eds. Ron Peters and Allen Hertzke. M.E. Sharpe.
1992  "Responsiveness in the Upper Chamber:  The Constitution and the Institutional Development of the U.S. Senate," in *The Constitution and the American Political Process,* ed. Peter Nardulli. University of Illinois Press.
1991  "Lessons from the Post-Civil War Era," in *Causes and Consequences of Divided Government,* eds. Gary Cox and Samuel Kernell.  Westview Press.

1991    "Tax Reform in the 1980s," in *Politics and Economics in the 1980s,* eds. Alberto Alesina and Geoffrey Carliner. University of Chicago Press, pp. 143-170.

*Articles in refereed journals (Abbreviated)*

2020    "Reconsidering Lost Votes by Mail" *Harvard Review of Data Science.*

2020    "Abstention, Protest, and Residual Votes in the 2016 Election," (with R. Michael Alvarez, Stephen Pettigrew, and Cameron Wimpy) *Social Science Quarterly.* 101(2): 925–939. https://doi.org/10.1111/ssqu.12757.

2020    "Protecting the Perilous Path of Election Returns: From the Precinct to the News," (with Stephen Pettigrew) *Ohio State Technology Law Journal* 2020: 588–638.

2020    "Explaining the Blue Shift in Election Canvassing," (with Edward B. Foley) *Journal of Political Institutions and Political Economy* 1(2): 239–265. http://dx.doi.org/10.1561/113.00000010.

2020    "The Relationship of Public Health with Continued Shifting of Party Voting in the United States," (with Jason H. Wasfy, Emma W. Healy, and Jinghan Cui) *Social Science & Medicine* 252(May 2020): 112921. https://doi.org/10.1016/j.socscimed.2020.112921.

2019    "Causal Inference and American Political Development: The Case of the Gag Rule," (with Jeffery A. Jenkins) *Public Choice*. https://doi.org/10.1007/s11127-019-00754-9.

2019    "Learning from Each Other: Causal Inference and American Political Development," (with Jeffery A. Jenkins and Nolan McCarty) *Public Choice*. https://doi.org/10.1007/s11127-019-00728-x.

2019    "Waiting to Vote in the 2016 Presidential Election: Evidence from a Multi-county Study," (with Robert M. Stein, et al) *Political Research Quarterly*. https://doi.org/10.1177%2F1065912919832374.

2019    "Voter ID Laws: A View from the Public," (with Paul Gronke, et al) *Social Science Quarterly* 100(1): 215–232.

2018    "The Deinstitutionalization (?) of the House of Representatives: Reflections on Nelson Polsby's "The Institutionalization of the U.S. House of Representatives" at Fifty" (with Jeffery A. Jenkins) *Studies in American Political Development* 32(2): 166–187.

2018    "Pedagogical Value of Polling-Place Observation by Students" (with Christopher B. Mann, et al) *PS: Political Science & Politics* 51(4): 831–837.

2018    "Learning from Recounts," (with Stephen Ansolabehere, Barry C. Burden, and Kenneth R. Mayer) *Election Law Journal* 17(2): 100–116.

2017    "County Community Health Associations of Net Voting Shift in the 2016 U.S. Presidential Election," (with Jason Wasfy and Vijeta Bhambhani) *PLOS ONE,* Oct. 2, 2017, https://doi.org/10.1371/journal.pone.0185051.

2017    "The 2016 U.S. Election: Fears and Facts about Electoral Integrity," *Journal of Democracy* 28(2): 50–62.

2015    "Partisanship and Voter Confidence, 2000–2012," (with Michael W. Sances). *Electoral Studies* 40: 176–188.

2015    "Waiting to Vote" (with Stephen Ansolabehere). *Election Law Journal.* 14(1): 47–53.

2013    "U.S. Senate Elections before the 17th Amendment: Party Cohesion and Conflict, 1871–1913" (with Wendy J. Schiller and ). *Journal of Politics* 75(3): 835–847.

2013    "Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990–2010" (with Dustin Beckett and R. Michael Alvarez). *Political Research Quarterly* 66(4): 658–70.

2011    "Adding up the Costs and Benefits of Voting by Mail." *Election Law Journal* 10(3): 1–5.

2011    "Voter Opinions about Election Reform" (with R. Michael Alvarez, Thad E. Hall and Ines Levin) *Election Law Journal* 10(2): 73–87.

2006    "Residual Vote in the 2004 Election" *Election Law Journal* 5(2): 158–169.

2005    "Studying Elections: Data Quality and Pitfalls in Measuring the Effects of Voting Technologies" (with R. Michael Alvarez and Stephen Ansolabehere). *The Policy Studies Journal* 33(1): 15–24.

| | |
|---|---|
| 2005 | "Residual Votes Attributable to Technology" (with Stephen Ansolabehere). *Journal of Politics* 67(2): 365–389. |
| 2003 | "Out in the Open: The Emergence of Viva Voce Voting in House Speakership Elections" (with Jeff Jenkins). *Legislative Studies Quarterly,* 28(4): 481–508. |
| 2001 | "The Effects of Party and Preferences on Congressional Roll Call Voting (with Stephen D. Ansolabehere and James M. Snyder, Jr.). *Legislative Studies Quarterly,* 26(4): 533-572. |
| 2001 | "Candidate Positioning in U.S. House Elections," (with Stephen D. Ansolabehere and James M. Snyder, Jr.). *American Journal of Political Science,* 45(1): 136–159. |
| 2000 | "Old Voters, New Voters, and the Personal Vote: Using Redistricting to Measure the Incumbency Advantage" (with Stephen D. Ansolabehere and James M., Snyder, Jr.), *American Journal of Political Science*, 44(1): 17–34. |
| 1999 | "The Value of Committee Seats in the United States Senate, 1947–91," (with Tim Groseclose), *American Journal of Political Science.* 43(3): 963–973. |
| 1998 | "The Value of Committee Seats in the House, 1947-1991," (with Tim Groseclose) *American Journal of Political Science,* 42(2): 453–474. |

*Articles in law reviews (last ten years)*

| | |
|---|---|
| 2020 | "Protecting the Perilous Path of Election Returns: From the Precinct to the News," (with Stephen Pettigrew) *Ohio State Technology Law Journal* 2020: 587–637. |
| 2016 | "Revisiting Public Opinion on Voter Identification," (with Stephen Ansolabehere and Nathaniel Persily) *Stanford Law Review* 68(6): 1455–89. |
| 2013 | "Waiting to Vote," *Journal of Law and Politics* 28(4): 439–463. |
| 2013 | "Voter ID: Who Has Them? Who Shows Them?" *Oklahoma Law Review* 66(4): 21–52. |
| 2013 | "Regional Differences in Racial Polarization in the 2012 Presidential Election: Implications for the Constitutionality of Section 5 of the Voting Rights Act," *Harvard Law Review Forum* 126: 205–220. |
| 2010 | "Losing Votes by Mail," in *Journal of Legislation and Public Policy* 13(3): 573-602. |
| 2010 | "Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act." (with Stephen Ansolabehere and Nathaniel Persily) *Harvard Law Review* 123(6): 1385–1436. |