**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIMOTHY KING, *et al.*,
*Plaintiffs*,

v.

GRETCHEN WHITMER, in her
official capacity as Governor of the
State of Michigan,
*Defendants*,

and

ROBERT DAVIS, *et al.*,
*Intervenor Defendant*.

Case No. 20-cv-13134
Hon. Linda V. Parker

**PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS'**
**MOTION TO DISMISS AND THE CITY OF DETROIT'S**
**MOTION TO DISMISS AND FOR AN AWARD OF SANCTIONS**

Stefanie Lambert Junttila (P71303)
Attorney for Plaintiffs
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

1

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for State Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Nathan Fink (P75185)
Attorneys for Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

Scott R. Eldridge
Attorney for Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson, Jr. (P18690)
Attorney for Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

**PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS'**
**MOTION TO DISMISS AND THE CITY OF DETROIT'S**
**<u>MOTION TO DISMISS AND FOR AN AWARD OF SANCTIONS</u>**

Plaintiffs Timothy King, Marian Sheridan, John Haggard, Charles Ritchard, James Hooper, and Daren Rubingh ("Plaintiffs") respectfully request that this Court enter an order denying Defendants Governor Whitmer, Secretary Benson, and the Board of State Canvassers' (collectively "the State Defendants'") Motion to Dismiss, as well as Intervenor-Defendant the City of Detroit's ("the City's") Motion to Dismiss and for an Award of Sanctions—to the extent that they request the imposition of sanctions. (ECF No. 70 at 62; ECF No. 73 at 33-35).

By separate motion, to be filed later, Plaintiffs are voluntarily dismissing their complaint as amended, rendering all defense motions to dismiss moot. Accordingly, although Plaintiffs' complaint is completely grounded in fact and law, no substantive response to the arguments in favor of dismissal advanced by the State Defendants or the City (collectively "Defendants") is contained herein or in the attached Brief in Support.

The City's request for sanctions under 28 U.S.C. § 1927 is barred as a matter of law, and must be denied, for reasons more fully explained in the Brief in Support below, filed pursuant to Local Rule 7.1(d)(1)(A). The State Defendants' passing request for "sanctions and/or costs and fees" is even more deficient and procedurally improper, as it was not made by motion and with a supporting brief as required under Local Rule 7.1(b) and 7.1(d)(1)(A). It likewise must be denied.

For these reasons and the reasons stated more fully in the Brief in Support below, Defendants' requests for sanctions must be denied.

## BRIEF IN SUPPORT OF PLAINTIFFS' RESPONSE TO THE CITY OF DETROIT'S MOTION FOR AN AWARD OF SANCTIONS

### Issues Presented

I.      Whether Plaintiffs' counsel may be sanctioned under 28 U.S.C. § 1927.

### Controlling Authority

**Cases**

*Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674 (E.D. Mich. May 20, 2020)

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir.1999)

*FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335 (7th Cir. 2010)

*In re Ruben*, 825 F.2d 977 (6th Cir. 1987)

*Jensen v. Phillips Screw Co.*, 546 F.3d 59 (1st Cir. 2008)

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011)

*Matter of Yagman*, 796 F.2d 1165 (9th Cir. 1986)

*MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicone Corp.*, 420 F.3d 1369 (Fed.Cir. 2005)

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)

*Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997)

*Steinert v. Winn Group, Inc.*, 440 F.3d 1214 (10th Cir.2006)

*Thurmond v. Wayne Cnty. Sheriff Dept.*, 564 F. App'x 823 (6th Cir. 2014)

*United States v. Ross*, 535 F.2d 346 (6th Cir. 1976)

*Young v. Smith*, 269 F. Supp. 3d 251 (3d Cir. 2017)

*Zuk v. E. Pa. Psych. Inst.*, 103 F.3d 294 (3d Cir.1996)

**Statutes & Court Rules**

28 U.S.C. § 1927

Fed. R. Civ. P. 54(d)(2)

MCL § 168.726

i

## BRIEF IN SUPPORT

### Introduction

The City's requests for sanctions under 28 U.S.C. § 1927 ("Section 1927") must be denied. This Court has held an attorney's act in *initiating* an action, regardless of merit, falls outside the ambit of Section 1927's plain language. *See Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674, at *1 (E.D. Mich. May 20, 2020) (applying the "plain language" of Section 1927 to hold that the commencement of an action, or the filing of initial pleadings, cannot "multiply" proceedings, an interpretation affirmed in "an unbroken band of cases across the courts of appeals" (citing *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 65 (1st Cir. 2008)). Further, the City has not alleged any specific "unreasonabl[e] and vexatious[]" or dilatory conduct by Plaintiffs' counsel to prolong or "multiply" proceedings, nor has it provided any evidence that could support a finding that Plaintiffs' counsel acted recklessly, in subjective bad faith, or with an improper intent in commencing this proceeding.

Instead, Plaintiffs have taken every reasonable measure to expedite this proceeding and to terminate the proceeding once their claims became moot. In their November 29, 2020 "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" ("TRO Motion"), ECF No. 7, Plaintiffs requested an expedited briefing schedule, and agreed to forego an evidentiary hearing and discovery.  This Court granted the request for expedited briefing, ECF No. 24, and,

1

based solely on the initial pleadings and responses, dismissed the TRO Motion a mere eight days later on December 7, 2020.  ECF No. 62. Further, Plaintiffs have expeditiously, and concurrently with this response, moved for voluntary dismissal of the November 29, 2020 Amended Complaint, ECF No. 6, because the relief requested in the Amended Complaint appears to have become moot.

While Plaintiffs have moved as expeditiously as possible from the outset through the termination of this proceeding, it is the City that seeks to prolong this proceeding with meritless claims for sanctions—supported solely by incendiary accusations and *ad hominem* attacks on Plaintiffs' counsel, willful distortion of Plaintiffs' claims and motives, and apparent ignorance of the black letter law barring their claims for sanctions. On the contrary, it is precisely this type of intentional misconduct and "abuse [of] the judicial process," *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006) (citations omitted), that the City has engaged in, for which Section 1927 and other judicial sanctions are appropriate.

The State Defendants, in the last sentence of a 79-page memorandum, for the first and only time request an "award of sanctions and/or costs and fees." ECF No. 70 at 62.  State Defendants' request is procedurally improper insofar as it violates Local Rule 7.1(b) and (d)(1)(a) for failure to make this request by separate motion and with a supporting brief.  Further, State Defendants provide no factual

or legal basis for their request; their motion fails to provide Plaintiffs' counsel

notice of the claims against them, and thus fails to meet the requirements for

constitutional due process, or to provide Plaintiffs' counsel any basis on which to

form a substantive response.[1] Accordingly, the State Defendants' request must be

denied.

### Legal Standard: 28 U.S.C. § 1927

Section 1927 provides in pertinent part that:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Thus, for a court to sanction an attorney, the movant must, at a

minimum, show that the attorney has (1) "multiplie[d] the proceedings" (2) in an

"unreasonabl[e] and vexatious[]" manner, and (3) "as a result, causes additional

expenses to the opposing party." *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987).

The sanctions must be correlated to "discrete acts of claimed misconduct," and the

amount of such sanctions must correspond to "the impact upon defendants" of

those discrete acts.  *Ruben*, 825 F.2d at 990.

---

[1] To the extent State Defendants are requesting sanctions under Fed. R. Civ. P. Rule 11(c), their request must be denied for failure to comply with the requirements in Fed. R. Civ. P. Rule 11(c)(2), namely, that the "motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  State Defendants also failed to provide 21-days' notice to Plaintiffs' counsel before filing with this Court.

The City's motion can be disposed of with the first element because it has not shown that Plaintiffs' counsel have "multiplie[d]" proceedings, nor could it.  In *Beverly*, this Court first noted that the "plain language of the statute only penalizes attorneys who vexatiously and unreasonably 'multiply' proceedings," and that Section 1927 sanctions may not be imposed "based on the filing of an initial complaint that turns out to be meritless."  *Beverly,* 2020 WL2556674 at *1.2.

The *Beverly* court "join[ed] an unbroken band of cases across the courts of appeals holding that a lawyer ***cannot*** violate section 1927 in the course of commencing an action." *Jensen*, 546 F.3d at 65 (emphasis added). *See also id*. ("Congress's use of the verb 'multipl[y]' in the text of the statute clearly contemplates that, to be sanctionable thereunder, conduct must have an effect on an already initiated proceeding."); *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986) ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed."); *Steinert v. Winn Group, Inc.*, 440 F.3d

---

[2]  The *Beverly* court also explained that this interpretation was consistent with the Sixth Circuit's decision in *Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997). The *Ridder* court affirmed the imposition of Section 1927 sanctions against an attorney "for excess costs resulting from his initial filing and persistent assertion of meritless claims," because the attorney pursued his case "long after it should have become clear that his claims lacked any plausible basis," and thereby "forced the [defendant] to defend this action for a period in excess of five years." *Ridder*, 109 F.3d at 288-89.

1214, 1224-25 (10th Cir.2006) ("This unambiguous statutory language necessarily excludes the complaint that gives birth to the proceedings, as it is not possible to multiply proceedings until after those proceedings have begun.") (emphasis in original); *DeBauche v. Trani*, 191 F.3d 499, 511 (4th Cir.1999) (concluding "as a matter of law" that Section 1927 sanctions could not be imposed where plaintiff had filed only a complaint and amended complaint.).

Further, because Section 1927 applies only to conduct after the commencement of an action, it cannot be used as a basis to sanction for pre-filing conduct or "for failure to make a reasonably adequate inquiry into the facts and law before filing the lawsuit." *Zuk v. E. Pa. Psych. Inst.*, 103 F.3d 294, 297 (3d Cir.1996). *See also MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicone Corp.*, 420 F.3d 1369, 1382 (Fed.Cir.2005) ("the adequacy of [plaintiff's] prefiling investigation is irrelevant to the Section 1927 inquiry.").

Even assuming *arguendo* that the City could satisfy the first element, which it cannot as a matter of law, it would also have to prove that Plaintiffs' counsel acted "unreasonably and vexatiously," 28 U.S.C. §1927, and that counsel's conduct has "cause[d] additional expense" to the City. *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987). The Sixth Circuit has interpreted "unreasonably and vexatiously," as requiring a showing that the attorney has "intentionally abuse[d] the judicial process or knowingly disregard[ed] the risk that his actions will

5

needlessly multiply proceedings." *Red Carpet Studios*, 465 F.3d 642 at 646.  *See also United States v. Ross*, 535 F.2d 346 (6th Cir. 1976) (Section 1927 sanctions require "an intentional departure from proper conduct, or, at a minimum, . . . a reckless disregard of the duty owed by counsel to the court."). No such showing has been made here.

## **ARGUMENT**

### I.      **The Requests for Sanctions Are Procedurally Improper**.

Both the City's and the State Defendants' request for sanctions are procedurally improper because they each fail to comply with the requirements Local Rules 7.1(b) and 7.1(d)(1)(A).  The City's request is included in a motion styled as both a "Motion to Dismiss and for an Award of Sanctions." Normally, motions for sanctions are to be filed in a separate motion, with a separate brief, rather than being included in dispositive motions. *Cf.* Fed. R. Civ. P. Rule 11(c)(2). Nor does the City's request include a brief identifying the "controlling authority," which, as shown above bars its claim, or identify any "discrete acts of misconduct" by Plaintiffs.  The State Defendants' request fails for the same reasons, as well as the fact that State Defendants' motion fails altogether to mention the request for sanctions in the "concise statement of issues presented," ECF No. 70 at ix, to cite any authority whatsoever for its request, or to identify any factual or legal basis for its request. In fact, the word "sanctions" appears precisely once, in the very last

sentence of a 79-page pleading.

## II.    The Conduct of Plaintiffs' Counsel Does Not Satisfy Any of the Requirements for Imposition of Section 1927 Sanctions.

### a.    Plaintiffs' Counsel Have Not "Multiplie[d] Proceedings."

The City's request for Section 1927 sanctions is barred as a matter of law under the "plain language" of the statute, as interpreted by this Court's holding in *Beverly*, 2020 WL2556674 at *1, and the "unbroken band of cases across the courts of appeals holding that a lawyer cannot violate section 1927 in the course of commencing an action." *Jensen*, 546 F.3d at 65 (emphasis added).

Here, as in *Beverly*, Plaintiffs' counsel's conduct consists only of filing initial pleadings, responses to defendant and intervenor motions, and non-substantive motions, in particular: (1) an initial complaint on November 25, 2020 on the eve of the Thanksgiving holiday, ECF No. 1; (2) the November 29, 2020 Amended Complaint, ECF No. 6, which made non-material changes to the initial complaint on the Sunday before the first working day after Thanksgiving and before the Court had taken any action; (3) the November 29, 2020 TRO Motion; (4) the December 3, 2020 response to Defendants' motions, ECF No. 49, pursuant to this Court's order for expedited briefing, ECF No. 24; and (5) related non-substantive motions and responses to defendant and intervenor filings, including the December 4, 2020 notice of supplemental authority.  ECF No. 57. Plaintiffs' counsel has not injected new legal claims or evidence after this Court's December

7, 2020, Order denying the TRO Motion. ECF No. 62.

The filing of such initial pleadings, even if ultimately found to be without merit or even frivolous, cannot, without more, be the basis for Section 1927 sanctions.  The Sixth Circuit concluded as much in *Ridder*, where it affirmed the imposition of Section 1927 sanctions against an attorney "for excess costs resulting from his initial filing and persistent assertion of meritless claims," because the attorney pursued his case "long after it should have become clear that his claims lacked any plausible basis," and thereby "forced the [defendant] to defend this action for a period in excess of five years."  *Ridder*, 109 F.3d at 288-89.  Here, Plaintiffs' TRO motion was dismissed a mere eight days after filing, and Plaintiffs have also promptly moved to voluntarily dismiss the Amended Complaint within a week after the "certification" of Joseph Biden as President-Elect on January 7, 2020 because Plaintiffs' requested relief now appears moot.  Thus, Plaintiffs' counsel has not "multiplie[d]" proceedings at all, much less done so "unreasonably and vexatiously" in a manner that has unreasonably delayed the proceeding or caused defendants to incur additional costs.

While "the adequacy of [plaintiffs'] prefiling investigation is irrelevant to the Section 1927 inquiry," *MEMC Elec. Mat'ls*, 420 F.3d at 1382, Plaintiffs' counsel respectfully submits that their prefiling investigation of the legal and factual matters raised in the Amended Complaint was more than adequate to

satisfy Plaintiffs' counsel's obligations to this Court and in light of the limited time available in a post-election challenge; if anything, Plaintiffs' counsel apparently spent too much time on their pre-filing investigation, as this Court ultimately found that Plaintiffs waited too long to file and dismissed the TRO Motion based on the equitable doctrine of *laches*. ECF No. 62 at 19.

With respect to legal matters, the arguments raised in commencing a proceeding cannot, as a matter of law, be the basis for Section 1927 sanctions. With respect to factual matters, the pleading standard to survive a motion to dismiss is that respondents need only allege "enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, Defendant City begins its motion with language that claims Plaintiffs have "lied,"[3] yet it submits no evidence of its allegations, and it should face consequences for using such specious language against opposing counsel or the

---

[3] The City has repeatedly alleged that Plaintiffs' counsel have "lied." This conclusory and outrageous allegation is not supported by the record in this case, or by allegations and assertions made by other respectable parties, counsel and witnesses across the country, as explained further below. Additionally, in a filing in opposition to Plaintiffs' motion for a one week extension to file the instant opposition, ECF No. 83, the City maliciously and falsely accused Plaintiffs' counsel of murder, inciting a riot, and sedition. *Id.* These outrageous, malicious allegations by a major American metropolitan city are unacceptable. Nothing in this opposition should be construed as a waiver of Plaintiffs' or their counsels' rights in connection with seeking redress and monetary damages as a result of these false and defamatory statements.

parties.

With respect to the evidence supporting Plaintiffs' factual allegations, the lengthy Amended Complaint included hundreds of signed and sworn affidavits by fact witnesses, most of which were also included in similar state proceedings.[4] The Amended Complaint also included sworn affidavits from several expert witnesses with substantive reports supporting their conclusions. *See* ECF No. 6, Ex. 1-20 and 101-111.

For example, the expert witness testimony of Russell James Ramsland, Jr. ("Ramsland Affidavit"), which is described in greater detail below, identifies an event that occurred in Michigan on November 4, 2020, that is "physically impossible" *See* ECF No. 6, Ex. 104 at ¶14. That "event" reflected in the data is "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb, and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in

---

[4] These sworn affidavits—given by citizens claiming personal knowledge, under penalty of perjury in most instances—contain deeply troubling allegations which, if proven, would reasonably call into question the ability of any Michigan voter to confidently rest on the promise that his or her vote shall not be diluted, and indeed that it shall be counted at all. (ECF Nos. 6-1 and 6-3).

the four precincts/townships, than there was processing capacity." *Id.* This

amount alone is nearly twice the number of ballots by which Biden was certified to

have defeated President Trump (*i.e.,* 154,188 at the time the Amended Complaint

was filed). *See id.* at ¶¶ 144-145.

The Amended Complaint also presented expert witness testimony

demonstrating that several hundred thousand illegal, ineligible, duplicate or purely

fictitious votes must be thrown out, in particular:

A. A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible." *Id.*, Ex. 104 ¶14;

B. A report from Dr. Louis Bouchard finding to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4). *Id.*, Ex. 110 at 28;

C. A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. *See id.*, Ex. 101;

D. A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. *See id.*, Ex. 102);

E. A report from Dr. Stanley Young that looked at the entire State of

11

Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). *See id.*, Ex. 110;

F.    A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date. *See id.*, Ex. 110;

G.    A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precinct, but that the Democrat advantage (*i.e.*, the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated. *See id.*, Ex. 110; and

H.    A report by an affiant whose name must be redacted to protect his safety who concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points. Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400. However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." *See id.*, Ex. 111 ¶13.

Further, Plaintiff's December 4, 2020 response included signed and sworn

rebuttal testimony, submitted in response to Defendant-Intervenor's response, from

Plaintiffs' expert witnesses, Russell Ramsland, William Briggs, Eric Quinell, and expert testimony submitted under seal.  *See* ECF No. 49, Exs. 1-4.  There was no discovery conducted in this case or in connection with these submissions.  No documents were exchanged.  No depositions were taken. No hearing was held. Plaintiffs were not allowed to inspect any of the voting machines.  In short, Plaintiffs were never given an opportunity to develop their evidence further or to be heard on the evidence.

Indeed, since the filing of the Complaint in this case, many others have stepped forwarding submitting persuasive evidence of fraud in connection with the 2020 election in Michigan.  To begin with, on December 7, 2020, the same day this court rendered its decision, the State of Texas, filed a complaint in the United States Supreme Court against the States of Georgia, Michigan, Pennsylvania, and Wisconsin.  Ex. 1 ("Texas Complaint").

In the Texas Complaint, the State of Texas alleged that Michigan's vote results were unreliable:

> 96. These non-legislative modifications to Michigan's election statutes resulted in a number of constitutionally tainted votes that far exceeds the margin of voters separating the candidates in Michigan.

> 97. Additional public information confirms the material adverse impact on the integrity of the vote in Wayne County caused by these unconstitutional changes to Michigan's election law. For example, the Wayne County Statement of Votes Report lists 174,384 absentee ballots out of 566,694 absentee ballots tabulated

13

(about 30.8%) as counted without a registration number for precincts in the City of Detroit. The number of votes not tied to a registered voter by itself exceeds Vice President Biden's margin of margin of 146,007 votes by more than 28,377 votes.

98. The extra ballots cast most likely resulted from the phenomenon of Wayne County election workers running the same ballots through a tabulator multiple times, with Republican poll watchers obstructed or denied access, and election officials ignoring poll watchers' challenges, as documented by numerous declarations.

99. In addition, a member of the Wayne County Board of Canvassers ("Canvassers Board"), William Hartman, determined that 71% of Detroit's Absent Voter Counting Boards ("AVCBs") were unbalanced—i.e., the number of people who checked in did not match the number of ballots cast—without explanation.

100. On November 17, 2020, the Canvassers Board deadlocked 2-2 over whether to certify the results of the presidential election based on numerous reports of fraud and unanswered material discrepancies in the county-wide election results. A few hours later, the Republican Board members reversed their decision and voted to certify the results after severe harassment, including threats of violence.

101. The following day, the two Republican members of the Board rescinded their votes to certify the vote and signed affidavits alleging they were bullied and misled into approving election results and do not believe the votes should be certified until serious irregularities in Detroit votes are resolved.

*Id.* ¶¶ 96-101 (citations omitted).

The Texas complaint sought similar relief to that which Plaintiffs sought here. Among other things, it demanded to nullify the vote certification issued by the State Defendants for Joe Biden:

WHEREFORE, Plaintiff States respectfully request that this Court issue the following relief:

14

A. Declare that Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin administered the 2020 presidential election in violation of the Electors Clause and the Fourteenth Amendment of the U.S. Constitution.

B. Declare that any electoral college votes cast by such presidential electors appointed in Defendant States Pennsylvania, Georgia, Michigan, and Wisconsin are in violation of the Electors Clause and the Fourteenth Amendment of the U.S. Constitution and cannot be counted.

C. Enjoin Defendant States' use of the 2020 election results for the Office of President to appoint presidential electors to the Electoral College.

D. Enjoin Defendant States' use of the 2020 election results for the Office of President to appoint presidential electors to the Electoral College and authorize, pursuant to the Court's remedial authority, the Defendant States to conduct a special election to appoint presidential electors.

E. If any of Defendant States have already appointed presidential electors to the Electoral College using the 2020 election results, direct such States' legislatures, pursuant to 3 U.S.C. § 2 and U.S. CONST. art. II, § 1, cl. 2, to appoint a new set of presidential electors in a manner that does not violate the Electors Clause and the Fourteenth Amendment, or to appoint no presidential electors at all.

F. Enjoin the Defendant States from certifying presidential electors or otherwise meeting for purposes of the electoral college pursuant to 3 U.S.C. § 5, 3 U.S.C. § 7, or applicable law pending further order of this Court.

*Id.* at 39-40.

The Texas Complaint was joined by the Attorney Generals for eighteen

other states including Alabama, Arizona, Arkansas, Florida, Indiana, Kansas,

Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma,

South Carolina, South Dakota, Tennessee, Utah and West Virginia.[5] Accordingly,

nineteen states endorsed a complaint claiming that the State Defendants'

certification of Joe Biden should be thrown out, and that Mr. Biden's electors

should not be sent to the Electoral college.  This endorsement and complaint came

*after* the State Defendants and the City had fully briefed the issues in this case and

had presented all of their opposition evidence and all of their arguments.  While

this Court may disagree with the Plaintiffs and the Attorney Generals of nineteen

states, the claims asserted are not sanctionable.

Further, the Michigan State Senate Oversight Committee held a hearing in or

about early December, which included testimony from a former senator with

expertise on data and technology who explained that the voting machines were

connected to the internet in Detroit. The witness also spoke to the committee under

oath about voting by dead people, a truck full of ballots coming into the counting

center long after the deadline, and vulnerable voting machines.[6] Further testimony

included evidence of voters who voted absentee but had fake addresses or were

---

[5] *18 States join Texas election fraud lawsuit seeking to undo Biden's victory*,
BUSINESS STANDARD (Dec. 11, 2020), https://www.business-
standard.com/article/news-ani/18-states-join-texas-election-fraud-lawsuit-seeking-
to-overturn-biden-s-victory-120121100055_1.html.
[6] Fred Lucas, *4 Takeaways From the Michigan Senate's Election Fraud Hearing*,
THE DAILY SIGNAL (Dec. 1, 2020), https://www.dailysignal.com/2020/12/01/4-
takeaways-from-the-michigan-senates-election-fraud-hearing/.

deceased.

> "What I can say for sure, and swear to you here today, is that overall, 8.9% of the 30,000 absentee ballots that we've gone through and investigated, just in the city of Detroit, were unqualified, fraudulent ballots that should have been spoiled," Schornak said. He extrapolated about how the 30,000 sample could reflect on all of the absentee votes cast. "At the lowest levels, if these percentages carry through, this means of the 172,000 [absentee votes] in the city of Detroit, 1,300 of them could be deceased," he told the senators. "We are investigating it. And another 15,000 could have fraudulent addresses, described as living on vacant lots or [in] burnt-down houses."

The Michigan Oversight Committee also heard from a witness who was an IT specialist for Dominion Voting Systems who described what she called "complete fraud" at Detroit's TCF Center.[7]  She described the same ballots being repeatedly rescanned over and over. *Id*. While she is not an affiant in this case, this demonstrates that the Michigan Senate's Oversight Committee found these allegations sufficiently credible to take statements from fact witnesses because the complaints on the lack of integrity and object fraud in this election reached far and wide within Michigan.

John Lott, Ph.D. recently did a study, first published in late December 2020 and updated January 6, 2021 called "A Simple Test for the Extent of Vote Fraud

---

[7]  Andrew Miller, *'Sassy' Michigan Dominion worker and GOP witness goes viral after contentious exchange with lawmakers,* WASH. EXAMINER (Dec. 3, 2020), https://www.msn.com/en-us/news/politics/sassy-michigan-dominion-worker-and-gop-witness-goes-viral-after-contentious-exchange-with-lawmakers/ar-BB1bBR9w.

with Absentee Ballots in the 2020 Presidential Election: Georgia and Pennsylvania

Data." *See* Ex. 2, copy of Dr. Lott's Study. Dr. Lott's conclusion addresses

Michigan and other contested states:

> … The voter turnout rate data provides stronger evidence that there
> are significant excess votes in Arizona, Michigan, Nevada, and
> Wisconsin as well. While the problems shown here are large, there are
> two reasons to believe that they are underestimates: 1) the estimates
> using precinct level data assume that there is no fraud occurring with
> in-person voting and 2) the voter turnout estimates do not account for
> ballots for the opposing candidate that are lost, destroyed, or replaced
> with ballots filled out for the other candidate.

> Moreover, Plaintiffs' Complaint plead facts that the State Defendants and

the City did not dispute including:

- The first red flag is the Antrim County, Michigan "glitch" that switched
  6,000 Trump ballots to Biden, and that was only discoverable through a
  manual hand recount. The "glitch" was later attributed to "clerical error"
  by Dominion and Antrim Country, presumably because if it were
  correctly identified as a "glitch," "the system would be required to be
  'recertified' according to Dominion officials. This was not done." *See*
  ECF No. 6 ¶ 136. Mr. Ramsland points out that "the problem most likely
  did occur due to a glitch where an update file did not properly
  synchronize the ballot barcode generation and reading portions of the
  system." *Id.* Further, such a glitch would not be an "isolated error," as it
  "would cause entire ballot uploads to read as zero in the tabulation batch,
  which we also observed happening in the data (provisional ballots were
  accepted properly but in-person ballots were being rejected (zeroed out
  and/or changed (flipped))." *Id.* Accordingly, Mr. Ramsland concludes
  that it is likely that other Michigan counties using Dominion may "have
  the same problem." *Id. See* ECF No. 6 ¶ 136.

- Tabulator issues and election violations occurred elsewhere in Michigan
  reflecting a pattern, where multiple incidents occurred. In Oakland
  County, votes flipped a seat to an incumbent Republican, Adam
  Kochenderfer, from the Democrat challenger when: "A computer issue in

18

Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes.  They should only have been sent to us as absentee votes," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[8]  *See* ECF No. 6 at ¶¶ 131-132).

- The Oakland County flip of votes becomes significant because it reflects a second systems error, wherein both favored the Democrats, and precinct votes were sent out to be counted, and they were counted twice as a result until the error was caught on a recount.  Precinct votes should never be counted outside of the precinct, and they are required to be sealed in the precinct.  See generally, MCLS § 168.726.

These are just a few of the specific facts cited by Plaintiffs, which are not genuinely disputed and reflect evidence **of a pattern of defects or fraud** in the voting system machines of tabulating ballots favoring one candidate not the other. Indeed, when a Michigan court finally ordered discovery of a voting machine in Antrim County the results shows that the machine was infiltrated by a malware algorithm which transferred votes from Trump to Biden.[9]

The sheer gravity of those claims, and their implications on the integrity of our electoral system, justified counsel in pursuing every arguably permissible avenue to assist Plaintiffs in seeking redress. Even if those claims and counsels' legal theories are ultimately rejected by this Court, this does not render counsel's

---

[8]  Bill Laitner, *Fixed Computer Glitch Turns Losing Republican into a Winner in Oakland County,* Detroit Free Press (Nov. 20, 2020), https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/.

[9] Russell James Ramsland, Jr., *Allied Security Operations Groups Antrim Michigan Forensics Report Revised Preliminary Summary*, DEFENDING THE REPUBLIC (Dec. 13, 2020), https://defendingtherepublic.org/?page_id=1081.

actions "unreasonable and vexatious." *See Ruben*, 825 F.2d at 984 (warning that "judges faced with motions under section 1927 should be mindful that their individual perturbations will not alone justify a sanction").

### b. Plaintiffs' Counsel Have Not Acted "Unreasonably or Vexatiously," or Engaged in Any Reckless or Intentional Misconduct to Delay or Increase Defendants' Costs.

Even assuming arguendo that this claim were not barred as a matter of law, the City has failed to allege that any specific conduct by Plaintiffs' counsel, or factual allegation or legal claim in the pleadings, that could qualify as "unreasonabl[e] or vexatious[]," as required under Section 1927, or any specific reckless, bad faith or intentional misconduct required under controlling Sixth Circuit precedent.

Instead, the City simply makes blanket assertions that Plaintiffs' counsel has filed a "frivolous lawsuit" and "raised false allegations and pursued unsupportable legal theories."  ECF No. 73 at 25.  The City also cites to tweets and other public statements by co-counsel Sidney Powell and Lin Wood without any context or relation to this specific proceeding and gratuitous personal attacks on Plaintiffs' counsel, citing unrelated proceedings regarding original local counsel Greg Rohl. ECF No. 73 at 23-24.  Finally, the City engages in its own spurious speculation that Plaintiffs' co-counsel filed this lawsuit "hoping not to prevail but to damage democracy," ECF No. 23, a reckless and defamatory claim. This highlights the

20

lack of specificity in these allegations, with a blanket demand against all counsel whereas liability under § 1927 is direct, not vicarious. *FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335, 340-341 (7th Cir. 2010) (citations omitted) (liability is restricted to the misbehaving lawyer and may not be transferred to his partners or law firm). Because a lawyer who assisted plaintiff's lawyer did not himself engage in any vexatious or bad faith litigation tactics, and because Section 1927 did not impose on any lawyer a duty to supervise or correct another lawyer's work, sanctioning an assisting lawyer for another lawyer's misconduct was improper. *Id.*

As explained above, Plaintiffs' extensive and heavily documented claims regarding election fraud were not, and are not, objectively unreasonable, within the meaning of Section 1927 or otherwise. Counsels' representation of Plaintiffs who disagree with the City does not constitute bad faith, even if the Court strongly agrees with the City. Rather, it reflects an incompatible view of mutually exclusive assertions. This is not sanctionable.

### c. The City Has Not Identified Any "Discrete Acts of Misconduct" That Could Have Caused the City to Incur Any Additional Costs.

As shown above, the City has not identified any "discrete acts of claimed misconduct," Ruben, 825 F.2d at 990, much less shown that such purported misconduct "cause[d] additional expenses to" the City." Id. at 984. Blanket and defamatory assertions cannot meet this requirement.

In any case, all of City's expenses are due to the City's voluntary and

unnecessary intervention in this proceeding. The City was not a party or a

defendant to this action, but rather requested to intervene on their own motion

following Plaintiffs' filing of the initial complaint. ECF No. 5. Indeed, neither the

City, nor the other intervenors were a party to this action until this Court granted

their motion to intervene by order entered December 2, 2020, ECF No. 28, after

Plaintiffs' First Amended Complaint and TRO motion had already been filed. As a

result, they do not have standing to make this claim. Even if the City could

demonstrate that either the Complaint or the First Amended Complaint's filing

satisfied § 1927 (which it cannot), it cannot trace any expense to Plaintiffs'

counsel's filing of the complaint. Since the City entered this litigation on its own

motion after the action was already instituted, any sanctions must arise out the

City's expense resulting from some unreasonable and prolonging conduct by

Plaintiffs' counsel occurring on or after the entry of Court's order of December 2,

2020.

Further, Plaintiffs' counsel has not only done nothing to delay this

proceeding, they have in fact taken every reasonable measure to expedite, and then

to terminate the proceeding once their claims became moot. As explained above, in

their TRO Motion, ECF No. 7, Plaintiffs requested an expedited briefing schedule,

and agreed to forego an evidentiary hearing and discovery.  This Court granted the

request for expedited briefing, ECF No. 24, and based solely on the initial

22

pleadings and responses, dismissed the TRO Motion a mere eight days later on

December 7, 2020.  ECF No. 62. Further, Plaintiffs have expeditiously, and

concurrently with this response, moved for voluntary dismissal of the November

29, 2020 Amended Complaint, ECF No. 6, because the relief requested in the

Amended Complaint can no longer be granted by this Court after Congress

certified Joseph R. Biden as President Elect on January 7, 2021.

## III.    The Authorities Relied on by the City Weigh Against Sanctions.

None of the authorities cited by the City in favor of levying sanctions is

persuasive in this case, because they are all sharply distinguishable on their facts.

In Ruben (cited at ECF No. 73, at 33), the Sixth Circuit Court of Appeals reversed

an award of sanctions due to the failure of the District Court to adequately

correlate discrete acts by plaintiff's counsel to corresponding increases in

defendants' costs, expenses, and fees. 825 F.2d at 990-91.

The Court reached this conclusion even though the complaint stated on its

face that it was filed one day after the statute of limitations ran, and despite the fact

that substantive litigation in the case spanned nearly four years. Id. at 980-81, 987-

88. While the movants in Ruben could at least credibly accuse Ruben of engaging

in dilatory behavior by prolonging litigation over a facially time-barred action,

Plaintiffs' counsel has demonstrated a desire for a swift resolution on the merits

and only asked for short extensions of time, requiring no additional litigation by

the City Counsel when rendered absolutely necessary by counsel's workload.

In Jones (cited at ECF No. 73 at 33), the Sixth Circuit reversed another award under § 1927. The award was imposed on attorneys for a "sloppy" (inadequately specific) complaint, subsequent failure to cure the complaint's defect despite defense counsel's request for greater specificity, and refusal to sign a pretrial order which would have simplified the issues for trial. 789 F.2d at 1229-30, 1231-32.

The Sixth Circuit reversed, finding first that the record did not support a conclusion that counsel knew or should have known that "failure to amend their pleadings would retain frivolous claims" or "needlessly obstruct the litigation of nonfrivolous claims." Id. at 1230-31. The Court reasoned that "[i]n light of the clarity of the law" on the point that was left ambiguous by the complaint, "no significant attorney time could possibly have been spent preparing a defense" to potential frivolous claims encompassed therein. Id. at 1231. While criticizing counsel's complaint, the Court nevertheless concluded that its deficiencies were "so easily resolved that failure to amend cannot be characterized as unreasonable and vexation multiplication of the litigation." Id.

In *Thurmond v. Wayne Cnty. Sheriff Dept.*, 564 F. App'x 823 (6th Cir. 2014) (cited at ECF No. 73, at 33), the Court affirmed an award of sanctions, after "five years after the case was commenced," counsel continued to obstinately repeat

24

repeatedly-rejected arguments and renew previously-denied motions. *Id.* at 826-30. The Court emphasized the extremely lengthy delay in finality occasioned by counsel's conduct, as well as the district court and defense counsel's attempts to induce counsel to cease his frivolous conduct in favor of either nonfrivolous arguments or a negotiated resolution. *Id.* at 833-34. In sum, none of the authorities cited by the City support imposing sanctions; indeed, two of them weigh heavily against the City's requested relief, and the third ought to be distinguished.

### **CONCLUSION**

For these reasons, the Plaintiffs and their counsel respectfully request that this Honorable Court deny the City's motion for an award of sanctions and attorneys' fees under §1927, as well as the State Defendants' request for sanctions and attorneys' fees.

Respectfully submitted,

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA
(P71303)
Attorney for the Plaintiffs
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

Date: January 14, 2020

### **CERTIFICATE OF SERVICE**

I hereby certify that on January 14, 2021, I electronically filed the foregoing document with the Clerk of this Court using the ECF system, which will send notification of such filing to all attorneys of record registered for electronic filing.

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA
(P71303)
Attorney for the Plaintiffs
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com