# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TIMOTHY KING, *et al.*,
*Plaintiffs*,

v.

GRETCHEN WHITMER, in her
official capacity as Governor of the
State of Michigan, *et al.*,
*Defendants*,

and

ROBERT DAVIS,
*Intervenor Defendant.*

Case No. 20-cv-13134
District Judge Linda V. Parker
Magistrate Judge R. Steven Whalen

---

## PLAINTIFFS' OPPOSITION TO INTERVENOR DEFENDANT ROBERT DAVIS' MOTION FOR SANCTIONS TO BE ASSESSED AGAINST PLAINTIFFS AND PLAINTIFFS' COUNSEL PURSUANT TO THE COURT'S INHERENT AUTHORITY AND 28 U.S.C. §1927

Stefanie Lambert Junttila (P71303)
Attorney for Plaintiffs
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for State Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

Mary Ellen Gurewitz (P25724)
Attorney for Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

David Fink (P28235)
Nathan Fink (P75185)
Attorneys for Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Scott R. Eldridge
Attorney for Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson, Jr. (P18690)
Attorney for Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

**<u>PLAINTIFFS' OPPOSITION TO INTERVENOR DEFENDANT ROBERT DAVIS' MOTION FOR SANCTIONS TO BE ASSESSED AGAINST PLAINTIFFS AND PLAINTIFFS' COUNSEL PURSUANT TO THE COURT'S INHERENT AUTHORITY AND 28 U.S.C. §1927</u>**

Robert Davis' Motion for Sanctions to be Assessed Against Plaintiffs and Plaintiffs' Counsel Pursuant to the Court's Inherent Authority and 28 U.S.C. §1927 (Dkt. 69) is wholly meritless. Plaintiffs have previously filed an opposition to other §1927 sanctions motions filed by other parties. Dkt. 85. For the reasons explained in that Brief and for the reasons stated more fully in the Brief that follows, the motion for sanctions should be denied.

**<u>BRIEF IN SUPPORT OF PLAINTIFFS' OPPOSITION TO INTERVENOR
DEFENDANT ROBERT DAVIS' MOTION FOR SANCTIONS TO BE
ASSESSED AGAINST PLAINTIFFS AND PLAINTIFFS' COUNSEL
PURSUANT TO THE COURT'S INHERENT AUTHORITY AND 28
U.S.C. §1927</u>**

I.     Whether Plaintiffs' counsel may be sanctioned under 28 U.S.C. §1927?

II.    Whether Plaintiffs' counsel may be sanctioned pursuant to this Court's

inherent authority?

<u>**Controlling Authority**</u>

**Cases**

*Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674, at *1 (E.D. Mich. May 20, 2020)

*Carmack v. City of Detroit*, No. 18-CV-11018, 2019 WL 4670363, at *9 (E.D. Mich. Sept.

25, 2019)

*Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996)

*Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986)

*Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)

*Mys v. Michigan Dep't of State Police*, 736 F. App'x 116, 117 (6th Cir. 2018)

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed.

2d 67 (1984)

**Statutes**

28 U.S.C. §1927

## BRIEF IN SUPPORT

## INTRODUCTION

Sanctions are appropriate under 28 U.S.C. §1927 only when an attorney "unreasonably and vexatiously" multiplies the proceedings. Here, it is Intervenor Davis who has continued to multiply the proceedings through obstruction and frivolity, not counsel for Plaintiffs. Indeed, Plaintiffs have noted and sought dismissal of this matter, as the relief requested has become moot. Yet, Davis continues a campaign of obstruction by contesting the dismissal of the case as to him, even though the litigation remains in the early stages and the parties have yet to begin discovery. While this obstruction is unfortunate, it is hardly surprising: local courts are quite familiar with frivolous filings from Davis and his counsel.

For the reasons that follow, Intervenor Davis' motion for sanctions should be denied.

## BACKGROUND

### A. The cyber war on our election system is a bipartisan concern, not a Republican phantasm.

The allegations which form the basis of Plaintiffs' requests for injunctive and declaratory relief in this case arise out of well-documented, bipartisan concerns about the security of our electronic voting systems in America. Politicians and industry experts alike have sounded the alarm about our systems' sweeping vulnerabilities.

As University of Pennsylvania Security Researcher Sandy Clark warned in a recent HBO documentary,

> I feel like we are in terrible danger of losing what it means to be a democracy. If elections can be altered subtly, they can be altered in a way that is undetectable, how does one trust the results of their election? And democracy functions on trust. Without that trust, things descend into chaos and anarchy. Those of us who know how vulnerable … the voting systems are in these elections are terribly afraid right now.

Kill Chain: The Cyber War on America's Elections (HBO 2020).[1] Among the cybersecurity experts who have spoken out about this country's dangerously "hackable" electronic voting system is University of Michigan's own Professor J. Alex Halderman. Following allegations of Russian interference in the 2016 U.S. Presidential election, Professor Halderman testified about election security before the U.S. Senate's Intelligence Committee. During an exchange with Intelligence Committee Chair Senator Richard Burr (R-NC), Professor Halderman described how easy it is to hack into an electronic voting machine whilst remaining undetected. When asked by Senator Burr whether he was caught when he and his colleagues hacked election systems, Dr. Halderman responded:

> The one instance when I was invited to hack a real voting system while people were watching was in Washington, D.C., in 2010, and in that instance, it took less than 48 hours for us to change all the votes, and we were not caught.

---

[1] For the Court's reference, Ms. Clark's comments appear at 56:03.

Kill Chain: The Cyber War on America's Elections (HBO 2020).[2] In a similar vein, Clark explained to a room full of hackers at DEFCON, the world's largest hacking convention, how one could easily corrupt a voting machine by simply plugging an infected memory stick into the machine:

> 'Cause one of the things that you can do with these machines is install malware on whatever the memory media is. That will go back and infect the back end, vote tabulating, and next year's ballot design systems for years to come because the software doesn't get upgraded. Your malware could stay there forever and no one would know it was there.

Kill Chain: The Cyber War on America's Elections (HBO 2020).[3] These real vulnerabilities—not Plaintiffs' lawsuit seeking to expose and to remedy these vulnerabilities—have undermined American confidence in our country's democracy.

Democratic Senators Elizabeth Warren (D-MA) and Amy Klobuchar (D-MN) have been particularly notable voices in the effort to expose electronic voting system vulnerabilities and to improve voting security. Indeed, on March 27, 2019, Senators Klobuchar, Mark Warner (D-VA), Jack Reed (D-RI), and our own Gary Peters (D-MI) penned a letter to the Chief Executive Officers of the three largest election equipment vendors—including Dominion Voting Systems—expressing their concerns about voting machine vulnerabilities:

> The integrity of our elections remains under serious threat. Our nation's intelligence agencies continue to raise the alarm that foreign adversaries are actively trying to undermine our system of democracy, and will target the 2020 elections as they did the 2016 and 2018 elections.

---

[2] For the Court's reference, this exchange appears at 1:13:00 of the documentary.
[3] For the Court's reference, Ms. Clark's comments appear at 52:20 of the documentary.

....
Despite the progress that has been made, election security experts and federal and state government officials continue to warn that more must be done to fortify our election systems. Of particular concern is the fact that many of the machines that Americans use to vote have not been meaningfully updated in nearly two decades. Although each of your companies has a combination of older legacy machines and newer systems, vulnerabilities in each present a problem for the security of our democracy and they must be addressed.

....
The integrity of our elections is directly tied to the machines we vote on – the products that you make. Despite shouldering such a massive responsibility, there has been a lack of meaningful innovation in the election vendor industry and our democracy is paying the price.

*See* Exhibit 1, Letter to CEOs of Hart InterCivic, Inc., Election Systems & Software, LLC, and Dominion Voting Systems, pp. 3, 4. Likewise, on December 6, 2019, Senators Warren, Klobuchar, and Ron Wyden (D-OR), and Representative Mark Pocan (D-WI) authored a letter in which they expressed their concerns about a highly concentrated voting machine market plagued with security problems:

In 2018 alone "voters in South Carolina [were] reporting machines that switched their votes after they'd inputted them, scanners [were] rejecting paper ballots in Missouri, and busted machines [were] causing long lines in Indiana. In addition, researchers recently uncovered previously "undisclosed vulnerabilities in nearly three dozen backend election systems in 10 states." And, just this year, after the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast in a Pennsylvania state judicial election in 2019, the county's Republican Chairwoman said, "[ n ]othing went right on Election Day. Everything went wrong. That's a problem." These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

Exhibit 2, Letter to Co-CEOs of H.I.G. Capital, LLC, p. 3.

Ultimately, contrary to Davis' assertions in his Motion for Sanctions, election security is not a right-wing issue or a left-wing issue. These prominent Democratic voices were not seeking "to undermine the People's confidence in our country's democracy" when they voiced their concerns about the security of our electronic voting systems. *See* Dkt. 69, p. 5. In filing this lawsuit and in compiling hundreds of affidavits from both fact and expert witnesses that support the truth contained therein, Plaintiffs' aim was not to disenfranchise a single legal voter but to protect the franchise of every American from manipulation by bad actors seeking to subvert the voters' will. Plaintiffs are simply fighting for every eligible American's right to exactly one vote, no more, no less.

**B. Davis' intervention in this lawsuit and the instant Motion for Sanctions reflect a common pattern of "serial litigation" and "vexatious and frivolous filings."**

Robert Davis is a serial litigator. As of three and a half years ago, he had filed "more than 100 lawsuits, going after public officials both obscure and well-known as part of his self-proclaimed quest for transparent honest government." *See* Exhibit 3, Joe Guillen, *A felon's crusade: Robert Davis vs. everybody*, Detroit Free Press, Aug. 11, 2017, p. 1.[4] However, in the midst of a "flurry of litigation" that Davis claims was aimed at "exposing the unethical conduct" of certain Highland Park School Board members,

---

[4] This article is also available online at
https://www.freep.com/story/news/local/michigan/wayne/2017/08/11/felons-crusade-robert-davis-vs-everybody/512097001/ (last visited Jan. 4. 2021, 4:09 PM).

Davis embezzled nearly $200,000 of taxpayer money from the Highland Park School District:

> According to federal prosecutors, between 2006 and 2010, Davis used his influence as a school board member to arrange deals with three companies run by his friends. The companies would submit phony invoices to the school district, and large portions of the payments ended up in Davis' hands. He spent the stolen funds on restaurants, bars, travel and clothing. During its surveillance of Davis, the FBI would see him driving a silver Mercedes registered to him, according to court records.
>
> He pleaded guilty in September 2014 to stealing $197,983 from the district and for filing a false federal income tax return….
>
> The government said some of Davis' lawsuits were designed as a cover. He filed a flurry of litigation from 2008 to 2012 that were "intended to intimidate the (school) board and conceal Davis' embezzlement by distracting, dividing and manipulating the board," according to a memorandum prosecutors wrote to support their recommendation that he be sentenced to 18 to 24 months in prison.

*Id.* at 6-7. In the late 2000s, Davis was filing nearly a lawsuit every month against his fellow board members. *Id.* at 9.

Davis is represented on this Motion and in this matter by his long-time attorney, Andrew Paterson. This duo is well-known in Michigan state and federal courts. As the Sixth Circuit noted in a recent opinion, "Plaintiff Robert Davis and his attorney, Andrew Paterson, have a prolific history litigating cases in Michigan state courts and federal courts. Their filings could be defined, in many instances, as repetitive, vexatious, and frivolous." *Davis v. Johnson*, 664 F. App'x 446, 450 (6th Cir. 2016). Paterson is no stranger to sanctions disputes.

In a recent Report and Recommendation authored by Magistrate Judge Sally Berens of the Western District of Michigan, the court referred Paterson to Chief Judge Robert Jonker for discipline, providing a detailed history of the inappropriate litigation conduct that resulted in the courts of this state imposing sanctions on him. *See Blackwell v. Simon*, No. 1:18-CV-1261, 2020 WL 5351022, at *19-20 (W.D. Mich. Mar. 20, 2020), report and recommendation adopted, No. 1:18-CV-1261, 2020 WL 2553146 (W.D. Mich. May 20, 2020).[5] Although Chief Judge Jonker declined to discipline Paterson, he noted that "[t]he common theme of all the referenced  cases [in Magistrate Judge Berens' Referral for Discipline] … is a pattern of activity involving vexatious and

---

[5] *See, e.g., Davis v. Detroit Downtown Dev. Auth.*, 782 F. App'x 455, 456 (6th Cir. 2019) (affirming sanctions in the amount of $13,506 awarded under 28 U.S.C. §1927, finding that Paterson "went too far" when he "pursued two frivolous claims and one frivolous motion, necessitating unnecessary legal fees for defendants....");*Williams v. Detroit Downtown Dev. Auth.*, 2018 WL 4901158, at *6 (E.D. Mich. Oct. 9, 2018) (dismissing an action filed by Paterson as a sanction for Paterson's conduct, noting that Paterson had "violated three of the [c]ourt's discovery orders, ignored the Federal Rules of Civil Procedure, and had been less than honest in...representations to the [c]ourt," holding that Paterson had engaged in "contumacious" conduct, and observing that Paterson's accusations that the defendants' allegations were "misleading and false" were, themselves, misleading and false); *Carmack v. City of Detroit*, 2019 WL 4670363, at*1, 8 (E.D. Mich. Sept. 25, 2019) (sanctioning Paterson under the court's inherent authority "because Paterson's conduct fell far outside the realm of what could be considered permissible zealous advocacy, including filing two complaints containing allegations he ultimately admitted he did not know whether he could support, for refusing to concur in defendants' requests that he dismiss certain baseless claims, for violating a court order "prohibiting him from taking discovery," and for twice attempting to mislead the court on material matters); *Lotus Indus v. City of Detroit*, 2018 WL 4005608, at *4 (E.D. Mich. Aug. 22, 2018) (denying Paterson's motion on behalf of plaintiffs for leave to amend their complaint because "[p]laintiffs have flagrantly disregarded a court order by relying on [a] deposition in crafting their amended complaint," where a court order in a different case prohibited the use of that deposition for anything other than that litigation"); *Lotus Indus., LLC v. Archer*, No. 2:17-CV-13482, 2019 WL 4126558, at *1 (E.D. Mich. Aug. 30, 2019) (sanctioning Paterson for seeking financial documents from a nonparty which he "plainly did not have a good faith basis to request" and for withdrawing his request for the remaining documents listed at a hearing after counsel for the nonparty was forced to go through the time and expense of objecting to the request, responding to Paterson's motion to compel, and preparing to address those requests at the hearing); *Richards v. Wayne Cty. Airport Auth.*, 2014 WL 2600550, at *2 (Mich. Ct. App. June 10, 2014) (affirming sanctions against Patterson for filing a claim barred by *res judicata*, noting that the trial court found the complaint's primary purpose was "to harass, embarrass, and injure the prevailing party").

frivolous filings, outright misrepresentations of fact and other conduct far outside the normal bounds of zealous advocacy." *See* Exhibit 4, *In re: Andrew A. Paterson, Jr.*, Administrative Order No. AD-053 (W.D. Mich. Jul. 30, 2020).

In the instant matter, this Court permitted Davis to intervene under Fed. R. Civ. P. 24(b), even as the Court recognized that Defendants (Governor Gretchen Whitmer, Secretary of State Jocelyn Benson, and the Michigan Board of State Canvassers) and Defendant Intervenors (the City of Detroit and the Democratic Nation Committee/Michigan Democratic Party) "aim to protect the same interests on behalf of all Wayne County voters, including Davis." Dkt. 69, p. 3. Both Plaintiffs and Defendants opposed Davis' intervention. *See* Dkt. 25 (Plaintiffs' Response in Opposition to Motion to Intervene) and Dkt. 12, p. 2 (where Davis admits that Defendants denied his request to intervene).

After interposing himself in this matter, Davis now obtusely seeks sanctions against Plaintiffs under this Court's inherent authority and against Plaintiffs' counsel for "multipl[ying] the proceedings ... unreasonably and vexatiously." 28 U.S.C. § 1927. Given that his participation in this matter added absolutely nothing and only served to multiply the pleadings and to hinder the speedy disposition of this litigation, Davis' audacity is astounding.

Although it is troubling that a party would enter a case solely for the purpose of obtaining an award of attorney fees, it is allegedly the only way Paterson receives compensation for his representation of Davis. *See* Exhibit 3, Joe Guillen, *A felon's crusade:*

*Robert Davis vs. everybody, Detroit Free Press*, Aug. 11, 2017, p. 9 ("Generally, Paterson testified during a deposition, the only income he receives from representing Davis comes from any fees he is awarded for prevailing in court.").[6]

In keeping with the pattern and practice that Paterson has espoused in other cases, Paterson does not show *why* sanctions are warranted in this case. Instead, he relies on conclusions and misrepresentations. *See Davis v. Detroit Downtown Dev. Auth.*, 782 F. App'x 455, 457 (6th Cir. 2019) ("Here, Paterson does not give us reasons; he gives us conclusions. For example, he says that 'the claims as pl[eaded] were not frivolous' and that '[t]he district court's finding that certain claims were frivolous [wa]s simply misplaced.' Yet he never tells us why that's so.").

No grounds exist to sanction Plaintiffs and Plaintiffs' counsel. Davis' frivolous Motion for Sanctions should be denied.

## ARGUMENT

### I. No grounds exist to sanction Plaintiffs' counsel under 28 U.S.C. §1927.

As an initial matter, an award of sanctions against a losing plaintiff in a civil rights action is "an extreme sanction" and "must be limited to truly egregious cases of misconduct." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986). Sanctions are appropriate under § 1927 "when an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by a member of the

---

[6] *See supra* note 1.

bar to the court and which, as a result, causes additional expense to the opposing party.'" *Mys v. Michigan Dep't of State Police*, 736 F. App'x 116, 117 (6th Cir. 2018) (quoting *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996)). This Court has held an attorney's act in *initiating* an action, regardless of merit, falls outside the ambit of Section 1927's plain language. *See Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674, at *1 (E.D. Mich. May 20, 2020) (applying the "plain language" of Section 1927 to hold that the commencement of an action, or the filing of initial pleadings, cannot "multiply" proceedings, an interpretation affirmed in "an unbroken band of cases across the courts of appeals" (citing *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 65 (1st Cir. 2008)). Further, Davis has not alleged any specific "unreasonabl[e] and vexatious[]" or dilatory conduct by Plaintiffs' counsel to prolong or "multiply" proceedings, nor has he provided any evidence that could support a finding that Plaintiffs' counsel acted recklessly, in subjective bad faith, or with an improper intent in commencing this proceeding.

Given that this case was litigated before this Court in less than two weeks, it is difficult to conceive of how Plaintiffs' could have engaged in any dilatory practices over such a short period of time. In all events, Davis does not point to what excess costs he incurred as a result of any unreasonable or vexatious conduct on the part of Plaintiffs. *See Schmitzer v. Cty. of Riverside*, 26 F. App'x 701, 702 (9th Cir. 2002) ("The plain language of § 1927 provides for sanctions only if an attorney "multiplies the proceedings ... unreasonably and vexatiously."); *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1347–48 (9th Cir. 1985) ("Section 1927 authorizes the taxing of only excess

Case 2:20-cv-13134-LVP-RSW   ECF No. 93, PageID.4072   Filed 01/19/21   Page 15 of 22

costs incurred because of an attorney's unreasonable conduct; it does not authorize imposition of sanctions to reimburse a party for the ordinary costs of trial.'").

Instead, Davis grounds his Motion for Sanctions in the repeated assertion that "Plaintiffs' lawsuit was clearly frivolous from its initial filing." Dkt. 69, p. 4. He does not show why Plaintiffs' claims were frivolous. He does not explain why this Honorable Court spilled thirty-six pages of ink to address Plaintiffs' claims. He does not note that a Petition for Certiorari seeking review of this Court's ruling is currently pending before the United States Supreme Court. *See* King v. Whitmer, Docket No. 20-815. The closest Davis comes to making a particularized, fully formed argument relates to his assertion that Plaintiffs filed a "false affidavit" with the Court. Dkt. 69, p. 6. Pointing to a news article[7] that dismisses one paragraph out of a fourteen paragraph affidavit authored by expert Russell James Ramsland, Jr., Davis argues "that the information contained in Russell James Ramsland Jr.'s affidavit (ECF No. 1-14) and Expert Report (49-3) was FALSE because the numbers and data cited in his affidavit (ECF No. 1-14) and Expert Report (ECF No. 49-3) 'do not match the official statement of votes cast in all but one jurisdiction, and many inflate the numbers significantly.'" Dkt. 69, p. 6.

Facts are determined through hearings and evidentiary submissions not through blind adherence to media reporting. The news article Davis cites acknowledges that Mr.

---

[7] *See* Clara Hendrickson, *Affidavit in Michigan lawsuit makes wildly inaccurate claims about voter turnout in state,"* DETROIT FREE PRESS, available at https://www.freep.com/story/news/local/michigan/detroit/2020/12/04/michigan-lawsuit-makes-wild-claims-voter-turnout/3829654001/.

Ramsland filed a second affidavit in this case, *see* ECF No. 49-3, in which Mr. Ramsland explained the alleged discrepancy that the news article noted and updated his table with new data published by the State of Michigan. Dkt. 49-3, p. 13 ("Dr. Rodden was correct in his noting of excessive turnout figures listed in my affidavit for some precincts in MI based on new data from Michigan."). That figures would change, as available data changed, is to be expected. Mr. Ramsland updated the figures when new data became available. Davis has simply no basis for asserting that Mr. Ramsland's affidavit was "false" or that he executed his original affidavit with a fraudulent purpose. Any suggestion to the contrary is misleading.

Rather than providing reasons for his assertions that Plaintiffs' claims are "frivolous," Davis simply summarizes this Court's holdings and adds the adverb "clearly": "Plaintiffs' claims were clearly barred by Sovereign Immunity under the Eleventh Amendment of the U.S. Constitution, laches, mootness, and moreover, Plaintiffs lack standing to bring the claims." Dkt. 69, p. 5. While this Court has up until this point taken a view of the law and of the facts that is different than that of Plaintiffs, Plaintiffs claims are certainly colorable. Given the unprecedented nature of the factual allegations Plaintiffs made in their Complaint, Plaintiffs in many respects are operating in novel, uncharted constitutional territory.

Plaintiffs' extensive and heavily documented claims regarding election fraud were not, and are not, objectively unreasonable, within the meaning of Section 1927 or otherwise. Counsels' representation of Plaintiffs who disagree with Davis does not

constitute bad faith, even if the Court strongly agrees with the City. Rather, it reflects an incompatible view of mutually exclusive assertions. This is not sanctionable.

**A. The Eleventh Amendment.**

The Supreme Court has held that "[i]t is clear … that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984). However, "[w]hen the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.

This Court determined that Plaintiffs' claims against Governor Whitmer and Secretary of State Benson were "suit[s] against state officials when 'the state is the real, substantial party in interest.'" Dkt. 62, pp. 8-9. Plaintiffs respectfully disagree with that conclusion. Their Complaint alleges *ultra vires* executive conduct in violation of state law. Plaintiffs' cause of action is premised on the fact that Defendants Whitmer and Benson have acted inconsistently with state and federal law. Accordingly, in Plaintiffs' view, the state is not the real party in interest. Ultimately, the point is that the resolution of this issue is fact-intensive, not "clear."

**B. Laches.**

Laches is an equitable doctrine that is necessarily fact-dependent. After a diligent search, Plaintiffs have been unable to locate any analogous case in which a court

imposed sanctions on a plaintiff for bringing a claim that the court subsequently deemed barred by laches.

In the instant case, most of Defendants conduct did not become apparent until Election Day. Thereafter, Plaintiffs diligently collected dozens of affidavits and drafted a seventy-five page complaint detailing each of its claims. Plaintiffs filed their Complaint a mere two days after the Michigan Board of State Canvassers certified the election results. Plaintiffs had a reasonable argument for the roughly twenty-one day delay between Election Day and the filing of this Complaint. As such, sanctions would be grossly inappropriate on this basis; especially in a civil rights case such as this. Indeed, an award of sanctions on the basis of laches, or any other basis imagined by Davis, would have a dangerous chilling effect on future plaintiffs who wish to adjudicate voting rights disputes. Such Plaintiffs should not be dissuaded from moving to protect their constitutional rights by a fear that an unpersuaded judge will sanction them just for bringing the lawsuit.

## C. Mootness.

Plaintiffs and this Court disagreed on the question of whether or not the relief Plaintiffs sought was moot. The Court essentially concluded that it did not have the power to "decertify" election results once those results had been certified by the Governor. In delivering its reasons, the Court did not cite any controlling case law in support because this is a novel area. *See Torres v. City of Madera*, 2006 WL 3257491, at *4 (E.D. Cal. Nov. 9, 2006) ("Where no previous court has considered a particular or novel

issue, sanctions under § 1927 generally are disfavored.").   Accordingly, Plaintiffs' reasonable arguments in support of their entitlement to relief cannot be sanctionable on this basis.

### D. Standing.

As Presidential Electors, Plaintiffs, citing *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020), alleged that they had standing to raise post-election challenges concerning the manner in which votes are tabulated and counted for their election to the Constitutional public office of Elector. This is a novel issue that has not yet been directly addressed by the Supreme Court or by the Sixth Circuit. As such, Plaintiffs' claim was neither frivolous nor sanctionable.

Davis presents no argument and makes no showing as to why Plaintiffs' counsel should have known that Plaintiffs' claims were frivolous. Given the significant and *res nova* questions of law implicated here, it would be wholly inappropriate for this Court to punish Plaintiffs' counsel for making reasonable and novel legal arguments in support of their clients' claims.

## II.   No grounds exist to sanction Plaintiffs under this Court's inherent authority.

Davis has an even steeper hill to climb in order to obtain attorney fees pursuant to this Court's inherent authority. A court may assess attorney's fees under its inherent powers "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive

reasons," or when the conduct is "tantamount to bad faith." *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (internal citations omitted).

The Sixth Circuit applies a three-part test to determine whether the imposition of sanctions under this elevated bad faith standard is proper. This test requires the district court to find "[1] that 'the claims advanced were meritless, [2] that counsel knew or should have known this, and [3] that the motive for filing the suit was for an improper purpose such as harassment.'" *Id.* The mere fact that an action is without merit does not amount to bad faith. *Id.* Rather, "the court must find something more than that a party knowingly pursued a meritless claim or action at any stage of the proceedings." *Id.* Examples of "something more" include: a finding that the plaintiff filed the suit "for purposes of harassment or delay, or for other improper reasons," a finding that the plaintiff filed "a meritless lawsuit and [withheld] material evidence in support of a claim," or a finding that a party was "delaying or disrupting the litigation" or "hampering enforcement of a court order." *Id.* (internal citations omitted).

Davis essentially argues that Plaintiffs' claims are sanctionable because they are meritless and, as such, must have been brought for an improper purpose. Davis' conclusory assertions provide no support for the sanctions he seeks. Plaintiffs' claims were based on well-documented evidence of electronic voting machine vulnerabilities and statistical impossibilities supported by dozens of affidavits executed by both fact and expert witnesses. Plaintiffs' only aim in bringing this action was the protection of

the fundamental right to vote secured in our Constitution but threatened by a voting system that leaves the faithful execution of this right open to attack.

Because Davis failed to make any showing of bad faith, Davis' Motion for Sanctions under this Court's inherent authority must be denied.

## CONCLUSION

Davis makes no effort to demonstrate that Plaintiffs' counsel knew or reasonably should have known that Plaintiffs' claims were frivolous. He does nothing more than assert that Plaintiffs brought their claims in bad faith. In the history of our Republic, Plaintiffs' factual claims are unparalleled and the legal territory for these claims uncharted. *See Carmack v. City of Detroit*, No. 18-CV-11018, 2019 WL 4670363, at *9 (E.D. Mich. Sept. 25, 2019) ("[S]erious public interest lawyers certainly need some leeway to file legitimate and/or novel claims against state actors."). An order sanctioning the Plaintiffs or their counsel in this case would have a severe chilling effect on voting rights challenges and set a dangerous precedent that would undoubtedly compromise the political neutrality of the judiciary. Moreover, such an award would implicate Plaintiffs' and their counsel's First Amendment right of access to the courts, their Fifth and Fourteenth Amendment rights to due process, and their Fourteenth Amendment equal protection rights. This Court should resist Davis' frivolous invitation to go down this constitutionally problematic path and should deny Davis' utterly meritless Motion for Sanctions.

Respectfully submitted,

 /s/  Stefanie Lynn Junttila
Stefanie Lynn Junttila
Law Office of Stefanie L. Lambert PLLC
500 Griswold Steeet, Ste 2340
Detroit, MI 48301
248-270-6689
Email: attorneystefanielambert@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2020, a true and genuine copy of the

foregoing was served via electronic mail by the Court's CM/ECF system to all

counsel of record, including:

Andrew Paterson
46350 Grand River Ave.
Novi, MI 48374
248 568-9712
Fax: 248.662-0050
Email: aap43@hotmail.com

 /s/  Stefanie Lynn Junttila
Stefanie Lynn Junttila
Law Office of Stefanie L. Lambert PLLC
500 Griswold Steeet, Ste 2340
Detroit, MI 48301
248-270-6689
Email: attorneystefanielambert@gmail.com