# Detroit Free Press

WAYNE

# A felon's crusade: Robert Davis vs. everybody

**Joe Guillen** Detroit Free Press
Published 6:00 a.m. ET Aug. 11, 2017

Robert Davis strode into federal court 20 minutes late, just in time to hear the opposing lawyer's tirade casting him as a glory hound who stole from Highland Park schoolchildren.

"This court does not have to turn away from the knowledge Mr. Davis was convicted," attorney David Fink told U.S. District Judge Mark Goldsmith during Davis' challenge in late June to public funding for the Detroit Pistons' move into Little Caesars Arena.

"He's back at it. He's trying to be a political star on the rise, at great cost to the public," Fink said.

In local political circles and government offices, Davis has become synonymous with litigation. Over the last decade, he has filed more than 100 lawsuits, going after public officials both obscure and well-known as part of his self-proclaimed quest for transparent, honest government.

**More:** Detroit Land Bank Authority was formed illegally, activist says

Davis has targeted Gov. Rick Snyder, Detroit Mayor Mike Duggan, the Detroit City Council, Highland Park school board members, the University of Michigan Board of Regents, the Wayne County Airport Authority, the Detroit Land Bank Authority, the Troy City Council and Hamtramck election officials, among others, oftentimes alleging violations of the Open Meetings Act, the Freedom of Information Act or elections laws.

His opponents often dismiss him as reckless, and did so even before he pleaded guilty in 2014 to embezzling money.

But Davis' track record includes meaningful wins.

In 2013, Davis' challenge alongside former mayoral candidate Tom Barrow forced Duggan

to run as a write-in candidate because Duggan didn't meet residency requirements. In 2011, Davis' lawsuit against the Wayne County Airport Authority proved the board blatantly violated the state's Open Meetings Act when it hired Turkia Mullin as Metro Airport CEO. When Detroit was on the verge of bankruptcy in 2012, his lawsuits forced state-appointed officials discussing the city's fate to meet in public, and his efforts later uncovered e-mails revealing conversations about the secretive process to appoint emergency manager Kevyn Orr.

**More:** Robert Davis gets 18 months for embezzling from schools

Many of Davis' lawsuits against Gov. Snyder stemmed from the state's handling of Detroit's financial crisis and the constitutionality of the emergency manager law, which allows the state to temporarily take over local governments in financial crisis.

Ingham County Circuit Judge William Collette, who handled several of Davis' cases against Snyder, said some of them "were really justified and needed." Collette also credited Davis with having the gumption to take on the Republican power base in Lansing.

"He's about the only one that I could see that stands up to this bunch," Collette said.

Less than two hours after the June court hearing where Fink attacked his character, Davis sat down for an interview with the Free Press on the patio of Rosie O'Grady's in Ferndale.

Dressed in the same 10-year-old navy pinstripe suit he had worn to court, Davis vented about how his past trails him, whether he's questioning the use of tax money for the new downtown arena or pushing for the release of public records through his nonprofit he dubbed A Felon's Crusade for Equality, Honesty and Truth.

"It's unfortunate that individuals, even opposing counsel at times, always want to bring up my conviction," Davis, 37, said. "In spite of my past and people want to continue to bring that up, I'm not going to be silent. And I think ethical people look past that. My conviction has absolutely nothing to do with the issues that are being raised. And individuals have to learn to separate the two."

But like many topics he covered in several interviews with the Free Press since spring — including his days on the Highland Park school board, his work as a cunning political operative, how his civil lawyer of the last seven years gets paid — the reality of the situation is grayer than the black-and-white view from Davis' eyes.

## A good student

Davis is the youngest of Earnestine Davis' five children. His father died when Davis was a boy, before they were able to develop a memorable relationship. His mother was left to raise her children alone. She worked several jobs to provide them with a stable home environment.

Davis spent time as a youth playing in Police Athletic League sports, a program he grew to revere.

He was a good student, graduating from Detroit Renaissance High in 1997 with a 3.7 GPA. He earned all A's and B's — except in science, where he received 2 C's and a D.

After graduation, he spent his summer days like a typical teenager, playing basketball and hanging out with friends. But in the evenings, he was trying to recall Highland Park's then-Mayor Linsey Porter.

There was a simple reason. Coaches for Davis' PAL teams had played an instrumental role in his upbringing, and Porter eliminated the program.

"The decisions he was making as mayor really hurt the city and is hurting the city to this day," Davis said.

Although he was a teenager, Davis had gotten to know judges, lawyers and politicians through his visits to Detroit's old downtown YMCA. He said it was there that he settled on the idea to recall Porter.

"You gotta understand the downtown Y... You'd come down there and they had a round table, cats would just come down and sit around the round table because of the guys that were there. It's not every day that you'd bump into a federal judge willing to engage in open conversation with you about life. Or the deputy mayor, or judges or prominent lawyers," Davis said.

At 17, Davis was too young to vote or circulate recall petitions. So he walked the streets with seven adult residents, discussing the recall campaign door-to-door with other Highland Parkers, gathering petition signatures.

His legal training essentially began at that YMCA. That's where he met criminal defense attorneys Robert Kinney and Otis Culpepper, who invited him to work in their law offices

in the summers after his junior and senior years of high school. Davis said he was an office gopher of sorts, delivering documents and reading and editing some legal briefs.

The recall campaign ultimately failed, falling nine signatures short to earn a place on the ballot. Porter remained in office, but Davis' campaign left a mark.

Two years later, when Davis garnered more headlines as he ran unsuccessfully for Highland Park City Council, Porter was not in a mood to praise the 19-year-old's ambition.

"This young man has cost the city close to $100,000 in legal costs in the last two and a half years," Porter told the Free Press in 1999. "People thought he was cute in the beginning, but it's not cute anymore."

## Basketball star

Davis began his college education in 1997 at Wayne State University, where he studied journalism. He ended it as a seasoned political activist and record-setting college basketball player.

After his first two years at Wayne State, Davis transferred to the University of Michigan-Dearborn, where his former high school basketball coach had taken a job. He convinced Davis to join the team.

He was a rebounding machine at power forward, despite being somewhat undersized at 6-feet-4. He still holds program records for rebounds in a season (381) and rebounds in a single game (22).

Davis said he beat taller opponents to the ball by studying his teammates' shooting tendencies, looking for patterns in how their missed shots caromed off the rim.

"I'm just smart, very smart. I calculate everything," he said. "This is what I try to teach my son, is that, learn your teammates' spots and how they shoot. So if Joe, whenever he shoots from the right, it's always going to come off long. Or if he shoots from the center, it's going to come off short. So I studied my teammates and how they shot so I could judge how the ball came off."

College meant politics, also, for Davis. He said he helped Martha Scott as she ran for the state Legislature, and later conducted opposition research that benefited Gil Hill's failed run for Detroit mayor in 2001.

Davis' interest in studying law flourished in college. He worked as an intern for former Michigan Supreme Court Chief Justice Robert Young in the summers after his junior and senior years.

Young said Davis, as an undergrad, was far more advanced than even a typical first-year law school student would be.

"He had mad legal skills," Young said. "He had a real unexpected facility with law as a college kid."

Young wrote a letter in 2003 supporting Davis' application to Cooley Law School, Oakland University. Davis attended but said he dropped out sometime after his son was born in 2004. He said the reasons included focusing on fatherhood and full-time work with the American Federation of State, County and Municipal Employees (AFSCME) Council 25, Detroit's largest public employees union. But he also made a vague reference to "immaturity" and an issue with a professor.

Not completing law school is among Davis' biggest regrets.

He was elected to the Highland Park school board in the summer of 2002, weeks after graduating from college with a degree in political science. He was confrontational from the start, questioning other board members about nepotism and government waste.

His relationships with fellow board members were so toxic by 2009 that Davis stopped regularly attending school board meetings. That year, it was estimated Davis' lawsuits had cost the school board more than $105,000 in legal fees.

Davis filed nearly two dozen lawsuits against the Highland Park school board and its members in 2008-09. By the next year, when his term was up and he was deciding whether to run again, some in the community hoped he would decide against it.

"I would love to see him go away," Viola Sears, president of the Highland Park schools clerical bargaining unit, said at the time. "I wish I could pack his bags myself."

Davis ran for re-election but lost, placing third behind prevailing candidates Debra Humphrey and Clifford Chatman.

But he sued them both to keep them from serving. Humphrey improperly circulated her nominating petitions, Davis alleged. And he claimed the Highland Park house in which Chatman said he lived was vacant and abandoned. Davis prevailed in the case against

Chatman and he regained his school board seat.

The lawsuit against Humphrey was thornier, and it still lingers for Davis.

In dismissing Davis' complaint against Humphrey, former Wayne County Circuit Judge Amy Hathaway ordered that Davis post a $1,000 bond before filing any other action in the Wayne County Circuit Court.

"I must've been frustrated," Hathaway said in a recent interview. "At that time there were a lot of frivolous lawsuits."

Certain circuit court judges still require Davis to post the bond before proceeding with a case, even though Hathaway said that was not her intention.

The school district was crumbling during Davis' last term. Its deficit climbed and enrollment declined, from 3,179 in 2006 to 989 in January 2012. The district's first emergency manager was appointed in February 2012. Davis was indicted for embezzlement two months later.

## Not shy

Davis has a reserved nature, but he's not shy. He generally enjoys talking about his upbringing, his political career and his court battles.

He's far less comfortable discussing his crimes, often using vague terms to describe the act of stealing money from the school district for his personal use. He cut off multiple questions about the details of what he did and how things came to that point.

"I can't describe it; it just happened," Davis said. "I am not going to litigate, or re-litigate, anything that occurred in those criminal proceedings. … I crossed a line. I pled guilty to a particular crime and I paid my debt to society for it, and in learning from that situation, I would tell any politician just, you know, relationships with certain contractors and vendors are dangerous sometimes."

According to federal prosecutors, between 2006 and 2010, Davis used his influence as a school board member to arrange deals with three companies run by his friends. The companies would submit phony invoices to the school district, and large portions of the payments ended up in Davis' hands. He spent the stolen funds on restaurants, bars, travel and clothing. During its surveillance of Davis, the FBI would see him driving a silver

Mercedes registered to him, according to court records.

He pleaded guilty in September 2014 to stealing $197,983 from the district and for filing a false federal income tax return. In court and to this day, Davis said he accepts responsibility for what he did.

Davis' conviction struck his political allies in different ways.

Scott, whom Davis helped campaign for the Legislature, said she has known him since he was a boy.

"There are people that have done so many more things and they didn't get any time. He went after the governor, OK? And it's not easy for a black man to go after and do what he does, without this, OK?" said Scott, who is now a Wayne County Commissioner. "I see the president doing all these things and nothing has happened to him, OK? It's a white man's world."

Former school board member John Holloway said Davis was intelligent, charismatic and quick to learn.

"I was surprised. He wanted everybody else to walk the straight and narrow and then he wasn't walking the straight and narrow," Holloway said. "I know why he did it. Same reason as all the rest of them do it — greed."

The government said some of Davis' lawsuits were designed as a cover. He filed a flurry of litigation from 2008 to 2012 that were "intended to intimidate the (school) board and conceal Davis' embezzlement by distracting, dividing and manipulating the board," according to a memorandum prosecutors wrote to support their recommendation that he be sentenced to 18 to 24 months in prison.

That characterization is absurd, Davis said. "The lawsuits were intended to expose the unethical conduct of certain board members, which it did," he said.

Davis resists simple greed as an explanation for his theft.

"I was living a regular life, period. I went to the bar, period," paying with his union salary, Davis said, adding he paid for the Mercedes with a car allowance provided to him through his employment with AFSCME.

U.S. District Judge Arthur Tarnow sentenced Davis to 18 months in prison and ordered

him to repay the nearly $200,000 he was convicted of stealing.

On March 13, 2015, Davis took a commercial flight he paid for to Alabama, self-reporting to FPC Montgomery, a minimum security institution on Maxwell Air Force Base. It was listed among "The Best Places to Go to Prison" in a 2012 feature posted on cnbc.com, noting how inmates had access to a music room, pool tables and work opportunities outside the military base's prison camp.

"Where I was there are no cells. There are no bars, there are no gates, there are no guns," Davis said, adding that the lack of grueling prison conditions did not make it easier to be away from his family.

Less than a year after he went to prison, Davis was released on Feb. 3, 2016. He flew home, spent a week in a halfway house, then lived under home confinement in Highland Park until July 1, 2016.

## Government watchdog

During his incarceration, Davis said his motivation grew to be a government watchdog. He said he heard from people that city leaders were going unchallenged.

In himself, Davis sees a fearless crusader against hypocrisy, incompetence, corruption and backdoor deals in local government. He is not a lawyer, yet he has supreme confidence in his intellect to spot public officials' deception and outmaneuver the lawyers they hire to mount a defense.

"Just because someone has a P number and a law degree does not make them smart," Davis said, referring to the identification number the State Bar of Michigan issues to practicing lawyers.

Davis does a lot of his own legal work, but he has help — from an admittedly unlikely character.

"Not every day that a white guy from Ann Arbor would take a controversial case dealing with the inner city," Davis said.

Andrew Paterson, who has practiced law in Michigan since 1969, has represented Davis on many of his civil suits since 2010. They met about a decade before that, when Davis was a student at U-M Dearborn. Davis was helping a client of Paterson's who was trying to bring

a women's professional football team to Highland Park, Davis said.

Paterson has worked about 20 hours a week on his cases for the last year, Davis estimated. Davis said he does not pay him.

"Back when I was working and gainfully employed, of course I was compensating him. Currently, I'm not," Davis said.

Judge Collette, who handled several of Davis' cases against Gov. Snyder, said he has always wondered how Paterson gets paid.

"It's coming out of another pocket somewhere. No question," Collette said.

Davis said there is no secret benefactor, and Paterson did not return messages seeking comment. Davis said questions about Paterson's compensation are silly.

"Oftentimes, people say there has to be a ghost in the background," Davis said. "That's what's sad about this society. They always think somebody's doing something because somebody behind the scenes is asking them to do it.

"No, we're dispensing justice, period."

Generally, Paterson testified during a deposition, the only income he receives from representing Davis comes from any fees he is awarded for prevailing in court. Under Michigan's Open Meetings Act, public bodies can face financial penalties for breaking the law. The Detroit Downtown Development Authority, for example, wrote Paterson a $5,000 check in February as part of a settlement with Davis after he sued the DDA for holding secret finance committee meetings about the Pistons move downtown.

The DDA also agreed to open all future finance committee meetings to the public, breaking a 20-year policy of holding them behind closed doors.

People underestimate Davis, said Kevin Smith, the Highland Park School District's emergency manager. Smith got to know Davis in the late-2000s when Smith was the school district's general counsel and Davis was on the school board and filing nearly a lawsuit a month against his fellow board members.

Though he has spent his time opposing Davis in court, Smith confessed a certain respect for him.

"He's not somebody that's just throwing something in the wind. He reads the law," Smith

said. "He's reading all the Open Meetings Act provisions and he's going through the meeting minutes. …

"People take shortcuts and Robert doesn't."

## Found work

Until recently, Davis was unemployed since his release from prison, saying he was able to make ends meet "by the grace of God" and with help from "great family and friends who have supported me through this journey." In late July, he said, he found work. But he won't say what it entails. "My activism has jeopardized my job too many times. My job and where I work is immaterial."

Davis said he rents the same house in Highland Park he's been in for several years. He's divorced with a 12-year-old son, but those relationships he considers private, and he prefers not to talk about them.

For someone so guarded about his personal life, who harbors genuine animosity toward political foes, Davis can be affable. At a handful of interviews at restaurants with the Free Press, he randomly encountered friendly acquaintances who struck up conversations, including former Detroit News columnist Terry Foster and another man with whom Davis played basketball.

Davis said he wants to go back to law school and focus on mentoring African-American youths to keep them out of the criminal justice system.

For many lawyers and politicians who have interacted with him, Davis remains mysterious.

Dennis Pollard, a Troy lawyer who represented the Highland Park school system in a contentious case in which Pollard pursued an examination of Davis' financials, said he is curious about him.

"I just don't understand what his end game is with all of this," Pollard said. "I just don't know what makes him tick."

*Contact Joe Guillen: 313-222-6678 or jguillen@freepress.com. Follow him on Twitter: @joeguillen.*