## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TIMOTHY KING, MARIAN SHERIDAN,
JOHN HAGGARD, CHARLES RITCHARD,
JAMES HOOPER, DAREN RUBINGH,

      Plaintiffs,

v.

GRETCHEN WHITMER, in her official capacity as the Governor of the State of Michigan, JOCELYN BENSON, in her official capacity as Michigan Secretary of State and the Michigan BOARD OF STATE CANVASSERS,

      Defendants,

and

CITY OF DETROIT, DEMOCRATIC NATIONAL COMMITTEE and MICHIGAN DEMOCRATIC PARTY,
      Intervenor-Defendants.

      Defendant.

CASE NO. 2:20-cv-13134

Hon. Linda V. Parker

Mag. R. Steven Whalen

**PLAINTIFFS' SUPPLEMENTAL OPPOSITION TO THE CITY OF DETROIT'S MOTION FOR SANCTIONS, FOR DISCIPLINARY ACTION, FOR DISBARMENT REFERRAL AND FOR REFERRAL TO STATE BAR DISCIPLINARY BODIES AND TO THE DEFENDANTS WHITMER AND BENSON'S CONCURRENCE IN CITY OF DETROIT'S MOTION**

# FOR SANCTIONS

The City of Detroit's Motion for Sanctions, for Disciplinary Action, for Disbarment Referral And for Referral To State Bar Disciplinary Bodies is baseless, procedurally improper, and is an attempt to create a dangerous precedent that could dissuade future civil rights and voting rights plaintiffs from bringing their disputes to court. It should be denied, and the City of Detroit should be ordered to pay Plaintiffs' fees and costs incurred in opposing the motion.

## Issue Presented

Whether Plaintiffs and their' counsel should be sanctioned under Rule 11, Plaintiffs' counsel disbarred or referred to State Bar Disciplinary Bodies: <u>No</u>.

## Controlling Authority

<u>Cases</u>

*Beverly v. Sherman*, No. 2:19-CV-11473, WL 2556674 (E.D. Mich. May 20, 2020)

*DeBauche v. Trani*, 191 F.3d 499 (4th Cir.1999)

*FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335 (7th Cir. 2010) (*citing Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005)

*In re Ruben*, 825 F.2d 977 (6th Cir. 1987)

*Jensen v. Phillips Screw Co.*, 546 F.3d 59 (1st Cir. 2008).

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45(2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570(2007).

*Matter of Yagman*, 796 F.2d 1165 (9th Cir. 1986)

*MEMC Elec. Mat'ls, Inc. v. Mitsubishi Mat'ls Silicone Corp.*, 420 F.3d 1369 (Fed.Cir.2005)

*Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642 (6th Cir. 2006)

*Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997)

*Steinert v. Winn Group, Inc.*, 440 F.3d 1214 (10th Cir.2006)

*Thurmond v. Wayne Cnty. Sheriff Dept.*, 564 F. App'x 823 (6th Cir. 2014)

*United States v. Ross*, 535 F.2d 346

*Young v. Smith*, 269 F. Supp. 3d 251 (3d Cir. 2017)

Statutes & Court Rules

28 U.S.C. § 1927

Fed. R. Civ. P. 54(d)(2)

MCLS § 168.726

## **Introduction**

Defendants do not allege specific deficiencies in pleadings; instead they attack the credibility of evidence attached to the complaint, whether by Declaration or Affidavit – despite the Plaintiffs submitting evidence for nearly every paragraph in the Amended Complaint, with over 200 affidavits and declarations, and never having an evidentiary hearing.

Election integrity should be a non-partisan issue. In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "*trouble -plagued companies*'"

"*have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (*See* Am. Compl. at p. 59, par. G, citing Ex. 16).

Defendants' Motion reeks of political smear tactic and promotes a one-sided political viewpoint, rather than seeking to uphold any professional standards governing lawyers. Actually, it is the conduct of Defendants and their counsel that violates the code of legal ethics. The City's request for sanctions must be denied, for multiple reasons explained in the Brief in Support below, filed pursuant to Local Rule 7.1(d)(1)(A). The State Defendants' passing request for "sanctions and/or costs and fees" is procedurally improper, as it was not made by motion with a supporting as required under Local Rule 7.1(b) and 7.1(d)(1)(A), and likewise must be denied.

## Procedural background

On January 5, 2021, the City moved for sanctions under Rule 11, as well as for the extraordinary remedy of the disbarment of SEVEN attorneys, and their referral to state bars for disciplinary action. The City had previously moved for sanctions under 28 U.S.C. § 1927 ("Section 1927"),. (See ECF 70 and 73). On January 14, 2021, the State Defendants filed a Consent to the City's motion stating that they reserve the right to file their own motion for sanction at a future date. The "Consent" is not a recognizable motion and adds nothing to the motion presented by the City.

On November 25, 2020, Plaintiffs filed their Complaint. [ECF 1].  Plaintiffs amended their complaint on November 29th and also filed a motion for a TRO [ECF 6, 7].  Since its initial filings, Plaintiffs have taken every reasonable measure to expedite this proceeding and to terminate the proceeding once their claims were no longer viable. In their November 29, 2020 "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" ("TRO Motion"), ECF No. 7, Plaintiffs requested an expedited briefing schedule, which the Court granted. ECF No. 24.  On December 7, 2020, without oral argument, and based solely on the initial pleadings and responses, the Court denied the TRO Motion (See ECF No. 62).  Plaintiffs promptly appealed to the Sixth Circuit and to the US Supreme Court.  [ECF Nos. 64 and 68].

On December 22, 2020, with these appeals pending, the State Defendants and Intervenors moved to dismiss the Amended Complaint.  [ECF Nos. 70, 72, 73] On January 6, 2021, the US Congress "certified the election", rendering Plaintiffs' claims moot.  On January 14, 2020 Plaintiffs voluntary dismissed the Amended Complaint for all Defendants and Defendant/Intervenors other than Mr. Davis.  On January 17, 2021 regarding Intervenor Defendant Davis, Plaintiffs moved for voluntary dismissal ECF No. 86-92.

## LEGAL ARGUMENT

## I.    The Requests for Rule 11 Sanctions Fail for Procedural Reasons.

The City's Motion for both Rule 11 sanctions and for disbarment of attorneys and their referral to state bar associations for disciplinary action is procedurally improper because it violates the requirement that a Rule 11 sanctions motion "must be made separately from **any other motion**," Fed. R. Civ. P. Rule 11(c)(2) (emphasis added). The City has not cited any provision of the Federal Rules of Civil Procedure or Local Rules authorizing such a bundling or multiple types of sanctionable relief. The City intervened in this suit solely for the purpose of seeking sanctions—an action itself improper. It filed its specious motion in its own improper effort to promote its own agenda with the media and to distract from explosive evidence of voter fraud. Its motion is far more of a crafted smear to injure the standing and reputation of the Plaintiffs' attorneys than one to uphold any professional standards. Indeed, the City violated the very standards it purported to uphold by filing its spurious motion. There is no legal or factual basis for this Court to grant the City's requested relief. Accordingly, because the City has submitted one motion for Rule 11 sanctions and other types of punitive non-Rule 11 relief, the entire motion must be denied. *See, e.g., Dolinka Vannoord & Co. v. Oppenheimer & Co.,* 891 F. Supp. 1244, 1252 (W.D. Mich. 1995) (sanctions denied for failure to comply with separate Rule 11 motion requirement; "In any event, due to the uncertainty of Michigan law on the key issues in this case … sanctions would [have] be[en] inappropriate."); *Peloza v. Capistrano United Sch. Dist.,* 37 F.3d 517, 524 (9th Cir. 1994) (reversing sanctions award of $32,000 and finding First Amendment claims non-frivolous because plaintiff raised important questions of first

impression), *cert. denied*, 515 U.S. 1173 (1995); *Milwaukee Concrete Studios, Ltd. v. Field Mfg. Co.*, 8 F.3d 441 (7th Cir. 1993) (vacating sanctions because case involved issues of first impression); *United States v. Alexander*, 981 F.2d 250, 253 (5th Cir. 1993) (vacating imposition of sanctions; case presented novel issues and party's argument was plausible); *Clancy v. Mobil Oil Corp.,* 906 F. Supp. 42, 50 (D. Mass. 1995) ("In light of the lack of clearly defined First Circuit precedent in this area, plaintiffs' argument … is not entirely unfounded. … Plaintiffs' arguments therefore fall outside the reach of Rule 11."); *Fowler v. Towse*, 900 F. Supp. 454, 461 (S.D. Fla. 1995) (sanctions denied for non-frivolous argument on novel issue).

Secondly, the City's motion must be denied as to all attorneys who did not actually appear or sign any pleadings in this matter. Rule 11 is concerned with the signing of frivolous pleadings and other papers. *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986). It may not be invoked against attorneys whose names appear on a pleading but who have not signed the pleading or otherwise formally appeared in the action. *In re Ruben*, 825 F.2d 977, 984, (6th Cir. 1987).

Indeed, "[w]here plaintiff signed filed papers, but the attorney's name appeared on papers only in typewritten form, sanctions cannot be imposed on attorney since Rule 11 focuses only on individual who signed document in question. *White v. American Airlines, Inc.*, 915 F.2d 1414, 17 Fed. R. Serv. 3d (Callaghan) 1199, 6 I.E.R. Cas. (BNA) 1086, 116 Lab. Cas. (CCH) ¶56400, 1990 U.S. App. LEXIS 17201 (10th Cir. 1990). Typewritten name is not signature for purpose of Rule 11, and therefore senior

partner of law firm which represented defendants and whose name was typed on pleadings but who did not personally sign them is not subject to Rule 11 sanctions. *Giebelhaus v. Spindrift Yachts*, 938 F.2d 962, 91 Cal. Daily Op. Service 5352, 91 D.A.R. 8248, 19 Fed. R. Serv. 3d (Callaghan) 1364, 1991 U.S. App. LEXIS 14212 (9th Cir. 1991)."

*Id.  See also* Commentary, USCS Fed Rules Civ Proc R 11.

The Sixth Circuit in *In re Ruben* cited to *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986) which held that:

> Rule 11, requires that "every pleading, motion, and other paper of a party represented by an attorney shall be signed" by the attorney. It then provides that:
>
> the signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.
>
> Fed. R. Civ. P. 11.
>
> …From this language it is apparent that a sanction for attorneys' fees may be imposed either on the attorney who signs a paper, or on the party he represents, or on both. The key to rule 11 lies in the certification flowing from the signature to a pleading, motion, or other paper in a lawsuit. While a continuing prohibition against dilatory litigation is imposed by § 1927, *see Roadway Express*, 447 U.S. at 757; *Browning Debenture Holders' Committee*, 560 F.2d at 1088, rule 11, by contrast, deals with the signing of particular papers in violation of the implicit certification invoked by the signature.
>
> Rule 11 applies only to the initial signing of a "pleading, motion, or other paper". Limiting the application of Rule 11 to testing the attorney's

conduct at the time a paper is signed is virtually mandated by the plain language of the rule. Entitled "Signing of Pleadings, Motions, and Other Papers; Sanctions", the rule refers repeatedly to the signing of papers; its central feature is the certification established by the signature.

*Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986)

For this reason alone, the City's motion against all counsel other than local counsel, must be denied. The only signator or appearance made in the short life of this case has been by Plaintiffs' local counsel. No other counsel signed any pleadings. Indeed, the City recognizes that E. D. Mich. LR 83.20(a)(1) defines "practice in this court," to include: "appear in, commence, conduct, prosecute, or defend the action or proceeding; appear in open court; sign a paper; participate in a pretrial conference; represent a client at a deposition; or otherwise practice in this court or before an officer of this court." (See ECF 78, p. 37). None of that applies to any of Plaintiffs' non-local counsel. Attorney Gregory Rohl served, pro bono, as local counsel and filed the initial complaint in the instant case as it was provided to him by the Sidney Powell team making no additions, deletions, or corrections to the pleadings other than simply adding his name to the provided signature page. The local rules in the Eastern District of Michigan do not allow an out of state attorney to sign pleadings unless admitted to the Court. *United States District Court—Eastern Michigan District,* February 2, 2021,

https://www.mied.uscourts.gov/index.cfm?pageFunction=Information%20For%20

AttorneysFAQList&FAQGroup=Information%20For%20Attorneys.  (See Exhibit 1).

## II.    Rule 11(c)(2)'s Safe Harbor Notice Requirement and Plaintiff's Voluntary Dismissal of Complaint within 21 Days.

As a preliminary matter, Rule 11(c)(2) sets forth that:

> (2) <u>Motion for Sanctions</u>. A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b). The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets. If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.

 USCS Fed Rules Civ Proc R 11.

The City' Rule 11 motion claims regarding frivolous legal claims and unsupported factual allegations must be dismissed for failure to provide 21-days' notice and opportunity for response under Rule 11(c)(2).  Plaintiffs moved to voluntarily dismiss this case (and thereby withdraw all pleadings) on January 14, 2021.  The City served a copy of notice of an anticipated Motion on Plaintiffs' counsel on December 15, 2020. That "notice" makes only conclusory statements and blanket assertions regarding the alleged violations of Rule 11 and fails altogether to "describe the specific conduct that allegedly violates Rule 11(b)."  *Id.* Further, it fails to identify any specific factual allegation or witness that lacks evidentiary support.  Instead, it is only in the accompanying Brief, filed on January 5, 2021, that the City first identifies the "specific conduct" that allegedly violates Rule 11.  For r example, the Motion contains only a

single sentence identifying specific contested factual allegations, ECF No. 78 at vii,

while the Brief spends 13 pages.

In *Hadges & Kunstler v. Yonkers Racing Corp.,* 48 F.3d 1320, 1327-28 (2d Cir. 1995)

the Second Circuit commented on the amendment, as follows:

> Of particular relevance here, the 1993 amendment establishes a "safe
> harbor" of 21 days during which factual or legal contentions may be
> withdrawn or appropriately corrected in order to avoid sanction. Fed. R.
> Civ. P. 11(c)(1)(A).
> *Photocircuits Corp. v. Marathon Agents*, 162 F.R.D. 449, 451, (E.D. N.Y. 1995)

In addition, as the court in *Cromwell v. Cummings*, *supra*, 65 Cal. App. 4th Supp. 10,

recognized, "[a]pplication of the doctrine of substantial compliance would be

inconsistent with the plain language of the 'safe harbor' provision, which has been

strictly construed as an absolute perquisite to an award of sanctions under revised rule

11 of the Federal Rules of Civil Procedure (28 U.S.C). *Barnes v. Department of Corrections*,

74 Cal. App. 4th 126, 135-136, 87 Cal. Rptr. 2d 594, 602, (Ca. App. 1999)(*Citing Ridder

v. City of Springfield, supra,* 109 F.3d at p. 296.)" (*Id.* at p. Supp. 15.) Indeed, the Advisory

Committee Notes to rule 11 state: "To stress the seriousness of a motion for sanctions

and to define precisely the conduct claimed to violate the rule, **the revision provides**

**that the 'safe harbor' period begins to run only upon *service of the motion*.** In

most cases however, *counsel should be expected to give informal notice* to the other party,

whether in person or by a telephone call or *letter*, of a potential violation before

proceeding to prepare and serve a Rule 11 motion." (Fed. Rules Civ. Proc., Rule 11, 28 U.S.C.A., *supra*, Advisory Com. Notes, 1993 amendments, p. 284, italics added.)

This Court must, at a minimum, deny the Motion with respect to any argument, claim or contention first described in the City's Brief, as protected under the Rule 11(c)(2) safe harbor, and should deny the Motion as a whole based on the City's filing of the Motion on January 5th, 2020, because Defendants' filed dismissals to this Court for all parties on January 14, 2020, and regarding Intervenor Defendant Davis on January 17th, 2020.

As explained above, Plaintiffs promptly moved to voluntarily dismiss this case in its entirety, including pending appeals, within the 21-day notice period of the filing of the motion on January 5, 2020, (See ECF 78) and (ECF 86-92).

## III.     Rule 11(b)(1): The Complaint Was Properly Filed with Proper Purpose

### A.     Plaintiffs Did Not Seek to Harass the City

Even if the City's Motion were not procedurally barred, Plaintiffs and their counsel have not violated Rule 11. Rule 11 provides that "sanctions may be imposed if a reasonable inquiry discloses [that a] pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Sony/ATV Music Publ'g LLC v. 1729172 Ont., Inc.*, 2018 U.S. Dist. LEXIS 140856, *36-37, 2018 WL 4007537, (*citing Merritt v. Int'l Ass'n of*

*Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (citation omitted)....
'In order for conduct to be considered so "unreasonable" as to warrant sanctions, that
conduct must be "relatively egregious."' *Id.* (*citing Fulmer v. MPW Indus. Servs., Inc.*, 2006
U.S. Dist. LEXIS 42038, 2006 WL 1722433 at *5 (M.D. Tenn. June 21, 2006) (Trauger,
J.).

     "'A district court abuses its discretion if it bases its ruling on an erroneous view
of the law or a clearly erroneous assessment of the evidence.'" *Shirvell v. Gordon*, 602
Fed. Appx. 601, 604 (6th Cir. 2015) (*citing Merritt v. Int'l Ass'n of Machinists and Aerospace
Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quoting *Brown v. Raymond Corp.*, 432 F.3d
640, 647 (6th Cir. 2005)).

     Plaintiffs did not file for "any improper purpose, such as to harass, cause
unnecessary delay, or needlessly increase cost of litigation." Fed. R. Civ. P. Rule
11(b)(1). First, the City of Detroit was an intervenor in this proceeding, not a
defendant; nor was the City of Detroit a necessary party. Plaintiffs did not seek any
relief from the City of Detroit, or its officials or employees. The City voluntarily
intervened purportedly to "protect its reputation" and its own perception of election
integrity. *See* ECF No. 5 at 4. But the City was not accused of conducting elections
improperly. It does not conduct elections for the President of the United States. States,
through their counties, do. So while Detroit sits in Wayne County, and allegations were
made concerning fraudulent election activity in that county, the City of Detroit has no
role in the matter, and it should not have intervened.

Apart from its serial motions for sanctions, the City of Detroit has not made any unique legal arguments, but simply parroted the same arguments made by Defendants and other intervenors. Accordingly, Plaintiffs cannot be deemed to have filed for purposes of harassing the City, and in fact, opposed the City's intervention. *See* ECF No. 5 at 1.

**B. Public Statements and Tweets By Co-Counsel Do Not Demonstrate That Plaintiffs or Counsel Had Improper Purpose but State Defendants' Statements Call into Question the Propriety of Defendants' Purpose.**

The City's speculative attribution of an improper motive attributable to Plaintiffs' counsel because of the media appearances of Lin Wood and Sidney Powell do not implicate Rule 11(b)(1), as neither Mr. Wood nor Ms. Powell was a signer to the pleadings. The tweets referenced in the City of Detroit's outlandish character assassination of plaintiffs' counsel have nothing to do with the merits of the suit, the claims set forth in this Court, or the evidence provided by plaintiffs' counsel in support of their claims. Put frankly, they are entirely irrelevant to a Rule 11 consideration, particularly because no signer was the author or instigator of this media content. The actual signers of the pleading did not produce the tweets, reference the tweets, or retweet the tweets and have not been accused of making improper media appearances.

The Fourth Circuit in *In re Kunstler* held that any improper purpose must be "derived from the motive of the *signer* in pursuing the suit." 914 F.2d 505, 518–19 (4th Cir. 1990) (emphasis added). A Court may consider a *signer's* subjective beliefs in the

purpose analysis, solely if they so clearly demonstrate the signer knew the motion was baseless, and despite this knowledge, proceeded to file. *Id* at 519. Otherwise, the Court must judge the conduct of counsel under an objective standard of reasonableness. *Id.* at 518. Any evidence that cannot be viewed by a court without fear of misinterpretation, or that involves difficult determinations of credibility, is not objective for purposes of a Rule 11(b)(1) analysis. *Id.* at 519. Because neither Mr. Wood nor Ms. Powell were signers to the pleading, this Court may not assess their subjective beliefs in the improper purpose analysis; and there is not even a viable inference that local counsel had any improper purpose.

Even if the Court were to improperly consider the tweets, an evidentiary hearing would be required to assess the veracity of the media statements and their role in impacting the signer's decision to file the suit. As "determinations of credibility are best made after an evidentiary hearing," and because these media statements are the opinions of attorneys who did not sign the pleading, this Court cannot assume improper purpose from extrajudicial statements that are not objective, nor were made by the signer. *Id.* at 519-20. Plaintiffs' counsel welcomes the opportunity to participate in an evidentiary hearing to consider the credibility of the evidence presented before this Court.

The State Defendants address Sidney Powell's tweets regarding election integrity issues and concerns about getting an opportunity to be heard in court in their Motion for Sanctions. (See ECF No. 78, pp. 6, 10). Defendants cite tweets alleging that "those false messages are deliberately advanced by these attorneys to support their goals of

undermining our democracy" but by threatening plaintiffs and counsel over messages, Defendants undermine the Due Process Clause of the Constitution, "No person shall...be deprived of life, liberty, or property, without due process of law..." Defendants, however, have instead put out ,media headlines and talking points and messages *under the official color of law* to attempt punish Ms. Powell or other counsel over messages on election integrity or the lack thereof - while they had not yet filed or put Plaintiffs on notice of a Rule 11(c)(2) Motion for Sanctions, and appear to be working with one political party rather than from a position of neutrality incumbent on official government actors.

On December 22, 2020, the Michigan Attorney General is quoted in public statements on making assertions that, under color of law, she will seek to get counsel disbarred, where she is using her public office and appears that it is coordinated with DNC Counsel's statements from December 15, 2020.

On December 15, 2002, the City emailed a notice of its intent to file sanctions motions, purportedly to provide "notice to correct" under Rule 11 - but that December 15th notice appears instead to be coordinated with public statements put out that same day by both the Michigan Attorney General and counsel for the DNC. Specifically, they commented on the need to ensure Plaintiffs' and Plaintiffs' counsel "*pay a price*" for filing election integrity cases. "It's time for this nonsense to end," the City's lawyer **David Fink** told Law & Crime in a phone interview. "The lawyers filing these frivolous cases that undermine democracy **must pay a price**," Fink added.

Indeed, even before the City's motion had been filed, it was tweeted out by **Marc Elias**, an attorney from the Washington-based firm Perkins Coie who has regularly intervened in these cases on behalf of the Democratic Party and the Biden campaign.[1]

But that's not all.  Not to be undone by counsel for the City and the DNC, the Michigan Attorney General made the following slanderous and outrageous official statement concerning the filings in this case in which her office appears as counsel of record for the State Defendants:

> "These are *flagrant lies* that Ms. Powell is submitting to, of all places, the United States Supreme Court in some cases. It's disturbing and it undermines our entire profession, and she has to be held accountable," Nessel told Detroit reporters. "We'd be asking there be action taken against her law license including potential disbarment."[2]

---

[1] *Detroit Is Trying to Get Sidney Powell Fined, Banned from Court, and Referred to the Bar for Filing the 'Kraken', lawandcrime.com, by Adam Klasfeld, December 15, 2020* https://lawandcrime.com/2020-election/detroit-is-trying-to-get-sidney-powell-fined-banned-from-court-and-referred-to-the-bar-for-filing-the-kraken/)

[2] Michigan Attorney General Wants to Disbar Sidney Powell, Pro-Trump Attorneys:  Michigan is moving to disbar Sidney Powell and other pro-Trump attorneys for the work exposing credible accusations of voter fraud.  The National File, By Frankie Stockes by Frankie Stockes December 26, 2020.

https://nationalfile.com/michigan-attorney-general-wants-to-disbar-sidney-powell-pro-trump-attorneys/; see also  "The Democratic attorney general also plans to pursue court costs and fees and to file complaints with the attorney grievance commission, Nessel told reporters Tuesday." Sanctions sought against lawyers who pushed to overturn Michigan's election, the Detroit News, by Beth LeBlanc and Craign Mauger, December 22, 2020

https://www.detroitnews.com/story/news/local/michigan/2020/12/22/nessel-seek-sanctions-against-lawyers-challenging-election-results/4009929001/

It appears that their primary motivation in seeking to intervene in this case was to file serial sanctions motions and to defend its reputation, a purpose that has been held to be an impermissible and not to provide standing for filing Rule 11 sanctions. *See, e.g., New York News, Inc. v. Kheel*, 972 F.3d 482, 488 (2d Cir. 1992) (finding aggrieved non-party lacked standing to file Rule 11 motion for purportedly baseless allegations in plaintiffs' complaint).Accordingly, there is no basis for this Court to apply Rule 11 sanctions to non-counsel of record for public statements made. On the contrary, it is defense counsel whose motives for bringing the instant motion and whose contrary, it is the public statements made by counsel for the City of Detroit and the State of Michigan, under color or law, which should be closely scrutinized.

## C.   Plaintiffs Have Not Caused Unnecessary Delay or to Unnecessarily Increased Costs

Plaintiffs have taken every reasonable measure to expedite this proceeding and to terminate the proceeding once their claims were no longer viable while seeking relief for their clients. In their November 29, 2020 "Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief" ("TRO Motion"), ECF No. 7, Plaintiffs requested an expedited briefing schedule, and agreed to forego an evidentiary hearing and discovery specifically because of the time pressure on the relevance of the claims

---

The Motor City's motion asks a federal judge to fine the lawyers, ban them from practicing in the Eastern District in Michigan and refer them to the Wolverine State's bar for grievance proceedings.)

related to election fraud which by their very nature are challenging to bring because of the short time available to file suit. This Court granted the request for expedited briefing, ECF No. 24, and based solely on the initial pleadings and responses, dismissed the TRO Motion <u>a mere eight days later on December 7, 2020</u>. (See ECF No. 62). Further, thereafter Plaintiffs expeditiously moved for voluntary dismissal of the November 29, 2020 Amended Complaint, ECF No. 6, because the relief requested in the Amended Complaint appears to now have become moot.

Plaintiffs moved as expeditiously as possible, while acting in the best interests of their clients, from the outset through the termination of this proceeding, it is the City that seeks to prolong this proceeding with meritless claims for sanctions, supported solely by incendiary accusations and ad hominem attacks on Plaintiffs' counsel and willful misrepresentations of Plaintiffs' claims and motives.

## V.    Rule 11(b)(2), (b)(3): Plaintiffs Legal Claims Had Evidentiary Support and Were Not Frivolous

The commentary applicable to determining Rule 3.1. Meritorious Claims and Contentions explains:

> The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. What is required of lawyers is that they inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good-faith arguments in support of their clients' positions.

MRPC 3.1. 'As amended, the rule "stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed." *Merritt v. Int'l Ass'n of Machinists & Aero. Workers*, 613 F.3d 609, 626 (6th Cir. 2010), (*citing Id.* (*citing* Fed. R. Civ. P. 11 advisory committee's note to the 1983 amendment); *see also Century Prods., Inc. v. Sutter*, 837 F.2d 247, 250 (6th Cir. 1988)).

Rule 11 is "not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories," and "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct" based on what was "reasonable to believe" at the time of filing. *INVST Financial Group, Inc. v. Chem-Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir. 1987), *cert. denied*, 484 U.S. 927 (1987). (quoting Fed. R. Civ. P. Rule 11. Notes of Advisory Committee on Rules -- 1983 Amendment). Plaintiffs' central claim -- whether Presidential Electors had standing to bring federal constitutional claims under the Electors Clause and other constitutional provisions -- a was a novel claim for which there was no controlling authority in the Sixth Circuit, but for which there was support in other circuits.

As the Supreme Court has observed in a similar statute providing for recovery of attorney's fees for frivolous claims:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic would discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).  The Supreme Court affirmed the denial of attorney's fees where, as here, the defendant prevailed on "an issue of first impression requiring judicial resolution."  *Id.* (internal quotations omitted).  "If the area of law is considered complex and uncertain, however, Rule 11 sanctions are rarely granted …"  *Balfour Guthrie, Inc. v. Hunter Marine Transport, Inc.*, 118 F.R.D. 66, 74 (M.D. Tenn. 1987) (*citing Vatican Shrimp Co. v. Solis*, 820 F.2d 674, 681 (5th Cir. 1987)).

### A. Plaintiffs Had Reasonable Basis for Legal Claims

### 1.   Standing

Plaintiffs' central claim was that the Michigan Presidential Elector Plaintiffs had standing to file claims for violation of the Electors Clause, as well as standing to bring Equal Protection and Due Process claims and under the Fourteenth Amendment as candidates for office and as voters.  While the court found that Plaintiffs' claims lacked standing, the fact is Plaintiffs made a good faith legal argument under Article III, § 2, of the U.S.  Constitution which provides that,

> "The judicial Power shall extend to all Cases, in Law and Equity, arising
> under this Constitution, the Laws of the United States, and Treaties made,
> or which shall be made, under their Authority[.]"

"It is clear that the cause of action is one which 'arises under' the Federal Constitution."  *Baker v. Carr*, 369 U.S. 186, 199 (1962) (A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured

by the Constitution, when such impairment resulted from dilution by a false tally; or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.).

These claims were not frivolous as they had support in other circuits, and there was not at the time of filing, any controlling authority in the Sixth Circuit. Instead, there was a circuit split on the elector standing. Plaintiffs relied on a very recent case where the Eighth Circuit interpreted the presidential elector provisions of Minnesota law that were nearly identical to Michigan's electoral law as giving electors standing, as candidates for office, under the Electors Clause to challenge state law violations. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws). In that case, the Eighth Circuit Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." The Third Circuit, in a case dealing with a failed congressional candidate, not a Presidential elector, reached a different conclusion in *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020).

The existence of a circuit split on candidate standing demonstrates that Plaintiffs and counsel had a reasonable basis for their claims and that their position was not frivolous. In fact, the existence of a circuit split can defeat a motion for sanctions even if the position taken runs counter to current controlling authority. *See, e.g., Hunter v.*

*Earthgrains Co. Bakery*, 281 F.3d 144, 154-56 (4th Cir. 2002) (vacating district court order imposing Rule 11 sanctions where other circuits had taken legal position contrary to controlling Fourth Circuit precedent). Here, by contrast, there was no controlling Sixth Circuit or Supreme Court authority on elector standing.

### 2. The Eleventh Amendment.

The Supreme Court has held that "[i]t is clear … that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984). However, "[w]hen the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.

This Court determined that Plaintiffs' claims against Governor Whitmer and Secretary of State Benson were "suit[s] against state officials when 'the state is the real, substantial party in interest.'" Dkt. 62, pp. 8-9. Plaintiffs respectfully disagree with that conclusion. Their Complaint alleges *ultra vires* executive conduct in violation of state law. Plaintiffs' cause of action is premised on the fact that Defendants Whitmer and Benson have acted inconsistently with state and federal law. Accordingly, in Plaintiffs' view, the state is not the real party in interest. If it were, then no citizen could ever maintain a cause action against a state defendant. Ultimately, the point is that the resolution of this issue is fact-intensive, not "clear."

### 3. Laches.

Laches is an equitable doctrine that is necessarily fact-dependent. After a diligent search, Plaintiffs have been unable to locate any analogous case in which a court imposed sanctions on a plaintiff for bringing a claim that the court subsequently deemed barred by laches.

In the instant case, most of Defendants' conduct did not become apparent until Election Day. Thereafter, Plaintiffs diligently collected dozens of affidavits and drafted a seventy-five page initial complaint detailing each of its claims. Plaintiffs filed their Complaint a mere two days after the Michigan Board of State Canvassers certified the election results. Plaintiffs had a reasonable argument for the roughly twenty-one day delay between Election Day and the filing of this Complaint. As such, sanctions would be grossly inappropriate on this basis.

### 4. Mootness.

Plaintiffs and this Court disagreed on the question of whether or not the relief Plaintiffs sought was moot. The Court essentially concluded that it did not have the power to "decertify" election results once those results had been certified by the Governor. In delivering its reasons, the Court did not cite any controlling case law in support because this is a novel area. (*See* ECF No. 62, Court Op. and Order) However, in their complaint to the US Supreme Court on December 7, 2020, the state of Texas, joined by 18 other state attorney generals, believed a federal court did have the authority to decertify or otherwise invalidate certified state elections results. (See Plaintiffs' Brief

in Opposition to 1927 Sanctions] Accordingly, Plaintiffs' reasonable arguments in support of their entitlement to relief cannot be sanctionable on this basis.

**B.    Dismissal on Equitable Grounds Should Not Be Basis for Sanctions**

Equitable remedies allow that "substantial justice may be attained in particular cases where the prescribed or customary forms of ordinary law seem to be inadequate." 27A Am. Jur. 2d Equity § 1 (*citing Securities and Exchange Com'n v. U.S. Realty & Imp. Co.,* 310 U.S. 434, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940)). By its very nature, equitable claims are heavily fact and circumstance dependent and a particularly bad fit for sanctions when relief is denied. Litigants must know that they can come to court seeking out of the box equitable remedies in unusual disputes, without fear of sanctions. While equitable defenses, such as latches or mootness, may foreclose relief given a particular fact pattern it is particularly unlikely that the relief requested is factually or legally baseless because of the purposefully flexible nature of equity.

**C.    Dismissal for Failure to Adequately Plead Claims Is Not Basis for Sanctions.**

While the Court's rationale for dismissing Plaintiffs' Equal Protection and Due Process claims appears to be that the Court accepted the claims of the City and other parties that Plaintiffs' either failed to adequately plead these claims or to allege facts that, if true, would have stated a claim for relief. *See* ECF No. 62 at 33-34. "Although a legal claim might be so inartfully pled that it cannot survive a motion to dismiss, such a flaw will not in itself support Rule 11 sanction--only the lack **any** legal or factual basis

is sanctionable." *Hunter*, 281 F.3d at 153 (emphasis added). *See also id.* ("Creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment") (internal quotations omitted). A district court, however, should not impose sanctions so as to chill creativity or stifle enthusiasm or advocacy. *See Securities Indus. Ass'n v. Clarke,* 898 F.2d 318, 322 (2d Cir. 1990).

Moreover, plaintiffs and counsel "need not have in hand before filing enough proof to establish the case." *Samuels v. Wilder*, 906 F.2d 272, 274 (2d Cir. 1990). It "requires only an outline of case," and "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case ..." *Id.* (internal citations and quotations omitted). Here, there is a disagreement about the significance of the facts and testimony supporting Plaintiffs' complaint, particularly with respect to the allegations of differential weighting of Republican and Democratic votes by Dominion voting machines, discriminatory enforcement (or nonenforcement) of state election laws, and other illegal and discriminatory conduct at the TCF Center described in sworn eyewitness testimony. Plaintiffs alleged that this illegal and unconstitutional conduct did not affect all voters equally, and that it resulted in counting of illegal votes predominantly for Democrats and not counting legal votes for Republican voters. This Court found that Plaintiffs' allegations could not support these claims, and dismissed eyewitness statements in sworn testimony who believed that they observed vote switching or destruction as unsupported, and similar allegations as "theories, conjecture, and speculation that such alterations *were possible*." ECF No. 62 at

25

34.  But these are precisely the types of credibility determinations that could have been made at an evidentiary hearing, and allegations that could have found additional evidentiary support if discovery had been permitted.

The central goal of Rule 11 sanctions is the deterrence of baseless filings and the curbing of abuses. *Photocircuits Corp. v. Marathon Agents*, 162 F.R.D. 449, 451, (1995) (citing *Cooter & Gell v. Hartmarx Corporation,* 496 U.S. 384, 393, 110 S. Ct. 2447, 2454, 110 L. Ed. 2d 359 (1990**)**; *Caisse Nationale De Credit Agricole-CNCA v. Valcorp,* 28 F.3d 259 (2d Cir. 1994); *McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 21 (2d Cir. 1990) (Rule 11 was enacted to "discourage dilatory and abusive litigation tactics and eliminate frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process."). Rule 11 is designed to deter parties from abusing judicial resources, not from filing complaints. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 411, 110 S. Ct. 2447, 2464, 110 L. Ed. 2d 359, 385, (J. Stevens, 1990).

## VI.    Rule 11(b)(3): Plaintiffs Factual Allegations Had Evidentiary Support and/or Would Have Support After Further Discovery or Investigation

### A.    Plaintiffs' Factual Allegations Have Not Been "Debunked."

As an initial matter, the only contested factual allegations that may be before this Court (assuming the Motion is not dismissed as procedurally improper or on other grounds) are those in the Motion served on December 15, 2020, and filed with this Court on January 5, 2021.  The only "specific conduct" identified in the Motion are "[t]he allegations about supposed fraud in the processing and tabulation of absentee

26

ballots by the City at the TCF Center," which according to the City, "have been rejected by every court that has considered them," ECF No. 78 at 7, but does not cite to any case where this was "debunked." *Id.* Nor could they because it appears that no court has addressed these factual allegations on the merits or held an evidentiary hearing.

While factual allegations made for the first time in the January 5, 2021 Brief are not properly before this Court for failure to comply with Rule 11(c)(2)'s safe harbor and 21-day notice requirement, Plaintiffs will nevertheless demonstrate that the City of Detroit's claims are without merit. The City of Detroit heavily relies on the Wayne County Circuit Court's opinion and order in *Constantino v. Detroit*, Case No. 20-014780-AW (Nov. 13, 2020), ECF No. 78 at 13-18 ("*Constantino I*"), *aff'd*, 950 N.W.2d 707 (Mich. Nov. 23, 2020) ("*Constantino II*"). There, the circuit court denied a motion for preliminary injunctive relief that included many of the same factual allegations regarding misconduct at the TCF Center, supported by sworn affidavits from many of the same fact witnesses, as were included in the Complaint, Amended Complaint, and TRO Motion. ECF Nos. 1, 6, 7.

In doing so, the City neglects to mention that the Circuit Court, like this Court, did not conduct an evidentiary hearing. And Defendants fail to point out how it that case substantively differs from the case at bar which addressed a widespread pattern of actual fraud. The City also neglects to mention that three Michigan Supreme Court judges in *Constantino* issued concurring and dissenting opinions finding serious allegations of fraud that needed to be investigated. The Rule 11 Advisory Committee

27

Notes direct district courts to consider minority opinions in determining whether an attorney has conducted a reasonable inquiry as required. Fed. R. Civ. P. Rule 11, Notes of Advisory Committee – 1993 Amendment (directing district courts to take into account "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions").

Specifically, in his dissenting opinion, Justice Viviano highlighted the fact that the Circuit Court's "credibility determinations were made without the benefit of an evidentiary hearing," which "[o]rdinarily … is required where the conflicting affidavits create factual questions that are material to the trial court's decisions on a motion for preliminary injunction" under Michigan state law. *Constantino II*, 950 N.W.2d at 710 n.2 (Viviano, J. dissenting). In his view, "**[t]he trial court's factual finding have no significance** …" *Id.*, at 710-711 (emphasis added).

Justice Zahra, in a concurring opinion joined by Justice Markman, also disagreed with the Circuit Court's decision not to hold an evidentiary hearing. They also appear to have found the factual allegations of these witnesses to have some merit:

> Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by affiants …, among whom is Ruth Johnson, Michigan's immediate past Secretary of State."

*Id.* at 708 (Zahra, J., concurring). Justice Zahra therefore urged the Circuit Court to "meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants …" *Id.*

A court may, and given the exigencies of time sometimes must, act on motions for preliminary injunctive relief based on "the parties' bare affidavits," *Id.* at 710 (Viviano, J. dissenting), without an evidentiary hearing. However, such purported factual findings cannot be given preclusive effect much less form the basis for finding that factual allegations made in sworn affidavits lacked evidentiary support. Plaintiffs' Amended Complaint presented over 200 sworn fact witness (as well as sworn affidavits from more than a dozen expert witnesses (that were not addressed in *Constantino I* or *Constantino II*), that constitutes more than sufficient evidentiary support to meet the requirements of Rule 11, even before conducting any discovery which likely would have resulted in additional evidence supporting Plaintiffs' allegations.

While district courts are required to articulate a basis for awarding sanctions, nothing requires them to explain their reasons for not ordering sanctions." *Gibson v. Solideal USA*, Inc., 489 Fed. Appx. 24, 32, 2012 FED App. 0740N (6th Cir. 2012) (*cited Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996) (addressing a district court's silence on its reason to deny sanctions under its inherent powers); *see also Eaton Aerospace, L.L.C. v. SL Montevideo Tech.*, 129 F. App'x 146, 153 (6th Cir. 2005).

In the event this Court declines to deny the City's Motion and consider imposing Rule 11 sanctions under Rule 11(b)(3) it must first conduct an evidentiary hearing to make credibility determinations for Plaintiffs' witnesses. *See, e.g., Donaldson v. Clark*, 819 F.3d 1551, 1561 (11th Cir. 1987) ("when a court is asked to resolve an issue of credibility

...the risk of an erroneous imposition of sanctions under limited procedures and the probably value of additional hearing are likely to be greater.")  A hearing is further required in light of the draconian, punitive, and unprecedented nature of the City of Detroit's proposed sanctions: "[T]he more serious the possible sanction both in absolute size and in relation to actual expenditures, ***the more process that will be due.***" *Id.* (emphasis added).  Moreover, "[w]hen, as here, the case was dismissed without a trial,  due process may require some kind of hearing." *Davis v. Crush*, 862 F.2d 84, 89 (6th Cir. 1988) (internal quotations omitted).

### B.    Plaintiffs Provided Adequate Evidentiary Support for Factual Allegations and/or Would Have After Reasonable Opportunity for Further Investigation or Discovery

The standard is more importantly, to survive a motion to dismiss, respondents need only allege "enough facts to state a claim to relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309, 1322, 179 L. Ed. 2d 398, 413, (2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  Nevertheless, the City begins its motion with language that claims Plaintiffs have "lied," to this court.  Such outrageous and unprofessional allegations are entirely unacceptable.  The City cannot back up its absurd allegation. Proffering expert reports that are disputed by plaintiffs' experts does not make counsel liars.  And, if this were simply the ranting of a third rate five-man Detroit law firm, we would dismiss this behavior as pathetic unprofessionalism.  But these are the dirty,

media-attention hungry, slanderous and completely out-of-bounds statements by representatives of the City of Detroit. It should not be countenanced by this Court.

Rule 11 specifically says, "(d) *Inapplicability to Discovery. This rule does not apply to disclosures and discovery requests, responses, objections, and motions under Rules 26 through 37.* USCS Fed Rules Civ Proc R 11(d). None of the allegations and evidence proffered by the plaintiffs were allowed to be developed through discovery. None of the defense witnesses or evidence were permitted to be tested through discovery. Awarding Rule 11 sanctions on such a bare record is unprecedented and wrong.

The Amended Complaint presented expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

> A. A report from Russell Ramsland, Jr. showing the "physical impossibility" of nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (*see* Ex. 104 ¶14);
>
> B. A report from Dr. Louis Bouchard finding to be "statistically impossible" the widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval (11:31:48 on November 4), *see* Ex. 110 at 28);
>
> C. A report from Dr. William Briggs, showing that there were approximately 60,000 absentee ballots listed as "unreturned" by voters that either never requested them, or that requested and returned their ballots. (*See* Ex. 101);
>
> D. A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain

townships/precincts over 2016, and thus indicated that nearly 87,000 anomalous and likely fraudulent votes came from these precincts. (*See* Ex. 102);

E.     A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden totaling over 190,000 suspect "excess" Biden votes (whereas turnout in Michigan's 74 other counties was flat). (*See* Ex. 110);

F.     A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, 224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all (*i.e.*, the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), as well as an additional 217,271 ballots for which there was no return date (*i.e.*, consistent with eyewitness testimony described in Section II below). (*See* Ex. 110);

G.     A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precinct, but that the Democrat advantage (*i.e.*, the difference in the percentage of Democrat vs. Republican absentee voter) was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated.  (*See* Ex. 110); and

H.     A report by an affiant whose name must be redacted to protect his safety who concludes that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three and five point six percentage points.  Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400.  However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted." (*See* Ex. 111 ¶13).

(*See* ECF 6, Pls. Am. Compl. at par. 16).  And Plaintiff's December 4, 2020 response

included signed and sworn Rebuttal sworn statements in response to Defendant-

Intervenor's response, from Plaintiffs' expert witnesses, Russell Ramsland, William

Briggs, Eric Quinell, and expert testimony submitted under seal. (*See* ECF No. 49, Exhs. 1-4).

## **Young and Quinell**

The language invoked by Defendants is largely inappropriate in their attack on Dr. Young and Dr. Quinell. Defendants argue generally and broadly that these highly qualified individuals submitted reports that are "sloppy" and show "incomprehensible ignorance." (See ECF No. 78, p. 19). While Defendants are not examining these witnesses before a trier of fact they appear instead to seek to prejudice the court with hyperbole, without a counter expert or even a citation to published expert literature. Dr. Quinell holds a Ph.D. in computer arithmetic and is an electrical engineer who works in silicon computation devices and herein opines on a mathematical anomaly. In a reply that was submitted to this court Dr Quinell explained:

> These mathematical anomalous vote gains, until explained and/or investigated are of a large enough quantitative magnitude and consequence that the barrier of speculation should be held to engineering and mathematical standards, not to those of political science and editorial publications.
>
> In statistics, any "new population" may be added and absorbed to the whole- this population seems to have 8,000 voters who didn't appear in 2016 that parachuted in and voted 80 Dem/ 20 Rep – which is in complete opposition to Troy's moderate voting history. In a technique called "resampling", any new population that is added to an existing one is expected to behave and slightly change the behavior of the existing mass, testable by re-simulating the same dataset with the existing distribution mathematical qualities. Resampling in this case puts this new population deep into the tail of its own distribution, indicating again a completely new

phenomena that needs explaining.  Why would a populous increase its own turnout by 15% over 2016, and 98% of that go to one candidate?  Mathematically this behavior is anomalous to its own dataset.

What "literature" exists to explain that absentee ballot requests are a single variable – with a perfect scalar multiple of Democrats above Republicans – with a Pearson coefficient of 0.797?  Every precinct where a Republican voted by absentee guaranteed roughly 1.7 Democrats to vote absentee, regardless of precinct.  This "national phenomenon" of mathematically non-independent variables is not ubiquitous in all the Michigan counties nor in national data…

(See ECF 49-2, pp. 4-6).

The City's bald and toothless disagreement with the experts cited, would at best become a question for a trial or evidentiary hearing through the cross-examination of a witness.  It is not a basis for a Rule 11 motion.

## Spyder/Spider

Defendants attack the Declarant known as Spider because they attack his background - despite the fact that they have not deposed him or otherwise examined him.  Spider's identity and credentials were required to be withheld.  In Plaintiffs' motion to file under seal [ECF No. 8] the reasons were explained.  Nevertheless, defendants do not address the substance of Spider's 17-page report filled with analysis and evidence.  Instead they simply attack his credentials.  This is not a basis upon which to grant a Rule 11 motion.

## Russell James Ramsland

Defendants address Russell James Ramsland and allege that "the Secretary of State report is not even discussed." And based on this assumption, and lack of genuine research, Defendants proceed to allege that he makes false claims. (See ECF No. 78, p. 21). Yet, Mr. Ramsland already responded to the same points raised by defendants' expert, Dr. Rodden, and stands by his conclusions. (*See* Ramsland Reply Report, Docket No 49, Ex. 3 at par 6, filed 12/3/2020). He specifically addresses and thoroughly documents the lack of evidence for the Secretary of State's conclusion and summarizes:

> We do not believe that the Secretary of State report addresses this and states the issue at the time was not on the printed totals tape. The Secretary even states "Because the Clerk correctly updated the media drives for the tabulators with changes to races, and because the other tabulators did not have changes to races, all tabulators counted ballots correctly." This is not the case.

(*See Id.* at p. 12).

The report later summarizes:

> If this had been a user setup issue, then the test ballots they run to verify the results they get by comparing them with the test matrix should have caught that. When they made the software change that that used to tabulate the 11/6/20 rerun, there should be a log of the test ballots run through the system and verified against the test matrix. This alone might not show fraud, but it is a crucial part of the software configuration validation process and apparently was not done. We believe to a reasonable degree of professional certainty that this shows fraud and that vote changing at the local tabulator level has occurred due to a software change in all precincts were Dominion software was used in Michigan. This small sample amplified in a large population area would have major results. Without the explanation of why there was a re-tabulation, why the issue of numbers being off to a significant degree when a vote change was noted, and no further investigation occurred – and when 3 ballots were

removed from the totals that changed the final outcome of one proposal, constitutes a definitive indication of fraud.

(*See Id.* p. 13).

Mr. Ramsland also addresses the "event" reflected in the data are "4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb, and Kent). *Id.* Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount alone is **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.,* 154,188). (See Am. Compl. at pars. 144-145).

Mr. Ramsland further explains in depth in his declaration, which Defendants do not raise or discuss that:

> Mr. Ramsland's analysis of the raw data, which provides **votes counts, rather than just vote shares, in decimal form** provides highly probative evidence that, in his professional opinion, demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting" algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[1] Mr. Ramsland presents the following example of this data – taken from "Dominion's direct feed to news outlets" – in the table below. *Id.*

Mr. Ramsland describes how the RCV algorithm can be implemented, and the use of fractional vote counts as evidence, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

> For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes.  The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done.  Otherwise, votes would be solely represented as whole numbers.  Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals.  *Id.*[3]

(See ECF 6, Am. Compl. at ¶ ¶ 140-141).

## William Briggs / Matt Braynard

Defendants spend the better part of three full pages in this motion for sanctions, disbarment and referral to disciplinary bodies, attacking the credibility of Dr. Briggs, a Ph.D. statistician, with over 100 peer reviewed publications and yet, quite tellingly Defendants did not mention the most pertinent and important part of Dr. Briggs' analysis.  (See ECF No. 78 at pp. 39-43). This was the estimate for how many ballots went missing, calculated from answers to the question (in short) "*Did you return*

---

[3] *See id.* (*quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

*your ballot?*" There can be no arguable ambiguity in that question.  Dr. Briggs estimated that between about 28 to 35 thousand votes were returned but never recorded in Michigan.  This represents significant voter disenfranchisement --which cannot be ignored.

### a. Plaintiffs' Counsel Have Not Acted "Unreasonably or Vexatiously," or Engaged in Any Reckless or Intentional Misconduct to Delay or Increase Defendants' Costs.

Even assuming *arguendo* that this claim were not barred as a matter of law, the State Defendants failed to allege that any specific conduct by Plaintiffs' counsel, or factual allegation or legal claim in the pleadings, that could qualify as "unreasonabl[e] or vexatious[]," as required under Section 1927, or any specific reckless, bad faith or intentional misconduct required under controlling Sixth Circuit precedent.

Instead, the State Defendants simply make blanket assertions that Plaintiffs' counsel has filed a "frivolous lawsuit" and "raised false allegations and pursued unsupportable legal theories."  ECF No. 78 at 44.

Finally, the State Defendants engage in their own unsupported speculation that Plaintiffs' co-counsel filed this lawsuit "hoping not to prevail but to damage democracy," ECF No. 23, a reckless and defamatory claim.  This highlights the lack of specificity in these allegations, with a blanket demand against all counsel whereas liability under Rule 11 is direct, and not vicarious.

### b. Many other attorneys, witnesses and legislative representatives have raised election integrity issues in the Presidential Election of 2020.

Public reports have also highlighted wide-spread election fraud in the Contested States that prompted competing Electors' slates.[1]  In the Navarro report, it is shown that:

At midnight on the evening of November 3, and as illustrated in Table 1, President Trump was ahead by more than 110,000 votes in Wisconsin and more than 290,000 votes in Michigan. In Georgia, his lead was a whopping 356,945; and he led in Pennsylvania by more than half a million votes.  By December 7, however, these wide Trump leads would turn into razor thin Biden leads –11,779 votes in Georgia, 20,682 votes in Wisconsin, 81,660 votes in Pennsylvania, and 154,188 votes in Michigan.

*Id.*, Table 1: A Trump Red Tide Turns Biden Blue[4]

There was an equally interesting story unfolding in Arizona and Nevada. While Joe Biden was ahead in these two additional battleground states on election night –by just over 30,000 votes in Nevada and less than 150,000 votes in Arizona.

*Id.*

Most recently, an attorney in Catania, Italy, Prof. Alfio D'Urso, testified that the US presidential election results were hacked and changed by foreign actors on November 4, 2020 and that a cyber operator was criminally charged for his role in admitted testimony of switching votes from Donald Trump to Joe Biden:

**Arturo D'Elia, former head of the IT Department of Leonardo SpA** has been **charged by the public prosecutor of Naples**, Italy for technology / data manipulation and implementation, of viruses in main computers of Leonardo SpA. December 20, 2020.  D'Elia has been deposed by the presiding judge in

---

[4] *See* EXH. A, copy of Immaculate Deception, Six Key Dimensions of Election Irregularities, The Navarro Report, *available at:* https://bannonswarroom.com/wp-content/uploads/2020/12/The-Immaculate-Deception-12.15.20-1.pdf

Naples, and in sworn testimony states that on 4 11 20, under instruction and direction of U.S. persons working from the U.S. Embassy in Rome, [he] undertook the **operation to switch data from the U.S. election of 3 Nov. 20 from significant margin of victory for Donald Trump to Joe Biden in a number of states where Joe Biden was losing the vote totals**. Defendant states that he was working in Pascara facility of Leonardo SpA and utilized military grade cyber warfare encryption capabilities to transmit switched votes via military satellite of Fucino Tower to Frankfurt Germany...

This Testimony is available and in an attached written affidavit. (*See* **Exh. B**).

Defendants seek to allege, in a nutshell, that Plaintiffs filed a frivolous claim or it must be false, (similar to a *res ipsa* argument) because CISA issued a statement on November 12, 2020 that "the November 3rd Election was the most secure in American history." (*See* ECF No. 78 at p. 8, f.n. 12). But12 days earlier CISA had issued a joint statement with the FBI, entitled a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled:

**Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

This joint cybersecurity advisory was coauthored by the Cybersecurity and Infrastructure Security Agency (CISA) and the Federal Bureau of Investigation (FBI). **CISA and the FBI are aware of an Iranian advanced persistent threat (APT) actor targeting U.S. state websites to include election websites. CISA and the FBI assess this actor is responsible for the mass dissemination of voter intimidation emails to U.S. citizens and the dissemination of U.S. election-related working on the computers. disinformation in mid-October 2020**.1 (Reference FBI FLASH message ME-000138-TT, disseminated October 29, 2020). Further evaluation by CISA and the FBI has identified the targeting of U.S. state election websites was an intentional effort to influence and interfere with the 2020 U.S. presidential election.

(*See* ECF 6, Pls. Am. Compl. (citing Ex. 18 at 1, CISA and FBI Joint Cyber Security Advisory of October 30, 2020)).

Notably, on January 7, 2021 the Director of National Intelligence issued a report titled,

"Views on Intelligence Community Election Security Analysis" which concludes:

> In that same spirit, I am adding my voice in support of the stated minority view – based on all available sources of intelligence, with definitions consistently applied, and reached independent of political considerations or undue pressure – that t**he People's Republic of China sought to influence the 2020 U.S. federal elections**, and raising the need for the Intelligence Community to address the underlying issues with China reporting outlines above.

(*See* **Exh. C**, Copy of DNI report 01/07/21)

Yet, this appeared as a non-partisan issue back in late December of 2019, when three Democrat Senators, Warren, Klobuchar, Wyden, and House Member Mark Pocan wrote about their ***'particularized concerns that secretive & "trouble -plagued companies'" "have long skimped on security in favor of convenience***," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Am. Compl. At p. 59, pars. G and H). Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "*yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy.*" It's also an indictment, he said, "*of the notion that important*

*cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."* (*See Id.*[5]).

Indeed, the House was highly critical of election integrity risks and passed H.R. 2722 on June 27, 2019: *This bill addresses election security through grant programs and requirements for voting systems and paper ballots.*

*The bill establishes requirements for voting systems, including that systems (1) use individual, durable,* **voter-verified paper ballots***; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including* **the prohibition of the connection of a voting system to the internet.**

(*See* Congress.gov/H.R. 2722).

The Michigan state Senate Oversight Committee held the hearing in or about early December, which included testimony from a former senator with expertise on data and technology who explained that the Voting machines were connected to the internet in Detroit. The witness spoke to the committee under oath about voting by dead people, a truck full of ballots coming into the counting center long after the deadline, and vulnerable voting machines[2]. Further, testimony among others including evidence of voters who voted absentee but had fake addresses or were deceased. *Id.*

---

[5] *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Motherboard Tech by Vice, by Kim Zetter, August 8, 2019, https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials*

"What I can say for sure, and swear to you here today, is that overall, **8.9% of the 30,000 absentee ballots that we've gone through and investigated, just in the city of Detroit, were unqualified, fraudulent ballots that should have been spoiled**," Schornak said. He extrapolated about how the 30,000 sample could reflect on all of the absentee votes cast.  "At the lowest levels, if these percentages carry through, this means of the 172,000 [absentee votes] in the city of Detroit, 1,300 of them could be deceased," he told the senators. "We are investigating it. And another 15,000 could have fraudulent addresses, described as living on vacant lots or [in] burnt-down houses."

The claims of fraud in Michigan have gained widespread attention and attacks on witnesses credibility such as when the Michigan Oversight Committee heard from a witness who was an IT specialist for Dominion Voting Systems and she appeared and described what she called "complete fraud" at Detroit's TCF Center[3].  She described the same ballots being repeatedly rescanned over and over.  *Id.* While she is not an affiant in this case, this reflects Michigan's Oversight Committee took statements from many people because the complaints on the lack of integrity reached far and wide within Michigan and within the Contested States.

More recently, John Lott, Ph.D. recently did a study, first published in late December 2020 and updated January 6, 2021 called "*A Simple Test for the Extent of Vote Fraud with Absentee Ballots in the 2020 Presidential Election: Georgia and Pennsylvania Data.*" (*See* Exh D, copy of Dr. Lott's Study).  Dr. Lott's conclusion addresses Michigan and other contested states:

… The voter turnout rate data provides stronger evidence that there are significant excess votes in Arizona, Michigan, Nevada, and Wisconsin as well. While the problems shown here are large, there are two reasons to believe that they are underestimates: 1) the estimates using precinct level

data assume that there is no fraud occurring with in-person voting and 2) the voter turnout estimates do not account for ballots for the opposing candidate that are lost, destroyed, or replaced with ballots filled out for the other candidate.

We highlight the wide-spread complaints of election fraud separate and apart of Plaintiffs' filing and evidence to show that many people have submitted evidence of reports and eye-witness testimony of fraud in the 2020 election.

The State of Texas, along with Alabama, Arizona, Arkansas, Florida, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Utah and West Virginia, sued the Defendant states, Michigan, Wisconsin, Georgia and the Commonwealth of Pennsylvania alleging that each of the Defendant states had election irregularities. (*See* Response to 1927 Motion).

### c. Moreover, Plaintiffs' Complaint plead facts that the Defendant City does not actually dispute many facts plead in the Complaint.

The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount. *See supra* Paragraph 94. The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials. This was not done." *(See* Am. Compl. at par. 136*) (citing* Exh. 104, Ramsland Aff. at ¶10. Mr. Ramsland points out that "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system." *Id.* Further, **such a glitch would not be an "isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed**

**happening in the data** (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped)).” *Id.* Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may “have the same problem.” *Id. (See* Am. Compl. at par. 136*)*

Tabulator issues and election violations occurred elsewhere in Michigan **reflecting a pattern**, where multiple incidents occurred. In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger when: “***A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have been sent to us as absentee votes***,” Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[4] (See Am. Compl. at pars. 131-132).

The Oakland County flip of votes becomes significant because it **reflects a second systems error, wherein both favored the Democrats, and precinct votes were sent out to be counted,** and they were counted twice as a result until the error was caught on a recount. <u>Precinct votes should never be counted outside of the precinct, and they are required to be sealed in the precinct. See generally, MCLS § 168.726. (*See Id*).</u>

These are just a few of the specific facts cited by Plaintiffs, which are not genuinely disputed, while Defendants cite to the Secretary of State’s opinion on a systems error, but Plaintiffs submit with both expert testimony in support, and the undisputed facts that two such incidents of “error” instead reflect evidence **of a pattern of defects** in the voting systems machines of tabulating ballots favoring one candidate not the other. Rather than allowing for a full investigation, these two well documented and known incidents -- which also include the legal violation of counting precinct ballots outside of the precinct, were instead summarily dismissed rather than reviewed substantively. The sheer gravity of those claims, and their implications on the integrity

of our electoral system, justified counsel in pursuing every arguably permissible avenue to assist Plaintiffs in seeking redress.

### d. The State Defendants Failed to Identify Any "Discrete Acts of Misconduct" That Could Have Caused the City to Incur Any Additional Costs.

As shown above, the City has not identified any "discrete acts of claimed misconduct," *Ruben*, 825 F.2d at 990, much less shown that such purported misconduct "cause[d] additional expenses to" the City." *Id.* at 984. Blanket and defamatory assertions cannot meet this requirement. In any case, all of City's expenses are due to the City's voluntary and unnecessary intervention in this proceeding. The City was not named as a party defendant to this action, but rather requested to intervene on its own motion following Plaintiffs' filing of the initial complaint. (ECF No. 5). Indeed, neither the City, nor the other intervenors were a party to this action until this Court granted its motion to intervene by order entered December 2, 2020 (ECF No. 28), after Plaintiffs' First Amended Complaint had already been filed. As a result, they do not have standing to make this claim, and even if the City could demonstrate that either the Complaint or the First Amended Complaint's filing satisfied § 1927 (which it cannot), it cannot trace any expense to Plaintiffs' counsel's filing of the complaint. Since the City entered this litigation on its own motion after the action was already instituted, any sanctions must arise out the City's expense resulting from some unreasonable and prolonging conduct occurring on or after the entry of Court's order of December 2, 2020.

Plaintiffs' counsel has not only done nothing to delay this proceeding, they have in fact taken every reasonable measure to expedite, and then to terminate the proceeding once their claims were no longer viable. This Court granted the request for expedited briefing, ECF No. 24, and based solely on the initial pleadings and responses, dismissed the TRO Motion a mere eight days later on December 7, 2020.  ECF No. 62. Further, Plaintiffs have expeditiously, and concurrently within the 21 days of the service of the motion herein, moved for voluntary dismissal of the November 29, 2020 Amended Complaint, ECF No. 6.

## **CONCLUSION**

For all the foregoing reasons, the Plaintiffs and their counsel respectfully request that this Honorable Court deny the State Defendants' motions for an award of sanctions and attorneys' fees Rule 11. (ECF 78 and 84). Moreover, the City of Detroit should be ordered to pay Plaintiffs' legal fees for opposing this motion pursuant to Federal Rule of Civil Procedure 11(c)(2).

Respectfully submitted,

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA
(P71303)
Attorney for the Plaintiffs
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

47