## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TIMOTHY KING, MARIAN SHERIDAN,**
**JOHN HAGGARD, CHARLES RITCHARD,**
**JAMES HOOPER, DAREN RUBINGH,**

                       **Plaintiffs,**

**v.**

**GRETCHEN WHITMER, in her**
**official capacity as the Governor of the**
**State of Michigan, JOCELYN**
**BENSON, in her official capacity as**
**Michigan Secretary of State and the**
**Michigan BOARD OF STATE**
**CANVASSERS,**

                       **Defendants,**

**and**

**CITY OF DETROIT, DEMOCRATIC**
**NATIONAL COMMITTEE and**
**MICHIGAN DEMOCRATIC PARTY,**

                       **Intervenor-Defendants.**

**No. 2:20-cv-13134**
**Hon. Linda V. Parker**
**Mag. R. Steven Whalen**

---

Stefanie Lambert Junttila (P71303)
Attorney for Plaintiffs
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

Scott Hagerstrom (P57885)
Attorney for Plaintiffs
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom @yahoo.com

Gregory J. Rohl (P39185)
Attorney for Plaintiffs
41850 West 11 Mile Road, Suite 110
Novi, Michigan 48375
248.380.9404
gregoryrohl@yahoo.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Attorney for Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

## PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION FOR SANCTIONS UNDER 28 U.S.C. § 1927

Plaintiffs Timothy King, Marian Sheridan, John Haggard, Charles Ritchard, James Hooper, and Daren Rubingh ("Plaintiffs"), by and through their counsel, respectfully request that this Honorable Court enter an order denying Defendants Governor Whitmer, Secretary Benson, and the Board of State Canvassers' (collectively "the State Defendants'") Motion for an Award of Sanctions. (ECF No. 105).

Plaintiffs have voluntarily dismissed their complaint as amended, rendering all defense motions to dismiss moot. The State Defendants' newest request for sanctions under 28 U.S.C. § 1927 is barred as a matter of law and must be denied for reasons more fully explained in the Memorandum in Support below filed pursuant to Local Rule 7.1(d)(1)(A).

State Defendants' have now filed three sanctions motions against Plaintiffs and Plaintiffs' counsel (ECF 70,84, 105)[1]. Two of the motions are for sanctions under Rule 1927. These repetitive motions, preceded by public press releases by the State Defendants, violate the very rules they claim to enforce. They are not meant to preserve the integrity of the legal profession or to complain about repetitive and vexatious

---

[1] ECF No. 84, NOTICE of Joinder/Concurrence in 78 MOTION for Sanctions, *for Disciplinary Action, for Disbarment Referral and for Referral to State Bar Disciplinary Bodies* filed by City of Detroit by Jocelyn Benson, Gretchen Whitmer (See Court Docket, Entered: 01/14/2021)

litigation. They are a new form of political retribution.  Such abuse of the law  has no place in this court and is contrary to the law it hypocritically invokes.

As explained in Plaintiffs' prior responses to the seriatim motions for sanctions filed by the State Defendants and the Intervenors, the pleadings in this case were supported by hundreds of factual and expert affidavits, as well as substantial documentation.  Together, the filing amounts to nearly 1,000 pages.  State Defendants' conclusory and disingenuous arguments that Plaintiffs filed this case with no evidence and with unfounded allegations is belied by the voluminous record before this court. There is no basis whatsoever for sanctions against the Plaintiffs. Further, if this Court were inclined to give any serious regard to the instant motion, Plaintiffs **request a full Evidentiary Hearing** to present evidence in support of the Plaintiffs' claims.

For these reasons and the reasons stated more fully in the Memorandum in Support below, Plaintiffs respectfully request that this Court deny the State Defendants' motion for sanctions.

**PLAINTIFFS' OPPOSITION MEMORANDUM**

**TO STATE DEFENDANTS' MOTION FOR SANCTIONS**

**Table of Contents**

I. The State Defendants' Redundant Motion is
Itself a Violation of Section 1927. ...................................................................1

   A.   State Defendants Fail to State a Basis for Sanctions
Because of The Tweets Cited. ...................................................................3

   B.   Counsel's Out of Court Statements are Further Protected
under Litigation Privilege – and if Unrelated are Protected by the First
Amendment. .................................................................................................5

II.   State Defendants Publicly Violate Professional Conduct. ......................7

III.   Sanctions Against Plaintiffs fail to Meet the Legal Standard. .................16

IV.   The Authorities Relied on By the State Weigh Against Sanctions.........19

V.   Plaintiffs Had Reasonable Basis for Legal Claims.................................24

   A.   Standing and Mootness ..........................................................................24

   B.   The Eleventh Amendment .....................................................................30

   C.   Laches .....................................................................................................31

VI.   Dismissal on Equitable Grounds Should Not Be Basis for Sanctions. ..............32

VII.   Dismissal for Failure to Adequately Plead Claims,
Assumed Only Arguendo, Is Still Not Basis for Sanctions. ...................32

VIII.   Other Evidence of Potential Fraud and Investigations
Plaintiffs Did Not Rely on For the Case but That Supports the
Evidence Plaintiffs Did Provide..............................................................36

IX.   Plaintiffs' Amended Complaint and the Undisputed Facts Show
Tabulation Machines Flipped Votes in Only One Direction in Michigan. .........43

   A.   Russell James Ramsland ..........................................................................46

   B.   William Briggs.........................................................................................49

   C.   Young and Quinell...................................................................................50

# Table of Authorities

## Cases:

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787, 135 S. Ct. 2652, 192 L. Ed. 2d 704 (2015) ……………………..…….29

*Baker v. Carr*, 369 U.S. 186 (1962) …………………………………...….. …...…..25

*Beverly v. Shermeta Law Grp., PLLC*, 2020 U.S. Dist. LEXIS
88541, 2020 WL 2556674 (6th Cir. 2020)…………………………….…....1, 17, 18, 19

*Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308 (6th Cir. 1997)……………22

*Bognet v. Secy Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020)………………………26

*Bush v. Gore*, 531 U.S. 98 (2000) (Rehnquist, C.J., concurring)……………...….……..29

*Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020)………………………………............26

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)……………………...………18

*Constantino v. Detroit*, Case No. 20-014780-AW (Nov. 13, 2020),
aff'd, 950 N.W.2d 707 (Mich. Nov. 23, 2020)………………………………...……….33

*Curling v. Raffensperger*, Civil Action No. 1:17-cv-2989-AT, 2020 U.S. Dist. LEXIS
188508, 2020 WL 5994029 (N. Dist. GA. 2020)……………………...…………37, 38

*Del Monte Fresh Produce v. U.S.*, 570 F.3d 316 (D.C. Cir. 2009)……………………..30

*FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335 (7th Cir. 2010)…………...…………..23

*Henrick v. Mealor*, 2019 U.S. Dist. LEXIS 115463,
2019 WL 3027013 (6th Cir. 2019) ……………………………………………………6

*Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144 (4th Cir. 2002)……………...…26, 35

*In re Ruben* 825 F.2d 1225 (6th Cir. 1987)…………………………………………...20

*Jones v. Continental Corp.*, 789 F.2d at 1229-30 (6th Cir. 1986)…………………… . . .21

*Lawrence v. Burdi*, 314 Mich. App. 203,
886 N.W.2d 748 (Mich. App. 2016)…………………………………………....….....6

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S. Ct. 1309,
179 L. Ed. 2d 398, 413, (2011)……………………………………………………...50

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361,
201 L. Ed. 2d 835, (2018)…………………………………………………………..7

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,
104 S. Ct. 900,  79 L. Ed. 2d 67 (1984)……………………….……………..………30

*Red Carpet Studios Div. of Source Advantage, Ltd. V. Sater*,
465 F.3d 642 (6th Cir. 2006) …………………………………………………………17

*Ridder v. City of Springfield*, 109 F.3d 288 (6th Cir. 1997) …………………………….21

*Samuels v. Wilder*, 906 F.2d 272 (2d Cir. 1990)…………………………….....……..35

*Saenz v. Kohl's Dep't Stores, Inc.*, 2020 FED App. 0618N (6th Cir. 2020),
2020 U.S. App. LEXIS 34753,  2020 WL 6393335……………………….............17

*Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520 (6th Cir. 2006)…………..19, 20

*Securities Indus. Ass'n v. Clarke*, 898 F.2d 318 (2d Cir. 1990)…………………………35

*Smiley v. Holm*, 285 U.S. 355,
52 S. Ct. 397 L. Ed. 795 (1932)……………………..………………………………29

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,
194 L. Ed. 2d 635 (Thomas J., Concurring, 2016)……………………………..…..27

*Texas v. United States*, 749 F.2d 1144 (5th Cir. 1985). ……………………..……...28

*United States v. Alvarez*, 567 U.S. 709, 132 S. Ct. 2537,
183 L. Ed. 2d 574 (2012)……………………………………..………………….7

## Statutes/ Rules/ Other

Constitution Article III, § 2………………………………………………………25

Amendment XII……………………………………..………...27, 29

Michigan Rules of Professional Conduct, MI RPC 1.0 …………………...13

MI RPC 3.1……………………………………………………………….26

MI RPC 3.4…………………………………………………………….14

MI RPC 3.5……………………………………………………..……9

MI RPC 3.6 (a)………………………………………………….…....10

MIRPC 8.4(c)…………………………………………………………..13

28 U.S.C. § 1927…………………………………………………16, 17

Hamilton, Alexander. The Federalist No. 68, at 410-11 (C. Rossiter, ed. 1961) 28

27A Am. Jur. 2d Equity § 1………………………...………………….……..32

Congress.gov/ H.R. 2722…………………………………………...40

Fed. R. C. P. Rule 11, Notes of Advisory Comm……………………………34

**Exhibits:**

Exh. A, MI Attorney General's Website, 02/01/21……………..………………..9

Exh. B Copy of NY Supreme Court, Oswego County, ECF filing 20202-1376,

filed 02/02/2021)……………………………………………………32

Exh. C, MI Senators' and Representatives' Letter to Secretary of State Benson,
November 16, 2020 ………………………………………………………..40

Exh. D, copy of Dr. Lott's 1/6/21 Study……………………………………42

Exh. E, Spreadsheet of filings nationally………………………………...……..23

Exh. F, Copy of the mailed Notice to Plaintiffs on December 15, 2020………..11, 12

Exh. G, Dana Nessler February 7, 2021 Newsletter…………………..…….15

## Question Presented

Whether sanctions can be imposed under Section 1927 for the mere filing of a substantial complaint supported by sworn affidavits and in violation of the core of the Constitution: the Right to Petition the government for grievance.

## I.  The State Defendants' Redundant Motion is Itself a Violation of Section 1927.

The State Defendants already requested an award of sanctions against Plaintiffs in their Motion to Dismiss wherein the relief requested specifically stated: "including the award of sanctions and/or costs and fees incurred in defending against this baseless lawsuit." While they failed to properly caption their filing, Plaintiffs, nevertheless, filed an opposition explaining why sanctions in this case would be inappropriate.   In the Sixth Circuit, even were a court to make "the mere finding that an attorney failed to undertake a reasonable inquiry into the basis for a claim does not automatically imply that the proceedings were intentionally or unreasonably multiplied." *Beverly v. Shermeta Law Grp., PLLC*, 2020 U.S. Dist. LEXIS 88541, *2-3, 2020 WL 2556674 (6th Cir. 2020) (*citing Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997).   State Defendants' submitted exhibits in support of their motions which are based on the costs for responding to the Amended Complaint.  As a preliminary matter, §1927 motions are not based on Amended Complaints, but instead are based on dilatory conduct in multiplied filings.  As stated above, Section 1927 sanctions are not imposed "based on the filing of an initial complaint that turns out to be meritless." *Beverly*, 2020 WL2556674 at *1.

The State Defendants' current Motion for Sanctions constitutes State Defendants' third "bite at the apple" because they also filed a Joinder/Concurrence to the City Defendant's Motion for Sanctions (ECF 78) which was docketed as a Notice

of Joinder/ Concurrence, (because there is no such filing as a Concurrence) to the City

of Detroit's Motion for Sanctions.    It was in fact a Joinder to the City's Motion for

Sanctions. ECF 78.  Yet Attorney General Nessel and State Defendants have lodged

three motions requesting sanctions against the undersigned in what appears to be

dilatory and inconsistent with Rule: 3.2, "Expediting Litigation: A lawyer shall make

reasonable efforts to expedite litigation consistent with the interests of the client."

Indeed, the case at bar was commenced on November 25, 2020 and was effectively

over on December 7, 2020, when this Court denied plaintiffs' motion for a TRO.

    Undisputedly, the Plaintiffs' pleadings in this case were supported by hundreds

of factual and expert affidavits and substantial documentation.  Nessel, Benson and

Whitmer in fact admitted that the Plaintiffs have not filed repetitive or vexatious

litigation and all, and admit that Plaintiffs had significant support in their filings when

they argued that in the most recent motion for sanctions:

> **While this case has not required the filing of numerous pleadings
> by defense counsel**, given the length and complexity of Plaintiffs' filings,
> the  novel  claims  and  unprecedented  relief  requested,  **the  case  has
> involved significant review, research, and drafting.**
>
> Plaintiffs' November 25 complaint was 211 paragraphs long, and the total
> filing consisted of 830 pages, which included numerous exhibits for which
> no separate index or description was provided. (ECF No. 1, PageID.1-
> 830.) Plaintiffs' amended complaint, filed November 29, was 233
> paragraphs long, and the filing consisted of 960 pages. (ECF No. 6,

Amend. Compl., PageID.8721831.)[2]
(*See* ECF 105, p. 28).

### A.      State Defendants Fail to State a Basis for Sanctions Because of The Tweets Cited.

State Defendants engage in their own unsupported speculation—similarly to that of the City of Detroit—as to why Plaintiffs' filed this lawsuit. They state in part, "[w]hile this effort was unsuccessful, the terrible by-product of Plaintiffs' and their counsels' efforts is reflected in the January 6 insurrection at our Nation's Capital."  This is a reckless and defamatory claim—such egregious slander it should not be countenanced by a court of law.

These Plaintiffs did not dignify the City of Detroit's outrageous and absurd allegation that Plaintiffs or their counsel had anything to do with the tragic death of Ashlee Babbitt or others who died at the Capitol on January 6th.  The City argued that "there is blood on Lin Wood and Sidney Powell's hands and on the hands of all those who pushed this lawsuit...".[3]  In response, counsel merely pointed out that these egregious and defamatory allegations have no basis in fact and have no place before this court. Now, for a second time, counsel is again forced to addresses such irresponsible allegations from an Attorney General who joined in the City's filing and who now makes the preposterous claim that the "by product" of this lawsuit is the violence on January 6th at the Capitol.

---

[2] *See* ECF No. 105, State Defs' Current Mot. for Sanctions at p. 28.
[3] See City Defendant/ Intervenor Reply, ECF No. 103. at p. 1

As a reminder to this court, Plaintiffs' TRO was denied on December 7, 2020. There is no evidence that Plaintiffs' filing had anything to do with the conduct of a small cadre of people on January 6 at the Capitol. None. And the proponents of these outrageous comments know this. Yet, they are using this Court as a stage to make outrageous political statements and smear the reputation of outstanding lawyers who have practiced in the greatest traditions of the bar for decades. Such political mudslinging and smear campaign should not be countenanced by this Court.

The tweets by Plaintiffs' counsel, which State Defendants did not cite in their pleadings, but the City of Detroit included in its Reply, are constitutionally protected speech. There is no factual or evidentiary basis upon which this Court could rationally conclude that—as Defendant Intervenor malignly suggests—counsel is responsible for the January 6 events at the Capitol because "Sidney Powell approvingly retweeted someone calling the assault a "last resort to petition the government for grievances." That was re-tweeted long after the incident at the Capitol was well underway. (See ECF Doc. 103, Exh. 6) and simply means "seeking justice denied by authority" – which is an old concept.

Further, State Defendants cite to two tweets by Sidney Powell on January 2, 2021 related generally to election fraud. As this Court is well aware, there has been no court order, protective order or otherwise in place against either party prohibiting engagement with the press. Unlike State Defendants, who have engaged with the press on multiple

occasions,[4] Sidney Powell's tweets name no individual, do not attack any individual's credibility, nor specifically mention any evidence. Rather, they generally comment on the plaintiffs' claims in the case—a case which was publicly filed and freely accessible both through an online docketing system, and through the nonprofit webpage of Defending the Republic, www.defendingtherepublic.org. Had there been a violation of court gag order on counsel, then a motion might be appropriate… however, Ms. Powell's own commentary on the merits of Plaintiffs' case lacks relevance to the State Defendants', and for that matter, the City's Motions for sanctions.

### B. Counsel's Out of Court statements are further protected under Litigation Privilege – and if unrelated are protected by the First Amendment.

As a preliminary matter,

Statements made by judges, attorneys, and witnesses during the course of judicial proceedings are absolutely privileged if they are relevant, material, or pertinent to the issue being tried." *Oesterle v Wallace*, 272 Mich App 260, 264; 725 NW2d 470 (2006) (emphasis added). "The immunity extends to every step in the proceeding and covers anything that may be said in relation to the matter at issue, including pleadings and affidavits." *Couch v Schultz*, 193 Mich App 292, 295; 483 NW2d 684 (1992) (emphasis added). What a litigant considers to be pertinent or relevant is given much freedom, and the privilege is liberally construed as a matter of public policy "so that participants in judicial proceedings may have relative freedom to express themselves without fear of retaliation." *Sanders v Leeson*

---

[4] For example, AG Nessel, Gov. Whitmer, Secretary Benson Seek Disbarment of Attorneys for Pushing Election Fraud Narrative, 02/01/2021 https://www.michigan.gov/ag/0,4534,7-359--551080--,00.html

*Air Conditioning Corp.*, 362 Mich 692, 695; 108 NW2d 761 (1961) (quotation marks and citation omitted); see also Couch, 193 Mich App at 295. The statement "need not be strictly relevant to any issue involved" in the litigation. 3 Restatement Torts, 2d, § 586, cmt c, p 248.

*Lawrence v. Burdi*, 314 Mich. App. 203, 217-218, 886 N.W.2d 748, 757, (Mich. App. 2016).

The Sixth Circuit recently explained that Tennessee courts have recognized a "litigation privilege" that bars defamation claims for "statements made in the course of judicial proceedings which are relevant and pertinent to the issues." …Tennessee courts have expressly extended this absolute privilege to "communications preliminary to proposed or pending litigation." *Henrick v. Mealor*, 2019 U.S. Dist. LEXIS 115463, *4-5, 2019 WL 3027013 (6th Cir. 2019) (further citations omitted.)  Thus, Counsel's tweets are irrelevant here.  On the contrary, counsel has the fundamental right to express their opinion.

Even if the out of court statements about the Plaintiffs' claims generally are deemed unprotected by the Judicial Proceedings Privilege, these tweets do not relate to any individual or the reputation of any person, but to the Plaintiffs' claims generally. Nevertheless, even if the speech is detested, Justice Stephens writing for the Court has made clear when in *Alvarez*, the Supreme Court held in finding the Stolen Valor Act unconstitutional that, "*the Nation well knows that one of the costs of the First Amendment is that it protects the speech we detest as well as the speech we embrace. Though few might find respondent's*

statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression." *United States v. Alvarez*, 567 U.S. 709, 727-728, 729-730, 132 S. Ct. 2537, 2551, 183 L. Ed. 2d 574, 594, (2012). 'Speech is not unprotected merely because it is uttered by "professionals."' *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-2372, 201 L. Ed. 2d 835, 847, (2018). Setting a precedent to sanction an attorney whose case is denied at the district court level on procedural grounds is a grave abuse of the disciplinary process and potentially constitutes intimidation for filing a grievance against the government, which is a core protection of the First Amendment.

## II.    State Defendants Publicity Violate Professional Conduct.

State Defendants put out headlines and talking points under the official color of law and the authority of their offices to attempt to punish Ms. Powell, and improperly influence this Court through whipping up massive press converge and negative public opinion against Plaintiffs and their counsel and undisputedly seeking to destroy their reputations.  This court should say, "no." It will not participate in this frenzied political witch hunt by giving credit to sanction motions that are frivolous.

State Defendants have repeatedly made statements in the press attacking individual attorneys, and most often Sidney Powell, for Plaintiffs – each by name and seeking disbarment to destroy their reputations - while these baseless sanctions motions are all pending against counsel and plaintiffs.

The Michigan.gov website for the Attorney General's Office on February 1, 2021 includes the following:

LANSING - Michigan's top three elected officials are asking for the disbarment of four attorneys who pushed a false narrative of widespread election fraud in legal proceedings before multiple judges and courts - including the nation's highest judicial body, the U.S. Supreme Court - in their frivolous lawsuit, King v. Whitmer.

Michigan Attorney General Dana Nessel's office on Thursday filed motions for sanctions in federal court against the same four lawyers, Michigan attorneys Greg Rohl, Scott Hagerstrom and Stefanie Junttila, along with Texas attorney Sidney Powell.

**Today, Nessel joined with Gov. Gretchen Whitmer and Secretary of State Jocelyn Benson – all three licensed attorneys themselves - in filing complaints with the Attorney Grievance Commission of the State of Michigan and the State Bar of Texas, asking that the attorneys be disbarred and lose their privilege to practice law in those states.**

**"These attorneys filed a complaint based on falsehoods, used their law license in an attempt to disenfranchise Michigan voters and undermine the faith of the public in the legitimacy of the recent presidential election, and lent credence to untruths that led to violence and unrest," Nessel said. "In doing so, they violated their oath and the ethical rules to which they are bound, abused the court system, and compromised the administration of justice – an important foundation of our civil society and the very bulwark four democratic institutions. Anything short of disbarment would be an injustice to the American people."**

**"The 2020 general election was the most secure in our nation's history, and these lawyers abused their authority by filing meritless, frivolous lawsuits for the sole purpose of undermining public faith in the election," said Benson. "They must be held accountable for this unprecedented attack on our democracy and prevented from replicating such harm in the future."**

Court filings in King v. Whitmer, which sought to overturn

President Joe Biden's electoral victory in Michigan, were legally frivolous and supported by false evidence. The courts denied the plaintiffs any relief on numerous rounds. Similar lawsuits were filed in Pennsylvania, Georgia, Wisconsin and Arizona, and all failed. **Attorneys Powell and Junttila went so far as to brazenly misrepresent facts in a filing to the U.S. Supreme Court, claiming that the Michigan Legislature had endorsed competing slates of Republican and Democratic electors, when in reality, the Legislature's leaders stood by the slate of electors chosen by Michigan's voters.**

(See **Exh. A,** Copy of Website on 02/01/2021 for Michigan.gov/AG page) (emphasis added).

This press release is on the Michigan.gov government website, paid for by tax-payers on behalf of the public, emphasizing that Nessel, Benson and Whitmer are acting in their representative capacities under the color of law.  These public statements violate Michigan Professional Conduct Rule: 3.5, "Impartiality and Decorum of the Tribunal, A lawyer shall not: (a) seek to influence a judge, juror, prospective juror, or other official by means prohibited by law."  This statement specifically naming individuals is posted on the government website while sanctions motions are pending in this Court.

On its face it also appears in violation of the Michigan Rules of Professional Conduct 3.6 which states in relevant part:

(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter…

MI RPC 3.6 (a).

The judicial system provides an avenue for attorneys to represent clients to bring forth and attempt to resolve legal disputes. In this case particularly, any individual, much less a licensed attorney and representatives of the government, who reviewed the complaint and opposed it with research and diligence, found, by their own arguments, that the legal claims were plead with particularity.  Their blanket assertions show the lack of specificity required for such individual public attacks.

And this was not the first-time defendants have gone to the press with their attacks on Plaintiffs and their counsel. On December 22, 2020, the Michigan Attorney General publicly stated that she will seek to get plaintiffs' counsel Sidney Powell disbarred which shows that the Rule 11 Motion filing was coordinated with counsel for the DNC, Marc Elias who also made press statements:

> "These **are flagrant lies that Ms. Powell is submitting to,** of all places, the United States Supreme Court in some cases. It's disturbing and it undermines our entire profession, and she has to be held accountable," Nessel told Detroit reporters. "We'd be asking there be action taken against **her** law license including **potential disbarment."[5]**

---

[5] Michigan Attorney General Wants to Disbar Sidney Powell, Pro-Trump Attorneys:  Michigan is moving to disbar Sidney Powell and other pro-Trump attorneys for the work exposing credible accusations of voter fraud.  The National File, By Frankie Stockes by Frankie Stockes December 26, 2020.

*See  also,*  https://nationalfile.com/michigan-attorney-general-wants-to-disbar-sidney-powell-pro-trump-attorneys/; see also  "The Democratic attorney general also plans to pursue court costs and fees and to file complaints with the attorney grievance commission, Nessel told reporters Tuesday." Sanctions sought against lawyers who pushed to overturn Michigan's election, the Detroit News, by Beth LeBlanc and Craig Mauger, December 22, 2020 and

The Rule 11 motion referenced in this statement related to ECF 78, the Defendant Intervenor's Rule 11 Motion, which Nessel, Benson and Whitmer joined, but which had not yet even been filed or served on Plaintiffs, (the notice was first served December 15, 2020 and later the motion filed and served on January 5, 2021) (See **Exh. F**, copy of 1/15/2020 Notice to Plaintiffs), but

> "it was briefly tweeted out by Marc Elias, an attorney from the Washington-based firm Perkins Coie, LLP who has regularly intervened in these cases on behalf of the Democratic Party and the Biden campaign."[6]

Marc Elias, who represents the DNC, apparently coordinated with Nessel, Benson and Whitmer, is quoted in the article which include:

> "The key 'factual' allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been debunked," the sanctions motion states. "The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center have been rejected by every court which has considered them. If any of the claims in this lawsuit had merit, that would have been demonstrated in those cases."
> (*See Id.*)

---

https://www.detroitnews.com/story/news/local/michigan/2020/12/22/nessel-seek-sanctions-against-lawyers-challenging-election-results/4009929001/The Motor City's motion asks a federal judge to fine the lawyers, ban them from practicing in the Eastern District in Michigan and refer them to the Wolverine State's bar for grievance proceedings.)

[6] Adam Klasfeld, *Detroit Is Trying to Get Sidney Powell Fined, Banned from Court, and Referred to the Bar for Filing the 'Kraken',* lawandcrime.com, December 15, 2020 https://lawandcrime.com/2020-election/detroit-is-trying-to-get-sidney-powell-fined-banned-from-court-and-referred-to-the-bar-for-filing-the-kraken/).

But this statement is an inaccurate representation, when it is undisputed that there has been no evidentiary hearing much less the opportunity for discovery in the case… so the credibility or the documents attached to the Complaint were not examined in discovery nor was further discovery attainable. Moreover, Marc Elias, on behalf of the DNC, Intervenors in this case, recently filed a claim of election fraud in New York on February 2, 2021 in a race over the November 3, 2020 election in New York's 22nd District. He and his firm, Perkins Coie make the allegations of election fraud long after those Plaintiffs brought their case, which was first filed in November of 2020. Mr. Elias' allegation of election fraud rests *primarily* over a discrepancy of **nine (9)** votes. (*See* **Exh**. **B**, Copy of NY Supreme Court, Oswego County, ECF filing 20202-1376, filed 02/01/2021). That Order to Show Cause was filed much later than Plaintiffs' case for which AG Nessel, coordinated with Mr. Elias, is seeking Plaintiffs' counsels' disbarment. Mr. Elias, himself, now apparently agrees that the voting machines can cause fraudulent results. Notably, Mr. Elias was the very lawyer who procured through FusionGPS much of the work of creating the completely baseless "Steele dossier"—fomenting the "Russia collusion" hoax with which the DNC assaulted the prior administration for years—despite knowing it was false. The duplicity is palpable.

Similarly, the City of Detroit emailed a notice of its intent to file sanctions motions on December 15, 2020 to Plaintiffs' counsel, purportedly to provide "notice to correct" under Rule 11. (See **Exh**. **F**). The City's lawyer stated: "It's time for this

nonsense to end," Detroit's lawyer David Fink told Law & Crime in a phone interview.
"The lawyers filing these frivolous cases that undermine democracy must **pay a price**,"
Fink added.

Yet Sanctions Motions and the ethical complaints before the bar are not to be
used for political gain or activity. The Michigan Professional Rules of Conduct remind
us, that the purposes of the rules can be subverted when they are invoked by opposing
parties as procedural weapons:

> …**Furthermore, the purposes of the rules can be subverted when**
> **they are invoked by opposing parties as procedural weapons. The**
> **fact that a rule is a just basis for a lawyer's self-assessment, or for**
> **sanctioning a lawyer under the administration of a disciplinary**
> **authority, does not imply that an antagonist in a collateral**
> **proceeding or transaction has standing to seek enforcement of the**
> **rule.** Accordingly, nothing in the rules should be deemed to augment any
> substantive legal duty of lawyers or the extra disciplinary consequences of
> violating such a duty.

Michigan Rules of Professional Conduct, Rule 1.0 Scope and Applicability, Preamble,
a Lawyer's Responsibilities (emphasis added).

Further, Rule 8.4(c) states that: It is professional misconduct for a lawyer to:

(c) engage in conduct that is prejudicial to the administration of justice.

Additionally, relevant to Plaintiffs' case is information which includes reporting
that exposed election fraud, but Attorney General Nessel sent a Cease-and-Desist
letter in November 2020 to a journalist who exposed an audio recording of poll

workers training and discussing election process.  There the Attorney General

threatened criminal prosecution if the journalist did not take down the reporting.[7]

> Michigan Attorney General Dana Nessel sent a 'cease and desist' letter to Big League Politics about their exclusive content #DetroitLeaks that outlined poll worker training wherein workers were bragging about committing voter fraud in a variety of different ways.

> The intrepid reporter who broke this story, Shane Trejo, was also one who was a witness for the voter fraud in Detroit. Trejo says he considers this "witness intimidation" and is fearful that it will be used as pretext for some criminal actions[8].

In addition to the potential abuse of power at issue, it also appears to violate

Rule: 3.4 Fairness to Opposing Party and Counsel which specifically states:

> A lawyer shall not:
> (f)      request a person other than a client to refrain from voluntarily giving relevant information to another party, unless:
> (1)      the person is an employee or other agent of a client for purposes of MRE 801(d)(2)(D); and
> (2)      the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

MI. Rule 3.4.

---

[7] *SECOND #DetroitLeaks Video Released — Court Case That Gave Ballot Observers Close Proximity to Election Workers WAS HIDDEN FROM GOP OBSERVERS! (VIDEO),* by Jim Hoft, Gateway Pundit, November 19, 2020.  https://www.thegatewaypundit.com/2020/11/second-detroitleaks-video-released-court-case-gave-ballot-observers-close-proximity-election-workers-hidden-gop-observers-video/

[8] *HUGE EXCLUSIVE: Michigan AG Dana Nessel Sends Cease and Desist Order to Journalist Demanding He Erase His #DetroitLeaks Video Showing Voter Fraud Training — OR FACE CRIMINAL PROSECUTION,* The Gateway Pundit, by Jim Hoft, November 09, 2020 https://www.thegatewaypundit.com/2020/11/huge-exclusive-michigan-ag-dana-nessel-sends-cease-desist-order-journalist-demanding-erase-detroitleaks-video-showing-voter-fraud-training-face-criminal-prosecution/

Most recently, a February 7, 2021 email newsletter entitled "Dana's Dispatch: Legal Actions Against Trump, Scam Alerts & Holding Seditionist Lawyers Accountable" stated:

> The people who were involved in the insurrection believed what was in these lawsuits; they truly drank the Kool-Aid. And these lawyers mixed it, stirred it and served it up in Dixie cups. We have an obligation to fight back against these types of lies and efforts to undermine our election & democracy. As attorneys and elected officials in Michigan, if we aren't the proper authorities to bring such a complaint, who is?

(See **Exh. G**, copy of Newsletter of 11/7/21).

This inflammatory and defamatory language and characterization of Plaintiffs' lawsuit and counsel appears directly before a campaign fundraising pitch, which encourages newsletter recipients to "**Make sure Dana has the resources she needs to keep fighting for us**" and thanks recipients or donors for "being a part of Dana's re-election campaign!" It appears that Dana Nessel is fundraising off of this public attack on counsel.

State Defendants and their counsel's attempt to chill free speech and investigation into any election integrity issues raised by Plaintiffs. This litigation abuse is contrary to the spirit of the Constitution and the First Amendment—in addition to a bold lack of professional conduct toward opposing counsel. It is a flagrant violation of the above-cited Michigan Rules of Professional Conduct. Sanction motions brought by attorneys in violation of those rules should not even be considered, let alone, granted by this Court.

### III.    Sanctions Against Plaintiffs fail to Meet the Legal Standard.

Section 1927 provides in pertinent part that:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (emphasis added).

While there appears to be no court rule for the opportunity to file three sanctions motions, the triplicate and repetitive filings make State Defendants the dilatory and abusive party who should be subject to sanctions.  Even many of the cases cited in the current brief were cited to in prior motions, ECF Nos. 72, 73 and 78.  Moreover, State Defendants specifically attempted to work around a Joinder to the City's Motion by attempting to "reserve their option" to file a subsequent motion once the Court decides on the City of Detroit's Motion.

As Plaintiffs argued in opposition to the Joint Defendants' first sanctions motions, while Plaintiffs have moved as expeditiously as possible from the outset through the termination of this proceeding, it is the Defendants who seeks to prolong this proceeding with meritless claims for sanctions, supported solely by incendiary accusations and ad hominem attacks on Plaintiffs' counsel, willful misrepresentations of Plaintiffs' claims and motives, and apparently deliberate ignorance of the black letter law barring their claims for sanctions.  The State Defendants' disregard of the Rules of Procedure and their dilatory filing of a third sanctions motion is precisely the type of

intentional misconduct and "abuse [of] the judicial process," that should be sanctioned. See *Red Carpet Studios Div. of Source Advantage, Ltd. V. Sater*, 465 F.3d 642, 646 (6th Cir. 2006) (citations omitted).  Thus, it is the State Defendants for which Section 1927 and other judicial sanctions would be appropriately levied upon.

The United States Court of Appeals for the Sixth Circuit recently reiterated the legal standard for imposing sanctions under 28 U.S.C. § 1927:

> Yet absent bad faith, we decline to impose sanctions against this trial attorney whose legal argument on appellate procedure—though flawed— might conceivably be characterized as that of a reasonably zealous advocate. *Cf. Mys*, 736 F. App'x at 117-18 ("Section 1927's purpose is to 'deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.'") (*quoting Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006)). In our view, sanctions should generally be reserved only for "truly egregious cases of misconduct." (*Williams v. Shelby Cnty. Sch. Sys.*, 815 F. App'x 842, 846 (6th Cir. 2020) (*quoting Ridder*, 109 F.3d 288, 299 (6th Cir. 1997)).

*Saenz v. Kohl's Dep't Stores, Inc.*, 2020 FED App. 0618N (6th Cir. 2020), 2020 U.S. App. LEXIS 34753, *11, 15, 2020 WL 6393335.

State Defendants argue and seek sanctions under Section 1927 in large part simply because they filed motions to dismiss Plaintiffs' Amended Complaint on December 22, 2020 while this case was pending on appeal to both the Sixth Circuit and the U.S. Supreme Court.[9]  In *Beverly*, this Court first noted that the "plain language of the statute only penalizes attorneys who vexatiously and unreasonably 'multiply' proceedings," and

---

[9] *See* ECF No. 10, State Defs.' Current Mot. for Sanctions. at p. 15 and p. 28.

that Section 1927 sanctions are not imposed "based on the filing of an initial complaint that turns out to be meritless." *Beverly v. Shermeta Law Grp., PLLC,* 2020 U.S. Dist. LEXIS 88541, 2020 WL 2556674 *at \*1.10* (6th Cir. 2020).

As the Supreme Court has observed in a similar statute providing for recovery of attorney's fees for frivolous claims:

> [I]t is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic would discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22 (1978).  The Supreme Court affirmed the denial of attorney's fees where, as here, the defendant prevailed on "an issue of first impression requiring judicial resolution." *Id.* (internal quotations omitted).

> State Defendants admit that the basis for their demand for sanctions was their filing of motions as the initial responses to Plaintiffs' Amended Complaint.  Specifically, they noted "**this case has not required the filing of numerous pleadings by defense counsel . . .**"  Their complaint then about the length and complexity of the pleading belies their assertion it was baseless.[11]

---

[10]  The *Beverly* court also explained that this interpretation was consistent with the Sixth Circuit's decision in *Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997).  The *Ridder* court affirmed the imposition of Section 1927 sanctions against an attorney "for excess costs resulting from his initial filing and persistent assertion of meritless claims," because the attorney pursued his case "long after it should have become clear that his claims lacked any plausible basis," and thereby "forced the [defendant] to defend this action for a period **in excess of five years**." *Ridder*, 109 F.3d at 288-89 (emphasis added).  Here, this case effectively lasted just eight days; from November 29, 2020 when the Amended Complaint was filed, to December 7 when the Court issued its decision.  When compared to the five-year time frame in *Beverly*, the State Defendants' arguments are abjectly absurd.
[11] *See* ECF No. 105, State Defs' Current Mot. for Sanctions at p. 28.

State Defendants' motion can easily be disposed of because they admit that Plaintiffs' counsel have not multiplied these proceedings.  The Defendants have not been required to file numerous pleadings in this case. Further, if as suggested, Plaintiffs' claims were so "frivolous," as a matter of law, then the State Defendants would not have required to undertake "significant review, research and drafting" in mounting their opposition.

In sum, Plaintiffs cannot show that Plaintiffs conduct in bringing this case "vexatiously and unreasonably 'multipl[ied]' proceedings." *Beverly, 2020 WL 2556674 at *1.12.*  Only the Defendants have vexatiously and baselessly multiplied the proceedings.

## IV.    The Authorities Relied on By the State Weigh Against Sanctions.

None of the authorities cited by the State in support of sanctions is persuasive in this case because they are all sharply distinguishable on their facts.  Defendants cite to *Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 530, (6th Cir. 2006) (ECF No. 105, at 12, 18) arguing "that an attorney reasonably should know that a claim pursued is frivolous" – but Defendants fail to explain that there the Sixth Circuit reversed an order for sanctions under both § 1927 and Rule 11 finding the plaintiff's claim not unreasonable even where the court may have been right on its findings to include finding that the plaintiff lacked standing.  *See Id.*  And the Sixth Circuit in support of the plaintiff's claim therein cited to plaintiff's general right to petition the government:

Moreover, lest we not forget, the language of the First Amendment itself

---

[12] The *Beverly* court also explained that this interpretation was consistent with the Sixth Circuit's decision in *Ridder v. City of Springfield*, 109 F.3d 298 (6th Cir. 1997).   See n. 10 *supra*.

expressly precludes depriving persons of the right to petition the government. U.S. Const. amend. I ("Congress shall make no law . . . abridging . . .the right of the people . . . to petition the Government for a redress of grievances.").

*Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 530, (6th Cir. 2006)

Defendants cite *In re Ruben* 825 F.2d 1225 (6th Cir. 1987), (cited at ECF No. 105, at 12), to argue the legal standard on § 1927 motions, but fail to explain what that case actually held.[13] There, the Sixth Circuit reversed an award of sanctions due to the failure of the District Court to adequately correlate discrete acts by plaintiff's counsel to corresponding increases in defendants' costs, expenses, and fees. 825 F.2d at 990-91. The Court reached this conclusion even though the complaint stated on its face that it was filed one day after the statute of limitations ran, and despite the fact that substantive litigation in the case spanned ***nearly four years***. *Id.* at 980-81 987-88.

Notably, the Sixth Circuit held: "Thus, to sanction an attorney it must at a minimum be shown that the attorney has (1) "multiplie[d] the proceedings" (2) in an "unreasonabl[e] and vexatious[]" manner, and (3) "as a result, causes additional expenses to the opposing party.'" *Id.* at 984. The sanctions must be correlated to "discrete acts of claimed misconduct" and correspond to "the impact upon defendants" of those discrete acts. *Id.* at 990. "[C]are must be taken in assessing attorneys' fees under section 1927 lest attorneys be deterred from their duty to 'represent [a] client zealously." *Id.* (*quoting* Model Code of Professional Responsibility EC 7-1 (1980); and

---

[13] *See* ECF No. 105, State Defs. current motion for sanctions, at p. 12

*citing Colucci v. New York Times Co.*, 533 F. Supp. 1011, 1013-14 (S.D.N.Y. 1982)).

Moreover, in *Jones* v. *Continental Corp.,* (cited by Defendants at ECF No. 105, at 4, 1, 12, 21), the Sixth Circuit reversed another award under § 1927. 789 F.2d at 1229-30, 1231-32 (6th Cir. 1986). There, the award was imposed by the District Court on attorneys for a "sloppy" (inadequately specific) complaint, subsequent failure to cure the complaint's defect despite defense counsel's request for greater specificity, and a refusal to sign a pretrial order which would have simplified the issues for trial. *Id.* The Circuit Court reversed, finding first that the record did not support a conclusion that counsel knew or should have known that "failure to amend their pleadings would retain frivolous claims" or "needlessly obstruct the litigation of nonfrivolous claims." *Id.* at 1230-31. The Court reasoned that "[i]n light of the clarity of the law" on the point that was left ambiguous by the complaint, "*no significant attorney time could possibly have been spent preparing a defense" to potential frivolous claims encompassed therein. Id.* at 1231. While criticizing counsel's complaint, the Court nevertheless concluded that its deficiencies were "so easily resolved that failure to amend cannot be characterized as unreasonable and vexation multiplication of the litigation." *Id.*

Defendants also cite to *Ridder v. City of Springfield*, 109 F.3d 288 (6th Cir. 1997) arguing that "[n]evertheless Plaintiffs pursued the claims against Defendants long after it should have become clear that the claims lacked any plausible factual or [legal] basis." (ECF No. 105 at 21). But in *Ridder* an attorney pursued a municipal liability claim for **five years** without offering any evidence that individual officers had acted pursuant to

a municipal policy, custom, or usage despite the benefit of a full discovery period." *Kidis v. Reid*, 976 F.3d 708, 723 (Sixth Cir. 2020) (*citing Ridder v. City of Springfield*, 109 F.3d at 297-298).

This is not the case here, where a motion for a TRO was denied within eight days of its filing and then immediate appeals were taken to the Sixth Circuit and the US Supreme Court. Notably, the case is now on the Supreme Court's conference calendar for February 19, 2021.

Defendants also cite to *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313, (6th Cir. 1997), in which the Sixth Circuit reversed an award for attorneys' fees and began the legal analysis by citing to the American Rule: "[w]e start with the premise that under the American Rule, absent statutory authorization or an established contrary exception, each party bears its own attorney's fees." *Id.* (*citing Colombrito v. Kelly*, 764 F.2d 122, 133 (2d Cir. 1985) (*citing Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975)). The Sixth Circuit then found that "[a]lthough the district court felt that Big Yank's claim was meritless and was clearly displeased with the actions of its counsel, the bad faith exception requires that the district court make actual findings of fact that demonstrate that the claims were meritless, that counsel knew or should have known that the claims were meritless, and that the claims were pursued for an improper purpose. *Id.* at 314 (*citing Smith Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1375 (6th Cir. 1987)).

In the case at bar, the entire case went from the filing of Plaintiffs' first complaint

on November 25, 2020, until January 14th, 2020, when Plaintiffs dismissed their complaint against these Defendants. Plaintiffs were not dilatory. Moreover, the plaintiffs also had no opportunity for discovery or even any evidentiary hearing. Defendants highlight the lack of specificity in their request for sanctions with a blanket demand against multiple attorneys whereas liability under § 1927 is direct, not vicarious. *FM Indus. v. Citicorp Credit Servs.*, 614 F.3d 335, 340-341, (7th Cir. 2010) (*citing Claiborne v. Wisdom*, 414 F.3d 715, 722-24 (7th Cir. 2005) (liability is restricted to the misbehaving lawyer and may not be transferred to his partners or law firm).

Finally, Plaintiffs' claims regarding election fraud were not, and are not, objectively unreasonable, within the meaning of Section 1927 or otherwise. Dozens of lawsuits were filed in several states regarding similar election fraud claims. (See Exh. **E**, Spreadsheet of filings nationally). The State of Texas, joined by 18 other state attorney generals, filed a complaint in the United States Supreme Court asserting that Michigan's elections should be set aside. *See* Plaintiffs' Response to City of Detroit Rule 1927 Motion, ECF No. 95, PageID.4133. Indeed, there is massive evidence of widespread election fraud—without all but one court that we know of allowing any discovery or holding a hearing allowing the production of evidence. Thousands of citizens have come forward under penalty of perjury to provide their evidence of multiple kinds of fraud. Perhaps the Defendants are lashing out so fiercely here because the court in Antrim County Michigan is ordering discovery against the Michigan Secretary of State, and the Secretary of State of Pennsylvania has already been forced to resign.

The factual evidence submitted by Plaintiffs was never tested through discovery, depositions, or a hearing.  The Defendants' conclusory arguments that the claims are disproven, are false.  The claims that the evidence is false, are wrong.  This case was denied on legal and procedural grounds, not on the underlying factual merits.

Moreover, significantly more probative evidence has come out regarding electoral fraud in Michigan since the TRO Motion was denied, as summarized below.  What the State Defendants cast as dilatory—or more recently incitement to "violent insurrection," "seditious lies" or even apparently murder, (ECF No. 105 at 27, *see also* ECF 103 at 1)—more accurately reflects sharp and outrageous, inflammatory political rhetoric—far worse than bringing a substantial lawsuit supported by multiple experts and sworn affidavits or declarations.  Counsels' representation of Plaintiffs who disagree with the State Defendants does not constitute bad faith—even if the Court strongly agrees with the Defendants.

## V.     Plaintiffs Had Reasonable Basis for Legal Claims.

### A.     Standing and Mootness

Plaintiffs' central claim was that the Michigan Presidential Elector Plaintiffs had standing to file claims for violation of the Electors Clause, as well as standing to bring Equal Protection and Due Process claims and under the Fourteenth Amendment as candidates for office and as voters.  While the court found that Plaintiffs' claims lacked

standing, the fact is Plaintiffs made a good faith legal argument under Article III, § 2, of the U.S. Constitution which provides that,

> "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority[.]"

Article III, § 2.

"It is clear that the cause of action is one which 'arises under' the Federal Constitution." *Baker v. Carr*, 369 U.S. 186, 199 (1962) (A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally; or by a refusal to count votes from arbitrarily selected precincts, or by a stuffing of the ballot box.). These claims were not frivolous as they had support in other circuits, and there was not at the time of filing, any controlling authority in the Sixth Circuit. Instead, there was a circuit split on the elector standing. Plaintiffs relied on a very recent case where the Eighth Circuit interpreted the presidential elector provisions of Minnesota law that were nearly identical to Michigan's electoral law as giving electors standing, as candidates for office, under the Electors Clause to challenge state law violations. *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of Secretary of State in implementing or modifying State election laws). In that case, the Eighth Circuit held that Presidential Electors "have a cognizable interest in ensuring that the final vote tally

reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors." The Third Circuit, dealing with claims from private citizens and a congressional candidate who lost, reached a different conclusion in *Bognet v. Secy Commonwealth of Pa.*, 980 F.3d 336 (3d Cir. 2020). The existence of a circuit split on standing demonstrates that Plaintiffs and counsel had a reasonable basis for their claims and that their position was not frivolous. In fact, the existence of a circuit split can defeat a motion for sanctions even if the position taken runs counter to current controlling authority. *See Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 154-56 (4th Cir. 2002) (vacating district court order imposing Rule 11 sanctions where other circuits had taken legal position contrary to controlling Fourth Circuit precedent). Here, by contrast, there was no controlling Sixth Circuit or Supreme Court authority on elector standing.

As the Michigan Rules of Professional Conduct, 3.1 Meritorious Claims and Contentions, make clear, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous. ***A lawyer may offer a good-faith argument for an extension, modification, or reversal of existing law.***"

As explained by Justice Thomas, "A plaintiff seeking to vindicate a public right embodied in a federal statute, however, must demonstrate that the violation of that public right has caused him a concrete, individual harm distinct from the general population." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1553, 194 L. Ed. 2d 635, 650,

(Thomas J., Concurring, 2016) (*citing Lujan*, 112 S. Ct. 2130, 119 L. Ed. 2d 351). Plaintiffs submit, even if this court is correct on standing, the Plaintiffs had a good faith belief that they suffered a concrete and particularized harm, an individual harm distinct from the general population as Elected Presidential Electors for the State of Michigan, with a right to file a grievance, as their roles are prescribed in the Twelfth Amendment. (See Amendment XII).

Opposing Counsel and Defendants also allege the case was moot and "vexatious" over the pleadings in the case arguing that this argument based on the event of the Michigan Republican slate of Electors voting a dual slate of electors. (See ECF No. 105, PageID.4359). Defendants in so doing deny our American history, where even Senator Gore sought to count votes under the Twelfth Amendment[14].

---

[14] Congress, under Gore as President of the Senate, sought to count the votes under the Twelfth Amendment. Chris Land & David Schultz, *On the Unenforceability of The Electoral Count Act*, 13 Rutgers J.L. & Pub. Pol'y 340, 362.

> "At that moment, Rep. Alcee Hastings (D-FL) rose to object to the inclusion of the Sunshine State's twenty-five electoral votes, seeking to offer a formal challenge to their validity based on the litigated counting irregularities and alleged electoral fraud. Seventeen other objections and points of order were made by House members in the ensuing minutes, ranging from challenging the presence of a quorum, moving to withdraw the House of Representatives from the count to hold a formal debate on voting irregularities, and even remarkably attempting to overturn the parliamentary rulings of Vice President Gore on the previous motions by appealing to the full membership of the House and Senate. Each was overruled perfunctorily, with Gore meekly advising each that "reading the Electoral Count Act as a coherent whole" required that he overrule each objection because they were not seconded by a senator, in writing, pursuant to the statutory requirements of the ECA. Beyond the political fervor in the air of the Hall of the House of Representatives on this day, and Democratic expressions of "solidarity" with Vice President Gore, these overruled objections give rise today to the fundamental *question of whether the ECA is constitutionally enforceable in light of the Rules Clause, entrenchment, and the doctrine of non-delegation." Id.*

The passage of time does not bar fresh challenges to the application of unconstitutional or ultra vires laws or regulations. *Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985). In the Federalist No. 68, Alexander Hamilton provides the rationale both for the unique role of Presidential Electors in electing the President of the United States, and the Vice President's role in the Electoral College. Hamilton first explains that the choice of indirect election through electors, rather than direct democracy, because it is preferable for:

> A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations," and it will "afford as little opportunity as possible to tumult and disorder.

Hamilton, Alexander. The Federalist No. 68, at 410-11 (C. Rossiter, ed. 1961).

While Michigan's state law, cited by Defendants, may make the rules for electors, it would be remiss to ignore the Constitution which is the supreme law of the land. While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2677, 192 L. Ed. 2d 704, (2015), it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S.

355, 365 (1932).  The claims filed by Plaintiffs were not moot because they were filed before the December 14 deadline for electors to vote in their respective estate capitols.

Subsequently, the Electors had the right to press their claims that their votes should be counted by Congress on January 6.  They had the opportunity to vote as set forth by the Twelfth Amendment, which explains how objections from members of Congress to any proffered slate of electors is adjudicated:

> The electors shall meet in their respective states and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;…

Amendment XII.

Michigan's Republican electors attempted to vote at their State Capitol on December 14th but were denied entrance by the Michigan State Police.  Instead, they met on the grounds of the State Capitol and cast their votes for President Trump and Vice President Pence vote.[15]   Plaintiffs had and have the belief as specified in the Constitution that they had a claim for standing.  And the requested relief sought in the

---

[15] *See Michigan Police Block GOP Electors from Entering Capitol*, by Jacob Palmieri, the Palmieri Report, December 14, 2020, https://thepalmierireport.com/michigan-state-police-block-gop-electors-from-entering-capitol/.

Amended Complaint was not moot because it sought prospective relief in injunctive relief to address an act with ongoing live issues, including prospective relief for election fraud and to enforce the constitutional rights of Elected Electoral Officials, both of which is likely to be repeated and will evade review. *Del Monte Fresh Produce v. U.S.*, 570 F.3d 316, 321-22 (D.C. Cir. 2009).

### B.   The Eleventh Amendment

The Supreme Court has held that "[i]t is clear … that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984). However, "[w]hen the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.

This Court determined that Plaintiffs' claims against Governor Whitmer and Secretary of State Benson were "suit[s] against state officials when 'the state is the real, substantial party in interest.'" ECF No. 62, pp. 8-9. Plaintiffs respectfully disagree with that conclusion. Their Complaint alleges *ultra vires* executive conduct in violation of state law. Plaintiffs' cause of action is premised on the fact that Defendants Whitmer and Benson have acted inconsistently with state and federal law. Accordingly, in Plaintiffs' view, the state is not the real party in interest. If it were, then no citizen could ever

maintain a cause action against a state defendant. Ultimately, the point is that the resolution of this issue is fact-intensive—nnot "clear."

## C.   Laches

Laches is an equitable doctrine that is necessarily fact dependent.  After a diligent search, Plaintiffs have been unable to locate any analogous case in which a court-imposed sanctions on a plaintiff for bringing a claim that the court subsequently deemed barred by laches nor should this case have been so barred

In the instant case, most of Defendants conduct did not become apparent until Election Day. Thereafter, Plaintiffs diligently collected dozens of affidavits and drafted a substantive complaint detailing each of its claims and the support thereto. Plaintiffs filed their Complaint a mere two days after the Michigan Board of State Canvassers certified the election results. Plaintiffs had a reasonable argument for the roughly twenty-one-day delay between Election Day and the filing of this Complaint.

Moreover, Marc Elias, counsel for the DNC filed an Order to Show Cause in NY based on the November 2, 2020 election where because of pending litigation and recounts, certification has been delayed.   (See **Exh. B**, and see Court Docket). However, the DNC filing is primarily based on a discrepancy in nine (9) votes in one county – which they argue is sufficient to order further relief…despite the late date and the recount continues to favor the opposing party.   (*See Id*.).   Thus, even Intervenor defendants in this action have taken the position in another case that voting machines

31

used in the 2020 election produced wrong results- while seeking the disbarment of Plaintiffs' counsel in this case.

## VI.   Dismissal on Equitable Grounds Should Not Be Basis for Sanctions.

Equitable remedies allow that "substantial justice may be attained in particular cases where the prescribed or customary forms of ordinary law seem to be inadequate." 27A Am. Jur. 2d Equity § 1 (*citing Securities and Exchange Com'n v. U.S. Realty & Imp. Co.,* 310 U.S. 434, 60 S. Ct. 1044, 84 L. Ed. 1293 (1940)). By its very nature, equitable claims are heavily fact and circumstance dependent and a particularly bad fit for sanctions when relief is denied. Litigants must know that they can come to court seeking out of the box equitable remedies in unusual disputes, without fear of sanctions. While equitable defenses, such as latches or mootness, may foreclose relief given a particular fact pattern it cannot be held that the relief requested is factually or legally baseless because of the purposefully flexible nature of equity.

## VII.   Dismissal for Failure to Adequately Plead Claims, Assumed Only Arguendo, Is Still Not Basis for Sanctions.

Defendants' generally incorporate the City of Detroit's motion for sanctions, which they already joined in the "Concurrance."  Nevertheless, they state: "The City of Detroit's brief in support of its motion for sanctions fully details this point, (ECF No. 78, Detroit Rule 11 Brf, PageID.3644-3649), and Defendants incorporate that argument herein." (See ECF 105 at. PageID.4371).  One repetitive argument raised by Defendants appears to be a reliance on the Wayne County Circuit Court's opinion and order in

*Constantino v. Detroit*, Case No. 20-014780-AW (Nov. 13, 2020), ECF No. 78 at 13-18

("*Constantino I*"), aff'd, 950 N.W.2d 707 (Mich. Nov. 23, 2020) ("*Constantino II*").

In doing so, the Attorney General, the Governor and the Secretary of State fail

to mention that the Circuit Court, like the Eastern District Court, did not conduct an

evidentiary hearing, much less allow for discovery in that case.  And Defendants further

fail to point out how it substantively differs from the case at bar, in which this case

addressed a widespread pattern of actual fraud.  (*See Id.* and see ECF No. 6).

In *Constantino II*, three Michigan Supreme Court judges issued concurring and

dissenting opinions finding serious allegation of fraud that needed to be investigated.  In

a dissenting opinion, Justice Viviano highlighted the fact that the Circuit Court's

"***credibility determinations were made without the benefit of an evidentiary***

***hearing,***" which is **"[o]rdinarily ... is required where the conflicting affidavits**

***create factual questions that are material to the trial court's decisions on a***

***motion for preliminary injunction***" under Michigan state law.  *Constantino II*, 950

N.W.2d at 710 n.2 (Viviano, J. dissenting).  In his view, **"[t]he trial court's factual**

**finding have no significance ...**" *Id.*, at 710-711 (emphasis added). Justice Zahra, in

a concurring opinion joined by Justice Markman, also disagreed with the Circuit Court's

decision not to hold an evidentiary hearing.  They also appear to have found the factual

allegations of these witnesses to have some merit:

> **Nothing said is to diminish the troubling and serious allegations of fraud and irregularities asserted by affiants …, among whom is Ruth Johnson, Michigan's immediate past Secretary of State**."

*Id.* at 708 (Zahra, J., concurring). Justice Zahra therefore urged the Circuit Court to "**meaningfully assess plaintiffs' allegations by an evidentiary hearing, particularly with respect to the credibility of the competing affiants ...**" *Id.*

The Rule 11 Advisory Committee Notes direct district courts to consider minority opinions in determining whether an attorney has conducted a reasonable inquiry as required. Fed. R. Civ. P. Rule 11, Notes of Advisory Committee – 1993 Amendment (directing district courts to consider "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions").

Plaintiffs' claims regarding election fraud were not, and are not, objectively unreasonable, within the meaning of Rule 11 or otherwise. As this Court and defendants have noted, there were several proceedings in state court brought by other parties that are "substantially similar," (ECF No. 62 at 22), and "premised on similar factual allegations and many of the same federal and state claims." *Id.* at 23. Dozens of lawsuits were filed in several states regarding similar election fraud claims. In fact, this Court relied on parallel proceedings in denying the TRO Motion. *Id.*

Plaintiffs' counsel submitted well over two hundred sworn declarations and affidavits, by both fact witnesses and experts. Nevertheless, Plaintiffs have had no

34

opportunity to have those witnesses examined or their credibility even questioned – or access to any discovery that is usually afforded in civil cases. **A court may, and given the exigencies of time sometimes must, act on motions for preliminary injunctive relief based on "the parties' bare affidavits,"** Id. at 710 (Viviano, J. dissenting), without an evidentiary hearing.

The Court's rationale for dismissing Plaintiffs' Equal Protection and Due Process claims appears to be that the Court accepted the State Defendants and other parties' argument that Plaintiffs' either failed to adequately plead these claims or to allege facts that, if true, would have stated a claim for relief. *See* ECF No. 62 at 33-34. However, "[c]reative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." *Hunter*, 281 F.3d at 153 (emphasis added). (internal quotations omitted). A district court, however, should not impose sanctions so as to chill creativity or stifle enthusiasm or advocacy. *See Securities Indus. Ass'n v. Clarke,* 898 F.2d 318, 322 (2d Cir. 1990).

Plaintiffs raised constitutional issues crucial to the foundations of this Republic. Moreover, plaintiffs and counsel "need not have in hand before filing enough proof to establish the case." *Samuels v. Wilder*, 906 F.2d 272, 274 (2d Cir. 1990). It "requires only an outline of case," and "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case …" *Id.* (internal citations and quotations omitted).

There is a disagreement about the significance of the facts and testimony supporting Plaintiffs' complaint, particularly with respect to the allegations of differential weighting of Republican and Democratic votes by Dominion voting machines, discriminatory enforcement (or nonenforcement) of state election laws, and other illegal and discriminatory conduct at the TCF Center described in sworn eyewitness testimony. Plaintiffs alleged that this illegal and unconstitutional conduct did not affect all voters equally, and that it resulted in counting of illegal votes predominantly for Democrats and not counting legal votes for Republican voters. This Court found that Plaintiffs' allegations could not support these claims and dismissed eyewitness statements in sworn testimony who believed that they observed vote switching or destruction, as unsupported, and similar allegations as "theories, conjecture, and speculation that such alterations *were possible*." ECF No. 62 at 34. But these are precisely the types of credibility determinations that could have been made at an evidentiary hearing, and allegations that could have found additional evidentiary support through discovery if it had that been permitted.

## VIII.  Other Evidence of Potential Fraud and Investigations Plaintiffs Did Not Rely on For the Case but That Supports the Evidence Plaintiffs Did Provide.

In a recent pre-election case, a district court in Georgia found significant vulnerability with the Dominion voting machines:

Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software **presents serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted**. While these risks might appear theoretical to some, Plaintiffs have shown how voting equipment and voter registration database problems during the 2019 pilot elections and again in the June and August 2020 primary elections caused severe breakdowns at the polls, severely burdening voters' exercise of the franchise. (See September 28, 2020 Order, Doc. 918.)

*Curling v. Raffensperger*, Civil Action No. 1:17-cv-2989-AT, 2020 U.S. Dist. LEXIS 188508, *173-174, 2020 WL 5994029 (N. Dist. GA. 2020).

The Court further wrote:

The Court recognizes the major challenges facing the Secretary of State's Office in rapidly implementing a new statewide voting system. **Yet the vital issues identified in this case will not disappear or be appropriately addressed without focused State attention, resources, ongoing serious evaluation by independent cybersecurity experts, and open-mindedness**. The Secretary of State and Dominion are obviously not without resources to tackle these issues. And at very least, the Court cannot fathom why, post-election, the State and Dominion would not at least be moving toward consideration of the software upgrade option Dominion originally promised, allowing voters to cast ballots that are solely counted based on their voting designations and **not on an unencrypted, humanly unverifiable QR code that can be subject to external manipulation and does not allow proper voter verification and ballot vote auditing.**

*Id.* at *178-179 (emphasis added).

And the Georgia District Court further found:

But the Court cannot part with that message alone. **The Court's Order**

**has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances.** The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. **The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited**. The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode because of system breach, breakdown, or crashes. **Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.**

The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" — but "when it will happen," especially if further protective measures are not taken. **Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.**

*Curling v. Raffensperger*, supra, 2020 U.S. Dist. LEXIS 188508, *176-178, 2020 WL 5994029 (emphasis added)  Notably, this decision also invalidates any application of laches.  These issues were raised pre-election.

In further support of the election integrity questions that have been raised in Michigan as well as in the other states that had continued to count well after Election Day, the Michigan State Senate Oversight Committee held a hearing in early December,

which included testimony from a former senator with expertise on data and technology

who explained that the voting machines were connected to the internet in Detroit[16].

Michigan State Senators wrote Secretary of State Benson asking for an audit over this

election because of many enumerated discrepancies:

> Each of these allegations is backed up by sworn affidavits of over 100
> Michigan citizens, real people, willing to face legal consequences to their
> lives and livelihoods to stand by their assertions. These claims deserve
> our full attention and diligent investigation to ensure fairness and
> transparency in our election process. We must take every possible step to
> ensure that all Michiganders, and all Americans, have confidence that the
> state of Michigan conducted this election with integrity and accuracy.
> As such, and due directly to these issues, we are requesting that the
> secretary of state authorize a full, independent audit to be conducted to
> investigate each of the accusations listed above prior to the certification
> of any results. This independent audit should aim to achieve completion
> in a timely manner, certainly before Dec. 8, so that Michigan can fully
> participate when the electoral college meets on Dec. 14. The chief priority
> of this audit, however, should be to verify that our election law and
> processes were correctly administered and identify any illegality that may
> have taken place…

(See **Exh. C**, copy of November 16, 2020 letter to Secretary of State Benson).

This letter signed by eleven State Senators and 29 Michigan State Representatives

respectfully explained to the Secretary of State that fundamental concept in our

Michigan Constitution –

> Because of the successful adoption of Proposal 3 in the midterm elections
> of 2018, Section 4 of our Michigan Constitution ensures that "*every citizen
> of the United States who is an elector qualified to vote in Michigan*" has the right to

---

[16] ***Takeaways from the Michigan Senate's Election Fraud Hearing,*** the Daily Signal, by Fred Lucas,
December 1, 2020. https://www.dailysignal.com/2020/12/01/4-takeaways-from-the-michigan-
senates-election-fraud-hearing/

> "*have the results of statewide elections audited, in such a manner as prescribed by law,
> to ensure the accuracy and integrity of elections.*" The Michigan Legislature
> proscribed this process in Public Act 116 of 1954.

(*See Id.*)

Moreover, back on June 27, 2019, the House of Representatives passed a bill on

Election Integrity, H.R. 2722 in an attempt to address this issue of internet connection,

as recently identified by this witness before the Michigan Oversight Committee:

> This bill addresses election security through grant programs and
> requirements for voting systems and paper ballots.
> The bill establishes requirements for voting systems, including that
> systems (1) use individual, durable, voter-verified paper ballots; (2) make
> a voter's marked ballot available for inspection and verification by the
> voter before the vote is cast; (3) ensure that individuals with disabilities
> are given an equivalent opportunity to vote, including with privacy and
> independence, in a manner that produces a voter-verified paper ballot; (4)
> be manufactured in the United States; and (5) **meet specified
> cybersecurity requirements, including the prohibition of the
> connection of a voting system to the internet.**

See Congress.gov/ H.R. 2722.

In Michigan, a witness also spoke to the Michigan Oversight Committee under

oath about voting by dead people, a truck full of ballots coming into the counting center

long after the deadline,[17] and vulnerable voting machines[18].  Recently video has been

---

[17] Recent video released shows two trucks arriving at the TCF Center into the early morning hours of
November 4th and unloading boxes of ballots.  *Exclusive: The TCF Center Election Fraud – Newly Discovered Video
Shows Late Night Deliveries of Tens of Thousands of Illegal Ballots 8 Hours After Deadline*, The Gateway Pundit, by Jim
Hoff, 02/05/2021 https://www.thegatewaypundit.com/2021/02/exclusive-tcf-center-election-fraud-newly-
recovered-video-shows-late-night-deliveries-tens-thousands-illegal-ballots-michigan-arena/

[18] *4 Takeaways from the Michigan Senate's Election Fraud Hearing, the Daily Signal, by Fred Lucas,
December 1, 2020.  https://www.dailysignal.com/2020/12/01/4-takeaways-from-the-michigan-senates-
election-fraud-hearing/.*

produced of the TCF Center and late arriving ballots in the middle of the night with no

chain of custody process.  Further, testimony among others including evidence of

voters who voted absentee but had fake addresses or were deceased.  *Id.*  The timing of

the massive spikes in votes for Biden correlate to the times of the deliveries of these

suspect ballots in Michigan and in Georgia at a minimum.[19]

> "What I can say for sure, and swear to you here today, is that overall, **8.9% of the 30,000 absentee ballots that we've gone through and investigated, just in the city of Detroit, were unqualified, fraudulent ballots that should have been spoiled**," Schornak said. He extrapolated about how the 30,000 sample could reflect on all of the absentee votes cast.  "At the lowest levels, if these percentages carry through, this means of the 172,000 [absentee votes] in the city of Detroit, 1,300 of them could be deceased," he told the senators. "We are investigating it. And another 15,000 could have fraudulent addresses, described as living on vacant lots or [in] burnt-down houses."

*Id.*

The claims of fraud in Michigan gained wide-spread attention when the Michigan

Oversight Committee heard from a witness who was an IT specialist for Dominion

Voting Systems, who described what she called "complete fraud" at Detroit's TCF

Center20.  She described *the same ballots being repeatedly rescanned over and over.  Id.*

---

[19] *See* PureData, *Unmasked: Has the truth about the 2020 election been uncovered?*, Rumble (Feb. 5, 2021), https://rumble.com/vdlomr-unveiled-the-2020-election.html.
[20] *'Sassy' Michigan Dominion worker and GOP witness goes viral after contentious exchange with lawmakers* Washington Examiner, December 2020 https://www.msn.com/en-us/news/politics/sassy-michigan-dominion-worker-and-gop-witness-goes-viral-after-contentious-exchange-with-lawmakers/ar-BB1bBR9w

While that witness was not an affiant in this case, Michigan's Oversight Committee took statements from many people because the complaints on the lack of integrity reached far and wide within Michigan and their goal was to restore confidence in the election process – because as this Court can recognize, it is lacking.

Also not cited in the Plaintiffs' Amended Complaint but further evidence has since been revealed when John Lott, Ph.D. recently did a study, first published in late December 2020 <u>updated January 6, 2021</u> called "*A Simple Test for the Extent of Vote Fraud with Absentee Ballots in the 2020 Presidential Election: Georgia and Pennsylvania Data.*" (*See* Exh. **D**, copy of Dr. Lott's 1/6/21 Study). Dr. Lott's conclusion addresses Michigan and other contested states:

> … The voter turnout rate data provides stronger evidence that there are significant excess votes in Arizona, **Michigan**, Nevada, and Wisconsin as well. **While the problems shown here are large, there are two reasons to believe that they are underestimates: 1) the estimates using precinct level data assume that there is no fraud occurring with in-person voting and 2) the voter turnout estimates do not account for ballots for the opposing candidate that are lost, destroyed, or replaced with ballots filled out for the other candidate.**

Recent evidence is shown in a presentation that first appeared on One America News, in which the host Mike Lindell presents various statements and exhibits documenting wide-spread fraud in the election – and especially in Michigan, including statements from other Michigan counsel who currently have a pending action in Antrim County, which led to the discovery of forensic images that show a deliberate switching

of votes.[21]  This is evidence that had no opportunity to come to light in Plaintiffs' case

– but buttresses the claims Plaintiffs' made.

## IX.    Plaintiffs' Amended Complaint and the Undisputed Facts Show Tabulation Machines Flipped Votes in Only One Direction in Michigan.

Plaintiffs' Amended Complaint plead facts that the State Defendants do not

actually dispute including:

- The first red flag is the Antrim County, Michigan "glitch" that switched 6,000 Trump ballots to Biden, and that was only discoverable through a manual hand recount.  *See supra-Paragraph* **Error! Reference source not found.**.  The "glitch" was later attributed to "clerical error" by Dominion and Antrim Country, presumably because if it were correctly identified as a "glitch", "the system would be required to be 'recertified' according to Dominion officials.  This was not done." *(See* Am. Compl. at par. 136*) (citing* Exh. 104, Ramsland Aff. at ¶10.  Mr. Ramsland points out that "the problem most likely did occur due to a glitch where an update file did not properly synchronize the ballot barcode generation and reading portions of the system." *Id.*  Further, **such a glitch would not be an "isolated error," as it "would cause entire ballot uploads to read as zero in the tabulation batch, which we also observed happening in the data** (provisional ballots were accepted properly but in-person ballots were being rejected (zeroed out and/or changed (flipped))." *Id.*  Accordingly, Mr. Ramsland concludes that it is likely that other Michigan counties using Dominion may "have the same problem." *Id. (See* Am. Compl. at par. 136*)*

- Tabulator issues and election violations occurred elsewhere in Michigan reflecting a pattern, where multiple incidents occurred.  In Oakland County, votes flipped a seat to an incumbent Republican, Adam Kochenderfer, from the Democrat challenger

[21] https://welovetrump.com/2021/02/05/mike-lindell-debuts-absolute-proof-documentary-detailing-the-stolen-election-video-here/

when: "***A computer issue in Rochester Hills caused them to send us results for seven precincts as both precinct votes and absentee votes. They should only have been sent to us as absentee votes***," Joe Rozell, Oakland County Director of Elections for the City of Huntington Woods, said.[22]   (See Am. Compl. at pars. 131-132).

- The Oakland County flip of votes becomes significant because it **reflects a second systems "error," wherein both favored the one party – not the other while precinct votes were sent out to be counted,** and they were counted twice as a result until the error was caught on a recount.   **Precinct votes should never be counted outside of the precinct and they are required to be sealed in the precinct.   See generally, MCLS § 168.726. (*See Id.*) (emphasis added).**

- As Plaintiffs pointed out in their filing, however, and as Mr. Elias's new filing in New York shows, election integrity should be a non-partisan issue:

    In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & *"trouble -plagued companies"' "have long skimped on security in favor of convenience*," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, & Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (*See* Am. Compl. at p. 59, par. G, citing Exh. 16).

The Amended Complaint presented sworn declarations demonstrating that several hundred thousand illegal, ineligible, duplicate, or purely fictitious votes exist and evidence widespread fraud, in particular – and none of these witnesses had an

---

[22]  Bill Laitner, *Fixed Computer Glitch Turns Losing Republican into a Winner in Oakland County,* Detroit Free Press (Nov. 20, 2020), *available at:*
https://www.freep.com/story/news/local/michigan/oakland/2020/11/06/oakland-county-election-2020-race-results/6184186002/.

opportunity to be examined or otherwise present the evidence they relied upon to this

court – or to any other court:

i.    A report from Russell Ramsland, Jr. showing the "physical impossibility" of **nearly 385,000 votes injected by four precincts/township on November 4, 2020, that resulted in the counting of nearly 290,000 more ballots processed than available capacity** (which is based on statistical analysis that is independent of his analysis of Dominion's flaws), a result which he determined to be "physically impossible" (see Exh. 104 ¶14).

ii.   A report from Dr. Louis Bouchard finding to be "statistically impossible" the **widely reported "jump" in Biden's vote tally of 141,257 votes during a single time interval** (11:31:48 on November 4), see Exh. 110 at 28).

iii.  A report from Dr. William Briggs, showing that there were approximately **60,000 absentee ballots listed as "unreturned"** by voters that either never requested them, or that requested and returned their ballots. (See Exh. 101).

iv.   A report from Dr. Eric Quinell analyzing the anomalous turnout figures in Wayne and Oakland Counties showing that Biden gained nearly 100% and frequently more than 100% of all "new" voters in certain townships/precincts over 2016, and thus indicated **that nearly 87,000 anomalous and likely fraudulent votes came from these precincts**. (See Exh. 102).

v.    A report from Dr. Stanley Young that looked at the entire State of Michigan and identified nine "outlier" counties that had both significantly increased turnout in 2020 vs. 2016 almost all of which went to Biden **totaling over 190,000 suspect "excess" Biden votes** (whereas turnout in Michigan's 74 other counties was flat). (See Exh. 110).

vi.   A report from Robert Wilgus analyzing the absentee ballot data that identified a number of significant anomalies, in particular, **224,525 absentee ballot applications that were both sent and returned on the same day, 288,783 absentee ballots that were sent and returned on the same day, and 78,312 that had the same date for all** (i.e., the absentee application was sent/returned on same day as the absentee ballot itself was sent/returned), **as well as an additional 217,271 ballots for which there was no return date**

45

(i.e., consistent with eyewitness testimony described in Section II below).  (See Exh. 110).

vii.   A report from Thomas Davis showing that in 2020 for larger Michigan counties like Monroe and Oakland Counties, that not only was there a higher percentage of Democrat than Republican absentee voters in every single one of hundreds of precincts, but that the Democrat advantage (i.e., the difference in the percentage of Democrat vs. Republican absentee voter) **was consistent (+25%-30%) and the differences were highly correlated, whereas in 2016 the differences were uncorrelated**.  (See Exh. 110); and

viii.   A report by another affiant concluded that "the results of the analysis and the pattern seen in the included graph strongly suggest a systemic, **system-wide algorithm was enacted by an outside agent, causing the results of Michigan's vote tallies to be inflated by somewhere between three- and five-point six percentage points**.  Statistical estimating yields that in Michigan, the best estimate of the number of impacted votes is 162,400.  **However, a 95% confidence interval calculation yields that as many as 276,080 votes may have been impacted**."  (See Exh. 111 ¶13).

ix.   (*See* ECF 6, Pls. Am. Compl. at par. 16).

And Plaintiff's December 4, 2020 response included signed and sworn Rebuttal statements in response to Defendant-Intervenor's response, from Plaintiffs' expert witnesses, Russell Ramsland, William Briggs, Eric Quinell.  (See ECF No. 49, Exhs. 1-4).

## A.   Russell James Ramsland

The City of Detroit Intervenor-Defendant, in ECF No. 78, which State Defendants' joined, first address Plaintiffs' expert Russell James Ramsland's submission and allege that "the Secretary of State report is not even discussed." Based on this assumption, and lack of genuine research, Defendants proceed to allege that he makes

false claims. (See ECF No. 78, p. 21).  Yet, Russell James Ramsland already responded

to the same points raised by defendants' expert, Dr. Rodden. (*See* Ramsland Reply

Report, Docket No 49-3 at par 6.).  He specifically addressed and thoroughly

documents the lack of evidence for the Secretary of State's conclusion and summarizes:

> We do not believe that the Secretary of State report addresses this and
> states the issue at the time was not on the printed totals tape. The Secretary
> even states "Because the Clerk correctly updated the media drives for the
> tabulators with changes to races, and because the other tabulators did not
> have changes to races, all tabulators counted ballots correctly." This is not
> the case.

(*See Id.* at p. 12).

> The report later summarizes:

> If this had been a user setup issue, then the test ballots they run to verify
> the results they get by comparing them with the test matrix should have
> caught that. When they made the software change that that used to
> tabulate the 11/6/20 rerun, there should be a log of the test ballots run
> through the system and verified against the test matrix. This alone might
> not show fraud, but it is a crucial part of the software configuration
> validation process and apparently was not done. We believe to a
> reasonable degree of professional certainty that this shows fraud and that
> vote changing at the local tabulator level has occurred due to a software
> change in all precincts where Dominion software was used in Michigan.
> This small sample amplified in a large population area would have major
> results. Without the explanation of why there was a re-tabulation, why the
> issue of numbers being off to a significant degree when a vote change was
> noted, and no further investigation occurred – and when 3 ballots were
> removed from the totals that changed the final outcome of one proposal,
> constitutes a definitive indication of fraud.

(*See Id.* p. 13).

Russ Ramsland also addresses the "event" reflected in the data which are "**4 spikes totaling 384,733 ballots allegedly processed in a combined interval of 2 hour[s] and 38 minutes**" for four precincts/townships in four Michigan counties (Wayne, Oakland, Macomb, and Kent). *Id.*

Based on Mr. Ramsland's analysis of the voting machines available at the referenced locations, he determined that the maximum processing capability during this period was only 94,867 ballots, so that "there were 289,866 more ballots processed in the time available for processing in the four precincts/townships, than there was processing capacity." *Id.* This amount alone is **nearly twice the number of ballots by which Biden purportedly leads President Trump** (*i.e.*, 154,188). (See Am. Compl. at pars. 144-145).

Further, Mr. Ramsland's analysis of the raw data indicates **vote counts, rather than just vote shares, in decimal form** which is highly probative evidence that demonstrates that Dominion manipulated votes through the use of an "additive" or "Ranked Choice Voting" algorithm (or what Dominion's user guide refers to as the "RCV Method"). *See id.* at ¶12.[1] Mr. Ramsland further describes how the RCV algorithm can be implemented, and the use of fractional vote counts as evidence, with decimal places, rather than whole numbers, in demonstrating that Dominion did just that to manipulate Michigan votes.

For instance, blank ballots can be entered into the system and treated as "write-ins." Then the operator can enter an allocation of the write-ins

among candidates as he wishes. The final result then awards the winner based on "points" the algorithm in the compute, not actual votes. The fact that we observed raw vote data that includes decimal places suggests strongly that this was, in fact, done. Otherwise, votes would be solely represented as whole numbers. Below is an excerpt from Dominion's direct feed to news outlets showing actual calculated votes with decimals. *Id.[23]*

(See ECF 6, Am. Compl. at ¶ ¶ 140-141).

### B.     William Briggs

Dr. Briggs estimated that between about 28 to 35 thousand votes were returned but never recorded in Michigan. This was the estimate for how many ballots went missing, calculated from answers to the question (in short) "*Did you return your ballot?*" This represents significant voter disenfranchisement --which cannot be ignored.

The Plaintiffs were never given an opportunity to be heard on the evidence – and despite submitted signed declarations and affidavits, Defendants attack the submissions of witnesses or counsel's pleadings as based on "lies," – which albeit Defendants' attacks, verbose at they may be, remain unsubstantiated. These are evidentiary issues and credibility questions reserved for a trial, not a TRO motion. Further, with respect to the question of §1927 sanctions, as a preliminary matter, Plaintiffs *need only allege*

---

[23] *See id.* (*quoting* Democracy Suite EMS Results Tally and Reporting User Guide, Chapter 11, Settings 11.2.2., which reads, in part, "RCV METHOD: This will select the specific method of tabulating RCV votes to elect a winner.").

"enough facts to state a claim to relief that is plausible on its face. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45, 131 S. Ct. 1309, 1322, 179 L. Ed. 2d 398, 413, (2011) (*citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Undersigned counsel readily admits that they have zealously advocated for their clients, but strongly denies that they have done so with bad faith or negligently. Indeed, even if this Court ultimately rejects the factual assertions contained in the affidavits proffered in support of the Complaint and First Amended Complaint, it is undeniable that Plaintiffs' counsel provided the Court with voluminous factual support for their claims. (ECF Nos. 6-1 and 6-3).

## C. Young and Quinell

Dr. Quinell holds a Ph.D. in computer arithmetic and is an electrical engineer who works in silicon computation devices and herein opines on a mathematical anomaly, in a reply that was submitted to this court:

> These mathematical anomalous vote gains, until explained and/or investigated are of a large enough quantitative magnitude and consequence that the barrier of speculation should be held to engineering and mathematical standards, not to those of political science and editorial publications.
>
> In statistics, any "new population" may be added and absorbed to the whole- this population seems to have 8,000 voters who didn't appear in 2016 that parachuted in and voted 80 Dem/ 20 Rep – which is in complete opposition to Troy's moderate voting history. In a technique called

50

"resampling", any new population that is added to an existing one is expected to behave and slightly change the behavior of the existing mass, testable by re-simulating the same dataset with the existing distribution mathematical qualities.  Resampling in this case puts this new population deep into the tail of its own distribution, indicating again a completely new phenomena that needs explaining.  Why would a populous increase its own turnout by 15% over 2016, and 98% of that go to one candidate? Mathematically this behavior is anomalous to its own dataset.

What "literature" exists to explain that absentee ballot requests are a single variable – with a perfect scalar multiple of Democrats above Republicans – with a Pearson coefficient of 0.797?  Every precinct where a Republican voted by absentee guaranteed roughly 1.7 Democrats to vote absentee, regardless of precinct.   This "national phenomenon" of mathematically non-independent variables is not ubiquitous in all the Michigan counties nor in national data…

(*See* ECF 49-2, pp. 4-6).

These are just a few of the specific facts that arose in the action, cited by Plaintiffs, which are not genuinely disputed and reflect evidence **of a pattern of defects** in the voting system machines by tabulating ballots that all favor the same candidate and not the other.  Rather than allowing for a full investigation, these two well documented and known incidents—which also include the legal violation of counting precinct ballots outside of the precinct, were instead summarily dismissed rather than reviewed substantively.

The sheer gravity of those claims and their implications on the integrity of our

electoral system, justified counsel in pursuing every arguably permissible avenue to assist Plaintiffs in seeking redress. Even if those claims and counsel's legal theories are ultimately rejected by this Court, this does not render counsel's actions "unreasonable and vexatious." *See Ruben*, 825 F.2d at 984 (warning that "judges faced with motions under section 1927 should be mindful that their individual perturbations will not alone justify a sanction").

In conclusion, the State Defendants have filed not one – but three different motions for sanctions in addition to making public statements under color of law, to disparage Plaintiffs and their attorneys. This conduct appears dilatory and extreme and should not be tolerated by this Court.

Plaintiffs respectfully request the court deny the motion for sanctions for all of the reasons stated herein; and otherwise, Plaintiffs request an Evidentiary Hearing so that the evidence in the Complaint may be open to discovery and full examination.

Respectfully submitted,

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA
(P71303)
*Attorney for the Plaintiffs*
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2021, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA
(P71303)
*Attorney for the Plaintiffs*
500 Griswold Street, Ste. 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com