# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF OSWEGO

---------------------------------------- X
CLAUDIA TENNEY,                          :

        Petitioner,              :

  -against-                              :

OSWEGO COUNTY BOARD OF                   :
ELECTIONS, et al.,

        Respondents.             :

For an Order, etc.                       :
---------------------------------------- X

INDEX NO. EFC-2020-1376
(Justice DelConte)

MEMORANDUM IN SUPPORT OF
PROPOSED ORDER TO SHOW CAUSE
OF RESPONDENT ANTHONY BRINDISI

PERKINS COIE LLP
Marc E. Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Henry J. Brewster (NY Bar No. 5355201)
Shanna Reulbach (admitted *pro hac vice*)
Alexander G. Tischenko (admitted *pro hac vice*)
Alexi M. Velez (admitted *pro hac vice*)
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
HBrewster@perkinscoie.com
SReulbach@perkinscoie.com
ATischenko@perkinscoie.com
AVelez@perkinscoie.com

MARTIN E. CONNOR
61 Pierrepont Street, #71
Brooklyn, New York 11201
Telephone: 718-875-1010
Cell phone: 347-645-9146
Email: mconnorelectionlaw@gmail.com

Attorneys for Respondent Brindisi

## INTRODUCTION

The General Election for the public office of member of Congress, 22nd District of New York occurred on November 3, 2020. Since then, substantial errors and irregularities in the conduct of the election have come to light. As these proceedings have continued, that evidence has only mounted. In addition to failures to follow New York's election law, particularly by Respondent the Oneida County Board of Elections ("Oneida County"), (*see generally* NY St Cts Elec Filing [NYSCEF] Doc No. 110; NYSCEF Doc No. 187), there has also been mounting evidence of significant irregularities in the tabulation of ballots. Because the candidates are currently divided by a vote count of a mere 122 ballots as of this morning, these errors and irregularities threaten to deny the voters the election of their candidate of choice. As a result, a hand audit is warranted under New York law and should be immediately ordered. Specifically, and in the language of the statute, there is substantial evidence which "indicates that there is a likelihood of a material discrepancy between such manual audit tally and such voting machine or system tally, or a discrepancy as defined in subdivision three of section 9-208 of this chapter, which creates a substantial possibility that the winner of the election as reflected in the voting machine or system tally could change if a voter verifiable record audit of additional voting machines or systems or of all voting machines or systems applicable to such election were conducted." N.Y. Elec § 16-113(2).

Accordingly, Respondent and Cross-Petitioner Representative Anthony Brindisi respectfully moves this Court for an Order to Show Cause as to why: (1) a hand audit should not be ordered pursuant to Section 16-113(2) and Article 9 of the Election Laws and (2) this Court's Friday January 29, 2021 Order vacating the injunction against the County Boards and the State Board of Elections from certifying results in the 22nd Congressional District and ordering Respondent County Boards of Elections to immediately certify such results should not also be

1

stayed pending the outcome of such a hand audit and the resolution of appeals from Orders of the Court. (*See* NYSCEF Doc No. 187).

## BACKGROUND

That discrepancies between the number of votes cast and the number of votes tabulated have been pervasive in the counting of ballots for this race made itself undeniably evident on multiple occasions during the second and third canvasses in Oneida County. At each canvas, affidavit or absentee ballots were opened and first counted and tabulated at the counting tables. (Affidavit of Lucy MacIntosh ("MacIntosh Aff.") ¶¶ 3-7). Oneida County then transported the ballots from the canvassing location back to the Oneida Board of Elections Office for machine tabulation. (MacIntosh Aff. ¶ 8). Most evenings, the results as manually counted at the canvassing tables were different than those tabulated on the Oneida County tabulation machines. (MacIntosh Aff. ¶ 9). For example:

- On December 21, 2020, the manual tabulation at the table resulted in 33 votes for Petitioner Claudia Tenney ("Tenney"), 49 votes for Cross-Petitioner Representative Anthony Brindisi ("Brindisi"), and 3 "undervotes," but the machine tabulation resulted in 33 votes for Tenney, 47 votes for Brindisi, and 5 "undervotes." (*See* MacIntosh Aff. ¶ 10; *also compare* Exhibits 1 & 2 (showing Oneida County machine tabulations for December 21) *with* Exhibits 3 & 4 (showing Oneida County hand tabulations for December 21)).

- On December 22, 2020, the manual tabulation at the table resulted in 92 votes for Tenney, 125 votes for Brindisi, and 11 "undervotes," but the machine tabulation resulted in 91 votes for Tenney, 122 votes for Brindisi, and 15 "undervotes." (*See* MacIntosh Aff. ¶ 11; *also compare* Exhibit 5 (showing Oneida County machine

2

- tabulations for December 22) *with* Exhibits 7 through 9 (showing Oneida County hand tabulations for December 22).

- On December 28, 2020, the manual tabulation at the table resulted in 103 votes for Tenney, 50 votes for Brindisi, and 7 "undervotes," but the machine tabulation resulted in 103 votes for Tenney, 49 votes for Brindisi, and 8 "undervotes." (*See* MacIntosh Aff. ¶ 12; *also compare* Exhibit 11 (showing Oneida County machine tabulations for December 28) *with* Exhibits 12 & 13 (showing Oneida County hand tabulations for December 28)).

- On January 27, 2021, the manual tabulation at the table resulted in 133 votes for Tenney, 40 votes for Brindisi, and 8 "undervotes," but the machine tabulation resulted in 133 votes for Tenney, 39 votes for Brindisi, and 9 "undervotes." (MacIntosh Aff. ¶ 13).

- On January 28, 2021, the manual tabulation at the table resulted in 77 votes for Tenney, 72 votes for Brindisi, and 7 "undervotes," but the machine tabulation resulted in 77 votes for Tenney, 71 votes for Brindisi, and 8 "undervotes." (MacIntosh Aff. ¶ 14).[1]

- In addition, on December 22, 23, 28, and 29, and again on January 27, 28, and 29 of Oneida's second and third canvasses, a total of 52 ballots were tabulated by hand

---

[1] Notably, there can be no dispute between representatives for Tenney and Brindisi as to these discrepancies. Each day, a representative for Brindisi confirmed the hand tabulations at the tables with a representative for Tenney, and each day both representatives were in agreement as to the day's total hand tabulations. (MacIntosh Aff. ¶ 15).

3

only because they were not readable by the machines at all, and these hand counted ballots were then added to the machine tabulated totals.[2]

All told, there was a discrepancy of nine changed votes during the second and third canvasses of Oneida's administratively rejected affidavit and absentee ballots alone. Oneida County counted 1,127 ballots during the course of its second and third recanvasses. The nine-vote change yields an error rate of 0.8%. There were 325,548 votes cast in total in the race for New York's 22nd Congressional District. Applying the same error rate to 325,548 ballots, there may have been as many as 2,599 votes that the machines did not read. Even if the problem was with Oneida County tabulation machines only, of the around 100,000 ballots cast in Oneida, there may have been 800 votes that the Oneida County machines failed to read alone. That figure far exceeds the margin between the two candidates in this race, and based on this small sample size at least, appears to disproportionately affect Brindisi.

Other counties also reported issues relating to their attempts to accurately tabulate total votes cast. Specifically, Respondent the Oswego County Board of Elections ("Oswego County") encountered "voting machine issues in Constantia Districts 1 and 3 and Williamstown," which required all ballots cast to be "hand counted and added to the machine totals in those election districts." (NYSCEF Doc No. 104 at ¶ 7). Oswego County further averred to this Court that it last tested its voting machines in May 2020, and before the June 2020 Primary Election, admitting that

---

[2] Specifically, on December 22, 2020, Tenney received 5 additional votes, Brindisi received 7 additional votes, and Keith Price ("Price") received 1 additional vote. (*See* Exhibit 5). On December 23, 2020, Tenney received 8 additional votes, Brindisi received 2 additional votes, Price received 1 additional vote, and there was 1 additional undervote. (*See* Exhibit 13). On December 28, 2020, Price received 1 additional vote. (*See* Exhibit 10). On December 29, 2020, Tenney received 1 additional vote. (*See* Exhibit 14). On January 27, 2021, Tenney received 3 additional votes. (*See* Exhibit 15). On January 28, 2021, Tenney received 4 additional votes and Brindisi received 11 additional votes. (*See* Exhibit 16). On January 29, 2021, Tenney received 4 additional votes and Brindisi received 4 additional votes. (*See* Exhibit 17).

4

it was in violation of N.Y. Comp. Codes R. & Regs. tit. 9, § 6210.2(e), which requires testing prior to each general election. This testing of election equipment before *each* election is extremely important, as it serves as the only check on each tabulation machine's accuracy by requiring that each tabulation machine satisfy state-mandated accuracy standards to be used.

In addition to the table-to-machine count discrepancies of which the parties are aware, there have also been procedural inconsistencies that question the integrity of the process, as conducted by the counties. For example, on November 24, 2020, Respondent the Herkimer County Board of Elections ("Herkimer County") provided its "final numbers (all ballots)" for the vote count in the 22nd Congressional District race. (NYSCEF Doc No. 67). However, five days later, on November 29, 2020, Brindisi learned through a talk radio host that Herkimer County's vote totals had changed *since* that "final" tally, because of "incorrect numbers being transcribed in a few Election Districts." *Id.* Only after hours of attempts by Brindisi and his counsel to contact Herkimer County for further information regarding same did counsel for Herkimer County advise that the "correction" result in "an additional 10 votes for Brindisi and an additional 35 votes for Tenney." *Id.* It is still unclear why a talk radio host was advised of these developments before this Court and the candidates, and there has never been sufficient explanation provided by Herkimer County as to why this was discovered during a holiday weekend and days after the County had provided purported final tabulations to this Court. (*see also* NYSCEF Doc No. 76 & 78).

Herkimer County's announcement of its error then prompted a flurry of further changes in purported "final" tabulations from two other additional counties: Respondents the Madison County Board of Elections ("Madison County") and Oswego County. (*see* NYSCEF Doc No. 80; *see also* Exhibit 18 (Madison County Commissioner explaining to Brindisi's Campaign Manager on November 25, 2020, that, "Yesterday we were finally able to work through some discrepancies.

5

Once we get all the ballot counts in, we figure out the blanks & voids to get the totals to match the voter totals. In that process we noticed 2 districts had too many blanks on the presidential line to make sense. The error was in the absentee count. So we went back through the absentees & recounted those districts."); NYSCEF Doc No. 72 (Oswego County)).

Around that same time, Respondent the Chenango County Board of Elections ("Chenango County") reported for the first time that it somehow "found 55 early voting ballots that were not previously canvassed," which were "apparently mislaid" and therefore "never counted." (*see* NYSCEF Doc No. 82). Accordingly, the purported final tabulations as provided by Chenango County to this Court on November 24, 2020 were also incorrect.

As mounting errors by the Respondent County Boards of Elections increasingly came to light as a result of proceedings in this matter, Brindisi, by and through counsel, requested and obtained audit reports from the Boards. The audit reports provided by Oneida County explicitly noted that the audit results revealed "unexplained discrepancies" but failed to provide any explanation, in the report or otherwise, what caused those discrepancies or if they were ever resolved. *See* Exhibit 19.

## ARGUMENT

**A.  Brindisi is Entitled to A Manual Audit Under Section 16-113 and Article 9 of the Election Laws.**

Under New York law, a court may order a manual audit of an election upon consideration of evidence that "indicates that there is a likelihood of a material discrepancy between such manual audit tally and such voting machine or system tally" to an extent that "creates a substantial possibility" that the outcome of the election would change as a result of the audit. Elec. Law § 16-113(2). For decades, this State's courts have reviewed requests for manual audits liberally, affording candidates opportunities to present evidence supporting the petition, particularly in close

6

contests. (*See Slisz v. Beyer*, 937 N.Y.S.2d 800, 802 (2012) (reversing dismissal of audit where petitioner had not been given opportunity to present evidence of discrepancies in race with a one-vote margin)).

The right to request a manual audit under Section 16-113 (as Brindisi does here) is not the same as right to request a full hand recount of all ballots. And the proper scope of a manual audit necessarily varies under the circumstances.[3] However, "[i]f the audit officials are unable to reconcile the manual count with the electronic vote tabulation on a voting machine or system, then the Board of Elections *shall* conduct such further investigation of the discrepancies as may be necessary for the purpose of determining whether or not to certify the election results, expand the audit, or prohibit that voting machine or system's use in such jurisdiction." N.Y. Comp. Codes R. & Regs., tit. 9, § 6210.18(i) (emphasis added). Here, the pervasiveness of issues, not only with the tabulation and counting of ballots, but also with the conduct of the election more generally, necessitates the type of full and further investigation and reconciliation of discrepancies authorized by N.Y. Comp. Codes R. & Regs., tit. 9, § 6210.18, before county results are certified.

The margin in this case has been a moving target for nearly three months, but even now, with the margin as large as it has ever been, it is still infinitesimally small. Over 325,000 ballots

---

[3] As N.Y. Comp. Codes R. & Regs., tit. 9, § 6210.18(h) makes clear, the scope of a manual audit properly depends on factors such as: "(1) whether the discrepancies were exclusively or predominantly found on one type of voting machine or system; (2) the size of the discrepancies; (3) the number of discrepancies; (4) the percentage of machines or systems with discrepancies; (5) the number and distribution of unusable voter-verified paper audit trail records as described in subdivision (j) of this section; (6) the number of cancellations recorded on the voter-verified paper audit trail records reported pursuant to paragraph (c)(1) of this section; and (7) whether, when projected to a full audit, the discrepancies detected (no matter how small) might alter the outcome of the contest, question or proposal result," Boards "retain the authority to order manual counts of those records in whole or in part under such other and additional circumstances as they deem warranted."

7

were cast and counted in this race, and with a current margin of around 122 votes (a number that is subject to change yet again today, as the final canvassing of ballots ordered cast and canvassed by this Court's January 29th Order proceeds in the courtroom), the vote margin between the leading candidates is less than 0.04%. Notably, if this election were to have taken place this year, this vote differential would put this race well within the automatic recount margin set forth in the newly enacted Election Law § 9-208(4) (2020), which will act to trigger a *full* recount whenever the results of an election are within a 0.5% margin. In fact, under Section 9-208(4), a full recount would have been triggered in this race if the candidates were separated by as many as *1,625* votes (out of over 350,000 cast), obviously a much more significant margin than the 122 that presently separates the candidates here.

      Brindisi acknowledges that Section 9-208(4) did not yet apply to this election, but the fact that the vote differential would have put this race so comfortably within the margin to trigger a full recount reflects proper legislative concerns that when elections are this close, a winner should not be declared when the count is still in any question. In fact, Section § 9-208(4) imposes a new legislative presumption that, even when there is *no* evidence of errors or irregularities, a margin of 0.5% or less will be reason *alone* to trigger a recount. But just because Section § 9-208(4) was not yet in force, that does not mean that the Court should proceed to certification under the circumstances. To the contrary, and under the law as applicable to the election at issue, where, as here, there is substantial evidence of deeply concerning errors and irregularities, any number of which "creates a substantial possibility" that the outcome of the election could change as a result of a hand audit, the Court has the power and obligation to order a hand audit under the mechanism set forth in Section § 16-113(2).

8

In this case, there is reason to believe that voting tabulation machines misread *hundreds* if not *thousands* of valid votes as undervotes, (*supra* at 4), and that these tabulation machine errors disproportionately affected Brindisi, (*id*.). In addition, Oswego County admitted in a sworn statement to this Court that its tabulation machines were not tested and calibrated in the days leading up to the November 3, 2020 General Election as required by state law and necessary to ensure that the counts generated by tabulation machines are accurate. (*See supra* at 5; NYSCEF Doc No. 104).

The evidence induced in the many hearings held before this Court further establishes that the Boards of Elections—particularly Oneida County—have failed to comply with mandates of the New York State Election Law in administering the election for this congressional district. There have been an alarming number of errors discovered in the canvassing of ballots and recording of registrants. (*see generally* NYSCEF Doc No. 110; NYSCEF Doc No. 187). The totality of these errors corrupts the ability for the Respondent County Boards to certify this election absent a robust manual audit up to and including "manual counts" of all records as authorized by N.Y. Comp. Codes R. & Regs., tit. 9, § 6210.18. These material discrepancies cannot be resolved unless this Court stays any certification of the election based on the count conducted to date and orders a manual audit. This is what is properly contemplated by Section § 16-113(2), and the Court should not hesitate to promptly exercise its power to ensure that the will of the voters is correctly reflected in the final results of the election, once these myriad errors and irregularities are corrected.

**B.     The Court Should Stay its Order Directing the Certification of Uncertain Results Pending the Outcome of a Hand Audit and the Resolution Appeals from its Order.**

Given the above evidence of material discrepancies in vote tallies that potentially affect hundreds of ballots, and the hundreds of ballots preserved for this Court's review and review by

9

appellate courts, the portion of the Court's order directing County Boards to certify election results should be stayed until a hand audit can be conducted and appeals resolved. (*See* NYSCEF Doc No. 187 at 17). A stay of certification is particularly appropriate given that Section 16-113 and Article 9 of the Election Law contemplate that a manual audit will ordinarily take place after the apparent results are known (i.e., after the votes are tallied on a machine) but prior to certification of an election: the statute directs the court to examine whether the "winner of the election *as reflected in the voting machine or system tally* could change" as a result of the audit. N.Y. Elec. Law § 16-113 (emphasis added). Indeed, it would make little sense to permit a county to certify election results while simultaneously manually auditing those results precisely because anomalies call into question the accuracy of the results. Furthermore, allowing the counties to certify the apparent results in light of these abundant discrepancies without first conducting a robust and thorough manual audit, particularly as the discrepancies appear to disproportionately affect and undercount votes for Brindisi (*see supra* at 4), would be extremely prejudicial to Brindisi.

Staying the Court's order directing the counties to certify results is also independently justified by the pendency of appeals, whose resolution could also alter the outcome of the election. Indeed, the Court was thrust into the difficult position of resolving questions of statutory interpretation of first impression, as well as applying statutes and judicial precedents to unique and unprecedented circumstances in a pandemic election. The parties' appeals from these questions are far from meritless, and there exists at least a fair possibility that appellate courts could reach a different resolution on the Court's orders affecting hundreds of ballots. (*See, e.g.*, NYSCEF Doc No. 187 at 11 (noting "harsh result" of application of statutory provisions to novel factual situation); *id.* at 6 (noting absence of judicial interpretation of legislative amendments to statutory provisions); *Navy Yard Hous. Dev. Fund, Inc. v Carr*, 2002 NY Slip Op 50203(U) [Civ Ct May

10

23, 2002] (considering presumptive merits of appeal in application for stay and rejecting stay application on grounds that moving party failed to support purportedly meritorious defense with affirmative facts)). When an appellate court's resolution of appeals could alter the outcome of the election, certification prior to the resolution of those appeals distorts public perception of the election's outcome and risks undermining public confidence in the process.

Dated: February 1, 2020

                                                           */s/ Henry J. Brewster*
                                                           Henry J. Brewster

                                                           PERKINS COIE LLP
                                                           Marc E. Elias (admitted *pro hac vice*)
                                                           Bruce V. Spiva (admitted *pro hac vice*)
                                                           Henry J. Brewster (NY Bar No. 5355201)
                                                           Shanna Reulbach (admitted *pro hac vice*)
                                                           Alexander G. Tischenko (admitted *pro hac vice*)
                                                           Alexi M. Velez (admitted *pro hac vice*)
                                                           700 Thirteenth St., N.W., Suite 800
                                                           Washington, D.C. 20005-3960
                                                           Telephone: (202) 654-6200
                                                           Facsimile: (202) 654-6211
                                                           MElias@perkinscoie.com
                                                           BSpiva@perkinscoie.com
                                                           HBrewster@perkinscoie.com
                                                           SReulbach@perkinscoie.com
                                                           ATischenko@perkinscoie.com
                                                           AVelez@perkinscoie.com

                                                           *Attorneys for Respondent Brindisi*