**<u>EXHIBIT 1</u>**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL
HAGGARD, CHARLES JAMES
RITCHARD, JAMES DAVID
HOOPER, and DARREN WADE
RUBINGH,

No. 2-20-cv-13134

     Plaintiffs,

HON. LINDA V. PARKER

v

MAG. R. STEVEN WHALEN

GRETCHEN WHITMER, in her
official capacity as Governor of the
State of Michigan, JOCELYN
BENSON, in her official capacity as
Michigan Secretary of State and the
Michigan BOARD OF STATE
CANVASSERS,

**DEFENDANTS WHITMER
AND BENSON'S
SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION
FOR SANCTIONS UNDER
28 U.S.C. § 1927**

     Defendants,

CITY OF DETROIT,
     Intervening Defendant,

ROBERT DAVIS,
     Intervening Defendant,

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,
     Intervening Defendants.

_____

Sidney Powell (Texas Bar No. 16209700)
Attorney for Plaintiffs
2911 Turtle Creek Blvd
Dallas, TX 75219
(517) 763-7499
sidney@federalappeals.com

Stefanie Lambert Junttila (P71303)
Attorney for Plaintiffs
500 Griswold Street, Suite 2340
Detroit, MI 48226
(313) 963-4740
attorneystefanielambert@gmail.com

Scott Hagerstrom (P57885)
Attorney for Plaintiffs
222 West Genesee
Lansing, MI 48933
(517) 763-7499
Scotthagerstrom@yahoo.com

Gregory J. Rohl (P39185)
Attorney for Plaintiffs
41850 West 11 Mile Road, Suite 110
Novi, Michigan 48375
248.380.9404
gregoryrohl@yahoo.com

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

David Fink (P28235)
Attorney for Intervenor City of Detroit
38500 Woodward Avenue, Suite 350
Bloomfield Hills, Michigan 48304
248.971.2500
dfrink@finkbressack.com

Mary Ellen Gurewitz (P25724)
Attorney for Intervenor DNC/MDP
423 North Main Street, Suite 200
Royal Oak, Michigan 48067
313.204.6979
maryellen@cummingslawpllc.com

Scott R. Eldridge
Attorney for Intervenor DNC/MDP
One Michigan Avenue, Suite 900
Lansing, Michigan 48933
517.483.4918
eldridge@millercanfield.com

Andrew A. Paterson (P18690)
Attorney for Intervenor Davis
2893 East Eisenhower Parkway
Ann Arbor, Michigan 48108
248.568.9712
Aap43@outlook.com

_____/


**DEFENDANTS WHITMER AND BENSON'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SANCTIONS UNDER 28 U.S.C. § 1927**

Dana Nessel
Attorney General

Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
PO Box 30736
Lansing, Michigan 48909
517.335.7659
meingasth@michigan.gov
grille@michigan.gov

Dated: April __, 2021

# TABLE OF CONTENTS

<u>Page</u>

Table of Contents ....................................................................i

Index of Authorities .............................................................ii

Concise Statement of Issues Presented.....................................iii

Introduction........................................................................ 1

Argument............................................................................ 4

I.    The State Defendants are entitled to sanctions and an award
of attorneys' fees either under 28 U.S.C. § 1927 or based on
this Court's inherent authority. ........................................ 4

    A.    The statements at issue in the Dominion Action
include statements on which this action is based.................. 4

    B.    Ms. Powell's admissions in the Dominion Action
support sanctions against Plaintiffs' Counsel here. ............... 6

Conclusion and Relief Requested ........................................... 10

i

# INDEX OF AUTHORITIES

<u>Page</u>

**Cases**

*Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843 (6th Cir. 2010) ...................... 3, 8

*Salkikl v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520 (6th Cir. 2006) ............................................................................................... 2, 7

*Shrock v. Altru Nurses Registry*, 810 F.2d 658 (7th Cir. 1987) ........... 3, 9

**Statutes**

28 U.S.C. § 1927 .............................................................................. passim

**Rules**

MCR 1.109(E)(5) ...................................................................................... 8

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Whether Defendants Whitmer and Benson's motion for sanctions should be granted and an award of attorneys' fees entered in favor of the Michigan Department of Attorney General under 28 U.S.C. § 1927 or under the Court's inherent authority to award fees where Plaintiffs' counsel unreasonably multiplied the proceedings in this case and abused the judicial process?

## INTRODUCTION

Governor Whitmer and Secretary Benson submit this supplemental brief to apprise the Court of admissions Sidney Powell made in a recent filing in *US Dominion, Inc. v. Powell*, No. 1:21-cv-0040-CJN (the "Dominion Action"), pending before the United States District Court for the District of Columbia.  Faced with the specter of more than $1.3 billion in damages in the Dominion Action, Ms. Powell has adopted a new litigation strategy to evade Dominion's defamation claim: the truth.  Whether that strategy will be advantageous in the Dominion Action remains to be seen, but it strongly underscores why sanctions and attorneys' fees are appropriate here.

In her *Memorandum of Law in Support of Defendants' Motion to Dismiss* the Dominion Action, attached as Exhibit A, Ms. Powell all but admits that she and her co-counsel here have engaged in sanctionable conduct before this Court.  Addressing statements made by Plaintiffs in this action, Ms. Powell concedes in the Dominion Action that "no reasonable person would conclude that the statements were truly statements of fact," (Ex. A, pp 27-28), but rather were "claims that await testing by the courts through the adversary process" (*Id.*, p 32).

1

Ms. Powell argues that it was this Court's responsibility—not hers or her co-counsels'—to investigate the veracity of the statements on which this action was based.

That approach to litigation is sanctionable under any standard. Under 28 U.S.C. § 1927, Ms. Powell essentially admits she has failed the very test by which the Sixth Circuit measures attorney conduct:

| Section 1927 Standard | Ms. Powell's Admission |
|---|---|
| "[A] district court may impose sanctions under § 1927 when it determines that ' "an attorney *reasonably should know* that a claim pursued is frivolous." ' " | As to statements that form the basis for this action, "*no reasonable person would conclude* that the statements were truly statements of fact." |
| *Salkikl v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 532 (6th Cir. 2006) (emphasis added). | (Ex. A, pp 27-28) (emphasis added). |

And under Rule 11, Plaintiffs' counsels' failure to investigate the accuracy of the statements on which this action relies *requires* sanctions:

2

| Rule 11 Standard | Ms. Powell's Admission |
|---|---|
| Rule 11 "by its terms requires— it does not merely permit—the district court to impose sanctions on a plaintiff who files a complaint without some minimum of previous investigation." <br><br> *Shrock v. Altru Nurses Registry*, 810 F.2d 658, 661-62 (7th Cir. 1987). | Plaintiffs' counsel were not required to investigate the veracity of the statements on which they relied because "[l]awyers involved in fast-moving litigation" cannot be held to account for blindly relying on statements that "turn out not to be true." <br><br> (Ex. A, pp 36-37.) |

Section 1927 also requires lawyers to investigate the statements on which they rely in court.  *See Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 856 (6th Cir. 2010) (attorney's assertions "without first investigating the matter" supported sanctions under 28 U.S.C. § 1927).

Had Plaintiffs' counsel conducted even a superficial investigation of the bases for this lawsuit, they would have discovered their claims had no merit.  But they did not, leaving it to the Court and Defendants to parse through the speculation and conjecture contained in Plaintiffs' complaint.

Accordingly, Ms. Powell's admissions in the Dominion Action confirm the appropriateness of sanctions against Plaintiffs' counsel

here.  Defendants Whitmer and Benson's motion for sanctions should be granted.

## ARGUMENT

**I.    The State Defendants are entitled to sanctions and an award of attorneys' fees either under 28 U.S.C. § 1927 or based on this Court's inherent authority.**

In order to meet the standards for pressing forward an argument, an attorney must have some good faith basis either in fact or law to support a claim.  The statements made by Sidney Powell in the Dominion Action concede that the allegations here were not grounded in fact.  This Court should consider the statements in reviewing the motion of the State Defendants here for sanctions.

### A.    The statements at issue in the Dominion Action include statements on which this action is based.

On January 8, 2021, US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation filed a complaint, attached as Exhibit B, initiating the Dominion Action against Sidney Powell and her firms.  The complaint seeks recovery on two counts: defamation and deceptive trade practices.  Most of the allegations in the complaint focus on statements Ms. Powell made

4

regarding her lawsuits pertaining to the 2020 election including this lawsuit.

Many of the statements at issue in the Dominion Action are substantially the same as statements made in this case.  For example:

| *Dominion* Action | *King* Action |
|---|---|
| "They also used an algorithm to calculate the votes they would need to flip and they used the computers to flip those votes from Trump to Biden and from other Republican candidates to their competitors also."<br><br>(Ex. B, ¶ 181(b).) | ("'[T]he absentee voting counts in some counties in Michigan have likely been manipulated by a computer algorithm,' and [] at some time after the 2016 election, software was installed that programmed tabulating machines to 'shift a percentage of absentee ballot votes from Trump to Biden.'"<br><br>(ECF No. 6, PageID.916-917, ¶ 124.) |
| "[Dominion's] system was specifically created and designed by Venezuelan money and interests to rig elections for Hugo Chávez."<br><br>(Ex. B., ¶ 181(h).) | "Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election."<br><br>(ECF No. 6, PageID.874, ¶ 5) |

5

| | |
|---|---|
| "We know for example one of the Dominion's highest levels employees or offices went to Detroit himself to…decide which file folder in the system to put those votes into. That's why you see the massive spikes after hours when people were told that all of the votes were in, and all of the votes were counted."<br><br>(Ex. B, ¶ 181(k).) | "The several spikes cast solely for Biden could easily be produced in the Dominion system by pre-loading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system."<br><br>(ECF No. 6, PageID.922, § 143.) |

In other instances, the statements alleged as defamatory in the Dominion Action are taken directly from Plaintiffs' filings here. *See* Ex. B at 27, 35 (citing to filings in this action). In short, many of the statements Defendants Whitmer and Benson claim are sanctionable here are the same statements that Dominion claims are defamatory in the Dominion Action.

### B. Ms. Powell's admissions in the Dominion Action support sanctions against Plaintiffs' Counsel here.

In seeking to dismiss the complaint in the Dominion Action, Ms. Powell makes two stunning admissions. First, discussing statements that form the very foundation of this action, she admits that "*no reasonable person would conclude* that the statements were truly statements of fact." (Ex. A, pp 27-28) (emphasis added). She further

explains that "reasonable people would not accept such statements as fact but view them only as claims that await testing by the courts through the adversary process." (Ex. A, p 32.) Second, she tacitly admits that neither she nor her co-counsel made any effort to investigate the veracity of the statements they relied upon in bringing Plaintiffs' claims, arguing that "[l]awyers involved in fast-moving litigation" cannot be held to account for blindly relying on statements that "turn out not to be true." (Ex. A, pp 36-37.) Both of those admissions reveal the sort of egregious misconduct that demands sanctions.

On its own, the decision of Plaintiffs' counsel to file claims that were objectively false warrants sanctions. "[A] district court may impose sanctions under [28 U.S.C.] § 1927 when it determines that 'an attorney *reasonably should have known* that a claim pursued is frivolous.'" *Salkil v. Mt. Sterling Twp. Police Dep't*, 458 F.3d 520, 532 (6th Cir. 2006) (emphasis added). In their prior briefs, Defendants have gone to great pains to show that no reasonable person would believe the claims advanced by Plaintiffs in this case. Plaintiffs have pushed back on Defendants' arguments, **but now Ms. Powell herself has**

**admitted as much**.  If there were any doubts about counsel's mindset when filing this action, Ms. Powell has put them to rest—she and her co-counsel *knew* there was no reasonable basis for the statements they made in this litigation, but they made them anyway.

Given that, it is unsurprising that Plaintiffs' counsel made no effort to investigate the statements on which they based this lawsuit, as Ms. Powell also now admits. Relying on the standard applicable to journalists, not to attorneys (who are understandably held to a higher standard), Ms. Powell asserts that the First Amendment excuses her co-counsel and her from having to investigate the veracity of the statements on which she based Plaintiffs' claims in this case.  (Ex. A, pp 36-37.)

As Ms. Powell well knows or should know, an attorney is required to investigate the basis of her client's claims before filing a complaint. *See* MCR 1.109(E)(5).  Thus, where an attorney makes assertions in a case "without first investigating the matter," sanctions are appropriate under 28 U.S.C. § 1927. *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 856 (6th Cir. 2010).  Similarly, Rule 11 "by its terms requires—it does not merely permit—the district court to impose sanctions on a plaintiff who

8

files a complaint without some minimum of previous investigation."

*Shrock v. Altru Nurses Registry*, 810 F.2d 658, 661-62 (7th Cir. 1987).

Of course, Ms. Powell likely also knows that if she or her co-counsel *had* investigated the bases for this lawsuit, they would not have liked what they found.  For example, a simple Google search of Plaintiffs' purported expert, Russell Ramsland, would have revealed that Mr. Ramsland has peddled in political conspiracy theories for years—including a theory that George Soros, born August 12, 1930, founded the "Deep State" in Nazi Germany in the 1930s.[1]  But instead of conducting any due diligence on their claims, Plaintiffs' counsel pressed ahead, relying on "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded, or switched to votes for Vice President Biden."  (ECF No. 62, PageID.3328.)

For that reason, and because they (now admittedly) brought claims that were objectively meritless, this Court should accept this supplemental filing and Plaintiffs should be sanctioned.

---

[1] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sep. 20, 2018), https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories.

9

## CONCLUSION AND RELIEF REQUESTED

For all the reasons discussed above and in their principal brief and reply brief, Defendants Governor Gretchen Whitmer and Secretary of State Jocelyn Benson request that this Court enter an Order granting their motion for sanctions under 28 U.S.C. § 1927 or the Court's inherent authority, and award attorneys' fees in the amount of $11,071.00 to the Michigan Department of Attorney General.

Respectfully submitted,

DANA NESSEL
Attorney General

*s/Heather S. Meingast*
Heather S. Meingast (P55439)
Erik A. Grill (P64713)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.335.7659
Email:  meingasth@michigan.gov
P55439

Dated:  April __, 2021

10

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN ELLEN
SHERIDAN, JOHN EARL
HAGGARD, CHARLES JAMES
RITCHARD, JAMES DAVID
HOOPER, and DARREN WADE
RUBINGH,

       Plaintiffs,

v

GRETCHEN WHITMER, in her
official capacity as Governor of the
State of Michigan, JOCELYN
BENSON, in her official capacity as
Michigan Secretary of State and the
Michigan BOARD OF STATE
CANVASSERS,

       Defendants,

CITY OF DETROIT,
       Intervening Defendant,

ROBERT DAVIS,
       Intervening Defendant,

DEMOCRATIC NATIONAL
COMMITTEE and MICHIGAN
DEMOCRATIC PARTY,

       Intervening Defendants.

_____

No. 2-20-cv-13134

HON. LINDA V. PARKER

MAG. R. STEVEN WHALEN

**EXHIBIT LIST**

**DEFENDANTS WHITMER
AND BENSON'S
SUPPLEMENTAL BRIEF
IN SUPPORT OF MOTION
FOR SANCTIONS UNDER
28 U.S.C. § 1927**

**DEFENDANTS WHITMER AND BENSON'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SANCTIONS UNDER 28 U.S.C. § 1927**

**EXHIBIT LIST**

A.   Memorandum of Law in Support of Defendants' Motion to Dismiss the Dominion Action

B.   US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation filed a complaint

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 1:21-cv-00040-CJN ) |
| v. | ) ) |
| SIDNEY POWELL, SIDNEY POWELL, P.C., and DEFENDING THE REPUBLIC, INC., | ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Lawrence J. Joseph
D.C. Bar No. 464777
LAW OFFICE OF LAWRENCE J. JOSEPH
1250 Connecticut Av NW Suite 700-1A
Washington, DC 20036
Tel: (202) 355-9452
Fax: (202) 318-2254
ljoseph@larryjoseph.com

*Local Counsel for All Defendants*

Howard Kleinhendler
N.Y. Bar No. 2657120, admitted *pro hac vice*
HOWARD KLEINHENDLER ESQUIRE
369 Lexington Ave. 12th Floor
New York, New York 10017
Tel: (917) 793-1188
Email: howard@kleinhendler.com

*Counsel for Sidney Powell, Sidney Powell, P.C.*

Jesse R. Binnall
D.C. Bar No. 79292
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Email: jesse@binnall.com

*Counsel for Defending The Republic, Inc.*

# <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................ ii

Index of Exhibits ................................................................................................... ix

Introduction ............................................................................................................1

Summary of Allegations in the Complaint ............................................................2

Argument ................................................................................................................4

I.   This Court lacks personal jurisdiction over the Defendants. ...........................4

    A.  Standard of Review ....................................................................................4

    B.  Plaintiffs do not allege nor does the court possess general jurisdiction
       over Defendants. ..........................................................................................6

    C.  There is no basis for specific jurisdiction over Defendants. ......................8

          1.   Plaintiffs fail to establish jurisdiction under § 13-423(a)(1). ...............8

          2.   Plaintiffs fail to establish jurisdiction under § 13-423(a)(3) or (a)(4)....................11

          3.   Plaintiffs' alter ego allegations are insufficient as a matter of law. .........................13

II.  Venue is improper and inconvenient. ............................................................14

    A.  Venue is improper in this District. ...........................................................14

    B.  Venue should be transferred. ....................................................................16

III. The Complaint fails to state a claim. .............................................................19

    A.  Standard of Review ..................................................................................19

    B.  Choice of Law ..........................................................................................20

    C.  Applicable Defamation Law .....................................................................20

    D.  The statements alleged in the Complaint are constitutionally protected
       and not actionable. .....................................................................................24

          1.   The challenged statements relate to matters of public concern. ...............24

          2.   Dominion is a public figure. ..................................................................25

          3.   The statements at issue are protected and not actionable. ......................27

          4.   Plaintiffs cannot show that the statements at issue were made with
              malice. ..................................................................................................36

    E.  The Complaint fails to state a claim for defamation against DTR .................40

IV.  The Complaint fails to state a claim for deceptive trade practices .........................42

Conclusion ............................................................................................................43

# **TABLE OF AUTHORITIES**

## **CASES**

\* *Adelson v. Harris,*
    973 F. Supp. 2d 467 (S.D.N.Y. 2013) ........................................................22, 28

*Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations,*
    *LLC v. Stantec, Inc.,* 2021 U.S. Dist. LEXIS 4286 (D.D.C. Jan. 8, 2021) ........................7

*Arpaio v. Cottle,*
    2019 U.S. Dist. LEXIS 236331 (D.D.C. Dec. 3, 2019) ....................................................39

\* *Ashcroft v, Iqbal,*
    556 U.S. 662 (2009) ....................................................................... 13-14, 19, 41

\* *Ashhab-Jones v. Cherokee Nation Strategic Programs, LLC,*
    2020 U.S. Dist. LEXIS 197814 (D.D.C. Oct. 23, 2020) ..........................................5-7, 12

*Bauman v. Butowsky,*
    377 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................22, 33

\* *Bell Atlantic Corp. v. Twombly,*
    550 U.S.544 (2007) ...............................................................................14, 41

*Bigelow v. Garrett,*
    299 F. Supp. 3d 34 (D.D.C. 2018) .......................................................................7

*Biospherics, Inc. v. Forbes, Inc.*
    151 F.3d 180 (4th Cir. 1998) .............................................................................22

*Blumenthal v. Drudge,*
    992 F. Supp. 44 (D.D.C. 1998) ..........................................................................12

*BNSF Ry. v. Tyrrell,*
    137 S. Ct. 1549 (2017) .....................................................................................7

*Bose Corp. v. Consumers Union,*
    466 U.S. 485 (1984) ......................................................................................25

*Brown v. O'Bannon,*
    84 F. Supp. 2d 1176 (D. Colo. 2000) ..................................................................40

*Bucher v. Roberts,*
    595 P.2d 235 (Colo. 1979) ...............................................................................27

*Burman v. Phoenix Worldwide Indus.,*
    437 F. Supp. 2d 142 (D.D.C. 2006) ..................................................................5, 12

*Bustos v. United States,*
   257 F.R.D. 617 (D. Colo. 2009) ..................................................................23

*California Transport v. Trucking Unlimited*,
   404 U.S. 508 (1972)....................................................................................34

*Ciralsky v. CIA,*
   353 F.3d 661 (D.C. Cir. 2004) .....................................................................1

*City of San Diego v. Roe,*
   543 U.S. 77 (2004)......................................................................................24

*City of W. Palm Beach v. United States Army Corps of Eng'rs*,
   317 F. Supp. 3d 150 (D.D.C. 2018) ...........................................................17

*Corsi v. Caputo,*
   2020 U.S. Dist. LEXIS 60958 (D.D.C. April 7, 2020) ...............................12

*Corsi v. Infowars, LLC,*
   2020 U.S. Dist. LEXIS 41133 (D.D.C. Mar. 10, 2020)..............................16

*Crane v. N.Y. Zoological Soc'y,*
   894 F.2d 454 (D.C. 1990) .............................................................................4

*Curling v. Raffensperger*,
   2020 U.S Dist. LEXIS 188508 (N.D. Ga. Oct. 11, 2020).....................27, 30

*Daimler AG v. Bauman,*
   571 U.S. 117 (2011)..........................................................................7, 22, 33

*Democracy Partners v. Project Veritas Action Fund,*
   453 F. Supp. 3d 261 (D.D.C. 2020) ............................................................32

* *Diversified Management v. Denver Post,*
   653 P.2d 1103 (Colo. 1982)...........................................................23, 36, 40

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,*
   472 U.S. 749 (1985)....................................................................................24

*Examination of Bd. Of Prof. Home Inspectors v. Int'l Ass'n of Certified Home*
   *Inspectors,* 221 U.S. Dist. LEXIS 25274 (D. Colo. Feb. 10, 2021) ......21, 24

* *Exelon Generation Co. v. Grumbles,*
   380 F. Supp. 3d 1 (D.D.C. 2019) ................................................................15

*Fairbanks v. Roller,*
   314 F. Supp. 3d 85 (D.D.C. 2018) ..............................................................19

*Fay v. Humane Soc'y of the United States,*
2021 U.S. Dist. LEXIS 8969 (D.D.C. Jan. 19, 2021) .......................................................5

*\* Forest Cnty. Potawatomi Cmty. v. United States,*
169 F. Supp. 3d 114 (D.D.C. 2016) ...................................................................16

*\* Garrison v. Louisiana,*
379 U.S. 64 (1964)..............................................................................21, 36

*\* Gertz v. Welch,*
418 U.S. 323 (1974)..................................................................................23

*Gorman v. Ameritrade Holding Corp.,*
293 F.3d 506 (D.C. Cir. 2002) .........................................................................7

*Greater Yellowstone Coal. v. Bosworth,*
180 F. Supp. 2d 124 (D.D.C. 2001) ...................................................................16

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
199 F.3d 1343 (D.C. Cir. 2000) ......................................................................6, 9

*Helmer v. Doletskaya,*
393 F.3d 201 (D.C. Cir. 2004) ........................................................................12

*\* Holder v. Haarmann & Reimer Corp.,*
779 A.2d 264 (D.C. 2001) ..........................................................................9-11

*\* Hourani v. PsyberSolutions LLC,*
164 F. Supp. 3d 128 (D.D.C. 2006) ............................................................12-13, 20

*\* IMAPizza LLC v. At Pizza, Ltd.,*
334 F. Supp. 3d 95 (D.D.C. 2018) ...............................................................4, 9-10

*In re Lorazepam & Clorazepate Antitrust Litig.,*
2004 U.S. Dist. LEXIS 32268 (D.D.C. May 18, 2004) ....................................................26

*\* Int'l Shoe v. Washington,*
326 U.S. 310 (1946)...................................................................................7

*\* Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus.*
*Hygienists,*
625 F. Supp. 2d 1310 (D. Ga. 2008) ...............................................................42-43

*Jankovic v. Int'l Crisis Grp.,*
822 F.3d 576 (D.C. Cir. 2016) ......................................................................38, 40

*\* Kahl v. Bureau of Nat'l Affairs, Inc.,*
856 F.3d 106 (D.C. Cir. 2017) ........................................................................19

iv

\* *Keohane v. Stewart,*
    882 P.2d 1293 (Colo. 1994) ................................................................ 21-22, 27, 31

\* *Klaxon v. Stentor Electric Mfg. Co.,*
    313 U.S. 487 (1941) ................................................................................20

\* *Lewis v. Colorado Rockies Baseball Club,*
    941 P.2d 266 (Colo. 1997) ......................................................................23

*Mar-Jac Poultry, Inc. v. Katz,*
    773 F. Supp. 2d 103 (D.D.C. 2011) .........................................................20

*McFarlane v. Esquire Magazine,*
    74 F.3d 1296 (D.C. Cir. 1996) .................................................................19

*Members of City Council of Los Angeles v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) ................................................................................21

\* *Milkovich v. Lorain Journal Co.,*
    497 U.S. 1 (1990) ......................................................................... 21-22, 33

*Moldea v. N.Y. Times Co.,*
    22 F.3d 310 (D.C. Cir. 1994) ...................................................................23

*Moldea v. New York Times Co.,*
    15 F. 3d 1137 (D.C. Cir. 1994) ................................................................23

*Motir Servs. v. Ekwuno,*
    191 F. Supp. 3d 98 (D.D.C. 2016) ...................................................... 13-14

*Moulton v. VC3,*
    2000 U.S. Dist. LEXIS 19916, 2001-1 Trade Cas. (CCH) P73,202 (N.D.
    Ga. Nov. 6, 2000) ..................................................................................43

\* *N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ................................................................ 21, 23, 25, 33, 36-37

\* *NAACP v. Button,*
    371 U.S. 415 (1963) ........................................................................... 34-35

*Nat'l Sec. Counselors v. CIA,*
    811 F.3d 22 (D.C. Cir. 2016) ...................................................................14

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ............................................................................24

\* *NBC Subsidiary (KDNC-TV) v. Living Will Ctr.,*
    879 P. 2d 6 (Colo. 1994) ................................................................... 21-22, 33

*Norair Engineering Assoc's, Inc. v. Noland Co.*,
    365 F. Supp. 740 (D.D.C. 1973) .......................................................................13

*Old Dominion Branch No. 496 v. Austin*,
    418 U.S. 264 (1974) ...........................................................................................38

*Oveissi v. Islamic Republic of Iran*,
    573 F.3d 835 (D.C. Cir. 2009) ..........................................................................20

*People v. Ford*,
    773 P.2d 1059 (Colo. 1989) ..............................................................................23

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
    244 F.3d 1007 (9th Cir. 2001) ..........................................................................32

*Pruneyard Shopping Center v. Robins*,
    447 U.S. 74 (1980) .............................................................................................23

*Rock the Vote v. Trump*,
    2020 U.S. Dist. LEXIS 202069 (N. D. Cal. Sept. 14, 2020) .............................32

*Ruffin v. New Destination*,
    773 F. Supp. 2d 34 (D.D.C. 2011) ....................................................................14

*Second Amendment Found. v. U.S. Conf. of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) ............................................................................4

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007).................................................................................... 17-18

\* *St. Amant v. Thompson*,
    397 U.S. 727 (1968)................................................................... 37-38, 40

*Steaks Unlimited v. Deaner*,
    623 F.2d 264 (3d Cir. 1980)...............................................................................25

\* *Tah v. Global Witness Publ.*,
    2021 U.S. App. LEXIS 8046 (D.C. Cir. Mar. 19, 2021) ............................ 38-40

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) (*en banc*)..........................................................38

*Thompson Hine LLP v. Smoking Everywhere Inc.*,
    840 F. Supp. 2d 138 (D.D.C. 2012) ...............................................................8, 11

*Thompson Hine, LLP v. Taieb*,
    734 F.3d 1187 (D.C. Cir. 2013) ..........................................................................8

*Trump v. Comm. on Ways & Means,*
    415 F. Supp. 3d 98 (D.D.C. 2019) ...................................................................9

*United States v. Alvarez,*
    567 U.S. 709 (2012) .....................................................................................24

*United States v. Philip Morris Inc.,*
    116 F. Supp. 2d 116 (D.D.C. 2000) ...............................................................4

*Watts v. United States,*
    394 U.S. 705 (1969) .....................................................................................32

*Zimmerman v. Hanks,*
    2000 U.S. App. LEXIS 33710 (7th Cir. Dec. 19, 2000) ...............................39

*Zueger v. Goss,*
    343 P.3d 1028 (Colo. App. 2014) ..................................................................27

## STATUTES

U.S. CONST. amend. I ........................................19, 21, 23-24, 33-34, 36-37, 43

U.S. CONST. amend. XIV, § 1, cl. 3 .....................................................................6, 10

28 U.S.C. § 1391(a)(1) ...........................................................................................17

28 U.S.C. § 1391(b) ...........................................................................................14-15

28 U.S.C. § 1391(b)(2) ............................................................................................15

28 U.S.C. § 1404(a) ....................................................................................1, 16, 19

28 U.S.C. § 1406(a) ...........................................................................................1, 18

COLO. CONST. art. II, § 10 .....................................................................................21

D.C. CODE § 13-334 ..................................................................................................7

D.C. CODE § 13-422 ..............................................................................................5-6

D.C. CODE § 13-423 ..............................................................................................5, 8

D.C. CODE § 13-423(a)(1) .............................................................................8-12, 17

D.C. CODE § 13-423(a)(3) .............................................................................8, 10-13

D.C. CODE § 13-423(a)(4) ........................................................................8, 10-11, 13

D.C. CODE § 13-423(b) ............................................................................6, 8-9, 11

Georgia Deceptive Trade Practices Act,
    O.C.G.A. §§ 10-1-370-375 ..............................................................16

O.C.G.A. § 10-1-372(a)(8) ........................................................................42

## **RULES AND REGULATIONS**

FED. R. CIV. P. 4(k)(1)(A) ............................................................................5

FED. R. CIV. P. 8 ........................................................................................1

FED. R. CIV. P. 8(a)(2) ...............................................................................1

FED. R. CIV. P. 8(e)(1) ...............................................................................1

FED. R. CIV. P. 12(b)(2) ........................................................................1, 15

FED. R. CIV. P. 12(b)(3) .........................................................................1-2

FED. R. CIV. P. 12(b)(6) .............................................................. 1-2, 19, 40

## **OTHER AUTHORITIES**

Alexa Corse, *Sidney Powell Is Sued by Voting-Machine Company Dominion for*
    *Defamation*, WSJ.com, Jan. 8, 2021 .................................................26

Alexa Corse, *Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims*,
    WSJ.com, Politics, Election 2020, Feb. 22, 2021 .............................26

Brad Johnson, *Texas Rejected Use of Dominion Voting System Software Due to*
    *Efficiency Issues*, THE TEXAN (Nov. 19, 2020)............................. 38-39

John Poulos, *Voting System Vendors, Local Election Officials And Computer*
    *Science Professors Testified On 2020 Election Security Before The House*
    *Administration Committee*, C-SPAN, January 9, 2021.................. 26-27

http://www.publiccounsel.org/press_releases .............................................35

https://ag.ny.gov/press-releases .................................................................35

https://ij.org/press-releases/ ......................................................................35

https://oag.ca.gov/media/news ...................................................................35

https://www.justice.gov/news ....................................................................35

## INDEX OF EXHIBITS

EXHIBIT 1: Declaration of Patrick M. Byrne ............................................................................1

EXHIBIT 2: Declaration of Sidney K. Powell .........................................................................3

EXHIBIT 3: Alexa Corse, *Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims*, WSJ.com, Politics, Election 2020, Feb. 22, 2021[a] .............................................4

EXHIBIT 4: Alexa Corse, *Sidney Powell Is Sued by Voting-Machine Company Dominion for Defamation*, WSJ.com, Jan. 8, 2021[b] ......................................................................7

EXHIBIT 5: John Poulos transcript, Voting System Vendors, Local Election Officials And Computer Science Professors Testified On 2020 Election Security Before The House Administration Committee, C-SPAN, January 9, 2021[c] ...............................10

EXHIBIT 6: Fred Lucas, *The Top Five Rigged U.S. Presidential Elections*, Newsweek (Oct. 23, 2016)[d] ...........................................................................................................................12

EXHIBIT 7: Brad Johnson, Texas Rejected Use of Dominion Voting System Software Due to Efficiency Issues, THE TEXAN (Nov. 19, 2020)[e] ...............................................25

---

[a]     Available at https://www.wsj.com/articles/dominion-sues-mypillow-ceo-mike-lindell-over-election-claims-11613996104?mod=searchresults_pos2&page=1 (last visited Mar. 22, 2021).

[b]     Available at https://www.wsj.com/articles/sidney-powell-is-sued-by-voting-machine-company-dominion-for-defamation-11610124461 (last visited Mar. 22, 2021).

[c]     Available at https://www.c-span.org/video/?467976-1/2020-election-security# (last visited Mar. 22, 2021) (the excerpted Poulos testimony is runs from 19:35-22:27 of the 2:40:39 video).

[d]     Available at https://www.newsweek.com/top-five-rigged-us-presidential-elections-511765 (last visited Mar. 22, 2021).

[e]     Available at https://thetexan.news/texas-rejected-use-of-dominion-voting-system-software-due-to-efficiency-issues/ (last visited Mar. 22, 2021).

## INTRODUCTION

For the past several months, plaintiffs Dominion Voting Systems Corporation ("DVS"), U.S. Dominion, Inc., and Dominion Voting Systems, Inc. (hereinafter collectively "Plaintiffs" or "Dominion") have engaged in a well-orchestrated public relations campaign to save their business. Since the November 3, 2020 general election, Dominion has publicly touted the reliability of its election machines and software used by 40% of the US electorate. They began this campaign by sending dozens of "cease and desist" letters to various public figures who had criticized their operations, which received widespread media coverage. Then they threatened litigation against a host of unspecified alleged wrongdoers, which again received widespread media coverage. Then they finally filed this action with a sprawling and impermissibly incoherent Complaint.[1] Defendants Sidney Powell, Defending the Republic, Inc. ("DTR"), and Sidney Powell, P.C. (hereinafter collectively "Defendants") respectfully ask this Court to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(2), (b)(3), and (b)(6) or, alternatively, to transfer this action to the U.S. District Court for the Northern District of Texas pursuant to 28 U.S.C. § 1404(a) and § 1406(a).

The Complaint should be dismissed. First, under Federal Rule of Civil Procedure 12(b)(2),

---

[1]    In *Ciralsky v. CIA,* 353 F.3d 661 (D.C. Cir. 2004), the District of Columbia Circuit noted that a complaint that "weighed in at 119 pages and 367 numbered paragraphs" failed to comply with Fed. R. Civ. P. 8's requirements that a pleading contain a "short and plain statement of the claim" and that "each averment of a pleading shall be simple, concise and direct." *Id.* at 668-69 (citing Rules 8(a)(2) and (e)(1)). The Complaint here is 124 pages with over 230 separate paragraphs and subparagraphs, not to mention 107 separate exhibits constituting over 230 MB with 1837 pages of additional materials. Thus, Plaintiffs have placed an impermissible burden on this Court and on Defendants "who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Ciralsky,* 353 F.3d at 669 (quoting *Salhuddin v. Cuomo,* 861 F. 2d 40, 42 (2d Cir. 1988) (quoting 5 WRIGHT & MILLER § 1281, at 365 (1969))).

Plaintiffs have failed to allege facts supporting personal jurisdiction over any of the Defendants. Second, should the court disagree, the Complaint should be dismissed pursuant to Rule 12(b)(3) for improper venue, or transferred to the United States District Court for the Northern District of Texas. Finally, should the Court decide to address the Complaint's substantive allegations, the Complaint fails to state a claim under Rule 12(b)(6).

## SUMMARY OF ALLEGATIONS IN THE COMPLAINT

Plaintiffs are two Delaware corporations (U.S. Dominion, Inc. and Dominion Voting Systems, Inc.)., both with principal places of business in Denver, Colorado; and one Ontario, Canada corporation with its principal place of business in Toronto, Canada. Compl. at ¶¶ 12-14.[2] The Complaint does not allege that any of the Plaintiffs has any presence in, business in or connections to the District of Columbia.

Defendant Sidney Powell is an attorney and member of the State Bar of Texas who resides and is domiciled in Texas. *Id.* at ¶ 15. Defendant Sidney Powell, P.C. is a professional corporation registered and domiciled in Texas. *Id.* at ¶ 16. Defendant DTR is a corporation formed, registered, and domiciled in Texas. *Id.* at ¶ 21 (the foregoing collectively hereinafter referred to as "Defendants").

Plaintiffs' claims arise from a series of allegedly defamatory statements made by Sidney Powell in which she is claimed to have accused Plaintiffs of rigging the 2020 United States presidential election. *See generally* Compl. at ¶ 1 and *passim*. These statements were associated with a series of lawsuits filed elsewhere in the country by Powell and other counsel, all arising

---

[2]     Although the Complaint alleges that plaintiff DVS is a Canadian corporation with its principal place of business in Toronto (Compl. at ¶ 14), the Complaint caption lists a Denver address for DVS (*id.* at 1) and makes clear that DVS is a wholly owned subsidiary of plaintiff U.S. Dominion, Inc.

from the 2020 presidential election. *See, e.g.,* Compl. at ¶¶ 75-83, 87-96, 97-103, 104-109.

Given the sheer volume of the Complaint, the allegations relating to activity in or involving the District of Columbia are remarkably sparse. One focal point is a press conference held by Powell and others at the Republican National Committee headquarters in Washington, D.C. on November 19, 2020. *Id.* at ¶¶ 1, 24, 27, 61-63, 66, 87, 181(k) and 187. During that press conference, Powell and others discussed in some detail the substance and content of a recount petition already filed in Wisconsin, and lawsuits that Powell was preparing to file just days later in federal courts in Georgia and Michigan. *Id.* Plaintiffs allege that many of the statements made at the press conference were defamatory. *Id.*

Plaintiffs also allege that Powell made defamatory statements "from within Washington, D.C." on the following occasions: i) during November 8 and 15, 2020 appearances on the Fox News program *Sunday Morning Futures* with Maria Bartiromo (Compl. at ¶ 181(b) and (g)); ii) during November 13 and December 10, 2020 appearances on the Fox News Business program *Lou Dobbs Tonight* (Compl. at ¶ 181 (e) and (z)); iii) from a hotel room of the Trump International Hotel during a December 13, 2020 interview given to The Epoch Times program *American Thought Leaders* (Compl. at ¶ 181(aa)); and iv) from "within the Trump International Hotel" when she published a 270-page document to Zenger News (Compl. at ¶ 181(ff)).

Elsewhere in the Complaint, Plaintiffs allege that Powell, *inter alia,* i) repeatedly visited President Donald Trump in the White House, and ii) regularly transacts business in and derives substantial revenue from services rendered in the District of Columbia, including by soliciting funds to her website and by having represented Gen. Michael Flynn in the United States District Court for the District of Columbia. *Id.* at ¶¶ 24, 80. The Complaint does not tie any of these allegations to specific alleged defamatory statements. *Id.*

With respect to Sidney Powell, P.C., the allegations are even more sparse. Plaintiffs allege that Sidney Powell, P.C. regularly transacts business in the District of Columbia through i) its prior representation of Gen. Flynn; ii) by employing two attorneys who are members of the District of Columbia Bar and work from an office in the District; iii) by making defamatory statements through Sidney Powell; and v) as the alter ego of Sidney Powell. *Id.* at ¶ 25.

Finally, DTR is alleged to have transacted business in the District of Columbia by i) advertising for and soliciting donations worldwide, including from District of Columbia residents; ii) through Sidney Powell's defamatory media appearances in the District; iii) by funding the work of Powell and Sidney Powell, P.C.; iv) by employing attorneys and maintaining an office in the District; and v) as Sidney Powell's alter ego. *Id.* at ¶ 26.

## ARGUMENT

### I.  THIS COURT LACKS PERSONAL JURISDICTION OVER THE DEFENDANTS

#### A.  Standard of Review

Plaintiffs bear the burden of establishing jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. 1990). They "must allege specific acts connecting [each] defendant with the forum." *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (quoting *First Chi. Int'l v. United Exch. Co.,* 836 F.2d 1375, 1378 (D.C. Cir. 1988)). To survive a motion to dismiss for lack of personal jurisdiction, Plaintiffs must "make a *prima facie* showing of the pertinent jurisdictional facts." *IMAPizza LLC v. At Pizza, Ltd.,* 334 F. Supp. 3d 95, 107 (D.D.C. 2018) (quoting *First Chi. Int'l,* 836 F.3d at 1378)), *aff'd,* 965 F.3d 871 (D.C. Cir. 2020).

When reviewing a challenge to personal jurisdiction, a court may review declarations and consider other matters outside of the pleadings. *See, e.g., United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000) (quoting 5A C. WRIGHT & A. MILLER, *Federal Practice*

*and Procedure* § 1351 (1990)). Although factual discrepancies must be resolved in favor of the

plaintiff, conclusory statements or bare allegations regarding a defendant's action do not satisfy a

plaintiff's burden. *Ashhab-Jones v. Cherokee Nation Strategic Programs, LLC,* 2020 U.S. Dist.

LEXIS 197814, at *8 (D.D.C. Oct. 23, 2020).

      A federal court sitting in the District of Columbia may exercise personal jurisdiction only

to the extent of a court of general jurisdiction in the District. Fed. R. Civ. P. 4(k)(1)(A); *Fay v.*

*Humane Soc'y of the United States,* 2021 U.S. Dist. LEXIS 8969, at *9 (D.D.C. Jan. 19, 2021).

Personal jurisdiction can be satisfied by demonstrating that the court has general jurisdiction

pursuant to D.C. CODE § 13-422, or that the court has personal jurisdiction pursuant to the District

of Columbia long-arm statute, D.C. CODE § 13-423. *Burman v. Phoenix Worldwide Indus.,* 437 F.

Supp. 2d 142, 147 (D.D.C. 2006).

      As this Court recently explained in *Ashhab-Jones,*

> There are two types of personal jurisdiction: [1] general or all-
> purpose jurisdiction and [2] specific or case-linked jurisdiction. A
> defendant is subject to general jurisdiction when the defendant's
> affiliations with the forum State are so continuous and systematic as
> to render the defendant "at home" in the forum State. Specific
> jurisdiction, on the other hand, arises out of or relates to the
> defendant's contacts with the forum.
>
> To establish specific jurisdiction over a nonresident, the Court "must
> first examine whether jurisdiction is applicable under the D.C. long-
> arm statute and then determine whether a finding of jurisdiction
> satisfies the constitutional requirements of due process. The D.C.
> long-arm statute authorizes specific jurisdiction "over a person, who
> acts directly or by an agent, as to a claim for relief arising from"
> certain contacts that person may have with the forum. *D.C. Code*
> *§ 13-423(a)* (2020). As relevant here, a defendant's contacts with
> the District of Columbia can establish specific jurisdiction if the
> claim arises from the defendant's:
>
> > (1) transacting any business in the District of Columbia;
> >
> > . . .

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

*§ 13-423(a).* "When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in [*subsection 13-423(a)*] may be asserted against him." *§ 13- 423(b).*

*Ashhab-Jones* at \*\*6-7 (internal quotations and citations omitted, brackets in original).

Finally, even if Plaintiffs satisfy the long-arm statute, they must still satisfy the Due Process Clause by showing that Defendants have "minimum contacts" with the forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at \*8 (quoting *GTE New Media Servs., Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1347 (D.C. Cir. 2000)).

**B.**   **Plaintiffs do not allege nor does the court possess general jurisdiction over Defendants**

Plaintiffs do not allege that this Court has general jurisdiction over any of the Defendants. To the contrary, the Complaint's jurisdictional allegations as to all three Defendants are based exclusively on the District of Columbia long-arm statute. *See* Compl. at ¶¶ 23 (citing D.C. CODE § 13-423). In any event, none of the Defendants is subject to the Court's general jurisdiction.

D.C. CODE § 13-422 provides general jurisdiction over a party domiciled in, organized under the laws of, or maintaining its principal place of business in the District. All three Defendants are domiciled in Texas, and the corporate Defendants have their principal places of business there. *Id.* at ¶¶ 15-17. Thus, on its face, general jurisdiction under § 13-422 is lacking.

In rare cases, a non-resident party may be subject to general jurisdiction where its contacts

6

with the District are so pervasive, continuous, and systematic that the party is deemed "at home" in the District. *Ashhab-Jones,* 2020 U.S. Dist. LEXIS at *6 (citing *Daimler AG v. Bauman,* 571 U.S. 117, 137-39 (2011)). The bar for establishing general jurisdiction in such circumstances is high. *Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations, LLC v. Stantec, Inc.,* 2021 U.S. Dist. LEXIS 4286, at *16 (D.D.C. Jan. 8, 2021). "[T]he continuous corporate operations within a state [must be] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe v. Washington,* 326 U.S. 310, 318 (1946). Plaintiffs' allegations do not vault this high bar.

Plaintiffs allege that Sidney Powell, P.C. and DTR do business in the District, advertise and solicit donations, and that DTR has an office here. *See* Compl. at ¶¶ 23-27. But simply doing business or having an office (or multiple offices) in a forum does not confer general jurisdiction.[3] *See, e.g., Daimler AG,* 571 U.S. at 137-39 (2011) (multiple facilities and regional office insufficient); *BNSF Ry. v. Tyrrell,* 137 S. Ct. 1549, 1559 (2017) (2000 miles of railroad track and 2000 employees in state insufficient). Nor do mere advertising or fundraising rise to the level of constitutionally sufficient contacts. *See, e.g., Bigelow v. Garrett,* 299 F. Supp. 3d 34, 42 (D.D.C. 2018) (substantial expenditures for fundraising and advertising in the District, and receiving payments from donors in the District, insufficient to establish general jurisdiction).

In any event, the allegations regarding DTR doing business are wrong. DTR does not have a physical office in the District, but only a "virtual office" that functions as a mail drop. Declaration

---

[3]     D.C. CODE § 13-334 authorizes jurisdiction over a foreign corporation "doing business" in the District of Columbia. But that statute contains a "specific jurisdictional requirement" requiring that service "be made in the District of Columbia." *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 514 (D.C. Cir. 2002) (quoting *Everett v. Nissan Motor Corp.,* 628 A.2d 106, 108 (D.C. 1993)). That provision does not apply here as neither of the corporate Defendants was served in the District of Columbia. *See* Affidavits of Service at Dkt. 3, Dkt. 9.

of Patrick M. Byrne at ¶¶ 7-8 (attached as Exhibit 1). It has no employees in the District, nor does it transact business here. *Id.* at ¶¶ 9-10.

The Complaint nowhere alleges the type of pervasive, continuous, and systematic contacts with the District of Columbia that would justify the exercise of general jurisdiction over any of the Defendants. Thus, the analysis proceeds to the question of specific jurisdiction.

**C.    There is no basis for specific jurisdiction over any Defendants**

Plaintiffs assert personal jurisdiction under the District of Columbia long-arm statute, D.C. CODE § 13-423. Compl. at ¶ 23. Specifically, Plaintiffs allege that each of the Defendants: i) transacted business within the District of Columbia, ii) caused tortious injury by acts committed within the District of Columbia, and iii) caused tortious injury by acts committed outside the District of Columbia, while regularly doing business within, engaging in persistent conduct within and deriving substantial revenue from services rendered within the District of Columbia. *Id.* These allegations roughly (but not fully) track the language of § 13-423(a)(1), § 13-423(a)(3) and § 13-423(a)(4), respectively. As noted above, when jurisdiction over a person is predicated on any of these sections of the long-arm statute, "only a claim for relief arising from acts enumerated in this section may be asserted against him." § 13-423(b).

**1.    Plaintiffs fail to establish jurisdiction under § 13-423(a)(1)**

To establish jurisdiction under § 13-423(a)(1), a plaintiff must show that i) the defendant transacted business in the District, ii) the claim arose from that business, and iii) the business constituted minimum contacts such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice. *Thompson Hine LLP v. Smoking Everywhere Inc.,* 840 F. Supp. 2d 138, 142 (D.D.C. 2012), *aff'd sub nom. Thompson Hine, LLP v. Taieb,* 734 F.3d 1187 (D.C. Cir. 2013). The "transacting business" clause has been interpreted to be coextensive with the Constitution's due process requirements, and thus the statutory and

8

constitutional prongs of the statute merge into a single inquiry. *GTE New Media,* 199 F.3d at 1347.

The mere fact that a defendant has some contacts with the District is not sufficient to establish jurisdiction under § 13-423(a)(1). "To satisfy the due process requirements associated with the Superior Court's exercise of personal jurisdiction over a nonresident defendant under § 13-423(a)(1), the plaintiff must show that the defendant has purposefully engaged in some *commercial or business-related activity directed at District residents*." *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270-71 (D.C. 2001) (emphasis added); *see also Trump v. Comm. on Ways & Means,* 415 F. Supp. 3d 98, 107 (D.D.C. 2019) (quoting *Haarmann*). Ultimately, the determination of personal jurisdiction turns on the facts of the particular case. *Haarmann,* 779 A.2d at 271.

With respect to Sidney Powell, the only specific acts alleged to fulfill the requirements of *both* § 13-423(a)(1) (transacting business in the District) and § 13-423(b) (relating to the claim for relief) are her appearance at the November 19, 2020 press conference (*see* Compl. at ¶¶ 1, 24, 27, 61-63, 66, 87, 181(k) and 187); her interviews with Fox News, Fox Business News and The Epoch Times (*see* Complaint ¶¶ 181(b), 181(e) and 181(aa)); and her publication of a binder to Zenger News while in the District (¶ 181(ff)). These activities are insufficient to establish specific jurisdiction over Powell.

First, such activities are not business transactions as contemplated by *Haarmann* and the cases applying it. None of these alleged circumstances arise out of any commercial or transactional relationship involving the District. *See, e.g., Comm. on Ways & Means,* 415 F. Supp. 3d at 107 ("D.C. and federal courts have consistently interpreted subsection (a)(1) to require a commercial or business activity."). They do not constitute "commercial deal-making activities like negotiating or performing contracts." *IMAPizza,* 334 F. Supp. 3d at 111.

Notably, Defendants were not involved in any business transaction with Plaintiffs from which their injuries allegedly arose. There is no breach of contract or other business-related transaction alleged. Plaintiffs' claims against Defendants arise, not from the transaction of any business, but from the alleged tort of defamation. If, as Plaintiffs appear to suggest, Powell's allegedly defamatory press conference and interviews are construed to constitute "transacting business" under § 13-423(a)(1),[4] then the tort-based jurisdictional provisions of § 13-423(a)(3) and § 13-423(a)(4) (discussed below) would be rendered superfluous, and their specific jurisdictional requirement of an in-forum injury bypassed. As the *Haarmann* Court put it: "Any interpretation of section 13-423(a)(1) which would apply to contexts other than the transaction of business in the District … cannot be correct. Indeed, we have noted that the other provisions of the long-arm statute [*i.e.,* § 13-423(a)(3) and § 13-423(a)(4)] may not authorize the exercise of jurisdiction to the full extent permitted by the Due Process Clause." 779 A.2d at 270, n. 5.[5] *See also IMAPizza*, 334 F. Supp. 3d at 111 (citing *Haarmann* for the proposition that the in-state commission of a tort does not constitute "doing business.").

Even if these appearances and the alleged defamatory statements were considered "transacting business" for purposes of § 13-423(a)(1), the Complaint fails to allege a necessary element for application of the subsection: that the defendant directed her business activity at

---

[4] *See* Compl. at ¶ 24 (stating that Powell "made defamatory statements about Dominion from within the District of Columbia … and during various media appearances in November and December.); ¶ 26 (stating that DTR "transacted business within the District of Columbia by soliciting donations from within the District of Columbia through Sidney Powell's defamatory media appearances").

[5] Indeed, elsewhere in *Haarmann* the Court of Appeals observed that the District of Columbia long-arm statute, unlike the statutes of other jurisdictions, does not contain a provision under which the in-state commission of a tort is defined as "doing business" in the forum. 779 A.2d at 275, n.10.

District residents, as *Haarmann* requires. To the contrary, the Complaint is filled with allegations that Powell's defamatory statements were directed *globally*. *See, e.g.,* Compl. at ¶ 66 (stating that tweets of Powell's accusations at the D.C. press conference irreparably damaged Plaintiffs' reputation "to a global audience"); ¶ 91 (Powell and Wood "repeatedly told national audiences that Dominion had bribed Georgia's Republican governor and secretary of state"); ¶ 117 (Plaintiffs suffered harm as "a result of the false accusations disseminated to a global audience by Powell"); ¶ 175 (Defendants used their website to solicit donations from a global internet audience).

Finally, the remaining allegations regarding Powell's allegedly "transacting business" are not related to Plaintiffs' claims for relief, as § 13-423(b) requires. To the extent she represented Gen. Flynn, visited with President Trump, engaged in fundraising activities, or stayed in the Trump International Hotel, Plaintiffs' claims do not arise from those activities, as the long-arm statute requires. *See Thompson Hine,* 840 F. Supp. 2d at 142 (discussing relationship between § 13-423(a)(1) and § 13-423(b)).

The same is true for the other Defendants, DTR and Sidney Powell P.C. To the extent they are alleged to be transacting business in the District – such as by having an office, employing attorneys, fundraising, or representing Gen. Flynn – Plaintiffs' claims do not arise from those activities. Accordingly, they cannot subject Defendants to jurisdiction under § 13-423(a)(1).

### 2. Plaintiffs fail to establish jurisdiction under § 13-423(a)(3) or (a)(4)

Plaintiffs also seek to invoke personal jurisdiction under §§ 13-423(a)(3) and (a)(4) through their allegations i) that Defendants caused tortious injury by actions within the District and ii) that Defendants caused tortious injury by actions outside the District while regularly doing business within, engaging in persistent conduct within and deriving substantial revenue from services rendered within the District of Columbia. Compl. at ¶ 23. Neither of these sections supports personal jurisdiction over Defendants.

Unlike section 13-423(a)(1), section 13-423(a)(3) does not extend jurisdiction to the limits of due process. Rather, it is "'a precise and intentionally restricted tort section which stops short of the outer limits of due process,' and requires that both act and injury occur in the District of Columbia." *Burman,* 437 F. Supp. 2d at 152 (quoting *Helmer v. Doletskaya,* 393 F.3d 201, 208 (D.C. Cir. 2004)). Even if tortious activity occurs within the District, jurisdiction will not lie under § 13-423(a)(3) if the plaintiff's injury was not also suffered "in the District." *Helmer,* 393 F.3d at 209-10; *Ashhab-Jones,* 2020 U.S. Dist. LEXIS at *13. That is the situation here.

First, as in *Ashhab-Jones,* Plaintiffs do not even allege that they were injured in the District. Their paraphrase of the statute alleging jurisdiction carefully omits any reference to injuries occurring "in the District." Compl. at ¶ 23(ii).

To the extent the Complaint does allege the locale of any injuries, they occurred outside the District. The Complaint alleges, *inter alia,* that its contracts have been subject to scrutiny by state legislators in Arizona, Florida, Louisiana, Pennsylvania, Michigan, and Georgia. Compl. at ¶¶ 141-42. No such claims are made regarding the District of Columbia. The failure to allege injury in the District renders the Complaint facially defective under the long-arm statute.

 Nor could Plaintiffs amend to correct this deficiency, because they did not suffer any injury in the District of Columbia as a matter of law. In a defamation action, the injury occurs where the plaintiff lives and works. *See, e.g., Blumenthal v. Drudge,* 992 F. Supp. 44, 53 (D.D.C. 1998 (plaintiffs in defamation action citizens of and injured in the District); *Hourani v. PsyberSolutions LLC,* 164 F. Supp. 3d 128, 138 (D.D.C. 2006) (plaintiffs in libel action citizens of and injured in Virginia); *Corsi v. Caputo,* 2020 U.S. Dist. LEXIS 60958, at *8 (D.D.C. April 7, 2020) (plaintiff in defamation action citizen of and injured in New Jersey). Here, that is Colorado. *See infra* pp. 20-21. The Complaint does not allege any other facts suggesting that Plaintiffs

actually suffered or even could have suffered any injury in the District of Columbia. In fact, the Complaint does not allege that Plaintiffs have any connection with the District whatsoever.

The identical result obtains under § 13-423(a)(4). That section likewise requires that the plaintiff allege an injury "in the District." *Id. See also Hourani*, 164 F. Supp. 3d at 138 (noting that both subsections (a)(3) and (a)(4) require an injury "in the District"). There is no such allegation.[6] Thus, there is no basis for jurisdiction under § 13-423(a)(4).

### 3. Plaintiffs' alter ego allegations are insufficient as a matter of law

Plaintiffs suggest that the Court exercise personal jurisdiction over Defendants Sidney Powell, P.C. and DTR by finding that each entity is an "alter ego of Sidney Powell." Compl. at ¶¶ 25- 26. But, because we have shown that this Court does not have personal jurisdiction over any of the Defendants, Plaintiffs' attempt to bootstrap Sidney Powell, P.C. and DTR onto Sidney Powell for jurisdictional purposes is irrelevant. In any event, the Complaint fails to allege facts sufficient to support an alter ego finding.

This court has recognized that a finding of "alter ego" or "veil-piercing" is an "extraordinary measure that is not to be use[d] lightly[.]… [The] case [must] present[] the extreme circumstances that call for disregard of the corporate form." *Motir Servs. v. Ekwuno*, 191 F. Supp. 3d 98, 109 (D.D.C. 2016) (quoting *Schattner v. Giurard*, 668 F.2d 1366, 1370 (D.C. Cir. 1981)). Unity of ownership alone is insufficient. The District of Columbia Circuit has emphasized that "[a] corporation is 'viewed as a distinct entity, even when it is wholly owned by a single individual'"

---

[6] The Complaint repeatedly alleges that Defendants transact business in and derive substantial revenue from providing services in the District. Compl. at ¶¶ 23-27. Even assuming those allegations met *Iqbal*'s plausibility standard (which they do not), they are irrelevant. There is no need to evaluate those factors under § 13-423(a)(4), where, as here, the Plaintiffs suffered no injury in the District. *Norair Engineering Assoc's, Inc. v. Noland Co.*, 365 F. Supp. 740, 743 (D.D.C. 1973).

and that "the law takes seriously the formal line between a corporation and a natural person, even when the corporation is, in effect a one-person firm." *Nat'l Sec. Counselors v. CIA*, 811 F.3d 22, 31 (D.C. Cir. 2016) (quoting *Quinn v. Butz*, 510 F. 2d 743, 757 (D.C. Cir. 1975)).

In determining whether to pierce the corporate veil a court will consider whether there has been a commingling of individual and corporate funds, property, or staff; whether the corporation is adequately capitalized; whether corporate formalities have been observed; and, perhaps most importantly, whether the corporate form has been used to perpetuate a fraud. *Motir Serv.,* 191 F. Supp. 3d at 108; *Ruffin v. New Destination*, 773 F. Supp. 2d 34, 41 (D.D.C. 2011). The Complaint does not properly allege any of these factors. Instead, Plaintiffs make the bald claim that Sidney Powell, P.C. and DTR are Sidney Powell's "alter egos." This is nothing more than a legal conclusion which "is insufficient to provide the requisite factual support particularly for what the D.C. Circuit has described as an extraordinary measure." *Motir Serv.* 191 F. Supp. 3d at 109 (holding that an allegation that a corporation "merely serves as an alter ego for defendant…with a co-mingling of assets and no separate identit[y]" was insufficient to adequately plead a claim of alter ego or piercing the corporate veil).

Plaintiffs do not plead facts that would enable this Court to make an alter ego finding. On the contrary, Plaintiffs' alter ego allegations are precisely the type of bare legal assertions that courts routinely reject, consistent with the principles articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S.544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Rejection of Plaintiffs' alter ego claims is similarly appropriate here.

## II.    VENUE IS IMPROPER AND INCONVENIENT

### A.    <u>Venue is improper in this District</u>

The federal venue statute provides as follows:

> **Venue in general.** A civil action may be brought in—

14

> **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> **(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> **(3)** if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

Plaintiffs claim that venue is proper pursuant to subsection (b)(2) on the grounds that "a substantial part of the events giving rise to the claims in this Complaint occurred in this District and … because Defendants are subject to the Court's personal jurisdiction in this District." *See* Compl. at ¶ 28. This is incorrect.

To determine whether venue is proper under § 1391(b)(2), the court "undertake[s] a 'commonsense appraisal' of the 'events having operative significance in the case.'" *Exelon Generation Co. v. Grumbles,* 380 F. Supp. 3d 1, 11 (D.D.C. 2019) (quoting *Lamont v. Haig,* 590 F.2d 1124, 1134 (D.C. Cir. 2014)). A commonsense appraisal leads to the conclusion that venue is not proper here under subsection (b)(2).

First, as discussed above, very few of the events giving rise to the claims occurred in the District. Aside from the November 19, 2020 press conference at the Republican National Committee, the only acts alleged to have "occurred" in the District are Sidney Powell's four appearances on Fox News broadcasts, an appearance on an Epoch Times news program, and the publication of a 270-page document from "within the Trump International Hotel." *See supra* note 4. Where those acts occurred are hardly relevant in light of their dissemination, largely via media broadcast, throughout the country.

Other than that, this case has nothing to do with the District. None of the parties reside

here. None of the alleged injuries occurred here. The lawsuits containing the underlying allegations – exhibits and evidence on which the alleged defamatory statements were based –were filed in Georgia, Wisconsin, Arizona, and Michigan. *See* Compl. at ¶¶ 75-83. The "Stop the Steal" rally occurred in Georgia. *Id.* at ¶ 78. The remaining tweets, press releases, web postings and the like occurred outside the District. *Id.* at ¶ 181. Venue is thus not proper in this District. *See, e.g., Corsi v. Infowars, LLC,* 2020 U.S. Dist. LEXIS 41133 (D.D.C. Mar. 10, 2020) (in defamation case, where defendants resided in Texas and all the statements at issue were made on programs originating from Texas, venue was not proper in this District). Similarly, Plaintiffs' claim for violation of the Georgia Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370-375, could only have occurred in that state.

### B. Venue should be transferred

These same facts also support transfer to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses. In determining whether transfer is appropriate, this Court undertakes a two-part inquiry: first, it determines whether the transferee forum is one where the action might have been brought initially; and, second, it evaluates public and private interests to determine whether they weigh in favor of transfer. *Forest Cnty. Potawatomi Cmty. v. United States*, 169 F. Supp. 3d 114, 117 (D.D.C. 2016). Private-interest factors include (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. *Greater Yellowstone Coal. v. Bosworth*, 180 F. Supp. 2d 124, 127 (D.D.C. 2001). Public-interest factors include: (1) the proposed transferee court's familiarity with the governing laws and the pendency of related actions in the transferee's forum; (2) the

relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. *Id.* at 128.

There is no dispute that this case could have been brought in the District Court for the Northern District of Texas, as all Defendants are residents of Dallas, Texas, where the proposed transferee court is located. 28 U.S.C. § 1391(a)(1) ("A civil action may be brought in…a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."). The United States District Court for the Northern District of Texas was an appropriate forum to bring this action initially.

On balance, the private factors weigh in favor of transferring this lawsuit to Texas. *First*, requiring Defendants to defend this case in the District of Columbia would be inconvenient, burdensome, expensive, and prejudicial to them, as they reside nearly 1,300 miles from the District of Columbia. Powell does not have a home or an office in or near the District of Columbia, or a law license in the District. Her law practice, Sidney Powell P.C., is based entirely in Texas. *See* Declaration of Sidney K. Powell, ¶¶ 2-4 (attached as Exhibit 2). DTR is incorporated and has its principal place of business in Texas. Byrne Decl. ¶ 6 (attached as Exhibit 1).

Transferring this case to Texas would not prejudice Plaintiffs in any way. Plaintiffs are Colorado and Canada residents who live anywhere between 940 to 1,600 miles from the District of Columbia, and operate out of Denver, which is much closer to Dallas than to Washington, D.C. When they filed their complaint, plaintiffs did not identify an office in the District of Columbia, nor are their electronic voting systems used in the District. While courts typically give deference to a plaintiff's choice of forum, this deference "is lessened when the plaintiff does not choose its 'home forum.'" *City of W. Palm Beach v. United States Army Corps of Eng'rs*, 317 F. Supp. 3d 150, 154 (D.D.C. 2018); *see Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422,

430 (2007) ("When the plaintiff's choice is not its home forum, however, the presumption in the plaintiff's favor applies with less force, for the assumption that the chosen forum is appropriate is in such cases less reasonable.") (internal quotation marks and citation omitted).

Second, the witnesses relevant to this defamation action are not in the District of Columbia. Obviously, Sidney Powell will be a principal witness. The election lawsuits underlying this matter were filed in Georgia, Michigan, Arizona, and Wisconsin. The declarations and information relied upon by Powell to publicly discuss Plaintiffs' involvement in the 2020 election were not based on information gained from District of Columbia residents. In fact, to counsel's best knowledge, only one witness has a principal place of operation in the District of Columbia. Russell Ramsland, whom Plaintiffs brutishly disparage, is headquartered in Dallas, Texas. Compl. at ¶ 106, Exh. 56. Other witnesses, evidentiary data, and information pertinent to this litigation are also located in Texas.

Finally, public factors weigh in favor of transferring this litigation to Texas. This District has experienced immense overcrowding of its docket in light of the January 6, 2021 events at the Capitol and post-presidency lawsuits. It is public knowledge that this docket is backlogged, congested, and overwhelmed. Transferring this lawsuit to Texas would not prejudice Plaintiffs and would likely assist in resolving this dispute more expeditiously. Nor is this Court any more familiar with the applicable defamation law (that of Colorado) than the Northern District of Texas, and there is no local interest in deciding local controversies at home, since the dispute concerns matters far removed from Washington, D.C.

Pursuant to 28 U.S.C. § 1406(a), where venue is laid in an improper district, that court shall either dismiss the case, or if it be in the interests of justice, transfer to any district where it could

have been brought. The case may also be transferred pursuant to 28 U.S.C. § 1404(a).[7] Accordingly, this Court should either dismiss this case or transfer it to the United States District Court for the Northern District of Texas, where all Defendants reside.

## III. THE COMPLAINT FAILS TO STATE A CLAIM

### A. <u>Standard of Review</u>

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint. To survive a motion to dismiss, the complaint must contain sufficient factual matter … to state a claim for relief that is plausible on its face." *Iqbal,* 556 U.S. at 678. A claim is plausible on its face when it contains sufficient factual matter to permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In doing so, well-pleaded facts must be construed in the plaintiff's favor, but the court need not accept as true legal conclusions or threadbare recitals of a cause of action. *Id.*

"[T]he Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 108 (D.C. Cir. 2017). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) 'not only protects against the costs of meritless litigation but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive.'" *Fairbanks v. Roller,* 314 F. Supp. 3d 85, 89 (D.D.C. 2018) (quoting *Palin v. New York Times Co.*, 264 F. Supp. 3d 527, 533 (S.D.N.Y. 2017)).

---

[7]   *See McFarlane v. Esquire Magazine,* 74 F.3d 1296, 1301 (D.C. Cir. 1996) (noting the "nearly hopeless muddle of conflicting reasoning and precedent as to which statute [§ 1404 or § 1406] applies.") (internal quotation and citation omitted).

## B.    Choice of Law

When sitting in diversity, this Court applies the District of Columbia's choice of law rules to determine which state's substantive law applies. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). "To determine which jurisdiction's substantive law governs a dispute, District of Columbia courts blend a 'governmental interests analysis' with a 'most significant relationship' test." *Oveissi v. Islamic Republic of Iran,* 573 F.3d 835, 842 (D.C. Cir. 2009). "'Under the governmental interests analysis, a court must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review.' To determine which jurisdiction has the most significant relationship to a case, a court must consider the factors enumerated in the Restatement [(Second) of Conflict of Laws] § 145." *Id.* at 842 (internal alterations and citations omitted) (quoting *Hercules & Co v. Shama Rest. Corp.,* 566 A.2d 31, 40-41 (D.C. 1989)).

In applying this test to defamation cases, this Court has applied the law of the place of the plaintiff's injury. *See, e.g., Hourani v. PsyberSolutions LLC,* 164 F. Supp. 3d 128, 140 (D.D.C. 2016) *aff'd,* 690 F. App'x 1 (D.C. Cir. 2017). In a defamation case, that is the place where the plaintiff suffered reputational injury, *i.e.,* the plaintiff's domicile. *Id. See also Mar-Jac Poultry, Inc. v. Katz,* 773 F. Supp. 2d 103, 112 (D.D.C. 2011) (same). Here, Plaintiffs' domicile is Colorado.[8] To the extent that state common law governs Plaintiffs' claims, this Court should apply the law of Colorado.

## C.    Applicable Defamation Law

Claims of defamation must be evaluated to see whether the statements at issue are protected

---

[8]         *See supra* note 2.

by the First Amendment or article II, section 10 of the Colorado constitution. *See NBC Subsidiary (KDNC-TV) v. Living Will Ctr.,* 879 P. 2d 6, 9 (Colo. 1994). The United States Supreme Court has recognized the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964). As the Supreme Court has also noted, "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74-75 (1964). Consequently, courts have consistently ruled that political speech "is entitled to the fullest possible measure of constitutional protection." *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 816 (1984).[9]

Both the United States and Colorado Supreme Courts also recognize that, in order to be actionable, a statement must be capable of being proven true or false. "[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation, or which cannot reasonably [be] interpreted as stating actual facts about an individual, continues to receive full constitutional protection." *Keohane v. Stewart,* 882 P.2d 1293, 1299 (Colo. 1994) (quoting *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 18, 20 (1990)) (internal quotes and citations omitted).

In *Keohane,* the Colorado Supreme Court identified a two-step inquiry to determine whether a statement is protected. The first is whether the statement is "sufficiently factual to be susceptible of being proved true or false." *Id.* (quoting *Milkovich,* 497 U.S. at 20). The second is whether "reasonable people" would conclude that the assertion is one of fact. *Id.* "The factors

---

[9]     Whether a statement involves a matter of public concern is a question of law to be resolved on a case-by-case basis. *Examination of Bd. Of Prof. Home Inspectors v. Int'l Ass'n of Certified Home Inspectors,* 221 U.S. Dist. LEXIS 25274, at *21 (D. Colo. Feb. 10, 2021).

relevant to the second inquiry are: (1) how the assertion is phrased; (2) the context of the entire statement; and (3) the circumstances surrounding the assertion, including the medium through which the information is disseminated and the audience to whom the statement is directed." *Id.* (citing *Burns v. McGraw-Hill Broadcasting Co.,* 659 P.2d 1351, 1360 (Colo. 1983)).

Of particular importance in evaluating the actionability of a statement is whether the underlying facts on which it is based have been disclosed. In *NBC Subsidiary,* decided the same day as *Keohane,* the Colorado Supreme Court applied this test in determining that two broadcasts stating that the plaintiff's living-will package was a "scam," and that plaintiff's customers had been "totally taken" were not actionable. 879 P.2d at 7-8. Discussing the United States Supreme Court's decision in *Milkovich,* the Colorado Supreme Court noted that the statements were based on facts disclosed during the broadcasts. The Court thus concluded:

> [*Milkovich*] unquestionably excludes from defamation liability not only statements of rhetorical hyperbole – the type of speech at issue in the Bressler-Letter Carriers-Falwell cases – but also statements clearly recognizable as pure opinion because their factual premises are revealed. Both type of assertions have an identical impact on readers – neither reasonably appearing factual – and hence are protected equally under the principles espoused in *Milkovich.*

*Id.* at 12 (brackets in original) (citing *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 731 n.13 (1st Cir. 1992)).

This makes sense, because "when a defendant provides the facts underlying the challenged statements, it is 'clear that the challenged statements represent his own interpretation of those facts,' which 'leav[es] the reader free to draw his own conclusions.'" *Bauman v. Butowsky,* 377 F. Supp. 3d 1, 11 at n. 7 (D.D.C. 2019) (quoting *Adelson v. Harris,* 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013), *aff'd* 774 F.3d 803 (2d Cir. 2014)). "When 'the bases for … the conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related.'" *Biospherics, Inc. v. Forbes, Inc.* 151 F.3d 180, 185

22

(4th Cir. 1998) (quoting *Chapin v. Knight-Ridder, Inc.,* 993 F.3d 1087, 1093 (4th Cir. 1993)); *see also Moldea v. N.Y. Times Co.,* 22 F.3d 310, 317 (D.C. Cir. 1994) ("Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation.") (quoting *Moldea v. New York Times Co.,* 15 F. 3d 1137, 1144-45 (D.C. Cir. 1994)).

Importantly, the states are free to provide greater protections to individual liberties – including free speech – than those provided by the First Amendment. *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980). With respect to its own constitution, the Colorado Supreme Court has stated that "[t]he object of article II, section 10 is to 'guard against the trammels of political power, and to secure to the whole people a full and free discussion of public affairs.'" *People v. Ford,* 773 P.2d 1059, 1066 (Colo. 1989) (quoting *Cooper v. People,* 22 P. 790, 798 (Colo. 1889)). Accordingly, the Colorado Constitution "provides greater protection of free speech than does the First Amendment[.]" *Lewis v. Colorado Rockies Baseball Club,* 941 P.2d 266, 271 (Colo. 1997) (citing *Bock v. Westminster Mall Co.,* 819 P.2d 55, 59 (Colo. 1991)).

Under Colorado law, where an allegedly defamatory statement relates to a matter of public concern, plaintiff must prove that the statement was made with actual malice by clear and convincing evidence. *Diversified Management v. Denver Post,* 653 P.2d 1103 (Colo. 1982). This is true even if the plaintiff is not a public figure or public official as defined in *Gertz v. Welch,* 418 U.S. 323 (1974). Thus, plaintiff must prove by clear and convincing evidence that the statement was either false or made with reckless disregard as to whether the statement was true. *Diversified,* 653 P.2d at 1105; *Bustos v. United States,* 257 F.R.D. 617, 621 (D. Colo. 2009).

Whether speech addresses a matter of public concern is determined by looking at its

"content, form and context, as revealed by the whole record." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 761 (1985) (plurality opinion) (quoting *Connick v. Myers,* 461 U.S. 138, 147-48 (1983)). Public concern is something that is a matter of legitimate news interest and of concern to the public at the time of publication. *City of San Diego v. Roe,* 543 U.S. 77, 83-84 (2004).

Further, claims of defamation must be viewed through the lens of the First Amendment regardless of whether they are offensive to some. "Though few might find respondent's statements anything but contemptible, his right to make those statements is protected by the Constitution's guarantee of freedom of speech and expression." *United States v. Alvarez*, 567 U.S. 709, 727-28 (2012). And "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-72 (2018). With these fundamental principles in mind, Defendants proceed to explain why Plaintiffs fail to state a claim.

### D. The statements alleged in the Complaint are constitutionally protected and not actionable

Because the statements on which Plaintiffs premise their defamation claims are protected by the First Amendment and not actionable, Plaintiffs fail to state a defamation claim.

#### 1. The challenged statements relate to matters of public concern

Whether a statement involves a matter of public concern is a question of law to be resolved on a case-by-case basis. *Examination of Bd. of Prof. Home Inspectors v. Int'l Ass'n of Certified Home Inspectors,* 2021 U.S. Dist. LEXIS 25274, at *21 (D. Colo. Feb. 10, 2021). There can be no doubt that the statements at issue here relate to matters of public concern. They involve the 2020 presidential election and specifically address the reliability of the voting machines and processes used to determine the results of that election. The Complaint itself contains scores of references to tweets from President Donald Trump, statements by public officials, the content of related

24

litigation and national press coverage of the issues. The statements and comments at issue are alleged to have been broadcast nationally and internationally. Whether considered under federal or Colorado standards, this case clearly involves matters of public concern.

### 2.    Dominion is a public figure

"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions – and to do so on pain of libel judgments virtually unlimited in amount – leads to a comparable 'self-censorship.'" *N.Y. Times Co.*, 376 U.S. at 279. Thus, to recover on a defamation claim, the public figure must prove that the defendant acted with malice. *Id.* ("The constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false.").

To determine whether a plaintiff is a public figure, the courts are guided by several considerations. First, public figures usually enjoy significantly greater access to channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater. Effective access is "regular and continued access to the media." *Steaks Unlimited v. Deaner*, 623 F.2d 264, 273 (3d Cir. 1980) (citing *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)).

The status of a plaintiff as a public figure is determined as a matter of law. *Bose Corp. v. Consumers Union*, 466 U.S. 485, 510 (1984).

Dominion has publicly held itself out as a public figure. "The company says it supplies

election equipment used by more than 40% of U.S. voters**.**"[10] Indeed, Dominion's CEO stated

publicly that "harm" to Dominion is "harm[ to] the credibility of U.S. elections":

> "For us, it has been building up for many weeks and months,"
> Dominion Chief Executive John Poulos said in an interview.
>
> He said, in a statement, that the lies told about the company and
> government election officials also had harmed the credibility of U.S.
> elections.

Alexa Corse, *Sidney Powell Is Sued by Voting-Machine Company Dominion for Defamation*,

WSJ.com, Jan. 8, 2021 (attached as Exhibit 4).

On January 9, 2021, Mr. Poulos testified before the House Administration Committee and

admitted that Dominion conducted nearly 300 elections in the past year alone:

> The company abides by these principles to this day. Driving
> innovations and advancements for auditability and resilience
> directed by federal, state, and local election officials. Supporting
> elections is a full-time proposition for our company. **This past year
> alone, Dominion assisted state and local election officials in
> conducting nearly 300 elections. Complete with a rigorous
> public scrutiny that comes with it.** … Moreover, we actively
> engage with the EAC, DHS, and other trusted third parties to
> maintain and enhance our enterprise security[.] … Finally, we all --
> we meet all independent testing requirements, including EAC
> standards developed in conjunction with NIST and requirements …
> set forth by individual states. … **Our systems ensure federal
> protections for privacy and equal voting rights, and ballot
> casting options for all, including American service members
> abroad.** The existence of nation state threats means that **we must
> actively defend against any attempts to undermine faith in our
> democratic institutions**. In this regard, we hope to see Congress
> continuing its work with state and local election officials to keep

---

[10]    *Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims*, WSJ.com, Politics,
Election 2020, by Alexa Corse, February 22, 2021 (attached as Exhibit 3). "The Court may take
judicial notice of … matters of public record pursuant to Federal Rule of Evidence 201, and the
Court's consideration of judicially noticed facts does not transform a motion for judgment on the
pleadings into one for summary judgment." *In re Lorazepam & Clorazepate Antitrust Litig.*, 2004
U.S. Dist. LEXIS 32268, at *21 n.1 (D.D.C. May 18, 2004). "The Court may also take judicial
notice of newspaper articles." *Id.* at n. 3 (collecting cases).

> election systems secure. We commend Congress on its bipartisan
> investment of an additional $425 million to help election officials
> modernize their infrastructure.

John Poulos, *Voting System Vendors, Local Election Officials And Computer Science Professors Testified On 2020 Election Security Before The House Administration Committee*, C-SPAN, January 9, 2021 (emphasis added) (excerpt attached as Exhibit 5).

At a minimum, Plaintiffs are limited purpose public figures. Whether a person is a limited purpose public figure involves two inquiries: whether the defamatory statements involve a matter of public concern, and whether the level of the plaintiff's participation invites scrutiny. *Zueger v. Goss*, 343 P.3d 1028, 1035-36 (Colo. App. 2014) (quoting *Lewis v. McGraw-Hill Broad. Co.*, 839 P.2d 1118, 1122 (Colo. App. 1992)). Both requirements are fulfilled here. Not only does this case involve a matter of public concern, Plaintiffs' products and services had already been subject to scrutiny well before the matters giving rise to this action even transpired. *See Curling v. Raffensperger*, 2020 U.S Dist. LEXIS 188508, at *26 (N.D. Ga. Oct. 11, 2020) (ruling on motion for preliminary injunction where plaintiffs alleged, inter alia, that Dominion Voting Systems software and hardware were subject to being accessed and manipulated through hacking, unauthorized intrusion, cyberattacks or malware).

### 3. The statements at issue are protected and not actionable

Determining whether a statement is protected involves a two-step inquiry: Is the statement one which can be proved true or false? And would reasonable people conclude that the statement is one of fact, in light of its phrasing, context and the circumstances surrounding its publication. *Keohane,* 882 P.2d at 1299. This inquiry is determined as a matter of law. *Bucher v. Roberts,* 595 P.2d 235, 241 (Colo. 1979) ("Whether a particular statement constitutes fact or opinion is a question of law."). Analyzed under these factors, and even *assuming, arguendo,* that each of the statements alleged in the Complaint *could* be proved true or false, no reasonable person would

conclude that the statements were truly statements of fact.

With respect to context, it is helpful to consider both broad and specific contexts, as the court did in *Adelson*, 973 F. Supp. 2d at 489-491. As in that case, the broader societal context of the statements here is a political one: the 2020 election. As the *Adelson* court noted,

> While "often decr[ied]" by the media and others, "[t]he 'low level' of campaign tactics or rhetoric" in this nation's national campaigns is, now more than ever, a generally accepted fact of American life. *Secrist v. Harkin*, 874 F.2d 1244, 1249 (8th Cir. 1989) (citation omitted); *see also id*. ("There may be no public context more contentious than a political campaign.") Thus, courts "shelter strong, even outrageous political speech," on the ground that "the ordinary reader or listener will, in the context of political debate, assume that vituperation is some form of political opinion neither demonstrably true nor demonstrably false." Sack, *Sack on Defamation*, at § 4:3:1[B], 4-43; *see also id*., at § 4:3:1[A], 4-31 ("Potentially defamatory statements in the guise of statements of fact uttered during a bitter political debate are particularly likely to be understood as rhetorical opinion.").

*Id.* at 489.

The statements at issue fit precisely in this mold. They *all* concern the 2020 presidential election, which was both bitter and controversial. Indeed, the very first statement attributed to Powell is from November 8, 2020, during an appearance on the Fox News program *Sunday Morning Futures* with Maria Bartiromo. Compl. at ¶ 181(b). As the screen-capture reproduced in the Complaint makes abundantly clear, her appearance there was to discuss the topic "Trump Team Set To File New Lawsuits Over Balloting":



*Id.*

Furthermore, it is clear that Powell's statements were made as an attorney-advocate for her preferred candidate and in support of her legal and political positions. This was repeatedly confirmed in other appearances screenshotted in the Complaint, as the following examples show. Compl. ¶ 181(g) ("Trump Legal Team Challenges Remain Active in Several Battleground States"):



Compl. ¶ 181(j) ("Trump Legal Team's Examination Into Voter Fraud"):



Compl. ¶ 181(k) ("Sidney Powell Trump Campaign Lawyer"):



Compl. ¶ 181(l) ("The Battle for the White House Trump's Legal Team Lays Out Multiple Paths to Victory"):



Compl. ¶ 181(r) ("The Battle for the White House Powell Says Lawsuit Could Be Filed In GA Tomorrow"):



Notably, one of the focal points of the Complaint is the press conference held by Sidney Powell and others on November 19, 2020 at the *Republican* National Committee headquarters in Washington, D.C. Compl. at ¶¶ 24, 27, 62, 63, 181(k). Obviously, any press conference originating from the Republican National Committee is political to its core.

The Complaint further alleges President Trump's wholesale endorsement and encouragement of Sidney Powell's efforts (at least initially). The Complaint notes that President Trump tweeted as follows on November 14, 2020: "I look forward to Mayor Giuliani spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS! Rudy Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our other wonderful lawyers and representatives!" *Id.* at ¶ 59. And on the morning of the RNC press conference, the President tweeted "Important News Conference today by lawyers on a very clear and viable path the victory. Pieces are very nicely falling into place. RNC at 12 p.m." *Id.* at ¶ 61.

The highly charged and political nature of the statements likewise underscores their political and hence partisan nature. Powell alleged that "Democrats were trying to 'steal the vote' from Trump and that 'they ha[d] developed a computer system to alter votes electronically.'" *Id.* at

¶ 52. She and others appeared at a rally called "Stop the Steal," which the Complaint identifies as a "Georgia political rally." *Id.* at ¶ 1. She claimed that she had evidence that the election result was the "greatest crime of the century if not the life of the world." *Id.* at ¶ 181(bb).[11]

Reasonable people understand that the "language of the political arena, like the language used in labor disputes … is often vituperative, abusive and inexact." *Watts v. United States,* 394 U.S. 705, 708 (1969). It is likewise a "well recognized principle that political statements are inherently prone to exaggeration and hyperbole." *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists,* 244 F.3d 1007, 1009 (9th Cir. 2001). Given the highly charged and political context of the statements, it is clear that Powell was describing the facts on which she based the lawsuits she filed in support of President Trump. Indeed, Plaintiffs themselves characterize the statements at issue as "wild accusations" and "outlandish claims." *Id.* at ¶¶ 2, 60, 97, 111. They are repeatedly labelled "inherently improbable" and even "impossible." *Id.* at ¶¶ 110, 111, 114, 116 and 185. Such characterizations of the allegedly defamatory statements further support Defendants' position that reasonable people would not accept such statements as fact but view them only as claims that await testing by the courts through the adversary process.

Furthermore, Sidney Powell disclosed the facts upon which her conclusions were based. "[W]hen a defendant provides the facts underlying the challenged statements, it is 'clear that the

---

[11]     Such statements are hardly rare in the political context, particularly in connection with a national presidential election. *See* Fred Lucas, *The Top Five Rigged U.S. Presidential Elections*, Newsweek (Oct. 23, 2016) (attached as Exhibit 6). Allegations of election fraud permeated the 2020 campaign. President Trump himself made this a central focus of the election in the months leading up to the election. *See, e.g., Rock the Vote v. Trump,* 2020 U.S. Dist. LEXIS 202069, at * 4-6 (N. D. Cal. Sept. 14, 2020) (discussing Trump tweets about election fraud in summarizing allegations in Complaint against presidential Executive Order). Others did as well. *See, e.g., Democracy Partners v. Project Veritas Action Fund,* 453 F. Supp. 3d 261 (D.D.C. 2020) (litigation arising from defendant's YouTube series "Rigging the Election.").

challenged statements represent his own interpretation of those facts,' which 'leav[es] the reader free to draw his own conclusions.'" *Bauman,* 377 F. Supp. 3d at 11 at n. 7 (citations omitted). The documents supporting the various lawsuits were made available to the public on the DTR website, as the Complaint makes clear. *See, e.g.,* Compl. at ¶¶ 6, 77, 82, 85, 87, 89. Similarly, all the documents related to the election lawsuits filed were publicly available through the websites of the various courts.[12] Likewise, on December 23, 2020, the Complaint alleges, Powell published a 270-page document to the Zenger News website. She added a link to the Zenger website on her own website with the caption, "READ IT: SIDNEY POWELL BINDER OF ELECTION FRAUD EVIDENCE." *Id.* at ¶ 149.

In short, the speech at issue here is not actionable. As political speech, it lies at the core of First Amendment protection; such speech must be "uninhibited, robust, and wide-open." *N.Y. Times Co.*, 376 U.S. at 270. Additionally, in light of all the circumstances surrounding the statements, their context, and the availability of the facts on which the statements were based, it was clear to reasonable persons that Powell's claims were her opinions and legal theories on a matter of utmost public concern. Those members of the public who were interested in the controversy were free to, and did, review that evidence and reached their own conclusions—or awaited resolution of the matter by the courts before making up their minds. Under these circumstances, the statements are not actionable. *Keohane,* 882 P.2d at 1299; *NBC Subsidiary,* 879 P.2d at 11, 12; *Milkovich,* 497 U.S. at 20.

---

[12]        *See King v. Whitmer*, United States District Court for the Eastern District of Michigan, Case No. 20-cv-13134; *Bowyer v. Ducey*, United States District Court for the District of Arizona, Case No. 2-20-cv-02321; *Feehan v. Wisconsin Elections Comm'n, et al.,* United States District Court for the Eastern District of Wisconsin, Case No. 2:20-cv-1771; *Pearson, et al. v. Kemp, et al.,* United States District Court for the Northern District of Georgia, Case No. 120-cv-4809.

Finally, the statements in question are not actionable because they were made in the context of pending and impending litigation. The Supreme Court long ago recognized that "the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition." *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). And First Amendment protections are not limited to filing lawsuits; they extend to activities that precede or are concomitant with the litigation, such as soliciting clients, publicizing the possibility of legal redress, and gaining public support. *NAACP v. Button*, 371 U.S. 415 (1963). This is so because "'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Id.* at 437 (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945)). First Amendment protections apply with particular force where a party "[r]esort[s] to the courts to seek vindication of constitutional rights" or "employs constitutionally privileged means of expression to secure constitutionally guaranteed civil rights." *Id.* at 443, 441. "The exercise … of First Amendment rights to enforce constitutional rights through litigation, as a matter of law, cannot be deemed malicious." *Id.* at 439.

All the allegedly defamatory statements attributed to Defendants were made as part of the normal process of litigating issues of momentous significance and immense public interest. The statements were tightly focused on the legal theories they were advancing in litigation and the evidence they had presented, or were going to present, to the courts in support of their claims that the presidential election was stolen, denying millions of Americans their constitutional rights to "one person, one vote" by deliberately mis-counting ballots, diminishing the weight of certain ballots while enhancing the weight of others and otherwise manipulating the vote tabulation process to achieve a pre-determined result.

Making public announcements as to the status of cases that affect the public interest is an

accepted and time-honored means of keeping the public advised about litigation that may have a profound effect on their lives. Such announcements are routine by lawyers engaged in public interest litigation, including the U.S. Justice Department, https://www.justice.gov/news, state attorneys general, *e.g.* https://ag.ny.gov/press-releases, https://oag.ca.gov/media/news and public interest organizations, *e.g.* http://www.publiccounsel.org/press_releases, https://ij.org/press-releases/. And there are various websites dedicated to helping private lawyers publicize their cases. For example, https://www.lawfirmnewswire.com/ advises: "Legal news from attorneys and law firms drives the success of today's lawyer. No other form of law firm marketing has the ability to reach hundreds of thousands of readers, websites, blogs, news networks, news outlets, and most importantly, potential clients."

Keeping the public informed about ongoing litigation, particularly litigation that affects the public interest, is not merely an accepted and widely practiced strategy in the legal profession, it is an indispensable concomitant of pursuing the case in court. Public disclosure helps gain community and financial support, alert potential clients with similar grievances and identify witnesses who may come forward when they learn of the litigation. As the Supreme Court recognized in *NAACP v. Button*, "broadly curtailing group activity leading to litigation may easily become a weapon of oppression," 371 U.S. at 436, as it would pose "the gravest danger of smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority." *Id.* at 434. It would make no sense, and serve no public purpose, to give immunity for statements made during the course of litigation – which are themselves public – but burden lawyers with the threat of billion-dollar defamation verdicts when the same allegations are made at press conferences and news releases announcing and discussing the case. Under the authority of *NAACP v. Button* and the other cases holding that litigation is

protected by the First Amendment, none of the alleged defamatory statements is actionable.

**4. Plaintiffs cannot show that the statements at issue were made with malice**

As previously explained Plaintiffs cannot prevail unless they can show by clear and convincing evidence that Defendants made the allegedly defamatory statements with actual malice, meaning that Defendants knew the statements were false or were reckless about their truth or falsity. *N.Y. Times Co.,* 376 U.S. at 279; *Diversified Management,* 653 P.2d at 1106. This Plaintiffs cannot do because, on the face of their Complaint, they disclose that Defendants relied on sworn declarations that supported their statements regarding the vulnerability and manipulability of the Dominion voting machines. *See, e.g.* Complaint ¶ 97 ("During her defamatory media campaign, Powell has asserted that her accusations of Venezuelan election-rigging against Dominion are supported by the declaration of an anonymous purported Venezuelan military officer."); ¶ 98 ("his declaration blithely asserts that Smartmatic software is 'in the DNA' of every vote tabulating company's software and system"); ¶ 105 (declaration of Terpsichore Maras-Lindeman); ¶ 106 (declaration of Russell Ramsland); ¶ 107 (declaration of William Briggs); ¶ 108 (declaration of Navid Keshavarz-Nia); ¶ (declaration of Josh Merritt). As the Complaint acknowledges, these declarations were under oath and many of them were filed in various courts across the country. Public statements based on sworn declarations cannot, as a matter of law, support a finding that Defendants made the allegedly defamatory statements "with the high degree of awareness of their probable falsity demanded by *New York Times*[.]" *Garrison*, 379 U.S. at 74.

Plaintiffs' attempts to impugn the various declarations as unreliable, attack the veracity or reliability of various declarants or point to later statements that are arguably inconsistent are beside the point. Journalists usually repeat statements from sources (usually unsworn, often anonymous) on whom they rely for their stories, and sometimes those statements turn out not to be true. Yet

36

much of the protection afforded to the press by *N.Y. Times Co. v. Sullivan* would be lost if newspapers and television stations could be drawn into long court battles designed to deconstruct the accuracy of sources on which they rely. Journalists must be free to rely on sources they deem to be credible, without being second-guessed by irate public figures who believe that the journalists should have been more skeptical.

Lawyers involved in fast-moving litigation concerning matters of transcendent public importance, who rely on sworn declarations, are entitled to no less protection. If malice, as that term is defined by *N. Y. Times Co. v. Sullivan*, is to be judged by the kind of hindsight proffered by Plaintiffs, it will render *N. Y. Times Co. v. Sullivan* a dead letter. The true victim will be the public, which will be denied the "uninhibited, robust, and wide-open" discourse that the Supreme Court contemplated. *N.Y. Times Co.*, 376 U.S. at 270.

Fortunately, the protections provided by the First Amendment are far more robust. As the Supreme Court spelled out in *St. Amant v. Thompson,* 397 U.S. 727 (1968),

> reckless conduct is not measured by whether a reasonably prudent man would have published, **or would have investigated before publishing**. There must be sufficient evidence to permit the conclusion that **the defendant in fact entertained serious doubts as to the truth of his publication**. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731 (emphasis added). The Complaint comes nowhere close to meeting this daunting standard. It alleges no facts which, if proven by clear and convincing evidence, would show that Sidney Powell knew her statements were false (assuming that they were indeed false, which Defendants dispute). Nor have Plaintiffs alleged any facts showing that Powell "in fact entertained serious doubts as to the truth of h[er] publication." In fact, she believed the allegations then and she believes them now.

Plaintiffs also allege that Powell had improper motives for making the statements, claiming

that she did so to raise funds, to raise her public profile and to curry favor with Donald Trump. *See, e.g.,* Compl. at ¶¶ 75, 80, 185. But Plaintiffs offer no facts to support these allegations and, in any event, ill-will or improper motive are not elements of the actual malice standard and are insufficient to establish actual malice. *Old Dominion Branch No. 496 v. Austin,* 418 U.S. 264, 281 (1974). As the D.C. Circuit noted just last week, "[o]ur court … has made clear that evidence of ill will 'is insufficient by itself to support a finding of actual malice.'" *Tah v. Global Witness Publ.,* 2021 U.S. App. LEXIS 8046, at *23 (D.C. Cir. Mar. 19, 2021) (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (*en banc*).

The same is true of Plaintiffs' repeated claims that Powell had constructed a "preconceived narrative." Compl. at ¶¶ 1, 8, 52, 53, 55, 96, 111, 117. In the same recent case, the D.C. Circuit held that "'preconceived notions' or 'suspicion[s]' usually do 'little to show actual malice.' . . . After all, virtually any work of investigative journalism begins with some measure of suspicion. Thus, 'concoct[ing] a pre-conceived storyline' by itself is 'not antithetical to the truthful presentation of facts.'" *Tah,* 2021 U.S. App. LEXIS 8046, at *18-19 (quoting *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 597 (D.C. Cir. 2016) (alteration in original). "It would be sadly ironic for judges in our adversarial system to conclude … that the mere taking of an adversarial stance is antithetical to the truthful presentation of facts." *Tavoulareas*, 817 F.2d at 795.

In another futile attempt to allege actual malice, Plaintiffs repeatedly parrot *St. Amant's* "inherently improbable" language while attacking Powell's evidence. Compl. at ¶¶ 110-111, 114-116, 185. But there is nothing "inherently improbable" about questioning the reliability of a voting system repeatedly rejected by at least one state because "they had a vulnerability to fraud and unauthorized manipulation." Brad Johnson, *Texas Rejected Use of Dominion Voting System Software Due to Efficiency Issues*, THE TEXAN (Nov. 19, 2020) (quoting Texas Attorney General

Ken Paxton) (attached as Exhibit 7). In fact, as Plaintiffs' own Director of Product Strategy and Security, Dr. Eric Coomer, admitted under oath, "**all computers can be hacked with enough time and access**[.]" *Curling,* 2020 U.S. Dist. Lexis 188508, at *47 (emphasis supplied).

The only purported facts Plaintiffs cite to support this conclusory allegation is that a purportedly "independent audit" and Georgia's Republican governor and secretary of state refuted Powell's claims; that then Attorney General William Barr did the same; and that Powell "has not explained how a decades-old election-rigging conspiracy … could have evaded detection for so long." *Id.* at ¶ 116. But the failure to explain, or even discuss, contrary contentions is not evidence of malice. The same is true of allegations that Powell "purposefully avoided checking" (*id.* at ¶ 105) publicly available sources that undercut her claims. But this is not nearly enough to support a claim of actual malice. *See, e.g., Arpaio v. Cottle,* 2019 U.S. Dist. LEXIS 236331, at *2 (D.D.C. Dec. 3, 2019) (that defendants "purposefully avoided interviewing anyone who could contradict their story" and "purposefully avoided interviewing sources and following fundamental reporting practices in order to avoid the truth" does not demonstrate actual malice). "[E]ven an extreme departure from professional standards' is insufficient to prove actual malice on its own." *Tah,* 2021 U.S. App. LEXIS 8046, at *20 (quoting *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989)).

At the end of the day, Plaintiffs' claims of actual malice are reduced to their allegations that Powell's evidence and witnesses were unreliable or should not have been believed. *See, e.g.,* Compl. at ¶¶ 79-82, 87-96, 104-108. In support, Plaintiffs allege that certain witnesses did not draft their own declarations, but rather they were drafted by counsel. *Id.* at ¶¶ 6, 90, 97. The suggestion that this undermines credibility is risible. *See, e.g., Zimmerman v. Hanks,* 2000 U.S. App. LEXIS 33710, at *6 (7th Cir. Dec. 19, 2000) ("It is common practice for lawyers to draft affidavits for

their client's signature; we know of no court that refuses to consider an affidavit simply because it is not personally written by the witness."). Likewise, Plaintiffs' claim that Powell's legal contentions and conclusions are unsupported by the evidence does not demonstrate malice; rather it is a legal conclusion itself. Plaintiffs were required to allege facts that would "permit the conclusion that [Powell] **in fact entertained serious doubts** as to the truth of [her] publication." *St. Amant,* 390 U.S. at 731 (emphasis added). "The speaker's failure to meet an objective standard of reasonableness is insufficient; rather the speaker must have actually 'harbored subjective doubt.'" *Tah,* 2021 U.S. App. LEXIS 8046, at *16 (quoting *Jankovic*, 822 F.3d at 589). Plaintiffs have failed to allege anything of the sort and hence the Complaint must be dismissed.

### E. The Complaint fails to state a claim for defamation against DTR

Aside from the fact that the purported defamatory statements alleged in the Complaint are not actionable under Colorado law, the Complaint's defamation claims against DTR should also be dismissed because such allegations fail to state a claim for relief. Fed. R. Civ. P. 12(b)(6).

Under Colorado law, a well pled defamation claim must include sufficient allegations that (a) a defamatory statement concerning another (b) was published to a third party (c) with culpability amounting to at least negligence on the part of the publisher and (d) that plaintiff was damaged because of the defamation. *Brown v. O'Bannon*, 84 F. Supp. 2d 1176, 1181 (D. Colo. 2000). Furthermore, because the speech at issue involves a matter of important public concern, Plaintiffs here must also allege and prove by clear and convincing evidence that that the statements were made with actual malice. *Diversified Management,* 653 P.2d at 1106. Plaintiff's Complaint does not plead the existence of any of these elements regarding DTR. Thus, its claim for defamation against DTR should be dismissed.

The Complaint's substantive allegations about DTR are limited to the following: that certain materials referenced in the Complaint are "available at" DTR's website (*e.g.*, Compl. ¶¶ 6

n.6, 17 n.8, 57 n.31, 58 n.33, 85 n.52, 90 n.59, 175 n.125); that DTR is the "corporate form" for "Powell's fundraising website that was not created until December 1, 2020, *after* Powell had appeared on television to solicit donations to the website" (*id.* at ¶ 17) (emphasis in original); that DTR shares a mailing address with Sidney Powell, P.C. (*id.* at ¶ 21); that Powell controls the content of DTR's website (*id.* at ¶ 170); that attorneys employed by Sidney Powell's law firm sign pleadings under DTR's name (*id.* at ¶ 167); that DTR regularly transacts business in the District by soliciting donations from residents and by funding the work of the other two Defendants (*id.* at ¶ 26); that DTR maintains an office in D.C. and employs attorneys who practice law in D.C. (*id.*); that DTR is the alter ego of Defendant Powell (*id.*); that Powell stated that DTR is a non-profit which helps fund Powell's litigation defense (*id.* at ¶ 32); and that Sidney Powell and Sidney Powell P.C. advertise DTR to solicit donations (*id.* at ¶ 175).

None of these allegations, taken separately or combined, comes close to pleading a plausible claim of defamation under the *Iqbal* and T*wombl*y standards. First, the Complaint contains no allegation that DTR was the individual or entity that made any of the defamatory statements about Plaintiff alleged in the Complaint. The most the Complaint alleges is that certain of these statements might be available at DTR's website, but this is no different than the allegations made throughout the Complaint that these statements are also available at many other widely available sites.[13]

Moreover, the Complaint includes no allegation regarding the third element of a viable defamation claim, namely that the publisher had the requisite culpability at the time the alleged

---

[13]    *See generally* Compl. ¶ 181 nn. 131-154, noting publication of various statements at websites such as Johnfrederckradio.com, www.theepochtimes.com, www.youtube.com; www.newsmax.com, www.cbsnews.com, www.washingtonexaminer.com, **www.c-span.org**, www.iheart.com/podcast, foxnews.com, and criticalmention.com.

publication was made. Because the subject matter of the alleged statements at issue involved matters of public concern, Plaintiff would need to show, and would at least need to allege in its Complaint, that DTR acted with actual malice. No plausible factual allegations supporting malice are made anywhere in the Complaint. Finally, because Plaintiffs do not allege a viable claim that DTR published any statements which defamed Plaintiffs, the Complaint cannot satisfy the final element of a plausible defamation claim – that DTR's defamatory statements (which have not been alleged to exist) damaged Plaintiffs.

In sum, Plaintiffs' Complaint fails to allege a plausible claim of defamation against DTR. Consequently, Defendants respectfully request that DTR be dismissed from the litigation.

## IV.   THE COMPLAINT FAILS TO STATE A CLAIM FOR DECEPTIVE TRADE PRACTICES

Plaintiffs claim that the political speech at issue in this case "constitute[s] deceptive trade practices in violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a)(8), as they disparage Dominion's goods and services by false and misleading representations of fact." Complaint ¶ 192. The claim fails on its face because Plaintiffs make no allegation that Sidney Powell, "a media figure" and "attorney; Sidney Powell, PC, a law practice; or DTR, a (c) Corp., at all relevant times, were engaged in trade and commerce of goods, such as election voting systems.

"'[T]he publication, sale and distribution of matter concerning an article of trade by a person not engaged or financially interested in commerce in that trade is not an unfair or deceptive act or practice[.]'" *Int'l Brominated Solvents Ass'n v. Am. Conf. of Governmental Indus. Hygienists*, 625 F. Supp. 2d 1310, 1318 (D. Ga. 2008) (quoting *Scientific Mfg. Co. v. FTC*, 124 F.2d 640, 644, 34 F.T.C. 1793 (3d Cir. 1941)). In *Brominated Solvents*, the court "struggle[d] to accept Plaintiffs' characterization of their UDTPA claims"—which the court characterized as

42

"novel" and "an end run around" the First Amendment—and "remain[ed] unconvinced that the cause of action created in the UDTPA should be able to stifle [the] dissemination of [the] opinions" of someone "neither in the business of selling or distributing the [products] at issue, nor in the business of selling or distributing products similar to those sold and distributed by Plaintiffs." *Id.* Plaintiffs make the same baseless UDTPA claim here.

Moreover, even in cases potentially involving trade and commerce, it has been held that a statement that is not defamatory because it is protected opinion and not actionable under the UDTPA. *See Moulton v. VC3*, 2000 U.S. Dist. LEXIS 19916, *10-11, 2001-1 Trade Cas. (CCH) P73,202 (N.D. Ga. Nov. 6, 2000) (citing *Dominy v. Shumpert*, 235 Ga. App. 500, 506, 510 S.E.2d 81 (1998)). As explained above, Defendants' complained-of statements are, among other things, protected opinion.

Accordingly, this claim should also be dismissed as against all Defendants for failure to state a claim.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that their motion to dismiss for lack of personal jurisdiction or improper venue be granted, or that the Court transfer the case to the Northern District of Texas. Should the court reach the Complaint's substantive allegations, then it should dismiss the Complaint in its entirety for failure to state a claim.

Dated: March 22, 2021                              Respectfully submitted,


                                                   ___/s/ Lawrence J. Joseph_____

Howard Kleinhendler                                Lawrence J. Joseph
N.Y. Bar No. 2657120, admitted *pro hac vice*      D.C. Bar No. 464777
HOWARD KLEINHENDLER ESQUIRE                        LAW OFFICE OF LAWRENCE J. JOSEPH
369 Lexington Ave. 12th Floor                      1250 Connecticut Av NW Suite 700-1A
New York, New York 10017                           Washington, DC 20036
Tel: (917) 793-1188                                Tel: (202) 355-9452
Email: howard@kleinhendler.com                     Fax: (202) 318-2254
                                                   ljoseph@larryjoseph.com

*Counsel for Sidney Powell, Sidney Powell, P.C.*
                                                   *Local Counsel for All Defendants*

Jesse R. Binnall
D.C. Bar No. 79292
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Email: jesse@binnall.com


*Counsel for Defending The Republic, Inc.*

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| US DOMINION, INC.<br>1201 18th Street, Suite 210<br>Denver, CO 80202,<br><br>DOMINION VOTING SYSTEMS, INC.<br>1201 18th Street, Suite 210<br>Denver, CO 80202, and<br><br>DOMINION VOTING SYSTEMS<br>CORPORATION<br>1201 18th Street, Suite 210<br>Denver, CO 80202,<br><br>     Plaintiffs,<br><br>     v.<br><br>SIDNEY POWELL<br>3831 Turtle Creek Boulevard, Unit 5B<br>Dallas, TX 75219,<br><br>SIDNEY POWELL, P.C.<br>2911 Turtle Creek Boulevard, #300<br>Dallas, TX 75219, and<br><br>DEFENDING THE REPUBLIC, INC.<br>2911 Turtle Creek Boulevard #300<br>Dallas, TX 75219,<br><br>     Defendants. | Case No. _____ |

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

1.     This defamation action arises from statements made by Sidney Powell, who—acting in concert with allies and media outlets determined to promote a false preconceived narrative about the 2020 election—caused unprecedented harm.  During a Washington, D.C. press conference, a Georgia political rally, and a media blitz, Powell falsely claimed that Dominion had rigged the election, that Dominion was created in Venezuela to rig elections for Hugo Chávez, and that Dominion bribed Georgia officials for a no-bid contract.

1

2.     Powell's wild accusations are demonstrably false. Far from being created in Venezuela to rig elections for a now-deceased Venezuelan dictator, Dominion was founded in Toronto for the purpose of creating a fully auditable paper-based vote system that would empower people with disabilities to vote independently on verifiable paper ballots. As it grew, Dominion developed technology to solve many of the technical and voter intent issues that came to light as a result of the 2000 Presidential Election. Its systems are certified under standards promulgated by the U.S. Election Assistance Commission ("EAC"), reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results.[1] Since its founding, Dominion has been chosen by thousands of election officials throughout the United States to provide the technology to effectively administer transparent and fully auditable elections.

3.     Because of these safeguards, there are mountains of direct evidence that conclusively disprove Powell's vote manipulation claims against Dominion—namely, the millions of paper ballots that were audited and recounted by bipartisan officials and volunteers in Georgia and other swing states, which confirmed that Dominion accurately counted votes on paper ballots.

---

[1] "Dominion" refers to Plaintiffs, US Dominion, Inc. and its subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation. "Powell" refers to Defendants Sidney Powell and her alter egos Sidney Powell, P.C. and Defending the Republic, Inc.



Poll workers count paper ballots while poll watchers observe in Gwinnett County, Georgia on November 14, 2020.

4.      When respected Georgia Republicans disproved Powell's false accusations by announcing that Georgia's paper ballot recount had verified the accuracy of Dominion's vote counts, Powell sought to discredit them by falsely accusing Dominion of paying kickbacks to them and their families in return for a no-bid contract. The only "evidence" Powell ever put forward to support that false accusation was a doctored certificate from the Georgia Secretary of State. Powell has insinuated that the fact that the certificate is undated is suspicious. In reality, the authentic certificate is dated and is publicly available on the Georgia Secretary of State's website, along with public records showing there was a competitive bid process for the Georgia contract and that Dominion competed against Smartmatic and Election Systems & Software ("ES&S").[2]

---

[2] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/ (Ex. 1).

5.      Although Powell assured the public during television and radio appearances that her claims were backed by "evidence," Powell's "evidence" included declarations from a motley crew of conspiracy theorists, con artists, armchair "experts," and anonymous sources who were judicially determined to be "wholly unreliable."[3]  One of Powell's wholly unreliable sources was a purported "military intelligence expert" who has now admitted that he never actually worked in military intelligence, that the declaration Powell's clerks wrote for him to sign is "misleading," and that he "was trying to backtrack" on it.[4]  After he was discredited, Powell pivoted by presenting his declaration as having been written by a different anonymous source.

6.      During some of her media appearances Powell also touted a shocking declaration from an "anonymous source" purporting to be a Venezuelan military officer alleging a decades-old conspiracy beginning with now-deceased Venezuelan dictator Hugo Chávez.[5]  But the explanation in the "anonymous witness's" declaration for why he purportedly came forward was a near-verbatim recitation from another declaration put forward by Powell, proving that those witnesses did not write their declarations independently and raising serious questions about what role Powell and her team played in drafting the declaration.[6]

---

[3] Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84].
[4] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Wash. Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html (Ex. 2).
[5] Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela," *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4].
[6] *Compare* Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela," *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4], available at, https://defendingtherepublic.org/?page_id=986 *with* Statement by Ana Mercedes Díaz Cardozo, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3], available at, https://defendingtherepublic.org/?page_id=986.

7.     Powell deliberately lied about having a video of Dominion's founder saying he could "change a million votes, no problem at all."  Powell has never produced that recording because it does not exist.

8.     As a result of the defamatory falsehoods peddled by Powell—in concert with like-minded allies and media outlets who were determined to promote a false preconceived narrative—Dominion's founder, Dominion's employees, Georgia's governor, and Georgia's secretary of state have been harassed and have received death threats, and Dominion has suffered enormous harm.

9.     After Dominion sent Powell a letter putting her on formal notice of the facts and the death threats and asking her to retract her false claims, Powell doubled down, tweeting to her 1.2 million Twitter followers that she heard that "#Dominion" had written to her and that, although she had not even seen Dominion's letter yet, she was "retracting nothing" because "[w]e have #evidence" and "They are #fraud masters!"[7]  To ensure that her tweet would be published to the largest possible audience and inflict maximum harm on Dominion, Powell tagged some of her allies with massive Twitter followings, including Donald Trump, Georgia-based defamation attorney L. Lin Wood, and Powell's client, Trump's former National Security Advisor Michael Flynn.

10.     In the days and weeks that followed, Powell appeared for a number of media interviews and continued to double down on her false accusations about Dominion.

11.     Dominion brings this action to set the record straight, to vindicate the company's rights under civil law, to recover compensatory and punitive damages, to seek a narrowly tailored injunction, and to stand up for itself and its employees.

---

[7] Retraction Demand Letter from T. Clare and M. Meier to S. Powell (Dec. 16, 2020) (Ex. 3); Sidney Powell (@SidneyPowell1), Twitter (Dec. 20, 2020), available at, https://twitter.com/SidneyPowell1/status/1340760761228996614 (Ex. 4).

5

## **PARTIES**

12.     Plaintiff US Dominion, Inc. is a for-profit Delaware corporation with its principal place of business in Denver, Colorado.

13.     Plaintiff Dominion Voting Systems, Inc. is a for-profit Delaware corporation with its principal place of business in Denver, Colorado.

14.     Plaintiff Dominion Voting Systems Corporation is a for-profit Ontario corporation with its principal place of business in Toronto, Ontario.

15.     Defendant Sidney Powell is a self-proclaimed "media figure," self-published author of a book that purports to be a seminal work in "exposing 'the Deep State,'" a licensed attorney, and a member of the State Bar of Texas who practices law solely as Sidney Powell, P.C.  She is domiciled in Texas.

16.     Defendant Sidney Powell, P.C. ("Powell's law firm") is a law firm owned and operated by Sidney Powell as a sole proprietorship, where she acts as its president.  There is a unity of ownership and interest between Sidney Powell and Sidney Powell, P.C., such that there is no discernable difference between them.  Sidney Powell, P.C. is registered in the State of Texas and maintains an address with the Texas Secretary of State at Sidney Powell's home address.

17.     Defendant Defending the Republic, Inc. ("Powell's fundraising website") is the corporate form that was belatedly incorporated to solicit "millions of dollars" online at https://defendingtherepublic.org/, a website created shortly after the 2020 election.  The separate corporate entity for Powell's fundraising website was not created until December 1, 2020, *after* Powell had appeared on television to solicit donations to the website and *after* the website began

representing    to    potential    donors    that    it    was    a    501(c)(4)    organization.[8]

 

    18.    On or before January 7, 2021, defendingtherepublic.org began representing to potential donors that it is a "501c3 (Status Pending) Non-Profit."[9]



    19.    Unlike contributions to 501(c)(3) organizations, contributions to 501(c)(4) organizations are not tax deductible.

---

[8] *Sidney Powell talks about her allegations regarding the computerized voting systems on election night*, Washington Examiner (Nov. 20, 2020), available at, https://www.washingtonexaminer.com/videos/sidney-powell-talks-about-her-allegations-regarding-the-computerized-voting-systems-on-election-night (last visited Jan. 4, 2021) (Ex. 5); *Sidney Powell on Lou Dobbs Tonight on 11/30/20*, YouTube (Nov. 30, 2020), available at, https://www.youtube.com/watch?v=4uMr-TRZNCw (last visited Jan. 4, 2021) (Ex. 6); Defending the Republic (Nov. 23, 2020), available at, https://web.archive.org/web/20201123034128/https://defendingtherepublic.org/ (Ex. 7).
[9] Defending the Republic Contact Page, available at, https://defendingtherepublic.org/?page_id=15 (last visited Jan. 7, 2021).

20.     As of January 7, 2021, Defending the Republic, Inc. did not appear in a search of 501(c)(3) organizations or 501(c)(4) organizations on the IRS website.[10]



21.     Defending the Republic, Inc. has three directors: Sidney Powell, L. Lin Wood, and Brannon Castleberry, who, upon information and belief, is the owner of CWL Consulting, "a strategy group specializing in PR/Crisis Comms, Governmental Affairs, and Marketing." Defending the Republic, Inc. is a Texas corporation that shares a mailing address with Powell's law firm, Sidney Powell, P.C.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

---

[10] *Compare* November 23, 2020 capture of https://defendingtherepublic.org/ (Ex. 7) *with* IRS Tax Exempt Organization Search, available at, https://apps.irs.gov/app/eos/allSearch (Ex. 8).

23.     This Court has personal jurisdiction over all Defendants pursuant to § 13-423 of the District of Columbia Code because Defendants: (i) transacted business within the District of Columbia; (ii) caused tortious injury by acts committed within the District of Columbia, including and specifically by making false and defamatory statements about Dominion from within the District of Columbia; (iii) and caused tortious injury by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of Columbia.

24.     This Court has personal jurisdiction over Sidney Powell because she travelled to the District of Columbia shortly after the election and then made defamatory statements about Dominion from within the District of Columbia, including to members of the Trump Campaign, to Donald Trump, at a press conference on November 19, 2020, and during various media appearances in November and December.  Powell did multiple defamatory media appearances giving rise to the case from a hotel room in the Trump International Hotel in Washington, D.C.—and, upon such information and belief, stayed in the Trump International Hotel in Washington, D.C. during much of the time period relevant to this case.  Powell was in Washington, D.C. when she repeatedly visited the White House in December to pressure Donald Trump to appoint her special counsel to investigate the false accusations giving rise to this defamation case.  In addition, Powell regularly travels to and transacts business within the District of Columbia, and she derives substantial revenue from such services rendered within the District of Columbia, including by soliciting funds to her fundraising website and by representing Michael Flynn in the District Court for the District of Columbia.

25.     This Court has personal jurisdiction over Sidney Powell P.C. because (1) it regularly transacts business within the District of Columbia, such as its recent representation of

Case 2:20-cv-13134-LVP-RSW-ECF No. 1-8 at PageID.48708/21 Page 85 of 199

Michael Flynn in the District Court for the District of Columbia, and it derives substantial revenue from such services rendered within the District of Columbia; (2) it employs two at least attorneys who are members of the District of Columbia Bar, Brandon Johnson and Julia Haller, both of whom work from an office in the District of Columbia; (3) it, through Sidney Powell, made defamatory statements about Dominion from within the District of Columbia; and (4) it is an alter ego of Sidney Powell.

26.     This Court has personal jurisdiction over Defending the Republic, Inc. because (1) it regularly transacts business within the District of Columbia, as it advertises and solicits donations from residents of the District of Columbia; (2) it transacted business within the District of Columbia by soliciting donations from within the District of Columbia through Sidney Powell's defamatory media appearances that were done from within the District of Columbia and by funding the work of Sidney Powell and Sidney Powell, P.C.; (3) it maintains an office in the District of Columbia at 601 Pennsylvania Ave., NW, South Building, Ste. 900, Washington, D.C., 20004; (4) attorneys employed by Defending the Republic, Inc. engage in the practice of law in the District of Columbia; and (5) it is an alter ego of Sidney Powell.

27.     Requiring Defendants to litigate these claims in the District of Columbia does not offend traditional notions of fair play and substantial justice and is permitted by the Due Process Clause of the United States Constitution.  Dominion's claims arise in part from defamatory statements Powell made about Dominion from within the District of Columbia, including to members of the Trump Campaign, to Donald Trump, at a press conference on November 19, 2020, and during various media appearances in November and December.  Defendants avail themselves of numerous privileges in the District of Columbia, including those set forth above.

28.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and, as discussed above, because Defendants are subject to the Court's personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

*After Being Founded in John Poulos's Basement in Toronto,*
*Dominion Becomes an American Company and Provides Machines to*
*Help Local Election Officials Count Paper Ballots*

29.     In 2002, John Poulos had an idea that he thought could help blind people vote on paper ballots, so he founded a business out of his basement in Toronto and incorporated it under Ontario law as Dominion Voting Systems Corporation.

30.     By 2009, the business had grown in the United States and a subsidiary company, Dominion Voting Systems, Inc., was incorporated in Delaware and headquartered in Denver, Colorado.  Poulos voluntarily worked with the Committee on Foreign Investment in the United States ("CFIUS") to ensure they knew who he was and who was invested in Dominion.

31.     By 2018, the majority of the business's customers and employees were in the United States, so Poulos sold the majority stake of the business to U.S. investors.

32.     Today, Dominion's business is organized as US Dominion, Inc. and its two wholly owned subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation (collectively, "Dominion").

33.     Dominion contracts with state and local governments to provide its voting systems and services in a majority of states across the country.  Those contracts are typically multi-year contracts and range from tens of thousands of dollars to over a hundred million dollars, depending on the jurisdiction and scope of the contract.  For example, Dominion's contract with the state of Georgia—implemented in 2019—is a 10-year contract valued at over $100 million.  Given the nature of the U.S. election system and the voting services industry, Dominion's contracts have

historically been long term with high renewal rates. In 2020, Dominion had contracts in 28 states and Puerto Rico.

34.     Dominion provides local election officials with tools they can use to run elections, such as voting machines that count paper ballots.

35.     Dominion's voting systems are certified under standards promulgated by the EAC and reviewed and tested by independent testing laboratories accredited by the EAC.

36.     In 2016, when Donald Trump was elected president of the United States, Dominion's technology was used in 1,635 jurisdictions in more than two dozen "red" and "blue" states.

***Dominion Provides Machines to Count Paper Ballots for Local Election Officials in Georgia and Numerous Other "Red" and "Blue" States and Counties for the 2020 Election***

37.     As set forth in government records that are publicly available on the Georgia Secretary of State's website, there was a competitive bid process to provide voting machines for use in the 2020 election in Georgia.[11] Dominion competed against Smartmatic (further evidence that they are separate companies) and ES&S for the Georgia contract.[12]

38.     After scoring the highest in the competitive bid process, Dominion won the Georgia contract.[13] This initial contract is for a 10-year term and valued at over $100 million.

39.     On August 9, 2019, Georgia's Republican Secretary of State Brad Raffensperger signed and sealed a certificate attesting that Dominion's systems had "been thoroughly examined

---

[11] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/ (Ex. 1).
[12] *Id.*
[13] *Id.*

and tested and found to be in compliance with" applicable Georgia law. That certificate is dated and is publicly available on the Secretary of State's website.[14]

40.    In 2020, state and local election officials and bipartisan poll workers administered their elections by using Dominion's tabulation devices to count paper ballots in Georgia and many other "red" and "blue" states and numerous counties.

### Independent Audits and Hand Recounts of Paper Ballots Prove That Dominion's Vote Counts Were Accurate

41.    The voter verified paper ballots are the hard evidence that can be easily used to verify the accuracy of the Dominion machine counts. If Dominion or anyone else had rigged the election by manipulating the vote counts in the Dominion machines—whether by "weighting" votes, trashing votes, adding votes, or otherwise—the number of paper ballots that were verified and cast by voters would not match the machine counts. In fact, independent 100% hand audits and recounts of paper ballots have repeatedly verified the accuracy of the vote counts from Dominion machines.

42.    After a 100% hand audit of all the ballots cast in Georgia in the 2020 election, Georgia's Republican Secretary of State Brad Raffensperger explained that "Georgia's historic first statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[15]

---

[14] *Id.*; Georgia Secretary of State, Dominion Certification (Aug. 9, 2019), available at, https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf (Ex. 10).

[15] Georgia Secretary of State, *Historic First Statewide Audit of Paper Ballots Upholds Result of Presidential Race*, available at, https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_r esult_of_presidential_race#:~:text=2020%20Qualifying%20Packet- ,Historic%20First%20Statewide%20Audit%20of%20Paper%20Ballots%20Upholds%20Result% 20of,machine%20tally%20of%20votes%20cast (Ex. 11).

43. At the request of the Trump Campaign, in addition to the hand audit, Georgia also conducted a subsequent machine recount, which again affirmed the original outcome of the presidential race in Georgia.

44. As Secretary of State Raffensperger explained after a signature match audit affirmed the outcome of the 2020 presidential race in Georgia for a third time, "The Secretary of State's office has always been focused on calling balls and strikes in elections and, in this case, three strikes against the voter fraud claims and they're out."[16]

45. Similarly, as Secretary Raffensperger explained to Donald Trump during a telephone call that was reported by *The Washington Post*, "I don't believe that you're really questioning the Dominion machines. Because we did a hand re-tally, a 100 percent re-tally of all the ballots, and compared them to what the machines said and came up with virtually the same result. Then we did the recount, and we got virtually the same result. So I guess we can probably take that off the table. I don't think there's an issue about that."[17]

46. Similarly, in a press conference, an official from Georgia's Secretary of State's office explained, "Let's just go to the other ridiculous claims, that Dominion voting machines are somehow using fractional voting or flipping votes. Again, by doing the hand tally, it shows none of that is true. Not a whit."[18]

---

[16] Georgia Secretary of State, *3rd Strike Against Voter Fraud Claims Means They're Out After Signature Audit Finds No Fraud*, https://sos.ga.gov/index.php/elections/3rd_strike_against_voter _fraud_claims_means_theyre_out_after_signature_audit_finds_no_fraud (Ex. 12).

[17] Amy Gardner and Paulina Firozi, *Here's the full transcript and audio of the call between Trump and Raffensperger*, Wash. Post, (Jan. 3, 2021), available at, https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html (Ex. 13).

[18] *WATCH: Georgia election officials reject Trump call to 'find' more votes*, PBS (Jan. 4, 2021), available at, https://www.pbs.org/newshour/politics/watch-live-georgia-secretary-of-states-office-holds-press-conference (Ex. 14).

47.    A hand recount of paper ballots in Antrim County, Michigan confirmed that "Dominion's voting machines accurately tabulated the votes cast for president in Antrim County."[19]

48.    A spokesperson for the Michigan Secretary of State confirmed, "We have not seen any evidence of fraud or foul play in the actual administration of the election … What we have seen is that it was smooth, transparent, secure and accurate."[20]

49.    Following a bipartisan investigation into the vote in Antrim County, Michigan, the state's Republican Senate Majority Leader Mike Shirkey announced, "Our investigation, which has been very intense, discovered none, none of the allegations and accusations against Dominion [are] true."[21]

50.    In Arizona, the Chairman of the Maricopa County Board of Supervisors released a statement explaining, "The evidence overwhelmingly shows the system used in Maricopa County is accurate and provided voters with a reliable election ... The Dominion tabulation equipment met mandatory requirements during logic and accuracy testing before the Presidential Preference Election, the Primary Election and the General Election.  And after each of these 2020 elections, the hand count audit showed the machines generated an accurate count."[22]

---

[19] *See Trump still wins small Michigan county after hand recount*, Associated Press (Dec. 17, 2020), available at, https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387 (Ex. 15).

[20] Nick Corasaniti, Reid J. Epstein & Jim Rutenberg, *The Times Called Officials in Every State: No Evidence of Voter Fraud*, N. Y. Times (Nov. 10, 2020), available at, https://www.nytimes.com/2020/11/10/us/politics/voting-fraud.html (Ex. 16).

[21] Abigail Censky, *How Misinformation Lit The Fire Under A Year Of Political Chaos In Michigan*, NPR (Jan. 1, 2021), available at, https://www.npr.org/2021/01/01/952528193/how-misinformation-lit-the-fire-under-a-year-of-political-chaos-in-michigan (Ex. 17).

[22] Letter from Clint Hickman to Maricopa County Voters (Nov. 17, 2020), available at, https://www.maricopa.gov/DocumentCenter/View/64676/PR69-11-17-20-Letter-to-Voters#:~:text=Here%20are%20the%20facts%3A&text=The%20evidence%20overwhelmingly

51.     The Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees released a joint statement confirming that there is "**no evidence** that any voting system deleted or lost votes, changed votes, or was in any way compromised."[23]   The Joint Statement was signed and endorsed by, among others, the National Association of State Election Directors, National Association of Secretaries of State, and the U.S. Cybersecurity & Infrastructure Security Agency ("CISA")—then led by a Trump appointee, Chris Krebs.

### *Members of the Trump Campaign Raise Alarms About Powell's Baseless Claims, But She Nevertheless Appears as an Agent of the Campaign and Donald Trump at a Press Conference in Washington, D.C.*

52.     Early on, Powell decided on a false preconceived narrative to excuse Trump's impending loss in the 2020 election: during a televised interview with One America News Network ("OAN") on Election Day, she claimed that Democrats were trying to "steal the vote" from Trump and that "they ha[d] developed a computer system to alter votes electronically."[24]

53.     In her efforts to make the evidence conform to that false preconceived narrative, Powell found an ally in Patrick Byrne.  Byrne was previously the CEO of Overstock.com, but abruptly resigned his board seat and position as CEO after it was revealed that he had had a romantic affair with the now-notorious Russian agent, Maria Butina, who was sentenced to 18 months in prison after being indicted by federal prosecutors for trying to infiltrate powerful

---

%20shows%20the,voters%20with%20a%20reliable%20election.&text=As%20required%20by%20law%20(A.R.S,used%20in%20any%20Arizona%20elections (Ex. 18).
[23] Cybersecurity & Infrastructure Security Agency, *Joint Statement From Elections Infrastructure Government Coordinating Council & The Election Infrastructure Sector Coordinating Executive Committees* (Nov. 12, 2020), available at, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (Ex. 19) (emphasis added).
[24] *Sidney Powell: Dems will use 'lawfare' to alter election*, OAN (Nov. 5, 2020), available at, https://defendingtherepublic.org/?p=1154; https://www.youtube.com/watch?v=Vh5U_6apzvI&feature=emb_logo (last visited Jan. 7, 2021) (Ex. 20).

political circles in the United States at the direction of the Russian government.[25]  The day after the 2020 election, Byrne got in touch with Powell and Rudy Giuliani and told them that he knew months before the election that "goons" were going to steal the election, that he had started funding a plan in August, "had this plotted out what they were going to do," and had "reverse engineered" how the election was stolen.[26]  According to Byrne, his claims were "a little farfetched for other people in Washington," and Giuliani "came at this a bit differently," but Powell "was totally super receptive to what we had to say."[27]

54.    A couple of days after the election, Powell showed up at the Trump Campaign's headquarters and began pressing the campaign to focus suspicion on Dominion, saying that the Dominion strategy was ideal because it would draw into question the accuracy of voting in so many states.[28]

55.    When Trump Campaign attorneys Justin Clark and Matt Morgan sought evidence from Powell, she produced none.  They then told others that they should not present the Dominion theory because there was no evidence for it.[29]

---

[25] Michael Corkery, *Overstock C.E.O. Takes Aim at 'Deep State' After Romance With Russian Agent*, N.Y. Times (Aug. 15, 2019), available at, https://www.nytimes.com/2019/08/15/business/overstock-paul-byrne-maria-butina-affair.html (Ex. 21).
[26] *Patrick Byrne Explains Trump Path to Victory*, Corsi Nation (Dec. 24, 2020), available at, https://www.stitcher.com/show/corsi-nation-by-jerome-r-corsi-phd/episode/dr-corsi-news-12-24-20-patrick-byrne-explains-trump-path-to-victory-80388895 (Ex. 22).
[27] *Id.*
[28] Aaron C. Davis, Josh Dawsey, Emma Brown & Jon Swaine, *For Trump Advocate Sidney Powell, a playbook steeped in conspiracy theories*, Wash. Post (Nov. 28, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-trump-kraken-lawsuit/2020/11/28/344d0b12-2e78-11eb-96c2-aac3f162215d_story.html (Ex. 23).
[29] *Id.*

56.     At least one other Trump Campaign official was surprised by Powell's sudden involvement and observed that Powell did not seem interested in having evidence.[30]

57.     On November 6, 2020, around the same time Powell was meeting with the Trump Campaign, the domain name defendingtherepublic.org was registered, and Powell began using it as a fundraising website. By at least November 10, 2020, Powell's fundraising website proclaimed, "Over $500,000 must be raised in the next twenty-four hours" for her "to halt the certification of ballots in Georgia, Michigan, Nevada, Pennsylvania, and Wisconsin."[31] (Despite that representation, Powell is now admittedly using funds contributed to her fundraising website to fund her own legal defense.)[32]

---

[30] *Id.*

[31] Defending the Republic (Nov. 10, 2020), https://web.archive.org/web/20201110221040/http://ldfftar.org/ (Ex. 24).

[32] *The Rush Limbaugh Show*, iHeart Radio (Dec. 29, 2020), available at, https://www.iheart.com/podcast/1119-the-rush-limbaugh-show-57927691/episode/the-rush-limbaugh-show-podcast--75675693/ (last visited Jan. 7, 2021) (Ex. 25) (Powell: defendingtherepublic.org is a "non-profit that is working to help me defend all these cases *and to defend me* now that I'm under massive attack from the attorney general of Michigan and the City of Detroit and everything else.") (emphasis added).

58.     From November 8 to December 14—Powell, acting in concert with like-minded allies in the media, appeared on Fox Business, *The Epoch Times*, the Washington Examiner's podcast *Examining Politics*, and *The John Fredericks Show* to solicit donations to her fundraising website and to peddle the falsehood that Dominion was created in Venezuela to rig elections for Hugo Chávez, and had in fact rigged the 2020 U.S. Presidential Election by using "algorithms" in its machines to change the ballots and to "flip" and "shave" votes.[33]



---

[33] *Sidney Powell talks about her allegations regarding the computerized voting systems on election night*, Washington Examiner (Nov. 20, 2020), available at, https://www.washingtonexaminer.com/videos/sidney-powell-talks-about-her-allegations-regarding-the-computerized-voting-systems-on-election-night (Ex. 5) (last visited Jan. 4, 2021); *Sidney Powell on Lou Dobbs Tonight on 11/30/20*, YouTube (Nov. 30, 2020), available at, https://www.youtube.com/watch?v=4uMr-TRZNCw (Ex. 6) (last visited Jan. 4, 2021); *Sidney Powell to Newsmax TV: Our Case Was Prejudged*, Newsmax (Dec. 7, 2020), available at, https://defendingtherepublic.org/?p=1166; https://www.newsmax.com/newsmax-tv/sidney-powell-kraken-lawsuit-scotus/2020/12/07/id/1000459/ (last visited Jan. 4, 2021) (Ex. 26); *Evidence of Fraud: Sidney Powell and Lou Dobbs discuss*, Fox Business (Dec. 10, 2020), available at, https://defendingtherepublic.org/?p=1168; https://video.foxbusiness.com/v/6215520845001/#sp=show-clips (last visited Jan. 4, 2021) (Ex. 27); *Exclusive: Sidney Powell on 2020 Election Lawsuits, Supreme Court Decision, and the Flynn Case*, The Epoch Times (Dec. 13, 2020), available at, https://defendingtherepublic.org/?p=1170; https://www.theepochtimes.com/exclusive-sidney-powell-on-election-lawsuits-supreme-court-decision-and-the-flynn-case_3617067.html (last visited Jan. 4, 2021) (Ex. 28); *Sidney Powell: Kraken Released in MI; Scotus Next!*, The John Fredericks Show (Dec. 14, 2020), available at, https://www.johnfredericksradio.com/podcast/december-14-2020/; https://www.youtube.com/watch?v=qWt1vB-OIZk&list=PL1q2i_zsupwSdYDFTH0pA-X-YNz57E5TV&index=2 (last visited Dec. 29, 2020) (Ex. 29).

59.     On November 14, 2020, Donald Trump tweeted: "I look forward to Mayor Giuliani spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS! Rudy Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our other wonderful lawyers and representatives!"[34]   The tweet generated nearly 50,000 comments, was retweeted over 76,000 times, and received over 325,000 likes.



60.     During a Newsmax interview on November 17, Powell claimed to have bombshell evidence to substantiate her wild accusations: she promised to tweet out a video of Dominion's founder publicly admitting he "can change a million votes, no problem at all."[35]   Powell never tweeted out such a video because it does not exist.  The video does not exist because no such statement was ever made, nor would it be made, by Dominion's founder.

61.     Despite the fact that Trump appointee Chris Krebs had already confirmed there was no evidence of voting machine manipulation, despite the fact that Powell had told a nationally televised audience that she had incredible video evidence that she never produced, and despite the

---

[34]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (Nov.   14,   2020),   available   at, https://twitter.com/realdonaldtrump/status/1327811527123103746 (Ex. 106).
[35] *Sidney Powell to Newsmax: Dominion Designed to 'Rig Elections,'* Newsmax (Nov. 17, 2020), available       at,       https://www.newsmax.com/newsmax-tv/sidney-powell-dominion-voting-systems/2020/11/17/id/997526/ (last visited Dec. 4, 2020) (Ex. 30).

fact that the Trump Campaign knew that Powell had no evidence for her false accusations against Dominion, on the morning of November 19, 2020, Donald Trump invited more than 88 million of his Twitter followers to tune in for an "Important News Conference today by lawyers on a very clear and viable path to victory. Pieces are very nicely falling into place. RNC at 12 p.m."[36]

62.     At noon on November 19, 2020, along with Giuliani and Jenna Ellis, Powell gave a televised press conference at the Republican National Committee headquarters in Washington, D.C. Giuliani stated that they were "representing President Trump and we're representing the Trump campaign" and Ellis introduced the group as "an elite strike force team that is working on behalf of the president and the campaign."



Sidney Powell speaks during a televised press conference from the Republican National Committee headquarters in Washington, D.C. on November 19, 2020.

63.     After being introduced as a lawyer for the Trump Campaign and President Trump, Powell falsely told a global audience that Dominion was "created in Venezuela at the direction of

---

[36] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 19, 2020), available at, https://twitter.com/realDonaldTrump/status/1329408856733184008 (Ex. 31).

Hugo Chávez to make sure he never lost an election," that Dominion flipped votes from Trump to Biden by running an algorithm that automatically flips all the votes, and that George Soros's "number two person" Lord Malloch Brown was "one of the leaders of the Dominion project." Based on these false assertions of fact, Powell stated, "There should never be another election conducted in this country, I don't care if it's for local dog catcher, using a Dominion machine ..."[37]

64.  The same day as Powell's televised D.C. press conference with Rudy Giuliani and Jenna Ellis, someone purchased the web domain sidneypowell2024.com.  Privacy services were used to hide the registrant's name and address.

*Despite Having No Evidence to Support Her Claims,*
*Powell Capitalizes on Her False Accusations to Ingratiate Herself to Donald Trump*

65.  The same day as the press conference, Fox News's Tucker Carlson called Powell out for failing to produce any evidence to support her incredible claims.  Despite his invitation to Powell to appear on his show and present her evidence, "she never sent [] any evidence, despite a lot of requests  ... not a page."  He also stated that when he and his staff kept pressing for Powell to present evidence, "she got angry with us and told us to stop contacting her ... so we checked with others around the Trump campaign, people in positions of authority; they told us Powell has never given them any evidence either, nor did she provide any today at the press conference."  He concluded that Powell "never demonstrated that a single actual vote moved illegitimately by software from one candidate to another.  Not one."[38]

---

[37] *Trump Campaign News Conference on Legal Challenges,* CSPAN (Nov. 19, 2020), available at, https://www.c-span.org/video/?478246-1/trump-campaign-alleges-voter-fraud-states-plans-lawsuits (last visited Jan. 4, 2021) (Ex. 32).
[38] *MUST-SEE: Tucker Carlson ABANDONS Trump's election fraud case on air*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=BspHzH6RRxo (last visited Jan. 4, 2021) (Ex. 33).

66.     Despite Powell's failure to provide evidence, video of her false accusations at the D.C. press conference was foreseeably tweeted by the GOP and by Powell's ally, Donald Trump, to his more than 88 million followers, instantly and irreparably damaging Dominion's reputation and business to a global audience and putting the lives of Dominion employees in danger.[39]



67.     Emboldened by Trump's endorsement of her false accusations, which launched her into political superstardom, Powell's defamatory media campaign continued and intensified with appearances on the Fox Business program, *Mornings with Maria* and the Washington Examiner's podcast *Examining Politics*.

---

[39]   Donald J. Trump (@realDonaldTrump), Twitter (Nov. 20, 2020), available at, https://twitter.com/realDonaldTrump/status/1329760015314464770?s=20 (Ex. 34).

68.     On November 20, 2020, after a hand count of 100% of the paper ballots cast in Georgia's election verified the accuracy of the machine counts and conclusively disproved Powell's accusations of voter fraud in Georgia, Georgia's Republican Governor Kemp and Secretary of State Raffensperger certified the election results in that state.[40]

69.     The very next day, Powell conducted a telephonic interview with Newsmax, during which she doubled down on her false accusations against Dominion, claimed that the Georgia certification was a "total farse," and claimed that "Mr. Kemp and the Secretary of State … are in on this Dominion scam with their last-minute purchase or award of a contract to Dominion of a hundred million dollars."[41]  Governor Kemp and Secretary of State Raffensperger received death threats as a result of Powell's false claims.

70.     The next day, on November 22, during an interview on ABC News's *This Week*, Trump loyalist Chris Christie gave an interview in which he stated "If you've got the evidence of fraud, present it. … The conduct of the president's legal team has been a national embarrassment. Sidney Powell accusing Governor Brian Kemp of a crime, on television, yet being unwilling to go on TV and defend and lay out the evidence that she supposedly has. … If you're unwilling to come forward and present the evidence, it must mean the evidence doesn't exist."[42]  Powell has ***never***

---

[40] *See* Kate Brumback, *Georgia officials certify election results showing Biden win*, Associated Press (Nov. 20, 2020), available at, https://apnews.com/article/georgia-certify-election-joe-biden-ea8f867d740f3d7d42d0a55c1aef9e69 (Ex. 35).

[41] *Sidney Powell: It will be BIBLICAL*, Newsmax TV (Nov. 21, 2020), available                    at, https://www.youtube.com/embed/Y68pEknYyCM?rel=0&start=0 (last visited Jan. 4, 2021) (Ex. 36).

[42] Paul Kane and Felicia Sonmez, *Chris Christie calls the conduct of Trump's legal team a 'national embarrassment*,*'* Wash. Post (Nov. 22, 2020), available at, https://www.washingtonpost.com/politics/republicans-christie-trump-concede/2020/11/22/05c280e6-2cda-11eb-bae0-50bb17126614_story.html (Ex. 37).

come forward to present evidence that Dominion bribed Governor Kemp or Secretary Raffensperger because no such evidence exists; Powell's accusations are false.

71.     That same day, someone purchased the web domain sidneypowellforpresident.com. Privacy services were used to hide the registrant's name and address.

72.     In calls to the White House, several Republican senators warned that Powell seemed unhinged,[43] and the Trump Campaign issued the following statement: "Sidney Powell is practicing law on her own.  She is not a member of the Trump Legal Team.  She is also not a lawyer for the President in his personal capacity."



73.     Powell was undeterred.  On November 23, she issued public statements claiming that "votes for Trump and other Republicans" had been "stolen by massive election fraud through

---

[43] Aaron C. Davis, Josh Dawsey, Emma Brown & Jon Swaine, *For Trump Advocate Sidney Powell, a playbook steeped in conspiracy theories*, Wash. Post (Nov. 28, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-trump-kraken-lawsuit/2020/11/28/344d0b12-2e78-11eb-96c2-aac3f162215d_story.html (Ex. 23).

Dominion" and that she was compiling "overwhelming" "evidence" that Dominion's software "was used to shift millions of votes from President Trump…"[44]

74.    On November 24, just two days after the Trump Campaign had publicly distanced itself from her, Powell repeated her defamatory falsehoods about Dominion during a televised interview on the Fox Business program *Lou Dobbs Tonight*, which Powell's ally Donald Trump foreseeably retweeted to his more than 88 million Twitter followers.[45]



---

[44] Kathryn Watson, *Trump legal team disavows association with lawyer Sidney Powell*, CBS News (Nov. 23, 2020), available at, https://www.cbsnews.com/news/sidney-powell-disavowed-by-trump-campaign/ (Ex. 38); Masooma Haq, *Former Republican Candidate Alleges Hard Evidence of Corruption in US Election System*, The Epoch Times (Nov. 23, 2020), available at, https://www.theepochtimes.com/expert-hard-evidence-of-corruption-in-us-election-system_3590417.html (Ex. 39).

[45] *BREAKING NEWS: Sidney Powell Tells Lou Dobbs Her Lawsuit in Georgia May Be Filed As Soon As Tomorrow*, YouTube (Nov. 24, 2020), at, https://www.youtube.com/watch?v=KpT2Rz4rTWM (last visited Jan. 4, 2021) (Ex. 40); Lou Dobbs (@LouDobbs), Twitter (Nov. 24, 2020), available at, https://twitter.com/LouDobbs/status/1331366325629968386?s=20 (Ex. 41).

***Powell and Wood File Sham Litigations and Hold a Georgia Political Rally
to Further Their Defamatory Media Campaign***

75.     On November 25, Powell and her Georgia-based ally and co-counsel L. Lin Wood filed lawsuits together in federal courts in Georgia and Michigan.  (Wood is known for using Twitter —until his account was permanently suspended on January 6, 2021—and Parler to falsely accuse Chief Justice John G. Roberts of being a child-murdering pedophile and to call for Vice President Mike Pence to be executed by "firing squad" for "treason."[46])  In their lawsuits, Powell and Wood alleged "massive election fraud" in the 2020 election, claiming that Dominion was "founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chávez never lost another election."[47]  The following week, on December 1 and 2, 2020, Powell and Wood filed similar lawsuits in federal courts in Wisconsin and Arizona, repeating their false claims of "massive election fraud."

76.     As licensed attorneys, Powell and Wood were obligated to investigate the factual basis for their claims before making them in public filings.  As such, they either conducted the inquiry required of them as licensed attorneys and violated their ethical obligations by knowingly

---

[46]    Lin    Wood    (@LLinWood),    Twitter    (Jan.    1,    2021),    available    at, https://twitter.com/LLinWood/status/1345067881319587840; Lin Wood (@LLinWood), Twitter (Jan.    4,    2021),    available    at,    https://twitter.com/LLinWood/status/1345991175690457091; LLinWood    (@linwood),    Parler    (Jan.    4,    2021),    available    at, https://parler.com/post/99be4095510747c2928ed02a4bc41a18 (Ex. 9).

[47] Complaint at ¶ 5, *Pearson v. Kemp*, No. 12-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1], available at, https://defendingtherepublic.org/wp-content/uploads/2020/11/COMPLAINT-CJ-PEARSON-V.-KEMP-11.25.2020.pdf; Complaint for Declaratory, Emergency, and Permanent Injunctive Relief at ¶ 5, *King v. Whitmer*, No. 20-cv-13134 (E.D. Mich. Nov. 29, 2020) [Dkt. 6], available    at,    https://defendingtherepublic.org/wp-content/uploads/2020/11/Michigan-Complaint.pdf.

making false assertions rebutted by the information they found, or they violated their ethical obligations by purposefully avoiding undertaking the reasonable inquiry required of them.

77.     After Powell and Wood had filed their election lawsuit in Georgia and posted the "evidence" from that case to their fundraising website, Trump loyalist and then-U.S. Attorney General William Barr rebutted Powell's and Wood's claims against Dominion, stating, "There's been one assertion that would be systemic fraud and that would be the claim that machines were programmed essentially to skew the election results.  And the DHS and DOJ have looked into that, and so far, *we haven't seen anything to substantiate that*."[48]

78.     On December 2, 2020, the same day they filed their fourth election lawsuit, Powell and Wood co-led and spoke at a televised "Stop the Steal" rally attended by Trump supporters in Alpharetta, Georgia.  During the rally, Powell and Wood falsely accused Dominion of rigging the election against Trump, being created in Venezuela to rig elections for Hugo Chávez, and bribing Georgia's governor and secretary of state.  Based on those false accusations, which Wood claimed were backed by "piles of evidence" and "mountains of evidence," Powell told the crowd that there should not be a runoff election for Georgia's Senate seats "certainly not on Dominion machines," and implored Georgia voters to "flood the legislators here in Georgia and the Governor and the Secretary of State with phone calls and letters."  Wood instructed the crowd to surround Governor Kemp's house and blow their horns, led the crowd in chanting "LOCK HIM UP!," and vowed to never vote for Kemp again.  Wood also used the rally to promote OAN, Newsmax, and The Epoch Times—*i.e.*, three media outlets that gave Powell a platform and endorsed and repeated Powell's

---

[48] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (Ex. 43).

and Wood's false accusations about Dominion.[49]    Powell and Wood both solicited donations during the rally and, at one point Wood shouted, to thunderous applause, "How about Sidney Powell and Mike Flynn in 2024?"



Sidney Powell and L. Lin Wood at their "Stop the Steal" rally in
Alpharetta, Georgia, on December 2, 2020.



Hundreds gather to hear Sidney Powell and L. Lin Wood speak at a "Stop the
Steal" rally in Alpharetta, Georgia, on December 2, 2020.

---

[49] *Sidney Powell, Lin Wood attend 'Stop the Steal' rally in Georgia*, YouTube, (Dec. 2, 2020), available at, https://www.youtube.com/watch?v=pq-_B5z3QIA (last visited Jan. 4, 2021) (Ex. 44).

79.     Within a week of their "Stop the Steal" rally in Georgia, all four of the election lawsuits Powell and Wood had filed together were dismissed.  Between November 25 (the date their first election lawsuits were filed) and December 9 (the date their last election case was dismissed), when they were supposedly litigating cases they claimed would overturn the results of a U.S. presidential election, Powell gave five interviews (to Newsmax, Fox Business, *The John Fredericks Show*, and *Huckabee* with Mike Huckabee), during which she repeated her defamatory falsehoods about Dominion and touted the "evidence" on her fundraising website.

80.     Powell and Wood filed their election lawsuits—which never had a chance of reversing the results of the election—with the obvious and cynical purpose of creating court documents they could post on their fundraising websites and tout as "evidence" during their media campaign, to raise funds and their public profiles, and to ingratiate themselves to Donald Trump for additional benefits and opportunities that they expected to receive as a result of their association with him.  Indeed, the same day that Powell filed her election lawsuit in Georgia, Trump pardoned Powell's client Michael Flynn—who had previously pleaded guilty to lying to the FBI.  In December, Donald Trump repeatedly gave Powell an audience in the White House, where she pressured him to appoint her special counsel to investigate "election fraud," *i.e.*, the very false accusations giving rise to this case.  And, on information and belief, Powell has capitalized on her new-found fame to sell more copies of her book and t-shirts.[50]

81.     The Courts where Powell and Wood filed their meritless lawsuits saw right through their sham.  The United States District Court for the Eastern District of Michigan found that Powell

---

[50] *See* Sidney Powell (@SidneyPowell1), Twitter (Jan. 2, 2021), available at, https://twitter.com/SidneyPowell1/status/1345578709919670272; *see also* Sidney Powell, https://www.sidneypowell.com/shop (last visited Jan. 7, 2021) ("Due to increased demand, new book orders are on backorder until January 1, 2021.  Shop a selection of Sidney Powell's Best Seller <u>Licensed to Lie</u>, and "Creeps on A Mission" T-Shirts!").

and Wood had submitted "nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden." Op. & Order at 34, *King v. Whitmer*, No. 20-cv-12134 (E.D. Mich. Dec. 7, 2020) [Dkt. 62].

82.     The United States District Court for the District of Arizona found that the evidence put forward by Powell and Wood was impressive only for its volume and was "largely based on anonymous witnesses, hearsay, and irrelevant analysis of unrelated elections," and includes "expert reports" that "reach implausible conclusions, often because they are derived from ***wholly unreliable sources***." Order at 24-25, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84]. The "wholly unreliable sources" put forward by Powell and Wood in that case (whose declarations were posted on Powell's fundraising website) included Terpsichore Maras-Lindeman, Russell Ramsland, William Briggs, and Josh Merritt a.k.a. "Spyder."

83.     After her last election lawsuit was dismissed on December 9, Powell doubled down on her false accusations about Dominion; in response to a tweet by Donald Trump, she wrote, "The election & media were all #rigged. Your voters broke the #Dominion algorithm… This election fraud must be completely exposed & ended NOW for the world."[51]

---

[51]     Sidney Powell (@SidneyPowell1), Twitter (Dec. 10, 2020), available at, https://twitter.com/SidneyPowell1/status/1337251453359026183?s=20 (Exhibit 45).



84.     From December 10 to 15, Powell's defamatory media campaign continued with appearances on Fox Business's *Lou Dobbs Tonight*, *The Epoch Times*, and *The John Fredericks Show*, during which she repeated her defamatory falsehoods about Dominion.

85.     During her December 10 appearance on *Lou Dobbs Tonight*, Powell repeated her falsehoods about Dominion, claimed they were supported by "real evidence" on her fundraising website defendingtherepublic.org, and—in response to Dobbs's offer to put forward on the broadcast whatever evidence Powell had—Powell promised to get Dobbs "more information that is just stunning tonight."[52]  Powell broke that promise: as admitted by Dobbs weeks later, "Eight

---

[52] *Evidence of Fraud: Sidney Powell and Lou Dobbs discuss*, Fox Business (Dec. 10, 2020), available at, https://defendingtherepublic.org/?p=1168; https://video.foxbusiness.com/v/6215520 845001/#sp=show-clips (last visited Jan. 4, 2021) (Ex. 27).

weeks from the election and we still don't have verifiable, tangible support for the crimes that everyone knows were committed… We have had a devil of a time finding actual proof."[53]

86.    On December 11, 2020, Powell posted a tweet, tagging Donald Trump, L. Lin Wood, and Newsmax's Greg Kelly, and stating:

> #ElectionFraud
> There should be no more voting on computers or #Dominion anywhere
> Can only expect another #rigged result[54]



---

[53]    Matt Wilstein (@mattwilstein), Twitter (Jan. 4, 2021), available at, https://twitter.com/mattwilstein/status/1346245027932979200.

[54]    *See* Sidney Powell (@SidneyPowell1), Twitter (Dec. 11, 2020), available at, https://twitter.com/SidneyPowell1/status/1337264198041133057 (Ex. 46).

***To Bolster Her Fundraising and Defamatory Media Campaign, Powell Proffered "Evidence"***
***That Was Deliberately Misrepresented, Manufactured, and Cherry-Picked***

87.     Powell put forward purported "evidence" in her court filings that was deliberately misrepresented, manufactured, and cherry-picked.  Although Dominion is not currently suing Powell based on the false statements in Powell's sham litigations, the manipulation of the judicial process apparent in Powell's court filings is additional evidence that Powell knew the statements she made about Dominion—during her defamatory press conference in Washington, D.C., "Stop the Steal" rally, and media campaign—were false.  Moreover, as further evidence of her actual malice, during her defamatory media campaign, Powell sought to lend credence to her false accusations—and to solicit donations—by touting the flawed "evidence" attached to the court filings posted to her fundraising website.

88.     For example, Powell sponsored the declaration of an anonymous "military intelligence expert" code-named "Spyder," who has since been identified as Josh Merritt.[55] Powell's "military intelligence expert" has now admitted that he never actually worked in military intelligence and that the declaration Powell's team wrote for him to sign is "misleading" and he "was trying to backtrack" on it.[56]

89.     Powell also cherry-picked Princeton professor Andrew W. Appel's statements about a decades-old machine not designed by Dominion, which was not used in the 2020 election in any of the swing states being challenged by Powell.  Powell appended Professor Appel's cherry-picked statements to her court filings so that she could post them to her fundraising website, as

---

[55] Complaint at Ex. 7, *Pearson v. Kemp*, No. 12-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-9], available at, https://defendingtherepublic.org/?page_id=986.
[56] Emma Brown, Aaron C. Davis & Alice Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Wash. Post (Dec. 11, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html (Ex. 2).

though Professor Appel's expertise were "evidence" supporting her election-rigging claims against Dominion. In reality, Professor Appel and 58 other specialists in election security have forcefully rebutted Powell's claims, explaining that they "have never claimed that technical vulnerabilities have ***actually*** been exploited to alter the outcome of any US election."[57] They further explained that "***no credible evidence*** has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."[58]

90. Powell also touted a shocking declaration from an anonymous purported Venezuelan military officer alleging a decades-old international election-rigging conspiracy beginning with Hugo Chávez.[59] But the "anonymous witness's" explanation for why he purportedly came forward was a near-verbatim recitation from another declaration put forward by Powell, proving that those witnesses did not each write their declarations independently and raising serious questions about the role that Powell and her team played in drafting the declarations attached to Powell's court filings and touted as "evidence" during her defamatory media campaign.

---

[57] *See* Tony Adams, Prof. Andrew W Appel, et al., *Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence*, Matt Blaze (Nov. 16, 2020), available at, https://www.mattblaze.org/papers/election2020.pdf (Ex. 47) (emphasis added).
[58] *Id.* (emphasis added).
[59] Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela," *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4], available at, https://defendingtherepublic.org/?page_id=986; Complaint at Ex. 1, *King v. Whitmer*, No. 20-cv-13134 (E.D. Mich. Nov. 25, 2020) [Dkt. 1-1], available at, https://defendingtherepublic.org/?page_id=1015.

| Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela," *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4]. | Statement by Ana Mercedes Díaz Cardozo, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-3 at ¶ 3]. |
|---|---|
| "I want to alert the public and let the world know the truth about the corruption, manipulation, and lies being committed by a conspiracy of people and companies intent upon betraying the honest people of the United States and their legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to wrongfully gain and keep power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and keep power by changing the free will of the people and subverting the proper course of governing." | "I want to alert the public and let the world know the truth about corruption, manipulation, and lies being committed through a conspiracy of individuals and businesses with the intention of betraying the honest people of the United States and its legally constituted institutions and fundamental rights as citizens. This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world. It is a conspiracy to unjustly gain and maintain power and wealth. It involves political leaders, powerful companies, and other persons whose purpose is to gain and maintain power by changing people's free will and subverting the proper course of governing." |

### *Powell Put Forward Doctored Evidence and*
### *Withheld Key Proof to Support Her False Accusations About Dominion*

91.     Powell and Wood repeatedly told national audiences that Dominion had bribed

Georgia's Republican governor and secretary of state for a last-minute no-bid contract.  They

claimed to have evidence to support that accusation, but never produced it during their televised

appearances or on Twitter.   Instead, in their sham litigation in Georgia, they claimed that

Governor Kemp and Secretary of State Raffensperger had "rushed" through the purchase of

Dominion voting machines and software, noting that the Dominion certification from the secretary

of state was "undated," and attaching a copy of an undated Dominion Certification.  In reality, the

authentic certificate is dated August 9, 2019—more than a year before the November 2020 election—and is publicly available online at the Georgia Secretary of State's website.[60]

| Doctored undated Secretary of State certificate attached to Powell's complaint in Georgia | Authentic dated Secretary of State certificate publicly available online |
|---|---|
|  | |

92.     Upon information and belief, Powell, Wood, or someone reporting to them downloaded the authentic certificate from the Secretary of State's website and cut off the date, seal, and signature before attaching the doctored document as an exhibit to their Georgia complaint

---

[60] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/ (Ex. 1); *compare* Complaint at Ex. 5, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-6], available at, https://defendingtherepublic.org/?page_id=986 *with* Georgia Secretary of State, Dominion Certification (Aug. 9, 2019), available at, https://sos.ga.gov/admin/uploads/Dominion _Certification.pdf (Ex. 10).

and uploading it to Powell's fundraising website as "evidence" supporting the bribery accusations they made during the "Stop the Steal" rally and in media appearances.

93.     Other government records prove that Dominion won the Georgia contract after scoring the highest in a ***competitive*** bid process (not a no-bid process)—during which it competed against ES&S and Smartmatic; those records are also publicly available on the very same webpage where, upon information and belief, Powell, Wood, or someone reporting to them downloaded the dated Dominion Certification before doctoring it.[61]



---

[61] Georgia Secretary of State, *Elections Security Is Our Top Priority: Security-Focused Tech Company, Dominion Voting to Implement New Verified Paper Ballot System*, available at, https://sos.ga.gov/securevoting/ (Ex. 1).

94.     Anyone downloading the Dominion Certification from the Secretary of State's website can see—in the links directly ***above*** it—that Dominion competed ***against*** Smartmatic for the Georgia contract and is thus not the same company as Smartmatic or owned by Smartmatic.

95.     During her defamatory media campaign, Powell either actually knew about these readily available government records or purposefully avoided them in reckless disregard of the truth and in violation of her ethical duties as a licensed attorney.

96.     Ironically, of the three companies identified on the Georgia Secretary of State's website as having submitted a bid for the Georgia contract, Dominion is the only one that has never serviced an election in Venezuela.   Both Smartmatic and ES&S have serviced Venezuelan elections.   But Powell targeted Dominion with her claim of Venezuelan election-rigging not because she believed it was true, but because it supported her false preconceived narrative.

***Starting with the Claims of a Facially Unreliable Purported Venezuelan Military Officer, Powell Deliberately Embellished His Claims and Misrepresented the Relationship Between Dominion and Smartmatic to Support Her Defamatory Falsehoods About Dominion***

97.     During her defamatory media campaign, Powell has asserted that her accusations of Venezuelan election-rigging against Dominion are supported by the declaration of an anonymous purported Venezuelan military officer.   There are several obvious reasons why that source is unreliable on its face, including: (1) a key portion of his declaration is nearly word-for-word identical to another declaration submitted by Powell, proving that those witnesses did not write their declarations independently; (2) his declaration has been redacted to conceal his identity and key details about his background; (3) even if he is who he purports to be, there are serious reasons to doubt the outlandish claims of someone ***who worked for a dictatorship with an interest in undermining confidence in American democracy***, particularly where, as here, his claims had the potential to—and did in fact—undermine confidence in American democracy; and (4) American Trump appointees like Chris Krebs and Bill Barr—who, unlike Powell's source,

have never worked for a Venezuelan dictator—have confirmed that there was no widespread voter fraud in the 2020 election.

98.     But even if one were to credit the incredible claims of the associate of a foreign dictator, even his declaration—which was attached to Powell's court filings—does ***not*** actually claim that ***Dominion*** was created in Venezuela for the purpose of rigging elections for Hugo Chávez.    Rather, his declaration makes that claim about Dominion's competitor, ***Smartmatic***.  Although his declaration blithely asserts that Smartmatic software is "in the DNA" of every vote tabulating company's software and system, it fails to provide any credentials, expertise, or factual basis whatsoever from which the declarant could possibly determine what is "in the DNA" of proprietary software he never even claims to have had access to, which is operated by multiple voting machine companies he never even claims to have worked for.[62]  As such, Powell knew or recklessly disregarded that that claim was obviously baseless and false.

99.     In addition, if Powell's anonymous purported Venezuelan military officer is in fact Leamsy Villafaña José Salazar—as has been reported by the Associated Press and the Caracas Chronicles—that would raise other serious doubts about the veracity of his declaration. After serving Hugo Chávez, Salazar worked for Diosdado Cabello, the alleged head of a Venezuelan drug cartel, before cooperating with the United States Drug Enforcement Agency.  He is quoted in a 2016 book titled *Boomerang Chávez: The Fraud that Led to Venezuela's Collapse*, which alleges that Smartmatic (not Dominion) was involved in rigging elections for Hugo Chávez in Venezuela.

---

[62] Declaration of an anonymous source claiming to have been selected for the "national security guard detail of the President of Venezuela," *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-2 at ¶ 4], available at, https://defendingtherepublic.org/?page_id=986.

100.    But—unlike the declaration attached to Powell's sham litigation—the book makes ***no mention of Dominion*** and identifies Salazar ***by name***.  This raises troubling questions about Powell's knowledge of the falsity of her claims about Dominion and the evidence she presented in support of those claims.  For example, if Salazar was already identified by name in a book alleging Venezuelan election-rigging, why was his identity redacted from the declaration attached to Powell's court filings?  And if Salazar actually believed the Smartmatic software is "in the DNA" of Dominion and every other American voting machine company, why is that explosive accusation not mentioned anywhere in the book for which he was a source?  If Salazar is now a pure-hearted whistleblower with the best interests of American democracy at heart, why did he wait more than five years after arriving in the United States—until after Trump had lost the presidential election—to tell anyone that U.S. elections were being rigged through the use of decades-old Venezuelan vote-flipping software allegedly "in the DNA" of the software of all companies servicing U.S. elections?  And, especially given his prior cooperation with the U.S. federal government, why did he take his allegation to Sidney Powell, rather than to Trump's Attorney General Bill Barr or Trump's Justice Department or Trump appointee Chris Krebs?  Or perhaps he did take his allegation to them and they found it utterly lacking in credibility for all of the reasons set forth above, all of which were known to or readily knowable by Powell before she touted his allegation during her televised media tour.

101.    In any event, Powell ***deliberately*** embellished her anonymous declarant's obviously false accusation about Smartmatic software being "in the DNA" of Dominion's systems, claiming, for example, that "Smartmatic owns Dominion,"[63] that Dominion and Smartmatic "have the same

---

[63] *The Affidavit: Sidney Powell With Lou Dobbs*, YouTube (Nov. 16, 2020), available at, https://www.youtube.com/watch?v=n_p1sonhp-k (last visited Jan. 4, 2021) (Ex. 48).

history from their inception," that "[t]here's thousands of people in federal prison on far less evidence of criminal conduct than we have already against the Smartmatic and Dominion Systems companies,"[64] and that "[t]he flipping of votes by Dominion is even advertised in their ability to do that … They've done it in Venezuela."[65]

102.    These are just a few examples of instances when Powell deliberately misrepresented evidence in her possession to conflate Dominion and Smartmatic in order to tarnish Dominion with claims that had actually been made about Smartmatic.  For example, Powell gave an interview on *The Sean Hannity Show* and falsely claimed, "Senator Warren and Klobuchar and some others, in December of 2019, were complaining about the Venezuelan connection and the corruption in the Dominion systems.  And Carolyn Maloney was one of the congressmen who, ten years ago or so, called it out and tried to get the government not to approve its use whatsoever."[66]

103.    Powell's own court filings prove she knows those claims are false.  Congresswoman Maloney's letter (which Powell knew about because it was attached to her court filings) was not about Dominion; instead, it raised concerns that "a Venezuelan businessman" had

---

[64] *Sidney Powell Follows Up With Lou Dobbs About Today's Press Briefing*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=X-53TpxRtxI (last visited Jan. 4, 2021) (Ex. 49).

[65] *Powell: Election Fraud Now Obvious Because President Trump's Landslide Victory Broke Dominion 'Vote-Switch' Algorithm*, OAN (Dec. 30, 2020), available at, https://www.oann.com/powell-election-fraud-now-obvious-because-president-trumps-landslide-victory-broke-dominion-vote-switch-algorithm/ (last visited Jan. 4, 2021) (Ex. 50); *The Rush Limbaugh Show*, iHeart Radio (Dec. 29, 2020), available at, https://www.iheart.com/podcast/1119-the-rush-limbaugh-show-57927691/episode/the-rush-limbaugh-show-podcast--75675693/ (last visited Jan. 7, 2021) (Ex. 25).

[66] *The Sean Hannity Show* with Louie Gohmert, iHeart Radio (Dec. 23, 2020), available at, https://www.sidneypowell.com/media/listen-below-for-sidney-powells-latest-insight-into-the-fraudulent-2020-election (last visited Jan. 4, 2021) (Ex. 51).

"a controlling interest in Smartmatic."[67]   And, far from complaining about a "Venezuelan connection" and "corruption" in Dominion's systems or saying that Smartmatic owns Dominion, Senators Warren and Klobuchar's letter (which Powell knew about because it was attached to her court filings) raises questions about potential vulnerabilities—not "corruption"—in Dominion's systems, and makes clear that Dominion is majority owned by an American private equity firm— not Smartmatic or Venezuelans.[68]   Far from simply raising concerns about *potential* vulnerabilities as Senators Warren and Klobuchar had done, Powell falsely accused Dominion of actually rigging the 2020 election and having been designed for that very purpose, and then ***deliberately*** misrepresented that the letter from Senators Warren and Klobuchar was evidence supporting her false claim.

### *Powell Put Forward Conspiracy Theorists, Con Artists, and Other Facially Unreliable Sources as Experts*

104.    In order to bolster and lend credence to her false accusations about Dominion, Powell also touted "expert" witnesses who submitted declarations in support of her sham litigations, which Powell posted to her fundraising website.  Powell's so-called experts included Terpsichore Maras-Lindeman, Russell Ramsland, William Briggs, Matt Braynard, and Navid Keshavarz-Nia.

105.    According to a publicly available court order, Terpsichore Maras-Lindeman is a serial liar and con artist.[69]  After serving in the Navy for less than a year, Maras-Lindeman created

---

[67] Letter from Congresswoman Maloney to Henry M. Paulson (Oct. 6, 2006), Complaint at Ex. 24, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-24], available at, https://defendingtherepublic.org/?page_id=986.

[68] Letter from Senator Warren, Senator Klobuchar, Senator Ron Wyden, and Congressman Mark Pocan (Dec. 6, 2019), Complaint at Ex. 26, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-26], available at, https://defendingtherepublic.org/?page_id=986.

[69] Findings of Fact, Conclusions of Law, and Order for Judgment, *State v. Maras*, No. 51-2018-CV-01339 (Dist. Ct. N. Central Jud. Dist., N.D. Sept. 11, 2020), available at, https://attorneygeneral.nd.gov/sites/ag/files/documents/RecentActions/2020-09-14-

a profile on Together We Served, an online veteran community, and falsely claimed an extensive military career—including that she had reached the rank of lieutenant, served in the Office of Naval Intelligence and in combat zones in the Republic of Kosovo, Afghanistan, and Iraq, and was awarded multiple medals including a Purple Heart.[70]  In a recent fraud case, attorneys for the state of North Dakota said that Maras-Lindeman falsely claimed to be a doctor.[71]  They also said she used multiple aliases and social security numbers and created exaggerated online resumes as part of what they called "a persistent effort … to deceive others."[72]  They alleged that Maras-Lindeman organized a charitable event to raise funds for homeless shelters, a Catholic school, and a monument, but then used money she collected on purchases for herself at Wal-Mart, McDonald's, QVC, and elsewhere.[73]  A judge ordered Maras-Lindeman to pay more than $25,000 after finding that she violated consumer protection laws by misspending money she raised and soliciting donations while misrepresenting her experience and education.[74]  Powell put Maras-Lindeman's affidavit forward as evidence without even bothering to speak to her, whether to assess her credibility or otherwise.[75]  In addition, Powell either knew that she was putting forward the

---

MagicCityChristmas-Judgment.pdf (Ex. 52); *see also* Jon Swaine, *Powell's secret intelligence contractor witness is a pro-Trump podcaster*, Wash. Post (Dec. 24, 2020), available at, https://www.washingtonpost.com/investigations/sidney-powells-secret-intelligence-contractor-witness-is-a-pro-trump-podcaster/2020/12/24/d5a1ab9e-4403-11eb-a277-49a6d1f9dff1_story.html (Ex. 53).

[70] LT Terpsichore Lindeman, Together We Served, (Mar. 5, 2020), available at, https://web.archive.org/web/20200305152810/https%3A/navy.togetherweserved.com/usn/servlet/tws.webapp.WebApp?cmd=SBVTimeLine&type=Person&ID=506419 (Ex. 54); Ex. 53.

[71] Ex. 52; *see also* Ex. 53.

[72] *Id.*; Complaint at 26, *State v. Maras*, No. 51-2018-CV-01339 (Dist. Ct. N. Central Jud. Dist., N.D. Jul. 2, 2018) (Ex. 55).

[73] *Id.*

[74] Ex. 52.

[75] Ex. 53 ("Maras-Lindeman told The Post she had never spoken directly to Powell or anyone working on her legal team.  She said she distributed the affidavit widely to like-minded people and was unaware it had come to Powell's attention until it appeared as an exhibit in one of her cases.").  Powell posted Maras-Lindeman's affidavit to her fundraising website and attached it to court

affidavit of a judicially adjudicated con artist, or Powell purposefully avoided checking the publicly available court order on the North Dakota Attorney General's website confirming that Maras-Lindeman is exactly that.

106.    Russell Ramsland is a failed Republican congressional candidate and conspiracy theorist who has publicly claimed, among other things, that George Soros helped form the "Deep State" in Nazi Germany in the 1930s—along with President George H.W. Bush's father, the Muslim Brotherhood, and "leftists."[76]  (Mr. Soros was born in 1930.)  Ramsland's views on these points have been a matter of public record since at least 2018.  As such, Powell put Ramsland forward as an expert even though she either knew he was not a reliable source, or she recklessly disregarded readily available information demonstrating that.  A Delaware judge determined that Ramsland provided "materially false information" in support of his claims of vote manipulation[77] when he referenced and cited locations in Minnesota when alleging voter fraud in Michigan— something that Powell either knew or recklessly failed to verify by reference through a basic Google search.[78]  Antrim County officials determined that Ramsland's report was "riddled with

---

filings in her election cases in Wisconsin and Arizona.  *See* Am. Complaint at Ex. 13, *Feehan v. Wis. Election Comm'n,* No. 20-cv-01771 (E.D. Wis. Dec. 3, 2020) [Dkt. 9-13], available at, https://defendingtherepublic.org/?page_id=1045; Complaint at Ex. 13, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 1-5], available at, https://defendingtherepublic.org/?page_id=1036.

[76] John Savage, *Texas Tea Partiers Are Freaking Out Over 'Deep State' Conspiracy Theories*, Vice (Sept. 20, 2018), available at, https://www.vice.com/en/article/mbwgxx/texas-tea-partiers-are-freaking-out-over-deep-state-conspiracy-theories (Ex. 56).

[77] Rule to Show Cause, *Page v. Oath Inc.*, No. S20C-07-030 (Del. Super. Ct. Dec. 18, 2020).

[78] Clara Hendrickson, *Affidavit in Michigan lawsuit seeking to overturn election makes wildly inaccurate claims about vote*, PolitiFact (Dec. 4, 2020), available at, https://www.politifact.com/factchecks/2020/dec/04/russell-james-ramsland-jr/affidavit-michigan-lawsuit-seeking-overturn-electi/ (Ex. 57).

false and unsupported claims, baseless attacks, and incorrect use of technical terms."[79]  Similarly, the former acting director of the Election Assistance Commission's Voting System Testing and Certification program—who is actually an expert in voting systems—said that Ramsland's report showed a "grave misunderstanding" of Antrim County's voting system and "a lack of knowledge of election technology and process."[80]  Michigan's Attorney General and Secretary of State issued a joint statement that Ramsland's report was "critically flawed, filled with dramatic conclusions without any evidence to support them."[81]  And, conclusively disproving Ramsland's report, a hand recount of paper ballots in Antrim County confirmed that "Dominion's voting machines accurately tabulated the votes cast for president in Antrim County."[82]  Yet, even after Ramsland's report was conclusively disproven, Powell continued to misrepresent that Ramsland was a "forensic expert" whose report was evidence supporting her false claims about Dominion.

107.    William Briggs's claims are based on a list—compiled by Matt Braynard—of allegedly ineligible Georgia voters who supposedly voted illegally.  A federal judge rejected

---

[79] *See Report spreads debunked claims about Dominion machines in Michigan county*, Associated Press (Dec. 15, 2020), available at, https://apnews.com/article/fact-checking-afs:Content:9847904839 (Ex. 58).

[80] *See* Todd Spangler, *Former election security chief for Trump knocks down Antrim County report*, The Detroit Free Press (Dec. 16, 2020), available at, https://www.freep.com/story/news/politics/elections/2020/12/16/antrim-county-report-debunked-by-former-trump-election-official/3923499001/ (Ex. 59).

[81] *AG, SOS: Plaintiff's Report in Antrim County Election Lawsuit Demonstrates Lack of Credible Evidence in Widespread Fraud or Wrongdoing*, Michigan Dep't of Attorney General (Dec. 14, 2020), available at, https://www.michigan.gov/ag/0,4534,7-359-92297_47203-547422--,00.html (Ex. 42).

[82] *See Trump still wins small Michigan county after hand recount*, Associated Press (Dec. 17, 2020), available at, https://apnews.com/article/election-2020-joe-biden-donald-trump-michigan-elections-07e52e643d682c8033a0f26b0d863387 (Ex. 15).

Briggs's analysis and Braynard's list—which included voters who were eligible to vote—because of its "sheer unreliability."[83]

108.    Navid Keshavarz-Nia's claims about the 2020 election were described by then-CISA director and Trump-appointee Chris Krebs as "nonsense."[84]  And Keshavarz-Nia declared, under penalty of perjury, that there was a pattern of improbable vote reporting in "Edison County, Michigan"—a county that does not exist in that state.

109.    On information and belief, Powell knew that her purported experts were unreliable from information she possessed or purposefully avoided, from her training as an attorney, and from her experience as a former federal prosecutor.

### Powell Intentionally Disregarded Hard Evidence and Reliable Sources Including Trump Appointees, Republicans, and Election Security Experts Who Rebutted and Disproved Her False Accusations About Dominion

110.    Even after Powell's false claims about Dominion rigging the election had been repeatedly, forcefully, and publicly rebutted and disproven by the hard evidence of independent audits and hand recounts of paper ballots and by reliable sources like Trump appointee Chris Krebs, Trump appointee Bill Barr, Georgia's Republican Governor Brian Kemp, and Georgia's Republican Secretary of State Brad Raffensperger, federal judges, and 59 election security experts, Powell intentionally disregarded the truth and continued to promote inherently improbable falsehoods about Dominion.

---

[83] Order at 26, *Bowyer v. Ducey*, No. 2-20-cv-02321 (D. Ariz. Dec. 9, 2020) [Dkt. 84]; Michelle Ye Hee Lee, *Here's what happened when a Georgia lawmaker scrutinized the Trump campaign's list of allegedly illegal votes*, Wash. Post (Dec. 10, 2020), available at, https://www.washingtonpost.com/politics/heres-what-happened-when-a-georgia-lawmaker-scrutinized-the-trump-campaigns-list-of-allegedly-illegal-votes/2020/12/10/1400d628-3b06-11eb-bc68-96af0daae728_story.html (Ex. 60).
[84] Zach Montellaro and Kyle Cheney, *Pro-Trump legal crusade peppered with bizarre blunders*, Politico (Dec. 3, 2020), available at, https://www.politico.com/news/2020/12/03/sidney-powell-trump-election-lawsuit-442472 (Ex. 61).

111.     While endeavoring to make the facts conform to her false preconceived narrative that the election was rigged and was the "greatest crime of the century if not the life of the world," Powell was confronted with a number of hurdles that rendered her outlandish claims inherently improbable, if not outright impossible.[85]   At each step of the way, Powell either deliberately disregarded the facts disproving her claims or invented new falsehoods to explain away the hurdles and reinforce her false preconceived narrative.

112.     One hurdle was that Dominion—unlike its competitors, Smartmatic and ES&S—has never serviced a Venezuelan election at all, let alone to support Hugo Chávez.  No matter.  Powell attempted to overcome this hurdle by deliberately misrepresenting that Dominion was owned by Smartmatic, in order to tarnish Dominion with accusations that had actually been made about its competitor.

113.     Another hurdle was that Georgia's independent audit and hand count of 100% of the ballots conclusively disproved the falsehood that Dominion rigged the election in Georgia.  When specifically asked about this at the "Stop the Steal" rally, Powell falsely claimed that "Georgia did not do a full hand recount of the ballots."[86]

114.     Another hurdle rendering Powell's claims inherently improbable: Georgia's Republican secretary of state and governor rebutted Powell's claims and refused to overturn Georgia's election results.  Powell's reaction was to falsely accuse them of being in on the conspiracy.

---

[85] *Sidney Powell: Kraken Released in MI; Scotus Next!*, The John Fredericks Show (Dec. 14, 2020), available at, https://www.johnfredericksradio.com/podcast/december-14-2020/; https://www.youtube.com/watch?v=qWt1vB-OIZk&list=PL1q2i_zsupwSdYDFTH0pA-X-YNz57E5TV&index=2 (last visited Dec. 29, 2020) (Ex. 29).
[86] *Sidney Powell, Lin Wood attend 'Stop the Steal' rally in Georgia*, YouTube, (Dec. 2, 2020), available at, https://www.youtube.com/watch?v=pq-_B5z3QIA (last visited Jan. 4, 2021) (Ex. 44).

48

115.    Another hurdle: Trump loyalist Attorney General Bill Barr said that U.S. attorneys and FBI agents had followed up on complaints they had received, but that there was no evidence to substantiate Powell's claims.[87]   To overcome that hurdle, Powell repeatedly told televised audiences that it was "beyond my comprehension" why the government had not done more to address concerns about election integrity.  And Powell's ally L. Lin Wood exhorted the crowd of Trump supporters at their televised "Stop the Steal" rally to "send that message to Bill Barr at the Justice Department, do your job … You tell the director of the FBI, do your damn job.  You work for us.  Investigate this fraud."[88]

116.    For certain other hurdles rendering Powell's defamatory falsehoods inherently improbable, Powell simply ignored them.  For example, she has not explained how a decades-old international election-rigging conspiracy involving independent testing labs accredited by the EAC and thousands of bipartisan local election volunteers could have evaded detection for so long.  Nor has she explained how—if Dominion was willing and able to commit a massive fraud to deprive Trump of the presidency—Trump won the presidential election in 2016, despite the fact that Dominion machines were used in over 1,600 jurisdictions during that election.

### *Dominion Has Suffered Enormous Harm*

117.    As a result of the false accusations disseminated to a global audience by Powell, her allies, and like-minded media outlets—who acted in concert to promote a false preconceived narrative about the 2020 election, despite the total lack of evidence to support it, and despite the

---

[87] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, Associated Press (Dec. 1, 2020), available at, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (Ex. 43).
[88] *Sidney Powell, Lin Wood attend 'Stop the Steal' rally in Georgia*, YouTube, (Dec. 2, 2020), available at, https://www.youtube.com/watch?v=pq-_B5z3QIA (last visited Jan. 4, 2021) (Ex. 44).

mountains of paper ballots and the army of credible sources disproving it—Dominion has suffered enormous reputational and financial harm and its employees' lives have been put in danger.

118.   The disinformation campaign began to go viral after Powell's first appearance after the election on *Lou Dobbs Tonight* on November 6, 2020.   The day after that appearance, "Dominion" began trending on Twitter.[89]

119.   That trend grew.  By way of example, over a ***three-hour period*** on December 21, 2020, the terms "dominion" and "fraud" were tweeted out together by more than ***2,200*** users with over ***8.75 million*** total followers.



---

[89] *Twitter Trends on Trending words on 7th November, 2020*, Trend Calendar, available at, https://us.trend-calendar.com/trend/2020-11-07.html (Ex. 62).

120.    Those over 2,200 Twitter users were located across the United States and in 17 countries around the world.



121.    Countless media outlets and social media users foreseeably republished and disseminated the viral disinformation campaign about Dominion.  By way of example only, on December 9, 2020, an internet publication called *DC Clothesline* foreseeably republished Powell's false claims that the software in Dominion's voting machines "was developed and financed by some of our enemies, including Venezuela," that "Dominion machines cannot be relied on at all," that "fraud … happened in Georgia,"  and that "the system is just as rigged as it was four weeks ago."[90]  A social media user then posted a hyperlink to the article including Powell's false

---

[90] JD Heyes, *Attorney Sidney Powell drops more bombshells, says election software that rigged 2020 elections has been used for years to steal House, Senate, governor races*, DC Clothesline (Dec. 9, 2020), available at, https://www.dcclothesline.com/2020/12/09/attorney-sidney-powell-drops-more-bombshells-says-election-software-that-rigged-2020-elections-has-been-used-for-years-to-steal-house-senate-governor-races/ (Ex. 63).

statements, and added his own commentary reflecting that he believed Powell's defamatory falsehoods, writing, "They have been stealing elections for years, using Dominion."[91]



[91] Daniel Lynn (@daniellynn0001), Twitter (Dec. 9, 2020), available at, https://twitter.com/daniellynn0001/status/1336723643921920001 (Ex. 64).

122.     Another person foreseeably republished Powell's defamatory falsehoods about Dominion, writing "We start with the election and Sidney Powell. She stated that this election is [t]he most corrupt election ever. And she made a lot of people aware of Dominion – Dominion comes from Venezuela…"[92]



123.     Another person who believed Powell's defamatory falsehoods tweeted, "There has been so much fraud" including "Dominion machines moving Trump votes to Biden."[93]



---

[92]     Sofia Sjoberg (@risalusofia), Twitter (Dec. 8, 2020), available at, https://twitter.com/risalusofia/status/1336517540059766787 (Ex. 65).
[93]     Stephen (@Stephenwc24), Twitter (Dec. 9, 2020), available at, https://twitter.com/Stephenwc24/status/1336732043607068673 (Ex. 66).

124.    One person tweeted, "Dominion et al was created in Venezuela for Chávez & Maduro."[94]



125.    Another person succinctly summarized the devastating harm that Powell has inflicted on Dominion's commercial reputation, writing "Dominion is [a] fancy word for election fraud."[95]



---

[94]    Bruce Robinson (@brsquared), Twitter (Dec. 9, 2020), available at, https://twitter.com/brsquared/status/1336725318367911936 (Ex. 67).
[95]    Ivo Boutrous (@ivoboutros), Twitter (Dec. 8, 2020), available at, https://twitter.com/ivoboutros/status/1336443509134548993 (Ex. 68).

126.     Another person parroted Powell's false accusation that Dominion had bribed Governor Kemp, writing, "Did no one hear when Sidney Powell said there was evidence that many state governors, INCLUDING KEMP, were paid off by Dominion to allow their machines to be installed before the 2020 elections?"[96]



127.     Another person tweeted, "Sidney Powell … says we will hear evidence once in court that politicians can pay Dominion to win…She said she has evidence GovKemp ensured it."[97]



[96]     Donna     G     (@DonnaG7216),     Twitter     (Dec.     8,     2020),     available     at, https://twitter.com/DonnaG7216/status/1336477904591593472 (Ex. 69).
[97]     Heathers     (@NCPatriotMom),     Twitter     (Dec.     8,     2020),     available     at, https://twitter.com/NCPatriotMom/status/1336474913658515456 (Ex. 70).

128.     As reflected in polling data about decreasing confidence in the legitimacy of the 2020 election, tens of millions of people believed Powell's defamatory falsehoods about Dominion.  For example, before the election, 44% of Trump supporters were "not very" or "not at all" confident in the national vote count.[98]  But after the viral disinformation campaign against Dominion, 81% of Trump voters believe that voter fraud influenced the election outcome.[99]

129.     Among Republicans generally, 68% are concerned that the election was "rigged"[100] and 77% believe that "there was widespread voter fraud in the 2020 presidential election."[101]

130.     As of the date of this filing, a Google search of the terms "dominion," "voting," and "fraud" yields over 8.4 million results; a search of the terms "dominion," "manipulate," and "vote" yields over 1.9 million results; a search of the terms "boycott," "dominion," and "fraud" yields over 2.8 million results; and more focused searches like "who manufactures dominion voting machines" yields over 18.9 million results, just to name a few.

131.     As a result of the viral disinformation campaign against Dominion, the company and its employees have been targeted and have received calls for jail time and death threats.

---

[98] *A Democratic Stress Test – The 2020 Election and Its Aftermath*, Bright Line Watch (Nov. 2020), available at, http://brightlinewatch.org/american-democracy-on-the-eve-of-the-2020-election/a-democratic-stress-test-the-2020-election-and-its-aftermathbright-line-watch-november-2020-survey/ (Ex. 71).

[99] Candice Jaimungal, *Three-quarters of voters think fraud occurred during the election*, YouGov (Nov. 12, 2020), available at, https://today.yougov.com/topics/politics/articles-reports/2020/11/12/voters-think-fraud-occurred-during-elec (poll available at https://docs.cdn.yougov.com/9j7sr0my95/econTabReport.pdf) (Ex. 72).

[100] Chris Kahn, *Half of Republicans say Biden won because of a 'rigged' election: Reuters/Ipsos poll*, Reuters (Nov. 18, 2020), available at, https://www.reuters.com/article/us-usa-election-poll/half-of-republicans-say-biden-won-because-of-a-rigged-election-reuters-ipsos-poll-idUSKBN27Y1AJ (poll available at https://www.ipsos.com/sites/default/files/ct/news/documents/2020-11/topline_reuters_post_election_survey_11_18_2020.pdf) (Ex. 73).

[101] *60% View Joe Biden's 2020 Presidential Victory As Legitimate, Quinnipiac University National Poll Finds; 77% of Republicans Believe There Was Widespread Voter Fraud*, Quinnipiac University (Dec. 10, 2020), available at, https://poll.qu.edu/national/release-detail?ReleaseID=3685 (Ex. 74).

132.    For example, one person posted, "Why isn't every single Dominion employee in jail for their election fraud?!!!!!!!!!"[102]



133.    Another person posted, "jail dominion find them…ask allies to track them down"[103]



134.    One Dominion employee received text messages stating "*we are already watching you.  Come clean and you will live.*"

135.    One person left the following message on Dominion's customer support line:

> *You're all fucking dead, You're all fucking dead.  We're bringing back the firing squad and you fuckers are all dead, everybody involved up against the wall you motherfuckers.*  We're gonna have a fucking lottery to fucking give people a chance to shoot you motherfuckers you fucking wait you cocksuckers you commie pieces of shit.  *We're going to fucking*

---

[102]    Woody James (@WoodsonTJames), Twitter (Dec. 9, 2020), available at, https://twitter.com/WoodsonTJames/status/1336726130771038208 (Ex. 75).

[103]    Lionslovestrump (@leonkhanin1234), Twitter (Dec 8. 2020), available at, https://twitter.com/leonkhanin1234/status/1336497514598555650 (Ex. 76).

*kill you all you motherfuckers*.  After a fair trial of course you pieces of shit.  The American people are fucking coming for you this is the end of your fucking line guys your fucking days are numbered you better enjoy your Thanksgiving because you'll never see another one you fucking cocksuckers.  You will be gone soon. Happy Thanksgiving.  Cock suckers.  You're almost done just watch and see what happens.  Check out the executive order from September 12, 2018.  You'll see what's going to happen.  You'll own nothing.  You'll be on the fucking 2030 plan because you'll own nothing you fucking cocksuckers.  It's coming.  Buckle your fucking seatbelts.  Watch what's going to happen next.

136.    Another person sent a Dominion employee an email with the subject line, "***Time is up***" and with the message, "***You have 24 hours***…"

137.    And another person left the following message on Dominion's main office line:

Yeah, good afternoon.  Fuck you, fucking scumbags.  *We're gonna blow your fucking building up.*  Piece of fucking shit.

138.    Because of these threats and numerous others, Dominion has made significant expenditures to protect its people from harm—including by employing on-site police and security. Since the beginning of the viral disinformation campaign, Dominion has spent more than $565,000 on private security for the protection of its people.

139.    As a direct result of the viral disinformation campaign, Dominion has been forced to make significant expenditures in an attempt to mitigate the harm to its reputation and business. To date, Dominion has incurred expenses of more than $1,170,000 to that end.

140.    Dominion is a for-profit company that generates revenue by selling voting technology services to elected officials from both political parties.

141.    Just one day after Powell's Washington, D.C. press conference, Arizona state Congressman Warren Peterson tweeted "I'm drafting legislation to ban the use of Dominion software and equipment from the state of Arizona.  My constituents do not trust it…"[104]



142.    Similarly, since Powell began her media blitz, state legislators in various states in which Dominion has contracts—including Florida, Louisiana, Pennsylvania, Michigan, and Pennsylvania—have stated their intent to review and reassess those contracts.

143.    In calling for Georgia to abandon Dominion machines for the Georgia Senate runoff elections, in falsely accusing Georgia's Republican governor and secretary of state of accepting bribes from Dominion, and in explicitly calling upon Georgia voters to harass, intimidate, and imprison Georgia's governor—leading to death threats to Governor Kemp and Secretary Raffensperger—Powell and Wood sent a clear warning to elected officials in Georgia and elsewhere about what would happen to them if they contracted with Dominion or used Dominion machines going forward.

---

[104]    Warren Petersen (@votewarren), Twitter (Nov. 20, 2020), available at, https://twitter.com/votewarren/status/1329802399565770752 (Ex. 77).

144.    As illustrated in the examples above, as a result of the viral disinformation campaign, Dominion has been unfairly subjected to the hatred, contempt, and distrust of tens of millions of American voters, and the elected officials who are Dominion's actual and potential customers have received emails, letters, and calls from their constituents demanding that they avoid contracting with Dominion or using Dominion machines.  As a result, elected officials, insurers, and potential investors have been deterred from dealing with Dominion, putting Dominion's contracts in more than two dozen states and hundreds of counties and municipalities in jeopardy and significantly hampering Dominion's ability to win new contracts.  Based on Dominion's historic financial track record, contract pipeline, retention and renewal rates, and new business capture rates, as well as the nature, severity, pervasiveness, and permanence of the viral disinformation campaign, current projections show lost profits of $200 million over the next five years, when reduced to present value.  In addition, the viral disinformation campaign has irreparably damaged Dominion's reputation and destroyed the resale value of a business that was worth between $450 million and $500 million before the viral disinformation campaign.

### After Dominion Seeks a Retraction, Powell Repeatedly Doubles Down

145.    On December 16, 2020, Dominion sent Powell a retraction demand letter that laid out the facts, including that, as a result of Powell's false accusations, Dominion had suffered enormous harm and its employees had been stalked, had been harassed, and had received death threats.[105]

146.    Four days later, on December 20, 2020, L. Lin Wood wrote, and also shared on Twitter, a response to a retraction request from Dominion's competitor, Smartmatic: "I represent

---

[105] Retraction Demand Letter from T. Clare and M. Meier to S. Powell (Dec. 16, 2020) (Ex. 3).

Sidney Powell. I have carefully reviewed your letter of December 15, 2020. I am not impressed. Ms. Powell retracts nothing."[106]

147. Powell retweeted Wood's tweet and added:

Same is true for #Dominion
Heard they wrote me too!
Haven't seen it but retracting nothing
We have #evidence
They are #fraud masters![107]



148. Powell expected and intended to reach an audience of tens of millions when she posted that tweet. Her tweet foreseeably reached not only her 1.2 million Twitter followers (and the millions of followers of those liked or retweeted her post), but also the over 95 million Twitter followers of the 10 people she tagged in the tweet, which included Donald Trump.

149. Five days after receiving Dominion's retraction demand, Powell published a "binder of information" to Zenger News, which Zenger News foreseeably republished with the

---

[106] Lin Wood (@LLinWood), Twitter (Dec. 20, 2020), available at, https://twitter.com/LLinWood/status/1340729543267667970 (Ex. 78).
[107] Sidney Powell (@SidneyPowell1), Twitter (Dec. 20, 2020), available at, https://twitter.com/SidneyPowell1/status/1340760761228996614 (Ex. 4).

headline "Sidney Powell's Legal Team Has Binder of Documents She Says Establish the 2020 Election was a Fraud."[108] The binder did no such thing. Instead, it repackaged already disproven and discredited reports and declarations, some of which had never been filed in court. Indeed, no documents in Powell's binder had any references or indicia of any court filing or proceeding. Several days later, Zenger News reported that despite Powell's claims to the contrary, she "declined to provide any new evidence of voter fraud" and the "binder of material her staff provided to Zenger News" included only "previously published claims."[109] Powell added the link to the Zenger News website publishing her binder to her Kraken-Wood.com website with the caption, "READ IT: SIDNEY POWELL PUBLISHED BINDER OF ELECTION FRAUD EVIDENCE."

150. In her media binder of "evidence," Powell repackaged and published Ramsland's disproven report on Antrim County, even though the publicly available facts disproving the report were included in Dominion's retraction demand letter to Powell.

151. Powell's media binder of "evidence" also repackaged and published the declaration of the discredited Josh Merritt—Powell's purported "military intelligence expert" who never actually worked in military intelligence. But since Merritt had been discredited, Powell's media binder puts his declaration forward as though it were written by someone else. Indeed, the only

---

[108] Clare Swift, *Sidney Powell's Legal Team Has Binder of Documents She Says Establish the 2020 Election was a Fraud*, Zenger News (Dec. 23, 2020), available at, https://www.zenger.news/sidney-powell-document-binder-2020-election-fraud/ (Ex. 79).

[109] David Martosko, *VIDEO: Sidney Powell Wants to Fight for Donald Trump – But His Aides Won't Let Her, She Says*, Zenger News (Dec. 27, 2020), available at, https://www.zenger.news/2020/12/27/video-sidney-powell-wants-to-fight-for-donald-trump-but-his-aides-wont-let-her-she-says/ (Ex. 80).

difference between the "new" declaration and Merritt's declaration is the information about the declarant's background; the rest of the declaration is substantively *identical to Merritt's.*[110]



152.    In her media binder of "evidence," Powell also repackaged and published the declaration of the purported Venezuelan military officer that is not credible for the myriad reasons set forth in Dominion's retraction demand letter to Powell and above.

153.    Several days after she published her media binder to the press, Powell posted to her sidneypowell.com website a webpage titled "Evidence of Foreign Interference in the 2020 Election."[111] That "evidence" was comprised of an "Outline," a "Summary," and a "Timeline"

---

[110] *Compare* Complaint at Ex. 7, *Pearson v. Kemp*, No. 12-cv-04809 (N.D. Ga. Nov. 25, 2020) [Dkt. 1-9], available at, https://defendingtherepublic.org/?page_id=986 *with* Defending the Republic, *Foreign Ties Affidavit*, (Dec. 16, 2020), available at, https://defendingtherepublic.org/wp-content/uploads/2020/12/foreign_ties_affidavit.pdf (Ex. 102).

[111] Sidney Powell, *Evidence of Foreign Interference in the 2020 Election*, available at, https://www.sidneypowell.com/evidence-of-foreign-interference (last visited Jan. 4, 2021) (Ex. 81).

that repeated her false claims. But Powell did not include any actual evidence in those documents. In fact, the single footnote in her "evidence" publication is blank.[112]

154.    In her "Timeline," Powell published the knowingly false claim that "Dominion was designed to enable vote manipulation and used to keep Hugo Chávez in power" under the heading, "Affidavit of Venezuelan Whistleblower."[113]

155.    And in her "Summary," Powell repeated numerous falsehoods about Dominion, including the demonstrably false claims that Dominion and Smartmatic have a "shared origin of the software code," that "Dominion Voting Systems do not maintain a truly auditable trail for a number of reasons, among them being that its audit logs are editable by operators (and by those with unauthorized access)," that Carolyn Maloney's letter cited "concerns about foreign influence and control over *Dominion* machines," and that "there was a 5.6% increase in votes for one candidate for president across the entire Dominion system—with all other variables frozen."[114] Powell's "Summary" also included the claims in Ramsland's disproven report on Antrim County.

156.    In the midst of publishing her binder and summaries of her already disproven and discredited accusations, Powell also doubled down and repeated her false accusations about Dominion on *The Sean Hannity Show*, *The Rush Limbaugh Show*, *FlashPoint* with Gene Bailey, an installment of the *Global Prayer for Election Integrity* series, and *The CATS Roundtable* with John Catsimatidis. During her appearance on *The Rush Limbaugh Show*, Powell solicited contributions to her fundraising website, saying it was a "non-profit that is working to help me

---

[112] *See Summary Foreign Interference Draft 12. 22. 2020* at 2 n.1, available at, https://www.scribd.com/document/489248528/Summary (last visited Jan. 4, 2021) (Ex. 82).
[113] *Timeline*, available at, https://www.scribd.com/document/489248529/Timeline (last visited Jan. 4, 2021) (Ex. 83).
[114] *Summary Foreign Interference Draft 12. 22. 2020*, available at, https://www.scribd.com/document/489248528/Summary (last visited Jan. 4, 2021) (Ex. 82).

defend all these cases **and to defend me** now that I'm under massive attack from the attorney general of Michigan and the City of Detroit and everything else."[115]

157.    On January 3, 2021, Powell tweeted in response to an Epoch Times article that "24,658 Trump votes were removed" and "another 12,173 switched to Biden" in "just one" Georgia county, along with the hashtags "#Dominion staff in every county" and "#Dominion shredding documents." That tweet reached her 1.2 million followers as well as the over 1.5 million followers of the three people she tagged in the tweet.[116]



158.    On January 4, 2021, Powell published her "Summary: Select Evidence of Presidential Election Fraud 2020" to her sidneypowell.com website, in which she once again

---

[115]    *The Rush Limbaugh Show*, iHeart Radio (Dec. 29, 2020), available at, https://www.iheart.com/podcast/1119-the-rush-limbaugh-show-57927691/episode/the-rush-limbaugh-show-podcast--75675693/ (last visited Jan. 7, 2021) (Ex. 25).
[116]    Sidney Powell (@SidneyPowell1), Twitter (Jan. 3, 2021), available at, https://twitter.com/SidneyPowell1/status/1345679327887843329?s=20 (Ex. 84).

repeated her demonstrable falsehoods about Dominion.[117]  In this new summary, Powell falsely stated there was "Fraud by Dominion Voting Systems" and linked to the repurposed declaration of Josh Merritt.  And Powell once again republished Ramsland's disproven claims about Dominion's machines in Antrim County, Michigan.  She concluded by urging her readers to "FLOOD social media" and to "put pressure on state and local officials" to "decertify the fraudulent vote."

### *Incited by Powell's Disinformation Campaign, a Violent Mob Storms the United States Capitol and Disrupts the Certification of the 2020 U.S. Presidential Election*

159.    On January 6, 2021, the United States Congress convened to certify the results of the 2020 U.S. Presidential Election.

160.    During that joint session of Congress, Republican Senate Majority Leader and Trump loyalist Mitch McConnell called the claims Powell had been peddling for months "sweeping conspiracy theories"[118] that incited doubt "without any evidence."[119]

161.    Meanwhile, a crowd was gathering outside the White House, fueled by the disinformation campaign launched and sustained by Powell in concert with her allies and like-minded media outlets.

162.    At around 2:00 p.m., a mob pushed through barricades, smashed windows, broke down doors, and stormed into the halls of the United States Capitol.  The Capitol was placed on lockdown, buildings were evacuated, and Congress's certification of the election was temporarily halted.

---

[117]    Sidney Powell, *2020 Election Evidence Summary*, available, at https://www.sidneypowell.com/election-evidence-2020 (last visited Jan. 4, 2021) (Ex. 85).

[118] *Senate Leaders McConnell and Schumer Remarks on Objection to Counting of Electoral College Votes*, CSPAN (Jan. 6, 2021), available at, https://www.c-span.org/video/?c4933716/senate-leaders-mcconnell-schumer-remarks-objection-counting-electoral-college-votes (emphasis added).

[119] *Id.*

163.    Powell remained unapologetic.  She doubled down on her lies and, after plugging her Parler account, tweeted that the certification vote was "based on the most egregious fraud in the history of this almost former Republic."[120]   And even though the mob was, according to Fox News, "pro-Trump," Powell falsely blamed "Antifa" for the mayhem that she, her allies, and like-minded media outlets had incited.



***Sidney Powell's Law Firm and Fundraising Website are Her Alter Egos***

164.    Sidney Powell's law firm (Defendant Sidney Powell, P.C.) and fundraising website (Defending the Republic, Inc.) are her alter egos.

165.    In each of her sham litigations, Sidney Powell signed her pleadings under Sidney Powell, P.C.  Likewise, the "Of Counsel" attorneys employed by her firm signed the pleadings

---

[120]    Sidney    Powell    (@SidneyPowell1),    Twitter    (Jan.    6,    2021),    available    at, https://twitter.com/sidneypowell1/status/1346988845888200711?s=21.

under Sidney Powell, P.C. With respect to this legal work, there is no discernable difference between Sidney Powell and Sidney Powell, P.C.

166.   Likewise, the "Of Counsel" attorneys employed by Powell's law firm sign pleadings under Sidney Powell, P.C. and Defending the Republic, Inc. Julia Haller, Brandon Johnson, and Emily Newman have been included on pleadings in at least two cases as "Of Counsel" for Sidney Powell, P.C., including Powell's election litigation in Arizona, *Bowyer v. Ducey*, No. 2:20-cv-2321 (D. Ariz. Dec. 2, 2020), and Wisconsin, *Feehan v. Wisconsin Elections Comm'n*, No. 2:20-cv-1771 (D. Wis. Dec. 1, 2020). Haller and Newman have also appeared as "Of Counsel" for Sidney Powell, P.C. in Powell's election litigation in Michigan, *King v. Whitmer*, No. 2:20-cv-13134 (E.D. Mich. Nov. 25, 2020).

167.   Haller has also appeared and been admitted *pro hac vice* to the Northern District of Georgia in Powell's election litigation in Georgia, *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. Dec. 1, 2020) [Dkt. 24], where Haller represented that she is employed by Powell's fundraising website, "Defending the Republic," which has an address in the District of Columbia.

**Julia Z. Haller**
Defending the Republic
601 Pennsylvania Ave, NW
South Building
Ste 900
Washington, DC 20004
561-888-3166
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

168.   On December 27, 2020, in a complaint filed in the Eastern District of Texas, Brandon Johnson, another "Of Counsel" attorney for Sidney Powell, P.C., and Haller further represented that they are employed by "Defending the Republic" and listed an address in the

District of Columbia.  *See Gohmert et al. v. Pence*, No. 6:20-cv-660 (E.D. Tex. Dec. 27, 2020).

On January 1, 2021, Haller was admitted to the Eastern District of Texas *pro hac vice.  Id.*

Julia Z. Haller
DC Bar No. 466921
Brandon Johnson
DC Bar No. 491370
Defending the Republic
601 Pennsylvania Ave., NW
Suite 900
South Building
Washington, DC 20004
Tel: (561) 888-3166
Fax: 202-888-2162
Email: hallerjulia@outlook.com
Email: brandoncjohnson6@aol.com

**COUNSEL FOR PLAINTIFFS
LOUIE GOHMERT, TYLER BOWYER,
NANCY COTTLE, JAKE HOFFMAN,
ANTHONY KERN, JAMES R. LAMON,
SAM MOORHEAD, ROBERT
MONTGOMERY, LORAINE
PELLEGRINO, GREG SAFSTEN, KELLI
WARD and MICHAEL WARD**

169.    During numerous media appearances, Powell solicited donations to her fundraising

website by making false and defamatory statements about Dominion.[121]

---

[121] *See, e.g. Sidney Powell talks about her allegations regarding the computerized voting systems on election night*, Washington Examiner (Nov. 20, 2020), available at, https://www.washingtonexaminer.com/videos/sidney-powell-talks-about-her-allegations-regarding-the-computerized-voting-systems-on-election-night (last visited Jan. 4, 2021) (Ex. 5); *Sidney Powell on Lou Dobbs Tonight on 11/30/20*, YouTube (Nov. 30, 2020), available at, https://www.youtube.com/watch?v=4uMr-TRZNCw (last visited Jan. 4, 2021) (Ex. 6); *Sidney Powell to Newsmax TV: Our Case Was Prejudged*, Newsmax (Dec. 7, 2020), available at, https://defendingtherepublic.org/?p=1166; https://www.newsmax.com/newsmax-tv/sidney-powell-kraken-lawsuit-scotus/2020/12/07/id/1000459/ (last visited Jan. 4, 2021) (Ex. 26); *Evidence of Fraud: Sidney Powell and Lou Dobbs discuss*, Fox Business (Dec. 10, 2020), available at, https://defendingtherepublic.org/?p=1168; https://video.foxbusiness.com/v/6215520845001/#sp=show-clips (last visited Jan. 4, 2021) (Ex. 27); *Exclusive: Sidney Powell on 2020 Election Lawsuits, Supreme Court Decision, and the Flynn Case*, The Epoch Times (Dec. 13, 2020), available at, https://defendingtherepublic.org/?p=1170; https://www.theepochtimes.com/exclusive-sidney-powell-on-election-lawsuits-supreme-court-decision-and-the-flynn-case_3617067.html (last visited Jan. 4, 2021) (Ex. 28); *Sidney Powell: Kraken Released in MI; Scotus Next!*, The John Fredericks Show (Dec. 14, 2020), available at, https://www.johnfredericksradio.com/podcast/december-14-2020/; https://www.youtube.com/watch?v=qWt1vB-OIZk&list=PL1q2i_zsupwSdYDFTH0pA-X-YNz57E5TV&index=2 (last visited Dec. 29, 2020) (Ex. 29).

170.    On information and belief, Sidney Powell operates and controls the content on sidneypowell.com, her law firm's website, federalappeals.com, and her fundraising website, defendingtherepublic.org.   The websites are interconnected through at least ten different hyperlinks, wherein a user can seamlessly cross between them.   Hyperlinks and "pop up" advertisements regularly divert a user from one website to another.  For example, if a user visited sidneypowell.com, a white "pop up" directed the user to "DONATE HERE"–providing a link to defendingtherepublic.org.[122]



171.    On November 28, 2020, the domain name helpsidneypowell.com was registered. Visitors to helpsidneypowell.com are automatically redirected to defendingtherepublic.org.

172.    In addition, the websites publish and republish content such that the entities are indistinguishable from one another.  For example, sidneypowell.com has a section labeled "In the Media," where video clips of Powell's media appearances are republished.[123]

---

[122] Sidney Powell (Dec. 20, 2020), available at, https://web.archive.org/web/20201220235533/https://www.sidneypowell.com/ (Ex. 86).
[123] Sidney Powell, available at, https://www.sidneypowell.com/ (last visited Jan. 7, 2021).



173. Sidneypowell.com also provided hyperlinks to legal filings signed by Sidney Powell, Sidney Powell, P.C., and the "Of Counsel" attorneys for Sidney Powell, P.C. and Defending the Republic, Inc.[124]



174. Each website also prominently features a biography and headshot of Sidney Powell. Similarly, each website links to Sidney Powell's personal website—sidneypowell.com. Further, sidneypowell.com and federalappeals.com link to Powell's personal Facebook, Twitter, Parler and YouTube page.

---

[124] Sidney Powell (Dec. 23, 2020), available at, https://web.archive.org/web/20201223015943/https://www.sidneypowell.com/ (Ex. 87).

175.    Sidney Powell and Sidney Powell, P.C. also utilize their websites to advertise Defending the Republic, Inc. to—and to solicit donations from—a global internet audience, including residents of the District of Columbia and Georgia.  On each of the three websites, users are or were directed to "DONATE NOW," "Donate to Defend," and "Contribute to Defend the Republic."[125]



176.    Visitors to any of the Defendants' websites are or were invited to "donate," but depending on the website or hyperlink a user follows, they are or were directed to make checks

---

[125] Sidney Powell (Dec. 23, 2020), available at, https://web.archive.org/web/20201223015943/https://www.sidneypowell.com/ (Ex. 87);    Sidney    Powell,    P.C.,    available    at, https://www.federalappeals.com (last visited Jan. 7, 2021) (Ex. 89); Defending the Republic, available at, https://defendingtherepublic.org/#donate (last visited Jan. 7, 2021).

payable to various entities. For example, on sidneypowell.com, users were directed to make checks payable to "Sidney Powell, PC" for the "Defending the Republic Election Integrity Fund"—instead of having the checks written to Defending the Republic, Inc.[126]



177. Meanwhile, on defendingtherepublic.org, donors were directed to make checks payable to Defending the Republic LLC and mail them to Sidney Powell, P.C.[127]



178. There is no LLC registered in the United States with the name "Defending the Republic LLC."

---

[126] Sidney Powell (Dec. 23, 2020), available at, https://web.archive.org/web/20201223015943/https://www.sidneypowell.com/ (Ex. 87).
[127] Defending the Republic (Dec. 30, 2020), available at, https://web.archive.org/web/2020123000 01629/https://defendingtherepublic.org/ (Ex. 88).

179.     Upon information and belief, funds donated through any of these websites were commingled and used to bankroll Powell's sham litigations, travel to Washington, D.C., and Alpharetta, Georgia, and the defamatory media campaign giving rise to this case.

## COUNT ONE – DEFAMATION *PER SE*
### *(Against All Defendants)*

180.     Dominion repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

181.     Powell made the following false and defamatory statements of fact about Dominion:

(a) Beginning shortly after November 3, 2020, and continuing to the present day, Powell falsely claimed to members of the Trump Campaign, Donald Trump, numerous reporters, media outlets, and global audiences, in words or substance, that Dominion rigged the election by manipulating votes, that Dominion and its software were created in Venezuela to rig elections for Hugo Chávez, and that Dominion bribed Georgia's Governor and Secretary of State for a no-bid contract in Georgia.  In making these false claims, Powell acted in concert with like-minded allies and media outlets that were determined to promote a false preconceived narrative about the 2020 election, and Powell expected, intended, foresaw, and facilitated the republication of her false statements to the broadest possible audience.

(b) On November 8, 2020, from within Washington, D.C., Powell appeared on the Fox News program, *Sunday Morning Futures* with Fox News personality Maria Bartiromo, and falsely stated:

> Powell:  They also used an algorithm to calculate the votes they would need to flip and they used the computers to flip those votes from Trump to Biden and from other Republican candidates to their competitors also.
>
> …
>
> Bartiromo: We talked about the Dominion software.  I know that there were voting irregularities.  Tell me about that.
>
> Powell:  That's to put it mildly.  The computer glitches could not and should not have happened at all.  That is where the fraud took place where they were flipping votes in the computer system or adding votes that did not exist.
>
> …

They had this all planned, Maria. They had the algorithms. …
That's when they had to stop the vote count, and go in and replace
votes for Biden and take away Trump votes.[128]



(c)    On November 9, 2020, Powell tweeted the following false statement of fact:

It's not a "glitch." It's a feature of #Dominion designed to allow
#Democrats to steal votes of #Americans.[129]



(d)    On November 11, 2020, Powell tweeted the following false statement of fact:

[128] *Sunday Morning Futures with Maria Bartiromo Sydney Powell ELECTION FRAUD*, Fox
News (Nov. 9, 2020), available at, https://defendingtherepublic.org/?p=1164;
https://www.youtube.com/watch?v=g6swRH38oKs&list=PLnpdXA3HSORvJoUVwtdrX2cMu
m5d9I8x7&index=28 (last visited Jan. 4, 2021) (Ex. 90).
[129] Sidney Powell (@SidneyPowell1), Twitter (Nov. 9, 2020), available at,
https://twitter.com/SidneyPowell1/status/1325820207768633345?s=20 (Ex. 91).

Nefarious actors tried to steal the election from @realDonaldTrump and the Liberty loving #Patriots of this country through #Dominion voting machines.[130]



(e)     On November 13, 2020, from within Washington, D.C., Powell appeared on the Fox Business program *Lou Dobbs Tonight* with Fox personality Lou Dobbs, and falsely stated:

> Well, I can hardly wait to put forth all the evidence we've collected on Dominion, starting with the fact it was created to produce altered voting results in Venezuela for Hugo Chávez and then shipped internationally to manipulate votes for purchase in other countries including this one.
>
> …
>
> We also need to look at and we're beginning to collect evidence on the financial interest of some of the governors and secretaries of state who actually bought into the Dominion systems, surprisingly enough.   Hunter-Biden-type graft to line their own pockets by getting a voting machine in that would either make sure their election was successful or they got money for their family from it.
>
> …
>
> People need to come forward now and get on the right side of this issue and report the fraud they know existed in Dominion voting systems because that's what it was created to do. It was its sole original purpose.  It has been used all over the world to defy the will of people who wanted freedom.[131]

---

[130] Sidney Powell (@SidneyPowell1), Twitter (Nov. 11, 2020), available at, https://twitter.com/SidneyPowell1/status/1326622101772570624?s=20 (Ex. 92).

[131] *Sidney Powell with Lou Dobbs: Release the Kraken*, YouTube (Nov. 14, 2020), available at, https://www.youtube.com/watch?v=SFCXPw1t17o (last visited Jan. 4, 2021) (Ex. 93).



(f)     On November 15, 2020, Powell appeared on the KPTM program *America This Week* with Eric Bolling, and falsely stated:

> Powell:  It works through the Dominion company's votes machines that were in 30 states and does indeed alter and flip voting results.
>
> …
>
> Powell:  It's a feature of the system that was designed with a back door so that people could watch in real time and calculate with an algorithm how many votes they needed to change to make the result they wanted to create.
>
> …
>
> Bolling:  Dominion voting machines were in numerous states, numerous counties.  There is some sort of software back door not unlike most phones will have a back door, but this will actually calculate and tell the person accessing the back door what type of voting percentages and what type of numbers are needed to change the win for a certain party, for a certain candidate?
>
> Powell:  Exactly. They can watch the voting real time.  They run a computer algorithm on it as needed to either flip votes, take votes out, or alter the votes to make a candidate win.
>
> …
>
> Bolling:  You are saying there's an actual way to change the total, the vote tallies within the system?
>
> Powell:  That's exactly right.
>
> …

77

Powell:  It's massive criminal voter fraud, writ large, across at least 29 states it could have been happening. Any time a voting machine was connected to the internet, and we have evidence many were, it was obviously happening.  It's obvious from the algorithm and the statistics that our experts are tracking out for batches of votes and when the curves changed.[132]



(g)  On November 15, 2020, from within Washington, D.C., Powell appeared on the Fox News program, Sunday Morning Futures with Fox News personality Maria Bartiromo, and falsely stated:

President Trump won by not just hundreds of thousands of votes but by millions of votes that were shifted by this software that was designed expressly for that purpose.

We have sworn witness testimony of why the software was designed.  It was designed to rig elections.

…

It was exported internationally for profit by the people that are behind Smartmatic and Dominion.  They did this on purpose.  It was calculated.  They've done it before.  We have evidence from 2016 in California.  We have so much evidence I feel like it's coming in through a fire hose.

…

This is a massive election fraud, and I'm very concerned it involved not only Dominion and its Smartmatic software but that the software

---

[132] *One-on-one with Sidney Powell*, KPTM (Nov. 15, 2020), available at, https://app.criticalmention.com/app/#clip/view/3de8b395-d807-4ba7-9855-0af62dc1a005?token=37f52d99-127d-4b48-b8dc-e5e99babfaaa (last visited Jan. 4, 2021) (Ex. 94).

essentially was used by other election machines also. It's the software that was the problem.

…

They can put, it's like drag-and-drop, Trump votes to a separate folder and then delete that folder.

…

We've even got evidence of some kickbacks essentially.

…

We're collecting evidence now from various whistleblowers that are aware of substantial sums of money being given to family members of state officials who bought this software. I mean, we're talking about $100 million packages for new voting machines suddenly, in multiple states, and benefits ranging from financial benefits for family members to sort of what I would call election insurance, because they know that they can win the election if they are using that software.

…

We've identified mathematically the exact algorithm they used and planned to use from the beginning to modify the votes in this case to make sure Biden won.

…

It's massive election fraud. It's going to undo the entire election.[133]



---

[133] *Attorney Powell on election legal challenges that remain active in several states*, Fox News (Nov. 15, 2020), available at,
https://video.foxnews.com/v/6209930642001?playlist_id=3386055101001#sp=show-clips (last visited Jan. 4, 2021) (Ex. 95).

(h)    On November 16, 2020, Powell appeared on *The Rush Limbaugh Show* radio show hosted by Mark Steyn, and falsely stated:

> Steyn: What's the problem for you, with this Dominion Voting Systems?
>
> Powell: Well, there are so many problems, Mark, it would be hard to articulate all of them.  Their system was specifically created and designed by Venezuelan money and interests to rig elections for Hugo Chávez.   And then for Maduro, it was exported internationally, understand, to rig an election in Argentina.  And it has been used to rig this election for to make it appear the votes were for Mr. Biden when Donald Trump won overwhelmingly.
>
> …
>
> Any number of batches of votes were changed by the machine, which is by its own manual, tells people it can do that.  It was changed to run 67 percent for Biden and votes were injected in that number by the hundreds of thousands, multiple times the exact same number and ratio were injected like three times in Wisconsin and twice in Michigan or vice versa.  A couple of 20 minutes apart or something. … And for people to say, 'there's no evidence of fraud,' or the people that want to cover up the fraud for whatever their personal interests are—We also have some evidence coming in that people who bought these Dominion systems for their states got special benefits on the side.
>
> …
>
> Steyn: You said, if I understood you correctly, that they can actually program the percentages of as it were.  They can actually override whatever votes are in the machine and adjust them up and down until they reach the -- why would that be a feature of a voting machine?
>
> Powell:  Because it was created to do that to begin with.  That's how Hugo Chávez and Maduro have ensured they won every Venezuelan election.
>
> Steyn: So somehow a Canadian company wound up putting Venezuelan counting machines in 33 American states.  That's the upshot of that, Sidney.
>
> Powell:  Yeah, it was all created in Venezuela and designed to do this very thing.  And they've installed Venezuelan machines and then the votes actually go to Barcelona, Spain, and Frankfurt, Germany, where they can be further manipulated before they're sent back to be reported on AP and The New York Times and all that.  It was caught this big this time was because Donald Trump's lead was so overwhelming, they didn't calculate the algorithm high enough.
>
> …

You might as well call them Venezuelan machines because that's essentially what they are. … And yes, we have Venezuelan communists influenced by Cuban communists counting our votes, and deciding how our election is going to come out.

…

There are multiple means of how they alter it. They alter it to begin with by running the algorithm where they want to run it. But they can also alter it by trashing votes, adding votes. And then if they don't like it still, then they can change it again in Barcelona.[134]

(i)  On November 16, 2020, Powell appeared by telephone on Fox Business program *Lou Dobbs Tonight*, and falsely stated:

Dobbs: Dominion Voting Systems seems to be figuring larger and larger in the interest of your legal team. And, what is the latest?

Powell: Oh definitely, Lou. I've just gotten some stunning evidence from a first-hand witness, a high-ranking military officer who was present when Smartmatic was … designed in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumbprint or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted but that voter would not be tracked to the changed vote. He made it clear that the system would have to be set up but not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or fingerprint or thumbprint was going with a changed vote. Smartmatic agreed to create such a system and produce the software and hardware that accomplished the result for President Chávez. After the Smartmatic Electoral Management System was put in place, he closely observed several elections where the results were manipulated with the Smartmatic software.

…

Persons controlling the vote tabulation computer had the ability to change the recording of votes by moving votes from one candidate to another by using the Smartmatic software. And Smartmatic owns Dominion.

…

---

[134] *The Rush Limbaugh Show*, iHeart Radio (Nov. 16, 2020), available at, https://www.iheart.com/podcast/1119-the-rush-limbaugh-show-57927691/episode/the-rush-limbaugh-show-podcast--73947607/ (last visited Jan. 4, 2021) (Ex. 96).

And the Smartmatic software is in the DNA of every vote-tabulating company's software and systems.[135]



(j) On November 17, 2020, Powell appeared on the Newsmax program *Greg Kelly Reports*, and falsely stated:

Powell: And we know Dominion and has a long history of rigging elections. That's what it was created to do to begin with.

…

And worse than that, it had a backdoor so it could be manipulated by anyone who could access it through that backdoor and that was a deliberate feature. The affidavit of the young military officer we provided yesterday to the public explains how it was created for that very purpose so Maduro, I mean so Hugo Chávez, would never lose another election and he did not after that software was created. He won every single election and then they exported to Argentina and other countries in South America and then they brought it here.

…

We've got the evidence from mouth of the guy who founded the company. I haven't had a chance to get that out to the public yet but they admit -- the founder of the company admits he can change a million votes, no problem at all.

…

Kelly: The founder of Dominion admitted a long time ago? Recently to you? Tell us more, please.

---

[135] *The Affidavit: Sidney Powell With Lou Dobbs*, YouTube (Nov. 16, 2020), available at, https://www.youtube.com/watch?v=n_p1sonhp-k (last visited Jan. 4, 2021) (Ex. 48).

Powell: Publicly.  I will tweet out the video later and I will tag you in it.

…

The only the reason the glitches happened in the system was because he was so – had so far many more votes than they had calculated in advance, their algorithms wouldn't perform the functions they had originally performed or were set to perform.  They couldn't make up the vote count, he had gotten so many hundreds of thousands more than they planned.  So that's when they had to stop the counting and come up with a way to backfill the votes or destroy votes for Trump while they fabricated votes for Biden.[136]



(k)     On November 19, 2020, Powell appeared at a press conference in Washington, D.C., with Giuliani and Ellis, and falsely stated:

The Dominion Voting Systems, the Smartmatic technology software and the software that goes in other computerized voting systems here as well, not just Dominion, were created in Venezuela at the direction of Hugo Chávez to make sure he never lost an election after one constitutional referendum came out the way he did not want it to come out.

…

Now, the software … its most characteristic feature is its ability to flip votes.  It can set and run an algorithm that probably ran all over the country to take a certain percentage of votes from President

---

[136] *Sidney Powell to Newsmax: Dominion Designed to 'Rig Elections,'* Newsmax (Nov. 17, 2020), available at, https://www.newsmax.com/newsmax-tv/sidney-powell-dominion-voting-systems/2020/11/17/id/997526/ (last visited Dec. 4, 2020) (Ex. 30).

Trump and flip them to President Biden, which we might never have uncovered had the votes for President Trump not been so overwhelming in so many of these states that it broke the algorithm that had been plugged into the system, and that's what caused them to have to shut down in the states they shut down in.

…

One of the leaders of the Dominion project overall is Lord Malloch Brown, Mr. Soros's number two person in the U.K. and part of his organization.

…

People can admittedly go in and change whatever they want. They can set the ratio of votes from one thing to another. They can say a Biden vote counts as 1.25 and a Trump vote counts as .75. Those may be the numbers that were actually used here. It's not just the swing states that were affected. The algorithm was likely run across the country to affect the entire election.

…

There's been no oversight of Dominion or its software. Workers in each county were trained by Dominion, but there's no evidence of any monitoring otherwise. We have testimony of different workers admitting that they were trained how to dispose of Trump votes and add to Biden votes. The software has a feature pursuant to which you can drag and drop any number of batches of votes to the candidate of your choice or simply throw them away. So, we have mathematical evidence in a number of states of massive quantities of Trump votes being trashed—just simply put in the trash like you would on your computer with any file and Biden votes being injected. That's addition to the flipping. I mean, it really happens in two ways. There's an algorithm that runs that automatically flips all the votes, and then each operator has the ability to go in, override settings. They can ignore signature, they can ignore the top line of the ballot, they can go down ballot and select who they want to change results for.

…

There's evidence of different benefits being provided to the people who spent a hundred million dollars of taxpayer money at the last minute for their state to get the Dominion Voting Systems put in in time for this election in different ways. There's one person that a lawyer told me got, quote, election insurance, meaning that he would be able to make sure he was elected.

…

84

This is the consummate foreign interference in our election in the most criminal way you can possibly imagine.

…

We know for example one of the Dominion's highest levels employees or officers went to Detroit himself to man the Detroit operation center where he could watch the votes coming in real time and decide which file folder in the system to put those votes into. That's why you see massive spikes after hours when people were told that all of the votes were in, and all of the votes were counted.

…

There is no reasonable explanation for the up-shoots. The straight lines up. I'm not even talking about an angle, I'm talking about some massive straight lines up in the vote tallies in the middle of night after they supposedly stopped counting. And that's when the Dominion operators went in and injected votes and changed the whole system.[137]



(l)     On November 19, 2020, Powell appeared by telephone on the Fox Business program Lou Dobbs Tonight, and, after being introduced as a member of Trump's legal team, falsely stated:

>    The fact is that the Dominion machines run the Smartmatic software or parts of the key code of it, and that is what allows them to manipulate the votes in any way the operators choose to manipulate

---

[137] *Trump Campaign News Conference on Legal Challenges*, CSPAN (Nov. 19, 2020), available at, https://www.c-span.org/video/?478246-1/trump-campaign-alleges-voter-fraud-states-plans-lawsuits (last visited Jan. 4, 2021) (Ex. 32).

them. And every time there was a glitch they called it or a connection to internet, they also violated state laws that required the machines to be recertified and nothing to be changed before the vote.

…

It could have run an automatic algorithm against all the votes which is we believe what happened originally and then the machines had to stop and the recount—or the counting had to stop in multiple places because President Trump's lead was so great at that point, they had to stop the vote counting and come in and backfill the votes they needed to change the results.

…

There's thousands of people in federal prison on far less evidence of criminal conduct than we have already against the Smartmatic and Dominion Systems companies.[138]



(m)    On November 20, 2020, Powell appeared on the Fox Business program, *Mornings with Maria* with Maria Bartiromo and falsely stated:

> Bartiromo:  I want to first start off with your response to what Dominion says.  Dominion is calling all of the allegations that you and Rudy Giuliani and Jenna Ellis have made absurd.  Your response?

---

[138] *Sidney Powell Follows Up With Lou Dobbs About Today's Press Briefing*, YouTube (Nov. 19, 2020), available at, https://www.youtube.com/watch?v=X-53TpxRtxI (last visited Jan. 4, 2021) (Ex. 49).

Powell: They created this system in Venezuela for Hugo Chávez to rig the elections, and make sure he won. They sold that for that purpose to other countries and they brought it to this country for that very purpose and they've used it that way. We've got evidence that shows it.

…

Bartiromo: What about this comment from the Dominion side saying 'we have no ties to Venezuela.' What specifically are the ties to Venezuela? …. Dominion is saying 'we have no ties to Venezuela, no ties to Cuba.' Can you explain that?

…

Powell: … I can tell you that the company was started with Venezuelan money in Venezuela for the express purpose of rigging elections for Hugo Chávez. We have people that were there at his side while it was all done. They were in the control room and watched how the votes were flipped they can watch the votes in real time.[139]



(n) On November 20, 2020, Powell appeared on the Washington Examiner podcast *Examining Politics* and made the following false statements:

O'Connor: I think that much of the discussion of your appearance yesterday, Sidney Powell, was centered around the charges that you made with regard to the computerized ballot system and the software. And I know, I'm not going to insult your intelligence to suggest that here on the radio, you're going to present some sort of

---

[139] *Sidney Powell fires back at Tucker Carlson on Maria Bartiromo morning show, Fox News*, YouTube (Nov. 20, 2020), available at, https://www.youtube.com/watch?v=QRptwxOy8sc&t=14s (last visited Jan. 4, 2021) (Ex. 105).

evidence that you would normally present in open court. My interest is more in what type of evidence you could produce. Is the allegation here that there is a type of backdoor in the software system and people accessed that and just created vote tallies that did not exist? …

<u>Powell</u>: Their system even admits, their own training manual admits that people can go in and do that. That people can go in and put all kinds of votes in a 'trash' folder and then 'trash' them.

…

There are devices on the internet that can be used to see it, and we have multiple people who actually saw it as it was happening, an so we essentially have some pictures of it. And it is terrifying and it is a huge national security issue…

Dominion is closing its offices and moving; no doubt they're shredding documents and God only knows what else.

…

Well, you know, all they did was create a shell company in the United States, but they're completely intertwined, they share office space with one of George Soros's groups. His number 2 man heads up the operation out of England. But the money for it was all funded from Venezuela, and Cuba, and communists, and they did it. We've got an eyewitness to all of it who's has given a sworn affidavit that he saw it all done, and the purpose it was done for was to rig elections.

…

<u>O'Connor</u>: There was supposed to be a hearing in the state of Pennsylvania today with a representative from Dominion. They had volunteered to come in and answer questions from the state government committee overlooking these things. And at the last minute this morning, they backed out and decided that they didn't want to face the lawmakers in Pennsylvania. Have you heard about this?

<u>Powell</u>: Yes, I did hear about that and I'm sure they're now all hiring lawyers and everything else because they knew exactly what they were doing. They advertised these features of their machines. … They paid kickbacks and benefits to families of public officials who bought, uh got them their government contracts.

…

What I remain just absolutely appalled about is the failure of the government to seize the Dominion machines in every state and every place. And it's not just the Dominion machines, Larry. The same

DNA code of the corrupt system is in other voting machines around the country too.

…

O'Connor: The recount was just certified. The people of Georgia, the Secretary of State there claims that, 'you know, listen, we looked at it all, we audited it all, and the paper ballots match what the computers said.' How do you respond?

Powell: That's a lie. Well, it might have. I mean, you can run the same corrupted ballots through a machine and come out with the same thing. That really doesn't prove anything. … Not to mention the Secretary of State of Georgia and the Governor of Georgia rushed to buy, to give a $100 million contract to Dominion, I think in 2019, which is not that long ago before the election started. … We have one lawyer that has told me that they got essentially kickbacks and benefits for their families from doing that, not to mention what I would call election insurance, knowing that they would be elected or reelected in the process.[140]

(o)     On November 21, 2020, Powell appeared for a telephonic interview on Newsmax with Rob Schmitt and Mark Halperin and falsely stated:

Powell: Everybody saw it election night. They saw votes being subtracted from President Trump and appearing on the Biden side of the scale and that's exactly what this Dominion system was designed to do and we have eyewitness testimony to its entire creation for that very purpose.

…

But now they can literally drag and drop hundreds of thousands of votes wherever they want them. Everybody knew when they bought the system and that was one of the features of the system.

…

We the people in voting for Trump in a landslide election had essentially broken the algorithm that had been pre-programmed into the machine. … they just injected numbers or trashed votes for Trump otherwise and changed the numbers.

…

Mr. Kemp and the Secretary of State … are in on the Dominion scam with their last-minute purchase and reward of a contract to

---

[140] *Sidney Powell talks about her allegations regarding the computerized voting systems on election night*, Washington Examiner (Nov. 20, 2020), available at, https://www.washingtonexaminer.com/videos/sidney-powell-talks-about-her-allegations-regarding-the-computerized-voting-systems-on-election-night (last visited Jan. 4, 2021) (Ex. 5).

Dominion for $100 million. The state Bureau of Investigations for Georgia better be looking into financial benefits received by Mr. Kemp and the Secretary of State's family about that time. Another benefit Dominion was created to reward is what I would call election insurance; that's why Hugo Chávez had it created in the first place.

…

Georgia is extremely bad: we've got … the votes being switched, the algorithms being run. You name the manner of fraud, and it occurred in Georgia.

…

Yeah, and I think the algorithm ran most probably across the country … And it looks like 35,000 votes were added to every Democratic candidate.

….

Schmitt: You also talked about this ability of the system, and I thought this was so interesting when you said that, it could take a vote and it can make a vote for Biden worth more than a vote for Trump. Do you think that that happened or is that another part of the system that maybe wasn't used?

Powell: No, I think that definitely happened. I think that was the first step with the system. To weight the votes so that a Biden vote is worth 1.23, say, and a Trump vote is worth the rest of that. And so the Trump vote is about three-quarters and the Biden vote is one-and-a-quarter.

…

We're seeing essentially the same things in Michigan, except larger number of ballots being stuffed in. It's the old-fashioned stuffing the ballot box. They're just doing it by computer instead of by paper. That's really all it is. They're dragging and dropping files of votes from one person to another instead of just stuffing paper ballots in the ballot box.

…

I'm telling you, it's been used for both parties. One of the big problems is that we don't know who was elected by buying their election through Dominion. … And there's no telling how many congressional candidates should have won that lost by the addition

of 35,000 votes for Democrat or the algorithm that they were running against whoever they want to target.[141]



(p)    On or before November 23, 2020, Powell published the following false statement to CBS News, intending, expecting, and reasonably foreseeing that they would publish it to their audience; CBS News did so on November 23, 2020:

> I will continue to represent #WeThePeople who had their votes for Trump and other Republicans stolen by massive fraud through Dominion and Smartmatic.[142]

(q)    On November 23, 2020, The Epoch Times published the following false statement after Powell had published it to The Epoch Times, intending, expecting, and reasonably foreseeing that that The Epoch Times would republish it to their audience.

> Attorney Sidney Powell has also alleged that Dominion software was used to switch votes in the voting machines. Powell, in a statement, wrote, "The evidence I'm compiling is overwhelming that this software tool was used to shift millions of votes from President Trump and other Republican candidates to Biden and other Democrat candidates," she added.[143]

---

[141] *Sidney Powell: It will be BIBLICAL*, Newsmax TV (Nov. 21, 2020), available at, https://www.youtube.com/embed/Y68pEknYyCM?rel=0&start=0 (last visited Jan. 4, 2021) (Ex. 36).

[142] Kathryn Watson, *Trump legal team disavows association with lawyer Sidney Powell*, CBS News (Nov. 23, 2020), available at, https://www.cbsnews.com/news/sidney-powell-disavowed-by-trump-campaign/ (Ex. 38).

[143] Masooma Haq, *Former Republican Candidate Alleges Hard Evidence of Corruption in US Election System*, The Epoch Times (Nov. 23, 2020), available at,

(r)     On November 24, 2020, Powell appeared by telephone on the Fox Business program, *Lou Dobbs Tonight*, and falsely stated:

> There's no doubt that the software was created and used in Venezuela to control the elections and make sure that Hugo Chávez was always reelected as the dictator of Venezuela in what appeared to be, quote, free and fair elections, end quote.  But they were manipulated by the software used in the Dominion machines and used by other machines in the United States, frankly, and we're just continuing to be inundated by evidence of all the frauds here.[144]



(s)     On November 28, 2020, Powell appeared via telephone on Newsmax with Tom Basile and Mark Halperin, and falsely stated:

> It was designed to manipulate the votes and destroy the real votes of American citizens who were casting legal votes.  That applies to Georgia as well.  I have serious concerns that certain people, in fact one lawyer told me that one of his clients knew of money or benefits being paid to family members of those who signed the contract for Georgia.  And I believe it was a no-bid contract that Georgia awarded for the Dominion systems, a $100 million no bid contract.
> …
>
> We're seeing every manner and means of fraudulent voting you can possibly think of …  from the point shaving system that Dominion systems allows, they weighted votes for President Trump at .77% and they awarded votes to Biden at something like 1.22%.  So

---

https://www.theepochtimes.com/expert-hard-evidence-of-corruption-in-us-election-system_3590417.html (Ex. 39).

[144] *BREAKING NEWS: Sidney Powell Tells Lou Dobbs Her Lawsuit in Georgia May Be Filed As Soon As Tomorrow*, YouTube (Nov. 24, 2020), available at, https://www.youtube.com/watch?v=KpT2Rz4rTWM (last visited Jan. 4, 2021) (Ex. 40).

Biden's votes were weighted an additional 20% to that of President Trump's which automatically flipped approximately 2.7% of the vote to Biden in any number of counties if not across the entire state.

…

It was designed to enable those sorts of vote flipping and switching and the ability to trash votes in large numbers so that Mr. Biden would win without campaigning.[145]



(t) On November 30, 2020, Powell appeared on the Fox Business program *Lou Dobbs Tonight* and falsely stated:

We need, frankly, to stop the election that's supposed to happen in January because all the machines are infected with the software code that allows Dominion to shave votes for one candidate and give them to another and other features that do the same thing.

…

The system was set up to shave and flip different votes in different states. Some people were targeted as individual candidates. It's really the most massive and historical egregious fraud the world has ever seen.

…

It seems there were significant benefits for both Governor Kemp and perhaps Mr. Raffensperger also and maybe others on their team for deciding at the last minute to rush in a contract for Dominion for $107 million for the state.

---

[145] *Sidney Powell to Newsmax TV: Dominion Contracts Warrant Criminal Probe*, Newsmax (Dec. 28, 2020), available at, https://www.newsmax.com/newsmax-tv/sidney-powell-georgia-lawsuit-contract/2020/11/28/id/999106/ (last visited Jan. 4, 2021) (Ex. 97).

…

Dominion and its minions and other state officials everywhere are apparently out there trying to destroy everything they can get to before we can seize it.[146]



(u)     On December 2, 2020, Powell and Wood co-led and spoke at the "Stop the Steal" rally in Alpharetta, Georgia, where Powell falsely stated:

There was and is still massive voter fraud across this country.  It took all forms, it was not just the Dominion machines.  We have experts and a witness who have explained to us that the fraud exists in the DNA of all the software that was run by any voting system in the country …  I think we will eventually find that the algorithm that flipped votes at a certain percentage from Trump to Mr. Biden was run all across the country …  And then we have the extraordinary evidence of inexplicable spikes, I mean hundreds of thousands of spikes in votes.  We can see them injected into the system, sometimes at a rate of 90% for Biden and 10% for Trump.

…

There should not be a run-off, certainly not on Dominion machines.  I think I would encourage y'all Georgians to make it known that you will not vote at all until your vote is secure.

…

We expect that in Venezuela, unfortunately, where the Dominion systems and Smartmatic technology first took root and was used to ensure the election of Hugo Chávez, the brutal dictator.

---

[146] *Sidney Powell on Lou Dobbs Tonight on 11/30/20*, YouTube (Nov. 30, 2020), available at, https://www.youtube.com/watch?v=4uMr-TRZNCw (last visited Jan. 4, 2021) (Ex. 6).

…

So we need to flood the legislators here in Georgia, and the Governor and the Secretary of State with phone calls and letters.

…

[In response to a question about why Georgia's paper ballot recount did not reveal discrepancies between the number of paper ballots and the counts from the Dominion machines, Powell stated:]

Georgia did not do a full hand recount of the ballots. In the one county where they did do the hand recount, we found exactly what you're talking about. It was a small precinct. I don't remember the total number of votes but they flipped 37 from Trump to Biden in this very small precinct. It was .52 or 52% I think of the votes there. So they weighted Biden votes at 1.52 and they weighted Trump votes at .48 when the votes went into the machine to change them.

…

The machines are actually built to even try to alter the audit trail for them.

…

It's the first time it's been so blatant and that's because so many of you across the country voted for Donald Trump that you broke the algorithm.[147]



---

[147] *Sidney Powell, Lin Wood attend 'Stop the Steal' rally in Georgia*, YouTube, (Dec. 2, 2020), available at, https://www.youtube.com/watch?v=pq-_B5z3QIA (last visited Jan. 4, 2021) (Ex. 44).

(v)    On December 3, 2020, Powell appeared via telephone on *The John Fredericks Show*, which was broadcast from Atlanta, Georgia, and falsely stated:

> We're getting evidence of every manner and means of voter and election fraud you can imagine, but to know now that the voting machines have been rigged. And it's not just Dominion. The same DNA code is in most of the machines that run across the country, maybe not to the extent Dominion did. In fact, I saw a report yesterday that Dominion machines average 6% more for Biden than any of the others.
>
> …
>
> The interesting thing is the disparity between the places where Dominion is and all other places. And one of the things we know is, from prior use and testimony, that Dominion machines can flip 2.7% - 3% of the vote from Trump to Biden easily. That's kind of what they've run many times before. And that stands to reason that that accounts for the 6% up for Biden where the Dominion machines were operating.
>
> …
>
> We have direct witnesses who know why it was created, how it was created, watched it being used, was briefed on all its features. Their own online manual tells people they can drag and drop votes into the trash. They put them in this thing called an adjudication file, however many they want to. They can program the computer not to read signatures and therefore reject thousands of ballots. Put them in quote an adjudication file and then just trash it all. … We have the witness who watched it all work. He was in the control room when Dominion was rigging the elections in Venezuela.
>
> …
>
> You don't just add 350,000 Biden votes all of a sudden at 3 o'clock in the morning. That's like flipping a coin 350,000 times and it always lands on heads. It doesn't happen. It's a mathematical and statistical impossibility…they can literally just make up a number and inject it into the system.
>
> …
>
> The Trump landslide was so overwhelming that it broke the algorithm.[148]

---

[148] *Sidney Powell: "I Have Direct Evidence of Vote Fraud on the Biggest Scale in World History,"* The John Fredericks Show (Dec. 3, 2020), available at, https://www.johnfredericksradio.com/podcast/december-3-2020/; https://www.youtube.com/watch?v=QKzqvtxdwfA (last visited Jan. 3, 2021) (Ex. 98).



(w)    On December 5, 2020, Powell appeared on *Huckabee* with Mike Huckabee and falsely stated:

> The system right now is corrupt.  Dominion machines cannot be relied on at all, and we want everyone, Republicans, the candidates, to stand up and speak out about the fraud that happened in Georgia.
>
> …
>
> We know the Dominion machines were created for the very purpose of altering the vote count to ensure the election of people like Hugo Chávez and Maduro in Venezuela.  The Same thing is happening here now.[149]



---

[149] *EXCLUSIVE: Sidney Powell Suspects CIA in RIGGING Elections*, Huckabee (Dec. 5, 2020), available at, https://www.youtube.com/watch?v=dNK-LrrzxcE&list=PLp0iqOAbW0sZh0FqV39gW4NEwn-N0Rp0L (Ex. 99).

97

(x)     On December 7, 2020, Powell appeared on Newsmax program *Greg Kelly Reports*, and falsely stated:

> We focus also on the systemic problem with the Dominion machines. We have an expert who has identified that the vote for Biden was 5% overall greater where there were Dominion machines than any of the other votes. That is essentially the amount of votes you can flip, and brag about being able to flip ... these machines were created in Venezuela and the entire process was started there to make sure Mr. Chávez won every election ... This is the same technology, the same equipment. It came out of Venezuela to be used here.[150]



<hr>

[150] *Sidney Powell to Newsmax TV: Our Case Was Prejudged*, Newsmax (Dec. 7, 2020), available at, https://defendingtherepublic.org/?p=1166; https://www.newsmax.com/newsmax-tv/sidney-powell-kraken-lawsuit-scotus/2020/12/07/id/1000459/ (last visited Jan. 4, 2021) (Ex. 26).

(y)     On December 10, 2020, Powell tweeted, in response to a tweet by Donald Trump:

> The election & media were all #rigged
> Your voters broke the #Dominion algorithm
>
> ...
>
> This election fraud must be completely exposed & ended NOW 4 the world[151]



(z)     On December 10, 2020, from a hotel room at the Trump International Hotel in Washington, D.C., Powell appeared on Fox Business program *Lou Dobbs Tonight*, and falsely stated:

> They designed and developed the Smartmatic and Dominion programs and machines that include a controller module that allows people to log in and manipulate the vote even as it's happening ... We're finding reams and reams of actual documents from Smartmatic and Dominion, including evidence that they planned and executed all of this.  We know … that there are George Soros connections to the entire endeavor.  Lord Malloch Brown was part of it along with the other people from Dominion.
>
> …
>
> We have evidence of how they flipped the votes, how it was designed to flip the votes, and that all of it has been happening just as we've been saying it has been.
>
> …

---

[151] Sidney Powell (@SidneyPowell1), Twitter (Dec. 10, 2020), available at, https://twitter.com/SidneyPowell1/status/1337251453359026183?s=20 (Ex. 45).

[t]he entire system was created for the benefit of Venezuela and Hugo Chávez to rig elections to make sure he continued winning. And then it was passed on to Mr. Maduro to do the same. And we know it was exported to other countries by virtue of some of the Dominion executives that proceeded to go about and essentially sell elections to the highest bidder.

…

And they shared office space with George Soros's companies as well as the leadership of Lord Malloch Brown in the U.K. and Canada. It is a very concerning and troubling and illegal web of conduct that all of which focused on rigging the election in this country. And we are seeing the results in multiple states where we're now identifying specific votes flipped, like in a couple of Georgia counties.[152]



(aa)   On December 13, 2020, from a hotel room at the Trump International Hotel in Washington, D.C., Powell gave a televised interview to The Epoch Times program *American Thought Leaders* with Jan Jekielek, and falsely stated:

> Especially insidious and troubling is the machine fraud conducted through the Dominion voting systems. In fact, one of our experts says Dominion fraud was 5 per cent higher votes for Biden across the board everywhere there was a Dominion machine running. The same was true for other Democrats that were running on the tickets in those states.

---

[152] *Evidence of Fraud: Sidney Powell and Lou Dobbs discuss*, Fox Business (Dec. 10, 2020), available at, https://defendingtherepublic.org/?p=1168; https://video.foxbusiness.com/v/6215520 845001/#sp=show-clips (last visited Jan. 4, 2021) (Ex. 27).

…

They're owned, run, and were organized and created by Venezuelan dictator, Hugo Chávez, with his dirty money and the dirty money of the Cuban communists, to ensure he had won every election after it was used.

…

President Trump's voters poured out in such great number that they broke the algorithm they had pre-programmed in the computers for Dominion to create the fraud.  That's why they had to stop counting in five states.

…

Effectively what they did with the machine fraud was to, they did everything from injecting massive quantities of votes into the system that they just made up… They trashed votes. They had this thing called an adjudication system, where they could program the computer—even by their own manual they explain this—they can program the computer to reject ballots for any number of reasons. … And then the people running the machines, the computers, could simply take that whole adjudication file that had hundreds of thousands of Trump votes in it, and drop it, trash it or flip it to Biden. And that happened all across the board.

…

Another way they did it was to shave votes.  The machine can weight the ballots.  So they can give Biden votes a weight of 1.25 count, and Trump votes are reduced to a 0.75 count.  So they flip 25 per cent of the votes for Biden automatically, every vote count.  Instead of a vote counting as one, which is all a vote should ever count as—one man, one vote. That's our standard, long held rule; the only way it can work in a democratic republic.  And instead, if you voted for Biden, you got a 1.25.  If you voted for Trump, you got 0.75.  We can see in some of the readouts, that's exactly what happened.  You can go back, the mathematicians can go back and figure out the algorithm that was run, by precinct even.

…

I mean we know that Carolyn Maloney, for example, was complaining about it—I think it was in 2006—wrote a letter to the Secretary of the Treasury, I think, and other people, expressing concern over this Venezuelan-owned company that's running American elections.  … One of the things Dominion gets people with is what I would call election insurance—'If you put in the Dominion system, you're gonna win—re-elections, no problem at all.'  And that's what Hugo Chávez had it rigged for.

…

They have been doing this to American citizens and other countries around the world for at least 15 years. Venezuela hasn't had a free election since Hugo Chávez did the whole Smartmatic Dominion voting system thing.[153]



(bb) On December 14, 2020, Powell appeared on the radio program *The John Fredericks Show*, and falsely stated:

I hope things get cleaned up in Georgia fast because there's no point in voting on machines that commit fraud, and that's what the Dominion machines do. They can read the ballots, change the ballots, flip votes from Trump to Biden or from Kelly Loeffler to her opposition, they can override signatures, we have evidence that they put massive numbers in what they call an adjudication file, and by Dominion's own technical manual you can do whatever you want to with the adjudication file.

…

And Venezuela, of course, you know the system for Dominion and Smartmatic that caused this fraud came from Venezuela and was created to ensure the victories of Hugo Chávez, the dictator, and then

---

[153] *Exclusive: Sidney Powell on 2020 Election Lawsuits, Supreme Court Decision, and the Flynn Case*, The Epoch Times (Dec. 13, 2020), available at, https://defendingtherepublic.org/?p=1170; https://www.theepochtimes.com/exclusive-sidney-powell-on-election-lawsuits-supreme-court-decision-and-the-flynn-case_3617067.html (last visited Jan. 4, 2021) (Ex. 28).

of course Maduro has benefited from it. And they have sold it all over the place.

…

In fact one of our experts, and we have this evidence attached to the exhibits at sidneypowell.com, at defendingtherepublic.org, at kraken-wood.com, all of which people have attacked and tried to take down.

…

It's the greatest crime of the century if not the life of the world.

…

They've been telling everybody there's nothing wrong and that's a bald-faced lie.

…

This was rigged from the get-go, and everybody that was part of that knew it.

…

It's a 1.26 weighting. What the Dominion machines can do is instead of registering one vote for each candidate, they can go in and they can weight the votes. So, a vote for Biden counts as 1.26 points and a vote for Trump only counts as .74. So they do essentially a 25% shift in the votes that causes twice that amount in terms of a flip. It's … just as criminal as it can possibly be.

…

[I]n terms of the Dominion machine fraud, yes, it's going to be the same everywhere and, yes, multiple states should fall because of this fraud.[154]

---

[154] *Sidney Powell: Kraken Released in MI; Scotus Next!*, The John Fredericks Show (Dec. 14, 2020), available at, https://www.johnfredericksradio.com/podcast/december-14-2020/; https://www.youtube.com/watch?v=qWt1vB-OIZk&list=PL1q2i_zsupwSdYDFTH0pA-X-YNz57E5TV&index=2 (last visited Dec. 29, 2020) (Ex. 29).



(cc)  On December 15, 2020, Powell tweeted the following false statements:

> "Votes" are counted from images Dominion creates—not the ballots. The images are part of the fraud. Their error rate in Antrim county and elsewhere of over 66% reflects the algorithm pursuant to which these fraudsters shaved votes from Trump and gave them to Biden.[155]



---

[155] Sidney Powell (@SidneyPowell1), Twitter (Dec. 15, 2020), available at, https://twitter.com/SidneyPowell1/status/1338920555966320641?s=20 (Ex. 100).

(dd)   On December 20, 2020, four days after receiving Dominion's retraction demand letter, Powell retweeted her attorney's letter to Smartmatic saying "Ms. Powell retracts nothing," and doubled down on the truth of her false accusations against Dominion by tweeting the following false statements:

> Same is true for #Dominion
> Heard they wrote me too!
> Haven't seen it but retracting nothing
> We have #evidence
> They are #fraud masters![156]



[156] Sidney Powell (@SidneyPowell1), Twitter (Dec. 20, 2020), available at, https://twitter.com/SidneyPowell1/status/1340760761228996614 (Ex. 4).

(ee)   On December 23, 2020, Powell gave an interview on *The Sean Hannity Show* with Louie Gohmert and falsely stated:

> Powell: There's stunning mathematical and statistical evidence and data that's absolutely irrefutable of massive amounts of votes just disappearing from the system in the hundreds of thousands. And we know for example that in Michigan, in Antrim County, when we actually examined the Dominion voting machines—forensic experts did that—that there were—they have this way of sending votes computer-wise to what they call adjudication, and then they can just disappear them. And they did that for more than 80% of the votes. So somebody can just drag and drop 'em to the trash file.
>
> …
>
> Uh, No, it has to be -- it was accessible through the Internet, and that's an automatic violation of the federal law that requires voting machines to be, you know, protected from any sort of intrusion like that. And we also know they erased certain files on the machines in Antrim County, specifically the adjudication files that would have shown exactly where they put those votes that went missing. And there is evidence from other people in other states that machines were connected from the -- to the Internet; evidence from people in multiple states that people uploaded thumb drives of information to the machine; they can inject votes and create votes from thin air. They have done that, it appears, in any number of places. This election is the biggest crime in American history.
>
> …
>
> We've been focused on the fraud that occurred across the country as a result of the voting machines. And I'm not just talking about Dominion; they all use the same software. And we're finding more and more evidence that they ran an algorithm in the machines that automatically flipped a certain percentage of votes from Biden—from Trump to Biden, to give Biden a 2.7% flip, which amounts to like a 5.5% edge.
>
> …
>
> Gohmert:  But as I understand it, Smartmatic software has been incorporated into Dominion Voting Systems since 2004; was – was that your understanding?
>
> Powell:  Yes, that's my understanding.
>
> …
>
> Even Senator Warren and Klobuchar and some others, in December of 2019, were complaining about the Venezuelan connection and the corruption in the Dominion systems. And Carolyn Maloney was

one of the congressmen who, ten years ago or so, called it out and tried to get the government not to approve its use whatsoever.[157]

(ff)     On December 23, 2020, from within the Trump International Hotel in Washington, D.C., Powell published a 270-page document to Zenger News for the express purpose that Zenger News would publish it, which it foreseeably did. That document included the following false statements about Dominion:

> [December 13, 2020 Antrim Michigan Forensics Report]
>
> We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan. We further conclude that the results of Antrim County should not have been certified.
>
> …
>
> A staggering number of votes required adjudication. This was a 2020 issue not seen in previous election cycles still stored on the server. This is caused by intentional errors in the system. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency or audit trail. Our examination of the server logs indicates that this high error rate was incongruent with patterns from previous years. The statement attributing these issues to human error is not consistent with the forensic evaluation, which points more correctly to systemic machine and/or software errors. The systemic errors are intentionally designed to create errors in order to push a high volume of ballots to bulk adjudication.
>
> …
>
> The only reason to change software after the election would be to obfuscate evidence of fraud and/or to correct program errors that would de-certify the election. Our findings show that the Central Lake Township tabulator tape totals were significantly altered by utilizing two different program versions (10/23/2020 and 11/05/2020), both of which were software changes during an election which violates election law, and not just human error

---

[157] *The Sean Hannity Show* with Louie Gohmert, iHeart Radio (Dec. 23, 2020), available at, https://www.sidneypowell.com/media/listen-below-for-sidney-powells-latest-insight-into-the-fraudulent-2020-election (last visited Jan. 3, 2021) (Ex. 51).

associated with the Dominion Election Management System. This is clear evidence of software generated movement of votes.

…

The election logs for Antrim County consist of 15,676 total lines or events. Of the 15,676 there were a total of 10,667 critical errors/warnings or a 68.05% error rate.

…

A high "error rate" in the election software (in this case 68.05%) reflects an algorithm used that will weight one candidate greater than another (for instance, weight a specific candidate at a 2/3 to approximately 1/3 ratio). In the logs we identified that the RCV or Ranked Choice Voting Algorithm was enabled (see image below from the Dominion manual). This allows the user to apply a weighted numerical value to candidates and change the overall result. The declaration of winners can be done on a basis of points, not votes.

…

[November 15, 2020 Declaration by an Anonymous Venezuelan military officer]

This conspiracy began more than a decade ago in Venezuela and has spread to countries all over the world.

…

I was witness to the creation and operation of a sophisticated electronic voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power.

…

Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chávez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic ... The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.

…

After passage of the referendum, President Chávez instructed me to make arrangements for him to meet with Jorge Rodriguez, then President of the National Electoral Council, and three executives from Smartmatic. ... President Chávez. had multiple meetings with Rodriguez and the Smartmatic team at which I was present. In the first of four meetings, Jorge Rodriguez promoted the idea to create software that would manipulate elections. Chávez was very excited and made it clear that he would provide whatever Smartmatic needed. He wanted them immediately to create a voting system which would ensure that any time anything was going to be voted on the voting system would guarantee results that Chávez wanted. Chávez offered Smartmatic many inducements, including large sums of money, for Smartmatic to create or modify the voting system so that it would guarantee Chávez would win every election cycle. Smartmatic's team agreed to create such a system and did so.

…

I arranged and attended three more meetings between President Chávez and the representatives from Smartmatic at which details of the new voting system were discussed and agreed upon. ... At these meetings, the participants called their project the "Chávez revolution." From that point on, Chávez never lost any election. In fact, he was able to ensure wins for himself, his party, Congress persons and mayors from townships.

…

Chávez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. ... He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chávez.

…

After the Smartmatic Electoral Management System was put in place, I closely observed several elections where the results were manipulated using Smartmatic software. One such election was in December 2006 when Chávez was running against Rosales. Chávez won with a landslide over Manuel Rosales—a margin of nearly 6 million votes for Chávez versus 3. 7 million for Rosales.

…

On April 14, 2013, I witnessed another Venezuelan national election in which the Smartmatic Electoral Management System was used to

manipulate and change the results for the person to succeed Hugo Chávez as President. In that election, Nicolas Maduro ran against Capriles Radonsky. ... Inside that location was a control room in which there were multiple digital display screens – TV screens – for results of voting in each state in Venezuela. The actual voting results were fed into that room and onto the displays over an internet feed, which was connected to a sophisticated computer system created by Smartmatic. People in that room were able to see in "real time" whether the vote that came through the electronic voting system was in their favor or against them. If one looked at any particular screen, they could determine that the vote from any specific area or as a national total was going against either candidate. Persons controlling the vote tabulation computer had the ability to change the reporting of votes by moving votes from one candidate to another by using the Smartmatic software.

…

By two o'clock in the afternoon on that election day Capriles Radonsky was ahead of Nicolas Maduro by two million votes. When Maduro and his supporters realized the size of Radonsky's lead they were worried that they were in a crisis mode and would lose the election. The Smartmatic machines used for voting in each state were connected to the internet and reported their information over the internet to the Caracas control center in real-time. So, the decision was made to reset the entire system. Maduro's and his supporters ordered the network controllers to take the internet itself offline in practically all parts in Venezuela and to change the results.

…

It took the voting system operators approximately two hours to make the adjustments in the vote from Radonsky to Maduro. Then, when they turned the internet back on and the on-line reporting was up and running again, they checked each screen state by state to be certain where they could see that each vote was changed in favor of Nicholas Maduro. At that moment the Smartmatic system changed votes that were for Capriles Radonsky to Maduro. By the time the system operators finish, they had achieved a convincing, but narrow victory of 200,000 votes for Maduro.

…

When Chávez died, Smartmatic was in a position of being the only company that could guarantee results in Venezuelan elections for the party in power.

…

I want to point out that the software and fundamental design of the electronic electoral system and software of Dominion and other

110

election tabulating companies relies upon software that is a descendant of the Smartmatic Electoral Management System. In short, the Smartmatic software is in the DNA of every vote tabulating company's software and system.

…

Dominion uses the same methods and fundamentally same software design for the storage, transfer and computation of voter identification data and voting data. … The software, hardware and system have the same fundamental flaws which allow multiple opportunities to corrupt the data and mask the process in a way that the average person cannot detect any fraud or manipulation. The fact that the voting machine displays a voting result that the voter intends and then prints out a paper ballot which reflects that change does not matter. It is the software that counts the digitized vote and reports the results. The software itself is the one that changes the information electronically to the result that the operator of the software and vote counting system intends to produce that counts. That's how it is done. So the software, the software itself configures the vote and voting result -- changing the selection made by the voter. The software decides the result regardless of what the voter votes.[158]



**Sidney Powell's Legal Team Has Binder of Documents She Says Establish the 2020 Election was a Fraud**

(Claire Swift/Zenger News)

**Zenger News publishes the Powell binder in its entirety.**

---

[158] Clare Swift, *Sidney Powell's Legal Team Has Binder of Documents She Says Establish the 2020 Election was a Fraud*, Zenger News (Dec. 23, 2020), available at, https://www.zenger.news/sidney-powell-document-binder-2020-election-fraud/ (Ex. 79).

(gg)  On December 28, 2020, Powell published a "Summary" of "Evidence of Foreign Interference in the 2020 Election" to her website, sidneypowell.com, which included the following false statements about Dominion:

> These election systems appear to have been intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results.
>
> …
>
> The forensic report prepared for Antrim County, Michigan found that, "the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systematic fraud and influence election results.  For example, the report found that the system intentionally generates an enormously high number of ballot errors.  The intentional errors lead to individual or bulk adjudication of ballots with no oversight, no transparency, and no audit trail. Dominion operating system has control functions to allow for transfer of adjudication files from one Results Tally system to another.  This is the exact type of issue that leads to voter and/or election fraud.
>
> …
>
> These systems bear the same crucial code "features" and defects that allowed the same outside and foreign interference in the 2020 US General Election, in which votes were in fact altered and manipulated contrary to the will of the voters, as evidence by the forensic analysis of Antrim County MI as well as statements of citizens there who witnessed machine alteration of election results.
>
> …
>
> Dominion's purchase of Sequoia Voting Systems from Smartmatic has resulted in the same "Source Code" being used today. Due to this and various other mergers, acquisitions, licensing agreements and partnerships, the entire election ecosystem in the United States is convoluted, murky and hidden. This began with the Venezuelan investment into Smartmatic specifically to rig elections.
>
> …
>
> Analysis has established that there was a 5.6 % increase in votes for one candidate for president across the entire Dominion system— with all other variables frozen.[159]

---

[159] *See Summary Foreign Interference Draft 12. 22. 2020*, available at, https://www.scribd.com/document/489248528/Summary (last visited Jan. 4, 2021) (Ex. 82).



(hh) On December 29, 2020, Powell gave an interview on the Victory Channel's *FlashPoint* with Gene Bailey and falsely stated:

> I'm pretty sure they ran the algorithm to flip 2.7% of the votes from Trump to Biden almost everywhere across the country, certainly they did it everywhere on Dominion. ... And the vote in all the Dominion areas was 5.6% or so higher for Biden than any other areas in the country. And that would be attributable to that algorithm. ... All manner and means of fraud pervaded this election, but the most insidious and egregious of it is the machine fraud.[160]



---

[160] *FlashPoint: Hope Is Not Lost! Featuring Attorney Sidney Powell*, (The Victory Channel broadcast Dec. 29, 2020), available at, https://www.sidneypowell.com/media/flashpoint-hope-is-not-lost-featuring-attorney-sidney-powell (last visited Jan. 3, 2021) (Ex. 101).

(ii)     On December 29, 2020, Powell gave a telephonic interview on *The Rush Limbaugh Show* with host Todd Hermann and made the following false statements about Dominion:

> The flipping of votes by Dominion is even advertised; their ability to do that fraction, to make a Biden vote count 1.26 and a Trump vote count only .74. They've done it before. They've done it in Venezuela. They've done it in other foreign countries. They've done it in this country. We have evidence even that it was done in 2016 in California to benefit Hillary over Bernie, and it's been done in other local elections and smaller elections, different places.
>
> …
>
> It's absolutely the most appalling criminal operation in the history of our country.[161]

(jj)     On December 30, 2020, OAN foreseeably republished Powell's false statements from her December 29 interview on *The Rush Limbaugh Show*.[162]

---

[161] *The Rush Limbaugh Show*, iHeart Radio (Dec. 29, 2020), available at, https://www.iheart.com/podcast/1119-the-rush-limbaugh-show-57927691/episode/the-rush-limbaugh-show-podcast--75675693/ (last visited Jan. 7, 2021) (Ex. 25).

[162] *Powell: Election Fraud Now Obvious Because President Trump's Landslide Victory Broke Dominion 'Vote-Switch' Algorithm*, OAN (Dec. 30, 2020), available at, https://www.oann.com/powell-election-fraud-now-obvious-because-president-trumps-landslide-victory-broke-dominion-vote-switch-algorithm/ (last visited Jan. 4, 2021) (Ex. 50).

(kk)  On January 3, 2021, Powell tweeted the following false statements:

> Georgia Data Shows 24,658 of Trump's Votes Removed, Another 12,173 Switched to Biden: Data Scientists https://theepochtimes.com/georgia-election-data-shows-17650-votes-switched-from-trump-to-biden-data-scientists_3640670.html?st=P3cXX4eskG8RfE11tBFgIZHsIKUTxq2CY3_hdP90HRgXys3nzbKoYmVRr-kFoDpjGfdxNeGLpfuLgJWCzQOooWPZLVQZJyQaiBA ... via

> @epochtimes

> And that's just one county! HA has 159 #Dominion staff in every county #Dominion shredding documents

> @GoJackFlynn

> @GenFlynn

> @BoSnerdley[163]



[163] Sidney Powell (@SidneyPowell1), Twitter (Jan. 3, 2021), available at, https://twitter.com/SidneyPowell1/status/1345679327887843329?s=20 (Ex. 84).

(ll)     On January 3, 2021, Powell appeared on the nationally syndicated radio show *The CATS Roundtable* with John Catsimatidis and falsely stated:

> **Powell:**  This is the most fraudulent election in the history of the world.  It's so well documented and so observable.  Most people saw it start election night.  They saw it with their own eyes.  Votes don't disappear from one candidate and go to the other.  Yet people saw that happen.  We know it happened.  We have election machines and a report done on those by experts that show that votes were flipped from Trump to Biden and how the votes were manipulated according to an algorithm.
>
> …
>
> **Catsimatidis:**  Georgia, the Senate race on Tuesday; what's going to happen, do we have enough checks and balances in place?
>
> **Powell:**   I'm afraid we don't, John.   I mean, I'm encouraging everyone to get out and vote, and break the algorithm again.
>
> …
>
> The adjudication file wasn't kept in Michigan for this year.  It was kept for prior elections, but not for this year.  And that's because it would have shown, no doubt, how Dominion people threw the ballot count from Trump to Biden.[164]



---

[164] *Sidney Powell – Status of Presidential Election*, The CATS Roundtable (Jan. 3, 2021), available at, https://www.sidneypowell.com/media/status-of-the-presidential-election (last visited Jan. 3, 2021) (Ex. 103).

(mm) On January 3, 2021, Powell appeared on an installment of the *Global Prayer for Election Integrity* series, and falsely stated:

> And what we've gotten this year, we've finally seen it in real-time, is an algorithm being run to shave a substantial portion of the votes so that Mr. Biden got 1.26 in many places, and a Trump vote was weighed at .74. That's absolutely outrageous. It's supposed to be one person, one vote. There should be no fractions of any votes calculated anywhere. But we're getting more and more information that the algorithm ran in lots of places, including in the red states and against red counties.
>
> …
>
> And then there are particular places where so many Trump people poured out to vote on election day, which is what we all encouraged them to do, to wait for election day and vote in person to make sure their vote got counted, that they broke the algorithm in all the swing states that they had pre-calculated, based on the pre-election voting. And – and that's why the voting had to count – stopped counting in multiple states that night when we saw it all happen. And then suddenly, you know, Biden votes appear.
>
> …
>
> So we've seen every manner and means of fraud that anybody can imagine, but it's the machine fraud that I think is the absolute most insidious.
>
> …
>
> We've got more information coming out about the internet connections that the Dominion machines had. We know that information was uploaded to them by thumb drive; that was impermissible. There should have been nothing changed on the machines from several days – maybe even 30 days, I can't remember the exact number before the election, until after the votes were tallied and everything properly counted and accounted for. On the machine we got access to in Antrim County, Michigan – or the machines, I should say – they found a substantial flip rate of the votes. And even worse than that, the machines were calibrated to send the vast majority of votes into what's called an adjudication file that Dominion has on their machines, that then allows an individual to decide where those votes go. Well, we're talking about hundreds of thousands of votes going in an adjudication file, I think in Fulton County, Georgia, they found that over 92 percent of the votes went into an adjudication file. That's hundreds of thousands of votes that were then all of a sudden – any number of them disappeared for Trump or reappeared as if they were Biden votes to a substantial percentage.

…

There are multiple means of fraud, but the two biggest are the false ballots that were fed into the machines after they stopped counting on election night in all the swing states – and probably other states, too – and then the embedded machine fraud.

…

I think it should be mandatory that an independent forensic audit be conducted of a number of the Dominion voting machines. And, frankly, other voting systems. It's not exclusive to Dominion. The DNA of the – of the code that can run the algorithms and – and accomplish the cheating exists in all the systems.

…

Running the same fraudulent ballots back through the same fraudulent machines is not a valid recount. And the fact that they are trying to avoid having any of the machines examined forensically in any other place in Antrim County, Michigan, tells me all I need to know to know that they are hiding massive evidence of fraud that goes a lot farther back and wider than this election.[165]



---

[165] *Global Prayer for US Election Integrity*, Adam Schindler (Jan. 3, 2021), available at, https://www.adamschindler.com/prayer/global-prayer-for-us-election-integrity-20/ (last visited Jan. 4, 2021) (Ex. 107).

(nn) On January 4, 2021, Powell published to her website, sidneypowell.com, a document titled "SUMMARY:  SELECT EVIDENCE OF PRESIDENTIAL ELECTION FRAUD 2020," with the following false statements about Dominion:

> Fraud by Dominion Voting Systems
>
> …
>
> According to the report, Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail.[166]



---

[166] Sidney Powell, *2020 Election Evidence Summary*, available at, https://www.sidneypowell.com/election-evidence-2020 (last visited Jan. 4, 2021) (Ex. 85).

182.    Powell's statements are reasonably understood to be statements of fact about Dominion, and were understood by people who saw, heard, and read them to be statements of fact about Dominion.

183.    Powell's statements are false.  Far from being created in Venezuela to rig elections for a now-deceased Venezuelan dictator, Dominion was created in Toronto, and its voting systems are certified under standards promulgated by the EAC, reviewed and tested by independent testing laboratories accredited by the EAC, and were designed to be auditable and include a paper ballot backup to verify results.  Because of this backup, independent audits and hand recounts of paper ballots have conclusively and repeatedly disproven the false claim that Dominion rigged the 2020 U.S. presidential election by manipulating votes, shifting votes, installing and using an algorithm to modify or "weight" votes such that a vote for Biden counted more than a vote for Trump, trashing Trump votes, adding Biden votes, or training election workers to dispose of Trump votes and to add Biden votes.  Powell does not have a video of Dominion's founder admitting he can change a million votes.  Hugo Chávez's elections were not handled by Dominion, but by an entirely different company—Smartmatic—a competitor of Dominion's.  Dominion was not created in or for Venezuela, has never been located there, and is not owned by Smartmatic or Venezuelans.  Dominion has never provided machines or any of its software or technology to Venezuela, nor has it ever participated in any elections in Venezuela.  It has no ties to the Venezuelan government, Hugo Chávez, Malloch Brown, or George Soros.  Dominion does not use Smartmatic's software or machines, and there was no Smartmatic technology in any of Dominion's voting machines in the 2020 election.  Dominion did not bribe or pay kickbacks to Georgia officials or their families in return for a no-bid contract to use Dominion systems in the 2020 election.

184.    Powell had no applicable privilege or legal authorization to make these false and defamatory statements, or if she did, she abused it.

185.    As set forth above in detail, in the course of her business as a media figure, author, and attorney, Powell published these statements with actual malice, knowing or recklessly disregarding that they are false, including by intentionally lying about having a recording that does not exist; manufacturing, misrepresenting, and cherry-picking evidence to support her false accusations; purposefully avoiding or intentionally disregarding abundant and publicly available evidence, facts, and reliable sources rebutting and disproving her false claims; espousing inherently improbable accusations; forming and sticking to a false preconceived narrative in spite of the facts; relying on and putting forward facially unreliable sources; and—when specifically put on notice of the truth and asked to retract—doubling down on and republishing her false accusations, all in furtherance of her plan to financially enrich herself, to raise her public profile, and to ingratiate herself to Donald Trump for benefits she expected to receive as a result of that association.

186.    Dominion is entitled to punitive damages pursuant to O.G.C.A. Sec. 51-12-5.1 because, as set forth in detail above, there is clear and convincing evidence that Powell's defamatory statements at the Georgia "Stop the Steal" rally—and in any other statements described in this Complaint that Powell gave from within Georgia—showed willful misconduct, malice, wantonness, and an entire want of care which raises the presumption of conscious indifference to consequences.

187.    Dominion is also entitled to punitive damages under D.C. law for Powell's defamatory statements at the Washington, D.C. press conference and other statements described in this Complaint that Powell gave from within Washington, D.C., because, as set forth in detail

above, Powell's defamatory statements were accompanied with ill will, recklessness, wantonness, willful disregard of Dominion's rights, and other circumstances tending to aggravate the injury, including but not limited to Powell repeating her defamatory falsehoods even though she knew Dominion employees were receiving death threats because of them.

188.    Powell's statements are defamatory and defamatory *per se*.  Powell's statements have exposed Dominion to the most extreme hatred and contempt, and Powell's accusations about Dominion have been described by those who saw, heard, and read them as "the greatest crime in the history of this country."[167]  Powell herself called it the "greatest crime of the century if not the life of the world."  She has directly accused Dominion of fraud, election rigging, bribery, and conspiracy, which are serious crimes.  For Dominion—whose business is producing and providing voting systems for elections—there are no accusations that could do more to damage Dominion's business or to impugn Dominion's integrity, ethics, honesty, and financial integrity.  Powell's statements were calculated to—and did in fact—provoke outrage and cause Dominion enormous harm.

189.    Acting in concert with allies and media outlets that were determined to promote a false preconceived narrative about the 2020 election, Powell launched a viral disinformation campaign about Dominion that reached millions of people and caused enormous harm to Dominion.  As a direct, foreseeable, and intentional result of that viral disinformation campaign, Dominion has suffered the following single and indivisible injuries: Dominion employees have been stalked, have been harassed, and have received death threats; Dominion has been forced to make an expenditure of money to remedy the defamation and to protect the lives of its employees;

---

[167] *See, e.g., Tucker Carlson Tonight*, Fox News (Nov. 21, 2020), available at, https://video.foxnews.com/v/6211375866001?playlist_id=5198073478001#sp=show-clips (last visited Jan. 4, 2021) (Ex. 104).

Dominion has lost profits; and Dominion's reputation has been irreparably damaged.

190. In view of the forgoing, Dominion is entitled to actual, presumed, punitive, and other damages in an amount to be specifically determined at trial.

## COUNT TWO – DECEPTIVE TRADE PRACTICES
### *(Against All Defendants)*

191. Dominion repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

192. Powell's false and defamatory statements, as described in detail above, constitute deceptive trade practices in violation of Georgia law, O.C.G.A. Sec. 10-1-372(a)(8), as they disparage Dominion's goods and services by false and misleading representations of fact.

193. As alleged in detail above, despite knowing that her defamatory falsehoods about Dominion were deceptive, Powell willfully made them in the course of her business as a media figure, author, and attorney because she could derive—and did in fact derive—both direct and indirect financial benefits from making those false statements. For example, she used her defamatory falsehoods about Dominion to solicit funds to her fundraising website. She also used the defamatory accusations to garner media attention and raise her public profile, which sold additional copies of her book and drummed up additional potential clients for Powell.

194. Powell's statements have irreparably damaged Dominion and will, unless enjoined by this Court, further impair the value of Dominion's name, reputation, and goodwill.

195. Dominion is entitled to permanent injunctive relief requiring the removal of all the Defendants' statements that are determined to be false and defamatory and enjoining the Defendants from repeating such statements or engaging in any further deceptive trade practices relating to Dominion.

196.    Dominion is entitled to recover from Defendants its costs of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. Sec. 10-1-373(b).

## PRAYER FOR RELIEF

WHEREFORE, Dominion respectfully requests that the Court enter an award and judgment in its favor, and against all Defendants jointly and severally, as follows:

(a)    awarding Dominion compensatory damages of not less than $651,735,000;

(b)    awarding Dominion punitive damages of not less than $651,735,000;

(c)    awarding Dominion all expenses and costs, including attorneys' fees;

(d)    granting a narrowly tailored permanent injunction requiring the removal of all the Defendants' statements that are determined to be false and defamatory and enjoining the Defendants from repeating such statements or engaging in any further deceptive trade practices relating to Dominion; and

(e)    such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.


Date:    January 8, 2021

                              */s/ Thomas A. Clare, P.C.*
                              Thomas A. Clare, P.C. (D.C. Bar No. 461964)
                              Megan L. Meier (D.C. Bar No. 985553)
                              Dustin A. Pusch (D.C. Bar No. 1015069)
                              10 Prince Street
                              Alexandria, VA 22314
                              (202) 628-7400
                              tom@clarelocke.com
                              megan@clarelocke.com
                              dustin@clarelocke.com

                              *Attorneys for Plaintiffs*