IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, MARIAN SHERIDAN,
JOHN HAGGARD, CHARLES RITCHARD,
JAMES HOOPER, DAREN RUBINGH,

                Plaintiffs,

v.

GRETCHEN WHITMER, in her
official capacity as the Governor of the
State of Michigan, JOCELYN
BENSON, in her official capacity as
Michigan Secretary of State and the
Michigan BOARD OF STATE
CANVASSERS,

                Defendants,

and

CITY OF DETROIT, DEMOCRATIC
NATIONAL COMMITTEE and
MICHIGAN DEMOCRATIC PARTY,

                Intervenor-Defendants.

No. 2:20-cv-13134
Hon. Linda V. Parker
Mag. R. Steven Whalen

---

**Supplemental Brief of Stefanie Lambert Junttila per This Court's July 12, 2021, Order [ECF No. 150]**

**Introduction**

The question before the Court is whether Plaintiffs had a reasonable basis to bring their concerns before the Court in November 2020. They did. Americans must know that they can bring such disputes to an impartial court for adjudication. Accordingly, Plaintiffs respectfully request that the Court deny all relief sought in the sanctions motions. (ECF Nos. 69, 78, 105.)

**Argument**

**1.    The First Amendment prohibits this Court from sanctioning Plaintiffs and their attorneys**

The First Amendment provides citizens the right "to petition the Government for a redress of grievances." This right includes the right of court access, which includes the right to file a lawsuit. This includes not only procedural forum access but also substantive remedial access (guaranteeing the right of an injured person to obtain a meaningful remedy).[1]

**a.    A lawsuit is a petition**

It is undeniable that a lawsuit is a petition. In more than twenty Supreme Court cases over the past five decades, one or more Justices has asserted or assumed that a lawsuit is a petition, without a single colleague disputing the premise. See *Octane*

---

[1] From a textual perspective, the remedial theory gives the Petition Clause meaning independent of the Speech Clause, and it explains why the Framers expanded the Petition Clause's recipient subclause from "the Legislature" to "the Government."

1

*Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014); *Woodford v. Ngo*, 548 U.S. 81, 122-23 (2006) (Stevens, J., dissenting); *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Harbury*, 536 U.S. at 415 & n.12; *Lewis v. Casey*, 518 U.S. 343, 406 (1996) (Stevens, J., dissenting); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 636 (1995) (Kennedy, J., dissenting); *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56-57 (1993); *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Rhodes v. Chapman*, 452 U.S. 337, 362 n.9 (1981) (Brennan, J., concurring in the judgment); *Montanye v. Haymes*, 427 U.S. 236, 244 (1976) (Stevens, J., dissenting); *Pell v. Procunier*, 417 U.S. 817, 828 n.6 (1974); *Ortwein v. Schwab*, 410 U.S. 656, 660 (1973); *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 580 (1971); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967); *Bhd. R.R. Trainmen v. Va. ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964); *NAACP v. Button*, 371 U.S. 415, 444-45 (1963).

### b. <u>Courts discourage sanctions in suits against the government</u>

A citizen's right to present a petition is unquestionably protected by the Petition Clause of the First Amendment. More than any other litigation-related activity, filing a complaint is a citizen's presentation of a judicial petition to the

government. When a court applies sanctions to a complaint against the government

it chills free speech and punishes citizens' presentation of judicial petitions. Many

courts, including Judge Weinstein, have recognized the constitutional value in suites

against government agencies, and have argued that such litigation should not be

discouraged through imposition of Rule 11 sanctions.

> Some litigations should be, if not encouraged, at least not discouraged. Of particular importance are cases brought against government officials and government agencies. Such suits are often the only effective channel for keeping within bounds official arrogance and lawlessness. At the very least, they publicize grievances and thus permit the ventilation of private outrage that the First Amendment's right to petition protects. They serve the public policy of avoiding violence by providing a peaceful forum. They may provide the basis for legislative and executive ameliorative action even when the courts lack power to act. *See, e.g.,* Mather, *The Mobilizing Potential of Class Actions,* 57 Ind.L.J. 451 (1982).

> Sometimes there are reasons to sue even when one cannot win. Bad court decisions must be challenged if they are to be overruled, but the early challenges are certainly hopeless. The first attorney to challenge *Plessy v. Ferguson* was certainly bringing a frivolous action, but his efforts and the efforts of others eventually led to *Brown v. Board of Education.* Similarly, the apparently useless challenges by attorneys of the still relatively recent Supreme Court decision in *Swain v. Alabama* have induced the Court quickly to reconsider and reject that ill-conceived ruling. *Batson v. Kentucky,* ___ U.S. ___, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

*Eastway Constr. Corp. v. City of New York*, 637 F. Supp. 558, 575 (E.D.N.Y.

1986).

3

The Court should reject the defendants' and intervenors' demands for sanctions. A courtroom is the only forum where citizens can peacefully challenge electoral processes. *See Federalist 78* (stating that independent judges are necessary as "an essential safeguard against the effects of occasional ill humors in the society"). The judiciary is America's safety valve for disputes like this one.

Americans must know they can bring these inevitable disputes here—to the halls of justice—for adjudication before an impartial court. The alternative was on display at the nation's capital on January 6, 2021—and that is an alternative that all sides join in condemning.[2] Accordingly, the Attorneys respectfully request that the Court deny all relief sought in the sanctions motions. (ECF Nos. 69, 78, 105).

**2. <u>The Court cannot issue sanctions under Rule 11 or its inherent authority.</u>**

As an initial matter, several procedural issues limit the Court's ability to grant sanctions. First, Federal Rule of Civil Procedure 11 states that a court may not impose monetary sanctions on its own motion unless it issues a show-cause order under Rule 11(c)(3) *before voluntary dismissal* or settlement:

---

[2] The City of Detroit argued that "there is blood ... on the hands of all those who pushed this lawsuit." (ECF No. 103, PageID.4180). That argument is unsupported, grossly inappropriate, and wrong. A lawsuit does not cause a violent insurrection; it is the *alternative* to violent insurrection.

(5) Limitations on Monetary Sanctions. The court *must not* impose a monetary sanction:

(A) against a represented party for violating Rule 11(b)(2); or

(B) on its own, *unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal* or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned.

Fed. R. Civ. P. 11(c)(3) (emphasis added).

Plaintiffs dismissed all claims against Secretary of State Benson, the City of Detroit, Governor Whitmer, the Democratic National Committee, the Michigan Board of State Canvassers, and the Michigan Democratic Party on January 14, 2021. (ECF Nos. 86-92). The Court granted plaintiffs' motion to dismiss any claims against Robert Davis on July 9, 2021. (ECF No. 149, PageID.5267). So the Court can impose sanctions on its own motion only if it issued a show-cause order under Rule 11(c)(3) before these dismissals. To the best of the Attorneys' knowledge, the Court did not do so.

The Court indicated at the July 12, 2021 hearing that it was considering imposing sanctions on its own motion. (*Attachment A,* July 12, 2021 Transcript, at 11). That notice was after dismissal of all claims. It is therefore insufficient under Rule 11(c)(3). In the words of Rule 11, the Court "must not" impose sanctions on its own motion, having failed to provide notice under Rule 11(c)(3) before dismissal. Fed. R. Civ. P. 11(c)(3).

Relying on the Court's inherent authority to sanction misconduct does not avoid this problem. Rule 11 does not limit the scope of a court's inherent authority to sanction attorneys. *See Metz v. Unizan Bank,* 655 F.3d 485, 490-91 (6th Cir. 2011) (citing *Chambers v. Nasco, Inc.,* 501 U.S. 32, 50-51 (1991)). The Court's inherent power "is both broader and narrower than other means of imposing sanctions." *Chambers,* 501 U.S. at 46. But the comments accompanying Rule 11 indicate that its *procedures* are controlling when the Court exercises its inherent authority. *See* Fed. R. Civ. P. 11, 1993 cmts ("The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order."); *id.* (stating that "the procedures specified in Rule 11 . . . should ordinarily be employed when imposing a sanction under the court's inherent powers").[3] Because the Court did not follow those procedures by issuing a show-cause notice under Rule 11(c)(3) before voluntary dismissal, it cannot impose sanctions under its inherent authority.

The Court is also unable to impose sanctions under Rule 11 based on the defendants' and intervenors' motions. Governor Whitmer and Secretary Benson's

---

[3] Even *Chambers* states that Rule 11's procedures are the norm when a court relies on its inherent authority. *Chambers,* 501 U.S. at 50. ("…[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, *the court ordinarily should rely on the Rules rather than the inherent powe*r. But if in the informed discretion of the court, neither the statue nor the Rules are up to the task, the court may safely rely on its inherent power.") (emphasis added).

motion does not claim that they are entitled to sanctions under Rule 11. (ECF NO. 105).[4] Robert Davis seeks sanctions under Rule 11 but did not comply with Rule 11's safe-harbor requirements. (ECF No. 69). *See* Fed. R. Civ. P. 11(c)(2) (stating that a sanctions motion "must" be served under Fed. R. Civ. P. 5 at least 21 days before the motion is filed).

That leaves only the City of Detroit's motion. That motion says that counsel for Detroit served a copy of a motion for sanctions via email on December 15, 2020. (ECF No. 78, PageID.3617). There can be no dispute, however, that the City of Detroit failed to serve the brief that it later filed with this Court. The City of Detroit tries to excuse this oversight by citing non-binding cases holding that Rule 11's safe-harbor requirement only requires service of a "motion." (*The City of Detroit's Reply in Support of Motion for Sanctions, for Disciplinary Action, for Disbarment Referral and for Referral to State Bar Disciplinary Bodies*, ECF No. 103, PageID.4191). That argument overlooks the rules that govern in *this* district. This Court's local rules state that each motion "*must* be accompanied by a single brief." L.R. 7.1(d)(1)(A) (emphasis added). This Court would reject a motion filed without a brief as an improper motion. *Williams v. Huron Gardens 397 Trust v. Waterford Township,*

---

[4] Governor Whitmer and Secretary Benson suggest that the Court can award sanctions under its inherent authority. (ECF No. 105, PageID.4357). They overlook Fed. R. Civ. P. 11(c)(3), which establishes the procedure for court-initiated sanctions. That procedure was not followed here.

2019 WL 659009 (E.D. Mich. 2019) (unpublished) (striking motion filed without brief and noting that even *pro se* litigants are supposed to consult and follow the Local Rules). In the same way, a safe-harbor motion without a brief is not a proper motion at all.

The City of Detroit's failure to comply with the Court's rules had a material impact on this case. The document that the City of Detroit served as its "safe harbor" notice did not cite a *single* case or fact supporting the City of Detroit's arguments. (*Attachment B, Safe-Harbor Notice*). It offered only conclusory statements devoid of legal or factual support. So it offered no way for the Attorneys to meaningfully consider the City of Detroit's position and decide whether to withdraw their complaint. *See Penn v. Prosper Business Development Corp.,* 773 F.3d 764, 767 (6th Cir. 2014) (stating that the safe-harbor requirement is "to allow the nonmovant a reasonable period to reconsider the legal and factual basis for his contentions …"). It was an empty notice that defeated the very purpose of Fed. R. Civ. P. 11. Consequently, sanctions under Rule 11 are not available here.

1. **Sanctions are not warranted under § 1927 because the Attorneys did not unreasonably and vexatiously multiply these proceedings.**

Because none of the parties complied with Rule 11's safe-harbor rules and this Court did not issue a show-cause order under Rule 11(c)(3) before dismissal, the only available authority for sanctions is 28 U.S.C. § 1927. Section 1927 provides that "[a]ny attorney or other person admitted to conduct cases  in any court of the

United States … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Sanctions are appropriate under this rule when "an attorney objectively falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party." *Larry E. Parrish, P.C. v. Bennett,* 989 F.3d 452, 458 (6th Cir. 2021).

Sanctions under § 1927 do not require a showing of "subjective bad faith," but "the attorney in question must at least knowingly disregard the risk of abusing the judicial system, not be merely negligent." *Kidis v. Reid,* 976 F.3d 708, 723 (6th Cir. 2020). For example, an attorney was sanctioned in *Ridder v. City of Springfield,* 109 F.3d 288 (6th Cir. 1997), because he pursued a meritless claim for five years—even after the Court warned him against doing so. *See Kidis,* 976 F.3d at 723 (discussing *Ridder*).

Attorney Stefanie Lambert Junttila did not multiply these proceedings. Plaintiffs filed a complaint on November 25, 2020. (ECF No. 1). They promptly amended the complaint (ECF No. 6) and filed a motion for a temporary restraining order (ECF NO. 7). Just over a week after the Attorneys filed their TRO motion, the Court issued an order denying it. (ECF No. 62). Attorney Stefanie Lambert Junttila filed a Notice of Appearance on December 8, 2020 as well as Federal Circuit Notice

of Appeal (ECF NO. 63-64). On January 14, 2021—not yet two months after filing

their complaint—the plaintiffs voluntarily dismissed their claims. (ECF Nos. 86-91).

In the meantime, there were intervention motions and various procedural motions,

and briefing in response to those motions. But none of the Attorneys' actions

vexatiously multiplied these proceedings. In other words, the facts of this case are a

far cry from *Ridder*. A proceeding that wraps up in under two months does not

qualify for sanctions under 28 U.S.C. § 1927—particularly since the plaintiffs

voluntarily dismissed their claims.

The defendants and intervenors may claim that simply initiating this lawsuit

was enough for sanctions under 28 U.S.C. § 1927. As Judge Berg concluded last

year, however, "[c]ourts generally do not impose sanctions under 28 U.S.C. § 1927

based on the filing of an initial complaint that turns out to be meritless." *Beverly v.

Shermeta Law Group,* Case No. 2:19-cv-11473-TGB, *Order Denying Motion for

Sanctions,* \*3 (E.D. Mich., May 20, 2020) (citing cases).[5] Although *Ridder* seems at

first blush to allow sanctions under § 1927 just for the initial complaint, Judge Berg

correctly "read[ ] *Ridder* to be affirming a sanction for the five years of legal

---

[5] *Carter v. Hickory Healthcare, Inc.,* 905 F.3d 963 (6th Cir. 2018), supports
Judge Berg's conclusion. The Court cited "[m]aintaining a clearly time-barred
lawsuit" as "a classic example of conduct that warrants a sanction." *Id.* at 969
(emphasis added). The Court noted that the plaintiff was told about the statute-of-
limitations problem but "pressed on anyway." *Id.* "On this record," the Court wrote,
"the court did not abuse its discretion in awarding sanctions." *Id.*

wrangling that resulted from the filing of the initial complaint—not for the filing of the complaint itself." *Id.* at *3.

With the complaint eliminated as a possible source of sanctions under § 1927 and with the voluntary dismissal of this case after fewer than two months, there is no basis for sanctions under § 1927.

Even if sanctions were appropriate under § 1927, the City of Detroit and Robert Davis are not entitled to them. A party seeking sanctions under 28 U.S.C. § 1927 has a duty to mitigate their damages. *Carter,* 905 F.3d at 970 ("True, the party seeking sanctions under § 1927 must mitigate damages."). Robert Davis and the City of Detroit did the precise opposite of mitigating their damages: they chose to intervene in this proceeding, volunteering to spend time and money in this litigation. There was no need to do so. The defendants already had very capable attorneys. And if the plaintiffs' claims were as frivolous as Davis and the City of Detroit have claimed, they had no reasonable basis to believe that the defendants' counsel needed assistance. Even if there were a basis for sanctions under § 1927 (and there is not), the mitigation rule precludes any award for Davis and the City of Detroit.

## 2. Federal courts have authority to grant injunctive relief to protect the fundamental right to have one's vote counted.

The defendants and intervenors have also presented erroneous arguments in support of their requests for sanctions. One of their primary themes is that there is no precedent for the relief the plaintiffs sought in this case. That is incorrect.

According to the Federal Judicial Center, federal district courts have adjudicated 3,622 election cases since 2000 – or since Buch v Gore, 531 U.S. 98 (2000). *See* Federal Judicial Center, *Election Litigation: Case Studies in Emergency Election Litigation,* available at: https://www.fjc.gov/content/ case-studies (last visited July 20, 2021). An examination of those lawsuits belies defendants' argument that the relief sought in this case is unprecedented.

Consider *Krieger v. City of Peoria,* 2014 WL 4187500 (D. Ariz. 2014) (unpublished) (*Attachment C*). There, a candidate for Peoria City Council was left off the ballot—twice. *Id.* at *1. The city's solution was to count all votes from the first two ballots but allow voters to cast a third ballot that could replace their initial ballots. *Id.* at *2. The court found that solution to be inadequate and contrary to the plaintiffs' due-process rights. *Id.* at *6. The court therefore ordered exactly the kind of relief sought in this case: It prohibited the city from counting already-cast votes and ordered the city to hold a special election. *Id.* at *7.[6]

Or consider *Shannon v. Jacobowitz,* 301 F. Supp. 2d 249 (N.D.N.Y. 2003). There, a voting machine malfunctioned, costing an incumbent candidate a victory. The district court issued an order enjoining the county board of elections from

---

[6] The Federal Judicial Center reports that "[t]he judge and the parties resolved issues of whether the special election would allow for a runoff election and how campaign finance rules would apply." *See* https://www.fjc.gov/content/voting-irregularities (last visited July 20, 2021).

certifying a winner and enjoining the purported winner from taking office. *Id.* at 258. The Second Circuit Court of Appeals disagreed with the district court's analysis and vacated its injunctions. *Shannon v. Jacobowitz,* 394 F.3d 90, 97 (2d Cir. 2005). But the fact that the district court awarded exactly the kind of injunctive relief that plaintiffs sought here belies the argument that this lawsuit is unprecedented. In fact, it shows that there is room for reasonable minds to disagree on this issue.

*Curtis v. Oliver,* 479 F. Supp. 3d 1039 (D.N.M. 2020), is another example. There, a Libertarian candidate was 26 votes shy in the primary election of qualifying for the general election. *Id.* at 1053. The Libertarian Party asserted that it "received feedback from its members that numerous voters, well above the 230-vote threshold, cast votes for" that candidate. *Id.* (cleaned up). Citing irregularities in vote counting, the candidate sought a recount. The court found sufficient evidence of irregularities in only one county—and it granted an injunction directing a recount in that county. *Id.* at 1148.

Federal courts have affected elections in other ways, too. *See, e.g., Esshaki v. Whitmer,* 813 Fed. Appx. 170, 171 (6th Cir. 2020) ("uphold[ing] the core of the [district court's] injunction, which enjoins the State from enforcing the statute's two ballot-access provisions at issue unless the State provides some reasonable accommodation to aggrieved candidates"); *Acosta v. Pablo Restrepo,* 470 F. Supp. 3d 161 (D.R.I. 2020) (suspending state election law requiring in-person solicitation

only for 2020 because of pandemic-related exigencies); *Moore v. Johnson,* 2014 WL 4924409 (E.D. Mich. 2014) (unpublished) (holding that Michigan statute regulating who can circulate petitions was invalid and ordering that the Wayne County Election Commission "shall place Mr. [John] Conyers on the ballot for the August 2014 primary election").

And, of course, there's *Bush v. Gore,* 531 U.S. 98 (2000). The United States Supreme Court held that Florida's recount procedures were so unclear that they violated equal protection and due process. *Id.* at 110. It therefore ordered Florida to stop counting votes. *Id.* at 111. There was no doubt that, in doing so, the Supreme Court effectively decided the winner of the 2000 presidential election.[7] The Court even offered an apology of sorts for selecting the nation's president:

> None are more conscious of the vital limits of judicial authority than are the Members of this Court, and none stand more in admiration of the Constitution's design to leave the selection of the President to the people, through their legislatures, and to the political sphere. When contending parties invoke the process of the courts, however, it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront.

*Bush,* 531 U.S. at 111.

---

[7] *See, e.g.,* William C. Smith, *Bush vs. Gore: Evermore,* 87-May ABAJ 16 (2001) (noting that "the U.S. Supreme Court essentially decided the presidential election" in *Bush*).

At the July 12, 2021 hearing, the Court expressed skepticism about whether *Bush*'s holding—which decided a presidential election by *halting* a recount—could support deciding a presidential election by *ordering* a recount. (July 12, 2012 trans. at 25). *Bush* itself does not support such a limited reading. As Judge Bernice Donald wrote in 2006, "… [T]he lesson from *Bush v. Gore* is that there must be standards in place to assure the guarantees of the Equal Protection Clause, and that judicial review is appropriate to protect fundamental federal rights." *Ford v. Tennessee Senate,* 2006 WL 8435145, *6 (W.D. Tenn. 2006) (unpublished). And the right to have one's vote counted is a fundamental right. *Id.* at *2 (citing *Reynolds v. Sims,* 377 U.S. 533 (1964)).

The Attorneys and their clients learned that "lesson" from *Bush* as well. They believed that *Bush* recognizes a federal court's authority—indeed, its responsibility—to ensure that all votes are properly counted. *Bush,* 531 U.S. at 111 (citing the Court's "unsought responsibility," despite the political implications). The Court fulfilled that responsibility and the Attorneys accept its conclusions. The argument that the Attorneys had no basis to invoke that responsibility, however, is incorrect.

### 3. The Attorneys' reliance on the affidavits submitted with its complaint was not misconduct and warrants no sanctions.

Much of the sanctions discussion has focused on whether the Attorneys could reasonably rely on the affidavits submitted with their complaint. On this point, there

are a few core principles that no one can reasonably dispute. An attorney must not present an affidavit they know to be false. Mich. R. Prof'l Con. 3.3(a)(3). An attorney must take remedial measures if they learn that a previously produced affidavit is false. *Id.* And a court may sanction a party who violates these principles. *See, e.g., Scott v. Sanders,* 789 F. Supp. 2d 773 (E.D.KY 2011).

Those principles do not apply here. The defendants and intervenors do not allege that the Attorneys intentionally submitted false affidavits or that the affidavits were falsely executed. They argue that the Attorneys should have caught alleged factual errors. But they primarily argue that the Attorneys submitted affidavits without adequate vetting that, even if true, do not add up to the kind of election fraud that would support the relief sought in plaintiffs' complaint.

The Attorneys did, in fact, vet the affidavits prior to filing the Complaint, assessing their veracity and legal significance.[8] Even more importantly, the defendants and intervenors' argument does not support a finding of sanctionable

---

[8] For example, multiple attorneys reviewed the affidavit, spoke with Russell Ramsland a number of times, and even pushed back against some of the "improbable" numbers in the affidavit. (*Attachment A*, July 12, 2021 Transcript, at 56-57, 77-78, 94.) Howard Kleinhendler spoke with Joshua Merritt ("Spider") regarding his background, qualifications, and opinions and honestly believed that the statements Spider included in his affidavit were accurate. (*Id*. at 72, 84.) Julia Haller spoke with Ronald Watkins about his reports, the sources of his data, and the basis for his conclusions (*Id*. at 76.) And the Attorneys analyzed the affidavits filed in another actions, determining that the statements therein were consistent with the findings of plaintiffs' experts and other information presented to the Court. (*Id*. at 113, 125, 139, 148, 154-155.)

conduct under 28 U.S.C. § 1927, which is the only available vehicle for sanctions here.[9] After the Court indicated that these affidavits were unpersuasive, the Attorneys voluntarily dismissed their claims. These affidavits did not multiply these proceedings, which ended in fewer than two months.

Moreover, it's important to recognize that this case had a very unusual context. These attorneys are not the only individuals who viewed these affidavits as evidence of serious fraud. Justice Brian Zahra mentioned it in his concurrence in *Costantino v. City of Detroit*, 950 N.W.2d 707, 709 (Mich. 2020) ("I am cognizant that many Americans believe that plaintiffs' claims of electoral fraud and misconduct are frivolous and obstructive, *but I am equally cognizant that many Americans are of the view that the 2020 election was not fully free and fair. . . .* The latter is a view that strikes at the core of concerns about this election's lack of both

---

[9] Defendants' and intervenors' argument also misses a noteworthy point: The proper method to resolve conflicts between affidavits is through an evidentiary hearing. See, e.g., *Constantino*, 950 N.W.2d at 709 (Zahra, J., concurring); *id.* at 710 n. 2 (Viviano, J., dissenting) ("The court's credibility determinations were made without the benefit of an evidentiary hearing. Ordinarily, an evidentiary hearing is required where the conflicting affidavits create factual questions that are material to the trial court's decision on a motion for a preliminary injunction under MCR 3.310. See 4 Longhofer, Michigan Court Rules Practice, Text (7th ed., 2020 update), § 3310.6, pp. 518-519. See also *Fancy v. Egrin*, 177 Mich. App. 714, 723, 442 N.W.2d 765 (1989) (an evidentiary hearing is mandatory 'where the circumstances of the individual case so require').")· The court never held an evidentiary hearing in *Constantio* and, as a result, did not properly assess the merits of the action. This was one of the reasons why the Attorneys presented affidavits from that action in this case.

'accuracy' and 'integrity'—values that Const. 1963, art. 2, § 4(1)(h) appears designed to secure.") (emphasis added).

Of course attorneys should look beyond their prejudices and political beliefs, and to view evidence with a level of professional skepticism. But no one is immune to confirmation bias. *See, e.g., Williams v Pennsylvania*, 136 S Ct 1899, 1907 (2016) (creating objective standard for judicial recusal where judges are prone to confirmation bias).

As for the alleged factual errors in those affidavits, § 1927 requires "*knowing[ ] disregard* [of] the risk of abusing the judicial system," rather than mere negligence. *Kidis,* 976 F.3d at 723 (emphasis added). If the Attorneys failed to catch imperfect statements about Michigan counties, their conduct was not improper. And, crucially, their acts did not multiply these proceedings because the plaintiffs voluntarily dismissed their claims in under two months. Sanctions cannot be awarded under § 1927 merely because the Attorneys placed greater weight on the affidavits than this Court.

Accordingly, the Court should hold that the defendants and intervenors are not entitled to sanctions.

## Conclusion

The Court cannot impose sanctions under Rule 11 or its inherent authority, and sanctions under § 1927 are not appropriate for this brief litigation.

18

Plaintiffs respectfully request, therefore, that the Court deny the defendants'

and intervenors' motions for sanctions.

Respectfully submitted,


*/s/ Stefanie L. Lambert Junttila*
STEFANIE LAMBERT JUNTTILA (P71303)
500 Griswold Street, Ste. 2340
Detroit, MI 48226
Dated: July 28, 2021 (313) 963-4740

19

**Certificate of Service**

I certify that, on July 28, 2021, I electronically filed Supplemental Brief of

Stefanie Lambert Junttila per This Court's July 12, 2021, Order [ECF No. 150]

with the Clerk of the Court using the ECF system, and that a copy was

electronically served on all counsel of record via the ECF system.

/s/ Stefanie Lambert Junttila
STEFANIE LAMBERT JUNTTILA (P71303)