# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03747-NRN

KEVIN O'ROURKE,
NATHANIEL L. CARTER,
LORI CUTUNILLI,
LARRY D. COOK,
ALVIN CRISWELL,
KESHA CRENSHAW,
NEIL YARBROUGH, and
AMIE TRAPP,

Plaintiffs,

v.

DOMINION VOTING SYSTEMS INC., a Delaware corporation,
FACEBOOK, INC., a Delaware corporation,
CENTER FOR TECH AND CIVIC LIFE, an Illinois non-profit organization,
MARK E. ZUCKERBERG, individually,
PRISCILLA CHAN, individually,
BRIAN KEMP, individually,
BRAD RAFFENSPERGER, individually,
GRETCHEN WHITMER, individually,
JOCELYN BENSON, individually,
TOM WOLF, individually,
KATHY BOOCKVAR, individually,
TONY EVERS, individually,
ANN S. JACOBS, individually,
MARK L. THOMSEN, individually,
MARGE BOSTELMAN, individually,
JULIE M. GLANCEY,
DEAN KNUDSON, individually,
ROBERT F. SPINDELL, JR, individually, and
DOES 1-10,000,

Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SANCTIONS**
**(Dkt. ##98, 101, 102, 103, & 109)**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before the Court with the consent of the Parties, referred for all purposes by Chief Judge Philip A. Brimmer pursuant to 28 U.S.C. § 636(c).

### 1. Procedural History

This case was filed on December 22, 2020, more than a month-and-a-half after the November 3, 2020 Presidential election. As filed, the suit was a class action brought on behalf of all American registered voters, alleging that their constitutional right to vote for President somehow was unconstitutionally infringed on or burdened by the Defendants. Claims included alleged violations of the Electors, Due Process, and Equal Protections Clauses of the Constitution, and alleged violations of the First Amendment, including burdens on political speech and freedom of the press. On March 15, 2021, Plaintiffs sought to amend the Complaint to add more than 150 additional plaintiffs and several new claims, including claims brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO").

This Court dismissed the entire case for lack of standing on April 28, 2021, granting motions to dismiss filed by three private entity defendants, Facebook, Inc. ("Facebook"), Dominion Voting Systems, Inc. ("Dominion"), and the Center for Tech and Civic Life ("CTCL"). *See* Dkt. #92. In the order dismissing the case, the Court denied Plaintiffs' Motion for Leave to Amend, finding that any amendment would be futile. Various state officials (including governors) from the states of Georgia, Michigan, Pennsylvania, and Wisconsin (the "State Official Defendants"), who also were named as defendants in the case, had also filed motions to dismiss and had opposed Plaintiffs' request for leave to amend. But Plaintiffs voluntarily dismissed these State Official

Defendants prior to issuance of my order of dismissal. Therefore, the State Official Defendants' motions to dismiss were denied as moot.

Defendants Dominion, Facebook, and CTCL have moved for sanctions pursuant to Fed. R. Civ. Pro. 11; 28 U.S.C. § 1927; and the Court's inherent authority. *See* Dkt. #98 (Dominion's Motion); Dkt. #102 (CTCL's Motion); and Dkt. #103 (Facebook's Motion). Defendants from the state of Michigan, Governor Gretchen Whitmer and Secretary of State Jocelyn Benson (the "Michigan Defendants"), also have moved for sanctions pursuant to Rule 11, the Court's inherent authority, and under 28 U.S.C. § 1927. *See* Dkt. #109. Also moving for sanctions are Pennsylvania Governor Tom Wolf and Pennsylvania's former Secretary of the Commonwealth, Kathy Boockvar (the "Pennsylvania Defendants"). *See* Dkt. #101. The Pennsylvania Defendants' sanctions motion differs only in that they do not seek sanctions under Rule 11 because Plaintiffs voluntarily dismissed the Pennsylvania Defendants from the case within the time provided under the safe-harbor provisions of that Rule.

Plaintiffs have responded to the Defendants' various motions for sanctions and the moving Defendants have filed replies. I held a hearing on the Motions on July 16, 2021.

## 2.  Jurisdiction to hear Sanctions Motion

While dismissal terminates a court's subject-matter jurisdiction over the substantive merits of an action, the Court nonetheless "retains the inherent authority to issue orders on matters collateral to the merits." *Lundahl v. Halabi*, 600 F. App'x 596, 605 (10th Cir. 2014). This authority extends to conducting proceedings to address requests for sanctions and imposing "any sanction for abusive conduct for which

sanctions are authorized by the federal rules of procedure or federal statutes, including awarding costs or attorney's fees." *Id.* at 605–06.

As the Supreme Court has explained in justifying the imposition of sanctions, even after a voluntary dismissal, on a plaintiff for filing a baseless complaint:

> The filing of complaints, papers, or other motions without taking the necessary care in their preparation is a separate abuse of the judicial system, subject to separate sanction. As noted above, a voluntary dismissal does not eliminate the Rule 11 violation. Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would lose all incentive to "stop, think and investigate more carefully before serving and filing papers."

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 399 (1990) (quoting Amendments to Federal Rules of Civil Procedure, 97 F.R.D. 165, 192 (1983) (Letter from Judge Walter Mansfield, Chairman, Advisory Committee on Civil Rules) (Mar. 9, 1982)).

Accordingly, the Court retains jurisdiction to rule on Defendants' motions for sanctions.

### 3. <u>The Lawsuit</u>

This lawsuit arises out of the 2020 election for President of the United States. The original Complaint (Dkt. #1) purported to be a class action lawsuit on behalf of all American registered voters, alleging a vast conspiracy between four governors, secretaries of state, and various election officials of Michigan, Wisconsin, Pennsylvania and Georgia; along with Dominion, a private supplier of election and voting technology; the social media company Facebook; CTCL, a non-profit organization dedicated to

making elections more secure and inclusive; as well as Facebook founder Mark Zuckerberg and his wife Priscilla Chan.

I use the words "vast conspiracy" purposefully. The Complaint is one enormous conspiracy theory. And a conspiracy is what the original Complaint, all 84 pages and 409-plus paragraphs, alleged: that "the Defendants engaged in concerted action to interfere with the 2020 presidential election through a *coordinated effort* to, among other things, change voting laws without legislative approval, use unreliable voting machines, alter votes through an illegitimate adjudication process, provide illegal methods of voting, count illegal votes, suppress the speech of opposing voices, disproportionally and privately fund only certain municipalities and counties, and other methods, all prohibited by the Constitution." Dkt. #1 at 2, ¶ 4 (emphasis added).

So, this was not a normal case in any sense. Plaintiffs purported to represent 160 million American registered voters and came seeking a determination from a federal court in Colorado that the actions of multiple state legislatures, municipalities, and state courts in the conduct of the 2020 election should be declared legal nullities. *See* Dkt. #1 at 83 (asking that the Court "[d]eclare the actions of the Defendants, as herein described, as unconstitutional and ultra vires, thereby making them legal nullities"). This presumably would have included the certification of the votes of the states and the subsequent inauguration of President Biden. *See*, *e.g.,* Dkt. #1 at 50, ¶¶ 256–57 (alleging that the "certification of the Election in Pennsylvania is unconstitutional" and that Pennsylvania's certification of the Election "is void *ab initio*"); *Id.* at 58, ¶¶ 280–81 (alleging that the certification of the election in Wisconsin was *ultra vires*, unconstitutional and "void *ab initio*").

While Plaintiffs' counsel insist that the lawsuit was not intended to challenge the election or reverse the results, the effect of the allegations and relief sought would be to sow doubt over the legitimacy of the Biden presidency and the mechanisms of American democracy (the actual systems of voting) in numerous states.

In short, this was no slip-and-fall at the local grocery store. Albeit disorganized and fantastical, the Complaint's allegations are extraordinarily serious and, if accepted as true by large numbers of people, are the stuff of which violent insurrections are made.

The Complaint did seek, among other things, an injunction barring "any further unconstitutional behavior," *id.* at 81, and "permanent injunctive relief to remedy the ongoing effects of Defendants' unconstitutional conduct." *Id.* at 83. But the requested injunctions aside, the main focus of the suit, at least as emphasized by Plaintiffs' counsel in argument, was a demand for a massive amount of money, likely greater than any money damage award in American history. Seeking a "nominal amount of $1,000 per registered voter," Plaintiffs asked for a total $160 billion for the putative 160-million-person Plaintiff class. Dkt. #1 at 82. This figure is greater than the annual GDP of Hungary.[1]

According to the Complaint, it was filed "to give the people a civil mechanism to redress their grievances." *Id.* Plaintiffs equated this purported massive civil rights lawsuit to a mass tort injury case where "a ladder was defectively designed and thousands were hurt" and "the manufacturer and others would likely be sued." *Id.* Plaintiffs say they

---

[1] *See* World Bank/OECD data showing Hungary's 2020 GDP to be approximately $155 billion. https://data.worldbank.org/indicator/NY.GDP.MKTP.CD.

have "fallen off the ladder" and their goal is to ensure that "ladders manufactured in the future don't have the same defects—or at least a warning label on the top step." *Id*.

The personal affidavits Plaintiffs attached to the original Complaint recount the generalized fear and suspicion that the "system" is rigged, and a sense that American democracy no longer works. The affidavits are notable only in demonstrating no firsthand knowledge by any Plaintiff of any election fraud, misconduct, or malfeasance. Instead, Plaintiffs' affidavits are replete with conclusory statements about what must have happened during the election and Plaintiffs' "beliefs" that the election was corrupted, presumably based on rumors, innuendo, and unverified and questionable media reports.

For example, the affidavit of Amie Trapp, a resident of Alabama, recites,

> It is obvious our federal election has been tampered with and compromised by Dominion Voting Systems Inc, along with the founder of Facebook, Mark Zuckerberg, his wife Priscilla Chan, and many others acting as governors/secretaries of state across the country. Every day, we, as a country, find out more information about this corrupt system, Dominion, and the government officials who allow it.

Dkt. #1-9 at 3, ¶¶ 7–8. Not stated is any nonconclusory basis for Ms. Trapp to believe this.

The affidavit of Plaintiff Larry D. Cook of California presents similarly unconvincing allegations of election fraud, based solely on his belief (although Mr. Cook seems more distressed about mandatory vaccinations and the removal by Facebook of his posts related to vaccines and QAnon):

> I believe that there was widespread vote fraud and manipulation during the 2020 Presidential Election and as such, this topic, along with the vaccination topic, along with the Qanon topic, as well as other 'controversial topics,' should not be censored, 'fact checked,' deleted and/or result in a ban or permanent account deletion just because the topic at hand challenges the official narrative as presented in mainstream media, the Democrat Party,

the liability-free vaccine industry and other domestic and foreign controlling interests.

Dkt. #1-6 at 7, ¶ 29. Mr. Cook provides no personal knowledge about any election fraud or impropriety.

Alvin Criswell of Hutchinson County, Texas has similar unverified and nebulous complaints about the 2020 election:

> After much research and contemplation, it has come to my attention that the 2020 general election, and probably many more, have been compromised by a number of persons, including a corporation in the United States called Dominion Voting Machines, Inc., and others, such as, Mark Zuckerberg and his wife, Priscilla Chan; and other individuals acting as governors and secretaries of state, including, Brian Kemp and Brad Raffensperger of Georgia, and Gretchen Whitmer and Jocelyn Bensen from Michigan.

Dkt. #1-5 at 1, ¶ 6. Mr. Criswell, like all the other name plaintiffs, has no first-person knowledge whatsoever of any election malfeasance nor any evidence, direct or indirect, that his own vote was not counted or was inappropriately discounted.

### 4. Plaintiffs' Proposed Amended Complaint

After the filing of the first few motions to dismiss, on March 15, 2021, Plaintiffs' sought leave to file an Amended Complaint. See Dkt. ##48 & 48-1. The proposed Amended Complaint would have added 152 additional registered voters as plaintiffs and upped the length to a total of 882 paragraphs and 114 pages.

In connection with the Motion for Leave to Amend, Plaintiffs' counsel Ernest Walker filed a declaration explaining,

> Since filing this lawsuit, Plaintiffs' counsel and staff have been bombarded by inquiries and requests from citizens across the country seeking to become members of this lawsuit as Plaintiffs. Hundreds of phone calls and emails have been fielded, and tens of thousands have sought online information or to make personal donations of time or money to support Plaintiffs' litigation.

Dkt. #48-3 at 1, ¶¶ 2–3. Mr. Walker's declaration continued,

> Every individual who has made contact has universally believed that they
> had been damaged and expressed a deep sense of loss of trust and
> confidence in the electoral process, specifically caused by the actions of the
> named Defendants. . . . Practically everyone we spoke with were [sic]
> passionate about vindicating their rights and preventing the type of election
> we had in 2020 from ever happening again.

*Id.* at 2, ¶¶ 6 & 9.

The proposed Amended Complaint doubled down in making inflammatory accusations about the allegedly nefarious motives and intentions of the Defendants. *See, e.g.,* Dkt. #48-1 at 9, ¶ 47 ("Dominion *intentionally and purposefully designed* its voting system with inherent errors to create systemic fraud and influence election results.") (emphasis added); *id.,* ¶ 48 ("Dominion's voting systems *intentionally* generate a high number of ballot errors.") (emphasis added). The proposed Amended Complaint included allegations that Facebook, non-profit CTCL, and Facebook's founder Mark Zuckerberg and his wife, Priscilla Chan, were involved in a racketeering conspiracy to work behind the scenes to "influence perceptions, change rules and laws, steer media coverage and control the flow of information," all for the common purpose of influencing a Presidential election. *Id.* at 5, ¶¶ 13–14. The proposed Amended Complaint accused Facebook, at the direction of Zuckerberg, of "banning conservative and religious groups, promoting one political ideology, and censoring the speech of users who disagreed with the progressive ideals of the enterprise." *Id.* at 7, ¶ 29. The Facebook/Zuckerberg/Chan plan allegedly included, among other things, the censoring of information from President Trump and other information inconsistent with Facebook's preferred electoral outcome by, for example, eliminating from the platform negative information about Hunter Biden. *Id.* at 43, ¶ 336 n.29.

The proposed Amended Complaint was to be a nationwide class action on behalf of "all registered voters who were eligible to cast a ballot in the 2020 election for President and Vice President." *Id.* at 30, ¶ 240. Within this nationwide class, there were to be a number of subclasses, including a Republican Voter Subclass; a Democratic Voter Subclass; a Third-Party Voter Subclass; an Independent Voter Subclass; and a "Discouraged Voter" Subclass to include all registered voters who chose not to cast a ballot because they believed "the election process established to administer the 2020 Presidential Election had been corrupted, and that their vote would be diluted, discarded or disregarded." *Id.* at 30–31, ¶¶ 241–45.

The proposed Amended Complaint also listed supposed common questions to be resolved in the class action including, among others,

> a.     Whether Defendants engaged in a scheme and enterprise to improperly interfere with the 2020 Presidential election, by the use of devices and methods that affected or diluted the Plaintiffs' right to vote in a free and fair Presidential election;
>
> . . .
>
> d.     Whether Defendants engaged in a conspiracy against the rights and liberties of registered voters by employing their scheme and enterprise aimed at the election machinery;
>
> . . .
>
> g.     Whether Defendants engaged in a pattern and practice of electioneering and interference in the election process, aimed or directed to benefit one major political party, to the of determent [sic] the other, including third parties, thus affecting the integrity of the political and Presidential election process for all registered voters;
>
> . . .
>
> k.     Whether Dominion, acting as a foreign entity to the United States, was influenced by foreign actors, participated with foreign actors to interfere

with, or allowed interference with the election process, to the determent of the national security of the United States;

l.      Whether Facebook and Zuckerberg used its global presence as a social media platform to censor, limit access to, omit, conceal and tamper with political or dissenting speech in favor of one political ideology, over all others;

. . .

s.      Whether the Defendant politicians, herein, knowingly participated in, or negligently allowed, the scheme and enterprise to interfere with, exercise control over, or manipulate ballot tabulation and transmission in their respective states;

[and]

u.      Whether the Defendant politicians ratified the enterprise's pattern and practice of electioneering, manipulation of election laws, and numerous RICO violations.

*Id.* at 31–34, ¶¶ 253(a)–(w).

In support of its claims against Dominion, the Amended Complaint lists a series of supposed problems with the election machinery and ballot counting in, among other places, Maricopa County, Arizona (*id.* at 40–41, ¶ 306–14); Clark County, Nevada (*id.* at 41, ¶ 315); Fulton County, Georgia (*id.*, ¶ 316); Gwinnette County, Georgia (*id.*, ¶ 317); and Antrim County, Michigan (*id.*, ¶ 318).

The proposed Amended Complaint continued to name state government officials as defendants and included allegations that the state government officials were part of the coordinated effort to fix the election. *See. e.g., id.* at 27–28, ¶¶ 218–29 (listing state government officials as defendants); *id.* at , ¶ 519 (alleging that the Secretary of State of Georgia "unconstitutionally certified the Election, under color of O.C.G.A. §§ 21-2-502, and his official authority"); *id.* at ,67 ¶ 532 (alleging that the Pennsylvania Secretary of

the Commonwealth, "without legislative approval, unilaterally abrogated several Pennsylvania statutes requiring signature verification for absentee or mail-in ballots").

Despite the numerous additional plaintiffs and the addition of RICO conspiracy claims, nothing about the proposed Amended Complaint addressed one critical deficiency emphasized in all Defendants' dismissal motions: Plaintiffs' lack of standing to bring suit under Article III of the Constitution. Also absent from the proposed Amended Complaint was any effort to address the conspicuous personal jurisdictional problems raised by suing, in federal court *in Colorado*, state government officials from Pennsylvania, Wisconsin, Georgia, and Michigan, for acts taken in connection with their official duties in those respective states.

Defendants all opposed Plaintiffs' Motion for Leave to Amend on futility grounds. *See* Dkt. #58 (Opposition by Defendants Kemp and Rafffensperger); Dkt. #59 (Opposition by Boockvar and Wolf); Dkt. #60 (Opposition by Benson and Whitmer); Dkt. #61 (Opposition by Dominion); Dkt. #62 (Opposition by CTCL); & Dkt. #63 (Opposition by Facebook).

### 5.  Voluntary Dismissal of State Government Official Defendants

On April 19, 2021, prior to my issuing the order of dismissal, Plaintiffs voluntarily dismissed all claims against the government officials from Michigan, Georgia, Pennsylvania, and Wisconsin. *See* Dkt. #82 (Notice of Voluntary Dismissal of Wisconsin Governor Tony Evers, and the members of the Wisconsin Elections Commission); Dkt. #83 (Notice of Voluntary Dismissal of Michigan Governor Gretchen Whitmer and Secretary of State Jocelyn Benson); Dkt. #84 (Notice of Voluntary Dismissal of Georgia Governor Brian Kemp and Secretary of State Brad Raffensperger); & Dkt. #85 (Notice

of Voluntary Dismissal of Pennsylvania Governor Tom Wolf and Secretary of the Commonwealth Kathy Boockvar).[2] But, those voluntary dismissals came only after the State Official Defendants had filed their motions to dismiss and oppositions to the Motion for Leave to Amend. After all, in the proposed Amended Complaint, Plaintiffs' counsel had still included the state officials as defendants.

### 6. Basis for Order Dismissing the Suit—Lack of Constitutional Standing

The most patent deficiency in Plaintiffs' wide-ranging, scatter-shot Complaint was the individual Plaintiffs' lack of standing.

"[S]tanding 'is an essential and unchanging part of the case-or-controversy requirement of Article III.'" *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). As explained in more detail in the order dismissing the case and denying leave to amend (Dkt. #92), the Plaintiffs' grievances about the 2020 Presidential election were generalized and equally applicable to every registered voter. Every registered voter was similarly affected by the alleged misconduct.

---

[2] Each of these voluntary dismissals reflected the signatures of Plaintiffs' counsel and counsel for the named governmental defendants and, by rule, would be effective on filing. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii). There was a dispute about the purported dismissal of Pennsylvania Defendants. Although the dismissal notice bore the signature of the Chief Deputy Attorney General from Pennsylvania's Office of Attorney General, (*see* Dkt. #85), on April 20, 2021, the Pennsylvania Defendants filed a document explaining that they had not stipulated to dismissal without prejudice, and, instead, had been only prepared to agree to a dismissal with prejudice, and that the dismissal should also include Pennsylvania Attorney General Josh Shapiro, who was named as a defendant in the proposed amended complaint. The Pennsylvania Defendants also made clear they were reserving the right to request the imposition of sanctions against Plaintiffs based on the Court's inherent authority. *See* Dkt. #86. Plaintiffs followed up on April 20, 2021 by filing their own Motion for an Order voluntarily dismissing the Pennsylvania Defendants without prejudice. *See* Dkt. #87.

It is binding Supreme Court precedent that such generalized grievances about the conduct of an election cannot be the basis for a federal lawsuit. The constitutional standing requirement demands particularized individual injury. The claimed injury cannot be generalized, affecting everyone in the same way:

> We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan*, 504 U.S. at 573–74); *see also Chiles v. Thornburgh*, 865 F.2d 1197, 1205–06 (11th Cir. 1989) (explaining that an injury to the right "to require that the government be administered according to the law" is a generalized grievance).

The Supreme Court in *Lance v. Coffman* was specific that a case where voters allege only that the law (in that case the Elections Clause) has not been followed will not support standing to sue:

> [T]he problem with this allegation should be obvious: The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. *See, e.g. Baker v. Carr*, 369 U.S. 186, 207–208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring the Elections Clause claim.

549 U.S. at 1198.

Numerous other cases involving the 2020 Presidential election featured claims similar to the instant case and many of them cited in my order of dismissal found lack of standing because the plaintiffs made generalized, non-individual, complaints about how

the election was conducted. This includes cases where the plaintiffs purported to be registered voters, just like Plaintiffs here. *See In Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1004 (D. Nev. 2020) (dismissing lawsuit against Nevada's Secretary of State that sought to challenge a Nevada law that expanded mail-in voting due to the COVID-19 pandemic); *Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020) (holding inadequate claims under both the Elections Clause and the Equal Protection Clause based on vote dilution, agreeing that Plaintiffs lack standing to assert these claims and pointing out that "these allegations are nothing more than generalized grievances that any one of the 3.4 million Arizonans who voted could make if they were so allowed"); *King v. Whitmer,* 505 F.Supp.3d 720, 735–36 (E.D. Mich. 2020) (rejecting lawsuit brought by registered Michigan voters and nominees of the Republican Party to be Presidential Electors bringing claims of widespread voter irregularities and fraud in the 2020 general election, in part on the ground that where "the only injury Plaintiffs have alleged is the Elections Clause has not been followed, the United States Supreme Court has made clear that '[the] injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance'") (quoting *Lance*, 549 U.S. at 442)); *Feehan v. Wis. Elections Comm'n,* 506 F.Supp.3d 596, 609 (E.D. Wis. Dec. 9, 2020) (dismissing for lack of standing suit alleging the election was the subject of wide-spread ballot fraud and explaining that "[t]he plaintiff's alleged injuries are injuries that any Wisconsin voter suffers . . . . The plaintiff has not alleged that, as a voter, he has suffered a particularized, concrete injury sufficient to confer standing.").

Similar standing problems resulted in the dismissal of suits, like this one, seeking to find fault with CTCL grants to municipalities. See, *e.g., Tex. Voters All. v. Dallas Cnty.,* 495 F. Supp. 3d 441, 452 (E.D. Tex. 2020) (denying motion for temporary restraining order in a suit brought by voters under the Elections Clause, Supremacy Clause and Help Americans Vote Act and finding plaintiffs lacked standing to challenge the counties' acceptance of the CTCL grants because the injury claimed was an "undifferentiated, generalized grievance about the conduct of government" and "merely alleging that the grants may influence the election result and lead to possible disenfranchisement is not an injury-in-fact"); *Iowa Voter All. v. Black Hawk Cnty.,* C20-2078-LTS, 2021 WL 276700, at *7 (N.D. Iowa January 27, 2021) (dismissing lawsuit brought by voters and a voter group, which sought to challenge Iowa counties' acceptance of CTCL grants, finding none of plaintiffs alleged an injury in fact, as they had done no more than assert generalized grievances against government conduct of which they did not approve).

Plaintiffs' effort to distinguish this case from what I referred to as a "veritable tsunami" of adverse precedent (Dkt. #92 at 17) was not just unpersuasive but crossed the border into the frivolous. Plaintiffs argued, first, that this lawsuit was against corporations, not state actors or agencies, making it somehow qualitatively different from the many other dismissed election suits. This argument ignores that, as filed, this suit *was* brought against several state government officials who, the original Complaint made clear, were acting under color of state law. *See*, *e.g.,* Dkt. #1 at 5, ¶ 23 (suing Tom Wolf, "personally liable for her [sic] individual conduct, acting under color of his official authority as Governor of the Commonwealth of Pennsylvania"). This argument

was also self-contradictory because the Complaint specifically alleged that Dominion,

CTCL, and Facebook could be charged with violations of constitutional rights because

they were working so closely with the states that they should be treated as state actors.

*See id.* at 17, ¶ 82 (citing *Blum v. Yaretshy*, 457 U.S. 991, 1004 (1982), for proposition

that a "private corporation can be fairly be said to be a state actor for purposes of the

Civil Rights Act, if there is a sufficiently close nexus between the state and the

challenged action of the private entity, so that the action of the latter may fairly be

treated as that of the state itself"). Thus, Plaintiffs argued that they had standing

because they were suing private companies rather than government entities, but

Plaintiffs' claims of civil rights violations were based on the allegations that the private

companies *should be treated as state actors.*

The other problem with this argument is that it has been explicitly rejected by the

Supreme Court. Whether a plaintiff has alleged a cognizable injury-in-fact sufficient for

Article III standing "does not depend on the defendant's status as a governmental

entity." *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 n.5 (1998). Indeed,

"there is no conceivable reason why it should." *Id.*

Plaintiffs' second basis for distinguishing this case from the innumerable similar

cases dismissed for lack of standing was that, in this case, Plaintiffs were not trying to

overturn the election or obtain an injunction, but instead were seeking damages for

violation of their rights. This argument makes little sense as a basis for establishing the

personalized injury requirement for Article III standing.

First, Plaintiffs in fact were seeking injunctive relief in addition to monetary

damages. *See* Dkt. 1 at 79, ¶ 408 (seeking "permanent injunctive relief against the

Defendants to enjoin them from continuing to burden the rights of the Plaintiffs and all similarly situated registered voters"). So, to say that this Complaint was different because all the other cases sought injunctive relief is not convincing.

That Plaintiffs sought money damages is no more persuasive of a distinction. Standing requires particularized, concrete individual *injury*. Whether a plaintiff is seeking damages or an injunction as a *remedy* is irrelevant to whether she has suffered a sufficiently particularized *injury*. For Article III standing purposes, seeking an award of damages rather than (or in addition to) an injunction does not change a generalized complaint into a specific particularized injury. The Supreme Court recently made this clear in the case of *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021), where the Court specified that while a request for nominal damages may satisfy the *redressability* element of Article III standing, the other elements of standing, "such as a particularized injury," still need to be present. 141 S. Ct. at 802.

Thus, I dismissed the case for lack of Article III standing and denied leave to amend on the grounds of futility. *See generally* Dkt. #92. Nothing about the proposed Amended Complaint solved the manifest lack of standing. *Id.* at 27. Because the case was dismissed for lack of standing, in the order dismissing the case I chose not to address the numerous other problems Defendants had identified with the Complaint, such as lack of personal jurisdiction. *Id.* at 28.

In *Collins v. Daniels*, the Tenth Circuit affirmed an award of sanctions in a case where the plaintiffs' attorney had sued without any "objectively reasonable basis for asserting standing to sue." 916 F.3d 1302, 1321 (10th Cir. 2019). Parties had been added as defendants for improper political reasons "rather than to advance colorable

claims for judicial relief." *Id.* The *Collins* plaintiffs' standing arguments ignored controlling precedent and, when confronted with binding authorities in the defendants' motion to dismiss and motion for Rule 11 sanctions, the plaintiffs "unreasonably attempted to distinguish themselves from the plaintiffs" in those other binding cases. *Id.* Defendants seek sanctions in the instant case for many of the same reasons sanctions were awarded in *Collins*.

### 7. No Basis for Personal Jurisdiction over State Government Officials

While I did not address lack of personal jurisdiction in my dismissal order, this was another patent deficiency in the Complaint (and the proposed Amended Complaint), most especially with respect to the claims filed against the State Official Defendants. It should have been as obvious to Plaintiffs' counsel as it would be to a first-year civil procedure student that there was no legal or factual basis to assert personal jurisdiction *in Colorado* for actions taken by sister states' governors, secretaries of state, or other election officials, in those officials' home states.

The governors and secretaries of state sued in this case are public servants of their respective home states. This Court could exercise personal jurisdiction over them only if the State Official Defendants had purposefully directed activity toward Colorado and the injuries alleged in this case related to that targeted activity. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Those things did not happen.

A district court may not exercise jurisdiction over an out-of-state defendant unless the plaintiff establishes that the state in which the court is based would allow the exercise of jurisdiction, and also that exercising jurisdiction would not offend the Due Process Clause. *Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1322 (10th Cir.

19

2019). Because Colorado asserts jurisdiction over out-of-state defendants to the maximum extent allowed under the Due Process Clause, in this case the two inquiries are the same.

Due process allows jurisdiction over an out-of-state defendant only if "the defendant purposefully established minimum contacts within the forum State and the assertion of personal jurisdiction would comport with fair play and substantial justice." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017) (quotation marks and citations omitted). An out-of-state defendant whose contact with the forum state is "continuous and systematic" may be subject to that state's jurisdiction for all purposes. *Id.* at 903–04. Otherwise, case-specific jurisdiction is limited to when the out-of-state defendant has "purposefully directed its activities at residents of the forum state," and the plaintiff's injuries arise from those forum-related activities. *Id.* (citation omitted). The purposeful direction doctrine prevents defendants from being forced to appear based on "'random, fortuitous, or attenuated contacts' with the forum state." *Floyd's 99 Holdings, LLC v. Jude's Barbershop, Inc.*, 989 F. Supp. 2d 1202, 1207 (D. Colo. 2012) (citing *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)).

Here, the actions of the defendant governors, secretaries of state, and elections officials are all alleged to have occurred only in the home states of those various officials. *See* Dkt. #1 at 23–33, ¶¶ 127–90 (allegations regarding conduct of Michigan officials); *id.* at 34–41, ¶¶ 191–213 (regarding Georgia); *id.* at 42–50, ¶¶ 214–57 (regarding Pennsylvania); and *id.* at 51–58, ¶¶ 258–81 (regarding Wisconsin). The alleged acts in all four states pertained to the casting and counting of ballots and the

certification of the results. The administration of elections in Michigan, Georgia, Pennsylvania, or Wisconsin is not, and could not conceivably be found to be, "activity directed" at Colorado.

Using Pennsylvania as an example, Plaintiffs never alleged a single fact suggesting that the Pennsylvania Defendants took *any* action having *any* connection whatsoever to Colorado. All the allegations related to the administration of an election in Pennsylvania, for Pennsylvanians, and relying on Pennsylvania law.

When asked at the July 16 oral argument, Plaintiffs' counsel could cite no case in United States legal history where a state official had been sued successfully in the federal court of another state for on-the-job actions taken in the official's home state. *See* July 16, 2021 Hr'g Tr. 44:22–45:14, Dkt. #133 ("I can't think of one.").

And when further asked about the good faith legal basis for bringing claims against these state officials in Colorado rather than their home states, defense counsel Fielder explained, "Well, when they filed the motions [to dismiss] we researched it, we looked into it, we could not feel with certainty that we could establish personal jurisdiction." *Id.* 45:24–46:3. After supposedly doing that research, Plaintiffs voluntarily dismissed the State Official Defendants. When asked why it took motions to dismiss before Plaintiffs' counsel researched the question of personal jurisdiction, and why the research had not been conducted prior to the filing of the lawsuit, Mr. Fielder had no rational answer. *Id.* 46:4–16. As described in more detail below, there was no urgency associated with filing this lawsuit. Any necessary research should have happened before filing the suit, not after.

In opposing the State officials' motions for sanctions, Plaintiffs' counsel has repeatedly noted that personal jurisdiction can be waived, and Plaintiffs voluntarily dismissed the State Official Defendants after it became was clear the state officials would not waive personal jurisdiction. *See* Resp. to Mich. Defs.' Mot. for Sanctions, Dkt. #127 at 5 ("Instead, when it became clear that these Defendants would not voluntarily appear in their individual capacities, Plaintiffs ended that battle, here in the District of Colorado."). But it is inconceivable to have ever thought that state officials of Pennsylvania or Michigan would voluntarily waive personal jurisdiction and come to a *Colorado* federal court to answer charges about acts taken during the administration of Pennsylvania or Michigan elections.

Filing a lawsuit against an out-of-state defendant with no plausible good faith justification for the assertion of personal jurisdiction or venue is sanctionable conduct. *See, e.g., Boyer v. BNSF Ry. Co.*, 824 F.3d 694 (7th Cir. 2016) (holding that attorney's decision to file negligence action in Arkansas state court, despite nothing tying lawsuit to Arkansas, was sanctionable); *Levine v. FDIC,* 2 F.3d 476, 478 (2d Cir. 1993) (imposition of sanctions proper given that plaintiff's assertion of personal jurisdiction over defendant was without factual basis); *Novoselsky v. Zvunca*, 324 F.R.D. 197, 206 (E.D. Wis. 2017) (finding a Rule 11 sanction award appropriate in part because "personal jurisdiction over [defendants] was not plausible in this case"). My colleague, Judge William J. Martinez, recently issued such a sanction, awarding attorneys' fees under the Court's inherent power after a case had been voluntarily dismissed. *See Jamieson v. Hoven Vision LLC*, No. 20-cv-1122-WJM-KLM, 2021 WL 1564788 (D. Colo. April 21, 2021). In *Jamieson*, the defendant had little to no connection to Colorado and

the action did not arise out of those putative connections. Judge Martinez therefore rejected the notion that plaintiff's counsel "commenced the lawsuit with a legitimate belief that personal jurisdiction existed." Nor could plaintiff's counsel in that case demonstrate any basis in law or fact to conclude that personal jurisdiction did exist. 2021 WL 1564788, at *2. With respect to the State Official Defendants and the groundless asserted basis for personal jurisdiction, the circumstances in *Jamieson* parallel those of this case.

### 8. <u>Legal Standards for Imposing Sanctions</u>

#### a. Federal Rule of Civil Procedure 11

Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies *that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances*:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b) (emphasis added). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose

an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11 (c)(1).

The "central purpose of Rule 11 is to deter baseless filings in district court" and "streamline the administration and procedure of the federal courts." *Cooter & Gell*, 496 U.S. at 393. Where, as here, a complaint is the primary focus of a Rule 11 proceeding, "a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually 'baseless' from an objective perspective, and (2) if the attorney has conducted 'a reasonable and competent inquiry' before signing and filing it." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002) (quoting *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997)).

The Court determines the reasonableness of an inquiry by applying an objective standard. *See Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 548-50 (1991). The test, as the Tenth Circuit puts it, is "whether a reasonable attorney admitted to practice before the district court would file such a document." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015) (quoting *Adamson v. Bowen*, 855 F. 2d 668, 673 (10th Cir. 1988)). The signer has a "personal, nondelegable responsibility" to comply with the requirements of Rule 11 before signing a complaint. *Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 127 (1989). But, because the adversary system expects lawyers to zealously represent their clients, the Rule 11 standard is tough to satisfy. An attorney "can be rather aggressive and still be reasonable." *Collins*, 916 F.3d at 1320 (citing *Adamson*, 855 F. 2d at 673)).

Plaintiffs' counsel insisted at oral argument that they genuinely believe the factual allegations and legal contentions in the Complaint. But "belief" alone cannot form the

foundation for a lawsuit. An "empty-head" but "pure-heart" is no justification for patently frivolous arguments or factual assertions. *Collins*, 916 F.3d at 1320. The belief must be a "substantiated belief." *Cooter & Gell*, 496 U.S. at 394.

Thus, a critical piece of the Rule 11 sanction determination is whether an attorney's beliefs as to the law and the facts were formed after "an inquiry reasonable under the circumstances." The Advisory Committee note to the 1983 Amendment to Rule 11 attempts to explain what constitutes a "reasonable" inquiry:

> The rule is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories. The court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted. Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion or other paper; whether the pleading, motion or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar.

Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment.

One federal appellate court has made clear that Rule 11 sanctions are not to be imposed just because a claim fails; the issue is whether the claims "are so obviously foreclosed by existing precedent as to make them legally indefensible." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 529 (5th Cir. 2016) (affirming denial of a sanction award in a civil RICO case). The Advisory Committee Note to the 1993 Amendment describes the rule as requiring "litigants to 'stop-and-think' before initially making legal or factual contentions." Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment.

If, under an objective standard, the signer has made a reasonable inquiry both as to the facts and the law at the time a document was submitted,

> subsequent developments showing the signer's position was incorrect will
> not subject the signer to Rule 11 sanctions for having submitted the
> document. On the other hand, a signer making in inadequate inquiry into
> the sufficiency of the facts and law underlying a document will not be saved
> from a Rule 11 sanction by the stroke of luck that the document happened
> to be justified.

*Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1279 (3rd Cir. 1994); *see also Vista Mfg., Inc. v. Trac-4 Inc.,* 131 F.R.D. 134, 138 (N.D. Ind. 1990) ("A shot in the dark is a sanctionable event, even if it somehow hits the mark."). *But see Magnus Elecs. V. Masco Corp. of Indiana*, 871 F.2d 626, 629 (7th Cir. 1989) (for purposes of Rule 11, "[a]n attorney takes a frivolous position if he fails to make a reasonable inquiry into facts (which later prove false) or takes a position unwarranted by existing law or a good faith argument for its modification").

The Second Circuit has explained that a claim runs afoul of Rule 11 when one of the following situations exists: "(1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; or (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands." *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 390 (2d Cir.), *cert. denied*, 493 U.S. 1003 (1989).

### b. The Court's Inherent Authority to Sanction an Attorney

Federal courts have certain "inherent powers" which are not conferred by rule or statute "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962). Among these powers is a court's "ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991);

*see also Rice v. NBCUniversal Media, LLC*, 2019 WL 3000808, at *3–4 (S.D.N.Y. July 10, 2019) (imposing sanctions pursuant to court's inherent powers).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* 501 U.S. at 44. But it is undisputed that "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45–46 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975)).

One permissible sanction is an assessment of attorneys' fees, requiring the party that has engaged in misconduct to reimburse the legal fees and costs of the other party. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017). Such a sanction must be compensatory rather than punitive in nature, and any attorneys' fee award is limited to the fees "the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have occurred but for the bad faith." *Id.* at 1184.

Unlike Rule 11, sanctions under the Court's inherent authority appear to require a finding of bad faith on the part of the attorney to be sanctioned. *See Farmer v. Banco Popular of North America*, 791 F.3d 1246 (10th Cir. 2015) (upholding sanction award under the Court's inherent authority finding bad faith by a party in failing to comply with order enforcing settlement); *Chambers*, 501 U.S. 32 (1991) (holding there was no abuse of discretion in district court's resort to inherent power to impose sanctions for bad-faith conduct, even though some conduct was also sanctionable under the rules of civil procedure).

### c.  Sanctions under 28 U.S.C. § 1927

28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Given this statutory language, "[a] court may assess attorney[s'] fees against an attorney under § 1927 if (a) the actions of the attorney multiply the proceedings, and (b) the attorney's actions are vexatious and unreasonable." *Shackelford v. Courtesy Ford, Inc.*, 96 F. Supp. 2d 1140, 1144 (D. Colo. 2000).

"Actions are considered vexatious and unreasonable if the attorney acts in bad faith . . . or if the attorney's conduct constitutes a reckless disregard for the duty owed by counsel to the court." *Id.* The attorney's conduct is judged objectively; subjective bad faith is not required to justify § 1927 sanctions. *See Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1203 (10th Cir. 2008) ("Where, 'pure heart' notwithstanding, an attorney's momentarily 'empty head' results in an objectively vexatious and unreasonable multiplication of proceedings at expense to his opponent, the court may hold the attorney personally responsible.").

In *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337 (10th Cir. 1998), the Tenth Circuit listed the categories of conduct that might justify the imposition of sanctions under §1927. These include:

- acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law;

- when an attorney is cavalier or "bent on misleading the court;"

- intentionally acts without a plausible basis;

- when the entire course of the proceedings was unwarranted;

- or when certain discovery is substantially unjustified and interposed for the improper purposes of harassment, unnecessary delay and to increase the costs of the litigation.

143 F.3d at 1342; *see also Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1221 (10th Cir. 2006) (same).

That said, in the Tenth Circuit, the standard for imposing sanctions for unreasonably and vexatiously multiplying proceedings is an "extreme standard," and fees should be awarded as a sanction "only in instances evidencing a serious and standard disregard for the orderly process of justice." *Baca v. Berry*, 806 F.3d 1262, 1268 (10th Cir. 2015) (quoting *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528 (10th Cir. 1997) (internal quotation marks omitted)). Thus, courts must "strictly construe[ ]" the statute to guard against "dampen[ing] the legitimate zeal of an attorney in representing his client." *Braley v. Campbell*, 832 F.2d 1504, 1512 (10th Cir. 1987) (en banc).

Under § 1927, courts need not find that an attorney subjectively acted in bad faith. Rather, "any conduct that, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court[ ] is sanctionable." *Hamilton*, 519 F.3d at 1202 (internal quotation marks omitted). The statute makes attorneys potentially liable for harm caused "because of" unreasonable and vexatious multiplication of proceedings. 28 U.S.C. § 1927. Thus, "there must be a causal connection between the objectionable conduct of counsel and multiplication of the proceedings," such that the conduct "result[ed] in proceedings that would not have been conducted otherwise." *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997); *see also Lee v. First Lenders Ins. Servs., Inc.*, 236 F.3d 443, 445 (8th Cir. 2001).

The Seventh Circuit has articulated the standard for an award of sanctions under section 1927 as follows:

> If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious. To put this a little differently, a lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law. . . .

*In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985)

Ultimately, whether to award § 1927 sanctions is a matter committed to this Court's discretion. *Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278–79 (10th Cir. 2005). "A court's discretion to award fees is broad if it concludes an attorney acted in an objectively unreasonable way that multiplied proceedings." *Baca*, 806 F.3d at 1269. But sanctions cannot be imposed for the initiation of proceedings because it is "not possible to multiply proceedings until after those proceedings have begun." *Id.* at 1225.

### 9. <u>The Circumstances of this Case Mandated Significant Factual Inquiry before either Filing in the First Place or Seeking to Amend.</u>

The overall circumstances surrounding the filing of a case are critical to the determination of whether sanctions should be awarded. Rule 11 specifically requires that the signing attorney certify to the non-frivolous nature of the legal and factual claims "after an *inquiry reasonable under the circumstances*." Fed. R. Civ. P. 11(b) (emphasis added); *see also Garr*, 22 F.3d at 1279 (emphasizing that "inasmuch as the standard under Rule 11 is 'fact specific,' the court must consider all the material circumstances in evaluating the signer's conduct."). And, as Mr. Fielder has repeatedly claimed, the circumstances surrounding the filing of this lawsuit were "unprecedented."

    **a. The circumstances of this case both allowed for and mandated significant diligence and investigation before filing suit.**

One circumstance that must be considered was whether Plaintiffs' counsel was under any time pressure to file the Complaint—whether the statute of limitations was running or there was some emergency that required immediate filing before a detailed investigation into the veracity of the allegations could be completed. The answer to this question is an unequivocal "no." As Plaintiffs' counsel has emphasized, this was primarily a claim for damages for alleged civil rights violations as a result of the November 2020 election. There was nothing about a claim for damages that compelled it to be filed just weeks after the election in December 2020. Given the seriousness and scope of the allegations, extensive objective research into the legal basis for the claims and due diligence into the factual allegations should have occurred. And there was ample time for such investigation. There was no reason why Plaintiffs could not have waited for the completion of some of the state recounts and state-run investigations into alleged allegations of election-rigging.

As to the facts alleged in the Complaint, as described in more detail below, Plaintiffs' counsel should have been on notice as to the serious, publicly reported doubts as to the validity of election-rigging or election fraud allegations, and the associated importance of conducting extensive, objective, and independent due diligence before filing. Given the circumstances of this case, it was not enough to merely accept as true (or potentially true) what might be stated in the media, what had been pushed out over the Internet, or even what was included in other lawsuits filed around the country. Some effort at independent verification by the lawyers who signed the Complaint was required.

It must also be noted that this was not a client-driven lawsuit. As Plaintiffs'

counsel, Mr. Fielder, conceded at the July 16 hearing, the lawsuit was his idea. Mr.

Fielder and Mr. Walker were not relying on information from the named Plaintiffs to

construct the suit or for any of the substantive factual allegations. Lawyers who

conceive of a lawsuit seeking $160 billion dollars, making allegations questioning the

validity of a Presidential election, and the fairness of the basic mechanisms of American

democracy, must conduct extensive independent research and investigation into the

validity of the claims before filing suit.

> **b. Plaintiffs' counsel were on notice that numerous lawsuits making similar allegations had failed—meaning that more investigation was required.**

The 2020 election happened on November 3, 2020. Numerous lawsuits were

filed before the election regarding state election processes, including challenges to mail-

in ballots, alleged ballot harvesting, electronic voting processes, and allegedly illegal or

unconstitutional efforts to ensure voting access in the face of the COVID-19 pandemic.

After the election, more lawsuits were filed hoping to delay or stop the

certification of certain states' results. Uniformly, these dozens of suits (perhaps more

than 80)[3] failed, either for procedural deficiencies, lack of standing, or lack of proof. To

---

[3] *See* Jacob Shamsian and Sonam Sheth, *Trump and His Allies Filed More Than 40 Lawsuits Challenging the 2020 Election Results. All of Them Failed*, Business Insider (February 22, 2021), https://www.businessinsider.com/trump-campaign-lawsuits-election-results-2020-11 (describing 13 failed lawsuits in Pennsylvania, four lawsuits in Nevada, five in Georgia, five in Michigan, four in Arizona, seven in Wisconsin and one in New Mexico); Amy Sherman and Miriam Valverde, *Joe Biden is Right That More Than 60 of Trump's Election Lawsuits Lacked Merit*, PolitiFact (January 8, 2021), https://www.politifact.com/factchecks/2021/jan/08/joe-biden/joe-biden-right-more-60-trumps-election-lawsuits-l/; Alison Durkee, *Trump and The GOP Have Now Lost 50 Post-Election Lawsuits*, Forbes (December 8, 2020), https://www.forbes.com/sites/

use Pennsylvania as an example, failed suits included *Donald J. Trump for President, Inc. v. Boockvar*, 502 F. Supp. 3d 899 (M.D. Pa. 2020); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331 (W.D. Pa. 2020); *Metcalfe v. Wolf*, No. 636 M.D. 2020, 2020 WL 7241120 (Pa. Commw. Ct. Dec. 9, 2020); *Kelly v. Commonwealth*, 240 A.3d 1255 (Pa. 2020); *In re Canvass of Absentee & Mail-in Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020); *In re Canvassing Observation*, 241 A.3d 339 (Pa. 2020); *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591 (Pa. 2020). The allegations about Pennsylvania in Plaintiffs' Complaint are indistinguishable from those found in many of the failed lawsuits.

Moreover, it is not true that all of the numerous cases were dismissed only on procedural or standing grounds. A number of cases seeking injunctive relief failed in part because of an inability to present convincing evidence of fraud or illegal conduct. *See, e.g., Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377, 381 (3rd. Cir. 2020) ("Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. *Charges require specific allegations and then proof. We have neither here.*") (emphasis added); *Wis. Voters All. v. Pence*, No. 20-3971 (JEB), 2021 WL 686359, at *1 (D.D.C. Feb. 19, 2021) (in order referring plaintiff's counsel to court's grievance committee questioning why an election-challenge lawsuit spent 70+ pages on "irrelevant allegations of fraud, *not one instance of which persuaded any court in any state to question the election's outcome*") (emphasis added); *King v. Whitmer*, 505 F. Supp. 3d at 738 (finding no

---

alisondurkee/2020/12/08/trump-and-the-gop-have-now-lost-50-post-election-lawsuits/?sh=529cb6ac2960.

likelihood of success on the merits in challenge to 2020 Michigan election results, stating "[w]ith nothing but speculation and conjecture that votes for President Trump were destroyed, discarded or switched to votes for Vice President Biden, Plaintiffs' equal protection claim fails"). Given the seriousness of the instant lawsuit, the fact that lawsuits making the same substantive allegations had failed for lack of likely success on the merits should have been a strong warning sign to Plaintiffs' counsel that they needed to do more than just rely on allegations or affidavits filed in other cases.

Among the failed election-related suits were claims brought against municipalities who had received grants from CTCL seeking to bar the use of those donated funds on constitutional grounds. Plaintiffs make some of the same allegations in this lawsuit. On this issue, multiple federal courts have concluded that allegations regarding CTCL's donations 'are insufficient to adequately plead a constitutional violation. *See, e.g., Tex. Voters All.*, 495 F. Supp. 3d at 453 (rejecting the plaintiffs' argument "that the grants create a public-private partnership between the Counties and the CTCL that is constitutionally impermissible"); *Iowa Voter All.*, 2021 WL 276700, at *5 n.3 (observing court was "thoroughly unconvinced that the counties violated any particular law by accepting the CTCL grants"); *Wisc. Voters All. v. City of Racine*, No. 20-C-1487, 2021 WL 179166, at *3 (January 19, 2021) (rejecting on standing grounds claims alleging impropriety in a municipality's acceptance of funds from private parties to help pay for the increased costs of conducting safe and efficient elections and concluding that any concerns would require a "legislative response").

The rejected post-election challenges also included the historic gambit by the state of Texas to have Pennsylvania, Michigan, Georgia, and Wisconsin's election

results overturned by the U.S. Supreme Court. *See Texas v. Pennsylvania, et al*, 2020 WL 7229714 (U.S.). Texas' effort is notable because Plaintiffs' Complaint duplicates almost verbatim many of the allegations from that failed Supreme Court case. *See, e.g.,* Dkt. #1 at 32, ¶ 130 (citing the Bill of Complaint filed in *Texas v. Pennsylvania*, 2020 WL 7229714, at *24, ¶ 81, to the effect that Michigan Secretary of State Benson's acts and omissions "did away with protections designed to deter voter fraud"); *id.*, ¶ 131 (quoting the same pleading alleging that Secretary Benson's "flooding of Michigan with millions of absentee ballot applications prior to the 2020 general election violated" Michigan law); *id.* at 35, ¶ 198 (quoting Texas's Bill of Complaint and listing 17 alleged illegalities associated with Georgia's election taken straight from the *Texas v. Pennsylvania* lawsuit); *id.* at 53, ¶ 272 (asserting that the reported results of Wisconsin's election "are invalid" based upon "facts" alleged in paragraphs 104–08 of the Bill of Complaint); *id.* at 46, ¶ 232 (citing paragraphs 43–61 of Texas' Bill of Complaint to allege the existence of a supposedly "blatantly illegal" scheme in Pennsylvania involving, among other things, signature verification for absentee or mail-in ballots and the blocking of poll-watchers, which supposedly "renders all mail-in ballots constitutionally tainted").

By the time Plaintiffs filed their Complaint here, they had access to the state of Pennsylvania's and other states' responses to the Texas' Bill of Complaint. In its response, Pennsylvania explained, with citation to Pennsylvania state court decisions and various federal court decisions, that most of Texas' assertions of illegality in the conduct of Pennsylvania's election were baseless as a matter of Pennsylvania state law as decided by the Pennsylvania Supreme Court.

In addition, Plaintiffs' counsel should have known that they were taking an extreme risk in repeating the allegations from Texas' Bill of Complaint because at the time Texas' Bill was filed, it had been widely and publicly criticized by legal and ethics scholars. *See* Katie Buehler, *Atty Group Wants Discipline of AGs Who Challenged Election*, Law360 (Dec. 14, 2020) (quoting legal ethics expert Stephen Gillers as calling the Texas filing "a political campaign document in legal camouflage" and saying "[l]awyers who filed or joined it ill-treated the court, harmed the rule of law, and ill-served the public"). Constitutional scholar Lucas Powe of the University of Texas agreed, saying "Every constitutional lawyer knew the lawsuit was frivolous; the AG's office should have known that, too." *Id.*

Continuing with the theme of litigation by "cut-and-paste," Plaintiffs' Complaint also cites twelve paragraphs from a failed Georgia lawsuit filed by attorney Sidney Powell, alleging that Georgia's certification of the election was unconstitutional. *See* Dkt. #1 at 38 n.44, (citing the Complaint for Declaratory, Emergency, and Permanent Injunctive Relief filed in *Pearson, et al., v. Kemp.*, Case 1:20-cv-04809-TCM (N.D. Ga. Nov. 25, 2020)). Among the allegations cut and pasted from the *Pearson* case include (1) that the software used in Georgia's voting machines "was created to rig elections, facilitate vulnerability and to 'allow a select few to determine which votes will be counted in any election'." *id.* at 39, ¶ 203(h); and that there was a common scheme regarding the creation of the voting software "to manipulate elections, worldwide, e.g., in Venezuela." *Id.*, ¶ 203(i).

In sum, Plaintiffs were or should have been on notice that the lawsuits from which they were copying had failed. Given the "cut-and-paste" nature of Plaintiffs' own

filing, and the fact that many, if not all, of the prior lawsuits had been rejected on both procedural and substantive grounds, Plaintiffs' counsel had a heightened duty of diligence and investigation before filing a copy-job pleading containing the same previously rejected theories and allegations. Lawyers acting in good faith and without any meaningful time constraints would have taken the time to do additional original research into the validity of the allegations they were repeating.

### c. Both Independent and Republican Sources had Publicly Refuted Claims that the Election had been "Rigged" or that Dominion Machines had "Flipped" Votes.

Beyond being on notice that the "fraud" and "rigging" allegations had been seriously questioned or rejected in the courts, Plaintiffs' counsel also must have been aware that these same allegations had been, from the very beginning, extensively publicly rebutted by numerous independent (and even staunchly Republican) sources.

For example, on November 12, 2020, the United States Cybersecurity & Infrastructure Security Agency ("CISA"), a federal agency created in 2018 to protect the nation's critical infrastructure, issued a press release including a Joint Statement from Executive Committee of the Elections Infrastructure Government Coordinating Council. This Executive Committee included, among other people, the U.S. Election Assistance Commission Chair; the Chair of the National Association of Secretaries of State; the President of the National Association of State Election Directors; the Escambia County (Florida) Supervisor of Elections; and members of the Election Infrastructure Sector Coordinating Council. The statement read as follows:

> The November 3rd election was the most secure in American history. Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result.

When states have close elections, many will recount ballots. All of the states with close results in the 2020 presidential race have paper records of each vote, allowing the ability to go back and count each ballot if necessary. This is an added benefit for security and resilience. This process allows for the identification and correction of any mistakes or errors. There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.

Other security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020.

While we know there are many unfounded claims and opportunities for misinformation about the process of our elections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too. When you have questions, turn to elections officials as trusted voices as they administer elections."

Cybersec. & Infrastructure Sec. Agency, Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees (November 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.[4]

Former President Trump's Attorney General, William Barr, is on record repeatedly saying that, having investigated the claimed allegations of fraud and tampering, there was nothing to them. As early as December 1, 2020, Attorney General Barr, in an interview with the Associated Press, explained the Justice Department had uncovered no evidence of widespread voter fraud that could change the outcome of the 2020 election. Attorney General Barr told the AP that U.S. attorneys and FBI agents

---

[4] The Court is entitled to take judicial notice of official government publications. *See High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (court may take judicial notice of official government publications); *Clappier v. Flynn*, 605 F.2d 519, 535 (10th Cir.1979) (court may take judicial notice of official governmental publications). *See also* Fed. R. Evid. 201(b)(2) (permitting courts to take notice of a "fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

were working to follow up specific complaints and information they had received, but "to date, we have not seen fraud on a scale that could have effected a different outcome of the election." Michael Balsamo, *Disputing Trump, Barr Says No Widespread Election Fraud*, AP News (December 1, 2020), https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d.

Consistent with the federal CISA statement and the statements of Attorney General Barr, state governments have rejected the suggestion that election machines or electronic voting systems somehow failed or generated incorrect results. For example, in connection with the 2020 Presidential election, the State of Georgia conducted "the largest hand count of ballots in United States history," with audit boards from all 159 Georgia counties examining 41,881 batches, hand sorting and counting each ballot as part of the process. "The audit confirmed the original result of the election, namely that Joe Biden won the Presidential Contest in the State of Georgia." *Risk-Limiting Audit Report*, *Georgia Presidential Contest, November 2020* (Nov. 19, 2020), https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf.

Just days after the November 2020 election, the Michigan Senate Oversight Committee began an investigation into allegations that Michigan's Presidential election was rigged. Plaintiffs filed their suit and served the Defendants rather than waiting for the outcome of this Michigan investigation. Allegations about election misconduct in Antrim County play a major part in Plaintiffs' allegations about the State of Michigan in this case; Plaintiffs attached the so-called "ASOG Report" to their Complaint as evidence of Dominion malfeasance in Michigan. *See, e.g,* Dkt. #1 at 31, ¶¶ 173–75; Dkt. #1-10 ("Allied Security Operations Group" or "ASOG" Report prepared by Russell

Ramsland and purporting to have done a "forensic audit" of Dominion Voting Systems in Antrim County and concluding that "Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results").

On June 23, 2021, the Michigan Senate Oversight Committee issued a detailed, bipartisan, 55-page report that, while conceding certain weaknesses in the Michigan election system (such as lack of clarity in tabulation of ballots and unnecessary barriers to ensuring that every lawfully cast ballot is counted), ultimately concluded with a "finding that citizens should be confident the [reported election] results represent the true results of the ballots cast by the people of Michigan." Michigan Senate Oversight Committee, *Report on the November 2020 Election in Michigan* (June 23, 2021).

The Michigan Senate Oversight Committee investigation findings resulted "from 28 hours of testimony from almost 90 individuals spanning nine committee hearings, the review of thousands of pages of subpoenaed documents from multiple government entities, hundreds of hours of Senate Staff investigation, and countless review of claims and concerns from Michigan residents." *Id.* at 6. The "undeniable conclusion" was that "there is no evidence presented at this time to prove either significant acts of fraud or that an organized, wide-scale effort to commit fraudulent activity was perpetrated in order to subvert the will of Michigan voters." *Id.*

In a letter from the Chair of the Oversight Committee accompanying the Committee Report, Republican Senator Edward McBroom specifically emphasized the Committee's conclusions regarding Antrim County:

> The strongest conclusion comes in regard to Antrim County. All compelling theories that sprang forth from the rumors surrounding Antrim County are

diminished so significantly as *for it to be a complete waste of time to consider them further*. Most of the rigorous debate over additional audits comes from fears surrounding the technology used and its vulnerabilities as allegedly demonstrated in Antrim County. Without any evidence to validate those fears, another audit, a so-called forensic audit [of the Michigan results], is not justifiable.

*Id.* at 5 (emphasis added). The Committee Report provides a chart "clearly and concisely show[ing] that ideas and speculation that the Antrim County election workers or outside entities manipulated the vote by hand or electronically are indefensible." *Id.* at 16. Further, the Committee stated it "is appalled at what can only be deduced as a willful ignorance or avoidance of this proof perpetuated by some leading such speculation." *Id.*

As to the ASOG report that Plaintiffs attached to their Complaint (Dkt. #1-10), Michigan Bureau of Elections Director Jonathan Brater, referring to a previously unsigned version of the document, declared under oath in a Michigan court that it was apparent to him "that the [ASOG] report makes a series of unsupported conclusions, ascribes motives of fraud and obfuscation to processes that are easily explained as routine election procedures or error corrections, and suggests without explanation that elements of election software not used in Michigan are somehow responsible for tabulation or reporting." Press Release from Offices Michigan Attorney General and Secretary of State, *Plaintiff's Report in Antrim County Election Lawsuit Demonstrates Lack of Credible Evidence in Widespread Fraud or Wrongdoing*, (December 14, 2020), https://www.michigan.gov/ag/0,4534,7-359-92297_47203-547422--,00.html.

In addition, the expertise and credibility of the author of the ASOG report, Russell Ramsdale, was called into question after it was discovered that an affidavit he had submitted in L. Lin Wood's lawsuit seeking to stop certification of Georgia's vote which

claimed fraud in Michigan based on so-called "over-votes," was simply wrong—it was the result of a confusion in population numbers from Michigan precincts with counties in *Minnesota. See* Savannah Behrmann, *Trump Lawsuit Confuses Michigan and Minnesota Locations in Affidavit Claiming Voter Fraud*," USA TODAY (Nov. 20, 2020), https://www.usatoday.com/story/news/politics/elections/2020/11/20/trump-lawsuit-mixes-up-red-flags-michigan-minnesota/6362056002/; Louis Jacobson and Noah Y. Kim, *Giulinani Cites Affidavit With Crucial Errors in Press Conference*, Politifact (No. 20, 2020), https://www.politifact.com/factchecks/2020/nov/20/rudy-giuliani/giuliani-cites-affidavit-crucial-errors-press-conf/ (explaining that Giuliani relied on Ramsdale affidavit to falsely claim over-voting in numerous Michigan precincts, where the affidavit wrongly was using population numbers from precincts located in Minnesota and not Michigan).[5]

After the election and additional investigation into the numerous claims of election fraud and vote rigging, even media outlets usually perceived to be supportive of the former President publicly announced that they had seen no information or evidence to suggest that election machine companies were involved in election fraud. *See* Jemima McEvoy, *Fox News, Newsmax Walk Back Election Fraud Claims after Voting Machine Manufacturer Threatens Legal Action*, Forbes (Dec. 21, 2020), https://

---

[5] The Plaintiffs also attached to their Complaint, as purported evidence of fraud, the "Navarro Report," a document published by Secretary of Commerce Peter Navarro. *See* Dkt. #1-11. Shortly after its publication, this Navarro Report was described in the Washington Post as a 30-page compilation of "President Trump's voter-fraud greatest hits" and potentially "the most embarrassing document" ever created by a White House staffer, explaining that it threw out "as near-certainties things that are unfounded, misrepresented or unimportant." *See* Phillip Bump, *This Might Be the Most Embarrassing Document Created by a White House Staffer*, Washington Post (Dec. 18, 2020), https://www.washingtonpost.com/politics/2020/12/18/this-might-be-most-embarrassing-document-created-by-white-house-staffer/.

www.forbes.com/sites/jemimamcevoy/2020/12/21/fox-news-newsmax-walk-back-
election-fraud-claims-after-voting-machine-manufacturer-threatens-legal-action/
?sh=2112d35fcfd2 (describing Fox News and Newsmax airing segments about

companies Smartmatic and Dominion, describing the fraud claims made against the two

companies, and confirming there is "no evidence" to support some of those claims);

Eliza Relman and Jake Lahut, *Pro-Trump Network Newsmax Airs 2-Minute Video*

*Admitting It Has 'No Evidence' Of Outlandish Fraud Claims Against 2 Voting-Machine*

*Companies*, BusinessInsider.com (Dec. 21, 2020), https://www.businessinsider.com/

newsmax-airs-election-fraud-correction-video-lawsuit-dominion-smartmatic-2020-12.

Indeed, on May 5, 2021, Newsmax, which initially had amplified former President

Trump's allegations of election rigging and widespread fraud, made an apology, issuing

a statement retracting allegations against Dominion and its employee. The statement

reads in part,

> Since Election Day, various guests, attorneys, and hosts on
> Newsmax have offered opinions and claims about Dr. Eric Coomer, the
> Director of Product Strategy and Security at Dominion Voting Systems.

> Newsmax would like to clarify its coverage of Dr. Coomer and note
> that while Newsmax initially covered claims by President Trump's lawyers,
> supporters and others that Dr. Coomer played a role in manipulating
> Dominion voting machines, Dominion voting software, and the final vote
> counts in the 2020 presidential election, *Newsmax subsequently found no*
> *evidence that such allegations were true*.

> Many of the states whose results were contested by the Trump
> campaign after the November 2020 election have conducted extensive
> recounts and audits, and each of these states certified the results as legal
> and final.

Brendan Cole, *Newsmax Statement in Full as Network Apologizes to Dominion Employee*, Newsweek (April 2, 2021) (emphasis added), https://www.newsweek.com/newsmax-dominion-voter-systems-apology-full-retraction-1588042.

And finally, when pressed in court, the lawyers representing former President Trump have conceded they could not and did not allege there was fraud in connection with the election. *See, e.g., Donald J. Trump for President, Inc.*, 830 F. App'x at 381–82 ("The Trump Presidential Campaign asserts that Pennsylvania's 2020 election was unfair. But as lawyer Rudolph Giuliani stressed, the Campaign "doesn't plead fraud. . . . [T]his is not a fraud case.").

Thus, while reports of fraud or election rigging may have been widely disseminated across the internet, by certain media outlets, and in allegations and affidavits submitted in pleadings from failed lawsuits around the country, Plaintiffs' counsel were (or should have been) on notice before filing the original Complaint, prior to the attempted amendment, and subsequently, that all of these allegations were heavily disputed, that none had been accepted as true or verified by any government agency or court, that independent investigations by reputable news sources had found no evidence to support the allegations, and that many had been comprehensively rebutted by authoritative sources. This should have put Plaintiffs' counsel on high alert about the need to do significant independent due diligence before cutting and pasting from failed lawsuits, or, worse, directly copying into a federal lawsuit the ex-President's Tweets claiming that the election was fraudulently stolen.

### d. The circumstances of this case also include the volatile and potentially dangerous political environment.

In considering the circumstances of this case, the Court must also consider that against the backdrop of the numerous failed lawsuits alleging election illegality was an ominous refusal by the losing candidate or his supporters to concede defeat publicly, even weeks after the election. This refusal was linked arm-in-arm with the repeated and widespread assertions that the election was "rigged" or "stolen." These post-election claims had been foreshadowed by the former President via Twitter many months in advance of the election. *See* William Cummings, Joey Garrison, and Jim Sergent, *By the Numbers: President Donald Trump's Failed Efforts to Overturn the Election*," USA TODAY (Jan. 6. 2021), https://www.usatoday.com/in-depth/news/politics/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/ (recounting former President Trump's tweets, from as early as May 2020, decrying the use of mail-in ballots and declaring "it will be the greatest Rigged Election in history . . . .Trying to use Covid for this scam").

Post-election, the former President and his supporters' claims of the vote being "stolen" or "rigged" resulted in, among other things, serious threats to the safety of both public election officials and private employees of Dominion. *See, e.g.,* Fredreka Schouten and Kelly Mena, *Falsehoods and Death Threats Haunt Local Election Workers Weeks After Capitol Siege*, CNN Politics (Feb. 13. 2021), https://www.cnn.com/2021/02/13/politics/threats-still-haunt-election-officials/index.html ("Around the country, election supervisors and the rank-and-file workers who helped carry out the nuts and bolts of American democracy still are reeling from the barrage of threats and the flood of falsehoods they had to navigate as they helped a record number of people cast ballots in a pandemic."); Brian Snyder, *Trump-Inspired Death*

*Threats Are Terrorizing Election Workers*, Reuters (June 11, 2021), https://
www.reuters.com/investigates/special-report/usa-trump-georgia-threats/ (describing
election officials and their families "living with threats of hanging, firing squads, torture
and bomb blasts" and how the associated campaign of fear is threatening the U.S.
electoral system); Bente Birkeland and Miles Parks, *The Toll of Conspiracy Theories: a
Voting Security Expert Lives in Hiding*, NPR Morning Edition (Dec. 23. 2020), https://
www.npr.org/2020/12/23/948828692/the-toll-of-conspiracy-theories-a-voting-security-
expert-lives-in-hiding (describing how the overseer of Dominion's product strategy and
security now lives in hiding because of threats generated by narratives about the
election); Emily Czachor, *Dominion Voting Systems Employees Threatened, Including
Bounty Placed On One Worker, Amid Election Controversy*, Newsweek (Nov. 25. 2020),
https://www.newsweek.com/dominion-voting-systems-employees-threatened-including-
bounty-placed-one-worker-amid-election-1550270 (stating that Dominion employees
"are facing extensive harassment as unsubstantiated allegations of fraudulent election
activity continue to circulate").

The former President's pre- and post-election statements regarding the
purportedly "stolen" election also raised a substantial doubt about the continuation of
what arguably is the United States' greatest political tradition—the unbroken two-
century ritual of the peaceful transfer of power. *See* Michael Crowley, *Trump Won't
Commit to 'Peaceful' Post-election Transfer of Power*, N.Y. Times (Sept. 23, 2020),
https://www.nytimes.com/2020/09/23/us/politics/trump-power-transfer-2020-
election.html. The peaceful transition of Presidential power has been described as "the
ultimate expression of the rule of law and of a society governed by the law, not by

individual rulers" as well as George Washington's "greatest contribution to the American political tradition." Q&A between Daniel I. Weiner and Tim Lau, *Why the Presidential Transition Process Matters*, Brennan Center for Justice (Nov. 13, 2020), https://www.brennancenter.org/our-work/research-reports/why-presidential-transition-process-matters.

Horrifyingly, that two-century tradition arguably came to an end on January 6, 2021, when the United States Capitol was stormed during a violent attack against the United States Congress, with a mob attempting to overturn President Trump's defeat by disrupting the joint session of Congress assembled to formalize Joe Biden's victory. The Capitol complex was locked down and lawmakers and staff were evacuated while rioters occupied and vandalized the building for several hours. People died. "This was a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021) ("It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy . . . .").

Given the volatile political atmosphere and highly disputed contentions surrounding the election both before and after January 6, 2021, circumstances mandated that Plaintiffs' counsel perform heightened due diligence, research, and investigation before repeating in publicly filed documents the inflammatory, indisputably damaging, and potentially violence-provoking assertions about the election having been rigged or stolen. *See* Proposed Amended Compl., filed March 15, 2021, five weeks after

the assault on the Capitol, Dkt. #48-1 at 74, ¶ 579 (repeating former President Trump's November 12, 2020 Tweet stating: "DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE. DATA ANALYSIS FINDS 221,000 PENNSYLVANIA VOTES SWITCHED FROM PRESIDENT TRUMP TO BIDEN. 941,000 TRUMP VOTES DELETED. STATES USING DOMINION VOTING SYSTEMS SWITCHED 435,000 VOTES FROM TRUMP TO BIDEN.") (capitalization in original).

Even today, the judges of the District of Columbia, who are presently making detention decisions about alleged insurrectionists, are keeping people in jail precisely because of the continued propagation of evidence-lacking allegations of election fraud that spawned the insurrection to begin with. *See United States v. Meredith*, Crim. No. 21-0159 (SBJ), Dkt. #41 at 24 (D.D.C. May 26, 2021) (detaining defendant and listing as one basis for decision that "[t]he steady drumbeat that inspired defendant to take up arms has not faded away; six months later, the canard that the election was stolen is being repeated daily on major news outlets and from the corridors of power in state and federal government, not to mention the near-daily fulminations of the former President."); *United States v. Whitton,* No. 21-cr-35-5, 2021 WL 1546931, at *12 (D.D.C. Apr. 20, 2021) (detaining defendant in part because "the Court is not convinced that dissatisfaction and concern about the legitimacy of the election results has dissipated for all Americans" and citing former President Trump's "forceful public comments about the 'stolen election,' chastising individuals who did not reject the supposedly illegitimate results that put the current administration in place"); *United States v. Dresch*, Crim. No. 21-0071 (ABJ), 2021 WL 2453166, at *8 (D.D.C. May 27, 2021) (detaining defendant in part "given that his singular source of information, [former President Trump], continues

to propagate the lie that inspired the attack on a near daily basis. And the anger surrounding the false accusation continues to be stoked by multiple media outlets as well as the state and federal party leaders who are intent on censuring those who dare to challenge the former President's version of events") (citation omitted).

As described below, under these circumstances, Plaintiffs' counsel's investigation was deficient and not reasonable.

### 10.  Plaintiffs' Counsel must be Sanctioned for Filing this Lawsuit.

I conclude Plaintiffs' counsel should be sanctioned for filing this lawsuit and should be ordered to pay Defendants' attorneys' fees incurred for filing the motions to dismiss and having to oppose the attempted amendment. These fees should include defense counsel's fees for arguing the respective motions to dismiss and to amend. I understand that sanctions are to be rarely imposed, and that the improper or excessive use of sanctions could deter creative lawyers from filing cases reasonably arguing for extensions or modifications of existing law. But this is not such a suit.

This lawsuit was filed with a woeful lack of investigation into the law and (under the circumstances) the facts. The lawsuit put into or repeated into the public record highly inflammatory and damaging allegations that could have put individuals' safety in danger. Doing so without a valid legal basis or serious independent personal investigation into the facts was the height of recklessness.

**a.  Sanctions are Merited for Making Objectively Frivolous Legal Claims.**

**i.  The was no good faith basis for asserting that Plaintiffs had standing to sue.**

I find that Plaintiffs' counsel violated Rule 11 with respect to the legal basis for this lawsuit because there was no good faith basis for believing or asserting that Plaintiffs had standing to bring the claims they did. As described above and in my order of dismissal, binding Supreme Court authority (*Lance v. Coffman*) assured that this lawsuit was destined for failure from the beginning. Plaintiffs tried to bring the lawsuit on behalf of all registered voters for harm allegedly suffered by all registered voters because of supposedly illegal conduct during the election. There was no individual particularized harm alleged. Such a lawsuit was precluded from the beginning on standing grounds and Plaintiffs should have known it, based not only on Supreme Court precedent, but also because of the "tsunami" of other similar 2020 Presidential election challenges rejected for the same reason.

When confronted with motions to dismiss on this basis, Plaintiffs' efforts to distinguish between this case and the other dismissed lawsuits were either self-contradictory (claiming that this suit is brought against private entities and not government entities) or nonsensical and precluded by Supreme Court caselaw (suggestion that seeking money damages rather than an injunction as a remedy makes Plaintiffs' claimed injury sufficiently particularized to form a basis for standing).

This case never should have been filed because Plaintiffs never had a justiciable injury. I find that this case fits precisely within the Tenth Circuit's precedent in awarding sanctions. *See Collins*, 916 F.3d at 1320 (affirming sanctions award where plaintiffs' attorney had sued without any "objectively reasonable basis for asserting standing to sue," and when confronted with binding authorities, plaintiffs "unreasonably attempted to distinguish themselves from the plaintiffs" in those other binding cases). *See also Roth*

*v. Green*, 466 F.3d 1179, 1188–90 (10th Cir. 2006) (holding that district court did not

abuse its discretion when finding that plaintiffs' attorney violated Rule 11 because there

were "a host of legal impediments to [plaintiffs] prevailing on their claims," including that

"the majority of the defendants had, at best, only tangential relationships to" plaintiffs'

claims and plaintiffs' counsel ignored controlling precedent).

I come to this conclusion with respect to all Defendants who are seeking

sanctions. I find that sanctions should be awarded under Rule 11, 18 U.S.C. § 1927,

and the Court's inherent authority. As detailed more specifically below, I do find bad

faith with respect to the filing. No reasonable attorney would have believed Plaintiffs, as

registered voters and nothing more, had standing to bring this suit.

### ii. There was no good faith basis for asserting personal jurisdiction over the State Official Defendants.

An award of sanctions is also justified based on the frivolous and bad faith effort

to assert personal jurisdiction over the state officials from Michigan, Pennsylvania,

Georgia, and Wisconsin. As Plaintiffs' counsel admitted at oral argument, he could cite

no case in United States legal history where a state governor or secretary of state has

had to answer in some other state for official actions taken in their own state. None of

the allegedly illegal conduct of which Plaintiffs complain in Michigan or Pennsylvania (or

Wisconsin or Georgia) was directed at Colorado. It would have been a violation of the

individual state officeholders' rights to due process to make them come to answer

charges in Colorado.

Plaintiffs' counsel do not even try to make an argument justifying personal

jurisdiction over the Michigan or Pennsylvania Defendants. They admitted as much

when they finally dismissed the State Official Defendants after supposedly "researching"

the issue. Any research should have been done before filing the lawsuit, and not after putting the states through the cost of filing motions to dismiss and oppositions to the proposed Amended Complaint. Rule 11 required it. Not that any research should have been required to figure out what is obvious—a federal court in Colorado would not have personal jurisdiction over claims against other states' governors and secretaries of state for actions taken in those other states with respect to the administration of those states' elections. Bringing claims in Colorado against the Michigan and Pennsylvania (and Georgia and Wisconsin) state officials was highly improper.

> **b. The scope of Plaintiffs' counsel's inquiry into the alleged facts of this case was not reasonable under the circumstances and justifies the imposition of sanctions.**

The Court need not draw conclusions about the truth of the factual allegations in the Complaint and Amended Complaint to impose sanctions based on inadequate inquiry. At the July 16 oral argument on the motion for sanctions, I questioned all parties about my ability to draw definitive conclusions about the validity, or conversely, the frivolousness, of Plaintiffs' factual allegations of a RICO conspiracy and widespread election fraud. As Plaintiffs' counsel pointed out, in this case there has been no evidentiary hearing on the substance of the allegations and no witnesses have testified. So, as incredible as some of Plaintiffs' allegations may be (including Mr. Fielder's assertions at oral argument that China and Italy were involved in manipulating the Dominion machines' results (*see* July 16, 2021 Hr'g Tr. 29:4–6, Dkt. #133)), it would be difficult to make any definitive factual findings about the ultimate truth or falsity of Plaintiffs' claims.

Nevertheless, in assessing whether to award sanctions, I *am* entitled to assess and make findings about the scope and reasonableness of Plaintiffs' counsel's inquiry and investigation to determine whether it was proper, under the circumstances, for a lawyer to have ever made the allegations in a public court filing in the first place. *See Garr*, 22 F.3d at 1281 (explaining that sanctions against the lawyers there were not predicated on the conclusion that the complaint was unmeritorious, but the "Rule 11 problem [was] that neither [attorney] made a reasonable inquiry as required by Rule 11 before signing the Complaint").

Rule 11 requires the attorney personally to certify after an "inquiry reasonable under the circumstances" that the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation. Fed. R. Civ. P 11(b)(3). This requires an attorney, before so certifying, to investigate to determine whether the allegations in a complaint are well-grounded in fact. It is not a responsibility that can be delegated.

Plaintiffs do make extensive citation in their Complaint and proposed Amended Complaint to multiple sources and reports suggesting or concluding that there was fraud in the 2020 Presidential election. These include citations to allegations in other lawsuits, plus affidavits and "reports" prepared by third parties submitted in those other lawsuits. In oral argument, Plaintiffs' counsel defended the repetition of those allegations, saying some of them were made under oath and were filed by members of the bar. Referencing, among others, the owner of the MyPillow company, Mike Lindell, Mr. Fielder argued that these are "serious people" who are "all committed to disclosing the truth." July 16, 2021 Hr'g Tr. 29:4–20, Dkt. #133.

Yet, as cited above, there was substantial public evidence that these were not serious people,[6] and the numerous courts' rejection of the lawyers' arguments and factual claims should have put Plaintiffs' counsel on notice to be very cautious before repeating these damaging allegations via a massive cut-and-paste job, without additional strenuous verification efforts.

Plaintiffs' counsel should have spoken to some of the other lawyers whose complaints they were copying into this lawsuit. Plaintiffs' counsel should have confronted the authors of those failed lawsuits with evidence and public information that seemed to refute their claims to test their legitimacy. They should have done the same with the expert's whose affidavits or reports they were citing.

Instead, Plaintiffs' counsel spoke to no one.

Indeed, at oral argument Mr. Fielder was quick to say that he did not know Sidney Powell and had never spoken to her or attorney L. Lin Wood. *See* July 16, 2021 Hr'g Tr. 11:19-22, Dkt. #133. And yet Mr. Fielder and Mr. Walker cited in their own Complaint allegations from lawsuits those two attorneys had filed. *See* Dkt. #1 at 38, ¶ 201 n.43 (citing the L. Lin Wood Georgia complaint); *id.*, ¶ 203 (recounting allegations from Sidney Powell's complaint in *Pearson*). At the very least, Plaintiffs' counsel could have reached out to try to verify the credibility of the sources for those allegations.

---

[6] *See* Bill Keveney, *Newsmax Anchor Walks Off Set After Failing to Stop Mypillow CEO's False Rigged-Election Rant*, USA TODAY (Feb. 2, 2021), https://www.usatoday.com/story/entertainment/tv/2021/02/02/newsmax-anchor-walks-out-after-my-pillow-ceo-mike-lindell-rant/4363781001/ (explaining that Lindell had had his personal and corporate Twitter accounts suspended for violating a disinformation standard and was "shut down" when a Newsmax anchor walked off the set after repeatedly trying to stop Lindell "as he perpetuated election falsehoods" on air).

Similarly, Mr. Fielder and Mr. Walker could have spent some of the $95,000 they raised from the public to fund this litigation on an expert or three to assess and verify the truth of the information contained in the materials from other lawsuits which were copied into this Complaint. Rather than hiring an expert pre-filing, they spoke to no one. Mr. Fielder says he did send out some inquiring e-mails to experts who had filed affidavits in other cases but got no response. *See* July 16, 2021 Hr'g Tr. 10:19–21, Dkt. #133 ("And, no, I didn't speak to any of the experts, but I reached out and I tried to email people and get a hold of them. But no one ever really responded.").

It appears that Plaintiffs' counsel's process for formulating the factual allegations in this lawsuit was to compile all the allegations from all the lawsuits and media reports relating to alleged election fraud (and only the ones asserting fraud, not the ones refuting fraud), put it in one massive complaint, then file it and 'see what happens.' In Mr. Fielder's words,

> I was just amassing all of this data, and it all seemed to be connected. I was just connecting dots, and I put it in the complaint to establish what I was looking at. I wasn't trying to hide anything. I put it in there. But then I put in another report, and another report, and another report.

*Id.,* 31:1–7.

Material, including affidavits, from other lawsuits was accepted at face value, with no apparent critical assessment. *See id.*, 30:22–25 (Mr. Fielder admitting he took affidavits filed in other cases "a little bit at face value because I did include it in the complaint"). Mr. Fielder says he watched videos and listened to talk show interviews with some of the experts involved. He also says relied on his own many years' experience as a lawyer to "connect the dots." There is no evidence that Mr. Fielder or Mr. Walker have any experience or training in running elections or assessing the validity

of elections. And yet, these lawyers were apparently relying in part on their own personal assessments of what happened on election night as support for the lawsuit's claims. *See id.*, 11:10–18 ("And there did appear to be some factual anomalies that had even happened on the night and the morning of the election as I watched it myself. And, you know, the swing states of Georgia, Pennsylvania, Michigan, Wisconsin, they all seemed to stop counting at the same time. And a lot of the expert witnesses were talking about anomalies which took place in those early morning hours during which this counting was allegedly stopped, and that caused concern.").

Asked why they included the unverified and hotly disputed allegation from former President Trump's Tweet about "Dominion deleting 2.7 million trump votes nationwide." *see* Dkt. #1 at 49, ¶ 248, Mr. Fielder's only justification was that the source was the "President of the United States." *See* July 16, 2021 Hr'g Tr. 31:8–16, Dkt. #133. This allegation was included again in the proposed Amended Complaint, which was filed five weeks after the January 6, 2021 Capitol riot. *See* Dkt. #48-1 at 74, ¶ 579. Under the circumstances of this case, with this election, with this insurrection, with the on-going threats to election officials and company employees, including in a federal filing as if it were true such an inflammatory and damaging allegation, without any attempt at verification, merely because the out-going President had said it, was reckless and did not represent a reasonable inquiry under the circumstances.

Given the volatile post-election environment—where pressing ahead with serious allegations could be damaging both to the State Official Defendants and to the defendant corporations, and potentially subject state officials or company employees and executives to more harassment or even violence—the required degree of due

diligence and pre-filing investigation was heightened. Couple the seriousness of the allegations against the individual and corporate defendants with the broader allegations that the entire mechanism of American democracy was "rigged," and that the certification of the recently inaugurated President's election was invalid (or in the words of the Complaint "void *ab initio*"), then the reasonable inquiry requirement becomes even more stringent. *See Wis. Voters All.*, 2021 WL 686359, at *2 ("When any counsel seeks to target processes at the heart of our democracy, [one] may well conclude that they are required to act with far more diligence and good faith than existed here.").

And, as Plaintiffs' counsel have said, this was primarily a damages case, rather than a case primarily seeking an injunction to stop or reverse the election. As such, there was no time pressure at all and no concern about the running of the statute of limitations. There was nothing to prevent Plaintiffs' counsel from waiting some months to learn the results of the various government inquiries and hand recounts before filing. Similarly, rather than just cutting and pasting from pleadings or affidavits in other cases, there was nothing to prevent Plaintiffs' counsel from actually contacting the lawyers involved, or the experts whose affidavits had been submitted in failed lawsuits, to personally learn the bases for their opinions and confront them with the contrary evidence that was readily available from public sources. *See Garr,* 22 F.3d at 1280 (pointing out that the sanctioned lawyers advanced no reason why the lawsuit needed to be filed so quickly without proper investigation, there being no need for emergency relief or fear the defendants might have evaded process).

But Plaintiffs' counsel did none of this. Both Mr. Fielder and Mr. Walker admitted that they spoke to no other lawyers or experts involved in the many other cases (and

from which they had copied pleadings).  In short, Plaintiffs' counsel in this case did precious little to ensure that they were not part of a immense malignant feedback loop, echoing and repeating election-rigging conspiracy theories from the internet and from other failed lawsuits without any meaningful effort at verification.

Mr. Fielder and Mr. Walker apparently spent much of their time signing up new clients and verifying the truth of *their* affidavits attesting to their distress at the perceived unfairness of the election process. That was a pointless exercise. Affidavits from one hundred fifty new plaintiffs who lacked personal knowledge of any election fraud or conspiracy between Defendants, and who suffered no particularized injury, added nothing to the lawsuit. Mr. Fielder was not relying on his clients for any substantive information or evidence about the allegations in the case. And, as Mr. Fielder has admitted on his website, http://dominionclassaction.com, and repeated at the sanctions hearing, this lawsuit was his creation and his idea.

It is true that a signer's obligation "personally to comply with the requirements of Rule 11 clearly does not preclude the signer from any reliance on information from other persons." *Garr*, 22 F.3d at 1278. And it is sometimes "difficult to reconcile the tension between the requirement that a signer personally discharge the Rule 11 obligations and the acknowledgement that a signer may rely on another party's inquiry in some cases." *Id.* at 1279. That is why a court considering sanctions must assess "all the material circumstances in evaluating the signer's conduct." *Id.* at 1278.

The unique circumstances of this case, including the volatile conditions surrounding the 2020 election, the extremely serious and potentially damaging allegations against public servants and private entities, the remarkable request to

declare void and ineffective the certification of the electoral votes of several states,
along with an extraordinary money demand of $160 billion and the lack of any time
pressure, meant that any reasonable pre-filing investigation needed to involve extensive
due diligence and the testing of the allegations, including actually talking to human
beings, such as the lawyers who filed the failed lawsuits and the experts who submitted
affidavits. Under the circumstances of this case, Plaintiffs' counsel did not fulfil this
obligation.

The pre-filing reasonable inquiry requirement is not just some formality. The
license to practice law grants lawyers a privilege to file arguably defamatory documents
in court that, in any other circumstance, could subject the publisher to a libel lawsuit and
a judgment in damages. "An attorney at law is absolutely privileged to publish
defamatory matter concerning another in communications preliminary to a proposed
judicial proceeding, or in the institution of, or during the course and as part of, a judicial
proceeding in which he participates as counsel, if it has some relation to the
proceeding." *Club Valencia Homeowners Ass'n, Inc. v. Valencia Assoc.*, 712 P.2d 1024,
1027 (Colo. App. 1985) (*quoting Larmour v. Campanale*, 96 Cal. App.3d 566 (1979)).
The purpose of the privilege is to afford "litigants the utmost freedom of access to the
courts to preserve and defend their right and to protect attorneys during the course of
their representation of clients." *Id.*

But along with a law license and the associated privilege to make arguably
defamatory allegations in judicial proceedings comes the sworn obligation of every
lawyer, as an officer of the court and under Rule 11, not to abuse that privilege by

making factual allegations without first conducting a reasonable inquiry into the validity of those allegations.

Mr. Fielder's mantra, repeated over and over in argument and in Plaintiffs' briefs, that these are just "averments, that can be admitted or denied," is no rejoinder at all. *See* July 16, 2021 Hr'g Tr. 92:20, Dkt. #133 ("They were averments. You could admit or you could deny them."). Defendants should not have to respond at all to allegations made without reasonable investigation. Rule 11 imposes on lawyers a gatekeeper role, ensuring that potentially defamatory allegations are not made in public filings without an officer of the court having certified that a reasonable inquiry has been made as to their truth. Here, without making the necessary inquiries, Plaintiffs' counsel copied into their Complaint inflammatory and damaging allegations from failed lawsuits and media reports. Plaintiffs' counsel picked only the information, frequently from dubious sources, that supported their conspiracy theory, ignoring contrary available evidence, including statements from courts and non-partisan government agencies. They did not take any independent steps to verify the accuracy of the information by talking to actual human beings. The public statements from authoritative sources and courts rejecting allegations of widespread voter fraud or ballot-rigging should have been, if not bright red, at least flashing yellow lights warning Plaintiffs' counsel to proceed with caution. Instead, they drove through the lights at full speed, even accelerating when it came to the Amended Complaint, which was filed after the January 6, 2021 insurrection that had been prompted, in part, by dangerous suggestions that the election had been stolen.

In the face of all the contrary evidence, and even today not having spoken to any lawyer or expert who might support their claims, both Plaintiffs' counsel say they would file the same complaint again.[7]

### c. I also find Plaintiffs' counsel acted in bad faith and attempted to mislead the Court.

It is difficult to look into the mind of a person and determine his motives—what precisely he was thinking. Nevertheless, in this case, I can conclude that Plaintiffs' counsel acted with objective bad faith in filing this lawsuit and dumping into a public federal court pleading allegations of a RICO conspiracy that were utterly unmerited by any evidence.

I make this finding based on Plaintiffs' counsel's effort to add RICO conspiracy claims to the suit, coupled with extensive citation in their proposed Amended Complaint to a TIME Magazine article by Molly Ball published on February 4, 2021, titled "The Secret History of the Shadow Campaign That Saved the 2020 Election " ("*Secret History*").[8]

With no sense of irony or introspection, in oral argument, in their proposed Amended Complaint, and in their briefs, Plaintiffs' counsel repeatedly cite this article as proof of the RICO conspiracy that they allege involved state officials, Facebook, CTCL, Zuckerberg, and Ms. Chan. *See e.g.,* Proposed Amended Compl., Dkt. #48-1 at 5, ¶¶ 13, 15, & 16 n.10, 11, & 12; Pls. Resp. and Brief in Opp'n to Def. Facebook's Mot. to Dismiss, Dkt. #40 at 3 n.1, 4 n.3; *see also* March 11, 2021 Hr'g Tr. 22:7-9, Dkt. #45 (Mr.

---

[7] Plaintiffs' counsel do say they would not sue the state officials again if they were to refile the suit.

[8] https://time.com/5936036/secret-2020-election-campaign/.

Walker: "And I would just direct everybody to Molly Ball's TIME article if you want to get any kind of sense of what really happened here."). Holding out this article as near definitive proof of the claimed RICO conspiracy, Plaintiffs' counsel even proclaimed, "TIME Magazine doesn't print conspiracy theories, unless they're true." Dkt. #40 at 4.

But I question whether Plaintiffs' counsel actually read or bothered to try to understand the TIME article. Rather than some nefarious plot, the *Secret History* article describes in detail a valiant effort by both left and right-wing groups, labor organizations, businesses, and non-profit organizations to come together both before and after the election "to keep the peace and oppose [President] Trump's assault on democracy." *Secret History* at 2.

In light of Plaintiffs' repeated citation to and extensive reliance on this article in their proposed Amended Complaint and briefs, an extended excerpt is in order:

> The handshake between business and labor was just one component of a vast, cross-partisan campaign to protect the election–an extraordinary shadow effort dedicated not to winning the vote but to ensuring it would be free and fair, credible and uncorrupted. For more than a year, a loosely organized coalition of operatives scrambled to shore up America's institutions as they came under simultaneous attack from a remorseless pandemic and an autocratically inclined President. Though much of this activity took place on the left, it was separate from the Biden campaign and crossed ideological lines, with crucial contributions by nonpartisan and conservative actors. The scenario the shadow campaigners were desperate to stop was not a Trump victory. It was an election so calamitous that no result could be discerned at all, a failure of the central act of democratic self-governance that has been a hallmark of America since its founding.

> Their work touched every aspect of the election. They got states to change voting systems and laws and helped secure hundreds of millions in public and private funding. They fended off voter-suppression lawsuits, recruited armies of poll workers and got millions of people to vote by mail for the first time. They successfully pressured social media companies to take a harder line against disinformation and used data-driven strategies to fight viral smears. They executed national public-awareness campaigns

that helped Americans understand how the vote count would unfold over days or weeks, preventing Trump's conspiracy theories and false claims of victory from getting more traction. After Election Day, they monitored every pressure point to ensure that Trump could not overturn the result.

The untold story of the election is the thousands of people of both parties who accomplished the triumph of American democracy at its very foundation," says Norm Eisen, a prominent lawyer and former Obama Administration official who recruited Republicans and Democrats to the board of the Voter Protection Program.

For Trump and his allies were running their own campaign to spoil the election. The President spent months insisting that mail ballots were a Democratic plot and the election would be "rigged." His henchmen at the state level sought to block their use, while his lawyers brought dozens of spurious suits to make it more difficult to vote–an intensification of the GOP's legacy of suppressive tactics. Before the election, Trump plotted to block a legitimate vote count. And he spent the months following Nov. 3 trying to steal the election he'd lost–with lawsuits and conspiracy theories, pressure on state and local officials, and finally summoning his army of supporters to the Jan. 6 rally that ended in deadly violence at the Capitol.

The democracy campaigners watched with alarm. "Every week, we felt like we were in a struggle to try to pull off this election without the country going through a real dangerous moment of unraveling," says former GOP Representative Zach Wamp, a Trump supporter who helped coordinate a bipartisan election-protection council. "We can look back and say this thing went pretty well, but it was not at all clear in September and October that that was going to be the case."

*Id.* at 3–4.

In other words, on review of the *Secret History* article, not one word is remotely supportive of the existence of an illegal, illegitimate, or unconstitutional effort to rig the 2020 election, which is what the article is cited for in Plaintiffs' proposed Amended Complaint. *See* Dkt. #48-1 at 5, ¶ 13 (citing the Ball article for the allegation that the 2020 Presidential election "was *unconstitutionally* influenced by a well-funded cabal of powerful people") (emphasis added); *id.*, ¶ 14 (citing Ball article for the allegation that an enterprise was established with the intent "to influence a Presidential election").

Plaintiffs' counsel, via their proposed Amended Complaint and the arguments in their briefs, transmogrify what TIME unequivocally describes as a heroic effort to save America's democratic system of government, into a claimed RICO conspiracy, with donations to a non-profit and offers to assist municipalities in securing the election during a pandemic transformed into malicious implements of constitutional destruction. For Plaintiffs' counsel to hold up this article as supporting the existence of an *illegal* RICO conspiracy to rig the election is an affront to the truth and an attempt to mislead the Court.

There is no justification for distorting the contents of the article in pleadings or briefs to the Court. There was no good faith basis for relying on the *Secret History* article to allege a RICO conspiracy to rig the 2020 election. No reasonable lawyer acting in good faith, as an officer of the court, would have drawn that conclusion or made representations to the Court saying the allegations of a conspiracy to rig the election could be supported with citations to an article that which says the exact opposite. *See MAI Photo News Agency, Inc. v. Am. Broadcasting Co., Inc.*, 2001 WL 1800020, at *7 (S.D.N.Y. Feb. 22, 2001) (finding sanctions warranted where one party's briefs "contained purported quotations of portions of defendant's briefs with key words switched around to make the statements support his unfounded position").

### 11. <u>Conclusions</u>

For the reasons stated above, I find the following:

(1)     That this lawsuit was filed in bad faith;

(2)     That Plaintiffs' counsel's legal contention that the Plaintiffs had Article III standing to bring this suit was not warranted by existing law or a nonfrivolous

argument for extending, modifying, or reversing existing law or establishing new law. To the contrary, I find that Plaintiffs' counsel's arguments on the issue of standing frivolous;

(3)     That Plaintiffs' counsel's act of filing a lawsuit in Colorado against state officials from Georgia, Michigan, Pennsylvania, and Wisconsin was not warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law. To the contrary, it was obvious that there was no personal jurisdiction in Colorado over these defendants and suit against these state officials should never have been filed in Colorado;

(4)     That, in light of the unusual and highly volatile circumstances of this case and the surrounding political environment, Plaintiffs' counsel did not conduct a reasonable inquiry into whether the factual contentions had evidentiary support. Without doing any independent confirmation via, for example, the hiring of experts, or speaking to lawyers who had filed other failed lawsuits, they improperly accepted allegations from those suits and from media reports at face value and cut and pasted them into their Complaint and Amended Complaint;

(5)     That because of its inherent legal flaws and the inadequate inquiry into the factual allegations by Plaintiffs' counsel, this lawsuit should never have been filed in the first place or, using the Tenth Circuit's test, no "reasonable attorney admitted to practice before the district court would file such a document." *Predator Int'l, Inc.*, 793 F.3d at 1182 (quoting *Adamson*, 855 F.2d at 673);

(6)     That Plaintiffs' counsel's filing of a motion for leave to amend, without addressing the obvious fatal problems with standing and lack of personal

jurisdiction, while attempting to add RICO claims based on a TIME magazine article that provided no support for such claims, was a violation of 28 U.S.C. § 1927 in that the attempt to amend unreasonably and vexatiously multiplied the proceedings;

(7)     That Plaintiffs' counsel improperly included in a federal complaint highly disputed and inflammatory statements by the former President stating categorically that ""DOMINION DELETED 2.7 MILLION TRUMP VOTES NATIONWIDE" without doing anything to independently verify the truth of that statement;

(8)     That sanctions are merited under Rule 11 (except with respect to Pennsylvania) and 28 U.S.C. § 1927.

(9)     That sanctions are further merited under this Court's inherent authority because of the bad faith nature of the filing of the suit that Plaintiffs' counsel knew or should have known was doomed to failure from the very beginning; and

(10)     That sanctions are required to deter the filing of frivolous, politically motivated lawsuits such as this in the future and to compensate the Defendants for the unnecessary expenditure of private and public money in defense of a frivolous lawsuit filed without reasonable legal basis and without a reasonable inquiry into the facts.

For the foregoing reasons, it is **HEREBY ORDERED** that Plaintiffs' counsel shall jointly and severally pay the moving Defendants' reasonable attorneys for (1) having to

prepare and argue the motions to dismiss, and (2) having to prepare and argue the oppositions to the Motion for Leave to Amend.[9]

To justify an award of attorneys' fees and expenses, the party seeking such an award normally must provide the Court with time and expense records, specifying for each attorney who performed work on the matter, the date, hours expended and the nature of the work performed. Fees and expenses must be both necessary and reasonable.

Accordingly, it is **FURTHER ORDERED** that within 14 days from the date of this Order, the moving Defendants are directed to submit to Plaintiffs' counsel detailed billing records of each lawyer, reflecting the time spent on which tasks, with accompanying hourly rates, so that the Parties may attempt to confer and stipulate to a reasonable figure that would establish an appropriate sanction award for each moving Defendant. If a stipulation can be reached within ten days or receipt of the billing records, the Parties shall inform the Court of the stipulation (or stipulations). If no stipulation can be reached within 10 days after delivery of the billing records to Plaintiffs' counsel, the Parties shall inform the Court and, no later than seven days thereafter, each moving Defendant shall submit to the Court the records and an accompanying brief supporting their fee request (not to exceed seven pages in length). Plaintiffs then will have 14 days to respond.

---

[9] I recognize that Pennsylvania did not seek sanctions under Rule 11, but because of the bad faith nature of the suit from the beginning, and the unnecessary multiplying of the litigation by seeking to amend, sanctions for Pennsylvania under the Court's inherent power and 28 U.S.C. § 1927 nevertheless justify such an award.

The Court will note that the "reasonable" fees for commercial litigators vary wildly across the country. While hourly rates in excess of $1,000 per hour for an experienced litigator may be the going rate in some locations on the coasts, it is not the case in Colorado. The Court will be looking to the Colorado Bar Association <u>Economics of Law Practice Survey</u> for guidance on the reasonableness of the rates requested. The sanction award will not be excessive. The Court will similarly be looking at the number of hours spent to ensure that appropriate tasks were reasonably allocated to lawyers or paralegals at a lower hourly rate, and time was not unnecessarily spent. While Plaintiffs' counsel may well choose to appeal this sanction decision (as is their absolute right), it would be in all Parties' interest to reach an agreement as to the reasonable figure for each moving Defendant.

**SO ORDERED**

N. Reid Neureiter
United States Magistrate Judge

August 3rd, 2021