**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

<table>
<tr><td>Deborah S. Hunt<br>Clerk</td><td>100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988</td><td>Tel. (513) 564-7000<br>www.ca6.uscourts.gov</td></tr>
</table>

Filed:  June 23, 2023

Mr. David H. Fink
Mr. Nathan Joshua Fink
Fink Bressack
38500 Woodward Avenue
Suite 350
Bloomfield Hills, MI 48304

Mr. Timothy E. Galligan
39 S. Main Street, Suite 24
Clarkston, MI 48346

Mr. Erik A. Grill
Ms. Heather S. Meingast
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48909

Ms. Stefanie Lynn Junttila
Federal Criminal Attorneys of Michigan
500 Griswold Street
Suite 2340
Detroit, MI 48301

Mr. Howard Kleinhendler
Howard Kleinhendler Esquire
369 Lexington Avenue
12th Floor
New York, NY 10017

Mr. T. Russell Nobile
Judicial Watch
P.O. Box 6592
Gulfport, MS 39506

Mr. Paul Joseph Orfanedes
Judicial Watch
425 Third Street, S.W.
Suite 800
Washington, DC 20024

Ms. Sidney Powell
Sidney Powell
2911 Turtle Creek Boulevard
Suite # 300
Dallas, TX 75219

Mr. Paul J. Stablein
Law Office of Paul Stablein
33 Bloomfield Hills Parkway
Suite 242
Birmingham, MI 48009

Re:     Case Nos. 21-1785/21-1786/21-1787/22-1010, *Timothy King v. Gretchen Whitmer, et al*
        Originating Case No. : 2:20-cv-13134

Dear Counsel,

The court today announced its decision in the above-styled cases.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TIMOTHY KING, et al.,

  *Plaintiffs,*

L. LIN WOOD (21-1785); GREGORY J. ROHL, BRANDON JOHNSON, HOWARD KLEINHENDLER, SIDNEY POWELL, JULIA HALLER, and SCOTT HAGERSTROM (21-1786); EMILY NEWMAN (21-1787); STEFANIE LYNN JUNTTILA (22-1010),

  *Interested Parties-Appellants,*

  *v.*

GRETCHEN WHITMER; JOCELYN BENSON; CITY OF DETROIT, MICHIGAN,

  *Defendants-Appellees.*

Nos. 21-1785/1786/1787/22-1010

———————————

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-13134—Linda V. Parker, District Judge.

Argued:  December 8, 2022

Decided and Filed:  June 23, 2023

Before:  BOGGS, KETHLEDGE, and WHITE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:**  Paul J. Stablein, PAUL STABLEIN, PLLC, Birmingham, Michigan, for Appellant in 21-1785.  Sidney Powell, Dallas, Texas, in propriā personā and for Appellants in 21-1786. Timothy E. Galligan, TIMOTHY E. GALLIGAN PLLC, Clarkston, Michigan, for Appellant in 21-1787.  Stefanie Lynn Junttila, FEDERAL CRIMINAL ATTORNEYS OF MICHIGAN, Detroit, Michigan, in propriā personā, in 22-1010.  David H. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellee City of Detroit. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Gretchen

Whitmer and Jocelyn Benson in appeals 21-1786 and 22-1010. **ON BRIEF:** Paul J. Stablein, PAUL STABLEIN, PLLC, Birmingham, Michigan, for Appellant in 21-1785. Sidney Powell, SIDNEY POWELL, PC, Dallas, Texas and Howard Kleinhendler, HOWARD KLEINHENDLER ESQUIRE, New York, New York, in propriīs personīs and for Appellants in 21-1786. Timothy E. Galligan, TIMOTHY E. GALLIGAN PLLC, Clarkston, Michigan, for Appellant in 21-1787. Stefanie Lynn Junttila, FEDERAL CRIMINAL ATTORNEYS OF MICHIGAN, Detroit, Michigan, in propriā personā, in 22-1010. David H. Fink, Nathan J. Fink, FINK BRESSACK, Bloomfield Hills, Michigan, for Appellee City of Detroit. Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees Gretchen Whitmer and Jocelyn Benson in appeals 21-1786 and 22-1010. Paul Orfanedes, JUDICIAL WATCH, INC., Washington, D.C., for Amicus Curiae in appeal 21-1786.

_____

## OPINION

_____

KETHLEDGE, Circuit Judge. Three voters and three Republican nominees to the electoral college in Michigan brought this suit in a bid to overturn the results of the state's 2020 presidential election. The complaint plausibly alleged that Republican election challengers had been harassed and mistreated during vote counting at the TCF Center in Detroit, in violation of Michigan law. But the complaint also alleged that an international "collaboration"—with origins in Venezuela, extending to China and Iran, and including state actors in Michigan itself—had succeeded in generating hundreds of thousands of fraudulent votes in Michigan, thereby swinging the state's electoral votes to Joseph Biden. Many of those allegations—particularly the ones concerning Dominion voting machines—were refuted by the plaintiffs' own exhibits to their complaint. Other allegations arose from facially unreliable expert reports; still others were simply baseless. The district court found the entirety of the plaintiffs' complaint sanctionable, and ordered all of plaintiffs' attorneys, jointly and severally, to pay the defendants' and the City of Detroit's reasonable attorney's fees. We find only part of the complaint sanctionable, and thus reverse in part and affirm in part.

## I.

### A.

On November 3, 2020, Michigan voters cast their ballots in the presidential election.  As soon as the polls closed, teams of state election officials began "canvassing" the results—a public process in which officials and observers verify that the number of votes cast in each precinct matches the number of voters listed on the poll lists.  *See* M.C.L § 168.801.  This canvass concluded on November 17.  By the next day, every county in Michigan had reported its official election results to the Secretary of State and the Board of State Canvassers.

Michigan law allows any candidate with a "good-faith belief" that he lost the election due to "fraud or mistake" to request a recount within 48 hours of the canvass's conclusion.  *See* M.C.L § 168.879(1)(b), (c).  No candidate did so.  As a result, on November 23, the bipartisan Board of State Canvassers unanimously certified results indicating that Joseph Biden had won the State of Michigan by 154,188 votes.  That same day, Michigan's Governor transmitted those results to the United States Archivist.  Michigan's electors for the Democratic Party were thereafter "considered elected."  M.C.L § 168.42.  That ended the involvement of the Board and the Governor in the election.

### B.

This case began two days later, on November 25, 2020.  Plaintiffs sued Governor Gretchen Whitmer, Secretary of State Jocelyn Benson, and the Board of State Canvassers (together, the "state defendants"), asserting that they had "fraudulently manipulat[ed] the vote" through "a wide-ranging interstate—and international—collaboration" to ensure that Biden would win the election.  Compl. ¶1-3.  Plaintiffs alleged that unspecified "foreign adversaries" and "hostile foreign governments" had accessed Dominion voting machines; that Detroit election officials had participated in countless violations of state election law, including an "illegal vote dump" of "tens of thousands" of votes; and that expert analysis showed that the election results were fraudulent.  Compl. ¶84, 162, 224.  As a result, plaintiffs argued, they were entitled to "the elimination of the mail ballots from counting in the 2020 election"—meaning all of them—and an order directing "the electors of the State of Michigan . . . to vote for President Donald

Trump." Compl. ¶229-233. Sidney Powell, Scott Hagerstrom, and Gregory Rohl signed this complaint as the plaintiffs' attorneys, and five other lawyers—Emily Newman, Julia Haller, Brandon Johnson, Lin Wood, and Howard Kleinhendler—were listed as "Of Counsel."

On November 29, plaintiffs filed an emergency motion for injunctive relief, which repeated the arguments and requests of the complaint. The Democratic National Committee, the City of Detroit, and Robert Davis (an individual voter with no particular stake in the matter) each filed motions to intervene as defendants, which the court granted. On December 7, the court denied plaintiffs' motion for emergency relief. *King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020).

Plaintiffs thereafter hired a ninth attorney, Stephanie Junttila, to file an appeal with this court. Meanwhile, Michigan's electors were set to vote on December 14. Junttila and Powell filed a petition for certiorari with the Supreme Court, urging immediate intervention—because, they said, the case would become moot after the December 14 electoral-college vote. But the Supreme Court did not intervene, and on December 14 Michigan's electors cast their votes for Joseph Biden.

C.

On December 15, the City served plaintiffs and their attorneys with a "safe-harbor" letter, warning that the City would seek sanctions under Civil Rule 11 if plaintiffs did not voluntarily dismiss their complaint. Plaintiffs' counsel did not respond. On December 22, the state defendants e-mailed plaintiffs' counsel to seek their concurrence in upcoming motions to dismiss; Junttila responded and declined. That same day, the City, the DNC, and the state defendants filed separate motions to dismiss, and intervenor Davis filed a motion to sanction plaintiffs' counsel under 28 U.S.C. § 1927 and the court's inherent authority.

On January 5, 2021—three weeks after sending the safe-harbor letter without any response—the City moved for Rule 11 sanctions against plaintiffs and their attorneys, asking the court to impose a fine, to require plaintiffs' counsel to pay defendants' attorney's fees, and to refer them to their respective state bar associations for disciplinary proceedings. The state defendants joined the City's motion in full. On January 11 and 12, plaintiffs filed motions to

extend the time to respond to the pending motions to dismiss; the court extended that time until January 21. On January 14, however, plaintiffs filed a response announcing that they would voluntarily dismiss the complaint. The state defendants thereafter filed a separate motion for sanctions under 28 U.S.C. § 1927 against Powell, Junttila, Rohl, and Hagerstrom.

In July 2021, the district court held a lengthy hearing on the sanctions motions, during which it questioned plaintiffs' attorneys about the suit. Lin Wood said that, before he heard about the sanctions hearing, he had no idea his name had been on any filings in the suit. But he admitted he had offered to help Powell with the lawsuit, and Powell herself said she had "specifically ask[ed]" Wood for his permission before including his name on the filings. Emily Newman and Stephanie Junttila, for their parts, each said their involvement in the case was minimal. The remaining attorneys did not contest their roles in the case. The court also discussed 15 of the plaintiffs' affidavits, to determine whether the attorneys had conducted a prefiling investigation as to the plausibility of their allegations. In response, counsel repeatedly argued that they could rely on affidavits without conducting any inquiry.

The district court thereafter held that plaintiffs' counsel had violated Rule 11 by filing their suit for an improper purpose and by failing to conduct an adequate prefiling inquiry into the legal and factual merits of their claims. The court further found that counsel had needlessly prolonged the proceedings, in violation of 28 U.S.C. § 1927, and that counsel had acted in bad faith, warranting sanctions under the court's inherent authority. The court therefore ordered all nine of plaintiffs' attorneys, jointly and severally, to pay the reasonable legal fees of the City and the moving state defendants. The court also ordered those attorneys to attend 12 hours of non-partisan legal education on election law and federal pleading standards, and directed the clerk to send disciplinary referrals to counsel's respective bar associations—which the clerk did the next day. The court denied Davis's motion for sanctions and declined to impose sanctions on plaintiffs themselves.

In a separate order, the court considered objections to the amount of the City's request. (No attorney had objected to the moving state defendants' request of $21,964.75.) Of the $182,192 the City requested, the court awarded $153,285.62.

These four appeals followed.  Lin Wood, Emily Newman, and Stephanie Junttila each appeal individually, arguing that their involvement in this case was too minimal to warrant sanctions.  Gregory Rohl, Brandon Johnson, Howard Kleinhendler, Sidney Powell, Julia Haller, and Scott Hagerstrom appeal together, arguing primarily that none of their conduct was sanctionable.

## II.

We review the district court's imposition of sanctions for an abuse of discretion and its factual findings for clear error.  *Salkil v. Mount Sterling Twp. Police Dept.*, 458 F.3d 520, 527 (6th Cir. 2006); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991).

## A.

We begin with Rule 11, which in the district court's view authorized almost all the sanctions awarded here.  That rule provides, in relevant part, that attorneys who present a pleading or motion to the court thereby certify that:

> to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) [the pleading, written motion, or other paper] is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(1)-(3).

### 1.

As an initial matter, the district court held that the attorneys filed their suit for an improper purpose, in violation of Rule 11(b)(1).  Specifically, the court asserted that "what very clearly reflects bad faith is that Plaintiffs' attorneys are trying to use the judicial process to frame

a public 'narrative.'"  But another word for "framing a public narrative" is speech; and Rule 11 cannot proscribe conduct protected by the First Amendment.  True, an attorney may not say whatever she likes inside a courtroom.  *See Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005).  But an attorney's political speech outside a courtroom—including political speech about a lawsuit—is irrelevant to a Rule 11 inquiry about the suit itself.  To the contrary, parties and their attorneys are free to use litigation "as a vehicle for effective political expression and association[.]"  *In re Primus*, 436 U.S. 412, 431 (1978).  That is as true in election cases as in any other case.

Speech outside the courtroom is what the district court apparently found objectionable here.  But that speech did not show that counsel were "motivated by improper purposes such as harassment or delay," which means it was irrelevant to the district court's inquiry.  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 519 (6th Cir. 2002).  And contesting election results is not itself an improper purpose for litigation.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000); *Moss v. Bush*, 828 N.E.2d 994 (Ohio 2005); *Coleman v. Ritchie*, 762 N.W.2d 218 (Minn. 2009).  Nor does the record show that counsel were otherwise motivated by improper purposes.  *First Bank*, 307 F.3d at 519.  Thus, the district court did not identify any improper purpose supporting the imposition of sanctions under Rule 11(b)(1).

2.

The district court also sanctioned plaintiffs' counsel under Rule 11(b)(3), which mandates that attorneys engage in a reasonable prefiling inquiry to ensure that a pleading or motion is "well grounded in fact[.]"  *Merritt v. Int'l Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010).  Rule 11 also imposes an implied "duty of candor," which attorneys violate whenever they misrepresent the evidence supporting their claims.  *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009).  Thus, a court may sanction attorneys under Rule 11(b)(3) for factual assertions they know—or after reasonable investigation should have known—are false or wholly unsupported.

The first amended complaint contained 233 numbered paragraphs and over 800 pages of exhibits.  Of the complaint's allegations, 60 are irrelevant for purposes of Rule 11 because they

quoted legal standards or described undisputed facts.  The remaining paragraphs fall into three categories, to wit: allegations about Dominion's voting systems; allegations about statistical anomalies in the election results; and allegations about misconduct by election workers in Detroit.

a.

According to plaintiffs, the election fraud began "with the election software and hardware from Dominion Voting Systems."  Compl. ¶4.  Counsel devoted 61 paragraphs of the complaint to allegations about Dominion.  Those paragraphs make out the following theory: that "foreign oligarchs and dictators" founded Dominion in order to help Hugo Chavez manipulate Venezuelan elections; that Dominion accordingly designed its software to include hidden "ballot-stuffing" features; and that foreign states—along with Michigan's Governor and Secretary of State, apparently—then exploited those features during the 2020 Presidential elections.  Compl. ¶4-12, 125-174.

i.

The complaint said the following about Dominion's origins:

> Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1 Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report").  Notably, Chavez "won" every election thereafter.

Compl. ¶5.  The plaintiffs' sole evidentiary support for these allegations was the so-called "Dominion Whistleblower Report"—allegedly authored by an unnamed "adult of sound mine [*sic*]" who purported to be a former member of Chavez's national guard.  Yet the whistleblower report itself says nothing about Dominion's founding; instead, it describes a conspiracy "between a company known as Smartmatic" and "the Venezuelan government." Smartmatic is not Dominion, just as General Motors is not Ford.  The report otherwise says that Dominion "relies upon software that is a descendant of the Smartmatic Election Management System."  But the complaint's allegation that Dominion was founded as part of a Venezuelan conspiracy to commit

election fraud was entirely baseless. The district court rightly concluded that this whole raft of allegations was sanctionable.

ii.

The complaint also alleged that Dominion's voting systems were easy to hack and impossible to audit. By way of background, according to a journal article that plaintiffs attached to the complaint, modern election-management systems come in three kinds. One is a hand-marked paper-ballot system, in which voters manually complete a blank ballot and then take it to a machine to be scanned and tabulated. Another is a ballot-marking system, in which voters make their selections on a touch screen and receive a printed, marked ballot to take to the scanner. And in an all-in-one system, a single machine marks, scans, and tabulates the ballots without further action by the voter.

The problem with the complaint's allegations regarding Michigan's voting system, simply enough, is that they concerned different kinds of systems than the one Michigan used. As any Michigan voter could have told counsel, Michigan used a hand-marked ballot system— which one of the plaintiff's own exhibits, an article by Dr. Andrew Appel, said is "the only practical technology for contestable, strongly defensible voting systems." That plaintiffs attached Appel's article in support of their criticisms of Michigan's voting system illustrates how little counsel understood about the system they were criticizing. Similarly, the complaint alleged (by way of the Chavista whistleblower) that a "core requirement of the Smartmatic software design ultimately adopted by Dominion for Michigan's elections was the software's ability to hide its manipulation of votes from any audit." Compl. ¶7. But hand-marked ballots obviously can be recounted (and thus audited) by hand. The complaint likewise alleged that "Michigan officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation." Compl. ¶10. We set to one side that the "Texas decision" came after the relevant decision by "Michigan officials." For the Texas decision on its face concerned a ballot-marking system, not the hand-marked system that Michigan used. And Michigan's contract with Dominion, likewise an exhibit, was limited to the hand-marked ballot system.

Plaintiffs' own exhibits thus refuted rather than supported the complaint's allegations about the Dominion system used in Michigan. And an adequate prefiling inquiry under Rule 11 includes reading every document one plans to file. *See, e.g.*, *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1278, 1281 (3d Cir. 1994) (observing that "[w]e are at a total loss to understand how attorneys can urge that they have made a reasonable inquiry into the facts and law of a case when their complaint is predicated on allegedly false statements in documents which they have not bothered to read."). Plaintiffs' inquiry as to these allegations was patently inadequate.

### iii.

Plaintiffs' counsel sought to bolster their theories about Dominion with two putative expert reports. Attorneys are rarely sanctioned for relying upon experts: expert testimony by definition rests on "specialized knowledge[,]" Fed. R. Evid. 702, and consulting an expert is itself a way to investigate a claim's factual plausibility. But there is no Rule 702 exception to Rule 11; an attorney's reliance upon a putative expert opinion must itself meet the standard of reasonableness imposed by Rule 11. That means the expert's opinion must not be unreliable on its face—either because of the expert's lack of qualifications, or the substance of the opinion itself. And the attorney cannot misrepresent what the expert himself actually says.

Here, as to the alleged international conspiracy, the complaint alleged that "Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections." Compl. ¶17. The sole basis for that allegation was the report of what the complaint called a "former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence." Compl. ¶17. But that "intelligence analyst" turned out to be a Dallas IT consultant who dropped out of an entry-level intelligence course after seven months' training. And even a cursory review of his putative report shows that it concerned the integrity of Dominion's public website, not its voting machines. That distinction should not have been hard for counsel to keep straight. And the complaint further misrepresented the report when the complaint alleged that "Dominion allowed foreign adversaries to access data and *intentionally provided access* to their infrastructure" (emphasis added). Compl. ¶161-162. That allegation was utterly baseless.

The attorneys also presented an affidavit from Russell Ramsland to substantiate their suspicion that foreign powers had hacked into Dominion's machines. Ramsland said that his background included "advanced converged telecom, highly advanced semiconductor materials, hospitality, commercial real estate development & operation," as well as running "Europe's highest grossing Tex-Mex restaurant." His specialized knowledge as to foreign election-interference was thus questionable on its face. More to the point, Ramsland claimed that Dominion machines had been "manipulated" in "four precincts/townships" in four Michigan counties (Wayne, Oakland, Macomb, and Kent), which he said resulted in "289,866 illegal votes." Ramsland's theory was that the Dominion machines used in those counties—which he said were "Model DRM16011"—lacked the "processing capacity" to count as many ballots as were counted in the relevant precincts on election night. But Ramsland likewise assumed that those counties used a ballot-marking system nowhere used in Michigan, which showed that he did not know which machines were used in Michigan—meaning that his assumptions about "processing capacity" were baseless. Moreover, a simple internet search would have shown that Macomb and Oakland counties did not use Dominion systems at all.

A reasonable prefiling investigation would have shown counsel that their allegations about Dominion were baseless. Those allegations were therefore sanctionable under Rule 11(b)(3).

b.

i.

In another part of the complaint—covering about 19 paragraphs—counsel relied upon several putative expert reports to allege that Michigan's election results were statistically anomalous or impossible. The complaint alleged that "evidence compiled by Matt Braynard using the National Change Address Database" showed that 13,248 voters who had moved to another state had nonetheless illegally voted in Michigan. Compl. ¶119. But Braynard's opinion came in the form of four tweets, each 280 characters or less, which said nothing about his qualifications or the data he supposedly employed. That opinion was unreliable on its face; counsel violated Rule 11 by relying upon it.

Counsel also relied on a report by Dr. William Briggs, who—according to the complaint—opined that "Approximately 30,000 Michigan Mail-In Ballots Were Lost, and Approximately 30,000 More Were Fraudulently Recorded." *See* Compl. ¶108-112. But Briggs drew that conclusion by taking as true a second Braynard document, the so-called "Braynard Survey." That survey purported to describe Braynard's "multi-state phone survey data of 248 Michigan voters." Suffice it to say that Briggs's statistical extrapolations from that survey— 30,000 lost absentee ballots, and 30,000 fraudulent ones—were facially unreliable as well.

The complaint likewise cited Dr. Stanley Young, who asserted that Biden's gains over Trump among new voters in nine large, metropolitan counties (*e.g.*, Oakland, Washtenaw, Wayne, Kent, Kalamazoo) were "unexpected." According to Young, Biden received 190,000 "excess" votes in those counties because Biden's margin of victory there was 190,000 votes greater than Clinton's margin had been in 2016. Every one of those counties has a large suburban population, which suggests a simpler explanation than an international conspiracy for that shift in votes. And by Young's logic, Trump received an "excess" of 29,000 votes in the rest of Michigan. Still, counsel could have reasonably relied on Young's opinion that this shift was unexpected. What the complaint actually said, however, was that "Dr. Young's analysis indicates that, when the entire State of Michigan is concerned, there were likely over 190,000 'excess' and *likely fraudulent* votes, which once again is significantly larger than Biden's 154,188 margin in Michigan." Compl. ¶118 (emphasis added). An "unexpected" shift in suburban votes in Young's report thus became, in the complaint, 190,000 fraudulent votes that swung the election. That allegation misrepresented Young's report and was sanctionable. *See Rentz*, 556 F.3d at 395.

ii.

Plaintiffs' reliance on four other experts was not sanctionable. First, the complaint accurately stated Dr. Louis Bouchard's conclusion that several spikes in Biden's vote count in Michigan on election night were "statistically impossible." Compl. ¶122. Dr. Bouchard's reasoning was that "the election results" showed "a tight race" in both Florida and Michigan; that Biden's vote total in Florida had no corresponding spike; and thus the spikes in Michigan were

"anomalous." The proposition that Michigan's reporting of vote totals should track Florida's is without support; but Bouchard's technical analysis was not facially unreasonable to a layperson.

Second, Thomas Davis asserted that the share of Democrats who voted by absentee ballot exceeded the share of Republicans who did so by a similar percentage throughout the state— which, in Davis's view, suggested that a computer algorithm had manipulated the vote count. Occam's Razor suggests that Democrats just voted absentee more than Republicans did, but Davis's opinion—that the consistency of this difference across counties was suspicious—was not unreasonable on its face.

Third, Dr. Eric Quinnell and Dr. Young together opined that Michigan's election results were "mathematically anomalous," because, they said, the new voters in several Michigan townships mostly voted for Biden. Their report appears to assume that everyone who voted for Trump in 2016 voted for him again in 2020, that everyone who voted for Clinton in 2016 voted for Biden in 2020, and that Biden then took an outsized share of "new" voters. Although those assumptions might be implausible, we cannot say this opinion was facially unreasonable.

Finally, Robert Wilgus asserted that the number of absentee ballots that voters requested and returned on the same day warranted "further investigation." The Michigan Constitution enables voters to do both of those things on the same day, so Wilgus's assertion that doing so warrants investigation is dubious. *See* Mich. Const. Art II, § 4(h). But his conclusion was tepid enough not to be facially unreasonable.

c.

A third part of the complaint comprised 79 paragraphs of allegations about misconduct at the "TCF Center," which is where "Absentee Voter Counting Boards" counted all of Detroit's absentee ballots.

i.

The complaint's most provocative allegation as to these boards was that they "fraudulently added tens of thousands of new ballots and new voters in the early morning and evening of November 4." Compl. ¶82 (capitalization removed). "Perhaps the most probative

evidence" in support of this allegation, according to the complaint, came from the affidavit of Dominion employee Melissa Carone. Compl. ¶84. She wrote:

> There was two vans that pulled into the garage of the counting room, one on day shift and one on night shift. These vans were apparently bringing food into the building because they only had enough food for not even 1/3 of the workers. I never saw any food coming out of these vans, coincidentally it was announced on the news that Michigan had discovered over 100,000 more ballots—not even two hours after the last van left.

On the basis of this affidavit, the complaint alleged that Carone had "witnessed" an "illegal vote dump, as well as several other violations." Compl. ¶84. That allegation illustrates the complaint's pattern of embellishment to the point of misrepresentation. The only thing that Carone said she witnessed was the arrival of "two vans"—period. Powell and her co-appellants now concede that "Carone made it clear she had seen no ballots." *Reply* at 24. That means it was sanctionable to allege that she did. *Rentz*, 556 F.3d at 395.

Counsel also used two affidavits copied from a state-court case—*Constantino v. Detroit*—to support the "illegal vote dump" theory. The attorneys used the first affidavit, from election challenger Robert Cushman, to allege that "several thousand" ballots had been "fraudulently" counted at TCF. Compl. ¶83. Cushman was apparently a layperson as to election law; and in *Constantino*, Christopher Thomas—who served as Michigan's Director of Elections for over 30 years—submitted a detailed affidavit explaining that none of Cushman's observations suggested any violation of Michigan election law. Plaintiffs' counsel were not required to treat Thomas's affidavit as sacrosanct. But a reasonable prefiling inquiry—before renewing Cushman's allegations of fraud—would have included review of Thomas's explanation and a reasoned assessment as to whether those allegations remained plausible. The record here reveals no such inquiry on counsel's part.

The second affidavit from *Constantino* came from election challenger Andrew Sitto, who wrote in relevant part:

> At approximately 4:30 a.m., tens of thousands of ballots were brought in and placed on eight long tables. Unlike the other ballots, these boxes were brought in from the rear of the room. The same procedure was performed on the ballots that arrived at approximately 4:30 a.m., but I specifically noticed that every ballot I

observed was cast for Joe Biden. While counting these new ballots, I heard counters say at least five or six times that all five or six ballots were for Joe Biden. All ballots sampled that I heard and observed were for Joe Biden.

An attorney could legitimately use an affidavit like Sitto's to begin (rather than end) a line of inquiry regarding potential counting irregularities. But counsel here cited Sitto's affidavit as proof of "[t]he most egregious example of election workers' fraudulent and illegal behavior" at the TCF Center. That too was a gross exaggeration. Sitto did not say that the "tens of thousands of ballots" he saw were fraudulent. Compl. at ¶82. Nor did he say that election workers treated those ballots any differently from any others—to the contrary, he said the counters followed the "same procedure" as before. And though Sitto said that "every ballot" he observed was for Biden, his affidavit implied that he heard only 30 or so of the votes that were counted.

The complaint also cited an affidavit from Articia Bomer, who said she "believe[d]" that some of the counters at TCF "were changing votes that had been cast for Donald Trump and other Republican candidates." The complaint called this "eyewitness testimony of election workers manually changing votes for Trump to votes for Biden[.]" Compl. at ¶91. That too was an embellishment, considering that Bomer offered no basis for her belief.

Considered both individually and collectively, the affidavits cited in the complaint did not afford counsel a credible basis to allege that "tens of thousands" of fraudulent votes were counted at TCF. Those allegations therefore lacked the requisite basis in evidence. Fed. R. Civ. P. 11(b)(3).

ii.

The complaint also alleged various lesser violations of Michigan election law. The problem with those allegations, simply stated, is that counsel apparently did not read the statute they said was violated. For instance, the complaint includes 11 paragraphs of allegations about problems with verification of signatures and birthdates on absentee ballots at the TCF Center. But Michigan law does not require birthdate verification for absentee voters. *See* M.C.L. § 168.765a. Nor do the counting boards verify any signatures for the absentee ballots; instead, by the terms of the same statute, the city clerk's office would have already done that before the

ballots reached the TCF Center.  *See* M.C.L. § 168.765a(6) (absentee ballots delivered to absent-voter counting boards "must be" accompanied by "a statement by the clerk that the signatures of the absent voters on the envelopes have been checked and found to agree with the signatures of the voters on the registration cards").  The complaint did not allege otherwise; its allegations about improper verification at the TCF Center were therefore baseless.

Counsel similarly alleged that voters who had requested absentee ballots later illegally voted in person.  But the same statute specifies that Michigan law "does not prohibit an absent voter from voting in person within the voter's precinct at an election, notwithstanding that the voter may have applied for an absent voter ballot and the ballot may have been mailed or otherwise delivered to the voter."   M.C.L. § 168.765a(7).   And where the complaint did specifically allege double voting—as in paragraph 93—it misrepresented the supporting affidavit, which said only that some people who voted in person "had already *applied* for an absentee ballot."  (Emphasis added).

Of a piece was the complaint's allegation that election challengers had been improperly barred from observing the "ballot-duplication" process (meaning the process by which ballots that cannot be read by a machine are hand-copied onto ballots that can be scanned).  *See* Compl. ¶13, 76-77, 189.  For the same statute says that "at least 1 election *inspector* from each major political party" must witness the duplication.  M.C.L. § 168.765a(10) (emphasis added).  Under Michigan law, "challenger" and "inspector" mean two different things: election challengers are party volunteers with no official training in election procedure, whereas election inspectors are officials appointed by the Board of Election Commissioners.   M.C.L. § 168.765a(2).  The complaint unwittingly used those terms interchangeably; and nowhere does it suggest that anyone barred an election inspector from observing the ballot-duplication process.

The statute at issue here ran three pages; a reasonable prefiling inquiry as to all these allegations would have included reading it.

iii.

The complaint's remaining allegations about election-related events at TCF Center were not sanctionable.  One witness said she had seen an election worker manually correct ballots that

the witness thought should have been discarded as "over-votes"; the complaint fairly repeated that allegation. The same was true as to allegations by two challengers who thought they had seen someone move "spoiled" ballots to a "to be counted" pile. And counsel reasonably relied on the affidavit of one woman who said she had seen a voting record for her late son, purportedly reflecting that, after his death, he had voted in the 2020 election.

The complaint's most credible allegations were that election workers at the TCF Center mistreated, intimidated, and discriminated against Republican election challengers. Indeed some three dozen detailed affidavits supported the complaint's allegations to that effect. Those affidavits were notably consistent in their description of partisan hostility at the TCF Center. For instance, election challenger Abbie Helminen attested that, when the police removed a (presumably Republican) election challenger from the center, "the whole room erupted in claps & cheers, this included the poll workers." She also said that "Democrats outnumbered Republicans by at least 2:1." Similarly, Anna Pennala wrote that she "witnessed a pattern of chaos, intimidation, secrecy, and hostility by the poll workers," and that she saw workers "cheer, jeer, and clap when poll challengers were escorted out." And Emily Steffans wrote that she was "afraid . . . to challenge any ballots" because she "had watched two GOP people escorted out by the police," again to cheers from "democrat volunteers and poll workers at the table."

The intimidation and harassment alleged in these affidavits was potentially criminal. *See* M.C.L. § 168.734 ("Any officer or election board who shall prevent the presence of any such challenger as above provided, or shall refuse or fail to provide such challenger with conveniences for the performance of the duties expected of him, shall, upon conviction, be punished by a fine not exceeding $1,000.00, or by imprisonment in the state prison not exceeding two years"). And the rank partisanship among election workers described in these affidavits undermines public confidence in elections just as much as bogus allegations about voting machines do. The district court should not have dismissed these affiants' allegations out of hand.

### 3.

The district court next held that the entire complaint was independently sanctionable under Rule 11(b)(2). That rule requires attorneys to certify that "the claims, defenses, and other

legal contentions" in their filings "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). Thus, in short, frivolous "legal contentions" are sanctionable under Rule 11(b)(2).

a.

Three of the complaint's legal claims—an equal-protection claim, a due-process claim, and a claim under the Michigan Constitution—relied exclusively on frivolous allegations of widespread voter fraud. That means those claims were already sanctionable in full under Rule 11(b)(3). Thus, we need not consider whether the legal contentions in support of the complaint's voter-fraud claims were sanctionable under Rule 11(b)(2) as well.

b.

The defendants argue that the plaintiffs' remaining claims rested on frivolous legal contentions. A legal contention is frivolous if it is "obviously without merit" under existing law and unsupported by a good-faith argument to change or extend the law. Fed. R. Civ. P. 11(b)(2); *Waldman v. Stone*, 854 F.3d 853, 855 (6th Cir. 2017) (discussing frivolous claims under Appellate Rule 38).

i.

As an initial matter, counsel never should have asserted any claims against the Board of Canvassers in this case. The Board is a state agency; and unless the state waives Eleventh Amendment immunity or Congress abrogates it, state agencies are immune from federal suit. *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017). Here, the state did not waive immunity and Congress did not abrogate it, and plaintiffs have never argued otherwise. Hence the Board was indisputably entitled to sovereign immunity. *Id.* Moreover, the Board had already certified the election results by the time of plaintiffs' suit, and thus lacked power to redress any of plaintiffs' alleged harms. Hence the plaintiffs also lacked standing to sue the Board. *See Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 715-16 (6th Cir. 2015). The legal contentions in support of these claims, therefore, were frivolous. *See Waldman*, 854 F.3d at 855.

ii.

That leaves two federal claims against Governor Whitmer and Secretary Benson and a handful of state claims. The first federal claim was one under 42 U.S.C. § 1983 for alleged violations of the Elections and Electors Clauses of the Constitution. The theory behind that claim, as set forth in the complaint, was that the Governor and the Secretary of State "unilaterally" chose to "deviate from the requirements of the Michigan Election Code." Compl. ¶¶23, 179. That this claim was one of "unilateral" action means it depended on actions specific to the Governor and Secretary themselves. Yet the complaint alleged no such actions, apart from a conclusory allegation in the complaint's introduction (¶3) about "multifaceted schemes and artifices implemented by Defendants and their collaborators[.]" And that allegation itself obviously could not support this claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). This claim was therefore both legally and factually frivolous.

A second § 1983 claim against the Governor and Secretary was one for selective enforcement of election law, in violation of the Fourteenth Amendment's Equal Protection Clause. That claim presents a close question. As explained above, counsel had an evidentiary basis for pleading that Republican challengers were disproportionately excluded from and otherwise discriminated against in the TCF Center. To make out a selective-enforcement claim, counsel would have needed to plead that state actors "intended to accomplish some forbidden aim" through a "truly discriminatory application of a neutral law." *Stemler v. City of Florence*, 126 F.3d 856, 874 (6th Cir. 1996). Although counsel spent only a single paragraph of the complaint on this theory (¶189), that paragraph was a nonfrivolous attempt to state those elements. Counsel also requested injunctive relief targeting the alleged harms. Compl. ¶194. That is not to say the claim would have survived a motion to dismiss. For instance, the complaint did not explain what role, if any, the Governor and Secretary played in the law's discriminatory application. On balance, however, this claim was "meritless rather than frivolous." *See Waldman*, 854 F.3d at 855. Hence it was not sanctionable under Rule 11(b)(2).

The complaint also asserted several state-law claims against the Governor and Secretary. We have already explained that counsel's claims under the absentee-voting statute were sanctionable because the complaint failed to describe any violations of that statute. *See* M.C.L.

§ 168.765(a). Likewise frivolous was the complaint's attempt to state a claim under M.C.L. § 168.734, which merely sets forth certain criminal penalties for mistreatment of election challengers. But the complaint's claim under a neighboring election-challenger provision, M.C.L. § 168.733, was not frivolous. That claim had a factual basis, as described above. Although that provision also does not expressly create a private cause of action, its terms—*e.g.*, "[a] person shall not threaten or intimidate a challenger while performing" some 13 different activities—leave room to argue in good faith that one should be implied under Michigan law. *See Pompey v. Gen. Motors Corp.*, 385 Mich. 537 (1971). This claim was not frivolous.

c.

The defendants argue that even the complaint's nonfrivolous claims were sanctionable because the complaint's requests for relief were frivolous. But parties can tailor those requests as the case proceeds, and the complaint here included a request for any "relief as is just and proper." Compl. ¶233. That means counsel could have filed this lawsuit without any of the requests for relief that defendants say were frivolous. Those requests alone therefore do not render the nonfrivolous legal claims sanctionable. Nor did the district court identify any other ground to support a determination that the entirety of this complaint was frivolous.

Plaintiffs, for their part, defend the inadequacy of their complaint by pointing to the time constraints inherent in election contests. But Rule 11 imposes a safe-harbor period to protect attorneys from sanctions for hasty mistakes. A party may seek sanctions only after providing notice of the alleged violations, which the opposing party then has 21 days to cure. Fed. R. Civ. P. 11(c); *see also* advisory committee's note to 1993 amendment ("[T]he timely withdrawal of a contention will protect a party against a motion for sanctions."). Here, the City sent plaintiffs a detailed letter specifying the allegedly sanctionable material. Plaintiffs could have avoided sanctions by abandoning frivolous claims and allegations and concentrating the attention of the court on what remained. They did not do so, and that is why we uphold much of their Rule 11 sanctions today.

4.

In sum, therefore, the complaint stated two claims that were nonfrivolous: a selective-enforcement claim under 42 U.S.C. § 1983, and a state-law claim under M.C.L. § 168.733. Neither claim was sanctionable under Rule 11. We agree with the district court, however, that plaintiffs' other claims were all sanctionable under that rule.

The same analysis for the most part applies to plaintiffs' motion for a temporary restraining order. But that motion focused exclusively on election fraud and contained only a single sentence on plaintiffs' nonfrivolous allegations about election challengers. With the exception of that sentence and counsel's discussion of their experts, then, the motion relied entirely on allegations that were factually frivolous, and was to that extent sanctionable under Rule 11.

B.

The defendants also argue, and the district court agreed, that counsel are liable for the entirety of the defendants' reasonable attorney's fees after December 14—because the plaintiffs failed to dismiss their case after it had concededly become moot. Under 28 U.S.C. § 1927, courts may award sanctions against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Courts may award sanctions under this section "when an attorney knows or reasonably should know that a claim pursued is frivolous" and yet continues to litigate it. *Waeschle v. Dragovic*, 687 F.3d 292, 296 (6th Cir. 2012).

Here, plaintiffs themselves asserted in a petition to the Supreme Court that this case would become moot on December 14, 2020—the date Michigan's certified electors would cast their votes. Yet on December 15—when defendants sought plaintiffs' consent to a voluntary dismissal—counsel declined on the ground that the district court lacked jurisdiction to dismiss the case while it was on appeal. That excuse was makeweight: plaintiffs obviously could have voluntarily dismissed their appeal and complaint alike. Hence they unreasonably multiplied the proceedings by declining to dismiss their suit. *See Lemaster v. United States*, 891 F.2d 115, 118 (6th Cir. 1989).

The sanctioned attorneys now argue that the case gained "new life" when "an alternative slate of electors for Michigan was advanced in early January." That formulation is passive for a reason: what actually occurred in January is that the "alternative slate of electors" purported to elect themselves for the purpose of casting Michigan's electoral votes. And counsel do not explain why any competent attorney would take that self-election seriously for purposes of persisting in this lawsuit. Moreover, plaintiff's refusal to dismiss their suit had concrete consequences for defendants, who were forced to research and brief motions to dismiss that they should not have needed to file. The district court was right to impose sanctions under § 1927.

Finally, as noted above, the district court also invoked its inherent authority as an alternative basis for sanctions. But we need not review the court's exercise of that authority here. Unlike Rule 11, inherent-authority sanctions require a showing of bad faith in addition to frivolousness. *See Big Yank Corp. v. Lib. Mut. Fire Ins. Co.*, 125 F.3d 308, 314 (6th Cir. 1997). The court's inherent authority therefore does not support sanctions for the matters we have found non-sanctionable; and as to the sanctionable ones, Rule 11 and § 1927 sufficed.

## C.

### 1.

Some of the attorneys argue they were not responsible for the sanctionable filings in this case. Upon finding a violation of Rule 11, the court may sanction any attorney who "violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c). An attorney violates the rule directly by "presenting" an offending pleading to the court, such as "by signing, filing, submitting, or later advocating it." Fed. R. Civ. P. 11(b).

Separately, under 28 U.S.C. § 1927, the court may impose sanctions on attorneys whose conduct "falls short of the obligations owed by a member of the bar to the court." *Salkil*, 458 F.3d at 532. Here, the attorneys who appealed individually—Emily Newman, Stephanie Junttila, and Lin Wood, respectively—each argue they were not responsible for any frivolous filing under either standard.

a.

Although Emily Newman's name appeared on the complaint, she did not file or sign it. And at the sanctions hearing, Newman said she played only a minimal role in the litigation. Nobody at the hearing argued otherwise; in fact, Powell told the court that Newman "had no role whatseoever in the drafting and content of the[] complaints."  And the district court made no factual findings to suggest that Newman was involved in drafting the complaint, the motion for preliminary injunction, or any other filing that defended plaintiffs' frivolous claims.  Yet the court found that Newman was responsible for the complaint because it listed her as "Of Counsel."  Fed. R. Civ. P. 11(c).  The district court thus found Newman responsible more as a matter of form than as a matter of real responsibility.  We therefore reverse the imposition of sanctions as to Newman.

b.

Stephanie Junttila did not appear in the case until December 8, 2020, by which time the other attorneys had already filed the complaint and the motion for a preliminary injunction.  Yet the district court found that Junttila had "advocated" those filings—when she argued later that they were not sanctionable.  But to seek relief on a claim is plainly different from arguing later that the claim was not frivolous.  Junttila did only the latter; she never advocated the frivolous claims themselves.  The district court's reasoning on this point was mistaken.

Junttila did personally decline defendants' request for a voluntary dismissal.  But Junttila says she lacked the authority to agree to a voluntary dismissal, and nobody argues otherwise.  To the contrary, Powell (to her credit) candidly stated at oral argument that she was responsible for the decision to continue the case on December 14.  We therefore reverse the imposition of sanctions as to Junttila as well.

c.

Lin Wood says that someone placed his name on the complaint without his consent and that he knew nothing about this case until he "saw something in the newspaper about being sanctioned."  But two months before, Wood filed a brief in the Delaware Supreme Court, in

which he said he "represented plaintiffs challenging the results of the 2020 Presidential election in Michigan and Wisconsin." Wood also tweeted about this case in December 2020, six months before the sanctions hearing, saying that "the enemy is running scared." Moreover, Powell said she "did specifically ask Mr. Wood for his permission" to put his name on the complaint; and Gregory Rohl submitted an affidavit stating that Wood "spearheaded" this suit. Suffice it to say that the district court did not clearly err when it found Wood not credible as to his involvement here. Nor, contrary to Wood's argument, was the district court required to undertake "an individual analysis" of his conduct before it could sanction him. *See NPF Franchising*, *LLC v. SY Dawgs, LLC*, 37 F.4th 369, 380-81 (6th Cir. 2022).

Wood also argues that the state defendants never sought any sanctions against him. The state defendants concede that point on appeal. Thus, as to Wood, we reverse only the court's award of attorney's fees to the state defendants.

2.

The remaining attorneys argue that the district court's sanctions were excessive. The district court awarded the City and the state defendants their full reasonable attorney's fees, required each attorney to take 12 hours of continuing legal education, and sent a referral for disciplinary proceedings to each attorney's respective bar association.

a.

Courts must limit any award of attorney's fees to only "those expenses directly caused" by the sanctionable conduct. *Cooter & Gell v. Hartmarx Corp*, 496 U.S. 384, 406-07 (1990). When a filing is entirely baseless, sanctionable conduct causes every expense reasonably incurred in responding to it. *Id.* But when, as here, a filing is partially non-sanctionable, courts may award only fees incurred in responding to the sanctionable parts. *Id.*; *see also* Fed. R. Civ. P. 11(c)(4); *Garner v. Cuyahoga Cnty. Juv. Ct.*, 554 F.3d 624, 635-47 (2009).

Here—given the district court's finding that the entire complaint was sanctionable—the court did not distinguish between fees generated in response to sanctionable and non-

sanctionable parts of the complaint.  But courts are loath to prolong satellite litigation about fees, and here the record allows us to sort out those fees for ourselves.

i.

The district court awarded the state defendants $21,964.75 for 57.8 hours of work by two attorneys.  The state attorneys' billing records show they spent about 6 hours responding in various ways to nonfrivolous parts of the complaint, including review of the expert reports on which counsel reasonably relied.  Given the hourly rates for the attorneys involved, that work amounted to $2,325 in fees.  We therefore reduce the fee award to the state defendants to $19,639.75.

The district court awarded the City $153,285.62, about $30,000 less than it had requested. The City's billing records show that its attorneys spent approximately 26 hours responding to the nonfrivolous components of plaintiffs' complaint and preliminary-injunction motion.  This work amounted to $8,450 in fees, which we will deduct from the City's award.

Wood argues that the City's fee award included too many hours related to the sanctions litigation.  "The time, effort, and money a party must spend to get another party sanctioned realistically is part of the harm caused by that other party's wrongful conduct."  *Norelus v. Denny's Inc.*, 628 F.3d 1270, 1298 (11th Cir. 2010).  Thus, under Rule 11 a court may award fees incurred while pursuing sanctions.  *Id.*; *see also Chambers*, 501 U.S. at 32.

The record here, however, shows that the district court awarded fees for a number of tasks that bore little connection to sanctionable conduct in this case.  Those tasks included, for example, reviewing a Michigan State Senate report about the elections, and responding to filings by intervenor Davis, whose involvement in the case was no fault of plaintiffs' counsel.  The billing records show that together these tasks consumed about 37.5 hours, which amounted to an additional $12,025 in attorney's fees.  The district court abused its discretion when it included those fees in the City's award.  *See Cooter & Gell*, 496 U.S. at 406.  With both of these deductions, then, we reduce the City's award to $132,810.62.

The sanctioned attorneys also argue that, as an intervenor, the City should not receive more in attorney's fees than the original defendants did. That argument is meritless: the City was all but compelled to intervene in this case, given (among other things) the plaintiffs' request that all the absentee ballots from the City's residents be "eliminat[ed]" from the vote count. Compl. ¶232.

ii.

The attorneys' remaining objections concern the court's non-monetary sanctions—namely the disciplinary referrals and the required legal education. As an initial matter, we reject the state defendants' argument that the attorneys' appeal of those sanctions is moot. Non-monetary sanctions cause continuing harm to counsel's reputation as attorneys, and thus present a live controversy even after an attorney complies with them. *See, e.g.*, *United States v. Talao*, 222 F.3d 1133, 1138 (9th Cir. 2000); *In re Goldstein*, 430 F.3d 106, 111 (2d Cir. 2005).

But we reject the attorneys' arguments on the merits. They assert that the district court violated the local rule governing disciplinary referrals; but that rule permits such referrals rather than proscribes them. *See* E.D.M.I. Local Rule 83.22(c). Nor do the nonmonetary sanctions violate the First Amendment. *See Mezibov*, 411 F.3d at 717.

*    *    *

We reverse the district court's imposition of sanctions against Emily Newman and Stephanie Junttila, respectively; we reverse the state defendants' fee award as to Lin Wood; we reduce the City's award to $132,810.62; and we reduce the state defendants' fee award to $19,639.75. Otherwise, the district court's imposition of sanctions in its August 25, 2021 order is affirmed.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 21-1785/1786/1787/22-1010

TIMOTHY KING, et al.,

     Plaintiffs,

L. LIN WOOD (21-1785); GREGORY J. ROHL, BRANDON JOHNSON, HOWARD KLEINHENDLER, SIDNEY POWELL, JULIA HALLER, and SCOTT HAGERSTROM (21-1786); EMILY NEWMAN (21-1787); STEFANIE LYNN JUNTTILA (22-1010),

     Interested Parties - Appellants,

     v.

GRETCHEN WHITMER; JOCELYN BENSON; CITY OF DETROIT, MICHIGAN,

     Defendants - Appellees.

> **FILED**
> Jun 23, 2023
> DEBORAH S. HUNT, Clerk

Before:  BOGGS, KETHLEDGE, and WHITE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART and REVERSED IN PART.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk